# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALZA CORPORATION, and<br>McNEIL-PPC, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ANDRX PHARMACEUTICALS, L.L.C., and<br>ANDRX CORPORATION,<br><br>Defendants. | C.A. No. 05-642-JJF |

## PLAINTIFFS ALZA CORPORATION AND MCNEIL-PPC, INC.'S
## OPENING BRIEF ON CLAIM CONSTRUCTION

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil-PPC, Inc.*

*Of Counsel:*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
312-853-7000

-and-

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8000

-and-

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood
Suite 3400
Dallas, TX 75201
214-981-3300

Dated: November 13, 2006

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................1

  A.  Nature and Stage of the Proceedings ............................................................1

  B.  ALZA's Surprising Discovery: an "Ascending" Drug  Concentration Profile
      Provides Effective Treatment of ADD/ADHD for Extended Periods of Time ..........3

  C.  The Subject Matter of the '373 and '129 Patents .......................................7

      1.  The claimed treatment methods ..........................................................7

      2.  The patent specifications ....................................................................8

II.   ARGUMENT ..............................................................................................9

  A.  The Legal Standard for Claim Construction ..............................................9

  B.  The Proper Construction of the Disputed Terms in the '373 and '129 Patents ........11

      1.  The claimed methods concern administration of a single dose of
          methylphenidate ..............................................................................11

      2.  The limitations in dispute .................................................................13

      3.  The limitation "a pharmaceutically acceptable composition" ........................13

          (a) The ordinary meaning of "a pharmaceutically acceptable
              composition" .............................................................................14

          (b) The claimed "pharmaceutically acceptable composition" is not
              limited to an osmotic drug release system ...................................17

      4.  The claim limitation "ascending release rate over an extended period
          of time" .......................................................................................21

          (a) An express definition governs the meaning of this claim limitation ..........22

          (b) The claimed "ascending release rate" is not limited to "biorelevant"
              measurements, hourly intervals or particular types of mean data .............26

          (c) Andrx's proposed method for calculating the claimed "extended
              period of time" is wrong ..............................................................29

      5.  Construction of claims 2-8 of the '373 patent and claims 1-2 of the
          '129 patent .................................................................................31

          (a) The term "a substantially ascending methylphenidate  plasma drug
              concentration over a time period of about [x] hours" ................................32

          (b) The claimed "substantially ascending" plasma concentration profile
              is not limited to a mean profile or a slight dip that occurs only at a
              particular point in time ................................................................34

III.  CONCLUSION ..........................................................................................40

## TABLE OF CITATIONS

### CASES

*3M Innovative Properties Co. v. Avery Dennison Corp.*,
    350 F.3d 1365 (Fed. Cir. 2003) ........................................................................10

*Abbott Labs. v. Andrx Pharms., Inc.*,
    452 F.3d 1331 (Fed. Cir. 2006) ................................................................33, 34

*Affymetrix, Inc. v. Illumina, Inc.*,
    446 F. Supp. 2d 277 (D. Del. 2006) ...............................................10, 11, 30

*Alza Corp. v. Mylan Labs., Inc.*,
    349 F. Supp. 2d 1002 (N.D. W. Va. 2004) ................................14, 15, 20

*American Cyanamid Co. v. U. S. Surgical Corp.*,
    833 F. Supp. 92 (D. Conn. 1992) ..................................................................31

*Apple Computer, Inc. v. Articulate Sys., Inc.*,
    234 F.3d 14 (Fed. Cir. 2000) ..........................................................................12

*Astra Aktiebolag v. Andrx Pharms., Inc.*,
    222 F. Supp. 2d 423 (S.D.N.Y. 2002)
    *aff'd, In re Omeprazole Patent Litigation*, 84 Fed. Appx. 76 (Fed. Cir. 2003) ..............14

*AstraZeneca AB v. Mutual Pharm. Co.*,
    250 F. Supp. 2d 506 (E.D. Pa. 2003),
    *aff'd in part, rev'd in part*, 384 F.3d 1333 (Fed. Cir. 2004) .........................................15

*Aventis Pharms., Inc. v. Barr Labs. et al.*,
    341 F. Supp. 2d 502 (D.N.J. 2004) ..................................................17, 27, 37

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
    288 F. Supp. 2d 562 (S.D.N.Y. 2003) .......................................................24

*Cook Biotech Inc. v. Acell, Inc.*,
    460 F.3d 1365 (Fed. Cir. 2006) ....................................................................10

*Cordis Corp. v. Medtronic Avenue, Inc.*,
    339 F.3d 1352 (Fed. Cir. 2003) ..............................................................33, 36

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001) ....................................................................33

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.*,
    279 F.3d 1022 (Fed. Cir. 2002) ..............................................................13, 31

*Gechter v. Davidson*,
    116 F.3d 1454 (Fed. Cir. 1997) ....................................................................20

*Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*,
  972 F.2d 1272 (Fed. Cir. 1992) .......................................................................12

*Honeywell Inc. v. Victor Co. of Japan, Ltd.*,
  298 F.3d 1317 (Fed. Cir. 2002) .......................................................................29

*Housey Pharms., Inc. v. AstraZeneca UK Ltd.*,
  366 F.3d 1348 (Fed. Cir. 2004) .................................................................10, 22

*Johnson Worldwide Associates v. Zebco Corp.*,
  175 F.3d 985 (Fed. Cir. 1999) ...................................................................19, 27

*L.G. Phillips LCD Co. Ltd. v. Tatung Co.*,
  434 F. Supp. 2d 292 (D. Del. 2006) ................................................................10

*Laitram Corp. v. Cambridge Wire Cloth Co.*,
  863 F.2d 855 (Fed. Cir. 1988) .........................................................................37

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) .....................................................11, 37, 38, 39

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996) ...........................9, 10

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  228 F. Supp. 2d 480 (D. Del. 2002),
  *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003) ...............................................................2

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 488 (2006) .............33

*Multiform Dessicants, Inc. v. Medzam, Ltd.*,
  133 F.3d 1473 (Fed. Cir. 1998) .........................................................................9

*NTP, Inc. v. Research In Motion, Ltd.*,
  418 F.3d 1282 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1174 (2006) .........11, 13, 28, 31

*Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*,
  403 F.3d 1364 (Fed. Cir. 2005) .......................................................................38

*Nomos Corp. v. BrainLAB USA, Inc.*,
  195 F. Supp. 2d 606 (D. Del. 2002) ................................................................11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005),
  *cert. denied*, 126 S. Ct. 1332 (2006) ............................9, 10, 11, 17, 25, 38, 39

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
  422 F. Supp. 2d 446 (D. Del. 2006) .........................................................10, 22

*Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*,
    318 F.3d 1143 (Fed. Cir. 2003).............................................................................11

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    2004 WL. 26523, U.S.P.Q.2d 1185 (S.D.N.Y. 2004),
    *aff'd in part, vacated in part*, 438 F.3d 1123 (Fed. Cir. 2006) ........................2

*Purdue Pharma, L.P. v. F.H. Faulding & Co.*,
    48 F. Supp. 2d 420 (D. Del. 1999),
    *aff'd*, 230 F. 3d 1320 (Fed. Cir. 2000) ...................................3, 11, 17, 19, 27, 28, 35, 37

*Schoenhaus v. Genesco, Inc.*,
    440 F.3d 1354 (Fed. Cir. 2006)............................................................................10

*Signtech USA, Ltd. v. Vutek, Inc.*,
    174 F.3d 1352 (Fed. Cir. 1999).............................................................................11

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985).............................................................................38

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
    299 F.3d 1313 (Fed. Cir. 2002).............................................................................38

*U. S. v. Bristol-Myers Co.*,
    1982 WL 1816, 1982-1 Trade Cases P 64,597 (D.D.C. 1982) ......................15

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)..........................................................................9, 10

*Zelinski v. Brunswick Corp.*,
    185 F.3d 1311 (Fed. Cir. 1999)............................................................................10

## FEDERAL STATUTES

21 U.S.C. § 301 ...........................................................................................................1

21 U.S.C. § 355 ...........................................................................................................1

21 U.S.C. § 360cc ........................................................................................................1

28 U.S.C. § 2201 .........................................................................................................1

35 U.S.C. § 112 .........................................................................................................11

35 U.S.C. § 156 ...........................................................................................................1

35 U.S.C. § 271 ........................................................................................................1, 2

35 U.S.C. § 282 ...........................................................................................................1

## MISCELLANEOUS REFERENCES

Food and Drug Admin., U.S. Dep't of Health and Human Servs., Approved Drug
    Products with Therapeutic Equivalence Evaluations (25th ed. 2005) .............................2

Food and Drug Admin., U.S. Dep't of Health and Human Servs., Guidance for Industry,
    Extended Release Oral Dosage Forms:  Development, Evaluation, and
    Application for *In Vitro/In Vivo* Correlations (1997)......................................................24

Greenhill *et al.*, Pediatrics 109(3): 1-7 (2002) .........................................................4, 5

Hanson *et al.*, Handbook of Dissolution Testing (3rd ed. 2004) .................................24

Hubbard *et al.*, Journal of Pharmaceutical Sciences 78(11): 944-947 (1989) ............................20

Shargel *et al.*, Applied Biopharmaceutics & Pharmacokinetics,
    (4th ed. 1999) .......................................................................................................32

Swanson *et al.*, Clinical Pharmacology & Therapeutics 66(3): 295-305 (1999)  .........................6

U.S. Patent No. 6,124,355...........................................................................................15

U.S. Patent No. 6,930,129...........................................................................................*passim*

U.S. Patent No. 6,919,373...........................................................................................*passim*

I.    **INTRODUCTION**

A.    **Nature and Stage of the Proceedings**

This is a patent infringement suit brought under the provisions of the Hatch-Waxman Act.[1]  Plaintiffs, ALZA Corporation and McNeil-PPC, Inc., are innovative pharmaceutical companies that discover, develop and commercialize brand-name medicines and therapies to treat a wide variety of diseases and disorders.  One of plaintiffs' new prescription drug products, Concerta®, is the impetus for the present litigation.

Concerta® was approved as a new drug product by the Food and Drug Administration ("FDA") in August 2000.  Concerta® works by delivering the drug methylphenidate – the active ingredient of Ritalin® – via a novel "ascending" release rate over an extended period of time.  Since its introduction, Concerta® has rapidly become the recognized "standard of care" for treating individuals, particularly children and adolescents, who suffer from Attention Deficit Hyperactivity Disorder ("ADHD") or Attention Deficit Disorder ("ADD").  Individuals with ADHD typically have behavioral problems that, among other things, can interfere with social development, such as the ability to make and keep friends or participate in sports, and learning in school or other academic settings.  Indeed, Plaintiffs' novel approach in treating ADD/ADHD has spawned development of other new drug products that seek to deliver methylphenidate via novel release profiles over extended periods of time.

