## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X
                                        )
ALZA CORPORATION and                    )
McNEIL-PPC., INC.,                      )
                                        )
              Plaintiffs,               )        CIVIL ACTION NO.
                                        )
              v.                        )        05-CV-0642
ANDRX PHARMACEUTICALS, LLC  and         )
ANDRX CORPORATION,                      )
                                        )
              Defendants.               )
------------------------------------------------------------X
```

## REDACTED PUBLIC VERSION

**The Contents Hereof are Confidential and May be Reviewed
Only by Court Order or Upon Prior Written Consent of All Counsel**

# DEFENDANTS' OPENING *MARKMAN*
# BRIEF ON CLAIM CONSTRUCTION

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.   ARGUMENT .......................................................................................................... 4

  A.   Claim Construction Legal Principles ................................................................ 4

    1.   Claims ...................................................................................................... 5

    2.   Specification ........................................................................................... 6

    3.   Prosecution History ................................................................................ 7

    4.   Extrinsic Evidence .................................................................................. 8

  B.   The Claim Constructions ................................................................................ 8

    1.   "Release of methylphenidate at an ascending release rate" ................... 9

      a)   Type of dissolution methodology ....................................................... 11

      b)   Periodic interval ................................................................................. 14

      c)   Method of calculating dissolution rate ................................................ 15

    2.   "Extended period of time" ...................................................................... 16

    3.   "Substantially ascending methylphenidate plasma drug concentration" .......... 18

    4.   "About 'x' hours" .................................................................................... 21

    5.   "A pharmaceutically acceptable composition" or "dosage form" .................... 23

      a)   Osmotic dosage forms are the only types of dosage forms described and
           enabled by the specifications of the patents-in-suit ............................... 24

      b)   Non-osmotic dosage forms are not within the written description of the
           patents-in-suit ..................................................................................... 25

      c)   Non-osmotic dosage forms are not enabled by the patents-in-suit ............... 29

III.  CONCLUSION ........................................................................................................ 33

## TABLE OF AUTHORITIES

**Cases**

*Application of Dalton*, 188 F.2d 170, 173 (CCPA 1951), ................................................ 27

*Application of Ludtke*, 441 F.2d 660, 661 (CCPA 1971) ................................................ 27

*Bell Comm'ns Research, Inc. v. Vitalink Comm'ns Corp.*, 55 F.3d 615 (Fed. Cir. 1995).. 7

*Capon v. Eshhar*, 418 F.3d 1349 (Fed. Cir. 2005) .......................................................... 35

*Comark Comm'ns., Inc. v. Harris Corp.*, 156 F.3d 1182 (Fed. Cir. 1998) ........................ 6

*Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956 (Fed. Cir. 2002)..................... 26, 35

*Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311 (Fed. Cir. 2001) .......................... 5

*Geneva Pharm, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003).............. 12

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951 (Fed. Cir. 2000) ..... 6

*In re Barr*, 444 F.2d 588 (CCPA 1971) .......................................................................... 33

*In re Dreshfield*, 110 F.2d 235 (CCPA 1940)................................................................... 33

*In re Hyatt*, 708 F.2d 712 (Fed. Cir. 1983)...................................................................... 27

*In re Wands*, 858 F.2d 731 (Fed. Cir. 1988).............................................................. 31, 35

*Jepson v. Coleman*, 314 F.2d 533 (1963) ........................................................................ 30

*Johnson & Johnston Assoc. Inc. v. R.E. Service Co., Inc.*,
 285 F.3d 1046 (Fed. Cir. 2002) ...................................................................... 28

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999)............. 6

*Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709 (Fed. Cir. 1998).................................. 5

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336 (Fed. Cir. 2005). 28, 29

*Markman v. Westview Instrs., Inc.*, 517 U.S. 370 (1996) ............................................. 1, 4

*Markman v. Westview Instrs., Inc.*, 52 F.3d 967 (Fed. Cir. 1995)............................... 5, 7, 8

*Maxwell v. J. Baker, Inc.*, 86 F.3d 1098 (Fed. Cir. 1996) ............................................... 28

*Nystrom v. TREX Co., Inc.*, 424 F.3d 1136 (Fed. Cir. 2005)......................................... 8, 9

*Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ................................ 5

*Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211 (Fed. Cir. 1995)........................... 24

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) .............. 4, 5, 6, 7, 8, 9, 21, 25, 29

*Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320 (Fed. Cir. 2000)............... 28, 29, 30

*Rhine v. Casio, Inc.*, 183 F.3d 1342 (Fed. Cir. 1999) ........................................................ 25

*Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817 (Fed. Cir. 1999). .............. 4

*Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570 (Fed. Cir. 1995) ........................ 8

*Spectrum Int'l, Inc. v. Sterilite Corp.*, 164 F.3d 1372 (Fed. Cir. 1998) .............................. 8

*Tronzo v. Biomet, Inc.*, 156 F.3d 1154 (Fed. Cir. 1998) .................................................... 30

*Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555 (Fed. Cir. 1991) ............................................ 26

*V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307 (Fed. Cir. 2005) ...................... 7

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ............................... 4

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 842 F.2d 1275 (Fed. Cir. 1988) .................... 24

**Statutes**

35 U.S.C. § 112 ............................................................................... 2, 9, 25, 26, 27, 30, 31

## I.  PRELIMINARY STATEMENT

Defendants, Andrx Pharmaceuticals, LLC and Andrx Corporation (collectively, "Andrx"), submit this *Markman*[1] claim construction brief pursuant to this Court's order dated August 15, 2006 and the Stipulation and Order filed November 9, 2006. The subject patents ("patents-in-suit") are United States Patent Nos. 6,919,373 (the "'373 patent") and 6,930,129 (the "'129 patent").  The '373 and '129 patents are related patents. They cite as priority common parent applications and, in fact, the '129 patent is a continuation application of the '373 patent.[2]  Plaintiffs, Alza Corporation and McNeill-PPC, Inc. (collectively "Plaintiffs"), assert that Andrx's proposed generic extended release methylphenidate product ("the Andrx product") will infringe the claims of the '373 and '129 patents. The patents-in-suit are submitted herewith as Exhibits A and B, respectively. In addition, Appendix A sets forth the claims at issue and Defendants' proposed definitions of the disputed terms.

Both patents-in-suit relate to alleged inventions regarding extending the release of the drug methylphenidate ("MPH"). *See* Declaration of Umesh V. Banakar, Ph.D. ("Banakar Decl.", filed concurrently herewith) at ¶23.  MPH is a drug that is prescribed for the treatment of Attention Deficit Disorder ("ADD") or Attention Deficit Hyperactivity Disorder ("ADHD").  *See* col. 6, lines 63-65 of the '373 patent. The patent protection for the drug MPH itself has long expired.   The patents-in-suit, therefore, are directed to alleged improvements in extending the release of MPH from the dosage form in a particular way, *i.e.,* with an ascending release rate in a dissolution test (in the case of the '373 patent) or to

---

[1] The United States Supreme Court in *Markman v. Westview Instrs., Inc.*, 517 U.S. 370 (1996), held that during a patent infringement analysis, the court must first determine the proper scope and meaning of the asserted claims.  This is frequently referred to as a "Markman" or claim construction analysis.

[2] In short, a continuation application is a filing under 35 U.S.C. § 120, which uses the same specification as the

provide a substantially ascending blood plasma drug concentration profile (in the case of the

'129 patent).  Banakar Decl. at ¶29.

Significantly, the patents-in-suit do not claim an inventive dosage form over the

sustained release dosage forms of the prior art[3], but instead are *novel* in the undue breadth

that they attempt to claim.  Plaintiffs may have invented a method of treating ADD or

ADHD by administering a single dose of MPH wherein the dosage form is one that operates

osmotically, but that is not what Plaintiffs claimed as their invention.  Instead of claiming the

osmotic dosage form, no doubt realizing that companies developing other types of dosage

forms could design around claims to osmotic dosage forms, Plaintiffs sought to overreach

and claim all dosage forms that deliver MPH in a certain "ascending" way (either *in vitro* or

*in vivo*[4]).  In other words, although Plaintiffs may have developed only one way of achieving

a result -- osmotically -- Plaintiffs' claims seek to monopolize all dosage forms that might

achieve that result.  Such overbroad claiming violates two provisions of 35 U.S.C. § 112,

first paragraph, (a) the written description requirement (the specifications of the patents-in-

suit do not describe dosage forms other than osmotic dosage forms for achieving the claimed

results) and (b) the enablement requirement (the specifications of the patents-in-suit do not

enable one skilled in the art to practice the full breadth of the claimed invention).  Plaintiffs

now seek to enforce the overreaching claims of the patents-in-suit against Andrx products,

which are indisputably non-osmotic dosage formulations.[5]

---

parent application, but claims different subject matter.

[3] For example, Ritalin® SR was a sustained release formulation of MPH using a wax matrix to control release of the MPH.

[4] *In vitro* means out of the body, such as drug release in a dissolution test, and *in vivo* means in the body, such as by blood plasma drug concentration measurements.  Banakar Decl. at ¶30.

[5] **REDACTED.**  *See* United States Patent Publn. No. 2004/0156896, Exhibit C hereto.

Central to this case is determination of the scope and definition of various terms contained within the claims of the patents-in-suit. The most critical of these determinations concerns the meaning of the claim phrases "that provides a release of methylphenidate at an ascending release rate over an extended period of time" in the '373 patent and "a substantially ascending methylphenidate plasma drug concentration over a period of time of about 'x'[6] hours" in both the '129 and '373 patents. Proper construction of these phrases is essential because a proper infringement analysis will require the Court to determine as a factual matter, *inter alia*, that the Andrx product does not provide "an ascending dissolution rate" over the requisite period of time or "a substantially ascending plasma drug concentration" over the requisite period of time. Because Andrx's product is a dual pulse product that has an initial pulse of MPH released from an immediate release portion, followed by a delay of release and then a second pulse of MPH released from the enteric coated portion, the Andrx product does not provide the release rates or plasma profiles required in the claims of the patents-in-suit. Banakar Decl. ¶¶ 34-35. Construction of these terms also will impact the determination of validity of the patents-in-suit.

Andrx's claim constructions are consistent with the intrinsic evidence (the patent claims, the patent specifications and the patent prosecution histories) and in accord with how a person of ordinary skill in the art[7] would interpret the claims. Plaintiffs, on the other hand,

---

[6] The number of hours varies in the claims as follows: "about 8 hours" in claim 1 of the '129 patent, "about 9.5 hours" in claim 2 of the '129 patent; "about 4 hours" in the claim 2 of the '373 patent; "about 4 to about 5.5 hours" in claim 3 of the '373 patent; "about 4 to about 8 hours" in claim 4 of the '373 patent; "about 4 to about 9.5 hours" in claim 5 of the '373 patent; "about 5.5 hours" in claim 6 of the '373 patent; "about 8 hours" in claim 7 of the '373 patent and "about 9.5 hours" in claim 8 of the '373 patent.

[7] In construing the claims, claim terms are to be given the meaning that terms would have to a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005), *cert. denied*, 126 S.Ct. 1303 (2006). A person of ordinary skill in the art ("POSA") to which the patents pertain is a person skilled in the art of pharmaceutical formulation and pharmacokinetics. Such persons would, minimally, have a college degree in pharmacy (B.S. or Pharm. D.) or a B.S. in some closely related discipline such as chemical engineering. Those people who did not have an undergraduate degree in pharmacy would have

recognizing that the Andrx products do not infringe the claims of the patents-in-suit as properly interpreted, seek to improperly broaden the claim constructions. Additionally, Plaintiffs' tortured definitions are at odds with common usage and with the meanings employed by those skilled in the art.

## II. ARGUMENT

### A. Claim Construction Legal Principles

In *Markman v. Westview Instrs., Inc.*, 517 U.S. 370 (1996), the Supreme Court held that the interpretation of patent claims is an issue of law for the court to decide. *Id.* at 388-89. The first inquiry to be made by a court during claim construction is to consider whether the claims can be construed solely based on the "intrinsic evidence." *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). If so, the court properly should look no further. *Id.* at 1583. "Intrinsic evidence" consists of the patent "claims themselves, the written description portion of the specification and the prosecution history" of the patent. *See Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 825 (Fed. Cir. 1999). If, however, after consideration of the intrinsic evidence, a court still has some doubt or believes there is ambiguity as to the meaning of the claim terms in question, the court may consider "extrinsic evidence." *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 980-81 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). Extrinsic evidence includes materials external to the patent and its prosecution history, such as inventor testimony, expert opinions, treatises, dictionaries and the like. *Id. at 980.* Extrinsic evidence properly should

---

gained experience in areas not covered in their undergraduate degree, such as pharmaceutics, pharmacology and pharmacokinetics through a program of guided reading or attendance at appropriate courses. All persons skilled in the art would have a minimum of two years experience in the design and evaluation of drug delivery systems, including controlled release products. Further, persons skilled in the art of pharmaceutical formulation would have and would avail themselves of access to specialist advice in such fields as analytical chemistry, pharmacokinetics and pharmacology when needed. Banakar Decl. at ¶ 28.

not be considered when it is in conflict with the intrinsic evidence. *Id*). at 981 (noting that extrinsic evidence cannot be used "for the purpose of varying or contradicting the terms of the claim") (internal citations omitted); *Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) (disapproving of the use of "extrinsic evidence to arrive at a claim construction that is clearly at odds with the claim construction mandated by...the written record of the patent"); *see also Vitronics*, 90 F.3d at 1584. In *Phillips*, as more fully discussed below, the Federal Circuit set out the essential inquiries that must take place to achieve a consistent and appropriate construction of the terms.

Moreover, it is important to note that the two patents involved in this lawsuit are related. As noted above, the '129 patent is a continuation of the '373 patent and, therefore, the '373 properly is referred to as the parent patent of the '129 patent. It is a maxim of patent claim construction law "that the same claim term in the same patent or related patents carries the same construed meaning" unless otherwise compelled. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003); *see also Fin Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001). Thus, in this brief, Andrx has grouped like claim terms from the two patents together to allow for a single consideration and construction of the same term.

### 1. Claims

The claims of a patent define the scope of the invention and the patentee's rights. *Phillips*, 415 F.3d. at 1312. In construing the claims, the words of the claim are to be "given their ordinary and customary meaning." *Id.* (Internal citations omitted.) Claim terms are to be given the meaning that the terms would have to a person of ordinary skill in the art at the time of the invention. *Id.* at 1313. *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222

5

F.3d 951, 955 (Fed. Cir. 2000); *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 989 (Fed. Cir. 1999) (there is a "heavy presumption" that the claim language is to be given its ordinary meaning).

A person of ordinary skill in the art views the claim terms in light of the entire intrinsic record. *Phillips,* 415 F.3d at 1313. Within the intrinsic evidence, "[t]he appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Comm'ns., Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed. Cir. 1998) (internal citations omitted). Importantly, a claim term's ordinary meaning to one of ordinary skill in the art can serve only as an initial, default meaning because a patentee is always free to "act as a lexicographer and ascribe a different, or modified, meaning to the term." *Hockerson-Halberstadt,* 222 F.3d at 955 (internal citations omitted). Therefore, a court cannot merely determine the ordinary meaning of disputed claim terms and stop, but it must go further and "examine a patent's specification and prosecution history to determine whether the patentee has given the [disputed terms] an unconventional meaning." *Id.*

### 2. Specification

"Claims must be read in view of the specification, of which they are a part." *Markman*), 52 F.3d at 979; *Vitronics,* 90 F. 3d at 1582 ("the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."); *Phillips,* 415 F.3d at 1313 (noting that the claims do not stand alone, rather they must be read in view of the specification of which they are part.) In fact, "it is legal error to construe a claim by considering it in isolation. A claim must be read in view of the specification of which it is a part." *Bell Comm'ns Research, Inc. v. Vitalink Comm'ns Corp.,* 55 F.3d 615, 621 (Fed. Cir. 1995). The specification of the

patent may reveal a special definition given to a claim term by the patentee that differs from

the meaning it would otherwise possess. In these cases, the inventor's lexicography governs.

"In other cases, the specification may reveal an intentional disclaimer, or disavowal, of

claim scope by the inventor.   In that instance as well, the inventor has dictated the correct

claim scope, and the inventor's intention, as expressed in the specification, is regarded as

dispositive." *Phillips,* 415 F.3d at 1316.

### 3.  Prosecution History

In addition to consulting the specification, the court should also consider the patent's

prosecution history. The prosecution history is the "complete record of the proceedings

before the PTO[8] and includes the prior art cited during the examination of the patent." *Id.* at

1317; *see also V-Formation, Inc. v. Benetton Group SpA,* 401 F.3d 1307, 1311 (Fed. Cir.

2005). "Like the specification, the prosecution history provides evidence of how the PTO

and the inventor understood the patent." *Phillips,* 415 F.3d at 1317.   Reviewing the

prosecution history of a patent can be important for purposes of claim construction because

remarks and amendments made during prosecution can preclude the patentee from taking a

subsequent position on claim interpretation that is inconsistent with those statements. As

recognized by the Federal Circuit: "[t]hat explicit arguments made during prosecution to

overcome prior art can lead to narrow claim interpretations makes sense, because '[t]he

public has a right to rely on such definitive statements made during prosecution.'"

*Spectrum Int'l, Inc. v. Sterilite Corp.,* 164 F.3d 1372, 1378 (Fed. Cir. 1998) (internal citations

omitted); *see also Southwall Techs., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir.

1995) ("[t]he prosecution history limits the interpretation of claim terms so as to exclude any

---

[8] This reference and others in this brief to "PTO" are to the United States Patent and Trademark Office.

7

interpretation that was disclaimed during prosecution.")

### 4. Extrinsic Evidence

In certain instances, courts are permitted to refer to sources outside the patent documents for clarification of a disputed term. Courts have found it helpful to resort to dictionaries or treaties to discerning the meaning of the claims. *Nystrom v. TREX Co., Inc.,* 424 F.3d 1136, 1142-43 (Fed. Cir. 2005), *cert. denied,* 126 S.Ct. 1654 (2006) (citing *Phillips,* 415 F.3d at 1318). Nevertheless, extrinsic evidence should not be used to provide a definition that is different from one present in the intrinsic materials.

> What *Phillips* now counsels is that *in the absence of something* in the written description and/or prosecution history *to provide explicit or implicit notice to the public... that the inventor intended a disputed term to cover more than the ordinary and customary meaning* revealed by the context of the intrinsic record, *it is improper to read the term to encompass a broader definition* simply because it may be found in a dictionary, treatise or other extrinsic source. (Emphasis added).

*Id.* at 1145. Other extrinsic evidence may include legal treatises, inventor/expert testimony and the like. *Phillips,* 415 F.3d at 1317 (quoting *Markman*), 52 F.3d at 980).

Applying the principles of claim construction found in *Phillips* and *Nystrom* to the patents-in-suit supports only Andrx's proposed definition for each of the claim terms at issue.

### B. The Claim Constructions

Plaintiffs assert that Andrx's product will infringe the claims of the '373 and '129 patents.

As a preliminary matter, the parties have stipulated that the claim term "patient" means "an individual who is being treated for ADD and/or ADHD."

The following is a listing of terms/phrases in the claims of the patents-in-suit as to

which Andrx believes construction from the Court is required:

**A. Release of methylphenidate at an ascending release rate**
**B. Extended period of time**
**C. Substantially ascending methylphenidate plasma drug concentration**
**D. About 'x' hours**
**E. A "pharmaceutically acceptable composition" or "dosage form"**

**Andrx's construction of the terms is as follows:**

**1. "Release of methylphenidate at an ascending release rate"**

The phrase is found in independent claim 1 of the '373 patent.[9] Andrx and Plaintiffs

agree on parts of the definition, but differ in defining the dissolution methodology.

| ANDRX PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION[10] |
|---|---|
| In vitro dissolution rate (mg/hr) as measured in a USP dissolution apparatus and methodology that is biorelevant, wherein the release rate is calculated as a mean value of at least six dosage units and excludes release from any immediate release portion of the dosage form and wherein the release rate only ascends from one hourly time point to another and does not decline or remain constant from one time point to another | A release of methylphenidate from the dosage wherein the amount released in a periodic interval is increased over the amount released during the immediately-preceding periodic interval. The release rate is as determined by an appropriate in-vitro dissolution test. The ascending release rate does not include release of any drug from any immediate-release drug coating that may be applied to the dosage form |

_____

[9] Where an independent claim contains a claim limitation, all claims dependent from that independent claim also contain the same limitation. 35 U.S.C. § 112, fourth paragraph.

[10] Plaintiffs Proposed Definitions are as follows:

'373 patent, independent claim 1

"ascending release rate over an extended period of time" means:

A release of methylphenidate from the dosage wherein the amount released in a periodic interval is increased over the amount released during the immediately-preceding periodic interval starring at t=0 and continuing for at least 3 hours. The release rate is as determined by an appropriate in-vitro dissolution test. The ascending release rate does not include release of drug from any immediate-release drug coating that may be applied to the dosage form.

'373 patent, claims 2-8 and '129 patent, independent claims 1-2

"a substantially ascending methyphenidate plasma drug concentration over a time period of about [x] hours" means:

The terms "substantially" and "about" each mean approximately. Thus, a substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises over approximately [x] hours, but may include a slight dip.

'129 patent, independent claims 1-2

"a pharmaceutically acceptable composition comprising methylphenidate" means:

A pharmaceutical composition that includes a dose of methylphenidate.

9

**Agreed portion of the definition**

Andrx and Plaintiffs agree that:

(1) the "ascending" portion of this claim phrase requires that there be an increase in amount of drug release over a periodic interval for each subsequent periodic interval;

(2) the ascending release rate should be calculated excluding any immediate release portion of the drug in the dosage form; and

(3) the release rate should be determined by an *in vitro* dissolution test.

The parties disagree on the following:

(1) the type of dissolution methodology (Andrx requires the dissolution method to be biorelevant whereas Plaintiffs merely state that it should be "appropriate");

(2) the periodic interval (Andrx requires the periodic interval to be hourly whereas Plaintiffs leave the interval undefined); and

(3) the method of calculating the dissolution rate (Andrx requires the rate to be calculated as the mean of at least six dosage units whereas Plaintiffs leave the calculation method undefined).

10

**Support for Andrx's proposed definition**

**a) Type of dissolution methodology**

The type of dissolution methodology for calculating the dissolution rate is not defined in the '373 patent claims. The portion of the '373 patent specification discussing the method of dissolution reads as follows:

> A drug "release rate" refers to the quantity of drug released from a dosage form per unit time, e.g., milligrams of drug released per hour (mg/hr). Drug release rates are calculated under in vitro dosage form dissolution testing conditions known in the art. As used herein, a drug release rate obtained at a specified time "following administration" refers to the in vitro drug release rate obtained at the specified time following implementation of an appropriate dissolution test. The dissolution test utilized in the Examples described herein were performed on dosage forms placed in metal coil sample holders attached to a USP Type VII bath indexer and immersed in about 50 ml of acidified water (pH=3) equilibrated in a constant temperature water bath at 37°C. Aliquots of the release rate solutions were injected into a chromatographic system to quantify the amounts of drug released during the testing intervals.

'373 patent at col. 9, lines 21-36.

The disputes regarding the meaning of this claim phrase arise because the phrase used in the '373 patent claims is inherently indefinite. Banakar Decl. ¶¶ 40-41. **REDACTED.**[11] The claim itself does not provide the parameters of the dissolution testing and the results of dissolution testing can vary widely depending on the type of dissolution methodology employed (whether (1) the apparatus is a paddle stirred apparatus (USP[12] Type II), a basket type apparatus (USP Type I), a metal coil immersion apparatus (USP Type VII) or any other apparatus type (USP Types III-VI) and (2) the dissolution medium (the solution into which the dosage forms are placed) has an acidic or basic pH and

---

[11] **REDACTED.**

[12] USP refers to the United States Pharmacopeia which is the Official Compendia of Standards for the pharmaceutical industry in the United States.

11

is with or without enzymes). Banakar Decl. ¶42. Without this essential information, a person, though skilled in the art, cannot tell if his dosage formulation is within or without the scope of the claim. Banakar Decl. ¶43. This is the epitome of claim indefiniteness. *Geneva Pharm, Inc. v. GlaxoSmithKline PLC,* 349 F.3d 1373, 1384 (Fed. Cir. 2003) (noting that "[a] claim is indefinite if its legal scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not.") Plaintiffs' proposed interpretation – "appropriate" – does nothing to cure the indefiniteness of the claim, as it does not say "appropriate" for what and still leaves the person skilled in the art without any understanding of the metes and bounds of the claim. Banakar Decl. ¶44.

Andrx's proposed definition attempts to cure the inherent indefiniteness of the claim phrase by interpreting the claim in light of the specification. Andrx's proposed definition requires the dissolution testing to be "biorelevant," *i.e.*, under conditions that have relevance within the body in terms of pH. Banakar Decl. ¶¶45-46. Andrx does not believe that there is any dispute that the dissolution method is required to be a USP test, as this is the standard bearer for the pharmaceutical industry. Banakar Decl. ¶49. In the case of methylphenidate, this would require the pH to be acidic, as (1) MPH is unstable at high or basic pH's and (2) most of the relevant portion of the gastrointestinal tract is acidic to neutral (the stomach has a pH of 1-4, the small intestine from 5-6.8 and the large intestine from 6.8 to around 7.2. Banakar Decl. ¶¶47-48.

Further, it is undisputed that MPH is unstable at higher or basic pHs. REDACTED.[13] Moreover, the need for the use of an acidic or biorelevant dissolution medium would be understood by a person skilled in the art based on the '373 patent

12

specification and prosecution history. Banakar Decl. ¶51. In the above-quoted section of the '373 patent, the only dissolution medium mentioned is "acidified water (pH=3)."[14] No other dissolution medium is mentioned. Further, the whole purpose of the '373 patent is that the dosage form should provide an ascending rate of dissolution such that it achieves an ascending MPH plasma profile *in vivo*. Banakar Decl. at ¶¶52-54. This is expressed repeatedly in the '373 patent specification:

- in the "Field of the Invention" section – "In particular, the invention is directed to methods and devices that provide drug release within the gastrointestinal tract at an ascending release rate . . . [i]n this manner, drug is released at an ascending rate during a portion of the drug administration period sufficient to maintain a desired therapeutic drug effect." Col. 1, lines 27-33.

- In the "Brief Summary of the Invention" section – "It has been surprisingly discovered that . . . administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period." Col. 4, lines 13-19.

- In the "Detailed Description of the Invention" section – "It has been surprisingly discovered that administration of methylphenidate at a release rate that is substantially ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy." Col. 7, lines 50-55.

The '373 patent prosecution history provides further evidence that the release rate be calculated in a biorelevant dissolution medium. When the PTO rejected the '373 patent claims in two separate office actions[15], Plaintiffs, instead of running a separate dissolution test on the products of the prior art, submitted inventor declarations (attached hereto as Exhibits H and I) in which they took the MPH blood plasma data from the references and

---

[13] **REDACTED.**

[14] Because use of a USP Type VII bath indexer and immersion in about 50 ml of acidified water (pH=3) is the only dissolution method mentioned and used in the patents-in-suit, the court also could adopt this dissolution methodology for the claim construction as it is encompassed within Andrx's proposed interpretation of "biorelevant."

[15] PTO Office Actions dated May 7, 2003 and February 13, 2004 (Exhibits F and G attached hereto, respectively).

performed a mathematical calculation (called a deconvolution) on that blood plasma data to estimate *in vivo* absorption rates. These estimated rates *in vivo* absorption rates[16] were then equated with the dissolution rates required by the patent claims – in other words, admitting that the dissolution rates needed to be biorelevant. Banakar Decl. ¶¶57-61.

The extrinsic evidence further supports Andrx's proposed construction requiring the dissolution medium to comprise a biorelevant medium. REDACTED.[17]

### b) Periodic interval

Like the type of dissolution test, the '373 patent claims themselves do not define the periodic interval of measuring the dissolution rates. Plaintiffs' proposed construction also fails to specify the periodic interval. The '373 patent specification, however, supports Andrx's proposed construction that the periodic interval should be hourly. The same portion of the specification as cited above indicates that the periodic interval should be hourly – "milligrams of drug released per hour (mg/hr)." Col. 9, lines 22-23.

The '373 patent specification further contains the following passage:

> A "periodic release rate" refers to the quantity of drug released from a dosage form during a specified periodic interval as determined at the end of that specified periodic interval, i.e., at each periodic interval when a determination is made, the quantity of drug released represents the periodic release rate during that periodic interval. For example, the quantity of drug released as determined at t=1 h represents the periodic release rate from the dosage form during the first hour following administration and the quantity of drug release as determined at t=2 h represents the periodic release rate during the second hour following administration, etc.

Col. 9, lines 54-64. The only mention of the periodic interval in this section of the specification is hourly. Col. 8, lines 58-61 suggest that other intervals such as t=30 minutes

---

[16] **REDACTED.**
[17] **REDACTED.**

or t=2 hours could be used, however, every single example in the '373 patent measured the release rate hourly. Banakar Decl. ¶¶63-67.

Also, in the Declarations submitted by Dr. Suneel Gupta to show the patentability of the invention claimed in the '373 patent over the prior art cited by the Patent Examiner, Dr. Gupta deconvoluted the blood plasma concentration data in the prior art references into hourly *in vivo* absorption data. Banakar Decl. ¶68. Thus, the prosecution history supports Andrx's proposed construction.

The extrinsic evidence comports with Andrx's proposed construction. To determine whether the dissolution rates are increasing, a person skilled in the art would view hourly intervals as the only reasonable periodic interval when evaluating an extended release drug that is to deliver drug for a substantial number of hours. Banakar Decl. ¶69. **REDACTED.**[18]

### c) Method of calculating dissolution rate

Again, the claim construction issue here emanates from Plaintiffs' failure to state in the '373 patent claims how the rate should be calculated. Plaintiffs' proposed definition also fails to address this issue. Andrx, however, proposes that the rate be calculated as the mean of at least six tablets. This is in accord with the understanding of a POSA and the requirements of both the Food and Drug Administration ("FDA") and USP.[19] Banakar Decl. at ¶50.

---

[18] **REDACTED.**

[19] USP Section <711> Dissolution tests contain an acceptance table wherein at least six (6) units are tested; Section <724> Drug Release section also contains acceptance tables wherein the minimum number of units tested is six (6) (Exhibit L hereto).

### 2. "Extended period of time"

The term "extended period of time" is found in independent claim 1 of the '373 patent. Andrx seeks a separate claim construction of this term, while Plaintiffs have defined this term within their construction of the ascending release rate. Both Andrx and Plaintiffs agree that the extended period of time commences at t=0 hours.

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| Refers to the time period beginning at 0 hours and extends through the mid point of the $T_{90}$ of the dosage form, which mid point is calculated by determining the hourly time point at which 90 percent of the drug in the dosage form (including any immediate release portion) is released and dividing that number of hours by two and rounding up to the next hour (*i.e.*, if the $T_{90}$ is 8 hours, the extended period of time is 4 hours or if the $T_{90}$ is 9 hours, the extended period of time is 5 hours). | Periodic interval starting at t=0 and continuing for at least three hours. |

### Support for Andrx's proposed definition

The main difference between the proposed constructions of Andrx and Plaintiffs is the termination point of the extended period of time. As mentioned above, the parties agree that the time period commences at t=0. Andrx believes that the specification provides a definition requiring the terminal point to be that determined by one-half of the $T_{90}$ (the time at which 90% of the drug has been released), whereas Plaintiffs misconstrue the definition provided in the specification to define the terminal point as at least 3 hours. While Andrx agrees that the specification provides that the minimum extended period of time is 3 hours, the specification further provides an explicit definition for determining the end point of the extended period of time as a function of another metric, $T_{90}$ (the time point at which 90% of

16

the drug is released from the dosage form).  In this regard, the specification states as follows:

> As used herein with reference to the time period during which an ascending release rate is provided, "an extended time period" refers to a time period beginning at t=0 hours and continuing through at least the mid-point, and preferably beyond the mid-point, of the relevant $T_{90}$ of the dosage form. Because the dosage forms of the present invention are intended to provide sustained release of drug, a suitable $T_{90}$ for purposes of this invention is at least about 6 hours and, consequently, the "extended time period" during which an ascending release rate is provided is at least 3 hours.
>
> In accord with the above-recited definitions, an "ascending release rate over an extended time period" refers to ascending release rates of drug obtained from the time of administration of the dosage form through, and preferably beyond, the mid-point of the relevant $T_{90}$ for the dosage form. To illustrate, consider a situation where a dosage form has a $T_{90}$ of about 8 hours.  In this situation, "an ascending release rate over an extended time period" is achieved when the release rate at each hour through t=4 hours is greater than the release rate in the immediately-preceding hour.  Preferably, the release rate continues to ascend during time periods beyond t=4 hours.

'373 patent, col. 10, lines 31-52.

Thus, the '373 patent provides an explicit definition for "extended period of time," which Andrx requests the Court to adopt.  The inventors in this instance plainly acted as their own lexicographer, providing a specific definition for this phrase. The '373 patent inventors provided this as a definition to be used throughout the '373 patent including the claims and there is no reason to deviate from this definition.  Plaintiffs' proposed construction is based on the minimum number of hours that would be allowed under the definition, but itself is contrary to the definition that the inventors provided.  For example, under Plaintiffs' proposed definition, a product having a $T_{90}$ of 8 hours would only be required to have an extended period of time of ascending release rate of 3 hours, when the definition of the "extended time period" provided in the '373 patent itself would require 4 hours (4 obviously being the mid-point of 8).  *See also* Banakar Decl. at ¶¶ 74-75.

Andrx also proposes that in determining the $T_{90}$, the calculation requires the inclusion

17

of the immediate release portion of the dosage form. The correctness of Andrx's proposed definition can be discerned from the examples in the '373 patent. The example in the patent of a formulation including an IR product stated that the time at which 90% of the drug was released included the immediate release portion. *See* Example 6. *See also* Banakar Decl. ¶¶76-77.

**REDACTED.**[20]

### 3. "Substantially ascending methylphenidate plasma drug concentration"

The phrase "substantially ascending methylphenidate plasma drug concentration" is found in independent claims 1 and 2 of the '129 patent and dependent claims 2-8 of the '373 patent. The parties do not agree on this definition.

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| A methylphenidate mean plasma concentration from a non-fasting study conducted on at least 15 patients wherein the dosing occurs in the morning and that exhibits an initial rapid rise due largely to release of drug from an immediate release portion of the dosage form and subsequently does not decline but ascends or is flat except for a possible slight dip between 5.5 and 6.5 hours after administration through the requisite time period. | The term "substantially" means approximately. Thus, a substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises but may include a slight dip. |

**Support for Andrx's proposed definition**

Andrx's definition comes directly from and, therefore, is supported by the '373 and '129 patent specifications. In contrast, there is no support for Plaintiffs' proffered definition

---

[20] **REDACTED.**

that "substantially ascending" merely means that the curve "generally rises." The words "generally rises" do not appear anywhere in either specification of the patents-in-suit. The phrase is merely attorney argument proffered in an attempt to capture the Andrx products within the claims of the patents-in-suit. Moreover, this proposed definition of "ascending" contradicts Plaintiffs' prior definition of "ascending" – wherein Plaintiffs stated that an "ascending release rate" required the amount released to increase over each preceding periodic interval.

Andrx's proposed construction fully is supported by the definitional statement contained in '129 patent specification. This passage is the only discussion of ascending plasma profiles contained in the '129 patent and reads as follows:

> As shown in FIG. 4, the plasma drug concentration following each administration of an immediate-release dose rises relatively rapidly and then declines at a generally characteristic rate until the next dose is administered. The plasma drug concentration following administration of the tri-layer osmotic dosage form also exhibits *an initial relatively rapid rise due largely to release of drug from the immediate-release drug overcoat. Subsequently, however, the plasma drug concentration does not decline but continues to substantially ascend (save for a slight "dip" between t=5.5 hours and t=6.5 hours) through a time period of 9.5 hours.* Particularly striking is the difference during the time periods within about 1 hour before and about 1.5 hours following administration of the second and third immediate-release dose. With the standard regimen, during these periods, the plasma drug concentration declines to a trough concentration and then rises again to a peak concentration. With the experimental regimen, during these same time periods, the plasma drug concentration is substantially smoothly ascending and exhibits no peaks and troughs.

'129 patent, col. 21, line 64 to col. 22, line 28. (Emphasis added to highlight the portion that contains Andrx's definition).

Andrx's construction is supported by the specific definitions provided in this portion of the specification, namely that there is no declining of the drug concentration after the initial pulse from the immediate release portion of the drug formulation and that the plasma

19

profile is ascending or flat ("substantially ascending") for the entire time period except for the "slight dip" between 5.5 and 6.5 hours. The simple fact is that this is the only portion of the patent specification supporting/describing a plasma profile that "substantially ascends." Banakar Decl. at ¶¶79-81. Further, the graph in Fig. 4 of the '129 patent has only the one period of decline (at about 6.5 hours) and otherwise either is always ascending or flat. Banakar Decl. at ¶82.

Plaintiffs' construction improperly would allow for peaks and troughs at the time periods one would expect for immediate release dosing as long as the curve "generally" ascends. Banakar Decl. at ¶83. Plaintiffs' construction would include profiles that the patent specification specifically requires to be excluded – those that have an initial pulse to a peak level, followed by a decline to a trough due to a period of no, or substantially no, release and then an additional release from second pulse of drug to a second peak (Banakar Decl. at ¶84). Plaintiffs' proposed construction advocates the inclusion of material, within the claim scope, that the patent specifically teaches *should be excluded, and on its face* violates basic claim construction principles and invites legal error. *See Phillips,* 415 F.3d at 1316 (noting that "the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.")

**REDACTED.**

**REDACTED.** The requirement that the plasma levels come from patients (persons suffering from ADD or ADHD) is supported in the claims of the '129 patent. The preambles to the claims recite a method for treating ADD or ADHD. *See* col 23, lines 12-13

20

and col. 23, lines 20-21.  More importantly, the claims specifically recite that the composition be administered to a "patient."  *See* col. 23, lines 16 and 21.  If Plaintiffs intended to claim "healthy volunteers" or "subjects" they would have said so.

Moreover, there simply is no other plasma data in the patent but that from a mean curve on patients from a non-fasting (*i.e.*, fed) study.  Banakar Decl. at ¶¶90-91.  It is undisputed that the data for Figure 4 came from Example 7 of the '129 patent.[21]  The description of that example, found at col. 21, lines 25 *et seq.*, states that the subjects of the study were patients ("the subjects were current methylphenidate users" – col. 21, lines 37-38) and that the study included 16 study participants ("group of study participants (n=16)" – col. 21, lines 55-56).[22]

The specification also supports the use of mean data because only one curve is present in Figure 4 for a study that had 16 patient participants.  Banakar Decl. at ¶92.  Andrx's proposal to use a non-fasting study is based on the claim reciting a method of treating patients, who ordinarily would not be in a fasting state for the entire period of time required by the claims.  Banakar Decl. at ¶93.  Moreover, patients taking this medication are generally children who take the medication in the morning with breakfast before going to school.  Banakar Decl. at ¶27.

REDACTED.

### 4.  "About 'x' hours"

The term is found in independent claims 1 and 2 of the '129 patent and dependent claims 2-8 of the '373 patent.

---

[21] REDACTED.
[22] REDACTED.

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| the time period from one minute before to one minute after, *i.e.* "about 8 hours" refers to 7:59 to 8:01. | approximately |

### Support for Andrx's proposed definition

There is no definition for "about" a certain number of hours contained in the patent specification. "About" has been the subject of litigation in other cases and generally the definition varies on the amount of accuracy with which the modified parameter can be measured. *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1217 (Fed. Cir. 1995), *cert. denied*, 520 U.S. 1115 (1997) (affirming the district court's ruling that "word 'about' does not have a universal meaning in patent claims, and that the meaning depends on the technological facts of the particular case" and noting its past holdings to that effect); *see also W.L. Gore & Assocs., Inc.v. Garlock, Inc.*, 842 F.2d 1275, 1280 (Fed. Cir. 1988) (noting that the term "'about' is not subject to such a precise construction…but is dependent on the factual situation presented."). In this case, "about" modifies an hourly time point, which unquestionably can be measured very accurately. Thus, Andrx has proposed a narrow construction of plus or minus one minute. *See also* Banakar Decl. at ¶¶95-98.

Andrx's proposed claim construction also finds substantial support in the extrinsic evidence. Blood draws for obtaining plasma concentrations should be taken by the clinical laboratory within one minute of the time prescribed in the clinical protocol. Anything else is a deviation. Banakar Decl. at ¶99. Plaintiffs' proposed construction does nothing to aid in the understanding of this term, merely substituting one ambiguous term, "approximately," for another, "about."

22

### 5. "A pharmaceutically acceptable composition" or "dosage form"

These terms are found in independent claims 1 and 2 of the '129 patent and independent claim 1 of the '373 patent. The parties do not agree on the proper construction of this claim term.

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
| --- | --- |
| A dosage form that extends release wherein the rate controlling release mechanism is osmotic | A pharmaceutical composition that includes a dose of methylphenidate |

### Support for Andrx's proposed definition

As written in the claims, the phrases "pharmaceutically acceptable composition" and "dosage form" do not state the type of dosage form or the mechanism of controlling release. As expected, Plaintiffs' construction attempts to leave this phrase unmodified in order to capture the Andrx dosage form within the scope of the claim. Plaintiffs' claim construction, however, renders the claims of the patents-in-suit overbroad and, therefore, in violation of the requirements of 35 U.S.C. §112, first paragraph. Andrx submits that, for this reason, the claims are invalid, although such an invalidity argument is not proper subject matter for the current motion. Thus, in the alternative, and without prejudicing Andrx's rights to raise these validity arguments, Andrx has proposed a construction that would be supported by the written description of the specifications of the patents-in-suit and would be enabled by those specifications. As the Federal Circuit has determined, where necessary, courts should construe claims as to preserve their validity. *Phillips,* 415 F.3d at 1327 (noting the existence

of "the principle that 'claims should be so construed, if possible, as to sustain their validity'" (quoting *Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed. Cir. 1999))).

Andrx bases its claim construction that the claims require an osmotic release controlling dosage form or pharmaceutical composition on the grounds that:

(1) those are the only types of dosage forms described and enabled by the specifications of the patents-in-suit; and

(2) Plaintiffs, by deleting other dosage forms from the priority applications, either admitted (i) that those did not work to provide the claimed ascending release rates or plasma profiles or (ii) dedicated those types of dosage forms to the public by describing them in prior applications and abandoning them in the patents-in-suit.

*See also* Banakar Decl. at ¶¶101-04.

### a) Osmotic dosage forms are the only types of dosage forms described and enabled by the specifications of the patents-in-suit

The written description and enablement requirements come from one of the statutory sections defining patentability. The first paragraph of 35 U.S.C. § 112 reads as follows:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

*Id.* The Federal Circuit has held that the written description and enablement requirements of 35 U.S.C. § 112, first paragraph, are separate statutory requirements. *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 963 (Fed. Cir. 2002); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563 (Fed. Cir. 1991).

24

**b) Non-osmotic dosage forms are not within the written
description of the patents-in-suit**

As written, the claims of the patents-in-suit violate the written description

requirement of 35 U.S.C. § 112, first paragraph, because they claim a result without reciting

any structural limitations as to how to achieve that result and the specifications of the

patents-in-suit are limited to one specific structural dosage form for achieving that result,

namely, osmotically controlled dosage forms. Banakar Decl. at ¶105. *See Application of

Ludtke*, 441 F.2d 660, 661 (CCPA 1971) (sustaining a rejection of a claim because it merely

stated a desired result, which does not qualify as a structural limitation); *Application of

Dalton*, 188 F.2d 170, 173 (CCPA 1951), *cert. denied*, 342 U.S. 818 (1951) (noting that

"...results that may appear from the defined structure are not definitions of it and may not be

solely relied upon to make a claim containing them patentable unless there is a positive

setting out of the structure itself in the claims which, of course, must be responsible

for...results thereof."); *see also In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) (noting that

"[t]he long-recognized problem with a single means claim is that it covers every conceivable

means for achieving the stated result, while the specification discloses at most only those

means known to the inventor...Thus, the claim is properly rejected for what used to be

known as "undue breadth," but has since been appreciated as being, more accurately, based

on the first paragraph of § 112,." (internal citations omitted)). With regard to non-osmotic

dosage forms, any description of those dosage form types is limited to describing them as

prior art systems that do not work to provide the claimed result (ascending release rate or

ascending plasma profile) or were described in priority applications to the patents-in-suit and

then deleted and abandoned when the applications for the patents-in-suit were filed. Banakar

Decl. at ¶106. There simply is no description contained in the patents-in-suit that would

suggest to a person of ordinary skill in the art that the claims were intended to cover non-osmotic dosage forms. Banakar Decl. at ¶107. In fact, based on the specifications of the patents-in-suit, which describe other dosage forms as "failing to achieve the claimed profiles" and prosecution histories, which show abandonment of other dosage forms, a person skilled in the art would have no basis for concluding that the claims cover non-osmotic dosage forms. Banakar Decl. at ¶¶ 106-13  See also *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107-08 (Fed. Cir. 1996), *reh'g denied & sugg. for reh'g in banc declined* August 28, 1996, *cert. denied,* 520 U.S. 1115 (1997) (noting the well established rule that "subject matter disclosed but not claimed in a patent application is dedicated to the public." *Id.* (internal citations omitted). The rule of dedication to the public applies to the analyses of both literal infringement and infringement under the doctrine of equivalents. *Id.)*; *Johnson & Johnston Assoc. Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002) (noting that "when a patent drafter discloses but declines to claim subject matter...this action dedicates that unclaimed subject matter to the public.").

A patent is required to describe clearly the claimed invention so that one skilled in the art (1) can make and use the claimed invention; and (2) will know that the patentee really invented what is claimed. *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005), *reh'g en banc denied*, 433 F.3d 1373 (Fed. Cir. 2006) (affirming the district court's finding of summary judgment of noninfringement and invalidity for lack of written description where the specification described just one way of performing image compression and that limitation was omitted from the asserted claim); *Purdue Pharma L.P. v. Faulding Inc.*, 230 F.3d 1320, 1322, 1327 (Fed. Cir. 2000) (affirming the district court's finding of invalidity where patent claimed a characteristic exhibited by one exemplified

formulation but which would cover all formulations). Thus, the "written description" requirement is fundamental to the public purpose of the patent laws because it requires the patentee to clearly and correctly describe what has been invented by the inventors. *LizardTech*, 424 F.3d at 1346; *Phillips,* 415 F.3d at 1321, 1323.

Where, as in this case, the claimed characteristics (here the requisite dissolution release rates and plasma profile) only are discussed in the specification in the context of a single formulation type, the patentee may not use that characteristic as a claim limitation to claim all formulations containing that characteristic. *See Purdue Pharma L.P.,* 230 F.3d at 1327 (finding claim invalid for lack of written description). The only example of a formulation that possessed the ascending plasma profile of Claims 2-8 of the '373 patent and Claims 1-10 of the '129 patent was Example 7, which Example was a specific trilayer tablet that provided extended release by a specific osmotic mechanism. Banakar Decl. ¶109. With regard to the dissolution profile, although Plaintiffs' patents provided a number of examples of dosage forms that released MPH at an ascending release rate, all of the examples were osmotically controlled dosage forms. Banakar Decl. ¶110. None of the claims of the patents-in-suit include any limitation regarding the mechanism by which the ascending plasma profile or ascending dissolution release rates were obtained. Banakar Decl. ¶111. The written description requirement serves to prevent patent owners from overreaching in this manner by specifically requiring that claims describe the invention in sufficient detail so that one skilled in the art can determine whether future claims were encompassed within the original creation. *Id.* at 1327-29. *See also LizardTech*, 424 F.3d at 1343 (wherein the Federal Circuit found invalid a patent having a specification that described only one specific method for creating "seamless" type of discrete waveless transform technology (DWT) but

claimed seamless DWT without specifying that method as unsupported by the written description.)

In *Purdue,* a case with facts analogous to those here, the Federal Circuit held invalid a claim containing a limitation that the maximum plasma concentration of an opioid medicament be more than twice the plasma level of the opioid 24 hours after administration of the drug. *Purdue,* 230 F.3d at 1321. The Federal Circuit reasoned that, although the specification contained examples that provided data from which the Cmax/C24 ratio could be pieced together, such disclosure was insufficient to direct one of ordinary skill in the art that the Cmax/C24 ratio was an aspect of the invention without further limitations as to the drug composition. *Id.* at 1326. As the Federal Circuit stated in *Purdue,*

> one cannot disclose a forest in the original application, and then later pick a tree out of the forest and say here is my invention. In order to satisfy the written description requirement, the blaze marks directing the skilled artisan to that tree must be in the originally filed disclosure. . . It is "not a question of whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure . . . Rather, it is a question whether the application necessarily discloses that particular device." (quoting *Jepson v. Coleman,* 50 C.C.P.A. 1051, 314 F.2d 533, 536, 136 USPQ 647, 649-50 (1963)). [Other citations omitted].

*Purdue,* 230 F.3d at 1326-27.

Additionally, where the specification not only describes just one form of an invention but in fact describes how other forms are inferior, a broad claim will be found to be unsupported by the specification. *Tronzo v. Biomet, Inc.,* 156 F.3d 1154, 1158 (Fed. Cir. 1998) (noting that for a claim in a later-filed application to be entitled to the filing date of an earlier application, the earlier application must comply with the written description requirement of 35 U.S.C. § 112). In *Tronzo,* the Federal Circuit found that the specification described only one shape of cup for an artificial hip socket and, therefore, did not support

28

claims that were for generically shaped cups because the only discussion of other types of cups was where the specification specifically distinguished other types as inferior. *Id.*

Likewise, here, the only discussion of other types of dosage forms is in the Background of the Invention section of the specification, where the inventors are describing how the prior art systems were ineffective for providing the claimed dissolution release rates and plasma profiles. Banakar Decl. at ¶112. Thus, a person of ordinary skill in the art reading the specifications of the patents-in-suit would not understand that the inventors had invented all dosage forms for providing the requisite dissolution release rates and plasma profiles, but only osmotic dosage forms. Banakar Decl. at ¶113.

### c) Non-osmotic dosage forms are not enabled by the patents-in-suit

One of the other requirements of 35 U.S.C. § 112, first paragraph, is that the specification must enable a person skilled in the art to which the invention pertains to practice the invention commensurate in scope with the claims. If the claims are interpreted as covering all dosage forms, then the claims violate this provision as the patents-in-suit fail to provide any instruction on the preparation of a non-osmotic dosage form that releases MPH at ascending dissolution rates for an extended period of time and/or provides a substantially ascending plasma concentration profile. Banakar Decl. at ¶114.

The factors to be considered in determining whether a disclosure meets the enablement requirement of 35 U.S.C. § 112, first paragraph, are described in terms of undue experimentation in *In re Wands*, 858 F.2d 731 (Fed. Cir. 1988) and are commonly referred to as the *Wands* factors. The *Wands* factors are: (a) the nature of the invention, (b) the breadth of the claims, (c) the state of the prior art, (d) the relative skill of those in the art, (e) the amount of direction or guidance presented, (f) the predictability or unpredictability of the art,

29

(g) the presence or absence of working examples and (h) the quantity of experimentation necessary. *Id.* at 737.

(a) **The nature of the invention**.  The nature of the invention of the patents-in-suit is a method for treating ADD or ADHD by use of a pharmaceutical composition that releases MPH from the composition at an ascending dissolution rate for an extended period of time; provides a substantially ascending plasma profile or both. Banakar Decl. at ¶¶117-18. Because the nature of the invention is complex, this factor weighs in favor of undue experimentation.

(b) **The breadth of the claims.**  The claims are very broad as written and even broader as Plaintiffs propose to have them interpreted.  The claims encompass all dosage forms without limitations (even non-oral dosage forms).  Banakar Decl. at ¶119. The claims recite what the composition does and do not recite any structural limitation describing how the formulation functions to provide the claimed dissolution and/or pharmacokinetic results. Banakar Decl. at ¶¶120-21.  Because the claims are very broad, this factor weighs in favor of undue experimentation.

(c) **The state of the prior art.**  The state of the prior art described in the patents-in-suit was to provide extended release formulations with different release extending structural technologies, such as the wax matrix used in Ritalin® SR, which only provided a constant, non-ascending release. Banakar Decl. at ¶¶122-23.  Because the prior art does not provide guidance as to how to achieve the claimed result, this factor weighs in favor of undue experimentation.

(d) **The relative skill of those in the art.** As described above at in footnote xx, the relative skill of those in the art is high. Banakar Decl. at ¶¶124-25. Accordingly, this factor weighs in favor of no undue experimentation.

(e) **The amount of direction or guidance presented.** The specifications of the patents-in-suit provide no guidance, in the way of written description, on all the possible dosage formulations comprising MPH that could provide ascending dissolution release rates or ascending MPH plasma profiles. Banakar Decl. at ¶126. It is not obvious from the limited disclosure of formulations that use *only* osmotic technology that other MPH formulations using other release controlling technologies would work to provide the ascending dissolution release rates and/or ascending plasma profiles. Banakar Decl. at ¶127. *See, e.g., In re Dreshfield*, 110 F.2d 235 (CCPA 1940) and *In re Barr*, 444 F.2d 588 (CCPA 1971).

The lack of direction or guidance is evidenced by the patentees' own recitations of numerous sustained release technologies that failed to achieve the claimed ascending release rates and plasma profiles. Banakar Decl. at ¶128. Additional evidence of the lack of direction is derived from the prosecution history of the patents-in-suit, wherein the prophetic examples that the patentees alleged achieved certain results were later deleted from the patent, thereby abandoning them as unworkable. Banakar Decl. at ¶¶129-30. Thus, this factor weighs in favor of undue experimentation.

(f) **The predictability or unpredictability of the art.** There is a high level of unpredictability in the art of extended release pharmaceutical formulation, in general. Banakar Decl. at ¶¶131-32. This level is raised even higher where the result is to achieve a tailored dissolution profile or plasma concentration profile as is the case in the present

claimed inventions. Banakar Decl. at ¶133. The lack of guidance from the specification and from the prior art with regard to extended release formulations comprising MPH makes practicing the claimed invention unpredictable in the terms of which excipients should be utilized in which type of extended release system to provide the claimed dissolution and pharmacokinetic results. Banakar Decl. at ¶¶134-35. Accordingly, this factor weighs in favor of undue experimentation.

(g) **The presence or absence of working examples.** The specification discloses only osmotic release controlling formulations with specific excipients to achieve the claimed dissolution and pharmacokinetic results. No working examples exist in the patents-in-suit that show other extended release technologies. Banakar Decl. at ¶136. In fact, any other extended release technologies were removed and deleted from the specification and, therefore, are abandoned. Banakar Decl. at ¶137. The specification has enabled only compositions comprising MPH with specific osmotic construction (two layer LCT or three layer LCT) with specific excipients and has not enabled all of the possible extended release MPH formulations encompassed by Plaintiffs' proposed claim construction. Even the abandoned examples in the priority applications of other types of dosage forms were mere prophetic invitations to experiment, with minimal instructions on how to prepare such compositions. Banakar Decl. at ¶¶138-39. The lack of working examples favors undue experimentation.

(h) **The quantity of experimentation necessary.** The art demonstrates different formulations for extended release of MPH, which do not provide the requisite release profiles. Banakar Decl. at ¶140. Therefore, the practitioner would be relegated to trial and error experimentation to develop other non-osmotic (or different osmotic) formulations that

would exhibit the claimed dissolution and plasma profiles. Banakar Decl. at ¶141. This is

undue experimentation that would be highly burdensome on the practitioner. Banakar Decl.

at ¶142. Such experimentation is not the goal of the patent system, which at its heart is the

granting of a monopolist right to the exclusive manufacture, use and sale of an invention or

patented article in exchange for a description as precise as possible as to the boundaries of

the invention.

> The 'written description' requirement implements the principle that a patent
> must describe the technology that is sought to be patented; the requirement
> serves both to satisfy the inventor's obligation to disclose the technologic
> knowledge upon which the patent is based, and to demonstrate that the
> patentee was in possession of the invention that is claimed... The written
> description requirement thus satisfies the policy premises of the law, whereby
> the inventor's technical/scientific advance is added to the body of knowledge,
> as consideration for the grant of patent exclusivity.

*Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).

*See also Enzo Biochem., Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 970 (Fed. Cir. 2002) (noting

that the written description requirement "is the *quid pro quo* of the patent system; the public

must receive meaningful disclosure in exchange for being excluded from practicing the

invention for a limited period of time.")

In weighing the *Wands* factors, it is evident that the specifications of the patents-in-

suit are not enabling for the entire breadth of all possible extended release formulations but,

instead, are limited to specific extended release formulations, *i.e.*, osmotic dosage forms.

Thus, in order to preserve validity of the claims of the patents-in-suit, they must be construed

as limited to osmotically-controlled dosage forms or pharmaceutical compositions.

## III. CONCLUSION

Based on the foregoing, Andrx respectfully submits that the Court should adopt the

patent claim definitions that it has proffered herein.

Respectfully submitted,

**RAWLE & HENDERSON, LLP**

/s/ William J. Cattie, III  #953

William J. Cattie, III
I. D. No. 953
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
(302) 778-1200
Attorney for Defendant
ANDRX PHARMACEUTICALS, LLC
ANDRX CORPORATION

**OF COUNSEL:**
Alan B. Clement
Kathleen A. Costigan,
Nicholas P. Chiara
HEDMAN & COSTIGAN, P.C.
1185 Avenue of the Americas
New York, New York 10036
(212) 302-8989

Eric D. Isicoff
ISICOFF, RAGATZ & KOENIGSBERG, P.A.
1200 Brickell Avenue
Miami, Florida 33131
(305) 373 3232

**APPENDIX A**

**THE '373 PATENT**

| CLAIM LANGUAGE | DEFENDANTS' DEFINITIONS |
|---|---|
| 1. A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a **release of methylphenidate at an ascending release rate** over **an extended period of time.** | **Release of methylphenidate at an ascending release rate** –In vitro dissolution rate (mg/hr) as measured using a USP dissolution apparatus and methodology that is biorelevant, wherein the release rate is calculated as a mean value of at least six individual dosage units and excludes release from any immediate release portion of the dosage form and wherein release rate only ascends from one hourly time point to another and does not decline or remain constant from one time point to another |
| | **Extended period of time** Extended period of time refers to the time period beginning at 0 hours and extends through the mid point of the T90 of the dosage form, which mid point is calculated by determining the hourly time point at which 90 percent of the drug in the dosage form (including any immediate release portion) is released and dividing that number of hours by two and rounding up to the next hour (*i.e.*, if the T90 is 8 hours, the extended period of time is 4 hours or if the T90 is 9 hours the extended period of time is 5 hours). |
| 2. The method of claim 1 wherein said administration results in a **substantially ascending methylphenidate plasma drug concentration** **over a time period of about** 4 **hours** following said administration. | **Substantially ascending methylphenidate plasma drug concentration**. A methylphenidate mean plasma concentration from a non-fasting study conducted on at least 15 patients wherein the dosing occurs in the morning and that |

1

exhibits an initial rapid rise due largely to release of drug from an immediate release portion of the dosage form and subsequently does not decline but ascends or is flat except for a possible slight dip between 5.5 and 6.5 hours after administration through the requisite time period

**Over a time period of "about"** is defined as from one minute before the about x hours   the time period to one minute after, *i.e.* "about 8 hours" refers to 7:59 to 8:01

3. The method of claim 1 wherein said administration results in a **substantially ascending methylphenidate plasma drug concentration over a time period of about** 4 to about 5.5 **hours** following said administration.

4. The method of claim 1 wherein said administration results in a **substantially ascending methylphenidate plasma drug concentration over a time period of about** 4 to about 8 **hours** following said administration.

5. The method of claim 1 wherein said administration results in a **substantially ascending methylphenidate plasma drug concentration over a time period of about** 4 to about 9.5 **hours** following said administration.

6. The method of claim 1 wherein said administration results in a **substantially ascending methylphenidate plasma drug concentration over a time period of about** 5.5 **hours** following said administration.

7. The method of claim 1 wherein said administration results in a **substantially ascending methylphenidate plasma drug**

Claims 3 – 10 all employ the phrases **Substantially ascending methylphenidate plasma drug concentration**   and **Over a time period of about** X **hours** which are defined as set forth above.

2

**concentration**
**over a time period of about** 8 **hours**
following said administration.

8. The method of claim 1 wherein said
administration results in a **substantially**
**ascending methylphenidate plasma drug**
**concentration**
**over a time period of about** 9.5 **hours**
following said administration.

3

**THE '129 PATENT**

| CLAIM LANGUAGE | DEFENDANTS' DEFINITION |
|---|---|
| 1. A method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in **a patient**, wherein the method comprises administering a **pharmaceutically acceptable composition** comprising methylphenidate and a pharmaceutically acceptable carrier to said patient in a manner that achieves a | **A patient** -- an individual who is being treated for ADD and/or ADHD.

**Pharmaceutically acceptable composition** is a dosage form that extends release wherein the rate step controlling release mechanism is osmotic. |
| **substantially ascending methylphenidate plasma drug concentration**

**over a time period of about** 8 **hours** following said administration. | **Substantially ascending methylphenidate plasma drug concentration**. A methylphenidate mean plasma concentration from a non-fasting study conducted on at least 15 patients wherein the dosing occurs in the morning and that exhibits an initial rapid rise due largely to release of drug from an immediate release portion of the dosage form and subsequently does not decline but ascends or is flat except for a possible slight dip between 5.5 and 6.5 hours after administration through the requisite time period

**Over a time period of "about"** is defined as from one minute before the about x hours   the time period to one minute after, *i.e.* "about 8 hours" refers to 7:59 to 8:01 |
| 2. A method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in **a patient**, wherein the method comprises administering a **pharmaceutically acceptable composition** comprising methylphenidate and a pharmaceutically acceptable carrier to said patient in a manner that achieves a | **A patient** -- an individual who is being treated for ADD and/or ADHD.

**Pharmaceutically acceptable composition** is a dosage form that extends release wherein the rate step controlling release mechanism is osmotic. |

**substantially ascending methylphenidate plasma drug concentration**

**over**

**a time period of about** 9.5 **hours** following said administration.

**Substantially ascending methylphenidate plasma drug concentration**. A methylphenidate mean plasma concentration from a non-fasting study conducted on at least 15 patients wherein the dosing occurs in the morning and that exhibits an initial rapid rise due largely to release of drug from an immediate release portion of the dosage form and subsequently does not decline but ascends or is flat except for a possible slight dip between 5.5 and 6.5 hours after administration through the requisite time period

**Over a time period of "about"** is defined as from one minute before the about x hours  the time period to one minute after, *i.e.* "about 8 hours" refers to 7:59 to 8:01

3. A method of claim 1 wherein said composition comprises about 14 mg of methylphenidate.

4. A method of claim 1 wherein said composition comprises about 18 mg of methylphenidate.

5. A method of claim 1 wherein said composition comprises about 36 mg of methylphenidate.

6. A method of claim 1 wherein said composition comprises about 54 mg of methylphenidate.

7. A method of claim 2 wherein said composition comprises about 14 mg of methylphenidate.

8. A method of claim 2 wherein said composition comprises about 18 mg of methylphenidate.

9. A method of claim 2 wherein said composition comprises about 36 mg of methylphenidate.

10. A method of claim 2 wherein said composition comprises about 54 mg of methylphenidate.