# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------X
                                          )
ALZA CORPORATION, and                     )
McNEIL-PPC., INC.,                        )
                                          )
              Plaintiffs,                 )      CIVIL ACTION NO.
                                          )
              v.                          )      05-CV-0642
IMPAX LABORATORIES, INC.,                 )
ANDRX PHARMACEUTICALS, LLC and            )
ANDRX CORPORATION,                        )
                                          )
              Defendants.                 )
-----------------------------------------------------------
```

## REDACTED PUBLIC VERSION

## DECLARATION OF UMESH V. BANAKAR, PH.D.
## IN SUPPORT OF OPENING MARKMAN BRIEF SUBMITTED BY
## ANDRX PHARMACEUTICALS, LLC AND ANDRX CORPORATION

## I.    INTRODUCTION

1.    My name is Dr. Umesh V. Banakar.  As detailed in my Curriculum Vitae, attached to this declaration as Exhibit A, I am an independent consultant with a special expertise in modified-release pharmaceutical dosage formulations, their dissolution and in the bioavailability assessment of such formulations.

2.    I currently am an adjunct Professor at the University of Campinas, Department of Medicine in Brazil where I have developed and presented a Graduate Course for Masters and Doctoral programs entitled "Clinical Pharmacy Practice: Pharmacokinetics for the Practicing Healthcare Professional."  I currently am also an adjunct Professor at Creighton University, School of Pharmacy and Allied Health, which is located in Omaha, Nebraska.

3.      Andrx Pharmaceuticals, LLC and Andrx Corporation ("Andrx"), have retained me as an expert in this case. My scientific, technical and specialized knowledge in the areas of my expertise may assist the trier of fact to understand the evidence and/or to determine the facts at issue in this case, which generally concerns patent for sustained release pharmaceutical formulations.

II.              QUALIFICATIONS AND BACKGROUND

A. QUALIFICATIONS

4.      I am qualified as an expert because of my knowledge, skills, experience and training in the areas at issue in this litigation.  My educational and professional qualifications to testify in this case are set forth in my Curriculum Vitae (Exhibit A) and are described below.

1.       Areas of Expertise

5.      My primary areas of expertise relevant to this case are:

(a) Dissolution and Bioavailability Assessment – This is the study of the process by which a solid substance enters the solvent (medium) to yield a solution and becomes available for absorption in blood (by the body).

(b) Dosage Form Design for Bioavailability and Pharmacokinetic Studies – This is the study of how to design drug product dosage forms in order to meet goals concerning the length of time the dosage should be available for absorption by the body and what effect the dosage should have on the body (bioavailability) along with the rate at which the body processes the absorption and elimination of the drug from the dosage (pharmacokinetics).

(c) Drug Product Development and Evaluation – This is the study of how to achieve proper drug delivery from a particular dosage form by achieving a proper balance between the drug substance and the adjuvants and excipients – the inactive ingredients in the drug formulation.

### 2. Education

6.    I received a Ph.D. in Pharmaceutical Technology, majoring in dosage form development, biopharmaceutics and pharmacokinetics with a minor in pharmaceutical chemistry from Duquesne University in Pittsburgh, Pennsylvania. My thesis concerned sustained release pharmaceuticals and was entitled, "Polyethylenes as Potential Prolonged Release Tablet Excipients." I received a Bachelor of Pharmacy degree from Bombay University in Bombay, India. I have performed post-graduate work at the Massachusetts Institute of Technology, studying advances in controlled release technology.

### 3. Professional History

7.    I always have worked in the pharmaceutical field. While obtaining my undergraduate degree at Bombay University, I interned at Pfizer, Ltd.    Following graduation in 1978, I worked as a product chemist at Roussel Pharmaceuticals, Ltd. In 1980, I became a Lecturer in the Department of Pharmaceutics at J.N. Medical College in Belgaum, India.

8.    I came to the United States to pursue my Ph.D. and worked as Instructor-In-Charge of Pharmaceutics in the Department of Pharmaceutical Chemistry and Pharmaceutics at the School of Pharmacy at Duquesne University. After obtaining my

Ph.D. in 1985, I taught for five years at Creighton University School of Pharmacy, as assistant and then as Associate Professor of Pharmaceutics.

9.    In 1990, I was recruited by the St. Louis College of Pharmacy, where I held positions of Section Head of Pharmaceutical Sciences, Director of Research, Associate Professor of Pharmaceutics and then as Professor of Pharmaceutics. At St. Louis, in 1994, I became a full professor of pharmaceutics, less than ten years after obtaining my Ph.D.

10.    In 1997, Butler University's College of Pharmacy and Health Sciences in Indianapolis, Indiana, recruited me and until late 1999 I served there as Professor of Pharmaceutics and Chairman of Pharmaceutical Sciences and the Graduate Program.

11.    I am now an independent consultant, specializing in assisting drug manufacturers around the world to develop new pharmaceutical products. I also am an Adjunct Professor at the University of Campinas, Department of Medicine in Brazil where I have developed and presented a Graduate Course for Masters and Doctoral programs entitled "Clinical Pharmacy Practice: Pharmacokinetics for the Practicing Healthcare Professional." I currently am also an adjunct Professor at Creighton University, School of Pharmacy and Allied Health.

### 4.    Publications, Presentations, Honors and National/International Service

12.    I have authored more than one hundred publications, including numerous textbooks and manuals, in use by pharmaceutical scientists worldwide. Notably, I have authored a textbook on <u>Pharmaceutical Dissolution Testing</u>, which concerns evaluating drug release and dissolution of various types of dosage forms and drug delivery systems. I also have written a book on the pharmaceutical drug development process, concerning

how to identify the drug substance as a lead molecule, put it into a dosage form and evaluate its efficacy. I also have authored a text pertaining to the pharmacokinetic assessment of drug substances: *Basic Pharmacokinetics*, which is available on the Internet.

13.    As a specialist in modified-release pharmaceutical dosage formulations and the dissolution and bioavailability assessment of modified-release dosage formulations, I currently am preparing the second edition of my book, *Pharmaceutical Dissolution Testing*, 2d edition, Marcel Dekker, Inc., New York, New York (1998). I have written many other books and articles on the topic including *Computer Assisted Data Analysis of Sustained Release Formulations*, Interphex-USA '92, WS7, New York (1992) and *Correlating Dissolution and Bioavailability: Understanding IVIVC*, VanKel Technology Group, Cary, North Carolina (1999). I have developed and presented focused workshops (including workshop/course manuals) on 'Biorelevant Dissolution Testing' (Intl. Inst. Res., New York, NY; 2004 and 2005).

14.    I also have served on the Editorial Boards of a variety of publications related to this field, including acting as Founding Editor in Chief of the *International Journal of Pharmaceutical Advances*, Technomic Publishing Co., Inc., Ardsley, New York (1994-96); Editor-at-Large in the area of *Pharmaceutical Technology*, for Marcel Dekker, Inc., New York, New York (1990) and member of the editorial board for the *Journal of Biomaterial Applications*, Lancaster, Pennsylvania.

15.    I have been invited to give presentations on the pharmaceutical arts all over the world, including *Advanced Dissolution Testing and Correlating Dissolution and Bioavailability*, International Pharmaceutical Technology Conference and Expo,

Bangkok, Thailand (2000); *Drug Delivery and Drug Delivery Technology*, International Conference on Pharmaceutical Ingredients Excipients, London, England (1997) and *Bioavailability/Bioequivalence – Past, Present and Future*, Al-Azhar International Pharmaceutical Conference, Cairo, Egypt (1995).

16.      While I have received numerous academic and professional honors over the years, the honors I prize most greatly are the many opportunities I have been given to serve in the public sector, on both a national and international level. I currently am an advisor to the National Institutes of Health, NIAID, NINDS and SBIR/STTR programs. I have advised the United Nations International Executive Service Corps in Hungary and India and currently am an advisor to the United Nations Transfer of Knowledge Through Expatriate Nationals program and to the World Health Organization.

            5.      **Retention In Other Matters**

17.      In the last four years, I have given testimony either at trial or at deposition as an expert in the following matters:

-      *Biovail Corp. v. Andrx Pharmaceuticals, Inc.*

-      *FTC v. Upsher-Smith*

-      *Astra v. Andrx Pharmaceuticals, Inc.*

-      *Shire v. Impax*

-      *Shire v. Barr*

-      *Glaxo v. Andrx Pharmaceuticals Inc.*

**B.      RETENTION IN THIS CASE**

18.      Andrx has retained me in this case to examine the generic sustained release methylphenidate (MPH) formulation proposed by Andrx and Alza Corporation's

(Alza) United States Patent Nos. 6,919,373 ("the '373 patent") and 6,930,129 ("the '129 patent") (Exhibits B and C hereto, respectively). I have been advised by counsel for Andrx that the current purpose of my examination is to comment on the meaning of the claim terms of the '373 and '129 patents as a person of ordinary skill in the art would understand them using commonly accepted methods and principles. My compensation does not depend on either the conclusions I reach or the outcome of the case.

### C.    INFORMATION CONSIDERED IN THE PREPARATION OF THIS DECLARATION

19.    In preparing this declaration of my opinions in this matter, I have relied upon my more than twenty-five years of professional and scientific experience as a researcher and scientist to evaluate the products and patents at issue in this case. I also have relied on the types of facts or data that are reasonably relied on by experts in my fields of expertise in forming opinions or inferences about a topic.

20.    In addition to the '373 and '129 patents, I also have reviewed the entire prosecution histories for these patents, the deposition transcripts of Dr. Gupta, Dr. Shivananad, Mr. Ayer, Mr. Lam and Dr. Guinta including the exhibits to those deposition transcripts.

21.    I also have been informed that the claim terms that are at issue in this case are the following:

   a.    "release of methylphenidate at an ascending release rate"

   b.    "extended period of time"

   c.    "substantially ascending methylphenidate plasma drug concentration"

   d.    "about" 'x' hours

     e.  "pharmaceutically acceptable composition" or "dosage form"

22.  I further have been informed that the parties, Andrx and Alza, have agreed that the claim term "patient" should mean "an individual who is being treated for ADD and/or ADHD."

## III.  BRIEF SUMMARY OF THE TECHNOLOGY OF THE '373 AND '129 PATENTS AND THE ANDRX PRODUCTS

23.  Both of the patents-in-suit relate to extending the release of the drug (methylphenidate) MPH.

24.  Alza sells an extended release MPH product under the brand name Concerta®. *See Physician's Desk Reference* ("PDR") (2005) at page 1927 (Exhibit D hereto).

25.  Concerta® is prescribed for the treatment of Attention Deficit Disorder ("ADD") and/or Attention Deficit Hyperactivity Disorder ("ADHD"). *See* PDR at page 1928.

26.  Typically, Concerta® is administered to children. *Id.*

27.  According to the prescribing information, Concerta® is to be administered once-daily in the morning with or without food (although children will normally eat breakfast in the morning before school). *Id.* at 1929.

28.  From my review of the '373 and '129 patents, it is my opinion that a person of ordinary skill in the art ("POSA") to which the patents pertain is a person skilled in the art of pharmaceutical formulation and pharmacokinetics. I would expect that such persons would minimally have a college degree in pharmacy (B.S. or Pharm. D.) or a B.S. in some closely related discipline such as chemical engineering. I would expect that those people who did not have an undergraduate degree in pharmacy would

have gained experience in areas not covered in their undergraduate degree, such as pharmaceutics, pharmacology and pharmacokinetics through a program of guided reading or attendance at appropriate courses. I would expect all persons skilled in the art additionally to have at least two years experience in the design and evaluation of drug delivery systems, including controlled release products. Further, I would expect persons skilled in the art of pharmaceutical formulation would have and would avail themselves of access to specialist advice in such fields as analytical chemistry, pharmacokinetics and pharmacology when needed.

29.    My review of the patents-in-suit leads me to conclude that a POSA would understand that the patents are directed to extending the release of MPH in certain osmotic dosage forms in order to provide ascending release rates during dissolution testing and/or to provide substantially ascending plasma profiles in patients who have taken the dosage forms.

30.    Dissolution testing to determine how a dosage form behaves in a dissolution medium is referred to as *in vitro* or in a tube or outside a body. Plasma concentrations are measurements of drug level in the body or *in vivo*.

31.    All of the products described in the patents-in-suit operate to release the drug osmotically, from either or a two or three layer osmotic drug delivery system. In either type of the drug delivery system, a dosage form (tablet) is surrounded by a semi-permeable membrane that will allow fluid or water in, but not allow the contents of the dosage form out. The dosage form (tablet) further is provided with an orifice at the top of the tablet.

32.     In brief, the two layer dosage form has a top drug containing layer ("the pull layer") and a bottom non-drug containing layer with an expandable polymer ("the push layer"). The dosage form operates by having osmagents (the expandable polymer and/or other excipients which increase the osmotic pressure) draw fluid into the bottom layer, which when wet contains a polymer that will expand and push on the top layer, pushing the drug containing matrix in the top layer out of the dosage form through the orifice.

33.     The three layer dosage form includes a middle drug containing layer wherein the middle layer has a drug concentration that is higher than the top layer. Otherwise, the three layer dosage form works in somewhat similar fashion to the two layer dosage form, with the bottom layer acting as a "push" layer.

34.     **REDACTED.**

35.     **REDACTED.**

IV.     **RELEASE OF METHYLPHENIDATE AT AN ASCENDING RELEASE RATE**

36.     It is my opinion that, based on the language of claim 1 of the '373 patent, the '373 patent specification, the '373 patent prosecution history and the relevant extrinsic evidence, a POSA would understand the claim phrase "release of methylphenidate at an ascending release rate" to mean an *in vitro* dissolution rate (mg/hr) as measured in a USP dissolution apparatus and methodology that is biorelevant, wherein the release rate is calculated as a mean value of at least six dosage units and excludes release from any immediate release portion of the dosage form and wherein the release rate only ascends from one hourly time point to another and does not decline or remain constant from one time point to another.

37.    It is my understanding that the parties have agreed that (i) the "ascending" portion of this claim phrase requires that there be an increase in amount of drug release over a periodic interval for each subsequent periodic interval; (ii) the ascending release rate should be calculated excluding any immediate release portion of the drug in the dosage form and (iii) the release rate should be determined by an *in vitro* dissolution test.

38.    It is my understanding that the parties do not agree on (a) the type of dissolution methodology (Andrx requires the dissolution method to be biorelevant whereas Alza merely states that it should be "appropriate"); (b) the periodic interval (Andrx requires the periodic interval to be hourly whereas Alza leaves the interval undefined) and (c) the method of calculating the dissolution rate (Andrx requires the rate to be calculated as the mean of at least six dosage units whereas Alza leaves the calculation undefined).

39.    Accordingly, I will limit my discussion to the areas of disagreement.

(a)    **The type of dissolution methodology**

40.    It is my opinion that the dispute between the parties regarding this claim phrase arises because the '373 patent claims leave much required information undefined.

41.    The claim itself does not provide any of the parameters of a dissolution test method that are required for proper analysis.

42.    For example, the '373 patent claim does not state any of the necessary dissolution test conditions, most significantly whether the apparatus is a paddle stirred apparatus (USP Type II), a basket type apparatus (USP Type I) a metal coil immersion apparatus (USP Type VII) or any other apparatus type (USP Types III-VI) and whether

the dissolution medium (the solution into which the dosage forms are placed) has an acidic or basic pH and is with or without enzymes).

43.    Without this information, a POSA would not be able to tell if his dosage formulation is within or outside the scope of the claim.

44.    I note that Alza's proposed interpretation – "appropriate" – does nothing to improve the indefiniteness of the claim, as it does not say "appropriate" for what and still leaves the POSA without any understanding of the claim boundaries.

45.    Based on my review of the relevant evidence, in order to cure the inherent indefiniteness of the claim, it is my opinion that a POSA would understand the claim to require a dissolution testing that is biorelevant.

46.    By biorelevant, I mean taking into account the type of dosage form and the conditions under which the dosage form is to be administered to the patient and that the dissolution conditions have relevance to the conditions in the body at least in terms of pH.

47.    In the case of methylphenidate, it is my opinion that a biorelevant dissolution medium would require the pH to be relatively acidic during drug release, as (1) MPH is unstable at basic pHs and most of the relevant portion of the gastrointestinal tract in which the dosage form will release MPH in the body is acidic to slightly basic, as would be known to a POSA.

48.    In general, the stomach has a pH ranging from 1-4, the small intestine has a pH of from 5 to 6.8 and the large intestine from 6.8 to around 7.2.

49.    As far as appropriate apparatus and conditions, it is my opinion that the apparatus and conditions should be within the approved dissolution methods in the

12

United States Pharmacopeia (USP), as this is the standard bearer for the pharmaceutical industry in terms of dissolution testing.

50.    Additionally, under both USP and Food and Drug Administration requirements, the dissolution testing would require that at least six tablets, if not twelve, be tested and a mean calculated from the six tablets.

51.    The need for the use of relatively acidic or biorelevant dissolution medium also would be clear to a POSA from the '373 patent specification and prosecution history.

52.    In the section of the '373 patent specification that is relevant to dissolution testing, the only dissolution medium mentioned is "acidified water (pH=3)." This section provides the following instructive description:

> A drug "release rate" refers to the quantity of drug released from a dosage form per unit time, e.g., milligrams of drug released per hour (mg/hr). Drug release rates are calculated under in vitro dosage form dissolution testing conditions known in the art.  As used herein, a drug release rate obtained at a specified time "following administration" refers to the in vitro drug release rate obtained at the specified time following implementation of an appropriate dissolution test.  The dissolution test utilized in the Examples described herein were performed on dosage forms placed in metal coil sample holders attached to a USP Type VII bath indexer and immersed in about 50 ml of acidified water (pH=3) equilibrated in a constant temperature water bath at 37°C. Aliquots of the release rate solutions were injected into a chromatographic system to quantify the amounts of drug released during the testing intervals.

'373 patent at col. 9, lines 21-36.

53.    No other dissolution medium other than pH 3 is mentioned in the '373 patent specification.

54.    Further, the whole purpose of the '373 patent is that the dosage form should provide an ascending rate of dissolution such that it achieves an ascending MPH plasma profile *in vivo*.

55.    This is expressed over and over in the '373 patent specification, for example:

-    in the "Field of the Invention" section – "In particular, the invention is directed to methods and devices that provide drug release within the gastrointestinal tract at an ascending release rate . . . [i]n this manner, drug is released at an ascending rate duringa portion of the drug administration period sufficient to maintain a desired therapeutic drug effect." Col. 1, lines 27-33.

-    In the "Brief Summary of the Invention" section – "It has been surprisingly discovered that . . . administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period." Col. 4, lines 13-19.

-    In the "Detailed Description of the Invention" section – "It has been surprisingly discovered that administration of methylphenidate at a release rate that is substantially ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy." Col. 7, lines 50-55.

56.    The '373 patent prosecution history provides further evidence that the release rate be calculated in a biorelevant dissolution medium.

57.    The United States Patent Office rejected the '373 patent claims in two separate office actions on May 7, 2003  and February 13, 2004 (Exhibits E and F attached hereto).

58.    Both prior art references cited by the Examiner in those Office Actions disclosed only *in vivo* blood plasma profiles and did not contain any dissolution data.

14

59.    In responding to these Office Actions, Alza, instead of running a separate dissolution test on the products of the prior art over which their claims were rejected, submitted two Declarations by one of the inventors, Suneel Gupta (Exhibits G and H attached hereto).

60.    In these Declarations, Dr. Gupta used what is known as the Wagner-Nelson deconvolution to mathematically estimate *in vivo* absorption rates (not dissolution rates) from the blood plasma data and equated these *in vivo* absorption rates with the dissolution rates required by the patent claims.

61.    By using the *in vivo* absorption rates to support an argument regarding dissolution release rates, Alza effectively was admitting that the dissolution rates needed to be biorelevant.

62.    **REDACTED.**

(b)    **The periodic interval**

63.    As with the dissolution methodology, the '373 patent claims themselves are silent on the periodic intervals in which dissolution rates should be calculated.

64.    Likewise, Alza's proposed construction does not specify the periodic interval.

65.    It is my opinion that a POSA would understand the periodic interval to be an hourly interval based on the '373 patent specification and prosecution history.

66.    The same portion of the specification cited above mentions only an hourly interval – "milligrams of drug released per hour (mg/hr)." Col. 9, lines 22-33.

67.    Other sections of the specification indicate that an hourly period is what is intended by the inventors. *See*, *e.g.*, col. 9, lines 54-64, col. 10, lines 10-11; col. 10, line

25 and every single example of the '373 patent provides release rate information measured hourly.

68.    Also, in the Gupta Declarations discussed above, when Dr. Gupta deconvoluted the blood plasma concentration data in the prior art to show that his claimed invention was patentable over the prior art, Dr. Gupta did so hourly.

69.    In my opinion, a POSA also would understand the claim to be referring to an hourly periodic interval given the context of the claim – an extended release dosage form that is to release the drug for a number of hours.

70.    **REDACTED.**

## V.    EXTENDED PERIOD OF TIME

71.    It is my opinion that, based on the language of claim 1 of the '373 patent, the '373 patent specification, the '373 patent prosecution history and the relevant extrinsic evidence, a POSA would understand the claim phrase "extended period of time" to refer to the time period beginning at 0 hours and extending through the mid point of the $T_{90}$ of the dosage form, which mid point is calculated by determining the hourly time point at which 90 percent of the drug in the dosage form (including any immediate release portion) is released and dividing that number of hours by two and rounding up to the next hour (*i.e.*, if the $T_{90}$ is 8 hours, the extended period of time is 4 hours or if the $T_{90}$ is 9 hours, the extended period of time is 5 hours).

72.    It is my understanding that the parties have agreed that extended period of time commences at t=0.

16

73.    It is my understanding that the parties do not agree on the endpoint of the extended period of time because Alza asserts that the extended period of time is defined as continuing for at least three hours.

74.    Although the claims of the '373 patent do not explicitly define the terminal point of the extended period of time, the '373 patent specification does provide an explicit definition for determining the end point of the extended period of time as a function of another metric, $T_{90}$ (the time point at which 90% of the drug is released from the dosage form).  In this regard, the specification states as follows:

> As used herein with reference to the time period during which an ascending release rate is provided, "an extended time period" refers to a time period beginning at t=0 hours and continuing through at least the mid-point, and preferably beyond the mid-point, of the relevant $T_{90}$ of the dosage form.  Because the dosage forms of the present invention are intended to provide sustained release of drug, a suitable $T_{90}$ for purposes of this invention is at least about 6 hours and, consequently, the "extended time period" during which an ascending release rate is provided is at least 3 hours.
>
> In accord with the above-recited definitions, an "ascending release rate over an extended time period" refers to ascending release rates of drug obtained from the time of administration of the dosage form through, and preferably beyond, the mid-point of the relevant $T_{90}$ for the dosage form.  To illustrate, consider a situation where a dosage form has a $T_{90}$ of about 8 hours.  In this situation, "an ascending release rate over an extended time period" is achieved when the release rate at each hour through t=4 hours is greater than the release rate in the immediately-preceding hour.  Preferably, the release rate continues to ascend during time periods beyond t=4 hours.

'373 patent Col. 10, lines 31-52.

75.    Alza's proposed construction, which I understand requires only a minimum of three hours, is contrary to the definition that the inventors provided.  For example, under Alza's definition, a product having a $T_{90}$ of 8 hours would only be required to have an extended period of time of ascending release rate for 3

17

hours, when the definition of the "extended time period" provided in the '373

patent itself would require 4 hours (4 obviously being the mid-point of 8).

76.    It also is my opinion that a POSA would understand that, in determining

the $T_{90}$, the calculation requires the inclusion of the immediate release portion of the

dosage form.

77.    My opinion in this regard is based on an examination of the examples of

the patent. In Example 6 of the '373 patent, the immediate release portion was included

to calculate when 90% of the drug was released (see Table 5, at Col. 21).

78.    **REDACTED.**


VI.    **SUBSTANTIALLY ASCENDING METHYLPHENIDATE PLASMA DRUG CONCENTRATION**

79.    It is my opinion that, based on the language of claims 1 and 2 of the '129

patent, dependent claims 2-8 of the '373 patent, the patent specifications, the patent

prosecution histories and the relevant extrinsic evidence, a POSA would understand the

claim phrase "substantially ascending methylphenidate plasma drug concentration" to

mean that the methylphenidate mean plasma concentration profile from a non-fasting

study conducted on at least 15 patients wherein the dosing occurs in the morning and that

exhibits an initial rapid rise due largely to release of drug from an immediate release

portion of the dosage form and subsequently does not decline but ascends or is flat except

for a possible slight dip between 5.5 and 6.5 hours after administration through the

requisite time period.

80.    My opinion of what a POSA would understand the claim phrase to mean

is based on the definitional statement contained in '129 patent specification. This

passage is the only discussion of plasma profiles as ascending contained in the '129

patent and reads as follows:

> As shown in FIG. 4, the plasma drug concentration following each
> administration of an immediate-release dose rises relatively rapidly and
> then declines at a generally characteristic rate until the next dose is
> administered. The plasma drug concentration following administration of
> the tri-layer osmotic dosage form also exhibits *an initial relatively rapid
> rise due largely to release of drug from the immediate-release drug
> overcoat. Subsequently, however, the plasma drug concentration does
> not decline but continues to substantially ascend (save for a slight "dip"
> between t=5.5 hours and t=6.5 hours) through a time period of 9.5
> hours.* Particularly striking is the difference during the time periods
> within about 1 hour before and about 1.5 hours following administration
> of the second and third immediate-release dose. With the standard
> regimen, during these periods, the plasma drug concentration declines to a
> trough concentration and then rises again to a peak concentration. With
> the experimental regimen, during these same time periods, the plasma
> drug concentration is substantially smoothly ascending and exhibits no
> peaks and troughs.

Col. 21, lines 64 to col. 22, line 28. Emphasis added to show the portion of the passage

that contains my understanding of how a POSA would understand this claim phrase.

81.     My review of the patents revealed that there is no support in the patent

specification other than this language for a plasma profile that "substantially ascends."

82.     The graph in Fig. 4 has only the one period of decline at about 6.5 hours

and otherwise is always either ascending or flat.

83.     My understanding is that Alza's construction – that the profile generally

ascends -- would allow for peaks and troughs at the time periods one would expect for

immediate release dosing as long as the curve "generally" ascends.

84.     In my opinion, a POSA would view Alza's construction as including

plasma profiles that the patent specification specifically requires to be excluded – those

that have an initial pulse to a peak level, followed by a decline to a trough due to a period

of no or substantially no release and then a release from an additional pulse of drug to a second peak.

85.    My proposed construction also includes recitations that the plasma concentration profile should be a mean concentration profile from a non-fasting study conducted on at least 15 patients wherein the dosing occurs in the morning.

86.    This additional information is necessary because in my opinion the claim as written is indefinite.

87.    Without this information, *i.e.,* whether the study is in either fed or fasted condition, the number of patients or the use of mean data to construct the plasma concentration time curve, among others, a POSA cannot know if their dosage form infringes on the claim limitations.

88.    It is well known to POSAs that plasma levels between fed and fasted studies can vary greatly due to a number of factors, some of which are the different pH's and enzymes present in the gastrointestinal tract due to the presence or absence of food and the differing amounts of time a dosage form spends in each portion of the gastrointestinal tract in the fasted versus fed conditions.

89.    **REDACTED.**

90.    In fact, the requirement that the plasma levels come from patients (persons suffering from ADD or ADHD) is supported in the claims of the '129 patent themselves. The preambles to the claims recite a method for treating ADD or ADHD.  *See* col 23, lines 12-13 and col. 23, lines 20-21.  More importantly, the claims specifically recite that the composition be administered to a "patient." *See* col. 23, lines 16 and 21.

91.     Moreover, the only plasma data in the patent is from a mean curve on patients from a non-fasting study.  It is my understanding that the data for Figure 4 came from Example 7 of the '129 patent.   The description of that example, found at col. 21, lines 25 *et seq.,* states that the subjects of the study were patients ("the subjects were current methylphenidate users" – col. 21, lines 37-38) and the study included 16 study participants ("group of study participants (n=16)" – col. 21, lines 55-56).

92.     The use of mean data also is supported by the specification as there is only one curve in Figure 4 and in that study there were 16 patient participants.

93.     The requirement of a non-fasting study is based on the claim reciting a method of treating patients, who ordinarily would not be in a fasting state for the entire period of time required by the claims.

94.     **REDACTED.**

VII.    **"ABOUT" 'X' HOURS**

95.     It is my opinion that, based on the language of claims 1 and 2 of the '129 patent, dependent claims 2-8 of the '373 patent, the patent specifications, the patent prosecution histories and the relevant extrinsic evidence, a POSA would understand the claim phrase "about 'x' hours" to mean the time period from one minute before to one minute after, *i.e.*, "about 8 hours" refers to 7:59 to 8:01.

96.     In my opinion, the patent claims do not provide any guidance as to how to interpret "about" other than that the construction is in the context of hours and blood plasma concentration data.

97.     My review of the patent specification also did not reveal any special definition for the term "about."

98.     It is well known to persons skilled in the art, however, that time intervals for clinical blood plasma testing can be measured very accurately.

99.     Blood draws for obtaining plasma concentrations should be taken by the clinician within one minute of the time prescribed in the clinical protocol and that anything else must be recorded as a deviation.

100.    Thus, it is my opinion that a POSA would understand this claim term to refer to plus or minus one minute.

## VIII. "PHARMACEUTICALLY ACCEPTABLE COMPOSITION" OR "DOSAGE FORM"

101.    It is my opinion, that based on the language of claims 1 and 2 of the '129 patent, claim 1 of the '373 patent, the patent specifications, the patent prosecution histories and the relevant extrinsic evidence, a POSA would understand the claim phrases "pharmaceutically acceptable composition" and/or "dosage form" to mean a dosage form that extends release of MPH wherein the rate controlling mechanism for the dosage form is osmotic.

102.    Literally, the claim phrases "pharmaceutically acceptable composition" and "dosage form" do not state the type of dosage form or the mechanism of controlling release.

103.    If the claims are read literally such that they encompass any type of dosage form, however, it would be my opinion that the claims are broader in scope than what is described to a POSA in the patent specifications and that it would require a POSA to employ undue experimentation to produce a non-osmotic dosage form that achieves the results required in the claims.

104.    My reading of the claims is that, if there is no limitation on the type of dosage form, they claim a result without reciting any structural limitations as to how to achieve that result.

105.    In contrast, the patent specifications are limited to one specific structural dosage form for achieving that result, namely, osmotically controlled dosage forms.

106.    My review of the patents and prosecution histories revealed that, with regard to non-osmotic dosage forms, any description of those dosage form types is limited to describing them as prior art systems that do not work to provide the claimed result (ascending release rate or ascending plasma profile) and that other dosage forms were described in priority applications to the patents-in-suit and then deleted and abandoned when the applications for the patents-in-suit were filed.

107.    There simply is no description contained in the patents-in-suit that would suggest to a POSA that the claims were intended to cover non-osmotic dosage forms.

108.    In fact, a POSA would conclude the opposite from the patent specifications (which describe other dosage forms as failing to achieve the claimed profiles) or prosecution histories (which show abandonment of other dosage forms).

109.    The only example of a formulation that possessed the ascending plasma profile of Claims 2-8 of the '373 patent and Claims 1-10 of the '129 patent was Example 7, which Example was a specific trilayer tablet that provided extended release by a specific osmotic mechanism.

110.    With regard to the dissolution profile, although Alza's patents provided a number of examples of dosage forms that released MPH at an ascending release rate, all of the examples were osmotically controlled dosage forms.

111.    None of Alza's patent claims, however, include any limitation regarding the mechanism by which the ascending plasma profile or ascending dissolution release rates were obtained.

112.    The only discussion of other types of dosage forms is in the Background of the Invention section of the specification, where the inventors are describing how the prior art systems were ineffective for providing the claimed dissolution release rates and plasma profiles.

113.    Accordingly, it is my opinion that a POSA reading the specifications of the patents-in-suit would not understand that the inventors had invented all dosage forms for providing the requisite dissolution release rates and plasma profiles, but only osmotic dosage forms.

114.    It also is my opinion that, if the claims are interpreted as covering all dosage forms, then the claims require undue experimentation to prepare dosage forms as broad as claimed because there is no indication in the patents-in-suit as to how to prepare a non-osmotic dosage form that releases MPH at ascending dissolution rates for an extended period of time and/or provides a substantially ascending plasma concentration profile in a patient.

115.    I have been informed that the factors to consider in making a determination of undue experimentation are: the nature of the invention, the breadth of the claims, the state of the prior art, the relative skill of those in the art, the amount of direction or guidance presented, the predictability or unpredictability of the art, the presence or absence of working examples and the quantity of experimentation.

116.    I will comment on each of these separately.

117.    **Nature of the invention.** The nature of the invention of the patents-in-suit is a method for treating ADD or ADHD by use of a pharmaceutical composition that releases MPH from the composition at an ascending dissolution rate for an extended period of time, provides a substantially ascending plasma profile or both.

118.    It is my opinion that the nature of the invention is complex and that this factor weighs in favor of requiring undue experimentation.

119.    **Breadth of the claims.** The claims are very broad as written and as Alza would have them interpreted. The claims encompass all dosage forms without limitation. They would even encompass non-oral dosage forms.

120.    The claims recite what the composition does and do not recite any structural limitation describing how the formulation functions to provide the claimed dissolution and/or pharmacokinetic results.

121.    It is my opinion that because the claims are so broad, this factor weighs in favor of undue experimentation.

122.    **The state of the prior art.** The state of the prior art described in the patents-in-suit was to provide extended release formulations with different release extending structural technologies, such as the wax matrix used in Ritalin® SR, which only provided constant non-ascending release.

123.    It is my opinion that because the prior art does not provide guidance as to how to prepare a formulation to achieve the claimed result, this factor weighs in favor of undue experimentation.

124.    **The relative skill of those in the art.** The relative skill of those in the art is high.

25

125.    It is my opinion that because the relative skill of a POSA is high, this factor weighs in favor of no undue experimentation.

126.    **The amount of direction or guidance presented.** The specifications of the patents-in-suit provide no guidance, in the way of written description, on all the possible dosage formulations comprising MPH that could provide ascending dissolution release rates or ascending MPH plasma profiles.

127.    It is not obvious from the disclosure of formulations that use only osmotic release control that other MPH formulations using other release controlling technologies would work to provide the ascending dissolution release rates and/or ascending plasma profiles.

128.    The lack of direction or guidance is evidenced by the patentees' own recitations of numerous sustained release systems that failed to achieve the claimed ascending release rates and plasma profiles.

129.    Additional evidence of the lack of direction is from the prosecution history of the patents-in-suit, where in prophetic examples; the patentees alleged that certain results could be achieved, but then deleted those examples from the patent, thereby abandoning them as unworkable.

130.    Based on the foregoing, it is my opinion that, because there is no guidance as to how to prepare other types of dosage forms to achieve the claimed results and, in fact, there is guidance that it cannot be achieved, this factor weighs in favor of undue experimentation.

131.    **The predictability or unpredictability of the art.** There is a high level of unpredictability in the art of extended release pharmaceutical formulation in general.

132.    The art of pharmaceutical formulation always is challenging, especially; in the art of extended release pharmaceutical formulation. It is fraught with a high degree of variability and unpredictability. What can seem to be minor changes in formulation can elicit significant, if not unwanted (disastrous), effects in meeting the objectives of the (extended release) pharmaceutical formulations.

133. This level of challenge is raised even higher where the result is to achieve a tailored dissolution profile or plasma concentration profile as is the case in the present claimed inventions.

134.    The lack of guidance from the specification and from the prior art with regard to extended release formulation comprising MPH makes practicing the claimed invention unpredictable in terms of which excipients to use in which type of extended release system to provide the claimed dissolution and pharmacokinetic results.

135.    It is my opinion that, because there is a high level of unpredictability, this factor weighs in favor of undue experimentation.

136.    **The presence or absence of working examples.**    The specification discloses only osmotic release controlling formulations with specific excipients to achieve the claimed dissolution and pharmacokinetic results.  No working examples exist in the patents-in-suit that show other extended release formulations.

137.    In fact, other prophetic formulations that were present in earlier priority applications were removed and deleted from the specification.  It is my opinion that a POSA would view such deleted prophetic examples as abandoned and/or dedicated to the public.

138.    In my opinion, the patent specifications have enabled only compositions comprising MPH with specific osmotic construction (two layer LCT or three layer LCT) with specific excipients and has not enabled all of the possible extended release MPH formulations purportedly encompassed by the claims.  Even the abandoned examples in the priority applications of other types of dosage forms were mere prophetic invitations to experiment, with no instructions on how to prepare such compositions.

139.    It is my opinion that, because there is a lack of working examples of other types of dosage forms, this factor weighs in favor of undue experimentation.

140.    **The quantity of experimentation necessary.**    The art demonstrates different formulations for extended release of MPH, which do not provide the requisite release profiles.

141.    Therefore, it is my opinion that a POSA would be relegated to turning to trial and error experimentation to develop other non-osmotic (or different osmotic) formulations that would exhibit the claimed dissolution and plasma profile results.

142.   This undue experimentation would be highly burdensome on the practitioner.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.  Executed this 13th Day of November 2006.

_Nov. 13, 2006_

DATE

UMESH V. BANAKAR, PH.D.

30