## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALZA CORPORATION, and<br>McNEIL-PPC, INC.,<br><br>       Plaintiffs,<br><br>       v.<br><br>IMPAX LABORATORIES, INC.,<br>ANDRX PHARMACEUTICALS, L.L.C. and<br>ANDRX CORPORATION,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 05-642-JJF<br>)<br>)<br>)<br>)<br>)<br>) |

## DECLARATION OF MARTYN C. DAVIES, PH.D. IN SUPPORT OF REPLY MARKMAN BRIEF SUBMITTED BY ALZA CORP. AND MCNEIL-PPC, INC.

### I.    Engagement

1.    I have been retained by Alza Corporation ("Alza") and McNeil-PPC, Inc. ("McNeil") to provide my opinions on certain issues related to pharmaceutical dosage formulations, and in connection with issues pertaining to U.S. Patent Nos. 6,919,373 ("the '373 patent") and 6,930,129 ("the '129 patent") (Exhibits A and B, respectively).  I understand that my declaration will be submitted for the consideration of the Court in the legal proceeding Alza Corporation and McNeil-PPC, Inc. vs. Impax Laboratories, Inc., Andrx Pharmaceuticals, L.L.C. and Andrx Corporation case, Case No. 05-642-JJF.

## II.    Qualifications

2.    My educational background, professional experience, achievements and qualifications as an expert in biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques are detailed in my *curriculum vitae* (Exh. C).

3.    I received my Ph.D. in physical chemistry and surface energetics of hydroxypropylmethylcellulose from the Chelsea School of Pharmacy, Kings College University of London in 1985. I am currently Professor of Biomedical Surface Chemistry at the University of Nottingham in the United Kingdom, where I have been teaching for the last 21 years. In 1996, I was named Professor of Biomedical Surface Chemistry. I served as Deputy Head of the School of Pharmaceutical Sciences from 1999 until 2000 and was Head of the School of Pharmaceutical Sciences and the Pharmacy School from 2000 until 2003. I was the Chair for the School of Pharmaceutical Sciences Departmental Postgraduate Committee from 1997 until 1999 and Chair of the Institute of Pharmaceutical Sciences Development Committee from 1997 until 2000. I served as Vice Dean for Health Sciences at Nottingham University Graduate School from 1995 until 1997.

4.    In addition to my professorship, I am the Director of the Laboratory of Biophysics and Surface Analysis. My present research emphasis is in new biomaterials, surface biophysical tools for investigating biomolecular structure and interactions, drug delivery, and nanoscale engineering of surfaces. Over the

2

past 20 years, I have supervised more than 100 graduate students and post-doctoral associates in Biomedical Surface Chemistry and Pharmaceutical Sciences. I have taught both undergraduate and graduate courses in physical chemistry, drug delivery and biomedical surface chemistry for over 20 years. I have authored or co-authored more than 320 articles in the fields of Biomedical Surface Chemistry and Pharmaceutical Sciences. I regularly act as a referee for a variety of academic journals in the areas of surface analysis, biomaterials, biophysics and pharmaceuticals. I am currently on the editorial boards of Advanced Drug Delivery Reviews, the European Journal of Pharmaceutical Sciences and the Journal of Controlled Release.

5.    In 2003 I was named Fellow of the Royal Society of Chemistry, Fellow of the American Institute for Medical and Biological Engineering, and Fellow of the Royal Pharmaceutical Society of Great Britain. In 2003 I was also the Recipient of the GlaxoSmithKline International Achievement Award presented at the British Pharmaceutical Conference. I have received national and international recognition for my contributions to the structural characterization of pharmaceuticals and biomaterials including being Recipient of the Pharmatec Prize in 1988, a 1991 Pfizer Academic Award and Recipient of the Controlled Release Society's Young Investigator Award in 1997. I was named Science Chairman of the Millennium Meeting of the British Pharmaceutical Conference in 2000.

6.    I am an invited member of a large number of Learned Societies, including the Royal Pharmaceutical Society of Great Britain, the Royal Society of Chemistry,

the American Chemical Society, the American Association of Pharmaceutical Scientists, and the United Kingdom Academy of Pharmaceutical Scientists. I served as a Member of the Board of Governors of the Controlled Release Society from 1997 until 2000. I am the Founder of the United Kingdom Controlled Release Society and served as Acting Chairman of the Steering Committee from 1994 until 1997. I was re-elected the Scientific Secretary of the Controlled Release Society in 2003 (2000-2006) and have been a member of the Board of the Controlled Release Society since 2000.

7.    I have founded or co-founded several academic and industrial programs and companies. I am the Co-Founder, Director and Chairman of Molecular Profiles, which provides consulting expertise to the pharmaceutical and healthcare industries. I am also a Co-Founder of Regentec Ltd., a company which is a pioneer in the area of regenerative medicine and tissue engineering. I am currently a Director at Critical Pharmaceuticals Ltd. (a drug delivery company) and was a Member of the Scientific Advisory Board of Quadrant Healthcare Ltd. (developer of inhalation drug delivery systems) from 1998 until 2001.

**III.    Other Cases Within Last Four Years**

8.    I have offered testimony in the following proceedings within the last four years:

In re Omeprazole Patent Litigation (S.D.N.Y.), MDL No. 1291

In re Gabapentin Patent Litigation (D.N.J.), MDL No. 1384

Novartis Corporation *et al.* v. Teva Pharmaceuticals USA, Inc. (D.N.J.), Case No. 2:04CV04473

Biovail Laboratories International SRL v. Andrx Pharmaceuticals LLC
*et al.* (D. Del.), Case No. 1:05CV00586

## IV.    Compensation

9.    I am being compensated for my work in connection with this declaration at my customary rate of $800 per hour. My compensation is not in any way dependent on the outcome of this litigation.

## V.    Materials Considered

10.    The opinions and conclusions I express in this declaration are based on my general knowledge of, and my more than two decades of experience in, the fields of surface chemistry, analytical chemistry, biomaterials, biophysical chemistry and pharmaceutical sciences. They are also based upon my review of documents produced by the parties in this litigation, including the Declaration of Dr. Banakar, Ph.D. My opinions and conclusions are also based upon my review of the documents and literature references cited herein.

## VI.    Subject of this Declaration

11.    I have been asked to address three matters in this declaration in response to opinions offered by Dr. Banakar.

- First, I have been asked to respond to Dr. Banakar's opinion that a "person of ordinary skill in the art" would have interpreted the phrases "pharmaceutically acceptable composition" and "dosage form" as they are used in the '373 and '129 patent claims to mean a dosage form that extends release of methylphenidate wherein the rate controlling mechanism for the dosage form is osmotic. Banakar Decl. ¶ 101.

5

- Second, I have been asked to respond to Dr. Banakar's opinion that that there is no description contained in the patents-in-suit that would suggest to a person of ordinary skill that the claims were intended to cover non-osmotic dosage forms. Banakar Decl. ¶ 107.

- Finally, I have been asked to respond to Dr. Banakar's opinion that "if the claims are interpreted as covering all dosage forms, then the claims require undue experimentation to prepare dosage forms as broad as claimed because there is no indication in the patents-in-suit as to how to prepare a non-osmotic dosage form" that provides the claimed release rates or plasma concentrations. Banakar Decl. ¶ 114.

12. The opinions I express in this declaration reflect what I believe would be the views of a person skilled in the field of formulating extended release dosage forms as of November 1996. I believe that person would have the same views in February 1999 as well.

13. The '373 and '129 patent claims use the terms "pharmaceutical composition" and "dosage form" in an equivalent manner, namely, as referring to the drug product that is to be administered to treat ADD or ADHD. My comments in this declaration about "dosage forms" apply equally to "pharmaceutical compositions" as that term is used in the '129 patent claims, to the extent I do not provide an explicit observation concerning "pharmaceutical compositions."

## VII.    Opinion

### A.    Meaning of "Dosage Form" and "Pharmaceutical Composition"

14. In general terms, drug products are formulated either as immediate release systems, or as systems that deliver the active ingredient in a controlled manner,

often over an extended period of time. An immediate release dosage form typically releases the active ingredient in the dosage form within a short period, usually within an hour after ingestion. *See, e.g.*, '373 patent, column 2, lines 6-9. By contrast, controlled release systems release the active ingredient in a pre-determined manner, usually by releasing the active ingredient over a prolonged period of time.

15.     The claims of the '373 patent require a dosage form that provides an ascending rate of release of methylphenidate for an extended period of time. The '129 patent claims require a pharmaceutical composition that provides a substantially ascending methylphenidate plasma concentration for a specified period of time of at least about 8 hours. The patents thus require use of "sustained" or "extended" release dosage forms, since an immediate release formulation cannot deliver the required release profile for these extended periods of time.

16.     The patents, which have the same specification, clearly state that any suitable sustained release system can be used to produce the dosage forms required for the claimed treatment methods. In particular, at column 6, lines 1 to 14, the patent states:

> Although the present invention is illustrated herein by exemplary dosage forms containing specific exemplary drugs, methods of making such dosage forms and methods of using methylphenidate-containing dosage forms to provide a desired therapeutic outcome, *the invention is not limited by the exemplary embodiments*. The invention *broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period*, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent

to a person of skill in the art in view of the disclosure herein. (emphasis added)

17.  I understand the references to "exemplary" dosage forms in this paragraph to be referring to the specific examples of osmotic-release dosage forms that were produced, tested and described in the examples section of the patent (*i.e.*, columns 13 to 22 of the patent).

18.  The passage in the patent I quote above makes clear to me that the phrases "dosage form" and "pharmaceutically acceptable composition" as they are used in the claims of the patents cover dosage forms that employ any type of sustained release mechanism, as long as the dosage form provides an ascending release rate of methylphenidate over an extended period of time or a substantially ascending methylphenidate plasma concentration.

19.  Dr. Banakar states that, in his opinion, the phrase "dosage form" would be read by "a person of ordinary skill" as being limited to dosage forms "that extends release of MPH wherein the rate controlling mechanism for the dosage form is osmotic." Banakar Decl. ¶ 101.

20.  The phrases "pharmaceutically acceptable composition" and "dosage form" are not ordinarily read by individuals working in this field as requiring a particular type of a delivery system unless those terms are accompanied by additional words that describe (explicitly) these additional requirements of the composition or dosage form. As Dr. Banakar recognizes, "the phrases 'pharmaceutically acceptable composition' and 'dosage form' do not state the type of dosage form or the mechanisms of controlling release." Banakar Decl. ¶ 102.

21.    As such, in my opinion, Dr. Banakar has no basis for suggesting that the phrases

"pharmaceutically acceptable composition" or "dosage forms" (as they are used

in the '129 and '373 patent claims) require the use of sustained release dosage

forms that employ osmotic-release mechanisms. That interpretation, in my

opinion, is inconsistent with the plain wording in the claims, and the explicit

statements in the patent.

**B.    The Patent Specification Describes a Variety of Types of Sustained
        Release Systems**

22.    Dr. Banakar states that, in his opinion, the only types of dosage forms described

in the patents are osmotic-release dosage forms. He states, at paragraph 107 of

his Declaration, that "there simply is no description contained in the patents-in-

suit that would suggest to a [person of ordinary skill in the art] that the claims

were intended to cover non-osmotic dosage forms." I disagree.

23.    As I explained above, the passage in column 6 of the patent expressly states that

dosage forms suitable for use in the claimed treatment methods are not limited

to the osmotic-release dosage forms that are described in the examples in the

patent. This passage in the patent directly contradicts Dr. Banakar's statement at

paragraph 107 of his Declaration.

24.    Moreover, in my opinion, the patent plainly identifies other types of sustained

release systems that can be used to produce dosage forms that will meet the

requirements of the patent claims. For example, at column 2, lines 52 to 64, the

patent identifies a variety of sustained release systems that were well-known as

of November of 1996. These systems include diffusion systems (including reservoir and matrix diffusion system), dissolution systems (including encapsulated and matrix systems), combination diffusion-dissolution systems, osmotic systems and ion-exchange systems.

25.    The patent also refers to literature references that describe other types of sustained release formulations that can be used to prepare the dosage forms required by the patent claims. For example, at column 2, lines 64 to 66, the patent directs the reader to a well-known textbook (*i.e.*, REMINGTON'S PHARMACEUTICAL SCIENCES (Alfonso R. Gennaro ed., Mack Publishing Co. 18th ed. 1990)) that describes various types of sustained release systems and how to produce dosage forms using those systems.

26.    The patents also refer to earlier applications filed by the same patent owner. Several of these earlier applications (*e.g.*,U.S. Patent Application Nos. 08/910,593 and 60/030,514, Exhibits D and E, respectively) specifically illustrate production of dosage forms using other types of sustained release systems (*e.g.*, multilaminate systems, tiny time pills embedded in a hydrogel substrate, drug releasing beads, concentration gradient systems using erodible or nonerodible polymers, and diffusion systems). Each of these types of sustained release systems was well known by November of 1996.

27.    Accordingly, I believe that the patents clearly describe and are intended to cover dosage forms that employ a wide variety of types of sustained release systems (*i.e.*, diffusion, dissolution, multilaminate, combination diffusion-dissolution

systems, osmotic, ion-exchange, *etc.*), as long as the dosage form releases methylphenidate at an ascending rate over an extended period of time or provides a substantially ascending methylphenidate plasma concentration.

**C.    A Person Skilled in this Field Could Produce Non-Osmotic Dosage Forms that Provide Ascending Rates of Release of Methylphenidate For an Extended Period of Time With Only Routine Effort**

28.    The field of sustained release formulations was well-established by November of 1996.  In my opinion, a person skilled in this field could have produced a dosage form that provided an ascending rate of release of methylphenidate or which provided a substantially ascending methylphenidate plasma concentration for an extended period using a wide variety of sustained release systems, or combinations of these systems, with only routine effort, at that time.

29.    Dr. Banakar, in paragraphs 101 to 103 of his Declaration, states that "a person of ordinary skill in the art" would have had to engage in undue experimentation to produce a non-osmotic dosage form that provides an ascending rate of release for an extended period of time.  In Paragraphs 115-141 of his Declaration, Dr. Banakar provides his opinions as to the nature of the invention, the breadth of the claims, the state of the prior art, the relative skill of those in the art, the amount of direction or guidance presented in the patents, the predictability or unpredictability of the art, the presence or absence of working examples and the quantity of experimentation in the patent.

30.    For reasons I explain in more detail below, I disagree with Dr. Banakar that

producing non-osmotic dosage forms that provide an ascending rate of release of

methylphenidate would require undue experimentation by a person skilled in the

field of sustained release formulations in November of 1996.  In general terms, I

believe such a person, as of November of 1996, could have used the non-

osmotic sustained release systems identified in the patent to produce, with only

routine effort, a dosage form that exhibits an ascending release rate of

methylphenidate over an extended period of time or provides a substantially

ascending methylphenidate plasma concentration as required by the patents.

31.    Initially, I note that Dr. Banakar is incorrect when he states that the patent

indicates that the various types of non-osmotic sustained release systems

disclosed in the patent specification "would not work" or "would be ineffective"

in providing a dosage form that provides an ascending release rate of

methylphenidate or ascending plasma profile.  Banakar Decl. ¶¶ 106, 112.  Dr.

Banakar is misreading the patent.

32.    The patent does not in any way state or suggest that the various types of

sustained release systems listed in column 2 of the patent cannot be used to

produce a dosage form with ascending release rates or which will provide a

substantially ascending plasma concentration.  Instead, the patent states that

dosage forms that provide a *constant release rate of methylphenidate* were not

as effective in treating ADD and ADHD as dosage forms that provide an

ascending rate of release of methylphenidate.  *See, e.g.,* column 3, lines 58-60

("Although constant-release dosage forms have proven effective for many

different drug therapies, there are clinical situations where these have not been entirely satisfactory.") and column 4, lines 13-29 ("It has been surprisingly discovered that, in an exemplary clinical situation, administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period.")

33.    I understand that the question of whether a person must engage in undue experimentation, in a patent law sense, to practice a claimed invention is a legal issue that is influenced by a variety of factual issues, such as the degree of unpredictability in the field of the invention, the guidance provided by the patent disclosure and the prior art, the nature of the claims, the level of skill possessed by those working in the field and the presence or absence of examples in the patent. I also understand that it is not necessary to address every factor in reaching a conclusion, one way or the other, as to the question of undue experimentation.

34.    In my opinion, Dr. Banakar has inaccurately characterized many of the factors used to measure "undue experimentation." In particular, he has inaccurately described the level of unpredictability in the field of extended release formulation development and the guidance that is available in the patent and from the prior art. He also makes a number of statements that are inconsistent with my experiences in and knowledge of this field.

13

1.  **The Field of Sustained Release Formulations is Well-Established and Involves Use of Robust Materials and Predictable Scientific Principles**

35. Dr. Banakar claims that there was a "high level" of variability and unpredictability in the field of sustained release dosage form systems as of November of 1996. Based on this, he suggests that "what can seem to be minor changes in formulation can elicit significant, if not unwanted (disastrous) effects in meeting the objectives of the (extended release) pharmaceutical formulations." Banakar Decl. ¶¶ 131, 132.

36. He also states that, in his opinion, "the lack of guidance from the specification and from the prior art with regard to extended release formulation comprising MPH makes practicing the claimed invention unpredictable in terms of which excipients to use in which type of extended release system to provide the claimed dissolution and pharmacokinetic results." Banakar Decl. ¶ 134.

37. I disagree with Dr. Banakar's characterization of the field of sustained release dosage form development for numerous reasons.

38. Sustained release formulations are often termed "controlled release" formulations because they release the active ingredient of the dosage form in a pre-defined and predictable manner under *in vitro* conditions and reproducibly *in vivo*. The essence of these types of systems is that they *control* the release of the active ingredient in a precise manner.

39. The materials used in sustained release dosage forms are developed and chosen because they exhibit consistent, reproducible and predictable properties. These materials were widely available from numerous commercial providers in November of 1996, as were machines and other devices used to physically assemble extended release dosage forms.

40. In general terms, polymers used in sustained release dosage forms have well defined properties, and, when exposed to an aqueous environment, exhibit a consistent and predictable behavior. For example, some types of polymers expand or swell in a predictable manner. This characteristic makes them useful in formulating diffusion-based extended release dosage forms (*i.e.*, dosage forms in which an active ingredient will diffuse out of or through the polymer at a known rate). Other types of polymers dissolve or degrade, again in a predictable and consistent manner, a characteristic which makes these polymers useful in the preparation of a dosage form based on dissolution principles (*e.g.*, matrix or encapsulated dissolution systems in which an active ingredient is released from the dosage form as the polymer degrades or dissolves).

41. Similarly, design concepts widely known in November of 1996 provided those working in this field with the capability of preparing dosage forms for *in vitro* testing that would release an active ingredient in a controlled and predictable manner. Examples known in November of 1996 included: mixtures of different sized beads or coated particles with varying polymer thickness, multiple layers of polymers, polymer matrix systems, laminated polymers, pulsatile systems and incorporation of reservoirs or pockets into the dosage form. Similarly the

incorporation or use of various types of excipients in a sustained release formulation was a predictable and known means for altering the dissolution characteristics of a sustained release dosage form. *See*, Ho-Wah Hui *et al.*, *Design and Fabrication of Oral Controlled Release Drug Delivery Systems*, *in* CONTROLLED DRUG DELIVERY FUNDAMENTALS AND APPLICATIONS 373 (J.R. Robinson & V.H.L. Lee, eds., 2nd ed. 1987) (Exh. F).

42.    The consistent and precise behavior of these polymers and dosage form design techniques permitted those working in this field in November of 1996 to design into a new dosage form the rate of release of an active ingredient. This, in turn, enables the production of a dosage form that will have the desired rate of release or will provide the desired plasma concentration profile.

43.    Specifically, in my opinion, by November of 1996, I believe a person skilled in this field could have been provided a desired dissolution profile, and, using only routine efforts, produce a dosage form that would exhibit that desired dissolution profile.

44.    Similarly, given the necessary information, a person skilled in this field, by that time, could be given a desired pharmacokinetic profile (*e.g.*, a desired methylphenidate plasma concentration profile) and, through only routine effort, produce a sustained release dosage form that would yield that desired pharmacokinetic profile. In this case, one would need to convert the desired pharmacokinetic profile into an *in vivo* dissolution profile, and from that, determine an appropriate *in vitro* dissolution profile for the dosage form. This

can be accomplished using what is termed a "deconvolution" operation, provided one has information as to the *in vitro-in vivo* correlation between the plasma concentration data and *in vitro* dissolution data of the active ingredient. I note in this respect that information is contained in the patents that permits one to perform these calculations (*e.g.*, Figures 3 and 4 in the patent provide a dissolution profile of a particular dosage form and a pharmacokinetic profile associated with that dosage form).

45.    Accordingly, in my opinion, there is very little that is unpredictable in the process of designing, producing and testing a new extended release dosage form using the types of sustained release systems known in field in November of 1996. In my experience, a person skilled in this field can generally design, produce and test a sustained release dosage form that will deliver a desired release rate or desired pharmacokinetic profile within a short period of time using straightforward and well established procedures. As such, I disagree with Dr. Banakar's opinion, at paragraph 132 of his Declaration, that "minor changes in formulation can elicit significant, if not unwanted (disastrous) effects in meeting the objectives of the (extended release) pharmaceutical formulations." Contrary to Dr. Banakar's opinion, in my experience, formulation scientists regularly use minor changes in the drug formulation to fine tune the characteristics of a sustained release dosage form.

46.    Dr. Banakar apparently believes that, because the treatment of ADD and ADHD is a "complex" field, production of a dosage form that provides an ascending rate of release of methylphenidate for an extended period of time or which

17

provides a substantially ascending methylphenidate plasma concentration also is a "complex" undertaking. Banakar Decl. ¶¶ 117-118. I disagree.

47. Certainly, the field of medicine – such as developing new ways to treat ADD and ADHD using controlled delivery of methylphenidate over extended periods of time –is a complex and unpredictable field. The patent, for example, points out that it was surprising that effective treatment of the disease could be achieved for extended periods by using a dosage form that delivered an ascending rate of release of methylphenidate or a substantially ascending methylphenidate plasma concentration, based on the failure of earlier extended release products that released methylphenidate at a constant or decreasing rate.

48. However, the complexity that exists in the field of medicine does not make the preparation of sustained release dosage forms complex and unpredictable. As such, I do not agree with Dr. Banakar that preparation of a sustained release dosage form to provide a predetermined release rate or pharmacokinetic profile – including one developed after resolving the challenges of treating a complex disease such as ADD and ADHD – is thereby made a complex or unpredictable undertaking. Instead, the task of actually preparing the sustained release dosage form, as I explain above, was predictable and involved only routine experimentation in November of 1996.

2.    **The Patents Provide Ample Guidance for Preparing a
Variety of Types of Dosage Forms Using Conventional
Sustained Release Systems**

49.    In paragraphs 126 to 130 of his Declaration, Dr. Banakar suggests that the

patents "provide no guidance, in the way of written description, on all the

possible dosage formulations comprising MPH that could provide ascending

dissolution release rates or ascending MPH plasma profiles." He also suggests

that the prior art was similarly deficient, stating that the prior art only taught

sustained release systems relevant to methylphenidate by "extending structural

technologies, such as the wax matrix used in Ritalin® SR." Banakar Decl. ¶¶

122, 123, and 134.

50.    One reason Dr. Banakar appears to believe that this explicit guidance from the

patents and the prior art would be necessary is because he reads the patents as

suggesting that other types of non-osmotic release systems "failed to achieve the

claimed ascending release rates and plasma profiles." Banakar Decl. ¶128. Dr.

Banakar also seems to believe that the inventors "alleged that certain results

could be achieved" by prophetic examples, but the inventors then "deleted those

examples from the patent, thereby abandoning them as unworkable." Banakar

Decl. ¶ 129.

51.    Initially, I note that the patents do not in any way state or suggest that non-

osmotic sustained release systems cannot be used to prepare dosage forms that

meet the requirements of the claimed treatment methods. As I explained above

(paragraph 32), Dr. Banakar is misreading the discussion in the patent of use of

*constant release* dosage forms being ineffective in therapy of ADD and ADHD as suggesting that known types of sustained release formulations cannot be used to prepare ascending release rate dosage forms. This is simply an incorrect reading of the patent.

52.    I also found no passage in the patents or the patent file history suggesting that the inventors believed examples of non-osmotic dosage forms contained in earlier applications filed by the patent owner were "unworkable" or could not be used to prepare the claimed dosage forms. In my opinion, Dr. Banakar is inaccurately portraying the contents of the patent by suggesting that certain types of sustained release systems were tested and did not work. I find no mention in the patents of dosage forms that were produced and tested, but which did not provide an ascending rate of release of methylphenidate.

53.    More directly, I disagree with Dr. Banakar's characterization of what the patents actually disclose, and with his opinion that the patent and the prior art provide no direction or guidance to a person skilled in the field of formulating sustained release dosage forms as to how to prepare a non-osmotic sustained release dosage form that provides an ascending rate of release of methylphenidate or a substantially ascending methylphenidate plasma concentration.

54.    Several types of sustained release formulations are mentioned in the patents. See, *e.g.*, column 2, lines 50 to 64. Each of these types of sustained release systems was well known by November of 1996, and could be used to produce dosage forms that deliver a particular desired release rate or provide a desired

pharmacokinetic profile with only routine effort.  It was also well-known that formulations having desired release profiles or which provided desired pharmacokinetic profiles could be produced by using these different types of sustained release systems individually or in combination, as the patent points out, and as was well-known in the prior art. See, *e.g.*, K.W. Leong *et al.*, *Polymeric Controlled Drug Delivery*, 1 ADVANCED DRUG DELIVERY REVIEWS 199 (1987) (Exh. G); and Ho-Wah Hui *et al.*, *Design and Fabrication of Oral Controlled Release Drug Delivery Systems*, *in* CONTROLLED DRUG DELIVERY FUNDAMENTALS AND APPLICATIONS 373 (J.R. Robinson & V.H.L. Lee, eds., 2nd ed. 1987) (Exh. F).

55.    Thus, in my opinion, a person skilled in this field would have been able to readily adapt the different types of sustained release systems referred to in the patent to produce a dosage form that would deliver the desired drug delivery profile or desired pharmacokinetic profile with only routine effort.  This is because the release characteristics of the various types of delivery systems were well known and predictable, the materials used in these systems were widely available from commercial suppliers, and the work involved in preparing and testing dosage forms using these systems was routine and simple to perform.

### 3.    The Breadth of the Claims Does Not Make Production of Appropriate Dosage Forms Unpredictable or Difficult

56.    Dr. Banakar states that the claims are "broad" and do not recite "any structural limitation describing how the formulation functions to provide the claimed

dissolution and/or pharmacokinetic results." I do not agree with Dr. Banakar that this is an accurate or relevant description of the claims.

57.    The claims require that the dosage form provide an ascending rate of release of methylphenidate over an extended period of time, or provide a substantially ascending methylphenidate plasma concentration for specified periods of time. The patent indicates that any type of sustained release system can be used to produce a dosage form meeting the requirements of the claims.

58.    The patent claims thus specify the essential requirements for the dosage forms – either that they deliver an ascending rate of release of the methylphenidate for an extended period of time or that they provide a substantially ascending methylphenidate plasma concentration. Given the well-established nature of the field of sustained release systems, it would be unnecessary to indicate in the patent claims the various types of sustained release systems that could be used to produce a dosage form with these release rate characteristics or which would provide these plasma concentration effects.

59.    I thus disagree with Dr. Banakar that the absence of a description in the claims of the "structural" features of different types of sustained release dosage forms has any consequence for a person of ordinary skill in the art attempting to prepare a dosage form that can be used in the claimed treatment methods.

4. **The Level of Skill in the Art Was High, Which Enables a Person of Ordinary Skill to Produce Dosage Forms Without Undue Experimentation**

60.     Dr. Banakar expresses his opinion that the relative skill of those in the field of pharmaceutical formulations is high, and that this weighs in favor of finding that no undue experimentation would be required to produce dosage forms that meet the requirements of the claims. Banakar Decl. ¶¶ 124-125. I agree with Dr. Banakar that, given the high level of skill of individuals working in this field, one would not have to engage in undue experimentation to produce a dosage form that meets the requirements of the claims.

5. **Presence or Absence of Additional Working Examples of Dosage Forms that Provide an Ascending Rate of Release**

61.     Dr. Banakar suggests that because the only working examples disclosed in the patents concern osmotic-release controlling formulations, a person skilled in the field of developing sustained release formulations would have to resort to undue experimentation to produce dosage forms using other types of sustained release systems.

62.     As I explained above, the patent itself indicates that any type of sustained release system can be used to produce a dosage form that releases methylphenidate at an ascending release rate. The patents specifically identify various types of sustained release delivery systems that were well-known by November of 1996. The patents also contain a number of examples of formulations that deliver the desired profiles using an osmotic delivery system.

23

In my opinion a person skilled in this field would not need working examples of other types of sustained release delivery systems because these systems were extremely well known and well described within the art prior to November of 1996.

### 6. The Quantity of Experimentation Required to Produce a Dosage Form Meeting the Requirements of the Claims is Routine, Not "Undue"

63.  Dr. Banakar suggests that because there are no methylphenidate formulations in the prior art that provide the desired ascending profile, and no specific working examples of dosage forms that use non-osmotic systems, a "person of ordinary skill in the art" would be forced to engage in "trial and error experimentation" in order to develop other non-osmotic formulations. He then concludes that because "trial and error experimentation" would be necessary, such a person would have to engage in "undue" experimentation to produce a non-osmotic dosage form. I do not agree with Dr. Banakar's opinion.

64.  The type of routine experimentation that is involved in producing and testing a dosage form that employs a sustained release or other type of controlled release system is not, in my opinion, undue experimentation. As I explained above, starting with a desired release profile, a person skilled in this field could design a dosage form by selecting a type of sustained release system and the appropriate polymers and other formulation excipients that would deliver the desired release rate. Those choices would be driven by the active ingredient, polymer properties, mathematical principles, and other straightforward design

24

principles. The person would prepare samples of the dosage form and subject

them to routine dissolution testing. If the dosage forms did not meet the

person's requirements or expectations, adjustments would be made to the

formulation, and additional samples would be produced and tested. None of this

work is unpredictable, or particularly difficult. As such, I do not agree with Dr.

Banakar that the amount of experimentation involved in producing and

optimizing a dosage form would be "undue" experimentation, as I understand

that patent law concept.


I declare under penalty of perjury under the laws of the United States that the foregoing

is true and correct to the best of my knowledge. Executed this 30th day of November

2006.

_30/11/06_

DATE

MARTYN C. DAVIES, PH.D.

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of November, 2006, the attached **DECLARATION**

**OF MARTYN C. DAVIES, PH.D. IN SUPPORT OF REPLY MARKMAN BRIEF**

**SUBMITTED BY ALZA CORP. AND MCNEIL-PPC, INC.** was served upon the below-

named counsel of record at the address and in the manner indicated:

William J. Cattie, III, Esquire                                              HAND DELIVERY
Rawle & Henderson, LLP
300 Delaware Avenue, Suite 1015
Wilmington, DE  19899-0588

James V. Costigan, Esquire                                        VIA FEDERAL EXPRESS
Hedman & Costigan, P.C.
1185 Avenue of the Americas
New York, NY  10036

Eric D. Isicoff, Esquire                                              VIA FEDERAL EXPRESS
Isicoff, Ragatz & Koenigsberg, P.A.
1200 Brickell Avenue
Miami, FL  33131


*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon