## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ALZA CORPORATION, and
McNEIL-PPC, INC.,

                Plaintiffs,

v.

ANDRX PHARMACEUTICALS, L.L.C., and
ANDRX CORPORATION,

                Defendants.

Civil Action No. 05-642-JJF

**REDACTED PUBLIC
VERSION**

## PLAINTIFFS ALZA CORPORATION AND MCNEIL-PPC, INC.'S
## REPLY BRIEF ON CLAIM CONSTRUCTION

*Of Counsel:*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, Illinois 60603
312-853-7000

-and-

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8000

-and-

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood
Suite 3400
Dallas, TX 75201
214-981-3300

Dated: November 30, 2006

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888

*Attorneys for Plaintiffs ALZA Corporation and
McNeil-PPC, Inc.*

## TABLE OF CONTENTS

I.      Introduction ........................................................................................................ 1

II.     "Ascending Release Rate Over An Extended Period of Time" ........................... 2

    A.      Andrx's proposed "biorelevant" limitation should be rejected ......................... 2

        1.      Andrx's construction conflicts with the intrinsic evidence ................. 2

        2.      Andrx's proposed construction is based on unsupportable
        scientific theories and ambiguous concepts........................................... 2

        3.      Andrx's attempt to rewrite the claims in a manner prohibited
        by the Federal Circuit should be rejected ............................................. 7

    B.      A periodic interval is not limited to hourly intervals........................................ 8

    C.      Release rate "calculated as a mean value"......................................................... 9

III.    "Extended Period of Time" .............................................................................. 10

IV.     "Substantially Ascending" Plasma Drug Concentration .................................. 11

    A.      There is no restriction on when a "slight dip" may occur ............................... 11

    B.      The claimed "substantially ascending" plasma concentration profile is
    not limited to a mean profile from a non-fasting study conducted on at
    least 15 patients where dosing occurs in the morning .................................... 14

V.      "About [x] Hours" ........................................................................................... 16

VI.     Pharmaceutically Acceptable Composition – Dosage Form ........................... 17

VII.    Conclusion........................................................................................................ 20

## TABLE OF CITATIONS

### CASES

*Aero Prod. Int'l., Inc. v. Intex Recreational Corp.*,
466 F.3d 1000 (Fed. Cir. 2006) .......................................................................... 7

*Cross Med. Prod., Inc. v. Medtronic Sofamore Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005).. ....................................................................... 8

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
849 F.2d 1430 (Fed. Cir. 1988) ........................................................................ 18

*Genzyme Corp. v. Transkaryotic Therapies, Inc.*,
346 F.3d 1094 (Fed. Cir. 2003) .......................................................................... 9

*Hynix Semiconductor Inc. v. Toshiba Corp.*,
2006 WL 2547463 (N.D. Cal. Sep. 1, 2006) ...................................................... 6

*Johnson Worldwide Assocs. v. Zebco Corp.*,
175 F.3d 985 (Fed. Cir. 1999) ............................................................................. 9

*Konami Corp. v. Roxov Games, Inc.*,
445 F. Supp. 2d 725 (E.D. Tex. 2006) ............................................................... 6

*LG. Philips LCD Co. Ltd. v. Tatung Co.*,
434 F. Supp. 2d 292 (D. Del. 2006) .................................................................... 6

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) .......................................................................... 15

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc),
*cert. denied*, 126 S. Ct. 1332 (2006) ........................................ 4, 6, 8, 9, 12, 15, 18

*Purdue Pharma L.P. v. F.H. Faulding & Co.*,
48 F. Supp. 2d 420 (D. Del. 1999),
*aff'd*, 230 F.3d 1320 (Fed. Cir. 2000) .............................................................. 15

*Rhine v. Casio, Inc.*, 183 F.3d 1342 (Fed. Cir. 1999) .......................................... 8

### FEDERAL STATUTES

35 U.S.C. § 112 ................................................................................ 7, 17, 18

### MISCELLANEOUS

Banakar, *Pharmaceutical Dissolution Testing* (1992) ......................................... 6

*Webster's Ninth, New Collegiate Dictionary*, 106 (1987) ..................................... 14

## I.    **INTRODUCTION**

While the parties have been able to agree upon many of the claim elements in each of the patents, there are several elements that remain in dispute. These include (i) "ascending release rate over an extended period of time" ('373 patent); (ii) "substantially ascending methylphenidate plasma drug concentration" ('373 and '129 patents); (iii) the term "about" in the phrase "a time period of about [x] hours following said administration" ('373 and '129 patents); and (iv) "pharmaceutically acceptable composition" ('129 patent).

In its opening brief, Andrx asks this Court to write into each of these claim elements new limitations and requirements. In some instances, Andrx points to selected features found only in certain examples in the patent, despite explicit language in the patent to the contrary. Elsewhere, Andrx offers unnecessary and inaccurate extrinsic evidence – specifically, the conclusory and unsubstantiated testimony of Dr. Umesh Banakar, who purports to be an expert in diverse fields, ranging from treatment of ADD to pharmacokinetics to tablet formulation and testing. Andrx's goal is simple: convert plain, well understood terms into vague concepts or add arbitrarily chosen requirements. Andrx also devotes a substantial portion of its opening brief to an all-out attack on the validity of the claims, which courts have repeatedly held is improper in the claim construction stage.

By contrast, Plaintiffs have advanced simple, straightforward constructions for each of the claim terms in dispute. Certain constructions are compelled by the plain meaning of the claim terms. Others stem from definitions for the terms contained in the specification of the patent. In each case, Plaintiffs' constructions are fully supported by the intrinsic evidence.

Plaintiffs do not believe resort to extrinsic evidence is necessary to construe the claim terms in dispute. Nonetheless, Plaintiffs are compelled to respond to Andrx's efforts to introduce highly biased and inaccurate testimony into the record, specifically the conclusory and unsubstantiated expert testimony of Dr. Banakar. Plaintiffs accordingly offer the

testimony of three individuals with expertise in the various distinct disciplines that are addressed by the testimony of Dr. Banakar.

## II.    "ASCENDING RELEASE RATE OVER AN EXTENDED PERIOD OF TIME"

### A.    Andrx's proposed "biorelevant" limitation should be rejected

Andrx accepts that a "release of methylphenidate at an ascending release rate" refers to a rate of release determined by an *in vitro* dissolution test. Andrx, however, proposes to add a host of new limitations into this claim element that would require use of a particular *methodology of testing* relevant only to *proving* that a dosage form *has* the properties required by the claims. Andrx's proposed construction of this claim limitation is unsupportable.

#### 1.    Andrx's construction conflicts with the intrinsic evidence

The terms that Andrx suggests the Court read into the claim limitation – specifically, "biorelevant" and a variety of parameters of dissolution testing – find no support in the intrinsic evidence. Indeed, Andrx makes no effort to cite to intrinsic evidence to support its proposed constructions. Rather, Andrx concedes that "[t]he claim itself does not provide the parameters of the dissolution testing". Andrx Br., p.12. This point alone should dispose of Andrx's convoluted rationale for additional limitations.

As Plaintiffs explained in their opening brief, the patent specification clearly states that "an appropriate dissolution test" should be used to determine the release rate of a dosage form. Exh. A, col. 9, lines 25-30 ("As specified herein, a drug release rate obtained at a specified time 'following administration' refers to the *in vitro* drug release rate obtained at the specified time following implementation of *an appropriate dissolution test*.").

#### 2.    Andrx's proposed construction is based on unsupportable scientific theories and ambiguous concepts

Andrx's proposed dissolution testing requirements not only are at odds with the intrinsic record, but they also run counter to well-accepted standards governing dissolution

testing. These standards emphasize the need to select testing parameters that are tailored to the characteristics of the dosage form being tested.

The claims of the '373 patent define the requirements of dosage forms in simple terms; namely, the dosage form must release the methylphenidate at an ascending rate of release for an extended period of time. The claims of the '373 patent thus cover the use of various types of sustained release methylphenidate dosage forms.[1] As the parties agree, whether a particular dosage form exhibits the required release rate *property* is to be determined using an *in vitro* dissolution test.

Techniques for conducting dissolution tests are well-known and documented in the literature. As the patent points out, "drug release rates are calculated under *in vitro* dosage form dissolution testing conditions known in the art." Exh. A, col. 9, lines 23 to 25. Dissolution test parameters include the choice of a validated type of dissolution apparatus (e.g., a USP Type I apparatus), the nature of the dissolution medium, the frequency of agitation of the dosage form, the duration of the testing, etc. See Gray Decl. ¶¶ 49-51; Exh. L, at 1, 12.

Contrary to Andrx's assertions, dissolution testing is not a rigid "one size fits all" process. Rather, pursuant to the United States Pharmacopeia (USP), Food and Drug Administration (FDA) guidances and other relevant literature, dissolution test parameters vary based on the characteristics of the dosage form being tested. Gray Decl. ¶ 31. These characteristics include the type of dosage form, the drug release mechanism and the solubility of the drug itself. *Id.* ¶ 32. Indeed, the USP itself links selection of several dissolution testing parameters to characteristics of the dosage form being tested. Gray Decl. ¶¶ 31-32, 36. A dissolution test that is found to be suitable for one dosage form may not be appropriate for a

---

[1]       Andrx's expert, Dr. Banakar, acknowledges that there are no limitations on the type of dosage form that may be used in the claimed treatment methods. Banakar Decl. ¶ 119 ("The claims encompass all dosage forms without limitation.").

different dosage form, even if both dosage forms contain the same active ingredient.[2]

**REDACTED**

Andrx and its expert mischaracterize the USP by arguing that it requires use of a fixed set of dissolution test parameters that do not vary based on the nature of the dosage form. Tellingly, they do not point to any portion of the USP to support these assertions. Andrx Br., pp 12-13. Indeed, Andrx and its expert ignore perhaps the most relevant section of the USP; namely, the USP monograph devoted to testing of *extended release methylphenidate products*. This monograph expressly states that that the *preferred* dissolution media *is water*, which has a pH between 5 and 7. Gray Decl. ¶ 49. Moreover, the guidance in this USP monograph does not suggest rigid adherence to use of this dissolution medium or any other testing parameter. Instead, it directs those conducting dissolution tests to select testing parameters, including the pH of the dissolution medium, that are appropriate for the specific dosage form being tested. *Id.* ¶¶ 31, 32.

The assertions of Andrx and its expert that an acidic pH is necessary because methylphenidate is "unstable" at higher pHs also misses the mark. Although this chemical property of methylphenidate may affect how one measures the quantity of methylphenidate in the dissolution media *after it is released* from the dosage form, this property does not affect the release rate of methylphenidate, which is primarily controlled by the dosage form.[3] Gray Decl. ¶ 42.

---

[2]     While the specification indicates that a USP device (Apparatus VII) was utilized in dissolution tests "in the Examples" on certain of plaintiffs' exemplary dosage forms, the patent claims should not be limited to this exemplary test. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc), cert. denied, 126 S. Ct. 1332 (2006) (claims should not be limited to specific embodiments).

[3]     The fact that methylphenidate degrades in a basic solution means that the degradation has to be accounted for in order to properly calculate the amount of methylphenidate that has

Andrx also asserts that, because an example in the patent was tested in an acidic dissolution medium, the claims must be rewritten to require testing of any type of dosage form in that same medium. This not only runs afoul of the guidance in the literature, it conflicts with the principle that features in the examples are not to be incorporated as claim requirements. Moreover, in that example in the specification, the release rate of the dosage form tested was pH independent. The same results would have been observed for that dosage form at *any* pH. Thus, Andrx is wrong to suggest that the patent attaches any significance to use of a particular pH for the dissolution medium, much less to suggest that this arbitrary fixed pH should be used when testing dosage forms that have release rates that *are* pH sensitive. Andrx's and its expert's reading of the patent is plainly inconsistent with the patent disclosure and relevant literature, including the USP, which both Andrx and its expert point to as an authoritative guide for conducting dissolution testing procedures.

Andrx's attempt to insert the fictitious and manifestly ambiguous word "biorelevant" into the claims is flawed and unsupportable.[4] As an initial matter, the word "biorelevant" does not appear *anywhere* in the intrinsic evidence – a fact that Andrx does not dispute. In addition, Andrx cites no objective evidence that suggests that the word "biorelevant" had a single, well-defined meaning in the field of dissolution testing in 1996. Andrx's expert, Dr. Banakar, fails to cite to any article, text or source that even uses the word "biorelevant" in dissolution testing

---

been released at a particular time point. This is simply a matter of math. One determines the amount of methylphenidate and the degradation products present in the solution using standard techniques, and then adds these components together to arrive at the total amount of methylphenidate. Gray Decl. ¶ 43.

[4]    Andrx attempts, in a footnote, to introduce its recent theory of inequitable conduct based on mischaracterization of the testimony of inventor Dr. Suneel Gupta. In particular, Andrx asserts that Dr. Gupta admits he made material misrepresentations in declarations he submitted to the Patent and Trademark Office during the examination of the asserted patents. Dr. Gupta's testimony makes no such admission. The questions posed to Dr. Gupta asked him about his current or past knowledge about aspects of the Ritalin SR product. These questions and Dr. Gupta's answers do not go to issues of materiality or intent, and cannot otherwise be portrayed as supporting what Andrx asserts.

in 1996, much less shows that the term had a uniform meaning to individuals in that field. Banakar Decl. ¶¶ 40-62.

Even as explained by Dr. Banakar, the word "biorelevant" is vague and ambiguous. Gray Decl. ¶¶ 38-39. For example, Andrx makes no mention of any particular pH in advancing the idea that "biorelevant" conditions must be used. Buried several layers down in its brief and in Dr. Banakar's declaration is a tentative suggestion that "biorelevant" dissolution testing conditions are those that use an *acidic* dissolution medium. Banakar Decl. ¶¶ 47, 54-62. Yet, both Dr. Banakar and Andrx leave unanswered the question of why it is "biorelevant" to use *only* an acidic medium, given that they each acknowledge that the gastrointestinal tract can exhibit a range of pH's from acidic to basic.[5]

Moreover, Dr. Banakar's testimony is not consistent with Andrx's alternative theory that the only pH that is appropriate for testing sustained release methylphenidate dosage forms is pH 3 – on specific acidic pH. Importantly, this alternative, narrower definition is simply the pH used to test certain pH-independent dosage forms that were used to exemplify the invention in the patent. Banakar Decl. ¶ 48. In any event, whatever "biorelevant" may mean to Dr. Banakar personally, the term "biorelevant" remains ambiguous and should not be adopted. *See LG. Philips LCD Co. Ltd. v. Tatung Co.*, 434 F. Supp. 2d 292, 296 (D. Del. 2006) (declining to adopt a term in a proposed definition that "would make it more ambiguous."); *Hynix Semiconductor Inc. v. Toshiba Corp.*, 2006 WL 2547463 at *14 (N.D. Cal. Sept. 1, 2006) (same) (Exh. U); *Konami Corp. v. Roxor Games, Inc.*, 445 F. Supp. 2d 725, 735 n.9 (E.D. Tex. 2006) (same).

Andrx incorrectly suggests that portions of the specification discussing *in vivo* plasma profiles also justify requiring use of "biorelevant" *in vitro* dissolution tests. Andrx Br., pp. 13-14. Andrx is mixing apples and oranges. The specification describes (and the claims are

---

[5]    Dr. Banakar himself, in his book entitled *Pharmaceutical Dissolution Testing*, cites the range of pHs in the gastrointestinal tract to be 1.2 to 7.8. Exh. R, Banakar, *Pharmaceutical Dissolution Testing*, (1992), at 320.

directed to) *two different ways* of measuring dissolution profiles. One perspective employs the rate of release of methylphenidate from the dosage form, while the other employs the perspective of a methylphenidate plasma concentration. Moreover, the fact that *in vitro* dissolution results can be mathematically correlated to *in vivo* results (and vice versa) is a fact without consequence here. It certainly does not justify requiring *as a new claim element* use of a specific pH when performing dissolution tests as Andrx suggests. To the contrary, the patent's mandate of an *in vitro* test avoids the complexity that *in vivo/in vitro* correlations entail – an objective at cross purposes with Andrx's attempt to impose a "biorelevance" requirement. Accordingly, Andrx's proposed limitations that the dissolution tests be "biorelevant" and performed in a dissolution medium with an acidic pH should be rejected.

> 3.    **Andrx's attempt to rewrite the claims in a manner prohibited by the Federal Circuit should be rejected**

Andrx seeks to justify its added limitations by asserting that the claims are "inherently indefinite."[6] Essentially, Andrx is asking this Court to rewrite the claims to resolve what it believes is a deficiency of the claims under 35 U.S.C. 112, second paragraph. Specifically, Andrx asserts that, although the claims correctly refer to an *in vitro* dissolution test, a person of ordinary skill would not have enough information from the claims themselves *to perform* the dissolution testing and thereby determine the dissolution rate of the dosage form. Andrx. Br., p. 12.

This challenge based on "indefiniteness" is an invalidity issue. *See Aero Prod. Int'l, Inc. v. Intex Recreational Corp.*, 466 F.3d 1000, 1016 (Fed. Cir. 2006) (whether a claim recites subject matter that is "sufficiently definite" is an invalidity challenge under 35 U.S.C. § 112, ¶ 2). Andrx's invalidity assertions are premature at best because patent claims should be

---

[6]    Andrx refers to the testimony of named inventor Andrew Lam as confirming that the claims of the patent are inherently indefinite. Andrx Br., p. 12. Mr. Lam said no such thing. Rather, in response to questions posed by Andrx – none of which concerned the claims of the patents – Mr. Lam simply observed that the dissolution medium can have an effect on the dissolution rate of a dosage form. Andrx Exh. D, p. 131, lines 21-23

construed independent of invalidity considerations. *See Phillips*, 415 F.3d at 1328 (invalidity considerations have "no applicability" to claim construction); *Cross Medical Prod., Inc. v. Medtronic Sofamore Danek, Inc.*, 424 F.3d 1293, 1304 (Fed. Cir. 2005) ("considering validity would be improper" in construing a claim limitation). By inviting the Court "to cure" the alleged invalidity by rewriting the claim (Andrx Br., p. 12), Andrx violates the Federal Circuit's rule that claims should not be judicially rewritten to preserve validity. *See Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999). Andrx's invalidity challenge has no place in the current claim construction exercise.

In any event, the attached declaration of Vivian Gray squarely contradicts Dr. Banakar's conclusory opinions, and demonstrates that one skilled in the field of dissolution testing could have readily devised and carried out an appropriate dissolution testing protocol. Such a task plainly would be made more difficult – not easier – by imposing Andrx's ambiguous and extraneous "biorelevance" requirement. While plaintiffs have submitted this declaration so as not to leave uncontradicted the opinions of Dr. Banakar, resolution of the parties' dispute as to indefiniteness has no place in the current claim construction controversy.

### B.    A periodic interval is not limited to hourly intervals

In their Opening Brief, plaintiffs established that the specification teaches that the duration of the periodic interval used to determine whether an ascending release rate occurred can vary. Pltfs Br., pp. 23 n.14 and 27. Andrx, while acknowledging this, nonetheless contends periodic intervals must be hourly. Andrx Br., p. 15.[7]

Andrx's concession that the specification "suggest[s] that other intervals such as t=30 minutes or t=2 hours could be used" is fatal to its position that the periodic interval must be an

---

[7]    Andrx asserts that Dr. Gupta stated in his deposition that "hourly intervals are the only reasonable interval." Andrx misrepresents Dr. Gupta's testimony. First, it ignores the extensive exchange in which Dr. Gupta indicated that a variety of intervals would be appropriate, depending on the nature of the dosage form. Second, while Dr. Gupta does suggest that hourly intervals are common and may be suitable for a particular dosage form with a 12 hour interval, he also points out that one cannot make generalizations and that the specific interval chosen will still depend on the dosage form.

hourly interval. Andrx Br., p. 15. As such, Andrx's proposed construction directly contradicts the specification and is improper. Exh. A, col. 8, lines 56-61. *See Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999) ("Varied use of a disputed term in the written description demonstrates the breadth of the term rather than providing a limited definition.").

Andrx's reliance on intervals used in various examples in the patent also is improper. Indeed, in the very text that Andrx quotes, the words "For example" precede the mention of hourly intervals. Andrx Br., p. 15, citing Col. 9, lines 54-64. Andrx's proposed construction thus conflicts with the principle of claim construction that features of examples are not to be used to limit the claims. *See Phillips*, 415 F.3d at 1323. For similar reasons, the fact that a prior art reference cited during prosecution presented data measured in hourly intervals does not operate to limit the claims.

Finally, Andrx's reliance on extrinsic evidence, particularly the testimony of its expert Banakar that hourly intervals are "the only reasonable periodic interval," should be dismissed because it is unnecessary and inconsistent with the intrinsic evidence.

## C.     Release rate "calculated as a mean value"

Andrx also attempts to rewrite the '373 patent claims to require that the claimed "ascending release rate" be calculated "as a mean value of at least six dosage units." Andrx Br., pp. 10, 16. Because none of Andrx's restrictive concepts are compelled by the plain language of the claims, and none are used in the specification to define how dissolution release rates should be determined, the Court should reject Andrx's attempt to improperly create limitations that simply do not exist, and in this case, make no sense.

There is no dispute that Andrx's proposed limitations have no basis in the intrinsic evidence. Andrx concedes that no such limitations appear in the claim language. Andrx Br., p.16. And, neither Andrx nor Dr. Banakar cite to any part of the specification to support their view that these additional limitations are necessary. *Id.*; Banakar Decl. ¶ 50.

Instead of pointing to anything in the intrinsic evidence, Andrx again turns to extrinsic evidence in the form of Dr. Banakar's testimony. And, again, Dr. Banakar advances a fictitious and unsupported opinion – that USP and FDA requirements uniformly mandate the use of at least six tablets in dissolution testing. Banakar Decl. ¶ 50. In reality, the USP explicitly states that no particular quantity of a substance must be used in performing a dissolution test, so long as the given test is performed in accordance with good manufacturing practices. Gray Decl. ¶ 57.

Andrx may try to advance statistical arguments in the form of expert testimony in order to show that the accused product is not likely to infringe the claims of the patent, and to the extent these matters have any relevance to this case, they relate at most to proof of infringement. For their part, Plaintiffs will be free to refute such arguments. In any event, issues related to proof of infringement are not properly raised in the claim construction phase. Here, Andrx's arbitrarily chosen standard is plainly inconsistent with the specification's express indication that one should determine release rates by evaluating data obtained through an "appropriate dissolution test." Exh. A, col. 9, lines 21-29. As such, Andrx's arbitrary requirement that a mean from test results of at least six tablets should be rejected.

## III.    "EXTENDED PERIOD OF TIME"

Plaintiffs and Andrx both agree that the specification provides an express definition for the limitation "extended period of time" in the claim language "an ascending release rate over an extended period of time." Andrx Br., pp. 17-18. Both sides also agree that an "ascending release rate" must occur for at least three hours to qualify as "an ascending release rate over an extended period of time." *Id.*, p. 17. Andrx further contends that ascension must extend through the midpoint of the $T_{90}$ of the dosage form and then goes on to propose a formula for calculating the midpoint of the $T_{90}$ that is not found anywhere in the patent; namely, that one is to divide the $T_{90}$ by 2 and round this number up to the next whole hour.

Plaintiffs contend that the patent defines an extended period of time as being a minimum of three hours, and explains that the remainder of the discussion on $T_{90}$ is simply explanatory. Pltfs Br., pp. 29-30. Even if an ascending release through the midpoint of the $T_{90}$ were considered an additional requirement of an extended period of time, there is no justification for adopting Andrx's additional arbitrary and unsupported methodology for calculating what the midpoint of the $T_{90}$ should be. Andrx's formula not only contradicts the language of the patent, which refers to the "midpoint," commonly understood to be a point halfway or equidistant between two endpoints, it by rounding the actual midpoint up to the next whole hour, delivers a time that often will not represent the midpoint at all. For example, under Andrx's approach, all dosage forms that have a $T_{90}$ between 6.1 hrs and 8.0 hrs would be calculated as having the *same* "midpoint of the $T_{90}$"; namely, 4 hours. In other words, under Andrx's formula, dosage forms having a *nearly 2 hour difference* in their overall duration of release would be viewed as having the same midpoint.

Andrx is relying on its proposed calculation methodology to distort an otherwise simple and straightforward claim term (i.e., that an extended period of time means a period of release of "at least 3 hours."). Andrx Br., p. 17. Neither the claims nor the specification compel or even vaguely support Andrx's "halving and rounding up" procedure. Andrx does not even bother to have its expert advance a theory that could support this arbitrary formula. Clearly, Andrx is employing this proposed calculation as a vehicle to *arbitrarily extend the minimum required extended time period from 3 hours to 4 hours*. Andrx's proposed construction, which is at odds with both the express definition in the specification and common sense, should be rejected.

## IV.    "SUBSTANTIALLY ASCENDING" PLASMA DRUG CONCENTRATION

### A.    There is no restriction on when a "slight dip" may occur

Plaintiffs established that a "substantially ascending methylphenidate plasma drug concentration" profile is one in which the plasma concentration of methylphenidate generally

rises but may include a slight dip. Pltfs Br., pp. 33-34. Andrx concedes that a substantially ascending profile may contain a slight dip, but insists that the dip can only occur within a narrow window of time; namely, between 5.5 and 6.5 hours after administration. Andrx Br., pp. 19-23.

Andrx's position rests on a common theme – that new limitations should be added to narrow the claims to match specific examples in the patent. In this instance, Andrx asserts that a description of test results in the patent associated with a particular dosage form (i.e., Example 7) operates to limit the period during which any "slight dip" may occur to a period that occurs between 5.5 and 6.5 hours following administration. Andrx Br., pp. 20-21. By proposing to limit the claims in this manner, Andrx again violates the basic rule that claims are not to be limited to specific embodiments or examples in the specification. *See, e.g., Phillips*, 415 F.3d at 1323 (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").

Andrx's reliance on extrinsic evidence – Dr. Banakar's testimony – adds nothing to the analysis. In conclusory fashion, Dr. Banakar reasons that a slight dip can only occur between 5 and 6.5 hours after administration because, in his opinion, this is the only time that a dip is shown to occur in the clinical test data documented in Example 7. Banakar Decl. ¶¶ 80, 82. Dr. Banakar then suggests that without the new limitations proposed by Andrx, the claim would read on administration of several doses of an immediate release formulation, because, in his view, such a pattern of administration would create a generally ascending plasma concentration. Banakar Decl. ¶¶ 83-84.

Dr. Banakar's uninformed reading of the clinical data example in the specification ignores the known and well documented variability in plasma drug concentration levels that is observed when different individuals take the same formulation. Because of differences in metabolism and other aspects of the human body, different individuals will process drugs, such as methylphenidate, somewhat differently. Angst Decl. ¶ 16. As a result, one expects to

observe some variations in plasma drug concentration profiles in different individuals following administration of an identical dose of drug under identical conditions. *Id.* ¶ 18. Not surprisingly, the prior art confirms that these types of variations can and do occur among individuals treated with the same sustained-release methylphenidate formulation (Ritalin-SR). *Id.* ¶ 19.

## REDACTED

Andrx tries to justify its new claim limitations by asserting that, without them, the claims would cover profiles that the patent specification specifically requires to be excluded; namely, those that have an initial pulse to a peak level followed by a decline to a trough and then an additional release from a second pulse or administration of drug to a second peak. Andrx Br., p. 21; Banakar Decl. ¶ 84. But the patent specification itself makes clear that this is not a legitimate interpretation. In the same passage where the "slight dip" is described, the patent differentiates the profile from those exhibiting a very sharp decline and rebound in plasma concentration. The patent characterizes the latter as a "trough" rather than a "slight dip." The claim construction proposed by Andrx, by incorporating the patent's terminology ("slight dip"), fairly reflects this distinction.

Thus, the claims and the specification, properly construed, permit a slight dip in the plasma drug concentration to occur (if at all) at any point during the period of ascension of the methylphenidate plasma concentration following administration. Angst Decl. ¶¶ 18-25. Andrx's proposed claim construction, which would restrict the location of the "slight dip" to a specific window of time between 5.5 and 6.5 hours after administration, is inconsistent with how the human body functions, and as such, should be rejected.

Andrx also criticizes Plaintiffs' assertions that the words "substantially ascending" mean a plasma concentration profile that "generally rises" because these words do not appear

verbatim in the specification. Andrx Br., p. 20. Andrx ignores the fact that the ordinary meaning of the word "ascend" is "to rise." Exh. S, Webster's Ninth New Collegiate Dictionary (1987), at 106 ("ascend" means "to rise from a lower level or degree"). Similarly, the established ordinary meaning of "substantially" is "approximately," which is what plaintiffs intend by the use of the word "generally." Pltfs Br., p. 33. Thus, a reader would understand the ordinary meaning of "substantially ascending" to be that the plasma concentration "generally rises."

Finally, Andrx asserts that a "contradiction" exists between the patent's use of "ascending" language in two different contexts. Andrx Br., p. 20. Andrx overlooks the fact that the claims use different *sets* of words – one referring to an *in vitro* dissolution profile ("ascending release rate") and one referring to an *in vivo* plasma concentration profile ("substantially ascending ... concentration"). Because the words are used differently and in different contexts, there is no conflict.

**B.      The claimed "substantially ascending" plasma concentration profile is not limited to a mean profile from a non-fasting study conducted on at least 15 patients where dosing occurs in the morning**

Nothing in the claims suggest that the invention is limited to treatment of individuals who have eaten. Similarly, nothing in the claims suggest that the at least fifteen non-fasting individuals must exhibit – based on a mean of their plasma data – the substantially ascending plasma concentration. The words "mean" or "average" simply do not appear in the claims of the '129 patent. To the contrary, the claim language itself specifies that the methods are to be performed on *a* patient, not on a group of patients.[8] This individualized perspective is also

---

[8]      The parties have stipulated that the term "patient" means "an individual who is being treated for ADD and/or ADHD." Andrx Br., p. 3. There is no requirement in this definition that a "patient" has been diagnosed with ADD and/or ADHD. Instead, a "patient" is any individual who has received treatment for ADD and/or ADHD, regardless of disease state. It is noted that a person of ordinary skill in the art would not expect to observe distinctions in the pharmacokinetic behavior of methylphenidate between a healthy individual and an individual who has been diagnosed with ADD or ADHD. See Angst Decl. ¶ 13.

reflected in the singular references throughout the claim (e.g., "a substantially ascending methylphenidate plasma concentration").

The specification, similarly, does not suggest that particular attributes of one study group documented as an example in the patent are intended to limit the claimed method. It, for example, does not specify that patients must eat before they are administered a pharmaceutical composition to achieve a substantially ascending methylphenidate plasma concentration. The description of the exemplified data similarly attaches no significance to the fasting or non-fasting state of the subjects or the size of the study group.

Instead, Andrx makes another attempt to limit the claims to specific examples in the patent. In this case, Andrx asserts that certain parameters of exemplified clinical test should be read into the claims. Andrx Br., pp. 22-23; Banakar Decl. ¶¶ 89-92. As was explained earlier, this is plainly improper. Claims are not to be confined to specific embodiments or examples in the specification unless the language of the claim plainly imposes such a constrained scope. *Phillips*, 415 F.3d at 1323; *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906-08 (Fed. Cir. 2004); *see also Purdue Pharma L.P. v. F.H. Faulding & Co.*, 48 F. Supp. 2d 420, 435-36 (D. Del. 1999), *aff'd*, 230 F.3d 1320 (Fed. Cir. 2000).

Andrx also asserts that the claims are indefinite (and thus invalid) without these added terms, because in its opinion, a person of ordinary skill in the art could not determine if the claim requirements would be met. This, of course, is an invalidity issue, not an issue of claim construction. Similarly, the question of whether blood plasma levels should be from fed or fasted subjects, or whether a showing of ascending blood plasma concentrations of methylphenidate in less than fifteen subjects is sufficiently probative, are issues going to the proof of infringement. These issues are refuted by Plaintiffs' experts, and in any event are not properly raised during the claim construction. *Phillips*, 415 F.3d at 1327-28.

## V.   "ABOUT [X] HOURS"

Andrx suggests that a person of ordinary skill in the art would understand the claim limitation "about [x] hours" to mean that the referenced time period can vary by up to one minute. To support its view, Andrx cites an undisclosed clinical protocol in which timed blood draws must be taken within a minute of a specified measurement point. Andrx Br., pp. 23-24; Banakar Decl. ¶¶ 98-100.

REDACTED

More fundamentally, Andrx's approach also conflicts with how a person of ordinary skill in the art would understand the role of the word "about" in this phrase. The claims, of course, concern *treatment* of ADD or ADHD, not clinical testing. The claimed treatment method provides a substantially ascending methylphenidate plasma concentration for a specified period of time. Thus, the logical and grammatically accurate role of "about" is to refer to the duration of the period of the ascending plasma concentration.

Moreover, a person of ordinary skill in the art would not view an arbitrary undisclosed protocol for the timing of blood draws in a clinical study as being relevant to a treatment method. Angst Decl. ¶ 30. In fact, a doctor treating a patient according to the claimed methods would not ordinarily draw blood from the patient, much less draw blood on a strict hourly schedule. *Id.* And, a person of ordinary skill in the art also would understand that the phrase "about [x] hours" is present to account for the known variability in methylphenidate plasma concentration profiles that occurs between different patients. *Id.* As such, a person of ordinary skill in the art would understand that the word "about" is referring to the duration of therapeutic effectiveness, not the timing of blood draws. *Id.*

A person of ordinary skill in the art also would understand the phrase "about [x] hours" as providing some latitude in the duration of treatment, which logically would be proportional to the duration of the ascending plasma concentration specified in the claim (e.g., "about 8 hours" for claim 1 of the '129 patent). Angst Decl. ¶ 28. Andrx and its expert, however, propose an absolute and unvarying degree of variation unconnected to the time periods in the claims. A person of ordinary skill in the art would not view the word "about" as suggesting this constant absolute degree of variation (+/- one minute) in different claims specifying different periods. Angst Decl. ¶ 31. As such Andrx's proposed construction should be rejected.

## VI.   PHARMACEUTICALLY ACCEPTABLE COMPOSITION – DOSAGE FORM

Andrx argues that the terms "pharmaceutically acceptable composition" and "dosage form" must be limited to compositions and dosage forms that deliver methylphenidate via an osmotic release mechanism. The sole rationale advanced by Andrx for this construction is that the claims, without this limitation, are "overbroad" and therefore invalid under 35 U.S.C. § 112, first paragraph.

With respect to these claim elements, Andrx and its expert, Dr. Banakar, freely admit that the claims, read literally, encompass both osmotic release and non-osmotic release dosage forms. See Andrx Br., p. 27 ("As written, the claims of the patents-in-suit violate the written description requirement of 35 U.S.C. § 112, first paragraph, because they claim a result without reciting any structural limitations as to how to achieve that result..."); Banakar Decl. ¶ 102 ("Literally, the claim phrases 'pharmaceutically acceptable composition' and 'dosage form' do not state the type of dosage form or the mechanism of controlling release."). This admission by Andrx and its expert is dispositive of the dispute before the Court on this claim element. Both Andrx and Plaintiffs agree that the claim terms read literally do not require dosage forms or pharmaceutical compositions to have osmotic release mechanisms.

This plain meaning of the claims also is entirely consistent with the specification and prosecution history. For example, Exh. A, col. 6, lines 5 to 14, expressly states that the claimed methods are not limited to methods that use dosage forms described in the examples, but instead encompass use of any dosage form that exhibits an ascending rate of release or provides a substantially ascending methylphenidate blood plasma concentration. Davies Decl. ¶¶ 16-18. Similarly, during prosecution of the '129 patent, the Patent Office Examiner rejected the claims based on prior art that showed use of a sustained release formulation that did not employ an osmotic release mechanism. Pltfs Br., pp. 19-20. In view of the lack of any dispute over the literal meaning of the claims, and the consistent intrinsic evidence, the Court should reject Andrx's efforts to read any additional limitations into this claim element.

Andrx's primary attack is that the claim, properly construed, is invalid due to a lack of written description and enablement under 35 U.S.C § 112. Andrx advances this attack in an effort to have this Court employ a claim construction approach that has been squarely rejected by the Federal Circuit; namely, it is improper to add a new limitation to an *unambiguous* claim term in an effort to preserve its validity. *See Phillips*, 415 F.3d at 1327; *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1434 (Fed. Cir. 1988).

Andrx's attacks on written description and enablement are baseless. As to written description, Andrx and its expert assert that a person of ordinary skill in the art, reading the patent specification, would believe that Plaintiffs did not intend to encompass treatment methods that employed non-osmotic dosage forms or pharmaceutical compositions. Yet, the patent specification expressly states the opposite. Exh. A, col. 6, lines 5-14. And, as Dr. Davies explains, numerous types of osmotic and non-osmotic sustained release formulation systems are identified in the patent, demonstrating that a person of skill in the art, reading the description, would immediately recognize that the patent was intended to encompass both osmotic and non-osmotic dosage forms. Davies Decl. ¶¶ 24-26.

Andrx advances a similarly flawed attack under enablement.  Essentially, Andrx claims, based on the testimony of Dr. Banakar, that one would have to engage in undue experimentation to produce a non-osmotic dosage form that delivered an ascending rate of release of methylphenidate for an extended period of time, or which provided a substantially ascending methylphenidate plasma concentration for an extended duration.  To advance this view, Andrx and Dr. Banakar advance wildly inaccurate characterizations of the numerous "Wands" factors.  Andrx Br., pp. 31-35.

For example, Dr. Banakar claims that the production of sustained release formulations is "highly unpredictable" and that slight changes in a formulation can produce "disastrous" consequences.  Banakar Decl. ¶ 132.  Dr. Banakar provides nothing to support these opinions.  As Dr. Davies points out, sustained release formulations are termed *controlled release* systems because they *predictably* deliver a predetermined profile.  Davies Decl. ¶¶ 38-39.  Moreover, he observes that those of skill in this field actually employ slight changes in formulations to *predictably* optimize a dosage form.  *Id.* ¶ 45.  Dr. Davies further notes that the materials and design techniques for producing sustained release formulations employ materials with uniform characteristics and predictable behaviors, and that this enables one to design a dosage form having a predetermined rate of release or profile.  *Id.* ¶¶ 42, 44.  In short, this field is the antithesis of unpredictable.

Dr. Banakar also advances the view that the patents and the prior art provide no guidance to the skilled artisan as to how to produce a non-osmotic dosage form or composition that exhibits the requirements of the claims.  Banakar Decl. ¶¶ 123, 126.  In reality, the patents point to a long list of suitable systems that, by November of 1996, were extensively documented in the literature, and for which, materials from commercial suppliers were readily available.  Davies Decl. ¶¶ 24-26.  As Dr. Davies points out, a person skilled in pharmaceutical formulations could, using routine effort, produce a dosage form or composition meeting the requirements of the claims.  *Id.* ¶ 64.  All such a person would need is the desired profile,

19

taught in the patents, and, in the case of compositions that deliver a desired plasma profile, information that permits mathematical conversion of plasma data to dissolution data. *Id.* Dr. Banakar is in no position to disagree: he notes that the level of skill in the art in this field was high, suggesting that a person attempting to make a non-osmotic dosage form would be more likely to succeed, rather than fail. Banakar Decl. ¶¶ 124-125.

Finally, Andrx advances two novel theories of non-enablement. First, Andrx argues that by not explicitly repeating certain passages found in certain earlier filed applications, Plaintiffs alternatively (i) established that dosage forms using those types of sustained release systems would not work or (ii) expressly disclaimed dosage forms that employed those types of sustained release systems. Both theories have no basis in law or fact. There is nothing in the patents that remotely suggests that non-osmotic sustained release systems could not be used to produce dosage forms exhibiting the required characteristics. Similarly, nothing in the specification or prosecution history supports Andrx's theory that Plaintiffs disclaimed these non-osmotic systems. Rather, at column 6, lines 5 to 14, (Exh. A) Plaintiffs expressly state otherwise.

Accordingly, the Court should reject Andrx's attempt to insert a claim limitation that is plainly not present in the claims. Moreover, the Court should ignore Andrx's efforts to attack the written description and enablement of the claims, as such attacks are both premature and baseless.

## VII.　CONCLUSION

For the reasons set forth above, the Court should adopt plaintiffs' proposed constructions for each of the claim limitations that are in dispute.

ASHBY & GEDDES

/s/ Tiffany Geyer Lydon

*Of Counsel:*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois  60603
312-853-7000

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
202-736-8000

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood
Suite 3400
Dallas, TX  75201
214-981-3300

Dated:  November 30, 2006

175632.1

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil PPC, Inc.*

# EXHIBIT R

49

# Pharmaceutical Dissolution Testing



## Umesh V. Banakar

QM
38
12p
91

ekker

Library of Congress Cataloging-in-Publication Data

Banakar, Umesh V.
    Pharmaceutical dissolution testing / Umesh V. Banakar; with
contributions by William A. Hanson ... [et al.].
        p.    cm. -- (Drugs and the pharmaceutical sciences; v. 49)
    Includes bibliographical references and indexes.
    ISBN 0-8247-8567-3 (alk. paper)
    1. Drugs—Solubility—Testing. I. Title. II. Series.
    [DNLM: 1. Biological Availability. 2. Solubility. 3. Technology,
Pharmaceutical—methods.    W1 DR893B v.49 / QV 38 B212p]
RS189.B28      1991
615'.19—dc20
DNLM/DLC
for Library of Congress                                          91-25103
                                                                     CIP

This book is printed on acid-free paper.

Copyright © 1992 by MARCEL DEKKER, INC. All Rights Reserved

Neither this book nor any part may be reproduced or transmitted in any form
or by any means, electronic or mechanical, including photocopying,
microfilming, and recording, or by any information storage and retrieval
system, without permission in writing from the publisher.

MARCEL DEKKER, INC.
270 Madison Avenue, New York, New York, 10016

Current printing (last digit):
10 9 8 7 6 5 4 3 2 1

PRINTED IN THE UNITED STATES OF AMERICA

where $\rho$ is the density of the particle. Consequently, it is apparent that the dissolution surface plays an important role in the dissolution behavior of such products. Several examples reported in the literature allude to this fact (52,53).

Several other factors of equal importance—including particle size, crystal surface anisotropy, the drug's solubility, diffusion-layer thickness, partition and diffusion coefficients, viscosity, molecule size, and concentration gradient difference—have a bearing on the dissolution performance of modified-release products.

Modified-release dosage forms, unlike conventional, rapid-release dosage forms, spend more time in the dissolution medium or the biological system, whichever the case may be. Hence they are exposed to a milieu of varying pH in the gastrointestinal tract (pH approaching 1.2 in the acid-secreting stomach region to pH approaching 7.8 in the distal region of the intestinal tract). Consequently, pH becomes a major variable that must be considered in both design and evaluation of these products since it can control the dissolution process of modified-release dosage forms (54). Although all physiological conditions cannot be reproduced during dissolution testing, one should bear in mind that a variety of physiological parameters, in addition to those discussed here, can significantly influence the dissolution performance and thereby the bioavailability of such specialized dosage forms.

## INTERPRETATION OF DISSOLUTION DATA

The in vitro dissolution data obtained for modified-release dosage forms can be expressed in different ways. However, algebraic functions have customarily been employed to define the dissolution kinetics of both conventional, fast-release dosage forms and nonconventional modified-release dosage forms. In the latter case, owing to the very nature of the dissolution process, the resultant data can be interpreted employing algebraic functions more reliably and with relative ease. These functions relate the cumulative amount of drug dissolved $Q$ as a function of time. These functions can be further transcribed into respective graphical representations. These functions fall into four basic types $Q = f(t)$ functions, as shown in Fig. 8.5a-d.

For a dosage form in which the amount of drug permeating to the solution is constant for each time interval, $Q = kt$ can express this process. This dissolution process is said to follow zero-order kinetics (Fig. 8.5a). In many of the modified-release dosage forms, particularly controlled- or sustained-release dosage forms, this type of dissolution kinetics is expected.



Fig. 8.5 Graphic interpretation of dissolution profiles in terms of cumulative amount dissolved, $F(t)$, as a function of time. (a) Zero-order process; (b) first-order process; (c) dissolution adhering to cube-root law; (d) dissolution adhering to square-root equation.

When the dissolution kinetics can be explained via a $Q = 1 - kt$ function, we have a first-order process (Fig. 8.5b). Most conventional dosage forms exhibit this dissolution mechanism, and some modified-release preparations, particularly prolonged-release formulations, adhere to this type of dissolution process.

Some specialized dosage forms contain many drug particles of the same size and shape or their agglomerates that dissolve evenly. In such instances the dissolution process can be expressed employing the cube-root law, where $Q = 1 - (1 - kt)^3$, as shown in Fig. 8.5c.

A large number of modified-release dosage forms contain some sort of a matrix system. In such instances, the drug dissolves from this matrix; when it is dissolved in the matrix-forming substance, the process is controlled by diffusion. The diffusion-controlled dissolution process can be expressed via the square-root equation, where $Q = k\sqrt{t}$, as shown in Fig. 8.5d.

In many cases the dissolution process cannot be delineated as outlined above. Complex dissolution profiles result and the process cannot be explained with relative ease. In such instances, a conventional method is followed wherein the entire dissolution profile, with cumulative amount dissolved as a function of time from $t = 0$ to $t = \infty$, is considered. The $t = \infty$ is characterized by total release of the drug from the dosage form where no more drug is

Case 1:05-cv-06042-JLR   Document 39   Filed 12/06/2006   Page 28 of 47

# EXHIBIT S



# WEBSTER'S
# Ninth New
# Collegiate
# Dictionary



A GENUINE MERRIAM-WEBSTER

The name *Webster* alone is no guarantee of excellence. It is used by a number of publishers and may serve mainly to mislead an unwary buyer.

*A Merriam-Webster®* is the registered trademark you should look for when you consider the purchase of dictionaries or other fine reference books. It carries the reputation of a company that has been publishing since 1831 and is your assurance of quality and authority.

Copyright © 1987 by Merriam-Webster Inc.


Philippines Copyright 1987 by Merriam-Webster Inc.


Library of Congress Cataloging in Publication Data
Main entry under title:

Webster's ninth new collegiate dictionary.

   Based on Webster's third new international
dictionary.
   Includes index.
   1. English language—Dictionaries.   I. Merriam-
Webster Inc.
PE1628.W5638     1987     423     86-23801
ISBN 0-87779-508-8
ISBN 0-87779-509-6 (indexed)
ISBN 0-87779-510-X (deluxe)


Webster's Ninth New Collegiate Dictionary principal copyright 1983


COLLEGIATE trademark Reg. U.S. Pat. Off.

All rights reserved. No part of this book covered by the copyrights hereon may be re-
produced or copied in any form or by any means—graphic, electronic, or mechanical,
including photocopying, taping, or information storage and retrieval systems—without
written permission of the publisher.

Made in the United States of America


    2526RMcN87

European languages  b : NORDIC 4 : of or relating to Indo-European or its speakers

**ar·ti·fice** \'ärt-ə-fəs\ *n* [MF, fr. L *artificium,* fr. *artific-, artifex* artificer, fr. L *art-, ars* + *facere*] (1620) 1 : an artful stratagem : TRICK  b : false or insincere behavior (social ~)  2 : an ingenious device or expedient  b : clever or artful skill : INGENUITY (believing that characters had to be created from within rather than with ~ —Garson Kanin)  *syn* see TRICK, ART

**Aryan** \'ar-ē-ən, 'er-\ *n* (1851) 1 : a member of the Indo-European-speaking people early occupying the Iranian plateau or entering India and conquering and amalgamating with the earlier non-Indo-European inhabitants  2 : a member of the people speaking the language from which the Indo-European languages are derived  b : an individual of any of those peoples speaking these languages since prehistoric times : INDO-EUROPEAN  c : NORDIC  d : GENTILE

**ar·ti·fic·er** \är-'tif-ə-sər, 'ärt-ə-fə-sər\ *n* (14c) 1 : a skilled or artistic worker or craftsman  2 : one that makes or contrives : DEVISER (had been the ~ of his own fortunes —*Times Lit. Supp.*)

**aryl** \'ar-əl, -'l\ [ISV aromatic + -yl] (1906) : a radical (as phenyl) derived from an aromatic hydrocarbon by the removal of one hydrogen atom

**ar·ti·fi·cial** \,ärt-ə-'fish-əl\ *adj* (14c) 1 : humanly contrived often on a natural model : MAN-MADE (an ~ limb) (~ diamonds)  2 a : having existence in legal, economic, or political theory  b : caused or produced by a human and esp. social or political agency (an ~ price advantage) (~ barriers of discrimination —R.C. Weaver)  3 obs : ARTIFUL, CUNNING  4 a : lacking in natural or spontaneous quality (an ~ smile) (an ~ excitement)  c : IMITATION, SHAM (~ flavor)  5 : based on differential morphological characters not necessarily indicative of natural relationships (an ~ key for plant identification) — **ar·ti·fi·ci·al·i·ty** \,ärt-ə-,fish-ē-'al-ət-ē\ *n* — **ar·ti·fi·cial·ly** \-'fish-(ə-)lē\ *adv* — **ar·ti·fi·cial·ness** \-'fish-əl-nəs\ *n*

**ar·y·ba·l·los** \,ar-ə-'bal-əs\ *n, pl* **-loi** \-,oi\ [NL *aryballos,* fr. Gk *aryballoeidēs,* lit., ladle-shaped, fr. *aryballos* ladle]...

**artificial horizon** *n* (1933) 1 : HORIZON 1c  2 : an aeronautical instrument based on a gyroscope and designed to furnish a surface constantly perpendicular to the vertical and therefore parallel to the horizon

**artificial insemination** *n* (1897) : introduction of semen into the uterus or oviduct by other than natural means

**artificial intelligence** *n* (ca. 1961) : the capability of a machine to imitate intelligent human behavior

**as** \əz, (')az\ *adv* [ME, fr. OE *ealswā* likewise, just as — more at ALSO] (bef. 12c) 1 : to the same degree or amount (~ deaf as a post) (twice ~ long)  2 : for instance (various trees, ~ oak or pine)  3 : when considered in a specified form or relation — usu. used before a preposition or a participle (my opinion ~ distinguished from his)

**artificial respiration** *n* (1852) : the rhythmic forcing of air into and out of the lungs of a person whose breathing has stopped

**ar·til·ler·ist** \är-'til-ə-rəst\ *n* (1781) : GUNNER, ARTILLERYMAN

**ar·til·lery** \är-'til-(ə-)rē\ *n, pl* **-ler·ies** [ME *artillerie,* fr. MF] (14c) 1 : weapons (as bows, slings, and catapults) for discharging missiles  2 : large caliber crew-served mounted firearms (as guns, howitzers, and rockets) : ORDNANCE  3 : a branch of an army armed with artillery  4 : means of impressing, arguing, or persuading (the ~ of satire) (a soprano's vocal ~)

²as *conj* (12c) 1 : THAT, WHO, WHICH — used after *same* or *such* (in the same building ~ my brother) (tears such ~ angels weep —John Milton) and chiefly dial after *such*  2 : WHEN, WHILE (spilled the milk ~ she got up)  3 : in the way or manner that (did ~ I do)  4 : in accordance with what or the way in which (quite good ~ boys go)  5 : WHILE, WHEN (spilled the milk ~ she got up)  6 : regardless of the degree to which : THOUGH (improbable ~ it seems, it's true)  7 : for the reason that : BECAUSE, SINCE (stayed home ~ she had no car)  8 : that the result is (so clearly guilty ~ to leave no doubt) *usage* see LIKE — as is : in the presently existing condition without modification (bought the clock at an auction as is) — as it were : as if it were so : in a manner of speaking

**ar·til·lery·man** \-mən\ *n* (1635) : a soldier in the artillery

**ar·tio·dac·tyl** \,ärt-ē-ō-'dak-t'l\ *n* [deriv. of Gk *artios* fitting, even-numbered + *daktylos* finger, toe; akin to Gk *aratiskein* to fit — more at ARM] (ca. 1879) : any of an order (Artiodactyla) of hoofed mammals (as the camel or ox) with an even number of functional toes on each foot — **artiodactyl** *adj*

³as *prep* (13c) 1 : LIKE 2 (all rose ~ one man)  b : LIKE 1a (his face was ~ a mask — Max Beerbohm)  2 : in the capacity, character, condition, or role of (works ~ an editor)

**ar·ti·san** \'ärt-ə-zən, -sən, *chiefly Brit* ,ärt-ə-'zan\ *n* [MF, fr. Olt *artigiano,* fr. *arte* art, fr. L *art-, ars*] (1538) : one (as a carpenter, plumber, or tailor) trained to manual dexterity or skill in a trade; *broadly* : a skilled worker (literary ~s) — **ar·ti·san·al** \-'l, -əl\ — **ar·ti·san·ship** \-,ship\ *n*

⁴as *adv* (15c) 1 : THAT, WHO, WHICH — used after *same* or *such*

⁵as *pron* (12c) 1 : THAT, WHO, WHICH — used after *same* or *such*

**art·ist** \'ärt-əst\ *n* [F] (1712) : a skilled adept public performer; *specif* : a musical or theatrical entertainer

**as** \'ās\ *n, pl* **as·ses** \'as-əz, 'as-,ēz, 'äs-əz\ [L] (1540) 1 : LIBRA 2a  2 : a bronze coin of the ancient Roman republic  b : a unit of value equivalent to an as coin

**ar·tiste** \är-'tēst\ *n* [F] (1712) : a skilled adept public performer, *specif* : a musical or theatrical entertainer

**as-** — *see* AD-

**ar·tis·tic** \är-'tis-tik\ *adj* (1753) 1 : of, relating to, or characteristic of art or artists (~ subjects) (an ~ success)  2 : showing imaginative skill in arrangement or execution (~ photography) — **ar·tis·ti·cal·ly** \-ti-k(ə-)lē\ *adv*

**as·a·fet·i·da** *or* **as·a·foet·i·da** \,as-ə-'fet-əd-ə, -'fet-əd-ə\ *n* [ME *asafetida,* fr. ML *asafetida,* lit. Per *azā* mastic + L *foetida,* fem. of *foetidus* fetid] (14c) : the fetid gum resin of various oriental plants (genus *Ferula*) of the carrot family formerly used in medicine as an antispasmodic and in folk medicine as a general prophylactic against disease

**art·ist·ry** \'ärt-ə-strē\ *n* (1868) 1 : artistic quality of effect or workmanship (the ~ of his novel)  2 : artistic ability (the ~ of the violinist) (a lawyer's ~ in persuading jurors)

**as·bes·tos** *also* **as·bes·tus** \as-'bes-təs, az-\ *n* [ME *albeston* mineral supposed to be inextinguishable when set on fire, prob. fr. MF, fr. ML *asbeston,* alter. of L *asbestos,* fr. Gk, unslaked lime, fr. asbestos inextinguishable, fr. *a-* + *sbennynai* to quench] (1607) : any of several mineral silicates (as chrysotile) that readily separate into long flexible fibers suitable for use as a noncombustible, nonconducting, or chemically resistant material

**art·less** \'ärt-ləs\ *adj* (1589) 1 : lacking art, knowledge, or skill : UNCULTURED  2 a : made without skill : CRUDE  b : free from artificiality : NATURAL (~ grace)  3 : free from guile or craft : sincerely simple *syn* see NATURAL — **art·less·ly** *adv* — **art·less·ness** *n*

**as·bes·to·sis** \,as-,bes-'tō-səs, ,az-\ *n* [NL] (1927) : a pneumoconiosis due to asbestos particles

**art·song** \'ärt-,sȯŋ\ *n* (ca. 1910) : a solo through-composed lyric song with melody and accompaniment

**asc-** — *see* ASCO-

**asc·a·ri·a·sis** \,as-kə-'rī-ə-səs\ *n* (ca. 1888) : infestation with or disease caused by ascarids

**art·sy** \'ärt-sē\ *adj* (1902) : ARTY

**as·car·id** \'as-kə-rəd\ *n* [deriv. of LL *ascarid-, ascaris* intestinal worm, fr. Gk *askarid-, askaris*; akin to Gk *skairein* to gambol — more at CARDINAL] (ca. 1890) : any of a family (Ascaridae) of nematode worms that includes the common roundworm (*Ascaris lumbricoides*) parasitic in the human intestine

**art·sy-craft·sy** \,ärt-sē-'kraf(t)-sē\ *also* **arty-crafty** \,ärt-ē-'kraf-tē\ *adj* [fr. the phrase *arts and crafts*] (1902) : ARTY

**art·the·ater** *n* (1923) : a theater that specializes in the presentation of art films

**as·cend** \ə-'send\ *vb* [ME *ascenden,* fr. L *ascendere,* fr. *ad-* + *scandere* to climb — more at SCAN] *vi* (14c) 1 a : to move gradually upward  b : to slope upward  2 a : to rise from a lower level or degree  b : to go back in time or in order of genealogical succession ~ *vt* 1 : to go or move up or toward  2 : to succeed to : OCCUPY — **as·cend·a·ble** *or* **as·cend·ible** \-'sen-də-bəl\ *adj*

**art·work** \'ärt-,wərk\ *n* (1877) 1 a : an artistic production (an 8-foot metal ~)  b : material (as a drawing or photograph) prepared for reproduction in printed matter

**as·cen·dance** *also* **as·cen·dence** \ə-'sen-dən(t)s\ *n* (1732) : ASCENDANCY

**arty** \'ärt-ē\ *adj* **art·i·er; -est** (1901) : showily or pretentiously artistic (~ lighting and photography) — **art·i·ly** \'ärt-'l-ē\ *adv* — **art·i·ness** \'ärt-ē-nəs\ *n*

**as·cen·dan·cy** *also* **as·cen·den·cy** \ə-'sen-dən-sē\ *n* (1712) : governing or controlling influence : DOMINATION

**ar·u·gu·la** \ə-'rü-g(y)ə-lə\ *n* [prob. fr. It dial. *arugula,* fr. L *eruca* colewort; akin to F *roquette* rocket] (1967) : ROMAN ROCKET

**ascendant** *also* **ascendent** *adj* (14c) 1 : moving upward : RISING  b : directed upward (an ~ stem)  2 a : SUPERIOR  b : DOMINANT — **as·cen·dant·ly** *adv*

**ar·um** \'ar-əm, 'er-\ *n* [NL, fr. L *arum,* fr. Gk *aron*] (14c) : any of a genus (*Arum* of the family Araceae, the arum family) of Old World plants with flowers in a fleshy spathe subtended by a leafy bract; *broadly* : a plant of the arum family

**¹as·cen·dant** *also* **as·cen·dent** \ə-'sen-dənt\ *n* [ME, fr. MF, fr. ML *ascendent-, ascendens*] (14c) 1 : the point of the ecliptic or degree of the zodiac that rises above the eastern horizon at any moment  2 : a state or position of dominant power or importance  3 : a lineal or collateral relative in the ascending line

**ary** \(ə)-rē\ *adj suffix or n suffix* [ME *-arie,* fr. MF & L; MF *-aire,* fr. L *-arius*] : of, relating to, or connected with (legendary)

**as·cen·sion** \ə-'sen-chən\ *n* [ME, fr. L *ascension-, ascensio,* fr. *ascensus,* pp. of *ascendere*] (14c) 1 : the act or process of ascending

**²ary** *n suffix* [ME *-arie,* fr. MF & L; MF *-aire,* fr. L *-arius*] : of, relating to, or connected with (dispensary)  2 : thing belonging to or connected with esp. place of (ovary)  2 : person belonging to, connected with, or engaged in (functionary)

**Ascension Day** *n* (14c) : the Thursday 40 days after Easter observed in commemoration of Christ's ascension into Heaven

**Ar·y·an** \'ar-ē-ən, 'er-; 'är-yən\ *adj* [Skt *ārya* noble, belonging to the people speaking an Indo-European dialect who migrated into northern India] (1839) 1 : of or relating to the Indo-European family of languages or to their hypothetical prototype  2 : of or relating to speakers of Indo-European languages  3 : of or relating to a hypothetical ethnic type illustrated by or descended from early speakers of Indo-

**as·cen·sion·al** \ə-'sench-nəl, -ən-'l\ *adj* (1594) : of or relating to ascension or ascent

**as·cen·sive** \ə-'sen(t)-siv\ *adj* (1646) : rising or tending to rise

**ascent** \ə-'sent, a-\ *n* [irreg. fr. *ascend*] (1614) 1 : the act of rising or mounting upward : CLIMB  b : an upward slope or rising grade

# EXHIBIT T

# REDACTED

# EXHIBIT U

Westlaw.

Slip Copy                                                                                                              Page 1
Slip Copy, 2006 WL 2547463 (N.D.Cal.)
(Cite as: 2006 WL 2547463 (N.D.Cal.))

H

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
HYNIX SEMICONDUCTOR INC, Plaintiff,
v.
TOSHIBA CORPORATION, et al, Defendants.
And Related Counterclaims.
No. C-04-04708 VRW.

Sept. 1, 2006.

Daniel J. Furniss, Theodore G. Brown, III, Anne M. Rogaski, Eric P. Jacobs, Susan M. Spaeth, Townsend and Townsend and Crew LLP, Palo Alto, CA, Keith L. Slenkovich, Kenneth L. Nissly, Susan G. Van Keulen, Thelen Reid & Priest LLP, San Jose, CA, Robert A. McFarlane, Townsend and Townsend and Crew LLP, San Francisco, CA, for Plaintiff.

Ronald Loh-Hwa Yin, Alan A. Limbach, Erin Overom Dungan, Mark Fowler, Vincent Lam, Dla Piper Rudnick Gray Cary U.S. LLP, East Palo Alto, CA, for Defendants.

ORDER

VAUGHN R. WALKER, District Chief Judge.

*1 Plaintiff/counterdefendant Hynix Semiconductor, Inc ("Hynix") owns the eleven patents-in-suit, which relate to the design and manufacture of semiconductors. Defendant/ counterclaimant Toshiba Corporation seeks a judgment declaring that these patents are invalid and unenforceable or alternatively that Toshiba has not infringed any valid claims in these patents. Doc # 1 at 23-24; Doc # 25 at 16. Hynix denies these invalidity allegations and claims that Toshiba Corporation and various related entities (collectively, "Toshiba") have infringed the patents. Doc # 12 at 23.

On March 29, 2006, the court held a claim construction hearing pursuant to *Markman v. Westview Instruments, Inc*, 517 U.S. 370 (1996), for the disputed terms in four of these patents: United States Patent Nos 5,422,311 ("'311 patent");

5,512,519 ("'519 patent"); 6,330,190 ("'190 patent") and 5,031,111, which was subsequently reexamined in Reexamination certificate 4297 ("'111 patent"). Based on the parties' submissions to the court and their arguments at the hearing, the court issues the following claim construction order. As the court writes principally for the parties, it will not discuss the details of the inventions or define terms well-known to those skilled in the art, except as is necessary to construe the patent claims.

I

The construction of patent claims is a question of law to be determined by the court. *Id* at 384. The goal of claim construction is "to interpret what the patentee meant by a particular term or phrase in a claim." *Renishaw PLC v. Marposs SpA*, 158 F3d 1243, 1249 (Fed Cir1998). In doing so, the court looks first to the claim itself:

The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which "particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention." 35 USC § 112. It is to these wordings that one must look to determine whether there has been infringement. Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them.

*El Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed Cir1988).

"The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Renishaw*, 158 F3d at 1248. "The words used in the claim are viewed through the viewing glass of a person skilled in the art." *Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc*, 326 F3d 1215, 1220 (Fed Cir2003) (citing *Tegal Corp v. Tokyo Electron Am, Inc*, 257 F3d 1331, 1342 (Fed Cir2001)). "Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning." *York Prods, Inc v Central Tractor Farm & Family Ctr*, 99 F3d 1568, 1572 (Fed Cir1996). The court may, if necessary, consult a variety of sources to determine the ordinary and customary meaning of a claim term, including "the words of the claims themselves, the remainder of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Innova/Pure Water, Inc v. Safari Water,* 381 F3d 1111, 1116 (Fed Cir2004).

*2 The court begins its construction of claim terms by consulting intrinsic evidence of the meaning of disputed claim terms, which includes the claims, the specification and the prosecution history (if in evidence). *Lacks Industries, Inc v McKechnie Vehicle Components USA, Inc,* 322 F3d 1335, 1341 (Fed Cir2003) (citation omitted). "If upon examination of this intrinsic evidence the meaning of the claim language is sufficiently clear, resort to 'extrinsic' evidence * * * should not be necessary." *Digital Biometrics, Inc. v. Identix, Inc,* 149 F3d 1335, 1344 (Fed Cir1998). "[I]f after consideration of the intrinsic evidence, there remains doubt as to the exact meaning of the claim terms, consideration of extrinsic evidence may be necessary to determine the proper construction." *Id.* Although extrinsic evidence such as expert and inventor testimonies, dictionaries and learned treatises can shed useful light on the relevant art, extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips v. AWH Corp,* 415 F3d 1303, 1317 (Fed Cir2005) (quoting *C R Bard, Inc. v. United States Surgical Corp,* 388 F3d 858, 862 (Fed Cir2004)) (internal quotation marks omitted).

"[A] court may constrict the ordinary meaning of a claim term in at least one of four ways[:]" (1) "if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim in either the specification or prosecution history;" (2) "if the intrinsic evidence shows that the patentee distinguished [the] term from prior art on the basis of a particular embodiment, expressly disclaimed subject matter, or described a particular embodiment as important to the invention;" (3) "if the term chosen by the patentee so deprives the claim of clarity as to require resort to the other intrinsic evidence for a definite meaning;" or (4) "if the patentee phrased the claim in step- or means-plus-function format," then "a claim term will cover nothing more than the corresponding structure or step disclosed in the specification, as well as equivalents thereto * * *." *CCS Fitness, Inc v. Brunswick Corp,* 288 F3d 1359, 1366-67 (Fed Cir2002) (internal citations and quotation marks omitted).

Limitations from the specification, such as from a preferred embodiment, cannot be read into the claims unless expressly intended by the patentee. *Teleflex, Inc v. Ficosa North Am Corp,* 299 F3d 1313, 1326 (Fed Cir2002) ("The claims must be read in view of the specification, but limitations from the specification are not to be read into the claims."). And "a construction that excludes a preferred embodiment 'is rarely, if ever, correct.' " *C R Bard,* 388 F3d at 865 (citing *Vitronics Corp v. Conceptronic, Inc,* 90 F3d 1576, 1583 (Fed Cir1996)).

With these legal principles in mind, the court now construes the disputed claim language in the patents.

## II. *The '311 patent*

*3 The '311 patent issued on June 6, 1995, and discloses a method of fabricating conductive layers in a semiconductor device and decreasing the layers' resistivity. The patent addresses a basic problem of integrated circuit design: as the size of the conductive layers in a semiconductor device decreases, the device's resistivity increases, resulting in power dissipation and signal delay. Doc # 85 at 9.

### 1. "amorphous silicon film"

"Amorphous silicon film" appears in claims 1 and 6. Hynix contends this term means "a thin covering or coating of silicon that is devoid of long-range periodic structure." Doc # 85 (Hynix Br) at 12; Doc # 91 (Joint Cl Const), App 2 at 1. Toshiba instead construes the term as "[a] layer of silicon that is entirely non-crystalline and non-polycrystalline in form, formed in a temperature range insufficient to cause the formation of polysilicon ." Doc # 87 (Toshiba Br) at 3.

First, the specification fails to support Toshiba's proposed limitation mandating that the amorphous silicon film must be "formed in a temperature range insufficient to create polysilicon." Although the specification mentions temperature ranges at which an amorphous silicon film might be annealed and therefore turn into a polysilicon film, the specification never suggests that an amorphous silicon film can be formed only below these temperatures. In essence, Toshiba is asking the court to limit this term based solely on a disclosed embodiment, which is something the court cannot do. *Phillips,* 415 F3d at 1323. Moreover, Toshiba's proposed temperature limitation would tend to render superfluous dependent claims 3 and 8, which specify a particular temperature range at which an amorphous silicon film could be formed. See, e g, '311 patent at claim 3 (the "silicon film is deposited * * * at a

temperature of 450-550 degrees Celsius"). Toshiba's proposed construction is in tension with the doctrine of claim differentiation, which "creates a presumption that each claim in a patent has a different scope." *Free Motion Fitness, Inc v. Cybex Intl,* 423 F3d 1343, 1351 (Fed Cir2005) (quoting *Comark Communications, Inc v. Harris Corp,* 156 F3d 1182, 1187 (Fed Cir1998)). Cf id ("[D]ependent claims limiting the claim to a single cable confirm that the independent claims may encompass more than one cable.").

Similarly, Toshiba's proposed limitation requiring the "amorphous silicon film" to have no structure at all, i e, to be *"entirely* non-crystalline and non-polycrystalline," is unduly restrictive. The patent consistently contrasts an "amorphous silicon film" with the "polysilicon film" that is created after the "amorphous silicon film" is annealed. See, e g, '311 patent at 1:61-65 ("[A]n in-situ phosphorus doped amorphous silicon film is deposited on the substrate. The silicon film is then annealed to form a polysilicon film * * *."; id at 2:65-68 ("FIG 1B illustrates the formation of the polysilicon film 3a by annealing the silicon film 3 at a temperature above 800 degree Celsius * * *."); id at 3:60-63 ("FIG 2B illustrates the formation of a polysilicon film 3a by annealing the silicon film 3a at a low temperature of about 600 degrees Celsius under inert gas environment during a prolonged period * * *."). But the specification never suggests that an amorphous film necessarily lacks any structure. Common sense dictates that an amorphous silicon film, though certainly less structured than a polysilicon film, could have some small structural pockets. The treatise on which both parties rely supports such a construction. See Doc # 86, Ex G and Doc # 88, Ex H ("Solid matter exists in crystalline and amorphous forms. * * * *Amorphous* materials are devoid of long-range periodic structure.") (from Stanley Wolf & Richard Tauber, *Silicon Processing for the VLSI Era,* Vol 1-- Process Technology at 1-2 (Lattice Press 1986).

**\*4** Hence, because the specification contrasts "amorphous silicon film" from "polycrystalline" and "crystalline" films, the court construes an "amorphous silicon film" as a "a thin covering or coating of silicon that lacks sufficient structure to be crystalline or polycrystalline in form."

2. (a) "and then annealing said tungsten silicide film to form a polycide film and to form a silicon layer" and

(b) "silicon layer at the boundary between said

tungsten silicide film and said polysilicon film"

For purposes of this subsection, any reference to "first term" is to term 2(a) above and any reference to "second term" is to term 2(b) above. These two terms together comprise the bulk of the third clause of claim 1 and the fourth clause of claim 6; the only difference between the two clauses is that the latter clause has the word "reduced" appearing before "polysilicon film." Claim 1's third clause reads in full (with the terms to be construed emphasized):

depositing a tungsten silicide layer on said polysilicon film *and then annealing said tungsten silicide film to form a polycide film and to form a silicon layer at the boundary between said tungsten silicide film and said polysilicon film*

Although the parties briefed these terms separately, the court examines them together because each term provides guidance as to the other term's meaning.

Hynix proposes that "silicon layer" means "a region or regions of silicon" and that the remainder of the first term need not be construed by the court. Doc # 85 at 12-13. Alternatively, Hynix asserts that: (1) "and then" means "after that;" (2) "annealing" means "heat treat[ing];" (3) "tungsten silicide film" means "a thin covering or coating which comprises tungsten and silicon atoms in a variety of possible stoichiometric ratios" and (4) "polycide film" means "a multilayer structure comprising a low resistance material such as a refactory [sic] metal silicide (e g, tungsten silicide or titanium silicide) overlaying a layer of doped polycrystalline silicon." Joint Cl Const, App 2 at 4. For the second term, Hynix proposes that (1) "silicon layer at the boundary between said tungsten silicide film and said polysilicon film" means "a region or regions of silicon formed at the boundary between said tungsten silicide film and said polysilicon film" and (2) "polysilicon film" means "a thin covering or coating of polycrystalline silicon, i e, solid silicon composed of small single crystal regions." *Id at 8.*

Toshiba contends the first term means "[a] single thickness of a homogeneous silicon-only material and polycide film comprising the composite film of a tungsten silicide film and a polysilicon film are both formed after the composite film is annealed, and before the polycide layer is patterned, wherein the silicon-only material is formed by the transfer of silicon from the tungsten silicide film." *Id at 4.* Toshiba proposes that the second term means "[a] single thickness of a homogeneous silicon-only material is located at the lateral extent of a plane separating the tungsten silicide film and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 4
Slip Copy, 2006 WL 2547463 (N.D.Cal.)
(Cite as: 2006 WL 2547463 (N.D.Cal))

polysilicon film, which defines where one film
begins and the other film ends, wherein the silicon-
only material is transferred from the tungsten silicide
film decreasing the silicon in the tungsten silicide
film." *Id at 8.* Toshiba further defines "polysilicon
film" as "a layer of silicon having an aggregate of
more than one island of crystalline grains."

**\*5** The court begins pruning this thicket of terms by
observing that both parties apparently agree that "and
then" means "after that" and "annealing" means "heat
treat[ing]." The court now turns to the disputed terms.

#### a. "polysilicon film"

As noted previously, the specification consistently
contrasts "polysilicon" from "amorphous silicon."
See *supra* section II(1). Although the term
"polysilicon film" is never explicitly defined in the
specification, it is evident based on the usage of
"polysilicon film" throughout the specification that
the patentee assumed that one having ordinary skill in
the art would be familiar with the meaning of this
straightforward term. See, e.g., '311 patent at 1:7-11
("Generally, a conductor layer in a semiconductor
device is formed by utilizing a polycide having a low
resistivity. In order to make the polycide, a
polysilicon film is formed on a silicon substrate * *
*."); *id at 1:14-17* ("[A]s semiconductor device
integration is increased, the thickness of the
polysilicon film must be decreased."); *id at 1:24-26*
("[T]he major factors in determining the resistivity of
the polysilicon film are its impurity density, thickness
and the grain size of the film * * *."). Because the
patent does not appear to have used "polysilicon
film" outside its conventional meaning and because
that meaning is sufficiently clear to one having
ordinary skill in the art, the court declines presently
to construe this term.

#### b. "silicon layer"

First, the relevant claim language supports Toshiba's
construction. The relevant clause in which this term
appears states: *"and then annealing said tungsten
silicide film to form a polycide film and to form a
silicon layer* at the boundary between said tungsten
silicide film and said polysilicon film." Accordingly,
the claim itself states that the act of annealing the
tungsten silicide film is what creates the silicon layer,
at least suggesting that the silicon in that layer comes
from the tungsten silicide film.

This specification also supports Toshiba's
construction by consistently noting that the silicon

layer is formed only by silicon leaving the tungsten
silicide film when that film is annealed to the
polycide film. Although a court generally should not
import limitations from the specification based on
disclosed embodiments, "where the specification
makes clear at various points that the claimed
invention is narrower than the claim language might
imply, it is entirely permissible and proper to limit
the claims." *Alloc, Inc v. ITC,* 342 F3d 1361, 1370
(Fed Cir2003) (internal citations omitted). Here, the
specification makes clear that "the very character of
the invention," *id,* requires the silicon layer to be
formed only from the tungsten silicide film rather
than any other possible source. See, e.g., '311 patent at
abstract ("[T]he silicon in the tungsten silicide film is
transferred to the boundary between the tungsten
silicide film and the polysilicon film to increase the
adhesion properties therebetween."); *id at 3:28-36*
("FIG 1D illustrates the formation of a silicon layer 5
at the boundary between the tungsten silicide film 4
and the reduced polysilicon film 3b. The silicon layer
5 is formed by annealing the tungsten silicide film 4
and the reduced polysilicon film 3b * * *. The silicon
in the tungsten silicide film 4 is transferred to the
boundary between the tungsten silicide film 4 and the
reduced polysilicon film 3b having the large grain
size."); *id at 4:4-11* (same for FIG 2D).

**\*6** Still, Toshiba's proposed construction is unduly
complicated and restrictive. For example, Toshiba
adds a timing limitation, requiring the silicon layer to
be "formed after the composite film is annealed, and
before the polycide layer is patterned." This
limitation is unnecessary, given that the claims
themselves specify the order in which these steps
must occur. For example, claim 1's use of antecedent
basis makes clear that step b must occur before step
c. See '311 patent at claim 1 (step b: "annealing said
silicon film to form a polysilicon film * * *;" step c:
"depositing a tungsten silicide film on said
polysilicon film and then annealing said tungsten
silicide film * * * to form a silicon layer * * * ").
Similarly, step c by necessity occurs before step d
(step d: "patterning said polycide film * * * ").

Accordingly, the court adopts a blended version of
the parties' constructions: "a region or regions of
silicon formed by the transfer of silicon from the
tungsten silicide film."

#### c. "tungsten silicide film"

Although the specification does not explicitly define
what constitutes a "tungsten silicide film," the
specification provides various details in particular

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

embodiments that would enable one having ordinary skill in the art to build such a film. See, e g, '311 patent at *id* at 3:7-10 ("A tungsten silicide film 4 having a W-Six structure is formed on the reduced polysilicon film 3b after impurities generated by the annealing of the polysilicon film 3a have been removed."); see *id* at 3:67-4:3 ("FIG 2C illustrates the formation of a tungsten silicide film 4 on the polysilicon film 3a after impurities, generated by the annealing of the polysilicon film 3a at a low temperature during a long period of time in a solid state, have been removed."); *id* at 2:25-28 ("[T]he polysilicon film and tungsten silicide film are annealed at a temperature of 800-1000 degrees Celsius to form the silicon layer at the boundary therebetween."). In light of the specification, the meaning of this term would be known to one having ordinary skill in the art. Accordingly, the court presently declines to construe this term.

d. "polycide film"

Because "polycide film" is already clearly defined by the claim, the court declines to construe this term. See '311 patent at 4:52-55 ("the polycide film is formed by depositing a tungsten silicide film on the polysilicon layer and then annealing the two").

III. *The '519 patent*
The '519 patent, which issued on April 30, 1996, discloses a method of forming a silicon insulating layer that independently supplies and controls the flow rate of nitrous oxide and oxygen gases.

1. "supplying and exposing the silicon surface to an O2--containing gas"

Hynix proposes the term should be construed to mean "providing a gas that contains O2 and subjecting the silicon surface to said gas." Doc # 85 at 16. Toshiba contends the claim should instead be construed as "providing a gas that contains O2 and subjecting the uncovered surface of silicon to said gas." Doc # 87 at 9.

*7 Although the parties appear to agree that "supplying" should be construed to mean "providing a gas that contains O2," the parties dispute whether the "silicon layer" must be uncovered. Toshiba argues that the claim language necessarily implies that the silicon surface must be uncovered, because otherwise the surface could not be exposed to the oxygen gas. Doc # 87 at 9. Hynix argues that Toshiba's proposed construction of "silicon layer" cannot be squared with Toshiba's proposed use of "exposing:" "If the claim

term 'exposing' required the surface being exposed to be uncovered as Toshiba seeks to require in the first step, it would, of course not be possible to 'expose' the silicon surface after it is covered by an oxide layer." Doc # 92 at 6.

Toshiba's argument is supported by the patent's use of "silicon surface." The patent distinguishes the "silicon surface" that is exposed to an oxygen gas to form an oxide layer in claim 12 from the silicon layer that is covered by an oxide layer in claim 15. See '519 patent at 4:60-61 ("exposing the silicon surface to an O2 containing gas to form an oxide layer on the silicon surface") (emphasis added); *id* at 5:10-11 ("wherein the silicon surface having an oxide layer is exposed to an NO--containing gas at a second temperature") (emphasis added). Hynix's argument ignores that the claim does not assert that the silicon layer is the only material exposed to the gas after the oxide layer has been formed; rather "the silicon layer having an oxide layer" is exposed. By specifying when the silicon surface is covered by another material, the claims imply that the term "silicon layer" is generally uncovered unless otherwise stated. Compare *Phillips*, 415 F3d at 1314 (use of term "steel baffles" strongly implies that not all baffles are made of steel).

Accordingly, the court adopts Toshiba's construction and defines "supplying and exposing the silicon surface to an O2--containing gas" to mean "providing a gas that contains O2 and subjecting the uncovered surface of silicon to said gas."

2. "a gas containing essentially NO"

At the claim construction hearing, the parties appeared to agree that this term should be construed as "a gas predominantly composed of NO." The court adopts this reasonable construction.

3. "supply of NO and O2 containing gases is regulated independently"

Hynix proposes this term should be construed to mean "supply of NO--and O2-- containing gases is separately controlled." Doc # 85 at 18. Toshiba asks the term be construed as "the flow of each of the gases containing NO and O2 is controlled not dependent on the other." Doc # 87 at 10. The parties appear to agree that "regulating" means "controlling" but dispute the meaning of "independently."

Hynix's proposed construction is undercut by both the prosecution history and the term's use in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

patent. The claim was amended to insert the term "independently" prior to "regulating" in order to circumvent the prior art. See Office Action Dated 4/12/95 at p 3, Doc # 88 Ex N. The examiner explained:

*8 The art has recognized the need for incorporating nitrogen into a Si/SiO2 interface[.] * * * Therefore it would have been obvious for one skilled in the art to independently control the flow rates of active reactants * * * The examiner will withdraw the rejection if "independently" is inserted before regulating.

*Id.*

Again, Hynix's proposed construction appears to be an attempt to recover ground it surrendered during claim construction because the language "separately control[ing]" the supply rate of the NO—and O2 gases is analogous to "independently control[ing]" the flow rate of these active reactants, which is an action that the examiner explicitly stated would be obvious to one skilled in the art.

Moreover, the specification's use of the term further illuminates the error of Hynix's proposed construction. First, the specification states that the gases are regulated at different times, or steps, of the process. See '519 patent at 2:56-60 ("[T]he flow rate of the O2 gas is highly regulated at the beginning of the oxidation process, and then the flow rate of the NO gas is highly regulated at the end of the oxidation process."). Further, the specification recites the independent purpose of each gas. See '519 patent at 2:52-55 ("To obtain a thicker oxide layer, the flow rate is regulated to flow the O2 at a higher rate. In order to increase the amount of nitrogen included in the oxide lawyer, the flow rate of the NO gas is regulated to flow at a higher rate."). Accordingly, the specification clarifies that the gases are not just "separately controlled;" rather, their regulation occurs at different times and for different purposes. Hynix's proposed construction fails to capture this nuance.

By contrast, Toshiba's proposal comports with the intrinsic evidence. While the specification makes clear the gases are "separately" controlled, the disclosed preferred embodiments emphasize the gases have different functions, and should be controlled at different steps, which suggest the gases should be regulated "not dependent" on the other. The ordinary and accustomed meaning of "independent" is "not dependent" and the specification makes clear that the drafter did not intend to be his own lexicographer but rather to adopt this customary meaning. Accordingly, the court

defines the term to mean "the flow of each gases containing NO and O2 is controlled not dependent on the other."

IV. *The '190 patent*

The '190 patent, which issued on December 11, 2001, discloses a flash memory structure that is formed in a silicon substrate, which permits the use of lower voltages in programming and erasing data than employed by the prior art.

1. "The difference between the first positive potential and second positive potential is no more than about 1 volt."

The term appears in claim 13 of the patent. Hynix argues the term need not be construed, but in the alternative contends that the term means "any difference between the positive potential applied to the source is less than or equal to 1 volt." Doc # 85 at 31. Toshiba asserts the term should be construed to mean "the first potential and second potential are different resulting in a difference which does not exceed one volt." Doc # 87 at 15. The parties apparently contest whether there must be a difference in voltage between the positive potential applied to the source and the positive potential applied to the second well region.

a. "The difference"

*9 Toshiba contends the term "difference between the first and second positive potential is no more than about one volt" necessarily implies that there must be a difference between the first and second positive potentials. ' 190 patent at 14:37-38; Doc # 87 at 14. But this argument misses the point. Simply because the difference between these potentials can be "no more than about 1 volt," does not mean the first and second potentials cannot be the same. Indeed, a difference of zero is certainly contemplated by this language.

Moreover, the preferred embodiments in the specification refute Toshiba's assertion. Table 1 discloses a range of voltages that can be separately applied to the source and the second well in order to perform the erase operation. ' 190 patent 7:1-20. The parties agree that "Erase-2" is an illustration of the erase operation of claim 13. Doc # 87 at 14; Doc # 92 at 18. Because the possible ranges for these two potentials (3.0 to 6.5 for the source and 2.0 to 6.0 for the well) overlap, the specification explicitly provides that these two separately applied voltages could be the same.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

b. "no more than about one volt."

Hynix asserts this term should be construed as "less than or equal to 1 volt." Hynix asserts the patentees demonstrated their intent to be their own lexicographer by characterizing this limitation as "no more than 1 volt" during prosecution. Doc # 85 at 31. In the remarks section of its application to amend the '519 patent, the inventor states:

Sato et al discloses applying ⟶3 volts to the P-well and ⟶8 volts to the source. [ ] Sato discloses an erase method that maintains the potential difference of 5 volts between the P-well and source to prevent the need for raising the junction breakdown voltage[ ]. Therefore, Sato et al teaches away from the invention as recited in claim 8, reciting the potential difference between the first positive potential and second positive potential being no more than 1 volt.

Doc # 93, Ex EE at 7.

Contrary to this explanation, however, the amended claim uses the term "no more than about 1 volt" as it appears in the issued patent. Because "[t]he claim construction inquiry * * * begins and ends in all cases with the actual words of the claim," *Renishaw, 158 F.3d at 1248,* applicants' explanation of the amendment in the remarks section is less important than the actual language of the amended claim itself. Moreover, given that applicants were trying to distinguish the claim limitation from prior art disclosing a potential voltage difference of 5 volts, it appears that their explanation simply includes a typographical, rather than a deliberate, omission. By its very terms "no more than about one volt" denotes a range of variation both slightly less than and slightly greater than one volt.

Accordingly, the court adopts a hybrid construction: "the difference between the first positive potential and second positive potential is no more than about one volt" means "any difference between the first positive potential and the second positive potential does not exceed about 1 volt."

2. "An erase operation"

*10 Hynix contends the term, which appears in claim 13, refers to "the removal of charge carriers from the floating gate of the memory cell." Doc # 85 at 30. Toshiba proposes the term should be construed as "an operation to erase a floating gate nonvolatile memory cell wherein different voltages are applied to

the source (or the drain) and to the channel of the cell to create a voltage difference therebetween." Doc # 87 at 14. The parties agree the memory cell at issue is the floating gate, though Toshiba's construction uses the term "floating gate non-volatile memory cell" while Hynix merely uses "the floating gate of the memory cell." Again, the point of contention between the parties is whether there must be a difference in voltage between the two positive potentials. Additionally, Toshiba uses the term "channel" interchangeably with "well region," a usage that Hynix does not appear to dispute. See Doc # 85 at 14; Doc # 92.

In pertinent part, claim 13 reads:

To perform an erase operation on a selected memory cell from the plurality of memory cells, a negative potential is applied to the control gate of the selected memory cell, a first positive potential is applied to the source of the selected memory cell, and a second positive potential is applied to the second well region of the selected memory cell, wherein the difference between the first positive potential and second positive potential is no more than about 1 volt

'190 patent at 14:29-39.

Toshiba contends its construction is proper because (1) two potentials are separately applied to the source and well region and (2) there must be a difference between the two voltages applied. Doc # 85 at 14. As with the previous term, the court once again rejects Toshiba's contention that the two applied potentials must be different; the claim language does not preclude these voltages from being the same.

Moreover, Toshiba's proposed construction is redundant with the rest of claim 13. Because claim 13 itself specifies that the erase operation is performed by applying a first positive potential to the source region and a second positive potential to the well region, it makes little sense to construe "an erase operation" as necessarily including these limitations. Accordingly, the court adopts Hynix's proposed construction: "an erase operation" means "the removal of charge carriers from the floating gate of the memory cell."

V. The '111 patent

The '111 patent, issued on July 9, 1991, and subsequently reexamined on March 27, 2001, discloses a method and system for electronic design automation (EDA) that considers the interrelationships between the physical and electrical characteristics of an integrated circuit. The patent

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

notes that "the present invention represents a significant advance in the field of design and fabrication of integrated circuits for operation at high frequencies * * *." * 111 patent at 3:41-44. In particular, the patent states that it "provides a novel automated approach to the design of such circuits, using a knowledge based system to design circuits quickly based on user-supplied specifications." *Id at 3:45-49.* The patent also states that "[o]ther important aspects of the invention are its use of a unified data structure containing both the electrical and the physical characteristics of circuit elements in a single structure, to facilitate layout and other operations of the system, and its use of a circuit compaction technique to reduce the area occupied by the circuit without detracting from its electrical performance." *Id at 3:49-55.*

**11** Although Hynix contends that none of the following terms need to be construed except for "unified data structure," Hynix has proposed constructions should the court decide to construe any of the other terms. All terms at issue appear only in claim 17, which was issued during the reexamination. That claim reads in full:

17. For use in a system for *automatically fabricating integrated circuits for operation at high frequencies,* an electronic design automation method comprising the steps of:

[1] A method for storing and retrieving data relating to circuit modules, comprising the steps of:

[a] **partitioning a circuit into macrocells;**

[b] **partitioning the macrocells into microcells;**

[c] partitioning the microcells into smaller microcells and *primitive circuit elements;*

[d] storing for each macrocell, microcell and primitive circuit element, data in a *universal format,* said data together defining electrical characteristics and interconnections, and physical characteristics and locations of the circuit modules, to form a complete *hierarchical definition* of the entire circuit, whereby circuit layout is facilitated because the electrical and physical characteristics are stored together in a *unified data structure;* and

[2] A method for generating said circuit layout of a circuit module comprising the steps of:

[a] **inputting at least one design parameter;**

[b] defining at least one *constraint derived from said at least one design parameter* wherein compliance with said at least one constraint by said circuit layout prevents one or more undesirable effects on the electrical performance of said circuit modules;

[c] **considering at least one layout option;**

[d] **determining whether said at least one layout**

option complies with said at least one constraint;

[e] if said layout option complies with at least one said constraint, performing said layout option.

*Id* at claim 17 (emphasis added on disputed terms) (bracketed numbers and letters added).

1. "automatically fabricating integrated circuits"

Hynix contends this term, if construed, should be defined as "making integrated circuits with machines that reduce the involvement of expert designers." Joint Cl Const, App 1 at 1. Toshiba instead contends that "automatically fabricating integrated circuits" means "[a] process that manufactures integrated circuits, without intervention by a human operator." *Id.* Both parties appear to assume that this term relates directly to the *design,* rather than the *fabrication* (i e, making), of integrated circuits.

Putting aside whether "automatically fabricating integrated circuits" should be construed because it only appears in the preamble of claim 17, Hynix Br at 21-22, both parties have misconceived this term. The "system for automatically fabricating integrated circuits" is a machine that fabricates the actual, physical integrated circuits. This conclusion follows from language in the preamble itself: *"an electronic design automation method"* produces a circuit design *"[f]or use* in a *system for automatically fabricating integrated circuits* for operation at high frequencies." Indeed, the specification teaches that the "electronic design automation method" of this patent creates as its end product "a coded tape, * * * which may be used to generate fabrication masks in a commercially available integrated circuit fabrication system." '111 patent at 5:17-20. See also *id* at abstract ("The method of the invention permits a relatively unskilled user to specify a circuit by performance parameters only, and to obtain as an end product a coded output that will drive a conventional mask fabrication system used to produce the circuit."). Because the present dispute centers on the integrated circuit *design* methodology taught by the patent, and because "system for automatically fabricating integrated circuits" relates to the *fabrication,* not the design of such circuits, the meaning of this term is irrelevant to the present dispute. Accordingly, the court presently declines to construe this term. If a dispute later arises between the parties regarding the fabrication process encompassed by the present invention, the court can revisit construction of this term at that time.

2. "integrated circuits for operation at high

Slip Copy                                                        Page 9
Slip Copy, 2006 WL 2547463 (N.D.Cal.)
(Cite as: 2006 WL 2547463 (N.D.Cal.))

frequencies"

*12 Hynix proposes this term, if construed, should be defined as "integrated circuits that function at frequencies where the physical and electrical characteristics of the circuit are closely interrelated." Joint Cl Const, App 1 at 4. Toshiba instead contends that "integrated circuits for operation at high frequencies" are limited to "[m]icrowave and millimeter wave circuits, not including digital logic circuits." *Id.*

Toshiba's construction is problematic because it impermissibly limits the present invention to certain technologies. The patent states that "as a practical matter * * * it makes sense to apply the invention only to technologies and devices that operate at high enough frequencies to justify storing the component descriptions in a unified way * * *." '111 patent at 9:27-32. But the patent also explicitly recognizes that technologies other than microwave or millimeter wave circuit technologies could be used:

> The circuit components are defined in the unified data structure in a manner that is not dependent on the technology involved. Therefore, the data structure, and indeed the [Microwave Monolithic Integrated Circuit] MUSIC approach to design, are equally applicable to other technologies.

Id at 9:23-27. Because Toshiba's construction conflicts with the specification and Hynix contends this term need not be construed, the court declines to construe the term.

3. "primitive circuit elements"

Hynix proposes this term, if construed, means "elements of a circuit at the lower levels of a hierarchical definition of the circuit, examples of which include a resistor, a capacitor, and inductor and a transistor." Joint Cl Const, App 1 at 8. Toshiba contends the term means "[m]icrowave or millimeter wave circuit topologies." *Id.*

As with the previous term, Toshiba's construction impermissibly limits the present invention to microwave or millimeter wave circuit technologies. See *supra* section V(2). Because Hynix does not believe this term needs construction, the court declines to construe the term.

4. "universal format"

Hynix contends that this term, if construed, should be defined as "an arrangement of data constituting all or many characteristics of a circuit." Joint Cl Const,

App 1 at 10. Toshiba instead proposes a construction of "[p]ublicly available, vendor-independent, nonproprietary, arrangement of data for input or output." *Id.*

Toshiba does not cite intrinsic evidence in support of its excessively-detailed construction; rather, a dictionary definition--that "universal" means "used or understood by all"--is said to compel its proposal. Doc # 87 at 24. Yet the wide gap between this generic definition and Toshiba's detailed construction is left unexplained. Accordingly, the court follows Hynix's recommendation and declines to construe the term.

5. "hierarchical definition"

If this term is construed, Hynix proposes it should mean "specification of the design of a circuit through circuit elements of different levels of size or complexity, such as macrocells, microcells and primitive circuit elements." Joint Cl Const, App 1 at 12. Toshiba instead proposes a much more lengthy definition: "Partitioning a circuit into macrocells, partitioning the macrocells into microcells, partitioning the microcells into smaller microcells and primitive circuit elements, and storing for each macrocell, microcell and primitive circuit element, data in a unified format defining electrical characteristics and interconnections, and physical characteristics and locations of the circuit modules." *Id.*

*13 Toshiba's long-winded construction is completely unnecessary because it almost verbatim incorporates limitations that appear in the claim itself. See ' 111 patent at claim 17 ("a method * * * comprising steps of: partitioning a circuit into macrocells; partitioning the macrocells into microcells, partitioning the microcells into smaller microcells and primitive elements; storing for each macrocell, microcell and circuit element, data in a universal format, * * * defining electrical characteristics and interconnections, and physical characteristics and locations of the circuit modules"). Toshiba's construction provides no useful guidance as to the term's meaning and would simply confuse a jury.

Because Toshiba's construction is problematic and Hynix prefers not to construe this term, the court does not construe the term.

6. "unified data structure"

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hynix contends this term means, "a software system that enables access to electrical and physical characteristics of elements in a circuit design." Joint Cl Const, App 1 at 14. Toshiba again proposes a much more involved definition: "A file structure in which both physical and electrical characteristics of every circuit element are stored at any level of complexity together in the [sic] rationally consistent manner to facilitate circuit layout for use in a circuit compaction procedure." *Id*

In its reply brief, Hynix attacks Toshiba's construction only on the basis that it impermissibly imports the limitation "for use in a circuit compaction procedure" from a dependent claim and thereby violates the doctrine of claim differentiation. See Doc # 92 (Hynix Reply Br) at 14. In its submission to the court in support of its *Markman* presentation, Hynix reiterated this argument and also correctly noted the modifier "file" was not supported by the intrinsic evidence. Hynix *Markman* submission, Ex 17. In response to Hynix's reply brief, Toshiba noted in its *Markman* submission that it would be willing to drop the phrase "for use in a circuit compaction procedure" from its proposed construction. Toshiba *Markman* submission, Ex 50.

Toshiba correctly suggests that the parties' current proposed constructions are highly similar. Toshiba's construction in particular is based directly on language in the abstract and claim 17. But the simplicity and straightforwardness of Hynix's proposed construction recommends its adoption in contrast to the relatively and unnecessarily prolix Toshiba proposal. Accordingly, the court adopts Hynix's construction of "unified data structure."

7. "constraint derived from said at least one design parameter"

Hynix proposes this term, if construed, means "limitation on a property of the circuit design." Joint Cl Const, App 1 at 17. Toshiba again proposes a lengthy definition: "A rule received or obtained from at least one design parameter that captures the designer's abilities and intuition wherein compliance with the rule avoids adverse effects on the electrical characteristics of the circuit and compacts the circuit to as small an area as possible while complying with the rule." *Id*

*14 Toshiba again provides a convoluted construction, defining a 9-word term with a construction that is 49 words long. And Toshiba's construction relies on phrases such as "designer's

abilities and intuition" that seem more vague than the term itself. Moreover, the meaning of the term is clear enough from the claim and the specification: a constraint is, as Hynix states, a limitation on a property of circuit design. See '111 patent at FIGS 4 and 6; id at at 7:10-8:46. See also id at 8:12-14 ("The compaction procedure first sets up a set of simultaneous equations which describe the constraints of the layout problem."). Briefly, a user inputs a design parameter, from which a constraint is derived, and the program iterates until the proposed design can no longer meet that constraint. See id at 7:10-8:46.

Because Toshiba's construction is unnecessary and Hynix does not seek construction of this relatively straightforward term, the court declines to construe the term.

8. "considering at least one layout option"

Hynix contends that this term, if construed, means "generating an approximation of the physical information of a circuit design." Joint Cl Const, App 1 at 20. Toshiba instead proposes the term means, "Simulate and optimize the performance of the physical design including the effects of the layout of distributed elements." *Id*

Again, Toshiba has proposed an ambiguous and unnecessary construction. First, it is not clear what the phrase "distributed elements" means; indeed, this term does not even appear anywhere in the patent. Hence, Toshiba's construction would replace the present term with a more ambiguous one. Second, the meaning of "considering at least one layout option" would be clear to one having ordinary skill in the art in light of the specification, especially when compared to Toshiba's proposal. Accordingly, the court declines to construe the present term.

VI

In sum, the court has construed many of the disputed terms of the '311, ' 519, '190 and '111 patents according to the intrinsic record. The court declined to construe some terms because their meaning already was clear or was no longer ambiguous after the court had construed other related terms.

IT IS SO ORDERED.

Slip Copy, 2006 WL 2547463 (N.D.Cal.)

**Motions, Pleadings and Filings (Back to top)**

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2547463 (N.D.Cal.)
(Cite as: 2006 WL 2547463 (N.D.Cal.))

• 2006 WL 1045439 (Trial Motion, Memorandum and Affidavit) Hynix Semiconductor Inc.'s Claim Construction Reply Brief (Mar. 2, 2006)Original Image of this Document (PDF)

• 2006 WL 733610 (Trial Pleading) Plaintiff Hynix Semiconductor Inc.'s Claim Construction Brief (Feb. 9, 2006)Original Image of this Document (PDF)

• 2006 WL 733611 (Trial Pleading) The Toshiba Parties' Opening Claim Construction Brief (Feb. 9, 2006)Original Image of this Document (PDF)

• 2004 WL 2888375 (Trial Pleading) Complaint for Declaratory Judgment of Non-Infringement and Invalidity (Nov. 8, 2004)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of December, 2006, the attached **REDACTED**

**PUBLIC VERSION OF PLAINTIFFS ALZA CORPORATION AND MCNEIL-PPC,**

**INC.'S REPLY BRIEF ON CLAIM CONSTRUCTION** was served upon the below-named

counsel of record at the address and in the manner indicated:


William J. Cattie, III, Esquire                                  HAND DELIVERY
Rawle & Henderson, LLP
300 Delaware Avenue, Suite 1015
Wilmington, DE  19899-0588


James V. Costigan, Esquire                                   ELECTRONIC MAIL
Hedman & Costigan, P.C.
1185 Avenue of the Americas
New York, NY  10036


Eric D. Isicoff, Esquire                                     ELECTRONIC MAIL
Isicoff, Ragatz & Koenigsberg, P.A.
1200 Brickell Avenue
Miami, FL  33131


*/s/ Tiffany Geyer Lydon*
_____

Tiffany Geyer Lydon