**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **ALZA CORPORATION, and**<br>**McNEIL-PPC, INC.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **C.A. No. 05-642-JJF** |
| v. | ) | |
| | ) | <u>**REDACTED**</u> |
| **ANDRX PHARMACEUTICALS, L.L.C. and** | ) | <u>**PUBLIC VERSION**</u> |
| **ANDRX CORPORATION,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DECLARATION OF VIVIAN A. GRAY**
**IN SUPPORT OF REPLY MARKMAN BRIEF SUBMITTED BY**
<u>**ALZA CORPORATION AND McNEIL-PPC, INC.**</u>

**I.    ENGAGEMENT**

1.      I have been asked by ALZA Corporation and McNeil-PPC, Inc.

(collectively "ALZA") to provide my expert opinion on certain matters pertaining to

dissolution testing of dosage forms described in U.S. Patent Nos. 6,919,373 ("the '373

patent") and 6,930,129 ("the '129 patent") (collectively "the patents in suit").  I

understand that my opinion will be used in the above-captioned case.

2.      My consulting fee for this assignment is $250.00 per hour.  No part of my

compensation is dependent upon the outcome of this litigation.

**II.    PROFESSIONAL EXPERIENCE AND QUALIFICATIONS**

3.      My qualifications are reflected in my Curriculum Vitae, attached as

Exhibit A, and the following comments.

1

4.    I received a Bachelor of Science degree in Chemistry from Mary Washington College of the University of Virginia. I have completed several graduate courses in Advanced Organic Chemistry, Analytical Chemistry-Separation Techniques, and Psychopharmacology. Through the years I have taken numerous short courses on a variety of analytical techniques and pharmaceutical sciences.

5.    From 1974 to 1997, I worked at the United States Pharmacopeia (USP), the official public standards-setting authority for all prescription and over-the-counter medicines, dietary supplements, and other healthcare products manufactured and sold in the United States. I began my USP career as a bench chemist performing dissolution testing, and then became a supervisor of dissolution testing and method development.

6.    From 1990 to 1997, I was the staff liaison to the Biopharmaceutics Expert Committee. This committee consists of experts in the field who decide on the content and revisions to USP tests for drug products and USP testing procedures, including the USP General Chapters of Dissolution <711> and Drug Release <724>. My responsibilities as the staff liaison included reviewing proposals and changes to dissolution tests or chapters and providing information and interpretation to the expert committee.

7.    In August 2000, I was elected as a member of the Biopharmaceutics Expert Committee of the USP. The twelve members of the Biopharmaceutics Expert Committee are elected by the Counsel of Experts, a counsel comprised of the chairmen from all the USP Expert Committees. In addition, I am currently on several other USP committees and advisory panels, to include: USP Advisory Panel on Calibrator Tablets,

2

USP Task Force on Liquid-filled Capsules, USP Reference Standards Committee, and the USP Advisory Panel on Performance Testing of Aerosols.

8.    I was the Head of the Dissolution Group of the DuPont Pharmaceuticals Company's Analytical Research and Development Section from 1997 to 2002. In that position I gained experience in developing discriminating dissolution methods, adhering to strict current Good Manufacturing Practices (cGMP) practices, and filing dissolution methods and specifications with regulatory agencies.

9.    I have been an invited speaker for conferences on about 33 occasions, lecturing especially in the areas of calibration, dissolution equipment, sources of error in dissolution testing, method development and validation, new technology, and regulatory topics. I am a proactive participant in the field as demonstrated by my authorship/co-authorship of 40 publications, writing and revising several USP Chapters, initiating changes in USP methods, serving on the USP Biopharmaceutics Expert Committee, the International Pharmaceutical Federation Dissolution Working Group, and the Editorial Board for *Dissolution Technologies* (a peer-reviewed journal dealing specifically with dissolution testing issues). I served on the PhRMA Dissolution Committee from 1997 to 2001.

10.    In 2002, I formed my own company, V.A. Gray Consulting, Inc. I aid others in developing and validating dissolution methods, writing regulatory documents and justifying methodology and specifications, and assessment of current dissolution methods and data for troubleshooting problems. I prepare laboratory staff for audits and

inspections and provide training and supervision to recognize sources of error and importance of observations during the test.

11.    I am currently the Managing Director of the premier publication on dissolution issues, *Dissolution Technologies*.

12.    I have co-authored a book on dissolution testing, *Handbook of Dissolution Testing,* 3rd ed. (2004).

13.    I am a member of the American Association of Pharmaceutical Scientists (AAPS), American Chemical Society (ACS), American Standard Testing Methods, Delaware Valley Chromatography Forum, Philadelphia Pharmaceutical Forum, Controlled Release Society, AAPS in Vitro Release and Dissolution Testing Focus Group, and the ACS Chemical Consultants Network and Dissolution Discussion Group.

14.    By November of 1996, I had been with the USP for over 22 years.  My duties at the USP involved compendial tests and actively working on dissolution methods and calibrator tablets for the calibration of dissolution baths.  In 1996, specifically, I was the liaison to the USP Subcommittee on Dissolution and Bioavailability.  My duties were entirely related to issues surrounding dissolution methods, including method development, validation and regulatory dissolution tests.  I have practiced professionally in the field of dissolution for the past 31 consecutive years.

## III.    PRIOR EXPERT TESTIMONY

15.    In the last four years, I have provided expert deposition testimony in the following matter: *Abbott Labs. v. Teva,* Nos. 02-1512-KAJ and 03-120-KAJ (D. Del. 2005).

## IV.    MATERIALS CONSIDERED

16.    In forming my opinions and conclusions, I have relied upon my general knowledge of, and over three decades of experience in, dissolution testing procedures and evaluating new dissolution testing technology.  I have also reviewed documents produced by the parties in this litigation, including the expert declaration by Andrx's expert, Umesh V. Banakar, Ph.D.  My opinions and conclusions are also based upon my review of the documents and literature references I refer to in this declaration.

## V.    SUBJECT OF MY DECLARATION

17.    I have been asked to respond to the opinions expressed by Dr. Banakar in his declaration concerning appropriate dissolution testing parameters for extended release dosage forms that are to be used in the treatment methods claimed in the patents in suit.

18.    I understand that the patents claim methods of treating ADD or ADHD by administering a dosage form or a pharmaceutical composition containing methylphenidate.  I also understand that the dosage forms/compositions either are required to exhibit a particular dissolution rate (i.e., an ascending rate of release over an extended period of time) or, according to the declaration of ALZA expert Dr. Martin Angst, to cause a particular *in vivo* plasma profile (i.e., a substantially ascending

methylphenidate plasma concentration for about "x" hours). I also understand that some

of the claims of the '373 patent require both of these elements to be satisfied.

## VI.    "RELEASE OF METHYLPHENIDATE AT AN ASCENDING RELEASE RATE"

19.    At paragraph 36 of his Declaration, Dr. Banakar states that, in his opinion,

the phrase "release of methylphenidate at an ascending release rate" should be interpreted

as meaning:

> [A]n *in vitro* dissolution rate (mg/hr) as measured in a USP dissolution apparatus and methodology that is biorelevant, wherein the release rate is calculated as a mean value of at least six dosage units and excludes release from any immediate release portion of the dosage form and wherein the release rate only ascends from one hourly time point to another and does not decline or remain constant from one time point to another.

20.    Dr. Banakar then suggests that a person of ordinary skill could not

determine what an "appropriate dissolution test" would be for evaluating

methylphenidate dosage forms based on his review of the patents and his knowledge of

the field of dissolution testing. Instead, he suggests that a person of ordinary skill in the

dissolution testing field would interpret the patent claims as requiring dissolution testing

of methylphenidate dosage forms that is "biorelevant." I do not agree with Dr. Banakar

on either point.

### A.    Appropriate Dissolution Test Procedures Are Based on the Nature of the Dosage Form Being Tested

21.    The *in vitro* release rate of a sustained release methylphenidate dosage

form can be readily determined by performing an appropriate dissolution test on the

dosage form. An appropriate dissolution test is one that employs dissolution testing

parameters that are appropriate for the particular dosage form being tested. In other

6

words, the characteristics of the dosage form being tested will dictate what dissolution testing parameters are appropriate, and these would be readily understood and appreciated by a person working in this field.

22.     The techniques used in performing dissolution tests are well known, validated by industry standards, and simple to select and perform. As such, the selection of appropriate dissolution testing parameters for any particular dosage form is a straightforward process. Consistent with my opinion, the patent states that "[d]rug release rates are calculated under in vitro dosage form dissolution testing conditions known in the art." (Exh. B, col. 9, ll. 23-25)

23.     As the patent suggests, and based on my personal knowledge, there is extensive guidance in the public literature concerning the selection of appropriate dissolution testing conditions for extended release dosage forms. These well-accepted literature sources include (i) the United States Pharmacopeia and National Formulary (USP); (ii) Industry Guidances and other publications from the Food and Drug Administration (FDA) and (iii) other literature documenting dissolution testing procedures.

24.     Dr. Banakar                    **REDACTED**

confirmed that these references are among the known and well-accepted sources of relevant guidance for selecting appropriate dissolution testing procedures.

25.

**REDACTED**

**REDACTED**

26.    Similarly, Dr. Banakar states in his declaration that the USP is "the standard bearer for the pharmaceutical industry in terms of dissolution testing." *See* Banakar Decl. ¶49.

27.    The USP is a compendium of public pharmacopeial standards for, among other things, dosage forms, drug substances, dissolution and release rate testing. The USP is widely used by pharmaceutical manufacturers who develop, test and market therapeutic products worldwide. The Federal Food, Drug, and Cosmetics Act, 21 U.S.C. §321 et. seq., designates the USP as the official compendium of standards for drugs marketed in the United States.

28.    The USP also contains monographs for specific drug substances and dosage forms that provide comprehensive guidance on how to test and evaluate the drug product(s) that is the subject of the monograph.

29.    A monograph devoted to extended release (ER) methylphenidate hydrochloride formulations ("MPH-ER Monograph") (Exh. D) is part of the USP and has been since 1990. The MPH-ER monograph includes specific guidance on dissolution testing of extended release methylphenidate dosage forms.

30.    I note that while Dr. Banakar recognizes that the USP is an important reference used by those who conduct dissolution tests, he does not refer to the monograph

in the USP devoted to extended release methylphenidate products or any specific sections
of the USP to support his opinions.

31.     According to the USP and these other literature sources, an appropriate
dissolution test for a methylphenidate extended release dosage form is one that employs
testing parameters that are chosen based on the characteristics and properties of the
dosage form being tested. For example, General Chapter <1088> of the USP ("In Vitro
and In Vivo Evaluation") states the following as to the selection of the dissolution
medium and the apparatus for testing a dosage form:

a.      Dissolution medium: deaerated water or, *if substantiated by the solubility
        characteristics of the drug or the formulation,* buffered aqueous solutions
        (typically pH 4 to 8) *or* dilute acid (0.001N to 0.1 N hydrochloric acid).

b.      Apparatus: USP states that "choice of apparatus should be based *on
        knowledge of the formulation design and actual dosage form performance*
        in the *in vitro* test system" (emphases added).

32.     As these sections indicate, the selection of appropriate dissolution testing
parameters, such as the medium and the dissolution apparatus to be used, would be
chosen based on the physical characteristics of the dosage form being tested (i.e., the
physical properties of the dosage form, such as the mechanism by which the dosage form
releases the active ingredient, the solubility of active ingredient, etc.).

33.     Dr. Banakar agrees that one must take "into account the type of dosage
form" being tested when determining the parameters of an appropriate dissolution test.
Banakar Decl. ¶ 46. Despite this, Dr. Banakar does not refer to this specific guidance in

the USP concerning selection of appropriate dissolution testing parameters in his declaration.

     34.

**REDACTED**

            In FDA parlance, "drug product" refers to the dosage form (while "drug substance" refers to the active ingredient).

     35.    Based on these observations in the public literature and in the testimony of Dr. Banakar and Ms. Vaughn, I believe an individual seeking to determine the *in vitro* rate of release of an extended release methylphenidate dosage form could readily arrive at an appropriate dissolution test that is based on a selection of dissolution test parameters dictated primarily by the physical characteristics of the dosage form being tested.

     36.    As stated in the USP, one would know the characteristics of a formulation before beginning dissolution tests and therefore could readily take into account those characteristics in setting up an appropriate test. By way of example, if a tablet were designed to release a drug at a pH of at least 6.5, there would be no point in conducting dissolution tests at a lower pH. Persons who set up dissolution tests routinely consider such parameters and devise appropriate tests.

10

**B.    Dr. Banakar's Opinion That One Should Conduct "Biorelevant" Dissolution Testing or Testing in an Acidic Dissolution Medium Is Contrary to Guidance in the USP and Andrx's Own Dissolution Testing Protocol**

37.    Dr. Banakar suggests in his declaration that an appropriate dissolution test must be one that is "biorelevant." He indicates that, in his opinion, "biorelevant" means that one would take into account "the type of dosage form and the conditions under which the dosage form is to be administered to the patient and that the dissolution conditions have relevance to the conditions in the body at least in terms of pH." Banakar Decl. ¶46.

38.    I am not aware of any sections of the USP, FDA Guidances or other literature known in November of 1996 that suggest that dissolution testing be performed under "biorelevant" conditions, particularly as Dr. Banakar defines that concept. To my knowledge, in November of 1996, the term "biorelevant" had no single predefined or industry-accepted meaning of which I am aware that is relevant to dissolution testing.

39.    Indeed, the term is inherently ambiguous. To some, it might suggest that dissolution testing should be conducted in steps, each at a different pH similar to the pH in the different parts of the gastrointestinal tract. But Dr. Banakar seems to have a different view. At paragraph 46 of his Declaration, Dr. Banakar suggests that "biorelevant" testing means that one should, among other things, take into account "that the dissolution conditions have relevance to the conditions in the body at least in terms of pH." He then states, in paragraph 47, that "a biorelevant dissolution medium would require the pH to be relatively acidic during drug release, as ... most of the relevant portion of the gastrointestinal tract in which the dosage form will release MPH in the

body is acidic to slightly basic, as would be known to a [person of ordinary skill in the art]."

40.     As Dr. Banakar seems to appreciate (see, paragraph 48), the pH of the human gastrointestinal tract varies from acidic to basic. Because there is no single pH found in the environment of the gastrointestinal tract, Dr. Banakar has no basis for suggesting that only a highly acidic pH must be used in the dissolution testing medium.

41.     Dr. Banakar goes further and states that with respect to methylphenidate, his "biorelevant" requirement means that testing must occur in a highly acidic testing medium because "MPH is unstable at basic pHs ...."

42.     The instability of methylphenidate in highly basic solutions is a *chemical property* of methylphenidate. Moreover, this property of methylphenidate is a consideration relevant only to how one *measures* the amount of methylphenidate recovered in solution (i.e., the methylphenidate recovered in the dissolution media after it has been released from the dosage form). The instability of methylphenidate in basic solutions has no effect upon the rate at which the methylphenidate is *released* from the dosage form, which is controlled by the design and properties of the dosage form.

43.     The fact that some amount of methylphenidate may degrade at basic pHs also will not prevent one from accurately measuring the amounts of methylphenidate that have been released from a dosage form into the dissolution testing medium. When methylphenidate is exposed to a dissolution medium with a basic pH, it produces certain well-known degradation products. In order to determine the total amount of methylphenidate released from the dosage form, one merely adds the amounts of

methylphenidate and its degradation products that are recovered from the dissolution medium.

**REDACTED**

44.     Dr. Banakar also points to dissolution testing parameters that were used to test some of the examples of dosage forms described in the patent. He notes, for example, that the osmotic device systems described in the examples of the patent were tested using a pH 3 dissolution medium. My understanding is that the rate of release of methylphenidate from the examples of osmotic release dosage forms described in that patent is not dependent on the pH of the solution – i.e., the osmotic release systems disclosed in the patents will function the same way regardless of the pH of the solution. As such, one would not view the pH of the dissolution medium used in those examples to be an essential feature of dissolution testing of *any* type of dosage form that contains methylphenidate. This is because that person would have appreciated that a dissolution medium at any pH could have been employed without affecting the dissolution profiles that were observed for those dosage forms. To the contrary, if the dissolution rate of a dosage form was influenced by the pH of dissolution medium, that would be taken into account in setting up an appropriate dissolution test.

45.     Dr. Banakar's opinions regarding the pH of the dissolution testing medium also are inconsistent with Andrx's own testing protocol, the specific guidance in the USP MPH-ER Monograph, and the principles outlined in the USP and other literature for

selecting appropriate dissolution testing conditions for an extended release

methylphenidate dosage form.

46.

**REDACTED**

47.

**REDACTED**

48.

**REDACTED**

49.     Dr. Banakar's suggestion that the dissolution medium only be acidic also plainly contradicts the explicit guidance in the USP for testing methylphenidate extended release products.  The USP MPH-ER Monograph recommends use of unbuffered water as the dissolution medium for extended release methylphenidate dosage forms.  *See* Exh. D.  Water is a slightly acidic-to-neutral medium having a pH between 5.0 and 7.0.  Exh. I.

50.     I note that the USP MPH-ER Monograph provides specific guidance regarding selection of the dissolution testing apparatus.  For example, it refers to USP General Chapters <711> (Dissolution) and <724> (Drug Release) as a source of additional guidance on the selection of dissolution testing parameters.  These chapters explain that USP Apparatuses 1, 2, and 7 are suitable apparatuses for conducting dissolution testing extended release methylphenidate dosage forms.

51.                      **REDACTED**

                                        This appears to be consistent with the recommendations of the USP MPH-ER Monograph and the general guidance provided in the USP and other literature sources for selecting an appropriate dissolution testing apparatus.

52.     In view of these various points, I do not agree with Dr. Banakar's opinion that selection of appropriate dissolution testing conditions would prove to be challenging in any manner.

**REDACTED**

## C.    "Mean Value of At Least 6"

53.    Dr. Banakar suggests that the claims require that a "mean value of at least six dosage units" be used in evaluating properties of a dosage form, particularly to determine if the dosage form exhibits an ascending rate of release of methylphenidate. Banakar Decl. ¶36.  The only rationale offered by Dr. Banakar for his opinion is found in paragraph 50 of his Declaration.  There he states "under both USP and Food and Drug Administration requirements, the dissolution testing would require that at least six tablets, if not twelve, be tested and a mean calculated from the six tablets."

54.    I do not agree that the claims require one to test at least six tablets, or use mean data from testing of six tablets, to conclude that a dosage form exhibits an ascending rate of release.

55.    First, I note that Dr. Banakar does not provide any citation to a USP or FDA authority to support his opinion.  I also note that the USP explicitly states that no particular quantity of a substance must be used in performing a dissolution test, so long as the given test is performed in accordance with good manufacturing practices.  *See* Exh. J (USP General Notice, col. 2, second full paragraph).

56.    Finally, I was unable to find anything in the patents that states that the six tablets that must be tested, or that only mean data from testing of those six tablets must be used to determine if a dosage form exhibits an ascending rate of release for an extended period of time.

57.    As such, I do not agree with Dr. Banakar that it is a requirement of the claimed treatment methods that one conclude that a dosage form exhibits an ascending rate of release through use of mean data from testing of a least six tablets.

**D.    Periodic Interval**

58.    In his declaration, Dr. Banakar states that the claims require testing of dosage forms using an hourly periodic interval.

59.    The claims do not contain an explicit requirement for the duration of the periodic interval to be used in assessing whether a dosage form exhibits an ascending rate of release.  Also, I note that the patent specification uses a general definition of periodic interval.  Thus, while the patent does disclose use of an hourly interval in the context of the Examples, I cannot find any passage in the patent that indicates that *only* one-hour intervals must be used for all dosage forms.

60.    As I previously explained, appropriate dissolution testing parameters are selected based on the attributes of the dosage form being tested.  While a one hour interval is commonly used to evaluate dissolution rates of dosage forms designed to deliver active ingredient over a 12 to 24 hour period, it is not the only interval that can be or has been used.  In addition, for dosage forms that exhibit a shorter or longer duration of delivery, other intervals may be more appropriate (e.g., 30 minutes or 2 hours).  Therefore, the fact that a given dosage form is intended to release a drug for a "number of hours," Banakar Decl. ¶69, standing alone, does not explain why one must use only hourly intervals to measure the dissolution rate of a methylphenidate extended release dosage form.

61.    I thus disagree with Dr. Banakar's opinion that the claims require use of hourly intervals to measure dissolution rates of methylphenidate dosage forms to be used in the claimed treatment methods.

I declare under penalty of perjury under the laws of the United States of America that all statements and affirmations made herein of my own knowledge are true and correct, and all statements made are believed to be true and correct.

November 29, 2006

Vivian A. Gray

# EXHIBIT A

Curriculum Vitae (CV)

Vivian A. Gray
9 Yorkridge Trail
Hockessin, DE  19707
Tel. 302-235-0621, Fax 443-946-1264
vagray@rcn.com
www.vagrayconsulting.com
www.dissolutiontech.com

**Career Summary:** Vivian has spent the last 31 years involved in all aspects of dissolution testing and evaluating new dissolution technology. At the United States Pharmacopeia, she enjoyed a long career serving first as a bench chemist, supervisor and lastly as a liaison to various expert USP committees, including the Biopharmaceutics and Dissolution Expert Committee.  In 1997, Vivian joined the DuPont Pharmaceuticals Company Analytical Research and Development Section as the Head of the Dissolution Group. In that position, she gained experience in developing discriminating dissolution methods, writing SOP's and a variety of documents, adhering to strict cGMP practices, and filing CMC aspects of dissolution methods and specifications with regulatory agencies.

Vivian has been an invited speaker for conferences on 30 occasions, lecturing especially in the areas of calibration, dissolution equipment, sources of error in dissolution testing, method development and validation, new technology, and regulatory topics. She is a proactive participant in the field as demonstrated by 40 publications, writing and revising USP Chapters, initiating change in USP methods, organizing workshops, serving on the USP Biopharmaceutics Expert Committee, the FIP Dissolution Working Group, and the Editorial Board for *Dissolution Technologies*. She served on the PhRMA Dissolution Committee from 1997 to 2001.  Vivian received the American Society of Hospital Pharmacists Research and Education Foundation 1982 Research Award for co-authoring an article on packaging using USP calibrator model tablets and received the FDA Commissioner's Special Citation for involvement in the FDA task force on Gelatin Crosslinking.  Vivian has co-authored a book on dissolution testing called "Handbook of Dissolution Testing", Third Edition, published in 2004.

In 2002, she formed her own consulting business in dissolution testing and related areas. The company name is V. A. Gray, Consulting, Inc.  In June of 2003, she became Managing Director of *Dissolution Technologies*, a peer-reviewed journal dealing specifically with dissolution testing issues.

## ACADEMIC AND PROFESSIONAL HONORS

| Date | Institution/Organization | Honor |
|------|--------------------------|-------|
| 1982 | American Society of Hospital Pharmacists Research and Education Foundation | Research Award |
| 1998 | FDA | Commissioner's Special Citation |

## EMPLOYMENT HISTORY

6/10/03-Present        Dissolution Technologies, Inc., President

This is a quarterly journal consisting of technical articles on the subject of dissolution testing. A Question and Answer section is also included along with meeting reports.

Job Description

Managing Director: Collects and reviews articles for journal. Coordinates peer-review and proofreading of articles. Solicits and manages advertising.

1/01/02-Present        V. A. Gray Consulting, Inc., President

Job Description

Provides consulting services in developing and validation of dissolution methods, writing regulatory documents and justifications for methodology and specifications, assessing current dissolution methods and analyzing data for troubleshooting problems, advice on regulations from USP, other pharmacopoeias, and regulatory agencies, FDA and others. Consults on developing methods and evaluating new technology for conventional and novel dosage forms. Prepares laboratory staff for audits and inspections, and training for method development, validation, recognizing sources of

2

error and importance of observations during the test. Advice on the Biopharmaceutics Classification System filing and justification. Manages projects that involve laboratory work for method development and other dissolution testing in off-site testing facilities. Provides expert advice in litigation.

| | |
|---|---|
| 12/97-12/01 | Bristol-Myers Squibb Pharmaceutical Company (DuPont Pharmaceuticals Company until October 1, 2001), Analytical Research and Development, Senior Research Scientist, Group Leader of Dissolution Testing |

### Job Description

- Responsible for managing the group that performs dissolution testing of candidate formulations, including method development and selection of dissolution conditions, stability/clinical release testing, process optimization, technology transfer and cleaning certifications. This includes supervision of three supervisors in a group of 11 chemists.
- Responsible for dissolution portion of CMC section within NDA and MAA submissions, justification of dissolution specifications, answers regulatory questions, participates in FDA teleconferences.
- In-depth knowledge of FDA guidances and USP issues
- Writes dissolution validation, and development reports, pertinent sections of FDA background packages and tech transfer reports, and protocols.
- Oversees the calibration of equipment and writing of SOP's as applied to Dissolution testing.
- Prepared for pre-approval inspections and audits.
- Interacts frequently with formulators and PI's to interpret dissolution data, support formulation development, and ensure project timelines are met.
- Responsible for dissolution technology transfer.
- Training analyst in regulatory requirements and analytical techniques for dissolution.
- Evaluate new technology and automation to increase productivity and lab efficiency.
- Recommend and justify purchase requests.
- Performance reviews and mentoring analysts

| | |
|---|---|
| 1990 - 1997 | United States Pharmacopeia (USP), Rockville, MD |
| | Scientist, Liaison to the USP Subcommittee on Dissolution and Bioavailability, General Chapters Subcommittee, and Chemistry 4 Subcommittee |

### Job Description

- Revise and propose new USP monographs, USP General Chapters, and Dissolution tests with approval and in cooperation with the Subcommittee of experts.
- Initiate requests for laboratory support for analytical issues. Review completed lab work.
- Interact with industry, FDA and other interested parties to improve standards and/or harmonize with other Pharmacopoeias, dissolution tests, General Chapters, and monograph tests.
- Review submissions and evaluate validation data for improved or new tests, answer questions regarding dissolution, calibration, USP General Chapters and other methods.
- Give presentations on dissolution issues, impurity topics and method validation
- Write articles on USP initiatives and guidelines on dissolution and monograph impurity issues.
- Plan workshops, open conferences, and Subcommittee meetings

1982-1990          United States Pharmacopeia (USP), Rockville, MD
                   Supervisor, Methods Group

### Job Description

- Group Function: Development of new and evaluation of existing Dissolution tests, Assays, and organic volatile impurities and chromatographic purity methods.   Purity analysis of USP Reference Standards.

### Supervisory duties:

- Develop plan for experimental work, review, interpret, and tabulate results

- Write or edit project reports, write laboratory policies and manuals

- Schedule chemists' work and coordinate testing with other groups

- Recommend capital equipment purchases

- Give performance reviews and conduct interviews

1974-1982          United States Pharmacopeia (USP), Rockville, MD
                   Chemist III

### Job Description

- Perform experiments including HPLC, TLC, GC, UV, IR, NMR, and dissolution techniques
- Record data, write project reports
- Calibrate instruments and maintain log books

## COMMITTEE AND SOCIETY MEMBERSHIPS

| Date | Organization | Capacity |
|------|--------------|----------|
| AUG 2000- | USP Expert Biopharmaceutics Committee | Member |
| JULY 2001-Dec. 2005 | USP Calibration Project Team | Chair |
| JANUARY 1, 2006 | USP Advisory Panel on Calibrator Tablets | Chair |
| JAN 2003- | USP Task Force on Liquid-filled Capsules | Chair |
| JAN 2004- | USP Reference Standards Committee | Member |
| AUGUST 2003- | USP Advisory Panel on Performance Testing of Aerosols | Co-Chair |
| JAN 1998- | Delaware Valley Chromatography Forum | Member |
| JAN 1998- | American Chemical Society (ACS) | Member |
| JAN 1995- | Philadelphia Pharmaceutical Forum (PPF) | Member |
| JULY 1998-12/01 | PhRMA Dissolution Committee | PhRMA Subcommittee on Dissolution Calibration |
| JAN 1996- | Dissolution Discussion Group (DDG) | Member |
| JAN 1999- | Editorial Board for *Dissolution Technologies* | Research Editor |
| JUNE 2003- | *Dissolution Technologies* | Owner |
| JAN 1998-DEC. 2004 | FIP Dissolution Working Group | Member |
| JAN 1985- | AAPS, APQ section | Secretary Treasurer, 2005 Vice Chair, 2006 |
| JUNE 2003- | Controlled Release Society | Member |
| JUNE 2004- | AAPS Dissolution Focus Group | Member and co-founder |

5

EDUCATION

| School | Date(s) | Major | Degree |
|--------|---------|-------|--------|
| Mary Washington College of the University of Virginia, Fredericksburg, VA | 1967 | Chemistry (Biology Minor) | BSc. |

PUBLICATIONS

Vivian Gray, "Challenges to the Dissolution Test, Including Equipment Calibration", 2006, *Pharmaceutical Technology, Analytical Methods Primer*, 4-13.

Royal Hanson and Vivian Gray, "Handbook for Dissolution Testing", Third Edition, 2004, *Dissolution Technologies, Inc.*, Hockessin, DE.

Vivian Gray, "Controlled Release Society Annual Meeting Report. Dissolution Highlights", *Dissolution Technologies*, 2004, 11 (4), 30-31.

Vivian Gray, "Future Directions for Dissolution Testing in the Pharmaceutical Industry", *Dissolution Technologies*, 2004, 11 (3), 13-14.

C. Jeanne Taborsky and Vivian Gray, "Meeting Report, AAPS/USP/CRS Workshop on Dissolution; New Technologies and Regulatory Initiative", *Dissolution Technologies*, Volume 11, Issue 2, 2004, 20-27.

Vivian Gray, "Dissolution Specifications Industry Update", GMP Review, April 2004, pages 24-28.

Tahseen Mirza and Vivian Gray, "Meeting Report: Conference on Dissolution, Bioequivalence, and Bioavailability", *Dissolution Technologies*, 2004, 11 (1), 25-28.

Qingxi Wang and Vivian Gray, "HPLC in Dissolution Testing", Chapter for the book, "Handbook of Pharmaceutical Analysis by HPLC", accepted for publication, December 2003.

Vivian Gray, "Dissolution Testing; An Overview and Summary of Recent Trends and Regulatory Activities", Tablets and Capsules, 1 (1), October 2003, 20-24.

Mauger J, Ballard J, Brockson R, De S, Gray V, Robinson D, "Intrinsic Dissolution Performance Testing of the USP Dissolution Apparatus 2 (Rotating Paddle) Using Modified Salicylic Acid Calibrator Tablets: Proof of Principal", *Dissolution Technologies*, 10 (2), August 2003, 6-15.

Vivian Gray, "Dissolution Testing Using Fiber Optics – A Regulatory Perspective, *American Pharmaceutical Review*, Volume 6 (2), 2003, 26-30 and *Dissolution Technologies*, Volume 10 (4), November 2003.

Vivian Gray, "Fiber Optics Update", posted on Internet website, www.dissolutionsolutions.net, March 2003.

Vivian Gray, "Dissolution Testing -- Good Manufacturing Practices", *European Pharmaceutical Review,* 1 (2003), 58-61.

Vivian Gray, "Compendial Testing Equipment: Calibration, Qualification, and Sources of Error', Chapter for the book *Dissolution Testing of Pharmaceuticals* the next volume in the Dekker series *Drugs in the Pharmaceutical Sciences*, accepted for publication, August 2002.

Jeffrey Hofer, Lilly Research Laboratories and Vivian Gray, V. A. Gray Consulting, Inc., "Examination of Selection of Immediate Release Dissolution Acceptance Criteria", *Pharmacopeial Forum*, Volume 29 Number 1, 2003 and Dissolution Technologies, Volume 10 (1), 2003, 16-20.

Vivian Gray, "Let's Talk Fiber Optics", posted on Internet website, www.dissolutionsolutions.net, September 2002.

Vivian Gray, "Meeting Report: AAPS/FDA Workshop on Biopharmaceutics Classification System" *Dissolution Technologies*, Volume 9, Issue 4, 2002.

Vivian Gray, "Meeting Report: AAPS/FDA Workshop on Dissolution/In Vitro Release Testing and Specifications for Special Dosage Forms" *Dissolution Technologies*, Volume 9, Issue 4, 2002.

Vivian Gray, and Brent Miller, "Current Good Manufacturing Practices in the Dissolution Laboratory", *Pharmaceutical Canada*, Volume 3 Number 3, 2002.

Vivian Gray, "Identifying Sources of Error in Calibration and Sample Testing", *American Pharmaceutical Review*, summer 2002.

Vivian Gray, "Dissolution Summary: AAPS/FDA Workshop on Specifications", *Dissolution Technologies*, Volume 9, Issue 2, April 2002.

Vivian Gray, "Update on Dissolution Testing—Recent Activities and Trends, *Dissolution Technologies,* Volume 9, Issue 1, Feb. 2002.

Vivian Gray, Mary Beggy, Robert Brockson, Nancy Corrigan and John Mullen, "A Comparison of Dissolution Results using O-ring versus Clipped Basket Shafts", *Dissolution Technologies,* Volume 8, Issue 4, Nov. 2001

Vivian A. Gray, DuPont Pharmaceuticals Company (USP Biopharmaceutics Committee), Cynthia K. Brown, Quintiles, Inc., Jennifer B. Dressman, J.W. Goethe University, Lewis J. Leeson, LJL Associates, Inc. (USP Biopharmaceutics Committee). "A New General Chapter on Dissolution", *Pharmacopeial Forum,* Volume 27, Number 6, 2001

Vivian A. Gray, "Dissolution—Current Activities and Trends", published in *Pharmaceutical Canada,* spring 2001, Volume 2, Number 2 and Dissolution Technologies Volume 8, Issue 4, Nov. 2001.

Vivian A. Gray, "Basic Dissolution Testing"   Published as an AAPS Short Course, on CD-ROM (Microsoft Power Point electronic format).

PhRMA Subcommittee on Dissolution Calibration: Steve Brune (Pfizer); Jim Bucko (Eli Lilly); Sally Emr (Ortho-McNeil); Vivian A. Gray (DuPont Pharmaceutical Co.); Kathy Hippeli (Schering Plough); Al Kentrup (Hoescht Marion Roussel); Dave Whiteman (Hoescht Marion Roussel); Mark Loranger (Boeringer Ingelheim); Mary Oates, Chairperson (Warner Lambert), "Dissolution Calibrator: Recommendations for Reduced Chemical Testing and Enhanced Mechanical Calibration", *Pharm. Forum*, 2000, 26(4), 1149-1166.

Aubry, A. F.; Sebastian, D.; Hobson, T.; Xu, J. Q. and Gray, V. A., "In-Use Testing of Extemporaneously Prepared Suspension of New Non-nucleoside Reversed Transcriptase Inhibitors In Support of Phase I Clinical Studies", *J. Pharm. and Biomed. Anal.*, 23 (2000), 535-542.

Members of the Gelatin Capsule Working Group, "Collaborative Development of Two-Tier Dissolution Testing for Gelatin Capsules and Gelatin-Coated Tablets Using Enzyme-Containing Media", *Pharm. Forum*, 1998, 24(5), 7045-7050.

Gray, V.A., "Two-Tier Dissolution Testing", *Dissolution Technologies*, May, 1998, 5(2).

Gray, V.A., "Report on the USP Dissolution and Bioavailability Subcommittee Activity Regarding the Peak Vessel", *Dissolution Technologies*, Feb. 1998, from Roundtable Conference at AAPS meeting in Boston, MA, November, 1997

Gray, V.A. and Foster, T.S., "Utility of USP Salicylic Acid Calibrator Tablets", *Pharm. Forum* 1997, 23(6).

Gray, V.A. and Grady, L.T., "USP Dissolution Standards--Revisions, Initiatives and New Policies Since 1980", *Pharm Forum*, 1997, 23(3), 4183-4197.

Okeke, C.C.; Barletta, F.P.; Gray, V.A., Krasowski, J.A., Paul, W.L., Belson, J.J. and Grady, L.T., "USP Standards and Activities Affecting Pharmacy Practice," *Am. J. Health-Syst. Pharm.*, 1997, 54.

Foster, T.S. and Gray, V.A., "USP Dissolution <711>, Pooled Sampling--Response to Comments Received", *Pharm. Forum*, 1997, 23(3), 4248-4249.

Gray, V.A. and Rippere, R.A., "Labeling Issues for Recently Approved Abbreviated New Drug Applications for Extended-release Products", *Pharm. Forum*, 1996, 22(1), 1942.

Gray, V.A. and Dressman, J.B., "Change of pH Requirements for Simulated Intestinal Fluid TS", *Pharm. Forum*, 1996, 22(1), 1943-1945.

Gray, V.A. and Lovering, E.G., "Other Impurities Proposal--The 0.1% Level in Foreign Substances and Impurities", *Pharm. Forum*, 1995, 21(6), 1650-1653.

Achanta, A.S.; Gray, V.A., Cecil, T.L. and Grady, L.T., "Evaluation of the Performance of Prednisone and Salicylic Acid USP Dissolution Calibrators," *Drug Development and Industrial Pharmacy*, 1995, 21(10), 1171-1182.

Gray, V.A., Hubert, B.B. and Krasowski, J.A., "Calibration of Dissolution Apparatus 1 and 2--What to do When Your Equipment Fails", *Pharm. Forum*, 1994, 20(6), 8571-8573.

Taborsky-Urdinola, C.J., Gray, V.A. and Grady, L.T., "Effects of Packaging and Storage on the Dissolution of Model Prednisone Tablets", *J. of Hosp. Pharm.*, 1981, 38, 1322-1327.

Thakker, K.D., Naik, N.C.; Gray, V.A. and Sun, S., "Fine-Tuning of Dissolution Apparatus for Apparatus Suitability Test Using the USP Dissolution Calibrators", *Pharm. Forum*, 1980, 6(4).

PRESENTATIONS

Invited Speaker:

Vivian Gray, "Basic Dissolution Requirements" presented at the AAPS Sunrise School at the AAPS Annual Meeting held in Nashville, TN on November 9, 2005.

Vivian Gray," Future Challenges of the Dissolution Performance Test", presented at the AAPS Roundtable Symposium at the AAPS Annual Meeting held in Baltimore, MD, on November 10, 2004.

Vivian Gray, "Dissolution Method Development and Validation", presented at the USP Annual Meeting, held in Iselin, NJ, on September 28, 2004.

Vivian Gray, "Design and Calibration of Dissolution Test Equipment", presented at the FIP/WHO/CHINA Bioequivalence and Hands on Dissolution Workshop, held in Beijing, China on April 12-13 and Shanghai, China on April 15-16.

Vivian Gray, "Dissolution Testing with Fiber Optics: Industry Perspective on Regulatory Aspects", presented at the AAPS Workshop on Dissolution: New Technology and Regulatory Initiatives held in Bethesda, MD on March 30, 2004.

Vivian Gray, "Dissolution Regulatory GMP Issues, Including Preparing for a PAI", presented at the Dissolution, Bioequivalence and Bioavailability Conference in Philadelphia on January 26, 2004.

Vivian Gray, "Solubility Considerations in Dissolution Method Development", presented at the Strategies for Improving Solubility Conference held in Brussels, Belgium on October 3, 2003.

Vivian Gray, "Method Validation in the Dissolution Lab" presented at the Dissolution, Bioequivalence and Bioavailability Conference held in Brussels, Belgium October 2, 2003.

Vivian Gray, "Dissolution Specifications Industry Update", presented at the Dissolution, Bioequivalence and Bioavailability Conference in Brussels, Belgium October 3, 2003 and in Philadelphia January 26, 2004.

Vivian Gray, "Challenges of Developing Dissolution Methods and In Vivo/In Vitro Correlations for Poorly Soluble Drugs, Including a Discussion of Novel Dosage Forms", presented at the Dissolution, Bioequivalence and Bioavailability Conference in Philadelphia, PA on Feb. 3, 2003, June 23, 2003, and in Brussels, October 3, 2003.

Vivian Gray, "Calibration and Qualification of Non-Compendial Dissolution Equipment, Including Sources of Error', presented at the Dissolution Innovation Conference held in Raleigh, NC on August 5, 2003.

Vivian Gray, "Dissolution Testing with Fiber Optics: Regulatory Perspective and Evaluation Tips", presented at the Dissolution Innovation Conference held in Raleigh, NC on August 6, 2003.

Vivian Gray, "Dissolution Testing of Special Dosage Forms: Summary of FIP Workshops and Publication", presented at the Dissolution Innovation Conference held in Raleigh, NC on August 7, 2003.

Vivian Gray, "Dissolution Regulatory GMP Issues", presented at the International Pharmaceutical Academy Exposition 2002 in Toronto, Canada, on September 24, 2002.

Vivian Gray, "Calibration and Qualification—Mechanical and Tablet Calibration", presented at the AAPS/FDA Workshop on Dissolution/In Vitro Release Testing and Specifications for Special Dosage Forms In Arlington, VA on September 16, 2002.

Vivian Gray, "Challenges in Developing Dissolution Methods and In Vivo and In Vitro Correlations for Poorly Soluble Drugs", presented at the 44th Annual International Industrial Pharmaceutical Research and Development Conference on Strategies for formulating poorly soluble Drugs in Merrimac, Wisconsin on June 7, 2002.

Vivian Gray, "Recent Trends and Initiatives in Dissolution, Including Calibration", Presented at the DDG (Dissolution Discussion Group), in Chapel Hill, NC on May 23, 2002.

Vivian Gray, Mary Beggy, Robert Brockson, Gina Stick, "Oral Dosage Forms—General Considerations: Calibration and Qualification", Presented at Workshop sponsored by FIP, "Dissolution Testing of Special Dosage Forms", in Frankfurt, Germany on 05MAR01.

Vivian Gray, "Identifying Sources of Error and Variability and Sample Testing", Presented at a Dissolution Conference in Philadelphia, PA, 27FEB01

Vivian A. Gray, John J. Mullen, and Robert W. Brockson,

"Encapsulated Tablets - Dissolution Testing Considerations"   Presented at Dissolution Testing Conference, Vienna, VA, November 30 to December 1, 2000.

Vivian A. Gray and Munir Hussain, "Gelatin Cross-linking in Capsules and its Effect on Dissolution, Including a Case Study", Dissolution Testing Conference 2000, Philadelphia, PA.

Vivian A. Gray and Gina Leonard, "Overview of Semi-Automated Equipment in a Dissolution Laboratory", ISLAR, Boston, MA, 1999.

Vivian A. Gray, "Calibration of Apparatus I and II: What to do When Your Equipment Fails", Calibration and Validation Group, 1998.

Vivian A. Gray, "What Dissolution Can Do for You" DuPont Pharmaceuticals Company, 1998.

Vivian A. Gray, "USP Update: Chewable Tablets, Calibrator Tablets, Pooled Sampling, Two Tier Testing, and Other Issues", Philadelphia Pharmaceutical Forum, 1997

Vivian A. Gray, "Capsules Two Tier Dissolution Testing", AAPS Southeast Regional Meeting, 1997

Vivian A. Gray, "Extended Release Standards", Pharm Tech Conference, 1997.

Vivian A. Gray, "Dissolution Calibrators" AAPS Short Course on Dissolution, held at the AAPS Annual Meeting in November, 1996.

Vivian A. Gray, "Dissolution Calibrators", Zentrallaboratorium Deutscher Apotheker, held in Frankfurt Germany in 1996.

Vivian A. Gray, "Dissolution Calibrators",  AAPS Dissolution Workshop held in Crystal City , MD on Sept. 26, 1995.

Podium Presentations - Co Authorship:

Kim Huynh-Ba, Anne Aubry, and Vivian Gray, "Developing Dissolution Methods for Comparators", presented at the AAPS Workshop on Dissolution:  New Technology and Regulatory Initiatives held in Bethesda, MD on March 31, 2004.

Robert Brockson and Vivian Gray, "Systematic Errors in Dissolution Testing and Analysis", Presented at Dissolution Discussion Group Symposium, Raleigh NC, 02MAY01

Posters.

John Mauger*, Bob Brockson, Sinjan De, Vivian Gray, Dennis Robinson, "Intrinsic Dissolution Performance of USP Apparatus 2 Using Modified Salicylic Acid Calibrator Tablets', Presented at the AAPS National Meeting in Toronto, Canada on November 11, 2002.

Vivian Gray*, John Mullen, Robert Brockson, Nancy Corrigan, Mary Beggy, "A Comparison of Dissolution Results using O-ring versus Clipped Baskets", presented at AAPS National Meeting, 23OCT01.

David Buckley*, John J. Mullen, Vivian A. Gray, and Robert W. Brockson, " On-Line UV-Vis Dissolution of a Tablet Formulation in the Pharmaceutical Industry Using the VanKel Total Solution Instrument", presented at Eastern Analytical Symposium, Atlantic City, NJ, 30 September - 04 October, 2001.

Gray, V. A. *; Hussain, M. A.; Mullen, J. J.; Pang, J.; Wu, L. S.,"A Dissolution Case Study of a Capsule Product that Showed Pellicle on Stability", AAPS National Meeting, November 2000.

Ivy Ma*, Kimloan C. Huynh-Ba, Jenny Q. Xu, and Vivian A. Gray, "Development of Dissolution Testing for Suspension Products", American Association of Pharmaceutical Scientists (AAPS) National Meeting, October 29, 2000.

Thomas A. McCummings*, Vivian A. Gray, and Kimloan C. Huynh-Ba, "DMP 754 Tablets Multi-Media Study", ART Poster Session, Experimental Station, Wilmington, DE, October 11, 2000.

Buckley, D. *; Rice, B. O.; Leonard, G; Gray, V. A., "Development of a Dissolution Method for an Oral Suspension Formulation Containing the Second Generation Non-Nucleoside Reverse Transcriptase Inhibitor, DPC 961", ACS Regional Meeting, May 2000.

Mullen, J. J.*, Gray, V. A., Huynh-Ba, K. C. and Gangrade, N. K., "Dissolution Condition Selection for DMP 777 Capsules", AAPS National Meeting, 1999.

McGinnes, M. * and Gray, V. A., "Determination of Chromatographic Profile for Gloves Used in Manufacturing Equipment Cleaning Procedures", AAPS National Meeting, 1999.

Huynh-Ba, K.C.*; Mullen, J.J.; Ma, I.Y. and Gray, V.A., "Automating Dissolution Testing of Sustiva™ Tablets using the Zymark Multidose Dissolution Testing System", ISLAR, October 25, 1999.

Huynh-Ba, K.C.*; Xu, J.Q. and Gray, V.A., "Determination of DPC 961 in Dissolution Samples of DPC 961 Tablets", Eastern Analytical Symposium (EAS), November 14, 1999.

Huynh-Ba, K.C.*; Ma, I.Y.; Xu, J.Q. and Gray, V.A., "Development of Dissolution Testing for Suspension Products", AAPS National Meeting, 1999.

Gray, V.A.*; Morehead, W.T., Rice, B.O., "Examination of Pellicle Formation in Two Capsule Formulations", AAPS National Meeting, 1998.


<u>Workshops:</u>

AAPS Workshop

Planning Committee for Dissolution Workshop May 1-3, 2006.

AAPS/FDA/USP Workshops:

Planning Committee for Dissolution Tutorial Session of the USP Annual Meeting held in September, 2004

Planning Committee for Workshop on Dissolution: New Technologies and Regulatory Initiatives, March, 2004.  Moderator and speaker

Planning Committee, participant and co-author of consensus report for
    Scale-up of Adhesive Transdermal Drug Delivery Systems
    Scale-up of Liquid and Semisolid Disperse Systems
    Scale-up of Oral Extended-release Dosage Forms


AAPS/FDA Workshop on Specifications


Moderator for Breakout Session on Dissolution and co-author of consensus report— March, 2002

# EXHIBIT B

US006919373B1

(12) **United States Patent**     (10) Patent No.: **US 6,919,373 B1**
Lam et al.                        (45) Date of Patent:     **Jul. 19, 2005**

(54) **METHODS AND DEVICES FOR PROVIDING PROLONGED DRUG THERAPY**

(75) Inventors: **Andrew C. Lam**, South San Francisco, CA (US); **Padmaja Shivanand**, Mountain View, CA (US); **Atul D. Ayer**, Palo Alto, CA (US); **Richard G. Weyers**, Los Altos, CA (US); **Suneel K. Gupta**, Sunnyvale, CA (US); **Diane R. Guinta**, Palo Alto, CA (US); **Carol A. Christopher**, Belmont, CA (US); **Samuel R. Saks**, Burlingame, CA (US); **Lawrence G. Hamel**, Mountain View, CA (US); **Jeri D. Wright**, Dublin, CA (US); **Zabedeh Hatamkhany**, San Jose, CA (US)

(73) Assignee: **Alza Corporation**, Mountain View, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: 09/253,317

(22) Filed: **Feb. 19, 1999**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/070,666, filed on Apr. 30, 1998, now abandoned, which is a continuation-in-part of application No. 08/967,606, filed on Nov. 10, 1997, now abandoned, and a continuation-in-part of application No. 08/937,336, filed on Aug. 19, 1997, now abandoned, which is a continuation of application No. 08/910,593, filed on Jul. 31, 1997.

(60) Provisional application No. 60/044,121, filed on Apr. 22, 1997, provisional application No. 60/031,741, filed on Nov. 25, 1996, and provisional application No. 60/030,514, filed on Nov. 12, 1996.

(51) Int. Cl.⁷ ............................................ A61K 31/235
(52) U.S. Cl. .......................................... 514/532
(58) Field of Search ................................ 514/532, 252

(56)             **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,507,631 A | 5/1950 | Hartmann | 260/294 |
| 2,648,609 A | 8/1953 | Wurster | 99/166 |
| 2,668,162 A | 2/1954 | Lowe | 260/78.3 |
| 2,676,945 A | 4/1954 | Niggins | 260/45.7 |
| 2,738,303 A | 3/1956 | Blythe | 167/82 |
| 2,798,053 A | 7/1957 | Brown | 260/2.2 |
| 2,799,241 A | 7/1957 | Wurster | 118/24 |
| 2,909,462 A | 10/1959 | Warfield et al. | 167/56 |
| 2,957,880 A | 10/1960 | Rometsch | 260/294 |
| 2,996,431 A | 8/1961 | Barry | 167/82 |
| 3,139,383 A | 6/1964 | Barry | 424/462 |
| 3,625,214 A | 12/1971 | Higuchi | 128/260 |
| 3,773,919 A | 11/1973 | Boswell et al. | 424/19 |
| 3,811,444 A | 5/1974 | Heller et al. | 128/26 |
| 3,825,068 A | 7/1974 | Norton et al. | 166/305 R |
| 3,845,770 A | 11/1974 | Theeuwes et al. | 128/260 |
| 3,916,899 A | 11/1975 | Theeuwes et al. | 128/260 |
| 3,962,414 A | 6/1976 | Michaels | 424/19 |
| 3,992,518 A | 11/1976 | Chien et al. | 424/22 |

| | | | |
|---|---|---|---|
| 4,036,228 A | 7/1977 | Theeuwes | 128/260 |
| 4,063,064 A | 12/1977 | Saunders et al. | 219/121 L |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| BE | 675379 | 5/1966 |
| CA | 1 169 090 | 6/1984 |
| EP | 0 094 123 A2 | 11/1983 |
| EP | 0 212 747 A3 | 3/1987 |
| EP | 0 212 747 A2 | 3/1987 |
| EP | 0 216 743 A3 | 4/1987 |
| EP | 0 216 743 A2 | 4/1987 |
| EP | 0 348 808 A3 | 1/1990 |
| EP | 0 348 808 A2 | 1/1990 |
| EP | 0 381 219 A2 | 8/1990 |
| EP | 0 381 219 A3 | 8/1990 |
| EP | 0 621 032 A1 | 10/1994 |
| FR | 2 598 319 | 5/1987 |
| FR | 2 620 25 | 9/1988 |
| FR | 2 635 460 | 5/1989 |
| GB | 2 206 046 A | 12/1988 |
| GB | 2 206 047 A | 12/1988 |
| WO | 91/03247 A1 | 3/1991 |
| WO | 92/01445 A1 | 2/1992 |
| WO | 92/04012 A1 | 3/1992 |
| WO | 92/18102 A1 | 10/1992 |
| WO | 93/05769 A1 | 4/1993 |
| WO | 95/19174 A1 | 7/1995 |
| WO | 95/20946 A1 | 8/1995 |
| WO | 98/06380 A2 | 2/1998 |
| WO | 98/14168 A2 | 4/1998 |
| WO | 98/14168 A3 | 4/1998 |
| WO | 98/23263 A1 | 6/1998 |
| WO | 99/62496 A1 | 12/1999 |

OTHER PUBLICATIONS

Medline Abstract 89207694 (1989). Patrick et al *
Patrick, K.S., et al., "The absorption of sustained–release methylphenidate formulations compared to an immediate–release formulation," *Biopharmaceutics & Drug Disposition*, 1989, 10, 165–171
Drill, Pharmacology in Medicine, pp. 227 (1965) McGraw-Hill.
Goodman and Gilman's The Basis of Therapeutics, 8ᵗʰ ed., pp. 72 (1990) Pergamon Press.
Merck Index, 11ᵗʰ Edition, pp. 960, Item 6025 (1989).
Pharmaceutical Sciences by Remington, 17ᵗʰ ed., pp. 342–345 (1985).
Pharmaceutical Sciences by Remington, 17ᵗʰ ed., pp. 1603–1632 (1985).

(Continued)

*Primary Examiner*—Zohreh Fay
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57)             **ABSTRACT**

Methods and devices for maintaining a desired therapeutic drug effect over a prolonged therapy period are provided. In particular, oral dosage forms that release drug within the gastrointestinal tract at an ascending release rate over an extended time period are provided. The dosage forms may additionally comprise an immediate-release dose of drug.

**8 Claims, 2 Drawing Sheets**

**US 6,919,373 B1**
Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,066,747 A | 1/1978 | Capozza | 424/78 |
| 4,070,347 A | 1/1978 | Schmitt | 260/77.5 |
| 4,079,038 A | 3/1978 | Choi et al. | 260/77.5 |
| 4,083,949 A | 4/1978 | Benedikt | 424/19 |
| 4,088,864 A | 5/1978 | Theeuwes et al. | 219/121 LM |
| 4,093,709 A | 6/1978 | Choi et al. | 424/19 |
| 4,111,201 A | 9/1978 | Theeuwes | 424/473 |
| 4,111,202 A | 9/1978 | Theeuwes | 128/260 |
| 4,137,300 A | 1/1979 | Sheth et al. | 424/21 |
| 4,200,098 A | 4/1980 | Ayer et al. | 128/260 |
| 4,285,987 A | 8/1981 | Ayer et al. | 427/3 |
| 4,327,725 A | 5/1982 | Cortese et al. | 128/260 |
| 4,434,153 A | 2/1984 | Urquhart et al. | 424/22 |
| 4,449,983 A | 5/1984 | Cortese et al. | 604/892 |
| 4,612,008 A | 9/1986 | Wong et al. | 604/892 |
| 4,721,613 A | 1/1988 | Urquhart et al. | 424/19 |
| 4,752,470 A | 6/1988 | Mehta | 424/458 |
| 4,783,337 A | 11/1988 | Wong et al. | 424/468 |
| 4,814,181 A | 3/1989 | Jordan et al. | 424/473 |
| 4,853,229 A | 8/1989 | Theeuwes | 424/455 |
| 5,017,381 A | 5/1991 | Maruyama et al. | 424/472 |
| 5,030,456 A | 7/1991 | Ayer et al. | 424/473 |
| 5,082,668 A | 1/1992 | Wong et al. | 424/473 |
| 5,089,270 A | 2/1992 | Hampton et al. | 424/465 |
| 5,094,786 A | 3/1992 | Nagashima et al. | 264/40.2 |
| 5,178,866 A | 1/1993 | Wright et al. | 424/473 |
| 5,294,770 A | 3/1994 | Riddle et al. | 219/121.7 |
| 5,399,828 A | 3/1995 | Riddle et al. | 219/121.7 |
| 5,422,831 A | 6/1995 | Misra et al. | 364/552 |
| 5,464,631 A | 11/1995 | Hoover et al. | 424/454 |
| 5,558,231 A | 9/1996 | Weier | 209/580 |
| 5,707,663 A | 1/1998 | Ayer et al. | 424/473 |
| 5,718,700 A | 2/1998 | Edgren et al. | 604/892.1 |
| 5,770,227 A | 6/1998 | Dong et al. | 424/480 |
| 5,785,994 A | 7/1998 | Wong et al. | 424/473 |
| 5,824,338 A | 10/1998 | Jacobs et al. | 424/460 |
| 5,837,284 A | 11/1998 | Mehta et al. | 424/459 |
| 5,869,097 A | 2/1999 | Wong et al. | 424/473 |
| 5,874,090 A | 2/1999 | Baker et al. | 424/400 |

## OTHER PUBLICATIONS

Pharmaceutical Sciences by Remington, 17th ed., Ch. 68, pp. 1305–1306 (1985).

Journal of the American Pharmaceutical Association, vol. 48, pp. 451–454 (1959).

Journal of the American Pharmaceutical Association, vol. 49, pp. 83–84 (1960).

Grafton, P./Boonton Molding Co., Modern Plastic Encyclopedia, vol. 46, pp. 62–70 (1969).

Wurster, Dale E., The Pharmacological Basis of Therapeutics by Goodman and Gilman, 7th ed., Ch. 23, p. 534 (1940).

Pharmaceutical Sciences, Remington, 14th Ed., pp. 1626–1679 (1970).

S. Budavor. Ed., Merck Index 12th Edition, Merck Research Labs (New Jersey, USA) p. 1042 (Apr. 5, 1996).

Unknown, "Product Information" Physician's Desk Reference, Medical Economics Data (U.S.A.) p. 856–866 (Apr. 5, 1991).

Roff et al., "Cellulose Esthers (I)," Handbook of Common Polymers, CRC Press (U.S.A.) pp. 164–173, (Apr. 5, 1971).

Longer, M.A. et al., "Sustained Release Drug Delivery Systems," pp. 1676–1686.

Voigt, R: "Therapeutische Systeme." Pharmazeutische Technologie, 1993, pp. 556–557.

* cited by examiner



**FIG. 1**



**FIG. 2**



FIG. 3



FIG. 4

US 6,919,373 B1

**1**

# METHODS AND DEVICES FOR PROVIDING PROLONGED DRUG THERAPY

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 09/070,666, filed Apr. 30, 1998, now abandoned, which is a continuation of U.S. application Ser. No. 08/910,593, filed Jul. 31, 1997, which claims the benefit of U.S. Provisional Application Nos. 60/030,514 and 60/044,121, filed Nov. 12, 1996 and Apr. 22, 1997, respectively.

This application is also a continuation-in-part of U.S. application Ser. No. 08/967,606, filed Nov. 10, 1997, now abandoned, which claims the benefit of U.S. Provisional Application No. 60/031,741, filed Nov. 25, 1996.

This application is also a continuation-in-part of U.S. application Ser. No. 08/937,336, filed Aug. 19, 1997, now abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

This invention pertains to methods and devices for maintaining a desired therapeutic drug effect over a prolonged therapy period. In particular, the invention is directed to methods and devices that provide drug release within the gastrointestinal tract at an ascending release rate over an extended time period. In this manner, drug is released at an ascending rate during a portion of the drug administration period sufficient to maintain a desired therapeutic drug effect throughout a prolonged therapy period.

### 2. Description of the Related Art Including Information Disclosed Under 37 CFR 1.97 and 1.98

To produce its pharmacological effects, a drug must be made available in appropriate concentrations at its site of action within the body. This availability is affected by numerous factors including the quantity of the drug administered, the extent and rate of its absorption from its administration site, its distribution, binding or localization within tissues, its biotransformation and its excretion. One commonly-used indicator of drug availability is the concentration of drug that is obtained within the blood or plasma, or other appropriate body fluid or tissue, of a patient following administration of the drug. For convenience, this concentration may be referred to as "plasma drug concentration" hereinafter which is intended to be inclusive of drug concentration measured in any appropriate body fluid or tissue. Plasma drug concentration measurements provide very useful information including, for example, comparative information with regard to different drug dosage forms and/or different drug administration routes. In addition, for many drugs, various drug effects including both desired pharmacological effects, i.e., therapeutic drug effects, and undesired pharmacological effects, i.e., side effects, have been correlated with specific plasma drug concentrations or ranges of plasma drug concentrations.

For orally administered drug dosage forms, absorption occurs within the gastrointestinal ("g.i.") tract and is affected by many factors including the physicochemical properties of the local microenvironment, such as surface area, blood flow and membrane characteristics (which vary significantly in the different portions of the g.i. tract), the physicochemical properties of the drug entity, drug concentration, the existence and activity of drug-specific transport mechanisms, etc. One important factor in the rate of absorption of drug

**2**

administered as an oral dosage form is the rate at which drug is released from the dosage form. Drug release rates for oral dosage forms are typically measured as an in vitro rate of dissolution, i.e., a quantity of drug released from the dosage form per unit time.

Conventional oral dosage forms can be described as "immediate-release" because, generally, essentially the entire dose of drug is released from the dosage form within a very short period, i.e., minutes, following administration. As this bolus of released drug is absorbed, the plasma drug concentration typically rapidly rises to a maximal or peak concentration and subsequently declines as the drug is distributed, bound or localized within tissues, biotransformed and/or excreted. The time period for this decline varies for different drugs and depends on many factors but this time period will be characteristic of a particular drug. Generally, during some portion of the time period in which the plasma drug concentration rises, peaks and declines, the drug provides its therapeutic effects, i.e., the plasma drug concentration achieves or exceeds an effective concentration. Moreover, at some point during this time period, the therapeutic effects disappear, i.e., when the plasma drug concentration declines to a level that is below an effective concentration. In addition, often, during a portion of this time surrounding the time the peak concentration is attained, i.e., when the plasma drug concentration is in its highest range, undesired side effects may become apparent.

In view of the above, it will be appreciated that continued drug effectiveness occurs during the time period when the plasma drug concentration is within the effective plasma drug concentration range. Because the plasma drug concentration declines over time, however, multiple doses of the immediate-release drug dosage form must be administered at appropriate intervals to ensure that the plasma drug concentration remains in or, again, rises to, the effective concentration range. At the same time, however, there is a need to avoid or minimize plasma drug concentrations that rise to, and/or that remain for too long within, the higher ranges where side effects become apparent. Accordingly, for many drugs, multiple, separate doses of the immediate-release dosage form must be administered at appropriate intervals to maintain a satisfactory balance of desired and undesired pharmacological effects over a prolonged therapy period.

One focus of efforts to improve drug therapy has been directed to providing non-immediate-release oral dosage forms that affect absorption of the drug primarily by altering the release rate of the drug from the dosage form. Examples of such non-immediate-release delivery systems include delayed-release and sustained-release systems. Sustained-release dosage forms generally release drug for an extended time period compared to an immediate-release dosage form. There are many approaches to achieving sustained release of drugs from oral dosage forms known in the art. These different approaches include, for example, diffusion systems such as reservoir devices and matrix devices, dissolution systems such as encapsulated dissolution systems (including, for example, "tiny time pills") and matrix dissolution systems, combination diffusion/dissolution systems, osmotic systems and ion-exchange resin systems as described in *Remington's Pharmaceutical Sciences*, 1990 ed., pp. 1682–1685.

It is believed to be particularly desirable to provide sustained-release oral dosage forms that provide drug release at a substantially constant release rate over an extended time period. In this manner, for many drugs, the plasma drug concentration initially ascends for a short

US 6,919,373 B1

3

period of time as drug release begins and then remains substantially constant over an extended time period as drug release continues at a constant rate. For many drugs, this substantially constant plasma drug concentration correlates with substantially constant drug effectiveness over a prolonged therapy period. In addition, because an initial relatively high peak plasma drug concentration is avoided, side effects may be less of a problem. Accordingly, advantages of constant-release dosage forms include decreasing the number of doses of a drug that need to be administered over time and providing a better balance of desired and undesired pharmacological effects of the drug.

Osmotic dosage forms, in particular, have been notably successful at providing constant-release of drugs over extended time periods. Osmotic dosage forms, in general, utilize osmotic pressure to generate a driving force for imbibing fluid into a compartment formed, at least in part, by a semipermeable wall that permits free diffusion of fluid but not drug or osmotic agent(s), if present. A substantially constant rate of drug release can be achieved by designing the system to provide a relatively constant osmotic pressure and having suitable exit means for the drug formulation to permit the drug formulation to be released at a rate that corresponds to the rate of fluid imbibed as a result of the relatively constant osmotic pressure. A significant advantage to osmotic systems is that operation is pH-independent and thus continues at the osmotically-determined rate throughout an extended time period even as the dosage form transits the gastrointestinal tract and encounters differing microenvironments having significantly different pH values.

Surprisingly simple but highly effective osmotic devices comprising drug in a mixture with excipients, optionally including osmotically active component(s), within the compartment are known in the art. Although effective for many drugs, the release rate in these devices often declines over time and complete delivery of the drug load may not occur. A more sophisticated type of osmotic device comprises two component layers within the compartment formed by the semipermeable wall. One component layer comprises drug in a mixture with excipients, optionally including osmotically active component(s), that will form a deliverable drug formulation within the compartment and the second component layer comprises osmotically active component(s) but does not contain drug. The osmotically active component(s) in the second component layer typically comprise osmopolymerys) having relatively large molecular weights and which exhibit "swelling" as fluid is imbibed such that release of these components through the drug formulation exit means does not occur. The second component layer is referred to as a "push" layer since, as fluid is imbibed, the osmopolymer(s) swell and push against the deliverable drug formulation of the first component layer to thereby facilitate release of the drug formulation at a substantially constant rate. The above-described devices are known, for example, from the following US Patents, owned by Alza Corporation: U.S. Pat. Nos. 4,327,725; 4,612,008; 4,783,337; and 5,082,668, each of which is incorporated in its entirety by reference herein

Although constant-release dosage forms have proven effective for many different drug therapies, there are clinical situations where these have not been entirely satisfactory. It has been observed that for some patients being treated with constant-release dosage forms for some conditions or diseases, the therapeutic effectiveness of the drug decreases at time periods before the end of the desired therapy period despite the maintenance of substantially constant drug release that would be expected to provide continued effec-

4

tiveness. Accordingly, there remains a need to provide methods and devices for maintaining a desired therapeutic drug effect over a desired prolonged therapy period when sustained-release dosage forms that release drug at a substantially constant rate over an extended time period are not satisfactory.

BRIEF SUMMARY OF THE INVENTION

One aspect of the present invention pertains to providing improved drug therapy for those clinical situations where therapeutic effectiveness of an administered drug therapy unexpectedly decreases at time periods before the end of the intended therapy period. It has been surprisingly discovered that, in an exemplary clinical situation, administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period.

With the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for sustained-release oral dosage forms adapted to provide such a release rate over a suitable extended time period. Accordingly, other aspects of the present invention include providing oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period.

It has been surprisingly discovered that oral osmotic dosage forms exhibiting an ascending drug release rate for an extended time period can be achieved. In particular, the present invention is directed to osmotic dosage forms having bi-layer or tri-layer tablet cores that are adapted to provide ascending drug release rates over an extended period. In addition, to provide for an initial rapid onset of drug action, the present invention is also related to dosage forms that additionally comprise a dose of drug for immediate release.

The bi-layer oral osmotic dosage forms of the present invention include a first component layer, comprising a selected drug and excipients for forming a deliverable drug composition when hydrated, and a second push layer, comprising a fluid-expandable osmopolymer and excipients, contained within a compartment formed by a semipermeable membrane and having exit means for drug release from the compartment. The two layers are compressed into bi-layer tablet cores before the semipermeable membrane is applied and a suitable orifice for drug release therethrough is formed. Importantly, the bi-layer tablet cores disclosed herein are formed when two component layers are compressed together to provide a longitudinally compressed tablet ("LCT") core having a "capsule-shaped" configuration with a different layer at each narrow end.

The combination of features including the osmotic properties of the component layers, the fluid flux properties of the semipermeable membrane and the configuration of the tablet core ensures that drug is released at an ascending rate over an extended time period. In a preferred embodiment, sufficient activity in the push layer is provided by use of a relatively large concentration (at least about 35%) of osmotically effective solute, or osmagent, such as sodium chloride. In addition, sorbitol is preferably included in the first component layer.

The tri-layer oral osmotic dosage forms of the present invention include a novel tri-layer tablet core surrounded by a semipermeable membrane and having suitable exit means

US 6,919,373 B1

5

for releasing drug formulation through the semipermeable membrane. The novel tri-layer tablet core has a first drug-containing layer, a second drug-containing layer and a third push layer. In operation, through the cooperation of the dosage form components, drug is successively released from the first drug-containing layer and then from the second drug-containing layer. It has been discovered that a drug concentration gradient facilitates the achievement of an ascending drug release rate for an extended time period. Consequently, the other excipients in the drug-containing layers may be more flexibly varied and adjusted for other purposes such as manufacturing convenience and pharmaceutical elegance. In this manner, dosage forms that exhibit reliable drug release having the desired sustained and ascending rate over an extended time period can be reliably and efficiently manufactured.

It is preferred to use the LCT core configuration, as described above, to enhance hydration of the tri-layer core. In addition, a flux-enhancing agent is preferably included in the semipermeable wall composition. In a presently preferred embodiment, the combination of features including the LCT tri-layer core configuration, a suitable drug concentration gradient between the first and second component layers, the osmotic properties of the component layers and the fluid flux properties of the semipermeable membrane achieves the desired ascending rate of drug release over an extended time period.

There are numerous clinical situations and drug therapies that could be improved with the use of dosage forms that provide a sustained and ascending release rate over an extended time period. Exemplary dosage forms, as disclosed herein, comprise CNS-acting drugs and cardiovascular-acting drugs. It will be appreciated by persons of skill in the art that the invention is applicable to many other types of drugs and drug therapies. Examples of suitable types of drugs include, but are not limited to, anti-infectives, analgesics, anesthetics, antiarthritics, antiasthmatics, anticonvulsants, antidepressants, antidiabetics, antidiarrheals, antihistamines, antiinflammatories, antimigraines, antineoplastics, antiparkinsonisms, antipruritics, antipsychotics, antipyretics, antispasmodics, anticholinergics, sympathomimetics, calcium channel blockers, beta blockers, antiarrhythmics, antihypertensives, ACE inhibitors, diuretics, vasodilators, decongestants, hormones, hypnotics, immunosuppresives, parasympathomimetics, prostaglandins, proteins, peptides, sedatives and tranquilizers.

The exemplary clinical situation described herein involves treatment of ADHD with methylphenidate therapy. Accordingly, the present invention also pertains to making oral methylphenidate sustained release dosage forms that provide a sustained and ascending release rate of a drug over an extended time period.

It has further been discovered that oral methylphenidate sustained release dosage forms that provide an ascending release rate of a drug over an extended time period can be used to provide effective once-a-day therapy for ADHD. Thus, the present invention also pertains to improving drug therapy for ADHD by eliminating the need for multiple daily doses of methylphenidate yet providing therapeutic efficacy throughout the day that compares to the therapeutic efficacy provided by multiple doses of immediate release methylphenidate.

The above-described features and advantages, as well as others, will become more apparent from the following detailed disclosure of the invention and the accompanying claims.

6

Although the present invention is illustrated herein by exemplary dosage forms containing specific exemplary drugs, methods of making such dosage forms and methods of using methylphenidate-containing dosage forms to provide a desired therapeutic outcome, the invention is not limited by the exemplary embodiments. The invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in the art in view of the disclosure herein.

BRIEF DESCRIPTION OF THE SEVERAL VIEWS OF THE DRAWINGS

FIG. 1 is a cross-section view of a bi-layer osmotic dosage form in accord with the present invention.

FIG. 2 is a cross-section view of a tri-layer osmotic dosage form, additionally comprising an immediate-release drug overcoat and an aesthetic overcoat, in accord with the present invention.

FIG. 3 is a graph illustrating the quantity of drug released over time from a preferred embodiment of the present invention as described in Example 3.

FIG. 4 is a graph illustrating the plasma drug concentration over time obtained following administration of methylphenidate in accord with an experimental regimen (open diamonds) and a standard regimen (closed circles) as described in Example 7.

DETAILED DESCRIPTION OF THE INVENTION

Many effective drug therapies utilize immediate-release oral dosage forms administered at spaced intervals to provide and maintain a desired therapeutic effect over a prolonged therapy period. In addition, sustained-release dosage forms for many drugs are known and, in particular, constant-release oral dosage forms are known. There are many examples of effective drug therapies that utilize constant-release oral dosage forms to provide a desired therapeutic effect over a prolonged therapy period. In many cases, these drug therapies offer advantages over drug therapies that utilize immediate-release oral dosage forms administered at spaced intervals. There are clinical situations, however, where the constant-release dosage form has unexpectedly exhibited decreases in therapeutic effectiveness at time periods before the end of the desired prolonged therapy period.

One example of a clinical situation where drug therapy with sustained-release oral drug dosage forms that provide a substantially constant rate of drug release for an extended period has not been entirely satisfactory is with the use of central nervous system (CNS) stimulant drugs to treat various conditions and disorders including Attention Deficit Disorder (ADD) and Attention Deficit Hyperactivity Disorder (ADHD). These disorders are commonly diagnosed in children but can also occur in adults. Treatment of these and other psychological conditions with CNS stimulant drugs has a long history. About 25 years ago, methylphenidate replaced amphetamine as the primary stimulant prescribed to treat ADHD in children

Methylphenidate therapy in children with ADHD has been extensively studied and the efficacy and safety of this

US 6,919,373 B1

7

treatment is well-established. Methylphenidate therapy has been shown to be very effective in reducing symptoms of hyperactivity, inattention and impulsivity in children with ADHD. The goal of drug therapy is to control the behavioral symptoms during the daytime while the patient is in school or otherwise involved in activities where symptom control benefits the patient's ability to learn and/or otherwise beneficially participate in activities. Because of concerns related to side effects, however, drug therapy is typically discontinued during at least a portion of the evening and through the night in most patients. Depending on the patient's particular circumstances, drug therapy may or may not be discontinued over the weekends as well.

Treatment commonly utilizes immediate-release methylphenidate administered two or three times during the day. For various reasons, patients often experience difficulty complying with this administration schedule. Because of abuse potential, methylphenidate is a controlled substance and thus drug access is a special concern. This dosage regimen generally requires that at least one dose is administered during the school day and, as a rule, children are not permitted to self-administer the drug at school. For this reason, authorized school personnel generally take on the responsibility for administering the drug to children during the school day, however, this approach raises issues of medical privacy and potential stigmatizing of the child by peers. In addition, the compliance issue becomes further complicated as transportation, storage and supply of the drug typically must be documented and/or monitored and the schedules of the different parties involved, i.e., the child, the educators and the authorized school personnel, must be coordinated and accommodated. The unfortunate result is that doses may be given late or missed altogether resulting in decreased efficacy of the therapy.

For all of the above reasons, it would appear that a sustained-release oral dosage form of methylphenidate that provided substantially constant drug release over an extended period to thereby eliminate the need for dose administration during the school day would be a welcome improvement. In fact, such a sustained-release dosage form of methylphenidate has been commercially available for several years. Clinical experience with this dosage form, however, has been disappointing in that behavioral symptoms in patients taking the controlled-release dosage form is less well-controlled later in the day compared to those patients taking multiple doses of the immediate-release dosage form. In addition, the slower onset of action of the controlled-release dosage form compared to the immediate-release dosage form is unsatisfactory for many patients.

It has been surprisingly discovered that administration of methylphenidate at a release, rate that is substantially ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy similar to the efficacy obtained with multiple doses of immediate-release methylphenidate dosage forms. Details of this discovery are disclosed in copending U.S. application Ser. No. 910,593, filed Jul. 31, 1997, of which the present application is a continuation-in-part application. To briefly review, in one clinical study, a comparison of the behavioral, attentional, and cognitive efficacy of placebo; and methylphenidate administered according to three different release rate regimens, i.e., immediate-release, constant-release and ascending-release, was performed. The immediate-release methylphenidate was administered as two spaced-apart doses. The constant-release regimen was administered as an initial loading dose with the remaining total quantity administered in equal small doses at closely-spaced intervals

8

extending past the time of administration of the second immediate-release dose. The ascending-release regimen was administered as an initial loading dose with the remaining total quantity administered in increasing small doses at closely-spaced intervals extending past the time of administration of the second immediate-release dose.

In this study, the constant-release regimen was observed to have decreased clinical effectiveness compared to the immediate-release regimen at evaluation periods following administration of the second immediate-release dose. On the other hand, the ascending-release regimen demonstrated comparable clinical efficacy to the immediate-release regimen during these evaluation periods. Thus, the ascending-release regimen avoided the decrease in therapeutic efficacy seen with the constant-release regimen at later time periods during the prolonged therapy period.

While not making any assertions with respect to mechanism(s) of action of the present invention, it is noted that the development of acute tolerance to methylphenidate has been proposed as an explanation for the unsatisfactory decrease in therapeutic effectiveness that has been observed in some cases. Support for this theory was demonstrated in a second clinical study wherein a decrease in effectiveness of methylphenidate was seen over a prolonged therapy period both when a constant-release regimen was utilized as well as when very closely-spaced doses of immediate-release methylphenidate dosage forms were administered. An ascending-release regimen, however, was shown to maintain therapeutic efficacy throughout the prolonged therapy period.

With the discovery that drug effectiveness over a prolonged therapy period may be improved in some circumstances with administration of drug in an ascending release rate over an extended period, a need arises for sustained-release oral dosage forms adapted to provide such a release rate. In one aspect of the present invention, it has been surprisingly discovered that bi-layer oral osmotic dosage forms can be adapted to meet this need. In another aspect, it has been surprisingly discovered that sustained-release oral osmotic dosage forms having novel tri-layer cores can be produced that also achieve sustained release of drug formulations at an ascending rate for an extended time period.

As is known in the prior art, osmotic dosage forms comprising compressed tablet cores require a short time period following administration in which to become hydrated sufficiently to begin releasing drug. For some drug therapies, the slight delay in initial drug release is unsatisfactory. This problem is overcome with the addition of an initial dose of drug supplied in an immediate-release overcoat applied to the surface of the semipermeable membrane. In preferred embodiments of the present invention, as disclosed herein, such an immediate-release drug overcoat is applied onto the surface of the bi-layer or tri-layer osmotic dosage forms.

For purposes of this disclosure, the following definitions shall apply:

For clarity and convenience herein, the convention is utilized of designating the time of drug administration as zero hours (t=0 hours) and times following administration in appropriate time units, e.g., t=30 minutes or t=2 hours, etc.

As used herein, the term "drug" generally refers to a pharmacologically active substance that, when delivered into a living organism, produces a desired, usually beneficial, effect. Drug compositions are generally utilized clinically in the form of a pharmaceutically acceptable salt thereof. In addition, some drug compositions exhibit chiral-

9

ity and, thus, have more than one optical isomer. Because the different optical isomers may exhibit different pharmacological effects, it may be advantageous to utilize a substantially pure form of one optical isomer of a drug, or a pharmaceutically acceptable salt thereof. Accordingly, the term "drug" refers to a clinically useful form of a drug composition including a pharmaceutically acceptable salt thereof and including a substantially pure isomer of the drug composition and a pharmaceutically acceptable salt thereof. Although a limited number of drugs are represented in the exemplary embodiments herein, the invention is not to be limited by the exemplary embodiments but is fully applicable to other suitable drugs as would be understood by persons of skill in the art.

The amount of drug incorporated in the dosage forms of the present invention varies depending on the particular drug, the therapeutic indication and the desired administration period, e.g., every 12 hours, every 24 hours, etc. Depending on the dose of the dosage form desired to be administered, one or more of the dosage forms may be administered.

A drug "release rate" refers to the quantity of drug released from a dosage form per unit time, e.g., milligrams of drug released per hour (mg/hr). Drug release rates are calculated under in vitro dosage form dissolution testing conditions known in the art. As used herein, a drug release rate obtained at a specified time "following administration" refers to the in vitro drug release rate obtained at the specified time following implementation of an appropriate dissolution test. The dissolution test utilized in the Examples described herein were performed on dosage forms placed in metal coil sample holders attached to a USP Type VII bath indexer and immersed in about 50 ml of acidified water (pH=3) equilibrated in a constant temperature water bath at 37° C. Aliquots of the release rate solutions were injected into a chromatographic system to quantify the amounts of drug released during the testing intervals.

A commonly-used reference measurement for evaluating drug release from oral dosage forms is the time at which 90% of drug within a dosage form has been released. This measurement is referred to as the "$T_{90}$" for the dosage form.

An "immediate-release" dose of a drug refers to a dose that is substantially completely released within a time period of about 1 hour or less and, preferably, about 30 minutes or less. An immediate-release dose of drug applied as a coating on the surface of a dosage form, as used herein, refers to a dose of a drug prepared in a suitable pharmaceutically acceptable carrier to form a coating solution that will dissolve rapidly upon administration to thereby provide an immediate-release dose of drug. As is known in the art, such immediate-release overcoats may contain the same or a different drug or drugs as is contained within the underlying dosage form.

A "periodic release rate" refers to the quantity of drug released from a dosage form during a specified periodic interval as determined at the end of that specified periodic interval, i.e., at each periodic interval when a determination is made, the quantity of drug released represents the periodic release rate during that periodic interval. For example, the quantity of drug released as determined at t=1 represents the periodic release rate from the dosage form during the first hour following administration and the quantity of drug released as determined at t=2 h represents the periodic release rate during the second hour following administration, etc.

An "ascending release rate" refers to a periodic release rate that is increased over the immediately-preceding peri-

10

odic release rate, where the periodic intervals are the same. For example, when the quantity of drug released from a dosage form is measured at hourly intervals and the quantity of drug released during the fifth hour following administration (determined at t=5 hours) is greater than the quantity of drug released from the dosage form during the fourth hour following administration (determined at t=4 hours), an ascending release rate from the fourth hour to the fifth hour has occurred.

It will be appreciated that the first periodic release rate measured, e.g., the periodic release rate at t=1 hour (unless equal to 0), will always be greater than the release rate during the preceding period, e.g., the hour before the dosage form was administered, and, thus, the first periodic release rate always constitutes an occurrence of an ascending release rate.

The ascending release rates described herein refer to the release rate from a dosage form adapted to provide sustained release of drug and do not include release of drug from any immediate-release drug coating that may be applied to the dosage form. In dosage form embodiments additionally comprising an immediate-release dose of a drug applied as a coating onto the underlying dosage form, the drug release measured at t=1 hour will generally reflect both the drug released from the immediate-release drug coating and any drug released from the underlying dosage form, however, the quantity of drug released from the drug overcoat is disregarded in determining whether the drug release rate at t=2 hours is greater than the drug release at t=1 hour.

As used herein with reference to the time period during which an ascending release rate is provided, "an extended time period" refers to a time period beginning at t=0 hours and continuing through at least the mid-point, and preferably beyond the mid-point, of the relevant $T_{90}$ of the dosage form. Because the dosage forms of the present invention are intended to provide sustained release of drug, a suitable $T_{90}$ for purposes of this invention is at least about 6 hours and, consequently, the "extended time period" during which an ascending release rate is provided is at least 3 hours.

In accord with the above-recited definitions, an "ascending release rate over an extended time period" refers to ascending release rates of drug obtained from the time of administration of the dosage form through, and preferably beyond, the mid-point of the relevant $T_{90}$ for the dosage form. To illustrate, consider a situation where a dosage form has a $T_{90}$ of about 8 hours. In this situation, "an ascending release rate over an extended time period" is achieved when the release rate at each hour through t=4 hours is greater than the release rate in the immediately-preceding hour. Preferably, the release rate continues to ascend during time periods beyond t=4 hours.

Bi-layer oral osmotic dosage forms and methods of making and using such dosage forms are known in the art, for example, as described and claimed in the following US Patents, owned by Alza Corporation: U.S. Pat. Nos. 4,327,725; 4,612,008; 4,783,337; and 5,082,668, each of which is incorporated in its entirety by reference herein. The prior art bi-layer osmotic dosage forms achieve sustained release of drug formulations wherein a relatively brief initial period of ascending release rates is followed by substantially constant release rates over a major portion of the $T_{90}$ period. The achievement of an ascending release rate for an extended time period of at least 50% of the $T_{90}$ period is not found within the prior art. The dosage forms of the present invention are useful for providing continuous effective drug therapy over a prolonged therapy period without exhibiting

US 6,919,373 B1

11

a decrease in effectiveness during the after portion of the prolonged therapy period.

The bi-layer osmotic dosage forms of the present invention include a first component layer, comprising a selected drug and excipients for forming a deliverable drug composition when hydrated, and a second push layer, comprising a fluid-expandable osmopolymer and excipients, wherein the two layers are compressed into bi-layer tablet cores before the semipermeable membrane is applied and a suitable orifice for drug release therethrough is formed. The combination of features including the osmotic properties of the component layers, the fluid flux properties of the semipermeable membrane and the configuration of the tablet core ensures that drug is released at an ascending rate over an extended time period.

Importantly, the bi-layer tablet cores of the present invention are configured such that each component layer is substantially round in cross-dimension with a circumferential width and a length between a top and a bottom end. The two layers are compressed together longitudinally such that the resulting bi-layer tablet core has the same circumferential width as the component layers and a length that combines the lengths of the component layers. The overall configuration can be described as "capsule-shaped" wherein the bi-layer tablet core has a circumferential width that is less than its length and has a rounded "narrow" top end and a rounded "narrow" bottom end and wherein each narrow end comprises a different component tablet layer.

For purposes of this disclosure, the above-described tablet cores are referred to as longitudinally compressed tablet ("LCT") cores. This LCT configuration ensures that, as the push layer expands longitudinally within the compartment formed by the semipermeable membrane, the surface area of the push layer in contact with the semipermeable membrane is increased more than when other configurations are used.

In a preferred embodiment, sufficient activity in the push layer is achieved by use of a relatively large concentration (at least about 35%) of osmotically effective solute, or osmagent, such as sodium chloride. Consequently, the size of the push layer is relatively large and may be slightly larger than the first component layer containing the drug and excipients. In addition, for certain embodiments, sorbitol was found to be a useful excipient in the first component layer. It has been surprisingly discovered that the combination of features described above, including the LCT core configuration, the relatively high percent of osmagent and, in some exemplary embodiments, the use of sorbitol as an excipient provides the desired ascending release rate over an extended time period from bi-layer oral osmotic dosage forms. Exemplary embodiments of such bi-layer osmotic dosage forms are detailed below in Examples 1–3.

An embodiment of a bi-layer oral osmotic dosage form 15 is shown in cross-section in FIG. 1. The components are not drawn to scale. The bi-layer LCT core comprises a first component layer 21, containing drug and selected excipients, and a second push layer 29, containing at least one fluid-expandable osmopolymer and optionally containing at least one osmagent along with selected excipients. Suitable excipients are known in the art and include diluents, carriers, binders, fillers and processing aids. A semipermeable membrane 57 surrounds the bi-layer tablet core to form a compartment and a suitably sized orifice 55 is formed through the semipermeable membrane and into the first component layer 21 to permit drug formulation to be released from within the compartment. As illustrated, the orifice 55 is preferably formed in the narrow end of the

12

dosage form comprising the first component layer. In operation, through cooperation of the bi-layer osmotic dosage form components, drug is released from the first drug-containing layer at an ascending release rate for an extended time period. Although not shown in FIG. 1, an immediate-release dose of a drug may be provided by applying a drug-containing overcoat to a bi-layer dosage form, if desired, as described elsewhere herein.

In addition to the above-described bi-layer osmotic dosage forms, it has been surprisingly discovered that oral osmotic dosage forms exhibiting an ascending drug release rate for an extended time period can also be achieved with a novel tri-layer tablet core surrounded by a semipermeable membrane and having suitable exit means for releasing drug formulation through the semipermeable membrane. The novel tri-layer tablet core has a first drug-containing layer, a second drug-containing layer and a third push layer. In operation, through the cooperation of the dosage form components, drug is successively released, in a sustained and controlled manner, from the first drug-containing layer and then from the second drug-containing layer such that an ascending release rate over an extended time period is achieved.

It has been discovered that a drug concentration gradient between the first and second drug-containing layers of the tri-layer core facilitates the achievement of an ascending drug release rate for an extended time period from the tri-layer osmotic dosage form. Consequently, the other excipients in the drug-containing layers may be more flexibly varied and adjusted for other purposes such as manufacturing convenience and pharmaceutical elegance. For example, the tri-layer osmotic dosage forms preferably avoid the use of sorbitol as an excipient. This provides manufacturing efficiency and product shelf-life advantages since sorbitol is very hygroscopic and attracts moisture during storage which can pose difficulties in handling and manufacturing as well as longer-term stability concerns. In addition, sufficient activity in the s push layer may be achieved with the use of a relatively lower concentration (less than about 25%) of osmotically effective solute such that the size of the push layer can be smaller relative to the size of the two drug-containing layers. Preferably, the push layer is smaller than the combined size of the first and second drug-containing layers. An advantage to a smaller-sized push layer is that larger doses of drug, if desired, can be accommodated without the overall size of the dosage form becoming so large as to engender manufacturing challenges and/or to become unpalatable to patients.

In a presently preferred embodiment, the hydration rate of the tri-layer osmotic dosage form is improved with the inclusion of a flux-enhancing agent in the semipermeable membrane. In addition, it is preferred to use the longitudinally compressed tablet ("LCT") core configuration, as described above, for the tri-layer osmotic dosage forms to also enhance hydration In a presently preferred embodiment, the combination of features including the LCT tri-layer core configuration, a suitable drug concentration gradient between the first and second component layers, the osmotic properties of the component layers and the fluid flux properties of the semipermeable membrane achieves the desired ascending rate of drug release over an extended time period. Advantageously, such preferred embodiments exhibit consistent and reliable operation and can be efficiently manufactured on a large-scale basis.

A preferred embodiment of a tri-layer oral osmotic dosage form additionally comprising an immediate-release dose of drug applied as an overcoat and an aesthetic overcoat 14 is

US 6,919,373 B1

13

shown in cross-section in FIG. 2. The tri-layer LCT core comprises a first component layer 20, containing a selected drug in a pharmaceutically acceptable form along with selected excipients; a second component layer 18, containing a higher concentration of drug along with selected excipients; and a third push layer 28, containing at least one osmopolymer and optionally containing at least one osmagent along with selected excipients. A semipermeable membrane 56 surrounds the tri-layer tablet core to form a compartment and a suitably sized orifice 54 is formed through the semipermeable membrane and into the first component layer to permit drug formulation to be released from within the compartment. As illustrated, the orifice 54 is preferably formed in the narrow end of the dosage form comprising the first component layer. In operation, through cooperation of the tri-layer osmotic dosage form components, drug is successively released, in a sustained and controlled manner, from the first drug-containing layer and then from the second drug-containing layer at an ascending release rate for an extended time period.

As shown in FIG. 2, the preferred embodiment further comprises an immediate-release dose of drug contained within an overcoat 60 applied onto the surface of the tri-layer osmotic dosage form. The drug is mixed with suitable excipients such as, for example, hydroxypropylmethylcellulose, to prepare a solution for coating onto the surface of the semipermeable membrane of the tri-layer osmotic dosage form that will rapidly dissolve and release drug following administration.

As shown in FIG. 2, it is also preferred to provide an optional aesthetic overcoat 62 applied onto the surface of the drug-containing overcoat 60. As known in the art, such aesthetic overcoats provide advantages including taste-masking, improved appearance and "glidability" for facilitating swallowing and further processing steps such as printing, packaging, etc. Exemplary embodiments of tri-layer osmotic dosage forms that exhibit a substantially ascending release rate over an extended time period are detailed below in Examples 4–6 and Examples 8 and 9.

The continued maintenance of therapeutic effectiveness over a prolonged therapy period by the administration of the oral osmotic dosage forms that exhibit an ascending release rate over an extended time period of the present invention has been demonstrated. An exemplification is described below in Example 7. In particular, it has been discovered that such osmotic dosage forms containing methylphenidate can be used to provide effective once-a-day therapy, for ADHD. This discovery represents an important improvement in drug therapy for ADHD by eliminating the need for multiple daily doses of methylphenidate yet providing therapeutic efficacy throughout the day that compares to the therapeutic efficacy provided by multiple doses of immediate release methylphenidate.

The following examples are illustrative of the present invention, and the is examples should not be considered as limiting the scope of the invention in any way, as these examples, and other equivalents thereof, will become apparent to those versed in the art in the light of the present disclosure and the accompanying claims.

EXAMPLE 1

Bi-layer oral osmotic dosage forms were made in accord with conventional manufacturing processes known in the art and disclosed in detail in copending U.S. application Ser. No. 967,606, filed Nov. 10, 1997, of which the present application is a continuation-in-part application. Briefly, a

14

first component layer, containing methylphenidate hydrochloride and selected excipients, and a second push layer, containing suitable osmopolymers, 40% by weight of an osmagent and selected excipients, were separately prepared by granulation methods. Next, the first component layer and the second push layer granulation preparations were longitudinally compressed together to form bi-layer LCT cores. A selected semipermeable membrane was then coated around the bi-layer LCT cores and a suitable 30 mil orifice for drug release was formed therethrough and into the first component layer.

Each dosage form as prepared comprised:

| First component layer | |
|---|---|
| 14.08 mg | methylphenidate hydrochloride |
| 90.26 mg | poly(ethylene)oxide (200,000 number-average molecular weight) |
| 5.5 mg | poly(vinylpyrrolidone) (40,000 number-average molecular weight) |
| 0.11 mg | magnesium stearate |
| 0.555 mg | butylated hydroxy toluene |
| Second push layer | |
| 71.032 mg | poly(ethylene)oxide (7,000,000 number-average molecular weight) |
| 52.8 mg | sodium chloride |
| 6.6 mg | poly(vinylpyrrolidone) (40,000 number-average molecular weight) |
| 1.32 mg | red ferric oxide |
| 0.132 mg | magnesium stearate |
| 0.555 mg | butylated hydroxy toluene |
| Semipermeable Membrane | |
| 15.3 mg | cellulose acetate (39.8% acetyl content) |
| 1.7 mg | poly(ethylene glycol) (3350 number-average molecular weight |

The periodic release rates from the dosage form were determined hourly for ten hours using in vitro dissolution testing. A residual quantity of drug of 0.72 mg remained in the dosage form. The results are shown in Table 1 along with an indication of whether an ascending release rate occurred.

TABLE 1

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 0.22 | YES |
| 2 | 1.45 | YES |
| 3 | 1.72 | YES |
| 4 | 1.84 | YES |
| 5 | 2.05 | YES |
| 6 | 2.21 | YES |
| 7 | 2.13 | NO |
| 8 | 1.26 | NO |
| 9 | 0.39 | NO |
| 10 | 0.09 | NO |

As seen from Table 1, drug was released from the dosage forms at an ascending rate for an extended time period, i.e., more than 90% of the drug was released by t=8 hours and ascending release rates occurred through t=6 hours, an extended period of time well beyond the mid-point of the $T_{90}$.

EXAMPLE 2

Bi-layer oral osmotic dosage forms were made in accord with conventional manufacturing processes known in the art and disclosed in detail in copending U.S. application Ser.

US 6,919,373 B1

15

No. 967,606, filed Nov. 10, 1997, of which the present application is a continuation-in-part application. Briefly, a first component layer, containing methylphenidate hydrochloride, sorbitol and selected excipients, and a second push layer, containing suitable comopolymers, 40% by weight of an osmagent and selected excipients, were separately prepared by granulation methods. Next, the first component layer and the second push layer granulation preparations were longitudinally compressed together to form bi-layer LCT cores. A selected semipermeable membrane was then coated around the bi-layer LCT cores and a suitable 30 mil orifice for drug release was formed therethrough.

Each dosage form as prepared comprised:

| | First component layer (110 mg) |
|---|---|
| 12.8% | methylphenidate hydrochloride |
| 54.75% | poly(ethylene)oxide (200,000 number-average molecular weight) |
| 25.4% | sorbitol |
| 5% | hydroxypropylmethylcellulose (11,200 number-average molecular weight) |
| 2% | magnesium stearate |
| 0.05% | butylated hydroxy toluene |
| | Second push layer (132 mg) |
| 53.85% | poly(ethylene)oxide (7,000,000 number-average molecular weight) |
| 40% | sodium chloride |
| 5% | hydroxypropylmethylcellulose (11,200 number-average molecular weight) |
| 1% | red ferric oxide |
| 0.1% | magnesium stearate |
| 0.05% | butylated hydroxy toluene |
| | Semipermeable Membrane (42 mg) |
| 47.5% | cellulose acetate (39.8% acetyl content) |
| 47.5% | cellulose acetate (32% acetyl content) |
| 5% | poly(ethylene glycol) (3350 number-average molecular weight |

The periodic release rates from the dosage form were determined hourly for twelve hours. No residual quantity of drug remained in the dosage form. The results are shown in Table 2 along with an indication of the occurrences of an ascending release rate.

TABLE 2

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 0.13 | YES |
| 2 | 1.16 | YES |
| 3 | 1.53 | YES |
| 4 | 1.61 | YES |
| 5 | 1.75 | YES |
| 6 | 1.79 | YES |
| 7 | 2.13 | YES |
| 8 | 2.18 | YES |
| 9 | 1.07 | NO |
| 10 | 0.43 | NO |
| 11 | 0.17 | NO |
| 12 | 0.13 | NO |

As seen from Table 2, more than 90% of the drug was released by t hours and ascending release rates occurred through t=8 hours, an extended time period well beyond the mid-point of the $T_{90}$.

EXAMPLE 3

Bi-layer oral osmotic dosage forms additionally comprising an immediate-release dose of drug applied as an over-

16

coat onto the semipermeable membrane were made in accord with conventional manufacturing processes known in the art and disclosed in detail in copending U.S. application Ser. No. 967,606, filed Nov. 10, 1997, of which the present application is a continuation-in-part application. Briefly, a first component layer, containing methylphenidate hydrochloride, sorbitol and selected excipients, and a second push layer, containing suitable osmopolymers, 39.8% by weight of an osmagent and selected excipients, were separately prepared by granulation methods. Next, the first component layer and the second push layer granulation preparations were longitudinally compressed together to form bi-layer LCT cores. A selected semipermeable membrane was then coated around the bi-layer LCT cores and a suitable 30 mil orifice for drug release was formed therethrough. A drug-containing overcoat mixture was prepared and coated onto the semipermeable membrane of the osmotic dosage form. Optionally, a taste-masking overcoat is also applied.

Each osmotic bi-layer dosage form as prepared comprised:

| | First component layer |
|---|---|
| 14 mg | methylphenidate hydrochloride |
| 61 mg | poly(ethylene)oxide (2,000,000 number-average molecular weight) |
| 27.5 mg | sorbitol |
| 5.5 mg | polyvinylpyrrolidone |
| 2.2 mg | magnesium stearate |
| 0.055 mg | butylated hydroxy toluene |
| | Second push layer |
| 72 mg | poly(ethylene)oxide (7,000,000 number-average molecular weight) |
| 53 mg | sodium chloride |
| 6.6 mg | polyvinylpyrrolidone |
| 1.3 mg | red ferric oxide |
| 0.132 mg | magnesium stearate |
| 0.066 mg | butylated hydroxy toluene |
| | Semipermeable Membrane |
| 20 mg | cellulose acetate (39.8% acetyl content) |
| 20 mg | cellulose acetate (32% acetyl content) |
| 2 mg | poly(ethylene glycol) (4000 number-average molecular weight) |

An immediate-release drug-containing overcoat comprising 60% hydroxypropylmethylcellulose and 40% methylphenidate hydrochloride is prepared and a final solution of 10 mg (i.e., containing 4 mg of methylphenidate salt) is coated onto the semipermeable membrane of the osmotic dosage form.

The periodic release rates from the drug overcoat and the osmotic dosage form were determined at 30 minutes, 1 hour and then hourly for the next nine hours. The 4 mg of methylphenidate contained within the drug overcoat was released within the first 30 minutes and the periodic release rate shown at t=1 hour of 0.41 mg constitutes drug released from the bi-layer osmotic dosage form during the second 30-minute interval. No residual quantity of drug remained in the dosage form. The hourly results are shown in Table 3 along with an indication of the occurrences of an ascending release rate.

US 6,919,373 B1

17

18

TABLE 3

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 0.41 | YES |
| 2 | 1.05 | YES |
| 3 | 1.49 | YES |
| 4 | 1.57 | YES |
| 5 | 1.71 | YES |
| 6 | 1.75 | YES |
| 7 | 2.09 | YES |
| 8 | 2.14 | YES |
| 9 | 1.32 | NO |
| 10 | 0.48 | NO |

As seen from Table 3, exclusive of the immediate-release drug overcoat, more than 90% of the drug was released by t=9 hours and ascending release rates occurred through t=8 hours, an extended period of time well beyond the mid-point of the $T_{00}$.

EXAMPLE 4

Tri-layer oral osmotic dosage forms were made in accord with conventional manufacturing processes known in the art and disclosed in detail in copending U.S. application Ser. No. 937,336, filed Aug. 19, 1997, of which the present application is a continuation-in-part application. Briefly, a first component layer, containing pseudoephedrine hydrochloride and selected excipients, a second component layer, containing a higher concentration of pseudoephedrine hydrochloride and selected excipients, and a third push layer, containing suitable osmopolymers, an osmagent and selected excipients, were separately prepared by granulation methods. Next, the first component layer, second component layer and the third push layer granulation preparations were longitudinally compressed together to form tri-layer LCT cores. A selected semipermeable membrane was then coated around the tri-layer LCT cores and a suitable 30 mil orifice for drug release was formed therethrough.

Each dosage form as prepared comprised:

| | First component layer |
|---|---|
| 4.4 mg | pseudoephedrine hydrochloride |
| 15.3 mg | poly(ethylene)oxide (300,000 number-average molecular weight) |
| 1.1 mg | hydroxypropylmethylcellulose (9,200 number-average molecular weight) |
| 1.1 mg | polyoxyethylene 40 stearate |
| 0.11 mg | magnesium stearate |
| | Second component layer |
| 13.5 mg | pseudoephedrine hydrochloride |
| 2.59 mg | poly(ethylene)oxide (300,000 number-average molecular weight) |
| 0.9 mg | hydroxypropylmethylcellulose (9,200 number-average molecular weight) |
| 0.9 mg | polyoxyethylene 40 stearate |
| 0.018 mg | red ferric oxide |
| 0.09 mg | magnesium stearate |
| | Third push layer |
| 22.2 mg | poly(ethylene)oxide (7,000,000 number-average molecular weight) |
| 12 mg | sodium chloride |
| 2 mg | hydroxypropylmethylcellulose (9,200 number-average molecular weight) |
| 2 mg | polyoxyethylene 40 stearate |

-continued

| 1.2 mg | cross-linked acrylic acid polymer |
|---|---|
| 0.4 mg | red ferric oxide |
| 0.2 mg | magnesium stearate |
| | Semipermeable Membrane |
| 11.4 mg | cellulose acetate (39.8% acetyl content) |
| 0.6 mg | polyethylene glycol (3350 average number molecular weight) |

The periodic release rates from the osmotic dosage form were determined hourly for 7 hours and results are shown in Table 4 along with an indication of the occurrences of an ascending release rate.

TABLE 4

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 0.13 | YES |
| 2 | 0.65 | YES |
| 3 | 2.2 | YES |
| 4 | 2.78 | YES |
| 5 | 3.24 | YES |
| 6 | 3.14 | YES |
| 7 | 3.43 | YES |

As seen from Table 4, about 87% of drug was released during the first 7 hours and ascending release rates were achieved throughout this period.

EXAMPLE 5

Tri-layer oral osmotic dosage forms having a drug concentration gradient wherein the drug concentration was greater in the second component layer than the first component layer and also having viscosity gradients wherein the viscosity of the first component layer was less than the viscosity of the second component layer and the viscosity of the second component layer was lower than the viscosity of the third push layer were made in accord with conventional manufacturing processes known in the art and disclosed in detail in copending U.S. application Ser. No. 937,336, filed Aug. 19, 1997, of which the present application is a continuation-in-part application.

Each dosage form as prepared comprised:

| | First component layer (350 mg) |
|---|---|
| 8.6% | nicardipine |
| 54.8% | sorbitol |
| 36.8% | poly(ethylene)oxide (200,000 number-average molecular weight) |
| | Second component layer (120 mg) |
| 45% | nicardipine |
| 50% | poly(ethylene)oxide (300,000 number-average molecular weight) |
| 5% | hydroxypropylmethylcellulose (9,200 number-average molecular weight) |
| | Third push layer (350 mg) |
| 68.75% | poly(ethylene)oxide (7,000,000 number-average molecular weight) |
| 20% | sodium chloride |
| 5% | hydroxypropylmethylcellulose (9,200 number-average molecular weight) |

US 6,919,373 B1

19

20

-continued

| 5% | cross-linked acrylic acid polymer |
| 1% | ferric oxide |
| 0.25% | magnesium stearate |
| | Semipermeable Membrane (43.5 mg) |
| 95% | cellulose acetate (39.8% acetyl content) |
| 5% | polyethylene glycol (3350 average number molecular weight) |

The dosage forms had 25 mil exit orifices formed through the semipermeable membrane to permit release of drug formulation from within the compartment. An ascending release rate for an extended time period of about 16 hours was achieved with the dosage forms of Example 5.

EXAMPLE 6

Preferred embodiments of the tri-layer osmotic dosage forms of the present invention additionally comprising an immediate-release dose of drug applied as an overcoat, as shown in FIG. 2, were prepared in accord with conventional osmotic tablet manufacturing processes.

The first component layer contained the following (by weight percent): 9.40% methylphenidate hydrochloride, 83.71% polyethylene oxide (Polyox N-80 brand product of Union Carbide, Danbury, Conn.), 5% polyvinylpyrrolidone (Kollidon 29–32 product of BASF Corp., Mt. Olive, N.J.), 1.34% succinic acid; 0.5% stearic acid; and 0.05% butylated hydroxy toluene.

The second component layer contained the following (by weight percent): 13.65% methylphenidate hydrochloride, 78.80% polyethylene oxide (Polyox N80 brand product of Union Carbide, Danbury, Conn.), 5% polyvinylpyrrolidone (Kollidon 29–32 product of BASF Corp., Mt. Olive, N.J.), 1.95% succinic acid; 0.5% stearic acid; 0.05% butylated hydroxy toluene; and 0.05% yellow ferric oxide, as coloring agent.

The third push layer contained the following (by weight percent): 73.7% high molecular weight polyethylene oxide (Polyox 303 brand product of Union Carbide, Danbury, Conn.), 20% sodium chloride; 5% polyvinylpyrrolidone (Kollidon 29–32 brand product of BASF Corp., Mt. Olive, N.J.); 0.25% stearic acid; 0.05% butylated hydroxy toluene; and 1% green ferric oxide, as coloring agent.

Each of the first component layer, second component layer and third push layer were separately prepared into granulated compositions in a fluid bed granulator. The granulated compositions were then compressed sequentially and longitudinally on a rotary tablet press to produce the tri-layer LCT cores. For each dosage form, 40 mg of the first component layer granulation and 75 mg of the second component layer granulation were first sequentially filled and tamped at 100 newtons into the die. Then, 90 mg of the third push layer granulation to the die was added to the die and the final compression was performed at 1500 newtons.

The composition of the semipermeable membrane was 83% by weight cellulose acetate (CA 398-10, having an acetyl content of 39.8%, product of Eastman Chemical, Kingsport, Tenn.) and 17% by weight copolymer of ethylene and propylene oxide (Poloxamer 188 brand product of BASF Corp., Mt. Olive, N.J., added as a flux-enhancer. The two ingredients were dissolved in a blend of 99.5% acetone and 0.5% water to form a 5% solids solution In a pan Coater, the solution was then sprayed onto the tri-layer LCT cores to a weight of 25.7 mg and a thickness of 4–5 mil.

After the semipermeable membrane had been applied to form a compartment containing the tri-layer LCT cores, a 0.76 mm (40 mil) orifice was drilled through the semipermeable membrane at the narrow end of the compartment proximate to the first component layer to thereby form the preferred tri-layer osmotic dosage forms, each containing 14 mg of methylphenidate. Each dosage form was approximately 12 mm long with an approximate diameter of 5.3 mm.

The drug overcoat for providing an immediate-release initial dose of drug contains approximately 30% by weight methylphenidate hydrochloride, approximately 70% by weight hydroxypropylmethylcellulose (Methocel E3 brand name product of Dow Chemical Co., Midland, Mich.), and a trace amount of phosphoric acid (i.e., 20 ml of phosphoric acid added to 87 kg of drug in solution). An aqueous coating solution is prepared by dissolving and mixing the ingredients in water to form a solution with a 10% solids composition. In a pan coater, the solution was then sprayed onto the semipermeable membranes of the tri-layer osmotic dosage forms to a weight of about 14.0 mg comprising an immediate-release dose of methylphenidate of about 4 mg.

The final aesthetic overcoat composition weighed 16.9 mg and contained an underlayer of Opadry II, yellow (brand name product of Colorcon, West Point, Pa. and an overlayer of Opadry, clear, with a trace amount of carnauba wax, a glidant, prepared and applied as follows: first, Opadry II (10%) is suspended in water (90%) and sprayed onto the drug-overcoated dosage forms; next, clear Opadry (5%) is suspended in water (95%) and sprayed onto the drug- and Opadry II-overcoated dosage forms; finally, the dosage forms are tumbled in the coater with the carnauba wax for ten minutes to allow about 100 ppm of wax to be uniformly distributed onto the clear Opadry overcoat.

Many pharmaceutical dosage forms utilize drug in salt form such as the hydrochloride salt of methylphenidate utilized herein. Such salt forms of drugs prepared in aqueous solution, however, are prone to degradation and, thus, often have stability and shelf-life problems. It has been discovered that the addition of an appropriate pH-adjusting agent to the aqueous solution decreases undesired degradation and improves the stability of the product. In particular, in preferred embodiments tri-layer osmotic dosage forms comprising methylphenidate hydrochloride, it has been discovered that degradation of the drug ingredient can be minimized by the addition of suitable antidegradation agents, i.e., succinic acid in the first and second component layers and phosphoric acid in the drug overcoat. Other suitable antidegradation agents include compounds that dissolve in an aqueous medium are pharmaceutically acceptable, i.e., nontoxic and suitable for oral administration to humans, and that exhibit sufficient pH-adjusting ability, i.e., have a pH no greater than 4 and preferably of 3 or below. Additional examples include potassium phosphate, sodium phosphate, fumaric acid, citric acid, tartaric acid, malic acid, hydrochloric acid, aspartic acid, glutamic acid, oxalic acid, lactic acid, malonic acid, glyceric acid and ascorbic acid.

Periodic release rates for twenty-four sample dosage forms prepared as described were determined hourly for 12 hours and are presented in graph form in FIG. 3. The mean quantities released each hour are shown in Table 5 along with an indication of the occurrences of an ascending release rate. It is noted that the entire 4 mg immediate-release dose was essentially released within the first hour and this quantity is disregarded with respect to the determination that an ascending release rate occurred at t=2 hours, i.e., the mean quantity at t=2 hours was compared to the mean quantity at t=1 hours less 4 mg representing the immediate-release dose.

US 6,919,373 B1

21

TABLE 5

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 4.098 | YES |
| 2 | 1.138 | YES |
| 3 | 1.650 | YES |
| 4 | 1.993 | YES |
| 5 | 2.043 | YES |
| 6 | 2.099 | YES |
| 7 | 1.966 | NO |
| 8 | 1.763 | NO |
| 9 | 0.428 | NO |
| 10 | 0.174 | NO |
| 11 | 0.084 | NO |
| 12 | 0.061 | NO |

As seen from Table 5, exclusive of the immediate-release drug overcoat, more than 90% of the drug was released by t=8 hours and ascending release rates occurred through t=6 hours, an extended period of time well beyond the mid-point of the $T_{90}$.

EXAMPLE 7

Therapeutic effectiveness of single doses of tri-layer osmotic dosage forms containing 14 mg of methylphenidate and additionally comprising an immediate-release drug overcoat containing 4 mg of methylphenidate was studied and compared to multiple doses of immediate-release methylphenidate. Safety and therapeutic efficacy parameters were evaluated for a 12-hour period in the same subjects treated with the following regimens on different days: the experimental regimen wherein the tri-layer osmotic dosage form was administered once at t=0 hours and the standard regimen wherein immediate-release methylphenidate (Ritalin®) was administered three times, at t=0 hours, t=4 hours, and t=8 hours. Because the subjects were current methylphenidate users, the doses of methylphenidate administered during each regimen varied somewhat to match as closely as possible the "usual dose" each subject was routinely administered. For comparative purposes, the actual doses were normalized to a single 18 mg dose of the tri-layer osmotic dosage and to: 15 mg of Ritalin® administered as three 5 mg doses.

Plasma drug concentrations were determined in all subjects at the same times during the study periods for each regimen. The selected times corresponded to the time just prior to, and 1.5 hours and 2.5 hours following, administration of the first two doses of immediate-release methylphenidate (i.e., at t=0 hours, t=1.5 hours, t=2.5 hours, t=4 hours, t=5.5 hours, t=6.5 hours), and just prior to, and 1.5 hours and 3.5 hours following, administration of the third dose (i.e., at t=8 hours, t=9.5 hours and t=11.5 hours).

In FIG. 4, plasma drug concentrations obtained from one group of study participants (n=16) while treated with the experimental regimen represented by open diamonds) and while treated with the standard regimen represented by closed circles) are shown in graph form. A comparison of FIG. 3 and 4 demonstrates a correlation between the in vitro release rates through about t=8 hours and the in vivo plasma drug concentrations through about t=9.5 hours.

As shown in FIG. 4, the plasma drug concentration following each administration of an immediate-release dose rises relatively rapidly and then declines at a generally characteristic rate until the next dose is administered. The

22

plasma drug concentration following administration of the tri-layer osmotic dosage form also exhibits an initial relatively rapid rise due largely to release of drug from the immediate-release drug overcoat. Subsequently, however, the plasma drug concentration does not decline but continues to substantially ascend (save for a slight "dip" between t=5.5 hours and t=6.5 hours) through a time period of 9.5 hours. Particularly striking is the difference during the time periods within about 1 hour before and about 1.5 hours following administration of the second and the third immediate-release dose. With the standard regimen, during these periods, the plasma drug concentration declines to a trough concentration and then rises again to a peak concentration. With the experimental regimen, during these same time periods, the plasma drug concentration is substantially smoothly ascending and exhibits no peaks and troughs.

Safety and therapeutic parameters, including behavioral, attentional and cognitive functions, were assessed hourly during the first three hours and the last three hours of the study period and at two-hour intervals in between. The clinical effectiveness of the experimental regimen was closely comparable to the clinical effectiveness of the standard regimen throughout the twelve-hour study period. An effective once-a-day therapy for ADHD provides many advantages and offers a significant improvement in drug therapy by eliminating the need for multiple daily doses of methylphenidate while providing continued therapeutic efficacy throughout the day.

EXAMPLE 8

Tri-layer oral osmotic dosage forms were made in accord with the manufacturing processes of Example 6 but comprising twice as much methylphenidate, i.e., a total of 28 mg of methylphenidate contained within the first and second component layers and 8 mg of methylphenidate in the drug overcoat. All of the remaining ingredients are also doubled so that the weight percents are the same as in Example 6. The third push layer is also doubled. The semipermeable membrane had the same composition as in Example 6 but was applied to a weight of about 34 mg.

These dosage forms exhibit release of 36 mg of methylphenidate with about 8 mg released immediately and the remaining 28 mg released at an ascending release rate over an extended time period.

EXAMPLE 9

Tri-layer oral osmotic dosage forms were made in accord with the manufacturing processes of Example 6 but comprising a total of 42 mg of methylphenidate contained within the first and second component layers and 12 mg of methylphenidate in the drug overcoat. The first component layer contained the following (by weight percent): 11.5% methylphenidate hydrochloride, 81.6% polyethylene oxide (Polyox N-80 brand product of Union Carbide, Danbury, Conn.), 5% polyvinylpyrrolidone (Kolidon 29–32 product of BASF Corp., Mt. Olive, N.J.); 1.3% succinic acid; 0.5% stearic acid; 0.05% butylated hydroxy toluene; and 0.05% yellow ferric oxide, as coloring agent. The second component layer contained the following (by weight percent): 19.8% methylphenidate hydrochloride, 72.7% polyethylene oxide (Polyox N-80 brand product of Union Carbide, Danbury, Conn.), 5% polyvinylpyrrolidone (Kolidon 29–32 product of BASF Corp., Mt. Olive, N.J.); 1.95% succinic acid; 0.5% stearic acid; and 0.05% butylated hydroxy toluene. The third push layer from Example 6 and the semipermeable membrane had the same composition as in Example 6 but was applied to a weight of about 34 mg.

US 6,919,373 B1

23

24

These dosage forms exhibit release of 54 mg of methylphenidate with about 12 mg released immediately and the remaining 42 mg released at an ascending release rate over an extended time period.

While there has been described and pointed out features and advantages of the invention, as applied to present embodiments, those skilled in the art will appreciate that various modifications, changes, additions, and omissions in the descriptions within the specification can be made without departing from the spirit of the invention.

We claim:

1. A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

2. The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 4 hours following said administration.

3. The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 4 to about 5.5 hours following said administration.

4. The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 4 to about 8 hours following said administration.

5. The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 4 to about 9.5 hours following said administration.

6. The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours following said administration.

7. The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration.

8. The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 9.5 hours following said administration.

* * * * *

# EXHIBIT C

**REDACTED**

# EXHIBIT D

# 1995

# USP 23

# THE UNITED STATES PHARMACOPEIA

# NF 18

# THE NATIONAL FORMULARY

*By authority of the United States Pharmacopeial Convention, Inc., meeting at Washington, D.C., March 8–10, 1990. Prepared by the Committee of Revision and published by the Board of Trustees*

*Official from January 1, 1995*



## UNITED STATES PHARMACOPEIAL CONVENTION, INC.
12601 Twinbrook Parkway, Rockville, MD   20852

# Methylphenidate Hydrochloride

$C_{14}H_{19}NO_2 \cdot HCl$    269.77

2-Piperidineacetic acid, α-phenyl-, methyl ester, hydrochloride, $(R^*,R^*)$-(±)-.

Methyl α-phenyl-2-piperidineacetate hydrochloride [298-59-9].

» Methylphenidate Hydrochloride contains not less than 98.0 percent and not more than 100.5 percent of $C_{14}H_{19}NO_2 \cdot HCl$, calculated on the dried basis.

**Packaging and storage**—Preserve in well-closed containers.

**USP Reference standards** (11)—*USP Methylphenidate Hydrochloride RS. USP Methylphenidate Hydrochloride Erythro Isomer RS. USP α-Phenyl-2-piperidineacetic Acid Hydrochloride RS.*

**Identification**—

A: *Infrared Absorption* (197M).

B: It responds to the tests for *Chloride* (191).

**Loss on drying** (731)—Dry it in vacuum at 60° for 4 hours: it loses not more than 0.5% of its weight.

**Residue on ignition** (281): not more than 0.1%.

**Heavy metals**, *Method II* (231): 0.001%.

**Limit of erythro [$(R^*,S^*)$] isomer**—

*Mobile solvent*—Mix 190 volumes of chloroform with 10 volumes of methanol and 1 volume of ammonium hydroxide.

*Detecting reagent*—Dissolve 0.7 g of bismuth subnitrate in 40 mL of a mixture of 1 volume of glacial acetic acid and 4 volumes of water. Add 40 mL of potassium iodide solution (2 in 5), then add 120 mL of glacial acetic acid and 250 mL of water.

*Procedure*—Prepare methanol solutions of Methylphenidate Hydrochloride and of USP Methylphenidate Hydrochloride Erythro Isomer RS containing 50 mg per mL and 0.5 mg per mL, respectively. Apply 20-μL portions of each solution to a suitable thin-layer chromatographic plate (see *Chromatography* (621)) coated with a 0.25-mm layer of chromatographic silica gel. Allow the spots to dry, and develop the chromatogram, using the *Mobile solvent*, in a suitable chamber, lined with absorbent paper and previously equilibrated with the *Mobile solvent*, until the solvent front has moved about three-fourths of the length of the plate. Remove the plate from the developing chamber, and allow the solvent to evaporate. Locate the spots on the plate by spraying first with the *Detecting reagent* and then with 1 N sulfuric acid. Any spot in the lane from the methylphenidate hydrochloride at the same $R_f$ as the erythro isomer is not larger or more intense than that produced by USP Methylphenidate Hydrochloride Erythro Isomer RS, when viewed under ordinary lighting (1%).

**Limit of α-phenyl-2-piperidineacetic acid hydrochloride**—

*Mobile solvent*—Mix 65 volumes of chloroform with 25 volumes of methanol and 5 volumes of acetic acid.

*Sodium hydroxide–methanol*—Prepare a 1 in 2500 solution of sodium hydroxide in methanol.

*Spray reagent I*—Mix 850 mg of bismuth subnitrate with 40 mL of water and 10 mL of glacial acetic acid (*Solution A*). Dissolve 8 g of potassium iodide in 20 mL of water (*Solution B*). Mix *Solutions A* and *B* together to obtain the Stock solution. [NOTE—This Stock solution may be stored for several months in a dark bottle.] Mix 10 mL of the Stock solution with 20 mL of glacial acetic acid, and dilute with water to make 100 mL to obtain the *Spray reagent*.

*Spray reagent II*—Use hydrogen peroxide solution.

*Standard preparation*—Dissolve a suitable quantity of USP α-Phenyl-2-piperidineacetic Acid Hydrochloride RS in *Sodium hydroxide–methanol* to obtain a solution having a known concentration of about 240 μg per mL.

*Test preparation*—Dissolve 400 mg of Methylphenidate Hydrochloride, accurately weighed, in *Sodium hydroxide–methanol* to make 10.0 mL. Use immediately after preparation.

*Procedure*—Apply 10-μL portions of the *Test preparation* and the *Standard preparation* to a suitable thin-layer chromatographic plate (see *Chromatography* (621)) coated with a 0.25-mm layer of chromatographic silica gel. Allow the spots to dry, and develop the chromatogram, using the *Mobile solvent*, in a suitable chamber, lined with absorbent paper and previously equilibrated with *Mobile solvent*, until the solvent front has moved about three-fourths of the length of the plate. Remove the plate from the developing chamber, and allow the plate to dry for 30 minutes. Spray the plate with *Spray reagent I* followed by *Spray reagent II*. [NOTE—After spraying with the *Spray reagents*, cover the plate with a second plate to prevent fading of the spots.] Examine the plate: any spot in the lane from the *Test preparation* having the same $R_f$ value as the principal spot from the *Standard preparation* is not larger or more intense than that produced by the *Standard preparation* (0.6%).

**Organic volatile impurities,** *Method I* (467): meets the requirements.

**Assay**—Dissolve about 225 mg of Methylphenidate Hydrochloride, accurately weighed, in 50 mL of glacial acetic acid in a 125-mL conical flask. Add 15 mL of mercuric acetate TS and 5 drops of *p*-naphtholbenzein TS, and titrate with 0.1 N perchloric acid VS to a green endpoint. Perform a blank determination, and make any necessary correction. Each mL of 0.1 N perchloric acid is equivalent to 26.98 mg of $C_{14}H_{19}NO_2 \cdot HCl$.

# Methylphenidate Hydrochloride Tablets

» Methylphenidate Hydrochloride Tablets contain not less than 93.0 percent and not more than 107.0 percent of the labeled amount of $C_{14}H_{19}NO_2 \cdot HCl$.

**Packaging and storage**—Preserve in tight containers.

**USP Reference standards** (11)—*USP Methylphenidate Hydrochloride RS.*

**Identification**—Place a portion of powdered Tablets, equivalent to about 50 mg of methylphenidate hydrochloride, in a 40-mL centrifuge tube, add 10 mL of chloroform, shake, and centrifuge. Filter the clear extract through a medium-sized sintered-glass funnel into a beaker, and repeat the extraction with an additional 10-mL portion of chloroform. Evaporate the combined chloroform extracts on a steam bath to dryness. Agitate the dried residue with 2 mL of acetonitrile, and filter the mixture through a small sintered-glass funnel. Wash the crystals with an additional 2 mL of acetonitrile, and dry them with the aid of suction: the infrared absorption spectrum of a mineral oil dispersion of the residue exhibits maxima only at the same wavelengths as that of a similar preparation of USP Methylphenidate Hydrochloride RS.

**Dissolution** (711)—

*Medium:* water; 900 mL.

*Apparatus 1:* 100 rpm.

*Time:* 45 minutes.

*Procedure*—Determine the amount of $C_{14}H_{19}NO_2 \cdot HCl$ dissolved, employing the procedure set forth in the *Assay*, making any necessary volumetric adjustments.

*Tolerances*—Not less than 75% (*Q*) of the labeled amount of $C_{14}H_{19}NO_2 \cdot HCl$ is dissolved in 45 minutes.

**Uniformity of dosage units** (905): meet the requirements.

Assay—

  *Acetate buffer*—Dissolve 1.64 g of anhydrous sodium acetate in 900 mL of water, adjust with acetic acid to a pH of 4.0, dilute with water to make 1000 mL, and mix.

  *Mobile phase*—Prepare a filtered and degassed mixture of methanol, acetonitrile, and *Acetate buffer* (4:3:3). Make adjustments if necessary (see *System Suitability* under *Chromatography* (621)).

  *Internal standard solution*—Dissolve phenylephrine hydrochloride in *Mobile phase* to obtain a solution having a concentration of about 0.4 mg per mL.

  *Standard preparation*—Dissolve an accurately weighed quantity of USP Methylphenidate Hydrochloride RS in *Mobile phase*, and dilute quantitatively with *Mobile phase* to obtain a standard stock solution having a known concentration of about 0.2 mg per mL. Transfer 10.0 mL of this standard stock solution to a glass-stoppered, 25-mL conical flask, add 5.0 mL of *Internal standard solution*, and mix.

  *Assay preparation*—Weigh and finely powder not less than 20 Tablets. Transfer an accurately weighed portion of the powder, equivalent to about 20 mg of methylphenidate hydrochloride, to a 100-mL volumetric flask, add 70 mL of *Mobile phase*, and sonicate for 15 minutes. Cool to room temperature, dilute with *Mobile phase* to volume, and mix. Filter a portion of this solution, discarding the first portion of the filtrate. Transfer 10.0 mL of the clear filtrate to a glass-stoppered, 25-mL conical flask, add 5.0 mL of *Internal standard solution*, and mix.

  *Chromatographic system* (see *Chromatography* (621))—The liquid chromatograph is equipped with a 210-nm detector and a 4.6-mm × 25-cm column that contains packing L10. The flow rate is about 1.5 mL per minute. Chromatograph the *Standard preparation*, and record the peak responses as directed under *Procedure*: the resolution, *R*, between the analyte and the internal standard peaks is not less than 2.0, and the relative standard deviation of the ratio of the analyte peak response to the internal standard peak response for replicate injections is not more than 2.0%.

  *Procedure*—Separately inject equal volumes (about 50 μL) of the *Standard preparation* and the *Assay preparation* into the chromatograph, record the chromatograms, and measure the responses for the major peaks. The relative retention times are about 0.8 for phenylephrine hydrochloride and 1.0 for methylphenidate hydrochloride. Calculate the quantity, in mg, of $C_{14}H_{19}NO_2 \cdot HCl$ in the portion of Tablets taken by the formula:

$$100C(R_U/R_S),$$

in which *C* is the concentration, in mg per mL, of USP Methylphenidate Hydrochloride RS in the standard stock solution used to prepare the *Standard preparation*, and $R_U$ and $R_S$ are the response ratios of the analyte peak to the internal standard peak obtained from the *Assay preparation* and the *Standard preparation*, respectively.

# Methylphenidate Hydrochloride Extended-release Tablets

» Methylphenidate Hydrochloride Extended-release Tablets contain not less than 90.0 percent and not more than 110.0 percent of the labeled amount of $C_{14}H_{19}NO_2 \cdot HCl$.

Packaging and storage—Preserve in tight containers.

USP Reference standards (11)—*USP Methylphenidate Hydrochloride RS.*

Identification—Place a portion of powdered Tablets, equivalent to about 100 mg of methylphenidate hydrochloride, in a 100-mL beaker. Add 20 mL of chloroform, stir for 5 minutes, and filter, collecting the filtrate. Evaporate the filtrate to about 5 mL. Add ethyl ether slowly, with stirring, until crystals form. Filter the crystals, wash with ethyl ether, and dry at 80° for 30 minutes: the infrared absorption spectrum of a mineral oil dispersion of the crystals so obtained exhibits maxima only at the same wavelengths as that of a similar preparation of USP Methylphenidate Hydrochloride RS.

Drug release (724)—

  *Medium:* water; 500 mL.

  *Apparatus 2:* 50 rpm.

  *Times:* 0.125D hours; 0.250D hours; 0.438D hours; 0.625D hours; 0.875D hours.

  *Procedure*—Determine the amount of $C_{14}H_{19}NO_2 \cdot HCl$ dissolved, employing the procedure set forth in the *Assay*, making any necessary volumetric adjustments.

  *Tolerances*—The percentages of the labeled amount of $C_{14}H_{19}NO_2 \cdot HCl$ dissolved at the times specified conform to *Acceptance Table 1*.

| Time (hours) | Amount dissolved (%) |
|---|---|
| 0.125D | between 20% and 50% |
| 0.250D | between 35% and 70% |
| 0.438D | between 53% and 83% |
| 0.625D | between 70% and 95% |
| 0.875D | not less than 80% |

Uniformity of dosage units (905): meet the requirements.

Assay—Proceed as directed in the *Assay* under *Methylphenidate Hydrochloride Tablets*, using Tablets.

# Methylprednisolone



$C_{22}H_{30}O_5$    374.48

Pregna-1,4-diene-3,20-dione, 11,17,21-trihydroxy-6-methyl-, (6α,11β)-.

11β,17,21-Trihydroxy-6α-methylpregna-1,4-diene-3,20-dione    [83-43-2].

» Methylprednisolone contains not less than 97.0 percent and not more than 103.0 percent of $C_{22}H_{30}O_5$, calculated on the dried basis.

Packaging and storage—Preserve in tight, light-resistant containers.

USP Reference standards (11)—*USP Methylprednisolone RS.*

Identification—

  A: *Infrared Absorption* (197K).

  B: *Ultraviolet Absorption* (197U)—

  *Solution:* 1 in 100,000.

  *Medium:* alcohol. Absorptivities at 243 nm, calculated on the dried basis, do not differ by more than 3.0%.

  C: Dissolve about 5 mg in 2 mL of sulfuric acid: a red color is produced.

Specific rotation (781S): between +79° and +86°.

  *Test solution:* 5 mg per mL, in dioxane.

Loss on drying (731)—Dry it at 105° for 3 hours: it loses not more than 1.0% of its weight.

Residue on ignition (281): not more than 0.2%.

Ordinary impurities (466)—

  *Test solution:* methanol.

  *Standard solution:* methanol.

  *Application volume:* 10 μL.

  *Eluant:* a mixture of acetone, toluene, and 2 N formic acid (65:30:5), in a nonequilibrated chamber.

  *Visualization:* 5.

# EXHIBIT E

**REDACTED**

# EXHIBIT F

**REDACTED**

# EXHIBIT G

**REDACTED**

# EXHIBIT H

**REDACTED**

# EXHIBIT I

Other requirements—It meets the requirements of the tests for *pH*, *Sulfate*, *Calcium*, *Carbon dioxide*, and *Heavy metals* under *Purified Water*.

## Sterile Water for Irrigation

» Sterile Water for Irrigation is Water for Injection sterilized and suitably packaged. It contains no antimicrobial agent or other added substance.

**Packaging and storage**—Preserve in single-dose glass or plastic containers. Glass containers are preferably of Type I or Type II glass. The container may contain a volume of more than 1 liter, and may be designed to empty rapidly.

**Labeling**—Label it to indicate that no antimicrobial or other substance has been added. The designations "For irrigation only" and "Not for injection" appear prominently on the label.

**USP Reference standards** ⟨11⟩—*USP Endotoxin RS.*

**Other requirements**—It meets the requirements of all of the tests under *Sterile Water for Injection* except the test for *Particulate matter* ⟨788⟩.

## Purified Water

H₂O    18.02

» Purified Water is water obtained by distillation, ion-exchange treatment, reverse osmosis, or other suitable process. It is prepared from water complying with the regulations of the federal Environmental Protection Agency with respect to drinking water. It contains no added substance.

NOTE—Purified Water is intended for use as an ingredient in the preparation of compendial dosage forms. Where used for sterile dosage forms, other than for parenteral administration, process the article to meet the requirements under *Sterility Tests* ⟨71⟩, or first render the Purified Water sterile and thereafter protect it from microbial contamination. Do not use Purified Water in preparations intended for parenteral administration. For such purposes use Water for Injection, Bacteriostatic Water for Injection, or Sterile Water for Injection.

**Packaging and storage**—Where packaged, preserve in tight containers.

**Labeling**—Where packaged, label it to indicate the method of preparation.

**pH** ⟨791⟩: between 5.0 and 7.0, determined potentiometrically in a solution prepared by the addition of 0.30 mL of saturated potassium chloride solution to 100 mL of test specimen.

**Chloride**—To 100 mL add 5 drops of nitric acid and 1 mL of silver nitrate TS: no opalescence is produced.

**Sulfate**—To 100 mL add 1 mL of barium chloride TS: no turbidity is produced.

**Limit of ammonia**—To 100 mL add 2 mL of alkaline mercuric-potassium iodide TS: any yellow color produced immediately is not darker than that of a control containing 30 μg of added NH₃ in *High-purity Water* (see under *Reagents in Containers* ⟨661⟩) [0.3 ppm].

**Calcium**—To 100 mL add 2 mL of ammonium oxalate TS: no turbidity is produced.

**Carbon dioxide**—To 25 mL add 25 mL of calcium hydroxide TS: the mixture remains clear.

**Heavy metals**—Adjust 40 mL of Purified Water with 1 *N* acetic acid to a pH of 3.0 to 4.0 (using short-range pH indicator paper), add 10 mL of freshly prepared hydrogen sulfide TS, and allow the liquid to stand for 10 minutes: the color of the liquid, when viewed downward over a white surface, is not darker than the color of a mixture of 50 mL of the same Purified Water with the same amount of 1 *N* acetic acid as was added to the test specimen, matched color-comparison tubes being used for the comparison.

**Oxidizable substances**—To 100 mL add 10 mL of 2 *N* sulfuric acid, and heat to boiling. Add 0.1 mL of 0.1 *N* potassium permanganate, and boil for 10 minutes: the pink color does not completely disappear.

**Total solids**—Evaporate 100 mL on a steam bath to dryness, and dry the residue at 105° for 1 hour: not more than 1 mg of residue remains (0.001%).

**Wax, Carnauba**—*see* Wax, Carnauba NF

**Wax, Cetyl Esters**—*see* Cetyl Esters Wax NF

**Wax, Emulsifying**—*see* Wax, Emulsifying NF

**Wax, Microcrystalline**—*see* Wax, Microcrystalline NF

**Wax, White**—*see* Wax, White NF

**Wax, Yellow**—*see* Wax, Yellow NF

## White Lotion

» Prepare White Lotion as follows:

| | |
|---|---|
| Zinc Sulfate | 40 g |
| Sulfurated Potash | 40 g |
| Purified Water, a sufficient quantity, | |
| to make | 1000 mL |

Dissolve the Zinc Sulfate and the Sulfurated Potash separately, each in 450 mL of Purified Water, and filter each solution. Add the sulfurated potash solution slowly to the zinc sulfate solution with constant stirring. Then add the required amount of purified water, and mix.

NOTE—Prepare the Lotion fresh, and shake it thoroughly before dispensing.

**Packaging and storage**—Dispense in tight containers.

## Witch Hazel

» Witch Hazel is a clear, colorless distillate prepared from recently cut and partially dried dormant twigs of *Hamamelis virginiana* Linné.

Prepare Witch Hazel as follows. Macerate a weighed amount of the twigs for about 24 hours in about twice their weight of water, then distil until not less than 800 mL and not more than 850 mL of clear, colorless distillate is obtained from each 1000 g of the twigs taken. Add 150 mL of Alcohol to each 850 mL of distillate, and mix thoroughly.

**Packaging and storage**—Preserve in tight containers, and avoid exposure to excessive heat.

# EXHIBIT J

While one of the primary objectives of the Pharmacopeia is to assure the user of official articles of their identity, strength, quality, and purity, it is manifestly impossible to include in each monograph a test for every impurity, contaminant, or adulterant that might be present, including microbial contamination. These may arise from a change in the source of material or from a change in the processing, or may be introduced from extraneous sources. Tests suitable for detecting such occurrences, the presence of which is inconsistent with applicable manufacturing practice or good pharmaceutical practice, should be employed in addition to the tests provided in the individual monograph.

**Procedures** Assay and test procedures are provided for determining compliance with the Pharmacopeial standards of identity, strength, quality, and purity.

In performing the assay or test procedures in this Pharmacopeia, it is expected that safe laboratory practices will be followed. This includes the utilization of precautionary measures, protective equipment, and work practices consistent with the chemicals and procedures utilized. Prior to undertaking any assay or procedure described in this Pharmacopeia, the individual should be aware of the hazards associated with the chemicals and the procedures and means of protecting against them. This Pharmacopeia is not designed to describe such hazards or protective measures.

Every compendial article in commerce shall be so constituted that when examined in accordance with these assay and test procedures, it meets all of the requirements in the monograph defining it. However, it is not to be inferred that application of every analytical procedure in the monograph to samples from every production batch is necessarily a prerequisite for assuring compliance with Pharmacopeial standards before the batch is released for distribution. Data derived from manufacturing *process validation* studies and from *in-process controls* may provide greater assurance that a batch meets a particular monograph requirement than analytical data derived from an examination of finished units drawn from that batch. On the basis of such assurances, the analytical procedures in the monograph may be omitted by the manufacturer in judging compliance of the batch with the Pharmacopeial standards.

Automated procedures employing the same basic chemistry as those assay and test procedures given in the monograph are recognized as being equivalent in their suitability for determining compliance. Conversely, where an automated procedure is given in the monograph, manual procedures employing the same basic chemistry are recognized as being equivalent in their suitability for determining compliance. Compliance may be determined also by the use of alternative methods, chosen for advantages in accuracy, sensitivity, precision, selectivity, or adaptability to automation or computerized data reduction or in other special circumstances. Such alternative or automated procedures or methods shall be validated. However, Pharmacopeial standards and procedures are interrelated; therefore, where a difference appears or in the event of dispute, only the result obtained by the procedure given in this Pharmacopeia is conclusive.

In the performance of assay or test procedures, not less than the specified number of dosage units should be taken for analysis. Proportionately larger or smaller quantities than the specified weights and volumes of assay or test substances and Reference Standards may be taken, provided the measurement is made with at least equivalent accuracy and provided that any subsequent steps, such as dilutions, are adjusted accordingly to yield concentrations equivalent to those specified and are made in such manner as to provide at least equivalent accuracy.

Where it is directed in an assay or a test that a certain quantity of substance or a counted number of dosage units is to be examined, the specified quantity or number is a minimal figure (the singlet determination) chosen only for convenience of analytical manipulation; it is not intended to restrict the total quantity of substance or number of units that may be subjected to the assay or test or that should be tested in accordance with good manufacturing practices.

Where it is directed in the assay of Tablets to "weigh and finely powder not less than" a given number, usually 20, of the Tablets, it is intended that a counted number of Tablets shall be weighed and reduced to a powder. The portion of the powdered tablets taken for assay is representative of the whole Tablets and is, in turn, weighed accurately. The result of the assay is then related to the amount of active ingredient per Tablet by multiplying this result by the average Tablet weight and dividing by the weight of the portion taken for the assay.

Similarly, where it is directed in the assay of Capsules to remove, as completely as possible, the contents of not less than a given number, usually 20, of the Capsules, it is intended that a counted number of Capsules should be carefully opened and the contents quantitatively removed, combined, mixed, and weighed accurately. The portion of mixed Capsules contents taken for the assay is representative of the contents of the Capsules and is, in turn, weighed accurately. The result of the assay is then related to the amount of active ingredient per Capsule by multiplying this result by the average weight of Capsule content and dividing by the weight of the portion taken for the assay.

Where the definition in a monograph states the tolerances as being "calculated on the dried (or anhydrous or ignited) basis," the directions for drying or igniting the sample prior to assaying are generally omitted from the *Assay* procedure. Assay and test procedures may be performed on the undried or unignited substance and the results calculated on the dried, anhydrous, or ignited basis, provided a test for *Loss on drying*, or *Water*, or *Loss on ignition*, respectively, is given in the monograph. Where the presence of moisture or other volatile material may interfere with the procedure, previous drying of the substance is specified in the individual monograph and is obligatory.

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of December, 2006, the attached **REDACTED**

**PUBLIC VERSION OF DECLARATION OF VIVIAN A. GRAY IN SUPPORT OF**

**REPLY MARKMAN BRIEF SUBMITTED BY ALZA CORPORATION AND MCNEIL-**

**PPC, INC.** was served upon the below-named counsel of record at the address and in the manner

indicated:


William J. Cattie, III, Esquire                                    HAND DELIVERY
Rawle & Henderson, LLP
300 Delaware Avenue, Suite 1015
Wilmington, DE  19899-0588


James V. Costigan, Esquire                                    ELECTRONIC MAIL
Hedman & Costigan, P.C.
1185 Avenue of the Americas
New York, NY  10036


Eric D. Isicoff, Esquire                                          ELECTRONIC MAIL
Isicoff, Ragatz & Koenigsberg, P.A.
1200 Brickell Avenue
Miami, FL  33131



*/s/ Tiffany Geyer Lydon*
_____
Tiffany Geyer Lydon