## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

```
-------------------------------------------------------X
                                    )
ALZA CORPORATION and                )
McNEIL-PPC., INC.,                  )
                                    )
          Plaintiffs,               )       CIVIL ACTION NO.
                                    )
          v.                        )       05-CV-0642
ANDRX PHARMACEUTICALS, LLC  and     )
ANDRX CORPORATION,                  )
                                    )
          Defendants.               )
-------------------------------------------------------X
```

### REDACTED PUBLIC VERSION

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' *MARKMAN*
## BRIEF ON CLAIM CONSTRUCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ....................................................................... iii

I. INTRODUCTION ................................................................................ 1

    A.    Nature and Stage of the Proceedings ................................................. 1

    B.    Alza's "Surprising" Discovery ......................................................... 2

    C.    The Claim Construction Disputes ..................................................... 3

II. ARGUMENT ..................................................................................... 4

    A.    The Legal Standard For Claim Construction ....................................... 4

    B.    The Proper Construction of the Disputed Terms in the '373 and '129 Patents .. 6

        1.    The claimed method concerns administration of a single dose of
methylphenidate ............................................................................ 6

        2.    The limitations in dispute ................................................................ 6

          (i)    The claim limitation "extended period of time" .......................... 6

          (ii)    The claim limitation "release of methylphenidate at an ascending release
rate" ........................................................................................ 9

            (a) The type of dissolution methodology ...................................... 10

            (b) The periodic interval ......................................................... 11

            (c) The method of calculating the dissolution rate ........................ 13

          (iii)    The claim limitation "substantially ascending methylphenidate drug
plasma concentration" .................................................................. 17

            (a) "Substantially" ................................................................ 17

            (b) Use of mean data ............................................................. 20

(iv) "Dosage form" or "pharmaceutically acceptable composition" ............... 22

(a) The ordinary meaning of "a pharmaceutically acceptable composition" or "dosage form" ...................................................................................... 22

(b) The claimed "pharmaceutically acceptable composition" and "dosage form" is limited to osmotic drug release system........................................ 24

(v) The claim limitation "about [x] hours".................................................... 27

III. CONCLUSION.................................................................................................. 28

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs, v. Andrx Pharms., Inc.*, 452 F.3d 1331 (Fed. Cir. 2006) .............................. 22

*Alza Corp. v. Mylan Labs, Inc.*, 349 F.Supp.2d 1002 (N.D. W.Va. 2004) ................. 24, 25

*Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F.Supp.2d 423 (S.D.N.Y. 2002) ........ 23, 25

*Autogiro Co. of America v. United States*, 384 F.2d 391 (Cl.Ct. 1967) ........................... 19

*Aventis Pharms., Inc. v. Barr Labs, Inc.*, 341 F. Supp. 2d 502 (D. N.J. 2004)..... 16, 17, 18

*Chimie v. PPG Indus., Inc.*, 402 F.3d 1371 (Fed. Cir. 2005) ............................................ 5

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005) .................... 5

*Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302 (Fed. Cir. 2000)..... 9

*Evans Med. Ltd. v. American Cyanamid Co.*, 11 F.Supp.2d 338 (S.D.N.Y. 1998).......... 26

*Genentech Inc. v. Novo Nordisk A/S*, 108 F.3d 1361 (Fed. Cir. 1997) ............................. 26

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332

    (Fed. Cir. 2003) ................................................................................... 5, 11, 13, 23

*In re Clemens*, 622 F.2d 1029 (C.C.P.A. 1980) ............................................................... 27

*In re Omeprazole Patent Litigation*, 84 Fed. Appx. 76 (Fed. Cir. 2003) ........................ 23

*In re Wright*, 999 F.2d 1557 (Fed. Cir. 1993) .................................................................. 26

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999)............. 6

*Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709 (Fed. Cir. 1998)................................. 24

*Markman v. Westview Instrs., Inc.*, 517 U.S. 370 (1996) .................................................. 1

*Markman v. Westview Instrs., Inc.*, 52 F.3d 967 (Fed. Cir. 1995)............................*passim*

*Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*,

    976 F.2d 1559 (Fed. Cir. 1992)............................................................................... 19

*Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 375 F.3d 1328

    (Fed. Cir. 2004)................................................................................... 5, 6

*Ortho-McNeil Pharmaceutical Inc. v. Caraco Pharmaceutical Laboratories, Ltd.,*

    2005 WL 2679788 (E.D. Mich. Oct 19, 2005) ............................................ 29

*Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211 (Fed. Cir. 1995)...................... 4, 29

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ........................................... *passim*

*Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335

    (Fed. Cir. 2003)..................................................................................... 26

*Purdue Pharma, L.P. v. F.H. Faulding & Co.*, 48 F.Supp. 2d 420 (D. Del. 1999)... *passim*

*Rhine v. Casio, Inc.*, 183 F.3d 1342 (Fed. Cir. 1999) ...................................................... 27

*Schering Corp. v. Amgen, Inc.*, 18 F. Supp. 2d 372 (D. Del. 1998) ............... 15, 16, 22, 24

*Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033 (Fed. Cir. 1987)..................................... 19

*U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554 (Fed. Cir. 1997)....................... 10, 11

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ............................. 24

*W.L. Gore & Assocs., Inc.v. Garlock, Inc.*, 842 F.2d 1275 (Fed. Cir. 1988)................ 4, 29

## Statutes

35 U.S.C. §112................................................................................................ 5, 26

## Other Authorities

M.P.E.P. § 608.01(c)........................................................................................ 27

William C. Robinson, The Law of Patents for Useful Inventions, § 1019 (1890) ............. 5

## I. **INTRODUCTION**

### A.    **Nature and Stage of the Proceedings**

Defendants, Andrx Pharmaceuticals, LLC and Andrx Corporation (collectively, "Andrx"), submit this Opposition to Plaintiffs' *Markman*[1] claim construction brief ("Plaintiffs' *Markman* brief") pursuant to this Court's order dated August 15, 2006. Plaintiffs' *Markman* brief asserts that Andrx's proposed claim constructions improperly seek to import limitations from the patent specifications into the claims. Nothing could be further from the truth. Andrx's proposed claim constructions correctly provide definition to otherwise ambiguous claim terms. This is the essence of claim construction. Andrx's proposed claim constructions properly are based on the intrinsic evidence – the patent specifications and prosecution histories – and are consistent with the extrinsic evidence – expert testimony, treatises and inventor testimony.

Plaintiffs' proposed claim constructions, on the other hand, are the antithesis of claim construction – either not providing definitions and leaving the claim terms ambiguous or improperly relying on inconsistent extrinsic evidence.[2] Even Plaintiffs' choice of certain claim terms is improper. By grouping two separate terms -- "ascending release rate" and "extended period of time" -- into the same claim term, Plaintiffs invite erroneous claim construction by glossing over the phrase "extended period of time." Similarly, Plaintiffs also combined the terms "about [x] hours" and "ascending methylphenidate plasma drug concentration" in order to equate "about" with "substantially." These are different terms modifying different concepts (hours vs. drug

---

[1] The United States Supreme Court in *Markman v. Westview Instrs., Inc.*, 517 U.S. 370 (1996), held that during a patent infringement analysis, the court must first determine the proper scope and meaning of the asserted claims. This frequently is referred to as a *Markman* or claim construction analysis.

[2] Such as reliance on court decisions interpreting other wholly unrelated patent claims.

blood plasma concentrations). The claim terms should be analyzed using Andrx's claim terms and given Andrx's proposed claim constructions.

### B.    Alza's "Surprising" Discovery

The patents-in-suit are directed to alleged improvements in extending the release of methylphenidate ("MPH") from a dosage form in a particular release pattern, *i.e.,* at an ascending release rate in a dissolution test (in the case of the '373 patent) or in a substantially ascending blood plasma drug concentration profile (in the case of the '129 patent). *See* Declaration of Dr. Umesh Banakar filed concurrently with Andrx's Opening *Markman* Brief (hereinafter "Banakar Decl.") at ¶29.

A patent, like a deed to property, is intended to map out the metes and bounds of an applicants' invention. *Markman v. Westview Instrs., Inc.*, 52 F.3d 967, 997 (Fed. Cir. 1995) *aff'd* 517 U.S. 570 (1996). The problem with the '373 and '129 patent claims is that they use ambiguous claim terms. Without looking to the specifications and the prosecution histories of the patents-in-suit, a person of ordinary skill in the art ("POSA") is at a loss as to understand the claim boundaries. Unlike most patents, however, the '373 and '129 patent specifications do contain detailed definitions and explanations of the ambiguous claim terms.

In describing the claimed invention, Plaintiffs identify the ascending plasma profile as the inventors' "surprising discovery." In describing this "surprising discovery" at pages 5-7 of Plaintiffs' *Markman* brief, Plaintiffs point to the first clinical study and the "ascending" and "flat" blood plasma concentration profiles from that first clinical study. REDACTED.

### C.    The Claim Construction Disputes

The parties do agree on certain aspects of the claim constructions. The parties agree that the claims of the patents-in-suit are directed towards methods of treating ADD/ADHD patients using a once-a-day dosage form containing the drug MPH. The parties also agree that claim 1 of the '373 patent relates to measurement of *in vitro* release rates of MPH. The parties likewise agree that the claims of the '129 patent relate to *in vivo* MPH plasma concentration measurements.

The parties also agree that the '373 and '129 patents share a common parent application and essentially the same specification. This allows this Court to use one set of claim constructions for the common claim terms of the patents-in-suit. Specifically, Andrx submits that the terms "pharmaceutically acceptable composition" and "dosage form" should be given the same claim construction.[3]

However, with regard to the '373 patent, the parties disagree as to how the *in vitro* release rate should be measured,[4] the construction of the term "extended period of time" and the proper definition of "dosage form." With regard to the '129 patent, the parties disagree on the construction of the terms "substantially ascending methylphenidate drug concentration" and "pharmaceutically acceptable composition." With regard to the time periods specified in the claims of the '129 patent, the parties also are in disagreement over how the term "about" should be construed. Plaintiffs incorrectly seek to equate "about" a time period with "substantially" an amount of drug. It is settled law, however, that the definition of "about" must be read with regard to the "technological facts of the

---

[3] Plaintiffs agree that "pharmaceutically acceptable composition" and "dosage form" "are simply different expressions of the same thing" (Plaintiffs' Opening *Markman* brief at 14).

[4] Plaintiffs propose using the indefinite term "appropriate," whereas Andrx proposes the definite term "biorelevant." See Plaintiffs' Opening *Markman* brief at 7 and Andrx's Opening *Markman* brief at 11.

particular case." *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1217 (Fed. Cir. 1995), *cert. denied,* 520 U.S. 1115 (1997); *see also W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 842 F.2d 1275, 1280 (Fed. Cir. 1988). Plainly, time and drug blood plasma concentrations are different technological facts requiring different constructions.

## II. **ARGUMENT**

### A.    **The Legal Standard For Claim Construction**

Plaintiffs have misconstrued the principles of claim construction thereby diverting this Court's focus from the intentions of *Markman v. Westview Instrs., Inc.,* 52 F.3d 967 (Fed. Cir. 1995) *aff'd* 517 U.S. 570 (1996). The purpose of claim construction is to construe the language of claim terms, *i.e.,* provide definition. *See Markman,* 52 F.3d at 979. "[T]he court has the power and obligation to construe as a matter of law the meaning of language used in the patent claim. As such, '[a] patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims.'" *Id* (*citing* William C. Robinson, *The Law of Patents for Useful Inventions,* § 1019, at 247(1890)). *Markman* is explicit that the courts have an "obligation" to construe the claims of a patent. *See Markman,* 52 F.3d at 979. *See also Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1347 (Fed. Cir. 2005) stating:

> Every patent's specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112, ¶2 (2000). Because the claims perform the fundamental function of delineating the scope of the invention, *Chimie v. PPG Indus., Inc.,* 402 F.3d 1371, 1379 (Fed. Cir. 2005), the purpose of the definiteness requirement is to ensure that the claims delineate the scope of the invention using language that adequately notifies the public of the patentee's right to exclude, *Honeywell Int'l, Inc. v. Int'l Trade Comm'n,* 341 F.3d 1332, 1338 (Fed. Cir. 2003).

*Id.* Clarification is precisely what Andrx is attempting to facilitate in this *Markman* proceeding. Plaintiffs, in contrast, ask this Court to leave every disputed claim element indefinite and ambiguous.

The proper construction of claim elements is intended for the protection of the patentee as well as to provide direction to the public at large. *Markman* 52 F.3d at 978-79.

> Further, it is only fair (and statutorily required) that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude... It seems to us that nothing can be more just and fair, both to the patentee and to the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent.

*Id.* (internal citations omitted).

While the ordinary meaning of a claim term is the presumptive definition, this is a rebuttable presumption. *See Novartis Pharmaceuticals Corp. v. Abbott Laboratories,* 375 F.3d 1328, 1334 (Fed. Cir. 2004). "The presumption may be rebutted when: (1) the patentee has chosen to be his own lexicographer, or (2) a claim term lacks such clarity that there is 'no means by which the scope of the claim may be ascertained from the language used.'" *Id. (citing Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 990 (Fed. Cir. 1999)). Here, Andrx submits that either the claims of the patents-in-suit contain terms that lack clarity and must be given some level of definition[5] or the inventors acted as their own lexicographer.[6]

Andrx does not seek to import limitations from the specification into the claims. Instead, Andrx seeks to apply meaningful definitions to otherwise indefinite and

---

[5] Specifically, the claim terms: "dosage form;" "pharmaceutically acceptable composition;" "about [x] hours;" "release of methylphenidate at an ascending release rate" and "substantially ascending methylphenidate plasma drug concentration."

[6] Specifically, the claim term: "extended period of time."

ambiguous claim language.  In contrast, Plaintiffs seek to provide no definition to the claims, leaving them ambiguous and thereby rendering meaningless the entire *Markman* proceeding.

**B.**    **The Proper Construction of the Disputed Terms in the '373 and '129 Patents**

     **1.**    **The claimed method concerns administration of a single dose of methylphenidate**

This is an undisputed aspect of the claims of the patents-in-suit.  Andrx is unsure why Plaintiffs included this term in their briefing, but notes that it does point out that Plaintiffs' "surprising discovery" is not within the scope of the claims of the patents-in-suit.

     **2.**    **The limitations in dispute**

The parties dispute the meaning of the following claim elements:

(i)     "extended period of time;"[7]

(ii)    "release of methylphenidate at an ascending release rate;"

(iii)   "a substantially ascending methylphenidate plasma drug concentration;"

(iv)   "pharmaceutically acceptable composition" or "dosage form" and

(v)    "about [x] hours."

     **(i)**    **The claim limitation "extended period of time"**

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| Refers to the time period beginning at 0 | Periodic interval starting at t=0 and |

---

[7] As discussed earlier, Plaintiffs have combined "release of methylphenidate at an ascending release rate" and "extended period of time" to confuse the issues before this Court. *See* Plaintiffs' Opening *Markman* brief at 13.

| hours and extends through the mid point of the $T_{90}$ of the dosage form, which mid point is calculated by determining the hourly time point at which 90 percent of the drug in the dosage form (including any immediate release portion) is released and dividing that number of hours by two and rounding up to the next hour (*i.e.*, if the $T_{90}$ is 8 hours, the extended period of time is 4 hours or if the $T_{90}$ is 9 hours, the extended period of time is 5 hours). | continuing for at least three hours. |
|---|---|

There can be no question that Plaintiffs' proposed definition for "extended period of time" is incorrect. Plaintiffs began the confusion by not giving this claim term a separate claim construction and combining this claim term with the "ascending release rate" term. Even the patent specification treats these terms separately. "Ascending release rate" is defined at col. 9, line 66 to col. 10, line 30. The "extended period of time" definition is given separately in the patent at col. 10, lines 31-52. *See* Suppl. Banakar Decl. at ¶147-148.

Plaintiffs' proposed definition also is at odds with the complete and precise definition given in the patent. Plaintiffs are basing their definition on only a portion of the definition provided in the patent (*see* Plaintiffs' Opening *Markman* brief at 29). Plaintiffs point to a section of the specification where it recites that the "extended period of time" is "at least 3 hours." *See* col. 10, line 40. Plaintiffs then criticize Andrx for relying on the complete definition given in the patent, stating that the remaining portion is only explanatory as to why the "at least three hours" period was chosen. A simple review of the entire specification, instead of only a portion, reveals that Plaintiffs are wrong. In fact, Plaintiffs' construction directly contradicts the clear definition of

"extended period of time" given by the specification of the '373 patent. The entire section of the specification is reprinted below for the Court's convenience.

> **As used herein** with reference to the time period during which an ascending release rate is provided, **"an extended time period"** refers to a time period **beginning at t=0 hours and continuing through at least the mid-point, and preferably beyond the mid-point, of the relevant $T_{90}$ of the dosage form.** Because the dosage forms of the present invention are intended to provide sustained release of drug, a suitable $T_{90}$ for purposes of this invention is at least about 6 hours and, consequently, the "extended time period" during which an ascending release rate is provided is at least 3 hours.
>
> In accord with the above-recited definitions, an **"ascending release rate over an extended time period"** refers to ascending release rates of drug obtained from the **time of administration of the dosage form through, and preferably beyond, the mid-point of the relevant $T_{90}$ for the dosage form.** *To illustrate, consider a situation where a dosage form has a $T_{90}$ of about 8 hours. In this situation, "an ascending release rate over an extended time period" is achieved when the release rate at each hour through t=4 hours is greater than the release rate in the immediately-preceding hour.* Preferably, the release rate continues to ascend during time periods beyond t=4 hours.

'373 patent, col. 10, lines 31-52 (emphasis added).

The fallacy of Plaintiffs' claim construction can be seen in the *italicized* portion of the definition. In this portion, the patentees unequivocally state that where a dosage form has a $T_{90}$ of about 8 hours, the **"extended time period"** is 4 hours. *See also* Suppl. Banakar Decl. at ¶149. Under Plaintiffs' construction, only three hours would be required. Plaintiffs' proposed construction contradicts the express definition in the patent and, therefore, must be rejected. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005), *cert. denied,* 126 S.Ct. 1303 (2006).[8]

---

[8] Andrx's proposed definition does not permit the mid point of the $T_{90}$ to be less than 3 hours as Plaintiffs allege on page 30 of Plaintiffs' Opening *Markman* brief. Plaintiffs' assertion is disingenuous. As explained in Andrx's Opening *Markman* brief, Andrx agrees that 3 hours is a minimum for the mid point of the $T_{90}$ – thus the extended period of time has a minimum of 3 hours but is measured by the mid point of the $T_{90}$.

Plaintiffs' proposed claim construction suffers from the very problem that they have accused Andrx of throughout their Opening *Markman* brief. They improperly are imposing definitions on claim terms based on limited portions of the specification. This is contrary to a fundamental principle of patent law that requires the specification to be read as a whole. *See Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1307-08 (Fed. Cir. 2000).

### (ii)    The claim limitation "release of methylphenidate at an ascending release rate"

This term is the other half of the term that Plaintiffs improperly combined with the "extended period of time" term. As stated above, because this term includes different concepts from the "extended period of time" term and because the patent specification defined these terms separately, Andrx has treated them separately.

| ANDRX PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| In vitro dissolution rate (mg/hr) as measured in a USP dissolution apparatus and methodology that is biorelevant, wherein the release rate is calculated as a mean value of at least six dosage units and excludes release from any immediate release portion of the dosage form and wherein the release rate only ascends from one hourly time point to another and does not decline or remain constant from one time point to another | A release of methylphenidate from the dosage wherein the amount released in a periodic interval is increased over the amount released during the immediately-preceding periodic interval. The release rate is as determined by an appropriate in-vitro dissolution test. The ascending release rate does not include release of any drug from any immediate-release drug coating that may be applied to the dosage form |

The parties disagree on the following regarding this claim term:

9

(1) the type of dissolution methodology (Andrx requires the dissolution method to be "biorelevant" whereas Plaintiffs merely assert that it should be "appropriate");

(2) the periodic interval (Andrx requires the periodic interval to be hourly whereas Plaintiffs leave the interval undefined); and

(3) the method of calculating the dissolution rate (Andrx requires the rate to be calculated as the mean of at least six dosage units whereas Plaintiffs leave the calculation method undefined).

### (a)  The type of dissolution methodology

Plaintiffs' proposed claim construction of "appropriate" to describe the dissolution methodology does nothing to assist this Court in construing the claims of the patents-in-suit. As this Court is aware, *Markman* instructs courts to construe claim terms. *Markman*, 52 F.3d at 979. *See also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *Id.*)

Plaintiffs' proposed use of an "appropriate" dissolution method fails to identify the scope of the claims of the '373 patent. Defining the dissolution method as "appropriate" is tantamount to providing no definition at all – in the infringement stage the court still will be required to determine what an "appropriate" dissolution method is or is not. In contrast, Andrx's proposal of "biorelevant" is a proper claim construction

that renders meaning and clarity to the claims of the '373 patent. It is consistent with how the dissolution method is discussed in the '373 patent specification, used in the '373 patent claims and would be understood by a POSA reading these claims. Banakar Decl. at ¶¶36, 38, 45-56. The claims of the '373 patent are drawn to methods of treating patients diagnosed with ADD or ADHD. This indicates that the dosage form used will be administered to a human patient. In order to determine how the dosage form will release drug within a human body, the dosage form must be tested in a biorelevant dissolution medium, *i.e.*, one that is relevant to the conditions a dosage form will encounter as it passes through the gastrointestinal tract of the patient. Banakar Decl. ¶¶45-46.

Plaintiffs' proposed claim construction is ambiguous and contrary to the purpose of claim construction. The scope and breadth of the claims must be defined so that the public is put on notice. *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338-39 (Fed. Cir. 2003). Plaintiffs do not state "appropriate" for what. Defining the dissolution methodology as "appropriate" leaves the claims open-ended and ill-defined.

### (b) The periodic interval

Likewise, Plaintiffs' claim construction does not give any meaningful definition as to the periodic intervals for testing the release rate of MPH; again, in direct contravention of the dictates of *Markman*. *See Markman*, 52 F.3d at 974. Andrx's construction, on the other hand, provides a meaningful and proper periodic time interval that is consistent with the patent specification, the patent prosecution and how a POSA would understand the claim term having read the specification and prosecution history. Banakar Decl. at ¶¶63-70.

11

Plaintiffs' construction leaves the interval undefined. In this manner, a competitor cannot determine whether a proposed product infringes. What if a product meets the "ascending" limitation on two-hour interval basis, but not on a one hour or half-hour basis. Is there infringement? Andrx presented in its Opening *Markman* brief substantial intrinsic evidence that the proper interval is hourly. There are numerous places in the patent specification where there is reference to conducting dissolution on an hourly basis. Every example in the patents-in-suit uses an hourly periodic interval to determine dissolution rates. Banakar Decl. ¶¶63-67. Further, in the prosecution history, where inventor Dr. Gupta, when attempting to overcome a prior art rejection, deconvoluted blood plasma data from a prior art reference to compare the alleged dissolution rates of the reference with those of the claim, Dr. Gupta did so mostly on an hourly basis.[9] The public should be entitled to rely on this intrinsic evidence, not be subject to a later, after-the-fact standard based on an ambiguous claim term. REDACTED.[10]

Plaintiffs' argument against this obvious claim construction reveals its scheme to have broad and meaningless claim constructions. In this manner, Plaintiffs can manipulate the release rate data from Andrx's products (and the release rate data from possible later ANDA filers) and use a trial and error approach to prove infringement. For example, it would allow Plaintiffs to prove infringement using periodic intervals of every 15 minutes or any other interval (limited only by Plaintiffs' imagination) to determine if the subsequent periodic intervals are increasing one over the other. Again, this creates indefiniteness in the system and no level of assurance to the public as to the scope of the

---

[9] REDACTED.
[10] REDACTED.

12

claims of the '373 patent. *See Honeywell Int'l*, 341 F.3d at 1338-39 (requiring that the scope of patent claims be known to the public).

### (c)  The method of calculating the dissolution rate

There are no explicit instructions in the '373 patent claims of how the *in vitro* release rate of MPH should be calculated.  As expected, Plaintiffs' proposed definition fails to address this issue.  Plaintiffs are fully aware that a POSA understands that dissolution testing always is conducted as the mean of at least six tablets.  *See* Banakar Decl at ¶36, 38, 49-50.

Plaintiffs argue that it takes only one product to infringe its claims and that the use of mean data only would be appropriate to calculate damages (Plaintiffs' Brief at 28). This statement is meaningless in view of their use of mean data to support the claims of the '129 patent.  It also would render construction of an injunction order impossible.  If one out of 1000 pills produced by a generic company were to meet the claim limitation, should the generic company be enjoined from producing the 999 non-infringing tablets? Similarly, if Andrx had to test each and every tablet made, Andrx would have none to sell as all would be destroyed during the dissolution testing. It is not merely an issue of damage calculation – Plaintiffs are seeking an injunction here.

Although the testing method is undefined in the claims, Andrx has pointed to the intrinsic evidence – in the specification and the prosecution history of the patents-in-suit, to show that its proposed construction is proper.  Namely, the patent specification itself states that Fig. 3, and the release data in Table 5 were

produced using "twenty-four sample dosage forms." *See* '373 patent at col. 20, lines 57-58.[11] REDACTED.[12, 13] REDACTED.[14] REDACTED.

Likewise, during the prosecution history of the '373 patent, as noted above, Plaintiffs submitted declarations of inventor Dr. Gupta in order to argue over prior art references. In so doing, Dr. Gupta deconvoluted mean plasma data to obtain mean *in vivo* absorption rate data, which Dr. Gupta then used to compare to the claims to show that the claims distinguished over the prior art. In the First Gupta Declaration, Dr. Gupta deconvoluted mean blood plasma concentration data from Figure 2 of the Patrick reference. Similarly, in the Supplemental Gupta Declaration, where both individual and mean data were available, Dr. Gupta only deconvoluted data from the mean blood plasma curve and from one of the six patients. Suppl. Banakar Decl. at ¶150. If the claims were meant only to cover single patient data, why didn't Dr. Gupta deconvolute the data from all six patients instead of deconvoluting the mean data and representing that to the patent examiner?

Further, review of the extrinsic evidence comports with Andrx's proposed construction. *See Phillips*, 415 F.3d at 1317. In this regard, Andrx proposes that the rate be calculated as the mean of at least six tablets. This is in accord with the understanding of a POSA and the requirements of both the Food and Drug Administration ("FDA") and USP.[15] Banakar Decl. at ¶50. Under FDA and USP standards, single tablets can be out

---

[11] REDACTED.

[12] REDACTED.

[13] USP Section <711> Dissolution tests contain an acceptance table wherein at least six (6) units are tested: Section <724> Drug Release section also contains acceptance tables wherein the minimum number of units tested is six (6). United States Pharmacopoeia, p. 2011-22 (25th Ed. 2002) (Exhibit L to Andrx's Opening *Markman* brief).

[14] REDACTED.

[15] See FN 12, *supra*.

14

of dissolution specification as long as the mean dissolution values meet certain standards. This would be well understood by a POSA and the claims should be interpreted accordingly. Suppl. Banakar Decl. at ¶152.

Plaintiffs' reliance on prior case law that examined different patents with different prosecution histories, and in which Andrx was not a party, is unfavored extrinsic evidence. In *Schering Corp. v. Amgen, Inc.*, 18 F. Supp. 2d 372 (D. Del. 1998), the court reviewed the applicability of a claim construction regarding a related (continuation-in-part) application from a consent judgment in which one of the parties (Schering) was involved. The court properly declined to take the consent judgment claim construction into account, stating "[h]owever, such evidence is clearly extrinsic . . . [and] [a]lthough some ambiguity is found to exist, the Court declines to consider the Massachusetts consent judgment, favoring reliance on a 'favored' type of extrinsic evidence, a technical treatise, to resolve the ambiguity." *Id.* at 388-89 n.24. The court further reasoned that reliance on the consent judgment would be improper because Schering had not had a full and fair opportunity to litigate the issue in the prior case. *Id.*

Here, the cases on which Plaintiffs' seek to rely are unrelated and did not involve Andrx. For example, Plaintiffs cite to *Aventis Pharms., Inc. v. Barr Labs*, Inc., 341 F. Supp. 2d 502 (D. N.J. 2004) and *Purdue Pharma, L.P. v. F.H. Faulding & Co.*, 48 F.Supp. 2d 420 (D. Del. 1999) at pages 27-28 of Plaintiffs' Opening *Markman* brief, for the proposition that the claim term should apply to single tablet dissolution data and not mean tablet dissolution data. Indisputably, neither of these cases are related to the patents-in-suit in any way, shape or form.

The *Aventis* case involved interpretation of the term "pharmaceutical composition" as it related to claims for the drug fexofenadine. MPH is not mentioned anywhere in that case. Additionally, the court relied on factors not present in the present case to determine that the term "pharmaceutical composition" related to non-solid unit dosage forms as well as solid unit dosage forms. For example, in that case, unlike the present case, there was intrinsic evidence to suggest that the court's interpretation was correct: (1) the patent claims (in addition to claims to "pharmaceutical compositions" there were claims to "solid unit dosage forms" thereby indicating that the two terms meant something different (commonly known as the doctrine of claim differentiation)); (2) the patent specification (included language that stated that the pharmaceutical compositions included tablets, coated tablets, powders, dragees and hard or soft gelatin capsules and the like) and (3) the prosecution history (there was no evidence that the prosecution history suggested a different interpretation). *Aventis*, 341 F.Supp.2d at 508-09.

The *Purdue* case involved a patent related to a morphine drug formulation that claimed specific pharmacokinetic parameters (not dissolution testing). The patents in that case had nothing to do with MPH or the claims in the present litigation. The court in *Purdue*, like the court in *Aventis*, relied on specific language in the patent specification to support its interpretation that the pharmacokinetic parameters were related to a single tablet and not an average result. Specifically, the court in *Purdue* found that the specification "was devoid of any reference to 'average' results." *Purdue*, 48 F.Supp.2d at 435-36.

Here, there is an obvious ambiguity in the claims and, as Andrx has demonstrated above, clear direction in both the patent specification and the prosecution history that the dissolution rates should be measured as a mean value. There are no other claims using different claim language so the doctrine of claim differentiation does not apply. The '373 patent specification provides clear instruction that mean data should be employed and is devoid of any mention of any individual tablet dissolution data. For example, col. 9, lines 21-36 state that drug release rates should be "calculated under in vitro dosage form dissolution testing conditions known in the art" and that the dissolution tests "were performed on dosage forms placed in metal coil sample holders attached to a USP Type VII bath indexer . . ." A POSA would understand that dissolution testing conditions known in the art are USP testing conditions that require calculation of a mean from at least six tablets. Banakar Decl. at ¶36, 38, 49-50. Further, as noted above, in the prosecution history, the patentees represented to the examiner in the Gupta declarations that the dissolution values were mean values calculated from mean blood plasma profile data.

Thus, because of the differences in the facts and the parties, and because Plaintiffs' proffered extrinsic evidence (in the form of prior decisional law) contradicts the intrinsic evidence, Plaintiffs' reliance on *Aventis* and *Purdue* is misplaced.

### (iii)    The claim limitation "substantially ascending methylphenidate drug plasma concentration"

#### (a)    "Substantially"

The parties agree that the term "substantially ascending methylphenidate drug plasma concentration" appears in claims 2-8 of the '373 patent and claims 1-2 of the '129

17

patent. Plaintiffs, however, have included the claim term "about [x] hours" in their definition. Andrx submits that these claim terms need to be construed separately.

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| A methylphenidate mean plasma concentration from a non-fasting study conducted on at least 15 patients wherein the dosing occurs in the morning and that exhibits an initial rapid rise due largely to release of drug from an immediate release portion of the dosage form and subsequently does not decline but ascends or is flat except for a possible slight dip between 5.5 and 6.5 hours after administration through the requisite time period. | The term "substantially" means approximately. Thus, a substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises but may include a slight dip. |

The parties agree that the claim limitation "substantially ascending methylphenidate drug plasma concentration" allows for inclusion of a "slight dip" (*see* Andrx's *Markman* brief at 19). However, the parties disagree about when this "slight dip" should occur. *Id.*

Andrx's proposed claim construction is based on all of the available intrinsic evidence contained within the claims, the specification and the prosecution history. REDACTED.[16] *See Phillips*, 415 F.3d at 1317-18 (authorizing the use of extrinsic evidence when necessary to elucidate the claim terms).[17]

---

[16] REDACTED.

[17] Evidence that bears on the circumstances surrounding the inception of the patent application, including the development work that lead to the patent application, is routinely considered by courts as relevant evidence on the issue of claim construction. *See, e.g., Tillotson, Ltd. v. Walbro Corp.*, 831 F.2d 1033, 1037 (Fed. Cir. 1987) (("claims must be construed 'in connection with the other parts of the patent instrument and with the circumstances surrounding the inception of the patent application') (quoting *Autogiro Co. of America v. United States*, 384 F.2d 391, 396-97, 181 Cl.Ct. 55, 155 USPQ 697, 702 (1967))). *See also Minnesota Min. & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1576 (Fed. Cir. 1992) (court looked to laboratory notebooks as an aid to claim construction).

Andrx principally relies on the only place in the patent specification where a "substantially ascending plasma" profile is described. It is undisputed that Example 7 and Figure 4 of the patents-in-suit discloses the only MPH plasma concentration data in the patents. Figure 4 of the '129 patent, as well as its description at col. 21, line 62 to col. 22, line 7 of the '129 patent, disclose a "slight dip" between 5.5 hours and 6.5 hours after administration of the MPH dosage form. As recited in the text of the specification of the '129 patent, the MPH "continues to substantially ascend (save for a slight 'dip' between t=5.5 and 6.5 hours) through a time period of 9.5 hours." (col. 21, line 64 to col. 22, line 8).

Plaintiffs, on the other hand, again resort to ambiguity in defining the term "substantially." Plaintiffs propose that "substantially" means that the curve "generally" rises or "approximately" rises so that some undefined variation is permitted. Plaintiff's Opening *Markman* brief at 33. Under Plaintiffs' definition there can be a floating "slight dip" that could occur at anytime (and more than once), even at times that the patent specification specifically states should be avoided. Contrary to Plaintiffs' assertion, the specification does, in fact, place significance on the time the "slight dip" occurs. Specifically, the '129 patent unambiguously states that during the time periods at which the immediate release product was dosed, "the plasma drug concentration is substantially *smoothly ascending and exhibits no peaks and troughs*." '129 patent at col. 22, lines 13-15 (emphasis added).[18] Because Plaintiffs' construction would contradict the express description in the patent, Plaintiffs' construction necessarily must be rejected.

---

[18] Plaintiffs never explain the difference between a "slight dip" and a "trough." *See* '129 patent at col. 22, lines 5-16.

**(b)  Use of mean data**

Andrx's construction also provides that the plasma concentration profile should be a mean concentration profile from a non-fasting (*i.e.,* fed) study conducted on at least fifteen (15) patients wherein the dosing occurs in the morning.   This additional information is necessary because the claims as written are indefinite.   Without this information, namely, whether the study is fed or fasted, the number of patients, time of administration and the use of mean data to construct the plasma concentration time curve, a POSA cannot know if his/her dosage form infringes the claims of the patents-in-suit. Banakar Decl. at ¶¶85-87.

REDACTED.[19] REDACTED.   Plaintiffs' claim construction is contrary to how a POSA would understand the claims[20] and to the specification of the '129 patent.[21]

Plaintiffs' assertion that Andrx's claim construction is wrong based on prior case law regarding a different patent with different facts and in proceedings in which Andrx was not a party, is contrary to the prosecution history and provides no definiteness to the claims.

Plaintiffs again rely on prior case law as proof of their claim construction.   As explained above, however, prior case law is unfavored extrinsic evidence – particularly where it relates to a different patent and different parties. *See Schering*, 18 F.Supp. 2d at 388-89 n. 24.[22] As noted above, in *Purdue Pharma*, the court reasoned that claims at issue should not be interpreted as requiring mean data because the specification was

---

[19] REDACTED.
[20] *See* Banakar ¶¶ 90-94.
[21] *See* the '129 patent at col. 21, lines 45-60.
[22] Plaintiffs' citation to *Abbott Labs. v. Andrx Pharms.* for the proposition that mean blood plasma data should be acknowledged to be read as individual data is curious because no such proposition can be found in the citation. *See Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331,1340 (Fed. Cir. 2006).

"devoid of any reference to 'average' results." *Purdue Pharma,* 48 F.Supp. 2d at 435. Here, the specifications of the patents-in-suit are not devoid of mean data. To the contrary, the '129 patent specification is devoid of any individual patient data and *only* provides mean blood plasma data. *See* the '129 patent at col. 21, lines 45-60.[23]

Plaintiffs' reliance on the Gupta Declaration also is misplaced. While the Gupta Declaration did include one instance of single patient data (Patient Profile 2), the declaration also included the mean data set forth in Figure 2. Suppl. Banakar Decl. at ¶ 150. In fact, the declaration did not include the single patient data for the other five (5) patients, only patient number 2, although similar MPH blood data was given for each of the six (6) patients. From this, a POSA would conclude that Dr. Gupta was relying on the mean data as representative of all patients and that it was the mean data that counted. Suppl. Banakar Decl. at ¶151. Otherwise, to show patentability, Dr. Gupta would have calculated the total MPH plasma concentrations for each of the patients. Thus, contrary to Plaintiffs' assertions, the prosecution history here, unlike in *Purdue Pharma,* suggests that the claim term refers to mean data.

Plaintiffs' criticism that Andrx's proposed claim construction provides too much definition also should be rejected. Andrx's claim construction provides the exact definition that the *Markman* claim construction was intended to provide. For example, at page 35 of Plaintiffs' Opening *Markman* brief, Plaintiffs opine that, taken to its logical conclusion, Andrx's argument would mean that administration of tablets meeting the requisite profile to a child who skips breakfast would not infringe. Plaintiffs' are incorrect. Infringement still would occur if tablets tested in a study meeting the

---

[23] Furthermore, as in the case at hand, the patent claims in the *Purdue Pharma* litigation were found to be unsupported by the written description and, therefore, invalid. *Id.* at 442; *aff'd* 230 F.3d 1320 (Fed. Cir. 2000).

minimum requirements set forth in Andrx's proposed claim construction provided a substantially ascending the mean drug plasma concentrations. Thus, Andrx's proffered claim construction takes this situation into account and, unlike Plaintiffs' construction, provides notice to the public as to what is claimed and what is not. *See Honeywell Int'l*,, 341 F.3d at 1338-39.

(iv)    **"Dosage form" or "pharmaceutically acceptable composition"**

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| A dosage form that extends release wherein the rate controlling release mechanism is osmotic | A pharmaceutical composition that includes a dose of methylphenidate |

(a)    **The ordinary meaning of "a pharmaceutically acceptable composition" or "dosage form"**

Plaintiffs rely mainly on prior decisional law regarding other patents[24] to assert that Andrx's proposed claim construction is erroneous.    As demonstrated above, Plaintiffs' use of case decisions that defined similar claim elements (*see* Plaintiffs' *Markman* brief at 14-16) constitutes disfavored extrinsic evidence. *Schering*, 18 F.Supp.2d at 388-89 n.24.  Moreover, Plaintiffs' use of legal authorities under the guise of extrinsic evidence is in direct violation of *Phillips*, which states that, while "it is within the sound discretion of a court to use extrinsic evidence as an aid in construing a claim, extrinsic evidence is 'unlikely to result in a reliable interpreation of the patent claim scope unless considered in the context of the intrinsic evidence.'" *Phillips*, 415 F.3d at

---

[24] *See* Plaintiffs' use of *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F.Supp.2d 423, 446 (S.D.N.Y. 2002), *aff'd., In re Omeprazole Patent Litigation*, 84 Fed. Appx. 76 (Fed. Cir. 2003) and *Alza Corp. v. Mylan Labs, Inc.*, 349 F.Supp.2d 1002, 1009-10 (N.D. W.Va. 2004).

1324. The intrinsic evidence in the present case being the lack of teaching of non-osmotic dosage forms in the patents-in-suit. *See* Banakar at ¶110.

As the Federal Circuit held in *Phillips*, claim elements first must be viewed in the context of the specification and the prosecution history of the patents-in-suit. The first inquiry to be made by a court during claim construction is to consider whether the claims can be construed solely based on the "intrinsic evidence." *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). If so, the court properly should look no further. *Id.* at 1583; *see also Key Pharm. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) (disapproving of the use of "extrinsic evidence to arrive at a claim construction that is clearly at odds with the claim construction mandated by...the written record of the patent"); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996).

Nowhere did *Phillips* hold, or even consider, the use of prior decisional law regarding different patents and parties as a tool for claim construction. Plaintiffs, realizing that the intrinsic evidence and consistent extrinsic evidence do not support their position in this litigation, improperly are asserting definitions from other patents in unrelated litigations with different underlying facts as *authoritative* on claim construction for the patents-in-suit.

Plaintiffs rely on *Astra Aktiebolag v. Andrx Pharms., Inc.* and *Alza Corp. v. Mylan Labs, Inc.* to define the actual claim terms of the patents-in-suit instead of using the rules of claim construction. The claims litigated in *Astra* and *Mylan* came from different patents that contained different specifications and had different prosecution histories. It is undeniable that the patents in those cases have no relation to the patents-

23

in-suit. Plaintiffs' proposed definitions based on this inconsistent, inapplicable extrinsic evidence should be rejected.

**(b)    The claimed "pharmaceutically acceptable composition" and "dosage form" is limited to osmotic drug release systems**

Plaintiffs further assert that "nothing in the prosecution history of the '373 and '129 patents contradicts or alters the shared, ordinary meaning of the terms "dosage form" and "pharmaceutically acceptable composition." *See* Plaintiffs' Opening *Markman* brief at 19-20. This is not correct. As explained in detail in at pages 24-30 of Andrx's Opening *Markman* Brief, the intrinsic evidence of the patents-in-suit shows that the patent specifications direct a POSA away from non-osmotic dosage forms (because the patents-in-suit state that such dosage forms did not work to provide the ascending release rates or substantially ascending plasma profiles (*see* '373 patent at col. 2, lines 45 *et seq*)) and the prosecution histories show that the patentees originally described non-osmotic dosage forms in the priority patent applications, but then abandoned these dosage forms. *See also* Banakar Decl. at ¶¶106-107.

Moreover, as explained in detail in at pages 25-35 of Andrx's Opening *Markman* Brief, if the claims are interpreted as including non-osmotic dosage forms, as Plaintiffs assert, then the claims are invalid as violating either or both of the written description and enablement requirements of 35 U.S.C. § 112, first paragraph. *See also Plant Genetic Systems, N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1339 (Fed. Cir. 2003) stating:

> A patent application is required to "contain a written description of the invention, and of the manner and process of making and using it ⋯ as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112, ¶ 1 (2000). 'To be enabling, the specification of the patent must teach those

skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.' *Genentech Inc. v. Novo Nordisk A/S,* 108 F.3d 1361, 1365 (Fed. Cir. 1997) (quoting *In re Wright,* 999 F.2d 1557, 1561 (Fed. Cir. 1993)).

*See also Purdue Pharma, L.P. v. F.H. Faulding and Co.,* 48 F.Supp.2d 420, 427 (D.Del. 1999) (J. Farnan) ("The policy behind the written description requirement is to prevent overreaching and *post hoc* claims that were not part of the original invention.") Andrx submits that the claims are invalid under 35 U.S.C. §112, first paragraph. However, Andrx has proposed a construction that would be supported by the written description of the specifications of the patents-in-suit and would be enabled by those specifications.[25]

Andrx's construction is in accordance with the Federal Circuit's determination that, where necessary, courts should construe claims as to preserve their validity. *Phillips,* 415 F.3d at 1327 (noting the existence of "the principle that 'claims should be so construed, if possible, as to sustain their validity'" (quoting *Rhine v. Casio, Inc.,* 183 F.3d 1342, 1345 (Fed. Cir. 1999))). Only by limiting the claims to osmotic dosage forms are the claims described and enabled by the patent specification.

Plaintiffs, in attempting to find support for their broad construction, draw this Court's attention to boilerplate language in the opening paragraphs of the '373 and the '129 patents.[26] The quote from col. 2, lines 51-62 of the '373 patent is from the section of the '373 patent entitled "Description of the Related Art Including Information Disclosed Under 37 CFR 1.97 and 1.98." This section of a patent application is where patent applicants commonly list information that is known in the relevant field of the art.

---

[25] REDACTED. *See also Evans Med. Ltd. v. American Cyanamid Co.,* 11 F.Supp.2d 338, 350 (S.D.N.Y. 1998), *aff'd,* 215 F.3d 1357 (Fed. Cir. 1999) (testimony of the inventors against their own interest is relevant and persuasive to inform the court's claim construction).
[26] *See* Plaintiffs' Opening *Markman* brief at 18.

*See* M.P.E.P. § 608.01(c).[27]  In other words, this is the section of the patent where the patentees describe what was in the prior art and did not work to achieve their invention. *See In re Clemens*, 622 F.2d 1029, 1037 (C.C.P.A. 1980) (superceded by statute on other grounds).  This is NOT where the subject matter of novel inventions is listed.  In sharp contrast, this is where applicants contrast their invention with what is known in the art. In fact, a POSA reading the entire background section of the patents-in-suit, would be led to understand that the patentees only invented certain osmotic dosage forms as their invention and that the inventors believed the other conventional release-controlling systems would not work to achieve the required *in vitro* or *in vivo* profiles.  *See* Banakar Decl. at ¶¶108-113.

Next, Plaintiffs reference the paragraph at col. 6, lines 1-14 of the '373 patent. This paragraph, however, adds nothing substantively to the specification.  This language does not enable a non-osmotic dosage form that could produce an ascending release rate of methylphenidate for an extended period of time (REDACTED).  It also does not change the fact that, in that very application, the patentees abandoned their prior work on non-osmotic dosages forms as unworkable.  Thus, this paragraph does not support Plaintiffs' broad construction.  Rather it relates only to other types of osmotic dosage forms, such as single layer or non-longitudinally compressed tablets.

Plaintiffs incorrectly suggest that Andrx is attempting to read the limitations of the examples into the claims of the patents-in-suit.  In this regard, Plaintiffs cite to *Purdue Pharma L.P. v. Faulding Inc.*, 48 F.Supp. 2d 420 (D. Del. 1999).  *Purdue* instructs courts not to read examples into the claims of a patent.  *See Id.* at 436.  Andrx is

---

[27] Manual of Patent Examining Procedure, §608.01(c) (8th Ed. 2001).

not reading limitations from the examples into the patent claims. If Andrx improperly were reading limitations from the examples into the patent claims, as Plaintiffs suggest, then Andrx would be seeking to limit the claims to dual or trilayer longitudinally compressed osmotic tablets. Clearly, Andrx is not asserting such a claim construction. What is proper is limiting the claims of the patents-in-suit to osmotic dosage forms, the only dosage forms described and enabled in the patent specification and the only construction that is consistent with how a POSA would understand such claims in light of the patent specification and prosecution history.

(v)     The claim limitation "about [x] hours"

Plaintiffs have proposed the use of "approximately" as a definition for "about [x] hours" as used in the claims of the patents-in-suit. Andrx submits that this is yet another meaningless and arbitrary claim construction that does nothing to clarify the claim term. Andrx's proposed claim construction is as below:

| ANDRX'S PROPOSED DEFINITION | PLAINTIFFS' PROPOSED DEFINITION |
|---|---|
| the time period from one minute before to one minute after, *i.e.* "about 8 hours" refers to 7:59 to 8:01. | approximately |

There is no definition in the patent specification for "about" a certain number of hours. "About" has been the subject of litigation in other cases and generally the definition has depended on the amount of accuracy with which the modified parameter can be measured. *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995), *cert. denied*, 520 U.S. 1115 (1997) (affirming the district court's ruling that the

"word 'about' does not have a universal meaning in patent claims, and that the meaning depends on the technological facts of the particular case" and noting its past holdings to that effect); *see also W.L. Gore & Assocs., Inc.v. Garlock, Inc.*, 842 F.2d 1275, 1280 (Fed. Cir. 1988) (noting that the term "'about' is not subject to such a precise construction...but is dependent on the factual situation presented"); *see also, Ortho-McNeil Pharmaceutical Inc. v. Caraco Pharmaceutical Laboratories, Ltd.*, 2005 WL 2679788, *3 (E.D. Mich. Oct 19, 2005) (wherein Ortho-McNeil was chastised for its proposed claim construction for using the term "at least" before "about" because it resulted in a "meaningless and boundless construction.").[28]

In the present litigation, "about" modifies an hourly time point, which unquestionably can be measured very accurately. (*See Ortho-McNeil* at *4, wherein the court defines the term "about" with regard to its use in measuring weight and weight ratios within the patent specification). Thus, Andrx has proposed a narrow construction of plus or minus one minute. *See* Banakar Decl. at ¶¶95-98.

## III. CONCLUSION

Based on the foregoing, Andrx respectfully submits that it properly has identified the claim terms to be construed in this case and has provided claim constructions that comport with the plain and intended meaning of the language at issue and which are consistent with applicable law.

---

[28] Unlike Plaintiffs, Andrx does not cite case law here to provide the definition of the term "about," but only to provide guidance on the method that other courts have used in coming to a conclusion as to how the term "about" should be interpreted.

Respectfully submitted,

**RAWLE & HENDERSON, LLP**

/s/ William J. Cattie, III  #953

William J. Cattie, III
I. D. No. 953
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
(302) 778-1200
Attorney for Defendant
ANDRX PHARMACEUTICALS, LLC
ANDRX CORPORATION

**OF COUNSEL**:
Alan B. Clement
Kathleen A. Costigan,
Nicholas P. Chiara
HEDMAN & COSTIGAN, P.C.
1185 Avenue of the Americas
New York, New York 10036
(212) 302-8989

Eric D. Isicoff
ISICOFF, RAGATZ & KOENIGSBERG, P.A.
1200 Brickell Avenue
Miami, Florida 33131
(305) 373 3232