# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALZA CORPORATION, and<br>McNEIL-PPC., INC., | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION NO. |
| | ) | |
| v. | ) | 05-CV-0642 |
| IMPAX LABORATORIES, INC.,<br>ANDRX PHARMACEUTICALS, LLC and<br>ANDRX CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

### Expert Report of Bruce H. Stoner, Jr.

I have been retained by Andrx Pharmaceuticals, LLC and Andrx Corporation

(collectively "Andrx") as an expert in patent application prosecution practice before the United

States Patent and Trademark Office ("PTO").  The following is my expert report detailing the

subject matter and opinions about which I intend to testify, should a trial on the merits of this

matter be necessary.

**Background and Qualifications**

1.      I received a Bachelor of Science degree in Aerospace Engineering from

Pennsylvania State University in 1970 and a law degree from the Washington College of Law of

the American University in 1984.

2.      For over 33 years, I was employed by the PTO in a series of positions of

increasing responsibility, concluding as Chief Administrative Patent Judge of the Board of Patent

Appeals and Interferences ("BPAI").

3.      I began my service with the PTO as an Assistant Patent Examiner in 1970 and became a Primary Examiner in 1977.  As a Primary Examiner, I was responsible for reviewing the work and proposed office actions of Assistant Patent Examiners.  I was also responsible for examining patent applications directly.  As a Primary Examiner, I was delegated authority to sign all office actions, including actions in applications that I directly examined and applications examined by Assistant Examiners.

4.      Both as an Assistant Examiner and as a Primary Examiner, I was responsible for evaluating specifications and claims for compliance with the requirements of Title 35 of the U.S. Code, also referred to as the Patent Act, for applying the legal standards for novelty and nonobviousness, for writing rejections based on prior art, for evaluating responses to office actions (including evaluating declarations or affidavits for legal sufficiency under the applicable PTO rules of practice), for issuing restriction requirements and double patenting rejections, and for applying the existing laws, rules, and PTO procedures.

5.      In 1983, I became a Supervisory Patent Examiner.  In that position, I was responsible for an art unit of about ten examiners, including several Primary Examiners.  In addition to exercising the signatory authority of a Primary Examiner, I exercised supervisory authority over all the examiners in my art unit.  As a Supervisory Patent Examiner, I was responsible for training new examiners, guiding the development of examiners who had not yet been delegated signatory authority, distributing work and overseeing the dockets of all examiners in the unit, and reviewing the merits of Office Actions when an appeal was filed.  I was responsible for both the quantity and quality of the patent examinations performed by my art unit.  To ensure the quality of examinations within my art unit, I regularly reviewed non-final Office Action rejections of non-signatory examiners, as well as Office Actions passing

applications to issue and examiner's answers on appeal for all examiners. These reviews involved the file wrapper at issue and, in appropriate cases, parent application files.

6.      In 1986, I was appointed to the Board of Patent Appeals and Interferences ("BPAI") as an Examiner-in-Chief. The position later became known as Administrative Patent Judge. The BPAI is an administrative tribunal within the PTO that reviews appeals from the final refusal of an examiner to grant patent claims and decides questions of patentability and priority of invention in interference proceedings. At the BPAI, I served on panels of three or more Examiners-in-Chief or Administrative Patent Judges that were responsible for reviewing appeals from final rejections signed by Primary Examiners or Supervisory Patent Examiners. Then, as now, the BPAI panel would review rejections on appeal for technical and legal correctness to ensure that the examiner had properly rejected the claims from which appeal was taken by the patent applicant.

7.      In 1995, I became one of three Vice Chief Administrative Judges and later that year became the Chief Administrative Patent Judge. I served as Chief Judge until my retirement from federal service on October 31, 2003. As Chief Judge, I was responsible for ensuring the accomplishment of the statutory missions of the BPAI.

8.      From 1977 when I became a Primary Examiner to 1995 when I assumed a supervisory role at the BPAI, I reviewed and participated in the decision-making regarding claim patentability in several hundred patent applications each year. In my roles as Vice Chief Judge and Chief Judge, I was also involved in deciding appeals and had occasion to review hundreds of decisions annually, although I did not have opportunity to participate in as many panels or author as many opinions as when I did not have an executive role regarding the functioning of the BPAI. From the time I entered the PTO in 1970 as an Assistant Patent Examiner until the time I

retired as Chief Judge, my job entailed reviewing file histories, reading and evaluating patent application specifications, and reviewing responses to actions taken by examiners.

9.      After retiring from federal service, I became a patent attorney in private practice. Today, I am a registered patent attorney and admitted to the Virginia bar.  I am currently of counsel with Greenblum & Bernstein, P.L.C., of Reston, Virginia, and my practice involves counseling clients on patent litigation issues and patent interferences and other matters before the BPAI.

10.     I am an active member of the American Bar Association, the American Intellectual Property Law Association, the Federal Circuit Bar Association, and the Intellectual Property Owners' Association ("IPO").  I serve as a Vice Chair of the IPO's U.S. Patent Law Committee.  I am also an adjunct professor of law at William & Mary's Marshall-Wythe School of Law in Williamsburg, Virginia, where I teach a course on patent appeals and interferences.

11.     A copy of my most current *curriculum vitae* is attached as Exhibit A.

12.     In the past four years I have testified by deposition in *Eisai Co.  v. Teva Pharmaceuticals*, No 03 CV 9223 (GEL), and by deposition and at trial in *Takeda Pharmaceuticals v. Mylan Labs Inc.,* No. 03 CIV 8253 (DLC) and *Takeda Pharmaceuticals v. Alphapharm Pty Ltd. and Genpharm, Inc.* No. 04 CV 1966 (DLC), all of which were pending in the District Court for the Southern District of New York.  Likewise, I have testified by deposition in *University of Pittsburgh v. Marc H. Hedrick et al.* pending in the District Court for the Central District of California, CV 04 9014 CBM (AJWx) and *Andersen Corporation v. Pella Corporation and W.L. Gore & Associates, Inc.*, pending in the District Court for the District of Minnesota, 05-824 JMR/FLN.

**Assigned Tasks, Materials Considered in Forming My Opinion and Compensation**

13.     I have been asked by counsel for Andrx to review the patent prosecution records of U.S. Patent No. 6,919,373, issued July 19, 2005 ("the '373 patent"), and U.S. Patent No. 6,930,129, issued August 16, 2005 ("the '129 patent), collectively referred to as the patents in suit.  I have also been asked to review the patent prosecution records of abandoned applications 08/910,593, filed July 31, 1997, 08/937,336, filed August 19, 1997, 08/987,606, filed November 10, 1997, and 09/070,666, filed April 30, 1998.  Likewise, I have been asked to review the files of provisional applications 60/023,286, filed August 16, 1996, 60/028,726, filed September 30, 1996, 60/030,514, filed November 12, 1996, 60/031,741, filed November 25, 1996, and 60/044,121, filed April 22, 1997.  I have reviewed the patent prosecution records and the files of the provisional applications and am prepared to render my opinion as to what the examiner was doing at each step in the prosecution.  (*See* Index of Prosecution Histories served herewith).

14.     I have also been asked by counsel for Andrx to review the expert report of Dr. Umesh V. Banakar and to form opinions regarding the prosecution of the patents in suit, including whether there may have been a breach of the duty of disclosure committed during the prosecution of the patents in suit.  A list of all materials I have considered in forming my opinion is attached as Exhibit B.

15.     I have been informed by counsel for Andrx that the patents in suit and the above-identified applications are assigned to Alza Corporation, a plaintiff in this litigation.

16.     I am currently being compensated for my work in this matter at $560 per hour, plus reimbursement for expenses.  My compensation is not based on the opinions formed or the outcome of this litigation.

**Overview of Patent Prosecution in the PTO**

17.     The Patent Act sets forth requirements that must be satisfied for an applicant to receive a patent for an invention.  It is the duty of the Director of the PTO, formerly known as the Commissioner of Patents and Trademarks, to determine that those requirements are met.  To carry out the statutory duties, the Director employs patent examiners and other administrative employees.

18.     The Director promulgates rules, codified at Title 37 of the Code of Federal Regulations (CFR) and issues guidance through the Manual of Patent Examining Procedure (MPEP) regarding the conduct of proceedings before the PTO.  The MPEP is a guide for patent attorneys and examiners on procedural matters.  The MPEP does not have the force and effect of law, but describes procedures on which the public can rely.  The MPEP serves as an official interpretation of statutes and laws to the extent that it is not in conflict therewith.

19.     After initial clerical processing, a patent application is assigned to an examiner for review.  The examiner reviews the application to ensure that all required parts (the written description, drawings, claims, oath or declaration) are present and in proper form.  If so, the examiner reviews the description and claims to evaluate whether they comply with the formal requirements of the Patent Act.  An application might be rejected, for example, if it fails to "particularly point out and distinctly claim" that which the applicant considers his invention, or if the written description of the invention does not adequately describe or enable the claims.  In order to enable the claims of a patent, the patent specification must teach those of ordinary skill in the art how to make and use the full scope of the claimed invention without undue experimentation.  In addition, the examiner reads the specification and claims for substance in

order to evaluate whether the claims cover patentable subject matter and satisfy the novelty and nonobviousness requirements of the Patent Act.

20.    The examiner outlines and conducts a search for "prior art" references, typically patents and in some cases publications, that disclose similar subject matter and therefore may render the claims unpatentable for anticipation or obviousness.  Of course, the "effective filing date" for the claims, which depends on whether the current application is a proper "continuation" or "continuation-in-part" of an earlier application, or can properly claim benefit of an earlier application, at least in part defines the prior art that can form the basis for rejections.  There are several statutorily-defined conditions that must be met for a later-filed application to receive the benefit of the filing date of a prior-filed application.  An application can claim the benefit of an earlier application only if, among other things, the specification of the earlier application was sufficient to describe the subject matter claimed in the later application and would enable one of ordinary skill in the art to practice the later-claimed invention.  Also, the later-filed application must be copending with the prior-filed nonprovisional application for a benefit claim under 35 U.S.C. § 120, § 121, or § 365(c).   For a benefit claim under 35 U.S.C. § 119(e) (relating to provisional applications), the later-filed application must be filed not later than 12 months after the filing date of the prior provisional application.  The later-filed application must be filed by an inventor or inventors named in the prior-filed application.  If the claims in the later-filed application are not entitled to the benefit of an earlier filing date, the effective filing date of the later-filed application is the actual filing date of the later-filed application, not the filing date of the prior-filed application.

21.    After evaluating the results of the prior art search, the examiner prepares a letter to the applicant (an office action) reporting whether each claim is (1) allowed or (2) rejected,

along with the statutory and evidentiary bases for any rejection.  Allowed claims may proceed to

issuance after the applicant pays the required fees.  In an office action involving rejection of one

or more claims, the examiner typically sets a "shortened statutory period" (usually three months,

but sometimes less) for a response.  Failure to respond within the time set (or the time as

extended if an extension is obtained) results in the application being deemed "abandoned" by

operation of statute.

22.     The process of patent examination is interactive and typically iterative.

Examiners identify impediments to patentability, and the applicant then can respond with

evidence, arguments or amendments to overcome the examiner's objections or rejections.  When

any claim of an application or a patent under reexamination is rejected or objected to, any

evidence submitted to traverse the rejection or objection on a basis not otherwise provided for

must be by way of an oath or declaration under 37 CFR § 1.132.

23.     Usually this back-and-forth is in writing, although the examiner and applicant

may confer and negotiate orally.  The results of oral negotiations are expected to be made of

record in the file, either by use of an interview summary record form or otherwise.  If the

examiner remains unsatisfied of patentability, the examiner will make the rejection "final."  This

typically occurs at the time of the second office action on the merits of the claims.  An applicant

who receives a final rejection but would like to continue prosecuting the application has several

options.  The applicant may request continued examination as provided in 37 CFR § 1.114.

Alternatively, the applicant may abandon the current application but file a continuing

application, such as a continuation application or a continuation-in-part application as provided

in 37 CFR § 1.53 (claiming the benefit of the earlier filing date, to the extent permitted by the

Patent Act).  Alternatively, the applicant may appeal to the BPAI.

24.    To appeal a finally rejected application to the BPAI, an applicant must file a notice of appeal and an appeal brief.  If unpersuaded by the appeal brief, the examiner files an "examiner's answer," and the appeal is forwarded to the BPAI for decision.  If the BPAI affirms the examiner's rejection in whole or in part, the applicant may appeal that decision to the Court of Appeals for the Federal Circuit (or file a civil action in the District Court for the District of Columbia, although that is far less common).  Alternatively, the applicant may file a request for continued examination or file a continuing application, and seek to patent modified claims while retaining the benefit of the earlier filing date, to the extent permitted by the Patent Act.

**DUTY OF DISCLOSURE**

25.    Patent examination is an *ex parte* process.  While the patent examiner bears the burden of determining whether the applicant has satisfied the statutes and rules, such as making out a *prima facie* case for refusing claims or denying an applicant's requested relief, the patent examiner is not a patent applicant's adversary.

26.    In all but the most exceptional circumstances (e.g., where an applicant's representations are inherently unbelievable because they violate a law of nature), the *ex parte* nature of examination requires the PTO to rely on statements made by an applicant or his representatives, particularly those made under oath or declaration.  Accordingly, when an applicant avers sufficient "facts" to refute or overcome a rejection, as is permitted under 37 CFR § 1.132, the examiner ordinarily must accept these facts as true, barring evidence to the contrary.

27.    Given the volume of work handled by each examiner and the almost entirely *ex parte* nature of prosecution, and because the PTO has no research facilities or laboratories to test or verify information supplied to it by declaration or otherwise, the PTO has long prescribed by rule a duty of candor and good faith in dealing with the PTO.

28.     In the most recent version of Rule 56 (codified at 37 CFR § 1.56), that duty is described as follows: "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section."  Those having this duty include: "(1) Each inventor named in the application; (2) Each attorney or agent who prepares or prosecutes the application; and (3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application."  Thus, the duty applies to individuals within a corporation or institution who were substantively involved in the preparation or prosecution of the application, and actions by such individuals may affect the rights of the corporation or institution.

29.     A patent may be rendered unenforceable for inequitable conduct if an applicant, with intent to mislead or deceive the examiner, fails to disclose material information or submits materially false information to the PTO during prosecution.  *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330-31 (Fed. Cir. 2004).  It is my understanding that a party asserting inequitable conduct must prove a threshold level of materiality and intent by clear and convincing evidence. *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995).  It also is my understanding that the court must then determine whether the questioned conduct amounts to inequitable conduct by balancing "the levels of materiality and intent, with a greater showing of one factor allowing a lesser showing of the other."  *Union Pac. Res. Co. v. Chesapeake Energy Corp.*, 236 F.3d 684, 693 (Fed. Cir. 2001).

30.    It is my understanding that several different standards of materiality have emerged from the courts, including: (1) the objective "but for" standard, where the misrepresentation was so material that the patent should not have issued; (2) the subjective "but for" standard, where the misrepresentation actually caused the Examiner to approve the patent application when he would not otherwise have done so; and (3) the "but it may have" standard, where the misrepresentation may have influenced the patent Examiner in the course of prosecution. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc*., 725 F.2d 1350, 1362 (Fed. Cir. 1984) (citing *Plastic Container Corp. v. Continental Plastics of Okla., Inc*., 607 F.2d 885, 899 (10th Cir. 1979)); *Gemveto Jewelry Co.,Inc. v. Lambert Bros., Inc.,* 542 F. Supp. 933, 939-40 (S.D.N.Y. 1982)).

31.    In 1977, the PTO amended Rule 56 to clarify the duty of candor and good faith before the PTO.  That version of Rule 56 required applicants to disclose "information they are aware of which is material," stating that information is material "where there is a substantial likelihood that a reasonable Examiner would consider it important in deciding whether to allow the application to issue as a patent."  37 CFR § 1.56 (1977).  In adopting this standard of materiality, the PTO did not claim to be replacing or supplanting the existing case law addressing materiality, but rather noted that it was "codif[ying] the existing Office policy on fraud and inequitable conduct, which is believed consistent with the prevailing case law in the federal courts."  Duty of Disclosure, 42 Fed. Reg. 5589 (Jan. 28, 1977).

32.    In *American Hoist*, the Court of Appeals for the Federal Circuit noted that this Rule 56 standard of materiality was yet a fourth "official standard."  725 F.2d at 1362.  Although "strikingly similar to the 'but it may have' guideline," the court noted that the PTO standard was "an appropriate starting point for any discussion of materiality, for it appears to be the broadest,

thus encompassing the others, and because that materiality boundary most closely aligns with how one ought to conduct business with the PTO." *Id.* at 1362-63. Further, the court noted that "[t]here is no reason . . . to be bound by any single standard," as a finding of inequitable conduct requires a balancing of materiality and intent. *Id.* at 1363.

33.     It is my understanding that "because a party alleging inequitable conduct need only prove a 'threshold level' of materiality [and intent] in order to proceed to the second 'balancing' portion of the inequitable conduct inquiry, and because the PTO's 'reasonable examiner' standard was broader than the other three standards, the "PTO" standard gradually became the sole standard invoked by" the Court of Appeals for the Federal Circuit. *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1316 (Fed. Cir. 2006); *Dayco Prods., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1363 (Fed. Cir. 2003).

34.     "Even though the PTO's 'reasonable examiner' standard became the dominant standard invoked by the court," it did not "supplant or replace the case law precedent." *Digital Control*, 437 F.3d at 1316. Rather, it provided an additional broader and all-encompassing test of materiality. *Id.*

35.     In 1992, the PTO amended Rule 56, creating an arguably narrower standard of materiality:

> [I]nformation is material to patentability when it is not cumulative to information already of record or being made of record in the application, and (1) It establishes, by itself or in combination with other information, a *prima facie* case of unpatentability of a claim; or (2) It refutes, or is inconsistent with, a position the applicant takes in: (i) Opposing an argument of unpatentability relied on by the Office, or (ii) Asserting an argument of patentability.
>
> A *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and

> before any consideration is given to evidence which may be submitted in
> an attempt to establish a contrary conclusion of patentability.

37 CFR § 1.56(b) (2004).

36.    It is my understanding that the PTO's recent adoption of new Rule 56 has not

supplanted or replaced the court's case law.  *Digital Control*, 437 F.3d at 1316.   Rather, it is my

understanding that new Rule 56 merely provides an additional test of materiality.  *Id.*   "That is, if

a misstatement or omission is material under the new Rule 56 standard, it is material.  Similarly,

if a misstatement or omission is material under the "reasonable examiner" standard or under the

older three tests, it is also material."  *Id.  See also Cargill, Inc. v. Canbra Foods, Ltd* , 476 F.3d

1359, 1364 (Fed. Cir. 2007).

37.    It is my understanding that information need not be prior art in order to be

material.  *Dayco Prods*., 329 F.3d at 1363.  Rather, it is my understanding that materiality

embraces any information that a reasonable examiner would likely consider important in

deciding whether to allow an application to issue as a patent.  Stated differently, material

information is that information a reasonable examiner would have wanted to know in deciding

whether to allow an application to issue as a patent.  *See* 37 CFR § 1.56 (1977) (information is

material "where there is a substantial likelihood that a reasonable Examiner would consider it

important in deciding whether to allow the application to issue as a patent"); *Bristol-Myers

Squibb Co. v. Rhone-Poulenc Rorer, Inc*., 326 F.3d 1226,1235 (Fed. Cir. 2003) ("Under the

circumstances, a reasonable Examiner would have wanted to know whether the unsuccessful use

of MOM and TMS discussed in the JACS article affected the ability of a person of ordinary skill

in the art to practice the invention, which specifically taught the use of MOM and TMS, without

undue experimentation"); *Hoffmann-La Roche, Inc. v. Promega Corp*., 323 F.3d 1354, 1368

(Fed. Cir. 2003) ("Although the inventors' statements regarding purity were not the principal focus of the office action response, they were clearly an important aspect of it. Under the circumstances, a reasonable examiner would have wanted to know that the patentability argument based on purity was unsupported by the experimental results cited by the inventors").

38.    Under the reasonable examiner standard, information is material when "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *A.B. Dick Co. v. Burroughs Corp.,* 798 F.2d 1392, 1397 (Fed. Cir. 1986) citing 37 CFR §1.56(a); *see also Digital Control,* 437 F.3d at 1316 (suggesting that the reasonable examiner standard remains the starting point for assessing materiality).

39.    "False statements are more likely material when embodied in declarations or affidavits submitted to the PTO." *eSpeed, Inc. v. Brokertec USA, LLC,* ____F.3d_____, 2007 WL 817665,*6 (Fed. Cir. 2007). *See also Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1583 (Fed. Cir. 1996); *Rohm & Haas Co. v. Crystal Chem. Co.,* 722 F.2d 1556, 1571 (Fed. Cir. 1983). The Federal Circuit has "found that the submission of a false affidavit may be determined to be 'inherently material.'" *Digital Control,* 437 F.3d at 1318. In *Ferring B.V. v. Barr Labs. Inc.,* the court concluded that the failure to disclose possible bias of the declarants constituted a material omission where the declarations were submitted to overcome a prior art rejection. 437 F.3d 1181, 1190 (Fed.Cir. 2006) *see also Refac,* 81 F.3d at 1581 (finding declarations submitted to establish enablement but failing to disclose possible bias of declarants were material). Similarly, in *Digital Control,* the court concluded that false statements made in a declaration to antedate prior art were material. 437 F.3d at 1318.

40.    As used in my opinions, the concept of materiality embraces any information that a reasonable examiner would likely consider important in deciding whether to allow an

14

application to issue as a patent. Stated differently, material information is information a reasonable examiner would have wanted to know in deciding whether to allow an application to issue as a patent.

**Summary of Opinions:**

41.    Based on my review of the documents and materials relevant to this litigation and the Expert Report of Dr. Banakar, it is my opinion that a declaration and a supplemental declaration made by Dr. Suneel Gupta, an inventor and one of the applicants for the patents in suit, and arguments made by the attorneys for the applicants during the prosecution of the '373 patent, included erroneous and/or misleading statements regarding material information.

42.    Because the Gupta declaration and supplemental declaration misleadingly alleged but did not show that the subject matter of the '373 patent provided ascending release rates not shown by the references relied upon by the examiner, per Dr. Banakar, (a) the declaration statements made by Dr. Gupta and (b) the arguments for patentability made by the applicants' representative, each of whom owed a duty to the PTO under Rule 56, amounted to violations of that duty.

**Detailed Opinion:**

**Prosecution History of Patents-In-Suit**

43.    The chain of applications that led to the '373 patent and the '129 patent is lengthy and complex. While both patents indicate on their face that they originate from three provisional applications, they actually originate from five separate provisional applications. Attached as Exhibit E is a chart showing the relationship between the patents-in-suit and the provisional applications. My summary of the prosecution histories of the patents-in-suit is set forth below

(although I may testify to any procedural aspect of the prosecution history that becomes relevant):

### Provisional Application No. 60/028,726

44.     Provisional Application No. 60/028,726 ("the '726 provisional") was filed on September 30, 1996 and names Suneel K. Gupta, Diane R. Guinta, Carol A. Christopher, and Samuel R. Saks as inventors.  (Index of Prosecution Histories; Ex. 11.)

### Provisional Application No. 60/030,514

45.     Provisional Application 60/030,514 ("the '514 provisional") was filed November 12, 1996 and names Suneel K. Gupta, Diane R. Guinta, Carol A. Christopher, and Samuel R. Saks as inventors.  (PALZ000771).

### Provisional Application No. 60/044,121

46.     Provisional Application 60/044,121 ("the '121 provisional"), was filed on April 22, 1997, approximately 7 months and 6 months after the '726 provision and the '514 provisional, respectively, and names Suneel K. Gupta, Diane R. Guinta, Carol A. Christopher, and Samuel R. Saks as inventors.

### Provisional Application No. 60/031,741

47.     Provisional Application 60/031,741 ("the '741 provisional") was filed November 25, 1996 and names Larry G. Hamel, Atul D. Ayer, Jeri D. Wright, Andrew Lam, and Padmaja Shivanand as inventors.

### Application No. 08/910,593

48.     Application No. 08/910,593 ("the '593 application") was filed on July 31, 1997 and claimed priority to the '726, '514, and '121 provisionals.  This application named Suneel K.

Gupta, Diane R. Guinta, Carol A. Christopher, and Samuel R. Saks as inventors.  (PALZ 000939).

49.    The Examiner in the '593 application rejected the claims in an Office Action dated December 30, 1997 (i) under 35 USC § 103 as obvious over the references identified as "Gilman and Goodman" and "Higuchi" and (ii) under 35 USC § 112, ¶¶ 1 and 2, for a variety of reasons, including the indefiniteness of the terms "over time" and "over an extended time."

50.    The applicants then responded in an Amendment dated April 3, 1998 by amending the claims and arguing the rejections.  (PALZ 001011-12).

51.    The Examiner then allowed all the pending claims with some amendments. (PALZ 001018-20).  After some technical issues were addressed, the applicants then asked that the patent be withdrawn from issue and subsequently requested that an erroneously issued patent be treated as though it had not issued.  (PALZ 001056-57).  The PTO thereupon took action to effectively vacate the grant of the patent.  (PALZ001060-61).

Application No. 08/937,336

52.    While the '593 application was being prosecuted, Shivanand, Ayer, Wright, Lam and Hamel filed Application No. 08/937,336 ("the '336 application") on August 19, 1997, which purported to claim the benefit of Provisional Application No. 60/023,286.  This application, however, is not entitled to claim the benefit of the '286 provisional because it was filed more than 12 months after the August 16, 1996 filing date of the '286 provisional.

53.    In the first substantive action dated June 19, 1998, in the '336 application prosecution, the Examiner rejected Claims 1-5 as anticipated by a reference identified as "Jordan" and Claims 1-41 as obvious over a combination of three references including "Jordan" and patents identified as "Cortese et al" and "Wong."  (PALZ001140-42).

54.    The applicants in an Amendment dated December 18, 1998, then cancelled some claims, amended some others and argued the rejections. (PALZ 001175-76).

55.    Following a telephone interview and further amendment of the claims "to contain consistent syntax and appropriate antecedent bases" (PALZ 001182-86), the examiner allowed the pending claims.  (PALZ 001190).

56.    Instead of permitting the patent to issue, the Applicants abandoned the application without paying the issue fee.  (PALZ 00193).

Application No. 08/967,606

57.    While applications 08/910,593 and 08/937,336 were pending, Application No. 08/967,606 ("the '606 application") was filed on November 10, 1997 and named Hamel, Ayer, Wright, Lam, and Shivanand as inventors.  This application claimed priority from the '741 provisional.  (PALZ 001198-202).

58.    The Examiner rejected the originally filed claims in an Office Action dated July 7 28, 1998, on various grounds (PALZ001270-77), and the application then went abandoned (PALZ 001301).

Application No. 09/070,666

59.    On April 30, 1998, while each of Applications 08/910,593 and 08/967,606 were still pending, a continuation of the '593 application was then filed as Application No. 09/070,666 ("the '666 application").  (PALZ 001309).  A preliminary amendment was also filed.  (PALZ 001371-74).  The claims were rejected in an Office Action dated August 31, 1999, over a reference identified as "Fitzpatrick et al" (PALZ 001381-82), and the application subsequently was abandoned (PALZ 001384-85).

Application No. 09/253,317

60.    On February 19, 1999, Application 09/253,317 ("the '317 application") was filed. The applicants (Lam, Shivanand, Ayer, Weyers, Gupta, Guinta, Christopher, Saks, Hamel, Wright and Hatamkhany) identified this application as a continuation-in-part of each of the three prior applications, namely, the '336 application, the '606 application, and the '666 application. (PALZ 001392-1448).  A preliminary amendment was also filed.  (PALZ 001528-36).

61.    The Examiner, in an Office Action dated May 30, 2000, rejected claims 1-34 as obvious over the combination of references identified as "Patrick et al." and "Dong et al." (PALZ 001545-47).

62.    In response, the applicants filed an Amendment dated November 30, 2000, amending and adding claims and arguing the rejection. (PALZ 001567).

63.    The examiner responded in an Office Action dated November 8, 2001, by again rejecting the claims as obvious.  (PALZ 1573-75).

64.    The applicants responded in an Office Action dated May 8, 2002, by arguing that the cited references did not render the claimed invention obvious.  (PALZ 001589-92).

65.    The examiner, in an Office Action dated May 7, 2003, again rejected the claims and stated that Patrick teaches the ascending release form for methylphenidate.  (PALZ 002446-47).

66.    Applicants responded in an Amendment dated August 7, 2003, also providing a Declaration of Suneel Gupta to provide support for their response.  (PALZ 002461-67).

67.    The examiner, in an Office Action dated February 13, 2004, rejected the then pending claims as anticipated by a reference identified as "Hubbard et al." (PALZ 002493).

68.    The applicants again responded, in an Amendment dated March 23, 2004, with a supplemental Declaration from Dr. Gupta.  (PALZ 002505-09).

69.    Although initially maintaining the rejection (PALZ 002515-17), following an interview (PALZ 002521), the examiner passed the application to issue and the application issued as the '373 patent.  (PALZ 002535).

Application No. 09/802,709

70.    On March 8, 2001, while the '317 application was pending, Application No. 09/802,709 was filed as a continuation of the '317 application along with a preliminary amendment.  (PALZ 002622-26).  In the preliminary amendment, the applicants brought the "Examiner's attention [to] withdrawn U.S. Patent No. 6,034,101 (courtesy copy enclosed herewith).  The claims previously allowed in U.S. Patent No. 6,034,101 (claims 1-11), are the claims now presented by preliminary amendment.  This application claims priority to this withdrawn patent, i.e., U.S. Application No. 08/910,593, filed July 31, 1997."  (PALZ 002625).

71.    The Examiner, in an Office Action dated May 29, 2001, rejected the claims over references identified as "Dong" and "Patrick."  (PALZ 003040).  In the Applicants' response of November 29, 2001, the applicants pointed out that the Examiner had not taken note of the preliminary amendment (PALZ 003053) and argued that the prior art rejection over the cited art should be withdrawn.

72.    The Examiner next issued an Office Action dated April 9, 2003, rejecting two claims as anticipated by a reference identified as "Dante," and rejecting the remaining claims as obvious over a patent identified as "Horacke."  (PALZ 003103).  An interview summary signed by the Examiner followed, which states in full that:

> Applicant will consider amending the claims to overcome the prior art rejection and the office will consider the amendments favorably.  Agreement was reached pending further review of the prior art.  The Patrick reference was discussed.

(PALZ 003107).

73.    The applicants then, in an Amendment dated April 23, 2003 amended the claims, citing Figure 4 as support for the amendment (PALZ 003347-52).

74.    The Examiner then rejected the claims in an Office Action dated September 9, 2003 as anticipated by a reference identified as "Hubbard." (PALZ 003370).

75.    This rejection was then addressed during a telephonic interview on October 14, 2003, which was memorialized in a communication filed October 15, 2003.  (PALZ 00380-85).

76.    The claims were initially allowed (in a Notice of Allowance dated November 5, 2003), but during an internal PTO review process, the allowance was determined to have been issued in error and withdrawn.  The Examiner then issued an Office Action on June 18, 2004, rejecting some of the claims over the Hubbard reference.  (PALZ 003427-29).

77.    In response, the applicants filed an Amendment dated July 14, 2004, amending the claims and arguing the propriety of the rejection.  (PALZ 003434-37).  In support of their arguments, applicants also filed another declaration by Dr. Gupta.  (PALZ 003438-43).

78.    Following an interview on August 16, 2004, the applicants submitted a further reply presenting the claims in a manner required by rule and a terminal disclaimer.  (PALZ 003452-57; PALZ 003468-71).

79.    The application was then allowed to issue as the '129 patent.  (PALZ 003472-75).

80.    I have also been made aware by counsel that on February 28, 2007, after issuance of the '373 and '129 patents, some of the inventors named on the '373 patent and the '129 patent requested that they be removed as inventors, namely, Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright and Richard Weyers.  This request, if granted, would leave Suneel Gupta, Diane Guinta, Carol Christopher, Samuel Saks, and Lawrence Hamel as the inventors of the patents-in-suit.

**Statements Made in the Gupta Declaration and the
Representations Made to Overcome the Patrick Reference
Violated the Duty of Disclosure Prescribed by Rule 56**

81.     As noted above, during the prosecution of the application that became the '373

patent, on May 7, 2003, the Examiner responsible for the application issued a rejection of all

then-pending claims, relying on the combined teachings of several references, including a

reference identified by the Examiner as "Patrick et al" (Office Action of May 7, 2003) and as

"Medline Abstract 89207694 (1989) Patrick et al" (form 892 of May 30, 2000), hereinafter "the

Patrick reference."  The Patrick reference is more fully identified as Patrick, *et al*.,

*Biopharmaceutics & Drug Disposition* **1989**, *10*, 165 and is listed among the references cited in

the '373 patent.

82.     On August 4, 2003, an attorney for the patent applicants, filed an after-final-

rejection amendment.  The amendment was accompanied by a declaration signed by Dr. Suneel

Gupta, one of the inventors.

83.     As provided in Rule 56, each individual associated with the filing and prosecution

of a patent application, including each inventor and each attorney who prosecutes the

application, has a duty of candor and good faith in dealing with the Office, which includes a duty

to disclose to the Office all information known to that individual to be material to patentability as

defined in that rule.  Accordingly, at least applicants' attorney and Dr. Gupta had the duty of

disclosure defined in Rule 56.

84.     After the examiner refused to allow the application at the post-final-rejection

stage of the prosecution, the patent applicants filed a Request for Continued Examination (RCE)

on October 28, 2003, to gain consideration of the August 4, 2003, amendment and further

consideration of Dr. Gupta's declaration.  Based on the prosecution history, the applicants were

successful in persuading the Examiner to desist in her reliance upon the Patrick reference, since

no further rejections were made based on the Patrick reference.

85.    In his declaration filed August 4, 2003, Dr. Gupta said the following:

3.  I have been asked to assess the extent to which one can determine the rate at which the Ritalin SR product releases methylphenidate based on the plasma concentration data for that product that are provided in Patrick, *et al.*, *Biopharmaceutics & Drug Disposition* **1989**, *10*, 165 ("the Patrick reference"). To make this determination, I supervised the application of the Wagner-Nelson mathematical deconvolution method (Wagner, *et al., J. Pharm. Sci.* **1963** *52*, 610) to the plasma concentration that the Patrick reference discloses in Figure 2.  This type of deconvolution is routinely performed by those skilled in the field of pharmaceutical sciences and drug delivery, and I have deconvoluted plasma concentration data or supervised the deconvolution of such data numerous times during the course of my career.

4.  By deconvoluting the plasma concentration data that the Patrick reference discloses in Figure 2, one is able to approximate the release rate that the Ritalin SR product would have needed to achieve to produce the plasma concentrations that the reference reports.  Although there exist a number of different methods that potentially could be used to deconvolute the Ritalin SR plasma concentration data that the Patrick reference provides, the Wagner-Nelson method was one of the first to appear in the literature and one that I believe to produce representative results.

5.  By applying the Wagner-Nelson method to the data that the Patrick reference reports in Figure 2, I was able to determine that the methylphendate release rate for the Ritalin SR actually decreased during most of the 12-hour period over which the authors gathered their data . . . [graph omitted].
As this graph shows, the data reported in the Patrick reference indicates that although the rate of methylphenidate release increased over approximately the first hour with the Ritalin SR product, it decreased in a fairly steady manner thereafter.  I do not believe that anyone skilled in the field of drug delivery would consider this to constitute the "ascending release rate over an extended period of time" that I understand to be recited in the claims of the above-identified patent application.

86.    I understand from the Expert Report of Dr. Banakar that the Wagner-Nelson

deconvolution method: (a) is "based on the mathematical modeling of drug absorption and

elimination functions in a subject from drug plasma profile concentrations in order to estimate from the blood plasma levels the approximate *in vivo* absorption rate;" (b) was "one of the earliest deconvolution techniques developed (around 1963) to estimate *in vivo* absorption rate characteristics;" and (c) has "certain limitations."  I understand that Dr. Banakar considers these limitations to be that Wagner-Nelson "(1) requires the calculation of the true elimination rate constant, (2) requires an extensive sampling protocol and (3) assumes the absorption and elimination functions are one-compartment, *i.e.*, there is no distribution function."

87.    I also understand from the Expert Report of Dr. Banakar that he considers the statements in paragraphs 4-5 of the Gupta Declaration misleading because Dr. Gupta equates *in vivo* absorption rates with *in vitro* dissolution rates, even though it is well known in the art that *in vitro* dissolution and *in vivo* absorption are two entirely different functions and that one cannot equate *in vivo* absorption rates with *in vitro* dissolution rates.

88.    Dr. Gupta knew that the claimed release rate, as the specification of the '373 patent makes clear, pertains to an "*in vitro*" rate of release, as demonstrated in the colloquy in the transcript of the Gupta deposition at pp. 22-24.[1]

_____

[1] Asked about the meaning of an ascending release rate, Dr. Gupta stated:
> DR. GUPTA:  My understanding is from the Column 10, around -- of the patent -- '373 patent, which is in the paragraph starting with line 10 through line 15.  If you'd like me to recite it, I'll be happy to do so.  Release rate is measured at periodic intervals and when the -- the release rate is higher than the preceding release rate.  That's the definition of ascending release rate.
> Q: So it has to be higher than the prior time interval, right?
> DR. GUPTA.  Yes.
> Q: Is that an in vivo or in vitro release rate?
> DR. GUPTA.  This is in vitro release rate.
> Q: So it's your understanding that the term ascending release rate, as used in these patents, refers to an in vitro release rate, right?
> DR. GUPTA: Ascending release rate refers to in vitro release rate, yes.

89.     Contrary to Dr. Gupta's express representation to the Examiner in paragraph 3 of his declaration, that a Wagner-Nelson deconvolution was "routinely performed" for these types of analyses, Dr. Gupta knew that the Wagner-Nelson deconvolution method was not routinely used for calculating an "*in vitro*" release rate from plasma concentration data.  Rather, it is used, according to Dr. Gupta, to calculate an *in vivo* release rate, as demonstrated in the colloquy in the transcript of the Gupta deposition at pp. 206-207.[2]

90.    I am aware that Dr. Gupta has indicated that he believes the *in vivo* and *in vitro* release rates for methylphenidate are the same.  I am also aware that Dr. Gupta has pointed out that the legend on the graph in his declaration correctly indicated that the product of the deconvolution related to an *in vivo* release rate (Gupta Deposition, p. 213).

91.     Despite Dr. Gupta's alleged belief that the *in vivo* and *in vitro* release rates are the same (and based on my understanding of Dr. Banakar's opinion, Dr. Gupta has written to the contrary), the fact that Dr. Gupta was relying on an equivalence of the *in vivo* absorption and *in vitro* release rates is nowhere stated in his declaration.  He knew that the application and the claim language related to an *in vitro* release rate, whereas the data available from the Patrick

---

[2] Asked whether the Wagner-Nelson type of deconvolution is routinely performed by those skilled in the field of pharmaceutical sciences, Dr. Gupta responded:

DR. GUPTA:  Yes.
Q:   Why is it routinely performed, for what purpose?
DR. GUPTA:   To calculate in vivo release rate.
Q:   To calculate in vivo release rates, right?
DR. GUPTA:   Right.
Q:   Not in vitro, right?
DR. GUPTA:   That is true.
Q:   And you did a Wagner-Nelson deconvolution, right?
DR. GUPTA:   Wagner-Nelson deconvolution, yes.
Q:   Did you do any other types of deconvolution on data from the Patrick reference?
DR. GUPTA:   Not that I recall.

reference, upon deconvolution, could only yield *in vivo* absorption approximations, and not even *in vivo* release rates without additional assumptions, not identified to the Examiner.

92.    Dr. Gupta conceded that he was not an expert with regard to release rate testing of Ritalin SR (Gupta deposition, p. 25).  He also conceded that whether the *in vivo* and *in vitro* release rates for Ritalin SR were the same would require "certain assumptions" (Gupta deposition, p. 218).  He also indicated that the *in vivo* and *in vitro* release rates would depend on a number of variables, of whose effect he was unsure (Gupta deposition, pp. 26-28).

93.    Dr. Gupta's reliance on the graph legend stating that the release was "*in vivo*" and not "*in vitro*" does not negate his unqualified statement in his Declaration that,

> As this graph shows, the data reported in the Patrick reference indicates that although the rate of methylphenidate release increased over approximately the first hour with the Ritalin SR product, it decreased in a fairly steady manner thereafter.  I do not believe that anyone skilled in the field of drug delivery would consider this to constitute the "ascending release rate over an extended period of time" that I understand to be recited in the claims of the above-identified patent application.

94.    It is my opinion that the PTO assumes that statements made in a Rule 132 declaration are true and the making of statements in a Rule 132 declaration that are misleading or constitute misrepresentations are contrary to Rule 56 and may evidence an intention to deceive a patent examiner into allowing an application to issue as a patent.

95.    Based on the opinion of Dr. Banakar, it also is my belief that Dr. Gupta knowingly applied a technique that was not an appropriate technique for estimating *in vivo* absorption rates from the drug plasma concentration profiles from the Patrick reference, because a number of basic assumptions of the Wagner-Nelson technique are violated in the application employed by Dr. Gupta.  In my opinion, knowingly applying a technique that was not appropriate for estimating *in vivo* absorption rates from the drug plasma concentration, and then

incorporating the results in a Rule 132 declaration is conduct that violates the duty of candor owed to the PTO.

96.    In Dr. Banakar's opinion, application of the Wagner-Nelson deconvolution technique to estimate *in vivo* absorption rates for a sustained release methylphenidate product will lead to erroneous absorption characterization, which in turn will lead to a misleading and erroneous presentation of absorption rate data.

97.    Moreover, in Dr. Banakar's opinion, Dr. Gupta knew at the time he wrote his declaration submitted in August 2003 that application of the Wagner-Nelson deconvolution technique for approximating absorption rate characterizations for a sustained release methylphenidate product was unsupportable because Dr. Gupta was among the authors of two articles published prior to the dates of that declaration that used a different deconvolution technique due to the shortcomings of the Wagner-Nelson technique.

98.    Dr. Gupta misrepresented to the examiner that he had employed an appropriate technique ("the Wagner-Nelson deconvolution method") to calculate from plasma data a "release rate" that demonstrated that the reference could not yield an ascending release rate as claimed in the pending claims (that is, an ascending *in vitro* release rate) of what became the '373 patent.  In my opinion a reasonable examiner would have considered material to the examination process, the fact that it was not possible to calculate the claimed *in vitro* release rate in the manner Dr. Gupta purported to do; that the calculated value pertained only to *in vivo* data and that Dr. Gupta had no knowledge, but at most a belief, that the *in vitro* and *in vivo* data would be similar.  Dr. Gupta's failure to provide the Examiner with this critical information constitutes a breach of the duty of candor.

99.    That applicants and their prosecution counsel sought to have the Examiner

withdraw the rejection based on the Patrick reference on the basis of Dr. Gupta's declaration is

evident from the statements made during the prosecution of the '373 patent.  Thus, with apparent

reference to an interview held on April 4, 2003, the applicants' attorney said of Dr. Gupta's

declaration:

> In discussing the above-noted claims during the interview, the Examiner
> questioned whether the Ritalin SR product that is disclosed in Patrick et al,
> Biopharmaceutics & Drug Disposition 1989, 10, 165 ("the Patrick reference")
> would exhibit the claimed ascending release rate of methylphenidate over an
> extended period of time.  Applicants' undersigned attorney noted that the Patrick
> reference appears to disclose plasma concentrations observed using the Ritalin SR
> product, and indicated that he would investigate whether release rate data could
> be obtained.
>
> * * *
>
> Applicants hereby provide data which demonstrates that the Ritalin SR product
> that is disclosed in the Patrick reference does *not* exhibit the claimed ascending
> release rate profile over an extended period of time.  In fact, as is discussed in the
> accompanying declaration of inventor Suneel Gupta, the rate at which the Ritalin
> SR product methylphenidate actually *decreases* over an extended period of time.
> Dr. Gupta supervised an analysis of the Patrick reference's reported plasma
> concentration data using the Wagner-Nelson deconvolution technique (Gupta
> Declaration, at ¶ 3).  This type of data analysis, which is routinely performed by
> those skilled in the art (*id*), approximates the release rate that the Ritalin SR
> product would have needed to achieve to produce the plasma concentrations that
> are reported in the Patrick reference (*id* at ¶ 4).  As indicated by Dr. Gupta, this
> model clearly shows that the Ritalin SR release rate does not ascend over an
> extended period of time, but, rather, decreases (*id* at ¶ 5).

100.    Relying upon the expert report of Dr. Banakar, it is my opinion that Dr. Gupta and

applicants' attorney deprived the Examiner of information that was inconsistent both with Dr.

Gupta's declaration and with the argument that the attorney made in support of patentability in

reliance upon Dr. Gupta's declaration, namely the fact that the only information that could be

gleaned from performing a Wagner-Nelson deconvolution analysis of the Patrick reference's

plasma concentration information was an *in vivo* release rate whereas the specification of the patent application explicitly indicated that the release rate in question was an *in vitro* rate.  In my opinion, a reasonable examiner would have considered important the fact that the claimed rate recited *in vitro* data, whereas Dr. Gupta's effort to discredit the Patrick reference's data was based upon a calculation that yielded only *in vivo* absorption data, and was based on the use of an older deconvolution method that Dr. Gupta did not use when deconvoluting methylphenidate data in his own published papers.

**Statements Made in the Gupta Supplemental Declaration and the Representations Made to Overcome the Hubbard Reference Violated the Duty of Disclosure Prescribed by Rule 56**

101.   On February 13, 2004, the Examiner responsible for the application issued a rejection of most of the then-pending claims relying on a reference identified by the Examiner as "Hubbard et al" (Office Action of February 13, 2004).  The patent applicants subsequently identified this reference as Hubbard, *et al.*, *Journal of Pharmaceutical Sciences* **1989**, *78:11*, 944 ("the Hubbard reference"); *see, e.g.*, the supplemental declaration of Dr. Gupta filed March 23, 2004.   For reasons unclear, this reference is not identified in the '373 patent as among the references cited.

102.   On March 23, 2004, an attorney for the patent applicants, filed an amendment accompanied by a supplemental declaration signed by Dr. Gupta for the purpose of persuading the examiner to desist in her reliance upon the Hubbard reference.  Although the examiner did not do so immediately, she ultimately dropped her rejection based on the Hubbard reference and allowed the application on December 22, 2004.

103.    As provided in Rule 56, each individual associated with the filing and prosecution of a patent application, including each inventor and each attorney who prosecutes the application, has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in that rule.  Accordingly, at least applicants' attorney and Dr. Gupta have the duty of disclosure defined in Rule 56.

104.    The Gupta supplemental declaration filed on March 23, 2004, states:

> 2.  I have been asked to assess the extent to which one can determine the rate at which the Ritalin SR product releases methylphenidate based on the plasma concentration data for that product that are provided in Hubbard, *et al*., *Journal of Pharmaceutical Sciences* **1989**, *78:11*, 944 ("the Hubbard reference"). To make this determination, I supervised the application of the Wagner-Nelson mathematical deconvolution method (Wagner, *et al., J. Pharm. Sci.* **1963** *52*, 610) to the plasma concentrations that the Hubbard reference discloses in Figure 1 for "Patient Profile 2" and in Figure 2.  This type of deconvolution is routinely performed by those skilled in the field of pharmaceutical sciences and drug delivery, and I have deconvoluted plasma concentration data or supervised the deconvolution of such data numerous times during the course of my career.

> 3.  By deconvoluting the plasma concentration data that the Hubbard reference discloses, one is able to approximate the release rate that the Ritalin SR product would have needed to achieve to produce the plasma concentrations that the reference reports.  Although there exist a number of different methods that potentially could be used to deconvolute the Ritalin SR plasma concentration data that the Hubbard reference provides, the Wagner-Nelson method was one of the first to appear in the literature and one that I believe to produce representative results.

> 4.  By applying the Wagner-Nelson method to the data that the Hubbard reference reports, I was able to determine that the methylphendate release rate for the Ritalin SR actually decreased during the 6-hour period over which the authors gathered their data . . . [graphs omitted].
> . . . I do not believe that anyone skilled in the field of drug delivery would consider this to constitute the "ascending release rate over an extended period of time" that I understand to be recited in the claims of the above-identified patent application.

105.    I understand from the Expert Report of Dr. Banakar that the Wagner-Nelson deconvolution method: (a) is "based on the mathematical modeling of drug absorption and elimination functions in a subject from drug plasma profile concentrations in order to estimate from the blood plasma levels the approximate *in vivo* absorption rate;" (b) was "one of the earliest deconvolution techniques developed (around 1963) to estimate *in vivo* absorption rate characteristics;" and (c) has "certain limitations." I understand that Dr. Banakar considers these limitations to be that Wagner-Nelson "(1) requires the calculation of the true elimination rate constant, (2) requires an extensive sampling protocol and (3) assumes the absorption and elimination functions are one-compartment, *i.e.*, there is no distribution function."

106.    I also understand from the Expert Report of Dr. Banakar that he considers the statements in paragraphs 3-4 of the Gupta supplemental declaration misleading because Dr. Gupta equates *in vivo* absorption rates with *in vitro* dissolution rates, even though it is well known in the art that *in vitro* dissolution and *in vivo* absorption are two entirely different functions and that one cannot equate *in vivo* absorption rates with *in vitro* dissolution rates.

107.    Dr. Gupta knew that the claimed release rate, as the specification of the '373 patent makes clear, pertains to an "*in vitro*" rate of release, as demonstrated in the colloquy in the transcript of the Gupta deposition at pp. 22-24.

108.    Contrary to Dr. Gupta's express representation to the Examiner in paragraph 2 of his declaration, that a Wagner-Nelson deconvolution was "routinely performed" for these types of analyses, Dr. Gupta also knew that the Wagner-Nelson deconvolution method was not routinely used for calculating an "*in vitro*" release rate from plasma concentration data. Rather, it is used, according to Dr. Gupta, to calculate an *in vivo* release rate, as demonstrated in the colloquy in the transcript of the Gupta deposition at pp. 206-207.

109. I am aware that Dr. Gupta has indicated that he believes the *in vivo* and *in vitro* release rates for methylphenidate are the same. I am also aware that Dr. Gupta has pointed out that the legend on the graph in his declaration correctly indicated that the product of the deconvolution related to an *in vivo* release rate (Gupta Deposition, p. 213).

110. Despite Dr. Gupta's alleged belief that the *in vivo* and *in vitro* rates are the same (and based on my understanding of Dr. Banakar's opinion, Dr. Gupta has written to the contrary), the fact that Dr. Gupta was relying on an equivalence of the *in vivo* and *in vitro* release rates is nowhere stated in his declaration. He knew that the application and the claim language related to an *in vitro* release rate, whereas the data available from the Hubbard reference, upon deconvolution, could only yield *in vivo* results without additional assumptions, not identified to the Examiner.

111. Dr. Gupta conceded that he was not an expert with regard to release rate testing of Ritalin SR (Gupta deposition, p. 25). He also conceded that whether the *in vivo* and *in vitro* release rates for Ritalin SR were the same would require "certain assumptions" (Gupta deposition, p. 218). He also indicated that the *in vivo* and *in vitro* release rates would depend on a number of variables, of whose effect he was unsure (Gupta deposition, pp. 26-28).

112. That the graph in Dr. Gupta's supplemental declaration used the legend "*in vivo*" and not "*in vitro*," does not negate his unqualified statement in his supplemental declaration that,

> I do not believe that anyone skilled in the field of drug delivery would consider this [disclosure in the Hubbard reference] to constitute the "ascending release rate over an extended period of time" that I understand to be recited in the claims of the above-identified patent application.

113. It is my opinion that the PTO assumes that statements made in a Rule 132 declaration are true and the making of statements in a Rule 132 declaration that are misleading

and constitute misrepresentations are contrary to Rule 56 and may evidence an intention to deceive a patent examiner into allowing an application to issue as a patent.

114.    Based on the opinion of Dr. Banakar, it is also my belief that Dr. Gupta knowingly applied a technique that was not an appropriate technique for estimating *in vivo* absorption rates from the drug plasma concentration profiles from the Hubbard reference, because a number of basic assumptions of the Wagner-Nelson technique are violated in the application employed by Dr. Gupta. In my opinion, knowingly applying a technique that was not appropriate for estimating *in vivo* absorption rates from the drug plasma concentration, and then incorporating the results in a Rule 132 declaration is conduct that violates the duty of candor owed to the PTO.

115.    In Dr. Banakar's opinion, application of the Wagner-Nelson deconvolution technique to estimate *in vivo* absorption rates for a sustained release methylphenidate product will lead to erroneous absorption characterization, which in turn will lead to a misleading and erroneous presentation of absorption rate data.

116.    Moreover, in Dr. Banakar's opinion, Dr. Gupta knew at the time he wrote his March 2004 supplemental declaration that application of the Wagner-Nelson deconvolution technique for approximating absorption rate characterizations for a sustained release methylphenidate product was unsupportable because Dr. Gupta was among the authors of two articles published prior to the date of that supplemental declaration that used a different deconvolution technique due to the shortcomings of the Wagner-Nelson technique.

117.    Dr. Gupta misrepresented to the examiner that he had employed an appropriate technique ("the Wagner-Nelson deconvolution method") to calculate from plasma data a "release rate" that demonstrated that the reference could not yield an ascending release rate as claimed in

the pending claims (that is, an ascending *in vitro* release rate) of what became the '373 patent. In my opinion a reasonable examiner would have considered material to the examination process, the fact that it was not possible to calculate the claimed *in vitro* release rate in the manner Dr. Gupta purported to do; that the calculated value pertained only to *in vivo* data and that Dr. Gupta had no knowledge, but at most a belief, that the *in vitro* and *in vivo* data would be similar. Dr. Gupta's failure to provide the Examiner with this critical information constitutes a breach of the duty of candor.

118.    That applicants and their prosecution counsel sought to have the Examiner withdraw the rejection based on the Hubbard reference on the basis of Dr. Gupta's supplemental declaration is evident from the statements made during the prosecution of the '373 patent:

> Applicants provide herewith data demonstrating that the Ritalin SR product disclosed in the Hubbard reference does *not* exhibit the claimed ascending release rate profile over an extended period of time. In fact, as is discussed in the accompanying [supplemental] declaration of inventor Suneel Gupta, the rate at which the Ritalin SR product releases methylphenidate appears to actually *decrease* over an extended period of time. Dr. Gupta supervised an analysis, using the Wagner-Nelson deconvolution technique, of the plasma concentration that the Hubbard reference reports in Figure 1 for Patient Profile 2 and in Figure 2 (Gupta [supplemental] Declaration at ¶ 2). This type of data analysis, which is routinely performed by those skilled in the art (*id*), approximates the release rate that the Ritalin SR product would have needed to achieve to produce the plasma concentrations that are reported in the Hubbard reference (*id* at ¶ 3). As indicated by Dr. Gupta, this model clearly shows that the rate of release corresponding to Patient Profile 2 and Figure 2 does not ascend over an extended period of time, but, rather, decreases (*id* at ¶ 4).

119.    Relying upon the expert report of Dr. Banakar, it is my opinion that Dr. Gupta and his attorney deprived the Examiner of information that was inconsistent both with Dr. Gupta's supplemental declaration and with the argument that was made in support of patentability in reliance upon Dr. Gupta's supplemental declaration, namely the fact that the only information that could be gleaned from performing a Wagner-Nelson deconvolution analysis of the Hubbard

reference's plasma concentration information was an *in vivo* release rate whereas the specification of the patent application explicitly indicated that the release rate in question was an *in vitro* rate. In my opinion, a reasonable examiner would have considered important the fact that the claimed rate recited *in vitro* data, whereas Dr. Gupta's effort to discredit the the Hubbard reference data was based upon a calculation that yielded only *in vivo* data, and was based on the use of an older deconvolution method that Dr. Gupta did not use when deconvoluting methylphenidate data in his own published papers.

**Supplementation and Rebuttal**

120.    The opinions in this report are based on information currently available to me. I hereby reserve my right to supplement this report, as required by Rule 26 of the Federal Rules of Civil Procedure, in light of any information provided to me in the future and/or to rebut any expert or other testimony offered in response to the opinions stated herein. I also reserve the right to employ charts, videos, animations or the like in the presentation of my testimony.

I, Bruce H. Stoner, Jr., pursuant to Fed.R.Civ. P.26(a)(2), submit this report this 30th day of March 2007.

Bruce H. Stoner, Jr.