**The Patents In Suit**

1.  At the time of issuance, both the '373 and '129 patents named as inventors Suneel Gupta, Diane Guinta, Carol Christopher, Samuel Saks, Lawrence Hamel, Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright and Richard Weyers.

2.  On February 28, 2007, after issuance of the '373 and '129 patents, some of the named inventors requested that they be removed as inventors. The PTO removed Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright and Richard Weyers as inventors (these individuals may be referred to elsewhere as the "Removed Inventors"). This left Suneel Gupta, Diane Guinta, Carol Christopher, Samuel Saks, and Lawrence Hamel as the remaining named inventors (these individuals may be referred to elsewhere as the "Remaining Inventors").

3.  Both the '373 and '129 patents on their face claimed priority to three provisional applications. Two of those applications, 60/030,514 and 60/044,121, named Suneel Gupta, Diane Guinta, Carol Christopher, and Samuel Saks as inventors. The third, 60/031,741, named Larry Hamel, Atul Ayer, Jeri Wright, Andrew Lam, and Padmaja Shivanand as inventors.

4.  In addition to the three provisional applications that are referenced on the face of the patents in suit, there are two other provisional applications that were referenced during the prosecution of the applications that led to the patents in suit: 60/023,286 ("the '286 provisional"), filed August 16, 1996, and 60/028,726 ("the '726 provisional"), filed on September 30, 1996.

**Provisional Application No. 60/028,726**

5.  Provisional Application No. 60/028,726 ("the '726 provisional") was filed on September 30, 1996 and named Suneel K. Gupta, Diane R. Guinta, Carol A. Christopher, and Samuel R. Saks as inventors.

**Provisional Application No. 60/030,514**

6.  Provisional Application 60/030,514 (the "'514 application") was filed November 12, 1996 and indicated that the "invention pertains to both a novel dosage form and to a novel method for administering a drug for producing a therapeutic effect." (P ALZ000771, lines 3-4).

7.  The '514 application further stated that "[p]rior to the advent of this invention, the dosage form and the method for administering a drug, for example, a central nervous system acting drug, consisted in using a standard pharmaceutical dosage form." (P ALZ000772, lines 5-7).

8.  The '514 application stated that:

> A drug dispensed from a prior art sustained-release dosage form may ascend initially but not over the entire dosing interval, and it actually may decline over time. That is, these sustained-release dosage forms dispense a drug in a nonascending profile over time, as they do not provide a continuously increasing release rate per hour throughout the extended dosing period. . . . For drugs that act on the central nervous system, like methylphenidate, dispensed from a sustained-release nonascending dosage form, the patient often develops an acute tolerance to the drug manifested by a shortened duration and a decrease in the intensity of the therapeutic effect needed for acceptable therapy. The prior sustained-release delivery is also devoid of means that compensate for its shortcomings inherent therein.
> The above presentation teaches that a critical need exists for a novel dosage form and for a novel method for administering a drug that overcomes the shortcomings known to the prior art. This long-felt need exists for a dosage form and for a method for (1) administering the drug at a sustained-increasing rate that simultaneously reduces or eliminates the frequency of daily dosing; for (2) a dosage form and a method for administering the drug in a sustained-compensating dose to substantially compensate for acute tolerance to the drug thereby maintaining a preselected clinical response; for (3) a dosage form that administers the drug in a sustained-ascending profile clinically indicated for the management of Attention-Deficit Disorders; and, for (4) a dosage form and a method for administering the drug initially and in a sustained-ascending profile throughout the entire school day.

('514 application, P ALZ 000772, line 19 - 000773, line 14).

9.  The "Objects of the Invention" section described multiple times that it is an object of the invention to "make available" or "provide" a dosage form that will satisfy the long-felt

need in the art. (P ALZ 000773-74)

10. In the "Detailed Disclosure" section, the '514 application disclosed representative dosage forms including a hydrogel matrix containing a plurality of tiny pills, drug releasing beads, a concentration gradient on a polymer substrate rolled on itself, a multilayer system with increasing doses of drug, or a dosage form which release a drug from a polymer by diffusion, flux through pores or rupture of the polymer matrix. The application indicated that such dosage forms can be made (as opposed to having been made). (P ALZ 000778-81).

11. The '514 application described one method wherein the ascending release profile was accomplished by use of a study where the subjects physically administered increasing amounts of drug every 30 minutes. (P ALZ 000786-88).

12. Example 3 of the '514 application stated that methylphenidate could be administered as a spirally wound film to provide such an ascending release rate. (P ALZ 000789). Example 4 stated that pemoline could be administered as a multilayer system. (P ALZ 000789-90). Example 5 described a series of beads of increasing amounts that could be used with various ADHD-active drugs. (P ALZ 000790). None of these examples provided that these formulations were actually made or tested or that they achieved the desired result.

**Provisional Application No. 60/044,121**

13. The disclosure of Provisional Application No. 60/044,121 is similar to the disclosure of the '514 application regarding the prophetic nature of the examples. The '121 Provisional was filed approximately 6 months after the '514 application was filed.

**Provisional Application No. 60/031,741**

14. Provisional Application No. 60/031,741 (the "'741 application"), was filed within 2 weeks after the '514 application, and named only the Removed Inventors and Larry Hamel

(one of the Remaining Inventors).

15. The '741 application stated that the invention related to a dosage form for delivering an increasing dose of drug and a dosage form which had an increasing release rate of the drug over an extended time period. (Page 1 at lines 5-7).

16. The '741 application reviewed the prior art immediate release dosage forms and the typical, non-ascending sustained release dosage form. The applicants stated that the "prior art sustained-release dosage form is devoid of means that compensate for its shortcomings inherent therein." The applicants provided that a "critical and pressing need exists for a novel dosage form for delivering a drug that overcomes the shortcomings known to the prior art." (Pages 2-3).

17. The Detailed Description section of the '741 application provided that:

> In accordance with the practice of this invention, it has now been discovered [sic] a novel dosage form can be made available characterized by an ascending rate of drug delivery over time. The dosage form provided by this invention delivers a drug at a continuously increasing rate for a predetermined period of time. The dosage form of this invention is unexpected and it is a breakaway from the prior art existing dosage form technologies that deliver a drug at a constant zero-order unchanging rate over time. The dosage form of this invention avoids delivery at a zero order rate as it delivers a drug continuously in an ascending rate over time. The profile of the prior art dosage form consists of a short start-up in delivery, followed by a constant unchanged rate. The profile of this invention departs from the prior art by making available a dosage form wherein the drug release rate follows an ascending profile to achieve a desired drug delivery pattern. The dosage form of this invention achieves the ascending pattern by combining the dimensions of the dosage form with the internal formulation of the dosage form.

(Page 6, line 20 - Page 7, line 4).

18. An osmotic LCT dosage form was also disclosed.

**Application No. 08/910,593**

19. Suneel Gupta, Diane Guinta, Carol Christopher and Samuel Saks filed a non-provisional patent Application No. 08/910,593 (the "'593 application") which claimed priority to

three provisional applications: the '514 application, the '121 application, and the '726 application. (P ALZ 000939).

20. The originally filed claims of the '593 application were rejected over Goodman and Gilman (*The Pharmacological Bases of Therapeutics*, 8th Ed., p. 72 (1990)) in view of Higuchi (U.S. Patent No. 3,625,214). The examiner stated that:

> The primary reference teaches that tolerance may be acquired to the effects of many drugs resulting in the decrease of the therapeutic index. This phenomenon is well known and results in the necessity of increasing the dosage of said drugs to obtain the same pharmacological effect. Nothing unobvious is seen in providing for such an increase in a sustained release formulation in view of Higuchi who teaches such formulations which may be tailored for any release profile including increasing patterns of release.

(P ALZ 000999).

21. The claim terms "over time" and "over an extended time" were rejected by the examiner under 35 U.S.C. § 112, ¶2 as being indefinite. (P ALZ 001000).

22. The applicants canceled some claims and amended other claims, including changing "over an extended time" and "over time", in claims 6 and 9 respectively, to read "over 16 hours". (P ALZ 001007). Applicants also responded in part by providing:

> The rejection is traversed of all the claims as unpatentable over Higuchi. The Higuchi patent discloses a dosage form manufactured as a jelly roll, with [sic] is a spiral configuration with a possible increase in delivered drug. However, the Higuchi dosage form, after ingestion gradually erodes and thereby exposes the drug without any consideration of the intended therapy. More importantly, there is an absence of disclosure in Higuchi for converting the jelly roll into any other dosage forms, including the dosage form tablet, used by this invention, without destroying Higuchi. That is, a dosage form, oral solid dosage form, and the manufacture of these forms require compression, a direct applied force, to produce the dosage form of this invention. Under pressure, the jelly roll would splatter all of its ingredients. The jelly roll of Higuchi cannot be converted into any other form without destroying the structure of the jelly roll. For example, compression requires a lower punch, an upper punch and a die with the manufacture accompanied by pressure, all of which are foreign to Higuchi. The prior art textbook pertaining to the management of dosage form, <u>Remington's Pharmaceutical Sciences</u>, Seventeenth Edition, pg 1603 to 1624, (1985) teaches manufacturing

> techniques that show the Higuchi jelly roll is unacceptable for converting to other forms, and it must be restricted to its original design.
>
> The rejection of all claims is traversed further because the prior art does not provide a reference for considering Goodman and Gilman in view of Higuchi. The Goodman and Gilman reference does not teach a sustained and ascending dose, and the Goodman and Gilman reference does not teach how to change Higuchi into different and unrelated dosage forms for arriving at the invention of applicants without defeating the purpose of Higuchi.

(P ALZ 001011-12).

23.  The examiner allowed all the then pending claims with an Examiner's Amendment. (P ALZ 001018-20). The applicants filed a continued prosecution application and requested that the application be withdrawn from issue, but U.S. Patent No. 6,034,101 issued anyway. (*See* P ALZ 001060-61). After applicants called the Commissioner's attention to the improperly issued patent (P ALZ 001056-57), the PTO found that it was published in error and an erratum to that effect would be published in the Official Gazette. (P ALZ001060-61).

### Application No. 08/937,336

24.  While the '593 application was pending, Shivanand, Ayer, Wright, Lam and Hamel filed non-provisional patent Application No. 08/937,336 (the "'336 application"), on August 19, 1997, and claimed benefit of the provisional '286 application.

25.  However, because the '336 application was filed more than 12 months after the August 16, 1996 filing date of the provisional '286 application it was not entitled to claim the benefit of that application.

26.  The '336 application relates to a dosage form for administering a drug in an ascending dose and provided that the invention is related to a laminate for use in a dosage form in contrast to the LCT tablet of the '741 application. (P ALZ 001075). This application again disclosed that the "prior art sustained-release dosage form" is directed to a non-ascending profile over time, not an ascending profile. (P ALZ 001076-77). The application only depicted

multilayer osmotic dosage forms.

27. In the first substantive office action, the Examiner rejected claims 1-5 as anticipated over a patent to Jordan and further rejected claims 1-41 as obvious over a combination of three patents. (P ALZ001140-42).

28. In response, the applicants cancelled some claims and amended some others. With regard to the obviousness rejection, the applicants stated:

> According to the Examiner, Jordan teaches a first drug layer and a second drug layer for delivery from a dosage form. The Examiner concedes that Jordan does not teach a three layer dosage form having a first drug layer, a second drug layer and a third push layer but cites Wong and Cortese for teaching a push layer. Consequently, the Examiner asserts that incorporation of such a third push layer into the Jordan dosage form would have been obvious "because the expected result would have been further removal of the drug active(s) through the exit port." Although the cited "expected result" may be so achieved, Applicants note that this result is NOT the important result that was sought by Applicants, subsequently achieved and disclosed and claimed in the instant application, i.e., a dosage form adapted to release drug <u>at a rate per unit time that ascends substantially continuously for a prolonged period of time</u>. For this reason, Applicants believe that no motivation to combine the references in the manner suggested by the Examiner exists and withdrawal of the rejection is respectfully solicited.

(P ALZ 001175-76) (emphasis in original).

29. The applicants further stated that they:

> . . . respectfully submit that the incorporation of a third push layer into the Jordan dosage form, as suggested by the Examiner, could not be reasonably expected to successfully achieve Applicants' claimed subject matter. Because the third layer requires a period of time to imbibe fluid and expand, the incorporation of the third layer would likely have no effect on the almost immediate release of drug from the first, fast-releasing lamina and, thus, would potentially only affect release from the second, slow-releasing lamina. Exactly what, if any, effect would be expected, however, would depend on many factors relating to the interaction of the various components of the dosage form, i.e., the release rate-controlling factor could end up being determined by either the characteristics of the slow-releasing lamina or the third push layer independently of the other or the release rate might depend on some combination of the characteristics of the two layers. The third layer might have no effect at all on drug release from the dosage form or might have various other effects such as, for example, increasing (or decreasing) the total *quantity* of drug released or causing an undesired "merging" of the first and second drug layers due to the additional applied pushing force on the second drug layer. Consequently, the rate of drug release from either or both of the drug layers of Jordan may or may not be

affected by incorporation of a third push layer.  For these reasons, Applicants believe that the proposed combination would not have rendered obvious Applicants' claimed subject matter and withdrawal of the rejection is respectfully solicited.

Applicants have invented a dosage form wherein the three layer components and the surrounding semipermeable wall *are shaped and adapted to interact cooperatively such that drug contained within the first and second layers is released from the dosage form at a rate per unit time that ascends substantially continuously for a prolonged period of time.*

(P ALZ 001177-78) (italics in original).

30.  The applicants then had a telephone interview and further amended the claims "to contain consistent syntax and appropriate antecedent bases."  (P ALZ 001182-86).

31.  The Examiner then allowed the pending claims.  (P ALZ 001190).  But the application went abandoned when the applicants did not pay the issue fee.  (P ALZ 00193).

### Application No. 08/967,606

32.  While applications 08/910,593 and 08/937,336 were pending, Application No. 08/967,606 ("the '606 application") was filed on November 10, 1997, and named Hamel, Ayer, Wright, Lam, and Shivanand as inventors and claimed priority to the provisional '741 application.  (P ALZ 001198-202).

33.  The Examiner rejected the claims on various grounds.  (P ALZ001270-77).  The applicants did not respond to the rejection and the application went abandoned.  (P ALZ 001301).

### Application No. 09/070,666

34.  On April 30, 1998, while each of Applications 08/910,593 and 08/967,606 were still pending, a continuation of the '593 application was filed as Application No. 09/070,666 ("the '666 application").  A preliminary amendment was also filed.  (P ALZ 001371-74).  The claims were rejected over a reference identified as "Fitzpatrick et al."  (P ALZ 001381-82).  The applicants did not respond to the rejection and acknowledged on a telephonic interview with the examiner that the application was abandoned.  (P ALZ 001384-85).

**Application No. 09/253,317**

35. On February 19, 1999, Application 09/253,317 ("the '317 application") was filed, and named Lam, Shivanand, Ayer, Weyers, Gupta, Guinta, Christopher, Saks, Hamel, Wright and Hatamkhany as inventors. The '317 application was identified as a continuation in part application of each of the three prior applications: the '336 application, the '606 application, and the '666 application. (P ALZ 001392-1448). A preliminary amendment was also filed. (P ALZ 001528-36).

36. The patents in suit define "an extended time period" as follows:

> As used herein with reference to the time period during which an ascending release rate is provided, "an extended time period" refers to a time period beginning at t=0 hours and continuing through at least the mid-point, and preferably beyond the mid-point, of the relevant $T_{90}$ of the dosage form. Because the dosage forms of the present invention are intended to provide sustained release of drug, a suitable $T_{90}$ for purposes of this invention is at least about 6 hours and, consequently, the "extended time period" during which an ascending release rate is provided is at least 3 hours.

('373 patent at col. 10, lines 30-40).

37. The definition of "an extended period of time" – based on the midpoint of the $T_{90}$ – appeared for the first time in the '317 application.

38. The term "$T_{90}$" does not even appear in any of the applications filed prior to the '317 application.

39. The Examiner rejected claims 1-34 as obvious over the combination of the Patrick et al. article and the Dong et al. patent. (P ALZ 001545-47). According to the Examiner, Patrick teaches using methylphenidate in an extended release form, and Dong teaches the use of a multilayer extended release delivery system for another drug, progesterone. (P ALZ 001546). According to the Examiner, "[o]ne skilled in the art would have been motivated to employ the teachings of the above references since they relate to the use of the multi layer drug delivery

-9-

system as claimed herein and also the use of the claimed compounds in a sustained release formulation. The above references make clear that the claimed system of delivery is old and well known." (P ALZ 001546).

      40.     The applicants then amended and added claims. They also argued that:

> Dong et al. fail to teach or suggest any dosage form containing a longitudinally compressed tablet core. As stated in Applicants specification at page 19, lines 8-13, Applicants' unique LCT configuration ensures that, as the push layer expands longitudinally with the compartment formed by the semipermeable membrane, the surface area of the push layer in contact with the semipermeable membrane is increased more than when other configurations are used, i.e., the configuration taught by Dong et al.
> Additionally, Dong et al. do not teach or suggest a dosage form that releases drug at an ascending release rate as claimed by Applicants. Dong et al. merely provide an "acceptable oral means for administering progesterone at a controlled dose over time"…

(P ALZ 001567).

      41.     The examiner responded by again rejecting the claims as obvious in relation to Dong, Patrick and a patent to Ayer. (P ALZ 1573-75). The examiner noted that "[t]he above references differs [sic] from the claimed invention in releasing the active ingredients in an ascending form." (P ALZ 1574). The examiner continued:

> One skilled in the art would have been motivated to employ the teachings of the above references since they relate to the use of the multi layer drug delivery system as claimed herein and also the use of the claimed compounds in a sustained release formulation. The above references also teach a core, a semipermeable polymeric wall and another wall for pushing the therapeutic composition. To determine the rate of release is considered to be within the skill of the art in the absence of evidence to the contrary.

(P ALZ 001574-75).

      42.     The applicants responded by arguing that neither Dong or Ayer deal with a dosage form which releases at an ascending release, but rather disclose only constant (or zero order) release. The applicants also argued that Patrick likewise did not disclose or motivate an increasing rate of release. (P ALZ 001589-91). The applicants again also stressed the novelty of

their LCT tablet over the standard biconvex tablet shape configuration taught by Dong and Ayer. (P ALZ 001592).

43.     The examiner rejected the claims and stated that Patrick teaches the ascending release form for methylphenidate. (P ALZ 002446-47).

44.     Applicants provided a Declaration of Suneel Gupta which declared that the data from the Patrick article indicates that Ritalin SR has a descending rate of release. (P ALZ 002461-67).

45.     Later in the prosecution, the examiner rejected the then pending claims as anticipated by Hubbard et al. because the "curve presenting patient profile 2 teaches an ascending sustained plasma concentration of up to 6 hours. Such ascending plasma concentration is [] indicative of [an] ascending methylphenidate release." (P ALZ 002493).

46.     The applicants responded with a supplemental Declaration from Dr. Gupta which declared that the Ritalin SR product disclosed in Hubbard releases methylphenidate at a decreasing release rate. (P ALZ 002505-09). The examiner maintained the rejection. (P ALZ 002515-17).

47.     The applicants' counsel then had an in person interview with the examiner and discussed the rejection over Hubbard. (P ALZ 002521). In a subsequent document entitled "Reply Pursuant to 37 CFR § 1.111," the applicants again argued that the claims are directed to an ascending release rate and that the data associated with the Hubbard reference indicates a descending methylphenidate release rate and cited to Dr. Gupta's supplemental declaration. (P ALZ 002528). The claims were then allowed, and the application issued as the '373 patent. (P ALZ 002535).

**Application No. 09/802,709**

48. On March 8, 2001, while the '317 application was pending, Application No. 09/802,709 ("the '709 application") was filed as a continuation of the '317 application along with a preliminary amendment. (P ALZ 002622-26). The applicants brought the "Examiner's attention [to] withdrawn U.S. Patent No. 6,034,101 (courtesy copy enclosed herewith). The claims previously allowed in U.S. Patent No. 6,034,101 (claims 1-11), are the claims now presented by preliminary amendment. This application claims priority to this withdrawn patent, i.e., U.S. Application No. 08/910,593, filed July 31, 1997." (P ALZ 002625)

49. Similar to some of the rejections described above, the Examiner rejected the claims over the Dong and Patrick references. (P ALZ 003040). The applicants then pointed out that the Examiner had not taken note of the preliminary amendment. (P ALZ 003053). In arguing over Dong with the then existing claims, the applicants stated that: "Additionally, Dong et al. do not teach or suggest a dosage form that releases drug at a sustained and 'increasing' dose as claimed by Applicants. Dong et al. merely provide an 'acceptable oral means for administering progesterone at a controlled do[se] over time.'" (P ALZ 003055).

50. The Examiner next rejected two claims as anticipated by a Dante patent, and rejected the remaining claims as obvious over a patent to Horacke. (P ALZ 003103).

51. The applicants' counsel then conducted an in person interview with the examiner. This full interview summary provided that:

> Applicant will consider amending the claims to overcome the prior art rejection and the office will consider the amendments favorably. Agreement was reached pending further review of the prior art. The Patrick reference was discussed.

(P ALZ 003107).

52. The applicants then amended the claims (P ALZ 003347-51). They further stated

that "support for the added claims can be found in the specification at, for example, pages 37-38 and in Figure 4." (P ALZ 003352). They also stated: "As discussed during the interview, the claims have been amended to indicate that the recited compositions are administered to the patient in a manner that achieves a substantially ascending methylphenidate plasma drug concentration over specified time periods following administration." (P ALZ 003352).

53. These claims were then rejected as anticipated over Hubbard. The Examiner indicated that "Hubbard et al. [t]each the use of methylphenidate for the treatment of attention deficit-hyperactivity disorder in an ascending plasma drug formulation up to about 10 hours. See page 2, patient 3." (P ALZ 003370).

54. The rejection was then addressed during a telephonic interview on October 14, 2003. (P ALZ 003384). The applicants requested reconsideration, indicating:

> As was discussed during the interview, both curves presented for Patient Profile 3 show attainment of maximum methylphenidate plasma concentration at about 3.5 hours and a relatively steady concentration decline throughout the remainder of the measured time period. Neither curve shows an ascending plasma concentration over a period of "up to about 10 hours," as alleged in the Office Action, much less Applicants' claimed "substantially ascending [] concentration over a time period of about 5.5 hours following administration." Accordingly, the rejection for alleged anticipation should be withdrawn and — since no other rejection has been entered — the pending claims should be passed to issue.

(P ALZ 003384).

55. The claims were initially allowed, but during an internal Patent Office review process, they were identified as being allowed in error. (P ALZ 003393). The Patent Office review indicated that some of the claims should be rejected as anticipated by Hubbard indicating that: "The curve representing l-MPH from Patient profile 2 teaches an ascending sustained plasma concentration up to 6 hours. The claims contain the language 'substantially ascending methylphenidate plasma drug concentration', while the specification technically only defines

-13-

'ascending release rate.'"  (P ALZ 003396).

56.    The claims were also rejected for failing to comply with the written description requirement.  (P ALZ 003397).  The action also indicated that the "[a]pplicant's argument regarding the Hubbard et al reference was not correctly evaluated by the examiner" and another rejection was noted.  (P ALZ 003398).  Finally, the action made further notes regarding Hubbard and concluded that "Profile #2 does anticipate the instantly claimed invention for at least claims 37 and 46-48."  (P ALZ 003399).  These comments were generally reiterated in P ALZ 003426-29.

57.    In response to the rejections, the applicants amended some of the claims.  (P ALZ 003434-37).  The applicants noted that the claims were amended to overcome the written description rejection.  The applicants stated that patient profile 2 from Hubbard was not substantially ascending for 5.5 hours and that it was plotted on a logarithmic basis.  They further stated that the re-plotted non-logarithmic data disclose a "substantial decrease in methylphenidate plasma concentration over the relevant interval."  A declaration by Dr. Gupta supporting these positions was also filed.  (P ALZ 003438-43).

58.    The then pending claims consisted of a total of three independent claims.  Two of the then pending and amended independent claims would issue in the '129 patent – pending claims 49 and 50 became issued claims 1 and 2.  These two claims only differed in the requirement that the substantially ascending profile occur, respectively, over a time period of either about 8 hours or 9.5 hours; the third then pending independent claim (claim 37) only differed in that it required a substantially ascending profile for about 5.5 hours.  (P ALZ 003435-37).

59.    The applicants' filed a supplemental reply wherein it was indicated that an

interview had been conducted between the applicants' counsel and Examiners Fay and Low. The applicants also canceled some of the then pending claims (claims 37, 46-48, and 51-54) and indicated that a terminal disclaimer relating to the '317 application was being filed. (P ALZ 003452-57; P ALZ 003468-71). The canceled claims 46-48, and 51-54 depended from canceled independent claim 37 – the independent claim to a substantially ascending profile for about 5.5 hours.

      60.      The application was then allowed to issue as the '129 patent. (P ALZ 003472-75).