## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

ALZA CORPORATION, and
McNEIL-PPC, INC.,

               Plaintiffs,

    v.

ANDRX PHARMACEUTICALS, LLC, and
ANDRX CORPORATION,

               Defendants.

C.A. No. 05-642-JJF

**REDACTED**
**PUBLIC VERSION**

---

### DEFENDANTS' OPENING PRETRIAL BRIEF
### WITH PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Dated: November 2, 2007

RAWLE & HENDERSON LLP
William J. Cattie, III, Esq.
I. D. No. 953
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
302-778-1200
Facsimile: 302-778-1400

*Of Counsel:*

John W. Bateman
C. Kyle Musgrove
Robert F. Vroom
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
202-220-4200

James V. Costigan
Alan B. Clement
Nicholas P. Chiara
HEDMAN & COSTIGAN, P.C.
1185 Avenue of the Americas
New York, New York 10036
212-302-8989

*Attorney for Defendants*
*Andrx Pharmaceuticals, LLC and*
*Andrx Corporation.*

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................. iv

I.     PRELIMINARY STATEMENT ............................................................................ 1

II.    ALZA'S PATENTS ARE INVALID ..................................................................... 9

      A.    The Claims of the Patents in Suit Are Not Enabled for Their Full Scope as a Matter of Law................................................................................................ 9

           Findings of Fact ............................................................................................. 9

           Conclusions of Law Regarding Nonenablement as a Matter of Law ................. 16

           Argument Regarding Nonenablement as a Matter of Law ................................. 25

      B.    The Evidence Conclusively Establishes the Nonenablement of the Claims........ 27

           Findings of Fact ........................................................................................... 27

           1.    Specification of the Patents in Suit .................................................. 27

           2.    Prosecution History of the Patents in Suit ....................................... 35

                 a.    Provisional Application No. 60/030,514 ....................................... 35

                 b.    Provisional Application No. 60/031,741 ....................................... 37

                 c.    Application No. 08/910,593 ........................................................ 38

                 d.    Application No. 08/937,336 ........................................................ 40

                 e.    Application No. 09/253,317 ........................................................ 42

                 f.    Application No. 09/802,709 ........................................................ 44

            3.    The Boundaries, or Lack Thereof, of the Terms "Dosage Form" and "Pharmaceutically Acceptable Composition".................................... 47

                 a.    Nature of the invention: ............................................................. 56

                 b.    Breadth of the claims: ............................................................... 59

                 c.    The state of the prior art: ............................................................ 61

                 d.    The relative skill in the art: ........................................................ 62

                 e.    The amount of direction or guidance presented:............................ 65

                 f.    The predictability or unpredictability in the art: ........................... 66

                 g.    The presence or absence of working examples: ............................ 67

                 h.    The quantity of experimentation necessary: ................................. 68

            Conclusions of Law That the Claims Are Not Enabled for Their Full Scope Because Undue Experimentation Would Be Required to So Enable Them ............................................................................................................ 70

**TABLE OF CONTENTS**
(continued)

Page

Argument Regarding Undue Experimentation ................................................... 81

C.    The Claims are Indefinite.................................................................. 82

Findings of Fact Regarding Indefiniteness ......................................... 82

Conclusions of Law Regarding Indefiniteness .................................... 84

Argument Regarding Indefiniteness .................................................... 86

D.    The Invention Claimed in the '129 Patent is Anticipated.................... 87

Findings of Fact Regarding Anticipation............................................. 87

Conclusions of Law Regarding Anticipation....................................... 90

Argument Regarding Anticipation........................................................ 90

E.    The Claimed Inventions Are Obvious ................................................. 92

Findings of Fact Regarding Obviousness ............................................ 92

1.    The Prior Art and Ascending Plasma Profiles ......................... 92

2.    The Prior Art and Ascending Release Rates............................. 100

3.    Level of One of Ordinary Skill in the Art................................. 106

4.    The differences between the claimed invention and the prior art .......... 109

    a.    The Claims and the Common Specification of the '373 and '129 Patents................................................. 109

    b.    Comparison of claims 1 to 4 and 6 to 7 of the '373 patent with the prior art......................................... 115

    c.    Comparison of claims 1 and 4 to 6 of the '129 patent and the prior art.................................................. 117

5.    Secondary Considerations......................................................... 118

Conclusions of Law Regarding Obviousness ...................................... 120

Argument Regarding Obviousness ....................................................... 125

III.    NON-INFRINGEMENT........................................................................... 128

Findings of Fact ................................................................................... 128

A.    Claim 1 of U.S. Patent 6,919,373 ...................................................... 128

B.    Andrx's ANDA Products Do Not Have an "Ascending Release Rate" ............ 129

1.    Alza's Selected Dissolution Testing......................................... 129

2.    Andrx's ANDA Products Do Not Have A Non-IR Release During The Initial Time Period.................................. 130

**TABLE OF CONTENTS**
(continued)

                                                                                          Page

   C.    Alza Did Not Use an "Appropriate" Dissolution Test to Evaluate Andrx's
       ANDA products ................................................................................................ 135

   D.    Remaining asserted claims ............................................................................... 142

       1.    Andrx's ANDA products do not have a "substantially ascending
           methylphenidate plasma drug concentration" ....................................... 142

       Conclusions of Law .......................................................................................... 147

       Argument Regarding Non-infringement............................................................ 148

IV.    CONCLUSION ............................................................................................................ 151

# TABLE OF AUTHORITIES

Page

## Cases

*AK Steel Corp. v. Sollac,*
   344 F.3d 1234 (Fed. Cir. 2003) ................................................................... 72

*Amgen, Inc. v. Chugai Pharmaceutical Co.,*
   927 F.2d 1200 (Fed. Cir. 1991) ............................................................. 17, 71

*Automotive Technologies International, Inc. v. BMW North America, Inc.,*
   2007 WL 2493281 (Fed. Cir. Sept. 6, 2007) ............................... 71, 72, 73, 74, 75, 76, 77

*C.R. Bard, Inc. v. Advanced Cardiovascular Systems, Inc.,*
   911 F.2d 670 (Fed. Cir. 1990) ................................................................... 147

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries,*
   145 F.3d 1303 (Fed. Cir. 1998) ................................................................. 22

*Daiichi Sankyo Co., Ltd. v. Apotex, Inc.,*
   2007 WL 2615498 (Fed. Cir. Sept. 12, 2007) ............................... 122, 123, 127

*Data Line Corp. v. Micro Technologies, Inc.,*
   813 F.2d 1196 (Fed. Cir. 1987) ............................................................. 21, 22

*DSU Medical Corp. v. JMS Co., Ltd.,*
   471 F.3d 1293 (Fed. Cir. 2006) ........................................................... 147, 148

*Epcon Gas Systems, Inc. v. Bauer Compressors, Inc.,*
   279 F.3d 1022 (Fed. Cir. 2002). .................................................................. 90

*Ex Parte Kung,*
   17 U.S.P.Q.2d 1545 (B.P.A.I. 1989) .......................................................... 24

*Ex Parte Maizel,*
   27 U.S.P.Q.2d 1662 (B.P.A.I. 1993). ......................................................... 24

*Fiers v. Revel,*
   984 F.2d 1164 (Fed. Cir. 1993) .................................................................. 24

*General Electric Co. v. Wabash Appliance Corp.,*
   304 U.S. 364 (1938). ......................................................................... 19, 25, 26

*Glaxo Wellcome, Inc. v. Eon Labs Manufacturing,*
   2002 WL 1874830 (S.D.N.Y. Aug. 13, 2002) ............................... 24, 25, 79, 80

# TABLE OF AUTHORITIES
(continued)

Page

*Graham v. John Deere Co.,*
    383 U.S. 1 (1966) ................................................................................................ 120

*Halliburton Oil Well Cementing Co. v. Walker,*
    329 U.S. 1 (1946) ............................................................................................. 20, 21

*Honeywell International, Inc. v. United States International Trade Commission,*
    341 F.3d 1332 (Fed. Cir. 2003) ........................................................................ 85, 87

*In re Bigio,*
    381 F.3d 1320 (Fed. Cir. 2004) ............................................................................ 120

*In re Cortright,*
    165 F.3d 1353 (Fed. Cir. 1999) ................................................................... 16, 17, 70

*In re Donaldson Co.,*
    16 F.3d 1189 (Fed. Cir. 1994) ................................................................................ 21

*In re Fuetterer,*
    319 F.2d 259 (C.C.P.A. 1963) ................................................................................ 23

*In re GPAC Inc.,*
    57 F.3d 1573 (Fed. Cir. 1995) ................................................................ 120, 121, 122

*In re Hyatt,*
    708 F.2d 712 (Fed. Cir. 1983) ........................................................... 23, 24, 26, 86

*In re Swinehart,*
    439 F.2d 210 (C.C.P.A. 1971) ................................................................................ 80

*In re Vaeck,*
    947 F.2d 488 (Fed. Cir. 1991) ................................................................................ 71

*In re Wands,*
    858 F.2d 731 (Fed. Cir. 1988) ....................................................................... 8, 72, 78

*J & M Corp. v. Harley-Davidson, Inc.,*
    269 F.3d 1360 (Fed. Cir. 2001) .............................................................................. 21

*Johnston v. IVAC Corp.,*
    885 F.2d 1574 (Fed. Cir. 1989) ......................................................................... 21, 22

## TABLE OF AUTHORITIES
(continued)

**Page**

*KSR International, Co. v. Teleflex Inc.,*
    127 S. Ct 1727 (2007) ............................................................... 5, 120, 121, 122, 123, 124

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
    481 F.3d 1371 (Fed. Cir. 2007) ........................................... 27, 71, 72, 73, 77, 78

*Mas-Hamilton Group v. LaGard, Inc.,*
    156 F.3d 1206 (Fed. Cir. 1998) ........................................................................ 22

*Monsanto Co. v. Syngenta Seeds, Inc.,*
    2007 WL 2874217 (Fed. Cir. Oct. 4, 2007) ........................................ 72, 73, 78

*Morton International, Inc. v. Cardinal Chemical Co.,*
    5 F.3d 1464 (Fed. Cir. 1993) ............................................................................ 86

*National Recovery Technologies, Inc. v. Magnetic Separation Systems, Inc.,*
    166 F.3d 1190 (Fed. Cir. 1990) ....................................................................... 71

*O'Reilly v. Morse,*
    56 U.S.62 (1853) .............................................................. 17, 18, 23, 25, 27

*Pfizer, Inc. v. Apotex, Inc.,*
    480 F. 3d 1348 (Fed. Cir. 2007) ....................................... 5, 120, 121, 124, 125

*Pharmaceutical Resources, Inc. v. Roxane Laboratories, Inc.,*
    Appeal Nos. 2007-1093, -1134 (Oct. 26, 2007 Fed. Cir. 2007) .......................... 73, 78, 79

*Schering Corp. v. Geneva Pharmaceuticals, Inc.,*
    339 F3d. 1373 (Fed. Cir. 2003) ................................................................... 90, 92

*SmithKline Beecham Corp. v. Apotex Corp,.*
    403 F.3d 1331 (Fed. Cir. 2005) ................................................................... 90, 92

*United Carbon Co. v. Binney & Smith Co.,*
    317 U.S. 228 (1942) ................................................................................... 85, 86

*United States v. Bristol-Myers Co.,*
    1982 WL 1816 (D.D.C. 1982). ........................................................................ 12

*Upsher-Smith Laboratories, Inc. v. Pamlab, L.L.C.,*
    412 F.3d 1319 (Fed. Cir. 2005) ................................................................... 90, 91

**TABLE OF AUTHORITIES**
(continued)

Page

*Valmont Industries, Inc. v. Reinke Mfg. Co.,*
    983 F.2d 1039 (Fed. Cir. 1993) ............................................................. 8, 21

*W.L. Gore & Associates, Inc. v. Garlock, Inc.,*
    721 F.2d 1540 (Fed. Cir. 1983) ................................................................. 17

*Warner-Lambert Co. v. Apotex Corp.,*
    316 F.3d 1348 (Fed. Cir. 2003) ........................................................ 147, 148

**Statutes**

35 U.S.C. § 103(a) ...................................................................... 120, 124

35 U.S.C. § 112 ................................................... 7, 8, 16, 20, 21, 22, 23, 84

35 U.S.C. § 271(b) ............................................................................ 147

35 U.S.C. § 271(c) ............................................................................ 147

## I.    PRELIMINARY STATEMENT

The two patents in suit, U.S. Patent No. 6,919,373 (the "'373 patent") and U.S. Patent No. 6,930,129 (the "'129 patent"), are directed to methods of treatments using dosage forms having an ascending release rate (claim 1 of the '373 patent) and which provide a substantially ascending plasma profile for a certain period of time, whether those dosage forms have an ascending release rate (asserted claims 2-4 and 6-7 of the '373 patent) or not (claims 1 and 4-6 of the '129 patent). Based upon Alza's proposed claim construction that was accepted by this Court, the claims are limited only by whether or not a particular dosage form satisfies the claimed result of an ascending release rate and/or a substantially ascending plasma profile. Thus, the claims in effect become bounded only by the result that is achieved, not by any particular structural requirements. Because of the boundless nature of these claims, the claims are invalid for anticipation, obviousness, lack of enablement for the full scope, lack of written description and indefiniteness. But, even the breadth of those claims do not lead to infringement in this case because while the dosage form limitation is unbounded, Alza is unable to prove infringement of the functional limitations because Andrx's ANDA products manage to attain bioequivalence while operating in a different manner.

The reason that Alza sought such a broad interpretation of the claims is because Alza knew that if it were limited to the dosage form it disclosed in the specification of the patents in suit, *i.e.*, an osmotic dosage form, then Andrx's proposed product could not possibly infringe. Andrx pursued its own research and development efforts in an effort to create a formulation that was bioequivalent to Concerta, the commercial osmotic dosage form sold by Alza/J&J. Andrx's efforts were rewarded when it was able to create a formulation of a tablet which was not osmotic but instead was based upon a traditional sustained release matrix contained within a pH-sensitive coating. That core is then coated with an immediate release overcoat. In other words, Andrx's

1

product is designed so that approximately one quarter of the total active ingredient will be released within a very short time after ingestion by a patient. The remaining three quarters of the active is included in a coated core system. The coating on the core does not allow the delayed release component to begin releasing until the middle to lower portions of the intestines are reached. This is because the coating on the core is designed only to release above a pH of 7. The stomach, of course, is a very acidic environment and is the site of liberation of the immediate release portion of the dose from the dosage form. Over the length of the intestines, however, the pH rises from the strongly acidic pH of the stomach to a more neutral pH, *i.e.*, a pH of around 7.0, and finally becomes slightly basic, *i.e.*, a pH above 7.0. Thus, in contrast to Alza's constantly releasing pH-insensitive osmotic device, Andrx's product is designed so that, in the body, it would release in two phases, *i.e.*, there would be an immediate release followed by a period of no release followed by a slow release from the coated core.

In an attempt to prevent such independent development from reaching the market, Alza chose to abandon its pursuit of claims directed to any novel or non-obvious elements of the actual osmotic dosage form that it developed and instead pursued, and received, claims directed to, under the present claim construction, ***any*** dosage form which yields the dissolution results or plasma profile recited in the claims. However, even with the breadth of those claims, Andrx still does not infringe the claims at issue because, while Andrx's product is a dosage form, it does not achieve the results specified by those claims under the construction offered by Alza.

All of the claims at issue are method of treatment claims. There is no dispute that Andrx will not directly infringe those claims by actually treating anyone. Andrx will only supply its proposed generic product in various dosage strengths, and that product then will ultimately be

2

used by patients in consultation with their physicians.  Thus, Andrx can only be liable, if at all, under the doctrines of contributory infringement and inducement of infringement.

Infringement is not established with regard to the sole independent claim of the '373 patent because Andrx's various products do not have "an ascending release rate over an extending period of time."  More specifically, the construction of this phrase requires that "[t]he release rate is as determined by an *appropriate* dissolution test," and that "[t]he ascending release rate does not include release of drug from any immediate-release drug coating that may be applied to the dosage form."  Alza has not tested Andrx's product in an "appropriate" dissolution test which would allow one to attribute the amount released from the immediate release dose and the amount released from the enteric release coated core.  Indeed, under such an appropriate test, Alza's expert has indicated that Andrx's products would not infringe. Moreover, Andrx's products for the most part do not have any release from a non-immediate release portion during the first time period as calculated by Ms. Gray.  Since the patent makes it clear that the first time period must have some release of active from the non-immediate release portion, Andrx's products do not infringe even if Alza's tests were "appropriate."  Indeed, Alza's own documents acknowledge that a biphasic product, *i.e.*, a dosage form that releases the active in two separate phases (such as Andrx's) would not be covered by a claim to an "ascending profile."

With regard to the '129 patent, the sole asserted independent claim of that patent requires that the pharmaceutical composition used in the method exhibit a "substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration."  The Court has construed the term "substantially" to mean "approximately" and indicated that "[t]hus, a substantially ascending profile is one in which the plasma concentration

of methylphenidate generally rises over approximately [8] hours, but may include a slight dip." Alza did not clarify for this Court during the Markman proceedings what "a slight dip" is. Alza now argues, for purposes of infringement, that the Court's construction allows for *multiple dips* and that the only limitation is that each dip not result in a decrease of more than 15% of the plasma drug concentration from the preceding measurement. Indeed, Alza's construction allows a profile to continue to "substantially ascend" past its maximum plasma drug concentration up until the point that the concentration has decreased 15%.

Nevertheless, Alza's expert admits – even under his own construction – that Andrx's various strength dosage forms would not infringe in a large percentage of cases. Such a large percentage of noninfringement indicates that there are substantial noninfringing uses and as such contributory infringement cannot lie. Similarly, inducement would not apply where Andrx does nothing to induce the infringement separate and apart from the activities it undertakes to induce noninfringement.

With regard to the obviousness of the claims, we will start with the broadest claim, claim 1 of the '129 patent. Claim 1, as construed, is directed to a method of treating Attention-Deficit Hyperactivity Disorder ("ADHD") in a patient wherein the method comprises *any* pharmaceutical composition containing methylphenidate in a manner "that achieves a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration." The use of methylphenidate for treating ADHD was well known in the art. Similarly, a long acting methylphenidate product was known in the art which presented a typical "plateau" blood plasma level.[1] What was added by the claims as compared to

---

[1]    If this Court adopts Alza's theory of infringement that only one patient need have a "substantially ascending" plasma profile for 8 hours, then claim 1 of the '129 patent is anticipated by the use of Ritalin SR in some patients.

the prior art was a specific requirement that the blood plasma level must be "substantially ascending."

The possible plasma profiles identified for providing sustained activity in the mid-1990s, however, were few. Those profiles were: (1) an ascending profile, (2) a substantially ascending profile, (3) a pulsatile profile (*i.e.*, peaks and valleys similar to what is experienced by administering an immediate release composition followed several hours later by administering another immediate release composition), (4) a profile that ascends and then levels off for a period of time (*i.e.*, a profile that resembles a plateau), and potentially (5) a hybrid of a substantially ascending profile and a plateau (*i.e.*, its ascent to leveling off takes a longer period of time than with the typical plateau).

The prior commercial once a day methylphenidate product, Ritalin SR, was an embodiment of the plateau profile. Furthermore, the ascending profile would be encompassed by a substantially ascending profile, and the pulsatile profile would mimic the profile of the two separately administered immediate release doses. In essence, there were – at most – two untried plasma profiles. A person of ordinary skill in the art would have been motivated to test both of these profiles. The prior art indicated that some small number of dosage forms to achieve a substantially ascending profile could have been made. Indeed, throughout these proceedings Alza has contended that it would be a matter of routine experimentation to come up with a dosage form to achieve the substantially ascending profile. The requirement of 8 hours of substantial ascension adds nothing patentable because that is the typical length of the school day. Thus, the mere number of possible plasma profiles and Alza's contended ease in making dosage forms for any type of plasma profile indicates that this claim is obvious. *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727 (2007); *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007).

Moreover, even if obviousness requires the specific motivation to focus on the substantially ascending profile, the art here indicated such a focus. One of the identified problems with the prior art once a day methylphenidate product Ritalin SR was that it was known to have decreasing activity towards the end of the school day. Thus, it was desired to create a dosage form that would continue activity for at least 8 hours or until the end of a typical school day. It was also known, however, that Ritalin SR had a "plateau" profile, *i.e.*, the amount of drug in the plasma remained fairly constant over the course of the school day. The person of ordinary skill in the art was faced with the question regarding why the same amount of drug in plasma that was effective earlier in the day would not continue to be effective late in the day. Faced with this question, the art had hypothesized that methylphenidate might exhibit "acute tolerance (also known as tachyphlaxis or hysteresis)" over the course of the day. In other words, a patient would build up a tolerance to the same level of drug circulating in the blood over the course of the day. This tolerance had not been observed with separated in time immediate release dosage forms because the tolerance was short lived and was not seen after the washout period that occurred during the "valley" in the plasma level between the two "peaks" in plasma concentrations caused by the separate immediate release dosages. This lack of efficacy over the course of the day and the theory of acute tolerance prior to the "invention" of the subject matter claimed by the '373 and '129 patents is acknowledged in the specification of the patents in suit and has been acknowledged by Alza's witnesses and is apparent from its own documents. Furthermore, the art had suggested that methylphenidate might also be subject to a "ramp effect," *i.e.*, methylphenidate was only effective while the plasma level of the drug was rising.

With regard to tolerance, whether acute or long term, it was well known at the time that to continue to observe the same physiological effect of a substance, a greater amount of the

6

substance would need to be supplied to the body.  Thus, an increasing plasma profile, or an increasing amount of drug in the blood circulating to the relevant physiological structures, was an obvious solution to the theorized presence of acute tolerance.  Indeed, art dealing with other drugs known to exhibit acute tolerance such as the use of nitrates for angina suggested just such an increasing plasma profile to overcome acute tolerance.  Additionally, if one looked at the suggested "ramp effect" of methylphenidate, a person of ordinary skill in the art would have noted that it would be desirable to maintain the "ramp effect" over the desired period of time of activity while keeping the blood levels of drug below the blood level at which side effects would be observed.

As construed, claim 1 of the '373 patent only requires that the dosage form containing methylphenidate provide an ascending release rate over an extended period of time.  The art specifically suggested an ascending release rate as a way to overcome acute tolerance.  Again, Alza has contended that creating a dosage form to generate such sustained activity would be within the ability of a person of ordinary skill in the art.  Thus, claim 1 of the '373 patent would have been obvious as well.  The dependent claims likewise would have been obvious for the reasons set forth in more detail below.

The Section 112 issues, *i.e.*, enablement and indefiniteness, are also based on the broad claim construction advocated successfully by Alza.  With regard to enablement, there are two types of enablement that the claims in a patent must satisfy.  One is that the patent provides at least one way to practice the claims.  The second is that the claims are commensurate in scope to the disclosure, *i.e.*, the person of ordinary skill in the art must be able to practice an invention to its full scope.  This second requirement is called "enablement for the full scope" and primarily

7

focuses on the breadth of the claim, the breadth of the disclosure, the predictability in the art and the knowledge of a person of ordinary skill among other factors.

In this case, claim 1 of both of the patents in suit are directed towards a method of treatment using *any* dosage form which yields the results claimed, whether those results be an increasing release rate or a substantially ascending plasma drug concentration. In essence, claim 1 of both patents is a method of treatment using a dosage form "means" to yield a specific "function." Since, as defined by Alza, the dosage form is unlimited in its structural requirements as long as it yields the "function" required, these claims are, in essence, "single means claims," *i.e.*, Alza is actually only claiming the result. Even though Alza has disclosed in its patent one particular working embodiment which yields the claimed results, the claims as allowed have no relationship to the limited disclosure of the specification. For this reason, since the time of the Supreme Court's decision in the Telegraph Case, single means claims, *i.e.*, claims limited only by results and having no requirement of common structural features, have been held invalid *as a matter of law* as lacking enablement for the full scope of the claims.[2] None of the dependent claims sufficiently limit the claims to avoid this failure of enablement; rather, those claims are focused only on adding an additional functional requirement, *i.e.*, a substantially ascending plasma profile over a certain period of time in the '373 patent, or the addition of specific dosage amounts in the '129 patent. Additionally, if one goes beyond the single means aspect of the claims and focuses on the more traditional factors from *In re Wan*ds, those factors also indicate that the claims are not enabled for their full scope.

---

[2]    The scope of enablement concerns are why claims that specifically and explicitly invoke Section 112, paragraph 6's "means plus function" language now have the "means" limited to those means disclosed in the specification of the patent at issue and their structural equivalents. *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1042 (Fed. Cir. 1993). Similarly, these claims would have avoided Section 112, paragraph 1 and 2 issues if the claims had been limited to osmotic dosage forms.

Similarly, the unlimited nature of the claims as further interpreted by Alza also leaves the claims hopelessly indefinite.

## II.    ALZA'S PATENTS ARE INVALID

### A.    THE CLAIMS OF THE PATENTS IN SUIT ARE NOT ENABLED FOR THEIR FULL SCOPE AS A MATTER OF LAW

#### Findings of Fact

1.    Only claims 1, 2-4 and 6-7 of the '373 patent and claims 1 and 4-6 of the '129 patent have been asserted against Andrx. Thus, Andrx will only challenge at trial the validity of those claims.

2.    Claim 1 of the '373 patent reads:

A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

(DTX 1 at col. 23, ll. 12-15; Expected Trial Testimony of Dr. Needham).

3.    This is the only independent claim of the '373 patent. Claims 2-4 and 6-7 add that "said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about" certain defined time periods following administration of the dosage form. Claim 2 requires a time period of about 4 hours. Claim 6 requires a time period of about 5.5 hours, and claim 7 requires a time period of about 8 hours. Claim 3 requires that the time period be from about 4 to about 5.5 hours, and claim 4 requires that the time period be from about 4 to about 8 hours. (DTX 1 at col. 23, l. 16 - col. 24, l. 4 and col. 24, ll. 9-21; Expected Trial Testimony of Dr. Needham).

4.    Based upon the interpretation of the claim terms in this Court's October 5, 2007 Order, claim 1 was interpreted as follows:

9

A method for treating ADD or ADHD comprising administering a pharmaceutical composition that includes a dose of methylphenidate . . . that provides a release of methylphenidate . . . from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding period interval starting at t=0 and continuing through at least the midpoint of the T90 and for at least three hours. The release rate is as determined by an appropriate in-vitro dissolution test. The ascending release rate does not include release of drug from any immediate release-drug coating that may be applied to the dosage form.[3]

(*See* D.I. 130 [Claim construction Order]; Expected Trial Testimony of Dr. Needham).

5.      Claim 2 as construed by this Court would add the following language to that of

claim 1 just set forth:

wherein said administration results in an approximately ascending methylphenidate plasma drug concentration over a time period of approximately 4 hours following said administration. A substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises over approximately 4 hours, but may include a slight dip.

(*See id.*).

6.      Claims 3, 4, 6 and 7 would read the same as claim 2 above except that the "4

hours" clauses would change to "4 to approximately 5.5 hours," "4 to approximately 8 hours,"

"5.5 hours," and "8 hours," respectively. (Expected Trial Testimony of Dr. Needham).

7.      Claim 1 of the '129 patent states:

A method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in a patient, wherein the method comprises administering a pharmaceutically acceptable composition comprising methylphenidate and a pharmaceutically acceptable carrier to said patient in a manner that achieves a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration.

---

[3]      We deleted duplicative text in the claim that would have occurred based upon Alza's proffered construction that this Court used. For example, the first part of claim 1 would have read "a pharmaceutical composition that includes a dose of methylphenidate comprising methylphenidate." We merely ellipsed the second appearance of "comprising" and "methylphenidate" and the second appearance of "a release of methylphenidate."

(DTX 3 at col. 23, ll. 12-19; Expected Trial Testimony of Dr. Needham).

8.    Claims 4-6 depend from claim 1 and add that the dosage of methylphenidate in the composition be 18, 36 or 54 mgs, respectively.  (DTX 3, col. 24, ll. 7-12; Expected Trial Testimony of Dr. Needham).

9.    Claim 1 of the '129 patent as interpreted by the Court would read:

A method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in a patient, wherein the method comprises administering a pharmaceutical composition that includes methylphenidate comprising methylphenidate and a pharmaceutically acceptable carrier to said patient in a manner that achieves an approximately ascending methylphenidate plasma drug concentration over a time period of approximately 8 hours following said administration. Thus, a substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises over approximately 8 hours, but may include a slight dip.

(*See* D.I. 130 [Claim Construction Order]; Expected Trial Testimony of Dr. Needham).

10.    As is readily apparent from the interpretations ordered by this Court and suggested by Alza, claim 1 of the '373 patent covers a method of treating ADD or ADHD with *any* pharmaceutical composition including a dose of methylphenidate and wherein the methylphenidate was released at an ascending release rate for an extended period of time, *i.e.*, a release of methylphenidate . . . from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding period interval starting at t=0 and continuing through at least the midpoint of the $T_{90}$ and for at least three hours. The release rate is as determined by an *appropriate* in-vitro dissolution test.  The ascending release rate does not include release of drug from any immediate release-drug coating that may be applied to the dosage form. (Expected Trial Testimony of Dr. Needham).

11.    Claims 2-4 and 6-7 of the '373 patent likewise claim **any** pharmaceutical

11

composition that satisfies claim 1 of the '373 patent and also provides an approximately

ascending methylphenidate plasma drug concentration over a time period of the specified hours

of the particular claim. (Expected Trial Testimony of Dr. Needham).

12.    During the claim construction proceedings, in arguing that the claims were not

limited to osmotic dosage forms, Alza stated that "the specification indicates that the terms

"dosage form" and "pharmaceutically acceptable composition" broadly encompass

pharmaceutical compositions containing methylphenidate that can be adapted for administration

to an individual." (D.I. 87 [*Alza's Opening Claim Construction Brief*] at 16). Alza also stated

that "*[n]othing in the claim language itself* limits the term 'pharmaceutically acceptable

composition' *to a specific means for releasing methylphenidate* from the composition." (*Id.* at

17) (emphasis added). Alza also cited and emphasized that another court had construed similar

terminology so as to encompass pharmaceutical compositions *in all forms*. (*Id.* at 17 and 27; *see

also id.* at 15 (*citing United States v. Bristol-Myers Co.*, No. 822-70, 1982 WL 1816 at *1

(D.D.C. 1982) and stating ("'dosage form' means 'any form in which ethical pharmaceuticals are

packaged or formulated for use….'")). Finally, Alza indicated that the specification did not limit

the means by which the dosage form supplied the methylphenidate; rather, the specification (and

the claims) emphasizes the functional requirements of the claimed composition. *Id.* at 17.

13.    In its Reply Brief on Claim Construction, Alza makes the position that plaintiffs

were espousing, and which was adopted by this Court, even clearer. Alza first stated that:

> The claims of the '373 patent define the requirements of dosage form in simple
> terms; namely the dosage form must release the methylphenidate at an ascending
> rate of release for an extended period of time.

(D.I. 94 [*Alza's Claim Construction Reply Brief*] at 3).

14.    Alza also stated that "Andrx's expert, Dr. Banakar, acknowledges that there are

no limitations on the type of dosage form that may be used in the claimed treatment methods."

(*Id.* at 3, n.1).  Finally, Alza stated:

> This plain meaning of the claims also is entirely consistent with the specification
> and prosecution history. For example, [the patents in suit], expressly state[] that
> the claimed methods are not limited to methods that use dosage forms described
> in the examples, but instead *encompass use of any dosage form that exhibits an*
> *ascending rate of release or provides a substantially ascending methylphenidate*
> *blood plasma concentration.*

(*Id.* at 18) (emphasis added).

15.    Alza made similar arguments at the *Markman* Hearing:

> [P]laintiffs argue that the claim language . . . very broadly claims any type of
> acceptable composition comprising methylphenidate or any type of dosage form.

> *        *        *

> But what the inventors are saying is our invention is a substantially ascending
> release rate and *that can be achieved with any type of dosage form.*

> *        *        *

> There [are] plenty of disclosures in this patent to support the construction that we
> think is the correct and normal construction of these terms *covering all of the*
> *different types of dosage forms.*

(D.I. 109 [*Markman* Hearing] at 18:9-13; 26:15-18; 30:6-10) (emphasis added).

16.    After reviewing the patent and its claims, Andrx's expert, Dr. Needham, agreed

that under Alza's proposed definition of the claims (the definition that was adopted by the

Court), the claims are unlimited as to what type of dosage form is required.  Indeed, the claim

construction in this case does not even limit the dosage forms to just oral dosage forms.

(Expected Trial Testimony of Dr. Needham).

17.    The Court has granted Alza's claim construction request.  Having done so, it is

clear that the asserted claims of the '373 and '129 patents define the invention as the use (in treatment of ADD and ADHD) of *any* dosage form which has the functional requirement of the claims.

18.     To put this into context, it is worth noting that the United States Pharmacopeia is a standard reference guide used in the pharmaceutical arts.  The U.S. Pharmacopeia from 1995 (the applicable one for the time that the first provisional was filed, *i.e.*, the earliest dates to which the claims of the patents in suit could possibly be entitled) has a section titled Pharmaceutical Dosage Forms, Section 1151.  (DTX 656).  That section includes in its list of possible dosage forms:  aerosols, capsules, creams, emulsions, gels, implants (aka pellets), inhalations, injections, lozenges, ointments, solutions, pastes, powders, solutions, suppositories, suspensions, transdermal systems (typically a patch), and tablets.  (Expected Trial Testimony of Dr. Needham).

19.     Alza, however, has attempted to back away from its earlier statements and instead limit the dosage form to tablets, capsules and transdermal systems because other dosage forms would be considered "inappropriate" by the skilled formulator according to Alza's expert Dr. Davies.  (Expected Davies Trial Testimony).

20.     In other words, Dr. Davies does not have believe that the claims have to be enabled for their full scope.  Rather, Dr. Davies has asserted that the person of ordinary skill in the art would have only attempted to perform the claimed methods using certain dosage forms. The only textual support relied upon by Dr. Davies to so limit the claims is the requirement in the claims of the '373 patent which requires an ascending release rate.  The Court's construction provides that the claimed ascending release rate must be demonstrated in an "appropriate" dissolution test.  According to Dr. Davies, an appropriate dissolution test requires the use of a

14

USP approved apparatus. The USP approved apparti at the time of the filing of the patents in suit related to testing of tablets, capsules and transdermals. (Expected Davies Trial Testimony).

21.    First, it is worth noting that even if this were true of the dosage forms claimed in the '373 patent, there is no such requirement for the claims of the '129 patent. Rather, those claims merely require the use of a dosage form which supplies a substantially ascending plasma profile. Indeed, if claim 1 of the '129 patent required such an ascending release rate, it would be in all relevant parts the same as claim 7 of the '373 patent. (Expected Trial Testimony of Dr. Needham).

22.    Indeed, Alza has argued all along that the '129 patent does not require an ascending release rate but is only limited by the plasma profile provided. (See D.I. 87 [*Alza's Opening Claim Construction Brief*] at 21 ("All of the claims of the '373 patent . . . specify that the claimed dosage forms provide 'an ascending release rate over an extended period of time.' This limitation is not present in any of the '129 patent claims."); D.I. 109 [*Markman* Hearing] at 17:9-14 ("what you'll see here is *that the '129 patent does not have any language in it that is directed to the ascending rate of release* of the tablet. So *it does not have the in vitro dissolution test* as a part of these claims.") (emphasis added); D.I. 109 [*Markman* Hearing] at 57:18-20 ("In the '129 patent, there's no requirement that you have an ascending rate of release of the tablet.")).

23.    Secondly, Alza has represented to this Court that it was not contending that the dissolution tests would need to be from a USP apparatus to be "appropriate" within the meaning of that word in the '373 patent. Specifically, during the *Markman* hearing, when Andrx's counsel asserted that he understood Alza to agree that an "appropriate" dissolution test must use a USP apparatus, Alza's counsel responded by making it clear that Alza did not contend that an

"appropriate" dissolution test required the use of a USP apparatus:

> On the question of the ascending release rate, the statement was made a couple of times that [Alza] agree[s] that it has to be a USP apparatus. ***We do not agree with that, Your Honor.***

(D.I. 109 [*Markman* Hearing] at 133:19-23) (emphasis added).

24.     Finally, Ms. Gray, Alza's dissolution expert, also does not agree with Dr. Davies. She stated that although there is not a specific USP apparatus for use with various dosage forms such as creams and ointments that there are some general dissolution tests devoted to them. (Gray Dep. Tr. at p. 300).

25.     In any event, whether the Court determines the dosage forms broadly embrace all dosage forms known from the time of the application of the patent until the patent expires, or whether it is more limited as Dr. Davies would have it, it is irrelevant to the initial reason behind a finding of nonenablement of the asserted claims.

## Conclusions of Law Regarding Nonenablement as a Matter of Law

26.     Section 112 includes what is known as the enablement requirement. That requirement demands that the patent specification enable "those [skilled] in the art to make and use the invention as broadly as it is claimed without undue experimentation." *In re Cortright*, 165 F.3d 1353, 1356 (Fed. Cir. 1999) (citation omitted).

27.     The first paragraph of 35 U.S.C. Section 112 provides, *inter alia*, that:

> [t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same.... .

28.     *Cortright* makes clear that section 112 actually has two enablement requirements.

16

One requirement perhaps is more familiar, *i.e.*, that the claims teach *some* way of practicing the claim. The second requirement, however, requires that the claims do not greatly exceed the scope of what is taught in the specification.

> The PTO will make a scope of enablement rejection where the written description *enables something within the scope of the claims, but the claims are not limited to that scope.* This type of rejection is marked by language stating that *the specification does not enable one of ordinary skill to use the invention commensurate with the scope of the claims.* On the other hand, if the written description does not enable any subject matter within the scope of the claims, the PTO will make a general enablement rejection, stating that the specification does not teach how to make or use the invention.

165 F.3d 1353, 1356 (emphasis added) (citations omitted).

29.    The fact that some experimentation is necessary means that the patent specification is lacking in some regard, but if unduly extensive experimentation is necessary to practice the full scope of the claim, the claim will fail. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1557 (Fed. Cir. 1983).

30.    Enablement is an issue of law. *Amgen, Inc. v. Chugai Pharmaceutical Co.*, 927 F.2d 1200, 1212 (Fed. Cir. 1991).

31.    Some claims, however, are so broad in their scope that, as a matter of law, they fail for lack of enablement for the full scope regardless of what is taught in the specification. The instant claims are just such a situation.

32.    One of the first pronouncements of this legal principle was in a famous case relating to the invention of the telegraph, *O'Reilly v. Morse*, 56 U.S. 62, 112-119 (1853). Morse's Eighth claim stated that:

> I do not propose to limit myself to the specific machinery or parts of machinery described in the foregoing specification and claims; the essence of my invention being the use of the motive power of the electric or galvanic current, which I call

17

electromagnetism, however developed for marking or printing intelligible
characters, signs, or letters, at any distances, being a new application of that
power of which I claim to be the first inventor or discoverer.

*Id.* at 112.

33.     In rejecting the validity of claim 8 the Supreme Court first noted that it was

impossible to misunderstand the scope of this claim, *i.e.*, the claim covered the exclusive right to

every improvement where the motive power is the electric or galvanic current and the result was

the marking or printing of characters, signs, etc.  The Court went on to state:

> If this claim can be maintained, it matters not by what process or machinery the
> result is accomplished.  For aught that we now know some future inventor, in the
> onward march of science may discover a mode of writing or printing at a distance
> by means of the electric or galvanic current, without using any part of the process
> or combination set forth in the plaintiff's specification.  His invention may be less
> complicated-less liable to get out of order-less expensive in construction, and in
> its operation.  But yet if it is covered by this patent the inventor could not use it,
> nor the public have the benefit of it without the permission of this patentee.
>
>          *        *        *
>
> The court is of opinion that the claim is too broad, and not warranted by law.

*Id.* at 113.

34.     The Court noted that it took as a given that another legendary inventor, Robert

Fulton, could not have taken out a patent covering the exclusive right to use steam as a motive

force even though in that patent he may have particularly described the process and machinery

he used in creating the first practical steamboat.  *Id.*

35.     The Court further noted that the Patent Act in place at the time, like the present

Patent Statute, required that the specification provide a description of the manner and process of

making and using the same.  The manner and process of making and using the telegraph must be

set forth in exact terms.  Thus, in the past, patents had always been held to embrace only the

improvement described. *Id.* at 118-19.

36.     The Court concluded by stating that:

> Indeed, if the eighth claim of the patentee can be maintained, there was no
> necessity for any specification, further than to say that he had discovered that, by
> using the motive power of electromagnetism, he could print intelligible characters
> at any distance.  We presume it will be admitted on all hands, that no patent could
> have issued on such a specification.  Yet this claim can derive no aid from the
> specification filed.  It is outside of it, and the patentee claims beyond it.  And if it
> stands, it must stand simply on the ground that the broad terms abovementioned
> were a sufficient description, and entitled him to a patent in terms equally broad.
> In our judgment the act of Congress cannot be so construed.

*Id.* at 119-120.

37.     Several additional cases followed from the Supreme Court similarly holding

claims which only differed from the prior art due to the functionality recited as not enabled to the

full scope and/or indefinite based upon their breadth.  *See, e.g., General Electric Co. v. Wabash

Appliance Corp.*, 304 U.S. 364, 368-73 (1938) (stating, among other things, "The difficulty of

making adequate description may have some bearing on the sufficiency of the description

attempted, but it cannot justify a claim describing nothing new except perhaps in functional

terms." [at 372-73]).

38.     In the claims of the patents in suit, as will be discussed further below with regard

to obviousness, methods of treating ADD or ADHD in humans through the use of dosage forms

containing methylphenidate had been known for decades.  Therefore, the only limitations that

possibly provide patentability to the claims are the functional limitations relating to an ascending

release rate and/or a substantially ascending plasma profile provided in the claims.  Thus, these

Supreme Court cases make it clear that all the asserted claims of the patents in suit must fail for

lack of enablement.

39.    The line of Supreme Court cases described above reached its ascendant peak in

*Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 9-13 (1946). In *Halliburton*, the

Court noted that the language of the claim that described what was "new" did so "in terms of

what [the apparatus] will do rather than in terms of its own physical characteristics or its

arrangement in the new combination apparatus. We have held that a claim with such a

description of a product is invalid . . ." *Id.* at 9. In holding the claim invalid, the Court stated:

> ***Under these circumstances the broadness, ambiguity, and overhanging threat of
> the functional claim of Walker becomes apparent.*** What he claimed in the court
> below and what he claims here is that his patent bars anyone from using in an oil
> well any device heretofore or hereafter invented which combined with the Lehr
> and Wyatt machine performs the function of clearly and distinctly catching and
> recording echoes from tubing joints with regularity. ***Just how many different
> devices there are of various kinds and characters which would serve to
> emphasize these echoes, we do not know.*** The Halliburton device, alleged to
> infringe, employs an electric filter for this purpose. In this age of technological
> development there may be many other devices beyond our present information or
> indeed our imagination which will perform that function and yet fit these claims.
> And unless frightened from the course of experimentation by broad functional
> claims like these, inventive genius may evolve many more devices to accomplish
> the same purpose. Yet if Walker's blanket claims be valid, no device to clarify
> echo waves, now known or hereafter invented, whether the device be an actual
> equivalent of Walker's ingredient or not, could be used in a combination such as
> this, during the life of Walker's patent.
>
> ***Had Walker accurately described the machine he claims to have invented, he
> would have had no such broad rights to bar the use of all devices now or
> hereafter known which could accent waves.***

*Id.* at 12-13 (emphasis added) (citations omitted).

40.    In response to the *Halliburton* decision which would have prevented any claims

such as those presently asserted, *i.e.*, claims whose entire patentability depended upon the

functionality alleged, Congress decided to expressly permit such functional language when it

amended the Patent Statute in the 1952 Patent Act. This permission was supplied in the then

new section 112. This section for the first time expressly permitted the patent applicant to use

20

the means plus function language that is now relatively commonplace. *See Valmont*, 983 F.2d at 1042 (Fed. Cir. 1993); *see also In re Donaldson Co.*, 16 F.3d 1189, 1194 (Fed. Cir. 1994) (*en banc*).

41.     In permitting the use of means plus function language in section 112, however, Congress recognized the concern expressed through the line of cases leading to the *Halliburton* decision that the means for performing the function could not constitute **any** means for performing the function or the claim would preempt the field. Therefore, Congress enacted compromise language so as to permit functional claiming while limiting the scope of the claim. In this regard, what is now section 112, ¶ 6 reads:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and *such claim shall be construed to cover the corresponding structure*, material, or acts *described in the specification and equivalents thereof*.

(Emphasis added).

42.     The second clause of section 112, ¶ 6 confines the breadth of protection of the means term. "The applicant must describe in the patent specification some structure which performs the specified function. Moreover, a court must construe the functional claim language 'to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.'" *Valmont Indus.*, 983 F.2d at 1042. As such, this second clause has been noted to operate "more like the reverse doctrine of equivalents than the doctrine of equivalents *because it restricts the coverage of literal claim language*." *Id.* (emphasis added); *see also Donaldson*, 16 F.3d at 1194, n.5; *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1367 (Fed. Cir. 2001); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989); *Data Line Corp. v. Micro Techs., Inc.*, 813 F.2d 1196, 1201 (Fed. Cir. 1987).

21

43.     In *Johnston*, the Federal Circuit noted that: "An element of a claim described as a means for performing a function, if read literally, would encompass *any* means for performing the function. But section 112 ¶ 6 operates to *cut back* on the types of *means* which could literally satisfy the claim language." 885 F.2d at 1580 (emphasis in original) (citation omitted).

44.     Likewise the Federal Circuit noted that the second clause of 112 provided "specific instruction on interpretation of this type of claim which otherwise might be held to be indefinite. Thus, the provision excludes some means which perform the specified function from *literally* satisfying the claim limitation." *Data Line Corp.*, 813 F.2d at 1201 (emphasis in original).

45.     During claim construction proceedings, no party in this case argued that section 112 ¶ 6 applied to the claims in issue. But in arguing against Andrx's proposed construction that the claims be limited to osmotic dosage forms, Alza argued (and prevailed in its argument) that the claims are not so limited and rather cover *any* dosage form which provides the claimed results. *See* ¶ 15, *supra*.

46.     Nevertheless, it is clear that:

the "means" term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the specification.

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998); *see also Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

47.     Here rather than use the generic term "means," which, because of section 112 ¶ 6, would require that the structure in the specification be looked to, Alza used the equivalent generic terms "dosage form" and "pharmaceutically acceptable composition." Alza also successfully argued that the plain meaning of those claims does not require that they be limited

22

to the specific structures, *i.e.*, osmotic dosage forms, disclosed in the working examples of the specification.

48.    Even after the enactment of the language that now appears section 112 ¶ 6, *O'Reilly v. Morse* remains the law if the claims become defined only by their function, as they are here.

> Claims directed merely to a "desired result" have long been considered objectionable primarily because they cover any means which anyone may ever discover of producing the result.

*In re Fuetterer*, 319 F.2d 259, 263 (C.C.P.A. 1963) (*citing O'Reilly v. Morse*, 15 How. 62, 14 L.Ed. 601).

49.    Indeed, such claims are typically called, or analogized to, "single means claims."

> The long-recognized problem with a single means claim is that it covers every conceivable means for achieving the stated result, while the specification discloses at most only those means known to the inventor. *See O'Reilly v. Morse*, 56 U.S. (15 How.) 62, 112, 14 L.Ed. 601 (1853). Thus, the claim is properly rejected for what used to be known as "undue breadth," but has since been appreciated as being, more accurately, based on the first paragraph of § 112.

*In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983).

50.    According to *Hyatt*, "[t]he propriety of a rejection based broadly on § 112 flows irresistibly from th[e] premise [that the claim is a single means claim] despite any argument appellant has made, *or could conceivably make* were this case to be returned to the board." *Id.* at 715 (emphasis added). Thus, if the claims in suit are analogous to single means claims they are invalid *per se*.

51.    Several cases have analogized claims to "single means claims" even when the claims do not use the term "means" but instead use a generic, unbounded structural term. For

example, *Fiers v. Revel* involved an interference with a count which read "A DNA which

consists essentially of a DNA which codes for a human fibroblast interferon-beta polypeptide."

984 F.2d 1164, 1166 (Fed. Cir. 1993). The Federal Circuit defined this count as being

"analogous to a single means claim" "because [it] purports to cover all DNAs that code for" the

interferon.

> Claiming all DNA's that achieve a result without defining what means will do so
> is not in compliance with the description requirement; it is an attempt to preempt
> the future before it has arrived.

*Id.* at 1171.

52.    Similarly, the Board of Patent Appeals and Interferences stated in *Ex Parte*

*Maizel* that:

> Appellants *have not chosen to claim the DNA by what it is but, rather, by what
> it does*, i.e., encoding either a protein exhibiting certain characteristics, or a
> biologically functional equivalent thereof. *Appellants' claims might be
> analogized to a single means claim of the type disparaged by the [Federal
> Circuit]* in *In re Hyatt*, 708 F.2d 712, 218 USPQ 195 (Fed. Cir. 1983). The
> problem with the phrase "biologically functional equivalent thereof" is that it
> covers any conceivable means, i.e., cell or DNA, which achieves the stated
> biological result while the specification discloses, at most, only a specific DNA
> segment known to the inventor. *Clearly the disclosure is not commensurate in
> scope with the claims*.

27 U.S.P.Q.2d 1662, 1665 (B.P.A.I. 1993) (emphasis added); *see also Ex Parte Kung*, 17 U.S.

P.Q.2d 1545, 1548 (B.P.A.I. 1989) (analogizing to a single means claim and stating "Manifestly,

the claims at issue cover every conceivable monoclonal antibody which achieves the stated result

of recited reactivity, whereas appellants specification teaches only one very particular method or

means for accomplishing the claimed objective. Hence, we find that the enabling disclosure of

the present specification is not commensurate in scope with the breadth of [the] claims….");

*Glaxo Wellcome, Inc. v. Eon Labs Mfg.*, 2002 WL 1874830 at *4 (S.D.N.Y. Aug. 13, 2002),

*appeal dismissed by Glaxo Wellcome, Inc. v. Eon Labs Mfg.*, 53 Fed. Appx. 913 (Fed. Cir. Dec. 2, 2002).

### Argument Regarding Nonenablement as a Matter of Law

Case law from the 1800s first established the principle that you cannot claim every means for achieving a particular function. *O'Reilly*, 56 U.S. 62, 112-19. The asserted claims have violated that proscription.

In fact, over time, the appropriate invalidity position has varied on claims that are so broad as to constitute single means claims. The Telegraph Case seems to mainly turn on the insufficiency of the enablement of the specification. *Id.* Other cases, such as *General Electric* rely more on the indefiniteness position that the outer boundary of the claim cannot be discovered. 304 U.S. at 371.

The Telegraph Case was discussed in great detail above. *General Electric* involved claims to a tungsten filament "made up mainly of a number of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life ...." *Id.* at 368. The fatal flaw with the claim was that it "uses indeterminate adjectives which describe the function of the grains to the exclusion of any structural definition, and thus falls within the condemnation of the doctrine that a patentee may not broaden his product claims by describing the product in terms of function." *Id.*

While the claims at hand are not product claims, but rather are method of treatment claims, the same principle applies because the method of treatment uses as the object of the claim a product, *i.e.*, a "dosage form" or "pharmaceutically acceptable composition." Similarly, the product in the claims at issue are only defined by two things: (1) that it contain

25

methylphenidate and perhaps some other excipient, and (2) that it perform the function of the claims. Whether it is called lack of enablement for the full scope or indefiniteness as overly broad is really a matter of semantics. Clearly if a claim is so broad as to be indeterminate in its scope, as is the case with all the claims here, under Supreme Court precedent that claim is invalid as a matter of law. *Id.* at 371-73.

The Federal Circuit in *Hyatt*, however, indicated that the more proper ground of invalidity in a case like the present one is lack of enablement for the full scope. 708 F.2d at 714-15. In this instance, the claim is both overly broad, *i.e.*, lacking in enablement for the full scope, and indefinite. *See infra.*

Having successfully argued that the dosage forms of claims 1-4 and 6-7 of the '373 patent and claims 1 and 4-6 of the '129 patent are limited only by whether those dosage forms provide the results claimed, Alza is left with what is, in effect, a "single means claim." Alza has claimed *any* dosage form that provides the results claimed and has avoided having those claims limited to the working embodiment disclosed, *i.e.*, an osmotic dosage form. As such, Alza is effectively in the same position as Mr. Morse found himself in the telegraph case. Alza may have invented a novel dosage form and may have even have been entitled to claim such a dosage form, but Alza chose to claim, in essence, any way of administering methylphenidate to an ADHD patient which exists or ever will exist as long as it has one or both of the functionalities of the claim. To paraphrase the Supreme Court,

> Indeed, if these claims can be maintained, there was no necessity for any specification, further than to say that the inventors had discovered that by using an ascending release rate of methylphenidate over an extended period and/or providing a substantially ascending plasma profile over various time points, one could treat ADHD. We presume that it will be admitted on all hands, that no patent could have issued on such a specification. Yet these claims can derive no aid from the specification filed. They are outside of it, and the patentee claims

26

> beyond it. And if they stand, they must stand simply on the ground that the broad
> functional terms were a sufficient description, and entitled them to a patent in
> terms equally broad. In our judgment the act of Congress cannot be so construed.

(Paraphrased from *O'Reilly*, 56 U.S. at 119-20).

Or to put it differently, having argued for a claim construction which provided no

limitation on the what type of dosage forms or pharmaceutical compositions that could be used,

Alza must enable a similar scope. It cannot do so. The maxim "be careful what you wish for

because you just might get it" would seem to be appropriate. *See Liebel-Flarsheim Co. v.*

*Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).

**B.    THE EVIDENCE CONCLUSIVELY ESTABLISHES THE NONENABLEMENT OF THE
CLAIMS**

The next portion of the analysis of enablement investigates whether undue

experimentation would be required to practice the full scope of the claims. The Court need only

reach this analysis if it does not agree that the claims are invalid as a matter of law because of

their unlimited nature in claiming any dosage form or pharmaceutical composition which

provides the results of the claim.

**Findings of Fact**

**1.    Specification of the Patents in Suit**

53.    We first turn to the specification and prosecution histories of the patents in suit.

As the specifications of the two patents in suit are, in all material parts, the same because the

application that led to the '129 patent was a continuation of the application that led to the '373

patent, only the specification of the '373 patent will be cited for ease of reference.

54.    The specification begins by stating that:

[T]he invention is directed to methods and devices that provide drug release

27

within the gastrointestinal tract at an ascending release rate over an extended time period. In this manner, drug is released at an ascending rate during a portion of the drug administration period sufficient to maintain a desired therapeutic drug effect throughout a prolonged therapy period.

(DTX 1 at col. 1, ll. 27-33; *see also* Expected Trial Testimony of Dr. Needham).

55.    In defining the "plasma drug concentration" required by claims in both the '373 and '129 patents, the specification indicates that, although the term refers to plasma, the term can be applied to measurement of *any appropriate body fluid or tissue*:

> One commonly-used indicator of drug availability is the concentration of drug that is obtained within the blood or plasma, or other appropriate body fluid or tissue, of a patient following administration of the drug. For convenience, this concentration may be referred to as "plasma drug concentration" hereinafter which is intended to be inclusive of drug concentration measured in any appropriate body fluid or tissue.

(DTX 1 at col. 1, ll. 42-50; *see also* Expected Trial Testimony of Dr. Needham).

56.    The specification also explains that one area of research with regard to dosage forms and methods of treatment is to provide extended or delayed release products instead of the more typical immediate release dosage form. (DTX 1 at col. 2, l. 45 - col. 3, l. 11). The specification notes that the focus of these efforts has mainly been to provide drug release "at a substantially constant release rate over an extended time period." (DTX 1 at col. 2, ll. 63-66). Such a release is noted to lead to an ascending plasma drug concentration for a reasonably short period of time and then the plasma drug concentration is intended to remain substantially constant over an extended period of time. (DTX 1 at col. 2, l. 66 - col. 3, l. 3; *see also* Expected Trial Testimony of Dr. Needham).

57.    The specification specifically mentions the success of osmotic dosage forms in achieving this constant profile. (DTX 1 at col. 3, ll. 13-15). However, the "BACKGROUND OF

THE INVENTION" section of the specification concludes by noting that:

> Although constant-release dosage forms have proven effective for many different drug therapies, there are clinical situations where these have not been entirely satisfactory. *It has been observed that for some patients being treated with constant-release dosage forms for some conditions or diseases, the therapeutic effectiveness of the drug decreases at time periods before the end of the desired therapy period despite the maintenance of substantially constant drug release that would be expected to provide continued effectiveness.* Accordingly, there remains a need to provide methods and devices for maintaining a desired therapeutic drug effect over a desired prolonged therapy period when sustained-release dosage forms that release drug at a substantially constant rate over an extended time period are not satisfactory.

(DTX 1 at col. 3, l. 59 - col. 4, l. 6 (emphasis added); *see also* Expected Trial Testimony of Dr.

Needham).

58.     In briefly defining their discovery, the inventors state that:

> It has been surprisingly discovered that, in an exemplary clinical situation, administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period.

> With the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for sustained-release oral dosage forms adapted to provide such a release rate over a suitable extended time period. Accordingly, other aspects of the present invention include providing oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period.

> It has been surprisingly discovered that oral osmotic dosage forms exhibiting an ascending drug release rate for an extended time period can be achieved. In particular, the present invention is directed to osmotic dosage forms having bi-layer or tri-layer tablet cores that are adapted to provide ascending drug release rates over an extended period. In addition, to provide for an initial rapid onset of drug action, the present invention is also related to dosage forms that additionally comprise a dose of drug for immediate release.

(DTX 1 at col. 4, ll. 13-39; *see also* Expected Trial Testimony of Dr. Needham).

59.     The specification then makes some particular statements with regard to bi-layer

osmotic dosage forms.

> Importantly, the bi-layer tablet cores disclosed herein are formed when two
> component layers are compressed together to provide a longitudinally compressed
> tablet ("LCT") core having a "capsule-shaped" configuration with a different
> layer at each narrow end.

> The combination of features including the osmotic properties of the component
> layers, the fluid flux properties of the semipermeable membrane and the
> configuration of the tablet core ensures that drug is released at an ascending rate
> over an extended time period.

(DTX 1 at col. 4, ll. 50-59; *see also* Expected Trial Testimony of Dr. Needham).

60.     Similarly, the specification describes the trilayer osmotic systems for delivering

the ascending release rate as a "novel tri-layer tablet core." (DTX 1 at col. 4, l. 66; *see also*

Expected Trial Testimony of Dr. Needham).

61.     The specification further explains that there are numerous clinical situations and

types of therapy that could be improved by using dosage forms that provide a sustained,

ascending release rate over an extended period of time.  (DTX 1 at col. 5, ll. 27-30; *see also*

Expected Trial Testimony of Dr. Needham).

62.     The next section of the specification is entitled "DETAILED DESCRIPTION OF

THE INVENTION."  The patentees again explain that the most common methods of

pharmaceutical treatment are to use immediate release compositions or sustained, constant

release compositions, but that in some situations the sustained, constant release dosage forms

lose therapeutic effectiveness before the end of the desired therapy time point.  (DTX 1 at col. 6,

ll. 37-52).  The patent then further explains that using methylphenidate to treat Attention Deficit

Hyperactivity Disorder has been known for a long time, and that methylphenidate was

commercially available in both immediate-release and sustained-release dosage forms.  (DTX 1

at col. 6, l. 65 - col. 7, l. 49; *see also* Expected Trial Testimony of Dr. Needham).

63.     In this section the patent also details that while two to three immediate release doses seem to provide sufficient control of ADHD, the multiple dosages are problematic due to compliance issues and because this regiment requires dispensing the medicine by the school during the day which, since methylphenidate is a controlled substance, creates multiple administrative headaches. The patent also describes that the previously prescribed sustained, constant release formulation is inadequate because of delayed onset in treating the symptoms of ADHD and the lack of therapeutic effectiveness later in the day. (DTX 1 at col. 7, ll. 14-49; Expected Trial Testimony of Dr. Mayersohn; *see also* Expected Trial Testimony of Dr. Needham).

64.     The patentees then state that:

It has been surprisingly discovered that administration of methylphenidate at a release, [sic] rate that is substantially ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy similar to the efficacy obtained with multiple doses of immediate-release methylphenidate dosage forms. Details of this discovery are disclosed in copending U.S. application Ser. No. 910,593, filed Jul. 31, 1997, of which the present application is a continuation-in-part application.

(DTX 1 at col. 7, ll. 50-58; *see also* Expected Trial Testimony of Dr. Needham).

65.     The patent explains that this finding was based on a clinical study wherein the ascending-release regimen was administered as an initial loading dose followed by increasing small dosages at closely-spaced intervals which extended past the time of administration of "the second immediate-release dose." (DTX 1 at col. 7, l. 58 - col. 8, l. 6). This regimen was not seen as losing efficacy later in the day as was the case with the other sustained, constant release regimen. (DTX 1 at col. 8, ll. 7-16; Expected Trial Testimony of Dr. Mayersohn; *see also*

31

Expected Trial Testimony of Dr. Needham).

66.    The patentees then indicate that:

> With the discovery that drug effectiveness over a prolonged therapy period may
> be improved in some circumstances with administration of drug in an ascending
> release rate over an extended period, a need arises for sustained-release oral
> dosage forms adapted to provide such a release rate. In one aspect of the present
> invention, *it has been surprisingly discovered that bi-layer oral osmotic dosage*
> *forms can be adapted* to meet this need. In another aspect, *it has been*
> *surprisingly discovered that sustained-release oral osmotic dosage forms having*
> *novel tri-layer cores can be produced* that also achieve sustained release of drug
> formulations at an ascending rate for an extended time period.

(DTX 1 at col. 8, ll. 31-42 (emphasis added); *see also* Expected Trial Testimony of Dr.

Needham).

67.    The patentees indicate that the problem of the delayed onset of the previously

available sustained release dosage form was not solved by the ascending release rate but was

overcome with the addition of an immediate release overcoat applied to the sustained release

dosage form. (DTX 1 at col. 8, ll. 43-54; Expected Trial Testimony of Dr. Mayersohn; *see also*

Expected Trial Testimony of Dr. Needham).

68.    The patent then provides a definitional section. In this section, the patentees

describe, among other things, the drug "release rate" and indicate that this is an *in vitro*

methodology:

> The dissolution test utilized in the Examples described herein were performed on
> dosage forms placed in metal coil sample holders attached to a USP Type VII
> bath indexer and immersed in about 50 ml of acidified water (pH=3) equilibrated
> in a constant temperature water bath at 37°C.

(DTX 1 at col. 9, ll. 29-34; *see also* Expected Trial Testimony of Dr. Needham).

There are no other types of dissolution test described anywhere else in the patent.

69.    The patent describes previously used bi-layer osmotic dosage forms and indicates that such prior art dosage forms achieve an extended substantially constant release rate, and indicates that a dosage form which achieves "*an ascending release rate for an extended time period of at least 50% of the $T_{90}$ period is not found within the prior art.*" (DTX 1 at col. 10, ll. 52-65 (emphasis added); *see also* Expected Trial Testimony of Dr. Needham).

70.    The patentees next describe the bi-layer osmotic dosage forms which have been developed to achieve the ascending release rates of the invention. The patentees state that:

> Importantly, the bi-layer tablet cores of the present invention are configured such that each component layer is substantially round in cross-dimension with a circumferential width and a length between a top and a bottom end. The two layers are compressed together longitudinally such that the resulting bi-layer tablet core has the same circumferential width as the component layers and a length that combines the lengths of the component layers.

(DTX 1 at col. 11, ll. 16-23). The patentees define this "longitudinally compressed tablet" or LCT at col. 11, lines 3-35. The patentees also describe their "surprising discovery" that a novel tri-layer osmotic system can achieve an ascending release rate. (DTX 1 at col. 12, ll. 9-48; *see also* Expected Trial Testimony of Dr. Needham).

71.    After a description of some more particularly preferred embodiments, the patentees set forth illustrative examples. Examples 1-3 detail bi-layer LCT osmotic dosage forms containing methylphenidate and having ascending release rates. Example 4 details a tri-layer LCT osmotic dosage form employing pseudoephedrine hydrochloride, and Example 5 details a tri-layer osmotic dosage form using nicardipine. The latter does not indicate whether the tri-layer system was an LCT. Example 6 and Examples 8 and 9 (by reference to Example 6) then give more detail in providing the construction of tri-layer LCT osmotic dosage forms incorporating methylphenidate. (*See also* Expected Trial Testimony of Dr. Needham).

33

72.     Figures 1 and 2, the only drawings of dosage forms of the invention in the patents are osmotic dosage forms. Figure 1 is a bi-layer osmotic dosage form; Figure 2 is a tri-layer osmotic dosage form with an immediate release overcoat. (DTX 1 at Figures 1 and 2; DTX 1 at col. 6, ll. 18-23; *see also* Expected Trial Testimony of Dr. Needham).

73.     Example 7 provides an indication of the plasma drug concentrations produced by using a 14 mg methylphenidate tri-layer osmotic dosage form with an applied 4 mg immediate-release overcoat. This Example cites to Figure 4 of the patent and indicates that the plasma drug concentration provided therein "substantially ascend[s] (save for a slight 'dip' between t=5.5 hours and t=6.5 hours)." (DTX 1 at col. 22, ll. 4-8; *see also* Expected Trial Testimony of Dr. Needham).

74.     As was indicated earlier, the language of claim 1 of the '373 patent merely requires the treatment of ADD or ADHD by "administering a dosage form" containing methylphenidate to achieve the resulting ascending release rate over an extended period of time. (Expected Trial Testimony of Dr. Needham).

75.     All of the other claims in the '373 patent are dependent on claim 1, but the additional limitations in these claims do not include any further restrictions on the dosage form. Rather these claims further limit the results required of the dosage form. (Expected Trial Testimony of Dr. Needham).

76.     Similarly, claim 1 of the '129 patent claims a method for treating ADD or ADHD in a patient wherein "a pharmaceutically acceptable composition" containing methylphenidate and a pharmaceutically acceptable carrier (and perhaps other ingredients) is administered and results in a substantially ascending plasma drug concentration over about 8 hours following administration. (Expected Trial Testimony of Dr. Needham).

34

77.    The other asserted dependent claims (claims 4-6) provide further limitations on the amount of methylphenidate included in the composition but do not limit the type of composition used.  (Expected Trial Testimony of Dr. Needham).

### 2.    Prosecution History of the Patents in Suit

78.    Both patents in suit on their face indicate that they are related to three provisional applications.  Two of those applications, 60/030,514 (DTX 152) and 60/044,121 (DTX 35), name Suneel Gupta, Diane Guinta, Carol Christopher, and Samuel Saks as inventors.  The third, 60/031,741 (DTX 60), names Larry Hamel, Atul Ayer, Jeri Wright, Andrew Lam, and Padmaja Shivanand as inventors. The patents in suit have had Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright and Richard Weyers removed as inventors.  The remaining inventors are Suneel Gupta, Diane Guinta, Carol Christopher, Samuel Saks, and Lawrence Hamel.

79.    For ease of reference, a chart depicting the various prosecution histories of the patents in suit can be found at DTX 654.  (Attached as **Exhibit 1**).

### a.    Provisional Application No. 60/030,514

80.    Provisional Application 60/030,514 (the "'514 application") was filed November 12, 1996 and indicates that the "invention pertains to both a novel dosage form and to a novel method for administering a drug for producing a therapeutic effect."  (DTX 152 at PALZ000771, lines 3-4; *see also* Expected Trial Testimony of Dr. Needham).

81.    The '514 application further states that "[p]rior to the advent of this invention, the dosage form and the method for administering a drug, for example, a central nervous system acting drug, consisted in using a standard pharmaceutical dosage form."  (DTX 152 at

35

PALZ000772, lines 5-7; *see also* Expected Trial Testimony of Dr. Needham).

82.     The application then describes an immediate release dosage form followed by a

description of the prior art sustained-release dosage form.  With regard to the sustained-release

dosage form, the applicants state that:

> A drug dispensed from a prior art sustained-release dosage form may ascend
> initially but not over the entire dosing interval, and it actually may decline over
> time.  That is, these sustained-release dosage forms dispense a drug in a
> nonascending profile over time, as they do not provide a continuously increasing
> release rate per hour throughout the extended dosing period. . . .  For drugs that
> act on the central nervous system, like methylphenidate, dispensed from a
> sustained-release nonascending dosage form, the patient often develops an acute
> tolerance to the drug manifested by a shortened duration and a decrease in the
> intensity of the therapeutic effect needed for acceptable therapy.  The prior
> sustained-release delivery is also devoid of means that compensate for its
> shortcomings inherent therein.
>
> The above presentation teaches that *a critical need exists for a novel dosage form*
> and for a novel method for administering a drug that overcomes the shortcomings
> known to the prior art. *This long-felt need exists for a dosage form and for a
> method for (1) administering the drug at a sustained-increasing rate that
> simultaneously reduces or eliminates the frequency of daily dosing*; for (2) a
> dosage form and a method for administering the drug in a sustained-compensating
> dose to substantially compensate for acute tolerance to the drug thereby
> maintaining a preselected clinical response; *for (3) a dosage form that
> administers the drug in a sustained-ascending profile clinically indicated for
> the management of Attention-Deficit Disorders*; and, *for (4) a dosage form* and
> *a method for administering the drug initially and in a sustained-ascending
> profile throughout the entire school day*.

(DTX 152 at PALZ 000772, line 19 - 000773, line 14 (emphasis added); *see also* Expected Trial

Testimony of Dr. Needham).

83.     The "Objects of the Invention" section then describes multiple times that it is an

object of the invention to "make available" or "provide" a dosage form which will satisfy the

long-felt need in the art.  (DTX 152 at PALZ 000773-74; *see also* Expected Trial Testimony of

Dr. Needham).

84.     In the "Detailed Disclosure" section, the application contains representative

dosage forms including a hydrogel matrix containing a plurality of tiny pills, drug releasing

beads, a concentration gradient on a polymer substrate rolled on itself, a multilayer system with

increasing doses of drug, or dosage forms which releases a drug from a polymer by diffusion,

flux through pores or rupture of the polymer matrix. The application indicates that such dosage

forms can be made (as opposed to have been made). (DTX 152 at PALZ 000778-81; *see also*

Expected Trial Testimony of Dr. Needham).

85.     Example 3 states that methylphenidate could be administered as a spirally wound

film to provide such an ascending release rate. (DTX 152 at PALZ 000789). Example 4 states

that pemoline could be administered as a multilayer system. (DTX 152 at PALZ 000789-90).

Example 5 describes a series of beads of increasing amounts that could be used with various

ADHD-active drugs. (DTX 152 at PALZ 000790). None of these examples actually describe

that these formulations were made or tested or that they achieved the desired result. (*See also*

Expected Trial Testimony of Dr. Needham).

**b.      Provisional Application No. 60/031,741**

86.     Provisional Application No. 60/031,741 (the "'741 application"), filed within 2

weeks after filing of the '514 application, names the recently excluded inventors from the patents

in suit and Larry Hamel. (*See also* Expected Trial Testimony of Dr. Needham).

87.     The '741 application states that the invention related to a dosage form for

delivering an increasing dose of drug and a dosage form which had an increasing release rate of

the drug over an extended time period. (DTX 60 at p. 1, lines 5-7). Similar to the '514

application, the '741 application reviews the prior art immediate release dosage forms and the

typical, non-ascending sustained release dosage form. The applicants state that the "***prior art***

*sustained-release dosage form is devoid of means that compensate for its shortcomings inherent therein.*" (DTX 60 at p. 3, lines 8-9) (emphasis added). The applicants then provided that a "*critical and pressing need exists for a novel dosage form for delivering a drug that overcomes the shortcomings known to the prior art.*" (DTX 60 at p. 3, lines 10-12 (emphasis added); *see also* Expected Trial Testimony of Dr. Needham).

88.     The Detailed Description provided that:

> In accordance with the practice of this invention, *it has now been discovered [that] a novel dosage form can be made available characterized by an ascending rate of drug delivery over time.* The dosage form provided by this invention delivers a drug at a continuously increasing rate for a predetermined period of time. The dosage form of this invention is *unexpected* and it is a *breakaway from the prior art existing dosage form technologies that deliver a drug at a constant zero-order unchanging rate over time.* The dosage form of this invention avoids delivery at a zero order rate as it delivers a drug continuously in an ascending rate over time. *The profile of the prior art dosage form consists of a short start-up in delivery, followed by a constant unchanged rate. The profile of this invention departs from the prior art by making available a dosage form wherein the drug release rate follows an ascending profile to achieve a desired drug delivery pattern.* The dosage form of this invention achieves the ascending pattern by combining the dimensions of the dosage form with the internal formulation of the dosage form.

(DTX 60 at p. 6, line 20 - p. 7, line 4 (emphasis added); *see also* Expected Trial Testimony of Dr. Needham).

89.     The following pages then disclose an osmotic LCT dosage form. In contrast to the hypothetical nature of the examples of the '514 application, the '741 application's examples and specification provide detailed information for making an osmotic dosage form to achieve an ascending release rate. (*See also* Expected Trial Testimony of Dr. Needham).

### c.     Application No. 08/910,593

90.     Next, Suneel Gupta, Diane Guinta, Carol Christopher and Samuel Saks filed a

non-provisional patent Application No. 08/910,593 (the "'593 application") which cited to three

provisionals including the '514 application.  (DTX 36, Cover page; *see also* Expected Trial

Testimony of Dr. Needham).

      91.     The original, as filed, claims were rejected over Goodman and Gillman and a

Higuchi reference.  The examiner stated that:

> The primary reference teaches that tolerance may be acquired to the effects of
> many drugs resulting in the decrease of the therapeutic index.  This phenomenon
> is well known and results in the necessity of increasing the dosage of said drugs to
> obtain the same pharmacological effect.  ***Nothing unobvious is seen in providing
> for such an increase in a sustained release formulation in view of Higuchi who
> teaches such formulations which may be tailored for any release profile
> including increasing patterns of release.***

(DTX 36, Office Action dated 12/30/97 at p. 2 (emphasis added); *see also* Expected Trial

Testimony of Dr. Needham).

      92.     The applicants then amended the claims and responded in part by stating:

> The rejection is traversed of all the claims as unpatentable over Higuchi.  The
> Higuchi patent ***discloses a dosage form manufactured as a jelly roll***, with [sic] is
> a spiral configuration with a possible increase in delivered drug.  However, the
> Higuchi dosage form, after ingestion gradually erodes and thereby exposes the
> drug without any consideration of the intended therapy.  ***More importantly, there
> is an absence of disclosure in Higuchi for converting the jelly roll into any
> other dosage forms, including the dosage form tablet, used by this invention,
> without destroying Higuchi.***  That is, a dosage form, oral solid dosage form, and
> the manufacture of these forms require compression, a direct applied force, to
> produce the dosage form of this invention.  Under pressure, the jelly roll would
> splatter all of its ingredients.  The jelly roll of Higuchi cannot be converted into
> any other form without destroying the structure of the jelly roll.  For example,
> compression requires a lower punch, an upper punch and a die with the
> manufacture accompanied by pressure, all of which are foreign to Higuchi.  The
> prior art textbook pertaining to the management of dosage form, Remington's
> Pharmaceutical Sciences, Seventeenth Edition, pg 1603 to 1624, (1985) teaches
> manufacturing techniques that show the Higuchi jelly roll is unacceptable for
> converting to other forms, and it must be restricted to its original design.
>
> The rejection of all claims is traversed further because the prior art does not
> provide a reference for considering Goodman and Gilman in view of Higuchi.

The Goodman and Gilman reference does not teach a sustained and ascending dose, and *the Goodman and Gilman reference does not teach how to change Higuchi into different and unrelated dosage forms for arriving at the invention of applicants without defeating the purpose of Higuchi.*

(DTX 36, Response to Office Action dated 04/06/98 at p. 7-8 (emphasis added); *see also* Expected Trial Testimony of Dr. Needham).

93.    The Examiner then allowed all the pending claims with some amendments. (DTX 36, Notice of Allowability dated 06/18/98). After some technical issues were addressed, the applicants then asked that the patent be withdrawn from issue and that an issued patent be pulled as if it had not issued. (DTX 36, Petition for Clarification dated 03/09/00). The Patent Office vacated the grant of the patent. (DTX 36, Notice Vacating Patent Grant dated 03/15/00).

### d.    Application No. 08/937,336

94.    While the '593 application was being processed, Shivanand, Ayer, Wright, Lam and Hamel filed non-provisional patent Application No. 08/937,336, which claimed the benefit of Provisional Application 60/023,286. This application relates to a dosage form for administering a drug in an ascending dose, similar to what was discussed previously with regard to the '741 application, but this one mentions the invention as relating to a laminate for use in a dosage form in contrast to the LCT tablet of the '741 application. (DTX 156 at PALZ 001075). This application again mentions that the "prior art sustained-release dosage form" is directed to a non-ascending profile over time, not an ascending profile. (DTX 156 at PALZ 001076-77). The application then goes on to more particularly describe only multilayer osmotic dosage forms. (*See also* Expected Trial Testimony of Dr. Needham).

95.    In the first substantive action, the Examiner rejected Claims 1-5 as anticipated over a patent to Jordan and Claims 1-41 as obvious over a combination of three patents. (DTX

40

156 at PALZ001140-42; *see also* Expected Trial Testimony of Dr. Needham).

96.    The applicants then cancelled some claims and amended some others. With

regard to the obviousness rejection, the applicants stated:

> According to the Examiner, Jordan teaches a first drug layer and a second drug
> layer for delivery from a dosage form. The Examiner concedes that Jordan does
> not teach a three layer dosage form having a first drug layer, a second drug layer
> and a third push layer but cites Wong and Cortese for teaching a push layer.
> Consequently, the Examiner asserts that incorporation of such a third push layer
> into the Jordan dosage form would have been obvious "because the expected
> result would have been further removal of the drug active(s) through the exit
> port." Although the cited "expected result" may be so achieved, Applicants note
> that this result is NOT the important result that was sought by Applicants,
> subsequently achieved and disclosed and claimed in the instant application, i.e., a
> dosage form adapted to release drug <u>at a rate per unit time that ascends</u>
> <u>substantially continuously for a prolonged period of time</u>. For this reason,
> Applicants believe that no motivation to combine the references in the manner
> suggested by the Examiner exists and withdrawal of the rejection is respectfully
> solicited.

(DTX 156 at PALZ 001175-76 (emphasis in original); *see also* Expected Trial Testimony of Dr.

Needham).

97.    The applicants further stated that they:

> . . . respectfully submit that the incorporation of a third push layer into the Jordan
> dosage form, as suggested by the Examiner, could not be reasonably expected to
> successfully achieve Applicants' claimed subject matter. Because the third layer
> requires a period of time to imbibe fluid and expand, the incorporation of the third
> layer would likely have no effect on the almost immediate release of drug from
> the first, fast-releasing lamina and, thus, would potentially only affect release
> from the second, slow-releasing lamina. **Exactly what, if any, effect would be**
> **expected, however, would depend on many factors relating to the interaction**
> **of the various components of the dosage form, i.e., the release rate-**
> **controlling factor could end up being determined by either the**
> **characteristics of the slow-releasing lamina or the third push layer**
> **independently of the other or the release rate might depend on some**
> **combination of the characteristics of the two layers.** The third layer might
> have no effect at all on drug release from the dosage form or might have various
> other effects such as, for example, increasing (or decreasing) the total *quantity* of
> drug released or causing an undesired "merging" of the first and second drug

41

layers due to the additional applied pushing force on the second drug layer. Consequently, the rate of drug release from either or both of the drug layers of Jordan may or may not be affected by incorporation of a third push layer. For these reasons, Applicants believe that the proposed combination would not have rendered obvious Applicants' claimed subject matter and withdrawal of the rejection is respectfully solicited.

Applicants have invented a dosage form wherein the three layer components and the surrounding semipermeable wall *are shaped and adapted to interact cooperatively such that drug contained within the first and second layers is released from the dosage form at a rate per unit time that ascends substantially continuously for a prolonged period of time.*

(DTX 156 at PALZ 001177-78 (bolding added, italics in original); *see also* Expected Trial

Testimony of Dr. Needham).

98.    The applicants then had a telephone interview and further amended the claims "to

contain consistent syntax and appropriate antecedent bases." (DTX 156 at PALZ 001182-86).

The Examiner then allowed the pending claims. (DTX 156 at PALZ 001190). But the

Applicants abandoned the application without paying the issue fee. (DTX 156 at PALZ 001193).

### e.    Application No. 09/253,317

99.    Then on February 19, 1999, all of the applications were combined into

09/253,317. (DTX 14). The applicants also filed a preliminary amendment. (DTX 14,

Preliminary Amendment dated 06/14/99).

100.    The Examiner then rejected claims 1-34 as obvious over the combination of the

Patrick et al. article and the Dong et al. patent. (DTX 14, Office Action dated 05/30/00).

According to the Examiner, Patrick teaches using methylphenidate in an extended release form,

and Dong teaches the use of a multilayer extended release delivery system for another drug,

progesterone. (*Id.* at p. 2). According to the Examiner, "[o]ne skilled in the art would have been

motivated to employ the teachings of the above references since they relate to the use of the

42

multi layer drug delivery system as claimed herein and also the use of the claimed compounds in

a sustained release formulation. The above references make clear that the claimed system of

delivery is old and well known." (*Id.*).

101.     The applicants then amended and added claims. They also argued that:

Dong et al. fail to teach or suggest any dosage form containing a longitudinally
compressed tablet core. As stated in Applicants specification at page 19, lines 8-
13, Applicants' unique LCT configuration ensures that, as the push layer expands
longitudinally with the compartment formed by the semipermeable membrane, the
surface area of the push layer in contact with the semipermeable membrane is
increased more than when other configurations are used, i.e., the configuration
taught by Dong et al.

Additionally, Dong et al. do not teach or suggest a dosage form that releases drug
at an ascending release rate as claimed by Applicants. Dong et al. merely provide
an "acceptable oral means for administering progesterone at a controlled dose
over time"...

(DTX 14, Response to Office Action dated 12/05/00 at p. 13).

102.     The examiner responded by again rejecting the claims as obvious in relation to

Dong, Patrick and a patent to Ayer. (DTX 14, Office Action dated 11/08/01). The examiner

noted that "[t]he above references differs [sic] from the claimed invention in releasing the active

ingredients in an ascending form." (*Id.* at p. 2). The examiner continued:

One skilled in the art would have been motivated to employ the teachings of the
above references since they relate to the use of the multi layer drug delivery
system as claimed herein and also the use of the claimed compounds in a
sustained release formulation. The above references also teach a core, a
semipermeable polymeric wall and another wall for pushing the therapeutic
composition. To determine the rate of release is considered to be within the skill
of the art in the absence of evidence to the contrary.

(*Id.* at p. 2-3).

103.     The applicants responded by arguing that neither Dong or Ayer deal with a

dosage form which releases at an ascending release, but rather disclose only constant (or zero

43

order) release. The applicants also argued that Patrick likewise did not disclose or motivate an increasing rate of release. (DTX 14, Amendment in Response to Office Action dated 06/06/02 at p. 12-14). The applicants again also stressed the novelty of their LCT tablet over the standard biconvex tablet shape configuration taught by Dong and Ayer. (*Id.* at p. 15).

104.    The examiner again rejected the claims and stated that Patrick teaches the ascending release form for methylphenidate. (DTX 14, Office Action dated 05/07/03).

105.    Applicants responded by investigating the release rate of the Ritalin SR product disclosed in the Patrick reference. They then provided a Declaration of Suneel Gupta which argued that the data from the Patrick article indicates that Ritalin SR has a descending rate of release, and thus, the obviousness rejection could not stand. (DTX 14, Reply Pursuant to 37 CFR § 1.116 dated 08/04/03 at p. 4-6; Declaration of Suneel K. Gupta dated 08/04/03).

106.    The application ultimately issued as the '373 patent. (DTX 14, Notice of Allowability).

### f.    Application No. 09/802,709

107.    On March 8, 2001, while the '317 application was pending, Application No. 09/802,709 was filed as a continuation of the '317 application with a preliminary amendment. (DTX 65, Preliminary Amendment dated 03/08/01). The applicants brought the "Examiner's attention [to] withdrawn U.S. Patent No. 6,034,101 .... The claims previously allowed in U.S. Patent No. 6,034,101 (claims 1-11), are the claims now presented by preliminary amendment. This application claims priority to this withdrawn patent, i.e., U.S. Application No. 08/910,593, filed July 31, 1997." (*Id.* at p. 4).

108.    Similar to some of the rejections described above, the Examiner rejected the

claims over the Dong and Patrick references. (DTX 65, Office Action dated 05/29/01 at p. 2).

The applicants then pointed out that the Examiner had not taken note of the preliminary

amendment. (DTX 65, Amendment Under 37 CFR § 1.111 dated 01/09/02 at p. 1). In arguing

over Dong with the then existing claims, the applicants stated that: "Additionally, Dong et al. do

not teach or suggest a dosage form that releases drug at a sustained and 'increasing' dose as

claimed by Applicants. Dong et al. merely provide an 'acceptable oral means for administering

progesterone at a controlled do[se] over time.'" (Id. at p. 3).

109.     The Examiner next rejected two claims as anticipated by a Dante patent, and

rejected the remaining claims as obvious over a patent to Horacke. (DTX 65, Office Action

dated 04/09/03 at p. 2). An interview summary followed which states in full that:

> Applicant will consider amending the claims to overcome the prior art rejection
> and the office will consider the amendments favorably. Agreement was reached
> pending further review of the prior art. The Patrick reference was discussed.

(DTX 65, Interview Summary).

110.     The applicants then amended the claims (DTX 65, Amendments to the Claims

dated 04/23/03). They further stated that "support for the added claims can be found in the

specification at, for example, pages 37-38 and in Figure 4." (Id. at p. 6). They also stated: "As

discussed during the interview, the claims have been amended to indicate that the recited

compositions are administered to the patient in a manner that achieves a substantially ascending

methylphenidate plasma drug concentration over specified time periods following

administration." (Id.).

111.     These claims were then rejected as anticipated over Hubbard. The Examiner

indicated that "Hubbard et al. [t]each the use of methylphenidate for the treatment of attention

deficit-hyperactivity disorder in an ascending plasma drug formulation up to about 10 hours. See

page 2, patient 3." (DTX 65, Office Action dated 09/09/03 at p. 2).

     112.    The rejection was then addressed during a telephonic interview on October 14,

2003. (DTX 65, Reply Pursuant to 37 CFR § 1.116 dated 10/15/03 at p. 4). The applicants

requested reconsideration, indicating:

> As was discussed during the interview, both curves presented for Patient Profile 3
> show attainment of maximum methylphenidate plasma concentration at about 3.5
> hours and a relatively steady concentration decline throughout the remainder of
> the measured time period. Neither curve shows an ascending plasma
> concentration over a period of "up to about 10 hours," as alleged in the Office
> Action, much less Applicants' claimed "substantially ascending []concentration
> over a time period of about 5.5 hours following administration." Accordingly, the
> rejection for alleged anticipation should be withdrawn and — since no other
> rejection has been entered — the pending claims should be passed to issue.

(*Id.*).

     113.    The claims were initially allowed, but during an internal Patent Office review

process, were identified as being allowed in error. (DTX 65, Allowed Review - Potential Clear

Error). The later action again rejected some of the claims as anticipated over Hubbard indicating

that: "The curve representing l-MPH from Patient profile 2 teaches an ascending sustained

plasma concentration up to 6 hours. The claims contain the language 'substantially ascending

methylphenidate plasma drug concentration', while the specification technically only defines

'ascending release rate.'" (*Id.* at Section III). The claims were also rejected for failure of written

description. (*Id.* at Section V). The action also indicated that the "[a]pplicant's argument

regarding the Hubbard et al reference was not correctly evaluated by the examiner" and another

rejection was noted. (*Id.* at Section XIII). Finally, the action made further notes regarding

Hubbard and concluded that "Profile #2 does anticipate the instantly claimed invention for at

least claims 37 and 46-48." (*Id.*). These comments were generally reiterated in the Office

Action dated 06/18/04.  (DTX 65).

114.    In response, the applicants amended the claims.  (DTX 65, Reply Pursuant to 37 CFR § 1.111 dated 07/14/04).  The applicants noted that they amended the claims to overcome the written description rejection.  The applicants also argued that patient profile 2 from Hubbard was not substantially ascending because it was plotted on a logarithmic basis.  The argument further stated that if the data were re-plotted it would disclose a substantial decrease in methylphenidate plasma concentration over the relevant interval.  They also filed another declaration by Dr. Gupta to that effect.  (*Id.* at p. 5-6; Declaration of Suneel K. Gupta dated 07/14/04).

115.    The applicants' counsel then interviewed the case and filed a further reply making some changes in the claims (including, canceling previously pending claims 37, 46-48, and 51-54) and filed a document called a terminal disclaimer.  (DTX 65, Supplemental Reply Pursuant to 37 CFR § 1.111 dated 08/30/04; Supplemental Reply Pursuant to 37 CFR § 1.111 dated 09/29/04).

116.    The application was then allowed to issue as the '129 patent.  (DTX 65, Notice of Allowability).

### 3.    The Boundaries, or Lack Thereof, of the Terms "Dosage Form" and "Pharmaceutically Acceptable Composition"

117.    To the extent the patents discuss dosage forms, the discussion is directed to osmotic dosage forms.  As stated earlier, the United States Pharmacopeia and the pharmaceutical literature gives helpful suggestions of the types of dosage forms that were known in the art in the 1996-1999 timeframe in which the applications were filed.  The types of dosage forms include not only the more common oral dosage forms, *i.e.*, a tablet or capsule, they also include other

47

oral dosage forms such as powders, buccal tablets and a variety of liquid products. There are also non-oral dosage forms such as nasal sprays, inhalers, transdermal patches, suppositories, creams as well as a variety of parenteral or injectable dosage forms. (DTX 656 at 1940-51; Expected Trial Testimony of Dr. Needham).

118.     Alza's expert, Dr. Davies, similarly acknowledged some additional dosage forms that he has worked on with other active ingredients. (Davies Dep. Tr. at pp. 18, 58-60).

119.     As stated in the earlier discussion regarding enablement, the claims reach any one of these dosage forms if the dosage form contains methylphenidate and operate in such a way as to provide the resulting release rates and plasma profiles indicated in the patents in suit. In other words, according to Plaintiffs, the claims cover any conceivable and possible physical method of administration of methylphenidate which provides an increasing release rate in an *in vitro* dissolution media and/or provides an increasing methylphenidate plasma profile over some specified time period. (Expected Trial Testimony of Dr. Needham).

120.     The claims of the '373 patent are directed to an ascending release rate in an *in vitro* dissolution test. Some dosage forms do not have a dissolution rate because they deliver the active ingredient through other means. Thus, this limitation could be limited to dosage forms for which an appropriate dissolution test could be constructed. Such dissolution tests could be imagined for any of the dosage forms where the active is not already in solution or in the liquid or gas phase and would include, along with the tablets, capsules and transdermals noted by Dr. Davies, creams, gels, implants, suspensions, *etc.* (Expected Trial Testimony of Dr. Needham).

121.     The dosage forms for the '129 patent, however, do not require the use of an *in vitro* dissolution test, and, as such, are unlimited by any requirement other than they include methylphenidate and that they satisfy the functional requirement of a substantially ascending

48

plasma profile. Again, it is worth noting that the "plasma drug concentration" mentioned in the

claims has been defined in the specification as including not only the measurement of the drug in

blood, but also includes the measure of the drug in *any appropriate bodily fluid and tissue*.

(DTX 1 at col. 1, ll. 42-50; Expected Trial Testimony of Dr. Needham).

122. The only other physical requirements in any of the claims are in claims 4-6 of the

'129 patent which specify the amount of methylphenidate included in the dosage form but which

do not further restrict the type of dosage form used. (Expected Trial Testimony of Dr.

Needham).

123. It is true that one of ordinary skill in the art based upon the specification of the

patents could reproduce the examples of the patents and, assuming the information contained in

those examples is accurate, could practice the claim of the patent in at least those number of

ways. However, the different types of dosage forms that one could practice without undue

experimentation are extremely limited. Hence, the amount of space occupied by the claim is

large in that it is only bounded by the result. (Expected Trial Testimony of Dr. Needham).

124. Column 2, lines 45-62, of the '373 patent discusses the prior art focus of delayed-

release and sustained release systems, and mentions several systems, including osmotic systems,

which are known in the prior art. The patent then indicates that the focus of using these dosage

forms is to "provide drug release at a substantially constant release rate over an extended time

period," which only provides for a "plasma drug concentration [which] initially ascends for a

short period of time as drug release begins and then remains substantially constant over an

extended time period as drug release continues at a constant rate." (DTX 1 at col. 2, l. 64 - col.

3, l. 3). This section continues on to note that constant-release and constant plasma profiles are

the goals of the known prior art focus in dosage form development that was mentioned in column

2. (DTX 1 at col. 3, ll. 3-12). The patent then explains that osmotic systems have been notably successful in achieving this desired constant release rate and plasma profile. (DTX 1 at col. 3, ll. 13-58; Expected Trial Testimony of Dr. Needham).

125.    The patent concludes its discussion of the prior art noting that while these constant release dosage forms are desirable in many situations, they are not therapeutically effective in all situations, including the present one. More specifically, the patent notes:

> Accordingly, there remains a need to provide methods and devices for maintaining a desired therapeutic drug effect over a desired prolonged therapy period when sustained-release dosage forms that release drug at a substantially constant rate over an extended time period are not satisfactory.

(DTX 1 at col. 4, ll. 1-6; Expected Trial Testimony of Dr. Needham).

126.    The patent then explains that the desired method of treatment relates to an ascending release rate and states that it has been surprisingly discovered that one of the prior art dosage forms, an osmotic dosage form, can be modified so as to achieve an ascending release rate over an extended period of time. (DTX 1 at col. 4, ll. 9-32; Expected Trial Testimony of Dr. Needham).

127.    In other words, this portion of the patent merely summarizes that there are dosage forms which are known to be useful in achieving the prior art focus of constant release rate and constant plasma profile. The patent, however, then states that it was surprising that one of these dosage forms, osmotic systems, which were particularly notable for meeting the previously recognized desired release and plasma levels could also meet an ascending release rate and a sustained ascending profile. In this way, the patent teaches one of ordinary skill in the art that dosage forms outside of those typically used in the prior art will be necessary to achieve the ascending release rate and sustained ascending plasma levels. (Expected Trial Testimony of Dr.

50

Needham).

128.    Therefore, the patent leads one to believe that prior art oral dosage forms will not lead to the results claimed and non-routine (or undue) experimentation would be required to come up with other non-osmotic dosage forms of the invention.  (*Id.*).

129.    Alza's expert Dr. Davies believes that the sections just cited do not indicate that the prior art cannot be readily modified to achieve the results of the claims.  Dr. Davies, however, acknowledges that he did not review the prosecution history of the patents other than to the extent they were quoted in Dr. Needham's report.  Dr. Davies' views are inconsistent with the language from the early provisionals regarding a long felt need for dosage forms that could meet an ascending release rate and a sustained ascending plasma concentration.  *See* ¶¶ 82-83, *supra*.  If, as Dr. Davies opines, it was readily within the skill of one of ordinary skill in the art to prepare dosage forms to provide the results claimed at the filing date of the provisionals, then there would not have been a long felt need for such dosage forms because any need already would have been solved.  Moreover, as explained in further detail below, the actual experimental evidence from Alza indicates that more than routine experimentation is required to enable a reasonable number of dosage forms.

130.    Even if one were to assume that the specification enables the results claimed with a significant number of different types of oral dosage forms, there is no mention of how to achieve non-oral dosage forms covered by the claims as interpreted.  And even if one were to limit the dosage forms called for in the '373 patent because of the use of an "appropriate" dissolution test to determine whether the ascending release rate is met, there is no reason to limit the dosage forms that could be used according with regard to the '129 patent. (Expected Trial Testimony of Dr. Needham).

131.    Additionally, the prosecution history indicates that the asserted claims of the patents in suit are not enabled to the full scope of the claimed invention. As mentioned in the provisional applications and throughout the prosecution process, the patentees were seeking claims to the particular dosage form. The patentees indicated that there was a long felt need for a dosage form which could provide the ascending release rate and sustained ascending profile of the claims of the '373 and '129 patent, and that the applicants had to come up with a novel dosage form to achieve the desired results. This reinforces that the applicants represented that coming up with any dosage form other than the ones described in the patents to achieve the results would be non-routine. Of course, even if one were able to develop, in a routine manner, a few additional dosage forms that could achieve the claimed results, this is a far cry from making even a dent in enabling the full scope of the claim which would cover every dosage form that achieved those results. (Expected Trial Testimony of Dr. Needham).

132.    It is worth noting that some of the provisionals and earlier applications (some of which are mentioned in the specification of the '373 and '129 patents) do mention the possibility of other types of dosage forms that might possibly achieve the results claimed. As recited above, some of the provisionals indicate that representative dosage forms including a hydrogel matrix containing a plurality of tiny pills, drug releasing beads, a concentration gradient on a polymer substrate rolled on itself, a multilayer system with increasing doses of drug, or a dosage form which release a drug from a polymer by diffusion, flux through pores or rupture of the polymer matrix may achieve the ascending release rate of the claims as ultimately issued. The application indicates that such dosage forms may be made (as opposed to have been made). (DTX 152 at PALZ 000778-80; Expected Trial Testimony of Dr. Needham).

133.    These examples, however, merely indicate to one of ordinary skill in the art that

52

one could attempt to use these approaches in attempting to achieve the desired results, but there is no teaching that such an approach had worked or would actually work. (Expected Trial Testimony of Dr. Needham).

134.    Indeed, the actual evidence in this case indicates that to the extent such dosage forms were tried, they did not work. Mr. Lam, one of the formulators whom Alza deleted as an inventor, indicated that he has a B.S. in Chemical Engineering, had been at ALZA since 1987 and had worked in formulation and product development from then through the 1996-99 time frame. Mr. Lam also indicated that he had worked on osmotic systems and other more traditional systems such as a matrix system. (Lam Dep. Tr. at JDT 00769-88). In other words, Mr. Lam had far more experience at the relevant time frame than is required of one of ordinary skill in the art (which will be discussed, *infra*). (*See also* Expected Trial Testimony of Dr. Needham).

135.    Mr. Lam testified that he was approached in 1994 to "evaluate[] if an ascending release profile can be delivered by the OROS technology", *i.e.*, through an osmotic device. (Lam Dep. Tr. at JDT 00790-93). Alza, as a company was known as of that time period to have the most expertise in osmotic devices. Yet prior to being asked to evaluate the feasibility of OROS and an ascending release rate *in vitro* for this product in 1994, Mr. Lam had not produced an ascending release profile with any active drug. (*See* Lam Dep. Tr. at JDT 00791-807; *see also* Expected Trial Testimony of Dr. Needham).

136.    Similarly, Mr. Hamel, one of the named inventors, who had worked in formulation since 1977 and by 1993 was head of all the formulators, engineers and scale-up people, also had not worked on an ascending release rate product prior to the work on methylphenidate. Mr. Hamel's background included a BS in Biology. He additionally took

53

many graduate courses in pharmacology or related fields. He took only one pharmacokinetics

course. Mr. Hamel was not directly involved in the design of Concerta. Rather, he turned that

over to Mr. Lam's group. (Hamel Dep. Tr. at JDT 00714-16; JDT 00729-31; *see also* Expected

Trial Testimony of Dr. Needham).

137.    Mr. Ayer, one of the formulators that ALZA deleted as an inventor from the

patents, indicated that he had worked on ascending release rate dosage forms previously. Mr.

Ayer received a bachelor's degree in chemistry in 1973 and then went to work at ALZA in

formulation in 1974. He continued to work there for at least the next 30 years. (Ayer Dep. Tr. at

JDT 00031-32; JDT 00037-48). Mr. Ayer recalled that some of the non-osmotic dosage forms

for two other products that he had worked on had an ascending release rate for a long period of

time. (Ayer Dep. Tr. at JDT 00039-48; *see also* Expected Trial Testimony of Dr. Needham).

138.    Mr. Ayer's testimony, even if given credit, does not affect the enablement

analysis for several reasons. First, Mr. Ayer exceeds the level of ordinary skill in the art, so what

he might have achieved in the laboratory is of little value in what one of ordinary skill would be

able to accomplish. Second, Mr. Ayer's testimony is contrary to the patents because he states

that he was able to achieve an ascending rate with osmotic devices in previous projects. If that is

true, then it should not have been surprising to the named inventors, which at the time included

him, that such an ascending release rate could be achieved.    Finally, it is not clear from Mr.

Ayer's testimony how much experimentation was required to achieve such results, which drugs

may be amenable to his approach, how many dosage forms they were able to construct which

had the claimed results, or if their results were consistent. (Expected Trial Testimony of Dr.

Needham).

139.    Mr. Lam further indicated that he began the project by looking at different

54

potential designs for an osmotic system to see if they could achieve an extended release rate and even tried at least one or two non-osmotic matrix systems. (Lam Dep. Tr. at JDT 00803-805). Mr. Lam testified at deposition that his group worked on the matrix designs for approximately a month or two, but that they did not achieve an ascending release rate. (Lam Dep. Tr. at JDT 00805-807). Alza, however, has indicated that no nonosmotic dosage forms were tested during the Concerta project. (DTX 661 at 17-18 and 20; *see also* Expected Trial Testimony of Dr. Needham).

140.    Mr. Lam further stated that they tested other designs, including both OROS designs and an unidentified number of designs that were not based on osmotic technology. Of that unidentified number of non-osmotic device formulations, Mr. Lam indicated that he did not recall that any of the non-OROS technology resulted in an ascending release rate over an extended period of time. (Lam Dep. Tr. at JDT 00866-67; *see also* Expected Trial Testimony of Dr. Needham).

141.    This evidence indicates that ALZA was only able to achieve an ascending release rate in osmotic devices, a technology area for which it was the noted expert and for which its design team was vastly beyond the level of ordinary skill in the art as depicted by Mr. Lam, Mr. Ayer, Mr. Hamel, etc. And the evidence indicates that ALZA only achieved the ascending release rate by the design of its LCT technology, which it has described as novel and sought claims for and were allowed claims on (even though it chose for its own reasons not to let those claims issue). (Shivanand Dep. Tr. at JDT 01177-78; Hamel Dep. Tr. at JDT 00735-36; DTX 663; DTX 664; DTX 665 at ALZ 00148316, ALZ 00148338; DTX 666). Even with regard to the LCT technology, ALZA was not able to utilize its more traditional bilayer product design to work in a commercial manner. Alza had to resort to the more atypical and newly developed

55

trilayer design to achieve a commercially viable product. (Lam Dep. Tr. at JDT 00908-909; Hamel Dep. Tr. at JDT 00733-36; DTX 667 at ALZ 00151022; DTX 668 at ALZ 00157396; DTX 669 at ALZ 00309730; DTX 670 at ALZ 00169419; DTX 671 at ALZ 00161211; DTX 672; *see also* Expected Trial Testimony of Dr. Needham).

142.    Mr. Hamel also noted that the LCT was brand new technology that required design of unique manufacturing equipment to support its manufacture. It is difficult to believe that, if one of ordinary skill in the art could readily make a wide variety of dosage forms to achieve the results claimed, ALZA would have gone to the time and expense to use this new technology with all its technical problems rather than modifying what was known in the art. (Hamel Dep. Tr. at JDT 00750-51; *see also* Expected Trial Testimony of Dr. Needham).

143.    Based upon all the foregoing, claims 1-4 and 6-7 of the '373 patent and claims 1 and 4-6 of the '129 patent, when read to encompass any dosage form which yields the desired results, are not enabled to the full scope of the claims

144.    Additional factors support the conclusion that undue experimentation is required to reach the full scope of the claims.

### a.    Nature of the invention:

145.    The nature of the invention of the patents, as noted above, is directed to any method of treating ADD or ADHD which uses methylphenidate and is administered in such a way to have an increasing *in vitro* rate of release and/or an increasing plasma profile. The Court's claim construction makes clear that the increasing release rate is as determined in an appropriate dissolution test. Moreover, while the claims mention a "substantially ascending plasma profile" the specification makes clear that this limitation can be met not only by testing

the plasma but also through testing of any other appropriate bodily fluid or tissue. (Expected Trial Testimony of Dr. Needham).

146.     In essence, as mentioned previously, the asserted claims cover any means or way of achieving a functional result. (Expected Trial Testimony of Dr. Needham).

147.     As the applicants noted several times during prosecution of the patents, extended release products have tended to focus on maintaining a constant release rate and/or a constant blood plasma profile for extended periods. As a general matter, one of ordinary skill in the art who would be formulating the dosage forms to achieve the claimed results would have to go beyond their typical skill set to achieve a number of dosage forms providing an ascending release rate and/or a substantially ascending plasma profile. (Expected Trial Testimony of Dr. Needham).

148.     Even if the claims were construed more narrowly and were restricted to tablets, capsules and transdermals, as advocated by Dr. Davies, there are many possible approaches one could take that may or may not yield success in achieving the desired results. (Expected Trial Testimony of Dr. Needham).

149.     Overall, formulation of a dosage form is an iterative process. A product development scientist with ordinary skill in the art, when tasked to achieve the results described in the claims, would usually take a generally known approach to developing the product. Thus, outside of the specific working examples provided in the patent, one would not know what formulations would be successful or how many changes would be necessary to affect the desired result. Given sufficient time and resources, one of ordinary skill in the art could likely come up with a few approaches that may lead to one or a few dosage forms which achieve the results desired. (Expected Trial Testimony of Dr. Needham).

57

150.    In any event, it is highly questionable to what extent, if at all, any of that development work would be useful in enabling one to practice a non-oral dosage form. (Expected Trial Testimony of Dr. Needham).

151.    Moreover, osmotic dosage forms such as those described in the patent are typically not used by formulators as a starting point to begin formulating any other dosage forms as they are typically viewed as unique unto themselves, so the examples in the patents as issued provide little, if any, guidance to creating any other dosage forms. (Expected Trial Testimony of Dr. Needham).

152.    Dr. Davies cited to several possible approaches to yield an ascending release but could not say which approaches would be successful with methylphenidate. (*See* Davies Dep. Tr. at pp. 222-224, 283-84). The art cited by Dr. Davies, similar to the opinion espoused by Dr. Needham, indicates that there were some approaches one could try, but did not indicate which approach would likely be successful. (Expected Trial Testimony of Dr. Needham).

153.    Dr. Davies, however, indicated that it would be a routine matter to make a matrix tablet with an ascending release rate for an extended period of time. (Expected testimony of Dr. Davies). However, Dr. Davies indicated that he did not review Mr. Lam's complete deposition testimony in this case. Mr. Lam's experience, as someone greater than ordinary skill in the art, was that his group spent one to two months working on a matrix formulation of methylphenidate and could not get it to provide an ascending release rate for an extended period of time. (Lam Dep. Tr. at JDT 00805-807). In addition, Mr. Lam said this group worked on many non-osmotics and could not get them to work. (Lam Dep. Tr. at JDT 00866-67). Thus, the direct evidence in this case indicates that such development was not routine.

154.    This factor weighs in favor of undue experimentation. (Expected Trial Testimony

58