of Dr. Needham).

**b.     Breadth of the claims:**

155.    The dosage forms encompassed within the asserted claims include any dosage form that achieves the results desired.  Thus, these claims are extremely broad.  (Expected Trial Testimony of Dr. Needham).

156.    As shown above, the pharmaceutical literature provides a large number and a wide diversity of various types of dosage forms.  As we know from the common specifications' recitation of the prior art oral dosage approach, each one of these dosage forms encompasses a genus with many separate species.  The claims of both patents cover any one of those dosage forms which is formulated in a way to achieve the claimed result.  (Expected Trial Testimony of Dr. Needham).

157.    With regard to claim 1 of the '373 patent, as will be discussed further below, if the ascending release rate is interpreted as being met because such a rate is discovered in any "appropriate" dissolution media (*i.e.*, in any media), this claim effectively becomes boundless because the formulations for the dosage forms can be modified in many ways so as to create a large number of dosage forms, and the dissolution media and other variables of the dissolution test (apparatus, speed, *etc.*) can be varied to a large degree in search of the "appropriate" media.  Moreover, Alza's experts have conceded that an ascending release rate does not require any particular value of increase from time period to time period; thus, ***any*** ascending release rate is covered along with ***any*** dosage form.  (Davies Dep. Tr. at pp. 230-32; Gray Dep. Tr. at pp. 72-73; Feifel Dep. Tr. at pp. 110-111; Expected Trial Testimony of Dr. Needham).

158.    As mentioned previously, Dr. Davies has expressed an opinion that the dosage

59

forms are limited to those which provide an ascending release rate in an "appropriate" dissolution method. The only dosage forms, again, according to Dr. Davies, that would meet such a limitation are tablets, capsules and transdermals. As noted before, this testimony clearly cannot limit the claims of the '129 patent which does not require that the dosage form provide an ascending release rate.

159.    Moreover, Dr. Davies opinion is based in part on his view that an "appropriate" dissolution method requires the use of a USP approved apparatus. (Davies Dep. Tr. at pp. 79-84). Such a contention is directly contrary to Alza's counsel's previous representation to the Court that Alza did not contend that an "appropriate" dissolution method required a USP apparatus. Therefore, Dr. Davies testimony on this point should be given no weight as it is an attempt to retract a representation made by Alza to the Court in hopes of limiting the dosage form limitation after Alza argued for a construction of any dosage form or pharmaceutical composition.

160.    Dr. Davies also expressed the view during deposition that the claims of the '129 patent required the use of an appropriate dissolution test. (Davies Dep. Tr. at pp 88-91; 93-95). Such testimony is at odds with both the language of the claims and Alza's repeated arguments to this Court. As such, any testimony related to limiting the number of dosage forms included in the claims of the '129 patent is not given any weight.

161.    Dr. Davies expressed that he had not considered the full scope of the claims of the '129 patent because he had not considered whether there were ways to get a substantially ascending plasma profile other than by using an ascending release rate. (Davies Dep. Tr. at pp. 135-137). Thus, Dr. Davies has not provided rebuttal evidence on this factor with regard to the claims of the '129 patent.

162.    Additionally, it is worth noting that the measurement of the plasma drug concentration required by all asserted claims except for claim 1 of the '373 patent can be "measured in any appropriate body fluid or tissue." (DTX 1, col. 1, ll. 45-50). Such language further expands the scope of the claims, especially that of claim 1 of the '129 patent. (Expected Trial Testimony of Dr. Needham).

163.    This factor also weighs in favor of undue experimentation. (Expected Trial Testimony of Dr. Needham).

### c.    The state of the prior art:

164.    As noted in the common specification and discussed above, most extended release dosage form work in the 1996-99 time frame had been done to achieve constant release rates and constant plasma profiles. The art had not focused on providing an extended ascending release rate or plasma profile. (Expected Trial Testimony of Dr. Needham).

165.    In addition, the ability to achieve specific release rates and the resulting plasma profiles was critical for only a small number of drugs and more largely studied with some dosage forms rather than others. (Expected Trial Testimony of Dr. Needham).

166.    If one were attempting to design a number of formulations using various dosage forms, much of the art did not point to specific release rates or profiles, so one would be undertaking a mostly new endeavor (as ALZA's own experience recited above indicates). (Expected Trial Testimony of Dr. Needham).

167.    Dr. Davies' testimony that the prior art taught ways to control release and thus provide any desired profile again is contrary to the other evidence in this case. While the prior art clearly taught approaches to pursue and may have even provided some approaches that might

61

work, the provisional applications and prosecution history describe a "long felt" need for providing dosage forms that achieve the result claimed. Moreover, the prosecution history includes statements by the patentee that one could not move readily from the teaching of one type of dosage form, e.g., the Higuchi jelly roll, to any other dosage form. Therefore, all the intrinsic evidence undercuts Dr. Davies' testimony. Having made assertions of long felt need and inability to move between different dosage forms in order to obtain the patents in suit, Alza cannot now backtrack through Dr. Davies' testimony and argue the opposite. (Expected Trial Testimony of Dr. Needham).

168.    Additionally, Mr. Lam indicated that Alza had worked on a matrix system, *i.e.*, one of the systems that Dr. Davies said would be routine to use to provide the ascending release rate. Despite Alza's evidence of skill in the art of controlled release recited above, Alza could not get such a dosage form to work despite spending one to two months on the project. (Lam Dep. Tr. at JDT 00805-807). Rather, according to Mr. Lam, Alza tried other formulation approaches and could not get them to work. (Lam Dep. Tr. at JDT 00866-67). Similarly, Alza had to devise an entirely new osmotic capsule to achieve the ascending release rate and the substantially ascending plasma profile. The actual experimental evidence also undercuts Dr. Davies assertions. (Expected Trial Testimony of Dr. Needham).

169.    This factor weighs in favor of undue experimentation. (Expected Trial Testimony of Dr. Needham).

### d.    The relative skill in the art:

170.    With regard to the dosage form and pharmaceutical composition limitations, *i.e.*, the formulation limitations, of the claims, Dr. Needham opined that the person of ordinary skill in the art would have had at least a B.S. (or similar degree) in Pharmacy (or a similar field such

as Chemical Engineering or Chemistry) and would have had several years of formulation

experience. In addition, the person of ordinary skill in the art would likely have had one or more

years of modified or controlled release experience, but would not have had experience in

achieving an ascending rate of release. This level of experience would have been the same

throughout the entire period of 1995-1999. (Expected Trial Testimony of Dr. Needham).

171.    Dr. Needham worked in pharmaceutical development and drug delivery in

industry from 1979 through 1989. His positions included being Director of New Product

Development for the Drug Delivery Business Unit at Travenol and being a Section Head of

Pharmaceutical Development for G.D. Searle. Dr. Needham based his level of skill in the art on

who, in his experience, would have been approached within a pharmaceutical company to

generate a formulation which would provide the required functions of the claims. (Expected

Trial Testimony of Dr. Needham).

172.    Dr. Davies has opined that one of ordinary skill in the art of controlled release

would have had a Ph.D. in Pharmacy, Chemical Engineering, or Chemistry, and three years of

experience in industry in the field of controlled release. (Expected Davies Testimony). Dr.

Davies also indicated that the Ph.D. was a necessity and that "on the job training" would not

suffice in this instance. (Davies Dep. Tr. at pp. 199-201). He based his opinion on the people he

has interacted with in academia and later (since 1997) in his company Molecular Profiles.

(Davies Dep. Tr. at. pp. 196-203).

173.    Dr. Davies only applied the question of whether undue experimentation was

required in applying his level of skill in the art to the question. He did not hypothetically apply

Dr. Needham's level of skill in the art to his analysis to determine enablement for the full scope.

(Davies Dep. Tr. at pp. 203, 208 and 209).

174.    Dr. Davies, however, believes that the general person of ordinary skill in the art of the '373 and '129 patents would be an M.D. or a Ph.D. in clinical pharmacology or a comparable scientific field and would have about two years of experience such as that gained for a residency. This person of ordinary skill, however, is not required to have formulation experience. Rather, they would have sought out Dr. Davies' person of ordinary skill in the art of controlled release. Dr. Davies also did not apply the more general level of skill in the art to the enablement analysis. (Davies Dep. Tr. at pp. 202-203).

175.    Dr. Needham had much more experience in the non-academic field as of 1996 than did Dr. Davies. Moreover, Dr. Needham's person of ordinary skill in the art matches with the experience of the actual formulators involved in the Alza work. None of those individuals had a Ph.D., and, thus, according to Dr. Davies, none of them would have been of ordinary skill in the formulation art related to the patents in suit. (Davies Dep. Tr. at pp. 199-201). Thus, the practical experience of Alza in this case does not match with Dr. Davies proposed person of skill in the art. Those individuals, however, would have more than satisfied Dr. Needham's standard of skill in the art, and the group that was assembled matches with his own industrial experience.

176.    Based upon the foregoing, Dr. Needham's level of skill in the art should be used.

177.    While the relative skill in the formulation art was fairly high as a general matter, as stated above, the relative skill in seeking formulations to achieve an ascending release rate and a sustained ascending plasma profile was not common at the time and is not required of one of ordinary skill in the art. (Expected Trial Testimony of Dr. Needham).

178.    The level of skill in achieving the ascending release rates and plasma profiles claimed in the patents in suit was much lower, and thus supports a conclusion of undue experimentation. (Expected Trial Testimony of Dr. Needham).

64

e.    **The amount of direction or guidance presented:**

179.    The common specification as issued provides only examples of osmotic dosage forms. The specifications of several of the abandoned applications referenced in the common specification give hypothetical examples of other dosage forms. A person of ordinary skill in the art would not be able to correlate, with any degree of confidence, the performance of an osmotic system to any other dosage form. The theoretical concepts, excipients used and specific formulations that are necessary to develop a successful osmotic dosage form have little relationship or direct applicability to developing a product using other types of dosage form technologies. Thus, outside the applicability to osmotic dosage forms, the direction or guidance provided to any of the other multitude of dosage forms is minimal, if not non-existent. (Expected Trial Testimony of Dr. Needham).

180.    With regard to the examples that appeared in some of the provisional and earlier applications, those examples do not appear to have been made and tested. Rather, those examples merely point out some options one may want to consider in attempting to achieve the claimed results, and thus, are merely an invitation to experiment. (Expected Trial Testimony of Dr. Needham).

181.    The evidence regarding Mr. Lam's own experience with matrix and other non-osmotic systems and ALZA's work on the osmotic devices leading to Concerta, indicates that ALZA had great difficulty in achieving a workable solution. While the patents provide guidance on how to make osmotics that Mr. Lam's group did not have, the failed matrix and other dosage form experience would have been similar to what one would have expected to occur to a person of ordinary skill in the art even after issuance of the patent because the patents do not provide guidance in that regard. (Expected Trial Testimony of Dr. Needham).

65

182.    Meanwhile, all of the guidance that Dr. Davies relies on comes from outside the patent. Thus, again, upon reading the patent, a person of ordinary skill in the art would have had to perform research outside the patent to determine what non-osmotic approaches to take. (Expected Trial Testimony of Dr. Needham).

183.    This factor weighs in favor of undue experimentation. (Expected Trial Testimony of Dr. Needham).

### f.    The predictability or unpredictability in the art:

184.    As discussed above, formulation efforts to achieve the results in the claims were not predictable because such an approach had not been the focus of most formulators (and certainly would not have been the focus of the ordinarily skilled formulator). (Expected Trial Testimony of Dr. Needham).

185.    Even in the more well defined art of constant release formulation, there would be large amounts of unpredictability. But, here, where the art was much less well defined, there would be a much larger degree of unpredictability. (Expected Trial Testimony of Dr. Needham).

186.    The patents, by focusing on osmotic dosage forms, provide minimal guidance with regard to other dosage forms, and the concept of ascending release rate or ascending plasma drug levels had not been explored to a great degree. Thus, there was a high level of unpredictability. (Expected Trial Testimony of Dr. Needham).

187.    Dr. Davies acknowledges that while he believes some dosage forms could have been made without undue experimentation, he had not undertaken a consideration of how many could be made. Rather, Dr. Davies concerned himself with whether one could have made a single non-osmotic dosage form. Indeed, Dr. Davies was unable to say whether even 10

66

additional non-osmotic dosage forms could have been made without undue experimentation. (Davies Dep. Tr. at pp. 274-275). While one dosage form might have been able to be made without undue experimentation, that does not indicate that the enablement is commensurate with the scope of claiming *all* dosage forms that achieve the claimed results. (Expected Trial Testimony of Dr. Needham).

188.    Moreover, Dr. Davies did not review the prosecution histories of the patents in suit, and has indicated that he did not recall the provisionals indicating a long felt or critical need to provide a dosage form which yielded an ascending release rate and substantially ascending plasma drug concentration. (Davies Dep. Tr. at pp. 281-83).

189.    Finally, Dr. Davies indicated that there are novel dosage forms being developed all the time. (Davies Dep. Tr. at pp. 289-91). Thus, the field is evolving and unpredictable. (Expected Trial Testimony of Dr. Needham).

190.    This factor weighs in favor of undue experimentation. (Expected Trial Testimony of Dr. Needham).

g.    **The presence or absence of working examples:**

191.    As discussed in great detail above, the only working examples, which were indicated as being novel in the common specification, are to particular osmotic formulations. (Expected Trial Testimony of Dr. Needham).

192.    The prosecution history included other examples, but all of them appear to be prophetic and not examples that were actually made or tested. No data was provided. (Expected Trial Testimony of Dr. Needham).

193.    Thus, the patents have working examples devoted to the very narrow area of

osmotic dosage forms, and any disclosure related to those osmotic devices do not provide suggestions about what is likely to work with any other dosage form. (Expected Trial Testimony of Dr. Needham).

194.    Indeed, Dr. Davies did not indicate that the osmotic tablets taught him anything about how to make non-osmotic dosage forms. Rather, he pulled other examples from the literature and based his belief on merely the request to formulate a product with an ascending release rate or a substantially ascending plasma profile.

195.    This factor weighs in favor of undue experimentation.

### h.    The quantity of experimentation necessary:

196.    Based on the fact that ascending release rates and sustained ascending profiles were not a large focus in the art and the level of skill in achieving such rates was not common, significant quantities of experimentation would be necessary. (Expected Trial Testimony of Dr. Needham).

197.    The patents and prosecution history also support this by indicating that there was a long felt need for such dosage forms (which had not been met) and that it was surprising that an osmotic form could actually achieve the claimed results. *See* ¶¶ 58, 64, 66, 70, and 126, *supra*.

198.    Furthermore, there is also the actual experience of ALZA. Mr. Lam stated that they could not get a matrix system to work. And, the fact that the project started in 1993, but that the LCT trilayer that became the commercial product was not finally decided on until 1998 suggests much experimentation. Moreover, ALZA, the experts in osmotic dosage forms, were unable to get a typical osmotic dosage form to work and instead had to develop a completely

novel osmotic dosage form to achieve the results on a consistent, reproducible basis. (Expected Trial Testimony of Dr. Needham).

199.    Alza did not have the research reproduced in the patents during this process. Hence, the quantity of experimentation to achieve one of the working examples of the patent is extremely small, if it exists, but one of ordinary skill in the art would not typically be able to correlate results from an osmotic dosage form to another dosage form. A reasonably large amount of experimentation would be expected to achieve any other dosage form, much less any significant number of dosages forms to even approximate enablement to the full scope. (Expected Trial Testimony of Dr. Needham).

200.    This factor weighs in favor of undue experimentation. (Expected Trial Testimony of Dr. Needham).

201.    One of Andrx's deponents, Xiu Xiu Cheng, indicated that they were able to develop the Andrx product with a reasonable amount of effort. (Cheng Dep. Tr. at JDT 00277-279, 00288-297). Ultimately this testimony should not be given much weight for several reasons. Dr. Cheng is clearly above the level of skill in the art, and she provided guidance to Mr. Dixit in formulating the product. The time frame in which she worked was after the 1996-99 time frame. She applied specific prior work on an oxycodone formulation (which one of ordinary skill in the art would not normally have access to or experience with) to Andrx's efforts. Furthermore, Dr. Cheng's group was merely attempting to obtain a formulation which was bioequivalent to the Concerta product. It has not been established that the formulation which Andrx decided upon is within the claims of either patent. Finally, again, even if one, or a limited number of dosage forms could be formulated without undue experimentation, the question still exists as to how many can be so formulated versus how many are claimed. (Expected Trial

69

Testimony of Drs. Needham and Cheng).

202.    All these factors weigh in favor of undue experimentation, and thus, further

support that the asserted claims are not enabled for their full scope.  (Expected Trial Testimony

of Dr. Needham).

### Conclusions of Law That the Claims Are Not Enabled for Their Full Scope Because Undue Experimentation Would Be Required to So Enable Them

203.    The enablement requirement is an important limitation on the scope of patent

claims, preventing applicants from receiving more in patent protection than they give in

disclosure.  The enablement requirement demands not only that the patent teach some way to

practice the invention, it also demands that the specification enable "those in the art to make and

use the invention as broadly as it is claimed without undue experimentation." *In re Cortright*,

165 F.3d 1353, 1356 (Fed. Cir. 1999).

204.    As the Federal Circuit stated in *In re Cortright*, lack of enablement:

> takes several forms.  The PTO will make a scope of enablement rejection where
> the written description *enables something within the scope of the claims, but the
> claims are not limited to that scope.*  This type of rejection is marked by language
> stating that the specification does not enable one of ordinary skill to use the
> invention commensurate with the scope of the claims.  On the other hand, if the
> written description does not enable any subject matter within the scope of the
> claims, the PTO will make a general enablement rejection, stating that the
> specification does not teach how to make or use the invention.

165 F.3d 1353, 1356 (Fed. Cir. 1999) (emphasis added) (citations omitted).

205.    The law specifies such a requirement due to the *quid pro quo* of the patent process

wherein an inventor is supposed to exchange progressive teaching in the art for the statutory

monopoly of the patent claims.  Therefore,

70

> The enablement requirement ensures that the public knowledge is enriched by the patent specification to a degree at least commensurate with the scope of the claims. The scope of the claims must be less than or equal to the scope of the enablement. The scope of the enablement, in turn, is that which is disclosed in the specification plus the scope of what would be known to one of ordinary skill in the art without undue experimentation.

*National Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed. Cir. 1999).

206.    The issue of enablement is a matter of law based on underlying facts. *See Automotive Techs. Int'l, Inc. v. BMW North America, Inc.*, ___ F.3d ____, 84 U.S.P.Q.2d 1108, 1114, 2007 WL 2493281 at *5 (Fed. Cir. Sept. 6, 2007); *National Recovery Techs.*, 166 F.3d at 1194.

207.    To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without "undue experimentation." *See In re Vaeck*, 947 F.2d 488, 496 (Fed. Cir. 1991) (specification must teach those skilled in the art "how to make and how to use the invention as broadly as it is claimed").

208.    Furthermore, the scope of the enablement must be commensurate with the scope of the claim or the patent is non-enabled. *See Amgen*, 927 F.2d at 1216-17. In other words, where a range of options are claimed, as here, there must be reasonable enablement of the full scope of the range. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).

209.    The specification itself does not necessarily need to describe how to make and use every possible variant of the claimed invention. Rather, the person of ordinary skill in the art may often have knowledge from the prior art, supplemented by routine experimentation, to fill in the gaps in a reference, interpolate betweens disclosed embodiments and perhaps even

71

extrapolate beyond the disclosed embodiments, depending upon the predictability in the art. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

210.    However, even if the person of ordinary skill in the art is permitted to supplement the material disclosed in the specification with what is well known in the art, that is "'merely a rule of supplementation, not a substitute for a basic enabling disclosure.'" *Automotive Techs. Int'l, Inc. v. BMW North America, Inc.*, ___ F.3d ___, 2007 WL 2493281 at *7 (*quoting Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997)).

211.    In determining whether undue experimentation is required, the Federal Circuit has applied the test from *In re Wands*, 858 F.2d 731, 737 (Fed.Cir.1988). The Federal Circuit has set forth a number of factors to guide courts in the determination of what constitutes undue experimentation, including: 1) the quantity of experimentation necessary; 2) the amount of direction or guidance presented; 3) the presence or absence of working examples; 4) the nature of the invention; 5) the state of the prior art; 6) the relative skill of those in the art; 7) the predictability or unpredictability of the art; and 8) the breadth of the claims. *Id.*

212.    The *Wands* factors do not need to be applied rigidly in every case, however. *See Liebel-Flarsheim Co.*, 481 F.3d at 1378-80; *Automotive Techs.*, ___ F.3d ___, 2007 WL 2493281 at *5-*9; *AK Steel Corp.*, 344 F.3d at 1243-45.

213.    This case is similar to several recent cases wherein the Federal Circuit affirmed summary judgment determinations of non-enablement for the full scope. Each of those cases were held to encompass claims relating to any or all of the prescribed limitations, similar to the any and all dosage forms construction that Alza successfully contended for here. *See Monsanto Co. v. Syngenta Seeds, Inc.*, ___ F.3d ___, 2007 WL 2874217 at *7 (Fed. Cir. Oct. 4, 2007) ("*any* plant cell") (emphasis in original) (attached as **Exhibit 2**); *Automotive Techs.*, ___ F.3d

_____, 2007 WL 2493281 at *6 (means construed as including mechanical and electronic sensors) (attached as **Exhibit 3**); *Liebel-Flarsheim Co.*, 481 F.3d at 1374-75 (embodiments included syringes having pressure jackets and those without pressure jackets); *Pharmaceutical Resources, Inc. v. Roxane Labs., Inc.*, Appeal Nos. 2007-1093, -1134, Slip Op. at 6 (Oct. 26, 2007 Fed. Cir. 2007) (nonprecedential) ("<u>any</u> surfactant in <u>any</u> concentration") (emphasis in original) (attached as **Exhibit 4**).

214.    In *Monsanto Co.*, the Federal Circuit upheld the finding of non-enablement for the full scope due to the claims covering two classes of flowering plants and at the time of filing it was not known how to perform the recited function on one of those two classes. _____ F.3d _____, 2007 WL 2874217 at *7-8.

215.    In Automotive *Technologies*, the claims covered both mechanical and electronic side impact sensors in cars. The claims were held not enabled for their full scope because, while the mechanical sensors were enabled, the electronic sensors were not. _____ F.3d _____, 2007 WL 2493281 at *6-9.

216.    *Liebel-Flarsheim* involved claims directed to syringes with and without pressure jackets. The Court found one class, syringes without pressure jackets, non-enabled and thus, upheld the finding of nonenablement for the full scope. 481 F.3d at 1378-81.

217.    These cases seem to indicate that adequate disclosure of a range of claimed embodiments requires more than 50% enablement. As will be discussed in greater detail below, in this instance, it is unclear how many embodiments are covered by the claims, but the range includes ***any and all*** dosage forms that achieve the results claimed. Alza's expert Dr. Davies, however, was unable to state whether even an additional 10 embodiments were enabled. Thus, the claims are not enabled.

73

218.    This conclusion is supported further by the reasoning of the previously disclosed cases finding non-enablement as a matter of law in upholding the summary judgment findings.

219.    In *Automotive Technologies*, the Court noted that two columns and five figures in the patent were devoted to mechanical side impact sensors while only one short paragraph and one figure was devoted to an electronic sensor. ___ F.3d ___, 2007 WL 2493281 at *6. In this case, both figures of the patents in suit are directed to osmotic dosage forms and approximately 10 columns are directed to specific discussion of manufacturing osmotic dosage forms. (DTX 1 at Figures 1 and 2; col. 13, l. 63 - col. 23, l. 10). Other specific oral dosage forms are mentioned in one paragraph in column 2 of the '373 patent as part of the background invention. There is no discussion of any working embodiment of a non-osmotic dosage form in the patents in suit.

220.    Similarly in *Automotive Technologies*, the textual description provided little detail regarding how such an electronic sensor would be manufactured. ___ F.3d ___, 2007 WL 2493281 at *7. Here there is no textual detail in the patents in suit regarding how to manufacture a non-osmotic dosage form which provides either an ascending release rate or an ascending plasma profile for the time claimed. Rather, the patent cites one to a textbook to read up on various other sustained release dosage forms. (DTX 1 at col. 2, ll. 45-62).

221.    In *Automotive Technologies*, as is the case here, the plaintiff argued that despite the limited disclosure, "the knowledge of one skilled in the art was sufficient to supply the missing information." ___ F.3d ___, 2007 WL 2493281 at *7. In disagreeing, the Federal Circuit quoted *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d at 1366 and stated:

> **It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement."  Although the knowledge of one skilled in the art is indeed relevant, the novel aspect of an invention must be enabled in the patent.** The novel aspect of this invention is using a velocity-type sensor for side impact

74

sensing.

___ F.3d ____, 2007 WL 2493281 at *7 (emphasis added).

222.    The Federal Circuit then noted specific statements from the prosecution history

and stated:

> Thus, according to [the patentee], using inertial or acceleration sensors to sense
> side impacts represented a "breakthrough" in side impact crash sensing.  Given
> that the novel aspect of the invention is side impact sensors, it is insufficient to
> merely state that known technologies can be used to create an electronic sensor.
> As we stated in *Genentech*, the rule that a specification need not disclose what is
> well known in the art is "merely a rule of supplementation, not a substitute for a
> basic enabling disclosure." 108 F.3d at 1366.  We further stated that the "omission
> of minor details does not cause a specification to fail to meet the enablement
> requirement.  However, when there is no disclosure of any specific starting
> material or of any of the conditions under which a process can be carried out,
> undue experimentation is required." *Id.*

___ F.3d ____, 2007 WL 2493281 at *7.

223.    Similarly, in the present case, the novel aspect of the invention according to the

patentees is the provision of methylphenidate in an ascending release rate over an extended

period of time and the substantially ascending plasma drug profile of methylphenidate.  The

patent further states that there is thus a need for dosage forms to supply the desired novel release

and profile.  (DTX 1 at col. 4, ll. 9-30).  Yet the specification only discloses osmotic dosage

forms to supply this "novel aspect of the invention" while claiming all such dosage forms.

*Automotive Technologies* makes it clear that relying on the skill in the art, and the literature

search that Dr. Davies performed to provide the skill in the art, is a concession that the

specification fails to provide the novel aspect across the full range of embodiments of the claim.

___ F.3d ____, 2007 WL 2493281 at *7 ("the novel aspect of the invention ***must be enabled in***

the patent") (emphasis added).

224.    The prosecution history is even more explicit in that it states that a:

**critical need exists for a novel dosage form** and for a novel method for administering a drug that overcomes the shortcomings known to the prior art. **This long-felt need exists for a dosage form** and for a method **for (1) administering the drug at a sustained-increasing rate that simultaneously reduces or eliminates the frequency of daily dosing;** for (2) a dosage form and a method for administering the drug in a sustained-compensating dose to substantially compensate for acute tolerance to the drug thereby maintaining a preselected clinical response; **for (3) a dosage form that administers the drug in a sustained-ascending profile clinically indicated for the management of Attention-Deficit Disorders;** and, **for (4) a dosage form** and a method for administering the drug initially and **in a sustained-ascending profile throughout the entire school day.**

(DTX 152 at PALZ 000773, lines 3-14) (emphasis added).  If only routine experimentation was required to provide the methods and dosage forms included in the art, such a "critical" and "long-felt" need to supply a dosage form and method for administering the sustained increasing release rate and sustained ascending profile would not have existed.

225.    The provisional application also stated that:

In accordance with the practice of this invention, *it has now been discovered [that] a novel dosage form can be made available characterized by an ascending rate of drug delivery over time.* The dosage form provided by this invention delivers a drug at a continuously increasing rate for a predetermined period of time. The dosage form of this invention is *unexpected* and it is a *breakaway from the prior art existing dosage form technologies that deliver a drug at a constant zero-order unchanging rate over time.* The dosage form of this invention avoids delivery at a zero order rate as it delivers a drug continuously in an ascending rate over time.

(DTX 60 at p. 6, lines 20-29).  Again, if the dosage form is *unexpected* and is a *breakaway* from the prior art, the *Automotive Technologies* decision makes it clear that the dosage forms must be enabled by the specification.  That is not the case here.

226.    The prosecution history also addresses the inability to convert between dosage forms and the nonobviousness of the dosage form.  All that intrinsic evidence indicates non-

enablement for the full scope.  *See* ¶¶ 88 and 92, *supra.*

227.    Indeed, here it is clear that Alza is not only seeking to use the prior art to

supplement the disclosure, it is seeking to use the prior art *as* the disclosure.  This is not

sufficient to provide enablement for the full scope of the claims.  Alza's expert has also basically

acknowledged in his report by referring only to the prior art that the specification does not

disclose any specific starting material (other than methylphenidate) or any of the conditions

under which a process can be carried out to provide such a dosage form.  In such a situation,

"undue experimentation is required." ___ F.3d ____, 2007 WL 2493281 at *7.

228.    Ultimately, in this case, the specification provides merely "'a starting point, a

direction for further research'" regarding any dosage form other than an osmotic dosage form.

*Id.* at *8 (*quoting Genentech*).  The specification does not provide guidance to the person of

ordinary skill in the art how to make and use any dosage form other than an osmotic dosage

form, and thus, does not enable them.  *Id.*

229.    Finally, the *Automotive Technologies* court noted that enablement of one of the

two claimed embodiments in that case was insufficient.  The court also noted the irony of the

pyrrhic victory that the plaintiff won in getting the claims construed broadly only to have the

claims found invalid based upon the expansive nature of the claim.  *Id.* at *9.  That is exactly

what has occurred here.  Having successfully argued that its claims should not be limited to

osmotic dosage forms, the patents in suit must enable all the dosage forms.  They are not so

enabled.

230.    *Liebel-Flarsheim* also strongly supports a finding of nonenablement in this case

for many of the same reasons.  481 F.3d at 1378-1380.

231.    One item worthy of particular note from *Liebel-Flarsheim* is the reliance on the inventors' testimony regarding failures to make a jacketless system. 481 F.3d at 1379 (the fact that inventors admitted that they tried unsuccessfully to produce a pressure-jacketless system supports a conclusion that undue experimentation would have been required). Similarly here, Mr. Lam, initially one of the named inventors, but in any event the formulator in charge of the development of the product, testified that they could not get matrix or other non-osmotic dosage forms to work despite considerable effort. This also supports nonenablement.

232.    *Monsanto Co.* likewise provides that if extrinsic evidence indicates that one of the dosage forms claimed (here a matrix dosage form) did not work that lack of enablement for the full scope is proper. __ F.3d __, 2007 WL 2874217 at *7-8.

233.    Indeed, in this case, everyone acknowledges that many dosage forms would be difficult to make. Dr. Davies tries to ignore those dosage forms by terming them "inappropriate." Whether appropriate or not, they are claimed. As such, the claims are not enabled to the full scope.

234.    An analysis of the *Wands* factors, which are addressed in the fact section further support a finding of nonenablement for the full scope. There are two cases that are relevant here.

235.    In the recent, nonprecedential *Pharmaceutical Resources* case, the Federal Circuit upheld a summary judgment of nonenablement for the full scope based largely on two of the *Wands* factors, *i.e.*, the unpredictability of the art and the breadth of the claims. That decision notes that the scope of the claims permitted "<u>any</u> surfactant in <u>any</u> concentration." Appeal No. 2007-1093, -1134, Slip Op. at 6.

236.    In this case, as discussed previously, the claims of the '129 patent provide for any

78

and all dosage forms which provide the required plasma profile for approximately 8 hours wherein the plasma profile can be measured in any appropriate bodily fluid or tissue. Claim 1 of the '373 patent covers any and all dosage forms which provide any magnitude of the required ascending release rate in an appropriate dissolution media. The dependent claims of the '373 patent add the additional functional requirement of the required plasma profile for approximately the specified time period(s) wherein the plasma profile can be measured in any appropriately bodily fluid or tissue. The breadth of this claim should be unquestioned.

237.    With regard to the unpredictability of the art, the court noted that the patentee stressed the unpredictability of the pharmaceutical field in question as expressed in the patent and the prosecution history. Slip Op. at 4-5. As recited above, here the patentees indicated during the prosecution history that their method represented a "breakaway" from the prior art and that you could not extrapolate between, or modify, dosage forms and expect success. *See* ¶ 88, *supra*. This clearly demonstrates the unpredictability in the art at issue.

238.    In the *Pharmaceutical Resources* case, the court found only three working embodiments were insufficient to enable the broad scope of the claims. Slip Op. at 8-10. In the present case, all of the working embodiments are slightly varying osmotic formulations. This is insufficient to enable the broad scope of these claims.

239.    The case of *Glaxo Wellcome, Inc. v. Eon Labs Mfg.*, 2002 WL 1874830 (S.D.N.Y. August 13, 2002) (attached as **Exhibit 5**) is similar to the present case.

240.    In *Glaxo*, the District Court granted summary judgment of non-enablement for an ANDA filer based on the determination that the claim was broader than what was enabled by the specification. The patent-in-suit, United States Reissue Patent No. 33,994 contained a broad claim that was directed towards a sustained release formation of bupropion hydrochloride, with a

79

specific dissolution profile. *Glaxo*, 2002 WL 1874830 at * 1. After construing the claim, the

Court next set out to determine whether the claim as construed was fully enabled under § 112.

*Id.* at *4. The Court recognized that the claim must be bounded in some way by the

specification:

> However, a claim employing functional language 'covers any and all
> embodiments which perform the recited function. Legitimate concern often
> properly exists, therefore, as to whether the scope of protection defined thereby is
> warranted by the scope of enablement indicated and provided by the description
> contained in the specification.'

*Id.* (*citing In re Swinehart*, 439 F.2d 210, 213 (C.C.P.A.1971)).

241.    In analyzing the issue of enablement, the court looked to the specification, and

specifically the two very similar working examples, through the eyes of one of ordinary skill in

the art. *Glaxo*, 2002 WL 1874830 at * 4. The court determined that due to the breadth of the

claim, the limited examples, and the unpredictability of the chemical arts, the claim was not

enabled to its full scope and, therefore was invalid. *Id.* at *5-6.

242.    Just as in *Glaxo Wellcome*, Plaintiffs have sought to eliminate all structure from

their claim terms, which raises an issue of nonenablement. *Glaxo*, 2002 WL 1874830 at *4.

There are no meaningful limitations on the claims of the patents in suit. Under the Court's claim

construction, there is no structure in these claims to provide guidance regarding how to achieve

the claims. Similarly, there are very few working examples and they all are related to osmotic

dosage forms. *Id.* at *5. Thus, the *Glaxo Wellcome* case also supports a finding of non-

enablement for the full scope.

243.    Based upon all the foregoing, claims 1-4 and 6-7 of the '373 patent and claims 1

and 4-6 of the '129 patent are not enabled for their full scope.

## Argument Regarding Undue Experimentation

As indicated earlier, the Court need not reach this argument if it has already invalidated the asserted claims as single means claims. However, should the Court view the claims as more limited in some regard, the asserted claims still lack enablement for their full scope.

All the actual evidence in this case indicates that production of even a few dosage forms, much less a sufficient number of dosage forms to provide enablement commensurate in scope to claims that cover *all* dosage forms, requires undue experimentation. The specification indicates that new osmotic dosage forms had to be generated to provide the desired release profile. (DTX 1 at col. 8, ll. 31-42). More significantly, the patentees when filing their first provisional, indicated that "a critical need exists for a novel dosage form" and that a "long-felt need exists for a dosage form . . . for (1) administering the drug at a sustained-increasing rate . . . for (3) a dosage form that administers the drug in a sustained-ascending profile . . . and, for (4) a dosage form . . . for administering the drug initially and in a sustained-ascending profile  throughout the entire school day." (DTX 152 at PALZ 000773, lines 3-14).  As has been stated before, if only routine experimentation was needed to resolve this "long-felt" need of the inventors, then the long-felt need would already have been solved.

In another provisional, the '741, the formulation group indicated that they had come up with a new dosage form which was a "breakaway" from the prior art.  Again, if it were such an easy process, *i.e.*, routine, to make dosage forms with ascending release rates, it is not clear why one would need to "breakaway" from the prior art as opposed to logically controlling release as Dr. Davies says the ordinary formulator would.  Additionally, the applicants during prosecution indicated that it would be difficult to convert between a dosage form such as Higuchi and any other dosage form. (DTX 36, Response to Office Action dated 04/06/98 at p. 7-8).

Alza's experience also indicates the fact that production of such dosage forms was anything but routine. Mr. Lam indicated that Alza had tried other non-osmotic designs, including matrix designs, during the Concerta project and was unable to get them to provide the desired ascending release rate.

All of this evidence is sufficient to demonstrate non-enablement for the full scope. Furthermore, from a legal perspective, while the prior art is allowed to *supplement* the specification, here Dr. Davies tries to use it as a *substitute* for the specification. Again, according to Dr. Davies, all one needed to know was the desired profile and the desired release rate and it would be routine to achieve it. Again, similar to the earlier discussion of the Telegraph Cases, what Dr. Davies is indicating is that there need not have been any specification as the claims were sufficient instruction. This is legally incorrect.

Finally, if one were to take Dr. Davies at his word, he was only stating that a formulator of ordinary skill in the art could make a dosage form meeting the claims. He was unable to say whether the formulator of ordinary skill in the art could make as few as ten dosage forms. The question here is a question of how many dosage forms are covered by the claims and whether a commensurate number are taught by the patent. Here, even taking Dr. Davies in the best light possible, the claims are invalid as lacking enablement for the full scope, i.e., a commensurate scope of enablement.

## C.     THE CLAIMS ARE INDEFINITE

### Findings of Fact Regarding Indefiniteness

244.     The Court has construed the "ascending release rate over an extended period of time to mean "a release of methylphenidate from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding

period interval starting at t=0 and continuing through at least the midpoint of the T90 and for at least three hours. The release rate is as determined by an appropriate in-vitro dissolution test. The ascending release rate does not include release of drug from any immediate release-drug coating that may be applied to the dosage form."

245.    Alza's position is that to determine what the appropriate test is one must first know what the dosage form to be tested is. Thus, the scope of the claim apparently includes all possible dissolution tests prior to knowledge of what is alleged to be infringing.

246.    Moreover, once the dosage form is known, according to Alza's dissolution expert, Vivian Gray:

> An appropriate dissolution test to me is the best fit to the release mechanism of the product, so "best" to me implies one.
>
> So if you had other dissolution tests, they would not be the best test, and to me, the best test would be the appropriate test.

(Gray Dep. Tr. at pp. 307-08).

247.    There are multiple variables associated with dissolution testing including the composition of the media, the apparatus, the speed of agitation, etc. (Gray Dep. Tr. at pp. 116-119) (Expected Trial Testimony of Dr. Needham).

248.    As such, it appears that the only way to determine whether a dosage form infringes is to keep testing it until it infringes. (Expected Trial Testimony of Dr. Needham).

249.    For purposes of the present analysis it is assumed Ms. Gray's position is adopted by the Court, and that an appropriate dissolution test is, in any given instance, defined by what is being tested and is the undefined "best dissolution test" for that dosage form.

250.    If one reviews the specification, only one type of dissolution test is mentioned,

83

and that test was conducted at pH 3 in Apparatus VII (DTX 1 at col. 9, ll. 29-34). According to Ms. Gray this would be an appropriate test, but it is not the only appropriate test. The number of dissolution tests that could be used under Ms. Gray's approach is literally infinite. (Expected Trial Testimony of Dr. Needham).

251.    This approach would appear to provide no boundary to the claim, so claims 1-4 and 6-7 of the '373 patent are invalid as indefinite under Ms. Gray's proposed definition. (Expected Trial Testimony of Dr. Needham).

252.    Such an interpretation also supports the conclusion of lack of enablement to the full scope since it would yet further increase the scope of the claims as discussed above. (Expected Trial Testimony of Dr. Needham).

253.    Claim 1 of the '129 patent has similar issues. Under Alza's construction, it permits infringement if any single person who would take Andrx's product would have a substantially ascending plasma profile for 8 hours. And, the specification makes it clear that the "plasma drug concentration" can be measured in any appropriate bodily fluid or tissue. (Expected Trial Testimony of Dr. Needham).

254.    Again, this claim is effectively unbounded. As such, in addition to not being enabled to the full scope, it is also indefinite because the boundary of the claims cannot be established. (Expected Trial Testimony of Dr. Needham).

### **Conclusions of Law Regarding Indefiniteness**

255.    Section 112, ¶ 2 requires that the claims "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention." If a claim fails Section 112, ¶ 2, it is "indefinite."

84

256.    A determination of indefiniteness is a matter of law. *Honeywell Int'l, Inc. v. United States Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003).

257.    The Supreme Court has stated that this language is met only:

when [the claims] clearly distinguish what is claimed from what went before in the art and clearly circumscribe what is foreclosed from future enterprise. A zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims would discourage invention only a little less than unequivocal foreclosure of the field. Moreover, the claims must be reasonably clearcut to enable courts to determine whether novelty and invention are genuine.

*United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942). *United Carbon* held claims to substantially pure carbon black described in various functional ways to be indefinite.

258.    That Court noted that the claims "fall afoul of the rule that a patentee may not broaden his claims by describing the product in terms of function." *Id.* at 234. Some of the difficulty that the Court had in that test was that it was nearly impossible to determine whether the functional limitations were met. *Id.* at 233-34.

259.    Furthermore, when testing is required, such as here, testing results that would fall in or outside of the scope of the claims depending on the method used are indefinite as leaving the party unable to discern the bounds of the invention. *Honeywell*, 341 F.3d at 1341.

260.    In this instance, with regard to the ascending release rate claims, the "appropriate" dissolution test for the claims can only be construed and determined once the alleged infringing dosage form is created. In essence, one cannot know the bounds of what an "appropriate" dissolution test is because it basically seems to be whatever test one might infringe under. Thus, claims 1-4 and 6-7 of the '373 patent are invalid as indefinite.

261.    In addition, claims 1 and 4-6 of the '129 patent are likewise invalid as indefinite since the ascending plasma drug concentration could occur in any "appropriate body fluid or

85

tissue" without defining what those fluids or tissues are.

## <u>Argument Regarding Indefiniteness</u>

The cases just cited make it clear that claims are indefinite when an alleged infringer cannot determine whether her proposed activity would infringe or not. *See id.*; *see also Morton Int'l, Inc. v. Cardinal Chemical Co.*, 5 F.3d 1464, 1470 (Fed. Cir. 1993). In this instance, Alza has made it clear that there is no definition attributable to an "appropriate" dissolution test until the proposed allegedly infringing dosage form is known. Once the proposed dosage form is known, the "appropriate" test is undefined because it does not indicate "appropriate for what?" In this instance, it appears that it is "appropriate" to indicate infringement. Since dissolution tests can admittedly be changed in many ways and are not even limited, according to Alza's arguments at the Markman Hearing, to a particular type of apparatus, claims 1-4 and 6-7 of the '373 patent are invalid as indefinite.

Additionally, there can be no question that the claims are defined by their function without structural limitation (as discussed earlier). The *United Carbon* Supreme Court case indicates that such functional claims are indefinite as overly broad and indefinite. The same is true here.[4]

Claims 1 and 4-6 of the '129 patent are likewise invalid as indefinite since the required ascending plasma drug concentration can be determined in *any appropriate body fluid or tissue*. This language gives one no idea as to how many bodily fluids or tissues one should test in to determine infringement. In addition, it is unclear as to whether an alleged infringer could infringe in one fluid but not infringe in tissue or another fluid. Since one cannot conclusively

---

[4]    While the Federal Circuit cannot, of course, overrule the Supreme Court, it has indicated that claims that are defined only by their function, *i.e.*, single means claims, are more appropriately invalid due to lack of enablement for the full scope rather than indefiniteness. *Hyatt*, 708 F.2d at 714.

86

determine whether they infringe or not, these claims are likewise invalid for indefiniteness. *See Honeywell*, 341 F.3d at 1341.

### D.    THE INVENTION CLAIMED IN THE '129 PATENT IS ANTICIPATED

#### Findings of Fact Regarding Anticipation

262.    As interpreted by this Court and as expanded upon by Alza's proposals regarding what constitutes a slight dip, claim 1 of the '129 patent literally covers the situation where any individual anywhere in the world on a single day is administered a dosage form containing methylphenidate for treatment of ADD or ADHD and achieves a substantially ascending plasma drug concentration for a period of 8 hours in any appropriate fluid or tissue.

263.    If that is the total construction adopted by this Court, then such a profile would have occurred at least once in at least one person upon administration of Ritalin SR.  (Expected Trial Testimony of Dr. Mayersohn).

264.    Indeed, Dr. Feifel, one of Alza's experts, conceded at much at deposition.  At deposition, Dr. Feifel was asked the following questions and gave the following answers:

Q:    Okay fair.  Now with Ritalin SR, I guess as we've talked about, that generally produced a flat methylphenidate profile; is that fair?

A:    That's fair.

Q:    What's your view as to – if you looked at every patient who ever received Ritalin SR, what's your view as to whether any of those ever exhibited a methylphenidate plasma concentration that ascended from zero to eight hours?

A:    Oh, boy.  It's an incredibly speculative question.  I think what you're asking is if I were to take all the patients who ever received Ritalin SR and was able to view their plasma levels would there be at least one of them that demonstrated an ascending profile?

Q:    Yes.

A:    I think that there's a good chance that that would have happened.

87

Q:    And ascending plasma profile over eight hours; is that fair?

A:    I think that – if the numbers were high enough and I assume that there were – altogether thousands if not millions of patients given – prescriptions given or doses given, that there would be one profile that would fit that pattern.

Q:    Ritalin SR was on the market beginning in 1983, correct?

A:    I'm not sure, but that – I know that it was available in the '80s.

Q:    And as I think you intimated, hundreds of thousands if not millions of patients received Ritalin SR; is that correct?

A:    Correct.

Q:    And out of all those patients, the odds are overwhelming that at least one had a plasma concentration profile of methylphenidate that ascended from zero to eight hours; is that fair?

[Alza counsel]: Objection; vague.

A:    I would say that that's a reasonable guess given known variability from patient to patient and . . .

(Feifel Dep. Tr. at pp. 187-188).

265.    Dr. Feifel was not asked any questions regarding clarification at his deposition by counsel for Alza.  However, on September 7, 2007, Dr. Feifel submitted an errata sheet "clarifying" his testimony as follows (additions emphasized):

Q:    Okay fair.  Now with Ritalin SR, I guess as we've talked about, that generally produced a flat methylphenidate profile; is that fair?

A:    That's fair.

Q:    What's your view as to – if you looked at every patient who ever received Ritalin SR, what's your view as to whether any of those ever exhibited a methylphenidate plasma concentration that ascended from zero to eight hours?

A:    Oh, boy.  It's an incredibly speculative question.  I think what you're asking is if I were to take all the patients who ever received Ritalin SR and was able to view their plasma levels would there be at least one of them that demonstrated an ascending profile?

Q:    Yes.

88

A:    I think that there's a good chance that that would have happened in the sense that a patient could conceivably have a higher plasma concentration at hour 8 than earlier in the day.  I do not believe, however, that a patient taking Ritalin SR would have a plasma concentration that reached a maximum at about 8 hours.

Q:    And ascending plasma profile over eight hours; is that fair?

A:    I think that – if the numbers were high enough and I assume that there were – altogether thousands if not millions of patients given – prescriptions given or doses given, that there would be one profile that would fit that pattern *in the sense that a patient could conceivably have a higher plasma concentration at hour 8 than earlier in the day.  I do not believe, however, that a patient taking Ritalin SR would have a plasma concentration that reached a maximum at about 8 hours.*

Q:    Ritalin SR was on the market beginning in 1983, correct?

A:    I'm not sure, but that – I know that it was available in the '80s.

Q:    And as I think you intimated, hundreds of thousands if not millions of patients received Ritalin SR; is that correct?

A:    Correct.

Q:    And out of all those patients, the odds are overwhelming that at least one had a plasma concentration profile of methylphenidate that ascended from zero to eight hours; is that fair?

[Alza counsel]: Objection; vague.

A:    I would say that that's a reasonable guess given known variability from patient to patient [and . . .] *in the sense that a patient could conceivably have a higher plasma concentration at hour 8 than earlier in the day.  I do not believe, however, that a patient taking Ritalin SR would have a plasma concentration that reached a maximum at about 8 hours.*

(Feifel Dep. Tr. at pp. 187-188 and errata sheet) (additions emphasized).

266.    Dr. Feifel's attempt to take back his testimony is unsuccessful because Alza's construction permits the maximum concentration to occur significantly prior to 8 hours as long as the profile has risen for more than 60% of the time and the decline from the maximum concentration has not dropped more than 15%.  Therefore, it is not required that the plasma concentration reach its peak at about 8 hours.

89

267.    Thus, one person who took Ritalin SR would have met the limitations of claim 1 of the '129 patent as interpreted by this Court and further expanded upon by Alza.

### Conclusions of Law Regarding Anticipation

268.    Alza has argued that if Andrx were to market its product it would induce infringement of claim 1 of the '129 patent if even one patient had a substantially ascending plasma drug concentration over about 8 hours.

269.    A finding of induced infringement requires an underlying finding of direct infringement. *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1033 (Fed. Cir. 2002).

270.    It is black letter law that that which literally infringes if later anticipates if earlier. *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.,* 412 F.3d 1319, 1322 (Fed. Cir. 2005).

271.    Thus, if the dosing of Andrx's product to a single person would induce infringement if the plasma limitations were met, the same would be true of the plasma profile generated by Ritalin SR.

272.    Since Ritalin SR was on the market for more than a decade prior to the earliest possible filing date of the '129 patent, based upon the evidence, claim 1 must be anticipated.

273.    To hold otherwise would prevent the public from practicing the prior art of using Ritalin SR to treat ADHD.  Such preclusion is not allowed.  *See SmithKline Beecham Corp. v. Apotex Corp.,* 403 F.3d 1331, 1345-46 (Fed. Cir. 2005); *Schering Corp. v. Geneva Pharms., Inc.,* 339 F.3d 1373, 1379-81 (Fed. Cir. 2003).

### Argument Regarding Anticipation

Anticipation, like infringement, is a question of fact. *Upsher-Smith Labs., Inc. v. Pamlab,*

90

*L.L.C.,* 412 F.3d 1319, 1322 (Fed. Cir. 2005). There is symmetry between anticipation and infringement summarized by the maxim that that which literally infringes if later anticipates if earlier. *Upsher-Smith Labs.,* 412 F.3d at 1322. In this instance, Andrx only alleges anticipation of claim 1 of the '129 patent, and Andrx's allegation is based on the symmetry between anticipation and infringement.

In this case, Alza has made it clear throughout that its view is that if even one person taking a single dose of the Andrx proposed products has a substantially ascending plasma drug concentration over a time period of about 8 hours, such a use would infringe, and presumably, under Alza's thinking, Andrx would be liable as an indirect infringer. The other side of the coin for Alza, however, is that if such a single use would infringe now, a single use of a once a day methylphenidate product (Ritalin SR) in the prior art would be anticipatory.

While there is no specific data indicating that Ritalin SR had such a plasma profile, both plaintiffs expert Dr. Feifel and Andrx's expert Dr. Mayersohn acknowledge that based upon the known variability of individual blood levels and the number of doses or Ritalin SR dispensed. It is beyond belief that at least one person did not have such a plasma profile.

Moreover, it is clear that Ritalin SR met the other limitations of the claim as it was a pharmaceutically acceptable composition containing methylphenidate and was used for treating ADHD. It had other ingredients that acted as pharmaceutically acceptable carriers. Thus, if the plasma drug concentration of Ritalin SR substantially ascended to around 8 hours, it would anticipate.

Apparently, realizing that more than a month after Dr. Feifel's acknowledgement that such a profile would have undoubtedly occurred with Ritalin SR, Dr. Feifel "clarified" his testimony. Even with the "clarification," however, Dr. Feifel does not completely rescind his

statement rather he focuses on the wrong aspect, *i.e.*, whether the Cmax would occur around 8 hours. Alza's interpretation permits some descent (up to 15% from Cmax) before the plasma profile stops being substantially ascending. In any event, Dr. Feifel's litigation derived "clarification" should not be countenanced. The clear facts in this case indicated that the use of Ritalin SR anticipated claim 1 of the '129 patent at least with regard to how Alza would further construe that claim. To hold otherwise would prevent the public from practicing the prior art of using Ritalin SR to treat ADHD. Such preclusion is not allowed. *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345-46 (Fed. Cir. 2005); *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379-81 (Fed. Cir. 2003).

## E.    THE CLAIMED INVENTIONS ARE OBVIOUS

### Findings of Fact Regarding Obviousness

#### 1.    The Prior Art and Ascending Plasma Profiles

274.    By 1996, methylphenidate had been known for many years as a prominent treatment for ADHD. (DTX 1 at col. 6, l. 66-col. 7, l. 1; DTX 621; DTX 622; Expected Trial Testimony of Dr. Mayersohn).

275.    Methylphenidate was, and is, a controlled substance, and the population that is most frequently treated for ADHD is school aged children. (DTX 1 at col. 6, l. 66 - col. 7, l. 13). For such therapy, an immediate release ("IR") dosage form is not the most desirable form because methylphenidate has a relatively short half-life in the body. As a consequence, while taking multiple doses of an IR dosage form provided good efficacy, it was generally necessary for the doses to be taken approximately every four hours. Such a dosing regimen required that at least one dose be taken during school hours. This further meant that school personnel were required to deal with various issues relating to the administration of a controlled substance.

Thus, at the time, it would have been desirable to have a dosage form that provided efficacy comparable to a multiple dosing regimen of the IR product but which could be taken less frequently and, ideally, only once-a-day.  (DTX 1 at col. 7, ll.1-40; DTX 622; Expected Trial Testimony of Dr. Mayersohn).

276.    Ritalin SR was intended to be that product, but two issues were identified with that product.  Those issues were: (1) there was a time delay in the provision of an initial therapeutic effect, and (2) Ritalin SR seemed to lose therapeutic effectiveness toward the end of the school day.  (DTX 1 at col. 7, ll. 40-49; DTX 621 at 499; Expected Trial Testimony of Dr. Mayersohn).

277.    Faced with this problem, a person of ordinary skill in the art, like the inventors, would search the relevant art to understand why sustained release methylphenidate was not as effective as the standard IR methylphenidate multiple dosing regimen.  There were several publications which characterized the plasma profile of Ritalin SR, and those publications indicate that Ritalin SR was a traditional controlled release product which would "ramp-up" the blood concentrations of methylphenidate at a rate slower than that associated with an IR dosage form, would reach a plasma concentration above the minimum therapeutically effective plasma concentration, and would maintain that concentration at a fairly constant level for an extended period of time.  (DTX 624 at 946; DTX 625 at 170; Guinta Dep. Tr. at JDT 00476-480).  The data obtained for Ritalin SR indicated that it was a fairly well defined, conventional controlled release product (i.e., maintained relatively constant plasma concentrations), but the fact remained that it was not an ideal once-a-day product.  (Guinta Dep. Tr. at JDT 00476-480).  Thus, the data clearly indicated that a relatively constant plasma concentration-time profile was not, for some reason, providing ideal therapy.  (Expected Trial Testimony of Dr. Mayersohn).

278.    While Alza's experts Drs. Feifel and Patrick acknowledge that Ritalin SR was not viewed as being terribly effective in general, they have sought to insert doubt into whether or not it was known that Ritalin SR lost efficacy over the course of the day.  However, Dr. Guinta and Mr. Hamel, both of them named inventors, acknowledge that Alza undertook the project because it was approached by doctors indicating to them that they need a once a day methylphenidate product for ADHD, and that Ritalin SR was not that product because it lost efficacy over the course of the day.  (Guinta Dep. Tr. at JDT 00399-400, JDT 00476-480; Hamel Dep. Tr. at JDT 00718-724, JDT 741).

279.    Indeed, the patents in suit state that such a decreasing efficacy over the course of the day was known in the prior art even if it was only known anecdotally.  The common specification indicates:

> In fact, such a sustained-release dosage form of methylphenidate has been commercially available for several years.  Clinical experience with this dosage form, however, has been disappointing in that behavioral symptoms in patients taking the controlled-release dosage form is less well-controlled later in the day compared to those patients taking multiple doses of the immediate-release dosage form.

(DTX 1 at col. 7, ll. 40-47; Expected Trial Testimony of Dr. Mayersohn).

280.    Even Alza's experts admit that Ritalin SR was known to have a fairly good, flat plasma concentration time profile, but the evidence indicated that that profile did not work well.  Even before trying to figure out why the flat profile did not work well, the art would have indicated that there were only 4 to 5 known types of profile which might have provided sustained activity for methylphenidate.  Those profiles were (1) ascending, (2) substantially ascending, (3) typical sustained release (flat or plateau), (4) pulsatile (i.e., a single dosage form which mimics the profile of two immediate release tablets separated in time), and (5) a hybrid substantially

94

ascending and sustained release. (Expected Trial Testimony of Dr. Mayersohn).

281.    A profile that is ascending, *i.e.*, without any deviations from its steadily rising plasma concentration-time profile would be a subset of a substantially ascending profile, *i.e.*, a profile which would permit, but not require, a period of non-ascent.  Ritalin SR was a flat profile (plateau) which was already known not to work very well.  That left only three other potential once a day profiles.  A pulsatile profile would have been known to work since it would model the twice a day administration already used in the art.  Thus, the only profiles left were the substantially ascending profile or a hybrid profile.  As such, there were minimal choices, so a person of ordinary skill in the art would be motivated to test the other profiles against Ritalin SR. (Patrick Dep. Tr. at pp. 17-20; Expected Trial Testimony of Dr. Mayersohn).

282.    Indeed, that is exactly what Alza did.  Their initial test compared a flat profile against the pulsatile and the ascending profiles.  (DTX 73).  This was an obvious study to undertake.

283.    Also, a person of ordinary skill in the art would have known an ascending profile would be effective to treat ADHD.  The question with the ascending profile would be at what point, if at all, would side effects occur due to the rising blood plasma drug levels.  Efficacy would have been expected, however, based upon the known therapeutic level supplied by immediate release methylphenidate and Ritalin SR.  (Expected Trial Testimony of Dr. Mayersohn).

284.    Moreover, there was additional art which specifically indicated that one would be motivated to generate a substantially ascending plasma profile for at least 8 hours.

285.    In investigating methylphenidate (and central nervous system stimulants

generally) to determine why a relatively constant plasma concentration-time profile might cause

loss of efficacy over the course of the day, two thoughts were evident in the prior art. First, it

was known that acute tolerance had been shown to exist for central nervous system ("CNS")

stimulants generally. (DTX 626). It had been specifically noted that "a type of tolerance to CNS

stimulants that clearly does occur clinically is an acute tolerance after a single dose." (DTX 626

at 112). Since methylphenidate is a CNS stimulant, upon reading the Angrist publication, a

person of ordinary skill in the art would understand that methylphenidate would also likely

exhibit acute tolerance. (Expected Trial Testimony of Dr. Mayersohn)

286.    Indeed, the patentees acknowledged that this teaching was in the prior art when

they cited it in the background section of the '514 provisional application. Specifically, they

stated:

> A drug dispensed from a prior art sustained-release dosage form may ascend
> initially but not over the entire dosing interval, and it actually may decline over
> time. That is, these sustained-release dosage forms dispense a drug in a
> nonascending profile over time, as they do not provide a continuously increasing
> release rate per hour throughout the extended dosing period. . . . ***For drugs that
> act on the central nervous system, like methylphenidate, dispensed from a
> sustained-release nonascending dosage form, the patient often develops an
> acute tolerance to the drug manifested by a shortened duration and a decrease
> in the intensity of the therapeutic effect needed for acceptable therapy. The
> prior sustained-release delivery is also devoid of means that compensate for its
> shortcomings inherent therein.***

(DTX 152 at PALZ 000772, line 19 - 000773, line 2 (emphasis added); Expected Trial

Testimony of Dr. Mayersohn).

287.    Additionally, in an article devoted to sustained release methylphenidate,

Birmaher, *et al.* noted that:

> preliminary descriptive comments can be made about MPH-SR pharmacokinetics.
> The flattened curve of MPH plasma concentrations after MPH-SR ingestion (Fig.

2) resembles that seen with long-acting dextroamphetamine sulfate by Brown et al. (1980). This prolonged, stable level raises a question about whether MPH-SR may be more prone to tachyphylaxis, similar to that seen using a [sic] sympathomimetics with longer half-lives than standard MPH, such as the amphetamines (Nedergaard et al., 1988) or inhaled beta adrenergic agonists (Pauwels, 1988).

(DTX 627 at p. 771; Expected Trial Testimony of Dr. Mayersohn).

288.    This art specifically indicated that tachyphylaxis (or acute tolerance) was a possible issue with regard to Ritalin SR. (DTX 153; DTX 630 at 6; Expected Trial Testimony of Dr. Mayersohn).

289.    Again, Alza has acknowledged that the art so taught. Prior to the patents in suit issuing and causing this litigation, Alza used a Citizen's Petition to delay Andrx's generic product from gaining entrance to the marketplace. In one of its papers to the FDA filed September of 2004, McNeil, Alza's sole authorized distributor of Concerta, indicated that methylphenidate had been known to have acute tolerance and cited to the 1991 Perel Abstract. (DTX 141 at Vol. 1, page 9; Expected Trial Testimony of Dr. Mayersohn).

290.    Tolerance is defined in the art as the condition under which a larger dose of drug or a higher plasma concentration of the drug is required to achieve the same pharmacological effect in the same subject on different occasions. In many cases, tolerance occurs over time and during prolonged exposure to the drug. For example, one may think of the well known and thoroughly documented acquired tolerance to the pain relieving effects of the drug class of analgesic opioids. During long term exposure to drugs in this class, a human subject becomes progressively more tolerant to the analgesic, pain relieving pharmacological effects of those agents. It is common for patients needing long term pain relief from, for example cancer-induced pain, to require large increases in the dose of opioid during the course of therapy. Indeed, in

97

severe cases of pain, patients are permitted to self-administer opioids *via* intravenous infusion pumps in order to better control pain and overcome the tolerance effect.  (Expected Trial Testimony of Dr. Mayersohn).

291.    Acute tolerance, on the other hand, is a tolerance that occurs over a short time period, typically over the course of hours or over a day, and it may be observed following a single dose of the drug.  Typically, however, the acute tolerance effect dissipates rather quickly as might happen during a period of no drug administration.  One can think of this as a "rebooting" or normalization of the body system.  Such a situation is known to occur for nicotine obtained from cigarette smoking.  The first cigarette of the day provides the effect that the smoker desires, but the effect is modulated as smoking continues either from that first or from subsequent cigarettes smoked shortly after the first cigarette.  (DTX 628; DTX 629; Expected Trial Testimony of Dr. Mayersohn).

292.    As mentioned above, the prior art indicated that CNS stimulants were known to cause acute tolerance.  More specifically, the prior art indicated that acute tolerance might contribute to the less-than-ideal results obtained from Ritalin SR.  One of ordinary skill in the art, being aware of this well known pharmacological phenomenon, would realize that a constant rate of drug release and a corresponding constant plasma concentration of drug would result in reduced therapeutic efficacy over the course of the day or even after the first dose of drug as the tolerance mechanism set-in.  One of ordinary skill would also have known that an increased dosing rate (or greater plasma concentrations) would be needed to overcome this tolerance.  (DTX 633).  Finally, treatment of ADHD with use of stimulant drugs typically is not continued during the evening hours so as to not cause sleep difficulty due to the stimulant effect.  This period of no treatment allows the patient's system to "reboot" and start anew the next day.

(Expected Trial Testimony of Dr. Mayersohn).

293.    Thus, one of ordinary skill would have been motivated to formulate a dosage form to overcome the acute tolerance associated with Ritalin SR. To do so, one would know that increasing doses or increasing rates of drug delivery would be a logical option. (DTX 631; Feifel Dep. Tr. at pp. 91-92). Practicing such a method of drug delivery would necessarily lead to substantially increasing blood plasma concentrations over an extended period of time. And, with the patient population that is being treated, school age children, and the typical school day being on the order of 7-8 hours (followed by homework), one of ordinary skill in the art would have been motivated to seek to attain an increasing plasma concentration of methylphenidate for an 8 hour period (or possibly even for several hours longer) to permit control throughout the school day. (Expected Trial Testimony of Dr. Mayersohn).

294.    Additionally, the art at that time suggested that ADHD drugs (including methylphenidate) were effective during the absorption phase following oral dosing. (DTX 630). The absorption phase following an oral dose of a drug is characterized by increasing plasma drug concentrations. This rise in plasma concentrations occurs since the rate of drug input into the body (*i.e.*, drug movement from the gastrointestinal tract to the bloodstream) is greater than the rate of loss of drug from the body during those early post-dosing times. (Expected Trial Testimony of Dr. Mayersohn).

295.    The concept that the effects of psychostimulant effects on ADHD are related to the rate of absorption again raised the possibility that Ritalin SR induced acute tolerance. (DTX 630 at 6; Expected Trial Testimony of Dr. Mayersohn).

296.    This understanding of the pharmacology and pharmacokinetics of drugs such as methylphenidate, as outlined in the preceding paragraphs, would lead a person of ordinary skill

99

in the art to create a product that provides an ascending plasma concentration-time profile over the time period associated with the school day (*ca.*, 7-8 hours). (Expected Trial Testimony of Dr. Mayersohn).

### 2.    The Prior Art and Ascending Release Rates

297.    There is more than one way to achieve an increasing plasma concentration-time profile during a defined period of time. In seeking to determine which approach one might take, the person of ordinary skill in the art would have been led directly to study art which indicated how to provide appropriate treatment for conditions where acute tolerance was an issue. (Expected Trial Testimony of Dr. Mayersohn).

298.    Therefore, a person of ordinary skill in the art would have reviewed scientific literature and patents relating to tolerance to drugs and methods of overcoming tolerance. (Expected Trial Testimony of Dr. Mayersohn). In his or her search, during the mid-1990s time period, the person of ordinary skill would have been aware of an article by Ho-Leung Fung. This publication was concerned with nitrates for use as a treatment of angina. (DTX 631).

299.    As of 1995 it was known that the use of nitrates for angina resulted in acute tolerance. Therefore, antianginal research would have been looked to as an example of how to deal with acute tolerance, the very issue facing methylphenidate. (Patrick Dep. Tr. at p. 202; Expected Trial Testimony of Dr. Mayersohn).

300.    The Fung publication indicated that a nitrate drug, isosorbide dinitrate, produced tolerance within 6 to 10 hours after oral dosing. Tolerance created to that drug disappeared during the course of the day. (DTX 631 at 25; Expected Trial Testimony of Dr. Mayersohn).

301.    Significantly, based upon data from other studies conducted with isosorbide

100

nitrate, Fung stated that a, "rising nitrate 'blood level' may be beneficial in producing sustained nitrate action", rather than dosing with a controlled release dosage form which sustained nitrate plasma concentrations at a relatively constant value. (DTX 631 at 24, 25 and Figure 4; Expected Trial Testimony of Dr. Mayersohn).

302.    The article also discussed a transdermal nitroglycerin system that aimed at producing sustained steady-state nitrate plasma concentrations. Although it had been stated that such a dosing device would be effective for 24-hours after application to the skin, this was shown not to be true; this dosing approach was not effective for the full time contemplated, similar to the situation that existed with Ritalin SR. (DTX 631 at 25; Expected Trial Testimony of Dr. Mayersohn).

303.    Thus, Fung concluded that, "it would appear that this conventional dosing mode may not be optimum for sustained nitrate therapy." To overcome this nitrate tolerance, "an alternate input mode might be one that involves *escalating rates of drug delivery so that increasing systemic nitrate concentrations may be achieved.*" (DTX 631 at 25) (emphasis added). This publication further proposed a composite dosing mode that involves escalating input of nitroglycerin during the waking hours coupled with a period of no drug release. That hypothesis, however, was not actually tested. (DTX 631 at 25). Nevertheless, this art would have clearly indicated to one of ordinary skill that for the effective treatment of acute tolerance one could use a dosage form that offered an increasing rate of drug release resulting in an ascending pattern of plasma concentrations versus time. (Expected Trial Testimony of Dr. Mayersohn).

304.    Alza's expert Dr. Patrick is expected to contend that the pertinent art did not include art (such as Fung) that relates to nitrates and anginal treatments because one of ordinary

skill would not extrapolate between different drugs and different treatments. (Patrick expected testimony). Dr. Patrick also is expected to contend that in any event Fung is not helpful because Fung later indicated that he was unable to successfully generate a dosage form that both avoided tolerance and continued the therapeutic effects, *i.e.*, he was unable to generate the dosage form with the profile mentioned in the 1984 article.

305.    With regard to the first point, Dr. Patrick agreed that the relevant art included formulation art generally, whether used for ADD or ADHD treatment or not. (Patrick Dep. Tr. at pp. 139-141). Furthermore, Dr. Patrick was only able to think of only three instances of acute tolerance specifically known in the art as of 1995. Those three instances would be (1) drug abuse of stimulants (such as methylphenidate), (2) bronchodilators, and (3) nitrates for treatment of angina. (Patrick Dep. Tr. at pp. 199 and 202; Feifel Dep. Tr. at p. 83). Based upon the suggestion that the problem with sustained release methylphenidate could be due to acute tolerance, long term treatments directed to overcoming the acute tolerance of nitrates would be especially relevant. Finally, to the extent Dr. Patrick suggests that one cannot extrapolate between dosage forms containing different actives and different treatments, this emphasizes that the claims at issue are not enabled for their full scope (as discussed previously). (Expected Trial Testimony of Dr. Mayersohn).

306.    With regard to Dr. Patrick's second expected contention, *i.e.*, that Fung was unable to create the desired dosage form, that again indicates that the claims are not enabled for their full scope. In any event, the claims presently call for any dosage form which would achieve the claimed results, and as will be seen below, a few such dosage forms were known in the art. (Expected Trial Testimony of Dr. Mayersohn).

307.    In further searching of the prior art, one of ordinary skill in the art would have

102

found U.S. Patent 4,956,181 by Bayer *et al.* which was issued on September 11, 1990. (DTX 632). This patent cited the Fung publication. (DTX 632 at col. 1, ll. 42-61). The patent describes a method of administering nitrates in a way to avoid tolerance through a transdermal patch applied to the skin. Following an initial washout period, the nitrate is delivered at an effective rate and, after achieving that rate, the delivery rate is then increased over a "ramp-up" time period of from about 8 to about 21 hours. (DTX 632 at col. 3, ll. 10-50). While the patent is directed to transdermal dosage forms, the inventors indicated that other dosage forms, including oral dosage forms, can be used. (DTX 632 at col. 4, ll. 19-24; col. 8, ll. 51-57 (mentioning oral dosage forms as well as others); col. 10, ll. 1-25; Expected Trial Testimony of Dr. Mayersohn).

308.    One of ordinary skill in the art would also have been aware of Kochinke *et al.*, U.S. Patent No. 5,613,958 which was issued on March 25, 1997. (DTX 633). Kochinke was filed June 6, 1995. That filing was a continuation-in-part of an application dated May 12, 1993. (Expected Trial Testimony of Dr. Mayersohn).

309.    Kochinke *et al.* indicate that their discovery is directed to a device for delivery of tolerance-inducing drugs. (DTX 633 at col. 1, ll. 16-18). Table I in column 7 indicates that methylphenidate hydrochloride is one of the drugs which could be delivered by the system claimed. The system is described as specifically containing a three-phase delivery system: (1) an initial "ramp-up" period for increasing blood concentrations which ends between 2 and 10 hours after application; (2) the second phase is a period for maintaining blood concentrations; and (3) phase 3 permits a decrease in blood concentrations of the drug. (DTX 633 at col. 2, ll. 15-32; Figs. 4 and 10). The term "tolerance" is used in the patent to include both long-term tolerance and acute tolerance (tachyphylaxis or desensitization). (DTX 633 at col. 6, ll. 54-67). This drug

dosing system provides for substantially ascending plasma concentrations over an extended period of time. (DTX 633 at col. 15, ll. 4-44; col. 16, ll. 3-19; Figs. 2, 4 and 10; Expected Trial Testimony of Dr. Mayersohn).

310.    Alza's expert Dr. Patrick criticizes the use of Kochinke and focuses on the extent of time it takes to reach the maximum blood plasma concentration (Cmax). (Expected Patrick testimony). Dr. Patrick acknowledged at deposition that based upon his understanding of Alza's position regarding the time period for substantial ascension, the plasma profile can still be considered to be substantially ascending until the plasma concentration decreases more than 15%. (Patrick Dep. Tr. at p. 206). Under this definition, Dr. Patrick's criticism vanished, and he was both unable to, and, in his view, unqualified to, determine at what point in time the various figures in Kochinke stopped their substantial ascension. (Patrick Dep. Tr. at pp. 207-12).

311.    The person of ordinary skill in the art, having read the prior art scientific, clinical and patent literature, would have been led to the creation of a dosage form to solve the clinical disadvantages associated with the Ritalin SR product. (Expected Trial Testimony of Dr. Mayersohn). The solution taught by the prior art was a once-a-day methylphenidate formulation which provided an escalating rate of drug delivery in order to achieve an ascending pattern of plasma concentrations of methylphenidate over an extended and defined period of time (Expected Trial Testimony of Dr. Mayersohn). Such a dosage form would be expected to offer clinical superiority over the Ritalin SR product. The prior art discussed to this point suggests that such a rate of release could have been achieved with at least a transdermal patch. (Expected Trial Testimony of Dr. Mayersohn).

312.    The person of ordinary skill in the art would have fully expected that such an approach, as outlined above, would have been clinically successful for the treatment of ADHD,

based on what was known from the prior art concerning acute tolerance and what was known

about methylphenidate generally and Ritalin SR in particular. (Expected Trial Testimony of Dr.

Mayersohn).

313.    The person of ordinary skill in the art would also have noted that oral dosage

forms providing ascending release rates were known in the prior art. (Expected Trial Testimony

of Dr. Mayersohn). One such piece of prior art is U.S. Patent 5,156,850 to Wong *et al.* (the

"'850 patent"). (DTX 634). The '850 patent relates to an osmotic dosage form which provides a

means for the rate-programmed delivery of a drug in time-varying patterns. (DTX 634 at col. 1,

ll. 5-11). Specifically, the patent includes examples related to the ascending release rate of

verapamil from an osmotic dosage form. (DTX 634 at col. 17, l. 15 – col. 18, l. 33; Figures 6

and 8). This release rate is ascending for greater than 3 hours (Figs. 6 and 8) and, in the case

shown in Figure 6, appears to be ascending beyond one-half the $T_{90}$. (Compare Figs. 6 and 7).

314.    According to the patents in suit, the parameter $T_{90}$ is the time needed for 90% of

the cumulative amount of drug to be released into the *in vitro* dissolution medium. (DTX 1 at

col. 9, ll. 37 – 40; Expected Trial Testimony of Dr. Mayersohn).

315.    Similarly, Figures 10 and 11 include an ascending release rate for nicardipine

after a period of no drug release. (DTX 634 at col. 18, ll. 35-51). Once release begins, however,

the release rate is ascending for longer than 3 hours and for more than one-half the $T_{90}$.

(Compare Figures 10 and 11). Nicardipine was also used as the active ingredient in Example 5

of the '373 patent. (DTX 1 at col. 18, l. 35 - col. 19, l. 16; Expected Trial Testimony of Dr.

Mayersohn).

316.    The '850 patent states that this same dosage form could be used with

methylphenidate among other drugs. (DTX 634 at col. 10, ll. 16-29). While no specific example

105

depicts methylphenidate particularly, the hydrochloride salts of verapamil and methylphenidate have similar aqueous solubilities. (DTX 635). Thus, one of ordinary skill in the art as of the mid-1990s time period would have expected those two drugs to perform similarly in an osmotic-type drug delivery system. (Expected Trial Testimony of Dr. Mayersohn).

317.    Therefore, the art as of the mid-1990s taught approaches for providing an ascending release rate of a drug resulting in an extended rising plasma drug concentration-time profile during a dosing interval by using transdermal patches or oral osmotic dosage forms. (Expected Trial Testimony of Dr. Mayersohn).

### 3.    Level of One of Ordinary Skill in the Art

318.    The asserted claims of both the '373 and '129 patents are directed to methods for treating ADHD with a dosage form containing methylphenidate. Such a dosage form will provide an *in vitro* release rate of methylphenidate that increases over time, resulting in plasma concentrations of methylphenidate in a substantially ascending manner for certain periods of time.

319.    A person of ordinary skill in the art would be a practitioner as of the mid-1990s because that is the earliest date to which any claim may be entitled. The scientific specialty areas to which the claims are directed include formulation (which includes the measurement of *in vitro* drug dissolution), pharmacokinetics (which includes the plasma drug concentration-time profile in a living body) and pharmacodynamics (which includes the time-course of a pharmacologic or therapeutic response as it relates to plasma drug concentrations in a living body). The claims discuss use of a "dosage form" or a "pharmaceutically acceptable composition" to achieve the desired results listed in the claims. Thus, one of ordinary skill in the art at the relevant time would be a person conversant with and having an understanding of the general background

106

associated with the results claimed in the patents in suit. (Expected Trial Testimony of Dr. Mayersohn). Such an individual would have at least a B.S. or Pharm.D. in Pharmacy or a B.S. in chemistry, biology or engineering or a related scientific subject area. That individual would also have additional training either through advanced courses of study or work. The individual would have some experience with pharmaceuticals which would include work in formulation design and/or evaluation and a working knowledge of pharmacokinetics and pharmacodynamics and/or clinical medicine. (*See also* Expected Trial Testimony of Dr. Needham).

320.    With regard to the dosage form limitations of these claims, one of ordinary skill in the art is a person who might have been approached to achieve the ascending release rates and substantially ascending plasma concentrations that are required. (Expected Trial Testimony of Dr. Mayersohn). As noted above, one of ordinary skill in the art in this area would have had at least a B.S. or Pharm.D. in pharmacy (or a related field) and have had some formulation experience in the pharmaceutical industry. The person of ordinary skill would likely have worked specifically with modified or controlled release dosage forms for at least one year. (*See also* Expected Trial Testimony of Dr. Needham).

321.    Alza's definition of one of ordinary skill in the art is someone with an M.D., a Ph.D. in clinical pharmacology, clinical psychology or a comparable scientific field, and at least two years of practical experience such as that gained through a residency, post-doctoral appointment or comparable experience. While this definition does not expressly call for any formulation work, Dr. Patrick clarified that the two years of practical experience would be in a research rather than a practice environment and would involve research drug development either in the pharmaceutical industry or in an academic health care center in a research intensive university. (Patrick Dep. Tr. at pp. 112-115). Dr. Patrick, however, indicated that he would

107

require a Ph.D. because he did not feel that a B.S. degree was sufficient. (Patrick Dep. Tr. at pp. 119-21). Although Dr. Patrick would require drug development research he did not mention anything about specifically requiring controlled release.

322.    From these clarifications, if this is Alza's position, the definitions appear to be relatively close because while Dr. Mayersohn would only require a B.S. or Pharm.D. degree he would require additional work with pharmaceuticals. Moreover, most of the individuals involved in the formulation work, including still named inventor Hamel, did not have Ph.D.s or M.D.s.

323.    Overall, skill in development of pharmaceuticals is a requirement, but experience in residency and prescribing of ADHD treatments would seem to be irrelevant to a requirement for a person of ordinary skill in the art. (Expected Trial Testimony of Dr. Mayersohn). The general M.D. prescribing medication is not working on the development of methods of treatment. Indeed, it was this group of individuals that asked Alza for help in coming up with a solution to the Ritalin SR problem. (Guinta Dep. Tr. at JDT 00399-400, JDT 00476-80; Hamel Dep. Tr. at 00718-24, JDT 00746).

324.    To the extent that Dr. Patrick would require experience specifically in development of ADHD dosage forms and the use of methylphenidate in particular (Patrick Dep. Tr. at pp. 133-34), however, such experience for a person of ordinary skill in the art is not necessary. For instance, none of the inventors had such experience. Furthermore, typically, drug development is not rigidly constrained to one type of treatment. (Lam Dep. Tr. at JDT 00774-78; Saks Dep. Tr. at JDT 01048-54; Hamel Dep. Tr. at JDT 00717-18).

325.    Dr. Patrick, however, indicated that he is neither a formulation scientist nor a pharmacokineticist who interprets blood level data nor is he trained in pharmaceutics. (Patrick

Dep. Tr. at pp. 18, 106 and 166).

326.    If on the other hand, Alza's definition is as broad as Drs. Angst, Davies and Feifel would make it, i.e., an M.D., or a Ph.D. in clinical pharmacology or a comparable scientific field, and about two years of practical experience such as that gained through a residency, post-doctoral appointment or comparable experience, such a level of ordinary skill is not supported. (Expected Trial Testimony of Dr. Mayersohn).

327.    While the claims are directed to a method of treating ADHD, they are more particularly directed to a new method of treatment comprising a new dosage form to provide a new plasma profile.  Such a level of skill in the art ignores that such work is typically not performed by just any M.D. with a 2 year residency.  Rather it involves the work of drug companies and others involved in the development of new methods of treatment.  Thus, this level of skill in the art should be rejected.  (Expected Trial Testimony of Dr. Mayersohn).

328.    Everyone agrees that, regardless of which standard is used, the person of ordinary skill in the art would be the same whether the time frame were 1995-96 or 1999.

### 4.    The differences between the claimed invention and the prior art

#### a.    The Claims and the Common Specification of the '373 and '129 Patents

329.    Claim 1 of the '373 patent reads:

A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

(Expected Trial Testimony of Dr. Mayersohn).

330.    This is the only independent claim of the '373 patent.  Claims 2 to 4 and 6 to 7 add that, "said administration results in a substantially ascending methylphenidate plasma drug

concentration over a time period of about" selected times. Claim 2 requires a time period of

about 4 hours. Claim 6 requires a time period of about 5.5 hours, and claim 7 requires a time

period of about 8 hours. Claim 3 requires that the time period be from about 4 to about 5.5

hours, and claim 4 requires that the time period be from about 4 to about 8 hours. No other claim

of the '373 patent has been asserted. (Expected Trial Testimony of Dr. Mayersohn).

     331.    The only independent claim of the '129 patent that is being asserted is claim 1.

Claim 1 of the '129 patent states:

> A method for treating Attention-Deficit Disorder or Attention-Deficit
> Hyperactivity Disorder in a patient, wherein the method comprises administering
> a pharmaceutically acceptable composition comprising methylphenidate and a
> pharmaceutically acceptable carrier to said patient in a manner that achieves a
> substantially ascending methylphenidate plasma drug concentration over a time
> period of about 8 hours following said administration.

(Expected Trial Testimony of Dr. Mayersohn).

     332.    Claims 4 to 6 depend from claim 1 and add that the dosage of methylphenidate in

the composition be 18, 36 or 54 mg, respectively. No other claim of the '129 patent has been

asserted. (Expected Trial Testimony of Dr. Mayersohn).

     333.    The textual bodies of the '373 and '129 patents are, in all material respects, the

same. Therefore, for ease of reference, all citations to the common areas of the specification will

cite to the text of the '373 patent. (Expected Trial Testimony of Dr. Mayersohn).

     334.    The specification states that:

> One commonly-used indicator of drug availability is the concentration of drug
> that is obtained within the blood or plasma, or other appropriate body fluid or
> tissue, of a patient following administration of the drug. For convenience, this
> concentration may be referred to as "plasma drug concentration" hereinafter
> which is intended to be inclusive of drug concentration measured in any
> appropriate body fluid or tissue.

(DTX 1 at col. 1, ll. 42-50; Expected Trial Testimony of Dr. Mayersohn).

335.    The specification indicates that drug release rates for oral dosage forms are typically measured as an *in vitro* rate of dissolution.  (DTX 1 at col. 2, ll. 2-5; Expected Trial Testimony of Dr. Mayersohn).

336.    The specification specifically mentions the success of osmotic dosage forms in providing a constant profile.  The "Background of the Invention" section of the specification concludes by noting that:

> Although constant-release dosage forms have proven effective for many different drug therapies, there are clinical situations where these have not been entirely satisfactory.  It has been observed that for some patients being treated with constant-release dosage forms for some conditions or diseases, the therapeutic effectiveness of the drug decreases at time periods before the end of the desired therapy period despite the maintenance of substantially constant drug release that would be expected to provide continued effectiveness.  Accordingly, there remains a need to provide methods and devices for maintaining a desired therapeutic drug effect over a desired prolonged therapy period when sustained-release dosage forms that release drug at a substantially constant rate over an extended time period are not satisfactory.

(DTX 1 at col. 3, l. 59 – col. 4, l. 6; Expected Trial Testimony of Dr. Mayersohn).

337.    When the patentees began to summarize their discovery, they stated:

> It has been surprisingly discovered that, in an exemplary clinical situation, administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period.

> With the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for sustained-release oral dosage forms adapted to provide such a release rate over a suitable extended time period.  Accordingly, other aspects of the present invention include providing oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period.

It has been surprisingly discovered that oral osmotic dosage forms exhibiting an ascending drug release rate for an extended time period can be achieved. In particular, the present invention is directed to osmotic dosage forms having bi-layer or tri-layer tablet cores that are adapted to provide ascending drug release rates over an extended period. In addition, to provide for an initial rapid onset of drug action, the present invention is also related to dosage forms that additionally comprise a dose of drug for immediate release.

(DTX 1 at col. 4, ll. 13-39; Expected Trial Testimony of Dr. Mayersohn).

338.    The patentees further explained that:

Although the present invention is illustrated herein by exemplary dosage forms containing specific exemplary drugs, methods of making such dosage forms and methods of using methylphenidate-containing dosage forms to provide a desired therapeutic outcome, the invention is not limited by the exemplary embodiments. The invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period, method of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in the art in view of the disclosure herein.

(DTX 1 at col. 6, ll. 1-14; Expected Trial Testimony of Dr. Mayersohn).

339.    The next section of the specification is entitled "DETAILED DESCRIPTION OF THE INVENTION." The patentees described what had been reported with regard to the availability of methylphenidate for treatment of ADHD in the prior art, and that while two to three immediate release doses of methylphenidate provided adequate control, it was desirable to have a once-a-day product for purposes of convenience. (DTX 1 at col. 6, l. 37 – col. 7, l. 49; Expected Trial Testimony of Dr. Mayersohn).

340.    The patentees then stated that:

It has been surprisingly discovered that administration of methylphenidate at a release, [sic] rate that is substantially ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy similar to the efficacy obtained with multiple doses of immediate release methylphenidate dosage forms. Details of this discovery are disclosed in copending U.S. application Ser. No,

112

910,593, filed Jul. 31, 1997, of which the present application is a continuation-in-part.

(DTX 1 at col. 7, ll. 50-58; Expected Trial Testimony of Dr. Mayersohn).

341.    The patent explains that this discovery was based on a clinical study wherein the ascending-release regimen was administered as an initial loading dose followed by increasing small doses at closely spaced intervals which continued past the time of administration of "the second immediate-release dose." (DTX 1 at col. 7, l. 58 – col. 8, l. 6).  A loss of efficacy was not seen with this regimen as was observed with the other sustained, constant release regimen. (DTX 1 at col. 8, ll. 7-16; Expected Trial Testimony of Dr. Mayersohn).

342.    The patentees indicated that the problem of the delayed onset of the previously available sustained release dosage form was not solved by the ascending release rate but was overcome with the addition of an immediate release overcoat applied to the sustained release dosage form.  (DTX 1 at col. 8, ll. 43-54).  The prior art also indicated that doctors had prescribed Ritalin SR with an IR dose of Ritalin to eliminate the lag time caused by the sustained release dose.  (DTX 621 at 499; Expected Trial Testimony of Dr. Mayersohn).

343.    Examples 1 to 3 in the '373 patent detail bi-layer LCT osmotic dosage forms containing methylphenidate having ascending release rates.  Example 4 details a tri-layer LCT osmotic dosage forms employing pseudoephedrine hydrochloride, and Example 5 details a tri-layer osmotic dosage form using nicardipine.  The latter does not indicate whether the tri-layer system was an LCT.  Example 6 and Examples 8 and 9 (by reference to Example 6) relate to tri-layer LCT osmotic dosage forms incorporating methylphenidate.  (Expected Trial Testimony of Dr. Mayersohn).

344.    Example 7 provides an indication of the plasma drug concentrations produced by

113

a 14 mg methylphenidate tri-layer osmotic dosage form with an additional 4 mg immediate-release overcoat applied to it.  This Example is illustrated in Figure 4 of the patent and indicates that the plasma drug concentrations "substantially ascend[s] (save for a slight 'dip' between t=5.5 hours and t=6.5 hours)."  (DTX 1 at col. 22, ll. 4-10; Expected Trial Testimony of Dr. Mayersohn).

345.    As can be seen from the previously quoted language of claim 1 of the '373 patent, the method claimed merely requires "administering a dosage form" containing methylphenidate to achieve the resulting ascending release rate.  The language of the claim itself does not require that the dosage form even be restricted to an oral dosage form.  (Expected Trial Testimony of Dr. Mayersohn).

346.    All of the other claims of the '373 patent are dependent on claim 1, but the additional limitations in these claims do not include any further restrictions on the dosage form.  Rather, these claims further limit the results required of the dosage form.  (Expected Trial Testimony of Dr. Mayersohn).

347.    Similarly, claim 1 of the '129 patent claims a method for treating ADD or ADHD in a patient wherein "a pharmaceutically acceptable composition" containing methylphenidate and a pharmaceutically acceptable carrier (and perhaps other ingredients) is administered, resulting in substantially ascending plasma drug concentrations over about 8 hours following administration.  (Expected Trial Testimony of Dr. Mayersohn).

348.    The other asserted dependent claims (claims 4 to 6) provide further limitations on the amount of methylphenidate included in the composition, but they do not limit the type of composition used.  (Expected Trial Testimony of Dr. Mayersohn).

114