### b.    Comparison of claims 1 to 4 and 6 to 7 of the '373 patent with the prior art

349.    With regard to claim 1 of the '373 patent, it was well known that methylphenidate could be used to treat ADD or ADHD.  (Expected Trial Testimony of Dr. Mayersohn).

350.    Similarly, as indicated previously, it was known that a transdermal patch and an osmotic dosage form could be made which could provide an ascending release rate for an extended time.  Thus, whether Alza or Andrx's definition of dosage form is used, at least one dosage form required by each definition was known in the prior art to achieve the claimed result. Furthermore, the '850 patent specifically indicates that such an increasing release rate could be maintained for greater than 3 hours and through half of the $T_{90}$ with an oral osmotic dosage form. (Expected Trial Testimony of Dr. Mayersohn).

351.    Moreover, for present purposes, if Alza is correct that numerous dosage forms containing methylphenidate and meeting the claims of the patents in suit could be formulated sufficient to enable the asserted claims for their full scope, similarly, a person of ordinary skill in the formulation art in the mid-1990s would have been able to generate a dosage form with an ascending release rate over an extended period of time and/or an increasing plasma drug concentration-time profile for a particular time period such as 8 hours with only routine effort. (Expected Trial Testimony of Dr. Mayersohn).

352.    The reason to generate a dosage form to treat ADHD in the way claimed by claim 1 of the '373 patent is provided by: (1) a desire to improve Ritalin SR, (2) the teaching that both methylphenidate generally and Ritalin SR specifically were theorized to cause acute tolerance, and (3) the teaching that methylphenidate is only effective during the absorption phase.  In addition, the prior art taught using an increasing release rate in order to provide an ascending

115

plasma concentration-time profile and in order to overcome acute tolerance. (DTX 630, DTX 631, DTX 632; Expected Trial Testimony of Dr. Mayersohn).

353.    Claim 2 of the '373 patent adds that the administration of the dosage form results in a substantially ascending plasma profile over a time period of about 4 hours. Claim 6 is similar except that the time period is 5.5 hours. Claim 7 mentions that the time period is about 8 hours. A substantially ascending plasma profile, if ascending for 8 hours, would also satisfy the requirement that it be substantially ascending at lesser time periods like 4 or 5.5 hours or between 4 and 5.5 hours or between 4 and 8 hours. (Expected Trial Testimony of Dr. Mayersohn).

354.    In addition, such limitations would also necessarily be met by providing an increasing release rate for an extended time period as set forth above. (Expected Trial Testimony of Dr. Mayersohn).

355.    In addition, one of ordinary skill in the art would have understood that the desire was to achieve a formulation which would be active during the approximately 7-8 hour school day, as a minimum. As discussed above, the prior art indicated the development of acute tolerance to CNS stimulants generally and also indicated that acute tolerance might be an issue with Ritalin SR. The prior art further taught that stimulants exert pharmacological activity during the absorption phase. As a consequence of these teachings, one would conclude that a 7-8 hour increasing plasma concentration-time profile of methylphenidate would be ideal to maintain the therapeutic effect over the school day. (Expected Trial Testimony of Dr. Mayersohn).

356.    Claim 3 adds that the substantially ascending plasma profile occurs from about 4 to about 5.5 hours (claim 3) or from about 4 to about 8 hours (claim 4). Again, as stated above, one of ordinary skill in the art would have been motivated to obtain a plasma concentration-time

116

profile which ascended for, at least, the entire 8 hour dosing interval which would include the lesser time points of 4 and 5.5 hours and all time between.  (Expected Trial Testimony of Dr. Mayersohn).

357.    Thus, based on the assumption that one of ordinary skill in the formulation art could have achieved an ascending release rate over an extended period of time and a substantially ascending plasma concentrations for 8 hours with only routine experimentation, one of ordinary skill in the art would have been motivated to obtain such a profile and would have had a reasonable expectation of success that such a profile could be achieved.  (Expected Trial Testimony of Dr. Mayersohn).

358.    After completing the analysis of the first three factors which are to be considered in an obviousness analysis, the preliminary conclusion is that claims 1 to 4 and 6 to 7 of the '373 patent would have been obvious as of the mid-1990s.  (Expected Trial Testimony of Dr. Mayersohn).

### c.    Comparison of claims 1 and 4 to 6 of the '129 patent and the prior art

359.    Claim 1 of the '129 patent is similar to, but broader than, claim 7 of the '373 patent, in that claim 1 of the '129 patent does not require that the dosage form have an ascending release rate.  (Expected Trial Testimony of Dr. Mayersohn).

360.    Thus, for the same reasons as presented previously with regard to claim 7 of the '373 patent, claim 1 of the '129 patent would have been obvious to one of ordinary skill in the art.  (Expected Trial Testimony of Dr. Mayersohn).

361.    Claims 4 to 6 of the '129 patent require methylphenidate to be dosed in 18 mg, 36 mg, or 54 mg amounts, respectively.  (Expected Trial Testimony of Dr. Mayersohn).

362.     While no piece of pre-1996 prior art specifically suggested these amounts of methylphenidate, this is merely a selection of a dose range.  The prior art immediate release doses were provided in three dose amounts, 5, 10 and 20 mg.  (DTX 630, Table 1).  These dosage forms were typically ingested two to three times-a-day, for a total amount of 15, 30 and 60 mg of methylphenidate per day.  (DTX 630 at Table 1, page 6).  Selecting any particular dosages from within this range (such as 18, 36, or 54 mgs) is merely that - a selection.  Such dosages would have been expected to be active.  No data has been set forth that indicate that selecting 18, 36 and 54 mgs imparts any special properties to that dosage form.  Thus, these claims would have been obvious to one of ordinary skill in the art.  (Expected Trial Testimony of Dr. Mayersohn).

363.     In contrast to this detailed comparison between the prior art and the asserted claims, Dr. Patrick indicated that, while he had "seen" the patents in suit, he had not studied them in any detail.  (Patrick Dep. Tr. at p. 213).  Dr. Patrick was also incapable of indicating what the claims did or did not cover so as to be able make such a comparison and that he was uncomfortable discussing obviousness.  (Patrick Dep. Tr. at pp. 214, 217 and 218).

**5.     Secondary Considerations**

364.     In reaching a final conclusion concerning obviousness the Court should consider any secondary considerations that are alleged.  Secondary considerations, however, do not affect an anticipation analysis.

365.     In Response No. 5 from *Plaintiffs' Responses and Objections to Defendants' Second Set of Interrogatories to Plaintiffs* (DTX 640), plaintiffs indicate that they are alleging unexpected results, commercial success, meeting a long-felt need, failure of others, copying, and skepticism.

366.    Plaintiffs have indicated that it was the substantially ascending plasma concentration-time profile from 8 to 9.5 hours which allegedly provides the secondary considerations (*i.e.*, claim 7 of the '373 patent and claim 1 of the '129 patent).  (DTX 640, Response No. 5).  The allegations of secondary considerations also are not relevant to the ascending release rate except to the extent that that release rate provides a substantially ascending plasma concentration-time profile for 8 or more hours, i.e., claim 7 of the '373 patent. (*Id.*; Feifel Dep. Tr. at pp. 164 -165).

367.    According to Alza's expert Dr. Angst, however, Concerta has a substantially ascending plasma concentration-time profile for 8 or more hours less than 40% of the time.  Thus, any secondary consideration alleged for Concerta as an embodiment of the '373 and '129 patents only occurs 40% of the time.

368.    Moreover, Dr. Feifel indicated at least one other product with a different release rate and a different plasma profile, i.e., Ritalin LA, provides the same benefits of Concerta.  Thus, the claimed release rate and plasma profile clearly are not critical to providing the desired benefit.  (Feifel Dep. Tr. at pp. 131-32).  And, with regard to the prevalent use of Concerta over Ritalin LA and Metadate, Dr. Feifel ascribes that to Concerta being launched first and there being no desire to switch to a new product.  (Feifel Dep. Tr. at pp. 23-24).

369.    Similarly, Dr. Feifel confirmed that some methods of treatment that would be covered by the claims of the patents in suit would not provide the same secondary considerations or efficacy.  (Feifel Dep. Tr. at pp. 166-168).

370.    For the foregoing reason, the secondary considerations are not good evidence of the non-obviousness of the claims.

### Conclusions of Law Regarding Obviousness

371.    A claim is invalid if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which the subject matter pertains. 35 U.S.C. § 103(a).

372.    The ultimate conclusion of obviousness is a question of law based on underlying facts. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).

373.    In *Graham v. John Deere Co.*, the Supreme Court set forth the criteria to determine the obviousness or unobviousness of claimed subject matter. *Graham v. John Deere Co.*, 383 U.S. 1 (1966). This includes a factual finding of: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations, or objective indicia of nonobviousness, such as a long-felt need for the claimed invention, commercial success of the invention, and failure of others to achieve the invention. *Id.* at 17-18.

374.    The Supreme Court has recently reaffirmed the relevance and preeminent nature of the *Graham* factors. *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1731 (2007).

375.    The scope of the prior art includes art that is "reasonably pertinent to the particular problem with which the inventor was involved." *In re GPAC Inc.*, 57 F.3d 1573, 1577 (Fed. Cir. 1995). Two separate tests define the scope of the relevant prior art: (1) whether the art is from the same field of the endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

376.    If a reference disclosure relates to the same problem as that addressed by the claimed invention, that fact supports the use of that reference in an obviousness analysis. *GPAC*, 57 F.3d at 1578. Common sense teaches that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple references together like pieces of a puzzle. *KSR*, 127 S.Ct. at 1742.

377.    In this case, the inventors' field of endeavor is the treatment of attention deficit hyperactivity disorder (ADHD) through the use of pharmaceuticals as well as the art of pharmaceutical formulation.

378.    The scope that is reasonably pertinent to the particular problem with which the inventor was involved includes CNS disorders and their treatment, art relating to methylphenidate and other CNS stimulants, and art relating to acute tolerance (or tachyphylaxsis) issues seen in pharmaceuticals.

379.    The inventors' field of endeavor is the treatment of attention deficit hyperactivity disorder (ADHD) through the use of pharmaceuticals and the art of pharmaceutical formulation.

380.    Here, Ritalin SR was known to be a problem in that it lost efficacy over the course of the day. (DTX 1 at col. 7, ll. 40-49). In researching the problem of instances where a sustained release dosage form had maintained the initially desired flat profile over time but lost efficacy, the admittedly relevant art of Birmaher, Greenhill, Perel, etc., all suggested acute tolerance as an issue. Thus, prior art relating to acute tolerance would have been extremely relevant and pertinent art. *See KSR*, 127 S.Ct. at 1741-42; *Pfizer*, 480 F.3d at 1362-65.

381.    At the time, the treatment of angina with nitrates was known to cause acute tolerance. Thus, art relating to the treatment of angina with nitrates so as to overcome acute

tolerance was clearly relevant and pertinent art. Thus, all the art discussed above is considered pertinent art.

382.    The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art. *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

383.    The person of ordinary skill in the art, however, is also "a person of ordinary creativity, not an automaton," and a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ. *KSR*, 127 S.Ct. at 1742.

384.    Factors that may be considered in determining level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 2007 WL 2615498 at *2 (Fed. Cir. Sept. 12, 2007). These factors are not exhaustive but are merely a guide to determining the level or ordinary skill in the art. *Id.*

385.    Here, Andrx proposes that the skill in the art be an individual who has at least a B.S. or Pharm.D. in Pharmacy or a B.S. in chemistry, biology or engineering or a related scientific subject area. That individual would also have additional training either through advanced courses of study or work. The individual would have some experience with pharmaceuticals which would include work in formulation design and/or evaluation and a working knowledge of pharmacokinetics and pharmacodynamics and/or clinical medicine.

386.    Alza on the other hand, suggests that the person of ordinary skill in the art is an M.D., a Ph.D. in clinical pharmacology, clinical psychology or a comparable scientific field, and

at least two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience. Alza takes this position because the claims relate to methods of treating ADHD.

387.    While it is true that physicians would prescribe the dosage forms to be administered, the art is directed to the use of a dosage form with an allegedly new type of release and an allegedly new plasma profile. Typically, physicians and the like do not generate such dosage forms, and thus, they are not of skill in the art. *See Daiichi*, 2007 WL 2615498 at *2.

388.    Indeed, in this instance, it was the experienced M.D.s who approached Alza about generating a new dosage form. This clearly indicates that the person of ordinary skill is not an M.D., but rather is typically someone working in, or with, drug development organizations or who have similar types of experience.

389.    Thus, Andrx's proposed person of ordinary skill in the art is the appropriate standard.

390.    With regard to the differences between the claims and the prior art, the initial focus is "the objective reach of the claim." *KSR*, 127 S.Ct. at 1742. Here as discussed in the enablement section the claims are broad.

391.    Beginning with claim 1 of the '129 patent that claim, for all intents and purposes, merely requires a substantially ascending plasma profile over approximately 8 hours. In this instance, it was previously noted that there were only two identified long acting profiles which had not been tried, one of which was the ascending/substantially ascending profile. Such a profile was obvious because testing the profile was a matter of routine skill and optimization and because anyone of ordinary skill in the art would expect for plasma drug concentrations which

were higher than those of Ritalin SR would also have greater activity. *See Pfizer*, 480 F.3d at 1366-68.

392.    As the *KSR* Court stated,

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

127 S. Ct. at 1742.

393.    Moreover, the art based upon acute tolerance clearly taught an ascending plasma profile and provided a reasonable expectation of success that a substantially ascending profile for approximately 8 hours, i.e., approximately the length of a school day, and, thus, claim 1 of the '129 patent would have been obvious.

394.    Claims 4 through 6 are merely selections of dosages within the prior art total day amounts and, as such, are also obvious.

395.    With regard to claim 1 of the '373 relating to, in essence, the provision of an ascending release rate of methylphenidate over an extended period of time, it is clear that the pertinent art related to providing an ascending plasma profile over time suggested such a release rate. Additionally, it would be expected that an ascending release rate for an extended period of time would be effective to provide the desired increasing plasma profile over time. Thus, this claim is obvious.

396.    Finally, claims 2-4 and 6-7 also would have been obvious because the suggestion to have an ascending plasma profile over time which plasma profile was generated by an ascending release rate was present. Additionally, the desire would have been to have a

substantially ascending profile through all time points up to 8 hours, so the shorter or gerrymandered time limitations of the dependent claims would also have been obvious.

397.    With regard to secondary considerations, the facts in this case demonstrate that the secondary considerations are not commensurate with the scope of the claims.  Therefore, the alleged secondary considerations do not overcome the strong showing of obviousness.  *Pfizer*, 480 F.3d at 1372.

### Argument Regarding Obviousness

As of the mid 1990s, methylphenidate was the drug of choice, and had been for decades, to treat ADHD.  Immediate release methylphenidate was introduced in the 1950s.  There was one issue with immediate release methylphenidate, however: the product was only effective for about 4 hours.  For this reason, if a first dose was taken in the morning before school, a second dose had to be taken during the school day, which was undesirable for various reasons.  Then, in the early 1980s, Ritalin SR debuted in the hopes that it could be a once–a–day methylphenidate-containing treatment.  However, it was not well accepted as reports surfaced that it seemed to lose efficacy prior to the end of the school day.  (DTX 1, col. 7, ll. 40-49).  The few studies that were reported on Ritalin SR indicated that it should have continued its activity throughout the day because the plasma level of the blood stayed level and was thought to be in the therapeutic window.  Thus, the question became why would a dosage form lose activity over the course of the day if its blood level was staying the same?  One possibility was to not even worry about the question but rather to just try one of the other potential limited number of plasma profiles.  If that was undertaken, a substantially ascending plasma profile would have likely have been one of the first to be tested.  Indeed, that was exactly the study Alza undertook.

In any event, if one of ordinary skill in the art had proceeded to analyze why Ritalin SR

was not terribly successful during the latter portions of the school day, the likely answer would clearly have been that methylphenidate produced "acute tolerance" (or "tachyphylaxis") in patients, meaning that the same concentration of methylphenidate in the blood produced a diminished effect in the patient as the day wore on. Published reports explicitly suggested that methylphenidate exhibited acute tolerance. This was not surprising, as other CNS stimulants had been shown to exhibit acute tolerance. Indeed, in the earliest portions of the prosecution history, patentees acknowledged that drugs like methylphenidate were known to exhibit acute tolerance. (DTX 152 at PALZ 000772, line 19 - 000773, line 14).

Once acute tolerance was suggested, one obvious approach for overcoming this problem was to use a dosage form that would supply increasing amounts of methylphenidate throughout the day so as to avoid a decrease in activity, *i.e.*, providing a substantially ascending plasma profile. Indeed, this is exactly what was suggested by other references relating to the use of nitrates for anginal treatment, *i.e.*, one of the few identified treatments for which acute tolerance had been noted. The approximately 8 hour school day provided the period for which a person of ordinary skill in the art would want to achieve a rising plasma profile. And various pieces of prior art suggested that a good way to provide such a substantially ascending plasma profile would be through an ascending drug release rate designed so as to provide the 8 hour substantially ascending profile.

The person of ordinary skill in the art at the time would have had at least a B.S. or Pharm.D. in Pharmacy or a B.S. in chemistry, biology or engineering or a related scientific subject area. That individual would also have additional training either through advanced courses of study or work. The individual would have some experience with pharmaceuticals which would include work in formulation design and/or evaluation and a working knowledge of

126

pharmacokinetics and pharmacodynamics and/or clinical medicine. A person such as Alza

suggests, an M.D., is not the type of person who would have been working to develop new ways

to propose to formulate methylphenidate so as to provide a once a day product. Those

individuals, provided they had no further research background relating generally to drug

development, would have been the people who prescribed the dosage form, but they would not

have formulated it. *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 2007 WL 2615498 at *2 (Fed. Cir.

Sept. 12, 2007).

The true person of ordinary skill in the art would have explored the use of an ascending

release rate and an increasing plasma profile. Prior to beginning their exploration, however, they

would have expected that the profile would successfully treat ADHD, and likely would treat it

better than Ritalin SR.

Against this prior art backdrop sit the claims. As discussed in the enablement section,

these claims are extremely broad and would cover any administration of methylphenidate as long

as it had an ascending release rate over an extended period of time and/or had a substantially

ascending plasma drug concentration over various times up to 8 hours. Based upon the direction

of the art and the limited number of profiles, these claims are all clearly obvious.

The secondary considerations do not rebut such a demonstration of obviousness in this

instance. As demonstrated above, any secondary considerations are tied to the ascending plasma

profile of 0 to 8 hours, i.e., claim 7 of the '373 patent and claim 1 of the '129 patent. But,

according to Dr. Angst, Concerta only meets this limitation less than 40% of the time. Where a

claim limitation is satisfied less than half the time by the commercial dosage form, it makes no

sense to ascribe any secondary considerations to the claims.

Based upon all the foregoing, claims 1-4 and 6-7 of the '373 patent and claims 1 and 4-6

of the '129 patent are invalid as obvious.

## III.    NON-INFRINGEMENT

Despite the Court adopting all of Alza's proposed claim constructions, Alza still only claims that about 1/3 or so of Andrx's ANDA products meet the substantially ascending for eight hours claim limitations and result in "infringement." Moreover, Alza's infringement arguments ignore not only the teachings of the patents in suit and the claim language but also limitations contained in their own claim constructions. Alza's arguments also rely on dubious and spurious tests and interpretation of data.

### **Findings of Fact**

**A.    CLAIM 1 OF U.S. PATENT 6,919,373**

398.    Claim 1 of U.S. Patent 6,919,373 (the '373 patent) reads:

1.    A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

399.    The Court adopted Alza's proposed construction of the phrase "ascending release rate" and construed it to mean:

a release of methylphenidate from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding periodic interval starting at t=0 and continuing through at least the midpoint of the $T_{90}$ and for at least three hours. The release rate is as determined by an appropriate in-vitro dissolution test. The ascending release rate does not include release of drug from any immediate-release drug coating that may be applied to the dosage form.

(D.I. 130 [Claim Construction Order] at 2).

400.    This construction provides clarity for assessing some elements of infringement but it is ambiguous for other infringement elements.

401.    It is clear that a release for a given time period is ascending if it is greater than the amount released during the preceding time period.[5]

402.    It is also clear that the ascension begins at t=0 and continues until the midpoint of the $T_{90}$ and is at least three hours.

403.    And it is clear that only the methylphenidate released from the non-IR component is to be considered in the evaluation.

404.    But Alza's adopted construction does *not* provide clarity regarding how the data used in the evaluation is to be generated – the construction only provides that an "appropriate" *in vitro* dissolution test is used to generate the data.

**B.    ANDRX'S ANDA PRODUCTS DO NOT HAVE AN "ASCENDING RELEASE RATE"**

**1.    Alza's Selected Dissolution Testing**

405.    Alza retained Vivian Gray as an expert to provide guidance in the design and evaluation of dissolution testing for Andrx's ANDA products and Alza used Analytical Research Laboratories ("ARL") to conduct the testing.[6]   Ms. Gray approved a protocol that specified four different dissolution tests of Andrx's ANDA products (*see* DTX 371).   The protocol provided that either six or twelve tablets of each dosage strength would be run in each of the four dissolution tests.   The four dissolution tests were the same except that each was conducted at a different pH level.   Although all four dissolution tests were carried out, Ms. Gray only relied upon one of the tests to reach her opinions.   (Expected Trial Testimony of Dr. Needham).

---

[5]    Although not expressly provided in its proposed construction, Plaintiffs clearly represented to the Court that the periodic intervals must be of equal duration. (D.I. 87 [Alza's Opening Claim Construction Brief] at 23). Thus, while length of the periodic intervals is not specified, the intervals used in the evaluation must be the same (*e.g.*, hourly) – however, it is permissible that additional sampling points are included in an "appropriate" dissolution test. (*See, e.g.*, DTX 1 at col. 16, ll. 57-67).

[6]    Because there were no unexpired lots of the 18 mg dosage strength, Alza was only able to test Andrx's ANDA products at the 27 mg, 36 mg, and 54 mg dosage strengths

406.    The dissolution test selected by Ms. Gray, and its appropriateness, is discussed in more detail below, starting at ¶ 418.

407.    Setting aside, for now, such questions as its appropriateness, based upon her selected dissolution test, Ms. Gray concluded that nine out of the twelve 54 mg tablets tested "provided an ascending release rate through the midpoint of the $T_{90}$." (Expected Trial Testimony of Ms. Gray). Ms. Gray also concluded that eight and twelve of the twelve samples at the 36 mg and 27 mg strengths, respectively, also had an ascending release rate through the midpoint of the $T_{90}$. (Expected Trial Testimony of Ms. Gray). Ms. Gray's conclusions, however, ignore that an "ascending release rate" requires that there be an ascension "starting at t=0" – in other words – Ms. Gray ignored that there must be non-IR release during the initial time period evaluated in the appropriate dissolution test. (Expected Trial Testimony of Dr. Banakar).

**2.    Andrx's ANDA Products Do Not Have A Non-IR Release During The Initial Time Period**

408.    Claim 1 requires that the ascending release rate in the periodic interval "starting at t=0 and continuing through at least the midpoint of the $T_{90}$ and for at least three hours." As such the amount released starting at t=0 to at least three hours must be evaluated – and be found to increase – to potentially satisfy the requirements of claim 1 as construed. The tables given in the patent also reflect (and report) the evaluation and satisfaction of this requirement. For example, Table 1 provides:

130

TABLE 1

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 0.22 | YES |
| 2 | 1.45 | YES |
| 3 | 1.72 | YES |
| 4 | 1.84 | YES |
| 5 | 2.05 | YES |
| 6 | 2.21 | YES |
| 7 | 2.13 | NO |
| 8 | 1.26 | NO |
| 9 | 0.39 | NO |
| 10 | 0.09 | NO |

(DTX 1, Table 1 at column 14; Expected Trial Testimony of Dr. Banakar).

409.   As can be seen, the table reports a "YES" for the occurrence of an ascending

release rate for the first hourly interval at t=1 hour (*i.e.*, the non-IR amount released during the

t=0 to t=1 hour interval was more than the amount released before t=0).  (Expected Trial

Testimony of Dr. Banakar; *see also* Tables 2-5 in DTX 1).

410.   Ms. Gray, however, ignored the requirement that the ascending release rate is

evaluated from t=0 when she evaluated Andrx's ANDA products – this can be seen in her

reporting of the results of her selected dissolution testing.  For example:

### ANDRX 54 MG AVERAGE RELEASE RATE EVALUATION-pH 7.5

| Periodic Interval (h) | ARL Average (mcg/mL) | ARL Average % Recovery | (Andrx ANDA Average % Recovery) | ARL Average Quantity of Drug Released (mg) (Excluding 13.5 mg IR) | Ascending Release Rate Occurrence (Relative to Preceeding Interval) | ARL Average Quantity of Drug Released (mg) (Excluding 14.85 mg IR) | Ascending Release Rate Occurrence (Relative to Preceeding Interval) |
|---|---|---|---|---|---|---|---|
| 0 - 1 | 26.52 | 24.56 | 24.00 | 0.00 | --- | 0 | --- |
| 1 - 2 | 32.28 | 29.89 | 30.00 | 2.64 | YES | 1.29 | YES |
| 2 - 3 | 43.21 | 40.01 | | 5.46 | YES | 5.46 | YES |
| 3 - 4 | 56.27 | 52.10 | 53.00 | 6.53 | YES | 6.53 | YES |
| 4 - 5 | 68.50 | 63.43 | | 6.12 | | 6.12 | |
| 5 - 6 | 79.18 | 73.31 | | 5.34 | | 5.34 | |
| 6 - 7 | 90.47 | 83.77 | | 5.64 | | 5.64 | |
| 7 - 8 | 98.93 | 91.60 | 90.00 | 4.23 | | 4.23 | |
| 8 - 9 | 104.95 | 97.18 | | 3.01 | | 3.01 | |
| 9 - 10 | 108.90 | 100.83 | 100.00 | 1.97 | | 1.97 | |

T90 (ARL) Occurs Between 7-8 Hours; Midpoint of T90 Occurs Between 3.5 and 4 Hours

(DTX 383 (graph not reproduced)).

131

411.    As can be seen above, Ms. Gray did not report either a "YES" or a "NO" for the ascending release rate during the first time period as was done in the patent; rather, she simply side-stepped the question and provided "---" even though she reports that there are zero milligrams released during the first hour. When asked at her deposition about whether there was an initial release requirement, Ms. Gray reluctantly testified "I guess so" and volunteered that the relevant passage in the patent (DTX 1 at col. 10, l. 10 *et seq.*) "is a very hard paragraph for me. I've read it many times and still found it difficult." (Gray Dep. Tr. at pp. 230-232).

412.    Ms. Gray had to ignore the initial release requirement because Andrx's ANDA products do not have a non-IR release that begins releasing near the start of the dissolution test (or upon administration to a patient). The non-IR component of Andrx's ANDA products, as discussed below, does not begin to release methylphenidate until a pH of 7 is exceeded. As a pH above 7 is not typically encountered until significant passage through the GI tract, this means that the non-IR component in Andrx's ANDA products will begin to release more than one hour after administration to a patient (and most likely several hours after administration). (Expected Trial Testimony of Dr. Banakar).

413.    Andrx's ANDA products do not satisfy, at least, the early period of the ascending release rate's requirement of "starting at t=0 and continuing through the midpoint of the $T_{90}$ (a period of time that is at least 3 hours)," as taught in the '373 patent, as construed, and as tested by Ms. Gray. (Expected Trial Testimony of Drs. Banakar and Needham).

414.    As discussed above, the dissolution testing selected and relied upon by Ms. Gray also does not allow for attribution of how much methylphenidate was released from the IR component. To account for this deficiency in her dissolution test method, Ms. Gray made 'label-claim assumptions' based on the specifications for Andrx's ANDA products: 25% of the label

132

claim is present in the IR component (with acceptable variance between 22.5% and 27.5% of the label claim). Ms. Gray used this information and reported two 'label-claim assumptions' (as can be seen from her table above in the fourth to last and penultimate columns). She assumed that the IR component was either 25% or 27.5% of the label claim and subtracted that amount from the dissolution data to arrive at the amount released from the non-IR portion of Andrx's ANDA product. (Expected Trial Testimony of Ms. Gray).

415.    Ms. Gray has reported that under her 25% label claim assumption, 7 tablets out of the 36 tablets (12 tablets each for Andrx's ANDA products at the 54, 36, and 27 mg dosage strengths) showed non-IR release during the initial period. (Expected Trial Testimony of Ms. Gray). And under her 27.5% label claim assumption, she reported that only 1 tablet out of the 36 tablets showed non-IR release during the initial period. In other words, only one tablet can be said to have had any non-IR release under both of Ms. Gray's label claim assumptions. (Expected Trial Testimony of Dr. Banakar).

416.    However, Ms. Gray chose to make only two label claim assumptions (based on the middle and high boundary) and not one based on the lower boundary (as reported by Ms. Gray, for the IR component, Andrx ANDA products are within specification with an IR component ranging from 22.5% - 27.5%). Using a 'low' assumption of 22.5% (not reported by Ms. Gray), for the single tablet that showed (potentially) a non-IR release under the two assumptions that she did report, would (as with her assumptions) 'show' a non-IR release during the initial period, but *not* an ascending release rate from hour 1 to hour 2. This can be seen in the following table in which two columns were added to the data relied upon by Ms. Gray for the one tablet which 'showed' non-IR release under her two label claim assumption (the two added columns report the results using the "low" label claim):

133

**Andrx 54 mg Release Rate Evaluation for Cycle 2, Andrx A**

| Time Int. (h) | Andrx A (mcg/mL) | % Recovery | Cum mg Recovered | Quantity of Drug Released (mg) (Excl. 13.5 mg IR) | Ascending Release Rate Occurrence (Relative to Preceding Interval) | Quantity of Drug Released (mg) (Excl. 14.85 mg IR) | Ascending Release Rate Occurrence (Relative to Preceding Interval) | Quantity of Drug Released (mg) (Excl. 12.15 mg IR) | Ascending Release Rate Occurrence (Relative to Preceding Interval) |
|---|---|---|---|---|---|---|---|---|---|
| 0 - 1 | 31.45 | 29.12 | 15.72 | 2.22 | -- | 0.87 | -- | 3.57 | Yes |
| 1 - 2 | 36.01 | 33.34 | 18.00 | 2.28 | Yes | 2.28 | Yes | 2.28 | No |
| 2 - 3 | 46.65 | 43.19 | 23.32 | 5.32 | Yes | 5.32 | Yes | 5.32 | Yes |
| 3 - 4 | 59.52 | 55.11 | 29.76 | 6.44 | Yes | 6.44 | Yes | 6.44 | Yes |
| 4 - 5 | 72.37 | 67.01 | 36.19 | 6.43 | No | 6.43 | No | 6.43 | No |
| 5 - 6 | 83.59 | 77.40 | 41.80 | 5.61 | No | 5.61 | No | 5.61 | No |
| 6 - 7 | 95.19 | 88.14 | 47.60 | 5.80 | Yes | 5.80 | Yes | 5.80 | Yes |
| 7 - 8 | 103.45 | 95.79 | 51.73 | 4.13 | No | 4.13 | No | 4.13 | No |
| 8 - 9 | 109.05 | 100.97 | 54.52 | 2.80 | No | 2.80 | No | 2.80 | No |
| 9-10 | 111.74 | 103.46 | 55.87 | 1.34 | No | 1.34 | No | 1.34 | No |

(Expected Trial Testimony of Dr. Banakar).

417.    Therefore, under Ms. Gray's 27.5% assumption, at least 35 of 36 tablets tested (using the dissolution test selected by Ms. Gray) do not show an ascending release rate during the initial periodic interval. For the 1 of 36 tablets that did potentially show a non-IR release during that time under both assumptions, it would not show an ascending release rate in the next periodic interval if analyzed under a different assumption (22.5%), and thus would not meet the claim's requirement that the ascending release rate continue for at least three hours. Therefore, even under Ms. Gray's selected dissolution test, none of Andrx's ANDA products have the required ascending release rate.[7] The variable nature of these assumptions on infringement underlies why this entire test methodology was not "appropriate." (Expected Trial Testimony of Dr. Banakar).

---

[7]    As Andrx's ANDA products cannot be found to infringe claim 1 of the '373 patent and because claim 1 is the only independent claim, none of the remaining asserted claims (all of which depend from claim 1) can be found to be infringed.

**C.**     **ALZA DID NOT USE AN "APPROPRIATE" DISSOLUTION TEST TO EVALUATE ANDRX'S ANDA PRODUCTS**

418.     Alza's construction provides that an "appropriate" dissolution test is to be used – but this merely begs the question "appropriate for what purpose?" The only reasonable answer is: a test that is appropriate to determine whether or not there is an ascending release rate – in other words – to determine whether or not the accused product meets the claim limitations and therefore infringes. Therefore, a dissolution test can be viewed as "appropriate" only if it elucidates the release of methylphenidate from the accused product in a manner that allows for evaluation of the features as specified in the patent. Alza, however, has relied upon only a single dissolution test to support their allegations of infringement and that single test is not "appropriate." (Expected Trial Testimony of Dr. Needham).

419.     The test relied upon by Ms. Gray was performed in USP Apparatus 1, run at 100 rpm, with 500 mL of media at a pH of 7.5, a temperature of 37° C, and with hourly sample points.[8] This test is not appropriate for evaluating whether or not Andrx's ANDA products infringe the patent for several reasons. (Expected Trial Testimony of Dr. Needham).

420.     First, it should be noted that the dissolution test selected and relied upon by Ms. Gray is *not* from or based upon the patent. There is only one dissolution test described in the patent: USP Type VII apparatus using a media of 50 mL of acidified water (pH=3) at 37° C and sampling points at least hourly (as this apparatus dips the sample into the media there is no rpm parameter). (*See* DTX 1 at col. 9, ll. 29-34). However, as it is Ms. Gray's position that an "appropriate" dissolution test is based on the product being tested, it is her opinion that the dissolution test described in the patent is not an appropriate dissolution test for Andrx's ANDA

---

[8]     The other dissolution tests proscribed by Ms. Gray, but not relied upon by her, were conducted the same way with the exception of pH. The pH used in the other tests was 1.2, 4.2 or 6.5. (*See* DTX 371).

products. (Expected Trial Testimony of Ms. Gray). Even if an "appropriate" dissolution test must take into account the dosage form to be tested, Ms. Gray's methodology for selecting an "appropriate" dissolution test – or at least her implementation of her purported methodology – is flawed in that she selected a dissolution test that is contrary to both the teachings of the patent and the specific nature of Andrx's ANDA products. (Expected Trial Testimony of Dr. Needham).

421.    The Court's construction of the term "ascending release rate" makes clear that any IR component should be discounted: "The ascending release rate does not include release of drug from any immediate-release drug coating that may be applied to the dosage form." (Expected Trial Testimony of Dr. Needham).

422.    Despite this requirement of Alza's claim construction that was adopted by the Court, Ms. Gray selected a dissolution test that does not allow for the segregation of IR and non-IR components. Instead, Ms. Gray's dissolution test forces her to make an assumption regarding the IR component in Andrx's ANDA products, *i.e.*, Ms. Gray simply reads information that Andrx produced during discovery that was submitted to the FDA (basically the 'recipe' for the product) and uses the amount listed for the IR component to discount that amount in evaluating the data for her dissolution test. (Expected Trial Testimony of Dr. Needham).

423.    Although this assumption (which may be referred to elsewhere as the "label claim assumption") is not necessarily unsound, it does render her selected dissolution test *inappropriate* for purposes of assessing infringement. The impropriety of her test is readily apparent in view of the fact that Alza, and their expert Ms. Gray, have selected and relied upon a dissolution test that cannot be used to determine if a sample infringes unless the sample is accompanied by certain documentation. In other words, Alza and their dissolution expert cannot

136

take just a bottle of tablets and assess infringement – instead they are helpless unless they also read and rely on the tablets' manufacturing specifications. (Expected Trial Testimony of Dr. Needham).

424.    It is Andrx's position that the science of dissolution testing is sufficiently advanced to allow for the design and implementation of a dissolution test that can provide information about the nature of the accused product without relying upon supporting documentation. (Expected Trial Testimony of Dr. Needham).

425.    There is even a particular feature of Andrx's ANDA products that allow for the relatively easy attribution of IR and non-IR releases: Andrx's products have a delayed release component which is pH-dependent (*i.e.*, the non-IR release will occur only above pH 7) and an IR component which is pH-independent (*i.e.*, the IR release will occur at any pH). This property can be easily exploited by varying the pH of the media during the dissolution test. As such, there is simply no reason to estimate the amount of methylphenidate released from the IR component as opposed to actually testing for it. (Expected Trial Testimony of Dr. Needham).

426.    Ms. Gray acknowledges that Andrx's ANDA products have a delayed release component that is pH-dependent and an IR component that is pH-independent; moreover, Ms. Gray has testified that if Andrx's ANDA products are placed in a media with a pH below 7 there would not be an ascending release rate. (*See* Gray Dep. Tr. at p. 184). Ms. Gray has even acknowledged that a two stage pH dissolution test could allow for the attribution of release from both the IR and non-IR components. (*See* Gray Dep. Tr. at p. 179). Despite the plausibility of this approach, Ms. Gray testified that she is "not concerned with that" (*See* Gray Dep. Tr. at p. 179) because "why bother" with determining the exact amount in the IR component in Andrx's ANDA products since "we know that [the IR component] will be out – no one is arguing with the

137

fact that it will all be out within an hour." (Gray Dep. Tr. at p. 182). Ms. Gray also testified that

"it didn't make any sense to have an acid phase. For one thing, it's tedious to have two phases."

(Gray Dep. Tr. at p. 180).

427.    Essentially, it appears that it is Ms. Gray's opinion that a two stage pH dissolution

test would not provide any additional useful information regarding the IR component than her

selected dissolution test with its single stage pH of 7.5:

> We wouldn't get any more information because the 7.5 will -- it's soluble, the
> immediate release portion is soluble in that, so it would tell you the same
> information that you would get from the acid state.
>
>             *        *       *
>
> Q. Why wouldn't you just measure [the amount released by the non-IR
> component] by using gastric fluid?
>
> A. Well, we do. I mean, we do take the time point. We do have that one-hour
> time point.... We know that it's there, we know that it eludes in less than an hour
> at any pH, so there's really no -- I don't know of any reason that we need to have a
> finite number other than what we know is already in there from the label claim --
> the specifications.

(Gray Dep. Tr. at pp. 180 and 183).

428.    Ms. Gray even testified that if a two stage pH dissolution test was used for

Andrx's ANDA products she would assume that there would not be an ascending release rate for

"a while, if ever":

> Q. So if you did a step-wise function, setting aside that it was tedious, if you did
> a step-wise function with simulated gastric fluid, followed by a 7.5, where you
> could actually measure the IR portion and discount it, such a test would not give
> you an ascending release rate with regard to Andrx's product, correct?
>
> A. Well, I'm not -- since I haven't done it, I don't know. You know, I don't know.
> It's more -- but I would assume that it would take a while, if ever.

(Gray Dep. Tr. at pp. 184-185).

429.    Although it is understandable that Ms. Gray would view a two stage test as unnecessary if it does not provide any additional information, her position is rendered untenable in view of the patent's requirement that the amount released from the IR component be discounted.

430.    Further, Ms. Gray testified that a two stage dissolution test is standard for typical delayed release dosage forms, which is also provided in the USP.  (*See* Gray Dep. Tr. at p. 119).  However, because Andrx's ANDA products also have an IR component it was also Ms. Gray's opinion that that traditional two stage test is no longer needed.  (Gray Dep. Tr. at pp. 62-63).  At best, Ms. Gray's position is not well founded.  On one hand Ms. Gray believes the IR component removes the need for the traditional two stage test but on the other hand Ms. Gray repeatedly testified that the IR component was of no concern in view of the patent.  This is simply incorrect because only the amount from the non-IR portion is evaluated for the ascending release rate.  (Expected Trial Testimony of Dr. Needham).

**REDACTED**

139

**REDACTED**

Q. In your estimation, would it be inappropriate to run a test on Andrx's product for 2 hours in simulated gastric fluid, and then switching to 7.5?

A. Yeah, it would be inappropriate.

Q. Why would it be inappropriate?

A. Well, because, you know, we are looking at the delayed release mechanism, and we're designing an appropriate dissolution test that elucidates that mechanism, and -- you would do a test like that if you had a classic delayed release dosage form that nothing was going to come off in that first hour or 2 hours, or whatever, because, you know, the idea is to see does something -- you know, is it breaking down? Is that delayed release breaking down?

And since the immediate release coating is soluble in all pHs, including the 7 and-a-half, it doesn't tell me anything. It doesn't elucidate anything about the release mechanism of the extended release product, and that's -- the extended release product is what we are concerned with here.

The IR portion is -- we all know it's there, it exists, it's gone within an hour. You know, it's not -- I wouldn't -- I wouldn't learn anything.

(Gray Dep. Tr. at pp. 185-186).

435.     Because the only dissolution test relied upon by Ms. Gray for infringement purposes is not appropriate, Alza has failed to carry its burden in proving that Andrx's ANDA products infringe claim 1 of the '373 patent.  (Expected Trial Testimony of Dr. Needham).

436.    Moreover, Alza has failed to carry its burden because Ms. Gray's selected

dissolution test is not the only appropriate dissolution test or at the very least there is no evidence

to support that it is the only appropriate dissolution test.

> Q. No. I'm talking about can there be more than one appropriate dissolution test,
> regardless of what the change is?
>
> A. An appropriate dissolution test to me is the best fit to the release mechanism
> of the product, so "best" to me implies one. So if you had other dissolution tests,
> they would not be the best test, and to me, the best test would be the appropriate
> test.

(Gray Dep. Tr. at pp. 307-308).

437.    As Ms. Gray issued a protocol with only four dissolution tests (with only the pH

varying among the tests) she is unable to even argue that the one test she selected is the best /

most appropriate dissolution test because she has not conducted, requested, or relied upon any

testing that would allow for a comparison – to be the best you have to be better than the rest.

(Expected Trial Testimony of Dr. Needham).

438.    Indeed, Ms. Gray has acknowledged that small changes can result in a better test:

> Q. Hypothetically, is it possible that having the same test, except varying the
> paddle speed from 50 to 60, would be the 60 would be appropriate for a dosage
> form and the 50 would not?
>
> A. It's possible, uh-huh. It would obviously depend dosage form to dosage form.

(Gray Dep. Tr. at pp. 111-112).

439.    However, even setting aside questions regarding the appropriateness of Alza's

selected dissolution test, the data generated by that test actually establishes that Andrx's ANDA

products do not meet the requirements of claim 1 of the '373 patent and, therefore, do not

infringe that claim. (Expected Trial Testimony of Dr. Needham; Expected Trial Testimony of

141

Dr. Banakar).

**D.    REMAINING ASSERTED CLAIMS**

440.    The remaining asserted claims from the '373 patent (claims 2-4 and 6-7) depend

from claim 1 and add the requirement that the administration of the dosage form "results in a

substantially ascending methylphenidate plasma drug concentration" "over a time period of

about [x] hours following said administration." Each claim provides a different time period with

the longest being 8 hours.[9]

441.    In the '129 patent, claim 1 is the only asserted independent claim and it is similar

to dependent claim 7 of the '373 patent. It reads:

> 1.    A method for treating Attention-Deficit Disorder or Attention-Deficit
> Hyperactivity Disorder in a patient, wherein the method comprises administering
> a pharmaceutically acceptable composition comprising methylphenidate and a
> pharmaceutically acceptable carrier to said patient in a manner that achieves a
> substantially ascending methylphenidate plasma drug concentration over a time
> period of about 8 hours following said administration.

**1.    <u>Andrx's ANDA products do not have a "substantially ascending
methylphenidate plasma drug concentration"</u>**

442.    The Court construed the claim term "substantially ascending methylphenidate

plasma drug concentration over a time period of about [x] hours following said administration"

from both patents to mean:

> approximately. Thus, a substantially ascending profile is one in which the plasma
> concentration of methylphenidate generally rises over approximately [X] hours,
> but may include a slight dip.

(D.I. 130 [Claim Construction Order]).

---

[9]    With regard to the different time periods, claim 2 specifies "about 4 hours"; claim 3 specifies "about 4 to
about 5.5 hours"; claim 4 specifies "about 4 to about 8 hours"; claim 6 specifies "about 5.5 hours"; and claim 7
specifies "about 8 hours." Non-asserted claims 5 and 8 provide "about 4 to about 9.5 hours" and "about 9.5 hours,"
respectively.

443.    As a result of Alza's proposed construction, there are ambiguities remaining, *i.e.*, what constitutes a plasma profile that "generally rises" but "may include a slight dip." As discussed below, Alza's positions on these issues are not sound and are ***not based*** on the patent – instead they appear to be based upon a gerrymandering in an attempt to avoid the prior art while ensnaring Andrx's ANDA products.

444.    Alza's expert, Dr. Martin Angst, has testified that a substantially ascending plasma profile "generally rises" and can have "a slight dip" – which means that:

> a) the profile rises more than 50% of the time (however, Dr. Angst testified that he "actually used 60% of the time, which is conservative" for his analysis of Andrx's data);

> b) decreases in the plasma concentration up to 15% of the previous value are allowed; and

> c) the profile substantially ascends until a value 15% lower than the maximum concentration is reached. Moreover, it is Dr. Angst's current opinion that "substantially ascending" allows for ***multiple slight dips***.

(*See* Angst Dep. Tr. at p. 19) (emphasis added).

445.    These opinions are not based on the teachings of the patent – for example, the word "dip" appears once in the specification (and "dips" not at all). Moreover, Dr. Angst is not relying on, and is not aware of, any journal articles or textbooks which provide that decreases of 10 – 15% are considered to be "slight dips." (Angst Dep. Tr. at pp. 112-113). This utter lack of support is understandable because the term "dip" or "slight dip" are not terms of art used in pharmacokinetics. The specification itself indicates that the term dip is not a term of art – whereas commonly used pharmacokinetic terms such as peak and trough are simply written, in the only appearance of the word dip, it is provided inside quotation marks:

> the plasma drug concentration does not decline but continues to substantially ascend (save for a slight "dip" between t=5.5 hours and t=6.5 hours) through a

143

time period of 9.5 hours.

(DTX 1, col. 22, ll. 5-8; Expected Trial Testimony of Dr. Mayersohn; Expected Trial Testimony

of Dr. Bolton).

446.    Dr. Angst and Alza, in an attempt to allege infringement by as many of the

individual plasma profiles from Andrx's testing of its ANDA product as possible, have simply

contrived a definition that is baseless and allows for incredible interpretations of data.  The flaws

in Dr. Angst's definition are patently obvious in view of his opinion of a hypothetical

methylphenidate plasma drug concentration profile created by counsel for Dr. Angst's

deposition:



(DTX 143).

447.    It was Dr. Angst's opinion – as is allowed by his definitions – that ***this profile is***

***substantially ascending for at least 8 hours***.  (Angst Dep. Tr. at pp. 233-234).

448.    This profile, according to Dr. Angst, is substantially ascending for at least 8 hours

144

because:

> a) it is ascending more times than it is descending (there are five increases and three decreases, so it is ascending $5/8^{th}$ or 62.5% of the time – which is greater than Dr. Angst's "conservative" requirement of ascending 60% of the time);

> b) the three "dips" (at 3, 5, and 7 hours) are "dips" because they are less than a 15% drop relative to the prior concentration; and

> c) the plasma drug concentration is substantially ascending for at least 8 hours because at the 8 hour mark there has not been 15% drop relative to the peak concentration (as the Cmax is 40 ng/mL, the profile will continue to be viewed as substantially ascending until the profile descends below 34 ng/mL – which is not shown on this graph).

(*See* Angst Dep. Tr. at pp. 233-234).

449.    Dr. Angst's definition is preposterous as is highlighted by a slight modification to the hypothetical plasma profile reproduced above: if there was no blood sample drawn at t=0 (before administration of the product) or if there was no blood drawn at 1 hour then, respectively, there would be either no line segment from 0 – 1 hour (the line segment on the graph with "JWB" next to it) or there would be a single line connecting 0 to 2 hours. Although this slightly modified version would be identical otherwise (*e.g.*, if there was no sample taken at one hour, then the only difference would be the removal of the dot at two hours; the line would be the same), it would ***not*** be substantially ascending for 8 hours because there would be four increases and three decreases ($4/7^{th}$) which is equal to increases about 57% of the time – and thus, would not meet Dr. Angst's 'conservative requirement' that a substantially ascending profile must ascend more than 60% of the time. (*See* Angst Dep. Tr. at pp. 232-233). Such a disparate impact is indicative of the lack of robustness of Dr. Angst's definitions and analysis.

450.    Additionally, Dr. Angst's and Alza's new view of allowing ***many*** dips is a departure from their briefs, declarations and arguments made during the *Markman* phase of this

case. It was not until after filing briefs and declarations and repeatedly urging that "a slight 'dip'" should *not* be restricted to occur from 5.5 to 6.5 hours after administration (which the Court adopted) that Dr. Angst and Alza said that "a slight 'dip'" means *multiple* dips.

451.    For example, during the *Markman* proceedings, Alza provided that:

> As explained above, the evident purpose for allowing for *a slight dip* in plasma concentration is to account for the inherent variability of the biological systems being measured. *The patent certainly does not attach any significance to the slight dip occurring at a particular time*, such as between 5.5 and 6.5 hours.

(D.I. 87 [*Alza's Opening Claim Construction Brief*] at 38) (emphasis added).

> *The example shows a slight dip* occurring between 5.5 to 6.5 hours. Presumably, *because this example shows the slight dip* occurring during this window of time, Andrx is asserting that the claims require a slight dip to occur at only that time.

(D.I. 87 [*Alza's Opening Claim Construction Brief*] at 39) (emphasis added).

452.    Alza's and Dr. Angst's changing definition of "*a* slight dip" is highly inequitable in view of it coinciding with and furthering their goal of the moment. As such, Alza should be precluded from now asserting that a slight dip can be many dips.

453.    As Dr. Angst's definitions and the analysis based thereon are unsound, Alza cannot carry their burden of establishing any infringement resulting from Andrx's ANDA products. As such, Andrx cannot be found to be liable for infringement.

454.    However, even assuming *arguendo* that Dr. Angst's definitions and analysis are sound, Dr. Angst opines that only about one-third of the 77 plasma profiles of Andrx's ANDA products are "substantially ascending" for eight hours. This minority of 'infringing' products (viewing them as favorably as Dr. Angst and Alza can contrive) is not unexpected as a biphasic product such as Andrx's was contemplated by Alza more than nine years ago not to be covered

by a claim to an ascending profile. (*See* DTX 111). As described above, Andrx's ANDA

products have an IR component and a delayed release component – a biphasic system.

### Conclusions of Law

455.    All of the claims in the patents in suit are method claims – methods for treating

ADD. As the claims are method claims, it is undisputed that Andrx will not practice the claimed

method but, at most, will enable others to practice the claimed methods. Therefore, Andrx

cannot be found to directly infringe the patents in suit but, at most, could be found to indirectly

infringe. *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363, 1363 n.7 (Fed. Cir.

2003).

456.    There are two kinds of indirect infringement: contributory infringement or active

inducement of infringement under 35 U.S.C. § 271(c) or § 271(b), respectively. In order for

Andrx to be found liable for contributory or active inducement of infringement, Alza must prove

someone will directly infringe the patents in suit by administering Andrx's ANDA products

because proving a direct infringement is a necessary requirement to establish indirect

infringement. *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006).

457.    In addition to proving direct infringement by some person, contributory

infringement also requires Andrx "knowing" that the their methylphenidate product will be

especially made or especially adapted for use in the infringement of the patents in suit, and also

that Andrx's ANDA products have no suitable substantial noninfringing uses. *C.R. Bard, Inc. v.

Adv. Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed. Cir.1990). If Andrx's product is capable

of being substantially used without infringing Alza's patents, then Andrx cannot be liable for

contributory infringement. *Id.*

458.    Active inducement of infringement also has other requirements (in addition to proving a direct infringement).  An inducer must have an affirmative intent to cause direct infringement. *DSU Medical*, 471 F.3d at 1306 (en banc for this section).  Thus, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities. *Id.*; *see also Warner-Lambert*, 316 F.3d at 1363 ("Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent.").

459.    Andrx is neither liable for contributory infringement nor active inducement of infringement.  First, Alza cannot establish that patients taking Andrx's ANDA products will infringe the patents in suit.  Second, Andrx does not knowingly produce a methylphenidate product that infringes on the patents in suit.  Also – even assuming *arguendo* that all of Alza's arguments are correct – there are still substantial noninfringing uses of Andrx's ANDA products because, at most, Alza asserts that only a small fraction of the patients who take it will infringe.  Thus, there are substantial noninfringing uses of Andrx's product.  Finally, Alza cannot prove that Andrx actively induces users of their product to infringe on the patents in suit.  Andrx designed their product completely differently than Alza's product (matrix v. osmotic) and designed a completely different delivery profile than Alza's product (biphasic v. substantially ascending).  Therefore, Andrx did not intend to infringe on Alza's patents, nor do they knowingly aid and abet another to infringe on Alza's patents.

## **Argument Regarding Non-infringement**

Alza cannot meet its burden of establishing that Andrx's ANDA products infringe the asserted claims of the patents in suit *even though* all of the claim constructions urged by Alza were adopted by the Court.

This counter-intuitive result occurs primarily because Andrx's ANDA products are so fundamentally different than what is required by the claims as construed – and as understood and evaluated by Alza's own experts – that, at most, only a fraction of Andrx's ANDA products can be viewed as infringing even when assuming *arguendo* that Alza's experts are correct.

Claim 1 of the '373 patent requires that the dosage form have an ascending release rate. The patent, and Alza's construction, explicitly require, *inter alia*, that there be methylphenidate released from the non-IR component during the time periods being evaluated starting at t=0 and continuing through at least the midpoint of the $T_{90}$ and for at least three hours.

Because of the design of Andrx's ANDA products – as recognized by Alza's experts – the delayed-release core (*i.e.*, the non-IR component) only begins to release methylphenidate after a delay. In other words, as would be expected, the ***delayed***-release core does not begin to release methylphenidate starting at or near t=0, as required by the claims.

Further, as argued by Alza, the ascending release rate is to be evaluated using an "appropriate" dissolution test. However, Alza did not select an appropriate dissolution test. Moreover, Alza's expert has relied upon only a single dissolution test to reach her conclusions.

The test selected and relied upon by Alza's experts was not "appropriate." The selected test does not allow for the distinguishing of release from the IR and non-IR components as is required by the claims and the constructions adopted by the Court. Instead of allowing for the distinction between release of methylphenidate from the IR and non-IR components, the selected dissolution test – the ***only*** test relied upon by Alza's expert – actually confuses the issue because the pH parameter selected potentially allows for ***both*** the IR and non-IR component to release at the same time.

This test prevents Alza's expert from forming an opinion based on the data generated by it alone. Instead, conclusions can be made by Alza's expert only when the data is viewed in conjunction with written documentation produced by Andrx in this litigation. The documentation allows Alza's expert to make 'label-claim' assumptions regarding how much methylphenidate is released by the IR component – such an assumption is necessitated by the selected inappropriate dissolution test.

As such, Alza cannot establish that the selected test is "appropriate." This is particularly obvious in view of their expert's opinion that an "appropriate" dissolution test is *the best / most appropriate* dissolution test – as there are no other dissolution tests that Alza relied upon, there are no comparisons that can be made to establish that their selected dissolution test is the best / most appropriate.

The remaining asserted claims require evaluation of the plasma drug concentration, which is required to be "substantially ascending." Even though Alza successfully argued for a construction that specified that the profile "generally rises" but may have "a slight dip," Alza's current position is that "substantially ascending" allows for *many* dips and that a profile continues to substantially ascend *past its peak concentration* for however long it takes to drop 15% from the peak concentration.

Amazingly, even with such an incredible definition, Alza's expert concludes that only about a third of the profiles for Andrx's ANDA products had a substantially ascending methylphenidate plasma drug concentration for eight hours.

In sum, Alza cannot meet its burden in proving infringement by Andrx's ANDA products.

## IV.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that Plaintiffs' requested relief

be denied, and that judgment be entered in Defendants' favor declaring that claims 1-4 and 6-7

of the '373 patent and claims 1 and 4-6 of the '129 patent have not and will not be infringed, and

that those claims are invalid.

Respectfully Submitted,


Dated: December 3, 2007

/s/ William J. Cattie, III  #953
RAWLE & HENDERSON LLP
William J. Cattie, III, Esq.
I. D. No. 953
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
302-778-1200
Facsimile: 302-778-1400


*Of Counsel:*

*Attorneys for Defendants
Andrx Pharmaceuticals, LLC and
Andrx Corporation.*

John W. Bateman
C. Kyle Musgrove
Robert F. Vroom
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
202-220-4200