# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ALZA CORPORATION, and
McNEIL-PPC, INC.,

               Plaintiffs,

    v.

ANDRX PHARMACEUTICALS, LLC, and
ANDRX CORPORATION,

               Defendants.

C.A. No. 05-642-JJF

**REDACTED
PUBLIC VERSION**

## DEFENDANTS' PRETRIAL REPLY BRIEF

Dated: December 3, 2007

RAWLE & HENDERSON LLP
William J. Cattie, III, Esq.
I. D. No. 953
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
302-778-1200
Facsimile: 302-778-1400

*Of Counsel:*

John W. Bateman
C. Kyle Musgrove
Robert F. Vroom
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
202-220-4200

*Attorneys for Defendants
Andrx Pharmaceuticals, LLC and
Andrx Corporation.*

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................. 14

        A.      ALZA'S Development Work is Irrelevant ................................................ 14

        A1.     Andrx's Development and Design Around Effort .................................... 15

        B.      The Subject Matter of the '373 and '129 Patents .................................... 19

                1.      The claimed treatment methods ................................................... 20

                2.      The patent specifications ............................................................. 20

III.    NO INFRINGEMENT OF THE '373 AND '129 PATENTS ............................. 24

        A.      The Legal Standards For Infringement .................................................... 24

        B.      There is No Literal Infringement Of Claim 1 Of The '373 Patent ......... 27

                1.      The Elements of Claim 1 ............................................................. 27

                2.      The Court's Construction Of The Ascending Release Rate Element
                        Of Claim 1 Of The '373 Patent .................................................. 28

                        a.      Ms. Gray relies on an "inappropriate" dissolution test .............. 28

                        b.      The immediate release MPH is excluded before comparing
                                the MPH release rate during periodic intervals of time ............. 34

                        c.      Determining that a Release Rate is Ascending ........................... 38

                3.      Dissolution Testing Establishes That the ANDA Products Do Not
                        Literally Meet the Release Rate Element of Claim 1 ............................ 39

                        a.      The 54, 36 and 27 mg ANDA products ........................................ 39

                        b.      The 18 mg ANDA product ........................................................... 41

                4.      Use of the ANDA Products Will Not Literally Infringe Claim 1 ............ 42

        C.      There is No Literal Infringement of Claims 6 and 7 of the '373 Patent .............. 43

                1.      The Proposed ANDA Products Do Not Literally Infringe Claims 6
                        and 7 of the '373 Patent ............................................................... 43

                2.      The ANDA 54 mg Product Does Not "Achieve[] A Substantially
                        Ascending Methylphenidate Plasma Drug Concentration Over A
                        Time Period Of About 8 Hours Following Said Administration" ........... 51

                        a.      Defendants Represented to the FDA that their ANDA
                                Products Were Bioequivalent to Concerta ................................... 52

                        b.      The Individual Plasma Concentration Data in Defendants'
                                ANDA Does Not Demonstrate that a Substantial
                                Population of Individuals Will Exhibit a Substantially
                                Ascending MPH Plasma Concentration for About 8 Hours ........ 56

**TABLE OF CONTENTS**
(continued)

**Page**

          3.     Defendants' Proposed 18, 27, and 36 mg ANDA Products Will Not Be Administered "In A Manner That Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of About 8 Hours and About 5.5 Hours Following Said Administration" .......................................................................... 58

   D.    Defendants Will Not Induce Infringement Of The Asserted Claims.................. 58

   E.    Defendants Are Not Liable for Contributory Infringement of the Asserted Claims .............................................................................................................. 60

   F.    Even If This Court Were to Determine the Claims Were Infringed and Not Invalid, Plaintiffs' Still Are Not Entitled to Relief ............................................ 61

IV.    CONCLUSION .......................................................................................................... 63

## TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Bayer AG v. Biovail Corp.,*
    279 F.3d 1340 (Fed. Cir. 2002) ..................................................... 62

*Bell Communications Research Inc. v. Vitalink Communications. Corp.,*
    55 F.3d 615 (Fed. Cir. 1995) ................................................... 24, 25

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
    418 F. Supp. 2d 1021 (S.D. Ind. 2006)............................... 24, 25, 59

*DSU Medical Corp. v. JMS Co.,*
    471 F.3d 1293 (Fed. Cir. 2006) .......................... 15, 26, 27, 59, 60

*Johnson & Johnson Associates Inc. v. R.E. Service Co., Inc.,*
    285 F.3d 1046 (Fed. Cir. 2002) ............................................ 14, 52, 53

*Joy Technologies, Inc. v. Flakt, Inc.,*
    6 F.3d 770 (Fed. Cir. 1993) ......................................................... 63

*Purdue Pharma, L.P. v. F. H. Faulding and Co.,*
    48 F. Supp. 2d 420 (D. Del. 1999) ............................................... 51

*SmithKline Beecham Corp. v. Apotex Corp.,*
    247 F. Supp. 2d 1011 (N.D. Ill. 2003)............................. 13, 61, 62

*Wahpeton Canvas Co. v. Frontier, Inc.,*
    807 F.2d 1546 (Fed. Cir. 1989) ................................................... 43

*Zenith Laboratories, Inc. v. Bristol-Myers Squibb Co.,*
    19 F.3d 1418 (Fed. Cir. 1994) ............................................ 14, 52, 53

<u>**Statutes**</u>

35 U.S.C. § 112.................................................................................. 20

35 U.S.C. § 271(a) .......................................................................... 2, 62

35 U.S.C. § 271(b) ...................................................................... 3, 8, 26, 62

35 U.S.C. § 271(c) ...................................................................... 3, 25, 62

35 U.S.C. § 271(e)(2).......................................................................... 62

**TABLE OF AUTHORITIES**
(continued)

**Page**

35 U.S.C. § 271(e)(4) ........................................................................................... 13, 61, 62

35 U.S.C. § 271(e)(4)(A) ........................................................................................ 61, 62

Per Defendants' understanding of the Court's instructions regarding the format of the pretrial papers, the section titles used below track those used in Plaintiffs' opening pretrial brief.

## I.    INTRODUCTION

As an initial matter, Andrx notes that while Alza acknowledges that it brought suit on both the '373 and '129 patents, Alza indicates in footnote 1 of its Opening Pretrial Submission that, "[i]n the interest of streamlining this case for trial, plaintiffs will not assert infringement of any claims of the '129 patent at trial." (*Plaintiffs' Opening Pretrial Submission* at p. 1, n.1). Since Alza will not assert infringement of any of the claims of the '129 patent at trial, this Court should direct a judgment as a matter of law of non-infringement of the '129 patent prior to the commencement of trial and find that since Alza will not assert that patent at trial it cannot carry its burden of demonstrating infringement.[1]  Alza only notified Andrx on the afternoon of November 30, when it presented a revised Opening Submission nearly a month after the initial exchange of the Opening Submissions between the parties, that it was not going to assert the '129 patent, so Andrx is still in the process of considering all its options.  Andrx is hopeful that it can work out a form of agreement with Alza as relates to the '129 patent, but until it does so or until the Court enters judgment as a matter of law of noninfringement of that patent, Andrx intends to pursue its counterclaims of invalidity with regard to claims 1 and 4-6 of the '129 patent.  Andrx will promptly update this Court regarding any further developments relating to the '129 patent.

---

[1]    Andrx takes issue, however, with plaintiffs proffered explanation that this will "streamline" trial. This does not appear to be true. Claim 7 of the '373 patent, while narrower than claim 1 of the '129 patent , contains all the limitations thereof, *i.e.*, it could have been drafted as a dependent claim from claim 1 of the '129 patent. Thus, most of the same arguments are still in play and apparently all the same witnesses.

As regards the remaining triable issues, much of Plaintiffs' Opening Brief is devoted to two subjects: (1) how Alza developed the Concerta product, and (2) comparisons between Concerta and Andrx's proposed products. While perhaps making for somewhat interesting reading, those two subjects are legally irrelevant to an infringement analysis, which is the only analysis Plaintiffs purported to include in their Opening Pretrial Brief.

There are, however, some salient points made in Plaintiffs' brief. The first of which is that Plaintiffs have only alleged infringement of claims 1 and 6-7 of the '373 patent. The fact that Plaintiffs will offer proof regarding only those claims will be reciprocated by Defendants in that Defendants will only argue noninfringement and invalidity of the asserted claims of the '373 patent.[2] Furthermore, Plaintiffs have not asserted the Doctrine of Equivalents in its Opening Pretrial Brief with regard to any of the asserted claims. Thus, Defendants have nothing to respond to on that point. Thus, the only infringement questions that arise are whether claims 1 and 6-7 of the '373 patent are literally infringed. Of these claims, only claim 1 of the '373 patent is independent and the remaining claims are dependent from that claim. Thus, if claim 1 is not literally infringed, no asserted claim in suit can be infringed.

Alza also acknowledges, as it must, that all of the claims in suit are directed towards methods of treatment of ADD or ADHD. Andrx will not actually be treating anyone; therefore, Alza also acknowledges in it Pretrial Brief that Andrx's proposed activities would not directly infringe the claims in suit under 35 U.S.C. Section 271(a). (*Plaintiffs' Opening Pretrial*

---

[2]    In their Opening Pretrial Brief, Defendants also asserted invalidity of claims 2-4 of the '373 patent. Those claims had been alleged to be infringed in both Plaintiffs' expert reports and in the Joint Pretrial Order. Despite the fact that Defendants have counterclaims of invalidity pending, Defendants will only assert invalidity at trial of the claims of the '373 patent that Plaintiffs actually assert are infringed. As noted above, once an appropriate form of judgment is entered on the '129 patent, Andrx presently intends to drop its counterclaims directed toward that patent.

*Submission* at p. 42).

Thus, the case regarding infringement by Andrx ultimately becomes an issue of contributory infringement and inducement of infringement. 35 U.S.C. Sections 271(b) and (c). Direct infringement is still relevant because there can be no contributory infringement or inducement of infringement without direct infringement. In this regard the key limitations of the claims in suit are whether (1) the various strengths of Andrx's proposed tablets have an "ascending release rate over an extended period of time," and (2) whether the various strengths of Andrx's proposed tablets also provide a "substantially ascending methylphenidate plasma drug concentration over a time period of about [5.5 or 8] hours."

With regard to direct infringement of claim 1 of the '373 patent, as construed by this Court, the issue is whether Andrx's proposed tablets have an ascending release rate for the greater of 3 hours or half the T90 as measured in an "appropriate" dissolution media. Alza has asserted that under a particular test conducted in pH 7.5 media that 9, 8, and 12 out of 12 samples of Andrx's 54 mg, 36 mg, and 27 mg products, respectively, meet this limitation. Alza's argument, however, ignores that there must be an ascending release rate during the first time period.

Both Alza and Andrx agree, and this Court's claim construction provides, that the determination of whether a release rate is ascending or not is based only on the release from the non-IR portion of the particular dosage form (*i.e.*, it does not include the release from any IR component). Furthermore, the Court's claim construction notes that the ascending release rate must begin at time equals zero. Both that construction and the specification of the '373 patent makes clears that there must be some non-IR release during the first time period. If this analysis

is applied, Ms. Gray has admitted that, based on the data generated from her test and the assumptions that she applied, only 7 out of the 36 tested tablets could even conceivably be argued to infringe. The distribution of those allegedly infringing tablets consists of 3, 3, and 1 out of 12 of the 54, 36 and 27 mg tablets, respectively.

Ms. Gray's analysis also assumes a value of 25% of the total active (25% of the 54, 36 or 27 mgs) is contained in the IR portion and merely subtracts that amount out. Andrx's product specifications allow, however, for a variance in that amount for any given tablet. If each of the 7 samples that Ms. Gray asserts infringe actually contain a higher, yet within specification, percentage of the active in the overcoat, then none of those samples would infringe.

In any event, Ms. Gray also acknowledges that there is variability in the test and that no reasoned dissolution experimenter would rely on the value of a test of a single tablet since that test could have been in error. That is why tests are run in groupings of at least six. If these mean groupings were used for her analysis, Ms. Gray acknowledges that her data set for each of the dosage strengths demonstrates no ascending release rate in the first hour. Thus, Plaintiffs cannot carry their burden on the direct infringement portion of claim 1, and thus by dependency, claims 6 and 7, of the '373 patent.

Moreover, the variability on infringement introduced by Ms. Gray's assumptions indicate that the test proposed by Ms. Gray conducted from the beginning in a pH 7.5 medium is not appropriate with regard to the "ascending release rate" requirement of the claims of the '373 patent. Assuming, *arguendo*, that claims can be valid which require one to know what the allegedly infringing product and the way that product was formulated and made before being able to determine what an "appropriate" dissolution test might be, the specification in this

instance requires that the non-IR portion not be counted in determining whether a dosage form has an ascending release rate. With regard to osmotic dosage forms such as those exemplified in the patent, an approximation of the amount of IR coating is required because it is difficult, if not impossible, to completely separate the amount of active released from the IR coating from the active released from the interior of the osmotic device, *i.e.*, the non-IR portion (although, as will be explained below, there are also better ways for doing the approximation that Ms. Gray did than by using the methodology she supplied to the testing laboratory).

Andrx, however, designed its product in a very specific and very different way than the products described in the examples of the specification of the patents in suit. While the examples of the patent refer to an osmotic which would begin releasing active as soon as possible after introduction to any system, whether in vitro or in vivo, Andrx's products were designed to give an initial burst release from an IR overcoat and then provide a period of minimal or no release with accompanying declining plasma profiles, followed by a gradual and extended term release from the core of the product. Andrx's various strength proposed products achieve this release by having an IR coating disposed around a core with a pH-sensitive enteric coating placed between the core and the IR coating. This enteric coating is designed so as to inhibit release from the core until a pH of over 7 is reached.

Because of the way Andrx's proposed products are formulated, there is no need for Ms. Gray to make an assumption with regard to the amount of IR dose in each tablet. Rather, to undertake the calculation required by the claims of the '373 patent as they have been interpreted, Ms. Gray need only undertake a two stage test wherein the Andrx products would be subjected initially to a low pH media (such as simulated gastric fluid) for sufficient time to permit the dissolution and measurement of the amount of the IR dose and then move to a second, higher pH

(such as 7.5) which would permit measurement of the actual amounts released by the interior core of Andrx's proposed products. Indeed, Alza's testing laboratories performed a series of tests that provide just such information. However, Alza and Ms. Gray do not rely on that testing because to do so would result in a finding of non-infringement. Nevertheless, where the ascending release rate of the claims of the '373 patent require that the IR portion not be counted and where infringement turns on the question of how much active is released from the non-IR portion in the first hour and where that information can actually be calculated, an "appropriate" dissolution test requires the ability to make such calculations rather than rely on assumptions about the actual amount of active in the IR coating.[3] Alza asserts direct infringement based only on its testing of Andrx's proposed products in a dissolution test which is clearly inappropriate. Thus, Alza cannot meet its burden of demonstrating direct infringement, and thus cannot prevail on its theories of contributory infringement or infringement by inducement.

In anticipatory response to this argument, Alza has asserted that Andrx has conceded in its ANDA filings that the test used by Ms. Gray is "appropriate." Alza's argument relies entirely on the use of the word "appropriate" in Andrx's description of its tests to the FDA for purposes of the regulatory filings in question. Alza's argument, however, fails to recognize that the word "appropriate" is a qualitative word and depends on the context in which it appears. For example, "appropriate" attire for the beach is definitely not "appropriate" attire for a courtroom. In this instance, Andrx's representations about "appropriateness" of its test are done as part of quality

---

[3]     Additionally, as will be discussed below, even if one were going to make an assumption there are better ways to do the test to ensure appropriate segregation of the IR dose from the non-IR dose. Ms. Gray's methodology simply does not accurately allow calculation of the IR amount release. According to Ms. Gray, however, an "appropriate" test to a person skilled in dissolution means the best test. Since Ms. Gray's test was clearly not the best test, it was not an "appropriate" test under her definition and thus cannot establish infringement.

assurance and control of its product. Andrx's testing is performed so as to ensure that Andrx's

manufacturing process is running correctly and thus is producing product in a fashion that will

reproducibly lead to the *in vivo* results achieved in its biostudies. In that respect, Andrx is not

interested in excluding the IR portion of its proposed tablets from its calculation. Therefore, its

test can fairly be stated to be "appropriate" for that desired goal – but not for the purpose of

assessing the occurrence of an "ascending release rate over an extended period of time."

    Of course, as has been previously noted, the "appropriate" test(s) for purposes of the

patent with regard to a particular dosage form requires, to the extent possible, segregation of the

test results from the IR dose from those of the non-IR dose. The reason why such a distinction is

made is self explanatory and is observable as graphically depicted in Figure 3 of the patents in

suit:



FIG. 3

Figure 3 is a graphical representation of release rate(s) including that of the IR dose. If

the IR dose is not discounted, the release rate in hour 2 (or the time period just subsequent to the dissolution of the IR dose) would not be greater than that in the first time period. Therefore, it is entirely understandable that a test would be considered "appropriate" for the normal purposes associated with a dissolution test as reported in Andrx's ANDA while being "inappropriate" with regard to the claims of the '373 patent.

Additionally, the FDA did ask Andrx to more particularly provide information about the amount of material in the immediate release dose after it submitted its proposed dissolution test. Based on Andrx's information as accepted by the FDA, the correct assumption would be that all of the material released in the first hour of a pH 7.5 dissolution test would be from the IR dose. (*See* DTX 232). In other words, the correct assumption, if one were to be made, would be to assume that, due to the design of the dosage form, the material released in the first hour is attributable to the IR component. Focusing on the label claim is not a good assumption due to the acknowledged variability in the IR dose. Indeed, tests performed by Alza's testing lab confirm this. Based on the correct assumption, Andrx's product would not have had release from the non-IR portion during the first hour, and thus, no infringement occurs.

In any event, even assuming for the moment that the dissolution test used by Ms. Gray was appropriate and reliable for use in an individual fashion and that her 25% label claim assumption is sufficient for purposes of infringement, her tests only support that, at most, Andrx's product might infringe 25% of the time with regard to the 54, 36 and 18 mg tablets and that the 27 mg tablet might infringe less than 10% of the time. Contributory infringement and inducement of infringement, however, require more than just a conclusory showing of direct infringement in some small number of cases. Contributory infringement specifically requires that there not be substantial noninfringing uses. *See* 35 U.S.C. § 271(b). Clearly, in a case

where noninfringement would occur at least 75% of the time there are substantial noninfringing uses for each of Andrx's proposed products.  Therefore, contributory infringement cannot lie as regards the '373 patent.

Based on the applicable case law, inducement requires a culpable state of mind to actually induce or cause the infringement and not just the inclusion of a package insert or labeling under FDA rules.  Moreover, the same alleged activity which would lead to the "inducement" of infringement would also lead to the "inducement" of non-infringement.  Thus, these activities cannot be sufficient to provide the scienter required for inducement, and inducement is not proper under the facts provided by Alza and Ms. Gray as regards claims 1, 6 and 7 of the '373 patent.

Claim 7 of the '373 patent requires both the ascending release rate detailed above as well as a "substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration."  The Court has construed this phrase as requested by Alza to state that "[a] substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises over approximately 8 hours, but may include a slight dip."[4] This definition would seem to make clear that if a plasma concentration includes more than "a slight dip" than that profile is not substantially ascending.  During the *Markman* proceedings, however, Alza never proffered an explanation as to what constitutes "a slight dip."  Alza also has not proffered such a definition in its Pretrial Submission.  Rather, Alza argues in only conclusory fashion that Andrx's mean profile for its proposed 54 mg product, as depicted graphically, is substantially ascending for approximately 8 hours with a slight dip.  (Alza Pretrial Brief at 35-

---

[4]     Claim 6 of the '373 patent requires the same type of profile but specifies that the time period need only be 5.5 hours as opposed to 8 hours.

39).

The mean graphical data presented by Alza demonstrates a first Cmax at 2 hours (the first measured time point) followed by a lower value than that Cmax at both hours 3 and 4 followed by an ascension to a second Cmax at hours 7 to 7.1 with a decline after that time point. (*Plaintiffs' Opening Pretrial Submission* at 35-37). Alza has not indicated in its brief what would constitute "a slight dip" and how that applies to Andrx's data. This is significant because, as explained above with regard to the dissolution profile of Andrx's product, Andrx's product *in vivo* is designed so as to have an immediate release followed by a period of minimal, if any, release followed by a second rise in the plasma concentration after the Eudragit dissolves. It is this period of minimal or no release that provides the designed decrease in plasma concentration subsequent to hour 2. The context of "a slight dip" in Figure 4 and the accompanying text in the patent has no expected design reason and instead could be expected to be due to random error. Indeed, when Andrx's expert reviewed the data underlying Figure 4 that is exactly what was observed, *i.e.*, that the slight dip was not a statistically significant decline meaning that it cannot be established that, while the values represent an absolute value "dip," they could not be said to represent a true decline in value at any point. The data underlying Andrx's data, however, represents a statistically significant decline; such a decline is not "a slight dip" but rather is a decline which keeps Andrx's mean profile from substantially ascending.

This is perhaps even more notable with regard to claim 6 of the '373 patent which only requires that the profile substantially ascend for 5.5 hours. Plasma profile data points are available at 2, 3, 4, 5 and 5.5 hours. Of those data points, hours 3 and 4 in all of Andrx's mean data represent a decrease from hour 2. The profile then ascends from hours 4 through 5.5. Thus, a profile that decrease for 2 hours, or more than 1/3 of the total time of the 5.5 hour profile would

still "substantially ascend" under whatever Alza definition of a dip.[5] Such a result is illogical.

Alza spends much of the text of the section devoted to Andrx's mean profiles to asserting that Andrx argued to the FDA that it had a substantially ascending profile for 8 hours and that Andrx's products are bioequivalent to Concerta. With regard to the former, this is absolutely untrue. Andrx's submissions to the FDA assert that Andrx's products are bioequivalent to Concerta (which is the same as the second point). With regard to the second point, it is black letter law that an infringement comparison is made between the claims of the patents in suit and Andrx's proposed product and not between Andrx's proposed products and Alza's commercial product. Whether Andrx's product ultimately is determined by the FDA to be bioequivalent to Concerta is simply irrelevant.

Alza then proceeds to its analysis of the individual plasma profiles as compared to claim claims 6 and 7 of the '373 patent. As an initial matter, it is, at best, unclear that these claims are directed to individual, rather than mean, profiles. Claim 1 of the '129 patent, which will not be asserted at trial, requires that the method is used with, and the profile is presented in, "a patient," *i.e.*, an individual. Claims 6 and 7 have no such language, and the claim construction does not address this issue outside of the context of the word "patient." As such, it appears that the inventors felt the need to use the word "patient" when they wanted to claim to apply to the individual. Since claims 6 and 7 do not have such a limitation and thus the claim should be applied to mean plasma profiles. Even if such individual profiles are considered, however, at best, they support a finding of infringement in a minority of instances.

---

[5]     Since time point zero will always have a zero plasma concentration, the first time point taken will always represent an ascension. Here since the time point taken was 2 hours Alza is in effect attempting to take a free pass on over 33% or 25% of the 5.5 or 8 hour profiles respectively.

According to Alza's conclusory allegations on pages 38-39 of its Pretrial Submission, "as many as" 23 of the profiles depicted would meet the 8 hour requirement of claim 7 of the '373 patent.  Of course, this analysis fails to acknowledge that there were a total of 23 profiles.  Thus, if a maximum of 23 infringe, that means that, at a minimum, 70% of the profiles *do not infringe by Alza and Dr. Angst's own admission.*

Moreover, while it is unclear from its brief what Alza and Dr. Angst consider "a slight dip" (other than that "a slight dip" does not reach so far as to reach a 35-40% decrease in plasma levels), it is clear that Dr. Angst did include in his "infringing" profiles those containing multiple "dips" within the applicable time proposed.  Andrx also submits that a substantial ascension through approximately 8 hours could mean, on a favorable interpretation for Plaintiffs, that the Cmax of the formulation would need to occur only after 7 hours as a concession to the approximately 8 hours, *i.e*, at the 7.5 hour measurement or later of the depicted profiles (in the attached Exhibit 6, a tabular compilation of the exemplary 8 hour profiles, the Cmax is highlighted in yellow and if a Cmax potentially qualifies it is also bolded).  This requirement just follows the logic that if a profile has begun its descent to baseline at 7 hours or earlier, it cannot still be substantially ascending at approximately 8 hours.  If one eliminates the individual profiles that contain multiple dips prior to 7 hours and have a Cmax at the 7 hour mark or earlier from Dr. Angst's analysis, *then only 6 out of Dr. Angst's profiles could possibly infringe.*  (In Exhibit 6, decreases are highlighted blue.)

In any event, assuming that Alza and Dr. Angst's allegations of direct infringement are credited, neither contributory infringement nor inducement of infringement will lie for the same reasons presented with regard to claim 1 of the '373 patent.

Finally, Alza merely sets out in its brief and conclusions of law that they are entitled to an injunction against approval of Andrx's ANDA until January 31, 2018. Indeed, Alza has acknowledged that the typical relief in a non-ANDA cases where there is direct infringement at most a minority of times would be damages based on the percentage of sales and that an injunction would typically not be granted. (*Markman* Transcript [D.I. 109] at 43-44). Under Alza's theory, presumably the use of one Andrx tablet leading to one instance of direct infringement sold pursuant to the label and package insert would be enough to enjoin Andrx under 35 U.S.C. Section 271(e)(4). Such a result would clearly be inequitable, but Alza indicates that it is required by the language of Section 271(e)(4).

The specific language of 271(e)(4) in a similar context, however, was addressed by Judge Posner (sitting by designation) in *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1045-1051 (N.D. Ill. 2003), *aff'd on other grounds*, 403 F.3d 1331 (Fed. Cir. 2005).[6] Judge Posner's well reasoned opinion establishes that, while the language of 271(e)(4) at first blush might appear to require the result requested by Alza, the statue still permits judicial discretion in determining whether to grant an injunction. Thus, even if this Court were to hold the claims were not invalid and that there was inducement of some small level of infringement, the Court has the discretion not to enjoin Andrx's product. Such discretion should be exercised in this instance based upon the minimal infringement and lack of culpable mindset of Andrx.

---

[6]    The Federal Circuit did not reach the issue raised by 271(e)(4) because the Court invalidated the claim at issue and thus, did not need to reach the question of the appropriate remedy.

## II.     BACKGROUND

### A.     ALZA's DEVELOPMENT WORK IS IRRELEVANT

Pages 5 to 12 of Alza's Opening Pretrial Submission purportedly describes its

development of Concerta and has nothing whatsoever to do with the issue of whether Andrx's

product infringes.  Rather, as this Court no doubt is aware, in a situation such as this where

claims have been construed and only literal infringement has been alleged (even if only by

contributory infringement or infringement by inducement), the analysis to be undertaken is

straightforward in theory, if not necessarily in application to the actual facts.  The analysis only

requires a comparison of the asserted claims as construed with the use of Andrx's proposed

products and Andrx's allegedly contributory and inducing activities. *Johnson & Johnson Assoc.*

*Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002).  An analysis of infringement

comparing Alza's activities with Andrx's alleged infringing acts is legal error. *Zenith Labs., Inc.*

*v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994).  To the extent Alza

"discovered" anything, such discovery is only relevant, if at all, to rebutting Andrx's arguments

of invalidity, not to infringement.  Under the present order of trial, Andrx is supposed to make

the first presentation on invalidity.  Thus, Andrx objects to Alza putting on evidence of its

"discovery" outside of the its rebuttal case on invalidity, which order was set by this Court at the

final pretrial hearing.  More specifically, based on Alza's citations in its findings of fact for this

section, Andrx objects to Alza calling Dr. Guinta in its opening case in chief.

Additionally, Andrx objects to Dr. Guinta testifying on many of the areas that she is

proposed to testify based on Andrx's reading of Alza's findings of facts based on three reasons:

(1) hearsay, (2) lack of personal knowledge, and (3) duplication.  These areas will be addressed

specifically in each of the findings, but in general, Dr. Guinta has not been qualified as an expert

or submitted an expert report in this case. Thus, she is a fact witness. As such she can give

testimony relating to her work on Concerta or work that she observed. Many of the citations to

her testimony, however, relate to what the prior art indicated, what the problems were in the art,

the historical development of ADHD treatment, *etc.* Dr. Guinta simply is not qualified to testify

about such matters as a fact witness. Furthermore, Dr. Guinta's testimony, to the extent relevant,

is expected to be duplicative of other of Plaintiffs' witnesses such as Dr. Feifel. Alza will have

the opportunity to put on this information to the extent it is relevant during its rebuttal case at

trial, but Dr. Guinta is not the correct person to testify regarding much of it.

### A1.    ANDRX'S DEVELOPMENT AND DESIGN AROUND EFFORT

While the development process of CONCERTA is irrelevant to the issue of infringement,

the indirect infringement allegations leveled against Andrx require consideration of Andrx's

intent to contribute to, or induce, infringement. *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d

1293, 1304-05 (Fed. Cir. 2006) (Section III. B. en banc). Moreover, the development of Andrx's

products are also relevant to consideration as to whether Alza should be afforded the equitable

relief of an injunction that it seeks.

The 18 and 36 mg dosage strengths of CONCERTA were first approved by the FDA in

August 2000. Andrx's development work on its proposed products began in September 2000.

At that time, Andrx was aware of some of Alza's published patent applications which it

considered to be related to Concerta. Those publications noted that Alza's exemplary

embodiments demonstrated an ascending release rate and yielded an ascending plasma profile.

Thus, when Andrx undertook its work its goal was to generate a bioequivalent formulation to

Concerta through use of a product that would provide for an initial period of no release from the

delayed release core coupled with an immediate release core so as to differ from the ascending release rate of the publications (and a consequent drop in plasma profile).  (Expected Testimony of Xiu Xiu Cheng).

In pursuit of this goal, Andrx's development group chose to avoid the ascending release rate approach of the patents in suit.  Instead Andrx eventually settled on an approach based on a larger immediate release dose than that depicted in the publications (25% of the active in Andrx's proposed products versus 22% in the publications) followed by, first, a period of no release and, secondly, a period of extended release from a delayed release core.  Andrx believed that such an approach might provide a bioequivalent profile while designing around what was then published with regard to Alza's applications.  Dr. Cheng, the head of development on Andrx's project, was aware of previous work on a oxycodone containing product which might provide a good starting point for such a formulation.  Andrx's formulators began work on such a formulation using the oxycodone work as a model.  (*Id.*)

**REDACTED**

**REDACTED**

This expected profile is actually demonstrated in the mean plasma profiles obtained by Andrx from the biostudies set forth in its ANDA. (Expected Testimony of Xiu Xiu Cheng; DTX 699; DTX 700). Dr. Bolton, an expert biostatistician retained by Andrx in this litigation, will demonstrate that the decline demonstrated in Andrx's profile is actually a real decrease from the initial Cmax created by the IR coating, as would be expected based upon Andrx's formulation. Thus, the mean plasma profiles depicted upon administration by Andrx's products produce actual declines and not "slight 'dips'" based upon the design of the formulation. (Expected Testimony of Dr. Bolton). Andrx's efforts to avoid using the plasma profiles ultimately required by the claims were clearly successful, as even Alza acknowledges that Andrx's products do not produce a plasma profile satisfying the relevant limitations of claims 6 and 7 in the majority of cases.

Additionally, the claims and specification of the '373 patent indicate that the patents are directed towards formulations which, setting aside the IR dosage, are formulated so as to begin releasing from the extended release portion within the first hour and continue to release at an ascending release rate over an extended period of time. (DTX 1 at col. 10, lines 10-16 and 31-52). With regard to the *in vitro* tests that are required with regard to the claims of the '373 patent, everyone agrees, and the tests conducted for Alza by ARL but not relied on by Ms. Gray demonstrate, that in a dissolution media with a pH of less than 7 there will theoretically be no

release from the delayed release core. Thus, in a dissolution test containing a media with a pH of 7.0 or lower, there would theoretically be no ascending release rate as long as the coating was working as designed. Ms. Gray acknowledges that the tests generated indicate that Andrx's enteric coating was working as designed. (Gray Dep. Tr. at 171-72, 287). Moreover, both Andrx's and Alza's tests of Andrx's proposed products indicate that, even in a media with pH of 7.5, there is no release from the enteric coated core until more than one hour has passed. (Expected Testimony of Xiu Xiu Cheng and Drs. Banakar and Needham; *see* DTX 724 at P ALZ 005800). Thus, assuming for the moment that claim 1 of the '373 patent requires some release from the non-IR portion of the tablet during the first time period—in this instance, the first hour—the relevant test data indicates that such release does not occur. (Expected Testimony of Drs. Cheng and Banakar).

Andrx completed its design of its proposed generic product and filed its ANDA on the 54 mg tablets on February 3, 2003. (DTX 176). This filing was later amended on June 27, 2003, to add the additional strengths of 18, 27 and 36 mgs. (DTX 234) These filings all occurred long before the '373 patent was issued on July 19, 2005. At the time that Andrx filed its ANDA, three unexpired patents were listed in the Orange Book with regard to Concerta. Those three patents were all set to expire on September 16, 2003. Andrx filed a Paragraph III certification on those patents indicating that it would not market its ANDA products prior to the expiration of the patents. (DTX 176 at ANDRX 00029).

After the three listed patents expired and while Andrx was awaiting approval of its ANDA, McNeil, Alza's authorized distributor of Concerta, filed a White Paper with the FDA arguing that any generic product claiming bioequivalence should have to meet additional requirements to demonstrate bioequivalency. (Gelotte Dep. Tr. at JDT 00637-38). In the

meantime, Andrx was advancing towards final approval and indeed was prepared to ship product.

Then on March 19, 2004, McNeil filed a Citizen's Petition to delay any generic product, including Andrx's from coming to market. Amongst McNeil's series of filings with the FDA regarding its Citizen's petition, McNeil recognized that a product can be bioequivalent to Concerta and yet, in McNeil's view not have the same type of profile as Concerta. (DTX 106 at ALZ 00067897-98). That is what has occurred with regard to the plasma claims of the '373 patent. Andrx's product is bioequivalent but does not a provide a substantially ascending profile (as defined in this case) based on its design.

While successfully using McNeil's Citizen's Petition to delay Andrx's entrance onto the market,[7] Alza continued another facet of its delay game, seeking patent claims directed not to the potentially novel osmotic dosage form that it created, but rather to method of treatment claims. Alza eventually was successful in getting such claims and in listing the patents in the Orange Book. Once this happened the next facet of Alza's delay game began because Andrx was forced to certify against those patents. Alza then filed the present suit against Andrx. Trial is set to commence on December 10, 2007.

**B.    THE SUBJECT MATTER OF THE '373 AND '129 PATENTS**

This Court has already construed the claims of the '373 patent. As set forth in Andrx's

---

[7]    Citizen's Petitions have been noted as a non-patent related way for the NDA holders to attempt to delay the commercial introduction of generics. While in most cases these petitions are not upheld, they do serve the desired purpose of delaying introduction of lower priced products and permitting the NDA holders to garner millions of dollars or more of profit at the expense of patients. Marc Kaufman, Petitions to FDA Sometimes Delay Generic Drugs, Washington Post, July 6, 2006, at A01, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2006/07/02/AR2006070200840_pf.html. (Exhibit 7).

Opening Pretrial Brief at pages 9-128, those claims are obvious and are also invalid under Section 112. Defendants acknowledge Plaintiffs' representations that they will only assert infringement as to claims 1, 6 and 7 of the '373 patent.

### 1.     The claimed treatment methods

The Court has construed these claims. Andrx agrees that claim 1 of the '373 patent does not require any particular *in vivo* results, nor does it require any particular degree of ascension. Thus, claim 1 of the '373 patent covers dosage forms which would not actually be effective for treatment. Indeed, based on the breadth of this claim (as well as claims 6 and 7 which add *in vivo* limitations), those claims are invalid as obvious, not enabled for the full scope and indefinite. *See Defendants' Opening Pretrial Brief* at pp. 9-128.

### 2.     The patent specifications

The relevant portions of the common patent specification for the patents in suit are generally set forth in Andrx's Opening Pretrial Brief. *See id.* at pp. 27-35.

The specification portions are specifically relevant, however, for infringement on a couple of points given no attention by Alza. Specifically, the '373 patent states that, to qualify as an ascending release rate, there must be some measurable release from the non-IR portion during the first periodic interval. (Expected Testimony of Dr. Banakar).

The common specification first provides that:

> It will be appreciated that ***the first periodic release rate measured***, e.g., the periodic release rate at t=1 hour (***unless equal to 0), will always be greater than the release rate during the preceding period, e.g., the hour before the dosage form was administered,*** and, thus, the first periodic release rate always constitutes an occurrence of an ascending release rate.

(DTX 1 at col. 10, line 10-16) (emphasis added). Thus, the first periodic measurement, here Ms. Gray's 1 hour measurement, is compared to the release prior to the commencement of the dissolution test on Andrx's proposed tablet (which by definition is necessarily zero).

Next the specification provides that:

As used herein with reference to the time period during which an ascending release rate is provided, *"an extended time period" refers to a time period beginning at t=0 hours* and continuing through at least the mid-point, and preferably beyond the mid-point, of the relevant $T_{90}$ of the dosage form. Because the dosage forms of the present invention are intended to provide sustained release of drug, a suitable $T_{90}$ for purposes of this invention is at least about 6 hours and, consequently, the "extended time period" during which an ascending release rate is provided is at least 3 hours.

In accord with the above-recited definitions, an *"ascending release rate over an extended time period" refers to ascending release rates of drug obtained from the time of administration of the dosage form* through, and preferably beyond, the mid-point of the relevant $T_{90}$ for the dosage form. To illustrate, consider a situation where a dosage form has a $T_{90}$ of about 8 hours. In this situation, *"an ascending release rate over an extended time period" is achieved when the release rate at each hour through t=4 hours is greater than the release rate in the immediately-preceding hour*. Preferably, the release rate continues to ascend during time periods beyond t=4 hours.

(DTX 1, column 10, line 31-52) (emphasis added); (*see also id.* at Examples 1-4 (in cols. 13-18). This section of the specification requires, as does the Court's claim construction, that the ascending release rate be demonstrated from commencement of the test, *i.e.*, time equal zero. Thus, according to the claim construction and the language from the common specification, to have an "ascending release rate over an extended period" as required by the claims of the '373 patent, there must be some dissolution from the non-IR portion of the dosage form (a separate component of the Court's claim construction) at the time of the first sampling in the test performed by ARL and relied on by Ms. Gray.

Similarly, with regard to the allowance of "a slight dip" in the "substantially ascending"

-21-

profile, the patent indicates that a "substantially ascending profile" does not "decline" but can

have "a slight 'dip'":

> As shown in Fig. 4, the plasma drug concentration following each administration of an immediate-release dose rises relatively rapidly and then declines at a generally characteristic rate until the next dose is administered. The plasma drug concentration following administration of the tri-layer osmotic dosage form also exhibits an initial relatively rapid rise *due largely to release of drug from the immediate-release drug overcoat. Subsequently, however, the plasma drug concentration does not decline but continues to substantially ascend (save for a slight "dip" between t = 5.5 hours and t = 6.5 hours)* through a time period of 9.5 hours. Particularly striking is the difference during the time periods within about 1 hour before and about 1.5 hours following administration of the second and the third immediate-release dose [at t=4 and 8 hours, respectively]. With the standard regimen, during these periods, the plasma drug concentration declines to a trough concentration and then rises again to a peak concentration. With the experimental regimen, during these same time periods, the plasma drug concentration is substantially smoothly ascending and exhibits no peaks and troughs.

(DTX 1 at col. 21, line 64 – col. 22, line 16 (emphasis added); *see also* DTX 1 at Fig. 4). Thus,

the common specification indicates that a substantially ascending plasma drug concentration,

while permitting "a slight 'dip,'" does not permit a "decline" especially at the time when the

initial immediate release overcoat is being eliminated, *i.e.*, the plasma level associated with the

IR coating is decreasing.

Additionally, at the *Markman* Hearing, counsel for Alza characterized this portion of the

specification as follows:

> Finally, last issue on this is -- second to last issue on this is when does the -- can there be a slight dip, and when does it occur? And on this, Your Honor, let's take a look at the slide that I put up, because this is -- it's an important point. I want to make sure that I've explained it.

> Remember, this is the exemplary embodiment, and it is described in the specification as being a substantially ascending plasma concentration. And you see it is substantially ascending.

> And *as we propose in our construction, it's generally going up.* But you see

-22-

there's *a little itty bitty dip* right here. And this is explained in the specification, and I've put the language next to it.

It says that it describes this generally ascending, and it says that subsequently, the *first part comes from the immediate coat, and then subsequently the plasma drug concentration does not decline, but continues to substantially ascend [save] for a slight dip* between T equals five and a half hours to T equals six and a half hours -- that's the slight dip we see there -- through a time period of nine and a half hours.

*So it's generally going up to about nine and a half hours. And this is described as a substantially smoothly ascending plasma concentration. So what the specification is telling us is that substantially ascending doesn't mean there can't be any little dip in it. There can be a slight dip in it.*

The specification, when you read it and we didn't produce all of the language here, but it goes on to describe the old-fashioned initial release tablet. It describes these as peaks and troughs. And it says the substantially ascending concentration doesn't have the peaks and troughs.

*And so it gives pretty clear guidance as to what we're talking about, something that's substantially ascending similar to what we see in the example that is given.*

(D.I. 109 at 55-57 (emphasis added); *see also Defendants' Opening Pretrial Brief* at ¶¶ 450-451).

According to Dr. Gupta, the lead inventor on the patents in suit, based on his eyeballing of

Figure 4 under questioning by Plaintiffs' counsel, the "slight 'dip'" constituted a drop of about

10%. (Gupta Dep. Tr. at JDT 00372-373). When the actual data is examined underlying Figure

4 one notes that the actual "dip" constitutes a drop of 6%. (Expected Testimony of Dr. Bolton).

Alza now seeks to expand this minor and statistically insignificant "divot" to permit multiple

declines wherein the difference between successive point on the profile can decline by as much

as 15%. (Angst Dep. Tr. at 18-22).

-23-

### III.    NO INFRINGEMENT OF THE '373 AND '129 PATENTS

#### A.    THE LEGAL STANDARDS FOR INFRINGEMENT

Defendants do not disagree with much of the law of infringement set forth by Plaintiffs. There are a few points which require clarification, however. First, Alza states that "an accused method that *sometimes* meets all of the elements of the asserted claims infringes the claims. *Bell Commc'ns. Research Inc. v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) ('an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes.")." *Plaintiffs' Opening Pretrial Submission* at 16 (emphasis in original). This case is inapposite to the present claims of the '373 patent that are asserted. *Bell* does not stand for the premise quoted, *i.e.*, that an accused method can infringe when it only sometimes meets the elements of the claim. Rather, the quoted language is correct, namely an accused product that sometimes embodies the method can infringe.

The distinction between those two statements may seem subtle, but its implications are profound in this case. In the *Bell* case, a system entitled Vitalink sometimes practiced the claimed method and sometimes did not. In the present case, the products at issue are individual tablets which are not reusable. Each tablet will or will not perform the method claimed depending on whether it meets all the limitations of the claim including an ascending release rate. *See Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 418 F. Supp. 2d 1021, 1042 (S.D. Ind. 2006).

*Cardiac Pacemakers* dealt with a situation where an implantable device was implanted in a way which avoided practice of the claimed method. *Id.* at 1040. The patentee alleged that it was entitled to damages on every device sold because some of the product practiced the claimed

method and cited *Bell*. *Id.* at 1040-42. The *Cardiac Pacemaker* court noted that this argument "confuses the distinction between all devices sometimes practicing the patented method *and the very different situation of some devices never practicing the patented method*." *Id.* at 1042 (emphasis added). Direct infringement of the method claims, and thus liability, only occurs when the patented method is actually practiced. *Id.* at 1041.

In this instance, even taking Ms. Gray's and Dr. Angst's testimony at face value (which it should not be for the reasons set forth below), it is clear that some amount of Andrx's product will never infringe. Moreover, Alza can never actually show which tablets infringe and which do not because the mere act of determining whether or not a particular tablet has an "ascending release rate" as required by all the asserted claims destroys the tablet and prevents it from ever being used in the method. Thus, Alza can not show any actual evidence of direct infringement. It can only argue probabilities and percentages.

An additional point from *Cardiac Pacemakers*, however, is that the times when the "ascending release rate" is not achieved does not create liability or infringement, and as such, those uses should not be enjoined (as will be discussed later). At most, Alza may be entitled to some damages should this Court determine that some percentages of Andrx's sales will lead to direct infringement.

Additionally, however, Alza does not even mention here that Andrx can only be liable as either a contributory infringer or for inducing infringement; Andrx does not directly infringe the '373 patent. *See Plaintiffs' Opening Pretrial Submission* at 42-45. In this instance, again by Plaintiffs' experts' own admissions, there will be substantial noninfringing uses of Andrx's proposed products. Thus, from the sheer language of 271(c), contributory infringement will not

lie.

The Federal Circuit sitting *en banc* recently restated the requirements of inducement, and more specifically, it set for the standard regarding what type of intent is required for inducement. *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304-06 (Fed. Cir. 2006) (Section III B *en banc*). *DSU* is nowhere cited in Plaintiffs' Opening Submission. In *DSU* the Federal Circuit summarized the requirements of inducement as follows:

> Under section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they "actively and *knowingly* aid[ed] and abett[ed] another's direct infringement." *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir 1988) (emphasis in original). However, "knowledge of the acts alleged to constitute infringement" is not enough. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) (citation omitted). The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Id.* at 1364 (citing *Manville*, 917 F.2d at 554).

*DSU*, 471 F.3d at 1305.

Rather than citing *DSU* Plaintiffs state that:

> Since there is no dispute that Defendants had knowledge of the patent-in-suit, Plaintiffs are simply required to show intent to encourage the acts constituting infringement.

*Plaintiffs' Opening Pretrial Submission* at 43. This is simply not the law post-*DSU*:

> *Grokster* has clarified that ***the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement.*** Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement. . . . Accordingly, inducement *requires evidence of culpable conduct*, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.

*DSU*, 471 F.3d at 1306 (emphasis added). In declining to reverse the denial of a request for a

new trial, the *DSU* panel noted the existence of advice of counsel and that the alleged inducer did not believe its product infringed, and thus it lacked the specific intent required for inducement. *Id.* at 1307.

All of the cases cited by Plaintiffs' on pages 42-44 of it Opening Submission pre-date *DSU* and to the extent they are contrary to it, they are overruled. Most of them are inapposite in any event as will be discussed below.

### B.     THERE IS NO LITERAL INFRINGEMENT OF CLAIM 1 OF THE '373 PATENT

#### 1.     The Elements of Claim 1

Andrx generally agrees that claim 1 has three extremely broad elements. Andrx also notes that the use of elements (A) and (B), *i.e.*, methods of treating ADHD by administering ADD or ADHD through use of methyphenidate, was decades old by the time of the alleged "invention(s)" of the patents in suit. Indeed, a once a day treatment with methyphenidate was also in the market, Ritalin SR. While that product has been disparaged by Alza as being unsuccessful, it did have 10% of the market as defined by sales or 7% of the market as defined by the total prescriptions as of 1995. Thus, that product clearly worked for some group of individuals.

Additionally, Andrx disputes that the method claimed in claim 1 necessarily provides an advantage over Ritalin SR or any other ADHD product. Alza has acknowledged that, to the extent there is a benefit garnered from use of Concerta, the benefit is provided by the substantially ascending plasma profile over periods of at least 8 hours. (DTX 13 at p.4; Expected Trial Testimony of Dr. Mayersohn). As Alza repeatedly made clear during the *Markman*

Hearing, claim 1 of the '373 patent does not require any particular type of plasma profile much less a substantially ascending one for approximately 8 hours. Indeed, asserted claim 6 suffers from the same deficiency. The only asserted claim which does not appear to suffer from this infirmity is claim 7 of the '373 patent. However, as acknowledged by Alza, even in that instance the product offers convenience over the prior art multiple immediate release methylphenidate regimen of the prior art, but it does not represent any actual clinical advantage over that regimen. (DTX 13 at p. 4-5; Expected Trial Testimony of Dr. Mayersohn).

As set forth below, Andrx disagrees that the four proposed strengths of its products have the required ascending release rate.

**2.      The Court's Construction Of The Ascending Release Rate Element Of Claim 1 Of The '373 Patent**

        **a.      Ms. Gray relies on an "inappropriate" dissolution test**

Alza's construction, adopted by the Court, requires that the ascending release rate be evaluated based on data generated in an "appropriate dissolution test." Plaintiffs' definition begs the question as to what constitutes "an appropriate" dissolution test. Alza's arguments make it clear that there are a large number of "appropriate" dissolution tests available, whether due to changes in media, apparatus, speed of apparatus, etc. Yet, it appears that it is Alza's position that an "appropriate" dissolution test would be whatever test demonstrates an ascending release rate. If the definition of "appropriate" dissolution test is this broad and requires one to know what the allegedly infringing dosage form is prior to being able to begin to determine what is an "appropriate" test, such a claim is invalid for all the reasons set forth in Andrx's Opening Pretrial Brief.

From Defendants' perspective (as set forth in their Opening Brief), an "appropriate" dissolution test for purposes of the '373 patent is one that provides information regarding the relevant elements of the Court's construction; it elucidates the release of methylphenidate from the dosage form. More specifically, it permits: the determination of the amount of methylphenidate released (excluding the amount released from any IR portion) in periodic interval commencing with initiation of the test and continuing through at least the midpoint of the $T_{90}$. According to the '373 patent, an "appropriate test must also permit determination as to whether the rate of release of methylphenidate during a second time interval is greater than that released during the prior interval. Finally, an "appropriate" test must permit exclusion of the amount released from the IR portion (if any). (*See, e.g.*, Defendants' Pretrial Opening Brief at ¶¶ 401-403).

Early in its argument, Alza states that "[s]election of an appropriate dissolution test method for the ANDA products is straightforward and routine." (*See Plaintiffs' Opening Pretial Submission* at p. 21). Yet the relevant art indicates otherwise.

> [About fifty years] after the first attempts at dissolution testing, we are still grappling with the question of 'which media to use to run which dissolution tests.' This is not a trivial question, since the outcome of a test can be greatly dependent on the dissolution medium....
>
> (DTX 1064 at p. 193).

Moreover, the remainder of the paragraph which follows Alza's simple assertion stands in stark contrast: Alza provides that "both sides agree" that the selection of an appropriate dissolution test "should follow the guidance and recommendations for dissolution testing set forth in the United States Pharmacopeia (the USP)." (*See Plaintiffs' Opening Pretial Submission* at pp. 21-22 and fn. 8). This is simply incorrect. Alza's counsel expressly rejected such a notion

at the *Markman* hearing in successfully arguing for its proposed construction:

> On the question of the ascending release rate, the statement was made a couple of
> times that [Alza] agree[s] that it has to be a USP apparatus. ***We do not agree with
> that, Your Honor.***

(D.I. 109 [*Markman* Hearing] at 133:19-23) (emphasis added).

Similarly, Alza's allegation that Dr. Banakar "admitted" the same during the *Markman*

proceedings ignores the context in which his statement was made. *Plaintiffs' Opening Pretrial*

*Submission* at 21, n.8. Dr. Banakar's comment was made in the context of supporting Andrx's

proposed, and ultimately unsuccessful, "biorelevant" construction. With regard to Alza's

proposed construction, which is what is being used, Dr. Banakar specifically stated that:

> I note that Alza's proposed interpretation – "appropriate" – does nothing to
> improve the indefiniteness of the claim, as it does not say "appropriate" for what
> and still leaves the [Person of Ordinary Skill in the Art] without any
> understanding of the claim boundaries.

(D.I. 93 [Decl. of Banakar ISO Andrx's Opening *Markman* Brief at ¶ 44). It was only after

making this statement about Plaintiffs' proposed definition that Dr. Banakar stated that to cure

the indefiniteness he would read the claim as directed to a biorelevant dissolution test and in this

context he would use one of the USP apparati. (D.I. 93 at ¶¶ 45-51). Thus, Dr. Banakar's

"admission" was made in a context which is now irrelevant under the Court's construction.

In contrast, having been awarded its claim construction with its inherent lack of clarity as

to what test(s) is appropriate, Alza now seeks to pull an "about face" and tries to downplay the

intricacies of dissolution testing in order to portray it as straightforward and routine by

suggesting that scientists conduct dissolution testing for one purpose or that all dissolution tests

provide the same information. Alza's presumption is incorrect.

Dissolution testing is conducted, generally speaking, for one of two purposes: quality control or formulation development.[8] As discussed below, the type of information that needs to be generated for use in the evaluation required by the Court's claim construction is similar to that of formulation development dissolution testing and not quality control dissolution testing. (Expected Trial Testimony of Dr. Needham).

As a tool for quality control, scientists often try to select a dissolution test and its parameters in an effort to allow for detection of manufacturing variations among production batches. Quality control dissolution testing operates on the assumption that for a pharmaceutical product that has an established pharmacokinetic profile, if the product is manufactured in a reproducible fashion to give essentially the same physical dosage form, then that dosage form would be expected to give the same pharmacokinetic profile and behave similarly *in vivo*. Thus, the question becomes one of how to ensure that the process is running reproducibly and is yielding the same physical product. Quality control dissolution testing is but one of the tests used to determine that the process is yielding the expected physical product, which permits tangential inference that they will perform the same as similar dosage forms previously tested *in vivo*. (Expected Trial Testimony of Dr. Needham).

As one of the main purposes of quality control dissolution testing is to detect variations among batches and allow for one batch to be compared to another, such dissolution tests, to varying degrees, may or may not reflect conditions that are present in the intended recipient of the dosage form. For example, various parameters may be adjusted or used that do not reflect

---

[8]    As there are many uses for dissolution testing, these two groups are general categorizations, which encompass the various uses and differentiate them based on underlying rationale. (Expected Trial Testimony of Dr. Needham).

-31-

conditions present in the intended recipient (*e.g.*, the volume of dissolution medium or the particular pH of the dissolution medium), but which increase the reproducibility of the test or make the test more sensitive (in detecting variations among different batches). As provided by Gibson:

> An *in vitro* dissolution method for batch QC is always defined for a new solid dosage form product. However, this method may not be sufficient for all different aims of dissolution testing that might arise. *The choice of dissolution method and test conditions should therefore be adapted to best serve their purpose.* For example, simplicity and robustness are crucial properties of a QC method; whereas physiological relevance may overrule these factors when a method is used for *in vivo* predictions.

(DTX 1065 at page 241) (emphasis added).

The purposes of dissolution testing for formulation development and dissolution testing for quality control are different (although they may share similar goals). One of the primary purposes of formulation development dissolution testing is to understand, at least to some extent, how the dosage form should be expected to perform upon administration to a patient. This allows for, *e.g.*, the selection of which formulation(s) to advance to *in vivo* studies. Therefore, for formulation development dissolution testing, ideally, physiological conditions at the site of administration should be taken into account when selecting the dissolution test conditions. (DTX 1067 at p. 211).

In this particular case, Andrx conducted extensive dissolution studies for its proposed ANDA products using varying methods and using different media; it did not, as Alza implies, only perform dissolution testing in pH 7.5 media, but rather performed tests using a variety of pHs. Such testing is necessary to allow the FDA to approve a final dissolution method which can adequately detect variations between different batches. (Expected Testimony of Dr.

Needham).  After completing this array of testing, Andrx was comfortable proposing that, as long as no significant changes occurred to its process or its formulation, the use of a dissolution test containing only three specified sampling time points was "appropriate" for purposes of quality control.  Thus, Andrx's dissolution method can be said to be "appropriate" based on the purpose of the test.  (Expected Testimony of Dr. Needham).  Andrx's testing, however, is not appropriate for purposes of the '373 patent.  For example, the '373 patent requires the exclusion of the IR dissolution results in determining whether the release rate ascends.  Andrx's proposed method requires only testing at 3 time points, *i.e.*, at 1, 4 and 10 hours.  The reasons for Andrx's proposed method are clear.  The 1 hour time point ensures that the IR is all released by the end of one hour, and also ensures that the delayed release coated core is not releasing.  As 4 hours in 7.5 pH, the delayed release core is designed to begin releasing, but it is designed to release in a gradual manner.  By 10 hours, it is desired that about all of the active is release.  These three points are believed by Andrx to indicate that its product is being manufactured in a reproducible manner, and thus, the product will have the desired physiological qualities that were established with an earlier representative sample of tablets and individuals.  (*See* PX 207 at ANDRX 04041).

        To be "appropriate" for purposes of claim 1 of the '373 patent, however, the dissolution test must have equal intervals so as to determine whether the rate is the same from one interval to the next.  (DTX 1 at col. 9, line 66 - col. 10, line 9).  This is not the case with Andrx's test.  Furthermore, there must be some non-IR release in the first time period (either for Andrx or Ms. Gray's/ARL's test, this is at one hour), but Andrx assumes that there will be no release from the delayed release portion and that all of the amount released in the first hour is from the IR.  (Expected Testimony of Dr. Cheng).  Some of the Alza/ARL tests that Ms. Gray does not rely on establish that there is no release from the IR in the first hour.  (*See* DTX 724 at P ALZ 005800).

-33-

No measurement is taken at 3 hours (or at half the T90), nor is any intermediate measurement taken to establish an ascending release.  In other words, Andrx's tests, while "appropriate" for the ANDA purposes, are not "appropriate" for purposes of claim 1 of the '373 patent.

Similarly, Ms. Gray's pH 7.5 tests are not "appropriate" for purposes of the '373 patent.  While they do have equal time points through half the T90, they do not permit accurate subtraction of the IR dose and were incorrectly conducted, as will be demonstrated below.  Thus, Alza cannot carry its burden of proof relating to infringement.

> ### b.    The immediate release MPH is excluded before comparing the MPH release rate during periodic intervals of time

Alza agrees that the Court's construction of "ascending release rate for an extended period of time" requires the exclusion of any methylphenidate released from an IR component in determining whether there is an ascending rate of release.  *Plaintiffs' Opening Pretrial Submission* at 23.  However, Alza fails to mention that while there are dissolution tests that could allow for the calculation and exclusion of Andrx's actual IR component, Ms. Gray's dissolution test is not one of them.  *See Defendants' Opening Pretrial Brief* at ¶¶ 418-439.  Instead, Alza devotes one paragraph in which they state that the "outer IR layer of Andrx's ANDA products is designed to contain 25% of the tablet's total MPH dose" (this is the so-called 'label-claim') and that this amount is "simply subtract[ed]" to evaluate the non-IR release.  *Plaintiffs' Opening Pretrial Submission* at 24.

This analysis fails to note, however, that Andrx's IR coating can vary between 22.5% and 27.5%. (Gray Dep. Tr. at 179).  As the IR coating may permissibly vary between 22.5% and 27.5%, Ms. Gray's assumption of the IR component being 25% appears misplaced in that she is

using 25%, apparently, because this is the expected average – but she is using this average value as an assumption for individual tablets. Thus, an assumption that amounts to a "simple subtraction" of 25% fails to appropriately allow for permissible variations in the tablets and is "inappropriate" for purposes of the '373 patent if another test would allow such segregation. Since there are available tests which permit attribution of release from the IR and non-IR components, Ms. Gray's analysis is insufficient to carry Plaintiffs' burden of proof of infringement.

Defendants' discussion in its opening brief on the exclusion of the release from the IR component was centered around the requirement of the Court's construction that the (non-IR) ascending release rate begin at t=0 and thus, requires some release from the delayed release portion during the first time interval. Andrx's formulation permits one to select a dissolution test that allows for the segregation of releases from the IR and non-IR components. More specifically, the pH-sensitive enteric coating on its delayed release core would allow for the attribution of release from the IR and non-IR components by using a dissolution test that had a media with a change in pH wherein the first media was acidic, *i.e.*, had a pH below 7, and the second was basic, *i.e.*, had a pH above 7. *See Defendants' Opening Pretrial Brief* at ¶¶ 425-426.

Although a dissolution test that had a media with a pH change would allow for the attribution of release from the IR and non-IR component in Andrx's ANDA products in each test, there are other approaches that would allow for the attribution of release for the IR and non-IR components either for each test or reasonable treatment of the data generated in subsequent tests. Such a method is even disclosed in the patent.

Example 3 is the first example in the patent that included an IR component. In

conducting the dissolution testing, in addition to hourly sampling times for 10 hours, a single

sampling time was also taken at 30 minutes after initiation. This allowed for a segregation of the

release from the IR and non-IR components:

> The periodic release rates from the drug overcoat and the osmotic dosage form
> were determined at 30 minutes, 1 hour and then hourly for the next nine hours.
> *The 4 mg of methylphenidate contained within the drug overcoat was released*
> *within the first 30 minutes and the periodic release rate shown at t=1 hour of*
> *0.41 mg constitutes drug released from the bi-layer osmotic dosage form during*
> *the second 30-minute interval.* No residual quantity of drug remained in the
> dosage form. The hourly results are shown in Table 3 along with an indication of
> the occurrences of an ascending release rate.

(DTX 1, col. 16, ll. 57-67) (emphasis added). In subsequent examples the patent applied this

information provided in Example 3 to dissolution testing that only had hourly testing. In

Example 6, the patent discloses that the 4 mg from the reading at t=1 hour is subtracted and there

is an ascending release for the first hour. (DTX 1 at col. 20, line 62 - col. 21, line 18).

Indeed, ARL, Alza's testing laboratory apparently recognized this possibility and ran

dissolution tests on Andrx's ANDA products with increased sampling frequency during the first

few hours. In the "IR overcoat study", ARL investigated the release of methylphenidate from

the 54 mg Andrx ANDA product at pH 7.5 but with increased frequency of measurements: with

readings taken every 15 minutes for 2.5 hours (150 minutes). (*See* DTX 724 at P ALZ 005800; a

tabular format is attached as Exhibit 8 to this brief)

As can be seen in Exhibit 8, about 22% of the label claim is released within the first 15

minutes and about 25% of the label claim is reached after 105 minutes. Additionally, at 120

minutes about 28% of the label claim has been released and at 150 minutes about 32.5% of the

label claim has been released. This study, therefore, supports the expectation that the IR portion

of Andrx's ANDA products will be released rapidly (regardless of pH), while the combination of

the partially pH sensitive enteric coating in the Andrx ANDA products delay release even at a pH above 7.0 for a period of time before the release of methylphenidate begins.

Thus, the data from Alza/ARL's "IR overcoat study" demonstrates that, for Andrx's ANDA products, the IR portion is substantially released within 15 minutes *but the release from the non-IR portion does not begin to release until after 1 hour*. (*See* Exhibit 8). Applying the teachings of the patent to the data from the dissolution testing of Andrx's ANDA products, the amount of methylphenidate release at t=1 hour (*i.e., before* release from the non-IR component begins) is allocated to the IR component and that amount is then subtracted from the data at t=2 hours to determine the non-IR release. Therefore, one would expect that the only release measured by the tests Ms. Gray *does* rely on would be the IR release. Indeed, Ms. Gray admits as much when she stated in deposition that the IR coating is intended to be released within 1 hour and likely within an even shorter time frame. (Gray Dep. Tr. at 182, 185-86). Based on the variability inherent in the tablets and the expectations demonstrated by the IR overcoat study, the most likely explanation for any amounts released within the first hour in excess of the 25% label claim is that that individual tablet had slightly more of an IR overcoat or the excess is attributable to experimental error, not that it actually had any release from the delayed release core. Under this correct assumption (if one were to choose not to actually measure the amount in the IR coating through the two stage pH test in each case), Andrx's products would not have an ascending release rate in the first periodic interval, and thus, would not infringe.

Alza and Ms. Gray can only allege infringement by ignoring Alza's own IR overcoat study, ignoring the design of the Andrx product, and avoiding reliance on a two stage pH sensitive test because each of those would indicate non-infringement. In such circumstances, reliance on a faulty 25% label claim assumption, which has little bearing on what is actually

contained in the IR coat of the individual tablet tested, cannot carry Alza's burden of proof of infringement.

### c.    Determining that a Release Rate is Ascending

Andrx generally agrees with Alza's proposed method of determining the existence of an ascending release rate. There are two points, however, which bear noting. First, as has been noted, throughout Andrx's papers, the release rate must be ascending during the first hour. Alza notes that "[t]he starting point for measurement is the start of the dissolution test (i.e., where T=0)." *Plaintiff's Opening Pretrial Submission* at 24. While the test relied on by Ms. Gray did not make such a measurement, by definition, the amount of release at the time of initiation of the test is 0. (*See* DTX 1 at col. 10, lines 10-16 (wherein this 0 point measurement is treated as a 0 release over the time period of the initial periodic interval for purposes of comparison). Thereafter, each measurement is compared to the preceding measurement to determine whether there is an ascending release rate. As demonstrated above and below, Andrx's product does not infringe because it does not have an ascending release rate over the first periodic interval.

Additionally, Ms. Gray's testing protocol contained an error due to evaporation of the media, and that error was never adequately corrected. The facts underlying this error are set forth in detail in Andrx's Findings of Fact set forth below. But rather than duplicate all those facts, Andrx notes that the tests were unreliable and refers the Court to its Findings of Facts below.

3.   **Dissolution testing establishes that the ANDA products do not literally meet the ascending release rate element of Claim 1**

a.   **The 54, 36 and 27 mg ANDA products**

As provided in *Defendants' Opening Pretrial Brief* at ¶¶ 408-417, even using Ms. Gray's label-claim assumptions, only a few tablets of Andrx's ANDA products exhibited any non-IR release in the first time period. Specifically, only 3, 3, and 1 out of 12 (for a total of 7 out of 36 tablets) for the 54, 36 and 27 mg tablets, respectively, had any non-IR release during the first hour using Ms. Gray's 25% assumption. If one used the 27.5% assumption, then only 1 out of the 36 would satisfy the requirement that there be a non-IR release in the first time period.

Of course, all of Ms. Gray's assumption fail to allow for the variability of each individual tablet, the design of the delayed release coating, *etc.*, and that based upon Alza's IR overcoat study, *the most likely explanation is that there was no release from the delayed release core of Andrx's product in any of the tests relied on by Ms. Gray.* But, this Court and the parties are left with Ms. Gray's assumptions because Alza refused to run an "appropriate" test on each of these tablets so as to establish whether there was infringement. Additionally, each individual indication of an amount of ascension from a tablet is within the margin of error with regard to any release from the delayed release coating within the first hour, and all the mean data relied on by Ms. Gray, which data would lower the chance of error, indicates no release during the first hour. (Gray Dep. Tr. at 206-209).

Alza, in its opening brief, reproduced a table to support its assertions of infringement:

| Periodic Interval (h) | Quantity of Drug Released (mg) (Excluding 13.5 mg IR) | Ascending Release Rate (Relative to Preceding Interval) |
|---|---|---|
| 0-1 | 0.99 | --- |
| 1-2 | 2.53 | YES |
| 2-3 | 4.94 | YES |
| 3-4 | 6.52 | YES |
| 4-5 | 6.20 | |
| 5-6 | 5.12 | |
| 6-7 | 5.56 | |
| 7-8 | 4.81 | |
| 8-9 | 4.22 | |
| 9-10 | -1.09 | |

(*See Plaintiffs' Opening Pretrial Submission* at 26).

As might be expected, this table is for one of the seven tablets that "showed" non-IR release under Ms. Gray's 25% label-claim assumption. Nevertheless, this tablet would have been calculated to not have any non-IR release if Ms. Gray had used a 27.5% label claim assumption.

In its brief, Alza asserts that 9 out of the 12 tablets of the 54 mg dosage strength tested by ARL have an ascending release rate over an extended period of time. Alza, however, fails to note that the table above (and all of Ms. Gray's analysis) ignores the first periodic time interval by placing dashes next to that interval. As noted previously, if one were to account for that first hour, then even under the faulty 25% label claim assumption, only 3 out of 12 (or 25%) of Andrx's tablets at the 54 mg dosage strength of could infringe. This information was only elicited from Ms. Gray during deposition because Alza has steadfastly ignored whether there was any release during the first hour.

Additionally, even if one attempted to rely on the data that Ms. Gray relied, such a reliance would have been faulty as demonstrated by the errors in the test demonstrated by ARL's evaporation study. One fairly simple way to attempt to correct for these errors would be to normalize the data. (Expected Testimony of Dr. Banakar). Normalization of the data would set the final dissolution value at 100% and correct the data based on a ratio. In this instance, normalizing the data changed the midpoint of the $T_{90}$ for some of the tablets. (The normalized data, with an indication of when the midpoint of the $T_{90}$ was changed as a result of the normalization, is provided in the attached Exhibit 9 to this brief).

For the 54 mg dosage strength for which Ms. Gray opined that an ascending release rate occurred in 9 out of the 12 tablets tested, normalizing the data did not change the $T_{90}$ midpoints for the 3 tablets that Ms. Gray found did "not infringe" but *the $T_{90}$ midpoints for each of the 9 tablets that she opined "infringed" were changed and the ascending release rate did not continue through these changed $T_{90}$ midpoints*. Thus, mere adjustment of the data to account for the recognized evaporation problem observed by Ms. Gray led to non-infringement of all of the 54 mg samples (even ignoring the requirement of an ascending release rate during the initial time period). (*See* Exhibit 9).

### b.    The 18 mg ANDA product[9]

In order to support their assertions regarding Andrx's ANDA product at the 18 mg

---

[9]    Andrx agrees with Alza that it did not provide it with 18 mg samples, and thus, Alza could not test those samples. Alza contends in several places that Andrx was "unable to manufacture commercial-scale validated lots of the 18 g tablets that meet the ANDA specifications." *Plaintiffs' Opening Pretrial Submission* at 25, n. 11. That is not the case. As was noted previously, Andrx's ANDA related to the 18 mg product was filed over four years ago, in mid-2003, approximately 2 years before the '373 patent even issued. What Andrx noted to Alza was that it did not have any unexpired, validated lots of the 18 mg product. In any event, this point is irrelevant other than to explain why 18 mg samples were not produced (which all parties acknowledge).

dosage strength, Alza reportedly relies upon testing conducted by Andrx.  Alza stated that Ms.

Gray "used 2-hour periodic intervals since Defendants did take measurements at 2 hr and 4 hr"

(Plaintiffs' Opening Brief at pp. 29) and this "is necessitated by the dissolution data obtained by

Andrx, which did not include hourly release data."  (PPF ¶ 208).  Alza failed to use or even note

that the "dissolution data obtained by Andrx" also included sampling points at 30 minutes and 1

hour.  As is clear from at least the average data, 24% of the methylphenidate was released in 30

minutes, no additional methylphenidate was released by t=1 hour and an additional 5%

methylphenidate was released by t=2 hours.  Although Alza boasts that it uses a conservative

approach (at least in some aspects) their approach was not conservative in ignoring that there

was no non-IR release for the periods ending t=30 minutes or t=1 hour.  As with all of the other

dosage strengths it is clear that Andrx's ANDA products do not have a non-IR release beginning

at t=0.

Moreover, if the claims of the '373 patent only require a dissolution test which has some

non-IR release in the first two hours (in a pH designed to facilitate such release) and a second

period of release which has slightly greater release, such a construction demonstrates the extreme

breadth of the claims.

### 4.     Use of the ANDA products will not literally infringe Claim 1

As noted in Defendants' opening brief, Alza has long recognized that a biphasic product

will not be covered by their ascending claims but may be bioequivalent.  (DTX 111 at ALZ

00161214; DTX 106 at ALZ 00067891-92).  Andrx's product is just such a biphasic product.  An

"appropriate" dissolution test should clearly elucidate any such biphasic nature of a product.  The

biphasic nature of Andrx's ANDA products would be clear in a two-pH dissolution test (and is

clear in Alza's IR Overcoat Study or Andrx's 30 minute sampling time in its dissolution testing). (Exhibit 6)

It is clear that the only way that Alza could allege infringement is to rely on faulty data generated by an *in*appropriate dissolution test. This is not what the claims require as set forth above. Therefore, it is clear that Andrx's ANDA products do not infringe claim 1 (and by dependency claims 6 and 7) of the '373 patent.

Moreover, even if this Court were to credit all of Alza's and Ms. Gray's assertions, Andrx's products would infringe, at most, 25% of the time. As set forth in the legal standards both above and below, such a minor amount of infringement would not support a finding of contributory infringement or inducement by infringement. Nor would such minimal infringement entitle Alza to the relief it requests as is demonstrated below.

## C.    THERE IS NO LITERAL INFRINGEMENT OF CLAIMS 6 AND 7 OF THE '373 PATENT

### 1.    The Proposed ANDA Products Do Not Literally Infringe Claims 6 and 7 of the '373 Patent

As stated previously, as an initial matter, should the Court agree with Andrx that claim 1 of the '373 patent is not infringed, claims 6 and 7, as dependent claims, likewise would not be infringed. *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989) (It is axiomatic that dependent claims cannot be found infringed unless the claims from which they depend have been found to have been infringed).

In addition to the limitations imposed by their reliance on claim 1 of the '373 patent, claim 7 requires that upon treatment with a dosage form having the ascending release rate that the dosage form also result in a "substantially ascending methylphenidate plasma drug

concentration over a time period of about 8 hours." Claim 6 has similar language but only requires a period of "substantial" ascent of "about 5.5 hours." These limitations have been construed by the Court to mean "a MPH plasma concentration time profile that generally increases [*sic*] over approximately eight [or 5.5, respectively] hours, but may include a slight dip." (D.I. 130, Markman Order at 2). Even though the Court adopted Alza's proposed definition there still remains a dispute regarding direct infringement because while it is clear from this definition that if the profile has more than "a slight dip" it cannot be substantially ascending, Alza's proposed claim construction did not establish what "a slight dip" constituted.

Alza likewise did not make it clear in its Opening Pretrial Submission where the border lies with regard to a slight dip, but two things can be garnered: (1) Alza reads the term "a slight dip" which is singular to include multiple slight dips, and (2) Alza distinguishs between "a slight dip" and troughs amounting to 35-40% declines. *See Plaintiffs' Opening Pretrial Submission* at 39-40. Although Alza did not specify any additional requirements in its Pretrial submission, during expert discovery, Dr. Angst, Alza's pharmacokinetic expert, stated that in his view these claim terms are met when the following rules are satisfied:

> a) the plasma concentration of the methylphenidate at a sampling point increases more often that it decreases (*i.e.,* increases occur more than 50% of the time – however, Dr. Angst testified that instead of requiring increases more than 50% of the time he required increases to occur 60% of the time to be more "conservative");
>
> b) decreases in the plasma concentration of up to 15% of the previous value are allowed; and
>
> c) the profile continues to substantially ascend past the maximum concentration until a value 15% lower than the maximum concentration is reached.

(*See* Angst Dep. Tr. at 19-26).

As can be seen in Alza's rules, there is no limitation as to the number of "a slight dip"[s] permitted by the claims so long as there are more increases than decreases. This is a marked departure from their position during the Markman phase of this litigation wherein Alza argued for "a" slight dip.

> Finally, last issue on this is -- second to last issue on this is when does the -- can there be a slight dip, and when does it occur? And on this, Your Honor, let's take a look at the slide that I put up, because this is -- it's an important point. I want to make sure that I've explained it.
>
> Remember, this is the exemplary embodiment, and it is described in the specification as being a substantially ascending plasma concentration. And you see it is substantially ascending.
>
> And *as we propose in our construction, it's generally going up.* But you see there's *a little itty bitty dip* right here. And this is explained in the specification, and I've put the language next to it.
>
> *It says that it describes this generally ascending, and it says that subsequently, the first part comes from the immediate coat, and then subsequently the plasma drug concentration does not decline, but continues to substantially ascend [save] for a slight dip between T equals five and a half hours to T equals six and a half hours -- that's the slight dip we see there --* through a time period of nine and a half hours.
>
> *So it's generally going up to about nine and a half hours. And this is described as a substantially smoothly ascending plasma concentration. So what the specification is telling us is that substantially ascending doesn't mean there can't be any little dip in it. There can be a slight dip in it.*
>
> The specification, when you read it and we didn't produce all of the language here, but *it goes on to describe the old-fashioned initial release tablet. It describes these as peaks and troughs. And it says the substantially ascending concentration doesn't have the peaks and troughs.*
>
> *And so it gives pretty clear guidance as to what we're talking about, something that's substantially ascending similar to what we see in the example that is given.* Now, the dispute here is that *they agree there can be a slight dip along the way. The question is: Does it have to be between five and a half and six and a half hours?*

(Markman Tr. at 55-57 (emphasis added); *see also Defendants' Opening Pretrial Brief* at ¶¶ 450-451).

Alza's rules for determining whether or not a profile is substantially ascending is not based on the teachings of the patent or even any journal articles. (*See Defendants' Opening Pretrial Brief* at ¶ 445).  Instead of being based on the disclosure and claims of the patents in suit, these rules are simply Alza's litigation driven best attempt to capture as many of the profiles generated from clinical trials Andrx's ANDA products while also trying to avoid the prior art. One example of a profile that Dr. Angst would consider "substantially ascending" for about 8 hours would be:



(DTX 143).  Dr. Angst's view of "substantial ascension" fails to account for the fact that after this demonstrative profile reached its Cmax at 2 hours it began to descend.  Moreover, under Dr. Angsts' view, the mean profile of Ritalin SR – the prior art that Alza disparages – substantially ascends for the 5.5 hours called for by claim 6 of the '373 patent:

-46-



*(Plaintiffs' Opening Pretrial Submission* at 8)

Similarly amazing results also occur in the "exemplary profiles" (Alza's term for the 23 out of 77 profiles of Andrx's ANDA products that they assert infringe the patent in suit). For example, Dr. Angst and Alza assert that Subject 25: Test A2 is substantially ascending for about 8 hours. This "exemplary profile" was plotted by Alza and included in PX 257:



(PX 257 at P ALZ 004756). Dr. Angst never explains how it makes sense that a profile which begins a steady descent beginning at 6 hours can be said to "substantially ascend" for another 2 hours or until around 8 hours. A profile of all the data collected for A2 Subject 25 is:



In contrast to Alza's position, which after succeeding at claim construction was constructed out of whole cloth, Andrx's interpretation of the term "a slight dip" is consistent with the specification of the '373 patent and, indeed, consistent with Alza's counsel's statement at the *Markman* Hearing reproduced above. The only reference to the term "a slight 'dip'" in the '373 patent is incorporated as part of a reference to the data in Figure 4 and states:

> As shown in Fig. 4, the plasma drug concentration following each administration of an immediate-release dose rises relatively rapidly and then declines at a generally characteristic rate until the next dose is administered. The plasma drug concentration following administration of the tri-layer osmotic dosage form also exhibits an initial relatively rapid rise *due largely to release of drug from the immediate-release drug overcoat. Subsequently, however, the plasma drug concentration does not decline but continues to substantially ascend (save for a slight "dip" between t = 5.5 hours and t = 6.5 hours)* through a time period of 9.5 hours. Particularly striking is the difference during the time periods within about 1 hour before and about 1.5 hours following administration of the second and the third immediate-release dose [at t=4 and 8 hours,

respectively]. With the standard regimen, during these periods, the plasma drug concentration declines to a trough concentration and then rises again to a peak concentration. With the experimental regimen, during these same time periods, the plasma drug concentration is substantially smoothly ascending and exhibits no peaks and troughs.

(DTX 1 at col. 21, line 64 – col. 22, line 16 (emphasis added); *see also* Fig. 4). Therefore, to Andrx's understanding, this portion of the patent distinguishes between a "decline" and "a slight 'dip.'" Since the data depicted in Figure 4 was based on the study explained in Example 7, Andrx believes that the appropriate distinction in a mean plasma context is that between a decrease which is statistically significant (an actual and scientific "decline") and one that is not ("a slight dip"). (Expected Testimony of Drs. Bolton and Mayersohn). Just from the graphical depiction of the data in Figure 4, one would be led to this conclusion. (*Id.*)

Andrx's statistical expert, Dr. Bolton, examined figure 4 from the patents in suit and the data underlying it, as well as the data from the clinical studies of Andrx's ANDA products. Dr. Bolton concluded that the "slight dip" in figure 4 is not statistically significant (in other words, one cannot say that the slight dip in that figure is actually a decrease in the plasma concentration). This evidence supports the construction of "a slight 'dip'" offered by Andrx.

The data from the clinical studies of Andrx's ANDA products comes from two different studies – both conducted on healthy adult volunteers wherein one had fed subjects and the other had fasted subjects (the fasted study was a replicate study, so each subject was tested twice with the ANDA product). From these studies, there are therefore three sets of data. "A" data is from the fed study consisting of 23 subjects. The "A1" and "A2" data are from the fasting replicates consisting of 27 subjects. So there are 77 profiles (from 23 subjects + 27 subjects tested twice). Dr. Bolton examined the profile from each study and found that the decrease observable just after two hours is statistically significant (one can say that the observable decrease is an actual

decrease). (*See* DTX 701 and DTX 703). This actual decrease, therefore, does not follow the teachings of the patents and is more than is allowed by "a slight dip." Moreover, it is not surprising that Andrx's proposed products have a statistically significant decrease, since Andrx intentionally included that decrease in their proposed products.

   2.    <u>The ANDA 54 mg Product Does Not "Achieve[] A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of About 8 Hours Following Said Administration"</u>

Plaintiffs initially argue another construction that is nowhere in claims 6 and 7 of the '373 patent, namely, that the profile claimed only need be in "a person," not in a more typical mean plasma profile. While Plaintiffs assertion might make sense in the context of claim 1 of the '129 patent which contains similar language, that claim specifically indicates that the method of treatment is applied to "a patient," *i.e.*, an individual. (DTX 3 at claim 1). No such language is present in the claims of the '373 patent. Thus, while Andrx acknowledges that the language likewise does not say anything about using a mean profile, it is clear that Alza knew how to use the word "patient" to specify the individual when it wanted to do so. It did not do so with regard to the claims 6 and 7 of the '373 patent. Indeed, the only basis for the plasma profile claims in the patent relate to Figure 4 which is a depiction of mean data. Thus, the default understanding regarding profiles (especially with the lack of clarity imposed by the term "a slight 'dip'") would be to use mean data.

Andrx is aware that this Court in the past has construed claims relating plasma profiles to be directed to individual profiles. *Purdue Pharma, L.P. v. F.H. Faulding & Co.*, 48 F. Supp. 2d 420, 435 (D. Del. 1999). In that instance, however, the Court based its construction on the inclusion of the terms "a human patient" and "the patient" in the claims. *Id.* Here Alza has

chosen not to assert claims using those words but instead asserted claims which can only be

supported by the mean data depicted in Figure 4 as described in Example 7. Thus, the focus here

should be on the mean data.

Moreover, the assertions made concerning Andrx's "representations" to "convince" the

FDA that the Andrx's ANDA products are bioequivalent to Concerta are irrelevant to the

question of infringement.

       a.      **Defendants Represented to the FDA that their ANDA Products Were Bioequivalent to Concerta**

Andrx's representations to the FDA do *not* "unequivocally demonstrate that the plasma

profiles that result from administration of the ANDA products will be substantially ascending for

approximately 8 hours." *See Plaintiffs' Opening Pretrial Submission* at 34. Andrx included the

data and merely argued for bioequivalency. Whether or not Andrx's proposed products are

bioequivalent with Concerta is irrelevant to the issue of whether the claims are infringed.

*Johnson & Johnson*, 285 F.3d at 1052; *Zenith Labs.*,19 F.3d at 1423. Rather the appropriate

analysis is the language of the claim as compared to the plasma profile exhibited by Andrx's

product (assuming for the moment that said profile is generated by tablets which infringe claim

1).

This section of Plaintiffs' brief apparently concerns the mean data generated in the

clinical trials of Andrx's ANDA products. Plaintiffs, however, do not provide any analysis of

the mean data, but instead only provide some conclusory assertions premised mainly on the

irrelevant, and wholly unremarkable, fact that Andrx's ANDA products are bioequivalent to

Concerta. As noted previously, if this Court were to merely compare the profile generated by

Andrx's proposed products to Concerta, rather than the claims, any finding of infringement would be predicated on reversible error. *Johnson & Johnson*, 285 F.3d at 1052; *Zenith Labs.*, 19 F.3d at 1423.

Due to the difficulty in viewing the graph provided in this section of Plaintiffs' brief on page 35, in an attempt to provide more legible information, Defendants have reproduced the graph provided in Plaintiffs' brief and Defendants have re-plotted the data onto separate graphs, along with the graph for the fed study (the data for Concerta has been omitted for simplicity's sake, and because it is irrelevant for present purposes). As will be seen below, by stretching the graph out to 15 hours, or well past any time relevant to the analysis at hand, the magnitude of the decline just subsequent to the immediate release peak is more adequately depicted.











The decrease in all of the Andrx profiles depicted between the hours of two and four are expected because of Andrx's design choices regarding the anticipated period of no release. These design choices are very different from the steadily releasing osmotic devices exemplified in the '373 patent and used to generate Figure 4 of the '373 patent. The plasma decline occurs at the very point that the patent indicates that the "plasma drug concentration does not decline but continues to substantially ascend" and in which the difference between the claimed profile and the previously used IR profile were supposed to be the most striking and where the "experimental regimen . . . is substantially smoothly ascending and exhibits no peaks and troughs." (DTX 1 at col. 22, lines 1-16). The plasma decline also occurs exactly at the point one would expect due to Andrx's lack of a release of methylphenidate during that time period (this also supports the fact that Andrx's ANDA products do not have a non-IR release during the initial period).