Additionally, the "decline" represented by Andrx's mean profile is larger than "a slight 'dip.'" Dr. Bolton's analysis of Andrx's profile demonstrates a large degree of statistical significance in this structured decline. Thus, on a mean basis, the Andrx profiles do not demonstrate a "substantially ascending" plasma profile for about 8 hours as required by claim 7 of the '373 patent. (Expected Testimony of Drs. Bolton and Mayersohn).

Perhaps even more clearly, Andrx's mean profiles are not "substantially ascending" for about 5.5 hours. Andrx's mean profiles descend for over a third of the entire 5.5 hour time period. It is difficult to see how such a profile could be considered "substantially ascending" for 5.5 hours (even assuming the tablets used met the limitation of an ascending release rate in claim 1 of the '373 patent).

       **b.**      **The Individual Plasma Concentration Data in Defendants'
ANDA Does Not Demonstrate that a Substantial Population of
Individuals Will Exhibit a Substantially Ascending MPH
Plasma Concentration for About 8 Hours**

As stated previously, Andrx does not believe that claims 6 and 7 refer to individual profiles as claim 1 of the '129 patent does. Nevertheless, some useful information can be garnered from Plaintiffs assertion which undercut their theories of both contributory infringement and inducement of infringement.

Plaintiffs assert that "as many as" 23 out of the 77 profiles substantially ascend for about eight hours (termed the "8 hour exemplary profiles"). Again, the Plaintiffs do not discuss Dr. Angst's rules, or how he derived them, instead they merely assert that the exemplary profiles meet the limitations of the claims. Without stating what rules Dr. Angst applied, Plaintiffs make statements such as: "[f]or example, he characterized any decreases that were observed to occur

within the periods of ascension of the exemplary profiles to be no more than slight dips" and

"[h]e also observed that, while some of the profiles exhibited more than one slight dip, the

overall profile remained substantially ascending." (*Plaintiffs' Opening Pretrial Submission* at

39). These statements are essentially non-helpful and are conclusory non sequiturs.

> Perhaps the most definitive assertion in this section is that:

> "[n]one of the exemplary plasma profiles exhibit a dip comparable to the decrease
> seen in regimens based on multiple administrations of immediate release MPH
> products. These 35-40% decreases are troughs that reflect the lowest MPH
> plasma concentration prior to the ascension that follows a successive
> administration of the immediate release MPH dosage form."

(*Plaintiffs' Opening Pretrial Submission* at 40).

Thus, as far as Defendants can determine, Plaintiffs seem to have revised their position as

articulated by Dr. Angst at deposition and are now attempting to argue that "a slight dip" is

something that is less than a 35-40% decrease. Additionally, Dr. Angst makes it clear that he

included profiles that may have exhibited "more than one slight dip." Yet, even under this

extremely broad reading, Dr. Angst only argues that *a maximum of 23 out of 77 profiles*

*infringe* claim 7 of the '373 patent. In other words, Andrx's products do not infringe *70%* of the

time even if one were to credit everything argued by Plaintiffs. And, of course, as stated before,

it is impossible to determine how many of those allegedly infringing profiles were generated by a

tablet which had an ascending release rate as required by claim 7's dependency on claim 1.

In contrast to Alza's proposed conclusory showing, Andrx attempted to effectuate what it

believed the Court intended in interpreting the claim as it did. Initially, Andrx reviewed the 23

profiles that Dr. Angst alleged infringed. Andrx then disqualified any profiles which had

multiple "dips" (allowing them to be of any magnitude) at 7 hours or before because the

construction specifically states, as requested by Alza, that a "substantially ascending" profile

may only have "a slight 'dip'," not "slight 'dips.'" Additionally, Andrx tried to effectuate the

requirement that the ascension be for about 8 hours. In this regard, Andrx excluded any profiles

which had a Cmax at 7 hours or earlier because, if that had occurred, the profile was viewed as

declining and no longer ascending. When this analysis was performed with regard to the 23

profiles asserted by Dr. Angst, *only 5 of the 77* met that criteria. And, again, it is impossible to

know (or more precisely, for Alza to prove by a preponderance of the evidence) that any of those

five profiles were generated through use of a tablet which had an ascending release rate as

required by claim 1.

As regards the 5.5 hours of claim 6, even under that looser standard, Dr. Angst was only

able to allege that "as many as" 30 of the 77 profiles (or less than 40%) infringe. *Plaintiffs'*

*Pretrial Submission* at 39. Additionally, Plaintiffs cannot demonstrate that any of those profiles

were actually generated by tablets which had an ascending release rate. As such, Plaintiffs

cannot carry their burden of proof of infringement of claims 6 and 7 of the '373 patent.

3.    **Defendants' Proposed 18, 27, and 36 mg ANDA Products Will Not Be
       Administered In A Manner That Achieves A Substantially Ascending
       Methylphenidate Plasma Drug Concentration Over A Time Period Of
       About 8 Hours And About 5.5 Hours Following Said Administration**

Plaintiffs' assertions regarding the linear pharmacokinetics of methylphenidate are

essentially correct. The lower dosage strengths should not infringe just as the 54 mg dosage

strength does not infringe.

D.    **DEFENDANTS WILL NOT INDUCE INFRINGEMENT OF THE ASSERTED CLAIMS**

As an initial matter, Defendants note again that Plaintiffs' have not, and cannot, carry

their burden of proof of direct infringement for the reasons set forth above. As such, Defendants cannot be liable for either inducement of infringement or contributory infringement.

As demonstrated previously, inducement requires more than the mere intent to encourage the acts constituting infringement which Plaintiffs have urged. Rather, inducement requires evidence of culpable conduct, directed to encouraging infringement, and the inducer must have an affirmative intent to cause direct infringement. *DSU*, 471 F.3d at 1306.

While it is true that Defendants will direct patients to use the tablets covered by its ANDA to treat ADD and ADHD, this activity will lead to non-infringement in all instances where the tablet used does not have an ascending release rate as required by claim 1. Indeed, since any tablet which is tested to determine whether it meets claim 1 is destroyed prior to its use in the treatment, Plaintiffs are attempting to rely on percentages for direct infringement. However, as explained above and explained best by the *Cardiac Pacemaker* court, here the product either infringes or it does not, and even under Ms. Gray's proposed testimony taken at its most favorable for Plaintiffs, it is clear there will be substantial instances of non-infringement. Where the same acts that induce infringement also induce non-infringement, it is clear that Defendants do not have an affirmative intent to cause direct infringement.

Moreover, *DSU* made clear that the intent element was a subjective one based on its holding that the advice of counsel insulated the alleged inducement. *Id.* at 1307. Here, the evidence overwhelmingly evidences Andrx's good faith belief that it will not induce infringement:

(1)     Andrx's development work was directed towards, and achieved, a product having a period of no release (as can be seen from most of the dissolution tests and from the mean plasma profiles).

(2)    Andrx's development work and ANDA filing took place not only prior to its knowledge of the patent but also prior to *existence* of the '373 patent.

(3)    Andrx's proposed product admittedly has a non-ascending profile in every other test performed by ARL for Alza (but those tests are not relied on by Ms. Gray).

(4)    Even in Ms. Gray's test (and assuming her analysis is totally correct), Andrx's product still does not infringe a substantial portion of the time.

(5)    With regard to claims 6 and 7, the individual profiles are infringed, **at most**, less than 40% and 30% of the time by Plaintiffs' expert's own admission.

(6)    Andrx sent a Detailed Statement explaining, prior to commencement of suit, why it believed the product would not lead to infringement (*see* PX 17).

In *DSU*, a factor synonymous with item 6 above, standing alone, was sufficient to find no inducement. This case presents many more such factors and offers no factors evidencing a "culpable" mind or specific intent to cause infringement rather than non-infringement. As such, Andrx will not induce infringement if its ANDA products are launched.

### E.    DEFENDANTS ARE NOT LIABLE FOR CONTRIBUTORY INFRINGEMENT OF THE ASSERTED CLAIMS

With regard to contributory infringement, the statute requires that there be no substantial non-infringing uses, and Plaintiffs' recognize this. *Plaintiffs' Opening Pretrial Submission* at 45. Plaintiffs, however, argue that "the ANDA products will be approved *only* for use in treating ADHD in accordance with the package insert." *Id.* (emphasis in original). Plaintiffs argument, however, ignores the fact that the treatment of ADHD is only an infringement if the rest of claims 1, 6 and 7 are met, *i.e.*, if an ascending release rate is provided and, in the case of claims 6 and 7, the plasma profiles of the claims are met.

Taking the easiest principle first, Plaintiffs' expert Dr. Angst only alleges that claims 6

and 7 are met – at most – less than 40% and less than 30% of the time, respectively. Since upwards from 60% and 70% of the usage will be non-infringing of those claims, clearly there is a "substantial non-infringing use." With regard to claim 1, Ms. Gray acknowledges that even she only alleges infringement of the "ascending release rate" limitation, 75% and 67% of the time for the 54 and 36 mg tablets, respectively. Moreover, when the requirement for ascension in the first hour is effectuated, Ms. Gray acknowledges that the mean totals of the tablets do not infringe and at most only 25% of any dosage strength tablet infringes. Thus, even assuming some infringement of claim 1 (which has not been established), there are still substantial non-infringing uses of Andrx's ANDA product.

> **F.    Even If This Court Were To Determine the Claims Were Infringed and Not Invalid, Plaintiffs' Still Are Not Entitled to Relief.**

Plaintiffs' cite 35 U.S.C. Section 271(e)(4) and state without argument that they are entitled to an order (an injunction) directing the FDA not to approve the ANDAs in suit until January 31, 2018. *See Plaintiffs' Opening Pretrial Submission* at 45, CL 22-24. Presumably, Plaintiffs believe that if any amount of infringement lies, no matter how small, it is entitled the order specified in 271(e)(4)(A) which reads:

> For an act of infringement described in [271(e)(2)] –

> (A)    the court shall order the effective date of any approval of the drug . . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed . . . .

Andrx assumes that the Plaintiffs' argument is based on the use of the mandatory "shall." Andrx, however, has only been able to find one case that analyzes the use the word "shall" in this section. That case is *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1045-52 (N.D. Ill. 2003), *aff'd on other grounds*, 403 F.3d 1331(Fed. Cir. 2005) (Posner, J., by

designation). In this instance, Judge Posner assumed that the patent was valid and infringed (although *de minimis* infringement was occurring as is the case here) and set about to determine if the statute required him to ignore equity and grant the relief requested by SmithKline. *Id.* at 1048-52. Judge Posner, in a well reasoned opinion, determined that the injunction indicated in 271(e)(4)(A) should only apply when patent law would normally have applied an injunction. *Id.* at 1049. In response to the use of the word "shall," Judge Posner noted that "shall versus may" arguments are "weak" and "shall" sometimes is used to mean must, but it is also used to mean other words such as should, will or may and the meaning given the words should depend on the context. *Id.* Thus, if equity requires in an unusual case that 271(e)(4)(A) not be applied, that should be the case and cited to applicable Supreme Court and other precedent. *Id.* at 1050.

Here equity so demands. As explained above, even if some minimal amount of direct infringement does occur from the use of Andrx's product, Andrx will not contribute to or induce that infringement, and thus Alza is not entitled to any remedy against Andrx. Moreover, even if the Court finds that Andrx will contribute to or induce that minimal amount of direct infringement, the Court should not order the FDA to hold off approving Andrx's ANDA until after the '373 patent expires, which would have the effect of enjoining Andrx from engaging in activities that everyone agrees are not infringing for many years. Rather, this Court should allow the FDA to approve Andrx's ANDA, in which case Andrx may bring its products to market, and Alza can bring an action against Andrx based on Andrx's sales of those products. It is not unprecedented to have one case be brought under 35 USC § 271(e)(2) seeking to stop the approval of an ANDA, and a later suit brought under 35 USC § 271(a), (b) or (c) seeking to enjoin sales of the ANDA product after the ANDA is approved. *See Bayer AG v. Biovail Corp.*, 279 F.3d 1340 (Fed. Cir. 2002).

Should such a subsequent action be brought based on sales of Andrx's ANDA product, the Court will have range of remedies available to it, and can thus fashion a remedy that is appropriate for any minimal amount of infringement by Andrx, while still permitting Andrx to engage in activities that all parties agree are non-infringing. *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 776-77 (Fed. Cir. 1993). In contrast, in this 271(e)(2) action, this Court essentially has one remedy available to it: delaying the approval of Andrx's ANDA until the '373 patent expires. Use of this drastic remedy is inappropriate in a situation where the vast majority of the ANDA products sold will not give rise to direct infringement.

## IV.    CONCLUSION

For the foregoing reasons, this Court should determine that use of Andrx's proposed products will not directly infringe, and that Andrx will not contributorily or induce infringement. Finally, even if this Court determines that some minimal amount of infringement occurs and that the asserted claims are valid, this Court should not order the FDA to withhold approval of Andrx's product until after the expiration of the '373 patent.

Respectfully Submitted,

Dated: December 3, 2007

RAWLE & HENDERSON LLP
William J. Cattie, III, Esq.
I. D. No. 953
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
302-778-1200
Facsimile: 302-778-1400

*Of Counsel:*

*Attorneys for Defendants*
*Andrx Pharmaceuticals, LLC and*
*Andrx Corporation.*

John W. Bateman
C. Kyle Musgrove
Robert F. Vroom
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
202-220-4200

Per Andrx's understanding of the Court's instructions, below are Plaintiffs' proposed Findings of Fact and Andrx's responses and objections. To ease review, Plaintiffs' proposed findings of fact have been reproduced and Andrx has tried to limit its objections and responses to the pertinent portions of the proposed findings – absence of an objection or a response should not be viewed as a agreement or acquiescence to the proposed findings.

**ANDRX'S RESPONSES AND OBJECTIONS
TO ALZA'S PROPOSED FINDINGS OF FACT**

## I.    BACKGROUND

### A.    The Parties

1.    Plaintiff ALZA Corporation is incorporated in Delaware, having its principal place of business at 1900 Charleston Road, P.O. Box 7210, Mountain View, CA 94039-7210. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 1].

**Not Disputed.**

2.    Plaintiff McNeil-PPC, Inc. is organized under the laws of New Jersey, having a place of business at 7050 Camp Hill Road, Fort Washington, PA 19034. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 2].

**Not Disputed.**

3.    Defendant Andrx Pharmaceuticals, L.L.C. is organized under the laws of Delaware, having its principal place of business at 2945 West Corporate Lake Boulevard, Weston, FL 33331. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 3].

**Not Disputed.**

4.      Defendant Andrx Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 2945 West Corporate Lake Boulevard, Weston, FL 33331. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 4].

**Not Disputed.**

5.      Andrx Corporation is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., as a result of an acquisition completed on November 3, 2006. [JDT (L. Rosenthal) 1122-23; JDT (B. Berry) 117].

**RESPONSE:**

**Irrelevant.**

6.      This action arises under the patent laws of the United States, Title 35 of the United States Code and the Abbreviated New Drug Application provisions of the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

**Not Disputed.**

7.      The Court has personal jurisdiction over Defendants.

**Not Disputed.**

8.      Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400.

**Not Disputed.**

## B.    The Nature Of The Dispute

9.    This is a patent infringement case. Plaintiffs ALZA and McNeil filed a Complaint against Defendants on September 1, 2005 alleging infringement of the '373 patent pursuant to 35 U.S.C. § 271(e)(2) and § 271(b). [D.I. 1, Compl.; D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 12].[10]

**Not disputed.**

10.    Plaintiffs contend, among other things, that Andrx's proposed generic versions of CONCERTA® that are the subject of two ANDAs submitted to FDA, i.e., extended release tablets containing methylphenidate (in 54 mg, 36 mg, 27 mg and 18 mg dosage strengths) for use in treating ADHD, and their use as directed in the prescribing instructions will result in direct infringement of claims 1, 6, and 7 of the '373 patent. [D.I. 1, Compl.].

**RESPONSE:**  Andrx's ANDA products will not result in direct infringement of the asserted claims of the '373 patent as demonstrated in Andrx's Pretrial papers including these findings and the accompanying conclusions.  Andrx's non-infringement also will be demonstrated at trial.

11.    Plaintiffs allege that, upon approval of the Andrx ANDAs, Andrx's activities relating to its manufacture, distribution, offering for sale and/or sale of its generic extended release methylphenidate tablets in the United States will constitute contributory infringement

---

[10]    In the interest of streamlining this case for trial, plaintiffs will not assert infringement of the '129 patent at trial.
**RESPONSE:**  Plaintiffs' revised its opening papers to reflect this "streamlining" on November 30, 2007 – without prior notice to Defendants.  As noted previously, Andrx is entitled to judgment as a matter of law of non-infringement of the '129 patent.  Andrx will work with Platintiffs to try to reach agreement on an acceptable form of order for the Court's approval.

and/or inducement of infringement of the asserted claims of the '373 patent. [D.I. 1, Compl., ¶¶ 64-73].

**RESPONSE:**  Andrx's activities relating to its manufacture, distribution, offering for sale and/or sale of its generic extended release methylphenidate tablets in the United States will not constitute contributory infringement and/or inducement of infringement of the asserted claims of the '373 patent as demonstrated in Andrx's Pretrial papers including these findings and the accompanying conclusions.  Andrx's non-infringement also will be demonstrated at trial.

12.    Plaintiffs seek, as a remedy, an order directing FDA not to approve Andrx's ANDAs on a date earlier than the expiration dates of the '373 patent and related injunctive relief pursuant to 35 U.S.C. § 271(e)(4). [D.I. 1, Compl., ¶ F].

**RESPONSE:**  Andrx asserts that the remedies of an order directing FDA not to approve Andrx's ANDAs on a date earlier than the expiration dates of the '373 patent and related injunctive relief pursuant to 35 U.S.C. § 271(e)(4) are not warranted in the present case even if all of Alza's assertions regarding infringement are correct as demonstrated in Andrx's Pretrial papers including these findings and the accompanying conclusions.  The facts establishing the inequity of such relief will be demonstrated at trial.

13.    On October 25, 2005, Defendants filed an Answer and Counterclaims denying infringement of the '373 patent and '129 patents, and alleging that the asserted claims of those patents are invalid under Sections 102, 103 and/or 112 of the Patent Laws, Title 35 U.S.C. [D.I. 7, Answer and Countercl., ¶¶ 74-81].

**Not Disputed.**

14.     On October 5, 2007, the Court issued its Markman Order construing the disputed language in the claims of the '373 patent. [D.I. 130].

**RESPONSE:**  In its Markman Order, the Court adopted Plaintiffs' proposed constructions.  As demonstrated in Defendants' Pretrial papers, having prevailed on the constructions they sought, Plaintiffs now seek to alter their arguments during the infringement and validity portions of this case.  Plaintiffs should not be permitted to change their position after they prevailed on claim construction.

## II.     ALZA DISCOVERS A NEW METHOD FOR TREATING ADHD ONCE-DAILY USING AN "ASCENDING" MPH DELIVERY PROFILE

### A.     ADHD: A Serious Disorder With Limited Treatment Options

15.     ADHD is a chronic neurobehavioral disorder affecting children and adults that is characterized by three main types of symptoms: inattention, hyperactivity and impulsiveness. [PX 538 at P ALZ 7997-98 and 008134; PX 417 at P ALZ 7729]. ADHD has been known by several other names such as "minimal brain dysfunction," "hyperkinetic impulsive disorder" and "attention deficit disorder ("ADD")." [Testimony of Dr. Guinta].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant as there is no dispute that Andrx's proposed product will be labeled as a treatment for ADHD in children. Andrx further objects to Dr. Guinta offering testimony on this point, especially during Plaintiffs' case on infringement.  Dr. Guinta has not been qualified as an expert.  Her doctorate is in

microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness.

16.    Individuals with ADHD act without thinking, are hyperactive, and have trouble focusing or paying attention. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant as there is no dispute that Andrx's proposed product will be labeled as a treatment for ADHD in children. Andrx further objects to Dr. Guinta offering testimony on this point, especially during Plaintiffs' case on infringement. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness.

17.    ADHD is one of the most common mental disorders affecting children. A conservative estimate is that between 3-5% of children in the United States have ADHD. [PX 417 at P ALZ 7729; Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant as there is no dispute that Andrx's proposed product will be labeled as a treatment for ADHD in children. Andrx further objects to Dr. Guinta offering testimony on this point, especially during Plaintiffs' case on infringement. Dr. Guinta has not been qualified as an expert. Her doctorate is in

microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness.

18.    There is no cure for ADHD. The majority of children diagnosed with ADHD will continue to have the disorder as adults. [Testimony of Dr. Guinta].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant as there is no dispute that Andrx's proposed product will be labeled as a treatment for ADHD in children. Andrx further objects to Dr. Guinta offering testimony on this point, especially during Plaintiffs' case on infringement. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness.

19.    ADHD is a particularly serious problem for school-age children. Behavioral problems arising from ADHD can impede learning and interfere with social development, such as the ability to make and keep friends or participate in sports. [PX 417 at P ALZ 7730; DTX 73, C94-007-01 study at ALZ98908].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant since Andrx acknowledges that its proposed products would be labeled for the use of treatment of ADHD in children.

20.     In adults, ADHD can lead to poor occupational performance, antisocial behavior, and family dysfunction. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant as there is no dispute that Andrx's proposed product will be labeled as a treatment for ADHD in children and **will not be labeled for treatment in adults**. Andrx further objects to Dr. Guinta offering testimony on this point, especially during Plaintiffs' case on infringement. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness.

21.     If untreated, children with ADHD often are given extensive negative feedback from teachers, parents, and peers and are at a higher risk of repeating grades and placement in special education classes. In both children and adults, the disorder can have long-term adverse effects such as academic failure and permanent damage to self-confidence and self-esteem. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant as there is no dispute that Andrx's proposed product will be labeled as a treatment for ADHD in children and **will not be labeled for treatment in adults**. Andrx further objects to Dr. Guinta offering testimony on this point, especially during Plaintiffs' case on infringement. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness.

22.    The most frequently prescribed medications for managing the symptoms associated with ADHD are central nervous system stimulants, such as MPH and amphetamines. [PX 417 at P ALZ 7730].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:** Andrx acknowledges that the use of MPH to treat ADHD has been known for decades. MPH was the preferred method of treatment of ADHD prior to the development work leading to Alza's patents. Thus, the use of MPH would have been an obvious choice in an extended release product.

23.    MPH is categorized as a schedule II controlled substance by the Drug Enforcement Administration ("DEA"). MPH products are only available by prescription, and distribution is carefully controlled and regulated by the DEA. [Testimony of Dr. Guinta].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology.  As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony.  Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony.  Therefore, Andrx opposes presentation of this fact through this witness.

**RESPONSE:**  Andrx acknowledges that due to MPH's categorization as a schedule II controlled substance that the development of a once-a-day product for treatment of ADHD was an obvious choice.

24.     Stimulant medications such as MPH exhibit side effects, which increase in frequency and severity in proportion to the dosage of the medication being taken, *i.e.* higher doses produce more frequent and more pronounced side effects. [Testimony of Dr. Guinta; PX 419 (Gualtieri et al., Ther. Drug Monitoring 6:379-392 (1984)) at PALZ 7767].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point.  Dr. Guinta has not been qualified as an expert.  Her doctorate is in microbiology.  As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony.  Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony.  Therefore, Andrx opposes presentation of this fact through this witness.

**RESPONSE:**  Andrx acknowledges that with most drugs there is a toxic, high level dose where side effects are seen.  This level is not approached by any of the MPH products known in the market.

Perhaps equally as important, however, is the knowledge that the trough period in the multiple times per day immediate release dosing also led to side effects due to lack of control of ADHD.  Thus, the person of ordinary skill in the art would have understood that a once a day product would need to remain within upper and lower plasma profile boundaries so as to afford control and avoid other side effect.  Thus, a substantially ascending profile that remained within the upper and lower bounds was a logical and obvious choice to replace Ritalin SR.  (Expected Testimony of Dr. Mayersohn).

25.    The most common side effects associated with MPH products are decreased appetite, insomnia, increased anxiety, and/or irritability. [PX 417 at P ALZ 7736; PX 418 at P ALZ 7758; PX 428 at p. 456 (from the filed specification for U.S. Patent Application No. 10/726,024)].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

26.    Limiting side effects is an important consideration in designing methods for treating ADHD with MPH, particularly in children. Certain side effects, such as insomnia, increased anxiety and irritability, can exacerbate behavioral problems in children who have ADHD. Appetite suppression in children can lead to growth-related problems in long-term MPH treatment regimens. [Testimony of Dr. Guinta].

-75-

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant as there is no dispute that Andrx's proposed product will be labeled as a treatment for ADHD in children and **will not be labeled for treatment in adults.**  Andrx further objects to Dr. Guinta offering testimony on this point, especially during Plaintiffs' case on infringement.  Dr. Guinta has not been qualified as an expert.  Her doctorate is in microbiology.  As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony.  Furthermore, it is expected that this testimony on this point would be duplicative of Dr. Feifel's testimony.  Therefore, Andrx opposes presentation of this fact through this witness.

**RESPONSE:**  While Andrx agrees generally that limiting side effects is a desirable goal, Andrx disagrees that it is the primary goal.  Based on the prior art's disclosed plasma profiles, a substantially ascending plasma profile over the course of the school day was an obvious and logical choice.  (Expected Testimony of Dr. Mayersohn).

27.    Prior to CONCERTA®'s entrance to the pharmaceutical market, the only available MPH dosage forms for treating ADHD were Ritalin®, Ritalin SR®, and generic versions of these two products. [Testimony of Dr. Guinta].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:** In further response, Andrx notes that around the time of CONCERTA®'s entrance to the market, many new ADHD products were launched, whether containing MPH or not, and

that the promotion accompanying such new entrants led to increased treatment of ADHD generally.

28.     Ritalin® is an immediate-release MPH product that was first introduced by Ciba-Geigy in 1955. [Testimony of Dr. Patrick].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to issues of infringement.

29.     Following its introduction, Ritalin® rapidly became the most commonly prescribed treatment for ADHD, establishing MPH as the preferred agent for treating ADHD as compared to other agents, such as amphetamines, which were viewed at the time as being unsafe. [DTX 630 at p. 8-9].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement. Moreover, the cited document does not indicate that amphetamine were viewed at the time as being unsafe.  Today an amphetamine product (Adderall XR) is more successful than Concerta.

**RESPONSE:**  Andrx agrees that MPH was, at the time of the development of the patents in suit, the agent of choice for treating ADHD, and thus, MPH was the logical choice for development of a once a day product.  Today an amphetamine product (Adderall XR) is more successful than Concerta despite Concerta launching first and despite MPH originally being preferred. (Expected Testimony of Dr. Rozek).  Thus, Concerta has not been the unqualified success Plaintiffs indicate.

30.    Immediate release MPH products such as Ritalin® effectively controls ADHD symptoms for about 3 to 5 hours, with the greatest degree of effectiveness occurring over the first 1-2 hours after administration. [PX 574 at p.1].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:**  The efficacy of MPH varies for person to person.  Some patients with ADHD do not respond to MPH at all.  Nevertheless, Andrx agrees that MPH has a short half life and thus development of a once a day MPH product was an obvious project to pursue.

31.    An "immediate release" MPH releases all of the MPH contained in the dosage form within minutes of ingestion, making essentially all of the drug in the dosage form available for absorption in the body within a short period of time after ingestion. [PX 1, col. 2, lines 6-9].

**RESPONSE:**  Andrx agrees that the immediate release of MPH will occur quickly in any water-based media.  As such, the dissolution typically happens within minutes, and the amount in any IR portion can thus be assigned if a 30 minute sampling point is taken in a dissolution test.

32.    Following ingestion of an immediate release MPH product, plasma levels of MPH rise rapidly, reaching a peak concentration within about 2 hours, and then rapidly decrease as the drug is eliminated by the body. [PX 413 at P ALZ 7704-05].

**Not disputed other than it is not clear what is meant by "rapidly decrease."**

33.     Due to their short duration of efficacy, individuals being treated with immediate release MPH products usually require multiple doses to be administered during the day to adequately control their symptoms. [PX 413 at P ALZ 7704-05; PX 134 at ALZ 24092]. For children in school, this dosing schedule often requires that they receive at least one dose of an intermediate release MPH product while in school.

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:**  Andrx agrees that one prior art method of administering MPH was dosing two or three times a day.

34.     When multiple doses of an intermediate release MPH product are administered to a subject during the day, a "sawtooth" plasma profile pattern is produced, as illustrated in the figure below. (The figure illustrates the plasma MPH concentration-time profiles for immediate release MPH products administered twice daily and two sustained release MPH dosage forms (Ritalin SR® and a generic version) administered once daily). [*See* PX 137 at p. 170]. After ingestion of a dose of an intermediate [*sic*] release MPH product, the MPH plasma concentration in the patient ascends rapidly reaching a peak within about 2 hours, then rapidly decreases after reaching the peak concentration. Each successive dose causes a similar rapid ascension and decline of the plasma concentration.



**OBJECTION(S):** Andrx object to the extent that the figure is not correctly referred to as a mean concentration-time profile.

**RESPONSE:** Andrx notes that according to Alza's allegations relating to a substantially ascending profile for 5.5 hours, both of the prior art sustained release profiles set forth above appear to be substantially ascending for that time. Yet the patents in suit indicate that Ritalin SR was not effective throughout the day. Similarly, a profile that only substantially ascends for 5.5 hours, whatever the release mechanism of the dosage form that supplies such ascension, would not provide the desired advantages over the prior art. Such a profile without other limitations is not only obvious, that limitation is specifically disclosed by the prior art. (Expected Testimony of Dr. Mayersohn).

35.    The highest concentrations of MPH produced in a person that has been administered multiple doses of immediate release MPH products are termed "peaks" while the lowest concentrations observed after each peak is termed a "trough."

**RESPONSE:**  Andrx does not dispute the statement as phrased.  However, peaks and troughs are not necessarily only used in multiple dose administrations.  Once a day products such as Andrx's proposed biphasic product can have peaks and troughs.

36.    The "sawtooth" profile is also referred to as a "peak and valley" curve reflecting its overall shape. [Mayersohn Tr. 29: 4-12].

**RESPONSE:**  A "sawtooth" profile may be referred to by some as a "peak and valley."  Such terminology might be used due to the portions of the profile that are "peaks" and "valleys."  There can be, and are, other "sawtooth" profiles with multiple peaks and valleys that do not constitute the same degree of difference as depicted in the chart in paragraph 34.  "Sawtooth" profiles can also be produced by once a day products.

37.    MPH is a controlled substance, which makes the administration of MPH products to children during the school day difficult to manage and control. [PX 134 at ALZ 24093]. This, in turn, causes significant problems in achieving compliance by the school-aged children that had been prescribed treatment with an MPH regimen. [DTX 73 at ALZ00098909].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

38.    One of the problems associated with use of immediate release MPH products is that a school nurse or administrator ordinarily must handle and administer the drug, rather than

-81-

allowing the children to "self-medicate." In order to receive a dose of MPH medication, students must leave class and visit the school nurse each day. This disrupts their classroom activity and subjects them to potential peer ridicule and social exclusion. The school must also maintain and monitor a secure storage location to avoid theft of the medication. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant as to infringement. Andrx further objects to Dr. Guinta offering testimony on this point. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness, especially during the infringement portion of Plaintiffs' case.

39.    Children who are allowed to self-administer medication at school also face many difficulties. One symptom of ADHD is lack of attentiveness, which contributes to the inability of a person affected with ADHD to properly self-medicate. In addition, negative peer pressure can cause a child to not properly self-medicate. These difficulties and pressures can cause students to not take their medication at school, or to not take the medication on the correct schedule, raising both serious compliance issues and increasing the incidence of side effects. In addition, there are serious risks of drug diversion and abuse in settings where the drug is to be administered outside the supervision of adults. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on

personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness especially during the infringement portion of the case.

40.    Before the invention, there was a significant need in the market for a therapeutically effective single-administration, long acting MPH drug product that did not have significant side effects, and addressed compliance problems associated with MPH treatment regimens requiring multiple administrations of methylphenidate during the day. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness especially during the infringement portion of the case.

**RESPONSE:** Publications cited above by Plaintiffs report that there were long-acting stimulant medications on the market that had "beneficial effects" and were "generally equivalent" to a twice a day immediate release MPH regimen. (PX134 at ALZ 24092). One of these medications was Ritalin SR; which was reported, along with the others, as having "an effect within 2 hours of ingestion and the effects lasted for 9 hours." (PX134 at ALZ 24092). For example, the following figure was presented which indicates that all four medications were more

effective than a placebo (represent on the top line by "●"); Ritalin SR was represent by "■" and

Ritalin twice a day by "○":



**Figure.** Percentage of target stimuli to which errors of omission occurred, presented by medication condition and hours after medication ingestion. Active long-acting medications were administered at time 0 with placebo at hour 4, 10 mg of methylphenidate was administered at time 0 and hour 4, and placebo was administered at time 0 and hour 4. ●, placebo; ○, methylphenidate; ■, SR-20 Ritalin; □, pemoline; ▲, Dexedrine Spansule.

(PX134 at ALZ 24098).  Nevertheless, Andrx acknowledges that the patent in suit indicates that

Ritalin SR was known to lose effectiveness throughout the course of the day as compared to the

multiple administrations of the IR MPH. (DTX 1 at col. 7, lines 35-49).  Since Ritalin SR was

known to have a substantially flat profile (as can been seen in the Chart in Paragraph 34), it was

clear that a different profile was needed.  The shape of the profile of Ritalin SR and the known

loss of effectiveness over time for that product led to suggestions in the prior art that MPH

produced acute tolerance.  An obvious way to address acute tolerance was to have a substantially

ascending plasma profile throughout the desired time of treatment, *i.e.*, 8 hours.  (Expected

Testimony of Dr. Mayersohn).

-84-

41.    In 1983, more than 20 years after it introduced Ritalin®, Ciba-Geigy introduced Ritalin SR®. Ritalin SR® is a sustained-release, wax matrix MPH dosage form that releases MPH at a generally descending release rate over time. [Testimony of Dr. Davies; PX 334 (Erramouspe et al., Ann. Pharmacother. 31(10): 1123-1126 (1997)) at P ALZ 006857; PX 335 (Erramouspe et al., J. Pharm. Tech. 14: 209-211 (1998)) at P ALZ 006863; PX 337 (Hui et al., "Design and Fabrication of Oral Controlled Release Drug Delivery Systems," Chp. 9, pp. 373- 431 in Robinson et al., Controlled Drug Delivery Fundamentals and Applications, 2d (1987)) at p. 390 (P ALZ 006876); PX 410 at ¶ 35; PX 574 at p. 1; PX 417 at P ALZ 7735]. Ritalin SR® was marketed as being effective at controlling symptoms for about 8 hours, i.e. an alternative to treatment regimens based on twice-daily administration of Ritalin®, and as providing an effective, once-a-day MPH treatment option. [*Id.*].

**RESPONSE:** Whatever its release rate may be, there is no question that, as construed by Alza, Ritalin SR provides a substantially ascending mean plasma profile for about 5.5 hours. *See* paragraph 34, *supra.* Similarly, there is no question that some tablets of Ritalin SR would have provided a substantially ascending plasma profile for about 8 hours. (Expected Testimony of Dr. Mayersohn; Feifel Dep. Tr. at 187-88 and errata sheet; *see Defendants' Opening Pretrial Brief* at ¶¶ 262-67).

42.    The blood plasma concentration profile of individuals administered Ritalin SR® rises gradually, reaching a $C_{max}$ within 3 to 4 hours. After reaching the $C_{max}$, the blood plasma concentration remains relatively level for approximately two hours, and then starts to rapidly decline by about 5 to 6 hours after administration. [PFF ¶ 34].

**OBJECTION(S):** Andrx object to the extent that the figure in PFF ¶ 34 is not correctly referred to as a mean concentration-time profile.

**RESPONSE:** The mean profile provided in PFF ¶ 34 apparently shows that the plasma concentration of methylphenidate from both Ritalin SRs (generic and brand) rise at the same rate as that from Ritalin for the first few sampling points. Further, this profile (according to the rules asserted by Alza during expert discovery) appears to be substantially ascending for 6 hours; therefore it does not start "to rapidly decline by about 5 to 6 hours after administration." Furthermore, to the extent Alza represents that the decrease in the two Ritalin SR's plasma profiles "rapidly declines" at 5 hours, Andrx's mean concentration–time profiles have a similar rate of descent between the second and third or fourth hour.

43.    Ritalin SR® was never widely accepted as a once-a-day treatment for ADHD. [JDT (J. Swanson) 1262-1264, 1293]. This is evidenced by its infrequent use by practitioners and its low sales. [Testimony of Dr. Rozek].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

44.    One reason for the lack of commercial acceptance of Ritalin SR® is that in many individuals, Ritalin SR® proved to be unreliable and ineffective at controlling ADHD symptoms over the course of a day when compared to treatment regimens based on multiple daily administrations of an immediate release MPH product. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness especially during the infringement portion of the case.

**RESPONSE:** See Response to PFF ¶ 40.

45.    At the time of the invention, it was not known why Ritalin SR® was not as effective as treatment using a regimen involving multiple administrations of immediate release MPH products during the day. [Testimony of Dr. Guinta; Testimony of Dr. Patrick]. While a variety of hypotheses were advanced, prior to the invention, none had been shown to be the reason for the lack of effectiveness of Ritalin SR® relative to regimens based on immediate release MPH products. [Testimony of Dr. Guinta; JDT (J. Swanson) 1293-1294].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness especially during the infringement portion of the case.

**RESPONSE:**  The prior art indicated that one reason for the ineffectiveness of Ritalin SR was that methylphenidate produces "acute tolerance" or "tachyphylaxis," meaning that the same amount of methylphenidate in the blood of a patient at a later point in the day produces less of a clinical effect in the patient than that same amount of methylphenidate in the blood of the patient at an earlier point in the day.

Plaintiffs cited to DTX 630 in PFF ¶ 29.  That publication, from 1992, provides that in a comparison of efficacy of one 20 mg Ritalin SR given at 8 AM ("SR-20") with two doses of standard 10 mg MPH, given at 8 AM and at noon ("MPH-10 BID") showed no significantly different effect in the classroom, the home environment, or during the continuous performance test.  And:

> Although these studies did not show a definite advantage for either MPH formulation over the other, some authors have suggested that SR-20 may not be as effective. MPH-10 BID tablets produce higher peak plasma concentrations and yield a steeper absorption phase slope than do the longer-acting SR-20 preparation. *Current theory suggests that psychostimulant medication effects on ADHD are related to the rate of absorption (ramp effect)*, so standard MPH's steeper absorption curve may give it more powerful beneficial and adverse effects, particularly during long-term maintenance. *This concept has raised the possibility that MPH-SR's greater duration of action may alter pharmacokinetics (hepatic auto-induction) or receptor pharmacodynainics, inducing tachyphylaxis or tolerance.*

(DTX 930 at p.6) (emphasis added).

Furthermore, one of the provisional applications to which priority is claimed by the patents in suit, Provisional Application 60/030,514 (the "'514 application"), filed November 12, 1996, indicates that the "invention pertains to both a novel dosage form and to a novel method for administering a drug for producing a therapeutic effect." (DTX 5 at PALZ000771, lines 3-4).

In the '514 application, in the ***background*** of the invention section, the application describes an immediate release dosage form and then provides a description of the prior art sustained-release dosage form. With regard to the sustained-release dosage form, the applicants told the PTO that:

> A drug dispensed from a prior art sustained-release dosage form may ascend initially but not over the entire dosing interval, and it actually may decline over time. That is, these sustained-release dosage forms dispense a drug in a nonascending profile over time, as they do not provide a continuously increasing release rate per hour throughout the extended dosing period. . . . ***For drugs that act on the central nervous system, like methylphenidate, dispensed from a sustained-release nonascending dosage form, the patient often develops an acute tolerance*** to the drug manifested by a shortened duration and a decrease in the intensity of the therapeutic effect needed for acceptable therapy. The prior sustained-release delivery is also devoid of means that compensate for its shortcomings inherent therein.
>
> The above presentation teaches that a critical need exists for a novel dosage form and for a novel method for administering a drug that overcomes the shortcomings known to the prior art. This long-felt need exists for a dosage form and for a method for (1) administering the drug at a sustained-increasing rate that simultaneously reduces or eliminates the frequency of daily dosing; for (2) a dosage form and a method for administering the drug in a sustained-compensating dose to substantially compensate for acute tolerance to the drug thereby maintaining a preselected clinical response; for (3) a dosage form that administers the drug in a sustained-ascending profile clinically indicated for the management of Attention-Deficit Disorders; and, for (4) a dosage form and a method for administering the drug initially and in a sustained-ascending profile throughout the entire school day.

(DTX 5 at PALZ 000772, line 19 - 000773, line 14) (emphasis added).

Moreover, this is not the only time that Alza has made representations to a government agency that it was known that methylphenidate gives rise to acute tolerance. For example, one of the ways Alza has tried to stifle competition is by filing Citizen Petitions with the FDA to, *inter alia*, require more stringent bioequivalency metrics (*see, e.g.*, PFF ¶ 244). In one of the papers related to its Citizen Petition, Alza had a section entitled "Issues on Acute Tolerance: Acute

Tolerance Has Important Implications For the Rate of Delivery of Methylphenidate Treatment For ADHD" and to support their position that methylphenidate produces acute tolerance Alza cited to papers published as early as 1991. (*See* DTX 141 at p. 7 and fn. 16 at p. 9). *See also Defendants Opening Pretrial Brief* at ¶¶ 274-397.

46.    At the time of the invention, due to the failure of Ritalin SR®, the state of the art in treating ADHD using MPH remained essentially where it had been 30 years earlier. Specifically, the standard of care remained treatment regimens in which multiple doses of immediate release MPH were administered two or three times a day. [Testimony of Dr. Guinta; Testimony of Dr. Patrick].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point. Dr. Guinta has not been qualified as an expert. Her doctorate is in microbiology. As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony. Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony. Therefore, Andrx opposes presentation of this fact through this witness especially during the infringement portion of the case.

**RESPONSE:** As provided in the responses above, the state of the art had progressed.

### B.    ALZA Scientists Discover The First Reliably Effective Once-A-Day MPH Treatment For ADHD

47.    Ritalin SR® failed to respond to the need for an effective once-a-day MPH drug product. In light of this need, ALZA began investigations into development of a once-a-day

MPH drug product. [Testimony of Dr. Guinta; JDT (L. Hamel) 712-716, 718-724; JDT (S. Saks) 1047-1052, 1064-1065].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:**  At least for some patients, Ritalin SR® responded to the need for an effective once-a-day MPH drug product, *see, e.g.,* Response to PFF ¶40.  Furthermore, medical doctors approached Alza regarding undertaking a project to pursue once a day treatment of ADHD. While medical doctors could identify the need in the art, medical doctors did not traditionally come up with new pharmaceutical formulations to treat such needs. *See Defendants' Opening Pretrial Brief* at ¶¶ 278, 386-388.

48.    ALZA employees Diane Guinta, Samuel Saks, Suneel Gupta, Carol Christopher, and Lawrence Hamel were part of the company's MPH product development program, which began in 1993. As part of the MPH project, Ritalin SR® and its properties were studied. [Testimony of Dr. Guinta].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

49.    ALZA also consulted with experts in the fields of psychiatry and neurology in the early 1990s about the needs in the market for an effective, safe, once-a-day extended release drug product to treat ADHD, about their experiences with using Ritalin SR®, and their experiences with treatment of ADHD patients using methylphenidate and other drugs. [Testimony of Dr. Guinta; JDT (L. Hamel) 718-719; JDT (J. Swanson) 1265-1266].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:**  Andrx notes that it would have been obvious to make a product that produced a substantially ascending methylphenidate plasma concentration to overcome the acute tolerance that methylphenidate was known to produce in patients.  This is demonstrated by the fact that the Alza consulted with experts in the field, acquired the known information about methylphenidate (*e.g.*, that it produced acute tolerance), and then proposed using a substantially ascending plasma concentration to overcome the problem of acute tolerance in the first sipping study.

50.    The ALZA inventors learned that people within the ADHD community had found Ritalin SR® to not provide a viable solution to the need for a once-a-day MPH drug product. [JDT (L. Hamel) 720-721].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

51.    In 1994, Drs. Guinta and Gupta, working with others, designed a clinical study protocol to elucidate why a relatively constant MPH plasma concentration-time profile did not provide consistently effective treatment of ADHD. [JDT (L. Hamel) 720-724; JDT (S. Saks) 1064-1065]. ALZA retained Dr. James Swanson, who ran a laboratory school for ADHD diagnosed children, to assist the company in conducting these clinical studies involving MPH. [Testimony of Dr. Guinta; JDT (J. Swanson) 1271:22 – 1272:6].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

52.    The clinical studies were referred to as a "sipping study" because small amounts of MPH were administered throughout the day to achieve the desired MPH plasma concentration-time profiles. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

53.    The ALZA scientists designed three different arms of a clinical trial in an attempt to discover why Ritalin SR® failed to provide therapeutic effectiveness over the course of a school-day as compared to twice-a-day regimens using immediate release forms of Ritalin®. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

54.    The clinical study compared the therapeutic effectiveness of three different pharmacokinetic profiles. [JDT (S. Saks) 1064-1065; JDT (J. Swanson) 1272: 11-22; DTX 73]. Each arm of the study as designed – corresponding to three different plasma profiles – delivered the same total daily dose of MPH to each subject. [DTX 73 at ALZ98909-98910].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

55.    The first plasma profile modeled the conventional twice-a-day administration of Ritalin®. [DTX 73 at ALZ98909]. This arm of the study called for administering to each of the subjects two doses of immediate release MPH with a 4.5 hour window between each administration. [*Id.*]. This regimen corresponded to the "standard of care" for treating ADHD at the time. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:** This plasma profile was not one of the "Investigational Treatments," but rather was one of the "Control Treatments" (as was a placebo). (DEFENDANTS' DEPO. EX. At ALZ 00147317.)

56.    The second profile (the "flat" profile) was designed to rapidly reach a peak MPH plasma concentration (equivalent to 80% of the first Ritalin® dose) and then maintain that plasma concentration as a flat profile for about 8 hours. [DTX 73 at ALZ98909-98910]. This profile was designed to model an optimized sustained-release dosage form profile that would have no fluctuations in the MPH plasma concentration after reaching the peak MPH plasma concentration. [JDT (L. Hamel) 747; Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

57.    One purpose of the second arm of the study was to determine if problems in the therapeutic effectiveness of the Ritalin SR® were attributable to the formulation used in the Ritalin SR® drug product. [Testimony of Dr. Guinta]. Prior to analyzing the results from the sipping study, some people at ALZA assumed that the flat profile would be the most efficacious. [JDT (L. Hamel) 757].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:** Ritalin SR was known in the prior art to have a substantially flat plasma profile over time. The formulation is merely a way to get the drug absorbed and into the plasma (at least

-94-

for oral dosage forms). Thus, since Ritalin SR depicted a substantially flat profile, the formulation was successful in getting the MPH absorbed, and any concerns regarding Ritalin SR would lie in the plasma profile, not the formulation. (Expected Testimony of Dr. Mayersohn). This is also inconsistent with the testimony of the Alza witnesses that, when they saw the plasma profile that was produced by Ritalin SR, they thought it was a "pretty good" profile. (*See, e.g.,* Guinta Dep. at 136.) If one thought the profile was "pretty good" but that the results produced by that profile were not satisfactory, one would attempt to change the profile (as Alza did), not change the formulation used to achieve that profile (which Alza did not do).

58.    Dr. Gupta suggested that a new approach be studied in the sipping studies, referred to as an ascending profile, in which plasma concentration levels of MPH would generally be increased (instead of leveling off) and reach a peak MPH concentration at or after about 8 hours. This ascending profile was designed to determine whether therapeutic effectiveness could be achieved and how it might compare to effectiveness associated with twice-daily Ritalin[®] and essentially constant MPH plasma profiles. [JDT (S. Saks) 1064-1065; Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:** Such a study was obvious to undertake and yielded obvious results. *See generally Defendants' Opening Pretrial Brief.*

59.    The first sipping study was a double-blind, randomized, placebo-controlled crossover trial in which thirty-six children with ADHD, aged 7 to 12, participated. [DTX 73 at ALZ98911]. Thirty-one children completed the study. [*Id.*].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

60.    During the day, the children were in a classroom setting and measures of each child's behavior and cognitive performance were collected under the supervision of Dr. James Swanson and others. [*Id.* at ALZ98910].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

61.    Data concerning effectiveness in controlling ADHD symptoms was produced and analyzed in the first sipping study. The ALZA scientists surprisingly discovered that the conventional flat profile did not provide adequate control of ADHD symptoms throughout the treatment period. [DTX 73; Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:** This statement of fact is contradicted by the '373 patent which states that this loss of control was known in the prior art. (DTX 1 at col. 7, lines 35-49). Such an admission in the patent is binding. Also, Alza's own proposed findings indicate that Ritalin SR was known to be ineffective, so it is difficult to understand how it could be "surprising" that a "conventional flat profile" did not provide adequate control of ADHD symptoms throughout the treatment period.

62.    The ALZA scientists also surprisingly discovered that the ascending profile provided greater efficacy throughout the treatment period than the constant plasma profile, and that its efficacy approached the effectiveness of the conventional twice-a-day administration of immediate release Ritalin®. [*Id.*]. The discovery was contrary to the notion that two bolus administrations of Ritalin® resulting in two sharp peaks of high drug concentration were essential, and that the blood concentration of methylphenidate had to drop sharply between the doses in order for the second dose to be effective. [Testimony of Dr. Guinta; PX 428 at p. 456-57].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:**  An increasing amount of drug delivered into the plasma would be expected to work for a longer period of time than a constant profile based on acute tolerance.  While mimicking the prior art multiple administration profile could have, and has been, done, such a profile was also known to have lose of control during the valley of plasma profile.  A substantially ascending profile was one that was both suggested by the art and would have been expected to work (and one that would have been expected to avoid the known problems associated with the valley).  *See generally Defendants' Opening Pretrial Brief* at pages 89-124.

63.    The ALZA scientists were also surprised to learn that the ascending profile did not lead to a higher incidence of side effects relative to the level of side effects seen with the arm that modeled the twice-daily Ritalin® regimen, which produces a "sawtooth" plasma profile. [*Id.*].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement. Furthermore, whether the ALZA scientists were surprised by the results is irrelevant to any inquiry in this case.  Finally, Andrx is unaware of any data, especially from such a small clinical trial, which indicates that side effects were not increase over the twice-daily Ritalin regimen.

**RESPONSE:**  Andrx notes that the ascending profile was not as effective as the IR profile in the first sipping study.

64.    Due to the age of the patient population receiving the MPH, *i.e.* pre-adolescent children, side effects were a major concern for physicians prescribing MPH dosage forms and for the ALZA scientists working on the sipping study. [Testimony of Dr. Guinta].

**OBJECTION(S):**    Andrx objects to this proposed finding of fact as irrelevant to infringement. Andrx further objects to Dr. Guinta offering testimony on this point.  Dr. Guinta has not been qualified as an expert.  Her doctorate is in microbiology.  As such, her testimony is not based on personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion testimony.  Furthermore, it is expected that her proposed testimony on this point would be duplicative of Dr. Feifel's testimony.  Therefore, Andrx opposes presentation of this fact through this witness especially during the infringement portion of the case.  Andrx is also unaware of any data establishing that side effects are the same between an ascending profile (much less all substantially ascending profiles) and the multiple dosage IR formulation.

65.    Prior to the invention, the conventional practice for physicians treating ADHD with MPH, particularly in children, was to prescribe the lowest amount of MPH that yielded a

positive response. In addition, when prescribing Ritalin® three-times-a-day, the conventional

practice was to have the morning and noon dose be equivalent, and the third dose be half the

amount of the previous dose. [JDT (S. Gupta) 633-634]. Use of an ascending MPH delivery

profile – generally increasing MPH plasma concentration levels over time – was directly

contrary to these conventional and accepted practices. [*Id.*].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

Andrx further objects to the citation to Dr. Gupta.  Dr. Gupta has not been qualified as an expert

especially as it relates to physician prescribing habits.  As such, his testimony is not based on

personal knowledge but instead is based on hearsay and constitutes impermissible lay opinion

testimony.  Furthermore, it is expected that her proposed testimony on this point would be

duplicative of Dr. Feifel's testimony.  Therefore, Andrx opposes presentation of this fact through

this witness especially during the infringement portion of the case.  Andrx objects to this

proposed finding of fact as irrelevant.

**RESPONSE:**  The patent in suit acknowledges that the conventional SR dosage form and profile

were in the prior art, but that they did not work well.  Thus, while a sustained, constant plasma

profile might be the conventional approach, the conventional approach had been shown not to

work very well.  As set forth in *Defendants' Opening Pretrial Brief*, a substantially ascending

profile was an obvious way to treat ADHD especially once it was known that the conventional

approach had not yielded the desired success.

66.    Following the first sipping study, ALZA conducted market research and surveyed

parents of children with ADHD. ALZA discovered that a majority of children required three or

more doses of Ritalin® over the course of a day to maintain effective control of ADHD symptoms over this period. [JDT (L. Hamel) 725-726; JDT (J. Swanson) 1275:13-24].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

67.    In 1995, another sipping study was designed and conducted (the "second sipping study"). [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

68.    In the second sipping study, an ascending MPH plasma profile (different from the one in the first sipping study) was compared to a profile which modeled administration of immediate release Ritalin® three times a day, with a four hour window between administrations.

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

69.    The ascending profile in the second sipping study provided for an increased amount of MPH in the subject within the first hour as compared to the amount provided in the same period in the ascending profile in the first sipping study. This additional amount delivered to the patient was provided to determine if it was possible to improve the control of ADHD symptoms in the early hours of treatment. [Testimony of Dr. Guinta].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

70.    The second sipping study showed that the ascending profile tested was as effective in treating ADHD by administering immediate release Ritalin® three-times-a-day. It also showed that the number of side effects were essentially the same for the Ritalin® profile and the ascending profile. [Testimony of Dr. Guinta].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement. Additionally, Andrx is unaware of any data, especially from such a small clinical trial, which indicates that side effects were essentially the same as the thrice-daily Ritalin regimen.


71.    ALZA's discovery that an ascending MPH delivery profile could be used to provide effective, once-daily treatment ADHD without significant side effects was contrary to the conventional wisdom that suggested that a "flat profile" is the most desired approach to delivering drugs via extended release formulations. [PX 1, '373 patent, col. 2, line 64 to col. 3, line 13; Testimony of Dr. Guinta; JDT (S. Gupta) 633-634; JDT (L. Hamel) 747]. Prior to ALZA's discovery, it was believed that a substantially constant plasma concentration would minimize side effects by avoiding high peaks in MPH concentration, thus providing a balance of desired and undesired pharmacological effects. [PX 1, col. 2, line 64 to col. 3, line 13; Testimony of Dr. Guinta; Testimony of Dr. Patrick].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.


**RESPONSE:**  The patent in suit acknowledges that the conventional SR dosage form and profile were in the prior art, but that they did not work well.  Thus, while a sustained, constant plasma profile might be the conventional approach, the conventional approach had been shown not to

work very well. As set forth in *Defendants' Opening Pretrial Brief,* a substantially ascending profile was an obvious way to treat ADHD especially once it was known that the conventional approach had not yielded the desired success.

72.    ALZA's discovery was also contrary to experience gained from studying treatment regimens in which immediate release MPH products were administered twice or three times during the day. [JDT (S. Gupta) 634-635]. Previous studies suggested that two or three sharp peaks of a relatively high MPH plasma concentration were essential, and that the blood concentration of MPH had to drop sharply between successive doses in order for the next dose to be effective. [PX 428 at p. 456-57 (from the filed specification for U.S. Patent Application No. 10/726,024)].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:** An increasing amount of drug delivered into the plasma would be expected to work for a longer period of time than a constant profile based on acute tolerance.  While mimicking the prior art multiple administration profile could have, and has been, done, such a profile was also known to have loss of control during the valley of plasma profile.  A substantially ascending profile was one that was both suggested by the art and would have been expected to work.  *See generally Defendants' Opening Pretrial Brief* at pages 89-124.  PX 428, a patent application filed by Andrx, does not indicate that "[p]revious studies suggested that two or three peaks of a relatively high MPH plasma concentration were essential, and that the blood concentration of MPH had to drop sharply between successive doses in order for the next dose to

be effective." Rather, that patent application indicates only that a regimen of multiple doses of immediate release Ritalin overcame acute tolerance, but that this regimen had other problems.

73.    Once the ALZA scientists made the breakthrough discovery of learning that the ascending profile would achieve the desired longer-term treatment of ADHD without increasing the frequency or severity of side effects, they turned to development of a commercial MPH formulation that would release MPH in increasing amounts over an extended period and provide this ascending MPH plasma profile for use as a once-a-day treatment for ADHD. [JDT (A. Ayer) 31-33 and 37; Testimony of Dr. Guinta].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:**  *See* previous responses.  Also, even if everything Plaintiffs allege here is true, the invention (to the extent there was one) is tied to the plasma profile and not the ascending release rate of claim 1 of the '373 patent, which, at most, would be one way to achieve such a profile. And, as explained in *Defendants' Opening Pretrial Brief,* a substantially ascending profile was obvious, and an ascending release rate was an obvious manner in which to obtain the desired profile (as indicated by Plaintiff's own recitation above that having determined the profile, they began work on a dosage form having an ascending release rate to provide that profile).  Claim 6 adds nothing inventive to claim 1, as Plaintiffs' own mean plasma profile of the prior art Ritalin SR demonstrates that its profile "substantially ascended" for about 5.5 hours.  And claim 7 adds nothing inventive to claim 1 because, as noted above, using a plasma concentration that substantially ascends for about 8 hours was obvious.

74.    The ALZA scientists were the first to solve the problems that plagued Ritalin SR®, and their work paved the way for the development of CONCERTA® - a drug product that has proven to be at least as effective as administering two or three doses of immediate release MPH products, and has become the standard of care for treatment of ADHD patients. Currently, CONCERTA® is the most prescribed MPH product for the treatment of ADHD. [Testimony of Dr. Rozek; PX 499-502, 504-510]. In fact, annual sales of CONCERTA® in the U.S. are in excess of $900 million and growing, with CONCERTA® sales expected to reach the $1.0 billion/yr mark and "blockbuster" status in about a year. [Id.].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:**  Concerta is not the top ADHD medication.  Adderall XR is the top ADHD medication – its active ingredient is not MPH but is a mixture of four amphetamine salts, which salts Alza earlier stayed had been questioned regarding safety.  Moreover, although Adderall XR came to market after Concerta, Adderall XR has already achieved "blockbuster status." (Expected testimony of Dr. Rozek.).  The applicable market here is not just the MPH-containing market; rather, the applicable market is ADHD medications.  Dr. Rozek, however, did not analyze such a market.  Thus, his testimony should not be given much weight.  Additionally, Dr. Feifel testified that he used Concerta more than some of the later MPH drug products primarily because it was first to market.  (Feifel Dep. Tr. at 23-24.)

## C.    ALZA Obtains The '373 Patent

75.    Following ALZA's discovery that delivering MPH at an ascending release rate and/or achieving a substantially ascending methylphenidate blood plasma concentration over

time were beneficial in the treatment of ADD/ADHD, ALZA sought patent protection for the methods of treating ADD/ADHD.

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement.

**RESPONSE:** *See* response to PFF ¶ 76, below.

76.    To secure patent rights in the United States, ALZA first filed provisional applications on November 12, 1996, November 25, 1996, and April 22, 1997, which were assigned provisional application serial numbers 60/030,514 ("the '514 provisional application"), 60/031,741 ("the '741 provisional application"), and 60/044,121 ("the '121 provisional application"), respectively. [PX 3-PX 5].

**RESPONSE:** The '514 application was entitled "Dosage Form and Method for Administering Drug". The first sentence reads "This invention pertains to both a novel dosage form and to a novel method for administering a drug for producing a therapeutic effect." The provisional application was filed with 25 claims; claims 19 – 25 were to a dosage form. Therefore, at least initially, Alza not only "sought patent protection for the methods of treating ADD/ADHD" but also for, *inter alia*, dosage forms. Alza also filed two other provisional applications: 60/023,286 and 60/028,726. (DTX 63 and 33).

77.    These provisional applications, along with non-provisional applications, eventually led to the '373 patent, which contained a number of inventions related to the treatment of ADD/ADHD. [PX 1-PX 2].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement. Moreover, Andrx is not sure what Alza means by the '373 patent "contain[ing] a number of inventions related to the treatment of ADD/ADHD." As recited above, at most, the "inventors" determined what was obvious, namely, that a substantially ascending plasma profile would treat ADHD.

78.    The '373 patent was filed on February 19, 1999. The '373 patent issued on July 19, 2005. [PX 1].

**RESPONSE:** The application which eventually issued as the '373 patent was filed on February 19, 1999 and was a CIP of three earlier filed applications. (*See* Exhibit 1 to *Defendants' Opening Pretrial Brief*, which is a patent family tree for the patents in suit). As stated in the accompanying brief, the '373 patent issued over two years *after* Andrx's original ANDA filing.

79.    The '373 patent is a continuation-in-part ("CIP") of U.S. patent application serial number 09/070,666 ("the '666 application) which was a continuation ("CON") of U.S. patent application number 08/910,593 ("the '593 application"). The '373 patent is also a CIP of U.S. patent application number 08/967,606 ("the '606 application) and U.S. patent application number 08/937,336 "the '336 application"). [PX 1].[11]

80.    NUMBER NOT USED.

81.    NUMBER NOT USED.

---

[11]    The inventorship was corrected on April 29, 2007 for the '373 patent. Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright, and Richard Weyers were removed as inventors of the '373 patent.

82.    Generally, the specification of the '373 patent describes improvements in treatment methods and dosage forms that provide and maintain a desired therapeutic drug effect over a prolonged therapy period. While these improvements may be applied to a number of clinical situations and drug therapies, the specification focuses on the treatment of ADD and ADHD using MPH. These methods provide an improved ADD and ADHD therapy for most patients by eliminating the need for multiple daily doses of MPH to effectively control symptoms throughout the day. [PX 1, col. 5, line 28 to col. 7, line 58].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:**  The asserted claims do not have any requirement of efficacy.  Claim 1 of the '373 patent only requires, *inter alia*, that the dosage form has an ascending release rate as measured by an "appropriate" dissolution test.  Dependent claims 6 and 7 add the requirement that administration of the dosage form results in a "substantially ascending methylphenidate plasma drug concentration" for about 5.5 hours or about 8 hours, respectively.

83.    The claimed treatment methods offer many advantages over known methods of treating ADD and ADHD, and overcome the problems that had prevented clinical acceptance of Ritalin SR®. [PX 1, col. 7, lines 14-25 and lines 35-50; col. 13, lines 45-54].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement. It is also predicated on disputed facts.

**RESPONSE:**  The claims are so broad so as to provide for any level of treatment as long as there is some tiny amount of increase in the release rate and (with regard to claims 6 and 7) any level of "substantial ascension" in plasma profiles.  As such, the claims cover far more ground

than any particular commercial embodiment. Therefore, the "claimed" method is not commensurate in scope with any alleged improvement.

84.    All of the claims of the patent-in-suit are directed to methods for treating ADD or ADHD by providing the specified profile via a single morning administration of MPH, *i.e.*, a single administration in the morning of one or more dosage forms that each release the MPH according to the claimed profile, or a single administration of one or more pharmaceutical compositions that results in the MPH plasma concentrations specified in the claims. [PX 1, col. 5, lines 54-63, col. 23, line 11 to col. 24, line 21; PX 2, col. 23, line 11 to col. 24, line 21].

**OBJECTION(S):** As urged by Plaintiffs, the claims have not been construed to require morning administration. Moreover, claim 1 has been agreed amongst the parties to include "**a once-a day dosage form** containing the drug MPH," not dosage forms (plural) or pharmaceutical compositions (plural). These are yet other instances where, having prevailed at claim construction, Plaintiffs' are trying to change their position.

**RESPONSE:** Additionally, the independent claim requires an ascending release rate and the dependent claims require an ascending release rate and a "substantially ascending methylphenidate plasma drug concentration" as those claims have been construed by the Court.

85.    The specification states that any suitable pharmaceutical composition may be used to provide the claimed ascending profiles:

> Although the present invention is illustrated herein by exemplary dosage forms containing specific exemplary drugs, methods of making such dosage forms and

methods of using methylphenidate-containing dosage forms to provide a desired therapeutic outcome, the invention is not limited by the exemplary embodiments. *The invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period*, methods of making such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in the art in view of the disclosure herein.

[*See*, PX 1, col. 6, lines 1-14 (emphasis added); *see also* col. 23, lines 5-10].

**RESPONSE:** The Court adopted Plaintiffs' proposed construction of dosage form. During the *Markman* hearing, counsel for Plaintiffs argued that:

> But what the inventors are saying is ***our invention is a substantially ascending release rate and that can be achieved with any type of dosage form***. In fact, the language we looked at earlier was explicit that it can be done in any way.

(D.I. 109 at 26) (emphasis added).

> There is plenty of disclosures in this patent to support the construction that we think is ***the correct and normal construction of these terms covering all of the different types of dosage forms***.

(D.I. 109 at 30) (emphasis added).

86.     The specification goes on to expressly describe numerous types of non-osmotic oral sustained release dosage forms that can deliver the required ascending profile:

> There are many approaches to achieving sustained release of drugs from oral dosage forms known in the art. These different approaches include, for example, diffusion systems such as reservoir devices and matrix devices, dissolution systems such as encapsulated dissolution systems (including, for example, "tiny time pills") and matrix dissolution systems, combination diffusion/dissolution systems, osmotic systems and ion-exchange resin systems....

[PX 1, col. 2, lines 51-62].

**RESPONSE:** *See* Response to PFF ¶ 85.  There are no working embodiments of any of those dosage forms.  Those dosage forms had been used to achieve constant or declining, not ascending, release.  (Expected Testimony of Dr. Needham).

87.    Claim 1 of the '373 patent covers methods of treating ADD or ADHD by administering a dosage form comprising MPH, wherein the dosage form releases MPH at an ascending release rate over an extended period of time:

> 1. A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

[PX 1, col. 23, lines 12-16].

**RESPONSE:** Claim 1 has been construed by the Court.

88.    Dependent claims 6 and 7 of the '373 patent cover methods for treating ADD or ADHD by administering a dosage form comprising MPH, wherein the dosage form provides a substantially ascending MPH plasma drug concentration over a time period of about 5.5 hours and about 8 hours following administration of the dosage form:

> 6.    The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours following said administration.

> 7.    The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration.

[PX 1, col. 24, lines 9-17]. Plasma drug concentration levels refer to the amount of the drug in the blood or plasma after administration. [PX 1, col. 1, lines 42-53].

**RESPONSE:** "Plasma drug concentration" is defined in the patent as "intended to be inclusive of drug concentration measured in any appropriate body fluid or tissue." (DTX 1, col. 1, lines 42-53).

89.    The '373 patent claims priority to the '514 provisional application, the '741 provisional application, and the '121 provisional application. [PX 1-2].

   **Not disputed.**

90.    The PTO issued the '373 patent titled "Methods and Devices for Providing Prolonged Drug Therapy" on July 19, 2005. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 5].

   **Not disputed.**

91.    NUMBER NOT USED

92.    Plaintiff ALZA is the current assignee of the '373 patent. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 7]. ALZA owns all rights, title and interest in the '373 patent, including all rights needed to enforce the '373 patent.

   **Not disputed.**

93.    ALZA holds approved New Drug Application ("NDA") No. 21-121 for methylphenidate hydrochloride, which is marketed under the tradename CONCERTA® in the United States. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 8].

**Not disputed.**

94.    ALZA's NDA identifies the '373 patent as a patent "with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale" of CONCERTA®, and the FDA accordingly listed that patent in its list of Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book"). [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 9].

**RESPONSE:** Alza has similarly listed other patents, including the '129 patent.

95.    ALZA manufactures, and Mc-Neil PPC is the sole authorized distributor of CONCERTA®. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 10].

**Not disputed.**

## III.    THE ANDRX ANDAs AND ANDRX'S PROPOSED GENERIC PRODUCTS

### A.    ANDA Nos. 76-665 And 76-772

96.    Andrx Pharmaceuticals, L.L.C. submitted ANDA Nos. 76-665 and 76-772, which reference Plaintiffs' NDA 21-121, to the FDA seeking approval to market generic versions of all

dosage strengths of CONCERTA® for the treatment of ADHD. [D.I.126, Pretrial Order, Joint

Statement of Admitted Facts, ¶ 11; see PX 209 at ANDRX 18; PX 25 at ANDRX 03878].

**Not disputed.**

97.     Following issuance of the '373 patent, Andrx amended those ANDAs to add

certifications under 21 U.S.C. §355(j)(2)(A)(vii)(IV) (referred to as "Paragraph IV

certifications") indicating that Andrx intended to market its generic versions of CONCERTA®

prior to the expiration of the '373 patent. [D.I. 126, Pretrial Order, Joint Statement of Admitted

Facts, ¶ 11].

**RESPONSE:**  Andrx also provided that the '373 patent was invalid and would not be infringed

by Andrx's ANDA products.  By way of further response, Andrx notes that it filed its first

ANDA more than 2 years prior to issuance of the '373 patent.

98.     Andrx ANDA No. 76-665 is directed to 54 mg extended release methylphenidate

tablets that are represented to be both "pharmaceutically equivalent" and "bioequivalent" to the

54 mg CONCERTA® product. [PX 209 at ANDRX 02; see JDT (X. Cheng) 276, lines 17-22 and

278, lines 12-15].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant to infringement.

The appropriate comparisons is a comparison of the claims as construed to Andrx's proposed

products.  A comparison of Concerta to Andrx's proposed products is irrelevant.

99.    Andrx ANDA No. 76-665 includes the results of two bioequivalence studies: a single-dose, fasting study designated R02-469 and a food-effect study designated R02-470. [PX 210 at Andrx 00195-97; *see also* PX 294 (portion of ANDA containing R02-469 study); PX 293 (portion of ANDA containing R02-470 study)].

**OBJECTION(S):** *See* Objection to PFF ¶ 98.

100.    The results of the Andrx bioequivalence studies include a total of 77 plasma concentration-time profiles exhibited by individuals who received the 54 mg ANDA product. [*See* PX 293 at ANDRX 1034-35 (showing 23 plasma concentration time profiles)); PX 294 at ANDRX 2265-66 (showing 27 plasma concentration time profiles); PX 294 at ANDRX 2267-68 (showing 27 plasma concentration time profiles)].

**OBJECTION(S):** The cited pages provide "Individual Plasma Concentration Data" which can be used to graph a profile, but profiles are not provided on those pages.

101.    Andrx ANDA No. 76-772 is directed to generic 36 mg, 27 mg and 18 mg extended release methylphenidate tablets that are represented to be "pharmaceutically equivalent" and "bioequivalent" to the 36 mg, 27 mg and 18 mg CONCERTA® products, respectively.

**OBJECTION(S):** *See* Objection to PFF ¶ 98.

**B.     Andrx's Extended Release MPH Tablets (the "ANDA products")**

102.     The Andrx ANDAs include a proposed label and a proposed package insert for the ANDA products which describe the products and their use. [PX 209, ANDA (54 mg tablet) strength), ANDRX 05 (under the heading "Labeling") and ANDRX 058-099; PX 206, ANDA (18 mg, 27 mg and 36 mg tablets), ANDRX 3860 (under the heading "Labeling") and ANDRX 3918-957; JDT (J. Vaughn) 1236-1237, 1242-1244].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant and misleading to the extent that Alza does not indicate that the contents and use of Andrx's proposed label, proposed package insert and the naming of ANDA products  are subject to numerous laws, regulations and requirements.

**RESPONSE:**  Alza also fails to note that the claims are not merely to a "method of treatment." The claims require that the product have certain attributes and (for the dependent claims) that those products produce particular profiles.

103.     The package insert for the ANDA products will be packaged along with the products and made available on the company's internet website. [JDT (J. Vaughn) 1239-1240; JDT (L. Rosenthal) 1127].

**RESPONSE:**  *See* Objections and Response to PFF ¶ 102.

104.     PX 208 is a copy of the proposed package insert for the 54 mg ANDA product. [PX 208; JDT (J. Vaughn) 1235-1236]. The same package insert is used for the 18 mg, 27 mg

and 36 mg dosage strengths, except that it also refers to these additional dosage strengths. [JDT
(J. Vaughn) 1236-1237].

**RESPONSE:** *See* Objections and Response to PFF ¶ 102.


105.    Andrx's package insert for the ANDA products is intended for doctors, patients
and other caregivers, including parents of children who have ADHD. [JDT (J. Vaughn) 1241; PX
208 at ANDRX 085-098].

**RESPONSE:** *See* Objections and Response to PFF ¶ 102.


106.    The package insert describes the ANDA products as "extended release" tablets for
once-a-day oral administration containing 18, 27, 36 or 54 mg of MPH. [PX 206 at ANDRX
3926].

**RESPONSE:** *See* Objections and Response to PFF ¶ 102.


107.    According to the ANDAs, the official name for the Andrx products will be
"Methylphenidate Hydrochloride Extended-Release Tablets." [PX 209 at ANDRX 05; PX 206 at
ANDRX 3860].

**RESPONSE:** *See* Objections and Response to PFF ¶ 102.


108.    Each of the four ANDA products is a dosage form containing a dose of MPH.
[PX 206 at ANDRX 3926 and 3945; JDT (J. Vaughn) 1224, line 20 to 1226, line 1].

**RESPONSE:** Agreed since the Court has construed the term dosage form to mean any type of pharmaceutical composition.

109.    The ANDA products are clearly intended for use in treating ADHD. As the package insert expressly states, the ANDA products "are indicated for the treatment of Attention Deficit Hyperactivity Disorder (ADHD)." [PX 206, ANDRX 3925-57 at ANDRX 3933; JDT (J. Vaughn) 1242-1243].

**RESPONSE:** *See* Objections and Response to PFF ¶ 102.

110.    When administered once-daily as directed by the package insert, each of the ANDA products provides a single daily dose of MPH. [PX 206, ANDRX 3925-57 at ANDRX 3945 (under "Dosage and Administration")].

**RESPONSE:** *See* response to PFF ¶ 102. Furthermore, while Andrx's proposed products are once-a-day tablets, those tablets provide two separate doses of MPH. Andrx's proposed product will release one dose, the IR dose, immediately. Andrx's second release, from its delayed release core, will happen later in time and is separated by the IR dose by a period of no (or at best, minimal) release.

111.    The ANDA products contain MPH in an "immediate release" or an "IR" outer drug coating and a sustained release core. [JDT (X. Cheng) 328-330; PX 45]. The IR drug coating on the ANDA products dissolves rapidly in an aqueous medium of any pH -- the IR coating is pH-independent. [Testimony of Ms. Gray].

**RESPONSE:**  The sustained release core is more appropriately referred to as a "delayed release" core.  (JDT (X. Cheng) 328).  The ANDA products also utilize a delayed-release core underneath the immediate release drug coating.  (Expected Testimony of Ms. Gray).

112.    The immediate release drug coating and tablet core of the ANDA products are designed to contain 25% and 75%, respectively, of each product's total MPH dose. [JDT (X. Cheng) 329].

**RESPONSE:**  Although the tablets are designed to have the immediate release drug coating and tablet core contain 25% and 75%, respectively, there are permissible variations.

113.    In "Composition Statements" in the ANDA, Andrx represented to FDA that the ANDA products have 25% of their MPH in the immediate release coating and 75% of the MPH in the tablet core. [PX 210 at ANDRX 206]. For example, for the 54 mg ANDA product, the composition information shows that MPH comprises 14.52% of the total composition of the 54 mg tablet (10.89% core + 3.63% coating = 14.52% ) with 25% of the MPH in the immediate release drug coating (3.63% divided by 14.52% = 25%). [PX 210 at ANDRX 206].

**RESPONSE:**  *See* Response to PFF ¶ 112.

114.    The 54 mg ANDA products are designed to have 13.5 mg of MPH in the immediate-release drug coating on the product. [Testimony of Ms. Gray; PFF ¶¶ 111-113].

**RESPONSE:**  *See* Response to PFF ¶ 112.

115.    The 36 mg ANDA products are designed to have 9 mg of MPH in the immediate release drug coating on the product. [Testimony of Ms. Gray; PFF ¶¶ 111-113].

**RESPONSE:** *See* Response to PFF ¶ 112.


116.    The 27 mg ANDA products are designed to have 6.75 mg of MPH in the immediate-release drug coating on the product. [Testimony of Ms. Gray; PFF ¶¶ 111-113].

**RESPONSE:** *See* Response to PFF ¶ 112.


117.    The 18 mg ANDA products are designed to have 4.5 mg of MPH in the immediate-release drug coating on the product. [Testimony of Ms. Gray; PFF ¶¶ 111-113].

**RESPONSE:** *See* Response to PFF ¶ 112.




**REDACTED**

**REDACTED**

120.    The ANDA products are formulated to release the core dose of MPH at a pH above pH 7.0. [Testimony of Dr. Davis; Testimony of Ms. Gray; PFF ¶¶ 118-119]. Following administration, the immediate-release drug coating on the ANDA products dissolves within one hour, releasing an initial dose of MPH, typically in the stomach. [Testimony of Ms. Gray; PX 223-224 at ANDRX 73469 ("In an aqueous environment, the drug overcoat dissolves within one hour ... providing an initial dose of methylphenidate.")]. As the product passes further into the gastrointestinal tract, it will encounter a pH above pH 7.0 and gradually release the core dose of MPH. [Testimony of Ms. Gray; PX 250 at P ALZ 4599, Table 1 (summarizing typical pH values in the gastrointestinal tract in the body); PFF ¶¶ 118-119].