**RESPONSE:**  Defendants agree that "the immediate-release drug coating on the ANDA products dissolves within one hour, releasing an initial dose of MPH, typically in the stomach" – and that the release from the IR component occurs within 30 minutes.  Further, in the dissolution tests conducted at pH 7.5, the non-IR release occurs after one hour; therefore, there is no non-IR release by one hour.

121.    The MPH from the immediate release drug coating is released from the ANDA products in about 1 hour during in vitro dissolution testing in an aqueous medium. [JDT (X. Cheng) 330; PX 210 at ANDRX 199, "The first interval, 0-1 hr, captures the immediate release portion of the drug release..."; PX 223-224, at ANDRX 73469, "In an aqueous environment, the drug overcoat dissolves within one hour...."].

**RESPONSE:**  *See* response to PFF ¶ 120.  The MPH from the immediate release coating is released in less than 0.5 hours, while the MPH from the delayed-release core is not released until more than 1 hour has passed.  By way of further response, Andrx notes that the construction of an "ascending release rate" requires that the release begin ascending at time equals zero and that the IR release is not counted for purposes of ascension measurement.  Thus, there must be some release from Andrx's non-IR core within the first hour for that particular tablet to be infringing.

122.    The ANDA products are designed to complete the release of MPH by about 10 hours during in vitro dissolution testing in pH 7.5 dissolution media. [PX 210 at ANDRX 199, the period 0-10 hr "evaluates the full release" of the MPH].

**RESPONSE:**  As provided elsewhere on the page cited by Plaintiffs, at the 10 hour sampling the Andrx's ANDA products should have a release of at least 80% (NLT – not less than – 80%) of its methylphenidate.  Therefore "the period 0-10 hr "evaluates the full release" of the MPH" even though only 80% or more allows for such an evaluation.  Moreover, this does not support the proposition that the products are designed "to complete the release of MPH by about 10 hours during in vitro dissolution testing in pH 7.5 dissolution media"

## IV.    LITERAL INFRINGEMENT OF CLAIM 1 OF '373 PATENT

### A.    An "Appropriate" In Vitro Dissolution Test For The ANDA Products

123.    Ms. Vivian Gray is an expert in the field of in vitro dissolution, including development of dissolution test methods and specification setting. [Testimony of Ms. Gray].

124.    Ms. Gray's professional qualifications and experience in the field of in vitro dissolution testing are provided in her Curriculum Vitae, PX 201. [Testimony of Ms. Gray; PX 201].

125.    For purposes of evaluating whether the ANDA products meet the ascending release rate requirement of Claim 1 of the '373 patent, the release rate of MPH from the ANDA products needs to be determined by an appropriate in vitro dissolution test. [D.I. 130, p. 2].

126.    Dissolution is the process by which a solid substance dissolves in a liquid to form a solution. For drugs that are readily soluble, the amount of dissolved drug in the liquid is the same as the amount of drug released from the dosage form. [Testimony of Ms. Gray].

-122-

127.    An in vitro dissolution test is a routine laboratory test used to determine the dissolution rate of a drug, i.e., the amount of drug released over time, from a dosage form under controlled conditions. [Testimony of Ms. Gray; PX 1, '373 patent, col. 2, lines 2-5 and col. 9, lines 23-29; PX 253, col. 1, lines 18-29].

**RESPONSE:** An in vitro dissolution test is, at most, a not uncommon laboratory test – in some laboratories. Additionally, dissolution tests can be used to generate different data and it is often more commonly used to compare the dissolution to a specification or other values – as in that cited in PFF ¶ 122.

128.    An in vitro dissolution test utilizes a dissolution apparatus that generally includes a vessel (such as a glass cylinder) containing the dissolution medium. The dosage form is placed in the vessel and the apparatus operates to stir the medium or agitate the dosage form at a specific rate. Samples of the dissolution medium are withdrawn from the vessel at various times, and the amount of drug present in each sample is measured by a suitable assay. This series of measurements provides a drug release profile for the dosage form, i.e., how much drug is released over time. [Testimony of Ms. Gray; PX 253, col. 2, lines 4-14; PX 202, USP Chapter <711>, at P ALZ 4376-77].

**RESPONSE:** This provides some generalities for some dissolution tests, but as it provide generalizations they are not applicable to all dissolution tests. Moreover, a series of measurements may or may not provide "a drug release profile for the dosage form" – differing sampling times and number of sampling points will be needed for different dosage forms. Additionally, as Alza's counsel has made clear, the dissolution test required by the claim can

come in any form and is not required to follow the USP, either with regard to apparatus or any other requirement.

129.    The official methods used in performing dissolution tests are listed in a publication entitled the U.S. Pharmacopoeia-National Formulary ("USP") and are well-known to persons of ordinary skill in the field of dissolution testing. The USP is a compendium of public standards and information that serves as a guide to companies and individuals in fields relating to medicines and the pharmaceutical industry. [Testimony of Ms. Gray; JDT (X. Cheng) 311, line 25 to 312, line 9; PX 202, USP 23, at P ALZ 4372, the primary purpose of the USP is to "provide authoritative standards and specifications" for products and methods used in the practice of medicine].

**RESPONSE:**  The "official methods" are official for only certain purposes, which is why (at least in part) that it "serves as guide" rather than serving as a rulebook.

130.    The Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*, designates the USP as the official compendium of standards for drugs marketed in the United States. [21 U.S.C. § 321(j)].

131.    The USP provides substantial guidance for selecting an appropriate in vitro dissolution test for the ANDA products. [Testimony of Ms. Gray].

**RESPONSE:**  "Appropriate" is a relative term and to the extent that the "USP provides substantial guidance for selecting an appropriate in vitro dissolution test", the USP would be providing such guidance for the testing to further the purposes of the USP – e.g., an appropriate

test to allow for a comparison of one dosage form to another and not to determine the release profile from a proposed dosage form. *See, e.g.*, DTX 716 at p. 193 (About fifty years after first attempts of dissolution testing, "we are still grappling with the question of 'which media to use to run which dissolution tests.' This is not a trivial question, since the outcome of a test can be greatly dependent on the dissolution medium….")

132.    Defendants' dissolution expert, Dr. Banakar, admitted during the Markman proceedings that an appropriate apparatus and conditions for the ANDA products "should be within the approved dissolution methods in the United States Pharmacopeia (USP), as this is the standard bearer for the pharmaceutical industry in terms of dissolution testing." [D.I. 93, Banakar Declaration, ¶ 49].

1.    **RESPONSE:** Alza's allegation that Dr. Banakar "admitted" the same during the *Markman* proceedings ignores the context in which his statement was made. *Plaintiffs' Opening Pretrial Submission* at 21, n.8. Dr. Banakar's comment was made in the context of supporting Andrx's proposed, and ultimately unsuccessful, "biorelevant" construction. With regard to Alza's proposed construction, which is what is being used, Dr. Banakar specifically stated that:

> 2.    I note that Alza's proposed interpretation – "appropriate" – does nothing to improve the indefiniteness of the claim, as it does not say "appropriate" for what and still leaves the [Person of Ordinary Skill in the Art] without any understanding of the claim boundaries.

(D.I. 93 [Decl. of Banakar ISO Andrx's Opening *Markman* Brief at ¶ 44). It was only after making this statement about Plaintiffs' proposed definition that Dr. Banakar stated that to cure the indefiniteness he would read the claim as directed to a biorelevant dissolution test and in this

context he would use one of the USP apparati. (D.I. 93 at ¶¶ 45-51). Thus, Dr. Banakar's "admission" was made in a context which is now irrelevant under the Court's construction.

133. According to the USP guidance on dissolution testing of modified release dosage forms, the choice of apparatus and dissolution medium for a dosage form should be based on the design and solubility characteristics of the formulation, including any pH dependence. [Testimony of Ms. Gray; PX 202 at P ALZ 4386, under the heading "Dissolution and Drug Release Testing – Method Development for Modified-release Dosage Forms"].

**RESPONSE:**    In reading the USP, with the knowledge of the properties of Andrx's ANDA products as acknowledged by Ms. Gray (such as that Andrx's ANDA products have a delayed release / enteric coating), one would notice that dosage forms identified as enteric coated, should typically use the test provided in "*Delayed-release Articles* under *Drug Release <724>*" (discussed below). (DTX 720). Therefore, one looking for guidance – with the recognition that Andrx's products have an enteric coat in Andrx's ANDA products – would turn to that section.

To the extent that one understands that Andrx's ANDA products are a delayed release dosage form (as Ms. Gray recognized), one would also likely look to that section as it is entitled "Delayed-release." The "Delayed-release" section under *Drug Release <724>*, in turn, provides that one should use a dissolution test with a two-tier pH media: placing the dosage form initially in a highly acidic dissolution medium for two hours and then switching to a pH 6.8 medium (or to change the medium's pH to 6.8). (PX 324 p. 1793 *et seq.*). Therefore, one following the USP's guidance would limit the selection of an "appropriate" dissolution test to only those tests that have at least a two-tiered pH (or to the extent that an appropriate dissolution test could be

-126-

comprised of more than one test – the selection would be limited to those that include runs at different pHs).

134.    USP Apparatus 1 and Apparatus 2 have been and continue to be the preferred apparatus for dissolution testing of oral dosage forms, such as tablets and capsules. [Testimony of Ms. Gray].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

3.    **RESPONSE:**  Alza's counsel expressly rejected the notion at the *Markman* hearing that the Apparatus used in an "appropriate" dissolution test must be a USP apparatus in successfully arguing for its proposed construction:

> On the question of the ascending release rate, the statement was made a couple of times that [Alza] agree[s] that it has to be a USP apparatus. ***We do not agree with that, Your Honor.***

4.    (D.I. 109 [*Markman* Hearing] at 133:19-23) (emphasis added).

135.    FDA recommends the use of USP Apparatus 1 or Apparatus 2 for dissolution testing of oral dosage forms in published "Guidance" documents relating to the development and evaluation of oral dosage forms. [PX 220 at P ALZ 4448; PX 221 at P ALZ 4451].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

5.    **RESPONSE:**  Alza's counsel expressly rejected the notion at the *Markman* hearing that

the Apparatus used in an "appropriate" dissolution test must be a USP apparatus in successfully

arguing for its proposed construction:

> On the question of the ascending release rate, the statement was made a couple of times that [Alza] agree[s] that it has to be a USP apparatus. ***We do not agree with that, Your Honor.***

(D.I. 109 [*Markman* Hearing] at 133:19-23) (emphasis added).

136.    USP Apparatus 1 and Apparatus 2 and their use are described in detail in Chapter

711 of the USP Chapter which covers dissolution testing. There are seven official dissolution

apparatuses recognized in the USP. [Testimony of Ms. Gray; PX 202 at P ALZ 4376-77 (Chapter

<711> Dissolution); JDT (R. Medina) 994-996].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:**  *See* Response to PFF ¶¶ 134-35.

137.    In a USP Apparatus 1 dissolution test, a dosage form is placed in a stainless steel

wire mesh basket, and the basket is then submerged in a covered vessel containing a volume of

dissolution medium and rotated at a selected speed. [Testimony of Ms. Gray; PX 202 at P ALZ

4376-77, describing USP Apparatus 1; PX 253, col. 1, lines 35-50 and col. 2, lines 4-14].

138.    The vessel cover has multiple holes to allow the basket stirring shaft to pass

through it and for easy insertion of a thermometer and withdrawal of samples. [Testimony of Ms.

Gray; PX 202 at P ALZ 4376 n. 2].

139.    The vessel itself is typically made of glass or another inert, transparent material, which permits visual inspection of the dosage form during a dissolution test. [Testimony of Ms. Gray; PX 202 at P ALZ 4376, describing USP Apparatus 1].

140.    A USP Apparatus 2 dissolution test is essentially the same as an Apparatus 1 test, except that a paddle is used as a stirring element and the dosage form is allowed to sink to the bottom of the vessel (without a basket or other means to suspend the dosage form in the dissolution medium). In use, the paddle is rotated within the dissolution medium and above the dosage form at a selected speed. [Testimony of Ms. Gray; PX 253, col. 1, lines 50-64; PX 202 at P ALZ 4377, describing USP Apparatus 2].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

141.    The USP Apparatus 1 and Apparatus 2 methods are referred to as the "basket" and "paddle" methods, respectively. [Testimony of Ms. Gray; PX 220 at P ALZ 4448 ("The preferred dissolution apparatus is USP I (basket) or II (paddle)."); JDT (R. Medina) 1005, lines 9-12; JDT (F. Alvarez) 19, lines 12-15].

142.    While either USP Apparatus 1 or Apparatus 2 might be selected initially for dissolution testing of the ANDA products, testing of the ANDA products in USP Apparatus 2 tests revealed a problem. [Testimony of Ms. Gray].

**RESPONSE:**  Other USP Apparatus could also be used in dissolution testing of Andrx's ANDA products.  According to Alza's counsel "appropriate" dissolution tests do not require use of a USP apparatus.

143.    During Andrx's own internal development of a dissolution test method for the

ANDA products, Andrx initially used USP Apparatus 2 and found that the ANDA products were

sticking to the glass vessel containing the dissolution medium. [Testimony of Ms. Gray; JDT (X.

Cheng) 317, 318, lines 8-11, 320-321, and 322, lines 2-4; JDT (R. Medina) 1004; JDT (F.

Alvarez) 15, line 9 to 16, line 2; PX 222 ("the tablet sticks to the glass vessel hence it requires

App. 1"); PX 223-224 at ANDRX 73469].

144.    A dosage form sticking to a vessel in a dissolution test is undesirable since it can

adversely effect the accuracy and reproducibility of the test results. [Testimony of Ms. Gray;

JDT (F. Alvarez) 15, line 15 to 16, line 2; JDT (R. Medina) 1006, line 14 to 1007, line 2; PX 221

at P ALZ 4451 ("For some tablet dosage forms, in-vitro... dissolution may be slow due to the

manner in which the disintegrated product settles at the bottom of a dissolution vessel. In such

situations, USP Apparatus I may be preferred over Apparatus II.")].

145.    Andrx resolved the sticking issue that occurred with its ANDA products in USP

Apparatus 2 tests by switching to USP Apparatus 1. [JDT (X. Cheng) 317, 318, lines 8-11, 320-

321 and 322, lines 2-4; PX 222 ("the tablet sticks to the glass vessel hence it requires App. 1");

PX 223-224 at ANDRX 73469].

146.    In a USP Apparatus 1 test, the metal basket holding the dosage form restricts the

movement of the dosage form and prevents it from contacting and adhering to the dissolution

vessel. [Testimony of Ms. Gray; PFF ¶¶ 137-139].

147.    The occurrence of a dosage form adhering to the dissolution vessel in a USP

Apparatus 2 test, as Andrx experienced in its USP Apparatus 2 tests on the ANDA products, is a

valid and sufficient justification for preferring USP Apparatus 1 over USP Apparatus 2 for a particular dosage form. [Testimony of Ms. Gray].

148.    USP Apparatus 1 is an appropriate apparatus to use in conducting dissolution tests on the ANDA products. [Testimony of Ms. Gray].

**RESPONSE:** Other apparati (whether USP approved or not) may also be appropriate for use in conducting dissolution tests on the ANDA products. Also, to the extent that Alza is suggesting that Andrx contends that a USP Apparatus 2 would be appropriate, Alza is wrong. Andrx does not contend that a USP Apparatus would be an appropriate apparatus to use in testing its ANDA products.

149.    When testing with USP Apparatus 1 or USP Apparatus 2, the dissolution medium inside the vessel is heated to a standard temperature of 37° Celsius (± 0.5 ° C). [Testimony of Ms. Gray; PX 202 at P ALZ 4376 (the temperature inside the vessel is held at 37° ± 0.5); PX 253, col. 2, line 9; JDT (F. Alvarez) 19, line 20 to 20, line 3; JDT (J. Chi) 347, lines 5-13]. This temperature of 37° C corresponds to the average internal temperature of the human body (i.e., 98.6° Fahrenheit). [Testimony of Ms. Gray; PX 253, col. 2, lines 8-9].

150.    The standard temperature of 37° C for dissolution media in USP Apparatus 1 and Apparatus 2 tests is considerably hotter than room temperature, which is 22° C or 72° F. [Testimony of Ms. Gray]. .

151.    When testing with USP Apparatus 1, common practice dictates a rotation speed of 100 rpm for the stirring element. [Testimony of Ms. Gray; PX 202 at P ALZ 4386 ("The most common operating speeds are 100 rpm for Apparatus 1 (basket) and 50 rpm for Apparatus 2

(paddle) for solid-oral dosage forms."); JDT (X. Cheng) 322, lines 2-11; JDT (F. Alvarez) 19, lines 5-19; JDT (R. Medina) 1036, line 18 to 1037, line 2].

**RESPONSE:** Common practice may be a rotation speed of 100 rpm – but this does not dictate its use. When selecting a dissolution test, the RPM is varied to determine the criticality of this parameter. (*See* Defendants' Opening Brief at ¶ 438: "Indeed, Ms. Gray has acknowledged that small changes can result in a better test: Q. Hypothetically, is it possible that having the same test, except varying the paddle speed from 50 to 60, would be the 60 would be appropriate for a dosage form and the 50 would not? A. It's possible, uh-huh. It would obviously depend dosage form to dosage form. (Gray Dep. Tr. at pp. 111-112)") Ms. Gray did not test the criticality of her selected 100 rpm.

Additionally, according to Ms. Gray, the "appropriate" dissolution test is the best one for that dosage form. Whether or not 100 rpm is standard is irrelevant to whether it is the best, and thus the appropriate, dissolution test.

152.    The nature of a particular extended release dosage form and how it is designed to release the drug are of primary importance in selecting an appropriate dissolution medium. [Testimony of Ms. Gray; PFF ¶¶ 133].

**RESPONSE:** See responses to PFFs ¶¶ 131 and 133.

**REDACTED**

-132-

REDACTED

154.    During its efforts to develop a suitable dissolution method for the ANDA

products, Andrx concluded that the formulation "needs pH 7.5 for proper release." [PX 222 ("our

formulation needs pH 7.5 for proper release."); JDT (X. Cheng) 319, lines 3-15, and 320, lines 2-

16].

**OBJECTION(S):**  The dissolution test developed by Andrx's for the ANDA products is

irrelevant for present purposes.

6.    **RESPONSE:** *See* response to PFF ¶ 153.  In this particular case, Andrx conducted

extensive dissolution studies for its proposed ANDA products using varying methods and using different media; it did not, as Alza implies, go directly to testing in pH 7.5 media. Such testing is necessary to allow the FDA to approve a final dissolution method which can adequately detect variations between different batches. After completing this array of testing, Andrx was comfortable proposing that, as long as no significant changes occurred to its process or its formulation, the use of a dissolution test containing only three specified sampling time points was "appropriate" for purposes of quality control. Thus, Andrx's dissolution method can be said to be "appropriate" based on the purpose of the test. (Expected Testimony of Dr. Needham).

7.        Andrx's testing, however, is not appropriate for purposes of the '373 patent. For example, the '373 patent requires the exclusion of the IR dissolution results in determining whether the release rate ascends. Andrx's proposed method requires only testing at 3 time points, *i.e.*, at 1, 4 and 10 hours. The reasons for Andrx's proposed method are clear. The 1 hour time point ensures that the IR is all released by the end of one hour, and also ensures that the delayed release coated core is not releasing. As 4 hours in 7.5 pH, the delayed release core is designed to begin releasing, but it is designed to release in a gradual manner. By 10 hours, it is desired that about all of the active is release. These three points are believed by Andrx to indicate that its product is being manufactured in a reproducible manner, and thus, the product will have the desired physiological qualities that were established with an earlier representative sample of tablets and individuals. (*See* PTX 207 at ANDRX 04041).

8.

155.    A pH 7.5 dissolution media is well within the accepted range of pHs in the USP for dissolution testing of extended-release dosage forms: if appropriate for a formulation,

"buffered aqueous solutions (typically pH 4 to 8)...may be used." [Testimony of Ms. Gray; PX

202, USP 23, P ALZ 4386 and see P ALZ 4391 ("Simulated Intestinal Fluid" is a pH 7.5 test

solution)]. A phosphate buffer solution is used as the dissolution medium because it resists

changes in pH after the dosage form is added. [Testimony of Ms. Gray; PX 202, USP 23, at P

ALZ 4387 (describing "Buffer Solutions")].

156.    Use of a pH 7.5 dissolution medium (buffered solution) is appropriate to properly

evaluate the dissolution characteristics of the ANDA products. [Testimony of Ms. Gray; PFF ¶¶

153-155].

**RESPONSE:** *See* Responses to PFF ¶¶ 131 and 153 – 154.

157.    Thus, a dissolution test utilizing USP Apparatus 1, 100 rpm and pH 7.5

dissolution medium (buffered solution) at a temperature of 37° C is an appropriate in vitro

dissolution test for the ANDA products. [Testimony of Ms. Gray].

**RESPONSE:** *See* responses to PFF ¶¶ 131 and 153 – 155. In general, whether or not a

dissolution test is "appropriate," as explained previously, depends on the use it is intended to put

the test and the data produced. In this particular case, a key question with regard to Andrx's

proposed products are whether they provide a period of ascending release in the initial time

period. A test such as that identified by Alza does not provide information to inform one as to

whether Andrx's products have such an ascending release rate (excluding the IR dose). As such,

it cannot be appropriate for purposes of the claims of the '373 patent.

-135-

158.    The test method that Andrx developed and proposed to FDA as an appropriate dissolution method for the ANDA products uses the same test conditions – i.e., USP Apparatus 1 (basket) at 100 rpm and pH 7.5 phosphate buffer solution at 37° C. [Testimony of Ms. Gray; JDT (F. Alvarez) 09, line 20 to 10, line 7, and 13, lines 8-14; PX 210, ANDA (54 mg), at ANDRX 199 ("Andrx Proposed Dissolution Method"); PX 212, ANDRX 820-840 at 828 (Drug Release test for 54 mg Finished Product); JDT (J. Chi) 358-361; JDT (X. Cheng) 324, line 18 to 325, line 6; PX 207, ANDA (18, 27 and 36 mg), at ANDRX 4041; PX 206 at ANDRX 3857 (the ANDA products "meet an appropriate *in vitro* test requirement."); PX 225, ANDRX 5367-5390 at 5379 (Drug release test for 36 mg, 27 mg and 18 mg Finished Products)].

**OBJECTION(S):**    Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:** *See* responses to PFF ¶¶ 131, 153 – 154, and 156-57. The test method developed by Andrx's for the ANDA products is irrelevant for present purposes. That test method only uses three sampling time points – 1, 4 and 10 hours. The test method, including the sampling times, are not intended to elucidate the dissolution profile or release mechanism required by the claims of patent in suit and, for at least these reasons, is not "appropriate" for evaluating infringement of the '373 patent by Andrx's ANDA products.


159.    The FDA subsequently approved Andrx's proposed dissolution method for testing the ANDA products, stating "[t]he dissolution method (basket 100 rpm in 500 mL of 0.05 M pH 7.5 phosphate buffer) as proposed has been found acceptable." [PX 227].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:** *See* response to PFF ¶ 158.

B.    **Appropriate In Vitro Dissolution Testing Establishes That The ANDA Products Provide The Ascending Release Rate Profile In Claim 1 Of The '373 Patent**

160.    During discovery in this case, Andrx produced samples of the 54 mg, 36 mg and 27 mg extended-release methylphenidate tablet products that will be commercially manufactured upon approval of its ANDAs. [PX 233, emails from Andrx's counsel to Plaintiffs' counsel, at P ALZ 4465, 4467].

161.    During discovery, Plaintiffs requested samples of the 18 mg ANDA products, but Andrx was unable to provide them because it had not successfully manufactured a commercial scale, validated lot of the 18 mg product. [PX 233 at P ALZ 4465 ("there are no unexpired lots of the 18 mg dosage that meet all the ANDA specifications.") and P ALZ 4467 ("Andrx does not have samples from a commercial scale validated lot of the 18 mg."); JDT (J. Vaughn) 1254, line 24 to 1255, line 4, and 1256, lines 4-11].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as a mischaracterization.

**RESPONSE:**  Andrx's ANDA related to the 18 mg product was filed over four years ago, in mid-2003, approximately 2 years before the '373 patent even issued.  What Andrx noted to Alza was that it did not have any unexpired, validated lots of the 18 mg product.  In any event, this point is irrelevant other than to explain why 18 mg samples were not produced (which all parties acknowledge).

162.    Ms. Gray directed dissolution testing on the samples of the ANDA products (54 mg, 36 mg and 27 mg), using a dissolution test protocol she approved, at an independent testing laboratory, Analytical Research Laboratories ("ARL"), located in Oklahoma City, OK. [Testimony of Ms. Gray; PX 229, test protocol].

-137-

**OBJECTION(S):** Andrx objects to this proposed finding of fact to the extent that it is misleading if "directed" is viewed as doing more than just approving a dissolution test protocol.

**RESPONSE:** Ms. Gray similarly "directed" dissolution testing at various pHs (all lower than pH 7) that she did not rely upon and ignored in reaching her conclusions. Ms. Gray did not see ARL run any of the tests, nor has she even spoken to the person who conducted them. Whether the data that she relied on is authentic and reliable thus cannot be established by Ms. Gray.

163.    ARL performed in vitro dissolution tests on the ANDA products using USP Apparatus 1, 100 rpm, 500 mL of pH 7.5 dissolution media at 37° C as specified in "Stage 1" (54 mg ANDA product) and "Stage 2" (36 mg and 27 mg ANDA products) of the protocol. Brian Walker, a laboratory technician and dissolution specialist employed by ARL, carried out these dissolution tests on the ANDA products. [Testimony of Ms. Gray; Testimony of Mr. Walker].

**RESPONSE:** The protocol for the non-Stage 1 testing was revised to limit sampling times to 12 hours because during the Stage 1 test (which continued to 24 hours) had a readily observable problem with its data in that by 24 hours the dissolution media evaporated to a significant degree. The revision to the protocol for the subsequent testing did nothing to correct or account for the evaporation of the media, it only made it less observable because it was only run for 12 hours (*i.e.*, the evaporation from the media occurred over the course of 12 hours instead of 24 hours). ARL and Ms. Gray never ran any tests to establish whether or not evaporation was a concern during the first 12 hours of its testing.

164.    Both ARL and Brian Walker are fully qualified to perform in vitro dissolution tests on the ANDA products using the test protocol that had been approved by Ms. Gray. [Testimony of Ms. Gray; PX 230; PX 234 (Resume of B. Walker)].

**RESPONSE:**  Whether Brian Walker was qualified or not, his tests were poorly conducted and unreliable.

165.    The in vitro dissolution tests that Mr. Walker performed on twelve (12) individual samples of each dosage strength (i.e., 54 mg, 36 mg and 27 mg) of the ANDA products using USP Apparatus 1, 100 rpm, and pH 7.5 dissolution media at 37° C were appropriate dissolution tests for those products. [Testimony of Ms. Gray; PX 229, test protocol].

**RESPONSE:**  See responses to PFF ¶¶ 162.

166.    Brian Walker and ARL performed the in vitro dissolution tests on the ANDA products carefully and correctly, following the test procedure approved by Plaintiffs' dissolution expert, Ms. Gray. [Testimony of Ms. Gray; Testimony of Mr. Walker].

**RESPONSE:**  The evaporation issue indicates that the dissolution tests were not run carefully and correctly; and the failure to establish anything more than the existence of an evaporation problem and to make no corrections for the same is not careful or correct.

167.    For each set of twelve samples of a particular dosage strength, the ARL dissolution tests were done in two cycles, with six individual samples tested per cycle. The six samples tested in cycle 1 were designated as "Cycle 1, Andrx A-F." The six samples tested in

cycle 2 were designated as "Cycle 2, Andrx A-F." [Testimony of Ms. Gray; Testimony of Mr.

Walker; *see, e.g.*, PX 238, ARL report on dissolution tests for 54 mg ANDA product].

168.    In performing its in vitro dissolution tests, ARL determined the cumulative

amount of MPH released from each ANDA product during successive hourly intervals following

initiation of the dissolution test. ARL reported the dissolution test results as cumulative amount

recovered (mgc/mL) and cumulative "% Recovery" for each sample. [Testimony of Ms. Gray;

Testimony of Mr. Walker; *e.g.*, PX 238, ARL report with dissolution test results for 54 mg

ANDA product].

**RESPONSE:**  Andrx agrees with this proposed finding of fact as a generalization, but as seen in

other responses the data collected by ARL was flawed and therefore Andrx disagrees that ARL

collected data which can be accurately referred to as, e.g., "% Recovery" without a qualifier.

169.    ARL issued a report containing the results of its in vitro dissolution tests on each

of the 54 mg, 36 mg and 27 mg ANDA products. [Testimony of Ms. Gray; PX 238-240].

**RESPONSE:**  *See* response to PFF ¶ 168.

170.    From the ARL dissolution results, Ms. Gray calculated the quantity of MPH

released during each hourly interval, i.e., the release rate (mg/hr), for the first periodic interval

(t=0-1 hr) through the tenth interval (t=9-10 hrs) for each of the ANDA products. [Testimony of

Ms. Gray; see JDT (X. Cheng) 333, lines 11-17].

**RESPONSE:**  *See* response to PFF ¶ 168; further, Ms. Gray did not calculate "the quantity of

MPH released during … the first periodic interval (t=0-1 hr)."

171.    Ms. Gray used the following well-known formula to convert the cumulative MPH release data reported by ARL into MPH release rate per hour (mg/hr):

**Quantity Drug Rel$_{t=n}$ = (% Recovery$_{t=n}$ - %Recovery$_{t=n-1}$) x (LC)**

**Where**

| | | |
|---|---|---|
| **% Recovery$_{t=n}$** | **=** | **Cumulative percent MPH recovered at time n** |
| **%Recovery$_{t=n-1}$** | **=** | **Cumulative percent MPH recovered at hour n-1 (i.e., the immediately preceding hourly interval)** |
| **LC** | **=** | **Label claim (the stated dose of MPH in milligrams for a product, such as "54 mg")** |

[Testimony of Ms. Gray; see JDT (X. Cheng) 333, lines 11-17].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant insofar as it refers to the formula as well-known.

**RESPONSE:** See response to PFF ¶ 170.


1.    **Dissolution tests on the 54, 36 and 27 mg ANDA products**

172.    Ms. Gray prepared a MPH release rate evaluation for each set of the 54, 36 and 27 mg ANDA products based on the ARL dissolution test results. [Testimony of Ms. Gray].

**RESPONSE:** See response to PFF ¶ 170.


173.    PX 241 is the MPH release rate evaluation for each of the twelve 54 mg ANDA products tested by ARL. The columns labeled "Quantity of Drug Released (mg) (Excluding 13.5 mg IR)" report the MPH release rate for successive hourly intervals through 10 hours for each 54

mg sample. [Testimony of Ms. Gray; PX 241]. Ms. Gray excluded 13.5 mg of MPH – the amount of MPH attributable to the immediate-release drug coating of the 54 mg ANDA products – in calculating the quantity of MPH released during each hourly interval in accordance with the Court's construction of the ascending release rate element of claim 1. [Testimony of Ms. Gray; PX 241; D.I. 130, p. 2]. This was done by simply subtracting the amount of MPH contained in the IR coating from the total quantity of MPH determined to be present through ARL's dissolution tests. [Testimony of Ms. Gray].

**RESPONSE:** See response to PFF ¶ 170. Ms. Gray did not determine the amount of MPH attributable to the immediate-release drug coating of the 54 mg ANDA products. Rather, Ms. Gray assumed that each tablet had exactly 25% of the projected active in the tablet. This assumption is faulty because undoubtedly each tablet will not have 13.5 mg of MPH in the IR overcoat. Without the actual number included, one cannot determine whether or not there was any non-IR release in the first hour. Indeed, if one were going to make an estimation, the appropriate estimation based on ARL's IR Overcoat study would be to assume that there was no non-IR release in the first time period.

Furthermore, Ms. Gray's "label-claim assumption" described in this proposed finding of fact, is inappropriate and unnecessary. An appropriate dissolution test should allow for the attribution of releases for IR and non-IR components. Additionally, even using her improper assumption the majority of tablets tested, and the average of the tablets tested, did not infringe because there was no non-IR release during the initial periodic interval. For at least these reasons, Andrx's ANDA products do not exhibit an ascending release rate.

174.    Ms. Gray also determined the "midpoint of the $T_{90}$" for each of the twelve 54 mg

ANDA products tested and included those results in her MPH release rate evaluation.

[Testimony of Ms. Gray; PX 241; see D.I. 130, p. 2 (the ascending release rate of Claim 1 must

occur "through at least the midpoint of the $T_{90}$ and for at least three hours.")]. The $T_{90}$ is the time

at which 90% of drug within a dosage form has been released. [Testimony of Ms. Gray; PX 1,

'373 patent, col. 9, lines 37-40]. The midpoint of the $T_{90}$ is determined by simply dividing the $T_{90}$

in half. [Testimony of Ms. Gray].

**RESPONSE:**  *See* Response to PFF ¶ 173.  Additionally, the use of flawed data (from just the

evaporation issue alone) led Ms. Gray to make erroneous conclusions regarding the $T_{90}$ of some

of the samples.  As a result, the mid-point of the $T_{90}$ was similarly effected.  Adjusting for the

evaporation, at the 54 mg dosage strength for example, reveals that none of those samples tested

had an ascending release that continued through the mid-point of the $T_{90}$.  (Expected Testimony

of Dr. Banakar).


175.    The 54 mg ANDA product sample designated as Cycle 1, Andrx A, released

84.01% of its MPH by the end of the seventh periodic interval (t=7 hrs) and released 92.92% of

its MPH by the end of the eighth periodic interval (t=8 hrs). [Testimony of Ms. Gray; PX 241,

Cycle 1, Andrx A]. Thus, the 54 mg ANDA product sample designated as Cycle 1, Andrx A,

exhibited a $T_{90}$ between 7 and 8 hours. [Testimony of Ms. Gray; PX 241, Cycle 1, Andrx A].

**RESPONSE:**  *See* Response to PFF ¶ 174.

176.   The 54 mg ANDA product sample designated as Cycle 1, Andrx A, has a midpoint of the T$_{90}$ occurring between 3.5 and 4 hours. [Testimony of Ms. Gray; PX 241, Cycle 1, Andrx A].

**RESPONSE:**  *See* Response to PFF ¶ 174.


177.   As shown in PX 241, for 54 mg sample Cycle 1, Andrx A, the amount of MPH released in each successive hourly interval compared to the amount of MPH released during the immediately preceding hourly interval starting at t=0 and continuing through the fourth interval is as follows:

second interval (2.53 mg); first interval (0.99 mg)

third interval (4.94 mg); second interval (2.53 mg)

fourth interval (6.52 mg); third interval (4.94 mg)

[Testimony of Ms. Gray; PX 241, Cycle 1, Andrx A].

**RESPONSE:**  This proposed finding of fact improperly starts by comparing the first interval with the second interval and ignores the requirement that the first interval be an ascending release rate (*see* Defendants' Opening Brief at ¶¶ 408 – 411). (This is one of the few individual tablets that can, initially, be viewed as having an ascending release rate during the first interval (*i.e.*, 0.99 mg is greater than 0 mg). But the 0.99 mg is just assumed to come from the non-IR component – it is based on the improper label claim assumption and the mid-point of the T$_{90}$, as well as the other values, are based on the evaporation-flawed data. *See also* Response to PFF ¶¶ 173-74.

-144-

178.    As shown in PX 241, for Cycle 1, Andrx A, the amount of MPH released in each successive hourly interval increased over the amount released during the immediately preceding hourly interval starting at t=0 and continuing through the fourth interval (i.e., through 4 hrs), which is through the midpoint $T_{90}$ (i.e., between 3.5 and 4 hours) and at least 3 hours. [Testimony of Ms. Gray; PX 241].

**RESPONSE:** *See* Response to PFF ¶ 177.


179.    The 54 mg ANDA product sample designated as Cycle 1, Andrx A, provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent. [Testimony of Ms. Gray; PX 241; D.I. 130, p. 2; PFF ¶¶ 173-180].

**RESPONSE:** *See* Response to PFF ¶ 177.


180.    The same approach used to evaluate whether Cycle 1, Andrx A met the ascending release rate element of Claim 1 of the '373 patent was applied to the dissolution results for each of the 54 mg ANDA product samples and presented in PX 241. [Testimony of Ms. Gray; PX 241].

**RESPONSE:** *See* Response to PFF ¶ 177.


181.    Nine (9) of the twelve (12) individual 54 mg ANDA product samples – Cycle 1, Andrx A, C, E-F and Cycle 2, Andrx A-C and E-F – provided "an ascending release rate over an

extended period of time" in accordance with the Court's construction of this limitation of Claim of the '373 patent. [Testimony of Ms. Gray; PX 241; PFF ¶¶ 172-180].

**RESPONSE:** *See* Response to PFF ¶ 177. Again, correcting for evaporation, 0 out of 12 samples had an ascending release rate over an extended period of time. (Expected Testimony of Dr. Banakar).

182.    Andrx performed in vitro dissolution tests on its 54 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C and included the results in ANDA No. 76-665. [Testimony of Ms. Gray; PX 210, at ANDRX 201 and ANDRX 205]. In these dissolution tests, Andrx did not did not measure the amount of MPH released at 1-hour intervals. Instead, Andrx's dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr. [Testimony of Ms. Gray; PX 210 at ANDRX 201 and ANDRX 205].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant. Further, the cited Andrx data is not from "Andrx's dissolution method", rather it is one of the many dissolution tests conducted by Alza . As such, Alza's ignoring of Andrx's other testing is prejudicial (as is Alza's ignoring all of the time points provided in the testing cited by Alza). Additionally, the time points used in Andrx's testing is inappropriate for the present inquiry. (*See Defendants' Opening Pretrial Brief* at 129, n.5).

183.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from the ANDA and ARL dissolution tests on the 54 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C) is:

| Time (hr) | Andrx ANDA<br>Avg. % Recovery | ARL<br>Avg. % Recovery |
|---|---|---|
| 1 | 24.00 | 24.56 |
| 2 | 30.00 | 29.89 |
| 4 | 53.00 | 52.10 |
| 8 | 90.00 | 91.60 |
| 10 | 100.00 | 100.83 |

[Testimony of Ms. Gray; PX 242; PX 210 at ANDRX 201].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant – see also objection to PFF ¶ 182.

**RESPONSE:** As can be seen from this comparison and using Ms. Gray's assumption that the IR component in Andrx's ANDA products is 25%, there is no non-IR release in the first hour. For this reason alone, Andrx's ANDA products do not have an ascending release rate as required by the '373 patent.

184.    A comparison of the average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 54 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C, as well as the overall average dissolution profiles, establishes that the mean dissolution results obtained by Andrx and ARL are essentially the same. [Testimony of Ms. Gray; PX 242].

**RESPONSE:** *See* Objection(s) and Response to PFF ¶ 183.

185.    Since the mean dissolution results are essentially the same, ARL's dissolution test results on the 54 mg ANDA products (using USP Apparatus 1, 100 rpm and pH 7.5 dissolution

media at 37° C) are as reliable and representative as the dissolution results (under those same test conditions) that Andrx submitted to FDA to establish the dissolution properties of its 54 mg ANDA product. [Testimony of Ms. Gray; PFF ¶¶ 162, 183-184].

**RESPONSE:** *See* Response to PFF ¶ 184. Further, results that are "essentially the same" do not allow for the conclusory assertion that they are "as reliable and representative." This is particularly improper as Plaintiffs are using and relying upon an *in*appropriate dissolution testing (for our present purposes) as small differences in such data could be representative of substantial differences regarding whether a particular proposed product generates an ascending release rate in an appropriate dissolution test.

186.    The mean dissolution results in the ANDA for the 54 mg product, based on Andrx's dissolution tests using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C, are consistent with, and strongly corroborate, the results of Plaintiffs' dissolution tests on the 54 mg ANDA products. [Testimony of Ms. Gray].

**RESPONSE:** *See* Response to PFF ¶ 185.

187.    PX 243 is the MPH release rate evaluation for each of the twelve 36 mg ANDA products tested by ARL. The same approach used in evaluating the 54 mg samples was applied to the dissolution data for the 36 mg samples, except that Ms. Gray excluded 9 mg of MPH – the amount of MPH attributable to the immediate-release drug coating of the 36 mg ANDA products – in calculating the quantity of MPH released during each hourly interval. [Testimony of Ms.

Gray; PX 243; see D.I. 130, Markman Order, p. 2 ("The ascending release rate does not include release of a drug from any immediate-release drug coating. . .")].

**RESPONSE:** Defendants incorporate its prior responses regarding the 54 mg dosage strength for PFF ¶¶ 187 – 200 which are directed to the 36 and 27 mg dosage strengths. (*See* Responses to PFF ¶¶ 172 – 186).

188.    Eight (8) of the twelve (12) individual 36 mg ANDA product samples – Cycle 1, Andrx A-E and Cycle 2, Andrx B and E-F – provided "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent. [Testimony of Ms. Gray; PFF ¶¶ 187; D.I. 130, p. 2].

**RESPONSE:** *See* Response to PFF ¶ 187.

189.    Andrx also performed in vitro dissolution tests on its 36 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C and included the results in ANDA No. 76-772. [Testimony of Ms. Gray; PX 207 at ANDRX 4043 and ANDRX 4071]. These dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr. [Testimony of Ms. Gray; PX 207 at ANDRX 4043 and ANDRX 4071].

**RESPONSE:** *See* Response to PFF ¶ 187.

190.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 36 mg ANDA products

under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37°

C) is:

| Time (hr) | Andrx ANDA Avg. % Recovery | ARL Avg. % Recovery |
|-----------|----------------------------|---------------------|
| 1 | 24.00 | 24.06 |
| 2 | 30.00 | 31.81 |
| 4 | 57.00 | 56.98 |
| 8 | 95.00 | 95.01 |
| 10 | 103.00 | 101.66 |

[Testimony of Ms. Gray; PX 244; PX 207 at ANDRX 4043].

**RESPONSE:** *See* Response to PFF ¶ 187.


191.    A comparison of the average cumulative amount of MPH released ("%

Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on

the 36 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37°

C, as well as the overall average dissolution profiles, establishes that the mean dissolution results

obtained by Andrx and ARL are essentially the same. [Testimony of Ms. Gray; PX 244]

**RESPONSE:** *See* Response to PFF ¶ 187.


192.    ARL's dissolution test results on the 36 mg ANDA products (using USP

Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C) are as reliable and representative as

the dissolution results (under those same test conditions) that Andrx submitted to FDA to

establish the dissolution properties of its 36 mg ANDA product. [Testimony of Ms. Gray; PFF ¶¶

190-191]

**RESPONSE:** *See* Response to PFF ¶ 187.


193.    The mean dissolution results in the ANDA for the 36 mg product, based on Andrx's dissolution tests using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C, are consistent with, and strongly corroborate, the results of Plaintiffs' dissolution tests on the 36 mg ANDA products. [Testimony of Ms. Gray].

**RESPONSE:** *See* Response to PFF ¶ 187.


194.    PX 245 is the MPH release rate evaluation for each of the twelve 27 mg ANDA products tested by ARL. The same approach used in evaluating the 54 mg and 36 mg samples was applied to the dissolution data for the 27 mg samples, except that 6.75 mg of MPH was excluded – the amount of MPH attributable to the immediate-release drug coating of the 27 mg ANDA products – in calculating the quantity of MPH released during each hourly interval. [Testimony of Ms. Gray; see D.I. 130, Markman Order, p. 2 ("The ascending release rate does not include release of a drug from any immediate-release drug coating. . ."); PX 245].

**RESPONSE:** See Response to PFF ¶ 187.


195.    All twelve individual 27 mg ANDA product samples – Cycle 1, Andrx A-F and Cycle 2, Andrx A-F – provided "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent. [Testimony of Ms. Gray; PX 245; D.I. 130, p. 2].

**RESPONSE:** *See* Response to PFF ¶ 187.

196.    Andrx performed in vitro dissolution tests on its 27 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C and included the results in ANDA No. 76-772. [Testimony of Ms. Gray; PX 207 at ANDRX 4042 and ANDRX 4059]. These dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr. [Testimony of Ms. Gray; PX 207 at ANDRX 4042 and ANDRX 4059].

**RESPONSE:** *See* Response to PFF ¶ 187.


197.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 27 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C) is:

| Time (hr) | Andrx ANDA Avg. % Recovery | ARL Avg. % Recovery |
|---|---|---|
| 1 | 24.00 | 23.44 |
| 2 | 28.00 | 30.86 |
| 4 | 57.00 | 57.81 |
| 8 | 99.00 | 97.95 |
| 10 | 102.00 | 100.56 |

[Testimony of Ms. Gray; PX 246; PX 207 at ANDRX 4042].

**RESPONSE:** *See* Response to PFF ¶ 187.


198.    A comparison of the average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 27 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37°

C, as well as the overall average dissolution profiles, establishes that the mean dissolution results

obtained by Andrx and ARL are essentially the same. [Testimony of Ms. Gray; PX 246].

**RESPONSE:** *See* Response to PFF ¶ 187.


199.    ARL's dissolution test results on the 27 mg ANDA products (using USP

Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C) are as reliable and representative as

the dissolution results (under those same test conditions) that Andrx submitted to FDA to

establish the dissolution properties of its 27 mg ANDA product. [Testimony of Ms. Gray; PFF ¶¶

197-198].

**RESPONSE:** *See* Response to PFF ¶ 187.


200.    The mean dissolution results in the ANDA for the 27 mg product, based on

Andrx's dissolution tests using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C,

are consistent with, and strongly corroborate, the results of Plaintiffs' dissolution tests on the 27

mg ANDA products. [Testimony of Ms. Gray].

**RESPONSE:** *See* Response to PFF ¶ 187.


### 2.    The 18 mg ANDA products

201.    Andrx represented to FDA that the 18 mg ANDA product is "proportionally

equivalent" to, and the "same dosage form" as, the 54 mg ANDA product. [PX 206 at ANDRX

3857]. The amounts of each ingredient in the 18 mg and 54 mg ANDA products are directly proportional. [JDT (J. Vaughn) 1223, line 18 to 1224, line 6].

202.    Based on the proportional equivalence of their compositions, the dissolution release rate profiles for the 18 mg and 54 mg ANDA products (in USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C) would be substantially the same, and nearly all of the 18 mg ANDA products would provide "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent. [Testimony of Ms. Gray; PFF ¶ 181].

**RESPONSE:** Defendants incorporate its prior responses regarding the 54 mg dosage strength for PFF ¶¶ 202 – 209 which are directed to the 18 mg dosage strength. (*See* responses to PFF ¶¶ 172 – 186).

203.    ANDA No. 76-772 includes the results of dissolution tests performed by Andrx on the 18 mg ANDA product using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C. [Testimony of Ms. Gray; PX 207 at ANDRX 4042; PFF ¶¶ 157-58].

**RESPONSE:** *See* Response to PFF ¶ 202.

204.    PX 248 is a MPH release rate evaluation, prepared by Ms. Gray, for each of the twelve 18 mg ANDA products that are the subject of Andrx's dissolution tests in the ANDA. The columns labeled "Quantity of Drug Released (mg) (Excluding 4.5 mg IR)" reports the MPH release rate for the intervals 0-2 hr, 2-4 hr, 4-8 hr and 8-10 hr for each 18 mg sample. [Testimony of Ms. Gray; PX 248]. Ms. Gray excluded 4.5 mg of MPH – the amount of MPH attributable to the immediate-release drug coating of the 18 mg ANDA products -- in calculating

the quantity of MPH released during each interval. [Testimony of Ms. Gray; PX 248; D.I. 130, Markman Order, p. 2].

**RESPONSE:** *See* Response to PFF ¶ 202.

205.    Ms. Gray used the 8-hr timepoint as the "$T_{90}$" for each of the twelve 18 mg ANDA products. [Testimony of Ms. Gray]. A $T_{90}$ of 8-hours for the 18 mg ANDA products is conservative since each of the 18 mg tablets had fully released (about 100%) its MPH dose by the 8-hr timepoint in Andrx's dissolution tests. [Testimony of Ms. Gray].

**RESPONSE:** *See* Response to PFF ¶ 202.

206.    Based on a $T_{90}$ of 8-hours, the "midpoint of the $T_{90}$" for each of the 18 mg ANDA products is 4 hours. [Testimony of Ms. Gray].

207.    As shown in PX 248, for each of the twelve 18 mg samples tested, the amount of MPH released in each successive 2-hr interval increased over the amount released during the immediately preceding 2-hr hourly interval starting at t=0 and continuing through the second 2-hr interval (i.e., through four hours), which is through the midpoint $T_{90}$ (i.e., 4 hours) and at least 3 hours. [Testimony of Ms. Gray; PX 248].

**RESPONSE:** *See* Response to PFF ¶ 202. Additionally, Andrx notes that if this interpretation by Alza requiring only two times of ascension to establish an ascending release rate such a claim is hopelessly overbroad and obvious. Such a claim would also be met by many delayed release dosage forms if they are tested pursuant to USP Section 724.

208.    Use of 2-hr periodic intervals in determining whether the 18 mg ANDA products provide an ascending release rate as required by Claim 1 of the '373 patent is necessitated by the dissolution data obtained by Andrx, which did not include hourly release data. [Testimony of Ms. Gray].

**RESPONSE:**  *See* Response to PFF ¶ 202.


209.    Twelve (12) of the twelve (12) individual 18 mg ANDA products tested by Andrx provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent. [Testimony of Ms. Gray; PX 248; D.I. 130, p. 2].

**RESPONSE:**  *See* Response to PFF ¶ 202.


**C.    Use Of The ANDA Products As Directed Will Result In Literal Infringement**

210.    Claim 1 of the '373 patent has three basic elements: (A) A method for treating ADD or ADHD (B) administering a dosage form comprising methylphenidate (C) that provides a release of methylphenidate at an ascending release rate over an extended period of time. [PX 1, '373 patent, col. 23, lines 12-16].

211.    During the Markman proceedings, the parties agreed that claim 1 of the '373 patent is directed to a method of treating ADHD using a single administration of MPH – more specifically, "a once-a-day dosage form containing the drug MPH." [D.I. 92; Defendants' Brief on Claim Construction, p. 3].

212.    The ANDA products are intended to be orally administered on a once-daily basis (i.e., as a single dose) to individuals as a treatment for ADHD. [PX 206, Package Insert, ANDRX 3925-57 at ANDRX 3933 (under "Indication And Usage") and ANDRX 3945 (the ANDA products are "administered orally once-daily in the morning."); PFF ¶ 110].

213.    Use of the ANDA products as directed in the Package Insert provides a method for treating ADHD and literally meets Element (A) of Claim 1. [Testimony of Ms. Gray; PFF ¶¶ 109-110].

214.    In its Markman Order, the Court construed the language "a dosage form comprising methylphenidate" in Claim 1 of the '373 patent to mean "a pharmaceutical composition that includes a dose of methylphenidate." [D.I. 130, Markman Order].

215.    Each of the four ANDA products is a pharmaceutical composition that includes a dose of MPH. [Testimony of Ms. Gray; PFF ¶ 108].

216.    Administration of the ANDA products as directed in the package insert literally meets Element (B) of Claim 1 of the '373 patent. [Testimony of Ms. Gray; PFF ¶¶ 212-215].

217.    And, appropriate in vitro dissolution tests on samples of the ANDA products demonstrate that all, or nearly all, of each dosage strength of the ANDA products provide "an ascending release rate over an extended period of time" as construed by the Court. [Testimony of Ms. Gray; PFF ¶¶ 181, 188, 195, 202 and 209].

**RESPONSE:** *See* Responses to PFF ¶¶ 181, 188, 195, 202 and 209.  Additionally, to summarize these responses, Ms. Gray does not analyze whether there is an ascending release rate in the first hour.  If she did do so, as explained in Defendants' Brief attached hereto, even with her label

claim assumption, there would be at most 7 of the 36 54, 36 and 27 mg products that infringe. However, as explained in the attached brief and the preceding findings, this label claim is faulty and other testing or use of other (less faulty assumptions) would indicate that none of Andrx's products have an ascending release rate during the first time interval. Thus, use of Andrx's products do not result in literal infringement of claim 1 of the '373 patent.

218.    The 54 mg, 36 mg, 27 mg and 18 mg ANDA products literally meet Element (C) of Claim 1 of the '373 patent. [Testimony of Ms. Gray; PFF ¶ 217].

**RESPONSE:**  *See* Response to PFF ¶ 217.

219.    Thus, following approval, the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will be used, in accordance with the prescribing instructions, by patients, doctors and caregivers in the United States to treat ADHD. This use of the ANDA products will, in all or nearly all instances, meet each and every element of Claim 1 of the '373 patent. [PFF ¶¶ 210-218].

**RESPONSE:**  *See* Response to PFF ¶ 217.

220.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of Claim 1 of the '373 patent.

**RESPONSE:**  *See* Response to PFF ¶ 217. Further, Plaintiffs' have failed to carry their burden because they used an *in*appropriate dissolution test, the test was flawed and the data was not corrected.

## V.    LITERAL INFRINGEMENT OF CLAIMS 6 AND 7 OF THE '373 PATENT

221.    Dr. Martin Angst is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology. [Testimony of Dr. Angst].

**RESPONSE:** Dr. Angst's "expertise" in anesthesiology is irrelevant.

222.    Dr. Angst's professional qualifications and experience in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology are provided in his Curriculum Vitae, PX 256. [Testimony of Dr. Angst].

**RESPONSE:** *See* Response to PFF ¶ 221.

223.    Dr. Martyn Davies is an expert in biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques. [Testimony of Dr. Davies].

**RESPONSE:** Dr. Davies' "expertise" in biophysics, surface science analysis, biomolecular interactions and analytical techniques is irrelevant to his proposed testimony in this case. Furthermore, it is unclear as to what is meant by "drug delivery systems."

224.    Dr. Davies' professional qualifications and experience in the fields of biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques are provided in his Curriculum Vitae, PX 179. [Testimony of Dr. Davies].

**RESPONSE:** *See* Response to PFF ¶ 223.

225.    Dr. David Drover is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology, statistics, and anesthesiology. [Testimony of Dr. Drover].

**RESPONSE:**  Dr. Drover's "expertise" in pharmacokinetics, pharmacodynamics, clinical pharmacology, and anesthesiology is irrelevant to the material on which he submitted an expert report.

226.    Dr. Drover's professional qualifications and experience in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology, statistics, and anesthesiology are set forth in his Curriculum Vitae, PX 432. [Testimony of Dr. Drover].

**RESPONSE:** *See* Response to PFF ¶ 225.

227.    The claims of the patent-in-suit concern methods of treating ADD or ADHD using pharmaceutical compositions containing the drug MPH. [PX 1 at col. 23, line 11 to col. 24, line 21; PX 2 at col. 23, line 11 to col. 24, line 21].

**RESPONSE:**  The claims of the patent in suit have been construed by the Court.

228.    As of November 12, 1996 and at least through August 19, 1997, a person of ordinary skill in the field of treating ADD or ADHD using MPH products would have been someone with an M.D., or a Ph.D. in clinical pharmacology or a comparable scientific field, and about two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience. [Dr. Angst Testimony].

**RESPONSE:** As set forth in *Defendants' Opening Pretrial Brief* at 103-106 and 116-124, a person of ordinary skill in the art would be a practitioner as of the mid-1990s because that is the earliest date to which any claim may be entitled. The scientific specialty areas to which the claims are directed include formulation (which includes the measurement of *in vitro* drug dissolution), pharmacokinetics (which includes the drug plasma concentration-time profile in a living body) and pharmacodynamics (which includes the time-course of a pharmacologic or therapeutic response as it relates to drug plasma concentrations in a living body). The claims discuss use of a "dosage form" or a "pharmaceutically acceptable composition" to achieve the desired results listed in the claims. Thus, one of ordinary skill in the art at the relevant time would be a person conversant with and having an understanding of the general background associated with the results claimed in the patents in suit. (Expected Testimony of Dr. Mayersohn). Such an individual would have at least a B.S. or Pharm.D. in Pharmacy or a B.S. in chemistry, biology or engineering or a related scientific subject area. That individual would also have additional training either through advanced courses of study or work. The individual would have some experience with pharmaceuticals which would include work in formulation design and/or evaluation and a working knowledge of pharmacokinetics and pharmacodynamics and/or clinical medicine. (Expected Testimony of Dr. Mayersohn).

With regard to the dosage form limitations of these claims, one of ordinary skill in the art is a person who might have been approached to achieve the ascending release rates and substantially ascending plasma concentrations that are required. (Expected Trial Testimony of Drs. Mayersohn and Needham). As noted above, one of ordinary skill in the art in this area would have had at least a B.S. or Pharm.D. in pharmacy (or a related field) and have had some formulation experience in the pharmaceutical industry. The person of ordinary skill would likely

have worked specifically with modified or controlled release dosage forms for at least one year.

As further explained in *Defendants' Opening Pretrial Brief*, Alza's proposed definition does not relate to the individuals who would actually be pursuing such novel treatments. Rather, the proposed level of Dr. Angst is directed to the very people who came to Alza requesting Alza's help in pursuing an ADHD project.

A.    **The Proposed ANDA Products Literally Infringe Dependent Claims 6 and 7 of the '373 Patent**

229.    Claim 7 of the '373 patent has only a single element: that the method result in "a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration." [PX 1 at col. 24, lines 13-17] Claim 6 has the same requirement for a period of about 5.5 hours rather than 8 hours. [PX 1 at col. 24, lines 9-13].

**RESPONSE:** Claims 6 and 7 also incorporate all the limitations of claim 1 of the '373 patent. If that claim is not infringed, then no asserted claim is infringed.

230.    NUMBER NOT USED

231.    NUMBER NOT USED

232.    NUMBER NOT USED

233.    NUMBER NOT USED

234.    NUMBER NOT USED

235.    NUMBER NOT USED

1.    **The 54mg ANDA Products Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of Both About 8 Hours and About 5.5 Hours Following Said Administration**

236.    Claim 7 of the '373 patent is directed to methods of treating ADD or ADHD that provide a "substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours" in a person following administration of the claimed (MPH) composition. [*See* PX 1 at col. 24, lines 13-16 (claim 7)]. Claim 6 of the '373 patent is directed to methods of treating ADD or ADHD that provide a "substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours" in a person following administration of the claimed (MPH) composition. [*See* PX 1 at col. 24, lns. 9-13 (claim 6)].

**RESPONSE:** Claims 6 and 7 also incorporate all the limitations of claim 1 of the '373 patent. If that claim is not infringed, then no asserted claim is infringed.

237.    This Court has found that a "substantially ascending methylphenidate plasma drug concentration over about 8 hours" is a MPH plasma concentration time profile that generally increases over approximately eight hours, but may include a slight dip. [D.I. 130, Markman Order at p.2]. This Court has likewise found that a "substantially ascending methylphenidate plasma drug concentration over about 5.5 hours" is a MPH plasma concentration time profile that generally increases over approximately five and a half hours, but may include a slight dip. [*Id.*].

**RESPONSE:** The Court's construction is set forth in D.I. 130.

238.    A person of ordinary skill in the art, when determining whether a drug product will produce a particular blood plasma profile when administered to subjects, will consider

pharmacokinetic data from a representative number of subjects that actually have been administered the drug product and had their blood plasma concentrations measured in accordance with accepted clinical pharmacokinetic testing procedures. [Testimony of Dr. Angst]. That person will review both the individual plasma profiles as well as statistical analyses of the data, such as calculated means of the plasma profiles in various subpopulations of patients, to determine what type of plasma profile will be exhibited in a substantial population of patients that may be administered the drug product. [*Id.*].

**RESPONSE:** The patent in suit only presents mean data. The term "a slight 'dip'" is presented in that context as well as does not have any meaning in an individual profile. Finally, the '129 patent used the term 'a patient' to specify that the claims were applied on an individual basis. No such "singular" limitation was used in the '373 patent.

239. Defendants sought to convince the FDA that their ANDA products are bioequivalent to CONCERTA®. [Testimony of Dr. Angst; PX 293; PX 294]. Defendants presented to the FDA both statistical analyses of various subpopulations of subjects administered their ANDA products (e.g., mean plasma profiles) and the individual measured plasma profiles of these subjects. [*Id.*]. Defendants relied on the mean and individual data as part of their efforts to convince the FDA that their ANDA products will exhibit MPH plasma concentration profiles sufficiently similar to CONCERTA® so as to justify finding these ANDA products bioequivalent to CONCERTA®. [*Id.*].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to infringement. It is reversible error to compare commercial embodiments to each other in an infringement analysis.

-164-

240.    The data in Defendants' ANDA establishes that a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 8 hours. [Testimony of Dr. Angst].  Likewise, this evidence demonstrates that a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 5.5 hours. [*Id.*].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as conclusory and as the basis is not provided, it is incapable of direct rebuttal.

**RESPONSE:**  The data in Defendants' ANDA does not establish that a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 8 hours or 5.5 hours.

241.    Defendants have made representations to the FDA regarding the nature of the plasma profiles of their ANDA products that demonstrate that the plasma profiles that result from administration of the ANDA products will be substantially ascending for approximately 8 hours in a substantial population of patients. [Testimony of Dr. Angst].

**RESPONSE:**  *See* Objection(s) and Response to PFF ¶ 240.

242.    Defendants presented mean MPH plasma profile data to the FDA in their ANDA showing that their products will exhibit a substantially ascending plasma concentration for time periods of about 8 hours. [*Id.; see* PX 294; PX 293]. The following figure shows that the ANDA products exhibit mean MPH plasma profiles that substantially ascend for about 8 hours.  [*Id.*, PX

-165-

294 at 2281]. The plasma profiles are mean profiles, the data of which was calculated from measured MPH plasma concentrations from two distinct sets of subjects who had been administered the ANDA products (labeled "A1: Test" and "A2: Test"). [*Id.*]. The figure also shows mean MPH plasma concentrations Defendants measured from subjects administered CONCERTA® (labeled in the graph as "B1: Reference" and "B2: Reference"). [*Id.*]. The figure shows that mean plasma profiles produced in subjects administered the ANDA products, like those observed for subjects administered CONCERTA®, generally ascend for about 8 hours and include a slight dip. [*Id.*]. The ANDA products produce a mean peak MPH plasma concentration somewhere between 7 and 8 hours, and generally maintain that MPH concentration through and past 8 hours after administration. [*Id.*].



**OBJECTION(S):** *See* Objection(s) to PFF ¶ 240. Further, Andrx objects to the implication that it represented to the FDA that its profiles "substantially ascend." Andrx rather only sought to have its proposed products declared "bioequivalent" to the commercial product Concerta. Moreover, evidence relating to Concerta is irrelevant for purposes of infringement.