**RESPONSE:** *See* Response to PFF ¶ 240. Similarly, the significance of the decrease in concentration after two hours is not discussed.

243A. In addition to this graphical representation of the mean plasma concentration profiles, Defendants provided tables in their ANDA reflecting the statistical analysis of the plasma concentration measurements made in subjects administered the ANDA products. [Testimony of Dr. Angst; PX 294 at ANDRX 2297]. Defendants reported a calculated mean peak MPH concentration as occurring between 7.0 and 7.1 hours after administration, with a standard deviation of approximately 1.07 hours. [*Id.*]. Thus, as determined by Defendants, plasma profiles exhibited in substantial populations of subjects given the ANDA product reached a maximum MPH concentration at approximately 8 hours after being administered the ANDA products. [*Id.*].

**RESPONSE:** *See* Objections and Response to PFF ¶ 242. Further, Plaintiffs provide no assertion regarding how many individuals they assert will infringe other than it is a "substantial population".

243B. Defendants further represented to the FDA that a patient who eats rather than skips breakfast will have a mean plasma profile that substantially ascends for fully eight hours, as illustrated by the A:Test profile below. [Testimony of Dr. Angst; PX 293 at ANDRX 1045; *compare* PX 293 at ANDRX 1019 ("[s]ubjects were dosed 30 minutes after initiation of a standardized, high fat breakfast preceded by an overnight fast") *with* PX 294 at ANDRX 2250 ("A single dose...was administered with 240 mL of room temperature water after an overnight fast. Subjects then maintained a fast until 4.25 hours after drug administration", i.e. they skipped breakfast)].



**RESPONSE:** *See* Objections and Response to PFF ¶ 242.

243C.  Defendants further informed the FDA that the average patient who eats breakfast would reach $T_{max}$ at 9 hours, with a standard deviation of 2.4 hours. [Testimony of Dr. Angst; PX 293 at ANDRX 1038; *compare* PX 293 at ANDRX 1019 *with* PX 294 at ANDRX 2250].  Thus, as determined by Defendants, plasma profiles exhibited in the majority of subjects given the ANDA product who eat breakfast reached a maximum MPH concentration well over eight hours after being administered the ANDA products. [*Id.*]

**OBJECTION(S):** *See* Objections to PFF ¶ 242.

**RESPONSE:** *See* Response to PFF ¶ 242.  Andrx provided a tabular summary of the data.  In that table it was reported that the mean value for the $T_{max}$ was 9.00, with a standard deviation of 2.40 hours.

244.    Defendants represented to the FDA that their products would be bioequivalent to CONCERTA®, whether measured under conventional criteria or more stringent criteria that compare the shape of the MPH plasma profile produced by their products relative to the shape of the plasma profile produced by CONCERTA®. [Testimony of Dr. Angst; *see* PX 40, Letter from Janet Vaughn of Andrx Pharmaceuticals to FDA, at ANDRX 79751-3; JDT (J. Vaughn) 1210-13 (identifying herself as Andrx's "Director of regulatory affairs," responsible "for reviewing all submissions to the FDA")]. Defendants represented to the FDA in a communication dated March 25, 2004, that their products produced an AUC and $C_{max}$ between 80% to 125% of the AUC and $C_{max}$ criteria for CONCERTA®). [*Id.*]. Defendants further represented that their products would meet a more stringent assessment of bioequivalence that focused on the shape of the MPH plasma profile. [*Id.*]. Specifically, Defendants asserted that when measured under a "partial area under the curve" or $AUC_{pr}$ perspective, their products were essentially indistinguishable from CONCERTA®. [*Id.*]. The $AUC_{pr}$ is the "area under the curve up to the population median $T_{max}$" (the time at which the maximum concentration of MPH is observed).  [*Id.*].

**OBJECTION(S):**  Concerta is irrelevant to this infringement analysis (*i.e.*, it is improper to conduct a product to product comparison).

**RESPONSE:**  Besides being irrelevant to the infringement analysis, more than nine years ago, Alza recognized that their claims to an ascending profile would not cover two-pulse-type products:

> The patent for the ascending profile is not yet approved. In order to slow development of generics, the team will try to delay publication of the PK profile at least until the patent is approved. It should be noted that the patent will not preclude the marketing of two-pulse-type products currently under development by several companies.

-169-

(DTX 111 at ALZ 00161214).

Moreover, the figure provided in PFF ¶ 242 shows that Andrx's ANDA product is a "two-pulse-type" product, and therefore it is expected that that Andrx's ANDA products can be bioequivalent and not be covered by the patent.

245.    Defendants submitted to the FDA the following graphical representation of mean MPH plasma profile data from their ANDA for the purpose of demonstrating that their ANDA products (data points designated by a "●") will produce plasma profiles essentially indistinguishable to those produced by CONCERTA® (data points shown by "▲"). [Id.].



Pharmacokinetic Profiles for Andrx Methylphenidate ER tablets and Concerta (McNeil) ER tablets

**RESPONSE:**  See response to PFF ¶ 244.

246.    Defendants synthesized this representation of their plasma profile data using a subset of the plasma profile data they generated incidental to bioequivalence testing of their ANDA product. [Testimony of Dr. Angst; PX 40]. The representation they provided to the FDA is an "average" plasma profile based on a selected subset of the MPH plasma test data in their ANDA. [*Id.*]. The figure shown above compares that subset MPH plasma profile to the plasma profile exhibited by Defendants' testing of CONCERTA®. [*Id.*]. As can be seen, the figure shows a substantial degree of similarity in the shape of the MPH plasma profiles associated with the ANDA product relative to plasma profiles associated with CONCERTA®. [*Id.*]. In addition, plasma profiles resulting from administration of the ANDA products shows ascension continuing to approximately 8 hours. [*Id.*].

**RESPONSE:** *See* Response to PFF ¶ 244.


247.    ALZA's pharmacokinetic expert, Dr. Angst, reviewed the individual MPH plasma concentration time profiles contained in Defendants' ANDA. [Testimony of Dr. Angst; *see* PX 293; PX 294]. These profiles were the result of MPH concentrations measured over time in individuals who received the 54 mg ANDA product. [*Id.*]. The variability of response in different patients shows that, the MPH plasma concentration profiles of individual patients are not uniform. [*Id.*]. This variability can be observed from one patient to the next, and even in the same patient from day to day. [*Id.*].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:**  Variability ,or the concept of variability (other than, possibly, "a slight 'dip'"), does not appear in any of the claims or disclosure of the patent in suit.  Nowhere in its Opening Pretrial papers does Alza assert what the limitations are on "a slight 'dip.'"

248.    Based on his analysis of the individual plasma profiles in the ANDA, Dr. Angst determined that as many as 23 of the subjects tested in the studies exhibited a "substantially ascending methylphenidate plasma drug concentration over a time period of about eight hours" (the "8 hour exemplary profiles"). [Testimony of Dr. Angst; PX 257 at P ALZ 4748-58 (diagrams of the infringing profiles prepared by Dr. Angst); PX 590 (same); PX 293 at ANDRX 1034-35 (table setting forth numerically all profiles obtained by Andrx in R02-470 non-fasting study, forming the basis for the corresponding profiles plotted in PX 257 and PX 590); PX 294 at ANDRX 2265-68 (table setting forth numerically all profiles obtained by Andrx in R02-469 fasting study, forming the basis for the corresponding profiles plotted in PX 257 and PX 590))]. After reviewing these profiles, Dr. Angst observed that each of these exemplary profiles generally increases over a period of approximately eight hours. [*Id.*]. He also observed that each of these profiles over this period is substantially ascending. [*Id.*]. Dr. Angst concluded that any decreases that were observed to occur within the periods of ascension of these exemplary profiles were no more than slight dips. [*Id.*]. Dr. Angst also observed that while some profiles exhibited more than one slight dip, the overall profile remained substantially ascending. [*Id.*]. A person of ordinary skill, reviewing the same data, would similarly conclude that the decreases in these plasma profiles were nothing more than a slight dip in accordance with the claim requirements. [*Id.*].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as conclusory and as the basis is not provided, it is incapable of direct rebuttal.  Andrx also objects to "a slight dip" as being defined in a manner so as to allow many decreases, as Plaintiffs' representations during the *Markman* phase of this litigation, limited that term to "a" slight dip and not more than one dip. As such, Plaintiffs should be precluded from arguing differently now.

**RESPONSE:**  The data in Defendants' ANDA does not establish that a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 8 hours.  *See* accompanying brief.


249A.  Dr. Angst concluded that there was a substantial patient population in the Defendants' ANDA, as evidenced by as many as 23 individual profiles that he characterized under his conservative criteria, that exhibited a substantially ascending MPH plasma concentration for about 8 hours. [Testimony of Dr. Angst]. Dr. Angst's conclusions would remain the same; regardless of whether one or more profiles were found to not be a substantially ascending MPH plasma concentration, that a substantial population of individuals given the ANDA products exhibit a substantially ascending MPH plasma concentration for about 8 hours.

**RESPONSE:**  *See* Objection(s) and Response to PFF ¶ 248.  Moreover, Defendants dispute that (accepting Plaintiffs' assertions) the occurrence of "substantially ascending methylphenidate plasma drug concentration" only thirty percent of the time means that there is a "substantial population" in which this occurs.  Moreover, Plaintiffs' assertions that "Dr. Angst's conclusions would remain the same; regardless of whether one or more profiles were found to not be a substantially ascending" is baseless, unsupported and provides no limit on how low the incidence of occurrence may go.

249B.  Based on his analysis of the individual plasma profiles in the ANDA, Dr. Angst

determined that as many as 30 of the subjects tested in the studies exhibited a "substantially

ascending methylphenidate plasma drug concentration over a time period of about five and a half

hours" (the "5.5 hour exemplary profiles").  [Testimony of Dr. Angst; PX 257 at P ALZ 4748-61

(diagrams of the infringing profiles prepared by Dr. Angst); PX 590 (same); PX 591 (same); PX

293 at ANDRX 1034-35 (table setting forth numerically all profiles obtained by Andrx in R02-

470 non-fasting study, forming the basis for the corresponding profiles plotted in PX 257, PX

590 and PX 591); PX 294 at ANDRX 2265-68 (table setting forth numerically all profiles

obtained by Andrx in R02-469 fasting study, forming the basis for the corresponding profiles

plotted in PX 257, PX 590, PX 591))].  After reviewing these profiles, Dr. Angst observed that

each of these exemplary profiles generally increases over a period of approximately five and a

half hours. [*Id.*].  He also observed that each of these profiles over this period is substantially

ascending. [*Id.*].  Dr. Angst concluded that any decreases that were observed to occur within the

periods of ascension of these exemplary profiles were no more than slight dips. [*Id.*].  Dr. Angst

also observed that while some profiles exhibited more than one slight dip, the overall profile

remained substantially ascending. [*Id.*].  A person of ordinary skill, reviewing the same data

would similarly conclude that the decreases in these plasma profiles were nothing more than a

slight dip in accordance with the claim requirements. [*Id.*].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as conclusory and as the basis

is not provided, it is incapable of direct rebuttal.  Andrx also objects to "a slight dip" as being

defined in a manner so as to allow many decreases, as Plaintiffs' representations during the

*Markman* phase of this litigation, limited that term to "a" slight dip and not more than one dip.

As such, Plaintiffs should be precluded from arguing differently now.

**RESPONSE:** The data in Defendants' ANDA does not establish that a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 5.5 hours. *See* accompanying brief.

249C.   Dr. Angst concluded that there was a substantial patient population in the Defendants' ANDA, as evidenced by as many as 30 individual profiles that he characterized under his conservative criteria, that exhibited a substantially ascending MPH plasma concentration for about five and a half hours. [Testimony of Dr. Angst]. Dr. Angst's conclusions would remain the same regardless of whether one or more profiles were found to not be a substantially ascending MPH plasma concentration.

**RESPONSE:** *See* Objection(s) and Response to PFF ¶ 249B. Moreover, Defendants dispute that (accepting Plaintiffs' assertions) the occurrence of "substantially ascending methylphenidate plasma drug concentration" less than forty percent of the time means that there is a "substantial population" in which this occurs. Moreover, Plaintiffs' assertions that "Dr. Angst's conclusions would remain the same; regardless of whether one or more profiles were found to not be a substantially ascending" is baseless, unsupported and provides no limit on how low the incidence of occurrence may go.

250.   None of the 5.5 or 8 hour exemplary plasma profiles exhibit a dip that is comparable to the decrease seen in regimens based on multiple administrations of immediate release MPH products. [Testimony of Dr. Angst]. These 35-40% decreases are troughs that reflect the lowest MPH plasma concentration prior to the ascension that follows a successive administration of the immediate release MPH dosage form. [*Id.*; *see* PX 1 at Figure 4, col. 6,

lines 28-32 (identifying "closed circle" profile in Figure 4 as the "standard regimen . . . as described in Example 7"); PX 1 at col. 22, lines 11-14 (Example 7 describing "the standard regimen ... plasma drug concentration" as "declin[ing] to a trough concentration .... ")]. The patent-in-suit illustrates "trough[s]" with the black (closed) circle profile in Figure 4, which shows two substantial decreases in MPH plasma concentration of approximately 35-40%. [*Id.*].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:** Defendants agree that "a slight dip" is not the same as a trough. Indeed, the patent in suit makes clear that "a slight 'dip'" is not the same as a decline. (*See* DTX 1 at col. 22, lines 1-29). Alza, however, has provided no analysis as to what any of these terms mean and how to distinguish amongst them (other to continue that "a slight 'dip'" cannot be a decrease of 35 to 40%. Finally, it is especially unclear as to what could even possibly constitute "a slight 'dip'" in an individual patient. Further, the "slight dip" in Figure 4 of the patent is a decrease of about 6.1%. (*See* DTX 1136).

251.    It is well known to those of skill in the art that drug plasma concentrations will exhibit some degree of inherent variability. [Testimony of Dr. Angst]. For example, even the same person given the same drug product on successive days will exhibit slightly different plasma profiles on each day. [*Id.*]. Defendants' R02-469 bioequivalence study shows that the same individual, given the same 54 mg ANDA product on two different days experiences a first dip on the first day that is, on average, different in size and timing from a first dip on the second day. [*Id.;* PX 583 (comparison of first dips in same subject from R02-469 study prepared by Dr. Angst); PX 294 at ANDRX 2265-68 (underlying data used to prepare PX 583); Testimony of Dr. Angst]. For example, in some patients, the size of the dip on the first day was greater than that

observed on the second day by 14%. [*Id.*]. This inherent variability is a known and accepted factor in the field of pharmacokinetics. [*Id.*].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.  Andrx objects to this proposed finding of fact as conclusory and as the basis is not provided, it is incapable of direct rebuttal.

**RESPONSE:**  Variability, or the concept of variability (other than, possibly, "a slight 'dip'"), does not appear in any of the claims or disclosure of the patent in suit.  Nowhere in its Opening Pretrial papers does Alza assert what the limitations are on "a slight 'dip.'"  (*See also* DTX 277).

252.    This is further illustrated by examining MPH plasma profiles obtained with CONCERTA®, the exemplary composition described in the patent-in-suit. Specifically, the patent-in-suit describes the open circle plasma concentration time profile depicted in Figure 4 as an example of a "substantially ascending" plasma concentration time profile for over eight hours. [PX 1 at col. 22, lines 4-8 and Figure 4; PX 2 at col. 22, lines 3-7 and Figure 4]. This profile was obtained after administering an 18 mg MPH dosage form very similar to commercially available 18 mg CONCERTA®. [Testimony of Dr. Davies; *compare* DTX 308 at ALZ 270690 *with* PX 1, Figure 4 (showing Figure 4 is identical with this profile obtained in the C97-033-03 study) *and* PX 2, Figure 4 (same); DTX 308 at ALZ 270523 (showing 18 mg dosage forms were used in C97-033-03 study for all three dose levels (18, 36 and 54 mg MPH)); *compare* PX 194 at ALZ 12726 (appendix entitled "Formulation Summary," which identifies the formulation "Used in the following studies," including "C97-033") *with* PX 195 at ALZ 152922 (formulation for 18 mg CONCERTA®)]. No distinctions in MPH plasma profiles would be exhibited following ingestion of these two formulations that would be attributable to differences in the formulations of the two

-177-

products. [*Id.*]. Accordingly, from a pharmacokinetic perspective, the open circle plasma

concentration time profile in Figure 4 illustrates CONCERTA®. [*Id.*; Testimony of Dr. Angst].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant to this

infringement analysis (*i.e.*, it is improper to conduct a product to product comparison).

**RESPONSE:** The pharmacokinetic data generated from Concerta is different than that provided

in Figure 4 in the patent. (Expected Testimony of Dr. Mayersohn). Even if the assumption that

"No distinctions in MPH plasma profiles would be exhibited following ingestion of these two

formulations that would be attributable to differences in the formulations of the two products" is

correct, such an assumption need not have been made as Plaintiffs' could have evaluated data

without the need for such an assumption.


253.    One of the most common ways that one of ordinary skill would examine the

expected variation in a plasma concentration time profile would be to calculate its 95%

confidence interval. [Testimony of Dr. Angst and Dr. Drover; PX 585 at p.98 (textbook by one

of Defendants' experts, Dr. Bolton, referring to this interval as "the most commonly used . . . .

confidence interval . . . .")]. Plasma profiles exhibiting dips of 10-15% fall within the 95%

confidence interval of the mean plasma concentration time profile shown in the patent-in-suit for

CONCERTA®, as well as of the mean profile for CONCERTA® that Andrx obtained during its

bioequivalence studies. [Testimony of Dr. Angst and Dr. Drover; *see* PX 437 (underlying

calculations)]. Likewise, profiles exhibiting dips of this size fall within the 95% confidence

interval of the mean profile for the ANDA product. [*Id.*].

**OBJECTION(S):** Andrx objects to this proposed finding of fact as irrelevant. Andrx also objects to "a slight dip" as being defined in a manner so as to allow many decreases as Plaintiffs' representations during the *Markman* phase of this litigation, limited that term to "a" slight dip and not more than one dip. As such, Plaintiffs should be precluded from arguing differently now.

**RESPONSE:** Plaintiffs' assertions regarding a "dip" is not based on any disclosure in the patent. Moreover, as will be explained by Defendants expert Dr. Bolton, for purposes of biological studies such as the data used in this case, a 90% confidence interval is more prevalent. A 90% interval would serve to "tighten up" the permissible range for a dip. Indeed, Dr. Bolton ran a statistical analysis and determined that Andrx's data all exhibited statistically significant declines and thus, none exhibited "a slight 'dip.'" (Expected Testimony of Dr. Bolton).


254.    The 5.5 and 8 hour exemplary profiles include only slight dips, and thereby satisfy the requirement of being a substantially ascending plasma profile. [*See* PX 257, Infringing Profile Diagrams at P ALZ 4748-58; PX 590, Infringing Profile Diagram of A2:Test, Subject No. 12; Testimony of Dr. Angst]. Although not all of the 23 exemplary 8 hour infringing profiles exhibit a peak MPH concentration at 8 hours or later after administration, these profiles each nonetheless substantially ascend for approximately 8 hours. [*Id.*; D.I. 130 at 2]. Likewise, although not all of the 30 exemplary 5.5 hour profiles exhibit a peak MPH concentration at 5.5 hours or later after administration, these profiles each nonetheless substantially ascend for approximately 5.5 hours. [*Id.*; D.I. 130 at 2].

**OBJECTION(S):** *See* Objection(s) to PFF ¶ 253. Andrx objects to this proposed finding of fact as conclusory and since the basis is not provided, it is incapable of direct rebuttal.

-179-

**RESPONSE:**  The "exemplary profiles" do not include only slight dips and do not satisfy the requirement of being a substantially ascending plasma profile.  As an example, as described in the accompanying brief, Andrx reviewed the 23 profiles that Dr. Angst determined might infringe the approximately 8 hour limitation.  Andrx excluded the individual profiles which had more than 1 decline of any value prior to 7 hours (*i.e.*, at best the excluded profiles had multiple dips as opposed to a slight dip).  Andrx also exclude any profiles wherein the largest Cmax occurred at 7 hours or early.  7 hours was expansively chosen as "approximately 8 hours."  Under this application, at most, 6 out of the 77 profiles obtained could be held to be infringed.  Furthermore, Alza cannot show any instance of actual infringement because it is impossible to determine which, if any of the allegedly infringing profiles are obtained through use of a product having an ascending release rate.  Once the ascending release rate of a particular product is determined, the product cannot be used in the claimed method or provide any profile whatsoever.  Here, as described above, it is the rare case where a proposed product could even conceivably be alleged to have an ascending release rate.  In such circumstances, it would be improper to assume that the allegedly infringing profiles were generated through the use of a product having and ascending release rate *in vitro*.

255A.  Given the frequency in Defendants' bioequivalence studies in which plasma profiles substantially ascend for approximately 8 hours, and given Defendants' representations using mean values regarding the likely characteristics of the ANDA products, the 23 infringing profiles specifically found by Dr. Angst to meet the requirements of the claims are representative of the plasma profiles that will be exhibited if the Defendants' ANDAs are approved and the ANDA products are marketed and used in patients. [Testimony of Dr. Angst]. A profile that can

be seen 23 times out of 77 tests, or in approximately one out of every three subjects taking the 54 mg ANDA product, cannot be characterized as a random occurrence. [*Id.*].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as irrelevant.

**RESPONSE:** *See* Response to PFF ¶ 254.

255B.  Given the frequency in Defendants' bioequivalence studies in which plasma profiles substantially ascend for approximately 5.5 hours, and given Defendants' representations using mean values regarding the likely characteristics of the ANDA products, the 30 infringing profiles specifically found by Dr. Angst to meet the requirements of the claims are representative of the plasma profiles that will be exhibited if the Defendants' ANDAs are approved and the ANDA products are marketed and used in patients. [Testimony of Dr. Angst].  A profile that can be seen 30 times out of 77 tests, or in approximately one out of every three subjects taking the 54 mg ANDA product, cannot be characterized as a random occurrence. [*Id.*].

**RESPONSE:**  Plaintiffs fatally flawed methodology of contriving – at most – the occurrence of an ascending profile in "approximately one out of every three subjects" does not establish that administration of Andrx's ANDA products infringes the claim in anything but minor amounts. Furthermore, Alza cannot show any instance of actual infringement because it is impossible to determine which, if any of the allegedly infringing profiles are obtained through use of a product having an ascending release rate.  Once the ascending release rate of a particular product is determined, the product cannot be used in the claimed method or provide any profile whatsoever. Here, as described above, it is the rare case where a proposed product could even conceivably be alleged to have an ascending release rate.  In such circumstances, it would be improper to assume

that the allegedly infringing profiles were generated through the use of a product having and ascending release rate *in vitro*.

256.    Based on these observations, if the Defendants' ANDAs are approved by the FDA, administration of the 54 mg ANDA product to individuals as directed by the Defendants' label will result in substantial numbers of individuals having substantially ascending MPH plasma concentration time profiles for at least eight hours. [Testimony of Dr. Angst].

**RESPONSE:**  Andrx's ANDA products will not result in substantial numbers of individuals having substantially ascending MPH plasma concentration time profiles for at least eight hours.

>    **(a)    Defendants' Proposed 18, 27, and 36 mg ANDA Products Will Be Administered "In A Manner That Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of About 8 Hours and About 5.5 Hours Following Said Administration"**

257.    The Defendants' ANDAs do not provide bioequivalence test data generated from testing with the proposed 18, 27 and 36 mg ANDA products. [*See* JDT (J. Vaughn) 1223 (so testifying); JDT (J. Vaughn) 1210-13 (identifying herself as Andrx's "Director of regulatory affairs," responsible "for reviewing all submissions to the FDA")]; *see also* PX 18-28 (containing no such data)]. Nevertheless, the proposed 18, 27, and 36 mg ANDA products would result in substantially ascending MPH plasma concentration time profiles for eight hours to the same extent as the proposed 54 mg ANDA product. [Testimony of Dr. Angst].  The proposed 18, 27, and 36 mg ANDA products would also result in substantially ascending MPH plasma

concentration time profiles for five and a half hours to the same extent as the proposed 54 mg

ANDA product. [*Id.*].

**RESPONSE:**  The proposed 18, 27, and 36 mg ANDA products will not result in substantially

ascending MPH plasma concentration time profiles for eight hours.


258.    MPH products are well known to exhibit linear pharmacokinetics. [Testimony of

Dr. Angst; PX 376 at P ALZ 7656 (observing "[s]everal studies have demonstrated a linear

plasma concentration-dose relationship for the kinetics of MPH"); PX 377-78 at ALZ 125134

(reporting a linear plasma concentration-dose relationship for CONCERTA® at doses of 18 to 72

mg, which includes all of the dosages that Andrx proposes to sell)]. Andrx's own expert, Dr.

Mayersohn, has conceded this. Because of this, one can reliably predict the plasma concentration

time profile for an 18 mg dose simply by dividing the observed plasma concentration values for a

54 mg dose by three, because 18 mg is one third the dose of 54 mg.  [Testimony of Dr. Angst].

Profiles for 27 and 36 mg doses can likewise be predicted from a 54 mg plasma concentration

time profile by dividing by 2 and 1.5, respectively. [*Id.*]. The CONCERTA® profile in Figure 4

of the patent-in-suit was obtained using individual plasma concentration time profiles that were

scaled or "normalized" in exactly this way. [*Compare* DTX 308 at ALZ 270690 *with* PX 1,

Figure 4 (showing Figure 4 is identical with this C97-033- 03 profile) *and* PX 2, Figure 4 (same);

DTX 308 at ALZ 270690 (original Figure 4 graph, noting profiles are "Normalized to 18 mg");

DTX 138 at ALZ 271500 (reflecting that the original "Dose Levels" ranged from "1" which was

"18 mg" to "3," which was "54 mg"); Testimony of Dr. Angst].

**OBJECTION(S):**  Andrx objects to this proposed finding of fact as a generalization.

**RESPONSE:** Andrx asserts that to the extent that since use of the proposed 54 mg products will not infringe, likewise under the linearity discussed, use of the lower dosage strength ANDA products will not infringe.

259.    The formulations of the proposed 18, 27, and 36 mg ANDA products are sufficiently similar to the formulation for the proposed Andrx 54 mg ANDA product that the former products would be expected to have this same, linear pharmacokinetic relationship with the latter product. [*See* DTX 180 at ANDRX 4102-04 (Andrx ANDA section entitled "Formulation Data"); Testimony of Dr. Davies].

**RESPONSE:** *See* Response to PFF ¶ 258.

260.    If the Defendants' ANDAs are approved by the FDA, the 18, 27, 36, and 54 mg ANDA products will be used by patients, doctors and caregivers in the United States to treat ADHD in accordance with the prescribing instructions. [Testimony of Dr. Angst]. Following these instructions, a substantial population of individuals given the ANDA product will exhibit substantially ascending MPH plasma concentration time profiles of about eight hours. [*Id.*]. These plasma profiles establish that Defendants' products will result in methods that meet the requirements of claims 6 and 7 of the '373 patent. [*Id.*]. Plaintiffs have met their burden of proving, by a preponderance of the evidence, that following approval of the Defendants' ANDAs, use of the 18, 27, 36 and 54 mg ANDA products will result in direct literal infringement of claims 6 and 7 of the '373 patent. [*Id.*].

**RESPONSE:** Plaintiffs have failed to meet their burden of proving, by a preponderance of the evidence, that following approval of the Defendants' ANDAs, use of the 18, 27, 36 and 54 mg ANDA products will result in direct literal infringement of the patent in suit.

261.   NUMBER NOT USED

262.   NUMBER NOT USED

## VI.   UPON APPROVAL, ANDRX WILL ACTIVELY INDUCE INFRINGEMENT OF THE '373 PATENT

263.   Andrx knew of the '373 patent by September 1, 2005. [D.I. 1, Compl.].

**RESPONSE:** Andrx had submitted its ANDA's more than 2 years prior to this date.

264.   Upon approval by the FDA, Andrx intends to market the ANDA products in the U.S. [PX 13, Andrx Answer, ¶ 31 ("Andrx also admits that upon approval by FDA, Andrx intends to market its proposed methylphenidate hydrochloride products.")].

265.   Andrx will sell the ANDA products to "any and all" licensed buyers, including pharmacies and alternate care providers (hospitals, nursing homes and mail order pharmacies). [JDT (L. Rosenthal) 1139-1140; PX 93, p. 10].

266.   Following FDA approval, Andrx will offer for sale, sell and/or distribute the ANDA products along with a package insert that provides instructions on how to administer and use the ANDA products to treat ADHD. [PFF ¶ 102-109]. Administration and use of the ANDA products by others as directed in the package insert will result in direct infringement of Claims 1, 6 and 7 of the '373 patent.

**RESPONSE:**  Use of Andrx's ANDA products will not literally infringe the claims of the patent in suit.

267.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's will induce infringement of Claim 1, 6 and 7 of the '373 patent.

**RESPONSE:**  Plaintiffs have failed to meet their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx will induce infringement of the asserted claims of the '373 patent.  More specifically, for the reasons set out in the accompanying brief, Alza cannot show that Andrx has the requisite culpable state of mind and intent required to lead to liability of inducement.

## VII.    UPON APPROVAL, ANDRX WILL CONTRIBUTORILY INFRINGE THE '373 PATENT

268.    Andrx knew of the '373 patent by August 16, 2005. [PX 13, Andrx Answer, ¶ 39 ("Andrx admits that it had knowledge of the '373 patent when it filed the respective Paragraph IV certification letters."); PX 17, Andrx Paragraph IV certification letters].

269.    The ANDA products do not have a "substantial non-infringing use." Following FDA approval, the ANDA products will be approved only for use in treating ADHD in accordance with the package insert. The package insert does not state that the ANDA products are indicated for treating any other medical disorder or condition.

**RESPONSE:** As demonstrated above, Andrx's ANDA products will not literally infringe in most, if not all instances, thus Andrx's proposed products have a "substantial non-infringing use."

270.    Following FDA approval, Andrx will offer for sale, sell and/or distribute the ANDA products along with a package insert that provides instructions on how to administer and use the ANDA products to treat ADHD. [PFF ¶¶ 102-109]. Administration and use of the ANDA products by others as directed in the package insert will result in direct infringement of claims 1, 6 and 7 of the '373 patent.

**RESPONSE:** Use of Andrx's ANDA products will not directly infringe the claims of the patent in suit.

271.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx will contributorily infringe claim 1, 6 and 7 of the '373 patent.

**RESPONSE:** Because there are substantial non-infringing uses of Andrx's ANDA products, Andrx's sale of those products cannot be found to contributorily infringe the claims of the patent in suit.

## ANDRX'S ADDITIONAL PROPOSED FINDINGS OF FACT

(numbering continues from where it left off in Defendants' Opening Pretrial Brief)

**Experts**

460.    Dr. Umesh Banakar is an expert in the fields of formulation and pharmacokinetics, including the development and analysis of in vitro drug dissolution testing methods and the design and evaluation of drug formulations.  (Expected Testimony of Dr. Banakar).

461.    Dr. Banakar's professional qualifications and experience in the fields of formulation and pharmacokinetics are provided in his Curriculum Vitae, DTX 589.  (Expected Testimony of Dr. Banakar; DTX 589).

462.    Dr. Thomas Needham is an expert in the field of formulation, including the design and evaluation of drug formulations, including formulation of modified or controlled release dosage forms, and also is an expert in the field of the use of *in vitro* drug dissolution testing. (Expected Testimony of Dr. Needham).

463.    Dr. Needham's professional qualifications and experience in the field of formulation are provided in his Curriculum Vitae, DTX 646.  (Expected Testimony of Dr. Needham; DTX 646).

464.    Dr. Michael Mayersohn is an expert in the field of pharmacokinetics, including its relationship to the treatment of medical conditions and to pharmaceutical formulation and testing, including as it relates to modified and controlled release dosage forms.  (Expected Testimony of Dr. Mayersohn).

465.     Dr. Mayersohn's professional qualifications and experience in the field of pharmacokinetics are provided in his Curriculum Vitae, DTX 615. (Expected Testimony of Dr. Mayersohn; DTX 615).

466.     Dr. Sanford Bolton is an expert in the fields of statistics and biostatistics, including the designing of an experiment, the collection of data, the analysis of the data collected, and the interpretation of the analysis. (Expected Trial Testimony of Dr. Bolton).

467.     Dr. Bolton's professional qualifications and experience in the field of statistics and biostatistics are provided in his Curriculum Vitae, DTX 694. (Expected Trial Testimony of Dr. Bolton; DTX 694).

**The Evaporation Issue**

468.     Ms. Gray, Alza's dissolution test expert, endorsed a protocol for the testing of Andrx's ANDA products on October 6, 2006. (*See* DTX 371).

469.     That protocol was entitled "Analytical Testing protocol for assessment of the dissolution characteristics over the physiological pH range for Methylphenidate Hydrochloride Extended Release Tablets, 54 mg, 36 mg, and 27 mg manufactured by Andrx Pharmaceuticals, Inc." (DTX 371).

470.     That protocol specified four stages of dissolution testing of Andrx's ANDA products using USP Apparatus 1 at run at 100 rpm, with 500 mL of media at a temperature of 37° C. Media with various pHs ("over the physiological pH range") were specified: pH 1.2, pH 4.2, pH 6.5 and pH 7.5. The sampling times were to be taken hourly for twelve hours and a thirteenth sample was to be taken at 24 hours. (DTX 371).

-189-

471.    However, after completing the "Stage 1" testing (testing of the 54 mg dosage strength at pH 7.5) it was readily apparent to Brian Walker, the dissolution technician, that the readings at the 24 hour mark were high. (*See* Walker Dep. Tr. at pp. 83 – 85).

472.    To determine the cause of the high readings, Mr. Walker was instructed to conduct an "evaporation study." (*See* Walker Dep. Tr. at pp. 83 – 84). This was the first time in Mr. Walker's career that he had been requested to do an evaporation study; and Mr. Walker is not aware of any other people that have needed to conduct an evaporation study." (*See* Walker Dep. Tr. at pp. 71 – 73).

473.    The evaporation study consisted of determining how much media used in the evaporation study evaporated after 24 hours – and only at that time point. The study does not allow for the determination of how much media had evaporated at what time. (Walker Dep. Tr. at pp.108 – 109).

474.    The results of the evaporation study were recorded by Mr. Walker in his notebook. (*See* DTX 171). Mr. Walker determined that there was indeed a problem with evaporation. (*See* Walker Dep. Tr. at p. 143).

475.    Alza only took a single action to correct for this established problem, namely, Ms. Gray revised her protocol so that the dissolution testing would conclude after 12 hours. No other corrective actions were taken.

476.    Despite Mr. Walker immediately realizing that the data from Stage 1 was too high, Ms. Gray used that data without accounting for the high readings.

477.    Therefore, when Ms. Gray used the data from Stage 1 (the testing of Andrx's ANDA products at the 54 mg dosage strength) to calculate the T90 of that dosage form, the T90 was more accurately about a T85 (and resultingly her midpoint of the T90 was also too low).

478.    When the data for the 54 mg dosage strength was normalized – a simple correction for readings that are systematically off – the T90 was raised for many of the 12 samples and so were the mid-points of those T90s.

479.    Out of the 12 samples, 9 of the T90s changed – these were the same 9 tablets that she concluded "infringed".  With the corrected T90s *none* of those twelve tablets have an ascending release rate that continues through the mid-point of the T90.  The corrected tabular data are provided in attached Exhibit 9.

## VIII. CONCLUSIONS OF LAW RELATING TO INFRINGEMENT BY ANDRX

### A.    Jurisdiction

CL1.    This is an action for patent infringement that arises under the Patent Laws of the United States codified at Title 35 of the United States Code and the Abbreviated New Drug Application provisions of the Hatch-Waxman Amendments to the FDCA, 21 U.S.C. § 355(j).

**RESPONSE:**  Not disputed.

CL2.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

**RESPONSE:** Not disputed.

CL3.   This Court has personal jurisdiction over the parties.

**RESPONSE:** Not disputed.

CL4.   Venue in this Judicial District is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

**RESPONSE:** Not disputed.

B.    **ALZA's Infringement Claims**

1.    **Legal standard for infringement**

CL5.   A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States during the term of the patent. . ." 35 U.S.C. §271(a).

**RESPONSE:** Not disputed.

CL6.    Plaintiffs' suit against Andrx for patent infringement is predicated on Defendants'

filing of two ANDAs with FDA seeking approval for a generic version of CONCERTA®, acts

which give rise to an infringement suit under 35 U.S.C. § 271(e)(2).  See Abbott Labs. v.

Torpharm, Inc., 300 F.3d 1367, 1371 (Fed. Cir. 2002); Bayer AG v. Elan Pharm. Research Corp.,

212 F.3d 1241, 1244-45 (Fed. Cir. 2000); 35 U.S.C. § 271(e)(2) .

**RESPONSE:**  Andrx does not dispute that § 271(e)(2) provides for a highly artificial technical

act of infringement.

CL7.    A patent infringement analysis involves two steps.  First, the court determines the

meaning of the patent claims as a matter of law.  Second, the court compares the properly

construed claims to the allegedly infringing product or method.  Markman v. Westview

Instruments, Inc., 52 F.3d 967, 976, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996).

**RESPONSE:**  Alza is correct that infringement is a two step analysis.  And that a comparison is

to be made between the properly construed claims and the allegedly infringing product – and not

a comparison of a commercial product and the allegedly infringing product. *Johnson & Johnson*,

285 F.3d at 1052; *Zenith Labs.*,19 F.3d at 1423

CL8.   A patent owner may establish infringement under either of two theories: literal infringement or the doctrine of equivalents.  Literal infringement exists if each element of at least one claim of a patent is met by the alleged infringer's product.  Panduit Corp. v. Dennison Mfg. Corp., 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987); Merck & Co. Inc. v. Teva Pharm. USA, Inc., 228 F. Supp. 2d 480, 485 (D. Del. 2002).

**RESPONSE:**  Not disputed.  Andrx notes, however, that infringement under the doctrine of equivalents has not been asserted by Plaintiffs in their Opening Pretrial Submission.

CL9.   The patentee bears the burden of proving infringement by a preponderance of the evidence.  A preponderance of the evidence means such evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not.  Warner-Lambert Co. v. Teva Pharms. USA, Inc., 418 F.3d 1326, 1341 n. 15 (Fed. Cir. 2005) .

**RESPONSE:**  Not disputed.

CL10.  Where, as here, the infringement inquiry is provoked by an ANDA filing, the

question of infringement focuses on what is likely to be sold or used following FDA approval.

Abbott Labs., 300 F.3d at 1373; Novartis Corp. v. Ben Venue Labs., Inc., 271 F.3d 1043, 1047

(Fed. Cir. 2001) ("the infringement inquiry focuses on the hypothetical infringement that would

occur if the defendant's [A]NDA were approved and the defendant began to make and sell the

drug.").


**RESPONSE:** Not disputed.


CL11.  Infringement is established when a plaintiff proves, by a preponderance of the

evidence, that the accused product or method sometimes meets all of the limitations of the

asserted patent claims. Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp., 55 F.3d

615, 622-23 (Fed. Cir. 1995) ("an accused product that sometimes, but not always, embodies a

claimed method nonetheless infringes."), quoted in Impax Labs., Inc. v. Aventis Pharms., Inc.,

No. Civ.A. 02-581 JJF, 2004 WL 253482, at *3 (D. Del. Feb. 5, 2004); Purdue Pharma, L.P. v.

F.H. Faulding and Co., 48 F. Supp.2d 420, 439 and 441 (D. Del. 1999) (finding infringement of

method of treatment claims where all the elements of the claims were present in "the accused use

of…[defendant's drug product] in some patients"), aff'd, 230 F.3d 1320 (Fed. Cir. 2000) ;

Interspiro USA, Inc. v. Figgie Int'l, Inc., 815 F. Supp. 1488, 1512 (D. Del. 1993) ("it is of no

moment that in certain modes of operation…[defendant's product] may not operate in a way that

would infringe the '145 patent.  It matters only that the accused device operate in an infringing

way at some time."), aff'd, 18 F.3d 927 (Fed. Cir. 1994).

**RESPONSE:** *Bell* is inapposite to the present claims of the '373 patent that are asserted. *Bell* does not stand for the premise quoted, *i.e.*, that an accused method can infringe when it only sometimes meets the elements of the claim. Rather, the quoted language is correct, namely an accused product that sometimes embodies the method can infringe.

9.         The distinction between those two statements may seem subtle, but its implications are profound in this case. In the *Bell* case, a system entitled Vitalink sometimes practiced the claimed method and sometimes did not. In the present case, the products at issue are individual tablets which are not reusable. Each tablet will or will not perform the method claimed depending on whether it meets all the limitations of the claim including an ascending release rate. *See Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 418 F. Supp. 2d 1021, 1042 (S.D. Ind. 2006).

CL12. Infringement is a question of fact. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005).

**RESPONSE:** Not disputed.

CL13. 35 U.S.C. § 271(b) states, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b).

**RESPONSE:** Not disputed.

CL14. An alleged infringer is liable for inducing infringement if: (1) the alleged infringer knew of the patent; (2) the alleged infringer's action induced the infringing acts, and (3) the alleged infringer intended to encourage another's infringement. Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990).

**RESPONSE:** The Federal Circuit sitting *en banc* recently restated the requirements of inducement, and more specifically, it set forth the standard regarding what type of intent is required for inducement. *See DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1304-1306 (Fed. Cir. 2006) (Section III B en banc). *DSU* is nowhere cited in Plaintiffs' Opening Submission. In *DSU* the Federal Circuit summarized the requirements of inducement as follows:

> 10.    Under section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they "actively and *knowingly* aid[ed] and abett[ed] another's direct infringement." *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir 1988)(emphasis in original). However, "knowledge of the acts alleged to constitute infringement" is not enough. *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003) (citation omitted). The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." Id. at 1364 (citing *Manville*, 917 F.2d at 554).

> 11.

*DSU*, 471 F.3d at 1305.

Rather than citing *DSU* Plaintiffs state that:

> Since there is no dispute that Defendants had knowledge of the patent-in-suit, Plaintiffs are simply required to show intent to encourage the acts constituting infringement.

*Plaintiffs' Opening Pretrial Submission* at 43. This is simply not the law post-*DSU*:

-197-

> *Grokster* has clarified that ***the intent requirement for inducement requires more
> than just intent to cause the acts that produce direct infringement.*** Beyond that
> threshold knowledge, the inducer must have an affirmative intent to cause direct
> infringement. . . . Accordingly, inducement *requires evidence of culpable
> conduct*, directed to encouraging another's infringement, not merely that the
> inducer had knowledge of the direct infringer's activities.

*DSU*, 471 F.3d at 1306 (emphasis added). In declining to reverse the denial of a request for a

new trial, the *DSU* panel noted the existence of advice of counsel and that the alleged inducer did

not believe its product infringed, and thus it lacked the specific intent required for inducement.

*Id.* at 1307.

All of the cases cited by Plaintiffs' on pages 42-44 of it Opening Submission pre-date

*DSU* and to the extent they are contrary to it, they are overruled. Most of them are inapposite in

any event as will be discussed below.

CL15.  Direct infringement of a patent claim under 35 U.S.C. § 271(a) is a prerequisite to

finding that a party has induced infringement of the claim. Water Tech. Corp. v. Calco Ltd., 850

F.2d 660, 668 n. 7 (Fed. Cir. 1988).

**RESPONSE:** Not disputed.

CL16.  A party may be found liable for induced infringement when it sells a product and

provides instructions on how to use it in an infringing manner. Golden Blount, Inc. v. Robert H.

Peterson Co., 438 F.3d 1354, 1360 (Fed. Cir. 2006); In re Omeprazole Patent Litigation, 490 F.

Supp.2d 381, 485-86 (S.D.N.Y. 2007) (Defendant ANDA filer found to induce infringement of

method of treatment claim based on package insert for generic product); see also Metro-

Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 936 (2005) ("[I]nstructing how to

engage in an infringing use show[s] an affirmative intent that the product be used to

infringe…..").

12.    **RESPONSE:**  Inducement requires a culpable mindset.  *See* response to CL14.  In the

present situation Plaintiffs acknowledge direct infringement, at most, only part of the time by

some tablets and other factors are present which indicate Defendants lack of culpable mindset.

As explained best by the *Cardiac Pacemaker* court, here the product either infringes or it does

not, and even under Ms. Gray's proposed testimony taken at its most favorable for Plaintiffs, it is

clear there will be substantial instances of non-infringement.  Where the same acts that induce

infringement also induce non-infringement, it is clear that Defendants do not have an affirmative

intent to cause direct infringement.

Moreover, *DSU* made clear that the intent element was a subjective one based on its

holding that the advice of counsel insulated the alleged inducement.  *Id.* at 1307.  Here, the

evidence overwhelmingly evidences Andrx's good faith belief that it will not induce

infringement:

(7)          Andrx's development work was directed towards, and achieved, a product
             having a period of no release (as can be seen from most of the dissolution
             tests and from the mean plasma profiles).

(8)          Andrx's development work and ANDA filing took place not only prior to
             its knowledge of the patent but also prior to *existence* of the '373 patent.

(9)          Andrx's proposed product admittedly has a non-ascending profile in every

other test performed by ARL for Alza (but those tests are not relied on by Ms. Gray).

(10)     Even in Ms. Gray's test (and assuming her analysis is totally correct), Andrx's product still does not infringe a substantial portion of the time.

(11)     With regard to claims 6 and 7, the individual profiles are infringed, **at most**, less than 40% and 30% of the time by Plaintiffs' expert's own admission.

(12)     Andrx sent a Detailed Statement explaining, prior to commencement of suit, why it believed the product would not lead to infringement (*see* PX 17).

In *DSU*, a factor synonymous with item 6 above, standing alone, was sufficient to find no inducement. This case presents many more such factors and offers no factors evidencing a "culpable" mind or specific intent to cause infringement rather than non-infringement. As such, Andrx will not induce infringement if its ANDA products are launched.

CL17. Direct and induced infringement may both be proven through circumstantial evidence. Liquid Dynamics Corp. v. Vaughan Co., 449 F.3d 1209, 1219 (Fed. Cir. 2006); Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (citing Michalic v. Cleveland Tankers, Inc., 364 U.S. 325, 330 (1960) .

**RESPONSE:** Andrx agrees that infringement may be proven through circumstantial evidence.

CL18. To establish contributory infringement, plaintiffs must show that Defendants knowingly induced infringement and possessed specific intent to encourage another's infringement and that the ANDA products are "not a staple article or commodity of commerce

suitable for substantial noninfringing use." 35 U.S.C. §271(c); Cross Med. Prods., Inc. v.

Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1312 (Fed. Cir. 2005). Direct infringement of a

patent claim under 35 U.S.C. § 271(a) is a prerequisite to finding that a party has contributorily

infringed a claim. Id.

**RESPONSE:** Andrx agrees that it is Alza's burden to establish that there is no substantial non-

infringing use of Andrx's ANDA products.

### 2. ALZA's Remedy For Infringement by Andrx

CL19. Plaintiffs have met their burden of proving, by a preponderance of the evidence,

that, following approval of the ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA

products will result in direct literal infringement of Claim 1, 6 and 7 of the '373 patent.

**RESPONSE:** Plaintiffs have failed to carry their burden of establishing that Andrx's ANDA

products will result in direct infringement of claim 1 of the '373 patent, as well as, claims 6 and

7 of the '373 patent.

CL20.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will induce infringement of Claim 1, 6 and 7 of the '373 patent.

**RESPONSE:**  Plaintiffs have failed to carry their burden of establishing that that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will induce infringement of claim 1 of the '373 patent, as well as, claims 6 and 7 of the '373 patent.

CL21.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will contributorily infringe Claim 1, 6 and 7 of the '373 patent.

**RESPONSE:**  Plaintiffs have failed to carry their burden of establishing that that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will contributorily infringe of claim 1 of the '373 patent, as well as, claims 6 and 7 of the '373 patent.

CL22.  35 U.S.C. §271(e)(4) provides that for an act of infringement described by §271(e)(2), the patent owner's remedies include the following:

(A)  the court shall order the effective date of any approval of the drug. . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed;

-202-

(B)  injunctive relief may be granted against an infringed to prevent the commercial manufacture, use, offer to sell, or sale within the United States. . .


(C)  damages or other monetary relief may be awarded against an infringer. . .


**RESPONSE:**  Andrx does not dispute the selectively quoted language.  Section 271(e)(4) makes it clear, however, that those remedies are the "only" remedies available to a patentee whose infringement is based on 271(e)(2).  Indeed, subsections (B) and (C) are very selectively quoted.  Subsection (B) states that this injunctive relief is only available if the product is approved.  Subsection (C) does not provide for damages unless a product covered by the patent actually was launched commercially (with the only exception being an award, if appropriate, under 35 U.S.C. Section 285 based on an exceptional case finding).


CL23.  As a remedy for Defendants' infringement, the Court shall order that any approval of Andrx ANDA Nos. 76-665 and/or 76-772 by FDA occur no earlier than January 31, 2018, the date on which the patent-in-suit and the existing FDA (pediatric) exclusivity attached thereto expires.  The Court may also grant such other relief as the Court determines is just and proper. 35 U.S.C. § 271(e)(4); see, e.g., Celgene Corp. v. Teva Pharms. USA, Inc., 412 F. Supp. 439, 441-42 (D.N.J. 2006).


**RESPONSE:**  In *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1045-52 (N.D. Ill. 2003), *aff'd on other grounds*, 403 F.3d 1331(Fed. Cir. 2005) (Posner, J., by designation), Judge Posner assumed that the patent was valid and infringed (although *de minimis* infringement was occurring as is the case here) and set about to determine if the statute required

him to ignore equity and grant the relief requested by SmithKline. *Id.* at 1048-52. Judge Posner

determined that the injunction indicated in 271(e)(4)(A) should only apply when patent law

would normally have applied an injunction. *Id.* at 1049. In response to the use of the word

"shall," Judge Posner noted that "shall versus may" arguments are "weak" and "shall" sometimes

is used to mean must, but it is also used to mean other words such as should, will or may and the

meaning given the words should depend on the context. *Id.* Thus, if equity requires in an

unusual case that 271(e)(4)(A) not be applied, that should be the case and cited to applicable

Supreme Court and other precedent. *Id.* at 1050. Here equity so demands.


CL24. As a remedy for Defendants' infringement, the Court shall enjoin Defendants, and

any successor-in-interest to the ANDAs, from manufacturing, offering to sell, selling, or using

within the United States, or importing into the United States, Methylphenidate Hydrochloride

Extended-Release Tablets (54, 36, 27 and 18 mg) in accordance with ANDA Nos. 76-655 and

76-772 during the life (including applicable FDA exclusivity) of the '373 patent. 35 U.S.C. §

271(e)(4); see, e.g., Celgene Corp. v. Teva Pharms. USA, Inc., 412 F. Supp. 439, 441-42 (D.N.J.

2006).


**RESPONSE:** *See* response to CL23.

Respectfully Submitted,


Dated: December 3, 2007

/s/ William J. Cattie, III  #953
RAWLE & HENDERSON LLP
William J. Cattie, III, Esq.
I. D. No. 953
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
302-778-1200
Facsimile:  302-778-1400


*Of Counsel:*

*Attorneys for Defendants*
*Andrx Pharmaceuticals, LLC and*
*Andrx Corporation.*


John W. Bateman
C. Kyle Musgrove
Robert F. Vroom
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005
202-220-4200