# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALZA CORPORATION, and McNEIL-PPC, INC., | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| ANDRX PHARMACEUTICALS, L.L.C., and ANDRX CORPORATION, | ) ) ) ) |
| Defendants. | ) ) ) |

C.A. No. 05-642-JJF

**REDACTED
PUBLIC VERSION**

## PLAINTIFFS' OPENING PRETRIAL SUBMISSION

*Of Counsel*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, IL 60603
312-853-7000

-and-

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8000

-and-

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood, Suite 3400
Dallas, TX 75201
214-981-3300

Dated: November 2, 2007

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs
ALZA Corporation and McNeil PPC, Inc.*

## Table of Contents

TABLE OF AUTHORITIES ................................................................v

TABLE OF ABBREVIATIONS AND DEFINITIONS.......................................... viii

TABLE OF EXPERT WITNESSES ........................................................ ix

TABLE OF FACT WITNESSES .............................................................x

## PLAINTIFFS' OPENING PRETRIAL SUBMISSION

I.      INTRODUCTION .................................................................1

II.     BACKGROUND .................................................................5

        A.      ALZA's Surprising Discovery: an "Ascending" Drug Concentration
                Profile Provides Effective Treatment of ADHD for Extended Periods of
                Time .............................................................................5

        B.      The Subject Matter of the '373 Patent.............................................14

                1.      The claimed treatment methods...........................................14

                2.      The '373 patent specification.............................................15

III.    INFRINGEMENT OF THE '373 PATENT.............................................15

        A.      The Legal Standards For Infringement ............................................15

        B.      Literal Infringement Of Claim 1 Of The '373 Patent.........................17

                1.      The Elements of Claim 1 ....................................................17

                2.      The Court's Construction Of The Ascending Release Rate Element
                        Of Claim 1 Of The '373 Patent ...........................................18

                        (a)     An "appropriate" dissolution test for the ANDA products ........19

                        (b)     The immediate release MPH is excluded before comparing
                                the MPH release rate during periodic intervals of time ............23

                        (c)     Determining that a Release Rate is Ascending.........................24

                3.      Dissolution testing establishes that the ANDA products literally
                        meet the release rate element of Claim 1 ...............................25

                        (a)     The 54, 36 and 27 mg ANDA products .....................................25

i

          (b)    The 18 mg ANDA product ......................................................28

    **4.**    Use of the ANDA products will literally infringe Claim 1 ....................29

  **C.**    Literal Infringement of '373 Patent Claims 6 and 7 ............................................31

    **1.**    The Proposed ANDA Products Literally Infringe Claims 6 and 7 of the '373 Patent ............................................................................................31

    **2.**    The ANDA 54 mg Product Results In A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of Both About 8 Hours and about 5.5 Hours Following Said Administration .........................................................................................32

          (a)    Defendants Represented to the FDA that their ANDA Products Exhibit Substantially Ascending MPH Plasma Concentrations for Both About 8 Hours and About 5.5 Hours ............................................................................................34

          (b)    The Individual Plasma Concentration Data in Defendants' ANDA Demonstrates that a Substantial Population of Individuals Will Exhibit a Substantially Ascending MPH Plasma Concentration for Both About 8 Hours and About 5.5 Hours ........................................................................................38

    **3.**    Defendants' Proposed 18, 27, and 36 mg ANDA Products Will Be Administered In A Manner That Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of Both About 8 Hours and About 5.5 Hours Following Said Administration ............................................................40

  **D.**    Defendants Will Induce Infringement Of The Asserted Claims ........................42

  **E.**    Defendants Are Liable for Contributory Infringement of the Asserted Claims ..................................................................................................................44

**IV.**    CONCLUSION ................................................................................................................45

**FINDINGS OF FACT**

**I.**    BACKGROUND ..............................................................................................................47

  **A.**    The Parties ............................................................................................................47

  **B.**    The Nature Of The Dispute ..................................................................................48

**II.**    ALZA DISCOVERS A NEW METHOD FOR TREATING ADHD ONCE-DAILY USING AN "ASCENDING" MPH DELIVERY PROFILE ........................49

**A.**    ADHD: A Serious Disorder With Limited Treatment Options .........................49

**B.**    ALZA Scientists Discover The First Reliably Effective  Once-A-Day MPH Treatment For ADHD ............................................................57

**C.**    ALZA Obtains The '373 Patent .........................................................64

**III.**    THE ANDRX ANDAs AND ANDRX'S PROPOSED GENERIC PRODUCTS ........68

**A.**    ANDA Nos. 76-665 And 76-772 ......................................................68

**B.**    Andrx's Extended Release MPH Tablets (the "ANDA products")...................70

**IV.**    LITERAL INFRINGEMENT OF CLAIM 1 OF '373 PATENT...................................74

**A.**    An "Appropriate" In Vitro Dissolution Test For The ANDA Products.............74

**B.**    Appropriate In Vitro Dissolution Testing Establishes That The ANDA Products Provide The Ascending Release Rate Profile In Claim 1 Of The '373 Patent..............................................................................83

**1.**    Dissolution tests on the 54, 36 and 27 mg ANDA products.................85

**2.**    The 18 mg ANDA products..................................................94

**C.**    Use Of The ANDA Products As Directed Will Result In Literal Infringement...........................................................................96

**V.**    LITERAL INFRINGEMENT OF CLAIMS 6 AND 7 OF THE '373 PATENT ..........98

**A.**    The Proposed ANDA Products Literally Infringe Dependent Claims 6 and 7 of the '373 Patent.............................................................99

**1.**    The 54mg ANDA Products Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of Both About 8 Hours and About 5.5 Hours Following Said Administration ...................................................................100

**(a)**    Defendants' Proposed 18, 27, and 36 mg ANDA Products Will Be Administered In A Manner That Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of Both About 8 Hours and About 5.5 Hours Following Said Administration .............112

**VI.**    UPON APPROVAL, ANDRX WILL ACTIVELY INDUCE INFRINGEMENT OF THE '373 PATENT...............................................................115

**VII.**    UPON APPROVAL, ANDRX WILL CONTRIBUTORILY INFRINGE THE '373 PATENT ...........................................................................116

**VIII.**   CONCLUSIONS OF LAW RELATING TO INFRINGEMENT BY ANDRX .........117

    **A.**   Jurisdiction ...............................................................................117

    **B.**   ALZA's Infringement Claims ..........................................................117

        **1.**   Legal standard for infringement.............................................117

        **2.**   ALZA's Remedy For Infringement by Andrx.....................................121

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Abbott Laboratories v. Torpharm, Inc.*,
   300 F.3d 1367 (Fed. Cir. 2002)..................................................................119, 120

*Aventis Pharms., Inc. v. Barr Laboratories, Inc.*,
   411 F. Supp. 2d 490 (D.N.J. 2006) .......................................................................43

*Bayer AG v. Elan Pharmaceutical Research Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000)............................................................................119

*Bell Communications Research, Inc. v. Vitalink Communications Corp.*,
   55 F.3d 615 (Fed. Cir 1995).................................................................16, 31, 120

*Celgene Corp. v. Teva Pharmaceuticals USA, Inc.*,
   412 F. Supp. 2d 439 (D.N.J. 2006) .................................................................46, 123

*CollaGenex Pharmaceuticals, Inc. v. Ivax Corp.*,
   375 F. Supp. 2d 120 (E.D.N.Y. 2005) ..................................................................44

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005)..........................................................43, 45, 120, 122

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   438 F.3d 1354 (Fed. Cir. 2006).............................................................................121

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.*,
   No. 02-581 JJF, 2004 WL 253482 (D. Del. Feb. 5, 2004) ......................................120

*Interspiro USA, Inc. v. Figgie International, Inc.*,
   815 F. Supp. 1488 (D. Del. 1993).........................................................................120

*In re Omeprazole Patent Litigation*,
   490 F. Supp. 2d 381 (S.D.N.Y. 2007).........................................................44, 46, 121

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006).............................................................................121

*MEMC Electric Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
   420 F.3d 1369 (Fed. Cir. 2005)..............................................................................44

*Manville Sales Corp. v. Paramount System, Inc.*,
   917 F.2d 544 (Fed. Cir. 1990)...............................................................................121

v

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995)................................................................16, 119

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.*,
  228 F. Supp. 2d 480 (D. Del. 2002)....................................................14, 119

*Metropolitan-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
  545 U.S. 913 (2005)....................................................................................121

*Moleculon Research Corp. v. CBS, Inc.*,
  793 F.2d 1261 (Fed. Cir. 1986).................................................................121

*Novartis Corp. v. Ben Venue Laboratories, Inc.*,
  271 F.3d 1043 (Fed. Cir. 2001)....................................................17, 31, 120

*Panduit Corp. v. Dennison Manufacturing Corp.*,
  836 F.2d 1329 (Fed. Cir. 1987).........................................................16, 119

*Pfizer Inc. v. Ranbaxy Laboratories Ltd.*,
  405 F. Supp. 2d 495 (D. Del. 2005)............................................................16

*Philips Electric North America Corp. v. Contec Corp.*,
  411 F. Supp. 2d 470 (D. Del. 2006)............................................................45

*Purdue Pharma L.P. v. Endo Pharmaceuticals, Inc.*,
  No. 00 CIV. 8029, 2004 WL. 26523 (S.D.N.Y. 2004)...........................13, 42

*Purdue Pharma, L.P. v. F.H. Faulding & Co.*,
  48 F. Supp. 2d 420 (D. Del. 1999).................................................35, 44, 120

*Warner-Lambert Co. v. Teva Pharmaceuticals USA, Inc.*,
  418 F.3d 1326 (Fed. Cir. 2005).........................................................16, 119

*Water Tech. Corp. v. Calco Ltd.*,
  850 F.2d 660 (Fed. Cir. 1988)....................................................................121

# FEDERAL STATUTES

35 U.S.C. § 271(a) ........................................................................15, 43, 118, 121, 122

35 U.S.C. § 271(b) ...............................................................................15, 49, 120

35 U.S.C. § 271(c) ...............................................................................15, 45, 122

35 U.S.C. § 271(e)(2) ...............................................................13, 49, 119, 122

35 U.S.C. § 271(e)(4)....................................................46, 50, 122, 123

21 U.S.C. § 321 ...............................................................................................77

21 U.S.C. § 355(j) ...............................................................................49, 118

21 U.S.C. § 355(j)(2)(A) .......................................................................70

28 U.S.C. § 1331 ...............................................................................49, 118

28 U.S.C. § 1338 ...............................................................................49, 118

28 U.S.C. § 1391 ...............................................................................49, 118

28 U.S.C. § 1400.................................................................................49

# MISCELLANEOUS

Food & Drug Administration, U.S. Department of Health & Human Services,
   Approved Drug Products With Therapeutic Equivalence Evaluations
   (25th ed. 2005) ...............................................................................................13

## TABLE OF ABBREVIATIONS AND DEFINITIONS

| | |
|---|---|
| '129 patent | ALZA's U.S. Patent No. 6,930,129 issued August 16, 2005 (PX 2). |
| '373 patent | ALZA's U.S. Patent No. 6,919,373 issued July 19, 2005 (PX 1). |
| ADD | Attention Deficit Disorder. |
| ADHD | Attention Deficit Hyperactivity Disorder. |
| ALZA | Plaintiff ALZA Corporation. |
| ANDA | Abbreviated New Drug Application. |
| Andrx | Andrx Pharmaceuticals, L.L.C. and Andrx Corporation, collectively. |
| App. | Apparatus; typically in reference to a USP dissolution apparatus. |
| asserted claims | Claims 1, 6 and 7 of the '373 patent. |
| CL __ | A proposed conclusion of law. |
| $C_{max}$ | The maximum plasma concentration. |
| CONCERTA® | Plaintiff's once-daily extended-release methylphenidate tablets for the treatment of ADHD. |
| Defendants | Andrx Pharmaceuticals, L.L.C. and Andrx Corporation, collectively. |
| DTX __ | Defendants' trial exhibit.  (Specific page numbers are identified if necessary). |
| FDA | Food and Drug Administration. |
| Fig. | Figure |
| FDCA | Food, Drug and Cosmetic Act.  21 U.S.C. 355  *et seq*. |
| PFF __ | Plaintiffs' proposed finding of fact. |
| in vivo | Something occurring in or found in the human body. |
| JDT (Witness) __ | Joint deposition testimony appendix citation; witnesses name will be provided parenthetically. |

| | |
|---|---|
| Markman Order | The Court's Order construing the disputed language in the '373 and '129 patent claims. (D.I. 130). |
| MPH | Methylphenidate |
| Patent Office | The United States Patent and Trademark Office. |
| PK | Pharmacokinetics refers to how a drug is absorbed, distributed, metabolized and excreted in a subject. |
| Plaintiffs | ALZA Corporation and McNeil-PPC, collectively. |
| PX __ | Plaintiffs' trial exhibit.  (Specific page numbers are identified if necessary). |
| $T_{max}$ | The time to the maximum plasma concentration. |

## TABLE OF EXPERT WITNESSES

| Witness Testimony Abbreviation | Witness Full Name, Identification |
|---|---|
| Testimony of Dr. Angst | Dr. Martin Angst is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology.  [PFF 221].  Dr. Angst's professional qualifications and experience in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology are provided in his Curriculum Vitae, PX 256. [PFF 222]. |
| Testimony of Dr. Davies | Dr. Martyn Davies is an expert in biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques.  [PFF 224].  Dr. Davies' professional qualifications and experience in the fields of biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques are provided in his Curriculum Vitae, PX 179.  [PFF 220]. |
| Testimony of Dr. Drover | Dr. David Drover is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology, statistics, and anesthesiology.  [PFF 225].  Dr. Drover's professional qualifications and experience in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology, statistics, and anesthesiology are set forth in his Curriculum Vitae, PX 432.  [PFF 226]. |
| Testimony of Ms. Gray | Ms. Gray is an expert in the field of in vitro dissolution, including |

| | development of dissolution test methods and specification setting. [PFF 123]. Ms. Gray's professional qualifications and experience in the field of in vitro dissolution testing are provided in her Curriculum Vitae, PX 201. [PFF 124]. |
|---|---|
| Testimony of Mr. Walker | Mr. Brian Walker is a laboratory technician and dissolution specialist employed by ARL who carried out ALZA's dissolution tests on the ANDA products. [PFF 163]. Both ARL and Brian Walker are fully qualified to perform in vitro dissolution tests on the ANDA products using the test protocol that had been approved by Ms. Gray. [PFF 164]. |

### TABLE OF FACT WITNESSES

| Witness Abbreviation | Witness Full Name, Identification |
|---|---|
| F. Alvarez | Mr. Francisco Alvarez is Director of Analytical Research at Andrx. [JDT (F. Alvarez) 4]. |
| A. Ayer | Mr. Atul Ayer is a Senior Director at ALZA. [JDT (A. Ayer) 35]. |
| B. Berry | Dr. Brian Berry is an Associate Director of Pharmacokinetics and Bioequivalents at Andrx. [JDT (B. Berry) 117]. Dr. Berry appeared as Andrx's designee pursuant to Fed. R. Civ. P. 30(b)(6). |
| M. Brennan | Ms. Michelle Brennan is General Manager at Ortho Women's Health. [JDT (M. Brennan) 167]. Ms. Brennan appeared on behalf of ALZA pursuant to Fed. R. Civ. P. 30(b)(6). |
| N. Cappuccino | Dr. Nicholas Cappuccino is responsible for the research and development, regulatory affairs, process development and operations departments at Andrx. [JDT (N. Cappuccino) 257]. Dr. Cappuccino appeared on behalf of Andrx pursuant to Fed. R. Civ. P. 30(b)(6). |
| X. Cheng | Dr. Cheng is an employee of Andrx, who appeared as Andrx's designee pursuant to Fed. R. Civ. P. 30(b)(6). [JDT (X. Cheng) 273]. |
| J. Chi | Jie Chi is a scientist in Andrx's analytical research group. [JDT (J. Chi) 342-43]. |
| C. Gelotte | Dr. Cathy Gelotte is a senior clinical pharmacologist at McNeil Consumer and Pediatrics. [JDT (C. Gelotte) 367-68]. Ms. Gelotte appeared on behalf of ALZA pursuant to Fed. R. Civ. P. 30(b)(6). |
| D. Guinta | Dr. Diane Guinta is a named inventor on the patent-in-suit. [JDT (D. |

| | |
|---|---|
| | Guinta) 398]. |
| S. Gupta | Dr. Suneel Gupta is a named inventor on the patent-in-suit. [JDT (S. Gupta) 505]. Mr. Gupta appeared on behalf of ALZA pursuant to Fed. R. Civ. P. 30(b)(6). |
| L. Hamel | Mr. Lawrence Hamel is a named inventor on the patent-in-suit. |
| A. Lam | Mr. Andrew Lam is senior director of liquid OROS technology at ALZA. [JDT (A. Lam) 786]. |
| J. Lucci | Mr. Joseph Lucci is a patent attorney at the firm of Woodcock Washburn. [JDT (J. Lucci) 931]. Mr. Lucci appeared on behalf of ALZA pursuant to Fed. R. Civ. P. 30(b)(6). |
| R. Medina | Mr. Raul Medina holds the position of supervisor analytical research II at Andrx. [JDT (R. Medina) 990-91]. |
| L. Rosenthal | Mr. Lawrence Rosenthal is president of Andrx. [JDT (L. Rosenthal) 1109]. Mr. Rosenthal appeared on behalf of Andrx pursuant to Fed. R. Civ. P. 30(b)(6). |
| S. Saks | Dr. Samuel Saks is a named inventor on the patent-in-suit. |
| P. Shivanand | Dr. Padmaja Shivanand is senior director of oral controlled-release early development at ALZA. [JDT (P. Shivanand) 1157]. Ms. Shivanand appeared on behalf of ALZA pursuant to Fed. R. Civ. P. 30(b)(6). |
| J. Vaughn | Ms. Janet Vaughn is Andrx's director of regulatory affairs, responsible for reviewing all submissions to the FDA. [JDT (J. Vaughn) 1210-13]. |

—

Unless otherwise indicated, all emphasis has been added in Plaintiffs' Pretrial Submission and Proposed Findings of Fact and Conclusions of Law.

Plaintiffs, ALZA Corporation and McNeil-PPC, Inc. submit their Opening Pretrial Submission in this case. Plaintiffs' Opening Pretrial Submission consists of their Opening Pretrial Brief and related proposed Findings of Fact and Conclusions of Law for the issue on which they bear the burden of proof at trial, i.e., infringement of the '373 patent. Pursuant to the agreement of the parties, the parties shall exchange Responsive Pretrial Submissions on December 3, 2007. Complete pretrial submissions will be filed with the Court by December 3, 2007 in accordance with the direction of the Court. [D.I. 129].

## I.    INTRODUCTION

This patent infringement action arises under the Hatch-Waxman Act. Defendants Andrx filed an abbreviated new drug application ("ANDA") with the Food and Drug Administration ("FDA") seeking authorization to market a generic version of Plaintiffs' highly successful and innovative drug product, CONCERTA®. In response, Plaintiffs timely filed suit under the two patents listed in the Orange Book for CONCERTA®; namely, U.S. Patent No. 6,919,373 ("the '373 patent") and U.S. Patent No. 6,930,129 ("the '129 patent").[1]

CONCERTA® is a once-daily medication for treating Attention Deficit Hyperactivity Disorder, or "ADHD." CONCERTA® is used by millions of patients today to provide effective, safe treatment of ADHD. CONCERTA® is an innovative drug product that administers methylphenidate ("MPH") in a new way. CONCERTA® has made it possible, for the first time since MPH was introduced more than 30 years ago, to effectively and safely treat ADD for an entire day by a single administration of MPH.

---

[1]    In the interest of streamlining this case for trial, plaintiffs will not assert infringement of any claims of the '129 patent at trial.

1

Prior to the Plaintiffs' inventions, the prevailing and accepted ADHD treatment method involved administering immediate release MPH drug products two times a day ("BID") or three times a day ("TID") to patients. When followed correctly, this regimen does provide effective management of ADHD symptoms. However, this multi-administration regimen had several drawbacks. One was that it required administering a controlled substance to children – the primary patient population – at school. In addition to presenting practical difficulties for school administrators, the requirement that the MPH product be taken during the middle of the school day created serious compliance problems, which, in turn, contributed to increased incidence of side effects and decreased effectiveness over the course of the typical school day.

The problems with regimens based on immediate release MPH products were recognized in the industry prior to the inventions. More than 20 years ago, one company produced and attempted to market a once-a-day product, called Ritalin SR®, to respond to this need. The developers of Ritalin SR® took a conventional approach in designing their product. Specifically, they designed a product which would release MPH in a controlled manner so as to cause the patient's blood plasma concentration of the drug to reach a therapeutically effective level and thereafter maintain a relatively constant level of MPH for several hours. The conventional wisdom followed by the Ritalin SR® developers was that drugs generally remain efficacious so long as they are present in the blood at a concentration above a therapeutically effective threshold.

For reasons that remained unknown until the work of the ALZA scientists, Ritalin SR® proved to be unreliable and ineffective as a once-a-day ADHD treatment. Due to its shortcomings, most patients continued to follow the "gold standard" regimen of BID or TID treatment with immediate release MPH products prior to CONCERTA®'s commercial

2

introduction. And, despite the significant patient population and the pronounced market demand for a once-a-day MPH product to treat ADHD, no one developed an effective once-a-day treatment for ADHD before the ALZA scientists developed the treatment methods that are the subject of the patent-in-suit.

The ALZA scientists solved the problem by taking an unconventional and novel approach. In particular, the ALZA scientists discovered that providing a substantially increasing ("ascending") MPH plasma concentration or an increasing release rate of MPH for an extended period of time would provide effective treatment of ADHD throughout the day comparable to the effectiveness of the prevailing "gold standard" regimen based on three-times-a-day ("TID") administration of immediate release MPH formulations. CONCERTA® was the product that the ADHD community had needed for more than 30 years – an effective, safe once-a-day ADHD treatment that eliminated the need for in-school dosing and other problems associated with treatment regimens based on immediate release MPH products.

Annual sales of CONCERTA® in the U.S. are in excess of $900 million and growing, with CONCERTA® sales expected to reach the $1.0 billion/year mark and "blockbuster" status in about a year.

ALZA's patent at issue in this case, the '373 patent, claims methods for treating ADHD that implement the discoveries made by the ALZA scientists in two different ways. First, '373 patent claim 1 claims a method of treating ADHD in which a once-a-day MPH dosage form is administered and provides its therapeutic benefits by releasing the MPH from the dosage form at an ascending release rate over an extended period of time. The purpose of the ascending release rate of the MPH is to allow the MPH plasma concentration in the patient to increase over an

extended period of time, rather than remaining relatively constant. The rate of release of MPH from the dosage form, according to the patent, is measured in an appropriate in vitro dissolution test – a common laboratory test that measures the amount of drug released in specified intervals of time under standard conditions. Second, claims 6 and 7 of the '373 patent further narrow the method of claim 1 by claiming a method of treating ADHD by administering a pharmaceutical composition comprising MPH that causes the plasma concentration in the patient to substantially ascend for an extended period of time of about 5.5 hours and about 8 hours, respectively.

Defendants' proposed generic version of CONCERTA® utilizes ALZA's patented treatment methods. The results of independent in vitro dissolution tests on samples of the ANDA products, confirmed by Andrx's own dissolution test results in the ANDAs, demonstrate that the ANDA products provide an ascending MPH release rate as required by claim 1 of the '373 patent. Similarly, Defendants' own bioequivalence testing results reported in their ANDA demonstrate that the ANDA products, after being administered, provide a substantially ascending MPH plasma concentration as required by claims 6 and 7 of the '373 patent.

Plaintiffs' evidence establishes that all of the elements of the asserted claims in each patent are met by the ANDA products. If Defendants' ANDA is approved by the FDA, and Andrx commences marketing of its products, use of the ANDA products will literally infringe the asserted claims of the '373 patent, and Defendants will induce infringement of, and/or contributorily infringe those claims.

## II.    BACKGROUND

### A.    ALZA's Surprising Discovery: an "Ascending" Drug Concentration Profile Provides Effective Treatment of ADHD for Extended Periods of Time

ADHD, also referred to as ADD, is one of the most common neurobehavioral disorders affecting children and teens.  [PFF ¶¶ 15, 17].  Unfortunately there is no cure for ADHD; it is a chronic disorder that will often continue to affect patients into adulthood.  [PFF ¶ 18].  The principal symptoms of ADHD are inattention, hyperactivity, and impulsiveness.  [PFF ¶ 15]. Individuals with ADHD typically have behavioral problems that, among other things, can interfere with family relationships, social development, such as the ability to make and keep friends or participate in sports, and learning in school or other academic settings.  [PFF ¶¶ 19-21].  Children with ADHD who go untreated are often given extensive negative feedback from teachers, parents, and peers and are at a higher risk of repeating grades and placement in special education classes.  [PFF ¶ 21].

The most frequently prescribed medications for treating ADHD are central nervous system ("CNS") stimulants, such as MPH and amphetamines.  [PFF ¶ 22].  MPH, a controlled schedule II substance under the U.S. Drug Enforcement Administration, has been used to treat children with ADHD since the 1960s.  [PFF ¶¶ 23, 28-29].  Currently, MPH is the most commonly prescribed medication to treat ADHD in the United States.  [PFF ¶ 29].

Prior to the availability of CONCERTA®, the most common approach to treating ADHD was to administer to the patient an immediate release version of MPH multiple times per day. [PFF ¶ 46].  Immediate release MPH dosage forms release all of the MPH within minutes of ingestion by the subject.  [PFF ¶ 31].  Immediate release MPH products provide therapeutic

benefits only for a short period of time (about 3 to 5 hours) after ingestion, with the greatest degree of effectiveness occurring 1-2 hours after administration.  [PFF ¶ 30].

When using immediate release MPH products, multiple administrations are required to provide effective control of ADHD symptoms for the course of a typical school day.  [PFF ¶ 33]. The MPH plasma concentration-time profile observed over the course of a day of treatment with immediate release MPH products has been referred to as a "sawtooth" or "peak and valley" curve.  [PFF ¶¶ 34-36].  This is because, following each ingestion, MPH plasma concentrations ascend rapidly, reaching a peak within about 2 hours, then decrease.  [PFF ¶ 34].  When a second or third dose of immediate release MPH is administered, a trough reflecting the lowest MPH plasma concentration between administrations is observed, followed by a sharp rise to another peak.  [PFF ¶¶ 34-35].

Even though immediate release MPH products can be used in treatment regimens to safely and effectively control ADHD symptoms, these regimens present significant problems. Because of the short duration of effect of immediate release MPH products, children must be given multiple administrations of the product to provide effective control of ADHD symptoms during the course of a typical school day.  This means that at least one of these administrations will have to occur during the school day.  [PFF ¶ 33].  Requiring administration of MPH products during the school day leads to serious patient compliance issues, which, in turn, leads to a higher incidence of side effects and decreased effectiveness of control of ADHD symptoms. [PFF ¶¶ 37-39].  The need for multiple administrations of immediate release MPH products also creates serious risks of drug diversion and abuse, and presents significant challenges for school administrators, given the need to store, handle and administer a controlled substance in a school environment.  [PFF ¶¶ 38-39].  Thus, before the invention, there was a pronounced need for a

6

long-acting MPH dosage form that could be administered once-a-day, yet would provide safe and effective treatment of ADHD throughout the entire school day, thereby remedying the numerous problems associated with use of immediate release MPH products.  [PFF ¶ 40].

The first product developed in an attempt to address this long-felt and pronounced need in the market was Ritalin SR®.  [PFF ¶ 41].  Ritalin SR® is a wax-matrix dosage form that was designed to slowly release MPH over a period of several hours. [*Id.*].  Studies of Ritalin SR® revealed that it does not release MPH at an ascending rate of release for an extended period of time, nor produce a substantially ascending MPH plasma concentration for a period of about 8 hours.  [PFF ¶¶ 41-42].  Instead, Ritalin SR® releases MPH at a descending release rate.  [*Id.*].  As a consequence, Ritalin SR® results in a MPH plasma concentration that gradually increases after administration, reaching a peak concentration between 3 and 4 hours after administration, and then decreases.  [*Id.*].

MPH plasma profiles associated with multiple administrations of immediate release MPH products are compared to the MPH plasma profile associated with the Ritalin SR product in the figure below.  [PX 137, Patrick et al., Biopharm. Drug Dispos. 10(2): 165-171 (1989) at p. 170].  The MPH plasma concentration time profile observed over the course of a day of treatment with immediate release MPH products has been referred to as a "sawtooth" or "peak and valley" curve.  [PFF ¶¶ 34-36].  This is because, following each ingestion, MPH plasma concentrations ascend rapidly, reaching a peak within about 2 hours, then decreases rapidly.  [PFF ¶ 34].  When a second or third dose of immediate release MPH is administered, a trough reflecting the lowest MPH plasma concentration between administrations is observed, followed by a sharp rise to another peak.  [PFF ¶¶ 34-35].  In the figure below, the curve labeled "IR Sawtooth" is the MPH plasma concentration time associated with two administrations of the immediate release MPH

7

product, while the curves labeled "Ritalin SR" are MPH plasma concentrations measured over

time after administration of the Ritalin SR® product.  As can be seen, the Ritalin SR® profile

exhibits a flattened peak occurring between 3 and 4 hours after administration, as compared to

the immediate release MPH regimen, which has two sharp peaks and a trough occurring at

approximately 5 hours.



The design and characteristics of the Ritalin SR® product reflect the conventional wisdom

in the field of extended release dosage forms; namely, that such dosage forms should be designed

to release the drug from the dosage form at a rate that provides a relatively constant plasma

concentration of the drug over the desired duration of time.  [PFF ¶ 71].  For example, the Ritalin

SR® product illustrated in the figure above attempts to provide a generally consistent plasma

concentration between the second and fourth hours after administration.  The rationale

underlying this generally held belief was that since nearly all drugs exhibit a desired therapeutic effect at a particular "threshold" plasma concentration, one should strive to achieve but not exceed, this threshold plasma concentration. Doing so would achieve the twin goals of providing effective treatment but minimizing undesired side effects, which ordinarily increase with the increasing dose of a drug. MPH, for example, was known to exhibit side effects that corresponded, in part, to increased plasma concentrations of the drug. [PFF ¶ 24].

Studies of the pharmacokinetic characteristics of Ritalin SR® showed that it would cause the MPH plasma concentration following its administration to gradually increase and plateau, reaching a maximal concentration ($C_{max}$) between 3 and 4 hours, then markedly decrease thereafter. [PFF ¶ 42]. For unknown reasons, Ritalin SR® failed to provide a solution to the problems of Ritalin®–based treatment regimens. [PFF ¶¶ 44-45]. Even though it was designed to deliver an equivalent amount of MPH as compared to immediate release MPH products administered twice-a-day (about 8 hours of efficacy) and had a conventional drug delivery profile, Ritalin SR® in practice was not as effective as administering multiple doses of immediate release MPH products at specified intervals during the day. [PFF ¶¶ 43-45]. This is evidenced by its infrequent use by practitioners and its low sales, especially given the size of the market. [PFF ¶ 43].

Prior to the work of the inventors, however, there was no known or scientifically established basis for the lack of effectiveness of Ritalin SR® relative to regimens based on immediate release MPH dosage forms. [PFF ¶¶ 43-45]. As a result of its perceived problems, Ritalin SR® was not widely adopted in clinical practice. [*Id.*]. Thus, until 2000 when CONCERTA® was launched, the preferred method of treating ADHD remained a regimen that had been developed more than 30 years before the invention; namely, one in which multiple

9

doses of immediate release MPH were administered at specified periods during the day. [PFF ¶ 46].

In 1993, scientists at ALZA took up the challenge of developing an effective once-a-day MPH dosage form. [PFF ¶¶ 47-51]. The ALZA scientists began their efforts by designing and conducting a series of sophisticated clinical studies to learn more about how different types of plasma profiles of MPH relate to effectiveness of treatment of ADHD symptoms in patients. [PFF ¶¶ 51-58]. In particular, the ALZA scientists sought to discover why Ritalin SR® lost its effectiveness over the course of the day and why it was not as effective as administering separate doses of immediate release MPH products to children under the conventional BID treatment regimen. [*Id.*].

These seminal ALZA studies were referred to as the "sipping studies." [PFF ¶ 52]. Patients were given frequent small doses of MPH so that their plasma concentrations could be carefully controlled and measured throughout the day (hence the characterization as a "sipping" study). [PFF ¶¶ 51-59]. Sophisticated test procedures were used to assess the efficacy of each treatment regimen. [PFF ¶ 59].

ALZA's first clinical study compared the effectiveness of treating ADHD via three different MPH plasma profiles. [PFF ¶ 54]. The studies involved administration of the same amount of MPH products via three different profiles. One profile was the conventional BID administration of immediate release products namely, two doses were administered approximately 4.5 hours apart. [PFF ¶ 55]. This produced two peaks in the blood plasma concentration – each peak occurring after the administration of the drug and being followed by a trough.

10

A second profile was designed to achieve fairly quickly a therapeutically effective plasma concentration of MPH and then to maintain a relatively constant plasma concentration. [PFF ¶ 56]. This profile was designed to model an optimized sustained release profile with no fluctuations in the MPH plasma concentration. [*Id.*]. One purpose for including this profile was to assess whether problems seen with Ritalin SR® were attributable to a defective formulation, e.g., a problem with the wax-matrix dosage form – or whether, more fundamentally, treatment via a constant MPH plasma concentration was itself ineffective. [PFF ¶ 57].

The ALZA scientists also conceived of and tested a novel third profile; namely, one which would produce a generally ascending blood plasma concentration of MPH during the course of the day ("ascending profile"). [PFF ¶ 58]. This profile was designed to evaluate the distinctions in therapeutic effects (if any) between treatment with an essentially constant MPH plasma concentration (i.e., such as that associated with the Ritalin SR® product) and those associated with the conventional "sawtooth" plasma profile seen in patients taking multiple doses of immediate release MPH (i.e., where the plasma concentration has peaks and troughs). [*Id.*]. The experimental profile involved administering an initial loading dose of MPH, with the remaining quantity of the MPH being administered in doses that would create a substantially ascending MPH plasma profile extending past the time of administration of the second dose of the immediate release product. [PFF ¶¶ 54, 58].

The first sipping study surprisingly showed that an ascending profile was *more effective* than a flat or constant profile, and was about as effective as the twice-a-day dosing regimen. [PFF ¶¶ 61-62]. ALZA's discovery ran contrary to the prevailing wisdom that a "flat profile" was the objective when providing treatment via extended release drug formulations. [PFF ¶ 71]. It was also contrary to what experience with twice daily administration of immediate release

11

products had suggested – *i.e.*, that two separate administrations resulting in two sharp peaks of high drug concentration were essential, and that the blood concentration of MPH had to drop sharply between the doses in order for the second dose to be effective.  [PFF ¶¶ 62, 72].  In addition, the findings surprisingly showed that an ascending profile did not yield higher incidents of side effects than the standard Ritalin® BID profile.  [PFF ¶ 70].  Once the inventors had discovered that therapeutic benefits could be effectively delivered through an ascending MPH blood plasma concentration, they then determined that this could be achieved by making dosage forms that released MPH in increasing amounts over an extended period.  [PFF ¶ 73].

Before the insights of the ALZA scientists, no one had proposed treating ADHD by providing a substantially ascending blood plasma concentration of MPH or delivering MPH at an ascending release rate.  The ALZA scientists were the first to solve the problems that plagued Ritalin SR®, and their work paved the way for the development of CONCERTA® – a drug that has proven to be as effective as administering two or three doses of immediate release MPH products, and has rapidly become the new standard of care in treatment of ADHD, particularly for children and adolescents who suffer from ADHD.

Following its introduction, CONCERTA® rapidly experienced widespread clinical acceptance and enormous commercial success.  Annual sales of CONCERTA® in the U.S. are in excess of $900 million and growing, with CONCERTA® sales expected to reach the $1.0 billion/yr mark and "blockbuster" status in about a year.  [PFF ¶ 74].

Recognizing the commercial success of CONCERTA®, Defendants Andrx Pharmaceuticals, LLC and Andrx Corporation ("Andrx") have sought to develop a generic version of CONCERTA®.  [PFF ¶ 96].  Andrx has represented to the FDA that its products that

are the subject of its ANDA Nos. 76-665 And 76-772 are bioequivalent to CONCERTA®, not only under conventional bioequivalent metrics, but that its products behave in a very comparable manner to CONCERTA® to provide comparable therapeutic benefits to ADHD patients.  [PFF ¶¶ 96, 98-101].  Studies of the ANDA products, conducted by Andrx and by Plaintiffs, show that these products release MPH at an ascending rate for an extended period of time, comparable to CONCERTA®.  Pharmacokinetic studies of the ANDA products by Andrx also led Andrx to assert, as supported by the bioequivalence testing data they produced, that the ANDA products exhibit a substantially ascending MPH plasma concentration over a period of about 8 hours, again, comparable to CONCERTA®.  [PFF ¶¶ 239-244].

Andrx is in the business of producing and marketing generic copies of successful, brand-name drug products.  In July and August 2005, Andrx provided notice to Plaintiffs that it had filed ANDAs seeking to market generic copies of CONCERTA®.  [PFF ¶ 96-97].  The notice included "paragraph IV" certifications that asserted in relevant part that a U.S. Patent listed by Plaintiffs in the Orange Book[2] – the '373 patent – was invalid and/or would not be infringed by the marketing of Andrx's generic copy of CONCERTA®.

Andrx's filing of its ANDAs containing an assertion of invalidity or non-infringement of the '373 patent constitutes infringement of that patent pursuant to 35 U.S.C. § 271(e)(2)(A).  In response, pursuant to 35 U.S.C. § 271(e)(2), Plaintiffs initiated the current action against Andrx.[3]

---

[2]    Food and Drug Admin., U.S. Dep't of Health and Human Servs., Approved Drug Products with Therapeutic Equivalence Evaluations (25th ed. 2005).

[3]    The pertinent requirements and procedures of the Hatch-Waxman Act relating to initiation of a patent infringement suit against a company that has filed an ANDA with the FDA are well-known and are described in many district court decisions, including decisions by this Court.  *See, e.g.*, *Purdue Pharma L.P. v. Endo Pharms. Inc.*, No. 00 CIV. 8029, 2004 WL 26523 at *1, 1187 (S.D.N.Y. 2004), *withdrawn and superceded on other grounds*, 438 F.3d 1123 (Fed.

B.      The Subject Matter of the '373 Patent

The patent-in-suit describes and claims methods for treating ADHD by administering an amount of a drug (MPH) via a dosage form or pharmaceutically acceptable composition in a manner that provides a novel "ascending" profile.  [PFF ¶¶ 82-88].  Claim 1 of the '373 patent specifies treatment of ADHD by administering a dosage form having an ascending in vitro release rate of the MPH from the dosage form.  [PFF ¶ 87].  Dependent claims 6 and 7 of the '373 patent, by contrast, further limit claim 1 by specifying treatment by providing a substantially ascending MPH plasma concentration in the patient for about 5.5 and about 8 hours, respectively.  [PFF ¶ 88].  Plaintiffs are asserting claims 1, 6 and 7 of the '373 patent against Defendants in this case.

1.      The claimed treatment methods

All of the asserted claims of the '373 patent are directed to methods for treating ADD/ADHD by providing a single administration of MPH.  [PFF ¶¶ 82-84].  Claim 1 of the '373 patent reads:

> A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

[PFF ¶ 87].  As discussed below, the claimed "ascending release rate" refers, in part, to the rate of release of MPH from the dosage form as measured by an appropriate in vitro dissolution test.

Claim 7 of the '373 patent adds the requirement that the individual receiving treatment exhibit a "substantially ascending" plasma concentration of MPH over a specified time period (i.e. about 8 hours).  [PFF ¶ 88].  Plasma drug concentration levels refer to the amount of the

---

Cir. 2006); *Merck & Co. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480, 484-85 (D. Del. 2002), *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003).

drug in the blood or plasma after administration, and serve as an indicator of drug availability *in the body (in vivo)*. [*Id.*]. Claim 7 of the '373 patent, thus, combines dosage form dissolution rate elements found in claim 1 of the '373 patent with MPH plasma concentration elements. Claim 6 of the '373 patent adds the requirement of a substantially ascending MPH plasma concentration for about 5.5 hours to the requirement of claim 1 of the '373 patent. [*Id.*]. Infringement of claims 6 and 7 of the '373 patent are addressed after the discussion of infringement of claim 1 of the '373 patent, *infra.*

### 2.    The '373 patent specification

Generally, the '373 patent specification describes treatment methods and dosage forms that maintain a desired therapeutic drug effect over a prolonged therapy period. [PFF ¶ 82]. While these improvements may be applied to a number of clinical situations and drug therapies, the specification focuses on the treatment of ADHD using MPH therapy. [*Id.*]. The claimed treatment methods offer many advantages over other known methods of treating these disorders, and, in particular, overcomes the problems that had prevented clinical acceptance of Ritalin SR®. [PFF ¶ 83].

## III.    INFRINGEMENT OF THE '373 PATENT

### A.    The Legal Standards For Infringement

A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States during the term of the patent…." 35 U.S.C. § 271(a); CL 5. Additionally, whoever actively induces infringement of a patent or sells a material for use in practicing a patented method is liable as an infringer. 35 U.S.C. § 271(b), (c); CL 13. In determining whether a patent has been infringed, the patent owner bears the burden of proof, and

15

must meet its burden by a "preponderance of the evidence" standard.[4]  *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n. 15 (Fed. Cir. 2005); *Pfizer Inc. v. Ranbaxy Labs Ltd.*, 405 F. Supp.2d 495, 510 (D. Del. 2005) *aff'd in part, rev'd in part*; 457 F.3d 1284 (Fed. Cir. 2006) CL 9.  A patent owner may establish infringement under either of two theories: literal infringement or the doctrine of equivalents.  CL 8.

ALZA will establish that the use of the Andrx ANDA products according to the proposed label for the Defendants' products will result in literal infringement of the asserted claims of the '373 patent.  Literal infringement exists if each element of at least one claim of a patent is met by the alleged infringer's product.  *Panduit Corp. v. Dennison Mfg. Corp.*, 836 F.2d 1329, 1330 n. 1 (Fed. Cir. 1987); *Merck*, 228 F. Supp.2d at 485 (D. Del. 2002); CL 8.  An accused method that *sometimes* meets all of the elements of the asserted claims infringes the claims.  *Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 622-23 (Fed. Cir 1995) ("an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."); CL 11.

To find infringement, the Court must undertake a two-step process.  First, it must determine the meaning of the claims as a matter of law.  This first step, i.e., claim construction, already has been done.  On October 5, 2007, the Court issued its Order construing the disputed language of the asserted claims in this case.  D.I. 130.  Second, the Court compares the properly construed claims to the allegedly infringing product or method to determine whether each element of the claims are present.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976,

---

[4]     A "preponderance of the evidence" means such evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not.  *Warner-Lambert*, 418 F.3d at 1341 n. 15; CL 9.

979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996); CL 7.  Infringement is a question of fact.  CL 12.

Where, as here, the infringement inquiry stems from an ANDA filing, the second step in the infringement determination focuses on *what is likely to be sold or used* following FDA approval.  *See Novartis Corp. v. Ben Venue Labs.*, Inc., 271 F.3d 1043, 1047 (Fed. Cir. 2001) ("the infringement inquiry focuses on the hypothetical infringement that would occur if the defendant's [A]NDA were approved and the Defendants began to make and sell the drug.");  CL 10.  As shown below, use of Defendants' products that are likely to be sold or used to treat ADHD will meet each and every element of the asserted claims of the '373 patent and, therefore, will literally infringe those claims.  In addition, Plaintiffs will demonstrate that Defendants' intended conduct upon FDA approval – primarily manufacturing, selling and distributing the ANDA products with instructions to use the products and thereby facilitate infringement – render Defendants liable for inducing and contributory infringement.

**B.      Literal Infringement Of Claim 1 Of The '373 Patent**

       **1.      <u>The Elements of Claim 1</u>**

Claim 1 of the '373 patent is directed to methods for treating ADHD with a single administration of a MPH composition that is specially formulated to provide an unconventional drug release profile.  In this regard, claim 1 reads:

> A method of treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

[PFF ¶ 87].  These methods provide an improved ADHD therapy for most patients by eliminating the need for multiple daily doses of MPH to effectively control symptoms throughout the day.  [PFF ¶ 82; PX 1, '373 patent, col. 5, lines 54-63].

17

Claim 1 has three elements:

(A)    A method for treating ADD or ADHD comprising:

(B)    administering a dosage form comprising MPH

C)    that provides a release of MPH at an ascending release rate
       over an extended period of time.

[PFF ¶ 210].  During the Markman proceedings, the parties agreed that claim 1 of the '373 patent

is directed to a method of treating ADHD using a *single* administration of MPH – more

specifically, "a *once-a-day* dosage form containing the drug MPH."  [PFF ¶ 211].  The Court

resolved the disputed aspects of the claim elements in its Markman rulings.  [D.I. 130, Markman

Order].

According to its proposed package insert, Defendants' method of treating ADHD using

the ANDA products calls for treatment of ADHD by administering the ANDA products to a

subject, thereby literally satisfying elements (A) and (B) of claim 1 of the '373 patent.  [PFF ¶¶

109, 213-216].  Infringement of claim 1 of the '373 patent thus turns on whether the ANDA

products provide an "ascending release rate over an extended period of time."  The results of in

vitro dissolution tests conducted on Defendants' products, which are consistent with Defendants'

own dissolution test results provided in the ANDAs, conclusively establish that each of the four

strengths of the ANDA products provides the requisite ascending release rate and thus literally

meets the requirements of Element (C) of the '373 patent.  [PFF ¶¶ 217-218].

##         2.      The Court's Construction Of The Ascending Release Rate
                   Element Of Claim 1 Of The '373 Patent

The Court's construction of "an ascending release rate over an extended period of time"

provides the methodology for determining whether the Defendants' products exhibit an

ascending release rate.  [D.I. 130, Markman Order, at p. 2].  Specifically, the drug release rates

of the ANDA products are to be determined "by an appropriate in-vitro dissolution test."  [*Id.*]. The results of an appropriate dissolution test are then to be assessed relative to what the Court has construed to be the requirements of an ascending rate of release.

**(a)    An "appropriate" dissolution test for the ANDA products**

Appropriate in vitro dissolution tests on samples of the ANDA products, performed by a qualified, independent testing laboratory, demonstrate that the products provide the ascending release rate of claim 1 of the '373 patent.  Indeed, Plaintiffs' dissolution test method used the *same* test conditions and procedure that Defendants included in its ANDAs, and which the FDA accepted, as being an appropriate dissolution test for the ANDA products.  [PFF ¶¶ 157-159].

An in vitro dissolution test is a routine laboratory test used to determine the dissolution rate of a drug, i.e., the amount of drug released over time, from a dosage form under controlled conditions.[5]  [PFF ¶ 127].  The equipment and methodologies typically used to conduct dissolution testing are discussed in detail in the USP[6] and are well-known to persons of ordinary skill in the art.  [PFF ¶¶ 129, 132].

In vitro dissolution tests are performed using a dissolution apparatus.  [PFF ¶ 128].  A dissolution apparatus is a device which generally includes a vessel (such as a glass cylinder) containing the liquid being used as the dissolution medium, and means to create a consistent flow

---

[5]  Generally, dissolution is the process by which a solid substance dissolves in a liquid to form a solution.  [PFF ¶ 126].  For drugs that are readily soluble, the amount of dissolved drug in the liquid is the same as the amount of drug released from the dosage form.  [*Id.*].

[6]  USP refers to the United States Pharmacopeia, a publication that includes the official standards and test methods, including dissolution tests, for the pharmaceutical industry in the United States.  [PFF ¶¶ 129-131].

19

of liquid across the dosage form being tested.  [*Id.*].  A standard dissolution apparatus called USP Apparatus 1 is illustrated below.



USP Apparatus 1:  Basket.

In a USP Apparatus 1 dissolution test, the dosage form is placed in a wire basket and submerged in the vessel containing the dissolution medium.  [PFF ¶ 137].  The apparatus is then operated to rotate the basket containing the dosage form at a specific rate.  [*Id.*].  Samples of the dissolution medium are withdrawn from the vessel at various times (such as hourly intervals), and the amount of drug present in each sample is measured by a suitable assay.  [PFF ¶¶ 128, 137-138].  This series of measurements provides a drug release profile for the dosage form, i.e., how much drug is released over time.[7]  [PFF ¶ 128].

---

[7]  Typically, a dissolution test provides the *cumulative* amount of drug released at each sampling time.  However, this data can easily be converted to "release rate" units (e.g., milligrams per hour) by simply calculating the amount of drug released between successive time points.  [PFF ¶¶ 168, 171].

Selection of an appropriate dissolution test method for the ANDA products is straightforward and routine. In this regard, both sides agree that the selection of an appropriate dissolution apparatus and test conditions for testing the ANDA products should follow the guidance and recommendations for dissolution testing set forth in the United States Pharmacopeia (the USP).[8] The USP recognizes several specific types of dissolution apparatuses as being appropriate for conducting dissolution testing, and provides specific guidance on the selection of suitable test conditions. [PFF ¶¶ 131-136].

In accordance with the guidance and recommendations in the USP, Plaintiffs' expert, Ms. Gray, determined that an appropriate dissolution test for the ANDA products would use a USP Apparatus 1 at an operating speed of 100 rpm, and a pH 7.5 dissolution medium at a temperature of 37º Celsius. [PFF ¶ 157]. Defendants elected to use the same testing apparatus and conditions (i.e., a USP Apparatus 1 at an operating speed of 100 rpm, a pH 7.5 dissolution medium at 37° C) to conduct dissolution testing of its drug products for purposes of supporting its ANDA, and submitted data generated through use of these testing conditions to the FDA. [PFF ¶¶ 158-159].

Like Defendants, Ms. Gray determined that use of the USP Apparatus 1 would be appropriate. [PFF ¶ 148]. This decision was based on how the ANDA products performed in the tests.[9] [PFF ¶¶ 134-136, 142-148]. Defendants experienced a significant problem in using the

---

[8]  Defendant's dissolution expert, Dr. Banakar, admitted during the Markman proceedings that an appropriate apparatus and conditions for the ANDA products "should be within the approved dissolution methods in the United States Pharmacopeia (USP), as this is the standard bearer for the pharmaceutical industry in terms of dissolution testing." [PFF ¶ 130, 132].

[9]  A USP App. 2 dissolution test is essentially the same as an App. 1 test, except that a paddle is used as a stirring element and the dosage form is allowed to sink to the bottom of the vessel.

USP Apparatus 2 tests when it tested its MPH tablets – the tablets were found to stick to the glass vessel, potentially interfering with the dissolution results.  [PFF ¶¶ 143-144].  The use of USP Apparatus 1 avoided this problem.  [PFF ¶¶ 145-146].

Two of the test conditions, operating speed (rpm) and dissolution medium temperature, naturally follow from the decision to use USP Apparatus 1.  In this regard, an operating speed of 100 rpm is the most common speed for USP Apparatus 1.  [PFF ¶ 151].  Similarly, a temperature of 37º C is the standard temperature for the dissolution medium when conducting USP Apparatus 1 tests.  [PFF ¶¶ 149].

The selection of an appropriate dissolution medium for a tablet necessarily must take into account how the product is designed to release the active ingredient – e.g., it would be pointless to conduct a test in a medium in which the tablet will not dissolve or otherwise release the active ingredient.  [PFF ¶¶ 152-153].  In the case of the ANDA products, the extended release portion of the tablet is specifically designed to release MPH only at a pH above 7.0.  [PFF ¶ 153].  Hence a pH 7.5 dissolution medium is appropriate for determining the dissolution rate of these tablets. [PFF ¶¶ 152-156].  In its own dissolution studies submitted to the FDA as a part of its ANDA, Defendants similarly used a pH 7.5 dissolution medium. [PFF ¶ 158, 182, 189 and 196].

REDACTED

---

[PFF ¶¶ 140].  In contrast, in a USP App. 1 test, the dosage form is placed in a wire basket and suspended in the medium, away from the vessel walls.  [PFF ¶¶ 146].

**REDACTED**

In sum, a dissolution test using USP Apparatus 1 at an operating speed of 100 rpm and pH 7.5 dissolution medium at a temperature of 37° Celsius is an appropriate dissolution test for the ANDA products.  [PFF ¶ 157].   This selection of test conditions is the same as that selected by Defendants for the purposes of generating data it later submitted to the FDA.  [PFF ¶158]. The FDA accepted these test conditions, and the dissolution data generated using these conditions, as being appropriate.  [PFF ¶ 159].  Thus, Defendants cannot seriously contest that these are appropriate test conditions for measuring the rate of release of the ANDA products.

> **(b)    The immediate release MPH is excluded before comparing the MPH release rate during periodic intervals of time**

The Court construed the ascending release rate element of Claim 1 to require that any immediate-release or "IR" portion of MPH be *excluded* in determining whether the dosage form has an ascending rate of release.  [D.I. 130, Markman Order, at p. 2].

Defendants' extended-release MPH tablets are designed to contain an IR portion and an extended release portion of MPH.  [PFF ¶ 111].  The IR portion consists of an outer immediate release layer of MPH on the tablet that rapidly dissolves in the low pH environment of the stomach.  [PFF ¶ 120].  The inside of the ANDA products (the tablet core) is designed to dissolve and gradually release MPH only in an environment having a pH above 7.0, such as what is often observed in the gastrointestinal ("GI") tract.  [PFF ¶ 120].  The outer IR layer of the

---

[10]  The USP guidance on dissolution testing of modified-release dosage forms states that the solubility characteristics of a formulation may require use of "buffered aqueous solutions (typically pH 4 to 8)" as the dissolution medium.  [PFF ¶ 155].  A buffer solution at a desired pH is a standard dissolution medium because it resists changes in pH after the dosage form is added. [*Id*.].

ANDA products is designed to contain 25% of the tablet's total MPH dose.  [PFF ¶ 112].  This is the IR portion that must be excluded from the measurement of the dissolution rates.  [See D.I. 130, Markman Order, at p. 2].  This is done by simply subtracting the amount of MPH contained in the IR portion of the ANDA products from the total quantity of MPH determined to be present in the dissolution medium as measured by the testing procedures.  [PFF ¶ 173].

### (c)      Determining that a Release Rate is Ascending

Once the MPH attributable to the IR portion is excluded, only a simple numerical comparison of the amount of MPH released during each interval of the testing period is required to demonstrate that the ANDA products exhibit an ascending release rate.  According to the Court's claim construction, a dosage form exhibits an ascending release rate for an extended period if the amount of MPH released from the dosage form increases through at least the "midpoint of the $T_{90}$" for the dosage form.  [D.I. 130, Markman Order, at p.2].  The starting point for measurement is the start of the dissolution test (i.e., where T=0). [*Id.*].  Additionally, the overall duration of ascension must be at least three hours.  [*Id.*].

Thus, to determine if the dosage form being tested exhibits an ascending release rate, the $T_{90}$ for each dosage form is first determined.  This is done by calculating at what time 90% of the amount of MPH contained in the dosage form has been released from the dosage form.  [PFF ¶ 174].  This number is then divided by two to determine the midpoint of the $T_{90}$.  [*Id.*].  Then, amounts of MPH released from the dosage form in each interval of time are measured and compared.  After subtracting the amount of MPH contained in the IR portion of the dosage form, if the amount released from the dosage form increases up to or beyond the midpoint of the $T_{90}$ and that period of time is at least 3 hours, the ascending release rate element of the claim 1 is met.  [D.I. 130, Markman Order, at p.2].

24

As will be shown, the ANDA products clearly show "an ascending release rate over an extended period of time" as required by claim 1 of the '373 patent.

### 3. Dissolution testing establishes that the ANDA products literally meet the release rate element of Claim 1

#### (a) The 54, 36 and 27 mg ANDA products

Analytical Research Laboratories ("ARL"), an independent analytical testing laboratory, performed in vitro dissolution tests on samples of the 54, 36 and 27 mg ANDA products using USP App. 1, 100 rpm, and 500 mL of pH 7.5 dissolution media at 37º C in accordance with a dissolution test protocol approved by Ms. Gray.[11]  [PFF ¶¶ 162-163].  Brian Walker, a laboratory technician and dissolution specialist employed by ARL, carried out these dissolution tests.  [PFF ¶ 166].  Upon completing the dissolution tests, ARL issued a report containing the test results for each of the 54 mg, 36 mg and 27 mg ANDA products.[12]  [PFF ¶ 169].  Ms. Gray confirmed that Brian Walker and ARL performed the in vitro dissolution tests on the ANDA products carefully and correctly, following the approved test procedure.  [PFF ¶ 166].

From the ARL dissolution results, Ms. Gray prepared a "Release Rate Evaluation" for each of the three dosage strengths tested in order to determine whether the ascending release rate requirement, Element (C), of claim 1 of the '373 patent was met.  [PFF ¶ 172].  As part of her release rate evaluation for each sample tested, Ms. Gray: (1) excluded the MPH attributable to IR

---

[11]  Defendants did not provide plaintiffs with representative samples of the 18 mg ANDA product because it has been unable to manufacture commercial-scale validated lots of the 18 mg tablets that meet the ANDA specifications for the product.  [PFF ¶ 161].

[12]  ARL's dissolution tests determined the cumulative amount of MPH released from each ANDA product during successive hourly intervals following initiation of the dissolution test. [PFF ¶¶ 167-168].

outer coating[13]; (2) determined the midpoint of the $T_{90}$; and (3) calculated the MPH release rate during successive hourly intervals from the first periodic interval (t=0-1 hr) through the tenth interval (t=9-10 hrs).  [See PFF ¶¶ 173-176].

As shown in the Release Rate Evaluations, Ms. Gray compared successive hourly interval with the immediately preceding interval and recorded whether the release rate increased from one interval to the next.  An example of the data for the 54 mg sample identified as "Cycle 1, Andrx A" in Ms. Gray's Release Rate Evaluation for the 54 mg ANDA products appears below [PFF ¶¶ 177-178; PX 241]:

| Periodic Interval (h) | Quantity of Drug Released (mg) (Excluding 13.5 mg IR) | Ascending Release Rate (Relative to Preceding Interval) |
|:---:|:---:|:---:|
| 0-1 | 0.99 | --- |
| 1-2 | 2.53 | YES |
| 2-3 | 4.94 | YES |
| 3-4 | 6.52 | YES |
| 4-5 | 6.20 | |
| 5-6 | 5.12 | |
| 6-7 | 5.56 | |
| 7-8 | 4.81 | |
| 8-9 | 4.22 | |
| 9-10 | -1.09 | |

As indicated on the complete data set for this 54 mg sample, Cycle 1, Andrx A had a measured $T_{90}$ of between 7 and 8 hours, and thus exhibited a midpoint of the $T_{90}$ between 3.5 and 4 hours.  [PFF ¶ 175-177].  And, as is evident from the release rate data above, this sample provided an ascending release rate for 4 hours, which thus shows an ascending release rate

---

[13]  The ANDA products are designed to contain 25% of their total MPH dose in the immediate-release outer coating.  [PFF ¶¶ 112].  The 54 mg, 36 mg, 27 mg and 18 mg ANDA products are designed to have 13.5 mg, 9 mg, 6.75 mg and 4.5 mg of MPH in the immediate-release outer coating, respectively.  [PFF ¶¶ 114-117].

26

through at least the midpoint of the $T_{90}$ (between 3.5 and 4 hrs) and is at least 3 hours.  Thus, this sample literally meets Element (C) of claim 1 of the '373 patent.  [See PFF ¶¶ 178-179].

Ms. Gray performed a similar evaluation for the twelve samples of each dosage strength (54 mg, 36 mg and 27 mg) tested by ARL.  [PFF ¶¶ 180, 187 and 194].  These results are summarized as follows:

- 54 mg:  nine of the twelve samples met Element (C).  [PFF ¶ 181]

- 36 mg:  eight of the twelve samples met Element (C).  [PFF ¶ 188]

- 27 mg:  all twelve samples met Element (C).  [PFF ¶ 195]

The results of Defendants' own in vitro dissolution tests on the ANDA products are fully consistent with and corroborate Plaintiffs' dissolution test results.  In this regard, Defendants' in vitro dissolution test results on the ANDA products included in the ANDAs used the same test conditions as Plaintiffs' tests – USP Apparatus 1, 100 rpm and pH 7.5 dissolution medium at 37º C.  [PFF ¶ 158].  Defendants did not measure the dissolution rate of its products at each one hour interval as ARL had done.  [PFF ¶¶ 183, 190 and 197].  Despite this, the results obtained by Defendants at each periodic interval at which it measured the dissolution rate show essentially the same amount of MPH released at that interval as shown by the results of testing reported by ARL.  [*Id.*].  A comparison of the average cumulative amount of MPH released at the common sampling times from the Defendants' ANDA and ARL dissolution tests, as well as the overall average dissolution profiles, establishes that the average dissolution results obtained by Defendants and ARL are essentially the same.  [PFF ¶¶ 183-185, 190-192 and 197-199].  Thus, the dissolution results that Defendants are relying on in seeking approval of the ANDA products

substantiate and confirm Plaintiffs' test results, and establish literal infringement by the ANDA products.  [PFF ¶¶ 186, 193 and 200].

**(b)     The 18 mg ANDA product**

The 18 mg ANDA products also meet the ascending release rate element of claim 1 of the '373 patent.  According to the ANDA, the composition of the 18 mg ANDA product is "proportionally equivalent" to, and the "same dosage form" as, the 54 mg ANDA product.  [PFF ¶ 201].  Since the 18 mg tablet is a scaled-down version of the 54 mg product, their dissolution release rate profiles would be substantially the same (under the same dissolution test conditions) and all, or nearly all of the 18 mg tablets would provide "an ascending release rate over an extended period of time," just as the 54 mg tablets do.  [PFF ¶¶ 201-203].

Defendants could not provide samples of their proposed 18 mg product for independent testing by Plaintiffs.  Defendants represented that commercial versions of its 18 mg products had not been manufactured, and thus could not be provided in response to requests for production of those samples by Plaintiffs.  [PFF ¶ 161].  Nonetheless, Defendants' own in vitro dissolution data contained in its ANDA confirms that the 18 mg dosage form of the ANDA products exhibit the required ascending release rate.  Specifically, the results in the ANDA of testing of twelve samples demonstrates that all twelve of these 18 mg ANDA products tested by Defendants meet the ascending release rate element of claim 1 of the '373 patent.  [PFF ¶¶ 203-209].

Ms. Gray analyzed Defendants' dissolution test results for the 18 mg tablets in the ANDA using the same approach as with the other three dosage strengths, except that hourly release data was not available.  [PFF ¶¶ 207-208].  Based on the available data, Ms. Gray used 8 hours as the $T_{90}$, and thus 4 hours as the midpoint of the $T_{90}$, for all of the 18 mg tablets.  [PFF ¶¶ 205-206].  This is a very conservative approach because it requires that the ascending release rate occur

through the midpoint of the $T_{100}$, which is longer than claim 1 actually requires (i.e., through the midpoint of the $T_{90}$). [PFF ¶ 205]. In addition, Ms. Gray used 2-hour periodic intervals since Defendants did take measurements at 2 hr and 4 hr. [PFF ¶ 208]. As shown in Ms. Gray's Release Rate Evaluation for the 18 mg ANDA products, all twelve of the 18 mg samples tested by Defendants provided an ascending release rate for at least 4 hours, which is through the midpoint of the $T_{90}$ (and at least 3 hours). [PFF ¶ 209].

In sum, appropriate in vitro dissolution tests on the ANDA products demonstrate that all, or nearly all, of the ANDA products provide "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent.

### 4.    Use of the ANDA products will literally infringe Claim 1

The evidence clearly establishes that use of the ANDA products as directed by Defendants in the prescribing information for its products (i.e., the package insert) will in a high percentage of the tablets meet each and every element of claim 1 of the '373 patent and, thus, literally infringe that claim. The three elements of claim 1 are: (A) a method for treating ADD or ADHD; (B) administering a dosage form comprising methylphenidate; and (C) provid[ing] a release of methylphenidate at an ascending release rate over an extended period of time. [PFF ¶ 210].

During the Markman proceedings, the parties agreed that claim 1 of the '373 patent is directed to a method of treating ADHD using "a once-a-day dosage form containing the drug MPH." *Supra*, p. 17. The fact that the ANDA products are "once-a-day" dosage forms should be undisputed: the package insert states that they are "extended-release tablet[s] for once-a-day oral administration." [PFF ¶ 106]. Nevertheless, for completeness, Plaintiffs will include this aspect of the ANDA products in the discussion of Element B below.

29

**Element (A) is met**.  Use of the ANDA products provides a "method for treating ADD or ADHD" as recited in claim 1.  The package insert for the ANDA products expressly states that the Defendants' products "are indicated for the treatment of Attention Deficit Hyperactivity Disorder (ADHD)."  [PFF ¶ 109].  Thus, the ANDA products provide a method for treating ADHD and literally meet Element (A) of claim 1 of the '373 patent.  [PFF ¶ 213].  See *Merck & Co. Inc. v. Teva Pharmaceuticals USA, Inc.*, 228 F. Supp.2d 480, 495 (D. Del. 2002) (Defendants' generic version of Fosomax® met the method of treatment element of Plaintiffs' patent claim).

**Element (B) is met**.  There is also no dispute that each of the ANDA products is a "pharmaceutical product that includes a dose of methylphenidate" in accordance with the proper construction of Element B.  [PFF ¶ 215-216; D.I. 130].  The ANDA products are extended-release tablets for once-a-day oral administration that contain an 18, 27, 36 or 54 mg dose of MPH, for use in treating ADHD.  [PFF ¶ 106].  When administered once-daily as directed by the package insert, the ANDA products provide a single daily dose of MPH.  [PFF ¶ 110].  Thus, use of the ANDA products literally meets Element (B) of claim 1 of the '373 patent.  [PFF ¶ 216].  *See Merck & Co.*, 228 F. Supp.2d at 495-96.

**Element (C) is met**.  As shown above, appropriate in vitro dissolution tests on samples of the ANDA products demonstrate that samples of each dose of the ANDA products provide "an ascending release rate over an extended period of time" as properly construed by the Court.  *Supra*, 18-30.  Use of the ANDA products literally meets Element (C) of claim 1 of the '373 patent.

In the event that FDA approves the ANDAs, the ANDA products will be marketed by Defendants and used, in accordance with the package insert, by patients, doctors and caregivers in the United States to treat ADHD.  [PFF ¶ 105].  See *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1047 (Fed. Cir. 2001) ("the infringement inquiry focuses on the hypothetical infringement that would occur if the defendant's [A]NDA were approved and the defendant began to make and sell the drug.").  As shown above, the use of ANDA products will result in each and every element of Claim 1 of the '373 patent being met.

Accordingly, Plaintiffs will prove, by a preponderance of the evidence, that use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products results in direct literal infringement of Claim 1 of the '373 patent.  See *Bell Comm. Research, Inc. v. Vitalink Comm. Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) ("an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."); CL 11.

### C.     Literal Infringement of '373 Patent Claims 6 and 7

#### 1.      The Proposed ANDA Products Literally Infringe Claims 6 and 7 of the '373 Patent

Claim 7 of the '373 patent is directed to methods for treating ADHD with a single dose of a MPH composition that is specially formulated to provide an unconventional drug plasma concentration time profile.  Claim 7 reads:

> The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration.

The claimed '373 patent methods provide an improved ADHD therapy by eliminating the need for multiple administrations of MPH to effectively control symptoms throughout the day. [PFF ¶ 82].  Claim 7 has only a single element: that the method result in "a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours

31

following said administration." [PFF ¶ 88].  Claim 6 has the same requirement for a period of

about 5.5 hours rather than 8 hours.  [*Id.*].  Defendants' products, and their use according to the

Defendants' proposed label, meet these elements because the ANDA products result in a

substantially ascending methylphenidate plasma drug concentration over a time period of both

about 8 hours and about 5.5 hours following said administration in subjects given the ANDA

product.  [PFF ¶¶ 236-260].

> **2.    The ANDA 54 mg Product Results In A Substantially
> Ascending Methylphenidate Plasma Drug Concentration Over
> A Time Period Of Both About 8 Hours and about 5.5 Hours
> Following Said Administration**

Claim 7 of the '373 patent is directed to methods of treating ADD or ADHD that provide

a "substantially ascending methylphenidate plasma drug concentration over a time period of

about 8 hours" in a person following administration of the claimed MPH composition.  [PFF ¶

88].  Claim 6 of the '373 patent imposes this same requirement for 5.5 hours rather than 8 hours.

[*Id.*].  This Court has found a "substantially ascending methylphenidate plasma drug

concentration over about [8 or 5.5] hours" is a MPH plasma concentration time profile that

generally increases over approximately 8 or 5.5 hours, respectively, but may include a slight dip.

[PFF ¶ 237]; [D.I. 130, Markman Order at 2].

It is well known to those of skill in the art that drug plasma concentrations will exhibit

some degree of inherent variability.  [PFF ¶ 251].  For example, even the same person given the

same drug product on successive days will exhibit slightly different plasma profiles on each

day.[14]  [*Id.*].  This inherent variability is a known and accepted factor in the field of

pharmacokinetics.  [*Id.*].

---

[14]    Defendant's R02-469 bioequivalence study shows that the same individual given the
same 54 mg ANDA product on two different days experiences a first dip on the first day that is,

A person of ordinary skill in the art, when determining whether a drug product will produce a particular blood plasma profile when administered to subjects, will review pharmacokinetic data from a representative number of subjects that actually have been administered the drug product, and had their blood plasma concentrations measured in accordance with accepted clinical pharmacokinetic testing procedures.  [PFF ¶ 238].  That person will consider both the individual plasma profiles as well as statistical analyses of the data, such as calculated means of the plasma profiles in various subpopulations of patients, to determine what type of plasma profile will be exhibited in a substantial population of patients that may be administered the drug product.  [*Id.*].

Indeed, this is precisely what Defendants did to convince the FDA that their ANDA products are bioequivalent to CONCERTA®.  [PFF ¶ 239].  Specifically, Defendants presented to the FDA both statistical analyses of various subpopulations of subjects administered their ANDA products (e.g., mean plasma profiles), as well as the individual measured plasma profiles of these subjects.  [*Id.*]  Defendants relied on the mean and individual data as part of their efforts to convince the FDA that their ANDA products will exhibit plasma concentration profiles sufficiently similar to CONCERTA® so as to justify finding these ANDA products bioequivalent to CONCERTA®.

As can be seen from Defendants' own representations to the FDA, which are supported by the data in Defendants' ANDA, a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 8 hours.  [PFF ¶ 231].  Likewise, this evidence demonstrates that a substantial

---

on average, different in size and timing from a first dip on the second day.  [PFF ¶ 251].  For example, in some patients, the size of the dip on the first day was greater than that observed on the second day by 14%.  [*Id.*].

population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 5.5 hours.  [PFF ¶ 231].  Thus, the evidence demonstrates that Defendants' product, when administered to subjects, produces both a substantially ascending MPH plasma profile for about 8 hours, thereby satisfying element C of claim 7 of the '373 patent, and a substantially ascending MPH plasma profile for about 5.5 hours, thereby satisfying claim 6 of the '373 patent.  [*Id.*].

**(a)     Defendants Represented to the FDA that their ANDA Products Exhibit Substantially Ascending MPH Plasma Concentrations for Both About 8 Hours and About 5.5 Hours**

Defendants have made representations to the FDA regarding the nature of the plasma profiles of its ANDA products.  [PFF ¶ 241].  These representations unequivocally demonstrate that the plasma profiles that result from administration of the ANDA products will be substantially ascending for both approximately 8 hours and approximately 5.5 hours.  [*Id.*].

Defendants have made these representations in a variety of contexts.  [PFF ¶ 242].  For example, Defendants presented mean MPH plasma profile data to the FDA in its ANDA showing that its products will exhibit a substantially ascending plasma concentration for time periods of approximately 8 hours.  [*Id.*].  As can be seen in the figure below, the ANDA products exhibit mean MPH plasma profiles that substantially ascend for about 8 hours.  [*Id.*].  The plasma profiles are means calculated from measured MPH plasma concentrations from two distinct sets of subjects who had been administered the ANDA products (labeled "A1: Test" and "A2: Test").  [*Id.*].  The figure also shows mean MPH plasma concentrations Defendant measured in subjects administered CONCERTA® (labeled in the graph as "B1: Reference" and "B2: Reference").  [*Id.*]. The figure shows that mean plasma profiles produced in subjects administered the ANDA products, like those observed for subjects administered CONCERTA®,

34

generally ascend for about 8 hours and include a slight dip.  [*Id.*].  The ANDA products can be

shown producing a mean peak MPH plasma concentration somewhere between 7 and 8 hours,

and generally maintain that MPH concentration through and past 8 hours after administration.

[*Id.*].



In addition to this graphical representation of the mean plasma concentration profiles,

Defendants provided tables in their ANDA reflecting the statistical analysis of the plasma

concentration measurements made in subjects administered the ANDA products.  [PFF ¶ 243].

Defendants reported a calculated mean peak MPH concentration as occurring between 7.0 and

7.1 hours after administration, with a standard deviation of approximately 1.07 hours.  [*Id.*].

Thus, as determined by Defendants, plasma profiles exhibited in substantial populations of

subjects given the ANDA product reached a maximum MPH concentration at approximately 8

hours after being administered the ANDA products.  [*Id.*].  *See Purdue Pharma, L.P. v. F.H.*

*Faulding and Co.*, 48 F. Supp.2d 420, 438 (D. Del. 1999) (finding that individual values for a

pharmacokinetic parameter "will be distributed around" and "in the vicinity of" the average

value and, therefore, that the pharmacokinetic value of the claim was met for some individual

patients).

Defendants further represented to the FDA that a patient who eats rather than skips

breakfast will have a mean plasma profile that substantially ascends for eight hours, as illustrated

by the A:Test profile below.  [PFF 243B].



Defendants further informed the FDA that the average patient who eats breakfast would reach

$T_{max}$ at 9 hours, with a standard deviation of 2.4 hours.  [PFF ¶ 243C].  Thus as determined by

Defendants, plasma profiles exhibited in the majority of subjects given the ANDA product who

eat breakfast reached a maximum MPH concentration well over eight hours after being

administered the ANDA products.  [*Id.*].

Defendants also specifically represented to the FDA that its products would be

bioequivalent to CONCERTA®, whether measured under conventional criteria or more stringent

criteria that compare the shape of the MPH plasma profile produced by its products relative to

36

the shape of the plasma profile produced by CONCERTA®[15].  [PFF ¶ 244].  Defendants

submitted the following graphical representation of mean plasma profile data from their ANDA

to the FDA for the purpose of demonstrating that its ANDA products (data points designated by

a "●") will produce plasma profiles essentially indistinguishable to those produced by

CONCERTA® (data points shown by "▲").  [*Id.*].



footnote separator

[15]     Defendants represented to the FDA in a communication dated March 25, 2004, that its products produced an Area-Under-the-Curve (AUC) and maximum blood concentration ($C_{max}$) between 80% to 125% of the AUC and $C_{max}$ criteria for CONCERTA®).  [PFF ¶ 244].  It further represented that its products would meet a more stringent assessment of bioequivalence that focused on the shape of the MPH plasma profile.  [*Id.*].  Specifically, Defendants asserted that when measured under a "partial area under the curve" or $AUC_{pr}$ perspective, their products were essentially indistinguishable from CONCERTA®.  [*Id.*].  The $AUC_{pr}$ is the "area under the curve up to the population median $T_{max}$" (i.e., the time at which the maximum concentration of MPH is observed).  [*Id.*].

[*Id.*]  Defendants synthesized this representation of its plasma profile data using a subset of the plasma profile data it generated incidental to bioequivalence testing of its ANDA product.  [PFF ¶ 246].  The representation it provided to the FDA is an "average" plasma profile based on a selected subset of the plasma test data in its ANDA.  [*Id.*].  The figure shown above compares that plasma profile to the plasma profile exhibited by Defendants' testing of CONCERTA®.  [*Id.*].  As can be seen, the figure shows a substantial degree of similarity in the shape of the plasma profiles associated with the ANDA product relative to plasma profiles associated with CONCERTA®.  [*Id.*].  In addition, the plasma profiles resulting from administration of the ANDA products shows ascension continuing to approximately 8 hours.  [*Id.*].

> **(b)    The Individual Plasma Concentration Data in Defendants' ANDA Demonstrates that a Substantial Population of Individuals Will Exhibit a Substantially Ascending MPH Plasma Concentration for Both About 8 Hours and About 5.5 Hours**

ALZA's pharmacokinetic expert, Dr. Angst, reviewed the individual MPH plasma concentration time profiles contained in Defendant's ANDA.  [PFF ¶ 247].  These profiles were the result of measured MPH concentrations over time in individuals who received the 54 mg ANDA product.  [*Id.*].  Given the variability of response in different patients, the plasma concentration profiles of individual patients are not uniform.  [*Id.*].  The variability can be observed from one patient to the next and even in the same patient from day to day.  [*Id.*].  Thus Dr. Angst's inquiry was focused on determining whether the individual plasma profile data support a conclusion that a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH plasma concentration for about 8 hours.  [*Id.*].

Based on his analysis of the individual plasma profiles in the ANDA, Dr. Angst determined that as many as 23 of the subjects tested in the studies exhibited a "substantially ascending methylphenidate plasma drug concentration over a time period of about eight hours" (the "8 hour exemplary profiles") [PFF ¶ 248].  After reviewing the profiles, Dr. Angst observed that each of these exemplary profiles generally increase over a period of approximately eight hours.  [*Id.*].  He also observed that each of these profiles over this period is substantially ascending.  [*Id.*].  For example, he characterized any decreases that were observed to occur within the periods of ascension of the exemplary profiles to be no more than slight dips.  [*Id.*].  He also observed that, while some profiles exhibited more than one slight dip, the overall profile remained substantially ascending.  [*Id.*].  A person of ordinary skill, reviewing the same data, would similarly conclude that the decreases in these plasma profiles were nothing more than a slight dip in accordance with the claim requirements.  [*Id.*].

Based on his analysis of the individual plasma profiles in the ANDA, Dr. Angst further determined that as many as 30 of the subjects tested in the studies exhibited a "substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours" (the "5.5 hour exemplary profiles") [PFF ¶ 249B].  As with his analysis of the 8 hour exemplary profiles, Dr. Angst observed that each of the 5.5 hour exemplary profiles generally increase over a period of approximately five and a half hours.  [*Id.*].  He also observed that each of these profiles over this period is substantially ascending. [*Id.*].  He also concluded that any dips that occurred within the period of ascension would be considered no more than slight dips by one of ordinary skill in the art. [*Id.*].

None of the 5.5 or 8 hour exemplary plasma profiles exhibit a dip comparable to the decrease seen in regimens based on multiple administrations of immediate release MPH

39

products.  [PFF ¶ 250].  These 35-40% decreases are troughs that reflect the lowest MPH plasma

concentration prior to the ascension that follows a successive administration of the immediate

release MPH dosage form.  [*Id.*].  The patent-in-suit illustrates troughs with the black (closed)

circle profile in Fig. 4, which shows two substantial decreases in MPH plasma concentration of

approximately 35-40%.  [*Id.*].

Accordingly, the evidence, including Defendants' mean analysis of its plasma profiles

and the 8 hour exemplary plasma profiles, clearly demonstrates that a substantial population of

individuals given the ANDA product will exhibit substantially ascending MPH plasma

concentration profiles for about 8 hours.  The requirements of claim 7 of the '373 patent are thus

met.

Likewise, the Defendants' mean analysis of its plasma profiles and the 5.5 hour

exemplary plasma profiles demonstrate that a substantial population of individuals given the

ANDA product will exhibit substantially ascending MPH plasma concentration profiles for about

5.5 hours.  The requirements of claim 6 of the '373 patent are thus met.

### 3.    Defendants' Proposed 18, 27, and 36 mg ANDA Products Will Be Administered In A Manner That Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of Both About 8 Hours and About 5.5 Hours Following Said Administration

The Defendants' ANDAs do not provide bioequivalence test data generated from testing

with the proposed 18, 27 and 36 mg ANDA products.  [PFF ¶ 257].  Nevertheless, the proposed

18, 27, and 36 mg ANDA products would result in substantially ascending MPH plasma

concentration time profiles for eight hours to the same extent as the proposed 54 mg ANDA

product.  [*Id.*].  The proposed 18, 27, and 36 mg ANDA products would also result in

40

substantially ascending MPH plasma concentration time profiles for five and a half hours to the same extent as the proposed 54 mg ANDA product.  [*Id.*].

MPH products are well known to exhibit linear pharmacokinetics.  [PFF ¶ 258]. Defendants' own expert, Dr. Mayersohn, has conceded this.  [*Id.*].  Because of this, one can reliably predict the plasma concentration time profile for an 18 mg dose simply by dividing the observed plasma concentration values for a 54 mg dose by three, because 18 mg is one third the dose of 54 mg.  [*Id.*].  Profiles for 27 and 36 mg doses can likewise be predicted from a 54 mg plasma concentration time profile by dividing by 2 and 1.5, respectively.  [*Id.*].  The CONCERTA® profile in Fig. 4 of the patent was obtained using individual plasma concentration time profiles that were scaled or "normalized" in exactly this way.  *Id.; see Purdue Pharma L.P. v. Endo Pharms., Inc.*, 2004 WL 26523 at *18 (S.D.N.Y 2004) ("Applying the concept of linear kinetics [to Endo's 40 mg dose], where a doubling of the dose results in a doubling of the blood plasma concentration, which experts from both Endo and Purdue accept as a viable method of determining blood plasma concentration [cites omitted], Endo's 10 mg, 20 mg, and 80 mg proposed drugs also infringe the pharmacokinetic claims of the patents in suit."), *aff'd*, 410 F.3d 690 (Fed. Cir. 2005), *withdrawn and superseded on other grounds*, 438 F.3d 1123 (2006).

The formulations of the 18, 27, and 36 mg ANDA products are sufficiently similar to the formulation for the 54 mg ANDA product that the former products would be expected to have this same, linear pharmacokinetic relationship with the latter product.  [PFF ¶ 259].

If the Defendants' ANDAs are approved by the FDA, the 18 mg, 27 mg, 36 mg, and 54 mg ANDA products will be used by patients, doctors and caregivers in the United States to treat ADHD in accordance with the prescribing instructions.  [PFF ¶ 260].  Following these

41

instructions, a substantial population of individuals given the ANDA product will exhibit substantially ascending MPH plasma concentration time profiles of about eight hours.  [*Id.*].  These plasma profiles establish that Defendants' products will result in methods that meet the requirements of claims 6 and 7 of the '373 patent.  [*Id.*].  ALZA, thus, has met its burden of proving, by a preponderance of the evidence, that following approval of the Defendants' ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of claims 6 and 7 of the '373 patent.  [*Id.*].

### D.    Defendants Will Induce Infringement Of The Asserted Claims

Defendants will actively induce infringement of the method of treatment claims of the '373 patent by marketing the ANDA product.  [PFF ¶¶ 263-267].  The legal standard for inducing infringement is well-known and often applied:  "In order to succeed on a claim of inducement, the patentee must show, first that there has been direct infringement, and second, that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement."  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005).

Direct infringement of a patent claim under 35 U.S.C. § 271(a) is a prerequisite to finding that a party has induced infringement of the claim.  CL 15.  Defendants, as a pharmaceutical manufacturer and distributor, do not themselves directly infringe the asserted claims because they do not prescribe or administer the ANDA products to individuals as a treatment for ADHD.  Rather, the direct infringers are persons who would administer or use the ANDA products as a method for treating ADHD – primarily doctors, patients and caregivers.  Plaintiffs have already proven that use of the ANDA products by such individuals will literally infringe the asserted claims.  *Supra*, Section III.  Thus, the requirement for direct infringement is satisfied.

Furthermore, there is no dispute that Defendants had knowledge of the patent-in-suit. Defendants admit that it knew of the '373 patent no later than August 16, 2005, before this litigation commenced.  [PFF ¶ 263].  Defendants were required to make certifications regarding the patent-in-suit.  Since there is no dispute that Defendants had knowledge of the patent-in-suit, Plaintiffs are simply required to show intent to encourage the acts constituting infringement.  *See Aventis Pharms., Inc. v. Barr Labs., Inc.*, 411 F. Supp.2d 490, 515 (D.N.J. 2006).

It is not contested that Defendants will manufacture and sell the ANDA products, along with instructions (in the form of a label or package insert) for using the products to treat ADHD.  [PFF ¶¶ 264-266].  The package insert for the ANDA products expressly sets forth the procedures to be followed by doctors, patients and caregivers in administering the ANDA products.  [PFF ¶ 266].  The ANDA products are to be used for a single purpose; namely, as a once-a-day treatment for ADHD.  And, the method of treatment which the Defendants direct doctors, caregivers and patients to follow via the package insert is the same method of treatment covered by the asserted claims of the '373 patent.  [*Id.*].

This evidence, standing alone, demonstrates the necessary intent to induce infringement.  As the Federal Circuit explained:

> Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use *or instructing how to engage in an infringing use*, show an affirmative intent that the product be used to infringe.

*MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1379 (Fed. Cir. 2005).

Thus, following FDA approval, Defendants' actions will clearly induce infringement of the asserted claims.  *See*, *e.g.*, *In re Omeprazole Patent Litigation*, 490 F. Supp.2d 381, 485-86

(S.D.N.Y. 2007) (finding defendant had induced infringement of patent claims based on product

insert for ANDA products); *CollaGenex Pharms., Inc. v. Ivax Corp.*, 375 F. Supp.2d 120, 135-36

(E.D.N.Y. 2005) ("those who purchase generic versions of the drug for use in accordance with

the label will be induced to infringe [plaintiff's] patent."); *see also Purdue Pharma L.P. v. F.H.*

*Faulding and Co.*, 48 F. Supp.2d 420, 441 (D. Del. 1999) (finding defendant would be liable for

inducing infringement of method claims based on product labeling instructing once-a-day use of

product to treat pain).

### E.    Defendants Are Liable for Contributory Infringement of the Asserted Claims

Defendants will also contributorily infringe the asserted claims of the '373 patent.  To

establish contributory infringement, Plaintiffs must show that Defendants knew that the method

of treating ADHD provided by use of the ANDA products was both patented and infringing, and

that the ANDA products are "not a staple article or commodity of commerce suitable for

substantial noninfringing use."  35 U.S.C. § 271(c); *see also Cross Med. Prods.,* 424 F.3d at

1312.

As with inducing infringement, a showing of direct infringement is necessary to finding

that Defendants will contributorily infringe the asserted claims of the '373 patent.  CL 18.

Plaintiffs have already proven that, following FDA approval, use of the ANDA products by

individuals, such as physicians and patients, will result in direct literal infringement of the

asserted claims.  *Supra*, Section III.  In addition, Defendants knew of the '373 patent, and knew

that use of the ANDA products would infringe that patent, at least as of September 1, 2005, the

date that this lawsuit was filed.  [PFF ¶ 9].  Thus, the "direct infringement" and "knowledge"

elements of Plaintiffs' claim for contributory infringement are satisfied.  *See Philips Elec. North*

*America Corp. v. Contec Corp.*, 411 F. Supp.2d 470, 476 n. 4 (D. Del. 2006).

44

The ANDA products also do not have a "substantial non-infringing use." [PFF ¶ 269]. Following FDA approval, the ANDA products will be approved *only* for use in treating ADHD in accordance with the package insert. [*Id.*]. The package insert does not state that the ANDA products are indicated for treating any other medical disorder or condition. [*Id.*]. As such, the ANDA products are not capable of a substantial non-infringing use. *See Phillips Elec.*, 411 F. Supp.2d at 476-77. All of the elements of contributory infringement are met.

Thus, following FDA approval, Defendants will be liable for contributory infringement of the asserted claims. *See In re Omeprazole Patent Litigation*, 490 F. Supp.2d at 485-86 (finding defendant ANDA-filer had contributed to infringement of patent claims); *Philips Elec.*, 411 F. Supp.2d at 476-77 (granting summary judgment of contributory infringement against defendant).

## IV.    CONCLUSION

For all of the foregoing reasons, Plaintiffs request entry of judgment that Defendants will infringe claim 1, 6 and 7 of the '373 patent. Plaintiffs also request that the Court (1) issue an order directing FDA that the effective date of any approval of ANDA Nos. 76-655 and 76-772 shall be no earlier than January 31, 2018, the date on which the patent-in-suit and the existing FDA (pediatric) exclusivity attached thereto expires, and (2) enjoin Defendants, and any successor-in-interest to the ANDAs, from manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, Methylphenidate Hydrochloride Extended-Release Tablets (54, 36, 27 and 18 mg) in accordance with ANDA Nos. 76-655 and 76-772 during the life (including applicable FDA exclusivity) of the '373 patent. 35 U.S.C. § 271(e)(4); *see, e.g., Celgene Corp. v. Teva Pharms. USA, Inc.*, 412 F. Supp. 2d 439, 441-42 (D.N.J. 2006).

45

ASHBY & GEDDES

*/s/ Steven J. Balick*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil PPC, Inc.*

*Of Counsel*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois  60603
312-853-7000

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C.  20005
202-736-8000

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood
Suite 3400
Dallas, TX  75201
214-981-3300

Dated:  November 2, 2007

# FINDINGS OF FACT

## I.    BACKGROUND

### A.    The Parties

1.    Plaintiff ALZA Corporation is incorporated in Delaware, having its principal place of business at 1900 Charleston Road, P.O. Box 7210, Mountain View, CA 94039-7210. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 1].

2.    Plaintiff McNeil-PPC, Inc. is organized under the laws of New Jersey, having a place of business at 7050 Camp Hill Road, Fort Washington, PA 19034.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 2].

3.    Defendant Andrx Pharmaceuticals, L.L.C. is organized under the laws of Delaware, having its principal place of business at 2945 West Corporate Lake Boulevard, Weston, FL 33331.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 3].

4.    Defendant Andrx Corporation is incorporated under the laws of the State of Delaware and has its principal place of business at 2945 West Corporate Lake Boulevard, Weston, FL 33331.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 4].

5.    Andrx Corporation is a wholly-owned subsidiary of Watson Pharmaceuticals, Inc., as a result of an acquisition completed on November 3, 2006.  [JDT (L. Rosenthal) 1122-23; JDT (B. Berry) 117].

6.    This action arises under the patent laws of the United States, Title 35 of the United States Code and the Abbreviated New Drug Application provisions of the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j).  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

7.    The Court has personal jurisdiction over Defendants.

8.    Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400.

**B.    The Nature Of The Dispute**

9.    This is a patent infringement case.  Plaintiffs ALZA and McNeil filed a Complaint against Defendants on September 1, 2005 alleging infringement of the '373 and '129 patents pursuant to 35 U.S.C. § 271(e)(2) and § 271(b).  [D.I. 1, Compl.; D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 12].[16]

10.    Plaintiffs contend, among other things, that Andrx's proposed generic versions of CONCERTA® that are the subject of two ANDAs submitted to FDA, i.e., extended release tablets containing methylphenidate (in 54 mg, 36 mg, 27 mg and 18 mg dosage strengths) for use in treating ADHD, and their use as directed in the prescribing instructions will result in direct infringement of claims 1, 6 and 7 of the '373 patent.  [D.I. 1, Compl.].

---

[16]    In the interest of streamlining this case for trial, plaintiffs will not assert infringement of the '129 patent at trial.

48

11.    Plaintiffs allege that, upon approval of the Andrx ANDAs, Andrx's activities relating to its manufacture, distribution, offering for sale and/or sale of its generic extended-release methylphenidate tablets in the United States will constitute contributory infringement and/or inducement of infringement of the asserted claims of the '373 patent. [D.I. 1, Compl., ¶¶ 64-73].

12.    Plaintiffs seek, as a remedy, an order directing FDA not to approve Andrx's ANDAs on a date earlier than the expiration dates of the '373 patent and related injunctive relief pursuant to 35 U.S.C. § 271(e)(4). [D.I. 1, Compl., ¶ F].

13.    On October 25, 2005, Defendants filed an Answer and Counterclaims denying infringement of the '373 and '129 patents, and alleging that the asserted claims of those patents are invalid under Sections 102, 103 and/or 112 of the Patent Laws, Title 35 U.S.C. [D.I. 7, Answer and Countercl., ¶¶ 74-81].

14.    On October 5, 2007, the Court issued its Markman Order construing the disputed language in the claims of the '373 patent. [D.I. 130].

## II.    ALZA DISCOVERS A NEW METHOD FOR TREATING ADHD ONCE-DAILY USING AN "ASCENDING" MPH DELIVERY PROFILE

### A.    ADHD: A Serious Disorder With Limited Treatment Options

15.    ADHD is a chronic neurobehavioral disorder affecting children and adults that is characterized by three main types of symptoms: inattention, hyperactivity and impulsiveness. [PX 538 at P ALZ 7997-98 and 008134; PX 417 at P ALZ 7729]. ADHD has been known by

49

several other names such as "minimal brain dysfunction," "hyperkinetic impulsive disorder" and "attention deficit disorder ("ADD")."  [Testimony of Dr. Guinta].

16.     Individuals with ADHD act without thinking, are hyperactive, and have trouble focusing or paying attention.  [Testimony of Dr. Guinta].

17.     ADHD is one of the most common mental disorders affecting children.  A conservative estimate is that between 3-5% of children in the United States have ADHD.  [PX 417 at P ALZ 7729; Testimony of Dr. Guinta].

18.     There is no cure for ADHD.  The majority of children diagnosed with ADHD will continue to have the disorder as adults.  [Testimony of Dr. Guinta].

19.     ADHD is a particularly serious problem for school-age children.  Behavioral problems arising from ADHD can impede learning and interfere with social development, such as the ability to make and keep friends or participate in sports.  [PX 417 at P ALZ 7730; DTX 73, C94-007-01 study at ALZ98908].

20.     In adults, ADHD can lead to poor occupational performance, antisocial behavior, and family dysfunction.  [Testimony of Dr. Guinta].

21.     If untreated, children with ADHD often are given extensive negative feedback from teachers, parents, and peers and are at a higher risk of repeating grades and placement in special education classes.  In both children and adults, the disorder can have long-term adverse

effects such as academic failure and permanent damage to self-confidence and self-esteem.
[Testimony of Dr. Guinta].

22.    The most frequently prescribed medications for managing the symptoms
associated with ADHD are central nervous system stimulants, such as MPH and amphetamines.
[PX 417 at P ALZ 7730].

23.    MPH is categorized as a schedule II controlled substance by the Drug
Enforcement Administration ("DEA").  MPH products are only available by prescription, and
distribution is carefully controlled and regulated by the DEA.  [Testimony of Dr. Guinta].

24.    Stimulant medications such as MPH exhibit side effects, which increase in
frequency and severity in proportion to the dosage of the medication being taken, *i.e.* higher
doses produce more frequent and more pronounced side effects.   [Testimony of Dr. Guinta; PX
419 (Gualtieri et al., Ther. Drug Monitoring 6:379-392 (1984)) at PALZ 7767].

25.    The most common side effects associated with MPH products are decreased
appetite, insomnia, increased anxiety, and/or irritability.  [PX 417 at P ALZ 7736; PX 418 at P
ALZ 7758; PX 428 at p. 456 (from the filed specification for U.S. Patent Application No.
10/726,024)].

26.    Limiting side effects is an important consideration in designing methods for
treating ADHD with MPH, particularly in children.  Certain side effects, such as insomnia,
increased anxiety and irritability, can exacerbate behavioral problems in children who have

51

ADHD. Appetite suppression in children can lead to growth-related problems in long-term MPH treatment regimens.  [Testimony of Dr. Guinta].

27.    Prior to CONCERTA®'s entrance to the pharmaceutical market, the only available MPH dosage forms for treating ADHD were Ritalin®, Ritalin SR®, and generic versions of these two products.  [Testimony of Dr. Guinta].

28.    Ritalin® is an immediate-release MPH product that was first introduced by Ciba-Geigy in 1955.  [Testimony of Dr. Patrick].

29.    Following its introduction, Ritalin® rapidly became the most commonly prescribed treatment for ADHD, establishing MPH as the preferred agent for treating ADHD as compared to other agents, such as amphetamines, which were viewed at the time as being unsafe. [DTX 630 at p. 8-9].

30.    Immediate release MPH products such as Ritalin® effectively controls ADHD symptoms for about 3 to 5 hours, with the greatest degree of effectiveness occurring over the first 1-2 hours after administration.  [PX 574 at p.1].

31.    An "immediate release" MPH releases all of the MPH contained in the dosage form within minutes of ingestion, making essentially all of the drug in the dosage form available for absorption in the body within a short period of time after ingestion.  [PX 1, col. 2, lines 6-9].

32.      Following ingestion of an immediate release MPH product, plasma levels of MPH rise rapidly, reaching a peak concentration within about 2 hours, and then rapidly decrease as the drug is eliminated by the body.  [PX 413 at P ALZ 7704-05].

33.      Due to their short duration of efficacy, individuals being treated with immediate release MPH products usually require multiple doses to be administered during the day to adequately control their symptoms.  [PX 413 at P ALZ 7704-05; PX 134 at ALZ 24092].  For children in school, this dosing schedule often requires that they receive at least one dose of an intermediate release MPH product while in school.

34.      When multiple doses of an intermediate release MPH product are administered to a subject during the day, a "sawtooth" plasma profile pattern is produced, as illustrated in the figure below.  (The figure illustrates the plasma MPH concentration-time profiles for immediate release MPH products administered twice daily and two sustained release MPH dosage forms (Ritalin SR® and a generic version) administered once daily.  [*See* PX 137 at p. 170].  After ingestion of a dose of an intermediate release MPH product, the MPH plasma concentration in the patient ascends rapidly reaching a peak within about 2 hours, then rapidly decreases after reaching the peak concentration.  Each successive dose causes a similar rapid ascension and decline of the plasma concentration.



35.    The highest concentrations of MPH produced in a person that has been administered multiple doses of immediate release MPH products are termed "peaks" while the lowest concentrations observed after each peak is termed a "trough."

36.    The "sawtooth" profile is also referred to as a "peak and valley" curve reflecting its overall shape.  [Mayersohn Tr. 29: 4-12].

37.    MPH is a controlled substance, which makes the administration of MPH products to children during the school day difficult to manage and control.  [PX 134 at ALZ 24093].  This, in turn, causes significant problems in achieving compliance by the school-aged children that had been prescribed treatment with an MPH regimen.  [DTX 73 at ALZ00098909].

38.    One of the problems associated with use of immediate release MPH products is that a school nurse or administrator ordinarily must handle and administer the drug, rather than allowing the children to "self-medicate."  In order to receive a dose of MPH medication, students must leave class and visit the school nurse each day.  This disrupts their classroom activity and subjects them to potential peer ridicule and social exclusion.  The school must also maintain and monitor a secure storage location to avoid theft of the medication.  [Testimony of Dr. Guinta].

39.     Children who are allowed to self-administer medication at school also face many difficulties.  One symptom of ADHD is lack of attentiveness, which contributes to the inability of a person affected with ADHD to properly self-medicate.  In addition, negative peer pressure can cause a child to not properly self-medicate.  These difficulties and pressures can cause students to not take their medication at school, or to not take the medication on the correct schedule, raising both serious compliance issues and increasing the incidence of side effects.  In addition, there are serious risks of drug diversion and abuse in settings where the drug is to be administered outside the supervision of adults.  [Testimony of Dr. Guinta].

40.     Before the invention, there was a significant need in the market for a therapeutically effective single-administration, long acting MPH drug product that did not have significant side effects, and addressed compliance problems associated with MPH treatment regimens requiring multiple administrations of methylphenidate during the day.  [Testimony of Dr. Guinta].

41.     In 1983, more than 20 years after it introduced Ritalin®, Ciba-Geigy introduced Ritalin SR®.  Ritalin SR® is a sustained-release, wax matrix MPH dosage form that releases MPH at a generally descending release rate over time.  [Testimony of Dr. Davies; PX 334 (Erramouspe et al., Ann. Pharmacother. 31(10): 1123-1126 (1997)) at P ALZ 006857; PX 335 (Erramouspe et al., J. Pharm. Tech. 14: 209-211 (1998)) at P ALZ 006863; PX 337 (Hui et al., "Design and Fabrication of Oral Controlled Release Drug Delivery Systems," Chp. 9, pp. 373-431 in Robinson et al., Controlled Drug Delivery Fundamentals and Applications, 2d (1987)) at p. 390 (P ALZ 006876); PX 410 at ¶ 35; PX 574 at p. 1; PX 417 at P ALZ 7735].  Ritalin SR® was marketed as being effective at controlling symptoms for about 8 hours, i.e. an alternative to

55

treatment regimens based on twice-daily administration of Ritalin®, and as providing an effective, once-a-day MPH treatment option.  [*Id.*].

42.     The blood plasma concentration profile of individuals administered Ritalin SR® rises gradually, reaching a $C_{max}$ within 3 to 4 hours.  After reaching the $C_{max}$, the blood plasma concentration remains relatively level for approximately two hours, and then starts to rapidly decline by about 5 to 6 hours after administration.  [PFF ¶ 34].

43.     Ritalin SR® was never widely accepted as a once-a-day treatment for ADHD.  [JDT (J. Swanson) 1262-1264, 1293].  This is evidenced by its infrequent use by practitioners and its low sales.  [Testimony of Dr. Rozek].

44.     One reason for the lack of commercial acceptance of Ritalin SR® is that in many individuals, Ritalin SR® proved to be unreliable and ineffective at controlling ADHD symptoms over the course of a day when compared to treatment regimens based on multiple daily administrations of an immediate release MPH product.  [Testimony of Dr. Guinta].

45.     At the time of the invention, it was not known why Ritalin SR® was not as effective as treatment using a regimen involving multiple administrations of immediate release MPH products during the day.  [Testimony of Dr. Guinta; Testimony of Dr. Patrick].  While a variety of hypotheses were advanced, prior to the invention, none had been shown to be the reason for the lack of effectiveness of Ritalin SR® relative to regimens based on immediate release MPH products.  [Testimony of Dr. Guinta; JDT (J. Swanson) 1293-1294].

46.     At the time of the invention, due to the failure of Ritalin SR®, the state of the art in treating ADHD using MPH remained essentially where it had been 30 years earlier. Specifically, the standard of care remained treatment regimens in which multiple doses of immediate release MPH were administered two or three times a day. [Testimony of Dr. Guinta; Testimony of Dr. Patrick].

### B.    ALZA Scientists Discover The First Reliably Effective Once-A-Day MPH Treatment For ADHD

47.     Ritalin SR® failed to respond to the need for an effective once-a-day MPH drug product. In light of this need, ALZA began investigations into development of a once-a-day MPH drug product. [Testimony of Dr. Guinta; JDT (L. Hamel) 712-716, 718-724; JDT (S. Saks) 1047-1052, 1064-1065].

48.     ALZA employees Diane Guinta, Samuel Saks, Suneel Gupta, Carol Christopher, and Lawrence Hamel were part of the company's MPH product development program, which began in 1993. As part of the MPH project, Ritalin SR® and its properties were studied. [Testimony of Dr. Guinta].

49.     ALZA also consulted with experts in the fields of psychiatry and neurology in the early 1990s about the needs in the market for an effective, safe, once-a-day extended release drug product to treat ADHD, about their experiences with using Ritalin SR®, and their experiences with treatment of ADHD patients using methylphenidate and other drugs. [Testimony of Dr. Guinta; JDT (L. Hamel) 718-719; JDT (J. Swanson) 1265-1266].

50.     The ALZA inventors learned that people within the ADHD community had found Ritalin SR® to not provide a viable solution to the need for a once-a-day MPH drug product. [JDT (L. Hamel) 720-721].

51.     In 1994, Drs. Guinta and Gupta, working with others, designed a clinical study protocol to elucidate why a relatively constant MPH plasma concentration-time profile did not provide consistently effective treatment of ADHD.  [JDT (L. Hamel) 720-724; JDT (S. Saks) 1064-1065].  ALZA retained Dr. James Swanson, who ran a laboratory school for ADHD-diagnosed children, to assist the company in conducting these clinical studies involving MPH. [Testimony of Dr. Guinta; JDT (J. Swanson) 1271:22 – 1272:6].

52.     The clinical studies were referred to as a "sipping study" because small amounts of MPH were administered throughout the day to achieve the desired MPH plasma concentration-time profiles.  [Testimony of Dr. Guinta].

53.     The ALZA scientists designed three different arms of a clinical trial in an attempt to discover why Ritalin SR® failed to provide therapeutic effectiveness over the course of a school-day as compared to twice-a-day regimens using immediate release forms of Ritalin®. [Testimony of Dr. Guinta].

54.     The clinical study compared the therapeutic effectiveness of three different pharmacokinetic profiles.  [JDT (S. Saks) 1064-1065; JDT (J. Swanson) 1272: 11-22; DTX 73]. Each arm of the study as designed – corresponding to three different plasma profiles – delivered the same total daily dose of MPH to each subject.  [DTX 73 at ALZ98909-98910].

55.     The first plasma profile modeled the conventional twice-a-day administration of Ritalin®. [DTX 73 at ALZ98909]. This arm of the study called for administering to each of the subjects two doses of immediate release MPH with a 4.5 hour window between each administration. [*Id.*]. This regimen corresponded to the "standard of care" for treating ADHD at the time. [Testimony of Dr. Guinta].

56.     The second profile (the "flat" profile) was designed to rapidly reach a peak MPH plasma concentration (equivalent to 80% of the first Ritalin® dose) and then maintain that plasma concentration as a flat profile for about 8 hours. [DTX 73 at ALZ98909-98910]. This profile was designed to model an optimized sustained-release dosage form profile that would have no fluctuations in the MPH plasma concentration after reaching the peak MPH plasma concentration. [JDT (L. Hamel) 747; Testimony of Dr. Guinta].

57.     One purpose of the second arm of the study was to determine if problems in the therapeutic effectiveness of the Ritalin SR® were attributable to the formulation used in the Ritalin SR® drug product. [Testimony of Dr. Guinta]. Prior to analyzing the results from the sipping study, some people at ALZA assumed that the flat profile would be the most efficacious. [JDT (L. Hamel) 757].

58.     Dr. Gupta suggested that a new approach be studied in the sipping studies, referred to as an ascending profile, in which plasma concentration levels of MPH would generally be increased (instead of leveling off) and reach a peak MPH concentration at or after about 8 hours. This ascending profile was designed to determine whether therapeutic effectiveness could be achieved and how it might compare to effectiveness associated with

twice-daily Ritalin® and essentially constant MPH plasma profiles. [JDT (S. Saks) 1064-1065; Testimony of Dr. Guinta].

59.    The first sipping study was a double-blind, randomized, placebo-controlled crossover trial in which thirty-six children with ADHD, aged 7 to 12, participated. [DTX 73 at ALZ98911]. Thirty-one children completed the study. [*Id.*].

60.    During the day, the children were in a classroom setting and measures of each child's behavior and cognitive performance were collected under the supervision of Dr. James Swanson and others. [*Id.* at ALZ98910].

61.    Data concerning effectiveness in controlling ADHD symptoms was produced and analyzed in the first sipping study. The ALZA scientists surprisingly discovered that the conventional flat profile did not provide adequate control of ADHD symptoms throughout the treatment period. [DTX 73; Testimony of Dr. Guinta].

62.    The ALZA scientists also surprisingly discovered that the ascending profile provided greater efficacy throughout the treatment period than the constant plasma profile, and that its efficacy approached the effectiveness of the conventional twice-a-day administration of immediate release Ritalin®. [*Id.*]. The discovery was contrary to the notion that two bolus administrations of Ritalin® resulting in two sharp peaks of high drug concentration were essential, and that the blood concentration of methylphenidate had to drop sharply between the doses in order for the second dose to be effective. [Testimony of Dr. Guinta; PX 428 at p. 456-57].

63.     The ALZA scientists were also surprised to learn that the ascending profile did not lead to a higher incidence of side effects relative to the level of side effects seen with the arm that modeled the twice-daily Ritalin® regimen, which produces a "sawtooth" plasma profile. [*Id.*].

64.     Due to the age of the patient population receiving the MPH, *i.e.* pre-adolescent children, side effects were a major concern for physicians prescribing MPH dosage forms and for the ALZA scientists working on the sipping study.  [Testimony of Dr. Guinta].

65.     Prior to the invention, the conventional practice for physicians treating ADHD with MPH, particularly in children, was to prescribe the lowest amount of MPH that yielded a positive response.  In addition, when prescribing Ritalin® three-times-a-day, the conventional practice was to have the morning and noon dose be equivalent, and the third dose be half the amount of the previous dose. [JDT (S. Gupta) 633-634].  Use of an ascending MPH delivery profile – generally increasing MPH plasma concentration levels over time – was directly contrary to these conventional and accepted practices.  [*Id.*].

66.     Following the first sipping study, ALZA conducted market research and surveyed parents of children with ADHD.  ALZA discovered that a majority of children required three or more doses of Ritalin® over the course of a day to maintain effective control of ADHD symptoms over this period.  [JDT (L. Hamel) 725-726; JDT (J. Swanson) 1275:13-24].

67.     In 1995, another sipping study was designed and conducted (the "second sipping study").  [Testimony of Dr. Guinta].

61

68.    In the second sipping study, an ascending MPH plasma profile (different from the one in the first sipping study) was compared to a profile which modeled administration of immediate release Ritalin® three times a day, with a four hour window between administrations.

69.    The ascending profile in the second sipping study provided for an increased amount of MPH in the subject within the first hour as compared to the amount provided in the same period in the ascending profile in the first sipping study.  This additional amount delivered to the patient was provided to determine if it was possible to improve the control of ADHD symptoms in the early hours of treatment.  [Testimony of Dr. Guinta].

70.    The second sipping study showed that the ascending profile tested was as effective in treating ADHD by administering immediate release Ritalin® three-times-a-day.  It also showed that the number of side effects were essentially the same for the Ritalin® profile and the ascending profile.  [Testimony of Dr. Guinta].

71.    ALZA's discovery that an ascending MPH delivery profile could be used to provide effective, once-daily treatment ADHD without significant side effects was contrary to the conventional wisdom that suggested that a "flat profile" is the most desired approach to delivering drugs via extended release formulations.  [PX 1, '373 patent, col. 2, line 64 to col. 3, line 13; Testimony of Dr. Guinta; JDT (S. Gupta) 633-634; JDT (L. Hamel) 747].  Prior to ALZA's discovery, it was believed that a substantially constant plasma concentration would minimize side effects by avoiding high peaks in MPH concentration, thus providing a balance of desired and undesired pharmacological effects.  [PX 1, col. 2, line 64 to col. 3, line 13; Testimony of Dr. Guinta; Testimony of Dr. Patrick].

62

72.    ALZA's discovery was also contrary to experience gained from studying treatment regimens in which immediate release MPH products were administered twice or three times during the day.  [JDT (S. Gupta) 634-635].  Previous studies suggested that two or three sharp peaks of a relatively high MPH plasma concentration were essential, and that the blood concentration of MPH had to drop sharply between successive doses in order for the next dose to be effective.  [PX 428 at p. 456-57 (from the filed specification for U.S. Patent Application No. 10/726,024)].

73.    Once the ALZA scientists made the breakthrough discovery of learning that the ascending profile would achieve the desired longer-term treatment of ADHD without increasing the frequency or severity of side effects, they turned to development of a commercial MPH formulation that would release MPH in increasing amounts over an extended period and provide this ascending MPH plasma profile for use as a once-a-day treatment for ADHD.  [JDT (A. Ayer) 31-33 and 37; Testimony of Dr. Guinta].

74.    The ALZA scientists were the first to solve the problems that plagued Ritalin SR®, and their work paved the way for the development of CONCERTA® - a drug product that has proven to be at least as effective as administering two or three doses of immediate release MPH products, and has become the standard of care for treatment of ADHD patients.  Currently, CONCERTA® is the most prescribed MPH product for the treatment of ADHD.  [Testimony of Dr. Rozek; PX 499-502, 504-510].  In fact, annual sales of CONCERTA® in the U.S. are in excess of $900 million and growing, with CONCERTA® sales expected to reach the $1.0 billion/yr mark and "blockbuster" status in about a year.  [*Id.*].

### C.    ALZA Obtains The '373 Patent

75.    Following ALZA's discovery that delivering MPH at an ascending release rate and/or achieving a substantially ascending methylphenidate blood plasma concentration over time were beneficial in the treatment of ADD/ADHD, ALZA sought patent protection for the methods of treating ADD/ADHD.

76.    To secure patent rights in the United States, ALZA first filed provisional applications on November 12, 1996, November 25, 1996, and April 22, 1997, which were assigned provisional application serial numbers 60/030,514 ("the '514 provisional application"), 60/031,741 ("the '741 provisional application"), and 60/044,121 ("the '121 provisional application"), respectively. [PX 3-PX 5].

77.    These provisional applications, along with non-provisional applications, eventually led to the '373 patent, which contained a number of inventions related to the treatment of ADD/ADHD.  [PX 1-PX 2].

78.    The '373 patent was filed on February 19, 1999.  The '373 patent issued on July 19, 2005[17].  [PX 1].

79.    The '373 patent is a continuation-in-part ("CIP") of U.S. patent application serial number 09/070,666 ("the '666 application) which was a continuation ("CON") of U.S. patent application number 08/910,593 ("the '593 application").  The '373 patent is also a CIP of U.S.

_____

[17] The inventorship was corrected on April 29, 2007 for the '373 patent .  Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright, and Richard Weyers were removed as inventors of the '373 patent.

patent application number 08/967,606 ("the '606 application) and U.S. patent application number 08/937,336 "the '336 application").  [PX 1].

80.    Number not used.

81.    Number not used.

82.    Generally, the specification of the '373 patent describes improvements in treatment methods and dosage forms that provide and maintain a desired therapeutic drug effect over a prolonged therapy period.  While these improvements may be applied to a number of clinical situations and drug therapies, the specification focuses on the treatment of ADD and ADHD using MPH.  These methods provide an improved ADD and ADHD therapy for most patients by eliminating the need for multiple daily doses of MPH to effectively control symptoms throughout the day.  [PX 1, col. 5, line 28 to col. 7, line 58].

83.    The claimed treatment methods offer many advantages over known methods of treating ADD and ADHD, and overcome the problems that had prevented clinical acceptance of Ritalin SR®.  [PX 1, col. 7, lines 14-25 and lines 35-50; col. 13, lines 45-54].

84.    All of the claims of the patent-in-suit are directed to methods for treating ADD or ADHD by providing the specified profile via a single morning administration of MPH, *i.e.*, a single administration in the morning of one or more dosage forms that each release the MPH according to the claimed profile, or a single administration of one or more pharmaceutical

compositions that results in the MPH plasma concentrations specified in the claims.  [PX 1, col. 5, lines 54-63, col. 23, line 11 to col. 24, line 21; PX 2, col. 23, line 11 to col. 24, line 21].

85.    The specification states that any suitable pharmaceutical composition may be used to provide the claimed ascending profiles:

> Although the present invention is illustrated herein by exemplary dosage forms containing specific exemplary drugs, methods of making such dosage forms and methods of using methylphenidate-containing dosage forms to provide a desired therapeutic outcome, the invention is not limited by the exemplary embodiments.  *The invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period*, methods of making such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in the art in view of the disclosure herein.

[*See*, PX 1, col. 6, lines 1-14 (emphasis added); *see also* col. 23, lines 5-10].

86.    The specification goes on to expressly describe numerous types of non-osmotic oral sustained release dosage forms that can deliver the required ascending profile:

> There are many approaches to achieving sustained release of drugs from oral dosage forms known in the art.  These different approaches include, for example, diffusion systems such as reservoir devices and matrix devices, dissolution systems such as encapsulated dissolution systems (including, for example, "tiny time pills") and matrix dissolution systems, combination diffusion/dissolution systems, osmotic systems and ion-exchange resin systems….

[PX 1, col. 2, lines 51-62].

87.    Claim 1 of the '373 patent covers methods of treating ADD or ADHD by administering a dosage form comprising MPH, wherein the dosage form releases MPH at an ascending release rate over an extended period of time:

> 1. A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

[PX 1, col. 23, lines 12-16].

88.    Dependent claims 6 and 7 of the '373 patent cover methods for treating ADD or ADHD by administering a dosage form comprising MPH, wherein the dosage form provides a substantially ascending MPH plasma drug concentration over a time period of about 5.5 hours and about 8 hours following administration of the dosage form:

> 6.    The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours following said administration.

> 7.    The method of claim 1 wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration.

[PX 1, col. 24, lines 9-17].  Plasma drug concentration levels refer to the amount of the drug in the blood or plasma after administration.  [PX 1, col. 1, lines 42-53].

89.    The '373 patent claims priority to the '514 provisional application, the '741 provisional application, and the '121 provisional application.  [PX 1-2].

90.    The PTO issued the '373 patent titled "Methods and Devices for Providing Prolonged Drug Therapy" on July 19, 2005.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 5].

91.    Number not used.

67

92.     Plaintiff ALZA is the current assignee of the '373 patent.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 7].  ALZA owns all rights, title and interest in the '373 patent, including all rights needed to enforce the '373 patent.

93.     ALZA holds approved New Drug Application ("NDA") No. 21-121 for methylphenidate hydrochloride, which is marketed under the tradename CONCERTA® in the United States.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 8].

94.     ALZA's NDA identifies the '373 patent as a patent "with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale" of CONCERTA®, and the FDA accordingly listed that patent in its list of Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book").  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 9].

95.     ALZA manufactures, and Mc-Neil PPC is the sole authorized distributor of CONCERTA®.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 10].

## III.    THE ANDRX ANDAs AND ANDRX'S PROPOSED GENERIC PRODUCTS

### A.    ANDA Nos. 76-665 And 76-772

96.     Andrx Pharmaceuticals, L.L.C. submitted ANDA Nos. 76-665 and 76-772, which reference Plaintiffs' NDA 21-121, to the FDA seeking approval to market generic versions of all dosage strengths of CONCERTA® for the treatment of ADHD.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 11; see PX 209 at ANDRX 18; PX 25 at ANDRX 03878].

68

97.     Following issuance of the '373 patent, Andrx amended those ANDAs to add certifications under 21 U.S.C. §355(j)(2)(A)(vii)(IV) (referred to as "Paragraph IV certifications") indicating that Andrx intended to market its generic versions of CONCERTA® prior to the expiration of the '373 patent. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 11].

98.     Andrx ANDA No. 76-665 is directed to 54 mg extended release methylphenidate tablets that are represented to be both "pharmaceutically equivalent" and "bioequivalent" to the 54 mg CONCERTA® product. [PX 209 at ANDRX 02; see JDT (X. Cheng) 276, lines 17-22 and 278, lines 12-15].

99.     Andrx ANDA No. 76-665 includes the results of two bioequivalence studies: a single-dose, fasting study designated R02-469 and a food-effect study designated R02-470. [PX 210 at Andrx 00195-97; *see also* PX 294 (portion of ANDA containing R02-469 study); PX 293 (portion of ANDA containing R02-470 study)].

100.    The results of the Andrx bioequivalence studies include a total of 77 plasma concentration-time profiles exhibited by individuals who received the 54 mg ANDA product. [*See* PX 293 at ANDRX 1034-35 (showing 23 plasma concentration time profiles)); PX 294 at ANDRX 2265-66 (showing 27 plasma concentration time profiles); PX 294 at ANDRX 2267-68 (showing 27 plasma concentration time profiles)].

101.    Andrx ANDA No. 76-772 is directed to generic 36 mg, 27 mg and 18 mg extended release methylphenidate tablets that are represented to be "pharmaceutically

equivalent" and "bioequivalent" to the 36 mg, 27 mg and 18 mg CONCERTA® products, respectively.

## B.    Andrx's Extended Release MPH Tablets (the "ANDA products")

102.    The Andrx ANDAs include a proposed label and a proposed package insert for the ANDA products which describe the products and their use.  [PX 209, ANDA (54 mg tablet) strength), ANDRX 05 (under the heading "Labeling") and ANDRX 058-099; PX 206, ANDA (18 mg, 27 mg and 36 mg tablets), ANDRX 3860 (under the heading "Labeling") and ANDRX 3918-957; JDT (J. Vaughn) 1236-1237, 1242-1244].


103.    The package insert for the ANDA products will be packaged along with the products and made available on the company's internet website.  [JDT (J. Vaughn) 1239-1240; JDT (L. Rosenthal) 1127].


104.    PX 208 is a copy of the proposed package insert for the 54 mg ANDA product. [PX 208; JDT (J. Vaughn) 1235-1236].  The same package insert is used for the 18 mg, 27 mg and 36 mg dosage strengths, except that it also refers to these additional dosage strengths.  [JDT (J. Vaughn) 1236-1237].


105.    Andrx's package insert for the ANDA products is intended for doctors, patients and other caregivers, including parents of children who have ADHD.  [JDT (J. Vaughn) 1241; PX 208 at ANDRX 085-098].

106.    The package insert describes the ANDA products as "extended release" tablets for once-a-day oral administration containing 18, 27, 36 or 54 mg of MPH.  [PX 206 at ANDRX 3926].

107.    According to the ANDAs, the official name for the Andrx products will be "Methylphenidate Hydrochloride Extended-Release Tablets."  [PX 209 at ANDRX 05; PX 206 at ANDRX 3860].

108.    Each of the four ANDA products is a dosage form containing a dose of MPH. [PX 206 at ANDRX 3926 and 3945; JDT (J. Vaughn) 1224, line 20 to 1226, line 1].

109.    The ANDA products are clearly intended for use in treating ADHD.  As the package insert expressly states, the ANDA products "are indicated for the treatment of Attention Deficit Hyperactivity Disorder (ADHD)."  [PX 206, ANDRX 3925-57 at ANDRX 3933; JDT (J. Vaughn) 1242-1243].

110.    When administered once-daily as directed by the package insert, each of the ANDA products provides a single daily dose of MPH.  [PX 206, ANDRX 3925-57 at ANDRX 3945 (under "Dosage and Administration")].

111.    The ANDA products contain MPH in an "immediate release" or an "IR" outer drug coating and a sustained release core.  [JDT (X. Cheng) 328-330; PX 45].  The IR drug coating on the ANDA products dissolves rapidly in an aqueous medium of any pH -- the IR coating is pH-independent.  [Testimony of Ms. Gray].

71

112.    The immediate release drug coating and tablet core of the ANDA products are designed to contain 25% and 75%, respectively, of each product's total MPH dose.  [JDT (X. Cheng) 329].

113.    In "Composition Statements" in the ANDA, Andrx represented to FDA that the ANDA products have 25% of their MPH in the immediate release coating and 75% of the MPH in the tablet core.  [PX 210 at ANDRX 206].  For example, for the 54 mg ANDA product, the composition information shows that MPH comprises 14.52% of the total composition of the 54 mg tablet (10.89% core + 3.63% coating = 14.52% ) with 25% of the MPH in the immediate release drug coating (3.63% divided by 14.52% = 25%).  [PX 210 at ANDRX 206].

114.    The 54 mg ANDA products are designed to have 13.5 mg of MPH in the immediate-release drug coating on the product.  [Testimony of Ms. Gray; PFF ¶¶ 111-113].

115.    The 36 mg ANDA products are designed to have 9 mg of MPH in the immediate-release drug coating on the product.  [Testimony of Ms. Gray; PFF ¶¶ 111-113].

116.    The 27 mg ANDA products are designed to have 6.75 mg of MPH in the immediate-release drug coating on the product.  [Testimony of Ms. Gray; PFF ¶¶ 111-113].

117.    The 18 mg ANDA products are designed to have 4.5 mg of MPH in the immediate-release drug coating on the product.  [Testimony of Ms. Gray; PFF ¶¶ 111-113].

**REDACTED**

**REDACTED**

120.    The ANDA products are formulated to release the core dose of MPH at a pH

above pH 7.0.  [Testimony of Dr. Davis; Testimony of Ms. Gray; PFF ¶¶ 118-119].  Following

administration, the immediate-release drug coating on the ANDA products dissolves within one

hour, releasing an initial dose of MPH, typically in the stomach.  [Testimony of Ms. Gray; PX

223-224 at ANDRX 73469 ("In an aqueous environment, the drug overcoat dissolves within one

hour … providing an initial dose of methylphenidate.")].  As the product passes further into the

gastrointestinal tract, it will encounter a pH above pH 7.0 and gradually release the core dose of

MPH.  [Testimony of Ms. Gray; PX 250 at P ALZ 4599, Table 1 (summarizing typical pH values

in the gastrointestinal tract in the body); PFF ¶¶ 118-119].

121.    The MPH from the immediate release drug coating is released from the ANDA products in about 1 hour during in vitro dissolution testing in an aqueous medium.  [JDT (X. Cheng) 330; PX 210 at ANDRX 199, "The first interval, 0-1 hr, captures the immediate release portion of the drug release…"; PX 223-224, at ANDRX 73469, "In an aqueous environment, the drug overcoat dissolves within one hour…."].

122.    The ANDA products are designed to complete the release of MPH by about 10 hours during in vitro dissolution testing in pH 7.5 dissolution media.  [PX 210 at ANDRX 199, the period 0-10 hr "evaluates the full release" of the MPH].

## IV.    LITERAL INFRINGEMENT OF CLAIM 1 OF '373 PATENT

### A.    An "Appropriate" In Vitro Dissolution Test For The ANDA Products

123.    Ms. Vivian Gray is an expert in the field of in vitro dissolution, including development of dissolution test methods and specification setting.  [Testimony of Ms. Gray].

124.    Ms. Gray's professional qualifications and experience in the field of in vitro dissolution testing are provided in her Curriculum Vitae, PX 201.  [Testimony of Ms. Gray; PX 201].

125.    For purposes of evaluating whether the ANDA products meet the ascending release rate requirement of Claim 1 of the '373 patent, the release rate of MPH from the ANDA products needs to be determined by an appropriate in vitro dissolution test.  [D.I. 130, p. 2].

126.    Dissolution is the process by which a solid substance dissolves in a liquid to form a solution.  For drugs that are readily soluble, the amount of dissolved drug in the liquid is the same as the amount of drug released from the dosage form.  [Testimony of Ms. Gray].

127.    An in vitro dissolution test is a routine laboratory test used to determine the dissolution rate of a drug, i.e., the amount of drug released over time, from a dosage form under controlled conditions.  [Testimony of Ms. Gray; PX 1, '373 patent, col. 2, lines 2-5 and col. 9, lines 23-29; PX 253, col. 1, lines 18-29].

128.    An in vitro dissolution test utilizes a dissolution apparatus that generally includes a vessel (such as a glass cylinder) containing the dissolution medium.  The dosage form is placed in the vessel and the apparatus operates to stir the medium or agitate the dosage form at a specific rate.  Samples of the dissolution medium are withdrawn from the vessel at various times, and the amount of drug present in each sample is measured by a suitable assay.  This series of measurements provides a drug release profile for the dosage form, i.e., how much drug is released over time.  [Testimony of Ms. Gray; PX 253, col. 2, lines 4-14; PX 202, USP Chapter <711>, at P ALZ 4376-77].

129.    The official methods used in performing dissolution tests are listed in a publication entitled the U.S. Pharmacopoeia-National Formulary ("USP") and are well-known to persons of ordinary skill in the field of dissolution testing.  The USP is a compendium of public standards and information that serves as a guide to companies and individuals in fields relating to medicines and the pharmaceutical industry.  [Testimony of Ms. Gray; JDT (X. Cheng) 311, line 25 to 312, line 9; PX 202, USP 23, at P ALZ 4372, the primary purpose of the USP is to "provide

75

authoritative standards and specifications" for products and methods used in the practice of medicine].

130.    The Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq*., designates the USP as the official compendium of standards for drugs marketed in the United States.  [21 U.S.C. § 321(j)].

131.    The USP provides substantial guidance for selecting an appropriate in vitro dissolution test for the ANDA products.  [Testimony of Ms. Gray].

132.    Defendants' dissolution expert, Dr. Banakar, admitted during the Markman proceedings that an appropriate apparatus and conditions for the ANDA products "should be within the approved dissolution methods in the United States Pharmacopeia (USP), as this is the standard bearer for the pharmaceutical industry in terms of dissolution testing."  [D.I. 93, Banakar Declaration, ¶ 49].

133.    According to the USP guidance on dissolution testing of modified release dosage forms, the choice of apparatus and dissolution medium for a dosage form should be based on the design and solubility characteristics of the formulation, including any pH dependence. [Testimony of Ms. Gray; PX 202 at P ALZ 4386, under the heading "Dissolution and Drug Release Testing – Method Development for Modified-release Dosage Forms"].

134.    USP Apparatus 1 and Apparatus 2 have been and continue to be the preferred apparatus for dissolution testing of oral dosage forms, such as tablets and capsules.  [Testimony of Ms. Gray].

135.    FDA recommends the use of USP Apparatus 1 or Apparatus 2 for dissolution testing of oral dosage forms in published "Guidance" documents relating to the development and evaluation of oral dosage forms.  [PX 220 at P ALZ 4448; PX 221 at P ALZ 4451].

136.    USP Apparatus 1 and Apparatus 2 and their use are described in detail in Chapter 711 of the USP Chapter which covers dissolution testing.  There are seven official dissolution apparatuses recognized in the USP.  [Testimony of Ms. Gray; PX 202 at P ALZ 4376-77 (Chapter <711> Dissolution); JDT (R. Medina) 994-996].

137.    In a USP Apparatus 1 dissolution test, a dosage form is placed in a stainless steel wire mesh basket, and the basket is then submerged in a covered vessel containing a volume of dissolution medium and rotated at a selected speed.  [Testimony of Ms. Gray; PX 202 at P ALZ 4376-77, describing USP Apparatus 1; PX 253, col. 1, lines 35-50 and col. 2, lines 4-14].

138.    The vessel cover has multiple holes to allow the basket stirring shaft to pass through it and for easy insertion of a thermometer and withdrawal of samples.  [Testimony of Ms. Gray; PX 202 at P ALZ 4376 n. 2].

139.    The vessel itself is typically made of glass or another inert, transparent material, which permits visual inspection of the dosage form during a dissolution test.  [Testimony of Ms. Gray; PX 202 at P ALZ 4376, describing USP Apparatus 1].

140.    A USP Apparatus 2 dissolution test is essentially the same as an Apparatus 1 test, except that a paddle is used as a stirring element and the dosage form is allowed to sink to the bottom of the vessel (without a basket or other means to suspend the dosage form in the dissolution medium).  In use, the paddle is rotated within the dissolution medium and above the dosage form at a selected speed.  [Testimony of Ms. Gray; PX 253, col. 1, lines 50-64; PX 202 at P ALZ 4377, describing USP Apparatus 2].

141.    The USP Apparatus 1 and Apparatus 2 methods are referred to as the "basket" and "paddle" methods, respectively.  [Testimony of Ms. Gray; PX 220 at P ALZ 4448 ("The preferred dissolution apparatus is USP I (basket) or II (paddle)."); JDT (R. Medina) 1005, lines 9-12; JDT (F. Alvarez) 19, lines 12-15].

142.    While either USP Apparatus 1 or Apparatus 2 might be selected initially for dissolution testing of the ANDA products, testing of the ANDA products in USP Apparatus 2 tests revealed a problem.  [Testimony of Ms. Gray].

143.    During Andrx's own internal development of a dissolution test method for the ANDA products, Andrx initially used USP Apparatus 2 and found that the ANDA products were sticking to the glass vessel containing the dissolution medium.  [Testimony of Ms. Gray; JDT (X. Cheng) 317, 318, lines 8-11, 320-321, and 322, lines 2-4; JDT (R. Medina) 1004; JDT (F.

Alvarez) 15, line 9 to 16, line 2; PX 222 ("the tablet sticks to the glass vessel hence it requires App. 1"); PX 223-224 at ANDRX 73469].

144.     A dosage form sticking to a vessel in a dissolution test is undesirable since it can adversely effect the accuracy and reproducibility of the test results.  [Testimony of Ms. Gray; JDT (F. Alvarez) 15, line 15 to 16, line 2; JDT (R. Medina) 1006, line 14 to 1007, line 2; PX 221 at P ALZ 4451 ("For some tablet dosage forms, in-vitro…dissolution may be slow due to the manner in which the disintegrated product settles at the bottom of a dissolution vessel.  In such situations, USP Apparatus I may be preferred over Apparatus II.")].

145.     Andrx resolved the sticking issue that occurred with its ANDA products in USP Apparatus 2 tests by switching to USP Apparatus 1.  [JDT (X. Cheng) 317, 318, lines 8-11, 320-321 and 322, lines 2-4; PX 222 ("the tablet sticks to the glass vessel hence it requires App. 1"); PX 223-224 at ANDRX 73469].

146.     In a USP Apparatus 1 test, the metal basket holding the dosage form restricts the movement of the dosage form and prevents it from contacting and adhering to the dissolution vessel.  [Testimony of Ms. Gray; PFF ¶¶ 137-139].

147.     The occurrence of a dosage form adhering to the dissolution vessel in a USP Apparatus 2 test, as Andrx experienced in its USP Apparatus 2 tests on the ANDA products, is a valid and sufficient justification for preferring USP Apparatus 1 over USP Apparatus 2 for a particular dosage form.  [Testimony of Ms. Gray].

148.    USP Apparatus 1 is an appropriate apparatus to use in conducting dissolution tests on the ANDA products.  [Testimony of Ms. Gray].

149.    When testing with USP Apparatus 1 or USP Apparatus 2, the dissolution medium inside the vessel is heated to a standard temperature of 37º Celsius (± 0.5 º C).  [Testimony of Ms. Gray; PX 202 at P ALZ 4376 (the temperature inside the vessel is held at 37º ± 0.5); PX 253, col. 2, line 9; JDT (F. Alvarez) 19, line 20 to 20, line 3; JDT (J. Chi) 347, lines 5-13].  This temperature of  37º C corresponds to the average internal temperature of the human body (i.e., 98.6º Fahrenheit).  [Testimony of Ms. Gray; PX 253, col. 2, lines 8-9].

150.    The standard temperature of 37º C for dissolution media in USP Apparatus 1 and Apparatus 2 tests is considerably hotter than room temperature, which is 22º C or 72º F. [Testimony of Ms. Gray].

151.    When testing with USP Apparatus 1, common practice dictates a rotation speed of 100 rpm for the stirring element.  [Testimony of Ms. Gray; PX 202 at P ALZ 4386 ("The most common operating speeds are 100 rpm for Apparatus 1 (basket) and 50 rpm for Apparatus 2 (paddle) for solid-oral dosage forms."); JDT (X. Cheng) 322, lines 2-11; JDT (F. Alvarez) 19, lines 5-19; JDT (R. Medina) 1036, line 18 to 1037, line 2].

152.    The nature of a particular extended release dosage form and how it is designed to release the drug are of primary importance in selecting an appropriate dissolution medium. [Testimony of Ms. Gray; PFF ¶¶ 133].

REDACTED

154.    During its efforts to develop a suitable dissolution method for the ANDA

products, Andrx concluded that the formulation "needs pH 7.5 for proper release."  [PX 222

("our formulation needs pH 7.5 for proper release."); JDT (X. Cheng) 319, lines 3-15, and 320,

lines 2-16].

155.    A pH 7.5 dissolution media is well within the accepted range of pHs in the USP

for dissolution testing of extended-release dosage forms: if appropriate for a formulation,

"buffered aqueous solutions (typically pH 4 to 8)…may be used."  [Testimony of Ms. Gray; PX

202, USP 23, P ALZ 4386 and see P ALZ 4391 ("Simulated Intestinal Fluid" is a pH 7.5 test

solution)].  A phosphate buffer solution is used as the dissolution medium because it resists

changes in pH after the dosage form is added.  [Testimony of Ms. Gray; PX 202, USP 23, at P

ALZ 4387 (describing "Buffer Solutions")].

156.    Use of a pH 7.5 dissolution medium (buffered solution) is appropriate to properly evaluate the dissolution characteristics of the ANDA products.  [Testimony of Ms. Gray; PFF ¶¶ 153-155].

157.    Thus, a dissolution test utilizing USP Apparatus 1, 100 rpm and pH 7.5 dissolution medium (buffered solution) at a temperature of 37º C is an appropriate in vitro dissolution test for the ANDA products.  [Testimony of Ms. Gray].

158.    The test method that Andrx developed and proposed to FDA as an appropriate dissolution method for the ANDA products uses the same test conditions – i.e., USP Apparatus 1 (basket) at 100 rpm and pH 7.5 phosphate buffer solution at 37º C.  [Testimony of Ms. Gray; JDT (F. Alvarez) 09, line 20 to 10, line 7, and 13, lines 8-14; PX 210, ANDA (54 mg), at ANDRX 199 ("Andrx Proposed Dissolution Method"); PX 212, ANDRX 820-840 at 828 (Drug Release test for 54 mg Finished Product); JDT (J. Chi) 358-361; JDT (X. Cheng) 324, line 18 to 325, line 6; PX 207, ANDA (18, 27 and 36 mg), at ANDRX 4041; PX 206 at ANDRX 3857 (the ANDA products "meet an appropriate in vitro test requirement."); PX 225, ANDRX 5367-5390 at 5379 (Drug release test for 36 mg, 27 mg and 18 mg Finished Products)].

159.    The FDA subsequently approved Andrx's proposed dissolution method for testing the ANDA products, stating "[t]he dissolution method (basket 100 rpm in 500 mL of 0.05 M pH 7.5 phosphate buffer) as proposed has been found acceptable."  [PX 227].

**B.    Appropriate In Vitro Dissolution Testing Establishes That The ANDA Products Provide The Ascending Release Rate Profile In Claim 1 Of The '373 Patent**

160.    During discovery in this case, Andrx produced samples of the 54 mg, 36 mg and 27 mg extended-release methylphenidate tablet products that will be commercially manufactured upon approval of its ANDAs.  [PX 233, emails from Andrx's counsel to Plaintiffs' counsel, at P ALZ 4465, 4467].

161.    During discovery, Plaintiffs requested samples of the 18 mg ANDA products, but Andrx was unable to provide them because it had not successfully manufactured a commercial-scale, validated lot of the 18 mg product.  [PX 233 at P ALZ 4465 ("there are no unexpired lots of the 18 mg dosage that meet all the ANDA specifications.") and P ALZ 4467 ("Andrx does not have samples from a commercial scale validated lot of the 18 mg."); JDT (J. Vaughn) 1254, line 24 to 1255, line 4, and 1256, lines 4-11].

162.    Ms. Gray directed dissolution testing on the samples of the ANDA products (54 mg, 36 mg and 27 mg), using a dissolution test protocol she approved, at an independent testing laboratory, Analytical Research Laboratories ("ARL"), located in Oklahoma City, OK. [Testimony of Ms. Gray; PX 229, test protocol].

163.    ARL performed in vitro dissolution tests on the ANDA products using USP Apparatus 1, 100 rpm, 500 mL of pH 7.5 dissolution media at 37º C as specified in "Stage 1" (54 mg ANDA product) and "Stage 2" (36 mg and 27 mg ANDA products) of the protocol.  Brian Walker, a laboratory technician and dissolution specialist employed by ARL, carried out these dissolution tests on the ANDA products.  [Testimony of Ms. Gray; Testimony of Mr. Walker].

164.    Both ARL and Brian Walker are fully qualified to perform in vitro dissolution tests on the ANDA products using the test protocol that had been approved by Ms. Gray. [Testimony of Ms. Gray; PX 230; PX 234 (Resume of B. Walker)].

165.    The in vitro dissolution tests that Mr. Walker performed on twelve (12) individual samples of each dosage strength (i.e., 54 mg, 36 mg and 27 mg) of the ANDA products using USP Apparatus 1, 100 rpm, and pH 7.5 dissolution media at 37º C were appropriate dissolution tests for those products.  [Testimony of Ms. Gray; PX 229, test protocol].

166.    Brian Walker and ARL performed the in vitro dissolution tests on the ANDA products carefully and correctly, following the test procedure approved by Plaintiffs' dissolution expert, Ms. Gray.  [Testimony of Ms. Gray; Testimony of Mr. Walker].

167.    For each set of twelve samples of a particular dosage strength, the ARL dissolution tests were done in two cycles, with six individual samples tested per cycle.  The six samples tested in cycle 1 were designated as "Cycle 1, Andrx A-F."  The six samples tested in cycle 2 were designated as "Cycle 2, Andrx A-F."  [Testimony of Ms. Gray; Testimony of Mr. Walker; *see*, *e.g.*, PX 238, ARL report on dissolution tests for 54 mg ANDA product].

168.    In performing its in vitro dissolution tests, ARL determined the cumulative amount of MPH released from each ANDA product during successive hourly intervals following initiation of the dissolution test.  ARL reported the dissolution test results as cumulative amount recovered (mgc/mL) and cumulative "% Recovery" for each sample.  [Testimony of Ms. Gray;

Testimony of Mr. Walker; *e.g.*, PX 238, ARL report with dissolution test results for 54 mg ANDA product].

169.    ARL issued a report containing the results of its in vitro dissolution tests on each of the 54 mg, 36 mg and 27 mg ANDA products.  [Testimony of Ms. Gray; PX 238-240].

170.    From the ARL dissolution results, Ms. Gray calculated the quantity of MPH released during each hourly interval, i.e., the release rate (mg/hr), for the first periodic interval (t=0-1 hr) through the tenth interval (t=9-10 hrs) for each of the ANDA products.  [Testimony of Ms. Gray; see JDT (X. Cheng) 333, lines 11-17].

171.    Ms. Gray used the following well-known formula to convert the cumulative MPH release data reported by ARL into MPH release rate per hour (mg/hr):

$$\textbf{Quantity Drug Rel}_{t=n} = \textbf{(\% Recovery}_{t=n} - \textbf{\%Recovery}_{t=n-1}) \textbf{ x (LC)}$$

**Where**

| | | |
|---|---|---|
| **% Recovery**$_{t=n}$ | **=** | **Cumulative percent MPH recovered at time n** |
| **%Recovery**$_{t=n-1}$ | **=** | **Cumulative percent MPH recovered at hour n-1 (i.e., the immediately preceding hourly interval)** |
| **LC** | **=** | **Label claim (the stated dose of MPH in milligrams for a product, such as "54 mg")** |

[Testimony of Ms. Gray; see JDT (X. Cheng) 333, lines 11-17].

### 1.    Dissolution tests on the 54, 36 and 27 mg ANDA products

172.    Ms. Gray prepared a MPH release rate evaluation for each set of the 54, 36 and 27 mg ANDA products based on the ARL dissolution test results.  [Testimony of Ms. Gray].

173.    PX 241 is the MPH release rate evaluation for each of the twelve 54 mg ANDA products tested by ARL.  The columns labeled "Quantity of Drug Released (mg) (Excluding 13.5 mg IR)" report the MPH release rate for successive hourly intervals through 10 hours for each 54 mg sample.  [Testimony of Ms. Gray; PX 241].  Ms. Gray excluded 13.5 mg of MPH – the amount of MPH attributable to the immediate-release drug coating of the 54 mg ANDA products – in calculating the quantity of MPH released during each hourly interval in accordance with the Court's construction of the ascending release rate element of claim 1.  [Testimony of Ms. Gray; PX 241; D.I. 130, p. 2].  This was done by simply subtracting the amount of MPH contained in the IR coating from the total quantity of MPH determined to be present through ARL's dissolution tests.  [Testimony of Ms. Gray].

174.    Ms. Gray also determined the "midpoint of the $T_{90}$" for each of the twelve 54 mg ANDA products tested and included those results in her MPH release rate evaluation. [Testimony of Ms. Gray; PX 241; see D.I. 130, p. 2 (the ascending release rate of Claim 1 must occur "through at least the midpoint of the $T_{90}$ and for at least three hours.")].  The $T_{90}$ is the time at which 90% of drug within a dosage form has been released.  [Testimony of Ms. Gray; PX 1, '373 patent, col. 9, lines 37-40].  The midpoint of the $T_{90}$ is determined by simply dividing the $T_{90}$ in half.  [Testimony of Ms. Gray].

175.    The 54 mg ANDA product sample designated as Cycle 1, Andrx A, released 84.01% of its MPH by the end of the seventh periodic interval (t=7 hrs) and released 92.92% of its MPH by the end of the eighth periodic interval (t=8 hrs).  [Testimony of Ms. Gray; PX 241, Cycle 1, Andrx A].  Thus, the 54 mg ANDA product sample designated as Cycle 1, Andrx A, exhibited a $T_{90}$ between 7 and 8 hours.  [Testimony of Ms. Gray; PX 241, Cycle 1, Andrx A].

86

176.    The 54 mg ANDA product sample designated as Cycle 1, Andrx A, has a midpoint of the $T_{90}$ occurring between 3.5 and 4 hours.  [Testimony of Ms. Gray; PX 241, Cycle 1, Andrx A].

177.    As shown in PX 241, for 54 mg sample Cycle 1, Andrx A, the amount of MPH released in each successive hourly interval compared to the amount of MPH released during the immediately preceding hourly interval starting at t=0 and continuing through the fourth interval is as follows:

> second interval (2.53 mg); first interval (0.99 mg)
>
> third interval (4.94 mg); second interval (2.53 mg)
>
> fourth interval (6.52 mg); third interval (4.94 mg)

[Testimony of Ms. Gray; PX 241, Cycle 1, Andrx A].

178.    As shown in PX 241, for Cycle 1, Andrx A, the amount of MPH released in each successive hourly interval increased over the amount released during the immediately preceding hourly interval starting at t=0 and continuing through the fourth interval (i.e., through 4 hrs), which is through the midpoint $T_{90}$ (i.e., between 3.5 and 4 hours) and at least 3 hours. [Testimony of Ms. Gray; PX 241].

179.    The 54 mg ANDA product sample designated as Cycle 1, Andrx A, provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent.  [Testimony of Ms. Gray; PX 241; D.I. 130, p. 2; PFF ¶¶ 173-180].

180.    The same approach used to evaluate whether Cycle 1, Andrx A met the ascending release rate element of Claim 1 of the '373 patent was applied to the dissolution results for each of the 54 mg ANDA product samples and presented in PX 241.  [Testimony of Ms. Gray; PX 241].

181.    Nine (9) of the twelve (12) individual 54 mg ANDA product samples – Cycle 1, Andrx A, C, E-F and Cycle 2, Andrx A-C and E-F – provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim of the '373 patent.  [Testimony of Ms. Gray; PX 241; PFF ¶¶ 172-180].

182.    Andrx performed in vitro dissolution tests on its 54 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C and included the results in ANDA No. 76-665.  [Testimony of Ms. Gray; PX 210, at ANDRX 201 and ANDRX 205].  In these dissolution tests, Andrx did not did not measure the amount of MPH released at 1-hour intervals.  Instead, Andrx's dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr.  [Testimony of Ms. Gray; PX 210 at ANDRX 201 and ANDRX 205].

183.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from the ANDA and ARL dissolution tests on the 54 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) is:

| Time (hr) | Andrx ANDA Avg. % Recovery | ARL Avg. % Recovery |
|-----------|---------------------------|---------------------|
| 1 | 24.00 | 24.56 |
| 2 | 30.00 | 29.89 |
| 4 | 53.00 | 52.10 |
| 8 | 90.00 | 91.60 |
| 10 | 100.00 | 100.83 |

[Testimony of Ms. Gray; PX 242; PX 210 at ANDRX 201].

184.    A comparison of the average cumulative amount of MPH released ("%

Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on

the 54 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º

C, as well as the overall average dissolution profiles, establishes that the mean dissolution results

obtained by Andrx and ARL are essentially the same.  [Testimony of Ms. Gray; PX 242].

185.    Since the mean dissolution results are essentially the same, ARL's dissolution test

results on the 54 mg ANDA products (using USP Apparatus 1, 100 rpm and pH 7.5 dissolution

media at 37º C) are as reliable and representative as the dissolution results (under those same test

conditions) that Andrx submitted to FDA to establish the dissolution properties of its 54 mg

ANDA product.  [Testimony of Ms. Gray; PFF ¶¶ 162, 183-184].

186.    The mean dissolution results in the ANDA for the 54 mg product, based on

Andrx's dissolution tests using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C,

are consistent with, and strongly corroborate, the results of Plaintiffs' dissolution tests on the 54

mg ANDA products.  [Testimony of Ms. Gray].

187.    PX 243 is the MPH release rate evaluation for each of the twelve 36 mg ANDA products tested by ARL.  The same approach used in evaluating the 54 mg samples was applied to the dissolution data for the 36 mg samples, except that Ms. Gray excluded 9 mg of MPH – the amount of MPH attributable to the immediate-release drug coating of the 36 mg ANDA products – in calculating the quantity of MPH released during each hourly interval.  [Testimony of Ms. Gray; PX 243; see D.I. 130, Markman Order, p. 2 ("The ascending release rate does not include release of a drug from any immediate-release drug coating. . .")].

188.    Eight (8) of the twelve (12) individual 36 mg ANDA product samples – Cycle 1, Andrx A-E and Cycle 2, Andrx B and E-F – provided "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent.  [Testimony of Ms. Gray; PFF ¶¶ 187; D.I. 130, p. 2].

189.    Andrx also performed in vitro dissolution tests on its 36 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C and included the results in ANDA No. 76-772.  [Testimony of Ms. Gray; PX 207 at ANDRX 4043 and ANDRX 4071].  These dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr.  [Testimony of Ms. Gray; PX 207 at ANDRX 4043 and ANDRX 4071].

190.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 36 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) is:

| Time (hr) | Andrx ANDA Avg. % Recovery | ARL Avg. % Recovery |
|-----------|----------------------------|---------------------|
| 1 | 24.00 | 24.06 |
| 2 | 30.00 | 31.81 |
| 4 | 57.00 | 56.98 |
| 8 | 95.00 | 95.01 |
| 10 | 103.00 | 101.66 |

[Testimony of Ms. Gray; PX 244; PX 207 at ANDRX 4043].

191.    A comparison of the average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 36 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C, as well as the overall average dissolution profiles, establishes that the mean dissolution results obtained by Andrx and ARL are essentially the same.  [Testimony of Ms. Gray; PX 244]

192.    ARL's dissolution test results on the 36 mg ANDA products (using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C) are as reliable and representative as the dissolution results (under those same test conditions) that Andrx submitted to FDA to establish the dissolution properties of its 36 mg ANDA product.  [Testimony of Ms. Gray; PFF ¶¶ 190-191].

193.    The mean dissolution results in the ANDA for the 36 mg product, based on Andrx's dissolution tests using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37° C, are consistent with, and strongly corroborate, the results of Plaintiffs' dissolution tests on the 36 mg ANDA products.  [Testimony of Ms. Gray].

194.    PX 245 is the MPH release rate evaluation for each of the twelve 27 mg ANDA products tested by ARL.  The same approach used in evaluating the 54 mg and 36 mg samples was applied to the dissolution data for the 27 mg samples, except that 6.75 mg of MPH was excluded – the amount of MPH attributable to the immediate-release drug coating of the 27 mg ANDA products – in calculating the quantity of MPH released during each hourly interval. [Testimony of Ms. Gray; see D.I. 130, Markman Order, p. 2 ("The ascending release rate does not include release of a drug from any immediate-release drug coating. . ."); PX 245].

195.    All twelve individual 27 mg ANDA product samples – Cycle 1, Andrx A-F and Cycle 2, Andrx A-F – provided "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent.  [Testimony of Ms. Gray; PX 245; D.I. 130, p. 2].

196.    Andrx performed in vitro dissolution tests on its 27 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C and included the results in ANDA No. 76-772.  [Testimony of Ms. Gray; PX 207 at ANDRX 4042 and ANDRX 4059]. These dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr.  [Testimony of Ms. Gray; PX 207 at ANDRX 4042 and ANDRX 4059].

197.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 27 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) is:

| Time (hr) | Andrx ANDA Avg. % Recovery | ARL Avg. % Recovery |
|-----------|----------------------------|---------------------|
| 1 | 24.00 | 23.44 |
| 2 | 28.00 | 30.86 |
| 4 | 57.00 | 57.81 |
| 8 | 99.00 | 97.95 |
| 10 | 102.00 | 100.56 |

[Testimony of Ms. Gray; PX 246; PX 207 at ANDRX 4042].

198.    A comparison of the average cumulative amount of MPH released ("% Recovery") at the common sampling times from the Andrx ANDA and ARL dissolution tests on the 27 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C, as well as the overall average dissolution profiles, establishes that the mean dissolution results obtained by Andrx and ARL are essentially the same.  [Testimony of Ms. Gray; PX 246].

199.    ARL's dissolution test results on the 27 mg ANDA products (using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) are as reliable and representative as the dissolution results (under those same test conditions) that Andrx submitted to FDA to establish the dissolution properties of its 27 mg ANDA product.  [Testimony of Ms. Gray; PFF ¶¶ 197-198].

200.    The mean dissolution results in the ANDA for the 27 mg product, based on Andrx's dissolution tests using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C, are consistent with, and strongly corroborate, the results of Plaintiffs' dissolution tests on the 27 mg ANDA products.  [Testimony of Ms. Gray].

### 2.    The 18 mg ANDA products

201.    Andrx represented to FDA that the 18 mg ANDA product is "proportionally equivalent" to, and the "same dosage form" as, the 54 mg ANDA product.  [PX 206 at ANDRX 3857].  The amounts of each ingredient in the 18 mg and 54 mg ANDA products are directly proportional.  [JDT (J. Vaughn) 1223, line 18 to 1224, line 6].

202.    Based on the proportional equivalence of their compositions, the dissolution release rate profiles for the 18 mg and 54 mg ANDA products (in USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) would be substantially the same, and nearly all of the 18 mg ANDA products would provide "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent.  [Testimony of Ms. Gray; PFF ¶ 181].

203.    ANDA No. 76-772 includes the results of dissolution tests performed by Andrx on the 18 mg ANDA product using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C.  [Testimony of Ms. Gray; PX 207 at ANDRX 4042; PFF ¶¶ 157-58].

204.    PX 248 is a MPH release rate evaluation, prepared by Ms. Gray, for each of the twelve 18 mg ANDA products that are the subject of Andrx's dissolution tests in the ANDA. The columns labeled "Quantity of Drug Released (mg) (Excluding 4.5 mg IR)" reports the MPH release rate for the intervals 0-2 hr, 2-4 hr, 4-8 hr and 8-10 hr for each 18 mg sample. [Testimony of Ms. Gray; PX 248].  Ms. Gray excluded 4.5 mg of MPH – the amount of MPH attributable to the immediate-release drug coating of the 18 mg ANDA products -- in calculating the quantity of MPH released during each interval.  [Testimony of Ms. Gray; PX 248; D.I. 130, Markman Order, p. 2].

205.    Ms. Gray used the 8-hr timepoint as the "$T_{90}$" for each of the twelve 18 mg ANDA products.  [Testimony of Ms. Gray].  A $T_{90}$ of 8-hours for the 18 mg ANDA products is conservative since each of the 18 mg tablets had fully released (about 100%) its MPH dose by the 8-hr timepoint in Andrx's dissolution tests.  [Testimony of Ms. Gray].

206.    Based on a $T_{90}$ of 8-hours, the "midpoint of the $T_{90}$" for each of the 18 mg ANDA products is 4 hours.  [Testimony of Ms. Gray].

207.    As shown in PX 248, for each of the twelve 18 mg samples tested, the amount of MPH released in each successive 2-hr interval increased over the amount released during the immediately preceding 2-hr hourly interval starting at t=0 and continuing through the second 2-hr interval (i.e., through four hours), which is through the midpoint $T_{90}$ (i.e., 4 hours) and at least 3 hours.  [Testimony of Ms. Gray; PX 248].

208.    Use of 2-hr periodic intervals in determining whether the 18 mg ANDA products provide an ascending release rate as required by Claim 1 of the '373 patent is necessitated by the dissolution data obtained by Andrx, which did not include hourly release data.  [Testimony of Ms. Gray].

209.    Twelve (12) of the twelve (12) individual 18 mg ANDA products tested by Andrx provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent.  [Testimony of Ms. Gray; PX 248; D.I. 130, p. 2].

95

**C.     Use Of The ANDA Products As Directed Will Result In Literal Infringement**

210.    Claim 1 of the '373 patent has three basic elements:

(A)     A method for treating ADD or ADHD

(B)     administering a dosage form comprising methylphenidate

(C)     that provides a release of methylphenidate at an
ascending release rate over an extended period of time.

[PX 1, '373 patent, col. 23, lines 12-16].

211.    During the Markman proceedings, the parties agreed that claim 1 of the '373 patent is directed to a method of treating ADHD using a single administration of MPH – more specifically, "a once-a-day dosage form containing the drug MPH."  [D.I. 92; Defendants' Brief on Claim Construction, p. 3].

212.    The ANDA products are intended to be orally administered on a once-daily basis (i.e., as a single dose) to individuals as a treatment for ADHD.  [PX 206, Package Insert, ANDRX 3925-57 at ANDRX 3933 (under "Indication And Usage") and ANDRX 3945 (the ANDA products are "administered orally once-daily in the morning."); PFF ¶ 110].

213.    Use of the ANDA products as directed in the Package Insert provides a method for treating ADHD and literally meets Element (A) of Claim 1.  [Testimony of Ms. Gray; PFF ¶¶ 109-110].

214.    In its Markman Order, the Court construed the language "a dosage form comprising methylphenidate" in Claim 1 of the '373 patent to mean "a pharmaceutical composition that includes a dose of methylphenidate."  [D.I. 130, Markman Order].

215.    Each of the four ANDA products is a pharmaceutical composition that includes a dose of MPH.  [Testimony of Ms. Gray; PFF ¶ 108].

216.    Administration of the ANDA products as directed in the package insert literally meets Element (B) of Claim 1 of the '373 patent.  [Testimony of Ms. Gray; PFF ¶¶ 212-215].

217.    And, appropriate in vitro dissolution tests on samples of the ANDA products demonstrate that all, or nearly all, of each dosage strength of the ANDA products provide "an ascending release rate over an extended period of time" as construed by the Court.  [Testimony of Ms. Gray; PFF ¶¶ 181, 188, 195, 202 and 209].

218.    The 54 mg, 36 mg, 27 mg and 18 mg ANDA products literally meet Element (C) of Claim 1 of the '373 patent.  [Testimony of Ms. Gray; PFF ¶ 217].

219.    Thus, following approval, the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will be used, in accordance with the prescribing instructions, by patients, doctors and caregivers in the United States to treat ADHD.  This use of the ANDA products will, in all or nearly all instances, meet each and every element of Claim 1 of the '373 patent.  [PFF ¶¶ 210-218].

220.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of Claim 1 of the '373 patent.

## V.    LITERAL INFRINGEMENT OF CLAIMS 6 AND 7 OF THE '373 PATENT

221.    Dr. Martin Angst is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology.  [Testimony of Dr. Angst].

222.    Dr. Angst's professional qualifications and experience in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology are provided in his Curriculum Vitae, PX 256.  [Testimony of Dr. Angst].

223.    Dr. Martyn Davies is an expert in biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques.  [Testimony of Dr. Davies].

224.    Dr. Davies' professional qualifications and experience in the fields of biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques are provided in his Curriculum Vitae, PX 179.  [Testimony of Dr. Davies].

225.    Dr. David Drover is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology, statistics, and anesthesiology.  [Testimony of Dr. Drover].

226.    Dr. Drover's professional qualifications and experience in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology, statistics, and anesthesiology are set forth in his Curriculum Vitae, PX 432.  [Testimony of Dr. Drover].

227.    The claims of the patent-in-suit concern methods of treating ADD or ADHD using pharmaceutical compositions containing the drug MPH.  [PX 1 at col. 23, line 11 to col. 24, line 21; PX 2 at col. 23, line 11 to col. 24, line 21].

228.    As of November 12, 1996 and at least through August 19, 1997, a person of ordinary skill in the field of treating ADD or ADHD using MPH products would have been someone with an M.D., or a Ph.D. in clinical pharmacology or a comparable scientific field, and about two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience.  [Dr. Angst Testimony].

## A.    The Proposed ANDA Products Literally Infringe Dependent Claims 6 and 7 of the '373 Patent

229.    Claim 7 of the '373 patent has only a single element: that the method result in "a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration."  [PX 1 at col. 24, lines 13-17]  Claim 6 has the same requirement for a period of about 5.5 hours rather than 8 hours.  [PX 1 at col. 24, lines 9-13].

230.    Number not used.

231.    Number not used.

232.    Number not used.

233.    Number not used.

234.    Number not used.

235.    Number not used.

     1.    **The 54mg ANDA Products Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over A Time Period Of Both About 8 Hours and About 5.5 Hours Following Said Administration**

236.    Claim 7 of the '373 patent is directed to methods of treating ADD or ADHD that provide a "substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours" in a person following administration of the claimed (MPH) composition.  [*See* PX 1 at col. 24, lines 13-16 (claim 7) ].  Claim 6 of the '373 patent is directed to methods of treating ADD or ADHD that provide a "substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours" in a person following administration of the claimed (MPH) composition.  [*See* PX 1 at col. 24, lns. 9-13 (claim 6)].

237.    This Court has found that a "substantially ascending methylphenidate plasma drug concentration over about 8 hours" is a MPH plasma concentration time profile that generally increases over approximately eight hours, but may include a slight dip.  [D.I. 130, Markman Order at p.2].  This Court has likewise found that a "substantially ascending methylphenidate plasma drug concentration over about 5.5 hours" is a MPH plasma concentration time profile that generally increases over approximately five and a half hours, but may include a slight dip.  [*Id.*].

238.    A person of ordinary skill in the art, when determining whether a drug product will produce a particular blood plasma profile when administered to subjects, will consider pharmacokinetic data from a representative number of subjects that actually have been administered the drug product and had their blood plasma concentrations measured in accordance with accepted clinical pharmacokinetic testing procedures.  [Testimony of Dr. Angst].  That person will review both the individual plasma profiles as well as statistical analyses of the data, such as calculated means of the plasma profiles in various subpopulations of patients, to determine what type of plasma profile will be exhibited in a substantial population of patients that may be administered the drug product.  [*Id.*].

239.    Defendants sought to convince the FDA that their ANDA products are bioequivalent to CONCERTA®.  [Testimony of Dr. Angst; PX 293; PX 294].  Defendants presented to the FDA both statistical analyses of various subpopulations of subjects administered their ANDA products (e.g., mean plasma profiles) and the individual measured plasma profiles of these subjects.  [*Id.*].  Defendants relied on the mean and individual data as part of their efforts to convince the FDA that their ANDA products will exhibit MPH plasma concentration profiles sufficiently similar to CONCERTA® so as to justify finding these ANDA products bioequivalent to CONCERTA®.  [*Id.*].

240.    The data in Defendants' ANDA establishes that a substantial population of individuals administered the ANDA products will exhibit a substantially ascending MPH blood plasma concentration for approximately 8 hours.  [Testimony of Dr. Angst].  Likewise, this evidence demonstrates that a substantial population of individuals administered the ANDA

products will exhibit a substantially ascending MPH blood plasma concentration for approximately 5.5 hours. [*Id.*].

241.    Defendants have made representations to the FDA regarding the nature of the plasma profiles of their ANDA products that demonstrate that the plasma profiles that result from administration of the ANDA products will be substantially ascending for approximately 8 hours in a substantial population of patients.  [Testimony of Dr. Angst].

242.    Defendants presented mean MPH plasma profile data to the FDA in their ANDA showing that their products will exhibit a substantially ascending plasma concentration for time periods of about 8 hours.  [*Id.; see* PX 294; PX 293].  The following figure shows that the ANDA products exhibit mean MPH plasma profiles that substantially ascend for about 8 hours. [*Id.,* PX 294 at 2281].  The plasma profiles are mean profiles, the data of which was calculated from measured MPH plasma concentrations from two distinct sets of subjects who had been administered the ANDA products (labeled "A1: Test" and "A2: Test").  [*Id.*].  The figure also shows mean MPH plasma concentrations Defendants measured from subjects administered CONCERTA® (labeled in the graph as "B1: Reference" and "B2: Reference").  [*Id.*].  The figure shows that mean plasma profiles produced in subjects administered the ANDA products, like those observed for subjects administered CONCERTA®, generally ascend for about 8 hours and include a slight dip.  [*Id.*].  The ANDA products produce a mean peak MPH plasma concentration somewhere between 7 and 8 hours, and generally maintain that MPH concentration through and past 8 hours after administration.  [*Id.*].



243A.  In addition to this graphical representation of the mean plasma concentration profiles, Defendants provided tables in their ANDA reflecting the statistical analysis of the plasma concentration measurements made in subjects administered the ANDA products. [Testimony of Dr. Angst; PX 294 at ANDRX 2297].  Defendants reported a calculated mean peak MPH concentration as occurring between 7.0 and 7.1 hours after administration, with a standard deviation of approximately 1.07 hours.  [*Id.*].  Thus, as determined by Defendants, plasma profiles exhibited in substantial populations of subjects given the ANDA product reached a maximum MPH concentration at approximately 8 hours after being administered the ANDA products.  [*Id.*].

243B.  Defendants further represented to the FDA that a patient who eats rather than skips breakfast will have a mean plasma profile that substantially ascends for fully eight hours, as illustrated by the A:Test profile below.  [Testimony of Dr. Angst; PX 293 at ANDRX 1045;

*compare* PX 293 at ANDRX 1019 ("[s]ubjects were dosed 30 minutes after initiation of a

standardized, high fat breakfast preceded by an overnight fast") *with* PX 294 at ANDRX 2250

("A single dose . . . was administered with 240 mL of room temperature water after an overnight

fast.  Subjects then maintained a fast until 4.25 hours after dug administration", i.e. they skipped

breakfast)]



243C.   Defendants further informed the FDA that the average patient who eats breakfast

would reach $T_{max}$ at 9 hours, with a standard deviation of 2.4 hours.  [Testimony of Dr. Angst;

PX 293 at ANDRX 1038; *compare* PX 293 at ANDRX 1019 *with* PX 294 at ANDRX 2250].

Thus, as determined by Defendants, plasma profiles exhibited in the majority of subjects given

the ANDA product who eat breakfast reached a maximum MPH concentration well over eight

hours after being administered the ANDA products.  [*Id.*]

244.   Defendants represented to the FDA that their products would be bioequivalent to

CONCERTA[®], whether measured under conventional criteria or more stringent criteria that

compare the shape of the MPH plasma profile produced by their products relative to the shape of

the plasma profile produced by CONCERTA[®].  [Testimony of Dr. Angst; *see* PX 40, Letter from

Janet Vaughn of Andrx Pharmaceuticals to FDA, at ANDRX 79751-3; JDT (J. Vaughn) 1210-13 (identifying herself as Andrx's "Director of regulatory affairs," responsible "for reviewing all submissions to the FDA")]. Defendants represented to the FDA in a communication dated March 25, 2004, that their products produced an AUC and $C_{max}$ between 80% to 125% of the AUC and $C_{max}$ criteria for CONCERTA®). [*Id.*]. Defendants further represented that their products would meet a more stringent assessment of bioequivalence that focused on the shape of the MPH plasma profile. [*Id.*]. Specifically, Defendants asserted that when measured under a "partial area under the curve" or $AUC_{pr}$ perspective, their products were essentially indistinguishable from CONCERTA®. [*Id.*]. The $AUC_{pr}$ is the "area under the curve up to the population median $T_{max}$" (the time at which the maximum concentration of MPH is observed). [*Id.*].

245.    Defendants submitted to the FDA the following graphical representation of mean MPH plasma profile data from their ANDA for the purpose of demonstrating that their ANDA products (data points designated by a "●") will produce plasma profiles essentially indistinguishable to those produced by CONCERTA® (data points shown by "▲"). [*Id.*].



246.    Defendants synthesized this representation of their plasma profile data using a subset of the plasma profile data they generated incidental to bioequivalence testing of their ANDA product.  [Testimony of Dr. Angst; PX 40].  The representation they provided to the FDA is an "average" plasma profile based on a selected subset of the MPH plasma test data in their ANDA.  [*Id.*].  The figure shown above compares that subset MPH plasma profile to the plasma profile exhibited by Defendants' testing of CONCERTA[®].  [*Id.*].  As can be seen, the figure shows a substantial degree of similarity in the shape of the MPH plasma profiles associated with the ANDA product relative to plasma profiles associated with CONCERTA[®].  [*Id.*].  In addition, plasma profiles resulting from administration of the ANDA products shows ascension continuing to approximately 8 hours.  [*Id.*].

247.    ALZA's pharmacokinetic expert, Dr. Angst, reviewed the individual MPH plasma concentration time profiles contained in Defendants' ANDA.  [Testimony of Dr. Angst; *see* PX 293; PX 294].  These profiles were the result of MPH concentrations measured over time in individuals who received the 54 mg ANDA product.  [*Id.*].  The variability of response in different patients shows that, the MPH plasma concentration profiles of individual patients are not uniform.  [*Id.*].  This variability can be observed from one patient to the next, and even in the same patient from day to day.  [*Id.*].

248.    Based on his analysis of the individual plasma profiles in the ANDA, Dr. Angst determined that as many as 23 of the subjects tested in the studies exhibited a "substantially ascending methylphenidate plasma drug concentration over a time period of about eight hours" (the "8 hour exemplary profiles").  [Testimony of Dr. Angst; PX 257 at P ALZ 4748-58 (diagrams of the infringing profiles prepared by Dr. Angst); PX 590 (same); PX 293 at ANDRX 1034-35 (table setting forth numerically all profiles obtained by Andrx in R02-470 non-fasting study, forming the basis for the corresponding profiles plotted in PX 257 and PX 590); PX 294 at ANDRX 2265-68 (table setting forth numerically all profiles obtained by Andrx in R02-469 fasting study, forming the basis for the corresponding profiles plotted in PX 257 and PX 590))].  After reviewing these profiles, Dr. Angst observed that each of these exemplary profiles generally increases over a period of approximately eight hours.  [*Id.*].  He also observed that each of these profiles over this period is substantially ascending.  [*Id.*].  Dr. Angst concluded that any decreases that were observed to occur within the periods of ascension of these exemplary profiles were no more than slight dips.  [*Id.*].  Dr. Angst also observed that while some profiles exhibited more than one slight dip, the overall profile remained substantially ascending.  [*Id.*].  A person of ordinary skill, reviewing the same data, would similarly conclude that the decreases in these

plasma profiles were nothing more than a slight dip in accordance with the claim requirements. [*Id*.].

249A.  Dr. Angst concluded that there was a substantial patient population in the Defendants' ANDA, as evidenced by as many as 23 individual profiles that he characterized under his conservative criteria, that exhibited a substantially ascending MPH plasma concentration for about 8 hours.  [Testimony of Dr. Angst].  Dr. Angst's conclusions would remain the same regardless of whether one or more profiles were found to not be a substantially ascending MPH plasma concentration.

249B.  Based on his analysis of the individual plasma profiles in the ANDA, Dr. Angst determined that as many as 30 of the subjects tested in the studies exhibited a "substantially ascending methylphenidate plasma drug concentration over a time period of about five and a half hours" (the "5.5 hour exemplary profiles").  [Testimony of Dr. Angst; PX 257 at P ALZ 4748-61 (diagrams of the infringing profiles prepared by Dr. Angst); PX 590 (same); PX 591 (same);  PX 293 at ANDRX 1034-35 (table setting forth numerically all profiles obtained by Andrx in R02-470 non-fasting study, forming the basis for the corresponding profiles plotted in PX 257, PX 590 and PX 591); PX 294 at ANDRX 2265-68 (table setting forth numerically all profiles obtained by Andrx in R02-469 fasting study, forming the basis for the corresponding profiles plotted in PX 257, PX 590, PX 591))].  After reviewing these profiles, Dr. Angst observed that each of these exemplary profiles generally increases over a period of approximately five and a half hours. [*Id*.].  He also observed that each of these profiles over this period is substantially ascending. [*Id*.].  Dr. Angst concluded that any decreases that were observed to occur within the periods of ascension of these exemplary profiles were no more than slight dips. [*Id*.].  Dr. Angst

also observed that while some profiles exhibited more than one slight dip, the overall profile remained substantially ascending. [*Id.*]. A person of ordinary skill, reviewing the same data, would similarly conclude that the decreases in these plasma profiles were nothing more than a slight dip in accordance with the claim requirements. [*Id.*].

249C.  Dr. Angst concluded that there was a substantial patient population in the Defendants' ANDA, as evidenced by as many as 30 individual profiles that he characterized under his conservative criteria, that exhibited a substantially ascending MPH plasma concentration for about five and a half hours.  [Testimony of Dr. Angst].  Dr. Angst's conclusions would remain the same regardless of whether one or more profiles were found to not be a substantially ascending MPH plasma concentration.

250.    None of the 5.5 or 8 hour exemplary plasma profiles exhibit a dip that is comparable to the decrease seen in regimens based on multiple administrations of immediate release MPH products.  [Testimony of Dr. Angst].  These 35-40% decreases are troughs that reflect the lowest MPH plasma concentration prior to the ascension that follows a successive administration of the immediate release MPH dosage form.  [*Id.*; *see* PX 1 at Figure 4, col. 6, lines 28-32 (identifying "closed circle" profile in Figure 4 as the "standard regimen . . . as described in Example 7"); PX 1 at  col. 22, lines 11-14 (Example 7 describing "the standard regimen … plasma drug concentration" as "declin[ing] to a trough concentration …. ")].  The patent- in-suit illustrates "trough[s]" with the black (closed) circle profile in Figure 4, which shows two substantial decreases in MPH plasma concentration of approximately 35-40%.  [*Id.*].

251.    It is well known to those of skill in the art that drug plasma concentrations will exhibit some degree of inherent variability.  [Testimony of Dr. Angst].  For example, even the

same person given the same drug product on successive days will exhibit slightly different plasma profiles on each day.  [*Id.*].  Defendants' R02-469 bioequivalence study shows that the same individual, given the same 54 mg ANDA product on two different days experiences a first dip on the first day that is, on average, different in size and timing from a first dip on the second day.  [*Id.;* PX 583 (comparison of first dips in same subject from R02-469 study prepared by Dr. Angst); PX 294 at ANDRX 2265-68 (underlying data used to prepare PX 583); Testimony of Dr. Angst].  For example, in some patients, the size of the dip on the first day was greater than that observed on the second day by 14%.  [*Id.*].  This inherent variability is a known and accepted factor in the field of pharmacokinetics.  [*Id.*].

252.    This is further illustrated by examining MPH plasma profiles obtained with CONCERTA®, the exemplary composition described in the patent-in-suit.  Specifically, the patent-in-suit describes the open circle plasma concentration time profile depicted in Figure 4 as an example of a "substantially ascending" plasma concentration time profile for over eight hours. [PX 1 at col. 22, lines 4-8 and Figure 4; PX 2 at col. 22, lines 3-7 and Figure 4].  This profile was obtained after administering an 18 mg MPH dosage form very similar to commercially available 18 mg CONCERTA®.  [Testimony of Dr. Davies; *compare* DTX 308 at ALZ 270690 *with* PX 1, Figure 4 (showing Figure 4 is identical with this profile obtained in the C97-033-03 study) *and* PX 2, Figure 4 (same); DTX 308 at ALZ 270523 (showing 18 mg dosage forms were used in C97-033-03 study for all three dose levels (18, 36 and 54 mg MPH)); *compare* PX 194 at ALZ 12726 (appendix entitled "Formulation Summary," which identifies the formulation "Used in the following studies," including "C97-033") *with* PX 195 at ALZ 152922 (formulation for 18 mg CONCERTA®)].  No distinctions in MPH plasma profiles would be exhibited following ingestion of these two formulations that would be attributable to differences in the formulations

110

of the two products.  [*Id.*].  Accordingly, from a pharmacokinetic perspective, the open circle

plasma concentration time profile in Figure 4 illustrates CONCERTA®.  [*Id.*; Testimony of Dr.

Angst].

253.    One of the most common ways that one of ordinary skill would examine the

expected variation in a plasma concentration time profile would be to calculate its 95%

confidence interval.  [Testimony of Dr. Angst and Dr. Drover; PX 585 at p.98 (textbook by one

of Defendants' experts, Dr. Bolton, referring to this interval as "the most commonly used . . . .

confidence interval . . . .")].  Plasma profiles exhibiting dips of 10-15% fall within the 95%

confidence interval of the mean plasma concentration time profile shown in the patent-in-suit for

CONCERTA®, as well as of the mean profile for CONCERTA® that Andrx obtained during its

bioequivalence studies.  [Testimony of Dr. Angst and Dr. Drover; *see* PX 437 (underlying

calculations)].  Likewise, profiles exhibiting dips of this size fall within the 95% confidence

interval of the mean profile for the ANDA product.  [*Id.*].

254.    The 5.5 and 8 hour exemplary profiles include only slight dips, and thereby

satisfy the requirement of being a substantially ascending plasma profile.  [*See* PX 257,

Infringing Profile Diagrams at P ALZ 4748-58; PX 590, Infringing Profile Diagram of A2:Test,

Subject No. 12; Testimony of Dr. Angst].  Although not all of the 23 exemplary 8 hour

infringing profiles exhibit a peak MPH concentration at 8 hours or later after administration,

these profiles each nonetheless substantially ascend for approximately 8 hours.  [*Id.*; D.I. 130 at

2].  Likewise, although not all of the 30 exemplary 5.5 hour profiles exhibit a peak MPH

concentration at 5.5 hours or later after administration, these profiles each nonetheless

substantially ascend for approximately 5.5 hours.  [*Id.*; D.I. 130 at 2].

255A.  Given the frequency in Defendants' bioequivalence studies in which plasma profiles substantially ascend for approximately 8 hours, and given Defendants' representations using mean values regarding the likely characteristics of the ANDA products, the 23 infringing profiles specifically found by Dr. Angst to meet the requirements of the claims are representative of the plasma profiles that will be exhibited if the Defendants' ANDAs are approved and the ANDA products are marketed and used in patients.  [Testimony of Dr. Angst].  A profile that can be seen 23 times out of 77 tests, or in approximately one out of every three subjects taking the 54 mg ANDA product, cannot be characterized as a random occurrence.  [*Id.*].

255B.  Given the frequency in Defendants' bioequivalence studies in which plasma profiles substantially ascend for approximately 5.5 hours, and given Defendants' representations using mean values regarding the likely characteristics of the ANDA products, the 30 infringing profiles specifically found by Dr. Angst to meet the requirements of the claims are representative of the plasma profiles that will be exhibited if the Defendants' ANDAs are approved and the ANDA products are marketed and used in patients. [Testimony of Dr. Angst]. A profile that can be seen 30 times out of 77 tests, or in approximately one out of every three subjects taking the 54 mg ANDA product, cannot be characterized as a random occurrence. [*Id.*].

256.    Based on these observations, if the Defendants' ANDAs are approved by the FDA, administration of the 54 mg ANDA product to individuals as directed by the Defendants' label will result in substantial numbers of individuals having substantially ascending MPH plasma concentration time profiles for at least eight hours. [Testimony of Dr. Angst].

        **(a)**      **Defendants' Proposed 18, 27, and 36 mg ANDA Products Will Be Administered In A Manner That Achieves A Substantially Ascending Methylphenidate Plasma Drug Concentration Over**

**A Time Period Of Both About 8 Hours and About 5.5 Hours
Following Said Administration**

257.    The Defendants' ANDAs do not provide bioequivalence test data generated from

testing with the proposed 18, 27 and 36 mg ANDA products.  [*See* JDT (J. Vaughn) 1223 (so

testifying); JDT (J. Vaughn) 1210-13 (identifying herself as Andrx's "Director of regulatory

affairs," responsible "for reviewing all submissions to the FDA")]; *see also* PX 18-28

(containing no such data)].  Nevertheless, the proposed 18, 27, and 36 mg ANDA products

would result in substantially ascending MPH plasma concentration time profiles for eight hours

to the same extent as the proposed 54 mg ANDA product.  [Testimony of Dr. Angst].  The

proposed 18, 27, and 36 mg ANDA products would also result in substantially ascending MPH

plasma concentration time profiles for five and a half hours to the same extent as the proposed 54

mg ANDA product.  [*Id.*].


258.    MPH products are well known to exhibit linear pharmacokinetics.  [Testimony of

Dr. Angst; PX 376 at P ALZ 7656 (observing "[s]everal studies have demonstrated a linear

plasma concentration-dose relationship for the kinetics of MPH"); PX 377-78 at ALZ 125134

(reporting a linear plasma concentration-dose relationship for CONCERTA$^{®}$ at doses of 18 to 72

mg, which includes all of the dosages that Andrx proposes to sell)].  Andrx's own expert, Dr.

Mayersohn, has conceded this.  Because of this, one can reliably predict the plasma

concentration time profile for an 18 mg dose simply by dividing the observed plasma

concentration values for a 54 mg dose by three, because 18 mg is one third the dose of 54 mg.

[Testimony of Dr. Angst].  Profiles for 27 and 36 mg doses can likewise be predicted from a 54

mg plasma concentration time profile by dividing by 2 and 1.5, respectively.  [*Id.*].  The

CONCERTA$^{®}$ profile in Figure 4 of the patent-in-suit was obtained using individual plasma

113

concentration time profiles that were scaled or "normalized" in exactly this way. [*Compare* DTX 308 at ALZ 270690 *with* PX 1, Figure 4 (showing Figure 4 is identical with this C97-033-03 profile) *and* PX 2, Figure 4 (same); DTX 308 at ALZ 270690 (original Figure 4 graph, noting profiles are "Normalized to 18 mg"); DTX 138 at ALZ 271500 (reflecting that the original "Dose Levels" ranged from "1" which was "18 mg" to "3," which was "54 mg"); Testimony of Dr. Angst].

259.    The formulations of the proposed 18, 27, and 36 mg ANDA products are sufficiently similar to the formulation for the proposed Andrx 54 mg ANDA product that the former products would be expected to have this same, linear pharmacokinetic relationship with the latter product. [*See* DTX 180 at ANDRX 4102-04 (Andrx ANDA section entitled "Formulation Data"); Testimony of Dr. Davies].

260.    If the Defendants' ANDAs are approved by the FDA, the 18, 27, 36, and 54 mg ANDA products will be used by patients, doctors and caregivers in the United States to treat ADHD in accordance with the prescribing instructions. [Testimony of Dr. Angst]. Following these instructions, a substantial population of individuals given the ANDA product will exhibit substantially ascending MPH plasma concentration time profiles of about eight hours. [*Id.*]. These plasma profiles establish that Defendants' products will result in methods that meet the requirements of claims 6 and 7 of the '373 patent. [*Id.*]. Plaintiffs have met their burden of proving, by a preponderance of the evidence, that following approval of the Defendants' ANDAs, use of the 18, 27, 36 and 54 mg ANDA products will result in direct literal infringement of claims 6 and 7 of the '373 patent. [*Id.*].

114

261.    Number not used.


262.    Number not used.


## VI.    UPON APPROVAL, ANDRX WILL ACTIVELY INDUCE INFRINGEMENT OF THE '373 PATENT

263.    Andrx knew of the '373 patent by September 1, 2005.  [D.I. 1, Compl.].


264.    Upon approval by the FDA, Andrx intends to market the ANDA products in the U.S.  [PX 13, Andrx Answer, ¶ 31 ("Andrx also admits that upon approval by FDA, Andrx intends to market its proposed methylphenidate hydrochloride products.")].


265.    Andrx will sell the ANDA products to "any and all" licensed buyers, including pharmacies and alternate care providers (hospitals, nursing homes and mail order pharmacies). [JDT (L. Rosenthal) 1139-1140; PX 93, p. 10].


266.    Following FDA approval, Andrx will offer for sale, sell and/or distribute the ANDA products along with a package insert that provides instructions on how to administer and use the ANDA products to treat ADHD.  [PFF ¶ 102-109].  Administration and use of the ANDA products by others as directed in the package insert will result in direct infringement of Claims 1, 6 and 7 of the '373 patent.

267.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's will induce infringement of Claim 1, 6 and 7 of the '373 patent.

## VII.    UPON APPROVAL, ANDRX WILL CONTRIBUTORILY INFRINGE THE '373 PATENT

268.    Andrx knew of the '373 patent by August 16, 2005.  [PX 13, Andrx Answer, ¶ 39 ("Andrx admits that it had knowledge of the '373 patent . . . when it filed the respective Paragraph IV certification letters.); PX 17, Andrx Paragraph IV certification letters].

269.    The ANDA products do not have a "substantial non-infringing use."  Following FDA approval, the ANDA products will be approved only for use in treating ADHD in accordance with the package insert.  The package insert does not state that the ANDA products are indicated for treating any other medical disorder or condition.

270.    Following FDA approval, Andrx will offer for sale, sell and/or distribute the ANDA products along with a package insert that provides instructions on how to administer and use the ANDA products to treat ADHD.  [PFF ¶¶ 102-109].  Administration and use of the ANDA products by others as directed in the package insert will result in direct infringement of claims 1, 6 and 7 of the '373 patent.

271.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx will contributorily infringe claim 1, 6 and 7 of the '373 patent.

# VIII.   CONCLUSIONS OF LAW RELATING TO INFRINGEMENT BY ANDRX

### A.    Jurisdiction

CL1.      This is an action for patent infringement that arises under the Patent Laws of the United States codified at Title 35 of the United States Code and the Abbreviated New Drug Application provisions of the Hatch-Waxman Amendments to the FDCA, 21 U.S.C. § 355(j).

CL2.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

CL3.      This Court has personal jurisdiction over the parties.

CL4.      Venue in this Judicial District is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

### B.    ALZA's Infringement Claims

#### 1.    Legal standard for infringement

CL5.      A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States during the term of the patent. . ." 35 U.S.C. §271(a).

CL6.      Plaintiffs' suit against Andrx for patent infringement is predicated on Defendants' filing of two ANDAs with FDA seeking approval for a generic version of

117

CONCERTA®, acts which give rise to an infringement suit under 35 U.S.C. § 271(e)(2).

*See Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1371 (Fed. Cir. 2002); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1244-45 (Fed. Cir. 2000); 35 U.S.C. § 271(e)(2).

CL7.    A patent infringement analysis involves two steps. First, the court determines the meaning of the patent claims as a matter of law. Second, the court compares the properly construed claims to the allegedly infringing product or method. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

CL8.    A patent owner may establish infringement under either of two theories: literal infringement or the doctrine of equivalents. Literal infringement exists if each element of at least one claim of a patent is met by the alleged infringer's product. *Panduit Corp. v. Dennison Mfg. Corp.*, 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987); *Merck & Co. Inc. v. Teva Pharm. USA, Inc.*, 228 F. Supp. 2d 480, 485 (D. Del. 2002).

CL9.    The patentee bears the burden of proving infringement by a preponderance of the evidence. A preponderance of the evidence means such evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n. 15 (Fed. Cir. 2005).

CL10.    Where, as here, the infringement inquiry is provoked by an ANDA filing, the question of infringement focuses on what is likely to be sold or used following FDA

118

approval. *Abbott Labs.*, 300 F.3d at 1373; *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1047 (Fed. Cir. 2001) ("the infringement inquiry focuses on the hypothetical infringement that would occur if the defendant's [A]NDA were approved and the defendant began to make and sell the drug.").

CL11.    Infringement is established when a plaintiff proves, by a preponderance of the evidence, that the accused product or method *sometimes* meets all of the limitations of the asserted patent claims. *Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) ("an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."), *quoted in Impax Labs., Inc. v. Aventis Pharms., Inc.*, No. Civ.A. 02-581 JJF, 2004 WL 253482, at *3 (D. Del. Feb. 5, 2004); *Purdue Pharma, L.P. v. F.H. Faulding and Co.*, 48 F. Supp.2d 420, 439 and 441 (D. Del. 1999) (finding infringement of method of treatment claims where all the elements of the claims were present in "the accused use of…[defendant's drug product] *in some patients*"), *aff'd*, 230 F.3d 1320 (Fed. Cir. 2000) ; *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 815 F. Supp. 1488, 1512 (D. Del. 1993) ("it is of no moment that in certain modes of operation…[defendant's product] may not operate in a way that would infringe the '145 patent.  It matters only that the accused device operate in an infringing way at some time."), *aff'd*, 18 F.3d 927 (Fed. Cir. 1994).

CL12.    Infringement is a question of fact. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005).

CL13.    35 U.S.C. § 271(b) states, "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).

CL14.     An alleged infringer is liable for inducing infringement if: (1) the alleged infringer knew of the patent; (2) the alleged infringer's action induced the infringing acts, and (3) the alleged infringer intended to encourage another's infringement. *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).

CL15.     Direct infringement of a patent claim under 35 U.S.C. § 271(a) is a prerequisite to finding that a party has induced infringement of the claim. *Water Tech. Corp. v. Calco Ltd.*, 850 F.2d 660, 668 n. 7 (Fed. Cir. 1988).

CL16.     A party may be found liable for induced infringement when it sells a product and provides instructions on how to use it in an infringing manner. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1360 (Fed. Cir. 2006); *In re Omeprazole Patent Litigation*, 490 F. Supp.2d 381, 485-86 (S.D.N.Y. 2007) (Defendant ANDA filer found to induce infringement of method of treatment claim based on package insert for generic product); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) ("[I]nstructing how to engage in an infringing use show[s] an affirmative intent that the product be used to infringe….").

CL17.     Direct and induced infringement may both be proven through circumstantial evidence. *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

CL18.    To establish contributory infringement, plaintiffs must show that Defendants knowingly induced infringement and possessed specific intent to encourage another's infringement and that the ANDA products are "not a staple article or commodity of commerce suitable for substantial noninfringing use."  35 U.S.C. §271(c); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005).  Direct infringement of a patent claim under 35 U.S.C. § 271(a) is a prerequisite to finding that a party has contributorily infringed a claim.  *Id.*

## 2.    ALZA's Remedy For Infringement by Andrx

CL19.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of Claim 1, 6 and 7 of the '373 patent.

CL20.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will induce infringement of Claim 1, 6 and 7 of the '373 patent.

CL21.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will contributorily infringe Claim 1, 6 and 7 of the '373 patent.

CL22.    35 U.S.C. §271(e)(4) provides that for an act of infringement described by §271(e)(2), the patent owner's remedies include the following:

(A)  the court shall order the effective date of any approval of the drug. . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed;

(B)  injunctive relief may be granted against an infringed to prevent the commercial manufacture, use, offer to sell, or sale within the United States. . .

(C)  damages or other monetary relief may be awarded against an infringer. . .

CL23.    As a remedy for Defendants' infringement, the Court shall order that any approval of Andrx ANDA Nos. 76-665 and/or 76-772 by FDA occur no earlier than January 31, 2018, the date on which the patent-in-suit and the existing FDA (pediatric) exclusivity attached thereto expires.  The Court may also grant such other relief as the Court determines is just and proper.  35 U.S.C. § 271(e)(4); *see,* e.g., *Celgene Corp. v. Teva Pharms. USA, Inc.*, 412 F. Supp. 439, 441-42 (D.N.J. 2006).

CL24.    As a remedy for Defendants' infringement, the Court shall enjoin Defendants, and any successor-in-interest to the ANDAs, from manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, Methylphenidate Hydrochloride Extended-Release Tablets (54, 36, 27 and 18 mg) in accordance with ANDA Nos. 76-655 and 76-772 during the life (including applicable FDA exclusivity) of the '373 patent.  35 U.S.C. § 271(e)(4); *see,* e.g., *Celgene Corp. v. Teva Pharms. USA, Inc.*, 412 F. Supp. 439, 441-42 (D.N.J. 2006).

ASHBY & GEDDES

*/s/ Steven J. Balick*

Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil PPC, Inc.*

*Of Counsel*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, Illinois 60603
312-853-7000

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8000

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood
Suite 3400
Dallas, TX 75201
214-981-3300

Dated: November 2, 2007

123