## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ALZA CORPORATION, and McNEIL-PPC, INC., | ) ) ) |
|  | ) **C.A. No. 05-642-JJF** |
| Plaintiffs, | ) |
|  | ) **REDACTED** |
| v. | ) **PUBLIC VERSION** |
|  | ) |
| ANDRX PHARMACEUTICALS, L.L.C., and ANDRX CORPORATION, | ) ) |
|  | ) |
| Defendants. | ) |

### PLAINTIFFS' RESPONSIVE PRETRIAL SUBMISSION

*Of Counsel*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, IL 60603
312-853-7000

-and-

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8000

-and-

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood, Suite 3400
Dallas, TX 75201
214-981-3300

Dated: December 4, 2007

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil PPC, Inc.*

# TABLE OF CONTENTS

I.   THE CLAIMS-IN-SUIT DEFINE NOVEL AND NON-OBVIOUS TREATMENT METHODS ....................1

   A.   The Claimed Inventions Represent a Pioneering New Approach for Treating ADD and ADHD .............1

   B.   Overview of Relevant Legal Standards Relating to Obviousness under 35 U.S.C. §103 ..........................3

   C.   The Person of Ordinary Skill in the Art in the Field of the Inventions ........................................5

   D.   Differences between the Claimed Treatment Methods and the Prior Art ....................................8

      1.   Differences between the Method of Claim 1 and the Prior Art......................................9

      2.   Differences between Claims 6 and 7 and the Prior Art..............................................9

   E.   State of the Prior Art Before the Invention ..............................................................11

      1.   There Was a Pronounced and Long-Felt Need for an Effective Once-a-Day
           ADD/ADHD Treatment Method..........................................................11

      2.   The First Extended Release MPH Product – Ritalin SR – Failed to Meet the Long-Felt
           Need for an Effective Once-a-Day ADD Product....................................................12

      3.   Before the Invention, Various Hypotheses Had Been Advanced, but It Was Not
           Known Why Ritalin SR Did Not Provide Effective Treatment for the Entire School
           Day ......................................................................13

      4.   The Prior Art Teaches That the Only Effective Way to Achieve Effective Treatment
           of ADD or ADHD Is by Producing a Sawtooth Plasma Profile Characteristic of BID
           or TID Dosing with Immediate Release MPH Products ................................................19

      5.   The Prior Art Shows That Avoiding Side Effects of MPH in Treating ADD and
           ADHD Is of Critical Importance........................................................23

      6.   The Work by Plaintiffs Reflected the Need to Identify the Reasons for the Failure of
           Ritalin SR® ..........................................................24

   F.   The Prior Art Did Not Render the Claimed Treatment Methods Obvious and in Fact Taught
        Away from the Claimed Invention........................................................27

      1.   An Unpredictable Solution or an Invention at Odds with the Direction Set by the Prior
           Art Is Not Obvious..........................................................27

      2.   The Knowledge in the Art before the Invention Would Have Taught Away from the
           Claimed Treatment Methods ........................................................29

   G.   Defendants' Assertions of Obviousness Rest on a Grossly Inaccurate Picture of the Prior Art
        and Knowledge of the Person of Ordinary Skill in the Art ..............................................33

      1.   Acute Tolerance – and How to Overcome it – Was Not Known or Suggested by the
           Prior Art..........................................................35

      2.   The Possibility of Acute Tolerance Would Not Have Rendered the Claimed
           Inventions Obvious at the Time of the Invention ................................................37

      3.   The Person of Ordinary Skill in the Art Would Not Have Ignored Side Effects in
           Designing a New MPH Treatment Method, and These Would Have Counseled
           Strongly Against the Claimed Treatment Method ................................................38

      4.   The Additional Prior Art Cited by Defendants Does Not Render the Claimed Methods
           Obvious..........................................................40

         (a)   The Angina Drug Prior Art (Fung paper, Bayer patent. and Kochinke patent)
               Does Not Render the Claimed Treatment Methods Obvious..................................40

(b)   The Wong Patent Has No Relevance to the Claimed Treatment Methods ............................49

(c)   Conclusions Regarding the Secondary References Cited by the Defendants .........................52

H.   Non-obviousness Is Supported by Secondary Considerations ...............................................52

1.   CONCERTA® Has a Clear Nexus to the Claimed Treatment Methods...........................................53

2.   The Claimed Treatment Methods Address a Long-Felt Need for a Once-a-Day ADD/ADHD Treatment Method ....................................................................................54

3.   The Claimed Treatment Methods Provide Unexpectedly Superior Results in Treatment of ADD and ADHD......................................................................................55

4.   The Defendants Copied the Claimed Invention ....................................................................56

5.   The Claimed Inventions Enjoy Substantial Commercial Success............................................57

6.   Variability in Plasma Concentrations in Subjects Given CONCERTA® Does Not Establish that CONCERTA® Falls Outside the Claims In Suit ..........................................58

7.   The Existence of Other Products that Provide Effective Treatment of ADD and ADHD in the Market Is Immaterial to the Question of Commercial Success of the Claimed Invention ............................................................................................................59

II.   THE CLAIMS-IN-SUIT ARE FULLY ENABLED ..........................................................................61

A.   The Claims-in-Suit Are Directed to Treatment Methods That Use Oral Dosage Forms Exhibiting Specified Functional Properties ..................................................................61

B.   The Claims-in-Suit are Fully Enabled under 35 U.S.C. § 112, First Paragraph............................67

1.   Routine, Not Undue Experimentation, Is All That Would Be Required to Produce Extended Release Dosage Forms That Meet Desired Release Rate Characteristics, As Illustrated by the Extensive Guidance in the Patent Disclosures and the Prior Art .........................68

2.   Implementing a Desired Dissolution or Plasma Profile Would Have Been a Matter of Routine Effort for a Person Skilled in the Field of Extended Release Formulation Development as of the Filing Date of the Patent ...............................................................75

(a)   Controlled Release Dosage Forms Development Is Not an Unpredictable Field ...................76

(b)   Level of Skill of Extended Release Dosage Form Developers Is High ...................................79

(c)   There Is Extensive Guidance in the Patent Disclosures and the Prior Art Regarding Production of Extended Release Dosage Forms That Meet Desired Release Rate Characteristics ...................................................................................81

(d)   The Inclusion of Specific Working Examples Relating to Osmotic-Release Dosage Forms Does Not Render Non-Osmotic Dosage Forms Non-Enabled......................82

(e)   Quantity of Experimentation Needed to Develop Suitable Extended Release Dosage Forms Is Reasonable ...............................................................................86

3.   Plaintiffs Did Not Fail to Develop Non-Osmotic Dosage Forms to Implement the Invention.............................................................................................................87

(a)   ALZA's Research Efforts Focused on Osmotic Dosage Forms because That Was the Field Where It Had Intellectual Property and Special Expertise.......................................87

(b)   Defendants Mischaracterizes the Specification and Prosecution History as Suggesting One Skilled in the Art Could Not Produce Non-Osmotic Dosage Forms Meeting Requirements of the Invention....................................................................90

4.   Defendants Have Failed to Demonstrate an Objective Basis for Finding a Lack of Enablement of the Claims-in-Suit............................................................................................93

ii

   C.   The '373 Patent Claims Are Not Invalid as a "Matter of Law as Being "Single Means" Claims ............94

       1.   The Claims-In-Suit Are Not "Single Means" Claims ......................................................94

       2.   Defendants' Analysis of the Law of Enablement by Reference to Cases Discussing "Single Means" Claims Is Fundamentally Flawed and at Odds with Clear Federal Circuit Precedent ..........................................................................................................95

       3.   Use of Functional Terms in Claims Does Not Render Them Unduly Broad or Convert Them into "Means Plus Function" Claims under ¶6 of §112 ............................................97

III.   THE '373 PATENT CLAIMS ARE DEFINITE ...............................................................................101

   A.   Definiteness Requirement of §112, Second Paragraph, Is Met if Claim Boundaries Can Be Ascertained..............................................................................................................................101

   B.   The Court Has Found the Claims-in-Suit to Have Defined Boundaries ..................................101

   C.   The Requirement That Appropriate Dissolution Testing Conditions Be Selected Does Not Render the Claims-in-Suit Indefinite ......................................................................................102

IV.   DEFENDANTS' THEORIES OF NON-INFRINGEMENT ARE UNSUPPORTED BY LAW OR FACTS .106

   A.   There Is No Requirement that Non-Immediate Release MPH Must Be Released During the First Hour to Achieve an Ascending Release Rate..............................................................106

   B.   There Is No Reason to Use An Acidic Dissolution Medium for the First Hour in In-vitro Dissolution Tests on the ANDA Products ...........................................................................109

   C.   There Is No "Error" in Plaintiffs' Dissolution Test Results and Dr. Banakar's Revisions are Unwarranted........................................................................................................................112

   D.   The ANDA Products Exhibit Substantially Ascending MPH Plasma Concentrations for both About 5.5 and About 8 Hours ...............................................................................................115

# FINDINGS OF FACT

I.   Responsive Findings of Fact Concerning Obviousness .................................................................122

   A.   The Claimed Invention of the '373 Patent.............................................................................122

   B.   The Level of Ordinary Skill in the Art..................................................................................122

   C.   The Scope and Content of the Prior Art................................................................................124

       1.   Background on ADHD and MPH Treatment with Immediate Release Ritalin® BID and TID ...............................................................................................................124

       2.   The Methylphenidate Art:  Pelham (1987) ...........................................................128

       3.   The Methylphenidate Art:  Patrick 1989...............................................................131

       4.   The Methylphenidate Art:  Birmaher (1989) .........................................................132

       5.   The Methylphenidate Art:  Pelham (1990) ...........................................................134

       6.   The Methylphenidate Art:  Greenhill (1992) .........................................................136

   D.   ALZA's Citizen Petition .......................................................................................................138

       1.   Nicotine Art ..........................................................................................................139

       2.   Porchet .................................................................................................................139

       3.   Perkins .................................................................................................................141

   D.   CNS Stimulant Art ...............................................................................................................142

       1.   Angrist .................................................................................................................142

2.   Nitrate References ........................................................................................143

3.   Fung Paper ...................................................................................................144

4.   Bayer Patent ................................................................................................147

5.   Fung Patent .................................................................................................148

5.   Kochinke Patent ..........................................................................................151

7.   Wong Patent ................................................................................................154

E.   Differences Between the Prior Art and the Claimed Invention .................................156

F.   The Knowledge in the Art Before the Invention Would Have Taught Away from the Claimed Treatment Methods ...................................................................................................158

G.   Acute Tolerance – and How to Overcome It – Was Not Known or Suggested by the Prior Art ...........161

H.   The Possibility of Acute Tolerance Would Not Have Rendered the Claimed Inventions Obvious at the Time of the Invention ........................................................................163

I.   The Person of Ordinary Skill in the Art Would Not Have Ignored Side Effects in Designing a New MPH Treatment Method ..........................................................................................164

J.   The Additional Prior Art Cited by Defendants Does Not Render the Claimed Methods Obvious ................................................................................................................166

K.   Secondary Considerations ........................................................................................168

1.   Long-Felt Need and the Failure of Others ...................................................168

2.   Skepticism....................................................................................................170

3.   Unexpected Results......................................................................................171

4.   Commercial Success ....................................................................................172

M.   Nexus Between CONCERTA® and the Asserted Claims .........................................176

1.   CONCERTA® is Within the Scope of the Asserted Claims .........................176

2.   Sales Data Establishes That CONCERTA®'s Delivery Profile Is Responsible for Its Commercial Success .....................................................................................177

3.   No Other Factors Explain the Commercial Success of CONCERTA®..........179

4.   Copying .......................................................................................................179

5.   Miscellaneous ..............................................................................................180

II.   THE CLAIMS-IN-SUIT ARE FULLY ENABLED ................................................................183

A.   The Claims-in-Suit Are Directed to Treatment Methods That Use Oral Dosage Forms Exhibiting Specified Functional Properties ...............................................................183

B.   The Claims-in-Suit are Fully Enabled under 35 U.S.C. § 112, First Paragraph....................184

1.   Routine, Not Undue Experimentation, Is All That Would Be Required to Produce Extended Release Dosage Forms That Meet Desired Release Rate Characteristics, As Illustrated by the Extensive Guidance in the Patent Disclosures and the Prior Art .......184

2.   Implementing a Desired Dissolution or Plasma Profile Would Have Been a Matter of Routine Effort for a Person Skilled in the Field of Extended Release Formulation Development as of the Filing Date of the Patent ...........................................................203

(a)   Controlled Release Dosage Forms Development Is Not an Unpredictable Field .................203

(b)   Level of Skill of Extended Release Dosage Form Developers Is High .................206

iv

(c)    There Is Extensive Guidance in the Patent Disclosures and the Prior Art Regarding Production of Extended Release Dosage Forms That Meet Desired Release Rate Characteristics .................................................................................210

(d)    Quantity of Experimentation Needed to Develop Suitable Extended Release Dosage Forms Is Reasonable ................................................................................220

(e)    The Absence of Working Examples of Non-Osmotic Dosage Forms in the Specification is Immaterial Given Breadth of Teachings in Prior Art, Predictability in Field and Abilities of Person Skilled in the Art ..........................222

3.    Plaintiffs Did Not Fail to Develop Non-Osmotic Dosage Forms to Implement the Invention ...................................................................................................................225

(a)    Alza's Research Efforts Focused on Osmotic Dosage Forms because That Was the Field Where It Had Intellectual Property and Special Expertise .....................225

(b)    Defendants Mischaracterize the Specification and Prosecution History as Suggesting One Skilled in the Art Could Not Produce Non-Osmotic Dosage Forms Meeting Requirements of the Invention .................................................................226

D.    The ANDA Products Exhibit Substantially Ascending MPH Plasma Concentrations for both About 5.5 and About 8 Hours ...........................................................................................227

E.    Prosecution History of the ALZA Patent .........................................................................229

III.    RESPONSIVE FINDINGS OF FACT ON INFRINGEMENT ....................................................231

IV.    Indefiniteness ...............................................................................................................245

# CONCLUSIONS OF LAW

A.    The '373 Patent Is Novel and Not Obvious ......................................................................254

B.    The Claims-in-Suit are Fully Enabled under 35 U.S.C. § 112, First Paragraph .................256

C.    The Claims-in-Suit are Definite Under 35 U.S.C. §112, Second Paragraph .......................257

D.    ALZA Infringes the Asserted Claims ..............................................................................257

E.    ALZA Infringes the Asserted Claims ..............................................................................262

# TABLE OF AUTHORITIES

## CASES

*ALZA Corporation v. Mylan Laboratories, Inc.,*
349 F. Supp. 2d 1002 (N.D.W.Va. 2004) ...................................................78, 79, 84, 85

*Abbott Laboratoriess v. Torpharm, Inc.,*
300 F.3d 1367 (Fed. Cir. 2002).............................................................82, 83, 255, 256

*Abtox, Inc. v. Exitron Corp.,*
122 F.3d 1019 (Fed. Cir. 1997).............................................................................96

*Aero Products International, Inc. v. Intex Recreation Corp,*
466 F.3d 1000 (Fed. Cir. 2007).....................................................................81, 82, 255

*Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc.,*
344 F.3d 1186 (Fed. Cir. 2003)....................................................................36, 80, 253

*Akzo N.V. v. United States International Trade Commission,*
808 F.2d 1471 (Fed. Cir. 1986)............................................................................45

*Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,*
396 U.S. 57 (1969).........................................................................................8

*Andrew Corp. v. Gabriel Electric, Inc.,*
847 F.2d 819 (Fed. Cir. 1988)............................................................................83

*In re Angstadt,*
537 F.2d 498 (C.C.P.A. 1976) ...........................................................................46

*Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.,*
750 F.2d 1569 (Fed. Cir. 1984).......................................................................46, 65

*Bayer AG v. Elan Pharm. Research Corp.,*
212 F.3d 1241 (Fed. Cir. 2000)......................................................................83, 256

*Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.,*
55 F.3d 615 (Fed. Cir. 1995)........................................................................84, 257

*Capon v. Eshhar,*
418 F.3d 1349 (Fed. Cir. 2005)..............................................................46, 47, 48, 59

*Celgene Corp. v. Teva Pharms. USA, Inc.,*
412 F. Supp. 439 (D.N.J. 2006) ....................................................................87, 260

*In re Chupp*,
    816 F.2d 643 (Fed. Cir. 1987)................................................................9

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005)..........................................84, 85, 257, 258

*In re Curtis*,
    354 F.3d 1347 (Fed. Cir. 2004)...............................................................46

*In re Dinh Nguyen*,
    492 F.2d 856 (C.C.P.A. 1974) ................................................................46

*In re Donaldson Co. Inc.*,
    16 F.3d 1189 (Fed. Cir. 1994)................................................................76

*Ecolab, Inc. v. Envirochem, Inc.*,
    264 F.3d 1358 (Fed. Cir. 2001)..............................................................83

*Elan Pharms., Inc. v. Mayo Foundation for Medical Education*,
    346 F.3d 1051 (Fed. Cir. 2003)........................................................45, 66

*Environmental Designs, Ltd. v. Union Oil Co. of California*,
    713 F.2d 693 (Fed. Cir. 1983)........................................................6, 80, 253

*Enzo Biochem v. Calgene, Inc.*,
    188 F.3d 1362 (Fed. Cir. 1999)................................................................9

*In re Epstein*,
    32 F.3d 1559 (Fed. Cir. 2005)................................................................45

*Exxon Resources & Engineering Co. v. United States*,
    265 F.3d 1371 (Fed. Cir. 2001)........................................................81, 82, 255

*Falko-Gunter Falkner v. Inglis*,
    448 F.3d 1357 (Fed. Cir. 2006)...............................................................63

*In re Fine*,
    837 F.2d 1071 (Fed. Cir. 1988)........................................................8, 80, 253

*Forest Laboratoriess v. Ivax Pharm., Inc.*,
    501 F.3d 1263 (Fed. Cir. 2007).........................................................4, 35

*Geneva Pharmaceuticals, Inc., v. Glaxosmithkline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003)..............................................................82

*Glaxo Group Ltd. v. Apotex, Inc.*,

376 F.3d 1339 (Fed. Cir. 2004)........................................................5, 79, 252

*Golden Blount, Inc. v. Robert H. Peterson Co.,*
438 F.3d 1354 (Fed. Cir. 2006)........................................................85, 258

*In re Gordon,*
733 F.2d 900 (Fed. Cir. 1984)........................................................8

*Graham v. John Deere Co. of Kansas City,*
383 U.S. 1 (1966)........................................................3, 20, 80, 253

*Grain Processing Corp. v. America Maize-Products Co.,*
840 F.2d 902 (Fed. Cir. 1988)........................................................20

*Greenberg v. Ethicon Endo-Surgery Inc.,*
91 F.3d 1580 (Fed. Cir. 1996)........................................................78

*In re Gurley,*
27 F.3d 551 (Fed. Cir. 1994)........................................................7

*Halliburton Oil Well Cementing Co. v. Walker,*
329 U.S. 1 (1946)........................................................75

*Hewlett-Packard Co. v. Bausch & Lomb Inc.,*
909 F.2d 1464 (Fed. Cir. 1991)........................................................29

*In re Hyatt,*
708 F.2d 712 (Fed. Cir. 1983)........................................................75

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.,*
802 F.2d 1367 (Fed. Cir. 1986)........................................................61

*Chiron v. Genentech,*
363 F.3d 1247 (Fed. Cir. 2004)........................................48, 81, 61, 63, 66, 253

*Interconnect Planning Corp. v. Feil,*
774 F.2d 1132 (Fed. Cir. 1985)........................................................20

*Interspiro USA, Inc. v. Figgie International, Inc.,*
815 F. Supp. 1488 (D. Del. 1993)........................................................84, 257

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.,*
106 F.3d 1563 (Fed. Cir. 1997)........................................................33, 37, 80, 253

*Johns Hopkins University v. CellPro, Inc.,*

152 F.3d 1342 (Fed. Cir. 1998)........................................................................66, 68

*KSR International v. Teleflex, Inc.*,
127 S. Ct. 1727 (2007)...................................... 3, 4, 7-9, 35, 79, 80, 252, 253

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 1988)..................................................................................3

*Koito Manufacturing Co., Ltd. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004)..............................................48, 74, 81, 253

*Liebel-Flarsheim Co. v. v. Medrad, Inc.*,
481 F.3d 1371 (Fed. Cir. 2007)..............................................................57, 58

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006)..............................................................85, 258

*Manville Sales Corp. v. Paramount System, Inc.*,
917 F.2d 544 (Fed. Cir. 1990)................................................................84, 257

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996)....................83, 256

*In re Marzocchi*,
439 F.2d 220 (C.C.P.A. 1971) ..........................................................69, 70, 73

*Merck & Co. Inc. v. Teva Pharm. USA, Inc.*,
228 F. Supp. 2d 480 (D. Del. 2002)......................................................83, 256

*Metropolitan-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005)................................................................................85, 258

*Moleculon Research Corp. v. CBS, Inc.*,
793 F.2d 1261 (Fed. Cir. 1986)C ...............................................................85

*Monsanto v. Syngenta Seeds, Inc.*,
503 F.3d 1352 (Fed. Cir. 2007)..............................................................57, 58

*N. America Vaccine, Inc. v. American Cyanamid Co.*,
7 F.3d 1571 (Fed. Cir. 1993)........................................................................96

*In re Naquin*,
398 F.2d 863 (C.C.P.A. 1968) ....................................................................60

*Noelle v. Lederman*,
355 F.3d at 1350 .........................................................................................59

*Northpoint Technology, Ltd. v. MDS America, Inc.*,
    413 F.3d 1301 (Fed. Cir. 2005)......................................................................66

*Novartis Corp. v. Ben Venue Laboratoriess, Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001)...............................................................83, 99

*In re O'Farrell*,
    853 F.2d 894 (Fed. Cir. 1988).....................................................................14

*O'Reilly v. Morse*,
    56 U.S. (15 How.) 62 (1853) .......................................................................75

*In re Omeprazole Patent Litigation*,
    483 F.3d 1364 (Fed. Cir. 2007)...........................................20, 80, 85, 253, 258

*Orthopedic Equipment Co. v. All Orthopedic Appliances*,
    707 F.2d 1376 (Fed. Cir. 1983)......................................................................7

*Panduit Corp. v. Dennison Manufacturing Corp.*,
    836 F.2d 1329 (Fed. Cir. 1987)..............................................................83, 256

*Personalized Media Commc'ns LLC v. International Trade Commission*,
    161 F.3d 696 (Fed. Cir. 1998)......................................................................78

*Pfizer, Inc. v. Apotex, Inc.*,
    408 F.3d 1348 (Fed. Cir. 2007)..............................................................79, 252

*Pharm. Resources, Inc., v. Roxane Laboratoriess, Inc.*,
    Appeal Nos. 2007-1093, -1134 (Fed. Cir. 2007) ...........................................57

*PharmaStem Therapeutics, Inc. v. Viacell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007)......................................................................4

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..........................................................77, 82, 255

*Purdue Pharma, L.P. v. F.H. Faulding and Co.*,
    48 F. Supp. 2d 420 ............................................84, 99, 108, 109, 110, 111, 257

*Riverwood International Corp. v. R.A. Jones & Co.*,
    324 F.3d 1346 (Fed. Cir. 2003).....................................................................16

*Sakraida v. Ag Pro, Inc.*,
    425 U.S. 273 (1976).....................................................................................8

*In re Schreiber,*
    128 F.3d 1473 (Fed. Cir. 1997)..............................................................79

*In re Smythe,*
    480 F.2d 1376 (C.C.P.A. 1973) ................................................45, 46, 81

*Spectra-Physics, Inc. v. Coherent, Inc.,*
    827 F.2d 1524 (Fed. Cir. 1987)..............................................................63

*Standard Oil Co. v. American Cyanamid Co.,*
    774 F.2d 448 (Fed. Cir. 1985).................................................................7

*In re Swinehart,*
    439 F.2d 210 (C.C.P.A. 1971) ...............................................................79

*Takeda Chemical Industries v. Alphapharm PTY, Ltd.,*
    492 F.3d 1350 (Fed. Cir. 2007)....................................4, 5, 7, 9, 36, 79, 252

*United States v. Adams,*
    383 U.S. 39 (1966)..................................................................................8

*Vandenberg v. Dairy Equipment Co.,*
    740 F.2d 1560 (Fed. Cir. 1984)..............................................................36

*W.L. Gore & Associates, Inc. v. Garlock, Inc.,*
    721 F.2d 1540 (Fed. Cir. 1983)..............................................................83

*In re Wands,*
    858 F.2d 731 (Fed. Cir. 1988)...............................47, 48, 56, 61, 66, 81, 253

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,*
    418 F.3d 1326 (Fed. Cir. 2005).......................................................83, 256

*Water Tech. Corp. v. Calco Ltd.,*
    850 F.2d 660 (Fed. Cir. 1988).........................................................85, 258

## FEDERAL STATUTES

21 U.S.C. 355(j)(2)(A)(vii)(IV)..............................................................118

35 U.S.C. §103 .................................................................................3, 81

35 U.S.C. § 112................................................................10, 47, 74, 76, 81, 82

35 U.S.C. §271(a) ....................................................................................82, 85, 86

35 U.S.C. § 271(b) ...........................................................................................84

35 U.S.C. §271(c) .............................................................................................85

35 U.S.C. § 271(e)(2) ................................................................................82, 83

35 U.S.C. §271(e)(4)....................................................................................86, 87

## I.    THE CLAIMS-IN-SUIT DEFINE NOVEL AND NON-OBVIOUS TREATMENT METHODS

### A.    The Claimed Inventions Represent a Pioneering New Approach for Treating ADD and ADHD

Claims 1, 6 and 7 of the '373 patent (the "claims-in-suit") define innovative methods for treating ADD and ADHD. [PFF ¶¶ 74-75]. Claim 1 specifies that this goal is achieved through administration of a dosage form that releases methylphenidate (MPH) at an ascending rate for an extended period. [PFF ¶ 87]. Claims 6 and 7 additionally specify that the MPH plasma concentrations produced in a patient administered the dosage form substantially ascend for about 5.5 and about 8 hours, respectively. [PFF ¶¶ 273-274].

The claimed methods represent a groundbreaking therapeutic advance in the field of treatment of ADD and ADHD. [PFF ¶ 499]. Before the invention, the only way to reliably treat ADD and ADHD for the entire school day was to administer two or three doses of an immediate release MPH product (Ritalin® and its generic equivalents) at specific points in the day. [PFF ¶ 301]. This standard of care had remained unchanged for more than 30 years, despite the fact it presented immense practical difficulties for patients and caregivers. [*Id.*].

Defendants portray the new treatment methods of the invention as an obvious outgrowth of an earlier failed once-a-day MPH product (Ritalin SR®). [DFF ¶¶ 380; 393-96]. Ritalin SR®, as Defendants agree, was introduced in 1983, yet failed to meet the long-felt and pronounced need existing even then for an effective once-a-day ADD product. [DFF ¶ 276; PFF ¶¶ 41-43]. Indeed, that need and the failure of Ritalin SR® to meet it were not addressed until Plaintiffs' commercial embodiment of the invention – CONCERTA® – was launched *more than fifteen years after Ritalin SR® became available to patients*. [PFF ¶¶ 508-509]. Defendants' portrayal

1

of the invention as being an "obvious" solution to the Ritalin SR failure defies logic and actual experiences in the field of the invention.

The therapeutic innovation that is at the heart of the claimed inventions was not suggested anywhere in the prior art. [PFF ¶ 447]. Indeed, the prior art, as well as the instincts and knowledge of the person of ordinary skill, directly *taught away* from the methods that are the subject of the claims-in-suit. [PFF ¶¶ 460, 478, 485]:

- the only effective way of treating ADD and ADHD for the entire day was to administer two or three doses of immediate release MPH spaced 4 to 5 hours apart, and to thereby produce a characteristic sawtooth MPH plasma profile in the patient having sharp peaks and troughs corresponding to the timing of the administration of the doses of MPH [PFF ¶¶ 35-36, 55, 449-457];

- the last attempt to produce an effective once-a-day product – in 1983 – had failed, and the reasons why this product (Ritalin SR®) did not work were not known [PFF ¶¶ 43-45, 464-465]; and

- the necessity of avoiding side effects of MPH in the primary patient population (children), especially late in the day, would have *specifically discouraged* a person of ordinary skill in the art from attempting to treat ADD or ADHD using a dosage form that released MPH in an ascending manner for an extended period of time, and which produced a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours. [PFF ¶¶ 486-487].

Following its introduction, CONCERTA®, the commercial embodiment of the claimed inventions, rapidly became the standard of care in the treatment of ADD and ADHD, and has remained the first-line-treatment option for patients since then.  [PFF ¶¶ 508-509].  This has been true despite the fact that at least three new once-a-day ADD/ADHD medications have become available on the market after CONCERTA® was launched.  [PFF ¶ 510].  None of these other products shares the unique ascending release rate and substantially ascending MPH plasma concentration characteristics of CONCERTA®, and none of these products enjoys the dominant market share, and first-line-treatment status of CONCERTA®.  [PFF ¶ 539-540].

### B.   Overview of Relevant Legal Standards Relating to Obviousness under 35 U.S.C. §103

An invention is patentable under §103 if a person of ordinary skill in the art would not have considered the differences between the claimed invention and the prior art obvious at the time the invention was made.  *KSR International v. Teleflex, Inc*., 127 S.Ct. 1727 (2007).  The legal inquiry for obviousness is based on four factual findings; namely:

> 'Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined.   Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.'

*Id.* at 1734, citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966).

As the Court in *KSR* observed, conclusory assertions of obviousness should not be found persuasive.  *KSR*, 127 S. Ct. at 1740-41 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 1988).  Instead, the teachings in the prior art or held by the person of ordinary skill should be set forth with particularity.  *Id.*

The analysis for obviousness, thus, requires four factual determinations to be made with particularity by the Court:  "1) 'the scope and content of the prior art';  2) the 'differences between the prior art and the claims'; 3) 'the level of ordinary skill in the pertinent art';  and 4) objective evidence of nonobviousness."  *Takeda Chemical Industries v. Alphapharm PTY, Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007).  And, "[w]hile the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls."  *KSR*, 127 S.Ct. at 1734.

Cases decided since *KSR* confirm that obviousness cannot be found unless the prior art provides a motivation or teaching to make the claimed invention.  *Takeda*, 492 F.3d at 1357 ("the [*KSR*] Court acknowledged the importance of identifying 'a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does' . . .Thus . . .it remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish prima facie obviousness of a new claimed compound.");  *PharmaStem Therapeutics, Inc. v. Viacell, Inc.,* 491 F.3d 1342, 1362 (Fed. Cir. 2007) (stating that where challenger alleges that a combination of prior art references make the invention obvious, "the burden falls on the patent challenger to show by clear and convincing evidence that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, and would have had a reasonable expectation of success in doing.").

In addition, the inventor must have a "reasonable expectation of success" that applying the teachings of several prior art references will result in the invention.  *Forest Labs, Inc.*, 501 F.3d at 1267, 1269 (affirming the district court's finding that the patents were not obvious and that the

person of ordinary skill in the art would not have a reasonable expectation of success based on

disclosure in prior art); *Takeda*, 492 F.3d at 1361, 1364.

Defendants bear the burden of establishing the claims are invalid for reasons of

obviousness by clear and convincing evidence. *Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339,

1348 (Fed. Cir. 2004). As will be demonstrated below, Defendants do not come close to meeting

their burden of proof, much less to sustaining a coherent theory of obviousness that would be

sufficient to justify holding the claims in suit invalid for obviousness under §103.

### C.    The Person of Ordinary Skill in the Art in the Field of the Inventions

The claims-in-suit define methods for treating ADD or ADHD in a patient using MPH.

[PFF ¶¶ 272-274]. Given the focus of the claims on treatment methods, the person of ordinary

skill in the field of the claimed methods would necessarily have had *clinical* knowledge and

experience; in other words, knowledge and experience concerning treatment of patients with

MPH. [PFF ¶¶ 277-278]. Accordingly, the person of ordinary skill in the art would have been a

person with an M.D., or a Ph.D. in clinical pharmacology, clinical psychology or a comparable

scientific field, and at least two years of practical experience, such as that gained through a

residency, post-doctoral appointment or comparable experience. [PFF ¶ 279]. Such a person

would have had a basic understanding of the disease being treated (ADD/ADHD), the primary

patient population (children and young adults), and an understanding of how MPH and other

drugs are used to treat ADD and ADHD. [PFF ¶ 278]. That person also would have a general

understanding of the mechanism of action of MPH, and would have been familiar with such

5

issues as proper dosing, timing of administration, and minimization of side effects of the drug.[1]
[*Id.*].

Clinical knowledge and experience would have been a critical requirement for a person of ordinary skill in the art attempting to develop a new once-a-day treatment method for ADD and ADHD.  [PFF ¶¶ 278-279, 448]. This is because any effective treatment method for ADD or ADHD must balance competing treatment objectives: achieving effective control of ADD and ADHD symptoms while minimizing known side effects of MPH.  [*Id.*].  These side effects include insomnia, appetite suppression, lethargy or dullness, increased anxiety, restlessness, and growth inhibition, and are known to increase in incidence with increasing doses of MPH. [PFF ¶ 281].  Indeed, the side effects can create as many problems as the symptoms of ADD and ADHD.  Because these side effects can have severe and long-term consequences in children and young adults – the primary patient population – avoiding them would have been at least as important an objective for the person of ordinary skill in the art as achieving effective control of ADD or ADHD symptoms.  [PFF ¶ 448].

The awareness of these competing clinical requirements would have limited the range of possible options a person of ordinary skill would have tried in designing a new method for treating ADD and ADHD based on administration of a once-daily MPH drug product.  [PFF ¶¶ 448-449, 466-467].  This is the principal consequence of the difference between Plaintiffs'

---

[1]     Plaintiffs' definition is consistent with standards articulated by courts in defining the attributes of the person of ordinary skill in the art.  *See Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983) ("Factors that may be considered in determining level of ordinary skill in the art include:  (1) the educational level of the inventor; (2) type of problems encountered in the art;  (3) prior art solutions to those problems;  (4) rapidity with which innovations are made;  (5) sophistication of the technology;  and (6) educational level of active workers in the field.")

definition and that proposed by Defendants.  Indeed, Defendants' proposed definition for a person of ordinary skill in the art seems designed to strip that person of the capacity to appreciate and understand factors that would be directly relevant to treatment of ADD or ADHD.  They assert that a person of ordinary skill would have had only a basic education (i.e., a B.S. or Pharm.D in Pharmacy, or a B.S. in chemistry, biology, or engineering or a related scientific subject area), and very limited experience (i.e., additional training either through advanced courses of study or work, and experience with pharmaceuticals which would include work in formulation design and/or evaluation and a working knowledge of pharmacokinetics and pharmacodynamics and/or clinical medicine).  [DFF ¶¶ 319-320].

In part, Defendants seek to justify their definition by pointing to the education and training of one of Plaintiffs' inventors, Larry Hamel.  [DFF ¶ 322].  Defendants fail to point out that the majority of other inventors named on the patent; namely, Diane Guinta, Suneel Gupta, and Sam Saks, each possess education, training and experience consistent with Plaintiffs' proposed definition.  [PFF ¶ 280a].  Ultimately, however, the experience and training of the inventors is relevant, but not determinative of the skills possessed by the person of ordinary skill in the art.  *See Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985); *Orthopedic Equipment Co. v. All Orthopedic Appliances*, 707 F.2d 1376, 1382 (Fed. Cir. 1983).

Defendants justify their proposed definition by asserting that the person of ordinary skill in the art would be someone who would have been approached to prepare an extended release dosage form.  [*See, e.g.,* DFF ¶ 320 ("one of ordinary skill in the art is a person who might have been approached to achieve the ascending release rates and substantially ascending plasma concentrations that are required.")].  Thus, from Defendants' perspective, the *therapeutic* discovery that is at the heart of the claimed treatment methods is simply assumed.  According to

7

Defendants, the invention resides exclusively in making the dosage form used to implement the claimed treatment methods. [DFF ¶ 323]. This is clearly wrong, given the express focus of the claims-in-suit on treatment methods.

Defendants' definition also conflicts with the extensive *clinical* insights Defendants allege the person of ordinary skill would have derived from the prior art. [DFF ¶¶ 285, 290-291]. They fail to explain how their "drug formulator" would draw these extensive inferences with only a basic non-clinical education and limited non-clinical work experience. For example, as explained *infra*, Defendants rely extensively on the person of ordinary skill to decipher a morass of conflicting theories found in the prior art as to why the Ritalin SR® product was found to be *clinically* ineffective. [PFF ¶¶ 302-312a, 317-327, 336-347]. Many of the authors of these key prior art publications relied on by Defendants had extensive clinical experience with MPH. [PFF ¶¶ 326-327, 336]. Yet, the person of ordinary skill in the art – according to the Defendants' definition –would have been unlikely to have even reviewed that literature, given that person's primary focus on formulation design and lack of interest in clinical considerations. [DFF ¶ 323].

Accordingly, the definition of the person of ordinary skill in the art proposed by Plaintiffs should be employed by the Court in assessing the non-obviousness of the inventions defined by the claims-in-suit.

### D.    Differences between the Claimed Treatment Methods and the Prior Art

Defendants generally acknowledge that the differences between the claimed treatment methods and the prior art relate to the release rate and plasma concentration characteristics of the dosage forms used in the claimed treatment methods. [DFF ¶¶ 351, 357]. These distinctions over the prior art are a significant reason why the claimed treatment methods are effective.

8

### 1.    Differences between the Method of Claim 1 and the Prior Art

The claimed treatment methods defined by claim 1 relate to the use of a dosage form that exhibits an ascending rate of release for an extended period of time.  [PFF ¶ 272].  The prior art does not teach ADD or ADHD treatment methods using dosage forms that release MPH at an ascending rate of release for an extended period of time.  [PFF ¶ 435].  For example, immediate release formulations of MPH do not release the active ingredient at an ascending rate for an extended period of time.  [PFF ¶ 436].  Instead, these products release essentially all of the MPH in the dosage form immediately after ingestion.  [*Id.*].

Similarly, the other MPH dosage form known before the invention, Ritalin SR®, does not release MPH at an ascending rate of release for an extended period of time.  [PFF ¶ 437].  Ritalin SR®, instead, releases MPH at a primarily *descending* rate of release for most of the period during which the drug is released from the dosage form.  [*Id.*].  The literature, uncontested by Defendants, shows that Ritalin SR® releases MPH at an ascending rate for only about an hour, after which the amount released in each interval of time decreases.  [PFF ¶ 438].  The Ritalin SR® product, thus, does not meet the requirements of an ascending rate of release as that phrase has been interpreted by the Court because it does not release increasing amounts of MPH through at least the mid-point of the $T_{90}$ of the Ritalin SR® dosage form, nor does it release MPH at an ascending rate for at least three hours.  [PFF ¶¶ 439-440].

### 2.    Differences between Claims 6 and 7 and the Prior Art

Claims 6 and 7 of the '373 patent are dependent from claim 1.  [PFF ¶¶ 273-274].  The differences between these claims and the prior art include all of the differences noted above with respect to claim 1.  [PFF ¶¶ 434-441].  The differences between the prior art and claims 6 and 7, thus, are that the prior art does not teach treatment methods with once-a-day dosage forms that

(i) exhibit an ascending rate of release of MPH for an extended period of time and (ii) which result in a substantially ascending MPH plasma concentration for about 5.5 hours or about 8 hours, respectively.  [*Id.*].

The prior art immediate release dosage forms are characterized by a plasma concentration that peaks within 2 hours of administration and then rapidly descends.  [PFF ¶ 443].  These immediate release products meet neither the extended release rate dosage form requirements of the claims, nor do they produce substantially ascending MPH plasma concentrations for about 5.5 or about 8 hours.  [PFF ¶ 443a].  Similarly, Ritalin SR® does not release MPH at an ascending rate of release for an extended period of time and produce a substantially ascending plasma concentration for about 5.5 or about 8 hours.  [PFF ¶ 44].  Instead, Ritalin SR® produces a MPH plasma concentration that ascends for about 3 to 4 hours, then descends. [PFF¶ 296].

Instead, Ritalin SR® produces a MPH plasma concentration that peaks approximately 3 hours after ingestion, and begins a substantial descent at between 5 and 6 hours.  [PFF ¶¶ 296, 316].  The Ritalin SR product, thus, does not produce, through a dosage form that releases MPH at an ascending rate for an extended period of time, a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours.[2]

---

[2]  Defendants allege that the MPH plasma profile produced by Ritalin SR meets the requirements of claim 1 of U.S. Patent No. 6,930,129 (the '129 patent) [DFF ¶¶ 268-273; Andrx Brief at p.88]. Defendants do not base this assertion upon any objective evidence demonstrating that the MPH plasma profile of Ritalin SR generally ascends for about 8 hours, with only slight dips. For example, Defendants do not cite any publications or patents demonstrating that this is the nature of the MPH plasma profile actually produced by Ritalin SR.  In fact, the literature documenting the plasma profiles produced by Ritalin SR show that the MPH plasma concentration typically reached its maximum concentration at about 3.3 hours after administration.  [PFF ¶ 316].  None of Defendants' witnesses testify that an ascending plasma concentration for Ritalin SR over 8 hours has, in fact, ever been observed. Instead, Defendants rely only on deposition testimony of Plaintiffs' expert witness Dr. David

E.    **State of the Prior Art Before the Invention**

1.    **There Was a Pronounced and Long-Felt Need for an Effective Once-a-Day ADD/ADHD Treatment Method**

It appears undisputed among the parties that prior to the invention, there was a pronounced need for an effective, safe once-a-day treatment for ADD and ADHD.  [DFF ¶¶ 275-276; PFF ¶¶ 38-40].  As Defendants acknowledge, before the invention, the only consistently effective way to treat ADD or ADHD was to administer an immediate release version of MPH (e.g., Ritalin®, or a generic version of Ritalin®) two or three times a day.  [DFF ¶¶ 275-276].  Alternatives to regimens based on drugs other than MPH also existed, but these were generally associated with a higher incidence of adverse effects.  [PFF ¶ 284].

Regimens based on immediate release Ritalin® (referred to as BID "twice daily" or TID "three times daily" regimens) required administering a dose of Ritalin® every 4 to 5 hours to the

---

Feifel concerning the question whether any patient who had ever been administered Ritalin SR® might have experienced an ascending MPH plasma concentration about 8 hours after that patient had ingested Ritalin SR®.  [DFF ¶¶ 264-266].  The question and answer in the transcript were ambiguous, and Dr. Feifel clarified his testimony in corrections that he provided. Dr. Feifel testified that it was possible that a patient may have had a higher plasma drug concentration at eight hours than at some earlier point, but that he did not think that Ritalin SR® would have resulted in a maximum being reached at around that point or that there could have been a substantially increasing concentration over such a period with that formulation.  [*Id.*].  Dr. Feifel, like Dr. Patrick, also indicated that he had never seen Ritalin SR® produce such a plasma profile.  [Testimony of Dr. Patrick].  Indeed, Dr. Patrick, perhaps the world's foremost expert on MPH pharmacodynamics, is expected to testify he has never seen a Ritalin SR® plasma profile of this type, despite the fact that he has personally analyzed thousands of such profiles.  [Testimony of Dr. Patrick]. Thus, Defendants' assertions that claim 1 of the '129 patent is anticipated by the Ritalin SR® product are plainly wrong and unsupported by clear and convincing evidence.

Claim 7 of the '373 patent, which includes a claim limitation requiring that the plasma drug concentration substantially ascend over about 8 hours, is dependent on claim 1.  In conjunction, these two claims require not only the specified duration of a substantially ascending MPH plasma concentration, but also that the dosage form exhibit an ascending rate of release over an extended period of time.  No one has suggested that this requirement has, in fact, ever been satisfied by Ritalin SR.

patient. [PFF ¶ 55]. The success of a BID or TID regimen, measured in terms of achieving effective control of the symptoms of ADD or ADHD, and in avoiding undesired side effects, depended on proper timing of administration of doses of the immediate release product. [PFF ¶ 288]. Compliance with the regimen, thus, was of critical importance. [*Id.*].

The prior art showed, however, that compliance was a serious problem with the multiple-administration regimens based on immediate release MPH products. [PFF ¶¶ 37-39]. One problem was that the regimens required dosing during the middle of the school day. [PFF ¶ 503]. Because MPH is a controlled substance with substantial risks of diversion and abuse, it must be administered by a school official. [*Id.*]. This meant that the child on the regimen would have to leave the classroom to be administered the mid-day dose, which contributed to negative self-esteem and social pressure against adhering to the necessary regimen. [*Id.*]. Schools also faced practical challenges in administering the mid-day doses at the correct time. [PFF ¶ 503a]. Older patients who self-administered the drug also faced serious compliance issues, both due to the symptoms of the disease and due to the substantial risks regarding diversion and abuse. [PFF ¶ 504]. Clearly, a pronounced need existed for a once-a-day MPH product that would avoid compliance issues, and eliminate the need for in-school dosing.

> **2.     The First Extended Release MPH Product – Ritalin SR – Failed to Meet the Long-Felt Need for an Effective Once-a-Day ADD Product**

The initial response to the long-felt need for an effective once-a-day ADD/ADHD product was Ritalin SR®. [DFF ¶¶ 275-276; PFF ¶ 505]. This product, developed by the same company (Ciba-Geigy, now Novartis) that developed Ritalin®, was marketed as a once-a day MPH product. [*Id.*; PFF ¶¶ 304, 337]. Ritalin SR was introduced onto the market in 1983, roughly 15 years after Ritalin® had been approved for use in treatment of ADD and ADHD, and

17 years before CONCERTA® – the commercial embodiment of the invention – reached the market.  [PFF ¶ 505].

It is uncontested that Ritalin SR did not achieve the goal of providing effective treatment of ADD and ADHD through a once-a-day administration of a MPH dosage form.  [DFF ¶ 275-276; PFF ¶¶ 43, 298].  Ritalin SR® simply did not gain broad acceptance.  [*Id.*].  By the time of the invention, in the mid-1990s, only a tiny portion of the ADD/ADHD patient population was treated with Ritalin SR®.  [PFF ¶¶ 43-44].  Instead, twice-a-day dosing with immediate release Ritalin® remained the "gold standard" for treating ADD and ADHD.  [PFF ¶ 449].

### 3.     Before the Invention, Various Hypotheses Had Been Advanced, but It Was Not Known Why Ritalin SR Did Not Provide Effective Treatment for the Entire School Day

Ritalin SR® is a conventional extended release dosage form.  [PFF ¶ 296].  It is designed to, and in fact does, produce a generally constant, or flat, MPH plasma concentration for several hours after administration.  [*Id.*]. With comparable dosing levels, the MPH plasma concentration it produces is approximately the plasma concentration observed after the first dose of immediate release Ritalin®.  [PFF ¶ 314a].  Ritalin SR® thus was an extended release product that, according to conventional thinking in the design of extended release formulations before the invention, should have been an effective once-a-day product.  [PFF ¶ 297].  This conventional thinking holds that it is desirable for the extended release product to produce a therapeutically effective drug plasma concentration and to maintain that concentration at a constant level to avoid side effects.  [*Id.*].  Doing so generally provides consistent levels of effectiveness and avoids side effects from excessive concentrations and drug plasma fluctuations.  [*Id.*].

13

The failure of Ritalin SR® to provide effective and safe once-a-day treatment of ADD ADHD was puzzling to those working in the field. [PFF ¶¶ 321, 340-341, 464]. Initially, the reports of ineffectiveness of Ritalin SR® were primarily anecdotal. [PFF ¶¶ 300, 341]. These reports suggested that Ritalin SR® was not as effective throughout the entire school day as BID regimens based on immediate release MPH. [*Id.*]. Other reports suggested a lack of consistent results in patients, with some patients achieving effective treatment, and others not, and still others having varied degrees of effectiveness day to day. [PFF ¶¶ 308-309]. This led few physicians to select Ritalin SR® as the way to treat ADD or ADHD in their patients. [PFF ¶ 298].

In the late 1980's, more focused investigations were undertaken regarding the Ritalin SR® product. The literature reports from these investigations reported that there were varied types of perceived shortcomings of Ritalin SR®, that these shortcomings were inconsistently observed, and that the reasons why Ritalin SR® was less effective than BID dosing with immediate release MPH products was unknown. [PFF ¶¶ 321, 340-341, 464; Birmaher 1989; Greenhill 1992]. Defendants cite these publications as providing a clear path to the invention from the Ritalin SR® product. [DFF ¶¶ 285, 287-288]. An accurate review of these publications indicates the opposite.

One paper identified by Defendants, by Pelham *et al.*, Pediatrics 80:491 (1987) ("Pelham 1987") was published in 1987. [DFF ¶ 288]. In this paper, the authors reported on two clinical investigations comparing Ritalin SR® to immediate release MPH and other ADHD drugs. [PFF ¶ 302]. In their studies, subjects were either administered Ritalin® on a BID regimen, or given Ritalin SR® once daily. The authors reported that the first study led to a general perception that the BID regimen provided superior results compared to the once-daily Ritalin SR® regimen.

14

[PFF ¶ 306].  Their conclusions from the second study were varied.  Both the immediate release and SR products were observed to have detectable effects on behavior one hour after administration.  [PFF ¶ 308].  However, Ritalin SR® was reported to be less effective in controlling behavior than the BID regimen starting after the noon measurement (i.e., roughly 3 hours after administration).  [*Id.*].  They also reported that while the BID regimen produced significant benefits in cognitive behavior within an hour after administration, similar benefits were not observed in the SR regimen until approximately the third hourly measurement.  [PFF ¶ 309].  The authors concluded that while Ritalin SR "exerts its effects at a slower rate than the standard drug [Ritalin®] … once the SR-20 has begun to act, the drugs have similar effects and time courses."  [*Id.*].  The authors speculated that a possible source of the difference may have been the slower onset of cognitive effect or the inability of the wax matrix dosage form used in the Ritalin SR® product to achieve a high enough MPH plasma concentration in the subjects.  [PFF ¶ 310].  The authors of Pelham 1987, however, did not measure MPH plasma concentrations or take other steps to ascertain the reasons for the differences.  [PFF ¶ 312a].

In a subsequent paper published in 1990, the authors identified flaws within their earlier studies and conclusions.  [PFF ¶ 334].  In contrast with what they had reported in their first paper, they now reported that Ritalin SR® was generally as efficacious as Ritalin® administered BID over the course of a day.  [PFF ¶ 330].  They also reported a significantly higher incidence of side effects, such as insomnia and appetite suppression, associated with Ritalin SR® as compared to those observed in subjects on a BID regimen using immediate release Ritalin®.  [PFF ¶ 333].  These conflicting observations are at odds with Defendants' arguments that clear direction was provided in the prior art.

15

Another group, led by renowned ADHD researcher Dr. Laurence Greenhill, also conducted clinical investigations in this time period (1987-1992) comparing Ritalin SR® and BID MPH regimens [PFF ¶ 327]. In a first report, the Greenhill group analyzed plasma concentrations produced by Ritalin SR®. [PFF ¶ 318]. They began by emphasizing the limited nature of their study ("there are many limitations in this study") due to the small subject population, lack of controls, lack of consistent profile of subjects, lack of measurement of key physiological conditions (gastric emptying time), and other factors. [PFF ¶ 323]. In presenting their results, they noted the confusion in the field regarding why Ritalin SR® was perceived to be less effective than the BID-dosing regimen based on immediate release MPH products. They explicitly stated that "the reason for this lack of efficacy is not clear, because MPH-SR employs the same active methylphenidate that has been found to be clinically effective at the 20 mg. per day dose in over 22 controlled studies." [PFF ¶ 321]. They listed the then-prevailing theories that could provide "possible explanations for MPH-SR's relative inefficacy," including "problems in absorption in the gastrointestinal tract from its wax-matrix resin vehicle, delayed absorption, pharmacokinetic differences or differences at the brain receptor level (pharmaocodynamic differences) or tachyphylaxis (Jackson, pers. commun.)"[3] [PFF ¶ 322]. Finally, they pointed out that there were competing – and unproven – theories in the literature about how MPH provided therapeutic benefits (i.e., whether they were associated with the rate of absorption of MPH or observed after a peak plasma concentration had been reached). [PFF ¶ 325a]. They also hypothesized that the flattened MPH concentration time profile "raises a question about whether MPH-SR may be more prone to tachyphylaxis." [*Id.*].

---

[3]     This hypothesis of tachyphylaxis could not be evaluated because the source of the opinion is only a personal communication from an unidentified person, "Jackson". There are no references cited in the paper that refer to publications of a "Jackson" and no data are provided.

A few years later, Dr. Greenhill published a review of the state of the art.  In his 1992

paper, cited by Defendants, Dr. Greenhill pointed to the extensive confusion that existed in the

field just prior to the work of the inventors.  [PFF ¶¶ 340-341 ].  He started by mentioning, again,

the conflicting reports in the literature regarding the perceived nature of the lack of effectiveness

of Ritalin SR®-based regimens relative to immediate release regimens.[4]  [PFF ¶ 339].  Then, he

summarized the divergent theories circulating at the time as to a possible source of the relative

ineffectiveness of Ritalin SR®:

> Current theory suggests that psychostimulant medication effects on
> ADHD are related to the rate of absorption (ramp effect), so standard
> MPH's steeper absorption rate may give it more powerful beneficial and
> adverse effects, particularly during long-term maintenance.

[PFF ¶ 340].  Thus, Dr. Greenhill first pointed out that it was the *steep* ascension of the plasma

profile produced by the IR MPH products, referred to as the "ramp effect," that was perceived to

be a possible requirement for effectiveness of MPH.  [*Id.*; PFF ¶ 451].  Dr. Greenhill also listed

possible reasons for the shortcomings of Ritalin SR® (both as to decreased effectiveness and as

to increased adverse effects), that had been reported in the literature, including both his earlier

Birmaher paper in 1989 and the work of Pelham.  The authors of the Pelham 1987 paper

hypothesized that "MPH-SR's greater duration of action *may* alter the pharmacokinetics (hepatic

auto-induction) or receptor pharmacodynamics, inducing tachyphylaxis or tolerance." (citing

only the Birmaher et al., paper, with its unidentified "Jackson" personal communication source).

[Greenhill 1992; PFF ¶¶ 340-341].  Dr. Greenhill also  listed a range of other possible reasons

---

[4]    The shortcomings were not described in the simplistic manner that Defendants assert.
[DFF ¶ 276].  In particular, the shortcomings were not characterized as being a slower onset of
action, and a loss of effectiveness later in the day.  Instead, the shortcomings were cast as
observations in the degree of effect by cognitive and behavioral measures, the time effects were
observed, and the consistency in effects throughout the day.  [PFF ¶¶ 308-309].

reported in the literature for the shortcomings of Ritalin SR® relative to BID regimens.  [*Id.*].
This list is no more insightful than the list provided in the 1989 Birmaher paper and includes
unpredictable release of MPH from the Ritalin SR® wax matrix core, change in patient weight,
new stresses in the patient's environment, and altered pharmacokinetics (e.g., hepatic auto-
induction, which would affect metabolic conversion of the drug).  [*Id.*].

The prior art relating to ADD and ADHD treatment thus provided very little insight into
*why* Ritalin SR® was not effective throughout the course of the day.  [PFF ¶ 464].  The
conjecture reflected in the prior art identified a wide range of unrelated possible factors.  This
literature also shows that very little clinical work had been done to ascertain the actual reasons
for the ineffectiveness of Ritalin SR®.  [*Id.*].  Indeed, the absence of clinical research data led
Plaintiffs to design and conduct their groundbreaking clinical research.  [PFF ¶ 499].

The picture the prior art painted was a confused one.  It did not suggest, as Defendants
assert, that there were consistently observed and accepted problems with Ritalin SR®.  Thus,
contrary to Defendants' assertions, the literature certainly did not characterize the shortcomings
of Ritalin SR® as being well known and accepted.  The prior art and common knowledge at the
time certainly did not characterize the shortcomings of Ritalin SR® as being due to "two issues",
much less the two issues randomly selected by Defendants, i.e., "that (1) there was a time delay
in the provision of an initial therapeutic effect, and (2) Ritalin SR® seemed to lose therapeutic
effectiveness toward the end of the day" as Defendants assert.  [DFF ¶ 276].

More importantly, the very prior art cited by Defendants shows that there were *no* well-
established or accepted reasons why Ritalin SR® did not work, that could have influenced the
design of new treatment methods using MPH.  What the prior art actually showed was that there

was confusion in the field.  The prior art, and its absence of any clear insight into *why* Ritalin

SR® was not effective simply cannot be characterized as providing an obvious solution.

><blockquote>**4.    The Prior Art Teaches That the Only Effective Way to Achieve Effective Treatment of ADD or ADHD Is by Producing a Sawtooth Plasma Profile Characteristic of BID or TID Dosing with Immediate Release MPH Products**</blockquote>

The logical starting point for a person of ordinary skill in the art attempting to design new

treatment methods based on a once-a-day MPH dosage form would have been the only treatment

methods known at the time to work in providing effective treatment of ADD and ADHD for the

entire school day – i.e., the "BID" and "TID" treatment regimens.  These regimens are

administered by giving the patient two or three doses, respectively, of immediate release MPH at

specific points during the day, typically spaced about 4 to 5 hours apart.  [*Id.*].

The plasma profile that results from BID or TID treatment regimens are characterized by

two or three sharp MPH plasma ascensions, followed by sharp descents after each peak.  [PFF ¶¶

289-293].  There is a deep "trough" between the two peaks, where the plasma concentration

drops significantly.  [*Id.*].  This trough normally occurs shortly before lunchtime because the

initial dose in the regimen is given before the start of the school day.  [PFF ¶ 455].

The sawtooth plasma profile associated with BID or TID regimens would have

significantly influenced the thinking of a person of ordinary skill in the art attempting to design a

new once-a-day treatment method.  [PFF ¶ 460].  This is particularly true considering the

knowledge that a relatively flat, or constant, plasma profile (i.e., that produced by Ritalin SR®)

failed to produce satisfactory results through the entire school day.  [PFF ¶ 298].  Indeed, given

the absence of any clear explanation *why* Ritalin SR® did not work as a once-a-day product, the

only logical choice would have been, if anything, to try to reproduce the sawtooth plasma profile that actually worked via a once-a-day dosage form.  [PFF ¶ 460].

But in arguing how a person of skill would have approached the problem, Defendants inexplicably eliminate sawtooth plasma profile – the only one known to reliably work at the time of the invention – from possible consideration.  [DFF ¶ 281].  This is especially illogical in light of their admission that "a pulsatile profile would have been known to work since it would model the twice a day administration already used in the art."  [*Id.*].

The only apparent reason why Defendants have elected not to consider this plain teaching from the prior art is that it clearly *teaches away* from the presently claimed inventions.  In doing so, Defendants improperly resort to a hindsight analysis, in which they posit the question of obviousness before the Court as being how to find a suggestion in the prior art to make the claimed invention, rather than by assessing what the prior art and knowledge possessed by the person of ordinary skill in the art would have objectively suggested *before* the invention was known.  *See Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966); *see also In re Omeprazole Patent Litigation*, 483 F.3d 1364, 1381 (Fed. Cir. 2007), citing *Interconnect Planning Corp.  v. Feil*, 774 F.2d 1132, 1138 (Fed. Cir. 1985) ("The invention must be viewed not with the blueprint drawn by the inventor, but in the state of the art that existed at the time."); *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 840 F.2d 902, 907 (Fed. Cir. 1988) ("Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.'") (citation omitted).

Indeed, an accurate, objective, and complete reading of the prior art shows that a person of ordinary skill in the art would have concluded that the only known way for effectively treating ADD or ADHD for an entire school day would have been to produce a plasma profile that had a sharp increase in the MPH plasma concentration – similar to what is observed following the first hour after administration of immediate release Ritalin®—followed by a deep trough, and then a second or third sharp peak, with accompanying troughs, as needed.  [PFF ¶ 460].

Defendants actually point to the very prior art that makes this clear to the person of ordinary skill.  They acknowledge that certain authors had proposed that the effectiveness of MPH was correlated to the absorption phase of MPH.  [DFF ¶¶ 277, 294; Mayersohn Report ¶ 29].  The absorption phase described in these publications, also called the "ramp effect," is referring to the sharp increase in MPH plasma concentration during the "absorption phase" of the drug that occurs after dosing a patient with immediate release MPH.  [PFF ¶¶ 325, 340, 451].  The duration of this period of rapid increase is short – usually less than an hour.  This permits the blood plasma concentration to peak, and then descend to a low concentration (i.e., the trough in the BID profile) during the middle of the day, which, in turn, permits a second dose of immediate release product to be administered to the patient, with a corresponding second sharp increase in MPH plasma concentration.

The sharply increasing "ramp effect" seen with immediate release MPH products teaches away from the claimed treatment methods.  Unlike the plasma concentration profiles produced by immediate release products, the plasma concentrations produced by the claimed methods must substantially ascend, with only slight, rather than substantial, dips in the MPH plasma concentration, for about 5.5 or about 8 hours.  Moreover, all of the claims require that the MPH

be released for a period of at least three hours, and that the release rate ascend through at least the mid-point of the $T_{90}$ of the dosage form.

If the rate of absorption taught in the prior art for immediate release products (i.e., the "ramp" effect) were extended for the periods of time required by the claimed methods, the result would be a vastly excessive MPH plasma concentration in the patient.  [PFF ¶ 485].  A person of ordinary skill would have appreciated that this would cause unacceptable levels of side effects and toxicity.  [PFF ¶ 486].  Accordingly, a person of ordinary skill in the art would not have designed a dosage form that would produce an ascending plasma concentration for about 5.5 or about 8 hours having a rate of absorption comparable to the "ramp effect" rate of absorption observed for immediate release MPH products.  [PFF ¶ 487].  Instead, if that person were influenced by the "ramp effect" knowledge in any manner, that person would have designed a plasma profile that included necessary trough-like decreases in MPH concentration between the peaks of each sharp ascension, which the prior art would have suggested were necessary to avoid side effects and toxicity.

It is also telling to the question of obviousness that other companies working to develop once-a-day MPH treatment products around the time of the invention actually tried to recreate this BID plasma profile.  In particular, the Ritalin LA® product, under development in the late 1990's and approved for marketing in 2002 by the original developers of Ritalin® and Ritalin SR®, is characterized by a sawtooth-like plasma profile having two peaks separated by a significant drop in plasma concentration between the peaks.  [PFF ¶¶ 461-462].

Thus, the prior art and knowledge of a person of ordinary skill before the invention identifies only one "desirable" plasma profile to use to treat ADD and ADHD: a sawtooth plasma

profile having two or three sharp peaks separated by substantial decreases in MPH plasma concentration comparable to the troughs seen in BID or TID dosing with immediate release products. [PFF ¶¶ 460, 487a].  This type of profile teaches away from the claimed inventions, which require dosage forms that exhibit ascending release rates for at least three hours, and which produce substantially ascending MPH plasma concentrations having, at most, slight dips.

### 5.   The Prior Art Shows That Avoiding Side Effects of MPH in Treating ADD and ADHD Is of Critical Importance

The prior art and knowledge held by the person of ordinary skill in the art reveal that an important consideration in design of a new ADD/ADHD treatment method at the time of the invention would certainly have been the need to avoid side effects associated with MPH.  [PFF ¶¶ 332-333, 343-347; DFF ¶ 287].  In particular, given the primary patient population (children), a person of ordinary skill in the field of the invention would have placed at least equal weight on the goal of controlling ADD and ADHD symptoms and the goal of avoiding side effects.  [PFF ¶ 448].

At the time of the invention, MPH was known to exhibit significant side effects and toxicity that increased with dose.  [PFF ¶¶ 344, 452].  The consequences of these side effects are more severe later in the day.  For example, appetite suppression and insomnia are particularly undesirable side effects for children to experience at the end of the day, when the child is expected to eat dinner and sleep.  [PFF ¶¶ 345, 459].  Yet, under the claimed treatment methods, the highest MPH plasma concentrations are surprisingly observed in patients at the end of the school day.  A dosing pattern for MPH that provided the highest plasma concentrations at the end of the school day, thus, would be directly contrary to the training and experience of a person of ordinary skill in the art having familiarity with use of MPH products. [*Id.*].

23

The person of ordinary skill in the art also would have found the teachings relating to the BID regimen relevant for minimizing side effects.  For example, the trough in the MPH plasma concentration occurs during the sawtooth plasma profile at the point in the day when the child typically eats lunch.  [PFF ¶¶ 314, 455].  This would have been an additional benefit known to those of ordinary skill in the art of the BID-type regimen because it would decrease the side effect of inhibition of hunger around lunchtime and thereby provide an overall improvement in the effectiveness of treatment.  [*Id.*].  It was known that hunger contributes to negative mood and hyperactivity in ADHD subjects.  [PFF ¶ 455].  Moreover, as observed in the Pelham 1990 paper, there was a threefold increase in side effects of Ritalin SR® relative to the BID regime, and in the severity of these side effects.  [PFF ¶ 333].

### 6.    The Work by Plaintiffs Reflected the Need to Identify the Reasons for the Failure of Ritalin SR®

The confusion in the field regarding the failure of Ritalin SR®, coupled with the intense demand for an effective once-a-day ADD/ADHD treatment method, motivated Plaintiffs to initiate a clinical research program on MPH.  [PFF ¶¶ 47-50].  The inventors designed and conducted innovative clinical research that was aimed at uncovering the actual source of the problems with Ritalin SR.  [PFF ¶ 51].  Their groundbreaking research paved the way for new approach to be taken in the treatment of ADD and ADHD, and has revolutionized the field. [PFF ¶ 499].

The ALZA scientists carefully studied the literature and consulted with leaders in the field of ADD and ADHD treatment.  [PFF ¶¶ 49-50].  Based on this effort, they identified a range of possible reasons for the failure of Ritalin SR®, including:

- the wax matrix dosage form used in the Ritalin SR® was not releasing the MPH consistently in patients, did not produce a flat enough plasma concentration over time, or had other formulation issues;  [PFF ¶¶ 56-57]

- the rate of ascent of the MPH concentration in the blood following administration of Ritalin SR® was not sufficient compared to the rate of ascent seen with immediate release product (the so-called "ramp" effect); and  [PFF ¶¶325, 340]

- the Ritalin SR® profile did not include a trough in the middle of the day, as is seen in the BID regimen based on immediate release products.  [PFF ¶¶314, 355]

They also theorized that excessive dosing could be occurring in subjects given Ritalin SR®, which would produce listless behavior that could have been mistaken for inattentiveness during the middle of the day.  The ALZA scientists recognized that the clinical studies done previously did not measure the effectiveness in treatment in a systematic or sufficiently controlled manner.  This made it impossible to pinpoint when, during the day, the Ritalin SR® product was showing effective treatment and when it was not.

In light of these factors, they designed pioneering clinical investigations to discover why Ritalin SR® did not work.  Their first clinical study – termed the "first sipping study" – compared three different plasma profiles and included a placebo control.  [PFF ¶¶ 51-60].  The first plasma profile modeled was the "gold standard" BID regimen, having two doses administered 4.5 hours apart.  [PFF ¶ 55].  The second profile was an "optimized" flat profile, which delivered a constant MPH plasma concentration for most of the day.  [PFF ¶¶ 56-57].  The ALZA scientists included this profile to determine if the problems with Ritalin SR® were somehow due to the wax matrix characteristics of the Ritalin SR® dosage form – the precisely administered doses under

25

the sipping study would produce a flatter and more controlled constant plasma profile.  [PFF ¶ 57].  The third profile studied was an ascending profile.  [PFF ¶ 58].  The ALZA scientists included this profile, in part, to assess the effectiveness of an increasing plasma concentration of MPH over time, and to measure that effectiveness relative to the effectiveness observed in the ascending and descending phases of the BID regimen.  [PFF ¶507b].

The results were surprising.  [PFF ¶¶ 61-63].  First, they discovered that the optimized flat profile could be correlated to decreasing effectiveness during the course of the day.  [PFF ¶¶ 61-62].  This ruled out that the Ritalin SR® formulation was not solely attributable for its lack of effectiveness.  Second, they were surprised to see how effective the ascending profile was throughout the day.  [PFF ¶ 62].  In particular, they discovered that in the ascending profile, effectiveness comparable to the BID regimen was shown in the middle of the day at a concentration less than half that observed in the BID regimen.

These discoveries led the ALZA scientists to conduct additional research.  For example, the second sipping study established for the first time with experimental evidence that acute tolerance could be shown to exist.  Profiles based on three TID regimen were compared.  The study showed that decreases in effectiveness of modified TID regimens could be correlated to TID profiles in which the second dose was given at earlier or later point in the day relative to the standard TID regimen, where the three doses are spaced apart by 4.5 hours.

Plaintiffs' scientists also conducted surveys of caregivers to learn about dosing patterns used with immediate release products.  [PFF ¶ 66].  That research revealed that caregivers typically provided a third dose to their patients later in the day, but that dose was reduced, often half the earlier doses given during the first and second administrations.  They did this based on

the need to avoid undesirable side effects from excessive dosing late in the day and on

experience that a smaller dose later in the day could provide effectiveness.

Using the insights gained by their pioneering clinical research, the inventors designed

new types of MPH plasma profiles and dosage forms having release rates that would provide

those plasma profiles.  [PFF ¶ 73].  In particular, they outlined a dosage form release rate that

would release increasing amounts of MPH for at least half of the time it took to release the bulk

of the MPH in the dosage form and which would release increasing amounts of MPH for at least

three hours after administration.  [*Id.*].  They determined that dosage forms that exhibited such

release rates would provide a substantially ascending MPH plasma concentration for at least 5.5

and 8 hours, which, based on their clinical research, would achieve effective control of ADD and

ADHD symptoms for a duration that would be appropriate for their target patient population.

Plaintiffs subsequently filed patent applications claiming, *inter alia*, these treatment methods,

and unique dosage forms useful in these methods, and were issued the claims-in-suit.

### F.    The Prior Art Did Not Render the Claimed Treatment Methods Obvious and in Fact Taught Away from the Claimed Invention

#### 1.    An Unpredictable Solution or an Invention at Odds with the Direction Set by the Prior Art Is Not Obvious

If the prior art and knowledge of the person of ordinary skill in the art teach *away* from

the solution found by the inventors, the invention cannot be characterized as obvious.  *KSR*, 127

S.Ct. at 1740 (explaining "that when the prior art teaches away from combining certain known

elements, discovery of a successful means of combining them is more likely to be nonobvious");

*Tec Air, Inc. v. Denso Mfg. Michigan Inc*,  192 F.3d 1353, 1360 (Fed. Cir. 1999) citing *In re*

*Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994)("A reference may be said to teach away when a

person of ordinary skill, upon reading the reference, would be discouraged from following the

path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant ... [or] if it suggests that the line of development flowing from the reference's disclosure is unlikely to be productive of the result sought by the applicant."); *In re Gordon,* 733 F.2d 900, 902 (Fed. Cir. 1984) (explaining that prior art teaches away from an invention if it suggests that the proposed modification would render the prior art device or process inoperable or unsuitable for its intended purpose).

These principles build upon the similarly well-accepted principle that, to establish a *prima facie* showing of obviousness of a patent claim, the evidence must show "some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references." *In re Fine*, 837 F.2d 1071, 1074 (Fed. Cir. 1988). As *KSR*, *Fine* and other cases have made clear, this suggestion or motivation may come from within the references themselves or may come from the knowledge held by the person of ordinary skill. *KSR*, 127 S. Ct. at 1742.

Predictability plays an equally well-established role in the law governing obviousness. If the prior art does not suggest that the claimed invention could have been predictably achieved, it does not render the claimed invention obvious. *Id.* ("When there is a design need or market pressure to solve a problem and there are a finite number of identified, *predictable* solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to *the anticipated* success, it is likely the product not of innovation but of ordinary skill and common sense." (emphasis added)). Indeed, the Supreme Court distinguished *United States v. Adams*, 383 U.S. 39 (1966) from *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57 (1969) and *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273 (1976), on the precise issue of predictability in achieving the invention from the prior art teachings.

28

Specifically, it observed that the battery invention at issue in *Adams* was found non-obvious because "the prior art warned that risks were involved in using the types of electrodes he employed.  The fact that the elements worked together in an unexpected and fruitful manner supported the conclusion that Adams's design was not obvious to those skilled in the art."  *KSR*, 127 S. Ct. at 1740.

Under this precedent, the claimed treatment methods would not have been obvious to a person of ordinary skill in the art.  Biological systems, including human therapy, have been recognized in the patent law as being one of the *most* unpredictable fields of scientific research. *See, e.g., Takeda Chemical Industries, Ltd. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, (Fed. Cir. 2007) (holding invention not obvious due to unpredictable therapeutic effect of alteration of chemical structure); *Enzo Biochem v. Calgene, Inc.*, 188 F.3d 1362, 1374 (Fed. Cir. 1999) (subject matter concerning biological materials or reactions are generally considered to be unpredictable); *In re Chupp*, 816 F.2d 643 (Fed. Cir. 1987) (herbicide invention held not obvious due to unexpectedly higher biological activity).  Defendants provide no explanation of how a person of ordinary skill in the art could have predicted that an ascending rate of release of methylphenidate, either alone or coupled with a substantially ascending plasma concentration of drug could have achieved therapeutic benefits – without side effects – comparable to BID or TID dosing.

> **2.    The Knowledge in the Art before the Invention Would Have Taught Away from the Claimed Treatment Methods**

The knowledge of a person of ordinary skill and the contents of the prior art *teach away* from the claimed treatment methods and would have provided a strong *disincentive* for the person of ordinary skill to treat ADD or ADHD using a dosage form that released MPH at an

ascending rate for an extended period of time, and which produced a substantially ascending

MPH plasma concentration for about 5.5 or about 8 hours.  The prior art, coupled with

knowledge of the person of ordinary skill in the art at the time of the invention, plainly would not

have suggested the claimed treatment methods, and the treatment methods of the claims-in-suit

consequently are not invalid under §103.

First, the prior art plainly shows that the only type of MPH plasma profile known to be

effective for the course of an entire school day was the sawtooth profile produced by BID or TID

dosing with immediate release products. [PFF ¶¶ 449, 460].  This plasma profile is characterized

by a substantial decrease in the MPH plasma concentration in the middle of the day, which is

readily distinguishable from the plasma profile of Ritalin SR®, which has a substantial and

extended peak concentration at that point of the day.  [PFF ¶ 290].  The prior art also shows that

the generally flat MPH plasma profile produced by Ritalin SR® was clearly less effective than

BID and TID regimens and had more side effects.  [PFF ¶ 299].



These teachings would have led a person of ordinary skill to conclude that the only viable way of treating ADD or ADHD would have been to produce a plasma profile that includes a significant MPH plasma decrease in the middle of the day. [PFF ¶ 460]. This plainly teaches away from a dosage form that would produce a consistently increasing plasma concentration throughout the entire day.

Second, prior to the discoveries made by Plaintiffs, the need to avoid known side effects of MPH, particularly late in the school day, would have directly taught away from dosage forms that produced the highest MPH plasma concentration at the end of the school day. Yet, this is precisely what the claimed methods do. Accordingly, the need to avoid side effects, particularly late in the day, would have taught away from the claimed treatment methods. [PFF ¶¶ 452-453, 480]. This would have been considered to render the methods inoperative or unsuitable for these purposes.

Third, the prior art clearly identifies the formulation of the Ritalin SR® product as being a likely source of its problems.  [PFF ¶¶ 322, 341, 466].  Every publication cited by Defendants as suggesting that acute tolerance was a potential problem with Ritalin SR® also pointed directly to the wax matrix nature of the formulation of Ritalin SR® as a likely, if not dominant, source of its problems.  [*Id.*].  The logical consequence (if any) of these observations to a person of ordinary skill in the art would have been to produce a "better" extended release formulation and not to simply rule out a conventional "flat" MPH plasma profile as a possibility as Defendants suggest.  [*Id.*; PFF ¶ 467].

These observations in the prior art certainly would not have led a person of ordinary skill in the art to contemplate using in the place of a conventional flat profile a radically different and untested approach to treating ADD and ADHD.  Doing so would be inconsistent with conventional thinking concerning the design of extended release dosage forms, which encourages production of dosage forms that provide and then maintain a drug plasma concentration that stays within a relatively narrow "therapeutic window."  [PFF ¶¶ 287, 297].  This conventional approach ordinarily achieves the twin goals of providing enough drug in the plasma to create the desired beneficial therapeutic effect, without causing drug plasma fluctuations or excess dosing that results in undesired side effects or toxicity.  [PFF ¶ 467].  Thus, Defendants have no basis for asserting that a person of ordinary skill would have eliminated this type of profile from consideration in evaluating options for developing a new once-a-day dosage form for use in treatment of ADD and ADHD.

### G.    Defendants' Assertions of Obviousness Rest on a Grossly Inaccurate Picture of the Prior Art and Knowledge of the Person of Ordinary Skill in the Art

According to the Defendants, the problem existing at the time of the invention was a simple one to diagnose and solve.  They assert that it was known in the art that Ritalin SR® failed to provide effective once-a-day treatment of ADD and ADHD because of acute tolerance and that the solution to this problem was equally simple – just increase the dose of MPH.  [DFF ¶¶ 285, 287-288, 297].  This, according to Defendants, makes the design of an appropriate plasma profile to effectively treat ADD and ADHD simple and obvious – create a dosage form that produces a substantially ascending MPH plasma concentration for about 8 hours.  [DFF ¶¶ 380, 393].

To reach this conclusion, Defendants distort the teachings in the prior art and mischaracterize the knowledge of a person of ordinary skill in the art.  By doing so, they conclude that a person of ordinary skill would have recognized that there would have been only a few "logical" options for treating ADD and ADHD using MPH, namely, a sawtooth plasma profile (like the BID regimen), a flat plasma profile (like the Ritalin SR® regimen), or an ascending or substantially ascending plasma profile.  [DFF ¶¶ 280, 293].  According to the Defendants, each of these profiles would have been equivalently plausible.  To reach this conclusion, Defendants assume the person of ordinary skill would have ignored the well-known and severe side effects of MPH and their consequences to children as being unimportant considerations in the design of a new way of treating ADD and ADHD.  Defendants offer no evidence, or even a rationale, why the person of ordinary skill in the art would do this.  Defendants also advance no theory and offer no evidence why a person of ordinary skill in the art would have selected a dosage form that releases MPH at an ascending rate for at least three

hours and through at least the mid-point of the $T_{90}$ – instead, electing to simply dismiss this element of the claims.

Finally, according to Defendants, the person of ordinary skill in the art would eliminate two of the "logical" plasma profile solutions – the one that was known to work, and the one that was consistent with conventional extended release dosage form design – and instead select an unknown plasma profile that had never been tested or even proposed for treatment of ADD/ADHD and that would have raised serious concerns in the minds of people familiar with the side effects of MPH. [DFF ¶¶ 280-281]. Through this tortured logic, Defendants conclude that the person of ordinary skill would have readily arrived at the claimed treatment methods as the "obvious" solution to the problems in the prior art.

Defendants' rationale is inconsistent with the actual teachings of the very prior art they cite and with general understandings that a person of ordinary skill working in the field of the invention would have had regarding how to develop an effective once-a-day treatment method for ADD and ADHD. Defendants are also plainly incorrect in portraying the prior art as having established that acute tolerance was exhibited by Ritalin SR® and was the reason why Ritalin SR® did not provide effective once-a-day treatment of ADD and ADHD.

The mere *possibility* of acute tolerance of MPH would not have rendered the claimed treatment methods obvious at the time of the invention. As numerous cases make clear, the mere knowledge of a problem, standing alone, cannot render a claimed invention obvious. Instead, there must be some appreciation of *how to solve* the problem in the prior art teachings or in the common knowledge of the person of ordinary skill in the art. *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988) (stating that without indication or direction from the prior art, it cannot be

obvious to try all possible solutions).  There is neither a clear picture in the ADD and ADHD

prior art of the source of the shortcomings of Ritalin SR®, nor any indication of how to solve

these problems – other than by means of the traditional BID or TID dosing regimen.  And even if

one suspected acute tolerance, the logical way to overcome it would have been with a dosage

form that minimized the BID regimen with a trough that allowed some intra-day recovery.

Defendants' reliance on examples of treatment methods outside the field of ADD and

ADHD and its treatment using MPH is misplaced.  [DFF ¶¶ 285, 297, 307, 309, 313].  As

explained below, this prior art does not even teach what Defendants assert.  And, given the very

different nature of the diseases, and problems being addressed by these prior art approaches, they

would not have rendered obvious the treatment methods of the claims-in-suit.

### 1.    Acute Tolerance – and How to Overcome it – Was Not Known or Suggested by the Prior Art

As explained above, and contrary to Defendants' assertions, at the time of the invention,

acute tolerance was not known to occur with MPH, much less that it had been identified as *the*

reason why Ritalin SR did not provide an effective once-a-day treatment of ADD and ADHD.

Certainly, some authors had published theories that hypothesized – along with numerous other

possible explanations – that tolerance or acute tolerance *might* be a factor contributing to the

ineffectiveness of Ritalin SR.  [PFF ¶¶ 322, 341].  However, the very manner in which these

thoughts were expressed in these publications confirmed that acute tolerance had not been

*established* for MPH or was the reason why Ritalin SR was ineffective.[5]

---

[5]    For example, Birmaher et al., state: "This prolonged, stable level *raises a question* about
whether MPH-SR may be more prone to tachyphylaxis, similar to that seen using a
sympathomimetics with longer half-lives than standard MPH, such as the amphetamines or
inhaled beta adrenergic agonists." (citations omitted, emphasis added).  [PFF ¶¶ 325].

Lacking evidence linking acute tolerance to methylphenidate prior to the invention, Defendants make a fallback argument that central nervous system stimulants as a class were known to exhibit acute tolerance, citing Angrist. [DFF ¶ 285]. But the Angrist paper would not have been viewed by a person of ordinary skill in the art as being relevant to the therapeutic use of MPH to treat ADD and ADHD. The Angrist paper described and discussed tolerance issues associated with illegal drugs in *drug abuse* settings. [PFF ¶ 367]. The examples of acute tolerance discussed in Angrist focused on the pharmacological effects of narcotics at *supra-therapeutic*, often toxic levels, not therapeutic levels that would be relevant to treating a patient. [*Id.*]. A person of ordinary skill in the art would derive no insights from Angrist in designing treatment methods based on normal dosing levels and plasma concentrations of MPH. [*Id.*; PFF ¶¶ 472-473].

Defendants also attempt to bolster their assertions regarding knowledge of acute tolerance by pointing to the specification of the '373 patent:

> For drugs that act on the central nervous system, like MPH, dispensed from a sustained-release nonascending dosage form, the patient often develops an acute tolerance to the drug manifested by a shortened duration and a decrease in the intensity of the therapeutic effect needed for acceptable therapy. The prior sustained release-delivery is also devoid of means that compensate for its shortcomings inherent therein.

[DFF ¶ 286]. But this insight comes from *Plaintiffs' inventors*, not from the teachings in the prior art. In the quoted passage, the references are not acknowledging this insight as existing in the prior art. Defendants may not rely on the patentee's own teachings to support their assertions of obviousness. *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed. Cir.

---

Importantly, Birmhaher et al., also identified several other reasons unrelated to acute tolerance that may be have been a reason for the ineffectiveness of the Ritalin SR product.

2003) ("[A] reference can become prior art by admission," but "that doctrine is inapplicable when the subject matter at issue is the inventor's own work.").

Defendants' position regarding knowledge of acute tolerance in the field is also contradicted by the widespread recognition that publication of the "sipping studies" research was the first authoritative connection of acute tolerance to MPH.  [PFF ¶507a].

## 2.   The Possibility of Acute Tolerance Would Not Have Rendered the Claimed Inventions Obvious at the Time of the Invention

Even with a suspicion of acute tolerance, the person of ordinary skill in the art would not have considered an ascending release rate or substantially ascending plasma concentration to have been an "obvious" solution to the problem of Ritalin SR.  To the contrary, a person of ordinary skill in the art would have focused on the primary distinction between the sawtooth plasma profile produced through a BID or TID regimen (which worked) and generally flat profile produced by Ritalin SR (which did not).  [PFF ¶¶ 449-460].  The sawtooth plasma profile has a deep trough in the plasma concentration that occurs in the middle of the day, which is not present in the Ritalin SR plasma profile.  [*Id.*].  If anything, the person of ordinary skill in the art would have concluded from this that the trough was playing an important role in providing better overall effectiveness of the treatment regimen relative to the Ritalin SR profile.  [*Id.*].  And, if acute tolerance were suspected as the cause of the Ritalin SR problem, then the trough would likely have been viewed as the key to the effectiveness of the BID and TID regimens because the trough would allow recovery from acute tolerance.  [PFF ¶¶ 477-478].  Indeed, the prior art cited

by Defendants is filled with teachings that a recovery period was widely recognized as being an effective way to overcome tolerance.[6]  [PFF ¶¶ 335-336; DFF ¶ 291].

> ### 3.    The Person of Ordinary Skill in the Art Would Not Have Ignored Side Effects in Designing a New MPH Treatment Method, and These Would Have Counseled Strongly Against the Claimed Treatment Method

Defendants make passing reference to, but then completely ignore the role that side effects would have had in the considerations of the person of ordinary skill in the art seeking to design an effective once-a-day treatment method for ADD and ADHD.  [DFF ¶ 283].  As was known in the art, the side effects of MPH were known to increase with increasing dose.  This is why proper titration at the start of an MPH treatment regimen is necessary – the physician must strike a balance between effective treatment and minimization of side effects in patients.  [PFF ¶¶ 343-347, 448].

In view of these points, a person of ordinary skill in the art would not have considered as equally plausible choices, a plasma profile that creates a significantly higher MPH plasma concentration late in the day, as compared to plasma concentrations that mimic the known and effective BID or TID profiles, or which reach a therapeutic level and stay constant for several hours.  [*Id.*; PFF ¶ 460].  To the contrary, a plasma profile that continued to ascend over the

---

[6] For example, Defendants cite prior art studies discussing acute tolerance associated with nicotine.  [DFF ¶ 291].  Defendants explain that the prior art studies showed that the effects of a first cigarette in the day are greater than those smoked later in the day.  [*Id.*].  They assert that the prior art teaches that a period of "rebooting" or normalization must be occurring during the night that increases the potency of the first cigarette in the day.  [*Id.*].  Under the logic of Defendants' arguments, a person thinking that acute tolerance might be a problem with MPH would have suspected that the trough in the BID regimen was playing some role in "rebooting" the patient's system, similar to that which occurs during the evening in their smoking example and should not be omitted.

therapeutic dosage level would have been expected to severely exacerbate the problem of MPH side effects.  [PFF ¶¶ 297, 453].

Defendants also advance a simplistic "added dose" theory to overcome acute tolerance. DFF ¶292, 293.  Defendants, however, fail to explain what in the prior art or in the knowledge of the person skilled in the art provides guidance as to *how* or *when* to provide this added dose of MPH.  For example, they fail to explain why the person of ordinary skill would elect to provide this additional dose through the untested new approach of the patent claims, rather than simply giving the patient an additional dose of the drug, or an increased dose, at an appropriate point in the day, as is done under the conventional BID or TID regimen.  [PFF ¶ 460].  And, Defendants ignore the fact the prior art they rely so heavily on clearly teaches that increased dosing is *not the answer* to the problem acute tolerance of nitrate drugs in angina treatment.  Instead, as taught by that prior art, intermittent dosing with no-drug or "washout" periods was the solution.

Defendants' "added dose" theory also conflicts with actual experience and practices in the field in treating patients under TID MPH regimens.  Before the invention, caregivers often provided patients a third dose approximately 4 to 5 hours after the second dose.  [PFF ¶ 65]. But, importantly, the amount administered in the third dose typically was *half the dose* of the first or second dose.  [*Id.*].  Despite this, caregivers reported that they saw comparable effectiveness after this third, half-dose.  [*Id.*].  Thus, contrary to Defendants' theories, actual experiences in treating ADD and ADHD using MPH products prior to the invention would have suggested that a smaller dose, if any, would be required later in the day.

Accordingly, the last thing a person of ordinary skill treating ADD/ADHD patients would have wanted to do would have been to continually increase the patient's plasma drug

concentration through lunch time and into the mid-afternoon due to concerns over the known and serious side effects such as loss of appetite and insomnia.  [PFF ¶¶452-459].

4.    **The Additional Prior Art Cited by Defendants Does Not Render the Claimed Methods Obvious**

Because the MPH publications actually lead away from the invention, Defendants ultimately resort to a number of publications and patents outside the field of MPH and ADD/ADHD treatment in an attempt to bolster their hindsight-driven conclusions of obviousness.  [DFF ¶¶  298, 307, 309, 313].  They assert that the combination of these prior art references with the knowledge of the shortcomings of Ritalin SR would have rendered the claimed treatment methods obvious.  [*Id.*].  None of these secondary references even teaches what Defendants assert.  And, when they are considered in view of an accurate depiction of the knowledge existing before the invention of the claimed methods, they certainly do not establish that a person of ordinary skill in the art would have found the claimed ADD/ADHD treatment methods obvious at the time of the invention.

(a)    **The Angina Drug Prior Art (Fung paper, Bayer patent. and Kochinke patent) Does Not Render the Claimed Treatment Methods Obvious**

Defendants rely primarily on publications and patents concerning use of nitrate drugs in treating angina in heart patients (Fung paper, Bayer patent, and Kochinke patent).  [DFF ¶¶ 298, 307, 309].  Defendants incorrectly assert that these references – generally teach that one can overcome nitrate drug acute tolerance by providing an ascending plasma drug concentration and that a person of skill could have applied this to MPH.

Defendants place particular emphasis upon the Fung article.  They assert that this paper teaches that "a rising nitrate 'blood level' may be beneficial in producing a sustained nitrate

action,' rather than dosing with a controlled release dosage form which sustained nitrate plasma concentrations at a relatively constant value."  [DFF ¶ 301].  They also assert that Fung teaches that "to overcome this nitrate tolerance, 'an alternative input mode might be one that involves escalating rates of drug delivery so that increasing systemic nitrate concentrations may be achieved."  [DFF ¶ 303].

Defendants cite the Bayer patent as describing "a method of administering nitrates in a way to avoid tolerance through a transdermal patch applied to the skin."  [DFF ¶ 307].  Defendants state that the Bayer patent teaches to do this by providing a transdermal system in which "following an initial washout period, the nitrate is delivered at an effective rate and, after achieving that rate, the delivery is then increased over a ramp up time period of from about 8 to about 21 hours."  [*Id.*].  Defendants ignore the fact that this transdermal system, by Defendants' own characterization, does not provide the required ascending rate of release from the time of administration until through the mid-point of the $T_{90}$ of the dosage form.  [PFF ¶ 393].

Defendants also cite the Kochinke patent.  Defendants correctly characterize this patent as teaching "a three phase delivery system: (1) an initial "ramp-up" period for increasing blood concentrations which ends between 2 and 10 hours after application, (2) the second phase is a period for maintaining blood concentrations, and (3) phase 3 permits a decrease in blood concentrations."  [DFF ¶ 309].  Defendants characterize this patent as being pertinent because it refers to "tolerance" in the patent disclosure.  [*Id.*].

An accurate reading of the nitrate literature so heavily relied upon by Defendants demonstrates that none of these references would have made the claimed inventions obvious to a person of ordinary skill in the art before the date of invention.

41

First, Defendants fail to point out that the Fung article expressly characterized the pharmacokinetics and pharmacodynamics of nitrates as being "quite unusual." [PFF ¶ 375]. They also fail to point out that the article explained that this "quite unusual" characteristic of nitrates was based on their observation that "during long-term administration, occurrence of circulatory and antianginal tolerance was accompanied by an observation of increased, rather than decreased, nitrate plasma concentrations." [*Id.*]. In other words, the Fung authors are indicating the nature of the acute tolerance they observed in nitrates was what made these drugs unusual. Based on a correct reading of the Fung article, a person of ordinary skill in the would not have concluded that the type of acute tolerance exhibited by nitrates was commonly observed, nor would that person broadly extrapolate this observation to any other type of drug that exhibits acute tolerance, or any other type of disease state. [PFF ¶¶ 368-371, 385].

Second, Defendants fail to point out that precise dosing of nitrates, unlike MPH, is unnecessary. This is because wide ranges of doses of nitrates can be administered, and nitrates have few side effects that manifest themselves within this broad range of doses. [PFF ¶¶ 376-377]. For example, Figure 3 of the Fung paper shows that patients given approximately *eight times* the therapeutic dose necessary for isosorbide dinitrate to exert its therapeutic effect experienced little or no increase in reported clinical effects or in side effects. [PFF ¶ 376]. The person of ordinary skill in the art developing a nitrate extended release product would have had few, if any, concerns over increasing side-effects and toxicity in designing a nitrate treatment method, the precise converse of the situation facing the person of ordinary skill attempting to design a new ADD or ADHD treatment based on MPH. [PFF ¶ 377]. A person in the latter situation would never consider increasing the dose of MPH given to a child by an eight-fold amount in light of the known concerns about side-effects and toxicity of MPH. [PFF ¶ 492a].

42

Third, the person of ordinary skill in the art would have also appreciated the fundamentally different nature of the two diseases being treated and the physiological effects of the two drugs in question.  [PFF ¶¶ 368-371].  For example, angina and related diseases are related to problems in the vasculature, and nitrates treat those problems by causing hemodynamic effects.  [*Id.*].  By contrast, ADD and ADHD are central nervous systems (CNS) disorders, characterized by behavioral symptoms. [*Id.*].  MPH produces its therapeutic effects not by causing a change in the person's vasculature, but through intracellular signaling through agonist binding of MPH to cellular receptors.  [*Id.*]. There is no rational connection or analogy between the target of nitrate as an active ingredient, the mechanism of action of nitrates, and medical use of nitrates, relative to those associated with MPH.  [*Id.*].  A person of ordinary skill in the art would not have extrapolated teachings relating to nitrates to the use of MPH to treat a neurological disease (ADD and ADHD) and would have had no basis for expecting the treatment regimen to work.  [PFF ¶ 371a].

Defendants also ignore the plain teachings in the art that followed the publication of the Fung article which discredited the hypothesis.  A decade after the Fung paper was published, and four years after the Bayer patent was filed, the authors of the Fung article filed a patent application on treatment methods for angina.  [PFF ¶ 396].  The patent references not only the earlier Fung work, but also the Bayer patent.  [PFF ¶¶ 397-398].  The patent acknowledged that the Fung paper had theorized that "escalating rates" might overcome tolerance.  [*Id.*].  It also described the Bayer patent as proposing drug therapy involving "steadily increasing rate[s]" of drug delivery.  [*Id.*].

After describing the prior art teachings as such, the Fung patent states that "[a]t present no dosage regimen with nitrovasodilators has been developed that can achieve the dual

43

objectives of avoiding hemodynamic tolerance while continuously maintaining their beneficial effects." [PFF ¶ 399]. Thus, the hypothetical approach described in the Fung paper from a decade earlier – the paper which Defendants characterize as clearly teaching that an ascending plasma concentration would have been the "obvious" solution to acute tolerance for any type of drug – was never pursued, even as a way to overcome tolerance observed with nitrates. The Fung patent instead focuses on dosage forms that provide a *constant* release rate profile as the solution to acute tolerance. [PFF ¶ 400].

Indeed, the Fung patent cites other prior art that indicates that there is "uncertain[ty] whether higher doses administered continuously can overcome [tolerance], and that it seems equally likely that a nitrate-free interval, e.g., by interrupting administration during the night, might provide the means for avoiding tolerance."[7] [PFF ¶ 400a]. During prosecution of this patent, the inventors explained to the PTO that, as of the date of that patent, the only dosing regimen that had been discovered as being effective in overcoming nitrate tolerance was *intermittent dosing – not* the ascending plasma rate approach described in the Fung paper. [PFF ¶ 400]. This statement from the same authors as the Fung hypothesis plainly undercuts a fundamental tenant of Defendants' theory of obviousness in this case – that "one obvious approach for overcoming this problem [of acute tolerance] was to use a dosage form that would supply increasing amounts of methylphenidate throughout the day so as to avoid a decrease in activity." [Def. Brief at 122; *see also* DFF ¶ 293 (to overcome acute tolerance, "one would know that increasing doses or increasing rates of drug delivery would be a logical option.")]. Thus, the

---

[7]     The Fung patent also explains that they ultimately switched to a different drug – nitrites, rather than nitrates – and selected a dosage form that provided a constant rate of release of this drug, rather than one that exhibited an ascending rate of release. PFF ¶ 400. This constant release dosage form is described in the Fung patent as being effective to overcome tolerance. [PFF ¶400a].

Fung group plainly did not conclude that ascending release rate and ascending plasma concentrations of nitrates were a "logical" or "obvious" solution to acute tolerance exhibited by nitrates – let alone, other drugs.  Instead, they point to a solution comparable to the BID or TID administration of MPH.

Based on these considerations alone, the person of ordinary skill in the art would not have used the hypothetical solution in the Fung paper to use MPH to treat ADD and ADHD.  In addition, the features of the "proposed nitrate dosing mode" shown in Figure 4 of Fung plainly would not have been used by a such person as a design influence for a new way of using MPH to treat ADD and ADHD.  [PFF ¶ 383].  In that figure, nitrate drug levels escalate to levels more than twice that for the "conventional dosing mode" even after 12 hours post-ingestion.  [PFF ¶¶ 384-385].  Such a profile, which the Fung paper itself called "speculative," would not have been used with MPH in treatment of ADD/ADHD in children, as it would have been expected to cause significant increases in the incidence of side effects and toxicity.  [PFF ¶ 382].  And, by its own terms, the approach in Fung was a hypothetical approach.  As the paper stated: "the validity of this dosing approach has to be experimentally tested, and the potential problems arising from it . . . are yet to be fully appreciated."  [*Id.*].  Nothing suggests this hypothetical approach was ever pursued or tested.

The Bayer patent is even less relevant.  First, Bayer described transdermal nitrate delivery systems, not oral extended release dosage forms.  [PFF ¶ 388].  The Bayer system also did not exhibit an ascending rate of release of nitrate starting at t=0 and continuing through at least the midpoint of the $T_{90}$ of the dosage form.  [PFF ¶ 393].  Instead, Bayer described a system which provided *no release* for a period of time, then provided release at a constant rate for several hours, and finally, released an increasing amount during hours 8 to 21 after the start of

dosing.  [PFF ¶¶ 389-391].  Defendants selectively focus only on this last phase of the

transdermal system to assert that the Bayer patent would have suggested to a person of ordinary

skill the present inventions.  [PFF ¶ 307].

This is not how a person of ordinary skill would have evaluated Bayer.  Instead, the

person of ordinary skill would have considered *the entire profile* taught by Bayer, as well as the

reasons underlying the design of the proposed delivery profile.  [PFF ¶ 390].  The Bayer patent

explained that a delay or lag in the delivery of drug after administration prior to any ascending

drug delivery was an important and critical feature of the delivery profile.  [PFF ¶ 391].  Thus,

for the first 3 to 12 hours after administration, the goal of the dosage forms and methods

provided in the patent was to release nitrates at *sub-therapeutic* levels.  [PFF ¶ 389].  Such a

delivery profile would not be effective in the treatment of ADD or ADHD, where immediate

release of drug is necessary to control ADHD symptoms in the morning.  [PFF ¶ 391].

Moreover, the design of the Bayer dosage form would be impractical to adapt for use in treating

ADD and ADHD, as it would only start to provide therapeutically relevant amounts of MPH in

the late afternoon and would then increase doses delivered throughout the evening.  [PFF ¶ 392].

No rational person vaguely familiar with the needs of a child having ADD and ADHD would

have considered such a release profile to be relevant.  [PFF ¶ 392a].

Similarly, Defendants provide only a distorted and selective reading of the Kochinke

patent.  Defendants have admitted that the only relevant portions of Kochinke patent would be

Figures 2 and 4 in this patent.[8]  [DFF ¶ 309].  Figure 2 provides a conceptual overview of the

---

[8]    Defendants' Expert Dr. Mayersohn admitted that Figure 10 of the Kochinke patent would
be irrelevant to the claimed methods.  [PFF ¶ 412]

plasma profiles of the Kochinke invention.  [PFF ¶ 407].  Figure 4 provides an example of

transdermal system made with the Frandol drug.  [*Id.*].

The Kochinke patent explains the rationale of the dosage forms illustrated by figures 2

and 4 as follows:

> The rationale behind this drug delivery profile is that the initial high blood
> levels *may be more effective when followed by a period of decreasing*
> *dosage than if the blood levels were maintained at the higher or lower*
> *level throughout the entire administration period.* This modulated delivery
> profile is essential to effective nitrate therapy where tolerance can be
> avoided by an interval, typically in the range of about 6 to 10 hours, in
> which sub-therapeutic plasma levels of the nitrate drug, or a metabolite
> thereof, are obtained.  Thus, the device described herein is capable, by
> virtue of its modulated drug delivery profile, of preventing or greatly
> reducing the onset of tolerance to the drug being administered.

[PFF ¶ 410 (emphasis added)].  Thus, the Kochinke patent, by its very terms, is directed the

person of ordinary skill in the art to do *precisely the opposite* of what the claims-in-suit require.

[PFF ¶¶ 496-497].  Specifically, the Kochinke patent stated that a *descending* plasma

concentration of the drug is necessary to overcome tolerance.  [PFF ¶ 411].

The profiles proposed in the Kochinke patent also would have been recognized by a

person of ordinary skill in the art as unsuitable for treatment of ADD/ADHD.  Figures 2 and 4 of

the Kochinke patent disclosed plasma concentration profiles in which the plasma concentration

of the drug substantially exceeds the "target plasma levels" for large portions (8 hours and

beyond) of the day.  [PFF ¶ 407].  In addition, in these profiles, the plasma levels of the drug do

not drop off significantly until late in the day.  [PFF ¶ 408].  These profiles plainly would not

have been adapted by a person of ordinary skill in the art for use in the treatment of

ADD/ADHD, in part, because each would raise serious concerns over side effects and toxicity.

[PFF ¶ 409].

47

Moreover, none of the plasma concentration profiles described in the patent substantially ascends for an extended period.  Instead, as the Kochinke patent itself emphasizes, after an initial phase of ascension, the plasma profiles illustrated in Figures 2 and 4 *substantially descend for extended periods*.  [PFF ¶ 411].  Thus, each of the figures cited by Defendants actually *teaches away* from a substantially ascending plasma concentration profile during the relevant treatment period.  [PFF ¶¶ 496-497].

The Kochinke patent also provides no special insights regarding MPH.  The connection observed by Defendants is the inclusion of MPH in a list of more than 200 active ingredients of all types and purposes which the Kochinke patent indicates have "tolerance" issues.  [DFF ¶309].  The inclusion of MPH in this laundry list provides no special insights into either the question of *acute* tolerance of MPH, or the relevance of that possible problem to a solution.  [PFF ¶414].  Moreover, the Kochinke patent, read in proper context, is actually suggesting that a problem of tolerance with MPH be addressed through a *substantially descending* concentration, precisely the opposite of the claimed treatment methods.  [PFF ¶411].

An accurate picture of the prior art in the field of angina treatments shows that the person of ordinary skill in the art *even in that field* would not have considered an ascending release rate or an ascending plasma concentration profile to have been an "obvious" solution for the problem of acute tolerance *for angina drugs*.  To the contrary, these disclosures teach away from such concepts, by pointing to intermittent dosing or descending plasmas concentrations as the way to overcome tolerance for angina drugs.  [PFF ¶¶ 400a, 401, 495, 498].  Tellingly, Defendants have not come forward with a single example of any dosage form for nitrates (or any other drug) that was actually made and tested and shown to overcome acute tolerance by increasing the plasma drug concentration over an extended period of time in which the therapeutic effects are desired.

Accordingly, Defendants have no basis for making the even more strained suggestion that these references would have suggested to the person of ordinary skill in the art that ascending release rates and substantially ascending plasma profiles could be *predictably adapted* to an entirely different type of disease, using a drug with an entirely unrelated mechanism of action, and which exhibits severe side effects that increase with increasing dose. Plainly, these references, rather than suggesting the claimed inventions, provide no suggestion to the person of ordinary skill in the art to modify the Ritalin SR product to yield the claimed ADD and ADHD treatment methods.

### (b)    The Wong Patent Has No Relevance to the Claimed Treatment Methods

Another secondary reference relied on by Defendants is the Wong patent, which they argue suggests the use of a substantially ascending plasma concentration profile and an ascending release rate, respectively, for the treatment of ADHD with MPH. [DFF ¶ 313].

Importantly, the specification of the Wong patent was considered by the PTO during the examination of the '373 patent and the claims-in-suit. [PFF ¶¶ 420-422]. The PTO necessarily found that this patent did not render the claims-in-suit obvious. [*Id.*]. Thus, Defendants have a particularly heavy burden to overcome that this disclosure renders the claims-in-suit obvious. *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1467 (Fed. Cir. 1991) ("This burden is especially difficult when the prior art was before the PTO examiner during prosecution of the application.").

The working examples in the Wong patent involve anti-hypertensive agents (verapamil and nicardipine), and the primary objective of the Wong dosage form is to delay release of a therapeutically significant dose of the drug for an extended period. [PFF ¶ 423]. The patent

explains that blood pressure rises shortly before a patient wakes up in the morning, and the delayed release feature described in the patent enables the patient to take the medication before going to sleep.  [PFF ¶ 424].  The Wong patent explains that the osmotic dosage forms described in the patent release the drug at a very low, albeit ascending, level for a significant period of time after ingestion.  After a period of low-level release – following ingestion – the dosage form begins to release greater amounts of the drug toward the end of the period of release for the dosage form.  [PFF ¶ 426].  As the Wong patent explains, this is done so that only sub-therapeutic amounts of the drug are provided to the patient for an extended period after it has been administered.  [PFF ¶ 426].  After that period, when the drug release rates increase, the plasma concentrations of the drug begin to reach therapeutic levels.  [PFF ¶ 427].

Importantly, there is no mention anywhere in the Wong patent of tolerance and no statement or suggestion that its approach has any utility in overcoming tolerance.  [PFF ¶ 433].  This patent therefore provides no suggestion of any kind that the plasma concentration profiles illustrated in the patent could be used to overcome tolerance.  And, as noted *supra*, there was no clear indication in the prior art that acute tolerance was the problem that needed to be addressed with Ritalin SR.

Defendants argue that the Wong patent is somehow pertinent because MPH is listed, along with hundreds of other drugs, in the Wong disclosure as drugs that might prove suitable for use in the osmotic release systems described in the Wong  patent. [PFF ¶432 ].  They also assert that the hydrochloride salt of one of the two drugs that were the actually the focus of the Wong patent – verapamil – has "similar aqueous solubilities" to MPH hydrochloride. [PFF ¶423].  Defendants assert that this would have led a person of ordinary skill in the art to have expected

50

that the two drugs "would perform similarly in an osmotic-type drug delivery system." [DFF ¶ 316].

The inclusion of MPH on a list containing hundreds of other known drugs provides no guidance as to a suitable release rate or plasma profile for that drug. [PFF ¶414]. Similarly, the fact that MPH may have a "similar" solubility to one of the two drugs discussed in the Wong patent would say nothing of relevance to the person of ordinary skill tasked with development of a new ADD/ADHD treatment method.[9] [Testimony of Dr. Patrick].

A person of ordinary skill in the art would have recognized that the delayed release dosage form described in the Wong patent would have been incompatible with the treatment of ADHD because it would provide no control of ADHD symptoms during a majority of the school day (i.e., during the first period of the Wong patent dosage form when only sub-therapeutic doses are provided). [PFF ¶ 429].

The one example in the Wong patent where a therapeutic dose of the drug is to be provided earlier in the day actually teaches away from the claimed treatment methods. In this example, the Wong patent suggested coating the dosage form with an immediate release layer containing the drug. [PFF ¶ 431]. However, critically, the Wong patent indicates that in this embodiment, the dosage form must be designed to produce a *drug free plasma concentration period* after the immediate release dosing period ends. [*Id.*]. At the end of the "drug free" interval, the dosage form begins to release larger, therapeutically relevant doses of the drug. [*Id.*]. In other words, in this one example, the Wong patent described a dosage form that would

---

[9]    Indeed, when Defendants had their own patent application (claiming MPH dosage forms and treatment method) rejected over similar types of laundry list disclosures, Defendants stated to the PTO: [PFF ¶418]

produce a sawtooth plasma profile comparable to the BID regimen based on immediate release MPH products.

If a person of ordinary skill in the art considered the Wong patent at all that person would have focused on this embodiment, because it is the only embodiment that would provide a therapeutic dose of MPH at a time relevant to treatment of an ADD or ADHD patient (i.e., in the morning and middle of the day). Accordingly, the Wong patent does not render obvious the claimed treatment methods.

### (c)    Conclusions Regarding the Secondary References Cited by the Defendants

As explained above, the secondary references cited by the Defendants do nothing to correct the absence of guidance in the prior art as to how to solve the problems with Ritalin SR. Defendants inaccurately describe what the secondary references actually teach, as well as their significance to the person of ordinary skill in the art facing the challenge of designing a new treatment method for ADD and ADHD using MPH. Defendants cannot establish, through clear and convincing evidence, a *prima facie* showing of obviousness of the claimed treatment methods in suit. They can show neither a reason to make the claimed invention nor any reasonable expectation that it would work. Accordingly, their arguments that the claims are invalid for reasons of obviousness must fail.

### H.    Non-obviousness Is Supported by Secondary Considerations

At least four distinct secondary considerations show that the claims-in-suit define non-obvious methods of treating ADD and ADHD. Defendants provide no coherent basis for asserting that secondary indicia of non-obviousness do not exist for the claimed treatment methods.

### 1.    CONCERTA® Has a Clear Nexus to the Claimed Treatment Methods

Plaintiffs' CONCERTA® product falls within the scope of the claims-in-suit.  This is because, as required by claim 1 of the '373 patent, CONCERTA® exhibits an ascending rate of release of MPH for at least 3 hours, and through at least the midpoint of the $T_{90}$ of CONCERTA®.  [PFF ¶533].  CONCERTA® also causes the plasma concentration of a patient administered it to substantially ascend for about 5.5 hours or longer.  [PFF ¶534].  This is illustrated, *inter alia*, by data showing means of measurements of MPH plasma concentrations in subjects administered CONCERTA®.  The mean data show that the plasma concentration in the subject is ascending, without a slight dip, through at least 5.5 hours after administration of CONCERTA® in the population of subjects tested.  [PFF ¶535].  Similarly, the mean data also show that the plasma concentration in these subjects is substantially ascending through about 8 hours.  As such, CONCERTA® falls within the scope of claims 1, 6 and 7 of the '373 patent.  [PFF ¶535].

Secondary considerations of non-obviousness are presumed to have a nexus to a claimed invention if the article sold falls within the scope of the claims.  *See J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997), ("[w]hen a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention.").  This is true for CONCERTA®.  Accordingly, Defendants bear the burden of proving the secondary considerations are not attributable to the claimed invention.

Defendants have provided no evidence that the unexpected results, commercial success, and the satisfaction of the long-felt need for an effective once-a-day treatment method are due to

prior art features found in CONCERTA®, or due to features of CONCERTA® other than those reflected in the patent claims. Defendants also provide no evidence to refute the evidence that copied the commercial embodiment of the claimed invention, CONCERTA®. As such, there plainly is a nexus between CONCERTA® and the claimed invention, and consideration of the evidence of secondary considerations associated with CONCERTA® is appropriate in considering the non-obviousness of the claims-in-suit.

> **2.    The Claimed Treatment Methods Address a Long-Felt Need for a Once-a-Day ADD/ADHD Treatment Method**

Defendants acknowledge that a long-felt need existed for a once-a-day treatment method for ADD and ADHD. They do so by agreeing with Plaintiffs that the prior art method based on multiple administrations of immediate release MPH products was inadequate to meet the needs of patients, given its severe compliance problems and practical difficulties. [DFF ¶¶275-276]. They also agree that the only extended release MPH product known before the invention was ineffective to respond to this pronounced and long-felt need. [*Id.*]. Indeed, for 18 years after the introduction of Ritalin SR, no one had devised an effective new once-a-day treatment method, despite the fact that there was a pronounced need, and a significant market demand, for such a treatment method.

Plaintiffs' CONCERTA® product is widely acknowledged as being effective for use in a once-a-day treatment of ADD and ADHD. [PFF ¶¶508-509]. As such, the claimed treatment methods, as CONCERTA® illustrates, respond to and satisfy the long-felt need for an effective once-a-day treatment method for ADD and ADHD.

### 3.    The Claimed Treatment Methods Provide Unexpectedly Superior Results in Treatment of ADD and ADHD

The claimed treatment methods provide a surprising and unexpectedly superior way of treating ADD and ADHD.  As explained above, before the invention, the only known ways of treating ADD and ADHD were through use of immediate release MPH dosage forms administered twice or three times a day, or through administration of Ritalin SR once a day. As defendants acknowledge, Ritalin SR does not provide effective treatment of ADD and ADHD throughout the entire school day.

It was surprising to those working in the field of ADD and ADHD treatment that a dosage form that releases MPH at an ascending rate for an extended period of time (unlike Ritalin SR), and which produces a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours, would be an effective way to treat ADD and ADHD.  One surprising and unexpected feature of the claimed treatment methods was that the plasma concentration could be increased as required by the claims without increasing the incidence of side effects.  [PFF ¶¶515-516].  For example, the prior art showed that Ritalin SR, which produces a significant plasma concentration for a sustained period during the middle of the day, was accompanied by a three-fold increase in incidence of side effects relative to the BID regimen based on immediate release products.  [PFF ¶480-482].  By contrast, methods using CONCERTA® and other dosage forms meeting the requirements of the claims-in-suit do not exhibit an increased incidence of side effects relative to the BID and TID regimens.  [PFF ¶516].

Unexpected results are a strong secondary indicator of non-obviousness.  *See KSR*, 127 S. Ct. at 1740 (observing that unexpected property of battery supported conclusion of non-obviousness).  *See also* [*Forest Labs. v. Ivax Pharm., Inc.,* 501 F.3d 1263, 1269 (Fed. Cir. 2007);

*Takeda*, 492 F.3d at 1362; *Takeda Chemical Industries v. Alphapharm PTY, Ltd.*, 492 F.3d 1350, 1362-3 (Fed. Cir. 2007).  As none of these features of the claimed treatment methods are described in, or would have been suggested from the prior art, they are unexpected results associated with the claimed treatment methods that further support the non-obviousness of treatment methods of the claims-in-suit.

### 4.    The Defendants Copied the Claimed Invention

Evidence of copying of the claimed invention, or commercial embodiments of the claimed invention, especially in the face of other choices in the market, is strong evidence of the non-obviousness of a claimed invention.  *See Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc.* 344 F.3d 1186, 1196 (Fed. Cir. 2003) (finding copying of network server design of patent owner to be evidence supporting non-obviousness); *Vandenberg v. Dairy Equipment Co.,* 740 F.2d 1560, 1567 (Fed. Cir. 1984) ("The copying of an invention may constitute evidence that the invention was not an obvious one.").

As in *Akamai*, the Defendants have expended substantial effort attempting to produce a close copy of a commercial embodiment of the invention that is marketed by Plaintiffs.  For example, Defendants have represented to the FDA that the plasma profile that the ANDA product exhibits is highly similar to that of CONCERTA®, Plaintiffs' commercial embodiment of the claimed invention.  [PFF ¶¶546-547].

56



Pharmacokinetic Profiles for Andrx Methylphenidate ER tablets and Concerta (McNeil) ER tablets

Moreover, Defendants have admitted that CONCERTA®, and particularly its plasma profile, was the primary design influence for their ANDA product. [PFF ¶547]. Thus, substantial evidence exists that Defendants copied Plaintiffs' commercial embodiment of the patented invention.

### 5.    The Claimed Inventions Enjoy Substantial Commercial Success

There is strong evidence of commercial success due to the merits of the claimed treatment methods. The commercial embodiment of the patented invention, CONCERTA®, has displaced a treatment regimen that had been the standard of care in ADD and ADHD for more than 30 years. [PFF ¶¶508-510]. CONCERTA® is now the most commonly prescribed drug product for treating ADD and ADHD. [PFF ¶¶525-526]. Where there is strong evidence that a product found to be within the scope of the claimed invention enjoys significant commercial success, that evidence supports finding the invention non-obvious. *J.T. Eaton & Co.*, 106 F. 3d at 1571.

Defendants cannot seriously contend that CONCERTA® does not enjoy substantial commercial success. The evidence demonstrates that, shortly after its introduction, CONCERTA® exhibited substantially increased sales due to a substantially increasing volume of prescriptions for this product. [PFF ¶¶525-526]. At the same time, the sales of other MPH products, and other products used to treat ADD and ADHD, remained essentially constant. [*Id.*].

Plainly, the commercial success of CONCERTA® is due to its novel and non-obvious characteristics, particularly its property of releasing MPH at an ascending rate for at least 3 hours and at least through the midpoint of its $T_{90}$, and its effect in producing substantially ascending MPH plasma concentrations of about 5.5 or about 8 hours, after it is administered to a patient. [PFF ¶¶533-534]. These properties – which provide the superior effectiveness of CONCERTA® – have led physicians to prescribe CONCERTA® at such substantial levels. Moreover, the prior art conclusively demonstrates that the only other once-a-day product available and used in the market was Ritalin SR, which does not exhibit these release rate or plasma concentration attributes. [PFF ¶¶594-595]. As such, substantial evidence of commercial success attributable to the claimed inventions exists that supports the non-obviousness of the claimed treatment methods.

### 6.    Variability in Plasma Concentrations in Subjects Given CONCERTA® Does Not Establish that CONCERTA® Falls Outside the Claims In Suit

Defendants assert that only 40% of subjects given CONCERTA® will exhibit a substantially ascending plasma concentration for about 8 hours. [DFF ¶367]. Defendants offer no evidence regarding whether subjects given CONCERTA® will exhibit substantially ascending MPH plasma concentrations for about 5.5 hours. Defendants point to testimony from Plaintiffs' expert witness Dr. Martin Angst, who estimated that approximately 40% of patients

given CONCERTA® would be expected to see a substantially ascending MPH plasma concentration for about 8 hours.  [*Id.*].  But whether CONCERTA® achieves the full 8 hour ascending profile in every patient is beside the point.  It plainly does so in a very substantial patient population, and it is undisputed that it is widely used because of its extended duration of effectiveness.  Given the enormous use of CONCERTA®, the patient population showing the claimed profile is plainly large enough to support secondary consideration for claim 7.

> **7.    The Existence of Other Products that Provide Effective Treatment of ADD and ADHD in the Market Is Immaterial to the Question of Commercial Success of the Claimed Invention**

Defendants cite a statement by another ALZA witness, Dr. Feifel to assert that Ritalin® LA, having a different release rate and different plasma profile, provides the "same benefits" as CONCERTA®.  [DFF ¶368].  Dr. Feifel did not testify as Defendants represent.  Instead, Dr. Feifel stated that Ritalin® LA can be used to treat ADD and ADHD and that, in some patients, it can provide comparable effectiveness.  [PFF ¶547].  Defendants attempt to convert Dr. Feifel's testimony into something it is not; namely, a statement that the claimed ascending release rate and substantially ascending plasma concentration features of the invention are unimportant to the success of CONCERTA® in addressing the long-felt need for a once-a-day ADD/ADHD treatment method.

Critically, Dr. Feifel, in the portion of his deposition quoted by Defendants, does not say that Ritalin® LA "provides the same benefits of CONCERTA®."  [*Id.*].  Rather, Dr. Feifel, throughout the section of his deposition  from which this quote is lifted, clearly indicated that CONCERTA® is the "gold standard" – and thus superior – to other products, including Ritalin® LA.  [*Id.*].

In addition, Defendants' legal reasoning is flawed.  In essence, Defendants are arguing that the presence on the market of another product that can respond to the same *market demand* existing for the patented invention precludes reliance on evidence of commercial success of the patented invention to support non-obviousness.  As the evidence plainly establishes, the claimed release rate and plasma concentration attributes of CONCERTA® are the reason for its commercial success.  It is that nexus between the patented invention and the commercial success of the product, alone, that governs use of such evidence to support non-obviousness.

## II.    THE CLAIMS-IN-SUIT ARE FULLY ENABLED

The discovery that led to the claimed invention was a groundbreaking clinical advance, allowing the inventors to decipher a mystery existing in the field of ADD/ADHD treatment for nearly 20 years.  Unlike the unpredictable nature of this *clinical* research, the production of dosage forms exhibiting a desired release rate or plasma profile, once that release rate or profile has been defined, requires only routine experimentation by a skilled formulator.  Indeed, at the time of the invention, the field of "controlled-release" dosage form development was as predictable as its name would suggest.  Its practitioners were highly skilled and could draw on the extensive body of literature referenced in the patent to produce any of a wide variety of dosage forms that would provide the characteristics specified in the claims-in-suit through only routine experimentation.  Because only routine, not undue, experimentation would be required to practice the full scope of the claimed invention, the claims-in-suit are fully enabled and not invalid, as Defendants assert.

### A.    The Claims-in-Suit Are Directed to Treatment Methods That Use Oral Dosage Forms Exhibiting Specified Functional Properties

The claims-in-suit define novel and non-obvious methods for treatment of ADD and ADHD.  [*See, infra,* PFF ¶¶ 272 *et seq.*].  Claim 1 of the '373 patent specifies the requirements of the dosage forms that provide this utility.  [PFF ¶ 600].  In particular, the claims specify that the dosage forms release MPH at an ascending rate for an extended period of time.  [D.I. 130, Markman Order at 2].  The Court has construed this rate of release to be that which is determined through an appropriate in vitro dissolution test, in which the dosage form is dissolved and the release of the MPH from it measured over time.  [*Id.*].  Dependent claims 6 and 7 add a further

limitation, requiring that the dosage form produce a substantially ascending MPH plasma profile in a subject administered the dosage form.  [PFF ¶ 600].

The Court has construed the claims-in-suit to define the requirements of the dosage forms recited in these claims.  [*See* D.I. 130].  One requirement is that the dosage forms must release MPH at an ascending rate for an extended period of time, as measured in an appropriate *in vitro* dissolution test.  [*Id.* at 2].  This means the dosage forms must have a MPH release rate that can be measured in an appropriate dissolution test, and when tested, the dosage form must be shown to release MPH for at least 3 hours, and through at least the mid-point of the $T_{so}$ of the dosage form.  [*Id.*].  Similarly, dependent claims 6 and 7 require that the dosage forms, after they are administered to a patient, produce MPH plasma concentrations that generally ascend for specified durations (i.e., about 5.5 or about 8 hours), other than for slight dips in these plasma concentration profiles.  [*Id.*].

The functional requirements of dosage forms specified in the claims must be read in conjunction with the express indications in the specification that the dosage forms are to be *orally administered* to achieve the claimed treatment methods.  As the '373 patent specification itself points out, "[w]ith the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for *sustained-release oral dosage forms* adapted to provide such a release rate over a suitable extended time period."  [PFF ¶ 603 (emphasis added)].  Indeed, when the specification emphasizes that the dosage forms are *not limited* as to the osmotic dosage forms exemplified in the patent, it states clearly that the dosage forms *are* limited to orally administered dosage forms.  [*See id.* ("Although the present invention is illustrated herein by exemplary dosage forms … to provide a desired therapeutic outcome, the invention is not limited by the exemplary embodiments. The invention broadly

62

embraces *oral sustained-release dosage forms* that provide an ascending drug release rate over an extended time period…") (emphasis added)].  A person skilled in the formulation arts would recognize that dosage forms that are suitable for use in the claimed treatment methods are oral sustained-release dosage forms exhibiting the required functional characteristics.  [*Id.*].

Certainly, the dosage form element in the claims is "generic" – meaning it is not limited to specific dosage forms, such as the osmotic dosage form examples described in the patent.  However, contrary to Defendants' assertions, the claims do not encompass any imaginable type of dosage form.  Instead, the claims only encompass oral extended release dosage forms that exhibit the specified release rate characteristics, and optionally, produce the specified plasma profiles.  [D.I. 130 at 2; PFF ¶ 600].  These features of the claimed dosage forms are necessary for them to achieve the objects of the invention – treatment of ADD and ADHD through a single administration of the dosage form.  [*Id.*].

Defendants argue that the claims are not enabled because it would require undue experimentation for a skilled formulator to make bizarre types of "dosage forms" that no skilled formulator would ever prepare for use in a once-a-day ADD or ADHD treatment method.  [DFF ¶¶ 18, 155].  Defendants specifically argue that the claims literally cover any conceivable type of dosage form, including such things as suppositories, injectables, ointments, creams and lozenges.  [*Id.*].  The Defendants reason that since the claims do not limit "dosage forms" to specific types of dosage forms, the patent must teach the ordinarily skilled person how to adapt any and all types of dosage forms into extended release dosage forms that exhibit the required ascending release rate and plasma concentration characteristics of the claims.  [*Id.*].

63

Plainly, in this case, the combination of the claim requirements, the express teachings of the specification, and the dissolution testing requirements specified in the Court's claim construction operate to limit the scope of the claims to oral extended release dosage forms exhibiting the required functional properties.  In addition, a person skilled in the field of extended release formulations would immediately recognize certain types of formulations -- such as creams, nasal sprays, inhalers, buccal formulations, and suppository-style formulations -- would be plainly inappropriate to use as an extended release formulation pursuant to the claimed invention, and therefore outside the scope of the claims.  [PFF ¶¶ 648-53].

Plaintiffs thought it was clear from the Court's construction of the claims that they do not encompass these non-orally administered dosage forms, in part because they are not subjected to standard *in vitro* dissolution tests.  [*See id.*].  Nevertheless, to the extent there is any doubt on this score, the Court should clarify its construction to make clear, consistent with the express direction of the specification, that the claims cover only oral extended release dosage forms that exhibit the required MPH release rate characteristics, and the substantially ascending MPH plasma characteristics.

The Court has not indicated one way or the other whether the claims encompass transdermal dosage forms.  Even if they do, this presents no issue of consequence in this case.  First, Defendants have conceded that transdermal dosage forms that release MPH at an ascending rate as required by the claims are enabled.  [PFF ¶ 627].  In addition, Defendants cite transdermal prior art in the area of nitrates in asserting that the claims define obvious inventions.  [DFF ¶ 307; PFF ¶ 627].  By doing so, Defendants have admitted that these prior art disclosures are sufficient to enable a person skilled in extended release formulation development adapt them to produce transdermal MPH delivery systems that meet the requirements of the claims in suit.  *See*

*In re Epstein*, 32 F.3d 1559 (Fed. Cir. 2005); *Elan Pharms., Inc. v. Mayo Foundation for Medical Educ.*, 346 F.3d 1051, 1054 (Fed. Cir. 2003); *Akzo N.V. v. United States Int'l Trade Comm'n*, 808 F.2d 1471, 1479 (Fed. Cir. 1986), *cert. denied*, 482 U.S. 909, 107 S. Ct. 2490 (1987).  Defendants cannot now advance the contrary position that transdermal dosage forms that meet the requirements of the claims-in-suit would require undue experimentation to produce, and would thereby not be enabled.[10]

In any event, even if the claims did cover impractical dosage forms of the kind mentioned by Defendants, the claims would still be fully enabled.  Defendants' rationale ignores the well-established rule that enablement is to be assessed using the perspective of a person skilled in the relevant art.  *See, e.g., In re Smythe*, 480 F.2d 1376, 1383 (C.C.P.A. 1973).  That evaluation is not performed in an illogical or unthinking manner, such as by assuming that every species literally encompassed by the generic claim element must be shown to work to achieve the objective of the claimed invention.  *Id.*  Rather, as the Federal Circuit and its predecessor court have consistently explained, the person of skill will use *common sense* to select which species literally encompassed by a generic claim element may be used to achieve the invention.

For example, in *Smythe*, generic claims were challenged as requiring undue experimentation to practice their full scope because certain types of liquids literally encompassed by the claims could not be made to function as required by the claims without extensive effort, or at all.  *See id.*  The Court reasoned that the claims did not encompass such embodiments "which would be predictably inoperative in the invention and thus would never be selected by one

---

[10]    Plaintiffs' expert Dr. Davies also has explained that the prior art demonstrates that one could produce transdermal dosage forms that release MPH for an extended period of time using only routine experimentation.  [PFF ¶¶ 624-28].  He indicates that references such as the U.S. Patent issued to Govil *et al* and Bayer *et al.* provide ample guidance that could be used to produce such dosage forms.  [*Id.*].

skilled in the art." *Id.* As the Court explained: ". . . it is almost always possible to so construe a claim as to have it read on inoperative embodiments, but the alternative of requiring an applicant to be so specific in his claims 'as to exclude materials known to be inoperative and [which] even those not skilled in the art would not try' would result in claims which would fail to comply with 35 U.S.C. § 112, second paragraph, because they would be so detailed as to obscure, rather than to particularly point out and distinctly claim, the invention." *Id.* The Federal Circuit has endorsed this rationale. *See In re Curtis*, 354 F.3d 1347, 1355-56 (Fed. Cir. 2004).

Moreover, generic claim elements, such as the oral extended release dosage forms of the claims-in-suit, are not rendered non-enabled simply because a species literally falling within the scope of the claim does not work for the intended purpose of the claim. As the Federal Circuit has explained: "[i]t is not necessary that every permutation within a generally operable invention be effective in order for an inventor to obtain a generic claim, provided that the effect is sufficiently demonstrated to characterize a generic invention." *See Capon v. Esher*, 418 F.3d 1349, 1359 (Fed. Cir. 2005); *see also Atlas Powder Co. v. E.I. Du Pont de Nemours & Co.*, 750 F.2d 1569, 1576-77 (Fed. Cir. 1984) ("Even if some of the claimed combinations were inoperative, the claims are not necessarily invalid. 'It is not a function of the claims to specifically exclude ... possible inoperative substances....'" (*quoting In re Dinh Nguyen*, 492 F.2d 856, 858-59 (C.C.P.A. 1974))); *In re Angstadt,* 537 F.2d 498, 504 (C.C.P.A. 1976) ("We hold that the evidence as a whole, including the inoperative as well as the operative examples, negates the PTO position that persons of ordinary skill in this art, given its unpredictability, must engage in undue experimentation to determine which complexes work. The key word is 'undue,' not 'experimentation.'")

**B.    The Claims-in-Suit are Fully Enabled under 35 U.S.C. § 112, First Paragraph**

The claims-in-suit do not require the dosage forms to possess particular physical properties or structures.  Instead, they define the dosage form in terms of the functional properties it must exhibit (e.g., that it must be suitable for oral administration, that it will release MPH at an ascending rate for an extended period of time, and that it will cause a substantially ascending MPH plasma concentration in the subject administered the dosage form).  [PFF ¶ 601].  The dosage form element of the claims-in-suit thus is "generic" – it encompasses any type of oral dosage form that exhibits the specified functional characteristics and properties in the claims.

Generic claim elements of this sort are common in patent claims and are certainly not barred by §112, first paragraph, as Defendants argue.  [*See* DFF ¶ 38; Def. Brief at 26].  Instead, generic claim elements are assessed for enablement like any other patent claim: by considering whether the disclosure, in conjunction with the knowledge in the prior art, would enable a person skilled in the relevant field to practice the invention as it has been claimed.  *See Capon*, 418 F.3d at 1359.

Under §112, first paragraph, a claim is enabled if a person skilled in the art can practice the invention as claimed without undue experimentation.  *See In re Wands,* 858 F.2d 731, 736-37 (Fed. Cir. 1988).  Whether "undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations."  *Id.* at 737.  These factors include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the

predictability or unpredictability of the art, and (8) the breadth of the claims." *Id.*; *see also*

*Chiron v. Genentech,* 363 F.3d 1247, 1256 (Fed. Cir. 2004).  As the Federal Circuit has

explained, "[p]recedent illustrates that the determination of what is needed to support generic

claims to biological subject matter depends on a variety of factors, such as the existing

knowledge in the particular field, the extent and content of the prior art, the maturity of the

science or technology, the predictability of the aspect at issue, and other considerations

appropriate to the subject matter."  *Capon*, 418 F.3d at 1359.

A party seeking to establish a patent claim as invalid under §112, first paragraph, for

being non-enabled must provide clear and convincing evidence that undue experimentation

would be required to practice the claimed invention. *Koito Mfg. Co., Ltd. v. Turn-Key-Tech,*

*LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004).  This proof cannot take the form of conclusory

opinions about the amount of work involved, observations that every species encompassed by a

generic claim is not literally described, or by providing generalized assertions that the field of the

invention is unpredictable.  Instead, the evidence must demonstrate *why* undue experimentation

would be required to practice the invention as claimed.

> 1.    **Routine, Not Undue Experimentation, Is All That Would Be Required
>       to Produce Extended Release Dosage Forms That Meet Desired
>       Release Rate Characteristics, As Illustrated by the Extensive
>       Guidance in the Patent Disclosures and the Prior Art**

The teachings provided by the patent disclosure in conjunction with the prior art are to be

considered in assessing whether producing a claimed invention would involve undue

experimentation.  *See Wands,* 858 F.2d at 737; *Chiron,* 363 F.3d at 1254.  Here, as Dr. Davies

has explained, these teachings provide many illustrations of the routine nature of the

experimentation necessary to practice the claimed invention.  [PFF ¶ 603].

The '373 patent indicates that a wide variety of oral extended release dosage forms are known in the prior art: "[t]here are many approaches to achieving sustained release of drugs from oral dosage forms known in the art."  [*Id.*].  It further notes that "[t]he invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in the art in view of the disclosure herein."  [*Id.*].

As Dr. Davies explains, the patents refer to oral sustained release dosage forms broadly and the meaning of the phrase "dosage form" as used in the claims would be readily apparent to a person of skill in the art.  [PFF ¶ 604].  It would include, among other things, the prior art oral extended release systems identified earlier in the patent: "diffusion systems such as reservoir devices and matrix devices, dissolution systems such as encapsulated dissolution systems (including, for example, 'tiny time pills') and matrix dissolution systems, combination diffusion/dissolution systems, osmotic systems and ion-exchange resin systems as described in *Remington's Pharmaceutical Sciences*, 1990 ed. pp 1682-1685," a well-known textbook in the field.  [*Id.*].

Dr. Davies also explains that the guidance to persons skilled in the art from the prior art literature is extensive and would provide clear guidance to such persons regarding how to adapt known types of controlled release dosage form technologies to produce dosage forms that exhibit ascending release rates of MPH and/or substantially ascending plasma concentration time profiles as required by the claims-in-suit.  [PFF ¶ 605].

By way of example, Dr. Davies refers to a well known pharmacy textbook Kydonieus' *Treatise on Controlled Drug Delivery*.  [PFF ¶¶ 606-7].  Dr. Davies points out that the task of designing an ascending release rate dosage form was considered so straightforward that it formed the basis of a chapter review question in this textbook.  In the example, the task was to "design a device that will yield an increasing release rate."  [PFF ¶ 606].  The textbook provided an example, as one answer to this question, which explained that a "[d]evice whose exposed surface area increases with time and will lead to increasing release rate."  [*Id.*].  The specific example in the textbook was "a cone composed of a degradable polymer coated with a nondegradeable polymer cut off at the top."  [*Id.*].  Such a device would have an increasing exposed surface area over time leading to an increasing release rate, as generally illustrated at ingestion and at an arbitrary later time as follows in Figures 1 and 2.  [*Id.*].



Erodible polymer / drug

Non-erodible polymer

**Figure 1: Theoretical drug delivery device at time T=0**



Increasing surface area of erodible polymer/drug leads to increasing rate of drug delivery

**Figure 2: Theoretical drug delivery device at time T=1**

As these diagrams show, the surface area of this device would increase over time, thereby leading to increasing rates of release for the drug in this device.  [PFF ¶ 607].

Another example of an ascending release rate dosage form was published in two other well-known textbooks, Robinson *et al.*'s *Controlled Drug Delivery* and Lachman *et al.'s Theory and Practice of Industrial Pharmacy,* years after it was originally published in the *Journal of Pharmaceutical Sciences* by Rosen *et al*.  [PFF ¶ 609].  In particular, as Dr. Davies explains, these textbooks taught using a multiple pellet system to produce an extended release dosage form having an ascending release rate of a drug .  [*Id.*].  They taught that by varying the fat-wax coating applied to such pellets, the pellets release the drug at different times and thus together could achieve a targeted overall rate of release.  [*Id.*].  They taught in particular that the lowest level of wax coating (7%) leads to the fastest rate of release in the case of pellet F, as shown in Figures 3 and 4, below.  [*Id.*].  Progressively larger amounts of wax coating, increased in steps of 2%, were taught to lead to progressively slower rates of release, as illustrated by pellets E (9%) through A (17%) in these same figures.  [*Id.*].

Dr. Davies concludes that this prior art example clearly taught a skilled formulator how that person could have prepared custom blends of these pellets to achieve a desired ascending release profile, such as the custom blend disclosed as the dotted lines "G" in these figures.  [*Id.*].  Figures 3 and 4, shown below, illustrate the release rate profiles in original (log) and non-log scale.  [*Id.*].



FIG. 13-16. In vitro release patterns of ampheta-
mine sulfate pellets pan coated with various
amounts of a fat-wax coating. *A*, 17% coating; *B*,
15% coating; *C*, 13% coating; *D*, 11% coating; *E*, 9%
coating; *F*, 7% coating; *G*, selected blend of un-
coated pellets and coated pellets. (From the data
of Rosen et al.⁴ Courtesy Am. Pharmaceut. Assoc.)



**Figure 3**                    **Figure 4**

Dr. Davies explains that this multiple bead methodology could have been readily adapted

to produce dosage forms exhibiting ascending release rates of MPH and which would provide

substantially ascending plasma concentration time profiles.  [PFF ¶ 610].  In particular, this

demonstrates that a skilled formulator, provided with the guidance from the '373 patent, would

immediately see that a combination of pellets B and C would produce an ascending release rate

over an extended period of time.  [*Id.*].  As can be seen from the increasing slope of the Figure 4

cumulative release plot of pellet C between time points, this provides a modestly ascending rate

of release over time by itself, as can be readily seen by separately plotting its rate of release as

done below in Figure 5.  [*Id.*].



**Figure 5**

Pellet B's clearly increasing slope between time points on the Figure 4 cumulative release plot shows that pellet B provides an ascending rate of release, as can also be seen by separately plotting its rate of release in the below Figure 6.  [PFF ¶ 611].



**Figure 6**

The combination of these two pellets in equal parts would yield a release profile that adds their individual profiles together, as shown by Figure 7 below, which depicts this addition.  [PFF ¶ 612].



**Figure 7**

The prior art includes many other examples of sustained release formulation technologies that could be readily adapted to produce dosage forms exhibiting an ascending release rate of MPH as required by the claims-in-suit. [PFF ¶¶ 613-29]. For example, a U.S. Patent issued to Rudnic *et al.* taught pellet systems where a pH-sensitive coating was used to achieve a delayed release – the very methodology Defendants propose to use for their generic MPH product. [PFF ¶¶ 613, 674]. Using the same, straight-forward techniques described above, the prior art showed that such a pellet system would have the ascending rate of release shown below. [PFF ¶ 616].



**Figure 11a**

Yet another U.S. Patent issued to Mehta *et al.* provided a spheroid formulation that could also be used to achieve an ascending rate of release.  [PFF ¶¶ 617-19].  And even a decade before the filing of the patent in suit, the well-known *Journal of Controlled Release* published an article by Ping Lee that taught numerous dosage forms containing non-uniform drug concentrations that could achieve an ascending rate of release.  [PFF ¶¶ 620-23].

Plaintiffs do not believe that the '373 patent -- with its requirement for an ascending rate of release in an appropriate in vitro dissolution test -- covers transdermal patches.  [*See* PFF ¶ 603].  Unlike oral dosage forms, the medication in a transdermal patch is not dissolved in a dissolution medium.  However, even if the patent were understood to encompass transdermal patches, those embodiments, too, would be fully enabled.  Dr. Davies explains that analogous approaches could readily be taken with transdermal systems by a person skilled in the field of extended release formulation development.  [PFF ¶¶ 624-28].  Indeed, Defendants expressly rely on these very teachings, and their analogous application to oral dosage forms, in the course of making their alternative argument of obviousness.  [PFF ¶ 627].

Accordingly, the patent disclosure, in conjunction with the extensive knowledge in the prior art, would have provided sufficient guidance to a person skilled in the field of extended release formulation development to practice the claimed invention with routine, not undue experimentation.  [PFF ¶ 629].

> **2.    Implementing a Desired Dissolution or Plasma Profile Would Have Been a Matter of Routine Effort for a Person Skilled in the Field of Extended Release Formulation Development as of the Filing Date of the Patent**

The production of a wide variety of dosage forms that meet the requirements of the claims-in-suit would have been a matter of routine experimentation for a person skilled in the art

based on the patent disclosure and the teachings in the prior art. [PFF ¶ 630]. The generic character of the claims with respect to dosage forms is of no consequence to the question of enablement of these claims.

**(a)   Controlled Release Dosage Forms Development Is Not an Unpredictable Field**

A critical inquiry in assessing whether a patent disclosure enables the "full scope" of the claims is the predictability, or lack thereof, in the field of the invention. *Wands*, 858 F.2d at 737. The field of controlled release formulations was a mature and highly predictable field in November, 1996, the filing date of the '373 patent. [PFF ¶ 631]. Indeed, the very name of this field – controlled release dosage forms – suggests that it is the antithesis of an unpredictable field. [*See id.*]. As Dr. Davies explains, the controlled release dosage form field of technology is devoted to production of dosage forms have *highly predictable* characteristics and behaviors. [*Id.*].

The highly predictable field of extended release dosage form development enables a person skilled in this field to use the well-documented attributes and characteristics of materials used in extended release dosage forms to design dosage forms that will exhibit a desired rate of release of an active ingredient. [PFF ¶ 632]. This is possible because the materials used in extended release dosage forms, such as polymers of various types, are highly consistent in their characteristics and highly predictable in their behavior. [*Id.*]. In addition, the dissolution behavior (i.e., how an active ingredient is released from the dosage form as it dissolves) of the various types of structures used in extended release dosage forms is highly predictable. [*Id.*].

In fact, the release rate characteristics of extended release dosage forms are so predictable that they can be precisely modeled with mathematical formulae associated with the various

materials and structures used.  [PFF ¶ 633].  This enables a person of ordinary skill to produce a desired dissolution profile through a straightforward process.  [*Id.*].  Specifically, after being provided a desired dissolution rate profile, the person skilled in the art of formulation development selects the appropriate materials and structures that, based on straightforward mathematical calculations, will produce the desired release rate profile.  [*Id.*].  Then, that person prepares the dosage form using conventional procedures for assembling and forming the dosage form.  [*Id.*].  Once produced, the dosage form is evaluated using simple dissolution tests appropriate for the dosage form, using industry accepted procedures.  [*Id.*].  These dissolution tests are used to confirm that the dosage form behaves as it has been designed to.  [*Id.*].  Optimization of the dosage form to meet desired release rate characteristics is achieved through slight modifications to the formulation or its structure, and is a conventional step in the process of designing and testing a new dosage form.  [*Id.*].  All of these steps amount to only routine experimentation for the person skilled in the field of extended release formulation development. [*Id.*].

Accordingly, Defendants' reliance on cases concerning inventions in highly unpredictable fields of technology is wholly misplaced.  [Def. Brief at 70 (*citing Monsanto v. Syngenta Seeds, Inc.*, 503 F.3d 1352 (Fed. Cir. 2007), *Liebel-Flarsheim Co. v. v. Medrad, Inc.*, 481 F.3d 1371 (Fed. Cir. 2007), and the non-precedential case of *Pharm. Res., Inc., v. Roxane Labs., Inc.*, Appeal Nos. 2007-1093, -1134 (Fed. Cir. 2007)).  As these cases make clear, the degree of unpredictability in the field of the invention at issue was so great that the person of ordinary skill in the art would have doubted if it were possible to even achieve the invention.  This is plainly not comparable to the task of adapting conventional extended-release technologies to provide an ascending release rate of MPH.

The technology at issue in *Monsanto* stands in stark contrast to the extended release dosage form technology involved in this case. In *Monsanto*, the Federal Circuit specifically characterized the field of genetic transformation of plants at the time of the Monsanto patent filing date as being *highly* unpredictable. *Monsanto*, 503 F.3d at 1361. Indeed, in characterizing the patent claims at issue in *Monsanto*, the Federal Circuit observed:

> Once again, the 835 patent [the patent in suit] was filed *before transformation of monocot cells was possible*. Therefore, *those skilled in the art could not transform a monocot plant cell as of the filing date of the patent application*. The claim requires transformation of the plant cell. Without the ability to transform a monocot cell, one skilled in the art *could not determine whether the plant gene could carry out the claimed functions and thus fall within the scope of the claim*. (emphasis added).

*Id.* Similarly, in *Liebel-Flarsheim Co., v. Medrad, Inc.*, the Court found that it was *impossible* at the filing date of the patent involved to produce the full scope of the claimed invention:

> The specification's reference that teaches away from an injector system with a disposable syringe without a pressure jacket, combined with the testimonial evidence that *such a system could not have been produced at the time of filing*, supports the district court's conclusion that the specification fails to fulfill the enablement requirement of § 112. Because we are resolving this issue on the enablement ground, we do not need to consider the written description holding of invalidity.

*Liebel-Flarsheim*, 481 F.3d at 1380. And, in *Pharmaceutical Resources,* the court specifically found that "In this case, all of the record evidence establishes that the art of making stable flocculated suspensions of megestrol acetate is *highly unpredictable*." (emphasis added). *Pharm. Res.*, slip op at 2.

Unlike all of these cases, the field of extended release formulation development is highly predictable, *not* highly *unpredictable*. [PFF ¶¶ 631-34]. Defendants' claims to the contrary lack any objective basis. [PFF ¶¶ 635-37]. Moreover, in numerous cases, the Federal Circuit has

held that even the mere fact that some unpredictability may exist in the field of technology of the invention is not a sufficient basis for holding generic claims non-enabled.  For example, in *Capon*, the Federal Circuit reversed a PTO determination that generic claims to a novel chimeric protein made through genetic engineering techniques was not enabled based on a largely prophetic disclosure, simply because the field of genetic engineering is "unpredictable."  *Capon*, 418 F.3d at 1360.  Instead, as the Court explained,

> The PTO points out that for biochemical processes relating to gene modification, protein expression, and immune response, success is not assured.   However, generic inventions are not thereby invalid.   Precedent distinguishes among generic inventions that are adequately supported, those that are merely a "wish" or "plan," the words of *Fiers v. Revel*, 984 F.2d at 1171, and those in between, as illustrated by *Noelle v. Lederman*, 355 F.3d at 1350; the facts of the specific case must be evaluated.

*Id.* Considering the highly predictable nature of the field of extended release formulations, assertions by Defendants that the claims must be found non-enabled due to unpredictability must fail.

### (b)    Level of Skill of Extended Release Dosage Form Developers Is High

The level of skill of individuals experienced in development of extended release dosage forms is high.  [PFF ¶¶ 639-41].  As Dr. Davies explains, a person responsible for designing and testing an extended release dosage form will typically have a Ph.D. in Pharmacy, Chemical Engineering or Chemistry, and three years of experience in industry in the field of controlled release.  [PFF ¶¶ 640].

Initially, Defendants appear to confuse the question of relevant skill for the purposes of enablement with that required for assessing obviousness.[11]  As explained *supra*, the invention involves a novel method of treatment and can only be assessed from the perspective of someone having knowledge of and experience in the clinical treatment of ADD and ADHD.  [PFF ¶ 638].  The person of ordinary skill in the art for purposes of obviousness can rely on others to make embodiments of the invention -- here on persons skilled in the art of dosage formulation.  [PFF ¶¶ 638-42]; *see In re Naquin, 398 F.2d 863, 866* (C.C.P.A. 1968) ("The specification need describe the invention only in such detail as to enable a person skilled in the most relevant art to make and use it. When an invention, in its different aspects, involves distinct arts, that specification is adequate which enables the adepts of each art, those who have the best chance of being enabled, to carry out the aspect proper to their specialty.")*.*

Dr. Davies' opinion as to the training and experience of a person skilled in the field of extended release formulations is consistent with the views of one of Defendants' own experts, Dr. Banakar.  [PFF ¶¶ 640-47].  As Dr. Banakar stated in his opening declaration incidental to the Markman hearing,  "the relative skill of those in the art is high" such that "this factor weighs in favor of no undue experimentation."  [D.I. 86 ¶¶ 124-25, Declaration of Umesh V. Banakar, PhD.].  Dr. Needham, Defendants' second expert on formulation technologies, has expressed a different opinion.  Dr. Needham asserts that the level of skill is "much lower" than that identified by Dr. Banakar or Dr. Davies and "supports a conclusion of undue experimentation."  [DFF ¶

---

[11]     Indeed, Defendants exert substantial efforts attempting to convert statements in the patent specification explaining the surprising discovery that effective treatment of ADD and ADHD could be achieved using an ascending plasma concentration into suggestions that the production of oral sustained release dosage forms that release MPH at an ascending rate was surprising. This theory conflicts with the plain language of the sections of the patent cited by Defendants. [PFF ¶¶ 603-4.]

178; Needham Rep. ¶ 156]. Indeed, Dr. Needham has set aside the vast majority of his own training and experience – which is more consistent with the definitions of ordinary skill offered by Drs. Davies and Banakar. [PFF ¶ 647].

Defendants are attempting to lower the skills and capabilities of a person skilled in the field of extended release formulation development in order to give this Court the impression that the field of development of extended release dosage forms is highly unpredictable and that it would be more difficult to achieve a particular type of extended release dosage form having the specified dissolution rate properties than it actually is. Given the fact that two of the three experts – including Defendants' own expert – have asserted that the level of skill in the field of formulation development is high, the Court should not accept Defendants' characterization of the person skilled in the field of extended release formulation. [PFF ¶ 640; D.I. 86 ¶¶ 124-25, Declaration of Umesh V. Banakar, PhD.].

> **(c) There Is Extensive Guidance in the Patent Disclosures and the Prior Art Regarding Production of Extended Release Dosage Forms That Meet Desired Release Rate Characteristics**

The teachings provided by the patent disclosure in conjunction with the prior art are to be considered in assessing whether producing a claimed invention would involve undue experimentation. *See Wands,* 858 F.2d at 737; *Chiron,* 363 F.3d at 1254; *Hybritech, Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384 (Fed. Cir. 1986). As explained in detail above, the patent refers to a rich body of prior art and knowledge that illustrates the routine nature of the experimentation required to achieve dosage forms meeting the release rate characteristics specified in the claims-in-suit. *See, supra,* Section III.B.1. Thus, the evidence existing relevant to this *Wands* factor plainly supports the conclusion that only routine experimentation would be required to practice the full scope of the claimed invention.

Dr. Davies' characterization of the guidance found in the patent and the prior art art is consistent with Plaintiffs' own characterization of this field in the patent applications to which the patent-in-suit claims benefit. [PFF ¶ 661]. As Defendants agree, the specifications of various earlier filed applications to which the '373 patent claims benefit provide numerous examples of prior art oral extended release dosage form technologies. [PFF ¶ 661; DFF ¶ 132]. The technologies described in these earlier applications were well-known, as these earlier applications also indicate. [PFF ¶ 661]. And, the types of extended release dosage form technologies described in these earlier applications are plainly indicated in the applications as being suitable for use in producing the ascending release dosage forms required by the claims-in-suit. [*Id.*].

> **(d)    The Inclusion of Specific Working Examples Relating to Osmotic-Release Dosage Forms Does Not Render Non-Osmotic Dosage Forms Non-Enabled**

Defendants strive to portray the disclosure of the '373 patent as containing very few working examples, and therefore to be insufficient to enable the full scope of the claims and, particularly, "non-osmotic" dosage forms.

Defendants' criticism of the disclosure is unwarranted. Defendants ignore the fact that examples of *the invention* – treatment methods – are actually provided in the patent. These take the form of human clinical data demonstrating the effectiveness of the claimed ADD and ADHD treatment methods. The patent also provides several working examples of oral extended release dosage forms using the sophisticated osmotic-release dosage form designs.

Defendants nonetheless seem to believe that working examples of every type of dosage form encompassed by a patent claim must be literally described in the patent specification. This

is plainly wrong under the law of enablement. *See Chiron,* 363 F.3d at 1254 ("As noted above, a patent disclosure need not enable information within the knowledge of an ordinarily skilled artisan.  Thus, a patentee preferably omits from the disclosure any routine technology that is well known at the time of application."); *see also Falko-Gunter Falkner v. Inglis*, 448 F.3d 1357 (Fed. Cir. 2006) (*citing Spectra-Physics, Inc. v. Coherent, Inc*., 827 F.2d 1524, 1534 (Fed. Cir. 1987) ("If an invention pertains to an art where the results are predictable, … a broad claim can be enabled by disclosure of a single embodiment … and is not invalid for lack of enablement simply because it reads on another embodiment of the invention which is inadequately disclosed." (citations omitted)).

Moreover, as explained *supra*, producing extended release dosage forms that exhibit a desired release rate is highly predictable and can be readily achieved based on the extensive guidance from the patent and the prior art.  [PFF ¶¶ 603-637].  Given the extensive body of literature and the conventional and predictable nature of the work needed to produce non-osmotic oral extended release dosage forms, an extensive disclosure *in the patent* of these non-osmotic dosage forms is unnecessary.  [*See id.*].

Defendants nonetheless challenge the '373 patent disclosure as insufficient because it does not provide actual working examples of non-osmotic release dosage forms.  In particular, Defendants criticize the working examples of non-osmotic dosage forms that were actually identified in in earlier patent applications filed by the ALZA inventors as being suitable for implementing the claimed invention.  Defendants appear to criticize these non-osmotic dosage form examples simply because they were not actually made and tested, and were thus "prophetic" examples.

83

For example, Dr. Needham performed an extensive analysis of what is disclosed in these earlier applications.  He explains that examples outlined in the applications include a variety of types of extended release formulations including "a hydrogel matrix, a plurality of tiny pills, drug releasing beads, a concentration gradient on a polymer substrate, a multilayer system with increasing doses of drug, or a dosage form which release[s] [sic] a drug from a polymer by diffusion, flux through pores or rupture of the polymer matrix."  [DFF ¶ 84; Needham Rep. ¶ 69].  He also summarizes examples in these applications, including a spirally wound film, a multilayer system, and dosage forms using beads.  [DFF ¶ 85; Needham Rep. at ¶ 71].   He then observes that "none of these examples actually describe that these formulations were made or tested or that they achieved the desired result."  [*Id.*].

Critically, Dr. Needham does not ever offer his opinion that these extended release technologies *could not* be employed to produce a dosage form exhibiting an ascending release rate of MPH for an extended period of time or that producing such a dosage form using these technologies would involve anything more than routine experimentation.  Indeed, neither Defendants nor Dr. Needham offer any reasons *why* these conventional extended release technologies -- known in the prior art -- could not be used to produce an ascending release rate meeting the requirements of the claims.  In fact, Dr. Needham goes out of his way to disagree with Defendants' other expert, Dr. Banaker, that these types of extended release technologies had been abandoned as being "unworkable."  [Needham Rep. ¶¶ 159-60].  Dr. Needham instead focuses his opinions on issues such as whether the examples in the patent applications were actually made and tested, or what Plaintiffs' attorneys stated in response to rejections of the Patent and Trademark Office in various patent applications.  [*See, e.g.,* Needham Rep. ¶¶ 78-110; DFF ¶¶ 80-116].  Even when he focuses on the specific question of enablement of the full

scope of the claimed invention, Dr. Needham elects to present his opinion through the lens of what *he thinks the patentees believed*. [Needham Rep. ¶ 124; DFF ¶¶ 127-28].

Thus, Defendants and their expert, Dr. Needham, criticize these working examples of non-osmotic dosage forms simply because the patents and applications they cite do not indicate that they were actually made and tested. For example, Dr. Needham states that the examples in the ALZA applications "indicate to one of ordinary skill in the art that one could attempt to use these approaches in attempting to achieve the desired results, but there is no teaching that such an approach had worked or would work." [Needham Rep. ¶ 81; *see* ¶ DFF 85 ("none of these examples actually described that these formulations were made or tested or that they achieve the desired result")].

Defendants' arguments fundamentally misconceive the law of enablement and the purpose of these disclosures in the ALZA patent family. Prophetic examples are routinely used in patent applications, both to illustrate the scope of the invention and to provide guidance on implementing various embodiments of the invention. *Atlas Powder*, 750 F.2d at 1577. The fact that not every prophetic example taught in a patent has been actually made and tested is irrelevant to the question of their value in providing an adequate disclosure. The proper inquiry is whether there is an objective reason to doubt that the prophetic example would work as proposed.

As explained *supra*, there were many examples of different types of non-osmotic dosage form systems known in the art that could have been used to produce a dosage form with an ascending rate of release of MPH. [PFF ¶¶ 600-29]. These conventional extended release systems were well known to persons working in the field. [*Id.*]. There was no need to include an

exhaustive list of working examples made with these conventional technologies, much less to produce and test these examples knowing full well they would work. *Chiron*, 363 F.3d at 1252. By contrast, more sophisticated osmotic-release dosage forms were not as well known in the prior art, and the inventors had every reason -- indeed, the obligation -- to explain how the ascending rate of release and ascending plasma concentration could be achieved using these types of dosage forms.

### (e)    Quantity of Experimentation Needed to Develop Suitable Extended Release Dosage Forms Is Reasonable

An amount of experimentation in line with the expectations of a person skilled in the art generally establishes that the experimentation is routine, rather than undue. *See Northpoint Technology, Ltd. v. MDS America, Inc.*, 413 F.3d 1301, 1317-18 (Fed. Cir. 2005) ("Merely listing a quantity of experimentation is not sufficient to prove undue experimentation because '[t]he determination of what level of experimentation is 'undue,' so as to render a disclosure non-enabling, is made from the viewpoint of persons experienced in the field of the invention." (citing *Elan Pharm., Inc. v. Mayo Found. for Med. Educ. & Research,* 346 F.3d 1051, 1055 (Fed.Cir.2003))); *Wands*, 858 F.2d at 736-37 ("Enablement is not precluded by the necessity for some experimentation such as routine screening."); *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1354 (Fed. Cir. 1998).

The design, formulation, production, testing and optimization of a new dosage form can take several months of effort.  [PFF ¶ 672].  However, as explained above, extended release dosage forms are produced according to well-known procedures, using widely available and well-characterized materials, and are assessed using simple dissolution tests.  [*Id.*].  This work cannot be characterized as being an uncertain or unpredictable undertaking.  [*Id.*].  Preparing

ascending release rate MPH extended release dosage forms therefore involves only routine experimentation by the skilled formulator. [*Id.*].

Defendants' claims to the contrary are contradicted by their own experiences. Even Defendants admit that they were "able to develop the Andrx product with a reasonable amount of effort," not undue effort. [DFF ¶ 201].

Defendants also claim that their ANDA products were achieved by resort to knowledge that "one of ordinary skill in the art would not have access to or experience with," and the high level of skill of Dr. Cheng. [*Id.*]. However, as Dr. Davies explains, neither of these explanations is accurate. The dosage forms developed by Defendants use well-known prior art materials and a design for achieving an ascending release rate that one of ordinary skill in the art would have been aware of at the time of the invention. [PFF ¶¶ 673-75]. Not surprisingly, there is nothing remarkable about the actual formulation itself, demonstrating that only ordinary skill was required for its development, not extraordinary skill, as Defendants claims. [*Id.*].

### 3. Plaintiffs Did Not Fail to Develop Non-Osmotic Dosage Forms to Implement the Invention

Defendants attempt to reinforce their enablement arguments by asserting that ALZA scientists attempted and failed to produce non-osmotic dosage forms that met the requirements of the claimed invention. These assertions misrepresent the record.

### (a) ALZA's Research Efforts Focused on Osmotic Dosage Forms because That Was the Field Where It Had Intellectual Property and Special Expertise

ALZA elected to implement the invention in its commercial form using osmotic-release dosage forms because of commercial considerations. [PFF ¶ 683]. ALZA was a pioneer in

development of osmotic dosage forms and had previously developed a number of extended release drug products using this technology. [*Id.*]. ALZA also owned substantial intellectual property related to osmostic dosage form technology and, conversely, did not own substantial intellectual property in other types of non-osmotic dosage for technologies. [*Id.*]. ALZA also owned machinery and other equipment suitable for producing osmotic-dosage forms. [*Id.*]. Thus, commercial reasons were behind the decision of ALZA to implement the invention through an osmotic release technology. [*See id.*].

Moreover, as Mr. Ayer, the head of ALZA's formulation group at the time will testify, it was not at all difficult to develop non-osmotic dosage forms having an ascending release rate. [PFF ¶¶ 682, 684]. He had done so in the past, and scientists in his group did so again during the CONCERTA project. [PFF ¶ 684]. He also developed osmotic dosage forms using the technology that was ALZA's long-standing speciality in the field. [*Id.*].

Despite this, Defendants spend considerable effort attempting to portray the work of ALZA scientists in developing a commercial embodiment of the invention as evidence that serious technical challenges existed at the time of the invention that prevented ALZA scientists from producing non-osmotic dosage forms that exhibited ascending MPH release rates. In addition to being legally irrelevant to the question of enablement, Defendants' portrayal of ALZA's experiences and the beliefs of its scientists is inaccurate.

Defendants seek, in particular, to portray the testimony of Mr. Andrew Lam, an ALZA project manager, as evidence that ALZA was unable to make non-osmotic dosage forms that exhibited ascending rates of release of MPH. Defendants' characterization of Mr. Lam's testimony is inaccurate, and ultimately irrelevant.

Mr. Lam testified that on his own he did some experimentation with non-osmotic dosage forms, but abandoned the effort before he got them to work.  [PFF ¶ 685].  Importantly, Mr. Lam was not part of the formulation group at ALZA at the time CONCERTA was developed.  [*Id.*].  He had the administrative role of project manager.  [*Id.*].  As Mr. Ayer (who headed the formulation group at the time) will testify, Mr. Lam's responsibilities did not include any laboratory or bench work involving the development of particular dosage forms.  [*Id.*].  Isolated experimental work he may have undertaken on his own cannot be equated to ALZA's CONCERTA formulation development program and does not establish that ALZA somehow tried and failed to develop non-osmotic dosage forms meeting the requirements of the claims.

Other portions of Mr. Lam's deposition testimony show that the company focused on osmotic dosage forms for primarily commercial reasons.  For example, Mr. Lam characterized the mandate for the CONCERTA development effort as being "an initiative from the CEO of ALZA to find a commercialized compound that can be taking advantage with use of oral delivery technologies such as OROS."  [PFF ¶ 686].

In any event, under the law of enablement, all of this is legally irrelevant to the question of whether the claims-in-suit are enabled under §112, first paragraph.  The inquiry for enablement is an objective one based on the teachings in the disclosure and the prior art.  *See In re Marzocchi*, 439 F.2d 220, 223 (C.C.P.A. 1971) ("The first paragraph of §112 requires nothing more than objective enablement.  How such a teaching is set forth, either by the use of illustrative examples or by broad terminology, is of no importance.").  Mr. Lam's personal experiments have no relevance to this question.

Accordingly, Defendants' claim that ALZA had far greater difficulties with non-osmotic dosage forms than even Defendants did is baseless. In fact, ALZA's experience was the same as Defendants; namely, that, with only a little effort, non-osmotic dosage forms having an ascending release rate could readily be produced.

> **(b)    Defendants Mischaracterizes the Specification and Prosecution History as Suggesting One Skilled in the Art Could Not Produce Non-Osmotic Dosage Forms Meeting Requirements of the Invention**

Defendants also provide a convoluted and inaccurate presentation of random excerpts of a number of ALZA patents and patent applications. Defendants rely on their formulation expert, Dr. Needham to explain the various passages in these patents, and in the exchanges between ALZA's patent lawyers and the Patent and Trademark Office. [PFF ¶¶693-697].

Defendants' apparent purpose is to suggest that ALZA found it suprising that conventional extended release formulations could be adapted to produce dosage forms that released MPH at an ascending rate. [PFF ¶¶693-697].

Defendants misquote and inaccurately portray both what these various ALZA applications stated and the context in which the various quotes were made. For example, Defendants read the '373 patent as stating it was surprising that ascending release rate dosage forms could be achieved. [DFF ¶ 66]. The patent, in reality, states that it was surprising for the inventors to discover that *effective treatment of ADD and ADHD* could be achieved, not that the dosage forms with ascending release rates could be produced. [PFF ¶ 687]. And, the patent specification attaches no significance whatsoever of the therapeutic advance to the osmotic-release dosage forms also disclosed in the patent. [*See id.*]. The '373 disclosure also indicates

that particular types of osmotic release dosage forms developed by ALZA scientists were

advances, and independently deserving of patent protection.  [PFF ¶¶ 688; 693-697].

Another example is Defendants' selected reading of a passage from an ALZA provisional

application (No. 60/030,514):

> The above presentation teaches that a ***critical need exists for a novel dosage form*** and for a method for administering a drug that overcomes the shortcomings known to the prior art.  ***This long felt needs exists for a dosage form*** and for a method ***for (1) administering the drug at a sustained-increasing rate that simultaneously reduces or eliminates the frequency of daily dosing***; for (2) a dosage form and a method for administering the drug in a sustained-compensating dose to substantially compensate for acute tolerance to the drug thereby maintaining a preselected clinical response; ***for (3) a dosage form that administers the drug in a sustained-ascending profile clinically indicated for the management of Attention-Deficit Disorders;*** and for (4) ***a dosage form*** and a method for administering ***the drug initially and in a sustained-ascending profile throughout the entire school day.***  (***bold*** and *italic* emphasis original by defendants; additional emphasis in underline by plaintiffs).

[Def. Brief at 35 (*quoting* DTX 152 at PA LZ 772, line 19 to P ALZ 773, line 14)].  Defendants

have put in bold portions of this passage they wish to read out of context.  However, as this

excerpt clearly explains, the inventors had identified a pronounced need for a novel dosage form

and for *"a novel method for administering a drug that overcomes the shortcomings of the prior*

*art."*  [*Id.*].  It also clearly indicates that ALZA had also discovered novel dosage forms that

could be used to implement these methods.  [*Id.*].  Defendants quoted only half of the story in

this excerpt.  Defendants repeat this pattern of selectively mischaracterizing various excerpts of

the earlier ALZA applications and their respective prosecution histories for nearly ten pages in their brief.[12]  [PFF ¶¶693-697].

Defendants strive to portray ALZA's patent applications as indicating that it would have been nearly impossible to produce a non-osmotic dosage form that exhibited an ascending MPH release rate using conventional techniques.  This is refuted by the literal text of these applications, including the patent in suit, and by the explicit testimony of numerous ALZA scientists.  As Dr. Guinta will testify at trial, ALZA worked with more than 30 or 40 formulations that were a mixture of osmotic and non-osmotic dosage forms.  [PFF ¶ 684].  Mr. Ayer will likewise testify to this mixture of dosage forms, and that successful ascending release rate dosage forms were achieved with both kinds of dosage forms.  [*Id.*; PFF ¶¶693-697].

Defendants' narrowly focused dissection of excerpts from various ALZA patent applications and their prosecution records also overlooks the obvious point of those statements-- namely, that in addition to disclosing the *therapeutic* invention of treating ADD or ADHD via a novel and non-obvious MPH dissolution rate or plasma profile, the ALZA scientists believed they had made advances in developing an *improved* osmotic-release dosage form.  Their belief that a particular type of osmotic dosage form would have independent value as an advance in the field of dosage form systems is not a statement that non-osmotic dosage forms would not work to achieve the *therapeutic* invention defined by the claims-in-suit.  Indeed, the express indication that a variety of non-osmotic dosage forms could be used to achieve the *therapeutic* invention

---

[12]     Another example is at DFF ¶¶ 91-93, where Defendants discuss a PTO rejection and response by Alza, without drawing any connection between the claims at issue at the time and the claims-in-suit. Other examples of misrepresentations of prosecution events can be found at DFF ¶¶ 94-98 and DFF ¶¶101-103, and in Dr. Needham's report at ¶¶ 78 to 80, ¶¶ 81 to 84, and ¶¶ 92 to 94.

that is the subject of the claims-in-suit refutes the Defendants' constrained and distorted portrayal of the record of these applications.  [PFF ¶¶693-697].

Defendants' efforts to misread the specifications and prosecution histories of various ALZA applications, ultimately, is legally irrelevant to the question of enablement of the claims-in-suit.  Under the law of enablement, the subjective beliefs of an inventor – who may or may not be a person skilled in the relevant art – are immaterial.  As courts have repeatedly held, whether a claim is enabled under §112, first paragraph, is an *objective* inquiry, based on the teachings in the disclosure, the prior art, and from the perspective of the person skilled in the relevant art.  *See Marzocchi,* 439 F.2d at 223.  Thus, even if ALZA's lawyers and scientists believed prior art non-osmotic extended release technologies to be *inferior* to osmotic-release dosage forms, this belief is legally irrelevant to the question of enablement of the claims-in-suit.  [PFF ¶¶693-697].

### 4. Defendants Have Failed to Demonstrate an Objective Basis for Finding a Lack of Enablement of the Claims-in-Suit

Defendants' non-enablement arguments rest on a series of diffuse and unsupported criticisms comparable to what the Federal Circuit rejected in *Koito*.  In that case, *Koito* had argued that certain details about the invention were necessary for one of skill in the art to practice the claimed invention without undue experimentation.  The Court rejected the challenge to enablement, noting that "Koito failed to put forth clear and convincing evidence at trial that knowledge of such production details was necessary to practice the claimed invention without undue experimentation."  The Court explained that what is well known need not be incorporated into a patent disclosure, observing that "an inventor need not … explain every detail since he is speaking to those skilled in the art."  The Court concluded by observing that "[u]nless there is evidence to the contrary, … the lack of certain production details does not indicate failure of

enablement", finding that "Koito simply did not provide evidence at trial that the production details omitted would have made one of ordinary skill in the art unable to practice the claimed invention without undue experimentation." *Koito*, 381 F.3d at 1155-56.

This is precisely the case before the Court now. Defendants have not advanced any evidence objectively demonstrating that conventional non-osmotic dosage forms could not be readily adapted to produce the dosage forms required by the claims-in-suit. As such, their challenge to the validity of the claims-in-suit on the grounds of non-enablement must fail.

**C.    The '373 Patent Claims Are Not Invalid as a "Matter of Law as Being "Single Means" Claims**

Defendants advance a legally incorrect argument that the claims-in-suit are invalid under 35 U.S.C. §112, first paragraph, as impermissible "single means" claims. (Def't Brf. page 8).

**1.    The Claims-In-Suit Are Not "Single Means" Claims**

A single means claim is a claim that defines the invention exclusively in terms of the result that is to be achieved by the invention. In the context of this case, a single means claim would be a method of treating ADD or ADHD, *period*.

The claims in suit are *not* single means claims. They specify that a "result" (i.e., treatment of ADD/ADHD) is to be achieved in a *particular* manner. For example, claim 1 requires administering a dosage form containing MPH that exhibits an ascending rate of release for an extended period of time. The Court has construed the claims to specify the requirements of this dosage form; namely, that, starting at time equals zero, the amount of MPH released from the dosage form in each interval of measurement increases relative to the preceding interval, and that the overall period of ascension last at least three hours. Additionally, claims 6 and 7 require

94

the treatment to be achieved by providing a substantially ascending MPH concentration for about

5.5 or about 8 hours, respectively.  Because none of the claims-in-suit fail to specify a "means"

by which they achieve the result of treatment of ADD or ADHD, these claims cannot be

characterized as single means claims.

> **2.     Defendants' Analysis of the Law of Enablement by Reference to Cases Discussing "Single Means" Claims Is Fundamentally Flawed and at Odds with Clear Federal Circuit Precedent**

Defendants cite *O'Reilly v. Morse,* 56 U.S. (15 How.) 62, 112 (1853) and another

Supreme Court case from the middle of the last century, *Halliburton Oil Well Cementing Co. v.

Walker*, 329 U.S. 1, 9-13 (1946), as the authority for their assertions that the claims in suit are

invalid under §112, first paragraph, as a matter of law as being "single means" claims.  As may

be evident by their resort to these ancient cases, Defendants' challenge to the claims in suit under

§112, first paragraph, has no legal foundation.

Cases discussing "single means" claims have been made largely irrelevant by enactment

of the 1952 Patent Act (which was subsequent to the both of the "seminal" cases cited by

Defendant).  Moreover, the extensive jurisprudence governing enablement of patent claims under

§112, first paragraph, that has occurred since enactment of the 1952 Act is the primary authority

governing the question of enablement of patent claims, including generic patent claims.  Indeed,

the most recent Federal Circuit decision to actually address a "single means" claim used the pre-

1952 concept, by analogy, to illustrate the *actual* requirements of law of enablement under §112,

first paragraph.  *See In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983)("Thus, the claim is properly

rejected for *what used to be known* as "undue breadth," but *has since been appreciated as being,

more accurately, based on the first paragraph of § 112*."(emphasis added)).

Indeed, Defendants fail to even present the law relating to enablement of "single means" claims in a nominally accurate manner.  For example, Defendants assert that Congress validated *Halliburton's* prohibition on functional claims through its enactment of the "means plus function" standard of 35 U.S.C. 112, sixth paragraph, stating that it operates "more like the reverse doctrine of equivalents than the doctrine of equivalents ***because it restricts the coverage of literal claim language***." [*See* DFF ¶¶ 40-42].  Yet, in *In re Donaldson*, an en banc panel of the Federal Circuit *expressly rejected this characterization* of the Congressional intent.  *See In re Donaldson Co. Inc.,* 16 F.3d 1189, 1194 (Fed. Cir. 1994) (en banc) ("The [PTO] argues that Congress enacted paragraph six to codify the 'reverse doctrine of equivalents' for means-plus-function claim language, a claim interpretation tool which finds application only in the litigation context, wherefore Congress must have intended paragraph six to apply only in the context of post-issuance infringement and validity actions.  *We see no merit in this imaginative reasoning*, and no support for it has been cited.")  Indeed, even Defendants' characterization of  Halliburton and its status was at odds with this en banc decision.  As the Court stated: "In *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946), the Supreme Court held that means-plus-function language could not be employed at the exact point of novelty in a combination claim.  Congress enacted paragraph six, originally paragraph three, to *statutorily overrule that holding*.  See In re Fuetterer, 319 F.2d 259, 264 n. 11, 138 USPQ 217, 222 n. 11 (CCPA 1963) (*noting that it was Congress's intent to restore the law regarding broad functional language in combination claims to its state prior to Halliburton*)."  (emphasis added); *In re Donaldson*, 16 F.3d at 1194.

3.     **Use of Functional Terms in Claims Does Not Render Them Unduly Broad or Convert Them into "Means Plus Function" Claims under ¶6 of §112**

Defendants' criticize the claims-in-suit apparently because they employ functional language which they assert imposes *no limits* on the scope of the claims.  This incorrect characterization of the claims leads Defendants to conclude that "claims 1 and 6-7 of the '373 patent are limited only by whether those dosage forms provide the results claimed."  [Def. Brief at 26; *see also* DFF ¶ 38 ("… the only limitations that possibly provide patentability to the claims are the functional limitations relating to an ascending release rate and/or a substantially ascending plasma profile provided in the claims.  Thus, these Supreme Court cases make it clear that all the asserted claims of the patents in suit fail for lack of enablement.")].

Perhaps recognizing the weakness of their theory, Defendants analogize the claims to "means plus function" claims governed by ¶6 of section §112.  Specifically, Defendants assert that "… rather than use the generic term 'means,' which, because of section 112 ¶6, would require that the structure in the specification be looked to, ALZA used the equivalent generic terms 'dosage form' and 'pharmaceutically acceptable composition.'  [*See* DFF ¶¶ 46-48].  Defendants then stretch this "means plus function" analogy even further, asserting that because no corresponding structure is disclosed in the patent, the claims are "single means" claims.

As the Federal Circuit has repeatedly held, the "means plus function" provisions of ¶6 of §112 only apply to claims that expressly invoke the language "means for" or "steps for" achieving a specified result.  *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1311 (Fed. Cir. 2005) (en banc) (*citing Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703-04 (Fed. Cir. 1998) ("[W]e have held that the absence of [the term "means"] creates a rebuttable presumption that section 112, paragraph 6, does not apply.")).  Defendants' efforts to portray the

97

claims as "means plus function" claims governed by paragraph 6 of § 112, first paragraph, is plainly inconsistent with prevailing law governing when ¶6 applies.  Defendants also try to analogize the functional language in the claims-in-suit to the "means" language used in "means plus function" claims governed by ¶6 of §112, an analogy the Federal Circuit expressly rejected in *Greenberg v. Ethicon Endo-Surgery Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("[T]he fact that a particular mechanism – here "detent mechanism" – is defined in functional terms is not sufficient to convert a claim element containing that term into a "means for performing a specified function" within the meaning of section 112(6). Many devices take their names from the functions they perform. The examples are innumerable, such as "filter," "brake," "clamp," "screwdriver," or "lock."  Indeed, several of the devices at issue in this case have names that describe their functions, such as "graspers," "cutters," and "suture applicators."); *see also Personalized Media Commc'ns LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 704 (Fed. Cir. 1998) ("digital detector" is not a § 112 ¶ 6 limitation).

A similar effort to characterize generic dosage form claim limitations as unsupported "means plus function" claims was mounted in ALZA *Corporation v. Mylan Laboratories*, *Inc.* 349 F.Supp. 2d 1002 (N.D.W.Va. 2004).  The claims at issue in ALZA coupled a generic reference to "sustained-release oxybutynin formulation" with an *in vivo* dissolution rate profile of the drug from the dosage form.  Mylan challenged these claims, asserting that they were, in reality, "means plus function" claims subject to §112, ¶6.  *See* ALZA*,* 349 F. Supp. 2d at 1007 ("Mylan contends that 'sustained-release oxybutynin formulation' lacks any meaningful structure, and therefore must be construed as a means-plus-function limitation.").  Mylan coupled this attack, like Defendants have done in this case, on an inaccurate characterization of the specification, alleging that it only taught osmotic dosage forms.  *Id.*  ("Mylan also maintains that,

in the specification, the only described structure that administers the specified amounts of

oxybutynin is the bilayer push/pull osmotic pump system … disclosed in Examples 15-21.

Accordingly, Mylan asserts that the 'formulation' claims only cover the osmotic dosage forms

and its equivalents.").

The Court rejected this challenge. It held that "[a]lthough Mylan suggests otherwise, a

claim limitation does not need to 'connote a precise physical structure in the minds of those of

skill in the art.' . . . Indeed, the Federal Circuit has held that a term which conveys 'a variety of

structures' to a skilled artisan is 'sufficiently definite … to preclude the application of §112, ¶6.

*Id.* Moreover, "sustained release oxybutynin formulation "is not a generic structural term such as

"means,' 'element,' or 'device'; nor is it a coined term lacking a clear meaning, such as 'widget.'"

ALZA, 349 F.Supp.2d at 1008 (citing *Personalized Media Commc'ns,* 161 F.3d at 704 (footnote

omitted)).

Plainly, the use of functional language to define an invention is neither improper nor does

it render claims "impermissibly broad" as Defendants assert. Both before and after the 1952

Patent Act, courts have consistently held that patent owners may employ functional language to

define their inventions. *See In re Swinehart*, 439 F.2d 210, 213 (C.C.P.A. 1971)("[T]here is no

support, either in the actual holdings of prior cases or in the statute, for the proposition, put

forward here, that 'functional' language, in and of itself, renders a claim improper."); *In re*

*Schreiber*, 128 F.3d 1473, 1478 (Fed. Cir. 1997) ("A patent applicant is free to recite features of

an apparatus either structurally or functionally.").

In this case, the use of "functional" language in the claims to describe the inventions is

entirely proper, and indeed, compelled by the nature of the invention- a new way of treating

ADD by delivering MPH in a specific manner.   The use of dissolution rate and blood plasma concentration parameters is how a person skilled in the art would define the dissolution or plasma profile that is needed to deliver this result.  This manner of claiming is particularly appropriate to defining what is required of the method to achieve its specified result of treating ADD or ADHD.

### III.    THE '373 PATENT CLAIMS ARE DEFINITE

#### A.    Definiteness Requirement of §112, Second Paragraph, Is Met if Claim Boundaries Can Be Ascertained

The purpose of the second paragraph of §112 is to ensure that the public can ascertain the metes and bounds of a claim.  Recently, the Federal Circuit has clarified that, in light of the process of claim construction, a claim that is amenable to construction by the Court will not be found indefinite under §112, second paragraph.  *See Aero Products International, Inc. v. Intex Recreation Corp*, 466 F.3d 1000, 1016 (Fed. Cir. 2007) ("If a claim is amenable to construction, 'even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree,' the claim is not indefinite.") (citation omitted).  This conclusion follows from the well-established case law that holds that a claim whose "bounds" can be ascertained and understood by a person skilled in the relevant art is not indefinite under §112, second paragraph. *See Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) ("We have stated the standard for assessing whether a patent claim is sufficiently definite to satisfy the statutory requirement as follows:  If one skilled in the art would understand the bounds of the claim when read in light of the specification, then the claim satisfies section 112 paragraph 2."). [PFF ¶¶ 900-950].

#### B.    The Court Has Found the Claims-in-Suit to Have Defined Boundaries

During the claim construction phase of this case, the boundaries of the claims-in-suit, and in particular, the key claim limitations of "ascending release rate over an extended period of time"; "substantially ascending MPH plasma concentration" and "about X hours" were each evaluated.  The Court has determined that each of these terms has a boundary that can be ascertained by a person skilled in the art, either by the plain meaning of the terms used, or by

resort to the specification of the '373 patent.  None of the terms in the claims is unclear as to what methods are within or outside the claim boundaries.  Therefore, the claims are definite, thus meeting the requirements of §112, second paragraph.  [PFF ¶¶ 900-950].

C.    **The Requirement That Appropriate Dissolution Testing Conditions Be Selected Does Not Render the Claims-in-Suit Indefinite**

Defendants' only challenge to the definiteness of the claims-in-suit is that the requirement for "appropriate dissolution testing" to determine if the release rate of a potentially infringing dosage forms is ascending for an extended period of time is "impossible" to define.  Specifically, Defendants assert that because some degree of subjectivity is required to select the appropriate testing conditions, the range of test conditions is "infinite" and unbounded.  [DFF ¶¶ 248, 250-251]  Defendants then argue that because one can only determine what an appropriate dissolution test might be for a dosage form after analyzing the dosage form, "one cannot know the bounds of what an 'appropriate dissolution test is because it basically seems to be whatever test one might infringe under."  [DFF ¶260; PFF ¶¶ 900-950].

A patent claim is not indefinite simply because a person skilled in the field of the invention has to make choices in testing a product to determine if it infringes a patent claim, or has to otherwise perform experimentation to ascertain infringement.  As the Federal Circuit has explained, "[p]rovided that the claims are enabled, and no undue experimentation is required, the fact that some experimentation may be necessary to determine the scope of the claims does not render the claims indefinite."  *Exxon*, 265 F.3d at 1379; *see Geneva Pharmaceuticals, Inc., v. Glaxosmithkline PLC*, 349 F.3d 1373 (Fed. Cir. 2003) ("Our predecessor court has stated that "effective amount" is a common and generally acceptable term for pharmaceutical claims and is not ambiguous or indefinite, provided that a person of ordinary skill in the art could determine

the specific amounts without undue experimentation.") (citation omitted); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1557 (Fed. Cir. 1983) ("Assuming some experimentation were needed, a patent is not invalid because of a need for experimentation."); *see also*, *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) (holding that use of the term "substantially" does not render claim unclear); *Andrew Corp. v. Gabriel Elec., Inc.*, 847 F.2d 819, 821-22 (Fed. Cir. 1988) (holding that the terms "close to," "substantially equal," and "closely approximate" do not render a patent indefinite). [PFF ¶¶ 900-950].

Defendants' position on indefiniteness is strained and illogical. Well-established industry guidance guides the selection of appropriate dissolution testing parameters. This guidance instructs the person skilled in the art to start with an evaluation of the dosage form being tested. Test conditions are selected to ascertain the behavior of the dosage form in releasing the active ingredient over time. The selection of testing conditions is simple, and clearly does not present an "infinite" range of possibilities. For example, a person skilled in dissolution testing knows that the choices for machines to conduct dissolution testing is limited to seven USP-approved types of dissolution testing apparati. That person also has to select an appropriate pH and temperature of the dissolution media, and the rotational or agitation rate of the device. And, extensive guidance is provided by the United States Pharmacopeia (USP) on selecting appropriate combinations of these testing conditions. [PFF ¶¶ 900-950].

The selection of appropriate testing conditions, thus, is simple and straightforward, and is done pursuant to industry-accepted procedures. The handful of choices facing the person conducting the testing does not present an "infinite" range of choices, as Defendants assert. [PFF ¶¶ 900-950].

Defendants also portray the selection of appropriate testing conditions as being inherently arbitrary and designed exclusively to establish infringement of the patent claims. [DFF ¶ 260] Defendants overlook the fact that, in this case, the testing conditions selected by Plaintiff's dissolution experts for testing the ANDA products are *identical to the testing conditions selected by Defendants to test their ANDA product!* In other words, Defendants take the position that the testing conditions *they actually employed* to describe the dissolution characteristics of their ANDA products to the Food and Drug Administration are somehow "inappropriate" testing conditions, and should not be used by this Court to assess these same dissolution properties. Defendants primary objection thus appears to be that these plainly appropriate dissolution testing conditions conclusively establish that the ANDA products infringe the claims-in-suit, because those testing conditions show that the ANDA products exhibit an ascending release rate for an extended period of time. [PFF ¶¶ 900-950].

Defendants' efforts in this case parallel a similar challenge mounted by Mylan Pharmaceuticals in ALZA, discussed *supra*. First, like Defendants here, Mylan sought to limit the claims to dosage forms having an osmotic release mechanism. In doing so, they argued that construing the claims otherwise would result in claims having *an unlimited scope.* They reasoned, like Defendants here, that the absence of explicit dissolution testing conditions in the specification rendered the claims susceptible of any interpretation needed to establish infringement. *See* ALZA 349 F. Supp. 2d at 1014 ("In light of the importance of testing conditions for its accused drug, Mylan argues that *Honeywell* forbids a claim construction that permits ALZA to 'gerrymander' specific tests for infringement. Rather, according to Mylan, *Honeywell* compels this Court to construe the claims as requiring all possible methods of in vitro dissolution testing to determine oxybutynin release rates.") Then, after losing on their proposed

claim construction, Mylan sought to recast the *Honeywell* case as compelling a finding that the claims in suit were indefinite.  ALZA 349 F. Supp. 2d at 1019 ("Mylan maintains that (1) there are several ways to test an accused drug for infringement; (2) the claims, specification, and prosecution history of the '355 patent do not indicate which test to use; and (3) results vary greatly between the possible tests.  Therefore, it concludes that 'the claims at issue here are not sufficiently precise to permit a potential competitor to determine whether or not he is infringing.") (citation omitted).  [PFF ¶¶ 900-950].

The ALZA Court specifically rejected this indefiniteness challenge.  In doing so, it observed that the specification of the patent in suit in ALZA "specifically refers to The United States Pharmacopeia … which describes certain procedures for dissolution testing on different extended release drugs."  *Id.*  It then dismissed Mylan's challenge on indefiniteness of the claims, holding that "the definiteness inquiry focuses on a skilled artisan's comprehension of disputed claims, not the identification of the most salient infringement tests."  *Id.* at 1019-20.  [PFF ¶¶ 900-950].

Like Mylan attempted to do in the ALZA case, Defendants here claim that there are an infinite range of possibilities for dissolution testing conditions.  This, they assert under the logic of *Honeywell*, renders the claims-in-suit indefinite.  [DFF ¶ 259]   The Court should reject this baseless and legally unsupported challenge, as the ALZA Court did.  Plainly, to a person experienced in dissolution testing, the selection of appropriate testing conditions pursuant to USP and other accepted industry protocols is not complicated or uncertain.  Instead, it is a straightforward process, based on a simple assessment of the dosage form being tested and done according to standardized procedures. Defendants' challenge for indefiniteness is baseless and should be rejected.  [PFF ¶¶ 900-950].

## IV.    DEFENDANTS' THEORIES OF NON-INFRINGEMENT ARE UNSUPPORTED BY LAW OR FACTS

Plaintiffs' showing that all or nearly all of the ANDA products literally infringe claim 1 of the '373 patent is grounded on actual in-vitro dissolution testing of samples produced by Defendants.  [Plaintiffs' Opening Pretrial Submission, at p. 25 *et seq.*].  These dissolution tests, which were done using the *same* dissolution test that Defendants proposed to FDA for their products, conclusively establish that the ANDA products provide an "ascending release rate over an extended period of time" as construed by the Court.

Throughout this case, Defendants had a choice: whether or not to perform its own in-vitro dissolution tests on the ANDA products.  Defendants retained their own outside dissolution expert, Dr. Banakar, but then Defendants chose *not* to perform their own tests – a decision that speaks volumes about the expected outcome of such tests.  With no hourly in-vitro test data of their own, Defendants resort to non-infringement "defenses" based on (1) ignoring the Court's claim construction, (2) changing the FDA-accepted dissolution test conditions for the products and (3) changing Plaintiffs' test data.  In reality, Defendants have no genuine non-infringement defense.

### A.    There Is No Requirement that Non-Immediate Release MPH Must Be Released During the First Hour to Achieve an Ascending Release Rate

The Court's claim construction establishes the approach for determining whether the ascending release rate requirement of claim 1 is met.  As the claim construction expressly states, this involves determining whether the MPH release rate increases from one interval to the next interval.  [PFF ¶ 800].  Following the claim construction, Plaintiffs' dissolution expert Ms. Gray evaluated the MPH release rates provided by the ANDA products and concluded – as is evident

from the release rate data itself – that all or nearly all of the ANDA products satisfy the ascending release rate element of claim 1 of the '373 patent.  [Plaintiffs' Opening Pretrial Submission, at pp. 25-29].

In response, Defendants argue that an ascending release rate cannot occur if the only MPH released during the first hour in a dissolution test is immediate-release ("IR") MPH.  In that instance, the MPH release rate for the first hourly interval (i.e., t=0-1 hr) will be zero because the IR MPH is excluded from the ascending release rate analysis.  [Defendants' Opening Pretrial Brief, at pp. 126-128].  But, the release rate for the first interval – standing alone as Defendants view it – is of no consequence.

The determination of an ascending release rate looks at whether the MPH release rate increases from one interval to the next and continues to increase through subsequent intervals – thus, a *comparison* of successive intervals is necessary.  In this regard, the Court's construction provides that an ascending release rate occurs when "the amount [of MPH] released in a periodic interval is increased over the amount released during the immediately preceding periodic interval starting at t=0…."  [PFF ¶ 800].  Clearly, the release rates for separate, successive intervals must be compared to determine whether the release rates increased over that period of time.  [PFF ¶ 801].  Since an increase in release rate is all that is required, it simply does not matter whether, after excluding any IR MPH, the amount of MPH during the first hour in a dissolution test is zero, 5 mg, 20 mg or some other amount as long as the amount of MPH released during the second interval *increases* compared to the amount released during the first interval.  Defendants purposefully ignore this required comparison.

Furthermore, Defendants' approach is inconsistent with the '373 patent specification.  The patent specification clearly states that the claimed dosage forms can include an immediate release dose of MPH: "the present invention is also related to dosage forms that additionally comprise a dose of drug for immediate release."  [PFF ¶ 802].  It is illogical to suggest, as Defendants do, that products that provide an initial release of IR MPH cannot provide an ascending release rate when the patent confirms that the claimed treatment methods *include* the use of products that have an immediate-release drug layer.

For all these reasons, Defendants' complaint that Ms. Gray "ignored" Defendants' so-called initial release rate requirement is meritless.  No such requirement exists under the Court's claim construction.  And, Defendants' additional suggestion that any comparison of release rates goes backwards in time and starts with the hypothetical hour *before* the dissolution test begins is also contradicted by the claim construction.  [PFF ¶¶ 803-807].  According to the claim construction, the periodic intervals being compared "start[] at t=0," which both sides agree refers to the start of the dissolution test.   [PFF ¶ 805].

In sum, the Court's claim construction is fatal to Defendants' assertion that an ascending release rate cannot occur if only IR MPH is released during the first hour in an in-vitro dissolution test.[13]

---

[13]   In addition to imposing a non-existent requirement, Defendants' initial release rate defense is also at odds with the Court's claim construction because Defendants rely on *average* data for the ANDA products, rather than on the release rate results for individual tablets.  [See Defendants' Opening Pretrial Brief, at DFF ¶ 410].  In making its Markman rulings, the Court declined to adopt Defendants' interpretation that the release rate "is calculated as a mean value."  [PFF ¶ 808].  And, the ANDA products will, in some instances, release  non-IR MPH during the first hour in a pH 7.5 dissolution medium, as Defendants' expert Dr. Banakar admitted and Plaintiffs' test results demonstrate.  [PFF ¶¶ 809-810].

**B.      There Is No Reason to Use An Acidic Dissolution Medium for the First Hour in In-vitro Dissolution Tests on the ANDA Products**

Plaintiffs' in-vitro dissolution tests used the *same* dissolution test conditions that Defendants' proposed to FDA, and FDA accepted, for the ANDA products.  [PFF ¶¶ 157-159, 163].  This test method uses a pH 7.5 dissolution medium throughout the test which ensures proper release of both portions of MPH in the ANDA products (the IR MPH and the MPH from the tablet core).  It also uses, like Defendants' tests, a USP Type I dissolution apparatus with a 100 rpm rate of agitation.

Nevertheless, Defendants are now arguing that its FDA-accepted dissolution test is *not* an "appropriate" dissolution test for ANDA products.  More specifically, Defendants assert that an appropriate dissolution test for the ANDA products must initially use an acidic dissolution medium for the first hour in order to evaluate the IR MPH released by the ANDA products.  As will be shown, Defendants' assertion is baseless. [14]

The use of an acidic dissolution medium to evaluate the IR MPH layer on the ANDA products is completely unnecessary because the release values for the IR MPH will be the *same at any pH*.  [PFF ¶ 823].  As a result, the ANDA products fully release the IR MPH within the first hour in an in-vitro dissolution test at any pH.  [PFF ¶ 823].  Defendants concede all of this,

---

[14]   Defendants are clearly wrong to remark that the dissolution apparatus that plaintiffs' expert Ms. Gray chose for the tests on the ANDA products is not "based upon the patent." [Defendants' Opening Pretrial Brief, at DFF ¶ 420).  The '373 patent explicitly refers to "implementation of an appropriate dissolution test" for determining the drug release rates of an extended-release MPH dosage form, such as the ANDA products.  [PFF ¶ 812].  Consistent with this guidance, Ms. Gray selected USP Apparatus 1 for conducting dissolution tests on the ANDA products.  The special-use dissolution apparatus exemplified in the '373 patent – USP Apparatus VII – is appropriate for the osmotic dosage forms that are the subject of the patent examples, but this apparatus would not be considered for the ANDA products unless the standard apparatus (i.e., USP apparatus 1 and 2) proved unsuitable.  [PFF ¶¶ 817-822].

but simply ignore it.  [PFF ¶ 824; see DFF ¶ 425 – the "IR component . . . is pH-independent (i.e., the IR release will occur at any pH)."].

Thus, in evaluating the ANDA products, it does not matter whether the dissolution test uses (a) an acid stage for one hour before switching to a pH 7.5 dissolution medium or (b) pH 7.5 dissolution medium for the entire test.  This is because the exact same quantity of MPH will be released from the immediate release outer coat of the ADA products during the first hour at either pH.  Defendants' expert Dr. Needham agreed,  acknowledging (during his deposition) that there is no difference between using acidic dissolution mediums and pH 7.5 for the first hour of a dissolution test on the ANDA products:

> Q   So, at the one-hour time point, using pH 1.2, you're not obtaining a
> different release value than you would if you had used pH 7.5, correct?
> A   Correct.
> Q   And in pH 4.2, at the one hour time point, you're not obtaining a
> different release value than you would have obtained at pH 7.5?
> A   Correct.
> Q   And in pH 6.5, at the one hour time point, you're not obtaining a
> different release value than you would have obtained at pH 7.5?
> A   Correct.

[PFF ¶ 825].  Since the MPH release values at one hour are the same whether one uses a pH 7.5 dissolution medium or an acidic medium, there is no reason why a person skilled in dissolution testing would use more cumbersome (and hazardous) dissolution testing conditions which include an initial acid stage.

Defendants' further suggestion that the use of an acidic dissolution medium is necessary to "segregate" the IR MPH from the non-IR MPH being released from the ANDA products is equally pointless.  The ANDAs specify the amount of IR MPH that the ANDA products are supposed to contain.  According to the ANDAs, 25% of each product's total dose of MPH (based

on the label claim) is contained in the IR drug layer.  [PFF ¶¶ 112-113, 813-814].  Relying on the ANDA specification for the amount of IR MPH in the ANDA products, as Plaintiffs' expert Ms. Gray did in her release rate evaluations, is entirely reasonable.  [PFF ¶ 816].  Defendants concede as much, acknowledging that using the ANDA specification to quantify the amount of IR MPH in the ANDA products is "not necessarily unsound."  [PFF ¶ 815].

Moreover, the results of Plaintiffs' dissolution tests are entirely consistent with Defendants' specification for the IR MPH.[15]  Plaintiffs' use of a pH 7.5 dissolution medium in its dissolution tests of the ANDA products ensured that all of the IR MPH was captured in the release rate value for the first hourly interval in the tests, as discussed above, and Plaintiffs' use of the ANDA specification for IR MPH content ensured that it was fully excluded in determining whether the ascending release rate requirement was met.  [See, e.g., PFF ¶ 173].

Defendants' reference to a two-stage dissolution test that is used with certain other drug products, known as "delayed release" products, is also unavailing.  The ANDA products are classified as "extended release" products, not "delayed release" products.  [PFF ¶ 828].  A delayed release product is designed not to release any drug until after it passes through the stomach.  [PFF ¶ 830].  For such a product, an initial acid stage may be used to test the delayed release mechanism and confirm that *no drug is being released*.  [PFF ¶ 831].  In contrast, the IR drug coating on the ANDA products is designed to start releasing drug immediately in the

---

[15]   Plaintiffs' dissolution tests on the ANDA products show that, on average, slightly less than 25% of each tablet's MPH is released in the first hour (the time it takes for full release of the IR MPH).  [PFF ¶ 827].  By using 25%, plaintiffs may be slightly overestimating the amount of IR MPH in the ANDA products and thus are excluding too much MPH in some instances.  In those instances, plaintiffs are deducting some non-IR MPH as well, which favors Defendants because it is then less likely that an increasing release rate occurred.

stomach and that IR MPH release needs to be measured in addition to the release of MPH from the tablet core, both of which can be done using a pH 7.5 dissolution medium.[16]  [PFF ¶¶ 829, 826].

Ultimately, Defendants' criticism of Plaintiffs' use of a pH 7.5 dissolution medium cannot stand in the face of its own representations to FDA.  The dissolution method that Defendants proposed, and FDA accepted, for the ANDA products uses *only a pH 7.5* dissolution medium, and not a two-tiered test with an initial acid stage.  [PFF ¶ 833].  Defendants' representation to FDA that pH 7.5 is an appropriate dissolution medium for testing the ANDA products confirms that an initial acid stage is simply unnecessary.

Plaintiffs' dissolution tests using a pH 7.5 dissolution medium are appropriate for testing the ANDA products.[17]

### C. There Is No "Error" in Plaintiffs' Dissolution Test Results and Dr. Banakar's Revisions are Unwarranted

Plaintiffs anticipate that Defendants' expert Dr. Banakar will urge that Plaintiffs' dissolution test results are inaccurate and that he will offer "recalculated" release rate data.  As will be shown, there is nothing wrong with Plaintiffs' test results and Dr. Banakar has no legitimate basis for revising those results.

---

**REDACTED**

---

[17]    Plaintiffs' dissolution tests on the ANDA products using acidic dissolution mediums are not appropriate dissolution tests for the products.  These tests were done because Defendants were arguing that claim 1 should be construed to require dissolution tests *solely* in acidic medium and the Court had not yet decided the claim construction issues.  [PFF ¶¶ 834-837].

Defendants' own ANDA shows that the dissolution testing conducted by Plaintiffs' independent testing laboratory (ARL) accurately reports how much MPH is released over time from the ANDA products.  Defendants used the results of their own dissolution testing – done using the same conditions used by ARL – to report to the FDA how much MPH is released from their ANDA products at various points in time.  Defendants do not report in their ANDA amounts released from the ANDA products every hour, as ARL did.  However, at the common time points of measurement, the amounts reported by Defendants in their ANDA and those reported by ARL are nearly identical.  [PFF ¶ 183; PX242].  This shows that the Defendants' assertion that the Plaintiffs' dissolution test results are inaccurate is specious.

| Periodic Interval (h) | ARL Average % Recovery | Andrx ANDA Average % Recovery |
|:---:|:---:|:---:|
| 0 – 1 | **24.56** | **24.00** |
| 1 – 2 | **29.89** | **30.00** |
| 2 – 3 | 40.01 | |
| 3 – 4 | **52.10** | **53.00** |
| 4 – 5 | 63.43 | |
| 5 – 6 | 73.31 | |
| 6 – 7 | 83.77 | |
| 7 – 8 | **91.60** | **90.00** |
| 8 – 9 | 97.18 | |
| 9 - 10 | **100.83** | **100.00** |

During the in-vitro dissolution tests on the 54 mg ANDA product, Plaintiffs' testing laboratory took samples of the dissolution medium every hour for twelve hours and then took one additional sample twelve hours later, at 24 hours.  [PFF ¶¶ 838-839].  These dissolution tests showed that, overall, the 54 mg ANDA products performed as expected and fully released their mph within about 10 hours (i.e., essentially 100 % Recovery was observed by 10 hours).  [PFF ¶ 840].  This result matches both the overall drug release specification in the ANDA and Defendants' own dissolution test results reported in the ANDA.  [PFF ¶¶ 840-841].

113

Looking at the 24-hour time point, the % Recovery results appear to be high as they exceed 100% and, in some instances, by more than a few percent.  [PFF ¶ 842].  These "high" results were caused by the normal loss of dissolution medium through evaporation after 24 hours (which made the MPH appear more concentrated), as Plaintiffs' testing lab confirmed.  [PFF ¶¶ 843, 847-851].  Standard dissolution tests use a *water*-based dissolution medium and when the medium is heated and stirred for 24 hours, some evaporation of the liquid inevitably occurs.  [PFF ¶¶ 844-845].  This is a common observation in dissolution tests that run for 24 hours, as Dr. Banakar acknowledged.  [PFF ¶¶ 845-846].

When the volume loss is applied to the % Recovery calculation, the actual % Recovery value at 24 hours is *about 100%* (on average), which is exactly what one would expect.  [PFF ¶ 851].  Having confirmed that evaporation explained the apparent high results at 24 hours, there is simply no reason to adjust or correct Plaintiffs' data.  [PFF ¶ 852].  And, even if a correction is made to the 24 hour results, no adjustment would be made or is necessary for the dissolution results through 10 hours because any "error" from evaporation is inconsequential.  [PFF ¶ 853].  Defendants follow this same practice, as they did not adjust the dissolution results they submitted to FDA to account for any evaporation through 10 hours.  [PFF ¶ 854].

Defendants' expert Dr. Banakar simply ignores ARL's evaporation study and recalculates ("normalizes") all of Plaintiffs' tests results under the erroneous assumption that the ANDA products take 24 hours to fully release their MPH.  [PFF ¶ 855].  Apart from the basic point that recalculation is unnecessary as discussed above, Dr. Banakar's calculations are directed to a product that doesn't exist.  In doing his calculations, Dr. Banakar intentionally changes the release profile of the ANDA products and assumes that they take *24 hours* to fully release MPH when the products actually complete release *within 10 hours* – less than half that time – as

specified in the ANDAs.  [PFF ¶ 856].  Dr. Banakar's release rate values should not be accepted because they are not representative of the ANDA products.  [*Id.*].

In addition, Dr. Banakar applied his "normalization" technique to all of Plaintiffs' release rate data irrespective of whether or not there were any "high" results.  In this regard, Dr. Banakar recalculated Plaintiffs' test results on 36 mg and 27 mg ANDA products even though there was no 24-hour time point in those tests and no "high" results – none of the % Recovery values exceeded Dr. Banakar's acceptability limit (i.e., 105%).  [PFF ¶¶ 857-858].  No "correction" to the 36 mg and 27 mg should have been made under Dr. Banakar's own criteria – but he did it anyway.  Moreover, Dr. Banakar's recalculated test results for the 36 mg and 27 mg products don't change the conclusion of infringement.  [PFF ¶¶ 859-860].  And, for the 54 mg product, Dr. Banakar candidly conceded that he knew his recalculation method was biased to have a greater effect on the 54 mg release rates than on the lower dosage strengths (36 mg and 27 mg).  [PFF ¶ 861].  Dr. Banakar's flawed and indiscriminate "normalization" technique expose his recalculated data as worthless and litigation-driven.

Defendants' non-infringement theories are unsupported, contrived and meritless.

### D.    The ANDA Products Exhibit Substantially Ascending MPH Plasma Concentrations for both About 5.5 and About 8 Hours

As Plaintiffs demonstrated in their opening brief, Defendants' proposed ANDA product, when administered to a patient, exhibits a substantially ascending MPH plasma concentration for both about 5.5 hours and about 8 hours in at least a very substantial patient population.  [Pltf. Brief at 31-40; PFF ¶¶ 221-60].  The evidence Plaintiffs relied on included Defendants' own representation to the FDA that their product would have a mean plasma profile that substantially ascends for eight hours:



[Pltf. Brief at 36]. In response, Defendants have come forward with no independent analysis of the plasma drug profiles of their ANDA product and have offered no expert opinions that analyze the period of time during which the concentrations substantially ascend. Relying on lawyer argument, they have advanced several criticisms of the analysis undertaken by Plaintiffs' expert Dr. Angst. [*See* DFF ¶¶ 442-54].

Defendants first argue that some of the profiles considered by Dr. Angst involve more than a single slight dip and therefore would not qualify as substantially ascending. The Court's construction, however, does not say that there can be one and only one slight dip. It uses the article "a," which is understood in patent law to allow for one or more of the named items. *See Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997); *N. Am. Vaccine, Inc. v. American Cyanamid Co.*, 7 F.3d 1571, 1575 (Fed. Cir. 1993).

Defendants conceded as much during the Markman briefing, when they said that "[u]nder Plaintiffs' definition there can be a floating 'slight dip' that could occur at anytime (and more

than once), even at times that the patent specification specifically states should be avoided."

[D.I. 102, Defendants' Opposition to Plaintiff's Markman Brief on Claim Construction at 20.]

Moreover, as Dr. Angst will explain at trial, a "slight dip" is simply a descriptive term for well-known variations that arise in plasma concentration time data. [PFF ¶ 689]. Indeed, this phenomenon is so well known that even Defendants' expert Dr. Bolton admitted at his deposition that the slight dip in the patent was just "a chance observation . . ." [Bolton Dep. at 85]. As Dr. Angst will explain, dips of 10-15% are generally treated as irrelevant variations of this kind for MPH. [PFF ¶ 689]. Dr. Angst also confirmed this conclusion by reference to the data that Defendants themselves submitted to the FDA. [Id.]. Dr. Angst showed, for example, that the same patients taking the same product on two different days would experience a first dip on the first day that, on average, was different from the first dip on a second day by 14%. [Id.]. Thus, a patient who had no dip at all on the first occasion would, on average, have a first dip of 14% on the second occasion. [Id.].

As Dr. Angst will further explain, these variations are well known by those of ordinary skill to arise more than once over an eight hour period. [PFF ¶ 690]. Accordingly, Defendants' position that one dip is permissible, but a second is not would make no sense to a person of skill in the art, and Defendants offer no contrary expert opinion. [Id.]. In any event, many of the profiles considered by Dr. Angst involved only a single dip during the claimed time periods of 5.5 and 8 hours, including the mean data reproduced above. [Id.].

Defendants also argue that their product does not infringe because it dips by more than a "slight dip." [See DFF ¶ 454]. Specifically, Defendants take the position that their product does not infringe because it is "biphasic" which, when recast in terms of this Court's claim

construction, presumably means Defendants contend that their product dips more than a "slight dip."  [*Id*.].

However, there is no reasonable basis for this position.  "Biphasic" products would mimic the profiles observed in a Ritalin IR BID regimen, which show declines in plasma concentration of around 35-40%.  [PFF ¶ 691].  The patent itself draws this distinction explicitly [*Id*.].  All of the profiles Plaintiffs rely upon to show infringement have modest dips of 15% or less and nothing that even comes close to the troughs in the prior art BID regimen.  [*Id*.].  Defendants' characterization of their product as "biphasic" thus has absolutely no support, which is presumably why Defendants rely solely on attorney argument, rather than expert testimony.  [*See* DFF ¶ 454].

Again without expert support, Defendants next criticize Dr. Angst's position regarding which profiles "generally rise," and which do not  [DFF ¶¶ 445-56].  As Dr. Angst will explain at trial, the Court's construction requiring that profiles "generally rise" would be understood by one of ordinary skill to mean that the concentrations rise most of the time.  [PFF ¶ 692].  In order to be very conservative, he tried to identify as covered by the claims only those profiles in which the concentration was increasing at least 60% of the time (though anything above 50% could have been reasonably used).  [*Id*.].  This is a logical and entirely legitimate way to apply the claims.

Finally, Defendants attack Dr. Angst because of opinions he offered at his deposition concerning a purely hypothetical plasma concentration time-profile Defendants drew.  [DFF ¶¶ 446-49].  This has no relevance to any issue in the case because it makes no difference whether the hypothetical profile is or is not covered by the asserted claims.

Finally, Defendants argue that, even if Dr. Angst's infringement position is accepted, infringement in only one of every three individuals taking its product is insufficient to prove infringement.  [DFF ¶ 459].  Initially, this figure cited by Defendants represents only those individual profiles that Dr. Angst found had exhibited an ascending MPH plasma concentration for about 8 hours.  [*See* PFF ¶ 249A; PFF ¶ 100].  By contrast, the mean profile for patients who were fed (and which is reproduced above) shows that the mean concentration ascends for well over 8 hours.  [PFF ¶ 243B; ¶ 243C].  Fed, rather than fasted, patients represent the most likely types of patients who will take the ANDA products (i.e., children and young adults having ADD or ADHD and who eat breakfast before school).  In a Hatch Waxman case, the inquiry is whether there will likely be infringement if the ANDA is approved, and the ANDA products used.  *See Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1047 (Fed. Cir. 2001) ("the infringement inquiry focuses on the hypothetical infringement that would occur if the defendant's [A]NDA were approved and the defendant began to make and sell the drug.")  As this graph shows, there is a very high likelihood that substantial numbers of ADD or ADHD patients who take the ANDA products will exhibit substantially ascending MPH plasma concentrations for about 5 or about 8 hours.  [PFF ¶ 243B; PFF ¶ 243C].  And, even if only a minority of patients actually were treated in a way that infringed, that would be more than sufficient to establish infringement in a case of this kind.  *See Purdue Pharma L.P. v. F.H. Faulding & Co.*, 420 F. Supp.2d 420, 428, 437-41 (D. Del. 1999) (Farnan, J.) and Post-Trial Brief of Plaintiff at 20, *Purdue Pharma L.P. v. F.H. Faulding & Co.,* 420 F. Supp.2d 420 (D. Del. 1999) (No. Civ.A. 96-427 JJF) (Farnan, J.) (*citing* FF 250-313) (finding that if the patent at issue were valid, plaintiffs had proven literal infringement where 24 individual patients who received Kadian on a once-a-

day basis in a study, 8 of 24, or 33%, were determined to have met all the limitations of the claims).

Accordingly, Defendants' products will, upon FDA approval, infringe claims 6 and 7 of the '373 patent, in addition to claim 1 of the patent.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request entry of judgment in its favor finding claims 1, 6 and 7 of the '373 patent is infringed by Defendants, and is not invalid.

ASHBY & GEDDES

*Of Counsel*

*/s/ Steven J. Balick*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, IL 60603
312-853-7000

Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
302-654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

-and-

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8000

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil PPC, Inc.*

-and-

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood, Suite 3400
Dallas, TX 75201
214-981-3300

Dated:   December 4, 2007

# FINDINGS OF FACT

## I.    Responsive Findings of Fact Concerning Obviousness

### A.    The Claimed Invention of the '373 Patent

272.    Claim 1 of the '373 patent covers methods of treating ADD or ADHD by administering a dosage form comprising methylphenidate (MPH), wherein the dosage form releases MPH at an ascending release rate over an extended period of time.  [PX 1 at col. 23, lines 12-16].

273.    Claim 6 of the '373 patent claims the method of claim 1, "wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours following said administration."  [*Id.* at col. 24, lines 9-12].

274.    Claim 7 of the '373 patent claims the method of claim 1, "wherein said administration results in a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration."  [*Id.* at col. 24, lines 13-17].

275.    The Court has construed the terms of the '373 patent.  [D.I. 130, Markman Order].

### B.    The Level of Ordinary Skill in the Art

276.    The relevant time period for the purposes of determining the level of skill in the art and the scope of the prior art with respect to the claims-at-issue is between 1996 and 1997. [PX 1; PX 2].

277.    Because the claims-at-issue are each directed to a "method for treating ADD or ADHD," PFF ¶¶ 272-274, the person of ordinary skill in the art at the time of the discovery of the claims-in-suit would have been someone having clinical knowledge and experience

associated with the treatment of ADD or ADHD (collectively "ADHD"). [Testimony of Dr. Patrick; Testimony of Dr. Guinta; Testimony of Dr. Angst].

278.    The person of ordinary skill in the art would have had an understanding of the underlying causes of ADHD, the primary patient population, and the treatment options that were available to treat ADHD. [*Id.*]. Based on knowledge obtained from clinical work, that individual would also have had an understanding of the importance of proper dosing, timing of administration, and minimization of side-effects necessary for successful treatment of the symptoms of ADHD. [*Id.*].

279.    Thus, the person of ordinary skill in the art would have been someone with an M.D., a Ph.D. in clinical pharmacology, clinical psychology or a comparable scientific field, and at least two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience. [*Id.*].

280.    The person of ordinary skill in the art would not have been an individual with only a B.S. in Pharmacy or a Pharm. D., or a B.S. in chemistry, biology, or engineering, or a related subject area, even if that person had additional training through advanced courses of study or work. [*Id.*; compare DFF ¶ 319]. Without advanced clinical training, one cannot understand the complexities involved in the treatment of ADHD and the factors that are important to efficacy, patient safety, and tolerability. [Testimony of Dr. Patrick; Testimony of Dr. Guinta; Testimony of Dr. Angst].

280a.    Named inventors Diane Guinta, Suneel Gupta, and Sam Saks each possess education, training, and experience consistent with the level of skill in the art defined by the Plaintiffs. [JDT (Guinta) 397, 416-418; JDT (Saks) 1047-1048].

C.    The Scope and Content of the Prior Art

1.    Background on ADHD and MPH Treatment with Immediate Release
       Ritalin® BID and TID

281.    The most common side effects of MPH are appetite suppression, gastric distress,

irritability, headache, arrested growth, insomnia, restlessness, anxiety, and dullness/listlessness.

[PX 134 (Pelham et al., Pediatrics 86:226 (1990)) at p. 233, Table 5; DTX 630 (Greenhill et al.,

Pediatric Psychopharmacology 15:1 (1992)) at p. 12; Testimony of Dr. Patrick; Testimony of Dr.

Feifel; Testimony of Dr. Guinta].

282.    It was known in the art that the incidence and severity of side effects associated

with MPH were known to be dose-dependent.  As higher doses of drug are given to a patient, it

was known in the art that side effects become more prevalent and that a patient's tolerability to

the drug is reduced.  [*Id.*].

283.    It was known in the prior art that approximately 25% of patients prescribed MPH

did not respond well to treatment.  According to one report, the vast majority of these failures

were due to adverse effects.  [DTX 630 at p. 21].

284.    Alternatives to MPH for the treatment of ADHD, such as pemoline and

dextroamphetamine, were available in the art.  However, these were generally associated with a

higher incidence of adverse effects relative to MPH.  [PX 133 (Pelham et al., Pediatrics 80: 491

(1987)) at p. 491-92].

285.    Drug titration involves starting a patient with drug amounts that are below

therapeutic levels, and incrementally increasing the dose of drug until maximum control of

ADHD symptoms is achieved, while avoiding side-effects. [DTX 630 at p. 15; Testimony of Dr. Patrick; Testimony of Dr. Feifel].

286.    Titrating the proper dose of MPH for each patient was an important clinical aspect of treating ADHD. [*Id.*].

287.    For any given patient, the difference between the dose of MPH necessary to control the symptoms of ADHD and the dose of MPH in which side effects began to manifest themselves was small. [*Id.*]. Thus, it was known in the art that the "therapeutic window" of MPH was small. [Testimony of Dr. Patrick; Testimony of Dr. Feifel; Testimony of Dr. Guinta].

288.    Properly timing the administration of immediate release MPH doses was known to be important for adequate control of symptoms and to avoid undesired side effects through the course of the entire day. [Testimony of Dr. Patrick; Testimony of Dr. Feifel; Testimony of Dr. Guinta; DTX 630 at p. 16]. Compliance with the MPH dosing regimen prescribed by the doctor, thus, was of critical importance to successful treatment of ADHD. [*Id.*].

289.    The mean plasma concentration profile exhibited by immediate release MPH administered in a BID regimen was known by 1996-1997. [PX 137 (Patrick et al., Biopharmaceutics & Drug Disp. 10: 165 (1989)) at p. 170, Figure 2; Testimony of Dr. Patrick].

290.    The MPH plasma concentration-time profile observed over the course of a day of treatment with immediate release MPH products was sometimes referred to as a "sawtooth" or "peak and valley" curve. [PFF ¶¶ 34-36].

291.    Following each ingestion of immediate release MPH, the MPH plasma concentrations ascend rapidly, reaching a peak within about 2 hours, then decrease. [PFF ¶ 34].

292.    When a second or third dose of immediate release MPH is administered, a trough reflecting the lowest MPH plasma concentration between administrations iss observed, followed by a sharp rise to another peak.  [PFF ¶¶ 34-35].

293.    The ascending portion of each peak is a BID or TID immediate release MPH profile corresponds to the rapid rate of drug absorption and the descending portion of each peak corresponds to the rapid rate of drug elimination due to the short half-life of MPH.  [*Id.*; Testimony of Dr. Patrick].

294.    Ritalin SR® is a "wax matrix" formulation, which releases MPH in generally decreasing amounts over time, after releasing MPH at an ascending release rate for only about an hour.  [PFF ¶ 41; PX 133 at 500; PX 334 (Erramouspe et al., Ann. Pharmacother. 31(10): 1123-1126 (1997)) at P ALZ 006857; PX 335 (Erramouspe et al., J. Pharm. Tech. 14: 209-211 (1998)) at P ALZ 006863; PX 337 (Hui et al., "Design and Fabrication of Oral Controlled Release Drug Delivery Systems," Chp. 9, pp. 373-431 in Robinson et al., Controlled Drug Delivery Fundamentals and Applications, 2d (1987)) at p. 390 (P ALZ 006876); Testimony of Dr. Davies; Testimony of Dr. Angst].  After the first hour, Ritalin SR®'s "drug release rate continuously decreases with time."  [PX 133 at 500; PX 468 at 390; Testimony of Dr. Davies].

295.    The mean MPH plasma concentration profile exhibited by Ritalin SR® administered once-a-day was known in 1996-1997.  [PX 137 at p. 170, Figure 2].

296.    Following ingestion, Ritalin SR® produces what was recognized in the art as a "conventional" drug delivery profile for a sustained release formulation – *i.e.*, MPH blood plasma levels of the drug initially rise to therapeutic levels, reaching a $C_{max}$ within a few hours, and then remained relatively flat or constant for about 4 to 5 hours before beginning a substantial

125

descent by about 5 to 6 hours.  [PFF ¶¶ 41-42; Testimony of Dr. Patrick; Testimony of Dr. Feifel; Testimony of Dr. Guinta].

297.   Before the invention, providing a relatively constant plasma drug concentration over an extended period of time was widely viewed in the art as being desirable and the most effective way to deliver a given drug over the course of an entire day.  [Testimony of Dr. Feifel; Testimony of Dr. Guinta].  Using a conventional drug delivery approach, a constant plasma concentration level could be established and maintained at or just above the therapeutic level, but below harmful levels, which was thought to ensure effectiveness and reduce the risk of toxicity and unacceptable side effects.  [*Id.*].

298.   Ritalin SR® was never widely accepted as a once-a-day treatment for ADHD, because in many individuals it proved to be unreliable and ineffective at controlling ADHD symptoms over the course of a day when compared to treatment regimens using multiple daily doses of immediate release MPH products — i.e., the BID and TID regimens.  [PFF ¶¶ 43-44; Testimony of Dr. Feifel; Testimony of Dr. Patrick; Testimony of Dr. Guinta].

299.   Given the fact that Ritalin SR® produced a conventional, flat MPH plasma profile that was considered desirable for extended release drug products, its failure to meet the need for a once-a-day MPH drug product came as a surprise to those working in the field.  [Testimony of Dr. Feifel; Testimony of Dr. Guinta].

300.   Anecdotal reports that Ritalin SR® was less effective compared to Ritalin® BID began circulating soon after the introduction of Ritalin SR® into the market.  [DTX 630 at p. 6; Testimony of Dr. Feifel].  These anecdotal reports, which were based on doctor-patient

communications, did not provide a clear indication why the Ritalin SR ® treatment was less effective than regimens based on immediate release MPH products.  [Testimony of Dr. Feifel].

301.    Due to the shortcomings of Ritalin SR®, the state of the art in treating ADHD using MPH remained essentially where it had been 30 years earlier in which regimens based on administration of multiple doses of immediate release MPH was considered to be the only reliably effective MPH treatment for ADD and ADHD.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel; Testimony of Dr. Guinta].

## 2.    The Methylphenidate Art:  Pelham (1987)

302.    In 1987, Pelham et al. published the results of two clinical studies that compared the effects of Ritalin SR® administered once-a-day with Ritalin® administered BID ("the Pelham 1987 publication".).  [PX 133 at p. 491].

303.    The Pelham 1987 publication disclosed that certain limitations associated with Ritalin®, e.g., the need for multiple administrations and problems associated with noncompliance, prompted doctors to consider prescribing drugs other than MPH which have a longer duration of action.  [*Id.*].

304.    The Pelham 1987 publication. disclosed that Ritalin SR® was developed to be equivalent to 10 mg of Ritalin® administered BID and cited a study where the authors concluded that the two products "may be used interchangeably".  [*Id.*].

305.    The results of two clinical studies were reported in the Pelham 1987 publication. In the first, 13 boys diagnosed with ADD participated in a double-blind, within-subject trial of Ritalin® administered BID and Ritalin SR® administered once daily.  Medication was dispensed

by parents with breakfast and by the clinical staff just before lunch.  [*Id.* at p. 493].  Clinical staff evaluated the general effectiveness of the MPH medications, but the study did not evaluate the effectiveness at defined intervals over the course of a school day.  [*Id.*].

306.    The first study in the Pelham 1987 publication revealed several significant differences between Ritalin® and Ritalin SR®.  [*Id.* at p. 494].  Specifically, Ritalin® was found to be superior to Ritalin SR® on measures of noncompliance, negative verbalizations, and observed no-interaction codings.  [*Id.*].  Ritalin SR® was also found to exhibit higher variability on several measures of efficacy compared to Ritalin®.  [*Id.* at p. 494-495].  This suggested to the authors that Ritalin SR® was not as effective as Ritalin® given BID with as many children in the sample.  [*Id.* at p. 496].

307.    In the second study in the Pelham 1987 publication, a partially overlapping group of 9 boys diagnosed with ADD participated in a double-blind, within-subject trial of Ritalin® administered BID and Ritalin SR® administered once daily.  Unlike the first study, this study tracked the time courses of efficacy of the two drugs.  [*Id.* at p. 497].  Program staff administered the medication at 8:00 am and 12:00 pm.  [*Id.*].  Effects were evaluated hourly from 8:05 am until 4:05 pm.  [*Id.*].

308.    On behavioral measures, the Pelham 1987 publication reported that both Ritalin SR® and Ritalin® given BID began to have detectable effects after one hour, although the effects of Ritalin SR® began to wear off after the noon time point.  [*Id.* at p. 499].  The authors characterized the difference in effect, however, as "slight."  [*Id.*].

309.    On cognitive measures, the Pelham 1987 publication reported Ritalin SR® did not have a significant effect until three hours after ingestion, "whereas standard methylphenidate's

effects began to be detectable an hour after ingestion." [*Id.* at p. 498]. The effects of both drugs (with a noon dose in the standard drug condition) were "maintained through the last testing session." [*Id.*]. Thus, while Ritalin SR® "exerts its effects at a slower rate than the standard drug [Ritalin®]," the authors noted that "once SR-20 has begun to act, *the drugs have similar effects and time courses*." [*Id.* at p. 499 (emphasis added)].

310.    The 1987 Pelham publication noted that their studies did "not provide a complete answer" to the question as to why Ritalin SR® was not as effective as Ritalin® administered BID. [*Id.* at p. 500]. The authors speculated that possible causes might relate to Ritalin SR®'s slower onset of cognitive effect or the inability of the wax matrix dosage form of Ritalin SR® to achieve high enough plasma concentrations ($C_{max}$) of MPH. [*Id.*].

311.    To solve at least some of the problems associated with Ritalin SR®, the authors of the 1987 Pelham publication postulated that two Ritalin SR® tablets given simultaneously might have effects on social behavior that "were more equivalent to a comparable twice daily dose." [*Id.*].

312.    The authors of the 1987 Pelham publication also postulated that another possible solution to problems with Ritalin SR® was to give concurrent morning doses of 10 mg of immediate release MPH and Ritalin SR®. [*Id.* at p. 499].

312a.    The 1987 Pelham publication did not measure MPH plasma concentrations or take other steps to ascertain the reasons for the differences in activity between Ritalin SR® and Ritalin® administered BID. [Id. at p. 491 (Abstract).]

### 3.    The Methylphenidate Art:  Patrick 1989

313.    In 1989, Patrick et al. conducted a crossover study in 18 healthy subjects to evaluate the bioavailability of two different sustained release MPH dosage forms (Ritalin SR® and a generic dosage form manufactured by MD Pharmaceuticals) compared to Ritalin® administered BID with 5 hours separating doses.  [PX 137 at p. 166-67].

314.    Figure 2 of the Patrick paper reproduced below depicts the mean concentration-time profiles for the three formulations [*Id.* at p. 170].  This figure showed that the maximum plasma concentration ($C_{max}$) achieved with administration of the first dose of Ritalin® was similar to the $C_{max}$ achieved with either sustained release MPH formulation.  [*Id.*; Testimony of Dr. Patrick].  The "sawtooth" profile is the MPH plasma profile seen with BID dosing, while the other curves show the MPH plasma profiles of Ritalin SR® and a general version of Ritalin SR®.



315.    Patrick et al. reported that the $C_{max}$ achieved with the second dose of Ritalin[®] was higher than that achieved using either sustained release MPH formulation.  [*Id.* at p. 170, Table 1; Testimony of Dr. Patrick].  Patrick et al. disclosed that the mean peak MPH plasma concentration for Ritalin[®] was 6.4 ng/ml, and the mean peak MPH plasma concentration for Ritalin SR[®] and the generic product were 4.5 ng/ml and 4.8 ng/ml, respectively.  [*Id.*].

316.    Patrick et al. reported that the time necessary to achieve $C_{max}$ following administration was found to be slower in the two sustained release MPH formulations compared to Ritalin[®] administered BID.  [*Id.* at p. 170, Figure 2; Testimony of Dr. Patrick].  Patrick et al. disclosed that Ritalin[®] reached its maximum MPH concentration at 1.5 hours after administration of the first dose, whereas Ritalin SR[®] and the generic product reached maximum MPH concentrations at approximately 3.3 hours.  [*Id.*].

### 4.    The Methylphenidate Art:  <u>Birmaher (1989)</u>

317.    In 1989, Birmaher et al., J. Am. Child & Adol. Psych. 28: 768 (1989) [DTX 627] published the results of a clinical study in 9 males with ADHD who were administered Ritalin SR[®] and another clinical study in 8 different males with ADHD who were administered a higher, single morning dose of Ritalin[®].

318.    Birmaher et al. indicated that they "measured plasma levels of MPH-SR [Ritalin SR[®]] in ADDH [ADHD] males.  The study focused on whether MPH-SR (given once daily) produces very low methylphenidate plasma concentrations or shows delayed absorption and a delayed peak when compared to data previously collected on plasma levels of standard MPH [Ritalin[®]]."  [*Id.* at p. 768-769].

319.    Birmaher et al. disclosed that Ritalin SR® took longer to reach its maximum MPH plasma concentration than Ritalin®, and it did not reach the same maximum concentration as an identical dose of Ritalin®.  [*Id.*].

320.    Birmaher et al. also disclosed that Ritalin SR® reached its peak MPH plasma level from between 1.85 hours and 4.9 hours, with a mean time to peak of 3.36 hours.  [*Id.* at p. 769].

321.    Regarding the comparative efficacies of the two drugs, Birmaher et al. stated: "The reason for this lack of efficacy is not clear, because MPH-SR employs the same active methylphenidate that has been found to be clinically effective at the 20 mg. per day dose in over 22 controlled studies."  [*Id.* at p. 768].

322.    Birmaher et al. stated that "possible explanations of [Ritalin SR®'s] relative inefficacy include problems in absorption in the gastrointestinal track from its wax-matrix resin vehicle, delayed absorption, pharmacokinetic differences or differences at the brain receptor level (pharmacodynamic differences) or tachyphylaxis (Jackson, pers. commun.)."  [*Id.*].

322a.    Birmaher et al. provided no details regarding the undocumented "personal communication" from "Jackson." [*Id.*].

323.    Birmaher et al. noted that "[t]here are many limitations inherent in this study." Specifically, they stated:

> Ideally, the boys in this study should have been their own controls.  Instead of a contrast group, with different ages and on different doses, the same boys would have been the best group to also be given identical doses of standard MPH.  The standard MPH could have been given in the normal twice-per-day dosing pattern, morning and noon, rather than one large loading dose, as with the contrast group. Also, no control periods or groups are available to help interpret the performance measures…The correlations between the peak MPH-SR plasma levels and maximum change on the Gardner Steadiness Test were found only for the first 3

hours. The lack of correlation between activity measures and plasma levels may have been due to the very high variability in these measures for a very small sample of subjects.

[*Id.* at p. 770-771].

324.    Birmaher et al. disclosed that their clinical study results agreed with the results disclosed in the 1987 Pelham publication. [*Id.*].

325.    Birmaher et al. disclosed that other publications suggested that "stimulants exert their major attention-enhancing action during absorption," however "[i]t is not clear whether the rate of absorption or simply the peak plasma (or brain) concentrations alone accounts for MPH's efficacy in a given child. This might be interpreted as a 'threshold' model (peak reached) or 'ramp effect' model (rate of absorption driven kinetics) of drug action." [*Id.* at p. 771].

325a.   Birmaher et al. also hypothesized that the flattened MPH time concentration profile of Ritalin SR® "raises a question about whether MPH-SR may be more prone to tachyphylaxis." [*Id.*]

326.    One the authors of the Birmaher et al. paper was Dr. Laurence Greenhill. [*Id.* at p. 768].

327.    Dr. Greenhill, a clinical psychiatrist, was widely considered to be one of the leading authorities on the use of psychostimulants to treat ADHD. [Testimony of Dr. Patrick].

**5.    The Methylphenidate Art:  Pelham (1990)**

328.    In 1990, the results of another clinical study were published (the "1990 Pelham paper") by the lead author of the 1987 Pelham publication. [PX 134]. The 1990 Pelham paper disclosed the results of a placebo-controlled, double-blind, within-subject study in 22 boys

133

diagnosed with ADHD that compared Ritalin® administered BID, Ritalin SR® administered once daily, pemoline administered once daily, and dexedrine spansules administered once daily.  [*Id.* at p. 228].

329.    In the 1990 Pelham paper, a continuous performance task was administered repeatedly to the subjects to track the relative time courses of the drugs.  [*Id.*].

330.    The authors of the 1990 Pelham paper reported that *all* of the long-acting medications had detectable effects 1 hour after ingestion and effects 9 hours post-ingestion. [*Id.*].

331.    The Pelham 1990 paper noted that their "[r]esults revealed generally equivalent and beneficial effects of all four medications."  [*Id.* at p. 226].

332.    The Pelham 1990 paper examined numerous side effects were in the patients included in the study.  [*Id.* at p. 233, Table 5].  For example, the authors reported that "[c]onsiderably more difficulty falling asleep was reported for all long-acting drugs than for placebo and standard methylphenidate."  [*Id.* at p. 232].

333.    Table 5 of the 1990 Pelham paper reported that there was a three times higher incidence of insomnia with children taking Ritalin SR® compared to children taking immediate release Ritalin® BID.  [*Id.* at p. 233, Table 5].  Table 5 of the 1990 Pelham paper also reported a higher incidence of appetite suppression with Ritalin SR® (76.2%) compared to immediate release Ritalin® administered BID (61.9%).  [*Id.*].

334.    The authors of the 1990 Pelham paper recognized that their results contradicted the findings in their earlier paper.  They stated:

[T]hese results also contradict somewhat the available information about some of the slow-acting medications.  For example, SR-20 and DS [dexedrine spansules] both had significant effects on errors of omission at 1 hour and through 9 hours postingestion.  *This contrasts with both our previous study of SR-20, which showed SR not having an effect on CPT until 3 hours postingestion*, and Brown and colleagues' study of DS, which showed effects only at 2 hours postingestion.  Both previous studies had only 9 subjects, however, and the present results with an N of 22 may be a more veridical reflection of the medications' actual time courses.  Furthermore, our data showed that all three long-acting medications had effects at 9 hours postingestion that were as great or nearly so as effects at 2 hours postingestion.

[*Id.* at p. 235. (emphasis added)].

335.    The 1990 Pelham paper reported that after the clinical study was unblinded, the authors recommended continued treatment of one of the three long-acting medications for 14 of the 15 children for whom medication was recommended.  [*Id.*].  The authors of the 1990 Pelham paper felt that if the results were to hold true with a larger sample, "the implication is that a very large number of children with ADHD should be receiving a long-acting form of stimulant." [*Id.*].

### 6.    The Methylphenidate Art:  Greenhill (1992)

336.    In 1992, Dr. Laurence Greenhill published a review article surveying the literature regarding MPH.  [DTX 630].

337.    In the paper, Greenhill commented that Ritalin SR® was intended to promote once-per-day MPH dosing, which would avoid administration of MPH during the school day. [*Id.* at p. 5].  Greenhill noted that this was intended to solve problems such as school officials refusing to administer MPH, peers who ridiculed the child taking the medication, and compliance issues with children being forced to self-administer the medication.  [*Id.*].

338.    Greenhill disclosed that Ritalin SR® reached its peak MPH plasma concentration about one hour later than Ritalin®, and reached the maximum concentration about 3 hours after administration.  [*Id.*].

339.    Even though Greenhill disclosed that Ritalin SR® and Ritalin® administered BID showed "no significantly different effect in the classroom, the home environment, or during the continuous performance test," and that numerous studies did not "show a definite advantage for either MPH formulation over the other," Greenhill noted that "some authors have suggested that SR-20 [Ritalin SR®] may not be as effective" as Ritalin®.  [*Id.* at p. 6].

340.    As a possible explanation for the reports about the comparative lack of efficacy of Ritalin SR®, Greenhill noted: "MPH-10 BID tablets produce higher peak plasma concentrations and yield a steeper absorption phase slope than do the longer-acting SR-20 preparations.  Current theory suggests that psychostimulant medication effects on ADHD are related to the rate of absorption (ramp effect), so standard MPH's steeper absorption curve may give it more powerful beneficial and adverse effects, particularly during long-term maintenance."  [*Id.*].

341.    Greenhill offered other explanations for the perceived problems with Ritalin SR®: "This concept has raised the possibility that MPH-SR's greater duration of action may alter pharmacokinetics (hepatic auto-induction) or receptor pharmacodynamics, inducing tachyphylaxis or tolerance.  Other explanations for the *anecdotal reports* of MPH-SR's lack of ability to provide long-term coverage include poor compliance at home with taking medication, unpredictable release of active MPH from the SR's wax-matrix core, change in the patient's weight, or new stress in the environment."  [*Id.* (emphasis added)].

342.    In support of these explanations, Greenhill cited to the 1984 Birmaher et al. paper. [*Id.* at p. 6, 24].  Greenhill did not make reference to the Birmaher et al. statement that "[t]here are many limitations inherent in this study."  [PFF ¶ 323].

343.    Greenhill indicated that the common side effects of MPH included "insomnia, decreased appetite, weight loss, headache, heart rate elevation at rest, minor increases in systolic blood pressure, and increased crying."  [DTX 630 at p. 12].

344.    Greenhill noted that "[m]any of these side effects can be managed with temporary dose *reduction*."  [*Id.* (emphasis added)].

345.    As for the side effect of "severe insomnia," Greenhill noted that this side effect can be managed by changing the time of dosing, *with most of the medication given early in the day*."  [*Id.* at p. 12-13 (emphasis added)].

346.    Regarding "the titration phase" of drug dosing, Greenhill disclosed that it is important to start treatment with low, therapeutically ineffective doses to minimize adverse effects.  [*Id.* at p. 15].

347.    According to Greenhill, approximately 25% of school-aged children did not respond well the psychostimulant treatment.  According to one study that Greenhill referenced, the majority of treatment failures were due to the adverse effects of the drug.  [*Id.* at p. 21].

### D.    ALZA's Citizen Petition

348.    Defendants make reference to a "1991 Perel Abstract" that Defendants indicate was cited by ALZA in a comment to the Food and Drug Administration regarding a Citizen Petition submitted in connection with generic version of CONCERTA®.  [DFF ¶ 288].

137

349.    The comment was filed with the FDA on September 15, 2004, [DTX 141], and is not prior art.  [PFF ¶¶  276].  Defendants gave notice to Plaintiffs pursuant to 21 U.S.C. 355(j)(2)(A)(vii)(IV) on July 20, 2005.  Plaintiffs were unaware that Defendants had filed an ANDA referencing CONCERTA® at the time they filed the Citizen Petition.

350.    Swanson et al., Clin. Pharmacol. & Ther. 66: 295 (1999) [PX 575] ("the Swanson 1999 paper") is not prior art, but it was the first investigative study that established that MPH exhibited acute tolerance. [Testimony of Dr. Patrick].

### 1.    Nicotine Art

351.    Defendants cite to numerous references discussing tolerance associated with nicotine.  [DFF ¶ 291].  Publications regarding acute tolerance would not have been considered relevant to a person of ordinary skill in the art prior to the claimed inventions because acute tolerance was not known to be associated with MPH until the publication of the 1999 Swanson paper.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel; Testimony of Dr. Guinta].

### 2.    Porchet

352.    Porchet et al., J. Pharmacol. Exp. Ther. 244(1): 231-236 (1988) [DTX 628] disclosed that acute tolerance or "tachyphylaxis" is the decreased effect of a drug within the time course of a single dose.  [*Id.* at p. 231].  Additionally, "[a]cute tolerance may be related to change in the numbers of receptors in the target tissue, depletion of a second endogenous intermediary such as catecholamines and/or a physiologic adjustment by counterregulatory systems."  [*Id.*].

353.    In the clinical study described by Porchet et al., eight healthy men who were habitual cigarette smokers were given two identical infusions of nicotine.  [*Id.* at p. 231-32].

Depending on the day, the interval of time between infusions was varied.  [*Id.* at p. 232].  Blood samples were taken and heart rates were monitored.  [*Id.*].

354.    Porchet et al. disclosed that there was rapid development of acute tolerance to the cardioaccelerating effect of nicotine.  When successive doses were administered only an hour apart, even though the nicotine concentration was at its highest after the second dose, the maximum heart rate was found to be smaller.  The authors noted that "the smallest maximum response after the second infusion is achieved with the highest peak blood concentration of nicotine."  [*Id.* at p. 233].

355.    However, Porchet et al. disclosed that "as the time interval between the two infusions increases, the amplitude of the response to the second one increases and is completely restored to the first infusion level (80.0 bpm) when the second is given 3.5 hr after the end of the first.  These findings indicate rapid appearance and disappearance of tolerance to the cardioaccelerating effect of nicotine."  [*Id.*].

356.    This finding in Porchet et al. suggested that, for nicotine, tolerance to its effects may be overcome with a "rebooting" period between successive administrations of drug.  [DFF ¶ 291].

357.    Porchet et al. disclosed:

The rapid development of tolerance to nicotine suggests a possible basis for the relatively poor performance of nicotine gum in promoting smoking cessation. The successive peaks of high nicotine concentration, as obtained by cigarette smoking, are better able to overcome tolerance partially to produce psychologic effects.  Further, *the decline of nicotine levels between cigarettes permits substantial regression of tolerance.  In contrast, the slow rise in nicotine concentrations with use of nicotine gum and the more stable levels of nicotine concentration achieved may result in the full development of tolerance* and its maintenance throughout the day with repeated gum administration.

[*Id.* at p. 236 (emphasis added)].

### 3.    Perkins

358.    In 1991, Perkins et al., Drug and Alcohol Dependence 29 (1991): 77-85 [DTX 629] published the results of a clinical study examining the cardiovascular effects of nicotine following bolus administrations of nicotine.

359.    Perkins et al. disclosed that "acute tolerance has been defined in a number of different ways, and there may be no single, undisputed definition." [*Id.* at p. 77]. Perkins et al. used the phrase "acute tolerance" to mean a "reduced responding at the same blood concentrations on the descending versus ascending portions of blood concentration curve during a single dose administration." [*Id.*].

360.    The clinical study reported by Perkins et al. presented research regarding acute tolerance to heart rate, systolic blood pressure, diastolic blood pressure, and finger pulse amplitude after exposure to a bolus dose of nicotine (the dose was 5 equal doses administered intranasally every 60 seconds). [*Id.* at p. 78]. Blood samples from a subset of subjects were taken at 1, 3, 5, 10, and 15 minutes following the last nicotine dose. [*Id.*].

361.    Perkins et al. found that acute tolerance was only found with some, but not all, cardiovascular effects. [*Id.* at p. 83]. Systolic and diastolic blood pressure responses declined more rapidly than the plasma nicotine concentration, however the heart rate decline closely mirrored the decline in plasma concentration. [*Id.*]. In addition, acute tolerance was not shown for the finger pulse amplitude. [*Id.*]. Acute tolerance was not uniformly shown for all of the different cardiovascular responses to nicotine. [*Id.*].

D.     **CNS Stimulant Art**

1.     **Angrist**

362.     In 1987, Angrist authored a paper on the clinical effects of CNS stimulants.

[DTX 626 (Angrist, "Clinical Effects of Central Nervous System Stimulants: A Selective

Update," Brain Reward Systems and Abuse (1987))]. Defendants have cited to Angrist and have

extrapolated teachings regarding certain examples (cocaine and amphetamine) of these drugs to

MPH. [DFF ¶ 285]. Angrist would not have been considered relevant by a person of ordinary

skill in the art seeking to develop a new extended release dosage form of MPH for use in the

treatment of ADHD. [Testimony of Dr. Patrick].

363.     In a discussion of acute tolerance, the only CNS stimulants mentioned in Angrist

were cocaine and amphetamine. [*Id.* at p. 112-13].

364.     Angrist disclosed that acute tolerance may occur after a single dose and then

disappear rapidly, and that the effect is probably "clinically meaningful during the course of an

individual stimulant binge and could either contribute to abusers' safety or, conversely, lead to

higher doses being taken." [*Id.* at p. 112].

365.     Angrist did not discuss acute tolerance in terms of CNS stimulants used for

legitimate medicinal purposes. Angrist only disclosed aspects of acute tolerance for drugs that

were being abused and taken intranasally or intravenously. [*Id.* at p. 112-13; Testimony of Dr.

Patrick].

366.     Angrist indicated that the noradrenergic effects of amphetamines exhibited acute

tolerance in male rates, but not female rats. [*Id.* at p. 112]. In humans, Angrist suggested that

only the anorectic and cardiovascular effects of CNS drugs exhibited acute tolerance (but not other CNS effects, such as locomotive effects).  [*Id.*; Testimony of Dr. Patrick].

367.    In drug abuse situations, supratherapeutic levels of drug "insult" the body system. [Testimony of Dr. Patrick].  The studies referenced in Angrist would not have been considered relevant to a person of ordinary skill in the art seeking to understand the problems associated with MPH in a clinical setting, where drug is administered at therapeutic levels.  [Testimony of Dr. Patrick].

## 2.    Nitrate References

368.    Defendants cite to numerous references regarding nitrate drugs in support of their obviousness position including Fung, Am. J. Med. (1984), and U.S. Patent Nos. 4,956,181 and 5,613,958.  [DFF ¶¶ 298, 307, 308].  These references would not have been considered relevant by a person of ordinary skill in the art seeking to develop a new extended release MPH dosage form for use in the treatment of ADHD.  [Testimony of Dr. Patrick].

369.    The physiological effects of MPH and nitrates and the disease states treated by each of the two drugs were known in the art to be of a fundamentally different nature.  [*Id.*]. Nitrates were known to have resolved angina by relaxing vascular smooth muscle and causing dilatation of peripheral arteries and veins.  [*Id.*].  By contrast, ADD and ADHD were recognized to be complex CNS disorders, characterized by behavioral symptoms.  [*Id.*].

370.    MPH was known to produce its therapeutic effects through intracellular signaling through agonist binding to cellular receptors in the brain.  [*Id.*].  Nitrates produce their therapeutic effects by dilating blood vessels.  [*Id.*].

371.    It was understood in the art that there is no rational connection between the targets of nitrate drugs as an active ingredient, the mechanism of action of nitrates, and the medical use of nitrates relative to the targets of MPH, the mechanism of action of MPH, and the medical use of MPH.  [*Id.*].

371a.   Given that drug discovery and drug formulation are both rational undertakings, a person of ordinary skill in the art would not have extrapolated teachings relating to nitrates to the use of MPH to treat ADHD, and would have had no basis for expecting any treatment regimen associated with nitrate drug to work with MPH as used according to the methods of the claims-in-suit.  [*Id.*].

### 3.    Fung Paper

372.    Defendants cite to Fung, Am. J. Med. (1984) [DTX 631] ("Fung").  [DFF ¶ 298].

373.    Fung reviewed work performed by others relating to the pharmacokinetics and pharmacodynamics of nitrates.  [DTX 631].

374.    The Fung publication does not mention the treatment of any behavioral disorders, let alone mention ADD or ADHD specifically.  Similarly, the Fung publication does not mention the use of MPH or acute tolerance to MPH.  [Testimony of Dr. Patrick].

375.    With respect to pharmacokinetics, the Fung publication noted that the properties of nitrates are "quite unusual" because, among other things, "during long-term administration, occurrence of circulatory and antianginal tolerance was accompanied by an observation of increased, rather than decreased, nitrate plasma concentrations." [DTX 631 at p. 22].  The

identified purpose of the Fung publication was to discuss "recent results pertaining to the elucidation of these unusual features." [*Id.*].

376.    Figure 3 of the Fung publication showed that dosing of 120 mg of isosorbide nitrate four times daily for one week resulted in similar levels of therapeutic effect as dosing of 15 mg of isosorbide nitrate at the same dosing schedule. [*Id.*]. The difference in drug amount tested in this study was eight-fold. [Testimony of Dr. Patrick].

377.    Figure 3 of the Fung publication showed that nitrates have a high margin of safety and that side effects are not a significant concern with some nitrate drugs. [Testimony of Dr. Patrick].

378.    The Fung publication also reported on work performed with a transdermal nitroglycerin system, which was designed to produce sustained steady-state nitrate plasma concentrations. The Fung publication disclosed that there is a decrease in the circulatory and antianginal effects of nitrates during long-term therapy. [DTX 631 at p. 23].

379.    Isosorbide dinitrate metabolites, which have a longer elimination half-life than the parent drug, can decrease the systemic and hepatic metabolism of the parent drug. The Fung publication disclosed that there is metabolite inhibition in nitrate pharmacokinetics, which is linked to vascular tolerance. [*Id.* at p. 24].

380.    Surveying the work of others, Fung indicated that "we have presented data suggesting that blood (or plasma) concentrations of nitrates are, at best, complex indicators of their pharmacological effects." [*Id.* at p. 25].

381.    Because of the problems specifically associated with isosorbide dinitrate, Fung stated that "a rising nitrate blood level may be beneficial in producing sustained nitrate action." [*Id.*].

382.    Similarly, the Fung publication noted with respect to nitroglycerin:

An alternative input mode might be one that involves escalating rates of drug delivery so that increasing systemic nitrate concentrations may be achieved. . . .A composite dosing mode that involves escalating input of nitroglyercin during the awake period coupled with some washout may now be proposed, albeit in a speculative fashion.  (Figure 4).  Obviously, the validity of this dosing approach has to be experimentally tested, and the potential for problems arising from it (for example, control of nocturnal angina) are yet to be fully appreciated.

[*Id.*].

383.    Figure 4 of the Fung publication provided a "proposed nitrate dosing mode."

384.    The amount of drug provided to the patient in the mode proposed in Figure 4 of the Fung publication was substantially higher than the amount administered with the "conventional dosing mode."  [*Id.* at p.24; Testimony of Dr. Patrick].

385.    Because the teachings in the Fung publication relate to nitrates, in general, and the specific plasma concentrations proposed generally escalate through the late hours of the day (even 12 hours post-ingestion), a person of ordinary skill in the art would not have considered the information in the Fung publication relevant to the design of a new MPH dosage form for the treatment of ADHD.  [Testimony of Dr. Patrick].

### 4.   Bayer Patent

386.   Defendants cite to U.S. Patent No. 4,956,181 [DTX 632] ("the '181 patent") issued to Bayer et al. in 1990.  [DFF ¶ 307].  The '181 patent disclosed methods and devices for treating angina pectoris and preventing tolerance to nitrate drugs.  [*Id.* (Abstract)].

387.   The '181 patent did not discuss the use of MPH, nor did it discuss the treatment of ADD or ADHD.  [Testimony of Dr. Patrick].

388.   Andrx refers to a section of the delivery profile disclosed in the '181 patent and states "[t]he patent describes a method of administering nitrates in a way to avoid tolerance through a transdermal patch applied to the skin.  Following an initial washout period, the nitrate is delivered at an effective rate and, after achieving that rate, the delivery rate is then increased over a 'ramp-up' time period of from about 8 to about 21 hours."  [DFF ¶ 307].

389.   The '181 patent disclosed that a "washout period from about 3 to about 12 hours" occurred after the dose was administered, wherein preferably no drug was released.  [DTX 632 at col. 3, lines 11-28].  For the first 3 to 12 hours after administration, the goal of the '181 dosage form was to release nitrates at a sub-therapeutic level.  [*Id.*].

390.   When looking at plasma drug concentration profiles, one of ordinary skill in the art would look to the entire profile disclosed in the disclosure of the '181 patent and the intended purpose of the drug delivery profile, and not just selected portions.  [Testimony of Dr. Patrick].

391.   The person of ordinary skill in the art would understand the '181 patent to have indicated that a delay or lag in the delivery of drug after administration prior to any ascending

drug delivery was an important part of the delivery profile, and that such a delivery profile would not have been considered to be effective in the treatment of ADD or ADHD.  [*Id.*].

392.    The design of the dosage form described in the '181 patent would have been considered entirely impractical to adapt for use in treating ADHD, as it would only start to provide therapeutically relevant amounts of MPH in the late afternoon, and would then increase doses delivered throughout the evening.

392a.    No rational person familiar with the needs of a child having ADHD would have considered a release profile such as that described in the '181 patent to be relevant or practical. [*Id.*].

393.    There is no disclosure in the '181 patent that the dosage form described exhibited an ascending release rate of nitrate starting at T=0 and continuing through at least the midpoint of $T_{90}$.  [*Id.*].

394.    The '181 patent did not provide data correlating the disclosed delivery profiles with efficacy in treatment of angina pectoris.  [*Id.*].

### 5.    Fung Patent

395.    Defendants' citation to the Fung paper and the '181 patent ignores other nitrate art.

396.    About eight years after the publication of the Fung paper and two years after the issuance of the '181 patent by Bayer et al, Fung submitted a patent application to the U.S. Patent Office, which eventually issued as U.S. Patent No. 5,278,192 ("the '192 patent").  [PX 420].

397.    The '192 patent specification discussed the earlier 1984 Fung paper:

[the author] postulates that an alternate input mode, particularly for transdermal nitroglycerin, "might be one that involves escalating rates of drug delivery so that increasing systemic nitrate concentrations may be achieved. If nitrate tolerance is a concern over 24-hour dosing period, then a drug washout period may be incorporated (most likely during the sleeping hours)… *He concludes that the validity of this dosing approach has to be experimentally tested, and the potential problems arising from it (for example, control of nocturnal angina) are yet to be fully appreciated.*"

[*Id.* at col. 4, lines 36-46].

398.    In addition, the '192 patent discussed the '181 patent (Bayer et al.) and noted that it "discloses a method and device for treating angina pectoris and preventing tolerance to nitrate drugs. The treatment comprises administering drug therapy involving over-night drug-free wash-out periods followed by delivery of the nitrate at a steadily increasing rate during the day." [*Id.* at col. 4, lines 50-55].

399.    While referencing the earlier Fung publication and the '181 patent, the '192 patent stated that "[a]t present *no* dosage regimen with nitrovasodilators has been developed that can achieve the dual objectives of avoidance of hemodynamic tolerance while continuously maintaining their beneficial effects." [*Id.* at col. 2, lines 3-7 (emphasis added)].

400.    The '192 patent claimed a method of vasodilator therapy comprising administering a dose of an organic *nitrite* (as opposed to an organic *nitrate*) at a *constant rate* (as opposed to an ascending rate). [*Id.* (claim 17); col. 5, lines 35, 40].

400a.   The '192 patent cited other prior art that indicates that there is "uncertain[ty] whether higher doses administered continuously can overcome [tolerance], and that it seems equally likely that a nitrate-free interval, e.g., by interrupting administration during the night, might provide the means for avoiding tolerance." [*Id.* at col. 3, lines 24-29.]

148

401.     During prosecution of the '192 patent, its claims were rejected as being obvious over references that discussed the use of nitrates.  [PX 421, Office Action mailed August 18, 1992].  In a response mailed December 18, 1992, the inventors of the '192 patent stated:

> *The only solution to date to counter the tolerance problem associated with nitroglycerin administration is intermittent dosing.*  But, this approach is not satisfactory because the effect of the previous dose is lost within several hours of drug withdrawal, leaving the patient unprotected during the "dose-off" period.  Until the present invention, no dosage regimen with nitrovasodilators i.e., nitrate esters, has been developed that can achieve the dual objective of avoidance of hemodynamic tolerance while continuously maintaining their beneficial effects.  Thus, applicant's invention overcomes a major problem in the industry and is of great commercial significance.

> *Id.* at p. 5 (emphasis added)

402.     The person of ordinary skill in the art would have read the 1984 Fung publication and the '181 patent in the context of the '192 patent with its prosecution history.  What these references show was that the proposals provided in the earlier Fung publication and '181 patent did not lead to the development of a drug form that could overcome the tolerance observed with nitrates.  [Testimony of Dr. Patrick].

403.     The '192 patent did not indicate that the inventors were unable to successfully generate a dosage form which exhibited the profile mentioned in the 1984 publication and that both avoided tolerance and provided therapeutic effects.  [*Id.*].

404.     One of ordinary skill in the art would not have considered the 1984 Fung publication nor the '181 patent relevant or insightful to the challenges of producing an effective once-a-day MPH dosage form for treating ADHD.

149

5.    **Kochinke Patent**

405.    Defendants cite to U.S. Patent No. 5,613,958 ("the '958 patent"), issued in 1997 to Kochinke et al. [DTX 633; DFF ¶ 309].

406.    The '958 patent described a transdermal delivery system for administering vasodilators such as isosorbide dinitrate.  [DTX 633 at col. 2, lines 43-45].  The '958 patent disclosed that the transdermal patch could be used for delivering "tolerance-inducing" drugs.  [*Id.* (Abstract)].

407.    Figures 2 (conceptually) and 4 (Frandol example) of the patent '958 disclosed plasma concentration profiles in which the plasma concentration of the drug substantially exceeded the "target plasma levels" for large portions (8 hours and beyond) of the day.  [*Id.* at Figures 2, 4; Testimony of Dr. Patrick].

408.    In Figures 2 and 4 of the '958 patent, the plasma levels of the drug in did not drop off below "target plasma levels" until late in the day.  [*Id.*].

409.    The profiles shown in Figures 2 and 4 of the '958 patent would not have been adapted by a person of ordinary skill in the art for use in the treatment of ADHD, in part, because each would raise serious concerns over side effects if they were adapted.  [Testimony of Dr. Patrick.].

410.    The '958 patent explained the theory behind the dosage forms disclosed therein as follows:

> The rationale behind this drug delivery profile is that the initial high blood levels may be more effective when *followed by a period of decreasing dosage* than if the blood levels were maintained at the higher or lower level throughout the entire administration period. This modulated delivery

profile is essential to effective nitrate therapy where tolerance can be avoided by an interval, typically in the range of about 6 to 10 hours, in which sub-therapeutic plasma levels of the nitrate drug, or a metabolite thereof, are obtained.  Thus, the device described herein is capable, by virtue of its modulated drug delivery profile, of preventing or greatly reducing the onset of tolerance to the drug being administered.

[DTX 633 at col. 15, lines 45-57 (emphasis added)].

411.   A person of ordinary skill in the art would understand the '958 patent as teaching that a *descending* plasma concentration of the drug over an extended period of time (similar to that observed with Ritalin SR®) was necessary to overcome tolerance.  [Testimony of Dr. Patrick].

412.   Figure 10 of the '958 patent was directed to metabolites of isosorbide dinitrate, and would not have been considered relevant to a person of ordinary skill in the art.  [Mayersohn Dep. Tr. 163: 24-164: 3; 170: 14-175: 21].

413.   All of the working examples exhibited in the '958 patent were examples of nitrate patches.  [Testimony of Dr. Patrick].

414.   MPH was mentioned in a long list of over 200 "tolerance-inducing" drugs in the '958 patent.  [DTX 633 at col. 7, line 30].  The drugs on the list have an indeterminate range of pharmacological actions and mechanisms, and the '958 patent did not distinguish whether the drugs in the list had problems with long-term tolerance or acute tolerance.  The list provides no insights into either the question of acute tolerance of MPH, or the relevance of that possible problem to a solution.  [Testimony of Dr. Patrick].

415.    Andrx has taken the position that the disclosure of a single drug in a list containing numerous unrelated drugs does not provide any guidance as to whether or not any single drug may be used according to any specific method.  [PX 428].

416.    The U.S. Patent Office rejected one of Andrx's pending patent applications, U.S. 10/726,024, over a reference that did not provide any working examples of MPH, but listed MPH in the specification along with a number of other possible drugs.  [*Id.*].

417.    A Patent office rejection of Andrx's patent application no. 10/726,024 stated: "Accordingly, it would have been obvious to one having ordinary skill in the art at the time the invention was made to combine the teachings of Mehta et al. which teach a composition for the improved dosing of methylphenidate, with Ting et al. which teach a drug delivery system that facilitates the pulsatile release of a drug, including methylphenidate."  [*Id.*, Office Action dated October 10, 2006].

418.    In their response, Andrx explained that the cited reference failed to "provide any specific working example of a dosage form that employs methylphenidate," and that the cited reference only listed "methylphenidate as a potential drug in a laundry list of over one hundred differ[e]nt drugs."  [*Id.*, Response dated January 8, 2007 at p. 11].  Andrx represented to the Patent Office that the cited reference failed to disclose or suggest the claimed invention, which was a controlled release central nervous system stimulant formulation.

419.    In response to Andrx's arguments, the Patent Office withdrew the rejection based upon the cited reference.  [*Id.*].

7.    **Wong Patent**

420.    Defendants cite to U.S. Patent No. 5,156,850 ("the '850 patent"), which issued in 1992 to Wong [DTX 634; DFF ¶ 313].

421.    The specification of the '850 patent is identical to the specification of U.S. Patent No. 5,785,994 ("the '994 patent").  [DTX 126].

422.    The '994 patent was considered by the PTO during the examination of the '373 patent and the claims-in-suit.  [PX 1 at p. 2].  The PTO determined that this patent did not render the claims-in-suit obvious.  [*Id.*].

423.    The working examples in the '850 patent were directed to verapimil and nicarpidine, which are calcium channel blockers for the treatment of cardiovascular disease. [DTX 634 at Examples 1-3].

424.    The '850 patent explained that blood pressure rises shortly before a patient wakes up in the morning, and the delayed release feature described in the patent enabled the patient to take the medication before going to sleep.  [*Id.* at col. 1, lines 40-57].

425.    The '850 patent taught that after a period of low level release following ingestion, the dosage form described in the patent released increasing amounts toward the end of the period of release for the dosage form.  [*Id.*].

426.    As the '850 patent explained that the initial low level of drug release was done so that only sub-therapeutic amounts of the drug were provided to the patient for an extended period after it was administered.  [*Id.*].

427.    The '850 patent explained that after the period of sub-therapeutic dosing, when the drug release rates increased, the plasma concentrations of the drug began to reach therapeutic levels.  [*Id.*].

428.    The primary objective of the '850 patent was to provide a delayed release dosage form of the drug, and the '850 patent described osmotic dosage forms that released a drug at very low, albeit ascending, levels for a significant period of time.  [Testimony of Dr. Patrick].

429.    A person of ordinary skill in the art would have recognized that the type of release rate described in the '850 patent would have been incompatible with the treatment of ADHD, in part because it would provide no control of ADHD symptoms during a majority of the school day (i.e., during the first period when only sub-therapeutic doses are provided).  [*Id.*].

430.    None of the profiles taught in the '850 patent would be desirable for administering MPH in treating ADHD.  [*Id.*].

431.    The '850 patent also disclosed a dosage form comprising an immediate release layer.  In the specification, the inventors noted that a dosage form comprising an immediate release layer is:

> . . . indicated for twice a day (b.i.d.) therapy.  The dosage form on entering the gastrointestinal tract delivers the guanabenz acetate immediately, the first dose, and several hours later commences to deliver[] the guanabenz acetate, the second dose.  The immediate first dose provides antihypertensive action that reaches a therapeutic peak followed by a drug-free interval and then the second dose that provides antihypertensive action that reaches its therapeutic peak to enable the blood pressure to approach baseline values.  The dosage form accordingly provides a favorable therapeutic index, with convenient, as a compliance-enhancing b.i.d. dosage form.

> [Col. 21, ll. 36-49].

432.    The '850 patent did not provide working examples employing MPH, and listed MPH as one drug in a list of hundreds of other possible drugs.  The drugs described in the '850 patent encompassed a wide range of pharmacological actions.  [Testimony of Dr. Patrick].

433.    The '850 patent did not mention tolerance and would not have provided any suggestion to a person of ordinary skill in the art that the methods and devices disclosed therein could be used to overcome tolerance.  [*Id.*].

**E.    Differences Between the Prior Art and the Claimed Invention**

434.    Claims 1, 6 and 7 of the '373 patent include a limitation that the dosage forms used in the claimed treatment methods provide "an ascending release rate over an extended period of time."  [PX 1].

435.    The prior art relied upon by Defendants does not teach treatment methods using dosage forms that release MPH at an ascending rate of release for an extended period of time. [See supra, PFF ¶¶ 272-346].

436.    Immediate release formulations of MPH do not release the active ingredient at an ascending rate for an extended period of time.  Instead, these products release essentially all of the MPH in the dosage form immediately after ingestion.  [PFF ¶ 31].

437.    Ritalin SR® does not release MPH methylphenidate at an ascending rate of release for an extended period of time.  Instead, Ritalin SR® releases MPH at a primarily descending rate of release for most of the period during which MPH is released from the dosage form.  [PFF ¶¶ 41, 294, 294a].

438.    Ritalin SR® releases methylphenidate at an ascending rate for only about an hour, after which the amounts released in each subsequent interval of time decreases.  [[PFF ¶¶ 41, 294, 294a].

439.    Ritalin SR® does not provide an ascending rate of release over an extended period of time as that claim element has been interpreted by the Court.  [D.I. 130].

440.    Ritalin SR® product does not release increasing amounts of MPH through at least the mid-point of the $T_{90}$ of the product, nor does it release MPH at an ascending rate for at least three hours.  [PFF ¶ 294].

441.    Claims 6 and 7 of the '373 patent are dependent from claim 1. The differences between these claims and the prior art includes all of the differences noted above with respect to claim 1. [PFF ¶¶272-274]

442.    The prior art relied upon by Defendants does not teach treatment methods using a once-a-day dosage form that produces a substantially ascending methylphenidate plasma concentration for about 5.5 hours or about 8 hours. [*See supra*, at PFF ¶¶ 272-346].

443.    Immediate release MPH dosage forms are characterized by a plasma concentration of MPH that peaks within 2 hours following  administration and then rapidly descends. [PFF ¶ 34, 291].

443a.   Immediate release MPH products do not meet the ascending release rate requirement of the claims, nor do they produce substantially ascending MPH plasma concentrations for about 5.5 or about 8 hours as required by dependent claims 6 and 7 of the '373 patent.  [D.I. 130].

156

444.    The methylphenidate plasma concentration profile observed following administration of Ritalin SR® does not exhibit a substantially ascending plasma concentration for about 5.5 or about 8 hours as required by dependent claims 6 and 7 of the '373 patent. [PFF ¶¶ 42, 316].

445.    Ritalin SR® produces an essentially constant MPH plasma concentration for approximately 4 to 5 hours and after that the MPH plasma concentration decreases rapidly. [*Id.*].

446.    The differences between dependent claim 6 and 7, thus, include both that the dosage form specified in the claims released MPH at an ascending rate through at least the midpoint of the T90 of the dosage form and for at least 3 hours, and that it produces a substantially MPH plasma concentration for about 5.5 or about 8 hours. [PFF ¶¶ 272-274].

447.    None of the attributes of the dosage forms of the claimed methods is disclosed or suggested in the prior art.  [See supra, PFF ¶¶ 272-346].

## F.    The Knowledge in the Art Before the Invention Would Have Taught Away from the Claimed Treatment Methods

448.    Because side effects of MPH can be severe and prevent a patient from receiving effective treatment, an important goal of MPH-based ADHD treatment is to maintain a balance of controlling ADHD symptoms, while minimizing side effects.  The person of ordinary skill in the art would understand and take into account the role that side effects play in the development of new drug formulations.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel; PFF ¶ 278; DFF ¶ 283].

449.    During the relevant time period, a person of ordinary skill in the art seeking to develop a once-a-day MPH dosage form for treating ADHD would have been motivated to

design a dosage form that delivered a blood plasma profile similar to that of immediate release Ritalin®, which was considered to be the "gold standard" for treating ADHD. [Testimony of Dr. Patrick].

450. A steep rate of ascent (or rate of rise) of MPH plasma concentrations, which typically occurred following administration of an IR MPH product, was thought by some researchers to be important for efficacy. [DTX 154 at p. 771; DTX 630 at p. 6; Testimony of Dr. Patrick].

451. The hypothesized relationship between the steep rate of rise of MPH plasma concentrations, which typically occurred following administration of an IR MPH product, and efficacy observed with IR MPH products was known as the "ramp effect." [*Id.*].

452. A person of ordinary skill in the art would have known that the incidence of side effects with MPH was dose dependent. [DTX 630 at p. 12-13, 15; Testimony of Dr. Patrick].

453. Because of the risk of side effects and toxicity, the steep rate of rise of plasma concentrations observed with immediate release MPH products would not have been maintained for extended periods of time, such as a typical school day. [Testimony of Dr. Patrick].

454. Because of MPH's short half-life, plasma concentration levels of MPH begin to fall after about 2 hours after ingestion of an immediate release MPH product. [PX 137 at Figure 2; DTX 630 at p. 2; PX 133 at 226].

455. The timing of the trough in the plasma concentration profile observed with immediate release MPH, which generally coincides with lunchtime, would have been viewed as

important to prevent appetite suppression, which causes stomachaches, hyperactivity, irritability, mood swings, and arrests growth.  [Testimony of Dr. Patrick].

456.    Because peak drug concentration levels are reached within one hour after ingestion with immediate release MPH, the conventional practice was to administer a second dose at or around lunchtime.  [DTX 630 at p. 15].  With the second dose of IR MPH, a steep rate of rise in plasma concentrations is seen during the second absorption phase.  [Testimony of Dr. Patrick].

457.    By about 3 or 4 hours after ingestion of the second immediate release MPH dose, plasma MPH concentration levels have fallen off significantly.  [PX 137 at Figure 2].  This drop in plasma concentrations coincides with dinnertime and bedtime.  [Testimony of Dr. Patrick].

458.    Another significant side effect of MPH is insomnia.  [DTX 630 at p. 12-13; PX 134 at Table 5].

459.    A person of ordinary skill in the art would have recognized that MPH plasma concentrations must be kept low during evening hours to prevent sleeplessness.  [*Id.*; Testimony of Dr. Patrick].  Low MPH plasma levels are also necessary so that the child receiving treatment can eat dinner.  [*Id.*].

460.    Because the troughs in MPH plasma concentrations between doses of Ritalin® administered BID correspond to the critical periods of the day regarding side effects and BID dosing was an effective treatment of ADHD, this drug delivery pattern would have been the logical starting point for investigations into new once-daily dosage forms of MPH.  [Testimony of Dr. Patrick].

461.    Another MPH drug product, under development in the late 1990's, confirms that the sawtooth plasma concentration profile of Ritalin® administered BID would have been considered a desirable profile. [PX 543 (Lyseng-Williamson and Keating, Drugs 62(15): 2251-2259 (2002)].

462.    Ritalin LA® was approved for marketing in 2002 by the original developers of Ritalin® and Ritalin SR®.  Ritalin LA® is characterized by a sawtooth-like MPH plasma profile having two peaks separated by a significant drop in plasma concentration between the peaks. [*Id.*].  This profile is comparable to the peak-trough-peak plasma profile associated with a BID dosing of IR MPH products.

G.    **Acute Tolerance – and How to Overcome It – Was Not Known or Suggested by the Prior Art**

463.    The problems associated with Ritalin SR® would not have provided a person of ordinary skill in the art with a motivation to develop once-a-day MPH dosage forms that use the ascending drug delivery profiles described in the asserted claims of the '373 patent.  [Testimony of Dr. Patrick].

464.    The prior art suggested many possible explanations for the problems encountered with the use of Ritalin SR®.  [PFF ¶¶ 310, 322, 332-334, 340-341].  All of these explanations were speculative and amounted to untested hypotheses.  [Testimony of Dr. Patrick].

465.    Because the problems with Ritalin SR® were not understood by a person of ordinary skill in the art [PFF ¶ 464], the solution to the problems could not have been apparent to a person of ordinary skill in the art. [Testimony of Dr. Patrick; Testimony of Dr. Feifel].

466.    One of the potential with Ritalin SR® discussed in the prior art and known to persons of ordinary skill was unpredictable release of MPH from its wax-matrix formulation. [PFF ¶¶ 322, 341].

467.    To address the unpredictable MPH release from Ritalin SR®, the person of ordinary skill in the art may have attempted to design a new drug formulation that released MPH in a more predictable fashion, for example, in a manner that released drug more consistently and along a "flatter" profile during the maintenance stage of drug delivery.  [Testimony of Dr. Patrick;  Testimony of Dr. Guinta].

468.    Hypotheses linking "acute tolerance" or "tachyphylaxis" to MPH were speculative and not confirmed through any controlled studies.  [Testimony of Dr. Patrick;  Testimony of Dr. Feifel].

469.    The prior art did not recognize acute tolerance as the most likely or more likely cause of the problems with Ritalin SR®.  [Testimony of Dr. Patrick].

470.    Based on what was known in the prior art, the person of ordinary skill in the art would not have expected acute tolerance to be cause of Ritalin SR®'s efficacy issues.  [*Id.*].

471.    The discussion in the Angrist publication regarding CNS-drugs would not be viewed by a person of ordinary skill in the art as indicating that acute tolerance was the cause of efficacy problems with Ritalin SR®.  [PFF ¶ 367; Testimony of Dr. Patrick].

472.    The Angrist publication discussed tolerance with cocaine and amphetamines in *drug abuse* settings and the examples of acute tolerance in the publication focused on

pharmacological effects that were exhibited at very high  (often toxic) levels well beyond normal therapeutic amounts.  [Testimony of Dr. Patrick].

473.    A person of ordinary skill in the art would have derived no insights from the Angrist publication in designing treatment methods based on normal dosing levels and plasma concentrations of MPH.  [Testimony of Dr. Patrick].

474.    Even under the "abuse levels" that are the topic of the Angrist publication, acute tolerance was inconsistently observed and varied depending on the pharmacological effect.  [PFF ¶ 366; Testimony of Dr. Patrick].

475.    There was no mention in the Angrist publication that acute tolerance was observed with respect to locomotive effects, which are most closely related to the effects that MPH has in a person.  [Testimony of Dr. Patrick].

476.    A person of ordinary skill in the art would not have extrapolated the discussion in the Angrist publication with cocaine and amphetamines to MPH and concluded that MPH administration results in acute tolerance at therapeutic levels.  [Testimony of Dr. Patrick].

**H.    The Possibility of Acute Tolerance Would Not Have Rendered the Claimed Inventions Obvious at the Time of the Invention**

477.    Even if acute tolerance was established with MPH, the prior art would have taught away from the claimed inventions.  The person of ordinary skill in the art would have recognized that profiles including deep troughs did not exhibit tolerance and therefore would have expected a drug delivery profile with peaks and troughs to address the problem of acute tolerance. [Testimony of Dr. Patrick].

478.    Because no tolerance was observed when patients were administered Ritalin®
under the BID regimen, the person of ordinary skill in the art would have recognized that the
plasma concentration "trough" associated the BID regimen likely played an important role in
providing better overall effectiveness by serving as a recovery period.  A person of ordinary skill
in the art would have been motivated to mimic the sawtooth pattern exhibited by Ritalin®
administered BID.  [Testimony of Dr. Patrick].

I.    **The Person of Ordinary Skill in the Art Would Not Have Ignored Side
      Effects in Designing a New MPH Treatment Method**

479.    Because of the concern for side effects and drug intolerability that is related to
increasing the dose of drug during later periods of the day, the person of ordinary skill in the art
would not have had a reasonable expectation that a clinically effective MPH drug product would
be arrived at.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel].

480.    Table 5 of the Pelham 1990 paper indicated that insomnia was observed at a
higher rate in patients taking Ritalin SR® compared to patients taking Ritalin® with a BID
regimen.  [PX 134 at Table 5].  Greenhill stated that, if insomnia is a problem, higher levels of
drug should be administered earlier in the day.  [DTX 630 at p. 12-13].

481.    Defendants stated in their pretrial submission that "The question with the
ascending profile would be at what point, if at all, would side effects occur due to rising blood
plasma drug levels."  [DFF ¶ 283].

482.    The person of ordinary skill in the art would have expected an increased incidence
of certain severe side effects with an ascending MPH delivery profile.  [DTX at p. 12-13;
Testimony of Dr. Patrick].

483.    The person of ordinary skill in the art would not have understood the "ramp effect" associated with the rapid rate of rise in plasma MPH concentration during the absorption phase of immediate release MPH to suggest or teach an ascending release rate over an extended period of time and a substantially ascending MPH plasma concentration profile for about 5.5 hours or about 8 hours.  [Testimony of Dr. Patrick].

484.    To the extent the "ramp effect" provided an explanation regarding the differences between Ritalin® administered BID and Ritalin SR®, a person of ordinary skill in the art would have understood that the effect was very sensitive to manipulations in the rate of rise. [Testimony of Dr. Patrick].

485.    Extending the duration of the absorption phase along the slope of rise found in immediate release MPH for extended periods of time would have been thought to result in unacceptably high MPH plasma concentrations in the patient.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel].

486.    A person of ordinary skill in the art would immediately appreciate that this kind of drawn out profile would cause unacceptable levels of side effects and toxicity.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel; DTX 630 at p. 12, 15].

487.    A person of ordinary skill in the art would not have designed a dosage form that would produce an ascending plasma concentration for about 5.5 or about 8 hours having a rate of absorption comparable to the "ramp effect" rate of absorption observed for immediate release products.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel].

488.    Because the only plasma concentration profile that was known to work was the "sawtooth" profile associated with Ritalin® administered BID or TID, a person of ordinary skill in the art would have used this plasma concentration-time profile in designing a new extended release MPH dosage form. [Testimony of Dr. Patrick.]

487a.    If the person of ordinary skill in the art were influenced by the "ramp effect" knowledge in any manner, that person would have designed a plasma profile that included trough-like decreases in MPH concentration between the peaks of each sharp ascension, which the prior art suggested was necessary to avoid side effects and toxicity.  [Testimony of Dr. Patrick.]

### J.    The Additional Prior Art Cited by Defendants Does Not Render the Claimed Methods Obvious

489.    Even if acute tolerance was associated with MPH, the person of ordinary skill in the art would not have had a reasonable expectation of success that an ascending drug release rate or a substantially ascending MPH plasma profile would be effective in overcoming any acute tolerance based on the prior art relied on by the Defendants.  [Testimony of Dr. Patrick].

490.    Defendants cite to Figure 4 of the Fung paper and other statements therein regarding escalating rates of drug levels.  [DFF ¶¶ 298-303].

491.    The Fung paper stated that the escalating dosing approach was hypothetical:  "the validity of this dosing approach has to be experimentally tested, and the potential problems arising from it . . . are yet to be fully appreciated."  [DTX 631 at p. 25; Testimony of Dr. Patrick].

492.    Nothing in the prior art suggested that the Figure 4 plasma profile proposal hypothesized in the Fung paper was successful in overcoming the tolerance observed with nitrates.  [Testimony of Dr. Patrick].

492a.    Moreover, a person of ordinary skill in the art would not have administered 8 times more than the amount of MPH necessary to control ADHD symptoms, which is the dosing level that the Fung paper suggests (with nitrates) in Figure 3 of the paper.  [Testimony of Dr. Patrick].

493.    The fact that the later patent naming Fung as an inventor switched to nitrites and used a *constant release* rate to address the tolerance issues associated with nitrates would have suggested that overcoming tolerance with a particular plasma concentration profile was unpredictable.  [Testimony of Dr. Patrick].

494.    The Fung patent cited to previous work proposing an ascending nitrate plasma concentration profile (Fung paper) and a previous work disclosing a nitrate dosage form having an ascending release rate (the '181 patent (Bayer), but noted that "to date" attempts to overcome the tolerance associated with nitrates were unsuccessful.  These circumstances would not have suggested that the solution to acute tolerance was a predictable one.  [Testimony of Dr. Patrick].

495.    In addition, the prosecution history of the '192 patent issued to Fung indicated that only an *intermittent* dosing profile was successful in overcoming acute tolerance to nitrates, and the patent itself disclosed that for nitrites, a constant release rate was successful.  [PFF ¶ 401].

496.    The '958 patent (Kochinke) stated that a *descending* plasma concentration of the drug was used to overcome tolerance with nitrates.  [PFF ¶ 411].

497.    Thus, the '958 patent directed the person of ordinary skill in the art to do *precisely the opposite* of what the claims-in-suit require.  [Testimony of Dr. Patrick].

498.    To the extent other art would have been considered by the person of ordinary skill in the art, this art teaches away from the claimed inventions by suggesting the use of intermittent plasma profiles or descending plasma profiles to overcome problems with acute tolerance. [Testimony of Dr. Patrick].

### K.    Secondary Considerations

#### 1.    Long-Felt Need and the Failure of Others

499.    The claimed methods plainly represent a groundbreaking and pioneering therapeutic advance in the field of treatment of ADD and ADHD that satisfied a long-felt need in the art.  [Testimony of Dr. Patrick; Testimony of Dr. Feifel].

500.    Before the claimed inventions, the only way to reliably treat ADD and ADHD for the entire school day was to administer two or three doses of an immediate release MPH product (Ritalin® and its generic equivalents) at specific points in the day.  [PFF ¶¶ 46; PX 137; Testimony of Dr. Patrick; Testimony of Dr. Feifel].

501.    Treatment of ADD and ADHD with immediate release MPH administered BID or TID remained the standard of care for more than 30 years, despite the fact that it presented practical difficulties for patients and caregivers.  [*Id.*].

502.    Specifically, the prior art showed that compliance was a serious problem with the multiple-administration regimens based on immediate release MPH products.  [PFF ¶¶ 37-39; PX 133; PX 134; DTX 630; Testimony of Dr. Feifel; Testimony of Dr. Guinta].

503.    One problem was that the BID and TID regimens required dosing during the middle of the school day.  [*Id.*].  Because MPH is a controlled substance with substantial risks of diversion and abuse, it must be administered by a school official.  [*Id.*].  This meant that the child on the regimen would have to leave the classroom to be administered the mid-day dose, which contributed to negative self-esteem and social pressure against adhering to the necessary regimen.  [*Id.*].

503a.    Schools also faced practical challenges in administering the mid-day doses at the correct time.  [*Id.*].

504.    Patients that self-administered the drug also faced serious compliance issues, both due to the symptoms of the disease and due to the substantial risks regarding diversion and abuse.  [*Id.*].  As such, a pronounced need existed for a once-a-day MPH product that would avoid compliance issues, and eliminate the need for in-school dosing.  [*Id.*].

505.    Ritalin SR® was introduced to the market in 1983 and was intended to be a once-a-day MPH product that met the long-felt need that had existed in the treatment of ADHD.  [PFF ¶¶ 303-304, 337; PX 133; DTX 627].

506.    For reasons that were not entirely clear, Ritalin SR® failed to meet the long-felt need in the art.  [PFF ¶¶ 43, 298; DFF ¶¶ 275-276].  Ritalin SR® never gained wide acceptance by clinicians and performed poorly on the market.  [*Id.*].

507.    Thus, Ritalin SR® failed to meet the need for a once-a-day MPH product that would avoid compliance issues and eliminate the need for in-school dosing. [PFF ¶¶ 37-39; PX 137; DTX 630; Testimony of Dr. Patrick; Testimony of Dr. Feifel; Testimony of Dr. Guinta].

507a.   The ascending plasma concentration profile tested in the "sipping" study was included, in part, to assess the effectiveness of an increasing plasma concentration of MPH over time, and to measure that effectiveness relative to the effectiveness observed in the ascending and descending phases of the BID regimen.  This led the way to the commercial embodiment of the invention CONCERTA®.  [Testimony of Dr. Guinta].

508.    The commercial embodiment of the claims-in-suit was the first drug product to meet the need that Ritalin SR® had failed to address and that had existed in the art for over 30 years.  [Testimony of Dr. Feifel; Testimony of Dr. Patrick].

509.    Following its introduction, CONCERTA® rapidly became the standard of care in the treatment of ADD and ADHD and has remained the first-line-treatment option for patients since then.  [Testimony of Dr. Feifel].

510.    CONCERTA® has retained this status despite the fact that at least three new once-a-day ADD and ADHD medications have become available on the market after CONCERTA® was launched.  [Testimony of Dr. Rozek]  None of these other products shares the unique ascending release rate and substantially ascending MPH plasma concentration characteristics of CONCERTA®.  [Testimony of Dr. Feifel; Testimony of Dr. Patrick.]

## 2.    Skepticism

511.    In light of Ritalin SR®'s shortcomings and failure to meet the need for a once-a-day MPH drug formulation, some in the field of ADD and ADHD treatment held negative perceptions about the feasibility of another extended release MPH drug product.  [Testimony of Dr. Guinta].

512.    Ritalin SR® exhibited a conventional drug delivery profile having an essentially "flat" plasma drug concentration.  [*Id.*].  Many in the field regarded this pharmacokinetic profile as desirable for an extended release drug product.  [*Id.*].

513.    Until the discovery of the claimed inventions, the reasons for Ritalin SR®'s lack of efficacy were not known.  [PFF ¶¶ 321-322, 340-341, 464].  The problems with Ritalin SR® remained a mystery in the field for over fifteen years.  [*Id.*].

514.    When informed about the potential availability of a dosage form that exhibited a similarly smooth, but substantially ascending plasma concentration profile for about 5.5 or about 8 hours, some in the field expressed doubt and skepticism that this new extended release formulation -- which eventually came to be marketed as CONCERTA® -- would be as effective as MPH administered BID or TID.  [Testimony of Dr. Guinta].

### 3.    Unexpected Results

515.    It was surprising and unexpected to those working in the field of ADD and ADHD treatment that a dosage form that released MPH at an ascending rate for an extended period of time (unlike Ritalin SR®), and which produced a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours, would be a safe and effective way to treat ADD and ADHD.

516.    One would have expected treatment methods involving plasma concentrations of drug that steadily increased as required by the claims to increase the incidence of side effects. [Testimony of Dr. Patrick; Testimony of Dr. Feifel; Testimony of Dr. Guinta].  For example, the prior art showed that Ritalin SR®, which produces a significant plasma concentration for a sustained period during the middle of the day, was accompanied by a three-fold increase in the

incidence of insomnia and an increased incidence of appetite suppression relative to the BID regimen using immediate release MPH.  [PX 414 at p. 233, Table 5].  By contrast, CONCERTA® does not exhibit an increased incidence of these side effects relative to the BID and TID regimens.  [PX 371 at p. 209; Testimony of Dr. Feifel]  The person of ordinary skill in the art would have viewed these findings as unexpected and surprising.  [Testimony of Dr. Feifel].

### 4.    Commercial Success

517.    Concerta® is a commercial success both in absolute terms, and compared to other ADHD products.  [Testimony of Richard Rozek].

518.    There were five brand methylphenidate products and generic versions of two brand methylphenidate products commercially available in the U.S. when Concerta® launched in August 2000: Ritalin®, Ritalin SR®, Methylin®, Methylin® ER, Metadate®, generic methylphenidate hydrochloride, and generic methylphenidate hydrochloride SR.  [Testimony of Richard Rozek; PX-497].  And, in addition to the other available methylphenidate products, several other stimulants were approved for the treatment of ADHD.  [Testimony of Richard Rozek; Testimony of Dr. Feifel].

519.    CONCERTA® generated over $4 billion in cumulative dollar sales and resulted in over 42 million total prescriptions and new prescriptions in the U.S. from its launch in August 2000 through 2006.  [Testimony of Richard Rozek].

520.    From 2000 through 2006, dollar sales, total prescriptions, and new prescriptions of CONCERTA® in the U.S. increased substantially.  [Testimony of Richard Rozek; PX 500; PX 501; PX 502].  For instance:



**ANNUAL DOLLAR SALES OF CONCERTA IN THE U.S.**

Note: Concerta launched in August 2000.

[PX 500].

521.    CONCERTA® exhibited annual sales growth in the U.S. from $333 million (2001) to $930 million (2006), which represents a compound annual growth rate of dollar sales of approximately 23 percent.  By contrast, dollar sales of all methylphenidate products excluding CONCERTA® grew only 12 percent annually from 2001 to 2006.  [Testimony of Richard Rozek; PX 503].

522.    Similarly, total prescriptions of CONCERTA® in the U.S. increased from 4.2 million (2001) to 8.2 million (2006), which represents a compound annual growth rate of 14

percent. By contrast, total prescriptions of all methylphenidate products excluding CONCERTA® declined by 2 percent annually from 2001 to 2006. [Testimony of Richard Rozek; PX 503].

523.    Likewise, new prescriptions of CONCERTA® in the U.S. increased from 4.2 million (2001) to 8.2 million (2006), which represents a compound annual growth rate of 14 percent. By contrast, new prescriptions of all methylphenidate products excluding CONCERTA® declined by 2 percent annually from 2001 to 2006. (Testimony of Richard Rozek; PX 503].

524.    Andrx recognizes that CONCERTA® generates substantial levels of sales and represents an opportunity for growth. [Testimony of Richard Rozek; "Form 10-Q for ANDRX CORP /DE/, Quarterly Report," Andrx Corporation, May 4, 2006, http://biz.yahoo.com/e/060504/adrx10-q.html; "SCHEDULE 14A, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934," p. 10, filed on March 30, 2006, Andrx Corporation, http://www.secinfo.com/dsVsf.v2Rk.htm]. [PX538]

525.    CONCERTA® is a commercial success relative to other methylphenidate products, including methylphenidate products utilizing other extended release delivery methodologies. In 2001, its first full year after launch, dollar sales of CONCERTA® exceeded the total dollar sales of all other methylphenidate products combined by more than 75 percent. [Testimony of Richard Rozek; PX 504].



DOLLAR SALES OF METHYLPHENIDATE PRODUCTS IN THE U.S.

526.    Similarly, in 2001 total prescriptions and new prescriptions of CONCERTA®

exceeded each of the methylphenidate products including the low-price generic versions of

methylphenidate that had been commercially available for decades.  [Testimony of Richard

Rozek; PX 505; PX 506].

527.    Likewise, CONCERTA® emerged as the leading extended release

methylphenidate product within one year from its launch and continued to grow substantially

faster than the alternative products.  [Testimony of Richard Rozek; PX 511; PX 512; PX 513].

528.    CONCERTA® is a commercial success relative to all products used to treat

ADHD.  Based on sales (dollars, total prescriptions, and new prescriptions) in the U.S. for 23

brand and generic ADHD products, CONCERTA® emerged as a leading product.  Of these 23

products, only two products (CONCERTA® and Adderall XR®) captured 20 percent or more of

dollar sales, total prescriptions, or new prescriptions of all ADHD products in 2006.

CONCERTA® accounted for 28 percent, 23 percent, and 24 percent of the dollar sales, total

prescriptions, and new prescriptions of all ADHD products, respectively.  [Testimony of Richard

Rozek; PX 520; PX 521; PX 522].  CONCERTA® quickly displaced BID and TID immediate

release Ritalin® regimens, which had been the standard of care in ADD and ADHD treatment

for more than 30 years.

### M.    Nexus Between CONCERTA® and the Asserted Claims

#### 1.    CONCERTA® is Within the Scope of the Asserted Claims

529.    CONCERTA® is a dosage form containing 18, 27, 36 or 54 mg of

methylphenidate.  [Testimony of Martin C. Davies; PX490]

530.    CONCERTA® is a pharmaceutical composition containing 18, 27, 36 or 54 mg of

methylphenidate. [*Id.*]

531.    All dosage strengths of CONCERTA® contain a pharmaceutically acceptable

carrier.  (Testimony of Martin C. Davies; CONCERTA® Product Insert.)

532.    All dosage strengths of CONCERTA® are administered for the treatment of

ADHD.  (Testimony of David Feifel; CONCERTA® Product Insert.)

533.    All dosage strengths of CONCERTA® consistently exhibit, when submitted to an

appropriate dissolution test, an ascending release of methylphenidate over an extended period of

time (i.e., for at least three hours, and through at least the midpoint of $T_{90}$.  [Testimony of Vivian A. Gray; PX451]

534.    All dosage strengths of CONCERTA®, when ingested, consistently result in a substantially ascending methylphenidate plasma drug concentration over at least about 5.5 hours. [Testimony of Dr. Martin S. Angst; PX257, PX397, PX 398]

535.    All dosage strengths of CONCERTA®, when ingested, consistently result in a substantially ascending methylphenidate plasma drug concentration over at least about 8 hours. [Id.;  PX20 at ANDRX01036-37, 01045]

### 2.    Sales Data Establishes That CONCERTA®'s Delivery Profile Is Responsible for Its Commercial Success

536.    As of the end of 2006, doctors and patients had a choice between nine different products for the treatment of ADHD that contain methylphenidate, including two of which that are available in generic versions, Ritalin® and Ritalin® SR®.  Seven of those products are extended-release products, including generically available Ritalin® SR®.  [Testimony of Richard Rozek; PX 497.]

537.    From a dollar sales, a total prescriptions and a new prescriptions perspective, CONCERTA® dominated the other available methylphenidate products in 2006. CONCERTA® ranked first based on dollar sales, total prescriptions, and new prescriptions representing approximately 74 percent, 55 percent, and 55 percent of total dollar sales, total prescriptions, and new prescriptions of methylphenidate products, respectively.  In contrast, the next largest selling methylphenidate product represented 9 percent, 15 percent, and 14 percent of

total dollar sales, total prescriptions, and new prescriptions of methylphenidate products, respectively. [Testimony of Richard Rozek; PX 507; PX 508].

538. The primary differentiating factor between these products is the method by which they deliver methylphenidate. [Testimony of Richard Rozek; PX 497; PX 498, Testimony of Feifel; Testimony of Patrick]

539. CONCERTA®'s delivery profile includes an extended release rate over an extended period of time, resulting in substantially ascending plasma concentrations both for at least about 5.5 hours and for at least about 8 hours. [Testimony of Gray].

540. No other methylphenidate products has a delivery profile with an extended release rate over an extended period of time. Nor does any other methylphenidate products have a delivery profile that results in substantially ascending plasma concentrations for at least about 8 hours. Nor does any other methylphenidate products have a delivery profile with an ascending release rate over an extended period of time that results in substantially ascending plasma concentrations for at least about 5.5 hours. Nor does any other methylphenidate products have a delivery profile with an ascending release rate over an extended period of time that results in substantially ascending plasma concentrations for at least about 8 hours. [Testimony of Dr. Feifel].

541. That CONCERTA® substantially outsells all other methylphenidate products, including two low-cost generic versions, and the primary difference between the products (other than price) is their drug delivery profile, demonstrates that the delivery profile of CONCERTA® is responsible for its success. [Testimony of Richard Rozek].

177

542.    The claimed attributes of CONCERTA®'s delivery profile are the portions that are responsible for CONCERTA®'s commercial success.  Those are the attributes that other available methylphenidate products lack, and that Defendants copied – the ascending release rate for an extended period of time and the substantially ascending plasma concentrations. [PFF ¶¶ 102-262, 545-546]  That Defendants copied those attributes, and not, for instance, the OROS® delivery technology, demonstrates that Defendants believe those are the attributes that account for the effectiveness, and thus the commercial success, of Concerta®.

### 3.    No Other Factors Explain the Commercial Success of CONCERTA®

543.    Other economic factors do not explain the commercial success of CONCERTA®.  CONCERTA® is a success in the face of substantial competition due to the availability of other brand and generic immediate and extended release methylphenidate products and the availability of other brand and generic products for treating ADHD.  And, CONCERTA® is a success in the face of the availability of low-cost generic versions of both immediate and extended release methylphenidate products.  [Testimony of Richard Rozek].

544.    While CONCERTA® is marketed by ALZA, those marketing activities are consistent with other leading ADHD products, Adderall XR® and Strattera®.  Indeed, McNeil compared its marketing efforts to competitors and concluded that "CONCERTA® has the lowest share of voice, detail reach and frequency in the ADHD market."  [Testimony of Richard Rozek; PX 530].

### 4.    Copying

545.    Defendants have expended substantial efforts attempting to produce a copy of a commercial embodiment of the invention that is marketed by Plaintiffs.  For example,

Defendants have represented to the FDA that the plasma profile that the ANDA product exhibits is highly similar to that of CONCERTA®, Plaintiffs' commercial embodiment of the claimed invention.



546.    Moreover, Defendants have admitted that CONCERTA®, and particularly its plasma profile, was the primary design influence for their ANDA product.  [JDT (Cheng) 276-278, 280]

### 5.    Miscellaneous

547.    Dr. Feifel testified during his deposition:

Q.    So when you refer to Concerta as the gold standard, is it fair to say you're not necessarily saying it's better than all other methylphenidate products; it was just the first once-a-day methylphenidate product that produced satisfactory results?

MR. KUSHAN:  Objection; mischaracterizes the witness's testimony.

THE WITNESS:  Yeah, I think as -- sorry.  I would say no because, as I mentioned, I

think, a component of that gold standard terminology that I was using was the prevailing formulation for which others need to try to match or supersede in terms of overall utility and efficacy.  I personally don't think that there has been a product, a methylphenidate product that has superseded that.

BY MR. BATEMAN:

Q.    Are there ones that have equaled it?

A.    I think there are ones that in many patients produce comparable clinical benefits.

Dep. Tr. at p. 131, line 14 to p. 132, line 8.


        548.    Dr. Mayersohn testified during his deposition:


Q.    So, the profile of interest in

      Figure 10 would be the open circle profile

      that relates to the metabolite that is

      thought to be involved in the development

      of tolerance?

A.    Well, it's -- it's of interest

       for some reasons, but not for the ones

       that -- that I originally thought through.

Q.    Why?

A.    We -- we haven't been talking

      about metabolites causing tolerance,

       methylphenidate.  You -- you've pointed

       out to me that that's what this is doing.

Q.    Okay.

A.    Okay?  I had viewed this

incorrectly, obviously, as being parent

profiles, due to different formulations,

as opposed to metabolites tolerant --

causing tolerance or not.

Q.    So, does that change your view

that this drug dosing system, you know,

shown in Figure 10 provides a

substantially ascending plasma

concentration over an extended period of

time?

A.    It -- it does, but in the form

of a metabolite, not the parent drug.

Q.    Okay.

A.    That's all I'm trying to say.

[Dep. Tr. at p. 172, line 21 to p. 173, line 25.]

II.     **THE CLAIMS-IN-SUIT ARE FULLY ENABLED**

A.     **The Claims-in-Suit Are Directed to Treatment Methods That Use Oral Dosage Forms Exhibiting Specified Functional Properties**

600.     The claims in suit are '373 claims 1, 6, and 7, and are drawn to methods of treating ADD/ADHD.  [See PX 1, '373 Patent, at col. 23, line 13 (claim 1, drawn to "[a] method for treating ADD or ADHD"); id at col. 24, line 9 (claim 6, depending on claim 1); id. at col. 24, line 13 (claim 7, depending on claim 1)].  Claim 1 of the '373 patent specifies the requirements of dosage forms that provide this utility by reference to the dissolution rate of methylphenidate from the dosage form that is to be administered.  [See PX 1 at col. 23, lines 14-15 (claim 1, requiring "a dosage form . . . that provides a release of methylphenidate at an ascending release rate over an extended period of time"); see D.I. 130, Markman Order at 2 (construing this limitation, while maintaining these same fundamental requirements)].  Dependent claims 6 and 7 add a further limitation, requiring that the dosage form produce a particular methylphenidate plasma profile in a subject administered the dosage form.  [See PX 1 at col. 24, lines 9-17 (claims 6 and 7, requiring "a substantially ascending methylphenidate plasma drug concentration over a time period of about," 5.5 or 8 hours "following said administration," respectively); see D.I. 130, Markman Order at 2 (construing this limitation, while maintaining these same fundamental requirements)].

601.     The claims-in-suit do not require particular physical properties or structures to be possessed by the dosage forms other than as a consequence of the required functional properties of the dosage form (e.g., the rate of release of the active ingredient from the dosage form, or the effect on plasma concentration in the subject administered the dosage form). [See PX 1 at col.

182

23, lines 12-15 (claim 1, lacking any such limitations); see PX 1 at col. 24, lines 9-17 (claims 6 and 7, lacking any such limitations); see D.I. 130, Markman Order at 2 (construing these claims, without adding any such limitations)].

602.    A person skilled in extended release dosage formulation would not consider the dosage forms identified by Dr. Needham in ¶ 114 of his report as being appropriate for an extended release formulation meeting the requirements of claims 1, 6 and 7 of the '373 patent. [Testimony of Dr. Davies; Needham Rep. ¶ 114 (relying on "other oral dosage forms such as powders, buccal tablets and a variety of liquid products" as well as "non oral dosage forms such as nasal sprays, inhalers, transdermal systems, suppositories, creams as well as a variety of parenteral or injectable dosage forms"); DFF ¶ 38 (same); DFF ¶ 233 (same)].  The only dosage forms in the USP that a skilled formulator would seriously consider for purposes of practicing the full scope of the claims-in-suit would be a tablet, capsule, or possibly a transdermal system. [Testimony of Dr. Davies].

**B.    The Claims-in-Suit are Fully Enabled under 35 U.S.C. § 112, First Paragraph**

**1.    Routine, Not Undue Experimentation, Is All That Would Be Required to Produce Extended Release Dosage Forms That Meet Desired Release Rate Characteristics, As Illustrated by the Extensive Guidance in the Patent Disclosures and the Prior Art**

603.    The teachings provided by the patent disclosure in conjunction with the prior art illustrate that only routine experimentation is necessary to practice the claimed invention. [Testimony of Dr. Davies].  The '373 patent contains numerous passages that explain that a wide variety of oral extended release dosage forms were known in the prior art and could be used to implement the invention.  [Testimony of Dr. Davies].  These passages include:  PX 1 at col. 4,

lines 19-23 ("[w]ith the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for sustained-release oral dosage forms adapted to provide such a release rate over a suitable extended time period");  PX 1 at col. 2, lines 53-55 ("[t]here are many approaches to achieving sustained release of drugs from oral dosage forms known in the art"); PX 1 at col. 6, lines 1-6 ("[a]lthough the present invention is illustrated herein by exemplary dosage forms containing specific exemplary drugs, methods of making such dosage forms and methods of using methylphenidate-containing dosage forms to provide a desired therapeutic outcome, the invention is not limited by the exemplary embodiments." ); PX 1 at col. 6, lines 6-14 ("[t]he invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time period, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in the art in view of the disclosure herein.")  From these passages, a person skilled in the formulation arts would conclude that dosage forms that are suitable for use in the claimed treatment methods include oral sustained-release dosage forms exhibiting the required functional characteristics. [Testimony of Dr. Davies].


604.    The '373 patent refers to oral sustained release dosage forms broadly, and the meaning of the phrase "dosage form" as used in the claims would be readily apparent to a person of skill in the art.  [Testimony of Dr. Davies; PX 1 at col. 6, lines 6-14].  It would include, among other things, the prior art oral extended release systems identified earlier in the patent: "diffusion systems such as reservoir devices and matrix devices, dissolution systems such as encapsulated

dissolution systems (including, for example, 'tiny time pills') and matrix dissolution systems, combination diffusion/dissolution systems, osmotic systems and ion-exchange resin systems as described in Remington's Pharmaceutical Sciences, 1990 ed. pp 1682-1685," a well-known textbook in the field. [Testimony of Dr. Davies; PX 1 at col. 2, lines 56-62].

605.    The prior art literature is extensive, and would provide clear guidance to a person skilled in the formulation arts regarding how to adapt known types of controlled release dosage form technologies to produce dosage forms that exhibit ascending release rates of methylphenidate and/or substantially ascending plasma concentration time profiles as required by the claims-in-suit. [Testimony of Dr. Davies].

606.    At the time of the invention, the task of designing an ascending release rate dosage form was considered so straightforward that it formed the basis of a chapter review question in the well-known textbook, Kydonieus' Treatise on Controlled Drug Delivery. [Testimony of Dr. Davies; PX 465 at iv, 217]. In the example, the task is to "design a device that will yield an increasing release rate." [Testimony of Dr. Davies; PX 465 at 217]. The textbook provides as one answer to this question that a "[d]evice whose exposed surface area increases with time and will lead to increasing release rate." [Testimony of Dr. Davies; PX 465 at 218]. The specific example that the textbook provides is "a cone composed of a degradable polymer coated with a nondegradeable polymer cut off at the top." [Id.] Such a device would have an increasing exposed surface area over time leading to an increasing release rate, as generally illustrated at ingestion and at an arbitrary later time as follows in Figures 1 and 2. [Id.]



Erodible polymer / drug

Non-erodible polymer

Figure 1: Theoretical drug delivery device at time T=0



Increasing surface area of erodible polymer/drug leads to increasing rate of drug delivery

Figure 2: Theoretical drug delivery device at time T=1

607.   As figures 1 and 2 show, the surface area of this device would increase over time, thereby leading to increasing rates of release for the drug in this device.   [Testimony of Dr. Davies; PX 465 at 218].

608.   Using the disclosure in the '373 patent that an ascending release rate would be expected to yield a substantially ascending plasma concentration time profile, a skilled

formulator could use a variety of approaches to produce a dosage form achieving an ascending release rate and to thereby practice the full scope of the claimed methods of treating ADD/ADHD.  [Testimony of Dr. Davies; PX 1 at Figures 3, 4].  Beyond the teachings of Figures 3 and 4 themselves in the patents, any other substantially ascending plasma concentration time profiles desired could be deconvoluted and used to derive in vitro dissolution requirements based on the good correlation between in vivo and in vitro characteristics apparent from the patent.  [Testimony of Dr. Davies].

609.     At the time of the invention, another example of an ascending release rate dosage form had been published in two other well-known textbooks, Robinson et al.'s Controlled Drug Delivery and Lachman et al.'s Theory and Practice of Industrial Pharmacy, years after it was originally published in the Journal of Pharmacuetical Sciences by Rosen et al.  [Testimony of Dr. Davies; PX 467 at 426, Figures 13-16; PX 468 at 384, Figure 2 (deriving from the same work); PX 469 at 366, Table 1 (original publication of work)]. Multiple pellet systems are a dosage form structure that had been used in the prior art and could be readily used to produce an extended release dosage form having an ascending release rate of a drug.  [Testimony of Dr. Davies].  The prior art teaches that by varying the fat-wax coating applied to such pellets, different rates of release were achieved.  [Testimony of Dr. Davies; PX 467 at 426, Figures 13-16; PX 468 at 384, Figure 2; PX 469 at 366, Table 1].  The prior art shows that the lowest level of wax coating (7%) leads to the fastest rate of release in the case of pellet F, as shown in Figures 3 and 4, below.  [Testimony of Dr. Davies].  Progressively larger amounts of wax coating, increased in steps of 2%, leads to progressively slower rates of release, as illustrated by pellets E (9%) through A (17%) in these same figures.  [Id.].  This reference also teaches a skilled formulator how to

prepared custom blends of these pellets to achieve a desired ascending release profile, such as the custom blend disclosed as the dotted lines "G" in these figures. [Id.]. Figures 3 and 4, shown below, illustrate the release rate profiles in original (log) and non-log scale. [Id.].



FIG. 13-16.   In vitro release patterns of ampheta-mine sulfate pellets pan coated with various amounts of a fat-wax coating. A, 17% coating; B, 15% coating; C, 13% coating; D, 11% coating; E, 9% coating; F, 7% coating; G, selected blend of un-coated pellets and coated pellets. (From the data of Rosen et al.[4] Courtesy Am. Pharmaceut. Assoc.)

**Figure 3**

188



**Figure 4**

610.    Custom blends of wax coated pellets could have been readily adapted to produce dosage forms with ascending release rates and that provide substantially ascending plasma concentration time profiles.  [Testimony of Dr. Davies].  A skilled formulator, provided with the guidance from the specification and claims of the '373 patents, would have recognized that a combination of pellets B and C from Figures 3 and 4 would produce an ascending release rate over an extended period of time.   [Testimony of Dr. Davies].  As can be seen from the increasing slope of the Figure 4 cumulative release plot of pellet C between time points, this provides a modestly ascending rate of release over time by itself, as can be readily seen by separately plotting its rate of release  as done below in Figure 5.  [Testimony of Dr. Davies].



**Figure 5**

611.    Pellet B's increasing slope between time points on the Figure 4 cumulative release plot shows that pellet B provides an ascending rate of release, as can also be seen by separately plotting its rate of release in the below Figure 6.  [Testimony of Dr. Davies].



**Figure 6**

612.    The combination of pellets B and C from Figure 4 in equal parts would yield a
release profile that adds their individual profiles together, as shown by Figure 7 below.
[Testimony of Dr. Davies].



**Figure 7**

613.    At the time of the invention, a skilled formulator would have recognized that
Figure 1 in the work of Rudnic et al., reproduced below as Figure 8, disclosed a cumulative
dissolution profile for pellets B and C that could have been employed by said formulator to
produce dosage forms with an ascending release rate.  [Testimony of Dr. Davies; PX 470 at
Figure 1].

**Figure 8**

614.    The Rudnic et al. authors disclose that the earlier release of pellet B relative to pellet C is accomplished through the use of a "pH-controlled erosion" coating. [Testimony of Dr. Davies; PX 470 at Figure 1, col. 3, ll. 66 – col. 4, ll. 50]. Significantly, they illustrate the use of "any of the acrylic acid derivative phthalates (Eudragit)," for this purpose. [Testimony of Dr. Davies; PX 470 at col. 4, ll. 32-34]. Andrx uses the Eudragit coating to achieve ascending release with its MPH products. [Testimony of Dr. Davies]. A skilled formulator could have combined these two pellet types in equal parts to produce a dosage form that exhibits an ascending release rate over an extended period of time. [Testimony of Dr. Davies]. In cumulative plot Figure 8, the pellet B system shows the distinct increasing slope between time points indicating an ascending rate of release, as can be most clearly seen when plotting the rate of release for that system alone, as done below in Figure 9 . [Testimony of Dr. Davies].



**Figure 9**

615.    The C pellet system from Figure 8 above shows essentially no release for the first

5 or so hours owing to its Eudragit coating, and then shows the distinct increasing slope of

cumulative release plot between time points indicating an ascending rate of release.  [Testimony

of Dr. Davies].  That ascending rate of release can be seen by plotting the rate of release for that

system alone, as done below in Figure 10.  [Testimony of Dr. Davies].



**Figure 10**

616.    When pellets B and C are combined, the two rates of release add to yield an
ascending rate of release over an extended period of time, as depicted in Figure 11 below.
[Testimony of Dr. Davies].

194



**Figure 11**

617.    At the time of the invention, a skilled formulator would have recognized the cumulative profile disclosed in Figures 13 and 12 in the Mehta et al. reference as disclosing a dissolution profile for a spheroid formulation that could be used to produce a dosage form that exhibits an ascending release rate.  [Testimony of Dr. Davies; PX 471].  In particular, Figure 13 below discloses a dissolution profile that one of ordinary skill in the art would have recognized could have been used to produce a dosage form with an ascending release rate profile in combination with Figure 12  below.  [Testimony of Dr. Davies; PX 471 at Figure 4, Figure 3].



**Figure 12**



**Figure 13**

618.   At the time of the invention, using the information about the release

characteristics of these two different types of polymers described in the Mehta reference, a

skilled formulator could have produced a dosage form that combines an appropriate mixture of

the two spheroid systems depicted in Figures 12 and 13 above to produce a dosage form that

provides an ascending release rate  of an agent for an extended period of time  as shown in

Figure 14 below.  [Testimony of Dr. Davies; PX 471].



**Figure 14**

619.    At the time of the invention, a skilled formulator could also have produced dosage forms that deliver an ascending rate of release or provide a substantially ascending plasma concentration profile using dosage forms with "non-uniform" drug concentrations.  [Testimony of Dr. Davies].  These types of dosage forms typically employ a mixture of polymer-drug components that, when released in combination over time, produce the desired rate of release.  [Id.].  By knowing how much drug will be released over time from each component of the formulation, one can calculate the total amount of drug that will be released over time in combination by the dosage form.  [Id.].  This permits a skilled formulator to simply select the appropriate combination of these components to yield a "net" release rate of the drug from the dosage form that achieves the desired profile.  [Id.].  In essence, it is a simple mathematical operation – addition at each point in time T(x) of the total amount of drug that is being released from the various constituent elements of the dosage form.  [Id.].

620.     At the time of the invention, the preparation of dosage forms having a non-uniform drug composition that will provide a desired overall release rate was a matter of routine skill for a person skilled in the field of extended release formulation development.  [Testimony of Dr. Davies].  By 1996, a wide variety of polymers, structures and techniques were available for producing non-uniform drug concentration dosage forms and are generally referred to in the '373 patent and in earlier patent applications filed by Alza.  [Id.].  A skilled formulator can produce a dosage form by selecting an appropriate structural design for the formulation, selecting the polymers to be used, performing a series of straightforward mathematical operations that are dictated by these design and polymer choices, and then preparing and testing examples of the dosage forms.  [Id.].  All of this requires only routine effort and skill.  [Id.].

621.     The well-settled nature of the dosage design and testing process is reflected in extended release formulation textbooks that were available prior to the filing date of the patents. [Testimony of Dr. Davies; PX 465 at 217].

622.     At the time of the invention, a skilled formulator could readily prepare dosage forms with non-uniform drug concentrations that would provide increasing release rates over time.  [Testimony of Dr. Davies].  This graphically illustrated by one author (Ping Lee) in the well-known Journal of Controlled Release for diffusion controlled matrix systems having the geometries of a 1) planar sheet 2) cylinder and 3) sphere.  [Testimony of Dr. Davies; PX 472 at 5, Figure 2].  In Figure 15 below prepared by the author,  the correlation between the different constituent elements of the dosage form and the desired release rate are plainly shown. [Testimony of Dr. Davies; PX 472 at 5, Figure 2].  In the left-most frame, the drug concentration

within these three geometries is depicted from the interior of the dosage form ("0" on the x-axis,

having a concentration of "1") to the exterior of the dosage form ("1" on the x-axis, having a

concentration of "0"). [Testimony of Dr. Davies; PX 472 at 5]. That drug distribution leads to

the three cumulative release profiles over time (x-axis) labeled 1, 2, and 3 to depict each of the

three geometries: 1) planar sheet 2) cylinder and 3) sphere (middle frame). [Testimony of Dr.

Davies; PX 472 at 5, Figure 2]. It also leads to an ascending release rate over time (right-most

frame), again numerically labeled 1, 2, and 3 for each of the three geometries. [Testimony of Dr.

Davies; PX 472 at 5, Figure 2].



**Figure 15**

    623.   A 1986 Ping Lee Journal of Controlled Release article describing non-uniform

drug concentrations additionally contained the following illustrations for surface erosion

controlled matrix systems having increasing release rates having the geometries, of 1) planar

sheet 2) cylinder and 3) sphere is set forth in Figure 16 below reproducing these illustrations.

[Testimony of Dr. Davies; PX 472 at 6, Figure 3].



**Figure 16**

624. At the time of the invention, a skilled formulator could use the guidance in the literature to achieve an ascending release rate with transdermal systems, which can mediate the rate of release through membranes between the drug reservoir in the patch and the skin. [Testimony of Dr. Davies; PX 473 at 341-421.]

625. A transdermal patch with multiple chambers having different release rates, where slower releasing chambers held higher concentrations of drug, should, in principle, be able to achieve increasing release rates over time. [Testimony of Dr. Davies]. A patch of this general type of design is disclosed in the work of Govil et al., who disclose a transdermal patch design comprising two concentric rings, wherein the concentrations of drug and the permeability enhancer for each ring are varied. [Testimony of Dr. Davies; PX 474 at Abstract, col. 10, ll. 1-12]. The result is a patch that provides a constantly changing absorption profile, which yields a curved ascending profile as opposed to a zero-order absorption. [Testimony of Dr. Davies; PX

474 at col. 9, ll. 51-58].

626.    Andrx expressly relies on another prior art transdermal patch that yields an ascending profile in support of its alternative theory that the claims of the patents in suit are obvious. [DFF ¶ 307 (discussing the Bayer et al. patent, DTX 632)).] As Andrx puts it, the "delivery rate is . . . increased over a 'ramp up' time period," in this prior art reference. [DFF ¶ 307 (same).] Andrx further emphasizes that "[w]hile the patent is directed to transdermal dosage forms, the inventors indicated that other dosage forms, including oral dosage forms, can be used." [DFF ¶ 307 (same) (emphasis added).] This confirms Dr. Davies' opinion that common strategies for achieving an ascending release rate and a substantially ascending profile could be employed across oral and transdermal dosage forms with only routine experimentation. [Testimony of Dr. Davies].

627.    Indeed, Andrx's expert, Dr. Needham, conceded at his deposition that it was fair to say that one of ordinary skill in the art "would have a reasonable expectation of being able to achieve a transdermal system that provided increasing drug delivery rates," with only the "proviso depending on the drug." [Needham Dep. 127-28].

628.    Likewise, a transdermal patch with multiple laminate layers could achieve an ascending release rate. [Testimony of Dr. Davies]. Another approach would be to design a transdermal patch with a solvent that evaporated over time from the drug reservoir(s), which would increase the concentration of drug released over time. [Testimony of Dr. Davies]. This would then cause more of the drug agent to be conveyed through the patch and skin with the

passage of time, thereby providing the desired ascending release rate.  [Testimony of Dr. Davies].

629.    The '373 patent disclosure, in conjunction with the extensive knowledge in the prior art, would have provided sufficient guidance to a person skilled in the field of extended release formulation development to practice the claimed invention with routine, not undue experimentation.  [Testimony of Dr. Davies].

> **2.    Implementing a Desired Dissolution or Plasma Profile Would Have Been a Matter of Routine Effort for a Person Skilled in the Field of Extended Release Formulation Development as of the Filing Date of the Patent**

630.    At the time of the invention, the production of a wide variety of dosage forms that meet the requirements of the claims-in-suit would have been a matter of routine experimentation for a person skilled in the art based on the patent disclosure and the teachings in the prior art. [Testimony of Dr. Davies].

> **(a)    Controlled Release Dosage Forms Development Is Not an Unpredictable Field**

631.    The field of controlled release formulations was a mature and highly predictable field in November 1996, the filing date of the '373 patent.  [Testimony of Dr. Davies; PX 1 at 1 (claiming priority to November 12, 1996)].  Controlled release systems are designed to be predictable: hence they are called "controlled release systems."  [Testimony of Dr. Davies].  The controlled release dosage form field is devoted to production of dosage forms have highly predictable characteristics and behaviors.  [Id.].

632.    The highly predictable field of extended release dosage form development enables a person skilled in this field to use the well-documented attributes and characteristics of materials used in extended release dosage forms to design dosage forms that will exhibit a desired rate of release of an active ingredient.  [Testimony of Dr. Davies].  This is possible because the materials used in extended release dosage forms, such as polymers of various types, are highly consistent in their characteristics and highly predictable in their behavior.  [Id.].  In addition, the dissolution behavior (i.e., how an active ingredient is released from the dosage form as it dissolves) of the various types of structures used in extended release dosage forms is highly predictable.  [Id.].


633.    The release rate characteristics of extended release dosage forms known before the invention can be precisely modeled with mathematical formulae associated with the various materials and structures used.  [Testimony of Dr. Davies].  This enables a skilled formulator to produce a desired dissolution profile through a straightforward process.  [Id.].  Specifically, after being provided a desired dissolution rate profile, the formulator selects the appropriate materials and structures that, based on straightforward mathematical calculations, will produce the desired release rate profile.  [Id.].  Then, the formulator prepares the dosage form using conventional procedures for assembling and forming the dosage form.  [Id.].  Once produced, the dosage form is evaluated using simple dissolution tests appropriate for the dosage form, using industry accepted procedures.  [Id.].  These dissolution tests are used to confirm that the dosage form behaves as it has been designed to.  [Id.].  Optimization of the dosage form to meet desired release rate characteristics is achieved through slight modifications to the formulation or its structure, and is a conventional step in the process of designing and testing a new dosage form.

[Id.].  All of these steps amount to only routine experimentation for the person skilled in the field of extended release formulation development.  [Id.].

634.    Defendants provide no basis for their statement that "there would be large amounts of unpredictability" in the field of extended release development. [DFF ¶ 185].

635.    Defendants and Dr. Needham state that there is "a high level of unpredictability" in the relevant art.  [DFF ¶ 186].  Defendants distinguish this un-named "art" from the "more well-defined art of constant release formulation."  [DFF ¶ 185 (emphasis added)].  Defendants thus essentially take the position that the field of controlled release should be understood as divided into two arts: the art of "ascending release formulation' and the art of "constant release formulation."  [See DFF ¶ 185-86;  see also DFF ¶ 177 (referring to the skill in the art of "seeking formulations to achieve an ascending release rate" as distinct from skill "in the formulation art" as "a general matter")].

636.    Dr. Davies disagrees with the defendants position that the field of controlled release should be understood as divided into two arts: the art of "ascending release formulation' and the art of "constant release formulation."  [Testimony of Dr. Davies].  The distinction defendants are drawing is not one that one of ordinary skill in the formulation art would recognize, because many of the dosage forms developed in the so-called "constant release formulation" art are what one of ordinary skill would use to achieve ascending release rates. [Testimony of Dr. Davies].

637.    Many prior art dosage forms known at the time of the invention, when loaded with a uniform drug concentration, would intrinsically release drug at decreasing rates over time, not constant rates.  [Testimony of Dr. Davies].  Accordingly, even to achieve the "constant release rate" that was desired in the prior art over an extended period of time, it had always been necessary for formulators to take steps to stage later releases of drug in a manner that counteracted the intrinsic decline in rate found in many dosage forms.  [Testimony of Dr. Davies]. Those very same steps would readily lead the person skilled in the art to envision how to produce a dosage form that would provide an ascending release rate, if so desired.  [Testimony of Dr. Davies].  The predictability of these dosage forms would be essentially the same regardless of whether a constant release rate or an ascending release rate was desired. [Testimony of Dr. Davies].  Defendants' assertion that the latter would lead to "a much larger degree of unpredictability," than the former is incorrect.   [DFF ¶ 185; Testimony of Dr. Davies].

### (b)    Level of Skill of Extended Release Dosage Form Developers Is High

638.    The claims in suit concern methods of treating ADD/ADHD.  [See PFF ¶ 223]. As of November 12, 1996, a person of ordinary skill in the field of these patents would have been someone with an M.D., or a Ph.D. in clinical pharmacology or a comparable scientific field, and about two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience.  [Testimony of Dr. Angst and Dr. Davies; see PFF ¶ 228].

639.    The field of the invention of the claims in suit spans both medical treatment and formulation development.  To practice the full scope of the treatment methods claimed in the

'373 patent, a person of ordinary skill in the art would have consulted, or worked in collaboration with, persons of ordinary skill in the areas of formulating pharmaceutical products and in-vitro dissolution testing, to the extent necessary.  [Testimony of Dr. Angst and Dr. Davies].

640.    As of November 12, 1996, a person of ordinary skill in the art of formulating pharmaceutical products would have had a Ph.D. in Pharmacy, Chemical Engineering, or Chemistry, and three years experience in industry working with controlled release systems for drug delivery.  [Testimony of Dr. Davies].

641.    A skilled formulator would not have attempted to perform the claimed methods of the '373 patents using any type of dosage form, without any consideration or limit.  [Testimony of Dr. Davies].  A person of ordinary skill would have drawn on the expertise of a specialist skilled in the field of formulating extended release dosage forms as of November 1996 to select dosage forms and formulations that would provide the desired in vitro or in vivo characteristics for the claimed methods.  [Testimony of Dr. Davies].  This specialist would have been "high[ly]" skilled, as both Andrx's expert, Dr. Banakar previously opined and Alza's expert, Dr. Davies, previously agreed in connection with the Markman proceedings.  [Testimony of Dr. Davies; D.I. 86 ¶ 124, Declaration of Umesh V. Banakar, Ph.D.; D.I. 97 ¶ 60, Declaration of Martyn C. Davies].  The high skill level of this specialist would enable that person to readily formulate a range of dosage forms that deliver the desired characteristics.  [Testimony of Dr. Davies].

642.    Andrx expert Dr. Banakar has acknowledged that the level of skill in the extended release dosage formulation field is high and undercuts Andrx's position that undue

experimentation would be required to practice the full scope of the claimed methods.

[Testimony of Dr. Davies; D.I. 86 ¶¶ 124-125; D.I. 97 ¶ 60.]


643.    Andrx's expert Dr. Needham takes an inconsistent position with that taken by Dr. Banakar:  that the level of skill in the art supports, rather than undercutting, Andrx's position that undue experimentation would be required to practice the full scope of the claimed methods. [DFF ¶ 178].  Dr. Needham takes the position that this person would be a person of "skill in the art . . . to the achievement of ascending release rates and sustained ascending plasma profiles," rather than one of ordinary skill in extended release formulations generally.  [DFF ¶ 177].  Dr. Needham further expresses the view that "one of ordinary skill in the art would not have had experience in attempting to create an ascending rate of release because such a release rate was not typical at the time."  [Needham Rep. ¶ 22; see also DFF ¶ 177].  Dr. Needham then concludes that a "much lower" formulation skill would be used to practice the invention of Alza's claim than would be "generally" found in the formulation field.  [DFF ¶¶ 177-78].


644.    Alza's formulation expert, Dr. Davies, disagrees with Dr. Needham's position regarding the person of ordinary skill in the formulation art.  [Testimony of Dr. Davies].  In Dr. Davies' opinion, the generally high level of skill available in the extended release formulation arts could be brought to bear on "ascending release rates and sustained ascending plasma profiles.  [Testimony of Dr. Davies].  Many existing dosage forms, when loaded with a uniform drug concentration, will intrinsically release drug at decreasing rates over time, not constant rates.  [Id.].  Accordingly, even to achieve the constant release rate that was desired in the prior art over an extended period of time, it had always been necessary for formulators to take steps to

stage later releases of drug in a manner that counteracted the intrinsic decline in rate found in many dosage forms. [Id.]. Those very same steps would readily lead the person skilled in the art to envision how to produce a dosage form that would provide an ascending release rate if so desired. [Id.].

645.    A person of ordinary skill in the art of controlled release would have had a PhD in Pharmacy, Chemical Engineering, or Chemistry, and three years experience in industry in the field of controlled release. [Testimony of Dr. Davies.] They would not have had only a Bachelors degree in pharmacy, as Dr. Needham opines. [Testimony of Dr. Davies; DFF ¶ 170]. They would also not have had only a single years experience working specifically with modified or controlled release dosage forms. [Testimony of Dr. Davies; DFF ¶ 170]. A pharmaceutical company seeking to develop a new formulation simply would not depend on someone with just those qualifications in 1996-1999. [Testimony of Dr. Davies]. They would have turned, instead, to someone with a PhD in Pharmacy, Chemical Engineering, or Chemistry, and three years experience in industry in the field of controlled release. [Testimony of Dr. Davies].

646.    The training and experience of the Alza formulators who worked on Concerta® reflects the high level of skill found in the formulation field at the time of the invention. The formulation team was led by Dr. Shivanand, who had a PhD in Pharmaceutical Sciences. [JDT (Shivanand) 1151-3]. While in 1995 she herself had less than a years experience in controlled release, other members of her team and those who guided its work had well over three years experience at the time, such as Mr. Hamel and Mr. Ayer. [JDT (Shivanand) 1160-61; JDT (Hamel) 714, 718; JDT (Ayer) 32, 36-37]. Accordingly, Dr. Needham's person of ordinary skill

208

does not "match[] with the experience of the actual formulators involved in the Alza work."

[DFF ¶ 175].  Instead, these highly skilled and educated formulators are more consistent with Dr.

Davies' definition of one of ordinary skill in the art.


647.    Dr. Needham's own training and experience are more consistent with the

definitions of ordinary skill in the formulation art offered by Drs. Davies and Banakar than Dr.

Needham's definition.  Dr. Needham has a PhD in pharmaceutics, not just a Bachelors degree.

[Needham Rep. ¶ 3].  He also has "over 35 years of academic and industrial experience in the

research and development of drug delivery systems that modify or control the release

characteristics of a drug in order to meet the desired therapeutic requirements," or over 35 times

the single years experience Dr. Needham posits is the "ordinary" level of experience in this field.

[Compare Needham Rep. ¶ 2 with DFF ¶ 170].   Thus, in opining on the view of one of ordinary

skill in the art, Dr. Needham is both disregarding over 97% of his experience as well as the

entirety of his education after college.  [Id.].

> **(c)    There Is Extensive Guidance in the Patent Disclosures and the Prior Art Regarding Production of Extended Release Dosage Forms That Meet Desired Release Rate Characteristics**

648.    A skilled formulator, looking to implement the invention through types of dosage

forms other than the examples of osmotic dosage forms described in the patent specification,

would have consulted well-known sources for guidance.  [Testimony of Dr. Davies].  In this

connection, the range of choices that would have been explored by a person skilled in

formulation development would have initially be influenced by the indications in the patent

specification of the requirements of suitable dosage forms.  [Id.]. The specification indicates that

the dosage form is to be administered through oral means.  [Testimony of Dr. Davies; PX 1 at

col. 1, lines 24-30; col. 2, lines 53-62; col. 6, lines 1-14].   Also, according to the patent

specification, the dosage form would have to exhibit an ascending rate of release as measured

through an appropriate dissolution test.  [Testimony of Dr. Davies; PX 1 at col. 9, lines 25-30;

PX 1 at col. 9, line 66 to col. 10, line 52].  This provides further direction to select a dosage form

that would meet the practical requirements for administration, and that could be tested to confirm

it has the required functional properties (i.e., ascending rate of release over an extended period of

time).

649.    Based on the guidance in the specification and known in the literature, a person

skilled in the field of extended release formulation development would have eliminated certain

types of dosage forms as being inappropriate to use as an extended release formulation as a

practical matter.  [Testimony of Dr. Davies].  Dr. Needham takes the position that Alza's claims

"include[s] any dosage form which achieves the results desired."  [DFF ¶ 155].  Specifically, Dr.

Needham interprets Alza's claims as encompassing "not only the more common oral dosage

forms, i.e., a tablet or capsule, [but] also include[s] other oral dosage forms such as powders,

buccal tablets and a variety of liquid products."   [Needham Rep. ¶ 114; DFF ¶ 18].  Further

included, Dr. Needham continues, "are nonoral dosage forms such as nasal sprays, inhalers,

transdermal systems, suppositories, creams as well as a variety of parenteral or injectable dosage

forms."  [Needham Rep. ¶ 114; DFF ¶ 18].

650.    Dr. Davies disagrees that buccal tablets, lozenges, liquid products, powders, nasal

sprays, inhalers, suppositories, creams, and injectables would be considered suitable for use in

implementing the claimed methods by one of ordinary skill in the formulation art.  [Testimony of Dr. Davies].  All of these dosage forms would have been eliminated by a skilled formulator as being inappropriate for an extended release formulation.  [Testimony of Dr. Davies].  The only dosage forms in the USP that a skilled formulator would seriously consider for purposes of practicing the full scope of the claims would be a tablet, capsule, or possibly a transdermal system.  [Testimony of Dr. Davies; PX 478-79].

651.    In particular, buccal and lozenge formulations would be excluded due to patient compliance issues relating to the maintenance of the tablet over extended periods of time in the mouth.  [Testimony of Dr. Davies].  Andrx's own formulation experts have acknowledged such issues.  [See Banakar Dep. at 111 (when asked "[a]re you aware of any compliance issues associated with the use of lozenges to deliver a controlled substance," responded "[p]robably trying to train the person to keep the lozenge in their mouth without chewing it."); Banakar Dep. at 112 (when asked"[a]ll of the issues that we just talked about with regard to lozenges do they apply to buccal tablets, as well," responded "I would think so"); Needham Dep. at 134 (when asked "do all of the compliance and abuse issues that you discussed in the context of lozenges apply as well to the use of a buccal tablet to deliver an extended release methylphenidate for use in treating ADD or ADHD," responded, "[t]hose plus more, yes.")].

652.    Liquid products and powders also raise patient compliance issues because patients may not all measure the dose identically on every occasion, and also suffer from stability issues.  [Testimony of Dr. Davies].  Andrx's expert Dr. Banakar has acknowledged such issues.  [Banakar Dep. at 136-43].  As for nasal sprays and inhalers, delivering an ascending release rate

211

of drug over eight hours could require a nebulizer to be continuously worn by the patient.
[Testimony of Dr. Davies].  However, such a continuous delivery system is excluded by the
once-a-day administration requirement of the claims.  [See PFF ¶ 211].  Suppository-type
formulations would be excluded due to issues over unpredictable bowel clearance and
compliance issues in children.  [Testimony of Dr. Davies].  Andrx's expert Dr. Banakar has
acknowledged such issues.  [Banakar Dep. at 119-22].  Creams, ointments and semi-solids
applied directly to the skin also would be excluded for compliance issues, given the need to
consistently apply such a dosage form to the skin, in every season, every day for many hours at a
time.  [Testimony of Dr. Davies].  Andrx's expert Dr. Banakar has acknowledged such issues.
[Banakar Dep. at 125-28].

653.    Dr. Davies' opinion is confirmed by the failure of any Andrx expert to identify
any sustained release dosage form, as of 1996-1999, that was an aerosol, suppository, cream,
semisolid, lozenge, buccal tablet, or powder.  [See Banakar Dep. at 113 (aerosols), 116
(suppositories), 125 (creams), 128 (semisolid), 130 (lozenges), 135 (powder), 139 (liquids);
Needham Dep. at 102 (aerosols and suppositories), 106 (semisolids), 110 (lozenges), 112 (buccal
tablets and powders)].  Moreover, Andrx's experts could only identify a single sustained-release
liquid.  [Needham Dep. at 114].  This confirms Dr. Davies' opinion that a skilled formulator
would eliminate such dosage forms as inappropriate for an extended release formulation suitable
for the claimed treatment methods.  [Testimony of Dr. Davies].

654.    Dr. Davies' opinion is also confirmed by the limitation of the '373 patent claims
to an ascending release rate over an extended period of time as shown in "an appropriate

dissolution test," which can only be applied to oral and transdermal dosage forms.  [Testimony

of Dr. Davies; Testimony of Ms. Grey; PX 479 at ALZ 004378-84].


655.    During the Markman hearing, counsel for Alza stated the following regarding the

construction of "an appropriate dissolution test."  [D.I. 109, Markman Hearing Transcript at 133-

34].


On the question of the ascending release rate, the statement was made a couple of times
that we agree that it has to be USP apparatus.  We do not agree with that, Your Honor.
The USP provides a lot of guidance.  It's referred to in the patent, but we do not believe
that should be inscribed in a claim construction.  There's FDA guidance.  There's a lot of
sources that one can turn to for guidance on these test protocols.


656.    Counsel for Alza made these remarks in response to Andrx's proposed

construction of claim 1 of the '373 as limited to "In vitro dissolution rate (mg/hr) as measured in

a USP dissolution apparatus," contrary to Alza's proposed construction that the "release rate is as

determined by an appropriate dissolution test."  [D.I. 85, Andrx Markman Brief at 10].  The

former construction permitted the use of any of the seven USP dissolution apparati without any

requirement that the apparatus be "appropriate."  [D.I. 85, Andrx Markman Brief at 10].  Alza's

construction, however, required the entire test, including the apparatus selected, to be

"appropriate."  [D.I. 85, Andrx Markman Brief at 10].  This, as counsel for Alza mentioned,

permitted one to look beyond the USP for guidance, such as to the "FDA guidance," which

teaches that testing "should be carried out in USP Apparatus I . . . or Apparatus II," no other.

[D.I. 109, Markman Hearing Transcript at 133-34; PX 221 at P ALZ 4451].  In short, Alza's

construction narrowed the scope of the mechanism that could be used relative to Andrx's

construction.  [D.I. 85, Andrx Markman Brief at 10].

657.    Andrx takes the position that Dr. Davies' opinion that an appropriate dissolution test must use a USP apparatus is "directly contrary to counsel's previous representation to the Court." [DFF ¶ 159]. However, Counsel's previous representation in no way suggested using a non-USP apparatus. [D.I. 109, Markman Hearing Transcript at 133-34]. Instead, it was made to clarify that Alza did not agree with Andrx that any USP apparatus could be used for the dissolution testing required by the claims, without any consideration of its appropriateness.

658.    Andrx takes the position that "Ms Gray, Alza's dissolution expert, also does not agree with Dr. Davies." [DFF ¶ 24]. Andrx states that "[s]he stated that although there is not a specific USP apparatus for use with various dosage forms such as creams and ointments that there are some general dissolution tests devoted to them." [DFF ¶ 24] (citing Gray Tr. 300).

659.    The actual question and answer given by Ms. Gray were as follows:

Q    Do you know if presently there is any work being done on developing additional apparati other than apparatuses 1 through 7?

 A   There is the apparatus for creams and ointment, so there are two to three out there, the Franz cell and the enhancer cell, so that is being worked on.

660.    Apparatus that are "being worked on" today have no bearing on what a formulator over a decade ago would have used to develop dosage forms within the scope of the claims. [Testimony of Dr. Davies]. Indeed, even today, the work on the Franz cell and the enhancer cell

214

is not at a stage where either would be considered appropriate apparatus for a dissolution test for creams and ointments.  [Testimony of Dr. Gray].

661.    The specifications of various earlier filed applications to which the '373 patent claims benefit provide numerous examples of prior art oral extended release dosage form technologies that are suitable for producing dosage forms that can be used in the claimed methods.  [Testimony of Dr. Davies; PX 477 at P ALZ 778-81].  The technologies described in these earlier applications were well known, as these earlier applications also indicate. [Testimony of Dr. Davies; see, e.g., PX 477 at P ALZ 780].   The types of extended release dosage form technologies described in these earlier applications are indicated in the applications as being suitable for use in producing the ascending release dosage forms required by the claims-in-suit. [Testimony of Dr. Davies; PX 477 at P ALZ 778-81].  Several of these earlier applications specifically illustrate production of ascending release rate dosage forms using a number of types of sustained release systems (e.g., multilaminate systems, tiny time pills embedded in a hydrogel substrate, drug releasing beads, concentration gradient systems using erodible or nonerodible polymers, and diffusion systems).  [Id.].

662.    The patent disclosure and the prior art literature describe in extensive detail a wide range of types of extended release dosage form technologies that could have been employed to produce dosage forms according to the claims-in-suit with only routine experimentation.  [Testimony of Dr. Davies].

663.    Dr. Needham opines that "non-routine (or undue) experimentation" would have

been required to produce dosage forms according to the claims-in-suit. [DFF ¶ 128]. He also takes the position that "the patent leads one to believe that prior art oral dosage forms will not lead to the results claimed and non-routine (or undue) experimentation would be required . . ." [DFF ¶ 128].

664.    In Dr. Davies' opinion, the patent leads one to believe that prior art dosage forms can be readily adapted to achieve the claimed substantially ascending plasma concentration time profiles. [Testimony of Dr. Davies]. Dr. Needham offers no opinions on the key passages in the patent that indicate this. [See PFF ¶¶275-76 (discussing these passages and their meaning to one of ordinary skill)]. Dr. Needham instead focuses on the following statement in the patents: "[i]t has been surprisingly discovered that oral osmotic dosage forms exhibiting an ascending release rate for an extended time period can be achieved." [See DFF ¶ 126-7; Needham Rep. ¶¶ 123-124 (emphasis added)]. Dr. Needham further states that "it is my opinion that it would be equally surprising and non-routine for one of ordinary skill in the art in the 1990s to convert another constant release dosage form into an ascending release dosage form." [Needham Rep. ¶ 124 (emphasis added)]. "Therefore," Dr. Needham continues, "it is my opinion that the patent leads one to believe that prior art oral dosage forms will not lead to the results claimed and non-routine (or undue) experimentation would be required. . . ." [Needham Rep. ¶ 125; see DFF ¶ 126-7].

665.    In Dr. Davies' opinion, Dr. Needham only reaches his opinions regarding the patent by substituting his opinion for what the patent is stating. [Testimony of Dr. Davies]. Dr. Needham is not basing these opinions on what the relevant portions of the patent are explaining, and is not using the perspective that a person skilled in formulating extended release dosage

forms would use to interpret these sections of the patent. [Testimony of Dr. Davies]. In particular, Dr. Needham has incorrectly read the reference to the "surprising" nature of osmotic dosage forms to mean that it would have been surprising that a person skilled in the art could formulate using any type of extended release formulation technology a dosage form that provides an ascending release rate of a pharmaceutical agent. [Testimony of Dr. Davies]. This plainly cannot be "surprising" because even basic textbooks illustrate techniques that can be used to produce dosage forms that provide ascending release rates of a particular chemical compound. [Testimony of Dr. Davies; PX 465 at 217].

666.    In Dr. Davies' opinion, a more accurate reading of the passage in the patent Dr. Needham cites is that it was surprising that a dosage form with an osmotic release mechanism could be produced that would provide an ascending rate of release of an agent. [Testimony of Dr. Davies; Needham Rep. ¶ 125; see DFF ¶ 126-7]. Osmotic release mechanisms are usually designed to produce drug products with highly consistent zero order (i.e., constant release rate) characteristics. [Testimony of Dr. Davies.] Dr. Davies does not view the patent statement Dr. Needham cites as in any way suggesting that a person skilled in the field of formulating extended release dosage forms would have found it difficult to design, produce, and test dosage forms using any of a variety of types of extended release design techniques that would provide the ascending release rate called for in the patent specification. [Id.].

667.    Dr. Davies does not agree with Dr. Needham's opinion that "it would be equally surprising and non-routine for one of ordinary skill in the art in the 1990s to convert another constant release dosage form into an ascending release dosage form." [Testimony of Dr. Davies;

Needham Rep. ¶ 124].  Whatever difficulties the inventors may have experienced achieving their

osmotic dosage forms provide little, if any, insight into whether one of ordinary skill in the art

would encounter any difficulties in using non-osmotic dosage forms to produce a dosage form

suitable for the claimed methods.  [Testimony of Dr. Davies].   Among other things, the

literature at the time regarding achieving controlled release non-osmotic dosage forms was far

richer and provided far more guidance than the literature relating to osmotic dosage forms.  [Id.]


668.     Andrx has conceded that, whatever difficulty Alza may have had developing its

osmotic dosage forms in the first instance, the patent's disclosure of how the inventors overcame

those difficulties with the disclosed osmotic designs is more than adequate to enable those of

skill in the field to practice the claimed invention with those designs.  [D.I. 85, Defendant's

Opening Markman Brief at 24 (section entitled "Osmotic dosage forms are the only types of

dosage forms described and enabled by the specifications of the patents in suit")].  Dr. Needham

agrees that osmotic dosage forms are "unique unto themselves," elsewhere, which is consistent

with Dr. Davies' opinions.  [Testimony of Dr. Davies; DFF ¶ 151; Needham Rep. ¶ 148].


669.     The patents describe and are intended to cover dosage forms that employ a wide

variety of types of sustained release systems (i.e., diffusion, dissolution, multilaminate,

combination diffusion-dissolution systems, osmotic, ion-exchange, etc.), as long as the dosage

form releases methylphenidate at an ascending rate over an extended period of time or provides a

substantially ascending methylphenidate plasma concentration.  [Testimony of Dr. Davies].

Moreover, in Dr. Davies' opinion, a person skilled in this field could produce non-osmotic

dosage forms that provide ascending rates of release of methylphenidate for an extended period

of time with only routine effort.  [Id.]

### (d)  Quantity of Experimentation Needed to Develop Suitable Extended Release Dosage Forms Is Reasonable

670.    Dr. Needham previously expressed the view that "large quantities of experimentation would be necessary."  [Needham Rep. ¶ 167].  Dr. Needham has clarified his opinion that a "reasonably large amount of experimentation would be expected to achieve any other dosage form, much less any significant number of dosages forms [sic] to even approximate enablement to [sic] the full scope."  [DFF ¶ 199 (emphasis added); DFF ¶ 200].

671.    Dr. Davies does not agree with Dr. Needham's characterization of experimentation required to produce non-osmotic extended release dosage forms.  [Testimony of Dr. Davies].  The quantity of experimentation involved in developing a non-osmotic dosage form within the scope of the invention would be entirely reasonable and on the order of that generally involved in the routine development of any new dosage form.  [Testimony of Dr. Davies].

672.    The design, formulation, production, testing and optimization of a new dosage form can take several months of effort.  [Testimony of Dr. Davies].  However extended release dosage forms are produced according to well-known procedures, using widely available and well-characterized materials, and are assessed using simple dissolution tests.  [Id.].  This work, although potentially spanning several months, , cannot be characterized as being an uncertain or unpredictable undertaking.  [Id.].  Preparing ascending release rate MPH extended release dosage forms therefore involves only routine experimentation by the skilled formulator.  [Id.].

219

673.    Andrx was able to easily produce dosage forms using non-osmotic, well-known technologies that exhibit an ascending release rate and produce a substantially ascending plasma concentration.  [Testimony of Dr. Davies].  Dr. Davies believe there is nothing remarkable about the Andrx formulation used in the ANDA products, and that only ordinary skill was brought to bear in its development, not extraordinary skill, as Dr. Needham claims.  [Testimony of Dr. Davies; PX 481 at ANDRX 71922-23; DFF ¶ 201].  The prior art describes numerous strategies for achieving an ascending release rate using non-osmotic dosage forms, which use various mechanisms to introduce greater releases of drug, delayed significantly after earlier, initial releases of drugs.  [Testimony of Dr. Davies].  Eudragit coatings have long been known to be suitable for delaying release of a drug, and thus would have been readily adaptable to those teachings.  [Testimony of Dr. Davies].  The prior art specifically taught ascending release rates accomplished using a Eudragit coating for this very purpose.  [Testimony of Dr. Davies].

REDACTED

**REDACTED**

**REDACTED**

     **(e)**     **The Absence of Working Examples of Non-Osmotic Dosage Forms in the Specification is Immaterial Given Breadth of Teachings in Prior Art, Predictability in Field and Abilities of Person Skilled in the Art**

676.    Dr. Needham takes the position that "[a]s a general matter, one of ordinary skill in the art who would be formulating the dosage forms to achieve the claimed results would have to go beyond their typical skill set to achieve an ascending release rate and/or plasma profile in even one additional type of dosage form, much less the multiple types of dosage forms covered by the claims under this interpretation." [DFF ¶ 147].

677.    Dr. Davies disagrees with Dr. Needham's position that a skilled formulator would need to go beyond their typical skill set to formulate dosage forms meeting the required

221

characteristics of the claims in suit.  [Testimony of Dr. Davies].  Publications that were over a

decade old at the time of the invention disclose methods for producing dosage forms that provide

an ascending release rate.  [Testimony of Dr. Davies]. While Dr. Needham is correct that

"extended release products have tended to focus on maintaining a constant release rate," DFF ¶

147, that focus still required the use of the same basic forms and design concepts that were

taught by the prior art as readily adaptable to achieving an ascending release rate.  [Testimony of

Dr. Davies].

678.    At the time of the invention, many existing dosage forms, when loaded with a

uniform drug concentration, would intrinsically release drug at decreasing rates over time, not

constant rates.  [Testimony of Dr. Davies]. Accordingly, even to achieve the "constant release

rate" that was desired in the prior art over an extended period of time, it had always been

necessary for formulators to take steps to stage later releases of drug in a manner that

counteracted the intrinsic decline in rate found in many dosage forms.  [Testimony of Dr.

Davies]. Those very same steps would readily lead the person skilled in the art to envision how

to produce a dosage form that would provide an ascending release rate, if so desired.  [Testimony

of Dr. Davies].  Dr. Needham agrees with this by noting that "[a] product development scientist

with ordinary skill in the art, when tasked to achieve the results described in the claims, would

usually take a generally known approach to developing the product."  [DFF ¶ 149].  Dr.

Needham further notes, however, that "one would not know what formulations would be

successful or how many changes would be necessary to affect the desired result."   [DFF ¶ 149].

679.    Only routine  experimentation would have been necessary to achieve the claimed

release rates/plasma concentration time profiles. [Testimony of Dr. Davies]. Routine experimentation is very much a part of the business of formulation, and would be needed to develop any new formulation, even a new constant release rate formulation. [Testimony of Dr. Davies]. After being designed, the formulation must be actually made and tested to insure they work as designed. [Testimony of Dr. Davies]. If the formulation does not behave as expected, then changes in the formulation can be made to adjust the behavior of the formulation. [Testimony of Dr. Davies]. While the nature of this experimentation to make the formulation work in practice as desired would not be known in advance, such experimentation is routine, and the parameters that would potentially be adjusted in response to such experimentation were well-known. [Testimony of Dr. Davies; DFF ¶ 149]. Accordingly, this implicates nothing but the routine experimentation that had long been essential to the formulation art in 1996. [Testimony of Dr. Davies].

680.    Dr. Needham elsewhere contends that the "art had not focused on providing an extended ascending release rate or plasma profile." [DFF ¶ 164]. Whether or not the art had previously focused on this, even in the course of developing constant release rates, the formulation art had developed and had well in its possession the same, essential skill set and methods it needed to develop ascending release rate or substantially ascending plasma concentration time profile dosage forms. [Testimony of Dr. Davies].

681.    Dr. Needham further contends that "much of the art did not point to specific release rates or profiles, so one would be undertaking a mostly new endeavor." [DFF ¶ 164]. Dr. Davies disagrees. [Testimony of Dr. Davies]. The claims' requirement of ascending release

rates over an extended period of time or substantially ascending plasma concentration profiles over eight hours are ultimately no more or less precise than the types of general requirements that formulators were previously expected to meet. [Testimony of Dr. Davies].

**3.    Plaintiffs Did Not Fail to Develop Non-Osmotic Dosage Forms to Implement the Invention**

**(a)    Alza's Research Efforts Focused on Osmotic Dosage Forms because That Was the Field Where It Had Intellectual Property and Special Expertise**

682.    In the mid 1990s, Mr. Atul Ayer was Director of formulations, formulation group. [Testimony of Mr. Ayer]. The formulation group would develop new solid dosage forms. [Id.]. Specifically, they did work in the lab on the bench scale to develop new formulations. [Id.]. There were four to six managers reporting to Mr. Ayer, who were working in the lab developing different formulations. [Id.]. Mr. Ayer's role was to guide these managers in coming up with their dosage forms. [Id.]. They were responsible for all of the laboratory work for the development of all new formulations. [Id.].

683.    Alza elected to implement the invention in its commercial form using osmotic-release dosage forms because of commercial considerations. [Testimony of Mr. Ayer]. Alza was a pioneer in development of osmotic dosage forms and had previously developed a number of extended release drug products using this technology. [Id.]. Alza also owned substantial intellectual property related to osmostic dosage form technology and, conversely, did not own substantial intellectual property in other types of non-osmotic dosage for technologies. [Id.]. Alza also owned machinery and other equipment suitable for producing osmotic-dosage forms. [Id.].

684.    It was not difficult for a skilled formulator to develop non-osmotic dosage forms having an ascending release rate.  [Testimony of Mr. Ayer].  At the time of the Concerta project, Mr. Ayer had done so many times in the past and did so again during that project.  [Id.].  During that project, Mr. Ayer also developed osmotic dosage forms using the osmotic technology that was Alza's long-standing specialty in the field.  [Id.].  Alza worked with "more than 30 or 40 formulations" that were a mixture of osmotic and non-osmotic dosage forms.  [Testimony of Dr. Guinta; JDT (Guinta) 402-403].

685.    Mr. Lam testified that on his own he did some experimentation with non-osmotic dosage form, but abandoned the effort before he got them to work. [JDT (Lam) 804-805].  Mr. Lam was not part of the formulation group at Alza at the time Concerta was developed. [Testimony of Mr. Ayer].  He was a project manager on the Concerta project.  [JDT (Lam) 788]. Mr. Lam's responsibilities did not include any laboratory or bench work involving the development of particular dosage forms.  [Testimony of Mr. Ayer].

686.    Mr. Lam characterized the mandate for the Concerta development effort as being "an initiative from the CEO of Alza to find a commercialized compound that can be taking advantage with use of oral delivery technologies such as OROS."  [JDT (Lam) 789].

> (b)    **Defendants Mischaracterize the Specification and Prosecution History as Suggesting One Skilled in the Art Could Not Produce Non-Osmotic Dosage Forms Meeting Requirements of the Invention**

687.    The '373 disclosure indicates that it was surprising for the inventors to discover that effective treatment of ADD and ADHD could be achieved by providing dosage forms that

delivered MPH at an ascending rate for an extended period of time, or by providing a substantially ascending MPH plasma concentration in the patient.  [PX 1 at col. 4, lines 13-18].  As it states: "It has been surprisingly discovered that, in an exemplary clinical situation, administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period."  [Id.]


688.    The '373 disclosure also thereafter discusses specific examples that can be used to implement the invention.  [PX 1 at col. 4, lines 31-35].  Incidental to that description of examples, the inventors discuss the relative merits of osmotic dosage forms developed by Alza scientists that exhibit an ascending rate of release of MPH.  [PX 1 at col. 4, lines 31-35].  As the disclosure indicates, the Alza inventors believed these particular examples of osmotic dosage forms were independently deserving of patent protection.  [PX 1 at col. 4, lines 31-35].  As the specification states, "[i]t has been surprisingly discovered that oral osmotic dosage forms exhibiting an ascending drug release rate for an extended period can be achieved."  [PX 1 at col. 4, lines 31-33].  The specification immediately goes on to point to these examples in support, noting that "[i]n particular, the present invention is directed to osmotic dosage forms having bi-layer or tri-layer tablet cores," which it goes on to describe in detail.  [PX 1 at col. 4, lines 33-35].

**D.    The ANDA Products Exhibit Substantially Ascending MPH Plasma Concentrations for both About 5.5 and About 8 Hours**

689.    A "slight dip" is simply a descriptive term for well-known variations that arise in plasma concentration time data.  [Testimony of Dr. Angst].  Indeed, this phenomenon is so well

known that even Defendants' expert Dr. Bolton admitted at his deposition that the slight dip in

the patent was just "a chance observation . . ." [Bolton Dep. at 85]. Dips of 10-15% are

generally treated as irrelevant variations of this kind for MPH. [Testimony of Dr. Angst]. Dr.

Angst also confirmed this conclusion by reference to the data that Defendants themselves

submitted to the FDA. [Testimony of Dr. Angst; PFF ¶ 251]. Dr. Angst showed, for example,

that the same patients taking the same product on two different days would experience a first dip

on the first day that, on average, was different from the first dip on a second day by 14%. [Id.].

Thus, a patient who had no dip at all on the first occasion would, on average, have a first dip of

14% on the second occasion. [Id.].


690.    Plasma concentration time profile variations are well known by those of ordinary

skill to arise more than once over an eight hour period. [Testimony of Dr. Angst]. Accordingly,

Defendants' position that one dip is permissible, but a second is not would make no sense to a

person of skill in the art. [Id.]. In any event, many of the exemplary infringing profiles involved

only a single dip during the claimed time periods of 5.5 and 8 hours, including the mean data

reproduced above. [Id.; see PX 257 at P ALZ 4748-63]


691.    "Biphasic" products would mimic the profiles observed in a Ritalin IR bid

regimen, which show declines in plasma concentration of around 35-40%. [Testimony of Dr.

Angst; see PFF ¶ 250]. The patent itself draws this distinction explicitly. [Id.; see PX 1 at col.

22, lines 11-16]. All of the profiles Plaintiffs rely upon to show infringement have modest dips

of 15% or less and nothing that even comes close to the troughs in the prior art bid regimen.

[Testimony of Dr. Angst; see PFF ¶ 254].


227

692.    The Court's construction requiring that profiles "generally rise" would be understood by one of ordinary skill to mean that the concentrations rise most of the time. [Testimony of Dr. Angst; D.I. 130 at 2].  In order to be very conservative, Dr. Angst selected as exemplary infringing profiles only those profiles in which the concentration was increasing at least 60% of the time (though anything above 50% could have been reasonably used).] [Testimony of Dr. Angst].

### E.    Prosecution History of the ALZA Patent

693.    U.S. Patent No. 6,919,373 ("the '373 patent) indicates that it was surprising for the inventors to discover that effective treatment of ADD and ADHD could be achieved by providing dosage forms that delivered MPH at an ascending release rate for an extended period of time, or by providing a substantially ascending MPH plasma concentration in the patient.  [PX 1, col. 4, lines 13-30;, col. 5, lines 54-63].  The '373 patent discloses:

> One aspect of the present invention pertains to providing improved drug therapy for those clinical situations where therapeutic effectiveness of an administered drug therapy unexpectedly decreases at time periods before the end of the intended therapy period.  It has been surprisingly discovered that, in an exemplary clinical situation, administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period.
>
> With the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for sustained-release oral dosage forms adapted to provide such a release rate over a suitable extended time period.
>
> [PX 1, col. 4, lines 13-30].

694.    The '373 patent is a continuation-in-part of U.S. Patent Application No. 08/910,593 ("the '593 patent application").  [PX 6].

695.    During prosecution of the '593 patent application, the Examiner rejected all of the pending claims as being obvious over a combination of patents.  [*Id.* at PALZ 000999].  The claims rejected from the '593 patent application were not the same as the claims-in-suit.  [*Id.* at PALZ 000969-973; PX 1].

696.    The '373 patent is a continuation in part of U.S. Patent Application No. 08/937,336 ("the '336 patent application").  [PX 7].

697.    During prosecution of the '336 patent application, the Examiner rejected all of the pending claims as being obvious over a combination of patents.  [*Id.* at PALZ 001140-1142]. All of the pending claims were drawn to specific dosage forms, e.g. osmotic dosage forms.  [*Id.* at PALZ 001110-1117].  The claims rejected from the '336 patent application were not the same as the claims-in-suit.  [*Id.*; PX 1].

## III.     RESPONSIVE FINDINGS OF FACT ON INFRINGEMENT

800.     In accordance with the Court's claim construction, an "ascending release rate" occurs when "the amount [of MPH] released in a periodic interval is increased over the amount released during the immediately preceding periodic interval starting at t=0…."  [D.I. 130, Markman Order, at p. 2].

801.     Under the Court's construction of the ascending release rate element, the MPH release rates for separate, successive time intervals are compared to determine whether the release rates increased over that period of time.  [D.I. 130, Markman Order, at p. 2].

802.     The '373 patent specification states that "the present invention is also related to dosage forms that additionally comprise a dose of drug for immediate release."  [PX 1, '373 patent, col. 4, lines 37-39].

803.     Defendants assert that, in order to determine whether an ascending release rate is occurring, the amount of MPH released from the tablet core ("Non-IR" MPH) of the ANDA products during the first hourly interval in a dissolution test must be compared with "the amount released *before* t=0," a hypothetical one-hour period of time *before the in-vitro dissolution test commences*.  [Defendants' Opening Pretrial Brief, at DFF 409].

804.     Defendants' approach for evaluating whether an ascending release rate is occurring does not follow the Court's construction of this claim element, which requires that the periodic intervals of time during which MPH release is compared start at zero hours (i.e., t=0) and not one hour before t=0.  [D.I. 130, Markman Order, at p. 2].

805.    Defendants' assertion that the first periodic interval considered in determining whether an ascending release rate occurs is the one hour period *before* t=0 is inconsistent with their admission during the Markman proceedings that the intervals of time *start at t=0*.  [D.I. 85, Defendants' Opening Markman Brief on Claim Construction, at p. 17 ("the parties agree that the time period commences at t=0.")].

806.    Example 1 in the '373 patent includes Table 1, which reports MPH release rate data from an in-vitro dissolution test on an exemplary MPH dosage form that contains MPH in a single component layer and does not include an immediate release MPH drug coating.  [PX 1, '373 patent, cols. 13-14].

807.    Table 1 in the '373 patent does not illustrate an ascending release rate over an extended period of time for a dosage form that contains MPH in an immediate release outer coating.  [PX 1, '373 patent, col. 14, Table 1].

808.    In making its Markman rulings in this case, the Court did not adopt Defendants' proposed interpretation that the release rate for each periodic interval "is calculated as a mean value."  [Compare D.I. 130 at p. 2 with D.I. 85, Defendants' Opening Markman Brief on Claim Construction, at pp. 10 ("Andrx Proposed Definition") and 16 (Andrx "proposes that the [release] rate be calculated as the mean of at least six tablets.")].

809.    Defendants' expert Dr. Banakar testified (during his deposition) that the ANDA products release MPH from the tablet core during the first hour in a pH 7.5 dissolution medium:

> Q.    So at pH 7.5 you expect, you would expect that there will in most instances be a contribution [of MPH] from the delayed-release core at the one-hour time point?
>          [Objection to form omitted]
> A.    There could be, yes.

[Expected testimony of Dr. Banakar; Deposition testimony of Dr. Banakar, p. 223].

810.    Plaintiffs' dissolution tests on the ANDA products (54, 36 and 27 mg strengths) determined that many of the samples (i.e., 7 out of 36 samples) released non-IR MPH during the first hourly interval.  [Expected testimony of Ms. Gray; PX 241; PX 243 and PX 245].

811.    Defendants' assertion that the non-IR MPH in the ANDA products will begin to release several hours after administration in a patient's body (i.e., in-vivo) is irrelevant to determining whether the products meet the ascending release rate element of claim 1.  [D.I. 130, Markman Order, p. 2 – "release rate is as determined by an appropriate *in-vitro* dissolution test."].

812.    The '373 patent specification refers to "implementation of an appropriate dissolution test" for determining the drug release rates of an extended-release MPH dosage form. [PX 1, '373 patent, col. 9, lines 25-29].

813.    Dr. X. Cheng, Defendants' Rule 30(b)(6) witness on development of the ANDA products, testified that the products are designed to contain 25% of their total MPH dose in the IR drug coating.  [Expected testimony of Dr. X. Cheng; JDT (X. Cheng), at JDT 00329:8-21 and JDT00330:11-17].

814.    Defendants' expert Dr. Needham described the ANDA products as containing "about 25% of the total dose of methylphenidate" in an immediate-release drug coating. [Expected testimony of Dr. Needham; Rebuttal Expert Report of Dr. Needham, at p. 20].

815.    Defendants acknowledge in their pretrial submission that Ms. Gray's use of the ANDA specification to quantify the amount of IR MPH in the ANDA products is "not necessarily unsound."  [Defendants' Opening Pretrial Brief, at p. 129, DFF 422-423].

816.    It is reasonable for Ms. Gray to rely on the ANDA specification for IR MPH (i.e., 25% of the total MPH dose of the product) as the amount of IR MPH which is excluded in determining whether the ANDA products meet the ascending release rate element of claim 1 of the '373 patent.

817.    All of the exemplary dosage forms described in the Examples of the '373 patent are osmotic dosage forms, and four of them contain methylphenidate (Examples 1-3 and 6) as the active drug.  [PX 1, '373 patent].

818.    A person experienced in dissolution testing would know that USP Apparatus VII is a special-use dissolution apparatus that was developed by ALZA for testing osmotic dosage forms.  [Expected testimony of Ms. Gray; PX 448, at pp. 60-61].

819.    The USP Apparatus VII would not be considered as a dissolution apparatus for the ANDA products unless the preferred apparatus – USP Apparatus 1 and 2 – proved unsuitable for testing the products.  [Expected testimony of Ms. Gray; PX 1, '373 patent, at col. 3, lines 25-30].

820.    The osmotic dosage forms containing MPH exemplified in the '373 patent do not require a specific pH condition for proper drug release because they are pH-independent dosage forms.  [Expected testimony of Ms. Gray; PX 1, '373 patent, at col. 3, lines 25-30].

821.    The acidic dissolution medium (pH 3) used in the Examples for the osmotic dosage forms was appropriate because (i) the drug release mechanism does not require a higher pH (such as a basic pH) and (ii) MPH is more stable in acidic media than in basic media. [Expected testimony of Ms. Gray].

822.    Since the extended release mechanism of ALZA's osmotic dosage form is pH independent, a person experienced in dissolution testing would consider the properties of MPH itself in selecting an appropriate pH for the dissolution test.  [Expected testimony of Ms. Gray].

823.    Changing the pH of the dissolution medium will not affect the release values of the IR MPH from the ANDA products because the IR drug coating is pH independent and, thus, the IR MPH portion of the ANDA products fully dissolves in one hour in an aqueous dissolution medium at any pH.  [Expected testimony of Ms. Gray; Expected testimony of Dr. Needham; see JDT (X. Cheng) at JDT 00330:7-17].

824.    Defendants admit that the immediate release MPH portion of the ANDA products is pH independent – the "IR component…is pH independent (i.e., the IR release will occur at any pH)." [Defendants' Opening Pretrial Brief, at p. 133, DFF 425; Expected testimony of Dr. Banakar].

825.    Defendants' expert Dr. Needham testified (during his deposition) that there is no difference between using acidic dissolution mediums and pH 7.5 for the first hour of a dissolution test on the ANDA products:

    Q    So, at the one-hour time point, using pH 1.2, you're not obtaining a
         different release value than you would if you had used pH 7.5, correct?

    A    Correct.

Q    And in pH 4.2, at the one hour time point, you're not obtaining a different release value than you would have obtained at pH 7.5?

A    Correct.

Q    And in pH 6.5, at the one hour time point, you're not obtaining a different release value than you would have obtained at pH 7.5?

A    Correct.

[Needham Deposition Transcript, at 58:19 to 59:9].

826.    A dissolution test that uses a pH 7.5 dissolution medium is appropriate for the ANDA products because *both* the IR MPH component and the extended release MPH component of the products fully dissolve in this dissolution medium.  [Expected testimony of Ms. Gray].

827.    Plaintiffs' dissolution tests on the ANDA products show that, on average, slightly less than 25% of each tablet's MPH is released in the first hour.  [Expected testimony of Ms. Gray; e.g., PX 242 – reporting that 24.56% of the MPH was released (average % Recovery) in the first hour of Plaintiffs' tests].

828.    According to the ANDAs, the ANDA products are officially classified as "Extended-release" products.  [PX 209, at ANDRX 005 – under the heading "General," stating "[t]he official name for this product, as reflected in the labeling, will be 'Methylphenidate Hydrochloride *Extended-release* Tablets'"; PX 208 at ANDRX 0063].

REDACTED

235

830.    A "delayed release" drug product releases a drug at a time other than immediately following oral administration.  [DTX 721, at p. 30, definition of "Delayed Release"; Expected testimony of Dr. Needham].

831.    A two stage dissolution test – use of an acidic dissolution medium followed by a higher pH dissolution medium – is used for delayed release products in order to determine if the delayed release mechanism is working to *prevent* drug release in acidic conditions similar to the pH environment of the stomach.  [Expected testimony of Dr. Needham; Expected testimony of Ms. Gray].

**REDACTED**

833.    The in-vitro dissolution test that Defendants proposed to the FDA, and the FDA accepted, for the ANDA products uses a pH 7.5 dissolution medium throughout the test; it does *not* use two stages, i.e., an initial acidic dissolution medium followed by a dissolution medium having a pH above pH 7.0.  [PX 227].

834.    The dissolution test protocol for the ANDA products used by ARL refers to certain dissolution tests – stages 3 and 4 – that use dissolution media at several pHs below pH 7.0.  [Expected testimony of Ms. Gray; PX 229].

835.    At the time the testing protocol was approved, Defendants were proposing that claim 1 of the '373 patent should be construed as requiring dissolution tests solely in acidic

medium. [Expected testimony of Ms. Gray; see D.I. 85, Defendants' Opening Markman Br., at 12-13 ("[i]n the case of methylphenidate, this would require the pH to be acidic.")].

836.    Testing stages 3 and 4 were included in Plaintiffs' dissolution test protocol so that Plaintiffs had an approved procedure to obtain dissolution data on the ANDA products using a range of acidic dissolution media. [Expected testimony of Ms. Gray].


**REDACTED**


838.     During the ARL dissolution tests on the 54 mg ANDA products, samples of dissolution media were withdrawn every hour through 12 hours and one additional sample was taken twelve hours later, at 24-hours. [Expected testimony of Ms. Gray; PX 229, at P ALZ 004457 (under "Dissolution Methodology")].

839.    The sample taken at the 24-hr timepoint during the dissolution tests on the 54 mg ANDA products was exploratory since the ANDA products are designed to complete release of the MPH by about 10 hours in an in-vitro dissolution test using pH 7.5 dissolution media. [Expected testimony of Ms. Gray].

840.    The results of the ARL dissolution tests on the 54 mg ANDA products show that, overall, the ANDA products fully released the MPH within about 10 hours (i.e., essentially 100% Recovery was observed by 10 hours). [PX 242, reporting an average % Recovery of 100.83% at 10 hours; PX 242, reporting % Recovery values ranging from 97.03% to 104.4% for the

individual 54 mg tablets]; [PX 210, ANDA for 54 mg product, Andrx Proposed Dissolution

Method, at P ALZ 0199 – "the last interval, 0-10 hr, evaluates the *full release* of the labeled

quantity of methylphenidate hydrochloride."].

841.    In their ANDA, Defendants reported an average MPH release value of 100% at 10

hours, and individual release values ranging from 98% to 103% at 10 hours, from dissolution

tests on the 54 mg ANDA products under the same test conditions used by Plaintiffs' testing

laboratory (ARL).  [PX 210, at ANDRX 00201].

842.    In ARL's dissolution tests on the 54 mg ANDA products using USP Apparatus 1

and pH 7.5 dissolution medium, the cumulative amount of MPH released (expressed as "%

Recovery") at 24 hours for the individual tablets ranged from 102.71 % (Cycle 2, Andrx D) to

110.87% (Cycle 2, Andrx A).  [Expected testimony of Ms. Gray; PX 238].

843.    The apparently "high" % Recovery results at the 24-hour time point in ARL's

tests on the 54 mg ANDA products were caused by the normal loss of dissolution medium

through evaporation.  [Expected testimony of Ms. Gray].

844.    Standard dissolution tests, including the dissolution tests done by ARL, typically

use a *water*-based dissolution medium.  [Expected testimony of Ms. Gray].

845.    When a water-based dissolution medium is heated and stirred for 24 hours, some

evaporation of the liquid inevitably occurs.  [Expected testimony of Ms. Gray].

846.    Defendants' expert Dr. Banakar testified (during his deposition) that any

dissolution test that goes for 24 hours could have evaporation occurring.  [Expected testimony of

Dr. Banakar; Banakar deposition transcript at 224:21 to 225:16].

847.    ARL performed an evaporation study which confirmed that evaporation was the cause of the seemingly "high" percent released values at the 24-hr time point in its dissolution tests on the 54 mg ANDA products.  [Expected testimony of Ms. Gray; Expected testimony of Mr. Walker; DTX 171; DTX 170, at P ALZ 005987].

848.    In the evaporation study, ARL determined the amount of dissolution medium that was lost after 24 hours under the same operating conditions as the dissolution tests on the 54 mg ANDA products (except that no drug sample was present).  [Expected testimony of Mr. Walker; Expected testimony of Ms. Gray; DTX 171].

849.    ARL's evaporation study demonstrated that, on average, 93.4% (or 467 mL) of the original volume of 500 mL remained after 24 hours, an evaporative loss of about 6.6% (or 33 mL).  [Expected testimony of Mr. Walker; DTX 170, at P ALZ 005987; DTX 171].

850.    In its dissolution tests on the 54 ANDA products, ARL calculated the amount of MPH (% Recovery) in each dissolution sample using a constant dissolution volume (500 mL), which is exactly the same calculation that Defendants used to obtain the dissolution that they submitted to FDA in the ANDA.  [Expected testimony of Ms. Gray; Expected testimony of Mr. Walker; see PX 212, Andrx standard test method "STM# FP-028, at Andrx 0833 (in the calculation of amount of MPH dissolved, the "Dissolution volume" is a *constant* value of 500 mL); PX 210, ANDA for 54 mg product, at ANDRX 00201 (referencing Andrx test method "STM# FP-028); PX 229, Plaintiffs' testing protocol, at P ALZ 4458 ("The samples will be analyzed using methodology detailed in references STM # FP-0028")].

851.    When the dissolution volume loss determined from the evaporation study is applied to the  % Recovery calculation at 24 hours, the actual % Recovery value at 24 hours is

about 100% (on average).  [Expected testimony of Ms. Gray; Expected testimony of Mr. Walker].

852.    Since evaporation explains the apparently "high" % Recovery values at 24 hours in ARL's tests on the 54 mg ANDA products, there is no reason to adjust or correct Plaintiffs' data.  [Expected testimony of Ms. Gray; Expected testimony of Mr. Walker].

853.    Even if a correction for volume loss is made to the 24 hour results, no adjustment would be made or is necessary for the dissolution results through 10 hours because any "error" from evaporation is inconsequential.  [Expected testimony of Ms. Gray].

854.    Defendants did not adjust the in-vitro dissolution results that they submitted to FDA in the ANDAs to account for any evaporation that occurred through 10 hours.  [See PX 212, Andrx standard test method "STM# FP-028, at Andrx 00833 (in the calculation of amount of MPH released, the dissolution media volume is a *constant* value (500 mL)); PX 210, Andrx 00201 (referencing Andrx test method "STM# FP-028)].

855.    Defendants' expert Dr. Banakar recalculated Plaintiffs' dissolution data for the 54 mg, 36 mg and 27 mg ANDA products on the assumption that 100% drug release occurred at 24 hours.  [Expected testimony of Dr. Banakar; Banakar Rebuttal Expert Report, at 21, fn. 5 – the data was adjusted "so that at 24 hours there is 100% recovery."].

856.    Dr. Banakar's recalculated ("normalized") release rate values are not representative of the ANDA products because the full release specification for the ANDA products in a pH 7.5 dissolution medium is 10 hours, not 24 hours.  [PX 210, ANDA for 54 mg

product, Andrx Proposed Dissolution Method, at P ALZ 0199 – "the last interval, 0-10 hr,

evaluates the *full release* of the labeled quantity of methylphenidate hydrochloride."].

857.    In ARL dissolution tests on the 36 mg and 27 mg ANDA products, hourly

samples of the dissolution medium were withdrawn through 12 hours, which was the last time

point in these tests.  [Expected testimony of Ms. Gray; PX 229, at P ALZ 004457 (under

"Dissolution Methodology")].

858.    Dr. Banakar recalculated Plaintiffs' test results on the 36 mg and 27 mg ANDA

products even though none of the % Recovery values at 12 hours (the final sampling time)

exceeded Dr. Banakar's acceptability limit of 105%.  [PX 239, ARL results on 36 mg ANDA

product, showing % Recovery results at 12 hours for individual tablets ranging from 98.11% to

104.49%; PX 240, ARL results on 27 mg ANDA product, showing % Recovery results at 12

hours for individual tablets ranging from 98.19% to 104.6%; Banakar Deposition Transcript, at

228 ("I would give benefit of the doubt to 105 percent which is generally acceptable.")].

859.    Dr. Banakar acknowledged that, even after his "normalization" of the data, the

dissolution results for the 36 mg ANDA products demonstrate that 7 out of 12 tablets still

infringe claim 1 of the '373 patent (under the analysis applied by Ms. Gray).  [Expected

testimony of Dr. Banakar; Banakar Rebuttal Expert Report, at 22, fn. 6].

860.    Dr. Banakar acknowledged that, even after his "normalization" of the data, the

dissolution results for the 27 mg ANDA products demonstrate that all 12 tablets still infringe

claim 1 of the '373 patent (under the analysis applied by Ms. Gray).  [Expected testimony of Dr.

Banakar; Banakar Rebuttal expert report, at 22, fn. 6].

861.    Dr. Banakar stated that his normalization of Plaintiffs' dissolution results had a "disparate effect" on each of the three dosage strengths and that the dissolution results on the 54 mg ANDA product were most affected by his alteration of the data.  [Expected testimony of Dr. Banakar; Banakar Rebuttal expert report, at 22, fn. 6].

**Responsive Findings of Fact**

**IV.    Indefiniteness**

900.    In accordance with the Court's claim construction, release rate is determined by an appropriate in-vitro dissolution test.  [D.I. 130, at 2].

901.    The phrase an "appropriate dissolution test" as used in the specification of the '373 patent and the Court's construction of the ascending release rate element of claim 1 of the '373 patent is not indefinite because it would be readily understood by individuals experienced in the field of dissolution testing as of 1996-1999.  [Expected Testimony of Ms. Gray].

902.    A person experienced in dissolution testing as of 1996-1999 would readily understand that "appropriate dissolution test" refers to in-vitro dissolution testing conditions that are appropriate for the dosage form being subjected to dissolution testing.  [Expected testimony of Ms. Gray].

903.    Implementing an appropriate dissolution test for a particular dosage form containing methylphenidate is routine.  [Expected testimony of Ms. Gray].

904.    The choice of a suitable dissolution apparatus and testing conditions (e.g., agitation rate, temperature, media and pH) is reasonably limited and not "infinite," because a person experienced in dissolution testing would follow established dissolution testing recommendations, guidelines and practices, such as the standard procedures published in the USP.  [Expected testimony of Ms. Gray].

905.    The number of parameters involved in the design of an appropriate dissolution test are limited in number and do not involve complex analyses.  [Expected testimony of Ms. Gray].

906.    The selection of an appropriate dissolution apparatus and testing conditions is well within the capability of a person familiar with dissolution testing procedures and the extensive literature on dissolution testing.  [Expected testimony of Ms. Gray].

907.    In-vitro dissolution testing has been and remains one of the most common analytical techniques used to characterize a pharmaceutical dosage form, particularly a controlled or extended release dosage form.  [Expected testimony of Ms. Gray].

908.    The techniques used in performing dissolution tests are well known, validated by industry standards, and simple to select and perform.  [Expected testimony of Ms. Gray].

909.    The published materials in the field of dissolution testing provide extensive guidance on the design of testing methods for particular types of dosage forms.  [Expected testimony of Ms. Gray].

910.    The literature resources that are available to, and would be consulted by, persons working in the field of dissolution testing include (i) the United States Pharmacopeia and National Formulary (USP); (ii) Industry Guidances and other publications from the Food and Drug Administration (FDA); and (iii) other literature documenting dissolution testing procedures.  [Expected testimony of Ms. Gray; e.g., PX 441-443, PX 445-446].

911.    The dissolution properties of most, if not all, extended-release pharmaceutical dosage forms can be tested using an "official" USP (compendial) apparatus and methods. [Expected testimony of Ms. Gray].

912.    The selection and development of an "appropriate" dissolution test is based on well-known considerations.  [Expected testimony of Ms. Gray].

913.    First, and of primary importance, a person experienced in dissolution testing as of 1996-1999 would consider the dosage form itself, and how the dosage form is designed to deliver the active ingredient, when selecting an appropriate dissolution test.  [Expected testimony of Ms. Gray].

914.    This person would know, as common sense suggests, that a controlled or extended release mechanism acts to impose the conditions under which the drug is released from the modified release dosage form.  [Expected testimony of Ms. Gray].

915.    The USP reflects the common knowledge that the nature of the dosage form was a central factor in selecting an appropriate dissolution test.  [Expected testimony of Ms. Gray; PX 441, USP General Chapter <1088>, P ALZ 4385-4386 at P ALZ 4386 (referring to the "solubility characteristics of the drug or the formulation" and "formulation design" in choosing suitable dissolution test conditions)].

916.    As of 1996, there were seven dissolution apparatus and associated techniques recognized and catalogued in the USP.  [See PX 441, USP 23, General Chapters <711> and <724> (describing USP Apparatus 1 through 7)].

917.    USP Apparatus 1-7 were in use as of 1999, and remain the "official" USP apparatus today.  [Expected testimony of Ms. Gray].

918.    A person experienced in dissolution testing in 1996-1999 would initially select one of the recommended USP apparatus to evaluate the dissolution properties of an oral extended-release pharmaceutical dosage form.  [Expected testimony of Ms. Gray].

919.    In the case of oral, solid extended release dosage forms containing methylphenidate, a person experienced in dissolution testing would initially select either USP Apparatus 1 or USP Apparatus 2, which are the preferred apparatus.  [Expected testimony of Ms. Gray].

920.    The USP App. 1 and App. 2 were the two most common methods used for dissolution tests in the United States as of 1996 (and today).  [Expected testimony of Ms. Gray].

921.    Everyone involved in dissolution testing, including regulatory agencies like FDA, is familiar with the USP Apparatus 1 and Apparatus 2 methods and it is expected that dissolution tests for oral, solid dosage forms will use one of these two methods whenever possible.  [Expected testimony of Ms. Gray].

922.    USP Apparatus 1 (basket) and Apparatus 2 (paddle) are simple, robust and standardized devices that are universally accepted and supported by the widest experience of use.  [PX 442 at P ALZ 8751].

923.    Because of their advantages, USP Apparatus 1 and Apparatus 2 are consistently recommended as the first choices for the in-vitro dissolution testing of modified release dosage forms.  [PX 442 at P ALZ 8751; Expected testimony of Ms. Gray].

924.    In some instances, individuals experienced in dissolution testing might consider USP App. 3 or App. 4 for dissolution testing of oral, solid dosage forms containing methylphenidate.  [Expected testimony of Ms. Gray].

925.    Individuals experienced in dissolution testing would know that the primary application of USP App. 3 is for controlled or extended release dosage forms where pH change during the test run is needed.  [Expected testimony of Ms. Gray].

926.    Unless the design of the dosage form requires a pH change during the test run, individuals experienced in dissolution testing would be unlikely to select USP App. 3 for an oral, solid extended release dosage form containing methylphenidate.  [Expected testimony of Ms. Gray].

927.    Individuals experienced in dissolution testing would also know that the primary application of USP App. 4 is for solid dosage forms containing low-solubility drugs.  [Expected testimony of Ms. Gray].

928.    Individuals experienced in dissolution testing would be very unlikely to select USP App. 4 for an oral, solid extended release dosage form containing methylphenidate because MPH is not a low-solubility drug.  [Expected testimony of Ms. Gray; PX 447 at P ALZ 8790 ("[Methylphenidate] formulations contain this basic drug … as the hydrochloride salt, providing a highly soluble form suitable for dissolution in the fluids of the gastrointestinal tract.")].

929.    The USP also includes three other types of apparatus for dissolution testing.  [*See* PX 441, USP 23, pp. 1793-1799 (disclosing USP Apparatus 5 through 7)].

247

930.    Two USP apparatus – App. 5 and App. 6 – were originally developed for non-oral dosage forms, particularly transdermal dosage forms.  [Expected testimony of Ms. Gray; PX 441, USP 23, at P ALZ 4381-4382 (describing USP App. 5 and App. 6 as drug release tests for transdermal delivery systems)].

931.    USP App. 7 was originally developed by ALZA to test certain osmotic extended release methylphenidate dosage forms, including those exemplified in the specification of the '373 patent.  [Expected testimony of Ms. Gray].

932.    Individuals experienced in dissolution testing as of 1996-1999 seeking to determine the in-vitro release properties of transdermal systems would first consider USP App. 5 as an appropriate method.  [Expected testimony of Ms. Gray].

933.    USP App. 6 and 7 would be considered alternate methods for transdermal system testing if the USP App. 5 method proved to be unsuitable for a particular transdermal system. [Expected testimony of Ms. Gray].

934.    Once a dissolution apparatus is selected, there are a limited number of test conditions that an individual experienced in dissolution testing must select.  These test conditions include:  (1) agitation rate; (2) dissolution medium (e.g. water); (3) media temperature and (4) pH of the test medium.  [Expected testimony of Ms. Gray].

935.    The number of standard variables for each category of test condition is fairly limited.  [Expected testimony of Ms. Gray].

936.    A person experienced in dissolution testing would know that the selection of the appropriate conditions is primarily dictated by the type of USP apparatus used and the extended release mechanism in the MPH dosage form being tested.  [Expected testimony of Ms. Gray].

937.    In this regard, a person experienced with dissolution testing would consult the USP's guidance in the selection of appropriate dissolution testing conditions.  [Expected testimony of Ms. Gray].

938.    A primary reason for having "official" dissolution methods, such as those provided in USP, is to establish "standard" testing conditions that minimize the number of variables in dissolution testing.  [Expected testimony of Ms. Gray].

939.    When testing with USP App. 1, common practice dictates a rotation speed of 100 rpm and a temperature of 37°C.  [Expected testimony of Ms. Gray; PX 441, USP 23 at P ALZ 4376-4377 and P ALZ 4386].

940.    The USP guides the selection of a suitable dissolution medium, stating that water is preferred, but that buffered aqueous solutions within certain pH ranges may be used "if substantiated by the solubility characteristics of the drug or the formulation."  [PX 441, at P ALZ 4386].

941.    If a dosage form were designed to release the active ingredient at a particular pH, the appropriate dissolution test would be conducted at or reasonably above that pH.  [Expected testimony of Ms. Gray].

942.    The FIP Guidelines for dissolution testing are also a resource that provides recommendations on the test conditions that should be used in an appropriate dissolution test. [PX 442-443].

943.    Another consideration that guides the range of dissolution test conditions used is the requirement that a dissolution method adequately characterize the dissolution profile of the dosage form.  In the case of an extended release dosage form, the dissolution method should yield a dissolution curve representative of how the dosage form is designed to operate over time. [Expected testimony of Ms. Gray].

944.    An example of how a person experienced in dissolution testing could determine an appropriate dissolution test for an oral, solid extended release dosage form containing methylphenidate (specifically, Andrx's ANDA products) is presented in Plaintiff's Opening Pretrial Submission, at PFF ¶¶ 134-157.  [Expected testimony of Ms. Gray].

945.    The selection of an appropriate dissolution test for transdermal systems is within the skill of persons experienced in dissolution testing, and the general approach does not differ from the process described for oral, solid dosage forms.  [Expected testimony of Ms. Gray].

946.    In the case of the exemplary osmotic dosage forms disclosed in the '373 patent, USP App. 7 is an appropriate dissolution method.  [Expected testimony of Ms. Gray].

947.    As of 1996 (and through 1999), the USP recognized a limited number of oral dosage forms – specifically, tablets and capsules – and transdermal systems as the known and accepted extended release dosage forms for drug substances.  [Expected testimony of Ms. Gray].

948.    Even if one were to assume that the number of dosage forms covered by claim 1 of the '373 patent is large, the number of appropriate dissolution tests for each particular dosage form is not "infinite".  [Expected testimony of Ms. Gray].

949.    The USP-recommended practice of using the characteristics of the dosage form as the primary determinant for selecting an appropriate dissolution test method significantly reduces the number of choices that would be relevant to any particular dosage form.  [Expected testimony of Ms. Gray].

950.    No amount of manipulation, beyond the typical dissolution methodology, will cause a dosage form to release its active ingredient at an ascending rate of release *if the dosage form itself was not designed to yield such a release pattern*.  [Expected testimony of Ms. Gray].

## CONCLUSIONS OF LAW

**A.    The '373 Patent Is Novel and Not Obvious**

CL1.    The ultimate conclusion of obviousness is a question of law based on underlying facts.  *Pfizer, Inc. v. Apotex, Inc.*, 408 F.3d 1348, 1359 (Fed. Cir. 2007).

CL2.    Defendants bear the burden of establishing the claims are invalid for reasons of obviousness by clear and convincing evidence.  *Glaxo Group Ltd. v. Apotex, Inc.,* 376 F.3d 1339, 1348 (Fed. Cir. 2004).

CL3.    An invention is patentable under §103 if a person of ordinary skill in the art would not have considered the differences between the claimed invention and the prior art obvious at the time the invention was made.  *KSR International v. Teleflex, Inc.*, 127 S.Ct. 1727 (2007).

CL4.    The analysis for obviousness requires four factual determinations to be made by the Court:  "1) 'the scope and content of the prior art';  2) the 'differences between the prior art and the claims'; 3) 'the level of ordinary skill in the pertinent art';  and 4) objective evidence of nonobviousness."  See, *Takeda Chemical Industries v. Alphapharm PTY, Ltd.*, 492 F.3d 1350 (Fed. Cir. 2007).  And, "[w]hile the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls."  *KSR* at 1734.

CL5.    Factors that may be considered in determining level of ordinary skill in the art include:  (1) the educational level of the inventor;  (2) type of problems encountered in the art;  (3) prior art solutions to those problems;  (4) rapidity with which innovations are made;  (5)

sophistication of the technology; and (6) educational level of active workers in the field. See, *Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693 (Fed. Cir. 1983).

CL6.  The use of hindsight is prohibited in an obviousness analysis. *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966); *see also In re Omeprazole Patent Litigation*, 483 F.3d 1364, 1381 (Fed. Cir. 2007).

CL7.  To establish a *prima facie* showing of obviousness of a patent claim, the evidence must show "some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references." *In re Fine*, 837 F.2d 1071, 1074 (Fed. Cir. 1988).

CL8.  A suggestion or motivation to combine may come from within the references themselves or may come from the knowledge held by the person of ordinary skill. *KSR*, 127 S. Ct. at 1742.

CL9.  Objective indicia of nonobvious, or "secondary considerations," are also relevant to determining the obviousness or nonobviousness of the asserted claims. Secondary considerations include commercial success, long felt but unsolved needs, copying, and the failure of others. *Graham v. John Deere Co.*, 383 U.S. 1, 16-17 (1966); *Akamai Technologies, Inc. v. Cable & Wireless Internet Services, Inc.* 344 F.3d 1186, 1196 (Fed. Cir. 2003).

CL10.  Secondary considerations of non-obviousness are presumed to have a nexus to a claimed invention if the article sold falls within the scope of the claims. *See J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

CL11.  A long-felt need existed for a once-a-day treatment method for ADD and ADHD.

CL12.  The claimed treatment methods provide a surprising and unexpectedly superior way of treating ADD and ADHD.

CL13.  Defendants copied the commercial embodiment of the claimed invention.

CL14.  The claimed invention enjoys substantial commercial success.

CL15.  The asserted claims are valid and not obvious under 35 U.S.C. §103.

**B.     The Claims-in-Suit are Fully Enabled under 35 U.S.C. § 112, First Paragraph**

CL16.  Enablement is assessed using the perspective of a person skilled in the relevant art.  *See, e.g., In re Smythe*, 480 F.2d 1376, 1383 (C.C.P.A. 1973).

CL17.  A claim is enabled if a person skilled in the art can practice the invention as claimed without undue experimentation.  35 U.S.C. §112, first paragraph; *In re Wands,* 858 F.2d 731, 737 (Fed. Cir. 1988).

CL18.  Defendants must prove by clear and convincing evidence that undue experimentation would be required to practice the claimed invention.  *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1155 (Fed.Cir. 2004).

CL19.  Whether "undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations."  *Id.* These factors include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims."  *Id.*; *see also Chiron v. Genentech,* 363 F.3d 1247, 1256 (Fed. Cir. 2004).

CL20.  The asserted claims are valid and enabled under 35 U.S.C. §112, first paragraph.

CL21.  The asserted claims are valid and are not "impermissible single means" claims.

CL22.  The asserted claims are not "means plus function" claims.  The "means plus function" provisions of ¶6 of §112 only apply to claims that expressly invoke the language "means for" or "steps for" achieving a specified result.  *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005).

## C.    The Claims-in-Suit are Definite Under 35 U.S.C. §112, Second Paragraph

CL23.  A claim that is amenable to construction by the Court will not be found indefinite under §112, second paragraph.  *Aero Products International, Inc. v. Intex Recreation Corp*, 466 F.3d 1000 (Fed. Cir. 2007).

CL24.  A claim whose "bounds" can be ascertained and understood by a person skilled in the relevant art is not indefinite under §112, second paragraph.  *Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed.Cir.2001).

CL25.  The asserted claims are definite and valid under 35 U.S.C. §112, second paragraph.

## D.    ALZA Infringes the Asserted Claims

CL26.  A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States during the term of the patent. . ."  35 U.S.C. §271(a).

CL27.  Plaintiffs' suit against Andrx for patent infringement is predicated on Defendants' filing of two ANDAs with FDA seeking approval for a generic version of CONCERTA®, acts which give rise to an infringement suit under 35 U.S.C. § 271(e)(2).  *See Abbott Labs. v.*

*Torpharm, Inc.*, 300 F.3d 1367, 1371 (Fed. Cir. 2002); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1244-45 (Fed. Cir. 2000); 35 U.S.C. § 271(e)(2).

CL28.  A patent infringement analysis involves two steps.  First, the court determines the meaning of the patent claims as a matter of law.  Second, the court compares the properly construed claims to the allegedly infringing product or method.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

CL29.  A patent owner may establish infringement under either of two theories: literal infringement or the doctrine of equivalents.  Literal infringement exists if each element of at least one claim of a patent is met by the alleged infringer's product.  *Panduit Corp. v. Dennison Mfg. Corp.*, 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987); *Merck & Co. Inc. v. Teva Pharm. USA, Inc.*, 228 F. Supp. 2d 480, 485 (D. Del. 2002).

CL30.  The patentee bears the burden of proving infringement by a preponderance of the evidence.  A preponderance of the evidence means such evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not.  *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n. 15 (Fed. Cir. 2005).

CL31.  Where, as here, the infringement inquiry is provoked by an ANDA filing, the question of infringement focuses on what is likely to be sold or used following FDA approval.  *Abbott Labs.*, 300 F.3d at 1373; *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1047 (Fed. Cir. 2001) ("the infringement inquiry focuses on the hypothetical infringement that would occur if the defendant's [A]NDA were approved and the defendant began to make and sell the drug.").

CL32.  Infringement is established when a plaintiff proves, by a preponderance of the evidence, that the accused product or method *sometimes* meets all of the limitations of the asserted patent claims.  *Bell Commc'ns. Research, Inc. v. Vitalink Commc'ns. Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) ("an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."), *quoted in Impax Labs., Inc. v. Aventis Pharms., Inc.*, No. Civ.A. 02-581 JJF, 2004 WL 253482, at *3 (D. Del. Feb. 5, 2004); *Purdue Pharma, L.P. v. F.H. Faulding and Co.*, 48 F. Supp.2d 420, 439 and 441 (D. Del. 1999) (finding infringement of method of treatment claims where all the elements of the claims were present in "the accused use of…[defendant's drug product] *in some patients*"), *aff'd*, 230 F.3d 1320 (Fed. Cir. 2000) ; *Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 815 F. Supp. 1488, 1512 (D. Del. 1993) ("it is of no moment that in certain modes of operation…[defendant's product] may not operate in a way that would infringe the '145 patent.  It matters only that the accused device operate in an infringing way at some time."), *aff'd*, 18 F.3d 927 (Fed. Cir. 1994).

CL33.  Infringement is a question of fact.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005).

CL34.  35 U.S.C. § 271(b) states, "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).

CL35.  An alleged infringer is liable for inducing infringement if: (1) the alleged infringer knew of the patent; (2) the alleged infringer's action induced the infringing acts, and (3) the alleged infringer intended to encourage another's infringement.  *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).

CL36. Direct infringement of a patent claim under 35 U.S.C. § 271(a) is a prerequisite to finding that a party has induced infringement of the claim. *Water Tech. Corp. v. Calco Ltd.*, 850 F.2d 660, 668 n. 7 (Fed. Cir. 1988).

CL37. A party may be found liable for induced infringement when it sells a product and provides instructions on how to use it in an infringing manner. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1360 (Fed. Cir. 2006); *In re Omeprazole Patent Litigation*, 490 F. Supp.2d 381, 485-86 (S.D.N.Y. 2007) (Defendant ANDA filer found to induce infringement of method of treatment claim based on package insert for generic product); *see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) ("[I]nstructing how to engage in an infringing use show[s] an affirmative intent that the product be used to infringe….").

CL38. Direct and induced infringement may both be proven through circumstantial evidence. *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960).

CL39. To establish contributory infringement, plaintiffs must show that Defendants knowingly induced infringement and possessed specific intent to encourage another's infringement and that the ANDA products are "not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. §271(c); *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1312 (Fed. Cir. 2005). Direct infringement of a

patent claim under 35 U.S.C. § 271(a) is a prerequisite to finding that a party has contributorily infringed a claim.  *Id.*

**E.    ALZA Infringes the Asserted Claims**

CL40.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of Claim 1, 6 and 7 of the '373 patent.

CL41.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will induce infringement of Claim 1, 6 and 7 of the '373 patent.

CL42.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Andrx's activities relating to the ANDA products will contributorily infringe Claim 1, 6 and 7 of the '373 patent.

CL43.  35 U.S.C. §271(e)(4) provides that for an act of infringement described by §271(e)(2), the patent owner's remedies include the following:

> (A)  the court shall order the effective date of any approval of the drug. . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed;

> (B)  injunctive relief may be granted against an infringed to prevent the commercial manufacture, use, offer to sell, or sale within the United States. . .

> (C)  damages or other monetary relief may be awarded against an infringer. . .

CL44.  As a remedy for Defendants' infringement, the Court shall order that any approval of Andrx ANDA Nos. 76-665 and/or 76-772 by FDA occur no earlier than January 31, 2018, the date on which the patent-in-suit and the existing FDA (pediatric) exclusivity attached thereto

expires.  The Court may also grant such other relief as the Court determines is just and proper.

35 U.S.C. § 271(e)(4); *see,* e.g., *Celgene Corp. v. Teva Pharms. USA, Inc.*, 412 F. Supp. 439,

441-42 (D.N.J. 2006).

      CL45.  As a remedy for Defendants' infringement, the Court shall enjoin Defendants, and

any successor-in-interest to the ANDAs, from manufacturing, offering to sell, selling, or using

within the United States, or importing into the United States, Methylphenidate Hydrochloride

Extended-Release Tablets (54, 36, 27 and 18 mg) in accordance with ANDA Nos. 76-655 and

76-772 during the life (including applicable FDA exclusivity) of the '373 patent.  35 U.S.C. §

271(e)(4); *see,* e.g., *Celgene Corp. v. Teva Pharms. USA, Inc.*, 412 F. Supp. 439, 441-42 (D.N.J.

2006).

<table>
<tr><td><i>Of Counsel</i></td><td>ASHBY & GEDDES</td></tr>
<tr><td></td><td><i>/s/ Steven J. Balick</i></td></tr>
<tr><td>David T. Pritikin<br>Thomas D. Rein<br>SIDLEY AUSTIN LLP<br>One S. Dearborn Street<br>Chicago, IL  60603<br>312-853-7000</td><td>Steven J. Balick (I.D. #2114)<br>John G. Day (I.D. # 2403)<br>Tiffany Geyer Lydon (I.D. # 3950)<br>500 Delaware Avenue, 8th Floor<br>P.O. Box 1150<br>Wilmington, Delaware 19899<br>302-654-1888</td></tr>
<tr><td>-and-</td><td></td></tr>
<tr><td>Jeffrey P. Kushan<br>Todd A. Wagner<br>SIDLEY AUSTIN LLP<br>1501 K Street, N.W.<br>Washington, D.C.  20005<br>202-736-8000</td><td>sbalick@ashby-geddes.com<br>jday@ashby-geddes.com<br>tlydon@ashby-geddes.com<br><br><i>Attorneys for Plaintiffs</i><br><i>ALZA Corporation and McNeil PPC, Inc.</i></td></tr>
<tr><td>-and-</td><td></td></tr>
<tr><td>Michael D. Hatcher<br>SIDLEY AUSTIN LLP<br>717 North Harwood, Suite 3400<br>Dallas, TX  75201<br>214-981-3300</td><td></td></tr>
<tr><td>Dated:   December 4, 2007</td><td></td></tr>
</table>