The defendants, Andrx Pharmaceuticals, LLC and Andrx Corporation ("Andrx"), produce and market generic copies of successful, brand-name drug products.  In July and August 2005, Andrx provided notice to Plaintiffs that it had filed Abbreviated New Drug Applications ("ANDAs") seeking to market generic copies of Concerta®.  The notice included "paragraph IV" certifications that asserted that two U.S. Patents listed by plaintiffs in the

---

[1]    The Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (codified at 21 U.S.C. §§ 301, 355, 360cc (1994); 28 U.S.C. § 2201 (1994); 35 U.S.C. §§ 156, 271, 282 (1994)).

Orange Book[2] – Patent Nos. 6,919,373 ("the '373 patent") and 6,930,129 ("the '129 patent") – were invalid and/or would not be infringed by the marketing of Andrx's generic copy of Concerta®.[3]  In response, pursuant to 35 U.S.C. § 271(e)(2), plaintiffs initiated the current action against Andrx.[4]

Plaintiffs allege that Andrx's filing of its ANDA containing an assertion of invalidity or non-infringement of the '373 and '129 patents constitutes infringement of these patents pursuant to 35 U.S.C. § 271(e)(2)(A).  Both patents describe and claim methods for treating ADHD by administering an amount of a drug (methylphenidate) via a dosage form or pharmaceutically acceptable composition in a manner that provides a novel "ascending" profile.  The '373 patent defines the ascending profile by reference to the release rate of the methylphenidate from the dosage form, and in dependent claims, employs an additional measurement; namely, an ascending plasma drug concentration in the subject that has been administered the dosage form.  The '129 patent defines the profile by reference solely to the patient's plasma concentration after ingesting the pharmaceutical composition containing the methylphenidate.  The parties have conferred in an effort to narrow the claim construction issues to be decided.  As a result of these discussions, the parties have identified the claim terms in dispute.  Letter from Todd A. Wagner to Alan B. Clement (November 2, 2006) (Exh. D); Letter from Alan B. Clement to Todd A. Wagner (November 2, 2006) (Exh. E).  In addition, the parties have agreed that the

---

[2]      Food and Drug Admin., U.S. Dep't of Health and Human Servs., Approved Drug Products with Therapeutic Equivalence Evaluations (25th ed. 2005).

[3]      Copies of the '373 and '129 patents are attached hereto as Exhibits A and B, respectively.  All emphasis herein is added unless indicated otherwise.

[4]      The pertinent requirements and procedures of the Hatch-Waxman Act relating to initiation of a patent infringement suit against a company that has filed an ANDA with the FDA are well-known and are described in many district court decisions, including decisions by this Court.  *See, e.g.*, *Purdue Pharma L.P. v. Endo Pharms. Inc.*, No. 00 CIV. 8029, 2004 WL 26523 at *1, 70 U.S.P.Q.2d 1185, 1187 (S.D.N.Y. 2004) (Exh. C), *aff'd in part*, *vacated in part*, 438 F.3d 1123 (Fed. Cir. 2006); *Merck & Co. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480, 484-85 (D. Del. 2002) (Farnan, J.), *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003).

claim term "patient" means "an individual who is being treated for ADD and/or ADHD." Letter from Todd A. Wagner to Alan B. Clement (November 3, 2006) (Exh. F); E-mail from Alan B. Clement to Todd A. Wagner (November 8, 2006) (Exh. G).

With respect to the '373 and '129 patents, plaintiffs understand that at least the following claim terms require construction by the Court:

(1)    "pharmaceutically acceptable composition" ('129 patent);

(2)    "ascending release rate over an extended period of time" ('373 patent);

(3)    "substantially ascending methylphenidate plasma drug concentration," ('373 and '129 patents); and

(4)    the term "about" in the phrase "a time period of about [x] hours following said administration" ('373 and '129 patents).

For the remaining claim terms, *i.e.*, the terms not in dispute, interpretation beyond the plain and ordinary meaning of the language is unnecessary.[5]

### B.    ALZA's Surprising Discovery: an "Ascending" Drug Concentration Profile Provides Effective Treatment of ADD/ADHD for Extended Periods of Time

The patents-in-suit are generally directed to unique treatment methods that prolong the therapeutic effects of a drug, particularly, the treatment of ADD and/or ADHD with pharmaceutical compositions containing methylphenidate.

ADD and ADHD are developmental disorders that typically manifest during childhood. They are characterized by inappropriate levels of inattention and/or hyperactive-impulsive behavior. The most frequently prescribed medications for treating ADD and ADHD are stimulants, such as methylphenidate and amphetamines. Methylphenidate, a controlled schedule II substance under the U.S. Drug Enforcement Administration, has been used to treat children

---

[5]    *See Purdue Pharma, L.P. v. F.H. Faulding & Co.*, 48 F. Supp. 2d 420, 434-35 (D. Del. 1999), *aff'd*, 230 F.3d 1320 (Fed. Cir. 2000) (interpretation beyond the plain and ordinary meaning of undisputed claim language is unnecessary).

with ADD and/or ADHD since the 1960s.  Currently, methylphenidate is the most commonly prescribed medication to treat ADD and/or ADHD around the world.

At the time of the filing of the patents-in-suit, there were no commercially available, *long-acting* methylphenidate dosage forms that provided effective treatment of ADD and/or ADHD.  In fact, the only two approved methylphenidate drug products at that time were an immediate-release methylphenidate dosage form (*e.g.*, based on the immediate-release Ritalin® product) and a sustained-release methylphenidate dosage form ("Ritalin SR®").[6]

Immediate release methylphenidate products are effective only for a relatively short period of time; namely, 3 to 5 hours, with the greatest degree of effectiveness being delivered 1-2 hours after administration.  *See, e.g.*, Greenhill *et al.*, *A Double-Blind, Placebo-Controlled Study of Modified-Release Methylphenidate in Children with Attention-Deficit/Hyperactivity Disorder*, Pediatrics 109(3): 1-7 (2002) (Exh. H), at 1.  Because of the short duration of these immediate release products, children being treated with them must take multiple doses, at least one of which is administered during the school day.  *Id.*; Exh. A, col. 2, lines 31-44; col. 7, lines 14-15.  As explained in the patent specification, the administration of methylphenidate products throughout the day to school-age children creates many significant problems, including serious patient compliance issues, and challenges in handling and administering a controlled substance in a school environment.  Exh. A, col. 7, lines 14-34.

The Ritalin SR® sustained release product was developed in the late 1970s in an attempt to eliminate the numerous problems associated with the administration and use of

---

[6]      Conventional dosage forms, known as "immediate release ("IR)," release drug from the dosage form very quickly, making essentially all of the drug available in a short period of time.  Exh. A, col. 2, lines 6-14.  Having released its full dose over a short period of time, the efficacy of an IR dosage form typically declines very quickly.  *Id.* at col. 2, generally.  Thus, for many drugs, multiple, separate doses of the IR dosage form must be administered to achieve therapeutic effectiveness over a prolonged period.  *Id.*, col. 2, lines 31-44.  In contrast, "sustained-release" dosage forms release the drug for a longer period of time compared to an IR dosage form, and thus allow the medication to be administered less frequently.  *Id.*, col. 2, lines 45-62.

immediate-release Ritalin®. Exh. H, at 1. However, Ritalin SR® proved to be ineffective as a once-a-day treatment. Among other things, it had an insufficient duration of effect for a "once-a-day" product, and exhibited an overall lower degree of effectiveness compared to administration of multiple doses of immediate release products. *Id.* In particular, the effectiveness of Ritalin SR® diminished during the day despite continued release of drug by the Ritalin SR® dosage form. As a result of these problems, Ritalin SR® was not widely adopted in clinical practice. *Id.*

In 1993, ALZA decided to pursue the development of an effective once-a-day methylphenidate dosage form. At that time, the reasons for the diminishing effectiveness of Ritalin SR® during the course of the day were a mystery. And, before the work of the ALZA inventors, no one had solved the problem of providing effective treatment of ADHD/ADD for an extended period of time, despite the obvious and pronounced need for such a product. The ALZA researchers began their efforts by designing and conducting a series of detailed clinical studies comparing the efficacy of different modes of methylphenidate delivery. The studies sought to elucidate why Ritalin SR® lost its effectiveness over the course of the day, and why it was not as effective as administering separate doses of immediate release methylphenidate products to children in the morning and afternoon.

ALZA's first clinical study compared the effectiveness in treating ADD/ADHD of three different profiles of methylphenidate delivery. The studies involved administration of a consistent total amount of methylphenidate products via three different profiles. One delivery profile was the conventional twice-a-day ("BID") administration of immediate release products namely, two doses 4.5 hours apart. This produced two peaks in the blood plasma concentration – each peak following the administration of the drug. A second delivery profile was designed to achieve a "flat" profile. Under this profile, subjects were given an initial loading dose of

methylphenidate, followed by closely spaced administrations of equal doses of the drug

extending past the time of administration of the second dose of the immediate release dose.[7]

The ALZA inventors also conceived of and tested a novel third profile; namely, one

which would produce an ascending blood plasma concentration of methylphenidate during the

course of the day ("ascending profile").  They theorized that this type of profile might prolong

the effectiveness of the drug.  The experimental profile involved administering an initial loading

dose of methylphenidate, with the remaining quantity of the methylphenidate being periodically

administered in increasing amounts for a period extending past the time of administration of the

second dose of the immediate release product.

The study confirmed the inventors' theory: during the latter part of the day, the

ascending profile was *more effective* than the flat profile, and was about as effective as the

twice-a-day dosing regimen.  Swanson *et al.*, *Acute tolerance to methylphenidate in the*

*treatment of attention deficit hyperactivity disorder in children*, Clinical Pharmacology &

Therapeutics 66(3): 295-305 (1999) (Exh. I), at 295.  ALZA's discovery ran counter to the

prevailing wisdom that a "flat profile" was the desired approach to delivering drugs via

extended release formulations.  *See* Exh. A, col. 2, line 63 to col. 3, line 12.  It was also contrary

to what experience with twice daily administration of immediate release products suggested –

*i.e.*, that two sharp peaks of high drug concentration were essential, and that the blood

concentration of methylphenidate had to drop sharply between the doses in order for the second

dose to be effective.  Once the inventors had discovered the therapeutic effectiveness

attributable to an ascending blood plasma concentration, they also determined that this could be

---

[7]     Prior to the filing of the patents-in-suit, the conventional wisdom in the pharmaceutical
arts was that a sustained-release dosage form should provide a "flat profile" –  *i.e.*, deliver a
substantially constant amount of drug for an extended time period.  *See* Exh. A, col. 2, line 63 to
col. 3, line 12; *see also* col. 2, lines 36-39.  In a graph of drug concentration over time, a flat
profile would correspond (after a short, initial period of ascension) to a substantially horizontal
line over many hours.

achieved by making dosage forms that released methylphenidate in increasing amounts over an extended period.

Before the insights of the ALZA inventors, no one had proposed treating ADD/ADHD by providing a substantially ascending blood plasma concentration of methylphenidate to prolong the effectiveness of methylphenidate drug products.  The ALZA inventors were the first to solve the problems that plagued Ritalin SR®, and their work paved the way for the development of Concerta® – a drug that has proven to be as effective as administering two or three doses of immediate release methylphenidate products. Since its introduction, Concerta® has rapidly experienced widespread clinical acceptance and enormous commercial success. Sales of Concerta® in the U.S. in 2005 were in excess of $900 million.

### C.     The Subject Matter of the '373 and '129 Patents

#### 1.     The claimed treatment methods

All of the claims of the patents-in-suit are directed to methods for treating ADD/ADHD by providing a specified profile via a *single administration* of methylphenidate.  This single administration of methylphenidate typically occurs first thing in the morning.  *See* Exh. A, col. 5, lines 54-63.  Independent claim 1 of the '373 patent covers:

> A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

*Id.*, claim 1.  As discussed below, the claimed "ascending release rate" refers, in part, to the rate of release of methylphenidate from the dosage form as measured by an appropriate *in vitro* dissolution test.

Claims 2 through 8 of the '373 patent are dependent on claim 1.  Each adds the additional limitation, "wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about [x] hours following said administration."  Exh. A, claims 2-8.  The time periods recited by each of the dependent claims

are: "about 4 hours" (claim 2); "about 4 to about 5.5 hours" (claim 3); "about 4 to about 8

hours" (claim 4); "about 4 to about 9.5 hours" (claim 5); "about 5.5 hours" (claim 6); "about 8

hours" (claim 7); and "about 9.5 hours" (claim 8). *Id.*

     The claims of the '129 patent refer to administration of a "pharmaceutically acceptable

composition" containing methylphenidate and require that the individual receiving treatment

exhibit a "substantially ascending" plasma concentration of methylphenidate over a specified

time period. Plasma drug concentration levels refer to the amount of the drug in the blood or

plasma after administration, and serve as an indicator of drug availability *in the body (in-vivo)*.

*See* Exh. B, col. 1, lines 42-53. Independent claim 1 of the '129 patent specifies:

> A method for treating Attention-Deficit Disorder or Attention-
> Deficit Hyperactivity Disorder in a patient, wherein the method
> comprises administering a pharmaceutically acceptable
> composition comprising methylphenidate and a pharmaceutically
> acceptable carrier to said patient in a manner that achieves a
> substantially ascending methylphenidate plasma drug concentration
> over a time period of about 8 hours following said administration.

     Independent claim 2 of the '129 patent is identical to claim 1, except that it specifies a

time period of "about 9.5 hours" following administration. Exh. B, claim 2. Claims 3-6 of the

'129 patent are dependent upon claim 1, and further specify that the claimed composition

comprises "about [x] mg of methylphenidate," with "[x]" corresponding to amounts ranging

from "about 14 mg" (claim 3) to "about 54 mg" (claim 6). *Id.*, claims 3-6. Claims 7-10 of the

'129 patent are identical to claims 3-6, except that they depend from claim 2. *Id.*, claims 7-10.

### 2.    The patent specifications

     The '129 and '373 patents share a common parent patent application and, thus, the

specifications are essentially the same.[8] Generally, the specification describes treatment

---

[8]     The '129 patent was filed as a continuation of, and shares a common specification with,
the application that issued as the '373 patent. Citations to the common specification of the '373
and '129 patents will refer to the column and line numbers of the '373 patent.

methods and dosage forms that maintain a desired therapeutic drug effect over a prolonged

therapy period.  While these improvements may be applied to a number of clinical situations and

drug therapies, the specification focuses on the treatment of Attention Deficit Hyperactivity

Disorder ("ADHD") using methylphenidate therapy.  Exh. A, col. 5, line 28 to col. 7, line 58.

The claimed treatment methods offer many advantages over other known methods of treating

these disorders, and, in particular, overcome the problems that had prevented clinical acceptance

of Ritalin SR®, an earlier "sustained-release" methylphenidate product characterized by slow

onset of action and lower overall effectiveness relative to BID dosing with immediate release

forms of methylphenidate.  *Id.*, col. 7, lines 14-25 and lines 35-50; col. 13, lines 45-54.

## II.     ARGUMENT

### A.     The Legal Standard for Claim Construction

Claim construction is a matter of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d

967, 977-78 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370, 388-90 (1996).  "It is a bedrock

principle of patent law that the claims of a patent define the invention to which the patentee is

entitled the right to exclude."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en

banc) (internal quotation omitted), *cert. denied*, 126 S. Ct. 1332 (2006).

The "words of a claim are generally given their ordinary and customary meaning."  *Id.*

at 1312-13 (internal quotation omitted).  This is "the meaning that the term would have to a

person of ordinary skill in the art in question at the time of the invention . . . . "  *Id.* at 1313.  A

person of ordinary skill in the art "is deemed to read the claim term . . . in the context of the

entire patent, including the specification."  *Id.* (citing *Multiform Dessicants, Inc. v. Medzam,*

*Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998)).  The "intrinsic evidence of record, *i.e.*, the patent

itself, including the claims, the specification and, if in evidence, the prosecution history," is "the

most significant source of the legally operative meaning of disputed claim language."  *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  *See also Affymetrix, Inc. v.*

*Illumina, Inc.*, 446 F. Supp. 2d 277, 280 (D. Del. 2006) (Farnan, J.); *L.G. Phillips LCD Co. Ltd.*

9

*v. Tatung Co.*, 434 F. Supp. 2d 292, 295 (D. Del. 2006) (Farnan, J.). In particular, the specification is "the single best guide to the meaning of a disputed term" and is usually "dispositive." *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp.*, 90 F.3d at 1582). While "it is within the sound discretion of a court to use extrinsic evidence as an aid in construing a claim, extrinsic evidence is 'unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.'" *Affymetrix*, 446 F. Supp. 2d at 280 (quoting *Phillips*, 415 F.3d at 1319); *L.G. Phillips*, 434 F. Supp. 2d at 295 (quoting *Phillips*, 415 F.3d at 1319).

If the patentee supplies an express definition of a claim term in the specification, the patentee's express definition governs. The Court need not determine the "ordinary and customary meaning" of the claim term because "the inventor's lexicography governs." *Affymetrix*, 446 F. Supp. 2d at 283 (quoting *Phillips*, 415 F.3d at 1316). *See also Cook Biotech Inc. v. Acell, Inc.*, 460 F.3d 1365, 1373 (Fed. Cir. 2006); *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1358 (Fed. Cir. 2006) (patentee "may set forth any special definitions of the claim terms in the patent specification or file history."); *Housey Pharms., Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004) (express definition of a claim term supersedes the ordinary and customary meaning of a claim term); *3M Innovative Properties Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371 (Fed. Cir. 2003) (same); *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1315 (Fed. Cir. 1999) (same); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 422 F. Supp. 2d 446, 448-49 (D. Del. 2006) (Farnan, J.) ("If the patent inventor clearly supplies a different meaning; however, then the claim should be interpreted according to the meaning supplied by the inventor.") (citing *Markman*, 52 F.3d at 980). In other words, "the specification acts as a dictionary when it expressly defines terms used in the claims…" *Phillips*, 415 F.3d at 1321 (quoting *Vitronics*, 90 F.3d at 1582).

The claim construction process cannot be used to redefine the claims by inserting unclaimed elements, or in a way that contradicts unambiguous claim language. *Phillips*, 415

F.3d at 1322-23.  Adding limitations to the claims that are not required by the claim terms themselves is impermissible.  *See*, *e.g.*, *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1310-11 (Fed. Cir. 2005) (declining to add limitations to claim that were not included in the claim language), *cert. denied*, 126 S. Ct. 1174 (2006); *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.*, 318 F.3d 1143, 1151 (Fed. Cir. 2003) (same); *Purdue Pharma v. F.H Faulding & Co.*, 48 F. Supp. 2d 420, 435 (D. Del. 1999) (Farnan, J.) (same), *aff'd*, 230 F. 3d 1320 (Fed. Cir. 2000). Moreover, it is well established that claims are not to be confined to specific embodiments or examples in the specification unless the language of the claim plainly imposes such a constrained scope.  *Phillips*, 415 F.3d at 1327; *Liebel-Flarsheim Co. v. Medrad*, *Inc.,* 358 F.3d 898, 906 (Fed. Cir. 2004); *Affymetrix*, 446 F. Supp. 2d at 283; *compare Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352, 1358 (Fed. Cir. 1999) (contrasting ordinary claim construction with construction under 35 U.S.C. § 112, ¶ 6, which requires interpretation of a means-plus-function claim in accordance with the structure disclosed in the specification and its equivalents); *Nomos Corp. v. BrainLAB USA, Inc.*, 195 F. Supp. 2d 606, 612 (D. Del. 2002) (Farnan, J.) (same).

    **B.**    **The Proper Construction of the Disputed Terms in the '373 and '129 Patents**

        **1.**    **The claimed methods concern administration of a single dose of methylphenidate**

As an initial matter, all of the claims of the patents-in-suit are directed to methods for treating ADD or ADHD by providing the specified profile via a *single administration* of methylphenidate.  *See* Exh. A, col. 5, lines 54-63.  The claims do not encompass methods where multiple doses of methylphenidate are administered at *different* points in time during the day to obtain the claimed profiles.

This understanding follows from the claim language ("administering a pharmaceutically acceptable composition comprising methylphenidate" in all claims of the '129 patent; "administering a dosage form comprising methylphenidate that provides a release of methylphenidate" in all claims of the '373 patent) and is the only meaning consistent with the

11

specification.  For example, the specification states that the claimed treatment methods "provide effective *once-a-day* therapy for ADHD," thereby "improving drug therapy for ADHD by *eliminating the need for multiple daily doses* of methylphenidate" while maintaining the therapeutic efficacy provided by multiple doses of immediate-release methylphenidate.  Exh. A, col. 5, lines 54-63; *see also* col. 13, lines 45-48.  The specification also explicitly distinguishes the claimed compositions and methods from prior art, such as methods using immediate-release methylphenidate dosage forms that require multiple administrations during the day (*e.g.*, at two to three different points during the day).  Exh. A, col. 2, lines 31-44; col. 6, lines 37-40; col. 7, lines 14-15.  Furthermore, Example 7 of the '373 patent, in which the claimed treatments were administered to individuals – states that throughout the twelve-hour study period the clinical effectiveness of a *single dose* of the experimental dosage form of the present invention was "closely comparable" to the clinical effectiveness of *three doses* of immediate-release methylphenidate administered at different points during the day.  As such, the specification clearly conveys that the claimed methods are directed to a single administration of methylphenidate at one point in time, rather than at multiple time points.

Although Andrx apparently does not dispute this aspect of the claims, claim construction is the appropriate time to confirm that this interpretation will be followed by the parties and the Court.  For example, Andrx's proposed definition of the limitation "substantially ascending methylphenidate plasma drug concentration" states that "the dosing occurs in the morning," which clearly refers to a single administration at one point in time, not multiple administrations occurring at different points during the day.  As such, the requirement that the claimed methods concern profiles associated with a single administration should be applied uniformly to all claims of the '373 and '129 patent.  *See*, *e.g.*, *Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) (a patent claim "must be viewed as a whole") (*citing Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1274 (Fed. Cir. 1992)).

2.      **The limitations in dispute**

The parties dispute the meanings of the following claim elements:

(i)      "pharmaceutically acceptable composition,"

(ii)     "an ascending release rate over an extended period of time,"

(iii)    "a substantially ascending methylphenidate plasma drug concentration,"

(iv)     the word "about" in the phrase "about [x] hours" where [x] specifies a period of

time in hours.

Terms that appear in both the '373 and '129 patents claims should be construed to have

the same meaning for purposes of both patents.  *See NTP, Inc. v. Research In Motion, Ltd.*, 418

F.3d 1282, 1293 (Fed. Cir. 2005)  ("Because [the] patents [in suit] all derive from the same

parent application and share many common terms, we must interpret the claims consistently

across all asserted patents."), *cert. denied*, 126 S. Ct. 1174 (2006); *Epcon Gas Sys., Inc. v. Bauer

Compressors, Inc.*, 279 F.3d 1022, 1030 (Fed. Cir. 2002).

3.      **The limitation "a pharmaceutically acceptable
        composition"**

Independent claims 1 and 2 of the '129 patent are each directed to methods for treating

ADD or ADHD that utilize "a pharmaceutically acceptable composition comprising

methylphenidate."  The remaining claims, *i.e.*, claims 3-10, of the '129 patent are all dependent

on either claim 1 or claim 2.  Consequently, all of the claims in the '129 patent recite a

"pharmaceutically acceptable composition comprising methylphenidate" as a limitation.

The parties disagree about the proper construction of a "pharmaceutically acceptable

composition comprising methylphenidate."  The different constructions proposed by the parties

for this limitation are:

Plaintiffs' construction:      **A pharmaceutical composition that
                               includes a dose of methylphenidate**

Defendant's construction:      **A dosage form that extends release
                               wherein the rate step controlling
                               release mechanism is osmotic**

13

Plaintiffs contend this limitation should be construed in accordance with its plain and ordinary meaning. Andrx, on the other hand, proposes that the Court adopt a special definition by reading a particular type of drug release mechanism (osmotic) into the claim.

The claims of the '373 patent are also directed to methods for treating ADD or ADHD, but these methods refer to a "dosage form comprising methylphenidate." *See* Exh. A, Claim 1. The terms "pharmaceutically acceptable composition" and "dosage form" are simply different expressions of the same thing – a pharmaceutical composition is a dosage form and *vice versa*. *Compare Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 446 (S.D.N.Y. 2002) (construing "pharmaceutical preparation" to mean "any dosage form"), *aff'd, In re Omeprazole Patent Litigation*, 84 Fed. Appx. 76 (Fed. Cir. 2003) *with Alza Corp. v. Mylan Labs., Inc.*, 349 F. Supp. 2d 1002, 1009-10 (N.D. W.Va. 2004) (construing "dosage form" to mean "a pharmaceutical preparation in which doses of medicine are included."). Consistent with their established usage, the specification uses these two terms synonymously. Thus, for claim construction purposes, these two terms should be construed to have the same meaning.

> **(a)    The ordinary meaning of "a pharmaceutically acceptable composition"**

Construction of the limitation "a pharmaceutically acceptable composition" and its recognized equivalent "dosage form" is simple and straightforward. The term "dosage form" is one of the most common terms used in the pharmaceutical arts and its ordinary meaning is extremely well-known. Numerous courts have considered and determined the ordinary meaning of the term "dosage form." These courts have arrived at a substantially uniform definition for the claim term "dosage form"; namely, that it refers to a pharmaceutical composition that includes a dose of a drug. Because the ordinary, art-recognized meaning of this term is so well-established, the Court should adopt the same construction in this case.

For example, in *Mylan Labs.*, a patent infringement case involving a generic version of a treatment for incontinence, the district court construed the term "dosage form" in a claim

directed to a "sustained-release oxybutynin *dosage form* for oral administration…."  349 F. Supp. 2d at 1009 (emphasis supplied).  Although the parties originally stipulated to the definition of "dosage form," the defendant subsequently reneged and changed its proposed construction.  *Id*. at 1009-10.  Construing the term in accordance with its ordinary meaning, the court concluded that the term "dosage form" as used in the patent claims at issue referred to "a pharmaceutical preparation in which doses of medicine are included."  *Id*. at 1009-11 & n.2.  Thus, as of mid-1995[9], the plain and ordinary meaning of the term "dosage form" in the pharmaceutical field was a pharmaceutical composition that includes a dose of a drug.

Other courts have construed the claim term "dosage form" to have essentially the meaning as that found by the court in *Mylan Labs*.  *See*, *e.g.*, *AstraZeneca AB v. Mutual Pharm. Co.*, 250 F. Supp. 2d 506, 510 (E.D. Pa. 2003) (construing the term "pharmaceutical dosage form" to mean "a dosage form, such as a tablet or capsule, containing a dose of a drug."), *aff'd in part*, *rev'd in part on other grounds*, 384 F.3d 1333 (Fed. Cir. 2004); *U. S. v. Bristol-Myers Co.*, No. 822-70, MDLNO. 50, 1982 WL 1816 at *1, 1982-1 Trade Cases P 64,597 (D.D.C. 1982) ("dosage form" means "any form in which ethical pharmaceuticals are packaged or formulated for use….") (Exh. K).

Thus, consistent with how numerous other courts have found, the plain and ordinary meaning of the claim term "dosage form" fully supports and confirms plaintiffs' proposed construction – *i.e.*, a "dosage form comprising methylphenidate" refers to "a pharmaceutical composition that includes a dose of methylphenidate."

The patent specification does not alter the well-accepted meaning of the terms "dosage form" and "pharmaceutically acceptable composition."  No express definition for either of these

---

[9]     The U.S. patent containing this claim language originated from a parent patent application that was filed in May 1995.  349 F. Supp. 2d at 1005 (identifying the patent-in-suit as U.S. Patent No. 6,124,355); *See* '355 patent, col. 1 (indicating the chain of parent patent applications going back to May 1995) (Exh. J).

two terms is provided in the specification, and there is no intentional disclaimer or clear disavowal of their ordinary meaning. *See* Exh. A. Rather, the specification uses the terms "dosage form" and "pharmaceutically acceptable composition" in a manner fully consistent with the well-accepted meaning these terms have been given by numerous courts.

For example, the specification uses the terms "dosage form" and "pharmaceutically acceptable composition" synonymously to describe pharmaceutical compositions that can be administered to individuals. *See*, *e.g.*, Exh. A, col. 21, Example 7 (discussing administration of "dosage forms" containing methylphenidate to individuals) and col. 8, line 65 to col. 9, line 9 (discussing pharmaceutically acceptable compositions as "clinically useful"). The specification similarly describes the preparation and use of various pharmaceutical compositions containing methylphenidate. *See*, *e.g.*, col. 5, line 48 to col. 6, line 6; Examples 1-3, 6-8; col. 9, lines 15-18. These pharmaceutical compositions can be formulated in many different ways. col. 2, lines 53-62; col. 6, lines 1-14; col. 23, lines 5-10. Thus, the specification indicates that the terms "dosage form" and "pharmaceutically acceptable composition" broadly encompass pharmaceutical compositions containing methylphenidate that can be adapted for administration to an individual. And, nothing in the prosecution history of the '373 and '129 patents contradicts or alters the shared, ordinary meaning of the terms "dosage form" and "pharmaceutically acceptable composition."[10]

In sum, the Court should construe the phrase a "pharmaceutically acceptable composition comprising methylphenidate" (as used in the '129 patent claims) and a "dosage form comprising methylphenidate" (as used in the '373 patent claims) to each mean "a pharmaceutical composition that includes a dose of methylphenidate."

---

[10]     There also is no conflict between plaintiff's proposed definition and the ordinary meaning that would be derived from use of the words of the claims. *See Phillips*, 415 F.3d at 1322-23 (general dictionaries may be used to construe patent claims, provided the dictionary definition does not contradict the intrinsic evidence).

**(b)**    **The claimed "pharmaceutically acceptable composition" is not limited to an osmotic drug release system**

Andrx contends that the claim element "a pharmaceutically acceptable composition" should be limited to a pharmaceutical composition that utilizes a particular type of delivery mechanism – an osmotic release system.  In other words, Andrx proposes that the term "pharmaceutically acceptable composition" should be *rewritten* as "a pharmaceutically acceptable *osmotic release* composition."  Andrx's proposed construction is nothing more than a transparent attempt to impermissibly import an unclaimed limitation from a preferred embodiment in the specification into a claim element.  *See Phillips*, 415 F.3d at 1323 (claims should not be confined to specific embodiments of the invention); *Purdue Pharma*, 48 F. Supp. 2d at 436 (declining to limit claims to subject matter exemplified in a patent specification).

Nothing in the claim language itself limits the term "pharmaceutically acceptable composition" to a specific means for releasing methylphenidate from the composition.  The claim language at issue – "a pharmaceutically acceptable composition comprising methylphenidate" – does not include the word "osmotic."  Indeed, the word "osmotic" does not appear in any of the '129 or '373 patent claims.  Thus, on their face, the claims do not support Andrx's restrictive misreading, and the term "pharmaceutically acceptable composition" should not be limited to osmotic drug release systems.  *See*, *e.g.*, *Aventis Pharms., Inc. v. Barr Labs. et al.*, 341 F. Supp. 2d 502, 509 (D.N.J. 2004) (the claim term "'pharmaceutical composition,' in the absence of other stated limitations, *encompasses pharmaceutical compositions in all forms.*") (emphasis supplied); *see also Purdue Pharma*, 48 F. Supp. 2d at 435 (declining to add limitations to claim that were not included in the claim language).

The specification also does not limit "a pharmaceutically acceptable composition" to a composition that releases methylphenidate by an osmotic release means.  Instead, the specification emphasizes the functional requirements of the claimed compositions.  *See*, *e.g.*, Exh. A, col. 1, lines 36-58 and col. 9, lines 21-29, indicating that for a dosage form containing

methylphenidate to produce the claimed pharmacological effects, the methylphenidate must be released from the dosage form and become available in appropriate concentrations at its site of action within the body. Similarly, the specification describes and claims dosage forms containing methylphenidate that provide an "ascending release rate" – an *in-vitro* measure of drug release – and/or a "substantially ascending methylphenidate plasma drug concentration" – which refers to the availability of the drug *in the body (i.e., in-vivo)*. *See id.*, col. 1, lines 42-53.

Indeed, the specification specifically contradicts Andrx's flawed interpretation. While the specification discusses and exemplifies tablet formulations that use an osmotic system, the specification explicitly states that other suitable pharmaceutical compositions may be used to provide the claimed ascending profiles:

> Although the present invention is illustrated herein by exemplary dosage forms containing specific exemplary drugs, methods of making such dosage forms and methods of using methylphenidate-containing dosage forms to provide a desired therapeutic outcome, the invention is not limited by the exemplary embodiments. **The invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period**, methods of making such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in the art in view of the disclosure herein.

*See*, Exh. A, col. 6, lines 1-14 (emphasis supplied); *see also* col. 23, lines 5-10. The specification goes on to expressly describe numerous types of non-osmotic oral sustained release dosage forms that can deliver the required ascending profile:

> There are many approaches to achieving sustained release of drugs from oral dosage forms known in the art. These different approaches include, for example, diffusion systems such as reservoir devices and matrix devices, dissolution systems such as encapsulated dissolution systems (including, for example, "tiny time pills") and matrix dissolution systems, combination diffusion/dissolution systems, *osmotic systems* and ion-exchange resin systems….

*Id.*, col. 2, lines 51-62. Andrx's proposed constraint on the breadth of the claim term thus is plainly at odds with the explicit teachings of the specification which refer to both osmotic and

non-osmotic dosage forms. *See*, *e.g.*, *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999) ("Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition.").

Andrx appears to be attempting what courts have routinely rejected as a means of construing the claims; namely, limiting the claims to require features found in specific examples disclosed in the specification to illustrate the invention. Specifically, Andrx is seeking to convert one aspect of the working "Examples" – the osmotic delivery system in certain Examples in the patent – into an additional claim limitation. As this Court has correctly recognized, Examples provided in the specification to illustrate the invention cannot be used to limit the scope of the claims. *Purdue Pharma*, 48 F. Supp. 2d at 436 ("[A]s a legal matter, the Court may not use the Examples in the specification to limit the scope of the claims."). Moreover, the cautionary statements in the specification that "the invention is not limited by the exemplary embodiments" and that the claims "embrace" additional dosage forms that "would be apparent to a person of skill in the art" upon reading the specification (*see*, *e.g.*, Exh. A, col. 6, lines 1-14; col. 23, lines 5-10) stand in stark contrast to Andrx's factually and legally flawed construction that would read an additional requirement into the claim term. *See Purdue Pharma*, 48 F. Supp. 2d at 436 (relying on statements in the specification that "[the examples] are not to be construed to limit the claims" in declining to read a limitation from the Examples into the patent claims).

Andrx's proposed construction also is at odds with the prosecution history of the '129 patent. Specifically, the Patent and Trademark Office construed predecessor claims to the claims in dispute as encompassing (and thus being anticipated by) prior art dosage forms that did not employ osmotic release systems. *See*, Office Action dated June 18, 2004 (Exh. N), at 3-

4.[11]  The predecessor claims in question utilized the same "pharmaceutically acceptable composition" terminology found in the claims of the '129 patent.  However, these predecessor claims specified that the period of substantial ascension of the methylphenidate plasma concentration was about 5.5 hours, rather than the "about 8 hours" required by the present claims.  The publication cited by the PTO disclosed a plasma concentration profile produced by the Ritalin SR product, which uses a wax matrix release mechanism, not an osmotic release mechanism.  Exh. O, at 944.[12]  To establish anticipation, "*every* limitation of a claim must *identically* appear in a single prior art reference."  *Gechter v. Davidson,* 116 F.3d 1454, 1457 (Fed. Cir. 1997) (emphasis supplied).  Thus, the PTO itself construed the claim term "pharmaceutically acceptable composition" as encompassing non-osmotic delivery systems, and a person of skill in the art reviewing the file history would derive the same understanding.

In addition, one district court has already considered *and rejected* a defendant's attempt to have the word "osmotic" read into a claim directed to a "solid dosage form" – virtually the same issue presented here.  In *Mylan Labs*, the defendant, a generic drug manufacturer, asserted that the patent specification at issue implicitly limited the definition of the claim term "solid dosage form" to "osmotic dosage form."  349 F. Supp. 2d at 1010.  The district court rejected defendant's interpretation, emphasizing that the specification referred to both osmotic and non-osmotic dosage forms and that osmotic dosages forms were merely a preferred embodiment.  *Id.* at 1010-11.  Because virtually the same factual situation is present here, the *Mylan* decision

---

[11]    The Office rejected then-pending claims 37 and 46-48 under 35 U.S.C. §102(b) as being anticipated by Hubbard *et al.*, *Enantioselective Aspects of the Disposition of di-threo-Methylphenidate after the Administration of a Sustained-Release Formulation to Children with Attention Deficit-Hyperactivity Disorder*, Journal of Pharmaceutical Sciences 78(11): 944-947 (1989) (Exh. O).  The Office asserted that Hubbard *et al.* taught administration of "20 mg of MPH-SR (sustained release)" (the Ritalin SR product) which yielded "an ascending plasma concentration up to 6 hours."  The rejected claims pending at that time specified that the pharmaceutically acceptable composition achieve a substantially ascending methylphenidate plasma concentration for about 5.5 hours.

[12]    *See also*, Exh. A, col. 2, lines 53-62 (distinguishing between "matrix devices," "matrix dissolution systems" and "osmotic systems").

provides an additional basis for rejecting Andrx's contention that the word "osmotic" should be read into the claimed "pharmaceutically acceptable composition."

Andrx's attempt to rewrite the claim term by improperly importing limitations from the specification should be rejected.  As demonstrated above, the phrase a "pharmaceutically acceptable composition comprising methylphenidate" (as used in the '129 patent claims) should be construed in accordance with its ordinary meaning as referring to "a pharmaceutical composition that includes a dose of methylphenidate."

### 4.     The claim limitation "ascending release rate over an extended period of time"

All of the claims of the '373 patent – independent claim 1 and dependent claims 2-8 – specify that the claimed dosage forms provide "an ascending release rate over an extended period of time."  This limitation is not present in any of the '129 patent claims.

The parties disagree about the proper construction of "an ascending release rate over an extended period of time."  The different constructions proposed for this limitation are:

Plaintiffs' construction:

> **A release of methylphenidate from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding periodic interval starting at t=0 and continuing for at least 3 hours.  The release rate is as determined by an appropriate *in-vitro* dissolution test.  The ascending release rate does not include release of drug from any immediate-release drug coating that may be applied to the dosage form.**

Defendant's construction:

> **In vitro dissolution rate (mg/hr) as measured using a USP dissolution apparatus and methodology that is biorelevant, wherein the release rate is calculated as a mean value of at least six individual dosage units and excludes release from any immediate release portion of the dosage form and wherein release rate only ascends from one hourly time point to another and does not decline or remain constant from one time point to another.**
>
> **Extended period of time refers to the time period beginning at 0 hours and extends through the mid point of the T90 of the**

21

> **dosage form, which mid point is calculated by determining the hourly time point at which 90 percent of the drug in the dosage form (including any immediate release portion) is released and dividing that number of hours by two and rounding up to the next hour (*i.e.*, if the T90 is 8 hours, the extended period of time is 4 hours or if the T90 is 9 hours the extended period of time is 5 hours).**

Plaintiffs contend that this limitation should be construed in accordance with express definitions provided in the specification. Andrx, on the other hand, proposes a definition that is an arbitrary patchwork of concepts drawn from exemplary embodiments (*e.g.*, hourly intervals and particular types of assessments of test data) in the specification and contrived calculations (*e.g.*, the "rounding up" aspect).

### (a)    An express definition governs the meaning of this claim limitation

As will be shown, the specification provides *express definitions* for the elements an "ascending release rate" and "extended period of time." Because the specification expressly defines these terms, the express definitions should govern the meaning of these terms. *See Housey Pharms., Inc. v. AstraZeneca UK Ltd.*, 366 F.3d 1348, 1352 (Fed. Cir. 2004) (express definition of a claim term supersedes the ordinary and customary meaning of a claim term); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 422 F. Supp. 2d 446, 448-49 (D. Del. 2006).

The specification expressly defines an "ascending release rate" and illustrates how it is determined. In this regard, the specification states:

> An "ascending release rate" refers to a periodic release rate that is increased over the immediately-preceding periodic release rate, where the periodic intervals are the same. For example, when the quantity of drug released from a dosage form is measured at hourly intervals and the quantity of drug released during the fifth hour following administration (determined at t=5 hours) is greater than the quantity of drug released from the dosage form during the fourth hour following administration (determined at t=4 hours), an ascending release rate from the fourth hour to the fifth hour has occurred.

Exh. A, col. 9, line 66 to col. 10, lines 9.  Accordingly, an "ascending release rate" occurs when the quantity of drug released during one specified time period exceeds the amount of drug released during the immediately preceding time period.  The periods of time are termed "intervals" and have an equal duration.[13]  Moreover, as the specification makes clear, the first interval is the one *following* the administration of the dosage form (*i.e.*, the period from T=0, when the dosage form is ingested, to the end of the specified interval of time).[14]  *See*, *e.g.*, Exh. A, col. 9, lines 25-29 and 56-65.  This methodology for determining whether an "ascending release rate" has occurred is also illustrated in several of the Examples in the specification.  *See id.*, Example 1 at Table 1; Example 2 at Table 2.

The specification explains that drug release rates are "calculated under in vitro dosage form dissolution testing conditions known in the art" and further adds that the release rates are obtained "following implementation of an appropriate dissolution test."  Exh. A, col. 9, lines 23-29; *see also* col. 2, lines 2-5.  Dissolution testing is routine, and the equipment and methodologies used to conduct dissolution testing, including the selection of an appropriate test apparatus and test conditions, were well-known to those of ordinary skill in the art.  Dissolution tests typically employ an apparatus that can precisely measure the amount of drug that is

---

[13]     The reference to successive "periodic release rates" is consistent with and supports this definition.  The phrase "periodic release rate" is defined in the specification, and confirms this methodology for determining whether an "ascending release rate" has occurred.  According to the specification, a "periodic release rate" refers to "the quantity of drug released from a dosage form during a specified periodic interval as determined at the end of that specified periodic interval."  Exh. A, col. 9, lines 54-65.  Thus, the definition of "periodic release rate" fully accords with the illustration (comparing hourly intervals at the 4th and 5th hours) that accompanies the express definition of "ascending release rate."

[14]     The specification uses the shorthand "t=x" to refer to a unit of time, with "t=0 hours" referring to the time of drug administration.  Exh. A, col. 8, lines 58-61.  Appropriate time units include 30-minute intervals (e.g., t=30 minutes; t=60 minutes; t=90 minutes, etc.), 1-hour intervals and 2-hour intervals.  *Id.*

23

released by the dosage form in a controlled setting.[15]  As of 1991, methodologies based on two

types of dissolution machines – the USP[16] Apparatus 1 (Basket) and USP Apparatus 2 (Paddle)

tests – had become standard tests, representing "the techniques of choice" for testing of

pharmaceutical dosage forms.  *Id.*  Today, these two dissolution tests remain the dominant

methods for evaluating dissolution rates of pharmaceutical dosage forms.[17]  *Id.*  However,

dissolution tests utilizing other USP apparatuses, such as USP Apparatus 3 (reciprocating

cylinder) or USP Apparatus 7 (reciprocating holder), may also be appropriate depending on the

nature of the dosage form.[18]

　　　The specification also expressly defines the minimum time period over which an

ascending release rate must occur to achieve the claimed "ascending release rate over an

extended period of time."  Specifically, the specification states that, for purposes of the claimed

inventions, "the 'extended period of time' during which an ascending release rate is provided *is

at least 3 hours*."  Exh. A, col. 10, lines 38-39.

　　　Thus, based on the two express definitions, the language "ascending release rate over an

extended period of time" refers to a release of methylphenidate from the dosage form wherein

---

[15]　　Several types of dissolution apparatuses exist and are used in USP-based dissolution
testing protocols (*e.g., Type 1, Type 2, Type 3, Type 7*).  Royal A. Hanson *et al.*, Handbook of
Dissolution Testing (3rd ed. 2004) (Exh. L), at 1, 12.

[16]　　The United States Pharmacopeia ("USP") is an independent, science-based public health
organization, which acts as the official public-standards-setting authority for prescription and
over-the-counter drugs manufactured and sold in the United States.  The USP publishes official
drug monographs that specify standardized conditions for dissolution testing of pharmaceutical
products, which conditions include the use of an USP-accepted dissolution apparatus.  Exh. L, at
12; *see Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 288 F. Supp. 2d 562, 574
(S.D.N.Y. 2003) (discussing USP monographs generally).

[17]　　 For example, FDA identifies dissolution tests utilizing USP Apparatuses 1 and 2 as the
two preferred *in-vitro* dissolution test methodologies.  *See, e.g.*, Food and Drug Admin., U.S.
Dep't of Health and Human Servs., Guidance for Industry, Extended Release Oral Dosage
Forms: Development, Evaluation, and Application of *In Vitro/In Vivo* Correlations, (1997) (Exh.
M), at 4.

[18]　　The dissolution tests utilized in the Examples in the specification used USP Apparatus 7
(Exh. A, col. 9, lines 29-36), because this Apparatus allowed the exemplary osmotic dosage
forms to be oriented so that the orifice from which drug is released was not obstructed.

the amount released in a periodic interval is greater than the amount released during the immediately-preceding interval of the same duration, starting at t=0 (which is a shorthand reference to the time the dosage form is administered to the patient) and continuing for at least 3 hours.

The specification also indicates that the ascending release rate is independent of any immediate-release coating that may have been applied to the claimed dosage form. *See*, *e.g.*, Exh. A, col. 10, lines 17-21 ("The ascending release rates described herein refer to the release rate from a dosage form adapted to provide sustained release of drug and *do not include release of drug from any immediate-release drug coating* that may be applied to the dosage form."). The parties do not appear to disagree on this point. Thus, a complete definition of "ascending release rate over an extended period of time" would include the express requirement that the determination of an ascending release rate not include amounts of drug released from any immediate-release drug coating on the dosage form.

In sum, when the express definitions are considered together, as they should be, the claim requirement of "an ascending release rate over an extended period of time" means a release of methylphenidate from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding interval starting at t=0 and continuing for at least 3 hours. The release rate is to be determined by an appropriate *in vitro* dissolution test, and is not to include release of amounts of drug released from any immediate-release drug coating that may be applied to the dosage form. This express definition governs the construction of the claim limitation. *See Phillips*, 415 F.3d at 1316 (when the specification provides an express definition for a claim term, "the inventor's lexicography governs" the meaning of that claim term).

25

       **(b)**      **The claimed "ascending release rate" is not limited to "biorelevant" measurements, hourly intervals or particular types of mean data**

Both sides generally agree that the claim phrase "an ascending release rate" specifies an *in-vitro* dissolution rate that ascends from one time point to another and that the dissolution rate is measured by performing a suitable dissolution test. Both sides also agree that the measurement of amounts of methylphenidate released during an interval of time is to exclude amounts released from any immediate-release portion of the dosage form.

However, Andrx contends that the claims require several additional steps and elements. These are (i) that the measurement of the release rate of the methylphenidate from the dosage form be conducted using "biorelevant" testing, (ii) that comparisons be made using only *hourly intervals* (*i.e.*, "wherein [the] release rate only ascends from one hourly time point to another"); and (iii) that release rates be calculated using *mean* values from testing of at least six individual dosage units. Once again, Andrx is trying to improperly read limitations into the claims, drawn from arbitrarily invented concepts or from randomly selected aspects of individual examples found in the specification.

Andrx's first proposed new element is that the testing be conducted "using a USP dissolution apparatus and methodology that is 'biorelevant.'" Andrx can point to nothing in the specification that uses this term or concept. Indeed, Andrx itself advances no meaning for this arbitrary claim requirement. Moreover, nothing in the manner in which dissolution testing is described in the specification or actually conducted in practice supports use of this undefined concept. The specification simply refers to an "appropriate dissolution test" to measure amounts of methylphenidate that are released during measured intervals. The specification describes simple, straightforward methods for measuring dissolution rates, and refers to industry-accepted protocols and equipment used in conducting dissolution testing. The choice of procedures and apparatus for conducting dissolution tests is itself routine, and is dictated by the nature of the dosage form being tested.

Andrx next proposes that the claims be construed to *require* that an "ascending release rate" be based only on measurements taken on hourly intervals, and that measurements be based on a mean calculated from testing of least six samples of dosage forms. Neither of these additional proposed claim limitations is consistent with the plain meaning of the terms in the claims, or has any support from the intrinsic evidence.

The claim language at issue – "an ascending release rate over an extended period of time" – does not include the words "hourly," "one-hour intervals," "mean" or "average." Indeed, no such limitations appear anywhere in the claims of the '373 patent. Thus, on their face, the '373 patent claims do not support Andrx's proposed restrictions, and the phrase "ascending release rate" should not be limited to determinations based from measurements conducted only on hourly intervals or upon or through a "mean" calculated from data from testing of six or more samples. *See*, *e.g.*, *Aventis Pharms.*, 341 F. Supp. 2d at 509 (the claim term "'pharmaceutical composition,' in the absence of other stated limitations, *encompasses pharmaceutical compositions in all forms.*"); *see also Purdue Pharma*, 48 F. Supp. 2d at 435 (declining to add limitations to claim that were not included in the claim language).

The specification also contradicts Andrx's flawed interpretation of the term "ascending release rate." While the specification has some examples in which certain dosage forms were tested on hourly intervals, the specification clearly conveys that other intervals may be used. In this regard, the specification expressly states that appropriate time units can be 30-minute intervals and 2-hour intervals, as well as hourly intervals. *See* Exh. A, col. 8, lines 58-61. The fact that the specification explicitly refers to and envisions 30-minute and 2-hour intervals demonstrates that the claim term is not limited only to hourly intervals. *See*, *e.g.*, *Johnson Worldwide*, 175 F.3d at 991 ("Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition."). By contrast, the illustration of "ascending release rates" in the working examples with tests conducted on hourly intervals does not transform hourly intervals into a claim requirement. *See Purdue*

*Pharma*, 48 F. Supp. 2d at 436 ("[A]s a legal matter, the Court may not use the Examples in the specification to limit the scope of the claims.").

Andrx's attempt to add as a claim limitation an arbitrarily chosen requirement that an ascending release rate be demonstrated only using a "mean" of tests conducted on six or more samples of a dosage form similarly has no basis in the intrinsic evidence. Nothing in the definitional sections of the patent specification seeks to *define* the invention using a particular type of "mean," "average" or other statistical assessment of data generated from testing of dosage forms. Instead, the specification simply states that one can determine release rate information by evaluating data obtained through an "appropriate dissolution test." Exh. A, col. 9, lines 21-29.

Moreover, pharmaceutical formulations typically exhibit some degree of variability. Even if only a small number of Andrx's products reflected the claimed dissolution profile, those products would infringe the patent claims, regardless of what the "mean" purported to show. While issues concerning the "mean" profile might conceivably be relevant to the extent of infringement or damages (in the event the claims were asserted against a marketed product), the claims on their face pertain to individual tablets. *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1310-11 (Fed. Cir. 2005) (declining to add limitations to claim that were not included in the claim language), *cert. denied*, 126 S. Ct. 1174 (2006); *Purdue Pharma*, 48 F. Supp. 2d at 435 (same).

Thus, rather than seeking to use the specification to define the *attributes* of the claimed dosage forms, Andrx's proposed claim requirements of "biorelevant" testing, "hourly" intervals, and use of particular forms of "mean" test data all speak to the *measurement* of dosage forms to determine if they possess the necessary attributes required by the claims. Because none of Andrx's concepts are compelled by the plain language of the claims, and none are used in the specification to define the attributes of the dosage forms, the Court should reject Andrx's attempt to improperly create limitations which are not present in the claims.

(c)    **Andrx's proposed method for calculating the claimed "extended period of time" is wrong**

Andrx further contends that "an extended period of time" requires use of a particular calculation based on concepts such as the "mid point of the $T_{90}$ of the dosage form" and a "rounding up" procedure. Andrx's unnecessarily complicated method for calculating the period of time over which the claimed ascending release rate must occur improperly ignores the express definition of the term "extended period of time" provided in the specification.

Andrx's proposed construction is demonstrably wrong because the specification provides a clear and concise express definition for the term "extended period of time" that relies on a threshold period of time, rather than an involved (and unnecessary) calculation. In this regard, the specification unambiguously states that:

> Because the dosage forms of the present invention are intended to provide sustained release of drug, a suitable $T_{90}$ for purposes of this invention is at least about 6 hours and, *consequently*, the "extended time period" during which an ascending release rate is provided *is at least 3 hours*.

Exh. A, col. 10, lines 36-40.

Instead of focusing on this definitional language, Andrx bases its proposed claim construction on a series of calculations that explain how the inventors arrived at the three-hour minimum time period. The specification explains that the three hour minimum time period was chosen because it is at the midpoint of a six-hour time period, which was considered a minimum desirable period for release of drug from the dosage form. The $T_{90}$ is, of course, the time at which 90% of the drug has been released. In explaining that the $T_{90}$ should not be reached until about six hours, the specification is simply pointing out that the dosage forms "are intended to provide sustained release of drug" for at least that time period.

Andrx confuses the simple and clear definition in the specification of what constitutes "an extended period of time" – at least three hours – with the more extended explanation in the specification of why a three-hour minimum time period was chosen. *See Honeywell Inc. v.*

29

*Victor Co. of Japan, Ltd.,* 298 F.3d 1317, 13226 (Fed. Cir. 2002) (describing portion of written description as "simply an explanation of why the [arrangement] is a preferred embodiment of the invention," and stating that "[s]uch a description of a preferred embodiment does not, of course, limit the scope of the claims."); *Affymetrix Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 277, 283 (D. Del. 2006) (rejecting a defendant's attempt to read explanatory material into an express definition of a claim term provided by the patent specification). This distinction is conveyed by the use of the word "consequently" in the quote from the specification above. *See* Exh. A, col. 10, lines 36-40. As a matter of syntax, the word "consequently" separates the background discussion that precedes it from the *resulting definition* that follows it. According to the specification, an "ascending release rate" must occur over at least 3 hours to constitute an "extended period of time" within the claimed inventions.

In addition to plainly ignoring the express definition in the specification, Andrx's proposed construction is manifestly inconsistent with the specification. Andrx's argument cannot be correct because it permits the mid point of the $T_{90}$ to be less than 3 hours. Under Andrx's construction, when the $T_{90}$ is less than 6 hours, then half of the $T_{90}$ would be less than 3 hours. But that cannot be an "extended period of time" – the specification is explicit that an extended period of time must be 3 hours or longer. Exh. A, col. 10, lines 36-40. This further confirms that the discussion in the specification about the $T_{90}$ is explanatory only; by itself, it cannot be a definition without contradicting the express statement that an "extended period of time" must be at least 3 hours.

Similarly, Andrx's proposed "rounding up" procedure – which provides that, if the mid point of the $T_{90}$ is not a whole hour (*e.g.*, 3.0 hours, 4.0 hours, etc.), the number must be "rounded up" to the next whole hour – should also be rejected. First, the claim term is not limited to a determination based on only hourly intervals as explained above. Second, Andrx's proposed calculation artificially increases the time that the release rate for a dosage form must ascend to fall within the claim. Under Andrx's method, every time the midpoint of the $T_{90}$ is a

number other than a whole hour, that number is automatically rounded up to the next whole

hour.  For example, if the midpoint of the $T_{90}$ exhibited by a dosage form is 3.1 hours, that 3.1

hrs gets "rounded up" to 4 hrs and, thus, an ascending release rate must occur for at least a full 4

hours in order to fall within the claim.  This distorted construction leads to an unreasonable

result: it could require the period of ascension to last for nearly a full hour beyond the clear

minimum threshold – at least 3 hours – defined in the specification.

In sum, Andrx's proffered construction of "an extended period of time" should be

rejected as unreasonable and unsupported.  *See*, *e.g.*, *American Cyanamid Co. v. U. S. Surgical*

*Corp.*, 833 F. Supp. 92, 109 n.27 (D. Conn. 1992) ("claims should be construed in a rational and

practical manner, and their interpretation should lead to neither absurd or unjust results.").

### 5.    Construction of claims 2-8 of the '373 patent and claims 1-2 of the '129 patent

The claim limitation "a substantially ascending methylphenidate plasma drug

concentration over a time period of about [x] hours" appears in dependent claims 2-8 of the '373

patent and in all claims of the '129 patent.  Accordingly, this claim limitation should be

interpreted consistently in both the '373 and '129 patents.  *See NTP, Inc.*, 418 F.3d at 1293;

*Epcon Gas*, 279 F.3d at 1030.

The parties disagree about the proper construction of "a substantially ascending

methylphenidate plasma drug concentration over a time period of about [x] hours."  The

different constructions proposed by the parties for this limitation are:

Plaintiffs' construction:

> **The terms "substantially" and "about" each mean approximately.  Thus, a substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises over approximately [x] hours, but may include a slight dip.**

Defendant's construction:

> **A methylphenidate mean plasma concentration from a non-fasting study conducted on at least 15 patients wherein the dosing occurs in the morning and that exhibits an initial rapid**

31

> **rise due largely to release of drug from an immediate release portion of the dosage form and subsequently does not decline but ascends or is flat except for a possible slight dip between 5.5 and 6.5 hours after administration through the requisite time period. The word "about" (in "over a time period of about [x] hours") is defined as from one minute before the time period to one minute after, *i.e.*, "about 8 hours" refers to 7:59 to 8:01.**

Plaintiffs contend that this limitation should be construed in accordance with its ordinary meaning in light of the specification. But Andrx, once again, proposes a definition that is a patchwork of requirements arbitrarily selected from examples in the specification (*e.g.*, mean data and a specific time for occurrence of a slight dip) and other undisclosed sources.

        **(a)**      **The term "a substantially ascending methylphenidate plasma drug concentration over a time period of about [x] hours"**

The term "a substantially ascending methylphenidate plasma drug concentration over a time period of about [x] hours following said administration" should be construed in accordance with its ordinary meaning and the intrinsic evidence as requiring a profile in which the plasma concentration of methylphenidate in an individual generally rises over approximately [x] hours, but may include a slight dip in the plasma concentration during the period of ascension.

A dosage form may be evaluated by measuring the plasma concentration of the drug in an individual's body (*in-vivo*). The scientific discipline known as "pharmacokinetics" includes the study of the time course of the processes of drug absorption, distribution, and elimination (*i.e.*, excretion and metabolism). *See*, *e.g.*, Leon Shargel *et al.*, Applied Biopharmaceutics & Pharmacokinetics (4th ed. 1999) (Exh. Q), at 30. Measurement of the drug concentration in the plasma (also termed serum or blood) of an individual is "the most direct approach" to assessing the pharmacokinetics of a drug in the body. *Id.* at 32. A plasma concentration versus time curve may be generated by measuring the drug concentration in plasma samples taken at various time intervals after a dosage form is administered, and plotting the drug concentration on a graph with the corresponding time at which the plasma sample was removed. *Id.* at 32-33.

The specification expressly defines the term "plasma drug concentration" as "the concentration of drug that is obtained within the blood or plasma" of an individual following administration of the drug. *See*, *e.g.*, Exh. A, col. 1, lines 41-50; and Example 7. This express definition is consistent with the ordinary, art-recognized meaning of the phrase. *See*, *e.g.*, *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1338-39 (Fed. Cir. 2006) (agreeing with the district court that plasma concentration refers to "the concentration of drug in blood plasma").

The terms "substantially ascending" and "methylphenidate" both precede and modify the recited "plasma drug concentration." The ordinary meaning of the term "substantially" is well-established. According to the Federal Circuit, the term "substantially" is "a descriptive term commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (internal quotations omitted). Put simply, "substantially" means "approximately." *See Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1360 (Fed. Cir. 2003) (the claim term "substantially" denotes "approximation"). Thus, in the context of the '129 and '373 patent claims, the term "substantially" indicates that the plasma concentration is not required to uniformly ascend; rather, some variation is permitted.

Like the term "substantially," the ordinary meaning of the claim term "about" is "approximately." *See Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1369-72 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 488 (2006). Thus, with respect to claims 2-8 of the '373 patent and independent claims 1-2 of the '129 patent – each of which contain the language "over a time period of *about* [x] hours" – this language simply refers to a time period of *"approximately* [x] hours."

The specification confirms that a "substantially ascending" methylphenidate plasma concentration profile may include some variation – in the form of a slight dip in plasma concentration levels. Figure 4 of the '373 patent shows two plasma drug concentration profiles – one from individuals who received three doses of an immediate-release methylphenidate

product  (indicated by closed circles) and one from individuals who received a single dose of

methylphenidate from a claimed dosage form (indicated by open diamonds).  As the

specification explains, following administration of the claimed dosage form, the plasma drug

concentration initially rises and "*continues to substantially ascend (save for a slight 'dip'*

*between t=5.5 hours and t=6.5 hours) through a time period of 9.5 hours*."  Exh. A, col. 21, line

64 to col. 22, line 8.

This simply defined concept in the patent specification reflects how drugs function *in*

*vivo*; namely, there can be fluctuations in the amounts of the drug in the plasma of a patient at

any point in time during the course of treatment due to the inherent variability of the biological

systems being measured.  *See*, *e.g.*, *Abbott Labs.*, 452 F.3d at 1340 (Fed. Cir. 2006)

(acknowledging that blood plasma concentrations disclosed in reference show a range of values

in different individuals).   Slight fluctuations are not defined in the patent as precisely timed

events with significance to the claimed methods.  As such, the slight dip may occur at any point

in time during the required period of ascension.

In sum, the proper construction of a "substantially ascending methylphenidate plasma

drug concentration" refers to a plasma concentration profile that generally rises over

approximately [x] hours, *but may include a slight dip*.  Nothing in the prosecution history

contradicts or alters the definition that is evident from the specification.

### (b) The claimed "substantially ascending" plasma concentration profile is not limited to a mean profile or a slight dip that occurs only at a particular point in time

Andrx contends that the claimed "substantially ascending methylphenidate plasma drug

concentration" refers to (1) a mean profile from a non-fasting study conducted on at least 15

patients, (2) that dosing of patients occurs in the morning, and (3) that the phrase permits a slight

dip at only one specific point in time – between 5.5 and 6.5 hours following administration –

regardless of the $T_{90}$ periods that Andrx emphasizes in its proposed interpretations for other

claim elements.  As with many of the other arbitrary new limitations proposed by Andrx, these

proposed claim requirements are not supported by a logical reading of the patent claims or other intrinsic evidence.

First, nothing in the claim language or the specification suggests, much less requires, that plasma concentration profiles be based on mean data from a particular type of patient or study design (*e.g.*, more than 15 non-fasting subjects). For example, the claims of the '129 patent refer to treatment of "a" patient, not 15 patients. Moreover, nothing in the description of the patients to be treated pursuant to the specification attaches significance to whether the patient has eaten or not. Even the clinical investigation described in the patent (col. 21, line 25 to col. 22, line 27) attaches no significance to whether the subjects were fasting or not. Andrx's proposed requirement that an ascending plasma concentration be proven only in 15 or more non-fasting patients is entirely concocted and has no basis in the intrinsic evidence. Moreover, taken to its logical conclusion, Andrx's argument would mean that administration of tablets meeting the requisite profile to a child who skips breakfast do not infringe. There is no basis in any of the intrinsic record or logic for imposing a restriction of this kind on the claim's coverage.

Simply because the working "Examples" illustrate substantially ascending plasma concentration profiles based on mean data does not transform its use of mean data into a particular claim requirement. This Court considered and rejected a similar argument by a defendant in *Purdue Pharma v. F.H Faulding & Co.*, 48 F. Supp. 2d 420 (D. Del. 1999) (Farnan, J.), *aff'd*, 230 F. 3d 1320 (Fed. Cir. 2000). The defendant in the *Purdue Pharma* case sought to read the word "average" into method of treatment claims that recited certain pharmacokinetic ("PK") parameters because the Examples in the patent specification included average PK data. *Id.*, 48 F. Supp. 2d at 435-436. The Court found the defendant's construction to be factually unsupportable, concluding that:

> [T]he average results presented in the examples are a convenient and accepted way to summarize the results of clinical studies, and as such serve only to "illustrate" the desired PK results that are to be achieved in individual patients.

*Id*. at 436. The Court also found the defendant's position to be legally unsupportable based on the established rule that the examples in the specification cannot be used to limit the scope of the claims. *Id*. Similarly, Andrx's attempt to read the language "substantially ascending methylphenidate plasma drug concentration" as requiring the use of a particular form of proof of this profile (*e.g.*, a mean plasma drug concentration established from testing in 15 or more non-fasting subjects) should be rejected as improper and not supported by the claim language or the intrinsic evidence.

Andrx's proposed construction also is inconsistent with the prosecution history of the patents. For example, in support of arguments made regarding patentability of the claims over the prior art, Plaintiffs submitted a declaration of Dr. Suneel Gupta, one of the inventors of the patents. Gupta Decl. (Exh. P). The declaration was responding to an assertion by the Examiner that the prior art showed an example of one patient exhibiting a plasma profile that was asserted to meet the requirements of the then-pending claims in the application. Office Action dated June 18, 2004 (Exh. N), at 3-4. Dr. Gupta responded to this by explaining the data relating to this single patient's blood plasma profile. Gupta Decl. (Exh. P). There was no suggestion by the Office or by the Plaintiffs during this exchange that one would have to evaluate a particular type of "mean" data rather than the specific individual's profile. This intrinsic evidence strongly supports plaintiff's claim construction. *See*, *e.g.*, *Cordis Corp. v. Medtronic Ave, Inc.*, 339 F.3d 1352, 1360 (Fed. Cir. 2003) (adopting claim construction consistent with statements by both examiner and patentee indicating that limitation reciting "slots formed therein" was not limited to particular method of manufacture).

As was the case with Andrx's efforts to import as a new claim requirement use of a particular type of statistical measurement of dissolution rates, its effort to add as a new claim limitation the use of a particular form of statistical measurement of plasma concentrations is improper. As was the case with the dissolution profile claimed in the '373 patent, even if a small minority of patients exhibited the claimed plasma concentration profile, administration to

those patients would constitute infringement, regardless of the "mean" profile. Mean data might conceivably have a bearing on the extent of infringement, but would not absolve infringement with respect to administration of those tablets that do produce the claimed plasma profile.

The second new limitation Andrx proposes is that the claimed method requires a morning administration. The claim language contains no such requirement; rather, its requirement for duration of the ascending plasma concentration is linked to the time of ingestion of the dosage form. This, logically, can occur at any point during the day. The fact that the claimed methods have a particular utility in treating children with ADD/ADHD by dosing before school cannot be converted into a new requirement for when administration must occur. *See*, *e.g.*, *Liebel-Flarsheim,* 358 F.3d at 906 (Fed. Cir. 2004); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed. Cir. 1988) ("[r]eferences to a preferred embodiment, such as those often present in a specification, are not claim limitations.").

Third, Andrx's arbitrarily selected requirement that the slight dip occur only between 5.5 and 6.5 hours after ingestion is inconsistent with the intrinsic evidence. No such limitations appear anywhere in the claims of the '373 and '129 patents. Thus, on their face, the patent claims do not support Andrx's proposed restrictions, and the claimed plasma concentration profile should not be so limited. *See*, *e.g.*, *Aventis Pharms.,* 341 F. Supp. 2d at 509 (the claim term "'pharmaceutical composition,' in the absence of other stated limitations, *encompasses pharmaceutical compositions in all forms.*"); *see also Purdue Pharma*, 48 F. Supp. 2d at 435-36 (declining to add limitations to claim that were not included in the claim language).

In the specification, the term "plasma drug concentration" is used to refer to the concentration of drug in the blood plasma in an individual *in vivo*. *See*, *e.g.*, Exh. A, col. 1, lines 42-50; col. 21, lines 45-47; *see also* lines 55-66. Figure 4 provides an exemplary plasma level-time curve, which depicts plasma drug concentrations over a period of twelve hours following administration of an illustrative single dose, sustained-release dosage form described in the patent. Figure 4 compares a substantially ascending plasma drug concentration profile (depicted

in the figure by open diamonds), to plasma concentrations resulting from administration of three doses of an immediate-release methylphenidate product (Ritalin®) at times zero, four hours and eight hours (depicted in the figure by closed circles). *See, e.g.*, Exh. A, Fig. 4 and col. 21, line 56 to col. 22, line 16. The specification explains that Figure 4 shows that following administration of an illustrative sustained-release dosage form that delivers methylphenidate at an ascending release rate, the plasma drug concentration exhibits an initial relatively rapid rise due largely to release of drug from the immediate-release overcoat; "[s]ubsequently, however, the plasma drug concentration does not decline but continues to substantially ascend (save for a slight 'dip' between t=5.5 hours and t=6.5 hours) through a time period of 9.5 hours." *Id.* at col. 22, lines 1-7.

As explained above, the evident purpose for allowing for a slight dip in plasma concentration is to account for the inherent variability of the biological systems being measured. The patent certainly does not attach any significance to the slight dip occurring at a particular time, such as between 5.5 and 6.5 hours. As such, the court should reject Andrx's attempt to convert yet another example into a claim limitation.

By requiring the slight dip to be at only one location, Andrx commits the cardinal sin of confining the claims to a single preferred embodiment exemplified in the specification. The Federal Circuit has noted that "[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*) (citing *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification")); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-08 (Fed. Cir. 2004); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

Similarly, in *Liebel-Flarsheim*, the Federal Circuit rejected a district court's construction of the term "opening" because it impermissibly imported a limitation from embodiments of the invention disclosed in the specification. The infringer argued that "because all the embodiments described in the common specification of [the patents] featured pressure jackets, the claims of those patents must be construed as limited to devices that use pressure jackets." 358 F.3d at 905-06. The Federal Circuit, however, "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* at 906. The court also found that nothing in the specification described the invention as limited to the embodiments, and there was no clear disavowal of claim scope. *Id.* at 908, 912.

This prohibited approach to claim construction is what Andrx is proposing to do here. Specifically, Andrx is attempting to import as a claim element an attribute of the example in the patent that illustrates a "substantially ascending methylphenidate plasma concentration" from testing of a preferred embodiment in humans. The example shows a slight dip occurring between 5.5 to 6.5 hours. Presumably, because this example shows the slight dip occurring during this window of time, Andrx is asserting that the claims require a slight dip to occur at only that time. As noted by the Federal Circuit, simply because a patent describes a single embodiment of a "substantially ascending methylphenidate plasma concentration," does not mean that "the claims of the patent must be construed as limited to that embodiment." *Phillips*, 415 F.3d at 1323. See also *Liebel-Flarsheim*, 358 F.3d at 906-08.

Thus, as plaintiffs' demonstrate above, the proper construction of a "substantially ascending methylphenidate plasma drug concentration" refers to a plasma concentration profile that generally rises over approximately [x] hours, *but may include a slight dip* at any point during the period of ascension of the plasma concentration.

III.     **CONCLUSION**

For the reasons set forth above, the Court should adopt plaintiffs' proposed

constructions for each of the claim limitations that are in dispute.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil PPC, Inc.*

*Of Counsel:*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois  60603
312-853-7000

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
202-736-8000

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood
Suite 3400
Dallas, TX  75201
214-981-3300

Dated:  November 13, 2006

175119.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 13th day of November, 2006, the attached **PLAINTIFFS**

**ALZA CORPORATION AND MCNEIL-PPC, INC.'S OPENING BRIEF ON CLAIM**

**CONSTRUCTION** was served upon the below-named counsel of record at the address and in

the manner indicated:

William J. Cattie, III, Esquire                                      <u>HAND DELIVERY</u>
Rawle & Henderson, LLP
300 Delaware Avenue, Suite 1015
Wilmington, DE  19899-0588

James V. Costigan, Esquire                                     <u>VIA FEDERAL EXPRESS</u>
Hedman & Costigan, P.C.
1185 Avenue of the Americas
New York, NY  10036

Eric D. Isicoff, Esquire                                           <u>VIA FEDERAL EXPRESS</u>
Isicoff, Ragatz & Koenigsberg, P.A.
1200 Brickell Avenue
Miami, FL  33131

*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon