UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| ALZA CORPORATION, and McNEIL-PPC, INC., | ) **REDACTED** ) **PUBLIC VERSION** ) ) Civil Action No.: 05-642-JJF ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| ANDRX PHARMACEUTICALS, L.L.C., and ANDRX CORPORATION, | ) ) ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' PROPOSED POST-TRIAL FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

*Of Counsel*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, IL 60603
312-853-7000

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC 20005
202-736-8000

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood, Suite 3400
Dallas, TX 75201
214-981-3300

Dated:  June 16, 2008

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
302-654-1888

*Attorneys for Plaintiffs
ALZA Corporation and McNeil PPC, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... viii

TABLE OF ABBREVIATIONS AND DEFINITIONS.................................... xiii

TABLE OF EXPERT WITNESSES ......................................................... xiv

TABLE OF FACT WITNESSES .............................................................xv

I.    BACKGROUND .......................................................................1

      A.    The Parties ...................................................................1

      B.    The Nature of The Dispute ..............................................2

II.   ALZA SCIENTISTS DISCOVER A NEW ONCE-DAILY METHOD
      FOR TREATING ADHD USING AN ASCENDING MPH RELEASE
      RATE AND SUBSTANTIALLY ASCENDING PLASMA DRUG
      CONCENTRATION PROFILE ...................................................3

      A.    ADHD: A Serious Disorder with Limited Treatment Options ...................3

      B.    The Long-Felt Need for a Once-Daily MPH Dosage Form and the
            Failure of Ritalin SR® to Meet this Need ...................................6

      C.    ALZA Scientists Discover the First Reliably Effective Once-a-Day
            MPH Treatment for ADHD .......................................................13

      D.    ALZA Obtains the '373 Patent.................................................23

III.  USE OF DEFENDANTS' PROPOSED GENERIC DRUG PRODUCTS
      WILL LITERALLY INFRINGE CLAIMS 1, 6, AND 7 OF THE '373
      PATENT ............................................................................27

      A.    ANDA Nos. 76-665 and 76-772 ................................................27

      B.    Defendants' Extended-Release MPH Tablets (the "ANDA
            Products").....................................................................28

      C.    Literal Infringement of Claim 1 of the '373 Patent .......................32

            1.    An "Appropriate" in vitro Dissolution Test for the ANDA
                  Products..............................................................33

            2.    USP Apparatus 1 Is Appropriate for Conducting
                  Dissolution Tests on the ANDA Products ...........................35

i

3.  The ANDA Products Provide the Ascending Release Rate Profile Found in Claim 1 of the '373 Patent...................................41

    (a)  Appropriate Dissolution Tests on the 54, 36 and 27 mg ANDA Products.............................................................43

    (b)  The 18 mg ANDA Products.................................................54

4.  Use of the ANDA Products as Directed Will Result in Literal Infringement of Claim 1 ......................................................56

5.  Defendants' Arguments in Response to the Infringement Showing Made by Plaintiffs Are Without Merit............................58

    (a)  Defendants Misinterpret Parts of the Court's Claim Construction.......................................................................59

    (b)  The ANDA Products Would Infringe Even if Release of Non-IR MPH Were Required in the First Interval ..............................................................................62

    (c)  Defendants' Dissolution Tests on "DR Cores" Do Not Establish the Dissolution Properties of the Complete ANDA Products .................................................65

    (d)  Plaintiffs Used an Appropriate Dissolution Test for the ANDA Products ............................................................67

    (e)  There Is No "Error" in ARL's Dissolution Results ............71

D.  Literal Infringement of Claims 6 and 7 of the '373 Patent.........................80

1.  The Mean "Fed" Plasma Concentration Data in Defendants' ANDA Establishes that Defendants' ANDA Products Will Likely Result in a Substantially Ascending MPH Plasma Drug Concentration over about 5.5 and about 8 Hours. ...............82

2.  The Mean "Fasted" Plasma Concentration Data in Defendants' ANDA Establishes that Defendants' ANDA Products Will Likely Result in a Substantially Ascending MPH Plasma Drug Concentration over about 5.5 and about 8 Hours.........................................................................................91

3.  The Individual Plasma Concentration Data in Defendants' ANDA Establishes that Defendants' ANDA Products Will Likely Result in a Substantially Ascending MPH Plasma Drug Concentration over about 5.5 and about 8 Hours. ...............94

4.      Defendants Represented to the FDA that Their ANDA
        Products Exhibit Substantially Ascending MPH Plasma
        Concentrations for Both about 5.5 Hours and about 8
        Hours. ...........................................................................................99

5.      Defendants' Proposed 18, 27, And 36 mg ANDA Products
        Will Be Administered in a Manner that Achieves a
        Substantially Ascending MPH Plasma Drug Concentration
        over a Time Period of both about 8 Hours and about 5.5
        Hours Following Said Administration. .......................................102

IV.     UPON APPROVAL OF THE ANDAs, DEFENDANTS WILL
        ACTIVELY INDUCE INFRINGEMENT OF THE '373 PATENT .................104

V.      UPON APPROVAL OF THE ANDAs, DEFENDANTS WILL
        CONTRIBUTORILY INFRINGE THE '373 PATENT .....................................105

VI.     THE CLAIMED INVENTIONS WOULD NOT HAVE BEEN OBVIOUS
        TO A PERSON OF ORDINARY SKILL IN THE ART AT THE TIME
        OF THE INVENTION .......................................................................................106

        A.      Overview ...............................................................................................107

        B.      The Inventions Claimed in the '373 Patent .............................................114

        C.      The Level of Ordinary Skill in the Art....................................................115

        D.      The Scope and Content of the Prior Art...................................................116

                1.      The Prior Art Did Not Provide a Clear Explanation for the
                        Failures of Ritalin SR® .......................................................................116

                        (a)     The Pelham 1987 and Pelham 1990 Articles ..................117

                        (b)     The Greenhill Publications Did Not Identify Acute
                                Tolerance as the Reason for the Difference in
                                Efficacy Between Ritalin SR® and the Immediate-
                                Release Ritalin® BID and TID Regimens........................118

                        (c)     Birmaher 1989 ................................................................119

                        (d)     The 1991 Perel Abstract..................................................121

                        (e)     Greenhill 1992 ................................................................122

                2.      The Prior Art Showed that Only a BID or TID Regimen
                        Provided Effective Extended Treatment of ADHD....................124

3.   The 1996 "MTA Study" Recommendations Teach Away from the Claimed Invention ........................................................ 128

4.   The CNS Stimulant Art Would Not Have Been Considered Useful to a Person of Ordinary Skill Attempting to Design a New Once-a-Day MPH Dosage Form and Would Not Have Suggested that MPH Exhibits Acute Tolerance or a Solution to this Problem ............................................................. 129

     (a)   The Angrist Publication ................................................... 130

5.   The Published Work of the ALZA Scientists Describing the Discovery of the Claimed Inventions Established for the First Time that MPH Exhibits Acute Tolerance ......................... 131

6.   The Prior Art Did Not Establish a Connection Between Acute Tolerance and MPH, but Even if It Did, the Claimed Inventions Would Not Have Been Obvious ................................. 133

7.   The Various Nitrate References Cited by Defendants Confirm the Importance of Using an Intermittent Dosing Profile to Overcome Acute Tolerance ......................................... 136

8.   The Various Nitrate References Cited by Defendants Do Not Provide Any Indication that the Proposed Approaches for Overcoming Acute Tolerance Were Capable of Actually Achieving that Goal ....................................................... 140

9.   The Drug Delivery and Plasma Concentration Profiles Disclosed in the Various Nitrate References Cited by Defendants Would Not Have Been Suitable for the Treatment of ADHD .................................................................... 143

E.   The Differences Between the Prior Art and the Claimed Invention ........ 146

     1.   The Knowledge in the Art Before the Inventions Taught Away from the Claimed Treatment Methods ............................. 148

     2.   The Prior Art Did Not Provide a Motivation to Arrive at the Drug Release and Plasma Concentration Profiles Encompassed by Claimed Inventions ......................................... 150

     3.   The Person of Ordinary Skill in the Art Would Not Have Held a Reasonable Expectation that the Claimed Inventions Could Be Successfully Employed to Solve the Need for a Once-Daily MPH Dosage Form .................................................. 152

4.    The Claimed Inventions Would Not Have Been Obvious to Try ................................................................................154

5.    The Claimed Inventions Were Not Predictable ..........................159

F.    Secondary Considerations Support the Nonobviousness of the Claims ................................................................................160

1.    Long-Felt, But Unmet Needs and the Failure of Others .............161

2.    Unexpected Results....................................................................161

3.    Commercial Success ..................................................................162

(a)    Nexus Between CONCERTA® and the Asserted Claims .......................................................................166

(b)    CONCERTA® Is Within the Scope of the Asserted Claims .......................................................................167

(c)    Sales Data Establishes that CONCERTA®'s Delivery Profile Is Responsible for its Commercial Success ......................................................................168

(d)    No Other Factors Explain the Commercial Success of CONCERTA® ...............................................170

4.    Copying......................................................................................172

VII.    THE CLAIMED INVENTIONS ARE NOT ANTICIPATED BY THE PRIOR ART.................................................................................173

VIII.    THE CLAIMS-IN-SUIT ARE FULLY ENABLED .........................................175

A.    The Claims-in-Suit Are Directed to Treatment Methods that Use Oral Dosage Forms ..............................................................175

B.    The Claims-in-Suit Are Fully Enabled under 35 U.S.C. § 112, First Paragraph ......................................................................179

1.    While the Claimed ADHD Treatment Methods Were Not Predictable, Producing a Dosage Form that Released MPH at an Ascending Rate for an Extended Period of Time Was........179

2.    Routine, Not Undue Experimentation, Is All that Would Be Required to Produce Extended-Release Dosage Forms that Meet Desired Release Rate Characteristics, as Illustrated by the Extensive Guidance in the Prior Art ....................................181

|   | (a) | Erodible Systems ................................................................184 |
|   | (b) | pH-Controlled Erosion Coatings.......................................185 |
|   | (c) | Non-Uniform Drug Concentration.....................................188 |
|   | (d) | Other Techniques for Making an Ascending Release Dosage Form................................................................189 |
|   | (e) | Transdermal Patches .........................................................190 |

**3.** Implementing a Desired Dissolution or Plasma Profile Would Have Been a Matter of Routine Effort for a Person Skilled in the Field of Extended-Release Formulation Development as of the Filing Date of the Patent. ........................192

    (a) Controlled Release Dosage Forms Development Is a Predictable Field ................................................................192

    (b) Level of Skill of Extended-Release Dosage Form Developers Is High .............................................................193

    (c) The Quantity of Experimentation Needed to Develop Suitable Extended-Release Dosage Forms Is Reasonable ........................................................................195

    (d) The Absence of Working Examples of Non-Osmotic Dosage Forms in the Specification Is Immaterial Given Breadth of Teachings in the Prior Art, Predictability in the Field and Abilities of the Person Skilled in the Art ................................................197

**4.** There Is No Evidence that the ALZA Scientists Were Unable to Develop Non-Osmotic Dosage Forms to Implement the Invention ............................................................198

    (a) ALZA's Research Efforts Focused on Osmotic Dosage Forms Because that Was the Field Where it Had Intellectual Property and Special Expertise .............198

**IX.** CONCLUSIONS OF LAW .........................................................200

    **A.** Jurisdiction.............................................................................200

    **B.** Infringement by The Defendants ...........................................201

        **1.** Legal Standard for Infringement....................................201

        **2.** Plaintiffs' Remedy for Infringement by the Defendants ..............205

**C.**     The Asserted Claims Would Not Have Been Obvious ..........................206

**D.**     The Asserted Claims Were Not Anticipated ............................................209

**E.**     The Claims-in-Suit Are Fully Enabled under 35 U.S.C. § 112, First
Paragraph ...........................................................................................................211

**X.**     CONTINGENT PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW FOR THE PREVIOUSLY ASSERTED
CLAIMS OF THE '129 PATENT ......................................................................212

**A.**     ALZA Obtains the '129 Patent ..............................................................213

**B.**     Literal Infringement of Claims 1 and 4-6 of the '129 Patent ..................215

**C.**     The Claimed Inventions of the '129 Patent Would Not Have Been
Obvious ................................................................................................216

**D.**     The Claimed Inventions of the '129 Patent Are Not Anticipated by
the Prior Art .........................................................................................216

**E.**     The '129 Patent Claims Are Fully Enabled .............................................217

**F.**     CONCLUSIONS OF LAW FOR THE '129 PATENT ...........................217

     **1.**     Infringement by the Defendants ................................................218

     **2.**     The Asserted Claims Would Not Have Been Obvious ...............219

     **3.**     The Asserted Claims Were Not Anticipated ...............................219

     **4.**     The '129 Patent Claims Are Fully Enabled under 35 U.S.C.
§ 112, First Paragraph .................................................................219

# TABLE OF AUTHORITIES

*Abbott Laboratories v. Torpharm, Inc.*,
   300 F.3d 1367 (Fed. Cir. 2002)...........................................................................201, 202

*Akamai Techs, Inc. v. Cable & Wireless Internet Services, Inc.*,
   344 F.3d 1186 (Fed. Cir. 2003)...........................................................................208

*Baldwin Graphic System Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008)...........................................................................97

*Bayer AG v. Elan Pharm. Research Corp.*,
   212 F.3d 1241 (Fed. Cir. 2000)...........................................................................201

*Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*,
   55 F.3d 615 (Fed. Cir. 1995)...............................................................................202

*Celgene Corp. v. Teva Pharms. USA, Inc.*,
   412 F. Supp. 2d 439 (D.N.J. 2006) .....................................................................206, 219

*Chiron Corp. v. Genentech*,
   363 F.3d 1247 (Fed. Cir. 2004)...........................................................................212

*Continental Can Co. v. Monsanto Co.*,
   948 F.2d 1264 (Fed. Cir. 1991)...........................................................................209, 210

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005)...........................................................................203, 204

*DSU Medical Corp. v. JMS Co, Ltd.*,
   471 F.3d 1293, 1305 (Fed. Cir. 2006)..................................................................203

*Environmental Designs, Ltd. v. Union Oil Co. of California*,
   713 F.2d 693 (Fed. Cir. 1983).............................................................................207

*Glaxo Group Ltd. v. Apotex, Inc.*,
   376 F.3d 1339 (Fed. Cir. 2004)...........................................................................206

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
   438 F.3d 1354 (Fed. Cir. 2006)...........................................................................204

*Graham v. John Deere Co. of Kansas City*,
   383 U.S. 1 (1966) ................................................................................................207, 208

*Helifix, Ltd. v. Blok-Lok, Ltd.*,
    208 F.3d 1339 (Fed. Cir. 2000)...................................................209

*Hitzeman v. Rutter*,
    243 F.3d 1345 (Fed. Cir. 2001)...................................................210

*Impax Labs., Inc. v. Aventis Pharms., Inc.*,
    No. Civ.A. 02-581 JJF, 2004 WL 253482,
    (D. Del. Feb. 5, 2004) ...............................................................202

*In re Baxter Travenol Laboratories*,
    952 F.2d 388 (Fed. Cir. 1991)....................................................209

*In re Fine*,
    837 F.2d 1071 (Fed. Cir. 1988)..................................................207

*In re Icon Health & Fitness, Inc.*,
    496 F.3d 1374 (Fed. Cir. 2007)..................................................208

*In re Omeprazole Patent Litigation*,
    483 F.3d 1364 (Fed. Cir. 2007)..................................................207

*In re Omeprazole Patent Litigation*,
    490 F. Supp. 2d 381 (S.D.N.Y. 2007)........................................204

*In re Robertson*,
    169 F.3d 743 (Fed. Cir. 1999)....................................................210

*In re Smythe*,
    480 F.2d 1376 (C.C.P.A. 1973) ..................................................211

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988)..............................................211, 212

*Interspiro USA, Inc. v. Figgie International, Inc.*,
    815 F. Supp. 1488 (D. Del. 1993),
    *aff'd*, 18 F.3d 927 (Fed. Cir. 1994) .....................................202, 203

*J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997)..................................................208

*KSR International v. Teleflex Inc.*,
    127 S. Ct. 1727 (2007)...................................................206, 207, 208

*Kalman v. Kimberly-Clark Corp.*,
    713 F.2d 760 (Fed. Cir. 1983)....................................................209

*Koito Manufacturing Co. v. Turn-Key-Tech, LLC*,
   381 F.3d 1142 (Fed. Cir. 2004)................................................................211

*Liquid Dynamics Corp. v. Vaughan Co.*,
   449 F.3d 1209 (Fed. Cir. 2006)................................................................204

*Manville Sales Corp. v. Paramount System, Inc.*,
   917 F.2d 544 (Fed. Cir. 1990)................................................................203

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995),
   *aff'd*, 517 U.S. 370 (1996)................................................................201

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   228 F. Supp. 2d 480 (D. Del. 2002)................................................................202

*Metropolitan-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
   545 U.S. 913 (2005)................................................................204

*Michalic v. Cleveland Tankers, Inc.*,
   364 U.S. 325, 330 (1960)................................................................204

*Moleculon Research Corp. v. CBS, Inc.*,
   793 F.2d 1261 (Fed. Cir. 1986)................................................................204

*Motorola, Inc. v. Interdigital Tech. Corp.*,
   121 F.3d 1461 (Fed. Cir. 1997)................................................................211

*Novartis Corp. v. Ben Venue Laboratories, Inc.*,
   271 F.3d 1043 (Fed. Cir. 2001)................................................................202

*On Demand Machine Corp. v. Ingram Industrial*,
   442 F.3d 1331 (Fed. Cir. 2006)................................................................212, 220

*Ortho-McNeil Pharm., Inc. v. Mylan Laboratories, Inc.*,
   520 F.3d 1358 (Fed. Cir. 2008)................................................................208

*Panduit Corp. v. Dennison Manufacturing Corp.*,
   836 F.2d 1329 (Fed. Cir. 1987)................................................................202

*Pfizer, Inc. v. Apotex, Inc.*,
   480 F.3d 1348 (Fed. Cir. 2007)................................................................206

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)................................................................212, 220

x

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
  98 F. Supp. 2d 362 (S.D.N.Y. 2000).......................................................................211

*Purdue Pharma, L.P. v. F.H. Faulding and Co.,*
  48 F. Supp. 2d 420 (D. Del. 1999),
  *aff'd*, 230 F.3d 1320 (Fed. Cir. 2000) ................................................................202

*Super Sack Manufacturing Corp. v. Chase Packaging Corp.,*
  57 F.3d 1054, 1055, 1060 (Fed. Cir. 1995)...........................................................217

*Takeda Chemical Industries v. Alphapharm PTY, Ltd.,*
  492 F.3d 1350 (Fed. Cir. 2007)..............................................................................207

*Transclean Corp. v. Bridgewood Services, Inc.,*
  290 F.3d 1364 (Fed. Cir. 2002)..............................................................................210

*Trintec Industrial, Inc. v. Top-U.S.A. Corp.,*
  295 F.3d 1292 (Fed. Cir. 2002)..............................................................................210

*W.L. Gore & Associates, Inc. v. Garlock, Inc.,*
  721 F.2d 1540 (Fed. Cir. 1983)........................................................................210, 211

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,*
  418 F.3d 1326 (Fed. Cir. 2005)..............................................................................202

*Water Tech. Corp. v. Calco, Ltd.,*
  850 F.2d 660 (Fed. Cir. 1988)................................................................................203

## FEDERAL STATUTES

21 U.S.C. § 321 ................................................................................................................35

21 U.S.C. § 355(j)......................................................................................................2, 200

21 U.S.C. § 355(j)(2)(A)(vii)(IV)........................................................................................27

28 U.S.C. § 1331.........................................................................................................2, 200

28 U.S.C. § 1338.........................................................................................................2, 200

28 U.S.C. § 1391.........................................................................................................2, 201

28 U.S.C. § 1400.........................................................................................................2, 201

35 U.S.C. § 103......................................................................................................209, 219

35 U.S.C. § 112..................................................................................211, 212, 219

35 U.S.C. § 271(a) ............................................................................201, 203, 205

35 U.S.C. § 271(b) .....................................................................................203

35 U.S.C. § 271(c) .....................................................................................204

35 U.S.C. § 271(e)(2)........................................................................201, 218

35 U.S.C. § 271(e)(4)...............................................................3, 205, 206, 218, 219

## TABLE OF ABBREVIATIONS AND DEFINITIONS

| | |
|---|---|
| '373 patent | ALZA's U.S. Patent No. 6,919,373 issued July 19, 2005 (PX 1). |
| '129 patent | ALZA's U.S. Patent No. 6,930,129 issued August 16, 2005 (PX 2). |
| ADHD | Attention Deficit Hyperactivity Disorder. |
| ALZA | Plaintiff ALZA Corporation. |
| ANDA | Abbreviated New Drug Application. |
| ANDRX | Andrx Pharmaceuticals, L.L.C. and Andrx Corporation, collectively. |
| App. | Apparatus; typically in reference to a USP dissolution apparatus. |
| Asserted claims | Claims 1, 6 and 7 of the '373 patent. |
| CL __ | A proposed conclusion of law. |
| $C_{max}$ | The maximum plasma concentration. |
| CONCERTA® | Plaintiffs' once-daily extended-release methylphenidate tablets for the treatment of ADHD. |
| Defendants | Andrx Pharmaceuticals, L.L.C. and Andrx Corporation, collectively. |
| DTX __ | Defendants' trial exhibit.  (Specific page numbers are identified if necessary). |
| FDA | Food and Drug Administration. |
| Fig. | Figure |
| FDCA | Food, Drug and Cosmetic Act.  21 U.S.C. 355 *et seq.* |
| PFF __ | Plaintiffs' proposed finding of fact. |
| *in vivo* | Something occurring in or found in the human body. |

| | |
|---|---|
| JDT (Witness) __ | Joint deposition testimony appendix citation; witnesses names will be provided parenthetically. |
| Markman Order | The Court's Order construing the disputed language in the '373 and '129 patent claims. (D.I. 130). |
| MPH | Methylphenidate |
| Patent Office | The United States Patent and Trademark Office. |
| PK | Pharmacokinetics refers to how a drug is absorbed, distributed, metabolized and excreted in a subject. |
| Plaintiffs | ALZA Corporation and McNeil-PPC, collectively. |
| PX __ | Plaintiffs' trial exhibit.  (Specific page numbers are identified if necessary). |
| $T_{max}$ | The time to the maximum plasma concentration. |
| Trial Tr. (Witness) | Trial transcript; witnesses names in parentheses. |

## TABLE OF EXPERT WITNESSES

| Witness Testimony Abbreviation | Witness Full Name, Identification |
|---|---|
| M. Angst | Dr. Martin Angst is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology. Dr. Angst's professional qualifications and experience in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology are provided in his Curriculum Vitae, PX 256. |
| M. Davies | Dr. Martyn Davies is an expert in biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques.  Dr. Davies' professional qualifications and experience in the fields of biophysics, drug delivery systems, surface science analysis, biomolecular interactions and analytical techniques are provided in his Curriculum Vitae, PX 179. |
| V. Gray | Ms. Gray is an expert in the field of in vitro dissolution, including development of dissolution test methods and specification setting.  Ms. Gray's professional qualifications and |

| | |
|---|---|
| | experience in the field of in vitro dissolution testing are provided in her Curriculum Vitae, PX 201. |
| K. Patrick | Dr. Patrick is an expert in the field of methylphenidate pharmacology. Dr. Patrick's professional qualifications and experience in the field of methylphenidate pharmacology are provide in his Curriculum Vitae, PX. 411. |
| R. Rozek | Dr. Rozek is an expert in the field of economics. Mr. Rozek's professional qualifications and experience in the field of economics are provided in his Curriculum Vitae, PX 495 |

**TABLE OF FACT WITNESSES**

| Witness Abbreviation | Witness Full Name, Identification |
|---|---|
| F. Alvarez | Mr. Francisco Alvarez is Director of Analytical Research at Andrx. [JDT (F. Alvarez) 4]. |
| A. Ayer | Mr. Atul Ayer is a Senior Director at ALZA. [JDT (A. Ayer) 35]. |
| B. Berry | Dr. Brian Berry is an Associate Director of Pharmacokinetics and Bioequivalents at Andrx. [JDT (B. Berry) 117]. Dr. Berry appeared as Andrx's designee pursuant to Fed. R. Civ. P. 30(b)(6). |
| X. Cheng | Dr. Cheng is an employee of Andrx, who appeared as Andrx's designee pursuant to Fed. R. Civ. P. 30(b)(6). [JDT (X. Cheng) 273]. |
| J. Chi | Jie Chi is a scientist in Andrx's analytical research group. [JDT (J. Chi) 342-43]. |
| D. Guinta | Dr. Diane Guinta is a named inventor on the patent-in-suit. [JDT (D. Guinta) 398]. |
| S. Gupta | Dr. Suneel Gupta is a named inventor on the patent-in-suit. [JDT (S. Gupta) 505]. Mr. Gupta appeared on behalf of ALZA pursuant to Fed. R. Civ. P. 30(b)(6). |
| L. Hamel | Mr. Lawrence Hamel is a named inventor on the patent-in-suit. |
| A. Lam | Mr. Andrew Lam is senior director of liquid OROS technology at ALZA. [JDT (A. Lam) 786]. |
| R. Medina | Mr. Raul Medina holds the position of supervisor analytical |

| | research II at Andrx.  [JDT (R. Medina) 990-91]. |
|---|---|
| L. Rosenthal | Mr. Lawrence Rosenthal is president of Andrx.  [JDT (L. Rosenthal) 1109].  Mr. Rosenthal appeared on behalf of Andrx pursuant to Fed. R. Civ. P. 30(b)(6). |
| S. Saks | Dr. Samuel Saks is a named inventor on the patent-in-suit. |
| P. Shivanand | Dr. Padmaja Shivanand is senior director of oral controlled-release early development at ALZA.  [JDT (P. Shivanand) 1157].  Ms. Shivanand appeared on behalf of ALZA pursuant to Fed. R. Civ. P. 30(b)(6). |
| J. Vaughn | Ms. Janet Vaughn is Andrx's director of regulatory affairs, responsible for reviewing all submissions to the FDA.  [JDT (J. Vaughn) 1210-13]. |

I.      **BACKGROUND**

    A.      **The Parties**

    1.      Plaintiff ALZA Corporation ("ALZA") is incorporated in Delaware,

having its principal place of business at 1900 Charleston Road, P.O. Box 7210, Mountain

View, CA 94039-7210.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶

1].

    2.      Plaintiff McNeil-PPC, Inc. ("McNeil") is organized under the laws of New

Jersey, having a place of business at 7050 Camp Hill Road, Fort Washington, PA 19034.

[D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 2].

    3.      Defendant ANDRX Pharmaceuticals, L.L.C. is organized under the laws

of Delaware, having its principal place of business at 2945 West Corporate Lake

Boulevard, Weston, FL 33331.  [D.I. 126, Pretrial Order, Joint Statement of Admitted

Facts, ¶ 3].

    4.      Defendant ANDRX Corporation is incorporated under the laws of

Delaware and has its principal place of business at 2945 West Corporate Lake Boulevard,

Weston, FL 33331.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 4].

    5.      ANDRX Corporation is a wholly-owned subsidiary of Watson

Pharmaceuticals, Inc., as a result of an acquisition completed on November 3, 2006.

[JDT (L. Rosenthal) 1122-23; JDT (B. Berry) 117].

    6.      This action arises under the patent laws of the United States, Title 35 of

the United States Code and the Abbreviated New Drug Application ("ANDA")

provisions of the Hatch-Waxman Amendments to the Federal Food, Drug and Cosmetic

Act, 21 U.S.C. § 355(j). This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

      7.      The Court has personal jurisdiction over Defendants.

      8.      Venue in this District is proper under 28 U.S.C. §§ 1391 and 1400.

**B.     The Nature of The Dispute**

      9.      This is a patent infringement case. Plaintiffs ALZA and McNeil filed a Complaint against Defendants (collectively "ANDRX") on September 1, 2005 alleging infringement of U.S. Patent No. 6,919,373 ("the '373 patent") and U.S. Patent No. 6,930,129 ("the '129 patent") pursuant to 35 U.S.C. § 271(e)(2) and §§ 271(b)-(c). [D.I. 1, Compl.; D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 12].[1]

      10.     Plaintiffs contend, among other things, that Defendants' proposed generic versions of CONCERTA® that are the subject of two ANDAs submitted to the U.S. Food and Drug Administration ("FDA"), *i.e.*, extended-release tablets containing methylphenidate ("MPH") in 54 mg, 36 mg, 27 mg and 18 mg dosage strengths for use in treating Attention Deficit Hyperactivity Disorder ("ADHD"), and their use as directed in the prescribing instructions will result in direct infringement of Claims 1, 6 and 7 of the '373 patent. [D.I. 1, Compl.].

      11.     Plaintiffs allege that, upon approval of Defendants' ANDAs, Defendants' activities relating to the manufacture, distribution, offer for sale and/or sale of its generic

---

[1]    In the interest of simplifying this case, by letter brief and motion, dated December 11, 2007, Plaintiffs have requested that the Court dismiss all claims and counterclaims relating to the '129 patent. [D.I. 144; *see* Trial Tr. (Plaintiffs' Counsel) 3:6-4:5; 6:12-18]. Because the Court has not yet ruled on the motion to dismiss, Plaintiffs have included herein contingent proposed findings of fact and conclusions of law relating to infringement and validity issues pertaining to the asserted claims of the '129 patent.

extended-release MPH tablets in the United States will constitute contributory infringement and/or inducement of infringement of the asserted claims of the '373 patent. [D.I. 1, Compl., ¶¶ 64-73].

12.     Plaintiffs seek, as a remedy, an order directing the FDA not to approve Defendants' ANDAs on a date earlier than the expiration date of the '373 patent and related injunctive relief pursuant to 35 U.S.C. § 271(e)(4).  [D.I. 1, Compl., ¶ F].

13.     On October 25, 2005, Defendants filed an Answer and Counterclaims denying infringement of the '373 patent, and alleging that the asserted claims of the patent are invalid under Sections 102, 103 and/or 112 of the Patent Laws, Title 35 U.S.C. [D.I. 7, Answer and Countercl., ¶¶ 74-81].

14.     On October 5, 2007, the Court issued its Markman Order construing the disputed language in the claims of the '373 patent.  [D.I. 130].

14A.    A 5-day bench trial was held in this case from December 10-14, 2007.

II.     **ALZA SCIENTISTS DISCOVER A NEW ONCE-DAILY METHOD FOR TREATING ADHD USING AN ASCENDING MPH RELEASE RATE AND SUBSTANTIALLY ASCENDING PLASMA DRUG CONCENTRATION PROFILE**

A.      **ADHD: A Serious Disorder with Limited Treatment Options**

15.     ADHD, a chronic neurobehavioral disorder affecting children and adults, is characterized by three primary symptoms: inattention, hyperactivity and impulsiveness. Attention Deficit Disorder ("ADD") is a related disorder characterized by inattention and impulsiveness.  It is common to refer to both of these disorders as "ADHD."  [PX 538, at P ALZ 7997-98 and 008134; PX 417, at P ALZ 7729; Trial Tr. (D. Guinta) 22:4-23:22].

16.    ADHD is one of the most prevalent mental disorders affecting children.  A conservative estimate is that between 3-5% of children in the United States have ADHD. [PX 417, at P ALZ 7729; Trial Tr. (D. Guinta) 23:23-24:6].

17.    Left untreated, ADHD can lead to serious problems.  A child that is untreated often has difficulty with social interactions with peers, parents, and siblings. Difficulties in interactions with teachers can contribute to poor performance in school.  In older children, the consequences of poor performance in school can lead to additional behavioral problems including conduct disorder and frequent suspensions or expulsions. These issues can contribute to problems when the child becomes an adult.  Examples of problems that untreated adults with ADHD experience include poor occupational performance, antisocial behavior, and family dysfunction.  [Trial Tr. (D. Guinta) 24:18-25:23].

18.    In the mid-1990s, the standard approach for managing the symptoms of ADHD included counseling and/or treatment with stimulant medications, such as MPH in the form of Ritalin® (an immediate-release MPH dosage form made by Ciba-Geigy), and its generic counterparts.  [PX 417, at P ALZ 7730; Trial Tr. (D. Guinta) 24:7-17].

19.    Side-effects were a foremost concern in prescribing children MPH for the treatment of ADHD and were believed to be as important a consideration as treating the symptoms of the disorder.  [Trial Tr. (K. Patrick) 1025:22-1026:23].

20.    The most common side-effects associated with MPH products are appetite suppression, insomnia, increased anxiety, and irritability.  [PX 417, at P ALZ 7736; PX 418, at P ALZ 7758; Trial Tr. (D. Guinta) 34:8-24; Trial Tr. (K. Patrick) 1023:22-1025:13; PX 722].  Other side-effects associated with very high doses of MPH include

listlessness and dullness.  [Trial Tr. (D. Guinta) 34:8-16; Trial Tr. (K. Patrick) 1024:6-1025:13].

21.    The side-effects of MPH are highly dose dependent.  Thus, the frequency and severity of the side-effects of MPH increase in proportion to the amount of MPH being taken by the patient (*i.e.*, higher doses of MPH produce more frequent and more pronounced side-effects).  [Trial Tr. (D. Guinta) 34:8-24; Trial Tr. (K. Patrick) 1025:14-21; PX 419, at P ALZ 7767].

22.    Certain side-effects, such as insomnia, increased anxiety and irritability, can exacerbate behavioral problems in children who have ADHD.  In addition, appetite suppression in children can lead to growth-related problems in long-term MPH treatment regimens.  [Trial Tr. (K. Patrick) 1023:22-1025:13].

23.    Because the side-effects associated with MPH are significant and dose-dependent, minimizing the amount of drug given to a child was an important goal in treating patients with MPH.  A patient prescribed immediate-release MPH was started with a very low initial dose.  The amount of MPH was increased gradually on a weekly or bi-weekly basis until either the desired therapeutic response was achieved or unacceptable side-effects emerged.  This step-wise process was known as "titration." [Trial Tr. (K. Patrick) 1026:2-14; Trial Tr. (D. Guinta) 33:10-34:7; DTX 630, at p. 15].

24.    For any given patient, the difference between the dose of MPH necessary to control the symptoms of ADHD and the dose of MPH at which side-effects began to manifest themselves was small.  [*Id*.].  At trial, Defendants' expert, Dr. Michael Mayersohn ("Dr. Mayersohn"), agreed that the therapeutic window for treating children with MPH was narrow.  [Trial Tr. (M. Mayersohn) 947:10-948:9].

5

25.      For some children, treating the symptoms of ADHD with MPH was not possible because side-effects prevented favorable treatment outcomes.  It was known in the prior art that approximately 25% of patients prescribed psychostimulants such as MPH did not respond well to treatment.  According to one report, the vast majority of these failures were due to adverse effects.  [DTX 630, at p. 21].

26.      Alternatives to MPH for the treatment of ADHD, such as pemoline, were available in the art.  However, these alternatives were generally associated with a higher incidence of adverse effects relative to MPH.  [DTX 621, at pp. 491-492].

**B.    The Long-Felt Need for a Once-Daily MPH Dosage Form and the Failure of Ritalin SR® to Meet this Need**

27.      Prior to CONCERTA®, the only available MPH dosage forms for treating ADHD were Ritalin®, Ritalin SR®, and generic versions of these two products.  [Trial Tr. (D. Guinta) 29:8-15; Trial Tr. (M. Mayersohn) 911:9-912:3].

28.      Ritalin® was first introduced by Ciba-Geigy in the 1950s.  [Trial Tr. (K. Patrick) 1006:24-1007:5; Trial Tr. (D. Guinta) 27:7-19].  In the mid-1990s, Ritalin® was available in three dosage strengths (5 mg, 10 mg, and 20 mg), and the size of each dose administered to a patient ranged from 2.5 mg to 25 mg.  [DTX 630, at p. 6 (Table 1)].

29.      Following its introduction, Ritalin® rapidly became the most commonly prescribed treatment for ADHD, establishing MPH as the preferred agent for treating ADHD as compared to other agents.  [DTX 630, at p. 9].  It is undisputed that Ritalin® remained the "gold standard" for treating ADHD until the discovery of the claimed inventions.  [Trial Tr. (K. Patrick) 1006:12-20; Trial Tr. (M. Mayersohn) 809:11-15].

30.    Immediate-release MPH products such as Ritalin® effectively control ADHD symptoms for about 3 to 5 hours, with the greatest degree of effectiveness occurring over the first 1-2 hours after administration.  [PX 574, at p.1; Trial Tr. (D. Guinta) 41:12-42:2].

31.    As a dosage form, immediate-release MPH (*i.e.*, Ritalin®) releases all of the MPH within minutes of ingestion, making essentially all of the drug in the dosage form available for absorption in the body within a short period of time after ingestion. [*Id*.; DTX 1, col. 2, lines 6-9].

32.    Individuals treated with immediate-release MPH products usually require multiple doses during the day to adequately control their symptoms, because the duration of efficacy with each dose of immediate-release MPH is short.  [PX 575, at pp. 295-296; PX 134, at ALZ 24092].  For children, this dosing schedule often requires that they receive at least one dose of an immediate-release MPH product during the middle of the day while in school.  [Trial Tr. (D. Guinta) 35:1-24].

33.    In a "BID" regimen, two doses of immediate-release MPH are taken each day.  The first dose is taken in the morning before school.  As drug levels wear off in the middle of the day, a second dose is taken.  This second dose is usually taken 4 to 4.5 hours after the first dose.  [Trial Tr. (D. Guinta) 33:2-9; and 41:15-42:17].

34.    For children in need of additional control later in the day, the "TID" regimen, which added a third dose of immediate-release MPH in the afternoon, was frequently prescribed by doctors.  Typically, the third dose was half the size of the first two doses in order to reduce the incidence of side-effects such as appetite suppression

and insomnia during dinnertime and bedtime. [Trial Tr. (K. Patrick) 1020:2-22; Trial Tr. (D. Guinta) 80:11-81:11].

35.     In 1989, Dr. Kennerly Patrick ("Dr. Patrick") published a paper describing the mean MPH plasma concentration profile resulting from twice-daily (BID) administration of immediate-release MPH. [PX 137]. As shown in Fig. 2 of the publication (reproduced below), the MPH plasma concentration in the patient ascends rapidly after ingestion of the first dose, reaching a maximum concentration within about 2 hours, and then rapidly decreases as the drug is eliminated from the body. [*Id.*]. The decline in MPH levels continues until shortly after ingestion of the second dose ("Dose 2") of immediate-release MPH during the middle of the school day, which results in a second, similar rapid ascension and decline of the MPH plasma concentration. [PX 137 (Fig. 2); Trial Tr. (D. Guinta) 41:12-42:2].



36.    The highest MPH plasma concentrations shown in the graphs are termed "peaks" while the lowest concentrations observed after each peak are termed "troughs." [Trial Tr. (K. Patrick) 1014:16-1015:6].  This profile for immediate-release MPH is also referred to as a "sawtooth" profile or a "peak and valley" curve.  [Trial Tr. (D. Guinta) 43:3-9].

37.    The "peak and trough" MPH plasma concentration profile was considered to be important in achieving the dual objectives of day-long control of ADHD symptoms while minimizing the incidence of side-effects.  [Trial Tr. (K. Patrick) 1014:16–1020:1; Trial Tr. (D. Guinta) 41:15-43:2].  In these regimens, the initial dose of immediate-release MPH is administered at breakfast, which results in a MPH plasma concentration that reaches peak therapeutic levels by the time the child arrives at school.  At around lunchtime, the MPH plasma concentration drops to "trough" levels, which minimize side-effects, particularly appetite suppression.  [*Id.*].  After the second dose is taken in the afternoon, the MPH concentration again reaches peak therapeutic levels in time for the remainder of the school day.  [*Id.*].  By the end of school, the concentration of drug again declines in time to avoid side-effects of appetite suppression and insomnia, which disrupt dinner and bedtime.

38.    Properly timing the administration of immediate-release MPH doses was known to be important for adequate control of symptoms and to avoid undesired side-effects through the course of the entire day.  [Trial Tr. (K. Patrick) 1015:7-1020:1; Trial Tr. (D. Guinta) 41:12-43:2; DTX 630, at p. 16 ("Severe insomnia can be managed by changing time of dosing, with most of the medication given early in the day.")].  Compliance with the immediate-release MPH dosing regimen prescribed by the doctor,

therefore, was of critical importance to successful treatment of ADHD.  [*Id.*; Trial Tr. (D. Guinta) 35:1-36:6].

39.    Because MPH is a Schedule II controlled substance, the administration of MPH products to children during the school day is difficult to manage and control.  [PX 134, at ALZ 24093; Trial Tr. (D. Guinta) 35:1-8].  This, in turn, causes significant problems in achieving compliance by school-aged children.  [DTX 73, at ALZ 98909].

40.    One of the problems associated with the use of immediate-release MPH products is that a school nurse or administrator ordinarily must handle and administer the drug, rather than allowing the children to "self-medicate."  In order to get their medication, students must leave class and visit the school nurse each day.  This disrupts their classroom activity and subjects them to potential peer ridicule and social exclusion. The school must also maintain and monitor a secure storage location to avoid theft of the medication and diversion to other children.  [PX 134, at ALZ 24093; DTX 73, at ALZ 98909; Trial Tr. (D. Guinta) 35:1-36:6; DTX 630, at p. 5 ("Poor compliance results when ADHD children are put in charge of their own medication."); DTX 621, at p. 491 ("Furthermore, the child must be given a pill at school, an event that some children and some school personnel apparently avoid, resulting in poor compliance with prescribed regimens.")].

41.    Children who are allowed to self-administer medication at school also face many difficulties.  [*Id.*].  One symptom of ADHD is lack of attentiveness, which contributes to the inability of a person affected with ADHD to properly self-medicate. [*Id.*].  In addition, negative peer pressure can cause a child to not properly self-medicate. [*Id.*].  These difficulties and pressures can cause students to not take their medication, or

to not take the medication on the correct schedule. In addition, there are serious risks of drug diversion and abuse in settings where the drug is administered outside the supervision of adults. [*Id.*].

42.     It is uncontroverted that, before the claimed inventions, there was a pronounced and serious need for an effective once-daily, extended-release MPH drug product that did not exhibit significant side-effects and addressed the compliance problems associated with MPH treatment regimens requiring multiple administrations of drug during the day. [Trial Tr. (D. Guinta) 29:16-22; and 32:19-21; Trial Tr. (K. Patrick) 1006:12-23; Trial Tr. (T. Needham) 714:21-715:16; Trial Tr. (M. Mayersohn) 906:2-20; 912:9-23; DTX 630, at pp. 5-6].

43.     In the early 1980s, more than 20 years after it introduced Ritalin®, Ciba-Geigy introduced a once-daily extended-release version of Ritalin® called Ritalin SR®. [DTX 630, at p. 5]. Ritalin SR® is a sustained-release, wax matrix MPH dosage form that, by design, releases MPH at a generally descending release rate over time. [Trial Tr. (M. Davies) 1217:11-1218:4; PX 334, at P ALZ 6857; PX 335, at P ALZ 6863; PX 337, at p. 390 (P ALZ 6876); PX 410, at ¶ 35; PX 574, at p. 1; PX 417, at P ALZ 7735].

44.     Dr. Patrick's 1989 publication describes the mean MPH plasma concentration profile of Ritalin SR®. [PX 137, Fig. 2]. It shows that, within an hour of ingestion, plasma levels of drug rise rapidly to therapeutic levels. Thereafter, MPH plasma levels rise more gradually, reaching a maximum concentration within a few hours. After reaching this peak, the MPH blood plasma concentration begins to gradually decrease over a period of approximately two hours, before beginning a substantial descent by about 5 to 6 hours after administration. [PX 137, Fig. 2; Trial Tr. (D. Guinta)

43:13-44:8]. The Ritalin SR® MPH plasma profile was characterized as being "constant" or "flat," because the MPH plasma concentrations stayed within a specified range of concentrations over a period of several hours.

45.    Ritalin SR® exhibited a relatively constant or flat plasma concentration profile that was conventional for extended-release, once-daily drug formulations. [Trial Tr. (D. Guinta) 45:15-46:2]. Before the claimed inventions, such a profile was widely viewed in the art as being desirable and the most effective way to deliver a drug over the course of an entire day. [Trial Tr. (T. Needham) 693:11-16; 709:2-9]. Using a conventional drug delivery approach, a constant MPH plasma concentration level could be established and maintained at or just above the therapeutic level, but below harmful levels. Such an approach was thought to ensure effectiveness while at the same time reducing the risk of toxicity and side-effects. [Trial Tr. (D. Guinta) 44:17-46:2].

46.    Ritalin SR® was marketed as an alternative to treatment regimens based on twice-daily administration of Ritalin® and as providing an effective, once-a-day MPH treatment option. [DTX 621, at p. 492].

47.    However, it is undisputed that Ritalin SR® was never widely accepted as a once-a-day treatment for ADHD, because it proved to be unreliable and ineffective at controlling ADHD symptoms over the course of an entire day when compared to treatment regimens using multiple daily doses of immediate-release MPH products — i.e., the BID and TID regimens. [Trial Tr. (K. Patrick) 1021:12-1022:4; Trial Tr. (M. Mayersohn) 810:10-22; see also Trial Tr. (D. Guinta) 29:16-22].

48.    Because Ritalin SR® produced a conventional, relatively flat MPH plasma profile that was considered desirable for extended-release, once-daily drug products, its

failure to meet the need for an effective once-a-day MPH drug product came as a surprise to those working in the field.  [Trial Tr. (D. Guinta) 44:17- 46:2; and 72:10- 73:6; Trial Tr. (K. Patrick) 1026:24-1027:6].

49.     Anecdotal reports that Ritalin SR® was less effective compared to Ritalin® administered BID began circulating soon after the introduction of Ritalin SR® into the market.  [DTX 630, at p. 6; Trial Tr. (M. Mayersohn) 810:10-22].  These anecdotal reports did not provide an explanation as to why Ritalin SR® and its generally flat, conventional plasma profile was less effective than regimens based on immediate-release MPH products.  [Trial Tr. (K. Patrick) 1021:12-1022:4; Trial Tr. (D. Guinta) 36:7-38:15].

50.     Because of the shortcomings of Ritalin SR®, the state of the art in treating ADHD using MPH remained essentially where it had been since the introduction of Ritalin® in the 1950s —*i.e.*, regimens based on administration of multiple doses of immediate-release MPH were considered the only reliably effective MPH treatments for ADHD.  [Trial Tr. (K. Patrick) 1015:7-18; Trial (D. Guinta) Tr. 29:8-22].

### C.     ALZA Scientists Discover the First Reliably Effective Once-a-Day MPH Treatment for ADHD

51.     ALZA was founded in 1968 and is in the business of providing drug delivery solutions that improve patient care.  Examples of products that have been developed by ALZA include NICODERM® CQ, DURAGESIC®, PROCARDIA®, and PROVERA®.  [Trial Tr. (D. Guinta) 18:13-19:6; and 19:14-20:21].

52.     In 1993, ALZA began investigations into the development of a once-a-day MPH drug product.  [Trial Tr. (D. Guinta) 26:23-30:6; JDT (L. Hamel) 712-716, 718-

724; JDT (S. Saks) 1047-1052, 1064-1065]. The research conducted by the ALZA

scientists was groundbreaking and for the first time established the pharmacodynamic

relationship between MPH blood levels and therapeutic effects. [Trial Tr. (D. Guinta)

47:3-48:22]. The results of this groundbreaking clinical research led to the inventions

that are claimed in the '373 patent. [Trial Tr. (D. Guinta) 48:23-49:18].

53.     ALZA employees Dr. Diane Guinta, Dr. Samuel Saks, Dr. Suneel Gupta,

Carol Christopher, and Lawrence Hamel were part of the company's MPH product

development program. To varying degrees, all of these individuals had clinical training

or clinical experience. [Trial Tr. (D. Guinta) 30:2-32:5].

54.     During the early stages of the program, the ALZA scientists consulted

with experts in the fields of psychiatry and neurology about their experiences with using

Ritalin SR® and their experiences with treatment of ADHD patients using immediate-

release MPH and other drugs. [Trial Tr. (D. Guinta) 26:23-28:10; JDT (L. Hamel) 718-

719; JDT (J. Swanson) 1265-1266].

55.     The ALZA scientists learned that experts in the field of treating ADHD

had found Ritalin SR® was not providing a viable solution to the needs of ADHD patients

for a once-a-day MPH drug product. [Trial Tr. (D. Guinta) 29: 8-22; JDT (L. Hamel)

720-721].

56.     In 1994, Drs. Guinta and Gupta, working with others, designed a clinical

study protocol to understand the pharmacology and pharmacodynamics of MPH, about

which very little was known at the time they commenced their research. [Trial Tr. (D.

Guinta) 46:7-23]. In addition, the ALZA scientists sought to understand why a relatively

constant MPH plasma concentration-time profile, as found in Ritalin SR®, failed to meet

14

the need for a once-daily MPH dosage form.  [JDT (L. Hamel) 720-724; JDT (S. Saks) 1064-1065].

57.    ALZA retained Dr. James Swanson ("Dr. Swanson"), who ran a laboratory school for ADHD-diagnosed children at the University of California, Irvine, to assist the company in conducting these clinical studies.  [Trial Tr. (D. Guinta) 51:19-55:14; JDT (J. Swanson) 1271:22–1272:6].

58.    Dr. Swanson was a leader in the field of ADHD treatment and had published numerous articles on the subject.  He was also well-known for having created a quantitative scale, known as the SKAMP scale, for measuring the effectiveness of ADHD treatment methods.  [Trial Tr. (D. Guinta) 38:18-39:8].  SKAMP scales have been recognized by the FDA as an acceptable measure of efficacy for drugs used to treat ADHD.  [Trial Tr. (D. Guinta) 57:3-9].

59.    The clinical studies performed by the ALZA scientists were referred to as "sipping studies," because small amounts of MPH were administered to children at 30 minute time intervals to achieve the desired MPH plasma concentration-time profiles over the course of the day.  [Trial Tr. (D. Guinta) 50:2-23].  Administering the drug in this manner enabled the ALZA scientists to simulate different MPH plasma concentration-time profiles without the need to create a new dosage form exhibiting the characteristics necessary to create each test profile.  [*Id*. at 50:2-51:11].

60.    In the sipping studies, blood samples were not drawn from the subjects being studied because doing so, especially multiple times during the day, would have interfered with the behavioral characteristics of the children being evaluated.  In addition, there are significant risks associated with taking multiple blood samples from the same

15

small child in a single day.  As a consequence, the studies employed a calculated plasma

concentration profile that was generated using a mathematical model based on actual

plasma concentration measurements taken on a periodic basis from children not included

in the main study group.  [Trial Tr. (D. Guinta) 55:18-56:23].

61.    Three different pharmacokinetic profiles were examined in the clinical

study.  [JDT (S. Saks) 1064-1065; JDT (J. Swanson) 1272:11-22; DTX 73; Trial Tr. (D.

Guinta) 53:21-54:1].  Each pharmacokinetic profile resulted from the administration of a

total of 20 mg of MPH through the course of the day.  [DTX 73, at ALZ 98909-98912;

Trial Tr. (D. Guinta) 61:11-62:8].

62.    The clinical studies were conducted in accordance with good clinical

practice.  For example, the clinical studies were blinded, so that neither the inventors, nor

the investigators, nor the subjects knew which patient was on which regimen.  [Trial Tr.

(D. Guinta) 57:10-23].

63.    The first MPH plasma profile modeled the conventional BID regimen of

administering Ritalin®.  [DTX 73, at ALZ 98909].  This arm of the study simulated

administering two doses of immediate-release MPH with a 4.5 hour window between

each administration.  [*Id.*].  This test profile corresponded to the "standard of care" for

treating ADHD at the time.  [Trial Tr. (D. Guinta) 62:9-23; Trial Tr. (K. Patrick)

1007:23-1008:7].  The first MPH plasma profile provided a "positive" control—meaning

it produced a plasma profile that was known to be effective over the course of the

treatment regimen.  [Trial Tr. (D. Guinta) 62:9-23].

64.    The second profile was designed to simulate a rapid rise to a peak MPH

plasma concentration (equivalent to 80% of the first Ritalin® dose) and then maintenance

16

of that plasma concentration as a flat profile for about 8 hours. [DTX 73, at ALZ 98909-98910]. This profile modeled an optimized sustained-release dosage form profile that would have no fluctuations in the MPH plasma concentration after reaching the peak MPH plasma concentration. [JDT (L. Hamel) 747; Trial Tr. (D. Guinta) 62:24-63:20; and 64:16-20].

65.    One goal of the second arm of the clinical study was to determine if problems in the therapeutic effectiveness of Ritalin SR® were attributable to the wax-matrix formulation used in the Ritalin SR® drug product. [*Id.*]. Although Ritalin SR® followed a conventional approach for extended-release drug forms and produced a generally "flat" MPH plasma profile, the ALZA scientists believed the Ritalin SR® MPH plasma profile could be improved. [Trial Tr. (D. Guinta) 45:15-46:2; and 72:23-73:6]. In particular, a group of scientists at ALZA hypothesized that a MPH plasma profile that was "flatter" (*i.e.*, that reached the desired MPH concentration more rapidly, and maintained that plasma concentration at a constant level for a longer duration than that observed for Ritalin SR®) could overcome the efficacy problems associated with Ritalin SR®. [JDT (L. Hamel) 757].

66.    One of the objectives of the studies performed by the ALZA scientists was to determine the pharmacokinetics of MPH; namely, the precise relationship between MPH plasma concentrations and drug effect over the course of a day. [Trial Tr. (D. Guinta) 63:21-66:6].

67.    The ALZA scientists determined that it was not possible, however, to determine the relationship between MPH levels and efficacy using the profile that simulated the BID regimen because the periods of ascent and descent in MPH plasma

17

levels were too short and did not permit enough data points to be obtained.  [*Id*.].  The ALZA scientists, therefore, incorporated a third arm in their studies.  The third arm provided subjects an ascending plasma MPH concentration profile over the course of the treatment period.

68.    The ALZA researchers included the ascending plasma profile primarily to serve as a "research tool" that would provide data to contrast with the data obtained from the BID and flat profiles.  [*Id*. at 66:3-6].  Before conducting the study, the ALZA scientists did not consider the ascending plasma profile arm to be a possible candidate for a desired plasma profile.  [*Id.*].

69.    The first sipping study was a double-blind, randomized, placebo-controlled crossover trial in which thirty-six children with ADHD, aged 7 to 12, participated.  [DTX 73, at ALZ 98911; Trial Tr. (D. Guinta) 53:8-54:1].

70.    During the day, the children were placed in a classroom setting, and specialized measures of each child's behavior and cognitive performance (*i.e.*, SKAMP scores) were collected under the supervision of Dr. Swanson and other, highly trained specialists.  [DTX 73, at ALZ 98910; Trial Tr. (D. Guinta) 51:12-52:19].  Data were collected as the children engaged in different school-related activities such as games, reading, learning, and test-taking.  [Trial Tr. (D. Guinta) 54:9-55:14].

71.    In total, the study lasted 10 weeks.  [Trial Tr. (D. Guinta) 53:12-20]. When the results of the clinical study were unblinded, the ALZA scientists were surprised to discover that the optimized flat profile did not provide adequate control of ADHD symptoms throughout the treatment period.  [DTX 73; Trial Tr. (D. Guinta) 72:10–73:6].

72.     The ALZA scientists were also surprised to discover that the ascending MPH plasma concentration profile provided greater efficacy throughout the treatment period than the constant plasma profile and that its efficacy approached the effectiveness of the conventional BID regimen of administering Ritalin®. [*Id.*; Trial Tr. (D. Guinta) 68:9- 69:10; and 73:7-23].

73.     In addition, the ALZA scientists were surprised that effectiveness in control of ADHD symptoms was achieved in the ascending MPH plasma concentration profile even at very low MPH concentrations and that this effectiveness continued as the dose increased throughout the course of the profile. [Trial Tr. (D. Guinta) 69:3-10]. The ALZA scientists were also surprised to see comparable levels of effectiveness at lower MPH levels in the ascending MPH plasma concentration profile relative to MPH levels in the simulated BID plasma concentration-time profile. [Trial Tr. (D. Guinta) 73:7-74:14].

74.     ALZA's consultant, Dr. Swanson, who is recognized as being one of the premier researchers in the field of ADHD, was also surprised by these results. [Trial Tr. (D. Guinta) 69:11-13].

75.     Use of an ascending MPH delivery profile — generally increasing MPH plasma concentration levels over time — was directly contrary to conventional practices and accepted beliefs at the time of the claimed inventions. [Trial Tr. (D. Guinta) 44:17-46:2; Trial Tr. (T. Needham) 848:23-849:8; Trial Tr. (K. Patrick) 1008:8-11; and 1059:15-24; *see also* DTX 1, col. 2, line 63 to col. 3, line 12; Dep. Tr. (D. Feifel) 172:7-21].

76.     Prior to the discoveries made by the ALZA scientists, the conventional practice for doctors treating ADHD with MPH, particularly in children, was to prescribe

19

the lowest amount of MPH that yielded a positive response.  [Trial Tr. (D. Guinta) 33:10-34:24; DTX 630, at p. 15].  In addition, when prescribing Ritalin[®] according to a TID regimen, experts in the field recommended that the morning and mid-day dose be equivalent and that the third dose be *half the amount of the first two doses*.  [JDT (S. Gupta) 633-634; Trial Tr. (D. Guinta) 77:1-82:9; PX 593, at p. 5].

77.     Although the ALZA scientists believed that they had made an important discovery with their sipping study, they had additional questions regarding the mechanism by which an ascending MPH plasma concentration profile worked.  Further research was, therefore, performed.  [Trial Tr. (D. Guinta) 74:15-22].

78.     In 1995, another sipping study was designed and conducted (the "second sipping study").  [Trial Tr. (D. Guinta) 74:23-76:9].  In this study, three doses of MPH were given during the course of the day, but the timing of the second dose was varied relative to the first and third doses.  [*Id*.].  The ALZA inventors designed and conducted the second sipping study to further understand the pharmacodynamics of MPH.  [Trial Tr. (D. Guinta) 75:10–75:21].

79.     The results of the second sipping study established that acute tolerance was associated with MPH.  [Trial Tr. (D. Guinta) 76:4-6].  These results were published in the peer-reviewed journal, *Clinical Pharmacology & Therapeutics* in 1999, after the effective filing date of the '373 patent.  [PX 575; Trial Tr. (D. Guinta) 49:3-18].

80.     In additional studies, an ascending MPH plasma profile (different from the one in the first sipping study) was compared to a profile which modeled administration of Ritalin[®] three times a day, with a four hour window between administrations.  [PX 371].

81.    The ascending profile in these further studies provided for an increased amount of MPH in the subject within the first hour as compared to the amount provided in the same period in the ascending profile examined in the first sipping study.  This additional amount of MPH was provided to determine if it was possible to improve the control of ADHD symptoms in the early hours of treatment.  [*Id.* at ALZ 4773].

82.    These studies established that the ascending profile was as effective in treating ADHD as Ritalin® was when administered according to the TID regimen.  The studies also surprisingly showed that the severity and incidence of side-effects were essentially the same for both profiles.  [*Id*. at ALZ 4777; *See* Trial Tr. (D. Guinta) 34:17-24].

83.    ALZA's discovery that an ascending MPH delivery profile could be used to provide effective, once-daily treatment of ADHD without significant side-effects was contrary to the conventional wisdom that suggested that a "flat profile" is the most desired approach to delivering drugs via extended-release formulations.  [DTX 1, '373 patent, col. 2, line 64 to col. 3, line 13; Trial Tr. (D. Guinta) 44:17-46:2; JDT (S. Gupta) 633-634; JDT (L. Hamel) 747].  Prior to ALZA's discovery, it was believed that a substantially constant plasma concentration would minimize side-effects by avoiding high peaks in MPH concentration, thus providing a balance of desired and undesired pharmacological effects.  [DTX 1, col. 2, line 64 to col. 3, line 13; Trial Tr. (D. Guinta) 44:17- 46:2].

84.    ALZA's "sipping studies" are widely recognized as important scientific discoveries in the field of ADHD treatment.  [Trial Tr. (D. Guinta) 50:2-51:11; and 58:18-59:18; PX 575; PX 371].  The research conducted by the ALZA scientists was

groundbreaking and for the first time established the relationship between the blood

levels and effects (*i.e.*, the pharmacodynamics) of MPH. [Trial Tr. (D. Guinta) 47:3-

48:22].

85.    Once the ALZA scientists made the breakthrough discovery that the

ascending plasma concentration profile would achieve the desired longer-term treatment

of ADHD without increasing the frequency or severity of side-effects, they turned to the

development of a commercial MPH formulation that would release MPH in increasing

amounts over an extended period and thereby provide this ascending MPH plasma profile

for use as a once-a-day treatment for ADHD. [Trial Tr. (A. Ayer) 174:5-9; 180:8-24;

Trial Tr. (D. Guinta) 82:10-24].

86.    To obtain a formulation that would release MPH in increasing amounts

over an extended period of time, the ALZA scientists specified a tablet that (i) exhibited a

release rate that ascended through the midpoint of the time period required for 90% of the

drug in the tablet to be released (called the $T_{90}$) and (ii) would release MPH for at least

three hours. [Trial Tr. (D. Guinta) 76:10-24; *see also* JDT (A. Lam) 814:4-8]. This

dosage form was consistent with the release of drug described in the final study report for

the first sipping study, which shows that the amount of drug contained in the capsules

that were administered increased at hourly intervals over a period of 6.5 hours. [Trial Tr.

(D. Guinta) 66:7-68:4]. CONCERTA® was specifically designed to have an ascending

rate of release of MPH that continues through the mid-point of the $T_{90}$. [Trial Tr. (D.

Guinta) 26:14-22].

87.    The ALZA scientists were the first to develop a product that met the need

for a once-daily, extended-release MPH dosage form. This product, CONCERTA®, has

proven to be at least as effective as administering two or three daily doses of immediate-release MPH products with comparable or fewer side-effects, and has become the "gold standard" for treatment of ADHD patients.  [Trial Tr. (K. Patrick) 1006:12-23; and 1007:23-1008:11].

88.    Currently, CONCERTA® is the most prescribed MPH product for the treatment of ADHD.  [PX 499-502, 504-510].  In fact, annual sales of CONCERTA® in the U.S. are in excess of $900 million and growing, with CONCERTA® sales expected to reach the $1.0 billion/yr mark and "blockbuster" status in about a year.  [*Id.*].

### D.    ALZA Obtains the '373 Patent

89.    To secure patent rights in the United States, ALZA first filed provisional applications on November 12, 1996, November 25, 1996, and April 22, 1997, which were assigned provisional application serial numbers 60/030,514 ("the '514 provisional application"), 60/031,741 ("the '741 provisional application"), and 60/044,121 ("the '121 provisional application"), respectively.  [PX 3-PX 5].

90.    These provisional applications, along with non-provisional applications, eventually led to the '373 patent, which itself was filed on February 19, 1999.[2]  [DTX 1].

91.    The '373 patent is a continuation-in-part ("CIP") of U.S. patent application serial number 09/070,666 ("the '666 application") which was a continuation ("CON") of U.S. patent application number 08/910,593 ("the '593 application").  The '373 patent is

---

[2] The inventorship was corrected for the '373 patent on April 29, 2007.  Specifically, Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright, and Richard Weyers were removed as inventors.

also a CIP of U.S. patent application number 08/967,606 ("the '606 application") and U.S.

patent application number 08/937,336 ("the '336 application").  [DTX 1].

92.    The '373 patent specification identifies a variety of conventional and well

known extended-release formulation technologies, including both osmotic and non-

osmotic, known to be suitable for producing oral sustained-release dosage forms:

> There are many approaches to achieving sustained-release of
> drugs from oral dosage forms known in the art.  These different
> approaches include, for example, diffusion systems such as
> reservoir devices and matrix devices, dissolution systems such
> as encapsulated dissolution systems (including, for example,
> "tiny time pills") and matrix dissolution systems, combination
> diffusion/dissolution systems, osmotic systems and ion-
> exchange resin systems….

[DTX 1, col. 2, lines 51-62].

93.    The '373 patent reports the surprising discovery that treatment of ADHD,

comparable in effectiveness to TID administration with immediate-release MPH

products, can be achieved through administration of an oral extended-release dosage form

that releases MPH at an ascending rate.  [DTX 1, col. 4, lines 9-18].

94.    After describing this surprising discovery, the specification of the '373

patent explains that any suitable oral sustained-release dosage form may be used to

provide the desired ascending MPH release rate:

> Although the present invention is illustrated herein by
> exemplary dosage forms containing specific exemplary drugs,
> methods of making such dosage forms and methods of using
> MPH-containing dosage forms to provide a desired therapeutic
> outcome, the invention is not limited by the exemplary
> embodiments.  *The invention broadly embraces oral sustained-
> release dosage forms that provide an ascending drug release
> rate over an extended time period*, methods of making such
> dosage forms to maintain therapeutic effectiveness for a

24

> desired prolonged therapy period with respect to any
> appropriate drugs and drug therapies as would be apparent to a
> person of skill in the art in view of the disclosure herein.

[DTX 1, col. 6, lines 1-14 (emphasis added); *see also* col. 23, lines 5-10].

95.    Claim 1 of the '373 patent covers methods of treating ADD or ADHD by administering a dosage form comprising MPH, wherein the dosage form releases MPH at an ascending release rate over an extended period of time:

> 1.    A method for treating ADD or ADHD comprising
> administering a dosage form comprising MPH that provides a
> release of MPH at an ascending release rate over an extended
> period of time.

[DTX 1, col. 23, lines 12-16].

96.    Dependent Claims 6 and 7 of the '373 patent cover methods for treating ADD or ADHD by administering a dosage form comprising MPH, wherein the dosage form provides a substantially ascending MPH plasma drug concentration over a time period of about 5.5 hours and about 8 hours following administration of the dosage form:

> 6.    The method of claim 1 wherein said administration
> results in a substantially ascending MPH plasma drug
> concentration over a time period of about 5.5 hours following
> said administration.
>
> 7.    The method of claim 1 wherein said administration
> results in a substantially ascending MPH plasma drug
> concentration over a time period of about 8 hours following
> said administration.

[DTX 1, col. 24, lines 9-17].

97.    The '373 patent claims priority to the '514 provisional application, the '741 provisional application, and the '121 provisional application.  [DTX 1].

98.    The United States Patent and Trademark Office ("PTO") issued the '373 patent, titled "Methods and Devices for Providing Prolonged Drug Therapy," on July 19, 2005.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 5].

99.    ALZA is the current assignee of the '373 patent.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 7].  ALZA owns all rights, title and interest in the '373 patent, including all rights needed to enforce the '373 patent.

100.    ALZA holds approved New Drug Application ("NDA") No. 21-121 for extended-release MPH hydrochloride, which is marketed under the tradename CONCERTA® in the United States.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 8].

101.    ALZA's NDA identifies the '373 patent as a patent "with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale" of CONCERTA®, and the FDA accordingly listed that patent in its list of Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book").  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 9].

102.    ALZA manufactures, and McNeil is the sole authorized distributor of CONCERTA®.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 10].

III. **USE OF DEFENDANTS' PROPOSED GENERIC DRUG PRODUCTS WILL LITERALLY INFRINGE CLAIMS 1, 6, AND 7 OF THE '373 PATENT**

A. **ANDA Nos. 76-665 and 76-772**

103. Defendants submitted ANDA Nos. 76-665 and 76-772, which reference Plaintiffs' NDA 21-121, to the FDA seeking approval to market generic versions of all dosage strengths of CONCERTA® for the treatment of ADHD. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 11; *see also* PX 209, at ANDRX 18; PX 25, at ANDRX 03878].

104. Following issuance of the '373 patent, Defendants amended those ANDAs to add certifications under 21 U.S.C. § 355(j)(2)(A)(vii)(IV) (referred to as "Paragraph IV certifications") indicating that Defendants intended to market their generic versions of CONCERTA® prior to the expiration of the '373 patent. [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 11].

105. Defendants' ANDA No. 76-665 is directed to 54 mg extended-release MPH tablets that are represented to be both "pharmaceutically equivalent" and "bioequivalent" to the 54 mg CONCERTA® product. [PX 209, at ANDRX 02; *see also* JDT (X. Cheng) 276, lines 17-22 and 278, lines 12-15].

106. Defendants' ANDA No. 76-665 includes the results of two bioequivalence studies: a single-dose, fasting study designated R02-469 and a food-effect study designated R02-470. [PX 210, at ANDRX 00195-97; *see also* PX 294 (portion of ANDA containing R02-469 study); PX 293 (portion of ANDA containing R02-470 study)].

107. The results of Defendants' bioequivalence studies include a total of 77 plasma concentration-time profiles exhibited by individuals who received the 54 mg

ANDA product. [*See* PX 293, at ANDRX 1034-35 (showing 23 plasma concentration time profiles); PX 294, at ANDRX 2265-66 (showing 27 plasma concentration time profiles); PX 294 at ANDRX 2267-68 (showing 27 plasma concentration time profiles)].

108.    Defendants' ANDA No. 76-772 is directed to generic 36 mg, 27 mg and 18 mg extended-release MPH tablets that are represented to be "pharmaceutically equivalent" and "bioequivalent" to the 36 mg, 27 mg and 18 mg CONCERTA® products, respectively. [*See*, *e.g.*, PX 25, at ANDRX 3860].

**B.    Defendants' Extended-Release MPH Tablets (the "ANDA Products")**

109.    Defendants' ANDAs include proposed labels and proposed package inserts that describe the ANDA products and their use. [PX 209, at ANDRX 05 (under the heading "Labeling") and ANDRX 058-099; PX 206, at ANDRX 3860 (under the heading "Labeling") and ANDRX 3918-957; JDT (J. Vaughn) 1236-1237, 1242-1244].

110.    The package insert for the ANDA products will be packaged along with the products and made available on ANDRX's internet website. [JDT (J. Vaughn) 1239-1240; JDT (L. Rosenthal) 1127].

111.    PX 208 is a copy of the proposed package insert for the 54 mg ANDA product. [PX 208; JDT (J. Vaughn) 1235-1236]. The same package insert is used for the 18 mg, 27 mg and 36 mg dosage strengths, except that it also refers to these additional dosage strengths. [JDT (J. Vaughn) 1236-1237].

112.    Defendants' package insert for the ANDA products is intended for doctors, patients and other caregivers, including parents of children with ADHD. [JDT (J. Vaughn) 1241; PX 208, at ANDRX 85-98].

113.    The package insert describes the ANDA products as "extended-release" tablets for once-a-day oral administration containing 18, 27, 36 or 54 mg of MPH.  [PX 206, at ANDRX 3926; Trial Tr. (V. Gray) 227:1-15].

114.    Each of the four ANDA products is a dosage form containing a dose of MPH.  [PX 206, at ANDRX 3926 and 3945; JDT (J. Vaughn) 1224:20-1226:1].

115.    The ANDA products are intended for use in treating ADHD.  As the package insert expressly states, the ANDA products "are indicated for the treatment of Attention Deficit Hyperactivity Disorder (ADHD)."  [PX 206, at ANDRX 3925-57 and ANDRX 3933; JDT (J. Vaughn) 1242-1243].

116.    When administered once-daily as directed by the package insert, each of the ANDA products provides a single daily dose of MPH.  [PX 206, at ANDRX 3925-57 and ANDRX 3945 (under "Dosage and Administration"); Trial Tr. (V. Gray) 273:10-18].

117.    The ANDA products contain MPH in an "immediate-release" or an "IR" outer drug coating and a sustained-release core.  [PX 729; Trial Tr. (V. Gray) 236:12-237:11; JDT (X. Cheng) 328-330; PX 45].  The immediate-release drug coating on the ANDA products dissolves rapidly in an aqueous medium of any pH.  Thus, the IR coating is pH-independent.  [Trial Tr. (V. Gray) 239:17-240:3; Trial Tr. (X. Cheng) 642:21-643:6].

118.    The immediate-release drug coating and tablet core of the ANDA products are designed to contain 25% and 75%, respectively, of each tablet's total MPH dose.  [Trial Tr. (V. Gray) 237:12-238:5; and 1310:23-1311:3; JDT (X. Cheng) 329; see Trial Tr. (X. Cheng) 634:19-23].

29

119.    In "Composition Statements" in the ANDA, Defendants represented to the FDA that the ANDA products have 25% of their MPH in the immediate-release coating and 75% of the MPH in the tablet core. [PX 210, at ANDRX 206]. For example, for the 54 mg ANDA product, the composition information shows that MPH comprises 14.52% of the total composition of the 54 mg tablet (10.89% core + 3.63% coating = 14.52%) with 25% of the MPH in the immediate-release drug coating (3.63% divided by 14.52% = 25%). [PX 210, at ANDRX 206].

120.    The 54 mg ANDA products are designed to have 13.5 mg of MPH in the immediate-release drug coating on the product. [Trial Tr. (V. Gray) 253:4-23].

121.    The 36 mg ANDA products are designed to have 9 mg of MPH in the immediate-release drug coating on the product. [Trial Tr. (V. Gray) 259:24-260:6].

122.    The 27 mg ANDA products are designed to have 6.75 mg of MPH in the immediate-release drug coating on the product. [Trial Tr. (V. Gray) 260:23-261:5].

123.    The 18 mg ANDA products are designed to have 4.5 mg of MPH in the immediate-release drug coating on the product. [Trial Tr. (V. Gray) 262:24-263:12].

**REDACTED**

30

**REDACTED**

127.    The MPH from the immediate-release drug coating is released from the ANDA products in about 1 hour during *in vitro* dissolution testing in an aqueous medium.  [Trial Tr. (V. Gray) 238:6-239:10; JDT (X. Cheng) 330; Trial Tr. (X. Cheng) 643:7-11; PX 210, at ANDRX 199, "The first interval, 0-1 hr, captures the immediate-

release portion of the drug release…"; PX 223-224, at ANDRX 73469, "In an aqueous environment, the drug overcoat dissolves within one hour . . ."].

128.    The ANDA products are designed to complete the release of MPH by about 10 hours during *in vitro* dissolution testing in pH 7.5 dissolution media.  [Trial Tr. (V. Gray) 267:2-19; PX 210, at ANDRX 199 (the period 0-10 hr "evaluates the full release" of the MPH)].

**C.    Literal Infringement of Claim 1 of the '373 Patent**

129.    Claim 1 of the '373 patent has three Elements:

(A)    A method for treating ADD or ADHD comprising:

(B)    administering a dosage form comprising MPH

(C)    that provides a release of MPH at an ascending release rate over an extended period of time.

[DTX 1, col. 23, lines 12-16].  During the Markman proceedings, the parties agreed that Claim 1 of the '373 patent is directed to a method of treating ADHD using a *single* administration of MPH — more specifically, "a *once-a-day* dosage form containing the drug MPH."  [D.I. 92, Defendants' Brief on Claim Construction, p. 3].

130.    According to its proposed package insert, Defendants' method of treating ADHD using the ANDA products calls for treatment of ADHD by administering the ANDA products to an individual, thereby literally satisfying Elements (A) and (B) of Claim 1 of the '373 patent.  [*See supra* ¶¶ 109-116].

131.    Infringement of Claim 1 of the '373 patent thus turns on whether the ANDA products provide an "ascending release rate over an extended period of time." The results of *in vitro* dissolution tests conducted on Defendants' products, which are

consistent with Defendants' own dissolution test results provided in the ANDAs, conclusively establish that the ANDA products provide the requisite ascending release rate and thus literally meets the requirements of Element (C) of the '373 patent. [*See, e.g.*, PFF ¶¶ 164-165, 180-188 (evaluation of 54 mg ANDA product)]. Defendants' arguments in response to the infringement showing made by Plaintiffs are without merit.

### 1.    An "Appropriate" *in vitro* Dissolution Test for the ANDA Products

132.    Plaintiffs' dissolution testing was directed by Ms. Vivian Gray ("Ms. Gray"), who is an expert in the field of *in vitro* dissolution testing of pharmaceutical products, including development of dissolution test methods. [Trial Tr. (V. Gray) 215:21-216:3; and 207-215].

133.    Ms. Gray's professional qualifications and experience in the field of *in vitro* dissolution testing are provided in her Curriculum Vitae, PX 201. [Trial Tr. (V. Gray) 215:8-12; PX 201].

134.    For purposes of evaluating whether the ANDA products meet the ascending release rate requirement of Claim 1 of the '373 patent, the release rate of MPH from the ANDA products needs to be determined by an appropriate *in vitro* dissolution test. [D.I. 130, p. 2; Trial Tr. (V. Gray) 217:24-218:18].

135.    Dissolution is the process by which a solid substance dissolves in a liquid to form a solution. For drugs that are readily soluble, the amount of dissolved drug in the liquid is the same as the amount of drug released from the dosage form. [Trial Tr. (V. Gray) 208:15-22; and 219:20-220:7].

136.    An *in vitro* dissolution test is a routine laboratory test used to determine the dissolution rate of a drug, *i.e.*, the amount of drug released over time, from a dosage form under controlled conditions.  [Trial Tr. (V. Gray) 208:15-22; and 219:12-19; DTX 1, col. 2, lines 2-5 and col. 9, lines 23-29; PX 253, col. 1, lines 18-29].

137.    An *in vitro* dissolution test utilizes a dissolution apparatus that generally includes a vessel (such as a glass cylinder) containing the dissolution medium.  The dosage form is placed in the vessel, and the apparatus operates to stir the medium or agitate the dosage form at a specific rate.  Samples of the dissolution medium are withdrawn from the vessel at various times, and the amount of drug present in each sample is measured by a suitable assay.  This series of measurements provides a drug release profile for the dosage form, *i.e.*, how much drug is released over time.  [Trial Tr. (V. Gray) 220:8-222:21; PX 726 A-E; PX 253, col. 2, lines 4-14; PX 202, USP Chapter <711>, at P ALZ 4376-77].

138.    The official methods used in performing dissolution tests are listed in a publication entitled the U.S. Pharmacopoeia-National Formulary ("USP") and are well-known to persons of ordinary skill in the field of dissolution testing.  The USP is a compendium of public standards and information that serves as a guide to companies and individuals in fields relating to medicines and the pharmaceutical industry.  [Trial Tr. (V. Gray) 209:23-211:1; JDT (X. Cheng) 311:25-312:9; PX 202, USP 23, at P ALZ 4372, the primary purpose of the USP is to "provide authoritative standards and specifications" for products and methods used in the practice of medicine].

139.    The Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.*,
designates the USP as the official compendium of standards for drugs marketed in the
United States.  [21 U.S.C. § 321(j)].

140.    Defendants' dissolution expert, Dr. Umesh Banakar ("Dr. Banakar"),
agreed during the Markman proceedings that an appropriate apparatus and conditions for
the ANDA products "should be within the approved dissolution methods in the United
States Pharmacopeia (USP), as this is the standard bearer for the pharmaceutical industry
in terms of dissolution testing."  [D.I. 93, Banakar Declaration, ¶ 49].

141.    The USP provides substantial guidance for selecting an appropriate *in
vitro* dissolution test for the ANDA products.  According to the USP guidance on
dissolution testing of modified release dosage forms, the choice of apparatus and
dissolution medium for a dosage form should be based on the design and solubility
characteristics of the formulation, including any pH dependence.  [PX 202, at P ALZ
4386, under the heading "Dissolution and Drug Release Testing – Method Development
for Modified-release Dosage Forms"].

### 2.    USP Apparatus 1 Is Appropriate for Conducting Dissolution Tests on the ANDA Products

142.    USP Apparatus 1 and Apparatus 2 have been and continue to be the
preferred apparatus for dissolution testing of oral dosage forms, such as tablets and
capsules.  [Trial Tr. (V. Gray) 223:8-18; and 227:4-228:11].

143.    The FDA recommends the use of USP Apparatus 1 or Apparatus 2 for
dissolution testing of oral dosage forms in published "Guidance" documents relating to

the development and evaluation of oral dosage forms.  [PX 220, at P ALZ 4448; PX 221, at P ALZ 4451].

144.    USP Apparatus 1 and Apparatus 2 and their use are described in detail in Chapter 711 of the USP Chapter which covers dissolution testing.  There are seven official dissolution apparatuses recognized in the USP.  [Trial Tr. (V. Gray) 223:5-23; PX 202, at P ALZ 4376-77 (Chapter <711> Dissolution); JDT (R. Medina) 994-996].

145.    In a USP Apparatus 1 dissolution test, a dosage form is placed in a stainless steel wire mesh basket, and the basket is then submerged in a covered vessel containing a volume of dissolution medium and rotated at a selected speed.  [Trial Tr. (V. Gray) 220:19-221:22; PX 726 A-D; PX 202, at P ALZ 4376-77, describing USP Apparatus 1; PX 253, col. 1, lines 35-50 and col. 2, lines 4-14].

146.    The USP Apparatus 1 vessel cover has multiple holes to allow the basket stirring shaft to pass through it and for easy insertion of a thermometer and withdrawal of samples.  [PX 202, at P ALZ 4376 n.2].

147.    A USP Apparatus 2 dissolution test uses a paddle as a stirring element and the dosage form is allowed to sink to the bottom of the vessel (without a basket or other means to suspend the dosage form in the dissolution medium).  In use, the paddle is rotated within the dissolution medium and above the dosage form at a selected speed.  [Trial Tr. (V. Gray) 228:19-229:19; PX 253, col. 1, lines 50-64; PX 202, at P ALZ 4377, describing USP Apparatus 2].

148.    The USP Apparatus 1 and Apparatus 2 methods are referred to as the "basket" and "paddle" methods, respectively.  [Trial Tr. (V. Gray) 220:19-24; and

228:19-229:12; PX 220, at P ALZ 4448 ("The preferred dissolution apparatus is USP I (basket) or II (paddle)."); JDT (R. Medina) 1005:9-12; JDT (F. Alvarez) 19:12-15].

149.    While either USP Apparatus 1 or Apparatus 2 might be selected initially for dissolution testing of the ANDA products, Defendants performed tests on their products using USP Apparatus 2 and encountered a problem.  [Trial Tr. (V. Gray) 226:23-228:11; 229:20-230:3; and 233:13-22].

150.    During Defendants' own internal development of a dissolution test method for the ANDA products, Defendants initially used USP Apparatus 2 and found that the ANDA products were sticking to the glass vessel containing the dissolution medium. [Trial Tr. (V. Gray) 230:4-231:13; JDT (X. Cheng) 317; 318:8-11; 320-321; and 322:2-4; JDT (R. Medina) 1004; JDT (F. Alvarez) 15:9-16:2; PX 222 ("the tablet sticks to the glass vessel hence it requires App. 1"); PX 223-224, at ANDRX 73469].

151.    A dosage form sticking to a vessel in a dissolution test is undesirable since it can adversely affect the accuracy and reproducibility of the test results.  [Trial Tr. (V. Gray) 231:14-232:4; JDT (F. Alvarez) 15:15-16:2; JDT (R. Medina) 1006:14-1007:2; PX 221, at P ALZ 4451 ("For some tablet dosage forms, *in vitro*…dissolution may be slow due to the manner in which the disintegrated product settles at the bottom of a dissolution vessel.  In such situations, USP Apparatus I may be preferred over Apparatus II.")].

152.    Defendants resolved the sticking issue that occurred with its ANDA products in USP Apparatus 2 tests by switching to USP Apparatus 1.  [Trial Tr. (V. Gray) 232:18-22; JDT (X. Cheng) 317; 318:8-11; 320-321; and 322:2-4; PX 222 ("the tablet sticks to the glass vessel hence it requires App. 1"); PX 223-224, at ANDRX 73469].

153.    In a USP Apparatus 1 test, the metal basket holding the dosage form restricts the movement of the dosage form and prevents it from contacting and adhering to the dissolution vessel.  [Trial Tr. (V. Gray) 232:5-12; PX 726].

154.    The occurrence of a dosage form adhering to the dissolution vessel in a USP Apparatus 2 test, as Defendants experienced in their USP Apparatus 2 tests on the ANDA products, is a valid and sufficient justification for preferring USP Apparatus 1 over USP Apparatus 2 for a particular dosage form.  [Trial Tr. (V. Gray) 232:13-17].

155.    USP Apparatus 1 is an appropriate apparatus to use in conducting dissolution tests on the ANDA products.  [Trial Tr. (V. Gray) 223:24-224:22; and 232:23-233:1; PX 727].

156.    When testing with USP Apparatus 1 or USP Apparatus 2, the dissolution medium inside the vessel is heated to a standard temperature of 37º Celsius (± 0.5º C). [Trial Tr. (V. Gray) 234:20-235:5; and 226:5-9; PX 202, at P ALZ 4376 (the temperature inside the vessel is held at 37º ± 0.5); PX 253, col. 2, line 9; JDT (F. Alvarez) 19:20-20:3; JDT (J. Chi) 347:5-13].  This temperature of 37º C corresponds to the average internal temperature of the human body (*i.e.*, 98.6º Fahrenheit).  [Trial Tr. (V. Gray) 234:20-235:5; PX 253, col. 2, lines 8-9].

157.    The standard temperature of 37º C for dissolution media in USP Apparatus 1 and Apparatus 2 tests is considerably hotter than room temperature, which is 22º C or 72º F.  [Trial Tr. (V. Gray) 268:1-7].

158.    When testing with USP Apparatus 1, common practice dictates a rotation speed of 100 rpm for the stirring element.  [Trial Tr. (V. Gray) 234:7-19; PX 202, at P

ALZ 4386 ("The most common operating speeds are 100 rpm for Apparatus 1 (basket) and 50 rpm for Apparatus 2 (paddle) for solid-oral dosage forms."); JDT (X. Cheng) 322:2-11; JDT (F. Alvarez) 19:5-19; JDT (R. Medina) 1036:18-1037:2].

**REDACTED**

161.    During their efforts to develop a suitable dissolution method for the ANDA products, Defendants concluded that the formulation "needs pH 7.5 for proper release." [Trial Tr. (V. Gray) 242:6-243:15; PX 222 ("our formulation needs pH 7.5 for proper release."); JDT (X. Cheng) 319:3-15; and 320:2-16].

162.    A pH 7.5 dissolution media is well within the accepted range of pHs in the USP for dissolution testing of extended-release dosage forms: if appropriate for a formulation, "buffered aqueous solutions (typically pH 4 to 8)...may be used." [PX 202, USP 23, P ALZ 4386 and *see* P ALZ 4391 ("Simulated Intestinal Fluid" is a pH 7.5 test solution); Trial Tr. (V. Gray) 241:11-21]. A phosphate buffer solution is used as the dissolution medium because it resists changes in pH after the dosage form is added.

[Trial Tr. (V. Gray) 224:23-225:12; PX 202, USP 23, at P ALZ 4387 (describing "Buffer Solutions")].

163.    Use of a pH 7.5 dissolution medium (buffered solution) is appropriate to properly evaluate the dissolution characteristics of the ANDA products.  [Trial Tr. (V. Gray) 243:16-19; 224:10-22; 236:7-11; and 240-243; Trial Tr. (X. Cheng) 644:10-13; and 645:24-646:3].

164.    A dissolution test utilizing USP Apparatus 1, 100 rpm and pH 7.5 dissolution medium (buffered solution) at a temperature of 37º C is an appropriate *in vitro* dissolution test for the ANDA products.  [Trial Tr. (V. Gray) 223:24-224:22].

165.    The test method that Defendants developed and proposed to the FDA as an appropriate dissolution method for the ANDA products uses the same test conditions — *i.e.*, USP Apparatus 1 (basket) at 100 rpm and pH 7.5 phosphate buffer solution at 37º C. [Trial Tr. (V. Gray) 225:13-226:14; PX 227; JDT (F. Alvarez) 9:20-10:7; and 13 8-14; PX 210, at ANDRX 199 ("ANDRX Proposed Dissolution Method"); PX 212, at ANDRX 820-840 at 828 (Drug Release test for 54 mg Finished Product); JDT (J. Chi) 358-361; JDT (X. Cheng) 324:18-325:6; PX 207, at ANDRX 4041; PX 206, at ANDRX 3857 (the ANDA products "meet an appropriate *in vitro* test requirement."); PX 225, ANDRX 5367-5390, at 5379 (Drug release test for 36 mg, 27 mg and 18 mg Finished Products)].

166.    The FDA subsequently approved Defendants' proposed dissolution method for testing the ANDA products, stating "[t]he dissolution method (basket 100 rpm in 500 mL of 0.05 M pH 7.5 phosphate buffer) as proposed has been found acceptable." [PX 227; Trial Tr. (V. Gray) 225:19-226:9].

### 3.    The ANDA Products Provide the Ascending Release
### Rate Profile Found in Claim 1 of the '373 Patent

167.    During discovery in this case, Defendants produced samples of the 54 mg,

36 mg and 27 mg extended-release MPH tablet products that will be commercially

manufactured if Defendants' ANDAs are approved by the FDA.  [PX 233, emails from

Defendants' counsel to Plaintiffs' counsel, at P ALZ 4465, 4467].

168.    During discovery, Plaintiffs requested samples of the 18 mg ANDA

products, but Defendants were unable to provide them because Defendants had not

successfully manufactured a commercial-scale, validated lot of the 18 mg product.  [PX

233, at P ALZ 4465 ("there are no unexpired lots of the 18 mg dosage that meet all the

ANDA specifications.") and P ALZ 4467 ("ANDRX does not have samples from a

commercial scale validated lot of the 18 mg."); Trial Tr. (V. Gray) 261:10-17; JDT (J.

Vaughn) 1254:24-1255:4; and 1256:4-11].

169.    Ms. Gray directed dissolution testing on the samples of the ANDA

products (54 mg, 36 mg and 27 mg), using a dissolution test protocol she approved, at an

independent testing laboratory, Analytical Research Laboratories ("ARL"), located in

Oklahoma City, OK.  [Trial Tr. (V. Gray) 243:20-244:12; PX 229, test protocol].

170.    Defendants, in contrast, did not undertake any dissolution testing for the

purposes of this litigation.

171.    ARL performed *in vitro* dissolution tests on the ANDA products using

USP Apparatus 1, 100 rpm, 500 mL of pH 7.5 dissolution media at 37º C as specified in

"Stage 1" (54 mg ANDA product) and "Stage 2" (36 mg and 27 mg ANDA products) of

the protocol.  Brian Walker ("Mr. Walker"), a laboratory technician and dissolution

specialist employed by ARL, carried out these dissolution tests on the ANDA products. [Trial Tr. (V. Gray) 244:6-245:4; and 246:10-17; PX 229].

172.    Both ARL and Mr. Walker are fully qualified to perform *in vitro* dissolution tests on the ANDA products using the test protocol that had been approved by Ms. Gray.  [Trial Tr. (V. Gray) 246:18-247:22; PX 230; PX 234 (Resume of B. Walker)].

173.    The *in vitro* dissolution tests that Mr. Walker performed on twelve (12) individual samples of each dosage strength (*i.e.*, 54 mg, 36 mg and 27 mg) of the ANDA products using USP Apparatus 1, 100 rpm, and pH 7.5 dissolution media at 37º C were appropriate dissolution tests for those products.  [Trial Tr. (V. Gray) 244:6-245:4; 249:1-9; and 217:7-23; PX 229, test protocol].

174.    Mr. Walker and ARL performed the *in vitro* dissolution tests on the ANDA products carefully and correctly, following the test procedure approved by Ms. Gray.  [Trial Tr. (V. Gray) 264:16-265:24; PX 235-236].

175.    For each set of twelve samples of a particular dosage strength, the ARL dissolution tests were done in two cycles, with six individual samples tested per cycle. The six samples tested in cycle 1 were designated as "Cycle 1, ANDRX A-F."  The six samples tested in cycle 2 were designated as "Cycle 2, ANDRX A-F."  [Trial Tr. (V. Gray) 249:1-250:3; *see*, *e.g.*, PX 238, ARL report on dissolution tests for 54 mg ANDA product].

176.    In performing the *in vitro* dissolution tests, ARL determined the cumulative amount of MPH released from each ANDA product during successive hourly intervals following initiation of the dissolution test.  ARL reported the dissolution test

results as cumulative amount recovered (mg/mL) and cumulative "% Recovery" for each sample.  [Trial Tr. (V. Gray) 250:4-24; *e.g.*, PX 238, ARL report with dissolution test results for 54 mg ANDA product].

177.    ARL issued a report containing the results of its *in vitro* dissolution tests on each of the 54 mg, 36 mg and 27 mg ANDA products.  [Trial Tr. (V. Gray) 247:23-248:24; PX 238-240].

178.    From the ARL dissolution results, Ms. Gray calculated the quantity of MPH released during each hourly interval, *i.e.*, the release rate (mg/hr), for the first periodic interval (t=0-1 hr) through the tenth interval (t=9-10 hrs) for each of the ANDA products.  [Trial Tr. (V. Gray) 252:15-253:9; PX 241; *see also* JDT (X. Cheng) 333:11-17].

### (a)    Appropriate Dissolution Tests on the 54, 36 and 27 mg ANDA Products

179.    Ms. Gray prepared a MPH release rate evaluation for each set of the 54, 36 and 27 mg ANDA products based on the ARL dissolution test results.  [Trial Tr. (V. Gray) 251:1-4 (54 mg), 259:14-17 (36 mg) and 260:18-22 (27 mg)].

180.    PX 241 is the MPH release rate evaluation for each of the twelve 54 mg ANDA products tested by ARL.  The columns labeled "Quantity of Drug Released (mg) (Excluding 13.5 mg IR)" report the MPH release rate for successive hourly intervals through 10 hours for each 54 mg sample.  [Trial Tr. (V. Gray) 252:15-253:9; PX 241].  Ms. Gray excluded 13.5 mg of MPH — the amount of MPH attributable to the immediate-release drug coating of the 54 mg ANDA products — in calculating the quantity of MPH released during each hourly interval in accordance with the Court's

construction of the ascending release rate element of Claim 1. [Trial Tr. (V. Gray) 253:4-19 and *see* 251:5-16; PX 241; D.I. 130, p. 2]. This was done by assuming that the immediate release coating dissolved first and subtracting the amount of MPH contained in the immediate-release coating from the total quantity of MPH determined to be present through ARL's dissolution tests. [Trial Tr. (V. Gray) 253:10-254:13].

181.    Ms. Gray also determined the "midpoint of the $T_{90}$" for each of the twelve 54 mg ANDA products tested and included those results in her MPH release rate evaluation. [Trial Tr. (V. Gray) 252:3-14; PX 241; *see* D.I. 130, p. 2 (the ascending release rate of Claim 1 must occur "through at least the midpoint of the $T_{90}$ and for at least three hours.")]. The $T_{90}$ is the time at which 90% of drug within a dosage form has been released. [Trial Tr. (V. Gray) 255:8-19; DTX 1, at col. 9, lines 37-40]. The midpoint of the $T_{90}$ is determined by dividing the $T_{90}$ in half. [Trial Tr. (V. Gray) 255:8-19].

182.    The 54 mg ANDA product sample designated as Cycle 1, ANDRX A, released 84.01% of its MPH by the end of the seventh periodic interval (t=7 hrs) and released 92.92% of its MPH by the end of the eighth periodic interval (t=8 hrs). [Trial Tr. (V. Gray) 255:8-19; PX 241, Cycle 1, ANDRX A]. Thus, the 54 mg ANDA product sample designated as Cycle 1, ANDRX A, exhibited a $T_{90}$ between 7 and 8 hours. [Trial Tr. (V. Gray) 255:8-19; PX 241, Cycle 1, ANDRX A].

183.    The 54 mg ANDA product sample designated as Cycle 1, ANDRX A, has a midpoint of the $T_{90}$ occurring between 3.5 and 4 hours. [Trial Tr. (V. Gray) 255:11-19; PX 241, Cycle 1, ANDRX A].

184.    As shown in PX 241, for 54 mg sample Cycle 1, ANDRX A, the amount of MPH released in each successive hourly interval compared to the amount of MPH released during the immediately preceding hourly interval starting at t=0 and continuing through the fourth interval is as follows:

second interval (2.53 mg); first interval (0.99 mg)

third interval (4.94 mg); second interval (2.53 mg)

fourth interval (6.52 mg); third interval (4.94 mg)

[Trial Tr. (V. Gray) 254:14-255:7; PX 241, Cycle 1, ANDRX A].

185.    As shown in PX 241, for Cycle 1, ANDRX A, the amount of MPH released in each successive hourly interval was greater than the amount released during the immediately preceding hourly interval starting at t=0 and continuing through the fourth interval (*i.e.*, through 4 hrs), which is through the midpoint $T_{90}$ (*i.e.*, between 3.5 and 4 hours) and at least 3 hours.  [Trial Tr. (V. Gray) 255:4-256:9; PX 241].

186.    The 54 mg ANDA product sample designated as Cycle 1, ANDRX A, thus has "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 254:14-256:9; PX 241; D.I. 130, p. 2].

187.    The same approach used to evaluate whether Cycle 1, ANDRX A met the ascending release rate element of Claim 1 of the '373 patent was applied to the dissolution results for each of the 54 mg ANDA product samples and is presented in PX 241.  [Trial Tr. (V. Gray) 256:10-14; PX 241].

188.     Nine of the twelve individual 54 mg ANDA product samples tested —
Cycle 1, ANDRX A, C, E-F and Cycle 2, ANDRX A-C and E-F — provide "an
ascending release rate over an extended period of time" in accordance with the Court's
construction of this limitation of Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 256:15-
257:3; PX 241].

189.     Ms. Gray applied strict criteria to her evaluation.  For example, because
the testing involved measurements at hourly intervals, in some instances, it was
determined that the $T_{90}$ occurred very slightly after eight hours.  [*See*, *e.g.*, PX 241,
sample designated "Cycle 1, ANDRX D" released 88.69% MPH at 8 hours].  In those
circumstances, the midpoint of the $T_{90}$ would correspondingly have occurred slightly
after four hours.  [*See* Trial Tr. (V. Gray) 255:8-19].

190.     Applying these strict criteria, Ms. Gray did not characterize three 54 mg
ANDA product samples as necessarily having an ascending release rate through at least
the midpoint of the $T_{90}$ of each sample.  Ms. Gray indicated that while these samples did
not meet her strict criteria, they were very close to meeting those requirements.  Indeed,
she found each sample had data that were about 1% or less from meeting the
requirements of having an ascending release rate through at least the calculated $T_{90}$ of
each sample.  [Trial Tr. (V. Gray) 257:9-258:8].

191.     The three 54 mg ANDA product samples that Ms. Gray did not identify as
necessarily infringing provided MPH release rates that were extremely close to infringing
— just about 1% or less away from a release profile that would have shown an ascending
rate of release through at least the midpoint of the $T_{90}$.  [Trial Tr. (V. Gray) 257:4-
259:10].

192. Ms. Gray testified that she could have readily included one of the 54 mg ANDA product samples (*i.e.*, "Cycle 1, ANDRX B") in the group that met the requirements of an ascending release rate through at least the midpoint of the $T_{90}$, raising the total number of infringing 54 mg products to 10 out of 12 samples. [Trial Tr. (V. Gray) 257:4-24]. The cumulative amount of MPH released by this sample at the 8 hour interval was 89.64% and that value could have been properly rounded up to 90%, giving the sample a $T_{90}$ at 8 hours. [Trial Tr. (V. Gray) 257:9-24]. With a $T_{90}$ at 8 hours, this sample would have provided an ascending release rate through the midpoint of the $T_{90}$ (*i.e.*, 4 hours). [*Id.*; *see* PX 241, Cycle 1, ANDRX B].

193. According to Ms. Gray, the other two 54 mg ANDA product samples had released amounts of MPH slightly less than 90% by 8 hours — 88.69% (Cycle 1, ANDRX D) and 88.60% (Cycle 2, ANDRX D) — which led her to exclude them because they provided an ascending release rate through 4 hours, when the midpoint of the T90 was slightly in excess of 4 hours. [Trial Tr. (V. Gray) 258:1-8].

194. Ms. Gray used a "very conservative" approach in her evaluation of the test data. [Trial Tr. (V. Gray) 258:9-12]. In that approach, Ms. Gray used only the actual numerical values obtained from the dissolution analysis to evaluate infringement; she did not round the data or statistically manipulate it as part of her analysis.

195. PX 703 is a graph of the MPH release profiles over time, showing in blue the 54 mg ANDA products that meet Ms. Gray's strict test and clearly infringe. Shown in red are the profiles for three tablets that did not meet the strict test. [Trial Tr. (V. Gray) 258:13-22; PX 703]. The profiles shown in red did not meet Ms. Gray's strict numerical analysis because the $T_{90}$ apparently occurred just after 8 hours, and on that basis the

measurement taken at 4 hours suggests but does not conclusively establish that the ascending release rate continued through the midpoint of the $T_{90}$.  [PX 703; Trial Tr. (V. Gray) 258:23-259:10].  The data show that the dissolution rates of these three samples are very close to meeting the strict cutoff for $T_{90}$ used by Ms. Gray.

196.    Defendants performed *in vitro* dissolution tests on their 54 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C and included the results in ANDA No. 76-665.  [PX 210, at ANDRX 201 and ANDRX 205]. In these dissolution tests, Defendants did not did not measure the amount of MPH released at 1-hour intervals.  Instead, Defendants' dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr.  [PX 210, at ANDRX 201 and ANDRX 205; PX 242; *see* Trial Tr. (V. Gray) 263:13-21; and 264:4-9].

197.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from the ANDA and ARL dissolution tests on the 54 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) is:

| Time (hr) | ANDRX ANDA Avg. % Recovery | ARL Avg. % Recovery |
|-----------|---------------------------|---------------------|
| 1 | 24.00 | 24.56 |
| 2 | 30.00 | 29.89 |
| 4 | 53.00 | 52.10 |
| 8 | 90.00 | 91.60 |
| 10 | 100.00 | 100.83 |

[Trial Tr. (V. Gray) 271:3-272:7; PX 242; PX 210, at ANDRX 201].

198.    A comparison of the average cumulative amount of MPH released ("% Recovery") at the common sampling times from Defendants' ANDA and ARL dissolution tests on the 54 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C, as well as the overall average dissolution profiles, establishes that the mean dissolution results obtained by Defendants and ARL are essentially the same.  [Trial Tr. (V. Gray) 271:3-272:16; PX 242].

199.    Since the average dissolution results obtained by Defendants and ARL using appropriate test conditions are essentially the same, ARL's dissolution test results on the 54 mg ANDA products (using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) accurately represent the dissolution properties of the 54 mg ANDA product.  [Trial Tr. (V. Gray) 271:3-272:16].

200.    PX 243 is the MPH release rate evaluation for each of the twelve 36 mg ANDA products tested by ARL.  The same approach used in evaluating the 54 mg samples was applied to the dissolution data for the 36 mg samples, except that Ms. Gray excluded 9 mg of MPH — the amount of MPH attributable to the immediate-release drug coating of the 36 mg ANDA products — in calculating the quantity of MPH released during each hourly interval.  [Trial Tr. (V. Gray) 259:14-260:6; PX 243; *see* D.I. 130, Markman Order, p. 2 ("The ascending release rate does not include release of a drug from any immediate-release drug coating. . .")].

201.    For example, as shown in PX 243, the 36 mg ANDA product sample identified in ARL's dissolution tests as Cycle 1, ANDRX A has a midpoint of the $T_{90}$ occurring between 3.5 and 4 hours, and the amount of MPH released in each successive hourly interval compared to the amount of MPH released during the immediately

preceding hourly interval starting at t=0 and continuing through the fourth interval is as follows:

second interval (1.92 mg); first interval (0 mg)

third interval (4.23 mg); second interval (1.92 mg)

fourth interval (4.80 mg); third interval (4.23 mg)

[PX 243, Cycle 1, ANDRX A].

202.    As shown in PX 243, for Cycle 1, ANDRX A, the amount of MPH released in each successive hourly interval was greater than the amount released during the immediately preceding hourly interval starting at t=0 and continuing through the fourth interval (*i.e.*, through 4 hrs), which is through the midpoint $T_{90}$ (*i.e.*, between 3.5 and 4 hours) and at least 3 hours.  [PX 243].

203.    The 36 mg ANDA product sample designated as Cycle 1, ANDRX A, provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent.  [PX 243; D.I. 130, p. 2].

204.    Under Ms. Gray's strict methodology, eight of the twelve individual 36 mg ANDA product samples — Cycle 1, ANDRX A-E and Cycle 2, ANDRX B and E-F — provided "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 260:7-17; PX 243; D.I. 130, p. 2].

205.    Defendants performed *in vitro* dissolution tests on its 36 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C and included the results in ANDA No. 76-772.  [PX 207, at ANDRX 4043 and ANDRX

50

4071].  These dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr. [PX 207, at ANDRX 4043 and ANDRX 4071; PX 244].

206.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from Defendants' ANDA and ARL dissolution tests on the 36 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) is:

| Time (hr) | ANDRX ANDA Avg. % Recovery | ARL Avg. % Recovery |
|---|---|---|
| 1 | 24.00 | 24.06 |
| 2 | 30.00 | 31.81 |
| 4 | 57.00 | 56.98 |
| 8 | 95.00 | 95.01 |
| 10 | 103.00 | 101.66 |

[PX 244; PX 207, at ANDRX 4043].

207.    A comparison of the average cumulative amount of MPH released ("% Recovery") at the common sampling times from Defendants' ANDA and ARL dissolution tests on the 36 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C, as well as the overall average dissolution profiles, establishes that the mean dissolution results obtained by Defendants and ARL are essentially the same.  [PX 244; *see* Trial Tr. (V. Gray) 271:3-272:16 (54 mg dissolution result comparison)].

208.    ARL's dissolution test results on the 36 mg ANDA products (using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) accurately represent the dissolution properties of the 36 mg ANDA product.  [PX 244; *see* Trial Tr. (V. Gray) 271:3-272:16 (54 mg dissolution result comparison)].

51

209.    PX 245 is the MPH release rate evaluation for each of the twelve 27 mg

ANDA products tested by ARL.  The same approach used in evaluating the 54 mg and 36

mg samples was applied to the dissolution data for the 27 mg samples, except that 6.75

mg of MPH was excluded — the amount of MPH attributable to the immediate-release

drug coating of the 27 mg ANDA products — in calculating the quantity of MPH

released during each hourly interval.  [Trial Tr. (V. Gray) 260:18-261:5; PX 245; *see* D.I.

130, Markman Order, p. 2 ("The ascending release rate does not include release of a drug

from any immediate-release drug coating . . .")].

210.    For example, as shown in PX 245, the 27 mg ANDA product sample

identified in ARL's dissolution tests as Cycle 1, ANDRX A has a midpoint of the $T_{90}$

occurring between 3.5 and 4 hours, and the amount of MPH released in each successive

hourly interval compared to the amount of MPH released during the immediately

preceding hourly interval starting at t=0 and continuing through the fourth interval is as

follows:

        second interval (0.82 mg); first interval (0 mg)

        third interval (3.60 mg); second interval (0.82 mg)

        fourth interval (3.96 mg); third interval (3.60 mg)

[PX 245, Cycle 1, ANDRX A].

211.    As shown in PX 245, for Cycle 1, ANDRX A, the amount of MPH

released in each successive hourly interval was greater than the amount released during

the immediately preceding hourly interval starting at t=0 and continuing through the

fourth interval (*i.e.*, through 4 hrs), which is through the midpoint $T_{90}$ (*i.e.*, between 3.5 and 4 hours) and at least 3 hours.  [PX 245].

212.    The 27 mg ANDA product sample designated as Cycle 1, ANDRX A, provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent.  [PX 245; D.I. 130, p. 2].

213.    All twelve individual 27 mg ANDA product samples — Cycle 1, ANDRX A-F and Cycle 2, ANDRX A-F — provided "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 261:6-9; PX 245; D.I. 130, p. 2].

214.    Defendants performed *in vitro* dissolution tests on its 27 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C and included the results in ANDA No. 76-772.  [PX 207, at ANDRX 4042 and ANDRX 4059].  These dissolution tests used timepoints at 0.5 hr, 1 hr, 2 hr, 4 hr, 8 hr and 10 hr. [PX 207, at ANDRX 4042 and ANDRX 4059; PX 246].

215.    The average cumulative amount of MPH released ("% Recovery") at the common sampling times from Defendants' ANDA and ARL dissolution tests on the 27 mg ANDA products under the same test conditions (USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) is:

| Time (hr) | ANDRX ANDA Avg. % Recovery | ARL Avg. % Recovery |
|---|---|---|
| 1 | 24.00 | 23.44 |
| 2 | 28.00 | 30.86 |
| 4 | 57.00 | 57.81 |
| 8 | 99.00 | 97.95 |
| 10 | 102.00 | 100.56 |

[PX 246; PX 207, at ANDRX 4042].

216.    A comparison of the average cumulative amount of MPH released ("%
Recovery") at the common sampling times from Defendants' ANDA and ARL dissolution
tests on the 27 mg ANDA products using USP Apparatus 1, 100 rpm and pH 7.5
dissolution media at 37º C, as well as the overall average dissolution profiles, establishes
that the mean dissolution results obtained by Defendants and ARL are essentially the
same.  [PX 246; *see* Trial Tr. (V. Gray) 271:3-272:16 (54 mg dissolution result
comparison)].

217.    ARL's dissolution test results on the 27 mg ANDA products (using USP
Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) accurately represent the
dissolution properties of the 27 mg ANDA product.  [PX 246; Trial Tr. (V. Gray) 271:3-
272:16 (54 mg dissolution result comparison)].

### (b)    The 18 mg ANDA Products

218.    Defendants represented to the FDA that the 18 mg ANDA product is
"proportionally equivalent" to, and the "same dosage form" as, the 54 mg ANDA
product.  [PX 206, at ANDRX 3857; *see* Trial Tr. (V. Gray) 261:22-262:10].  The
amounts of each ingredient in the 18 mg and 54 mg ANDA products are directly
proportional.  [JDT (J. Vaughn) 1223:18-1224:6].

54

219.    Based on the proportional equivalence of their compositions, the dissolution release rate profiles for the 18 mg and 54 mg ANDA products (in USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C) would be substantially the same, and nearly all of the 18 mg ANDA products would provide "an ascending release rate over an extended period of time" as required by Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 261:18-262:10].

220.    ANDA No. 76-772 includes the results of dissolution tests performed by Defendants on the 18 mg ANDA product using USP Apparatus 1, 100 rpm and pH 7.5 dissolution media at 37º C.  [PX 207, at ANDRX 4042; Trial Tr. (V. Gray) 262:11-23].

221.    PX 248 is a MPH release rate evaluation, prepared by Ms. Gray, for each of the twelve 18 mg ANDA products that are the subject of Defendants' dissolution tests in the ANDA.  The columns labeled "Quantity of Drug Released (mg) (Excluding 4.5 mg IR)" reports the MPH release rate for the intervals 0-2 hr, 2-4 hr, 4-8 hr and 8-10 hr for each 18 mg sample.  [Trial Tr. (V. Gray) 262:24-263:12; PX 248].  Ms. Gray excluded 4.5 mg of MPH — the amount of MPH attributable to the immediate-release drug coating of the 18 mg ANDA products — in calculating the quantity of MPH released during each interval.  [Trial Tr. (V. Gray) 263:5-12 and *see* 253:10-23; PX 248; D.I. 130, Markman Order, p. 2].

222.    Ms. Gray used the 8-hr timepoint as the "$T_{90}$" for each of the twelve 18 mg ANDA products.  [Trial Tr. (V. Gray) 262:24-263:12].  A $T_{90}$ of 8-hours for the 18 mg ANDA products is conservative since each of the 18 mg tablets had fully released (about 100%) its MPH dose by the 8-hr timepoint in Defendants' dissolution tests.  [Trial Tr. (V. Gray) 263:13-264:3].

223.    Based on a $T_{90}$ of 8-hours, the "midpoint of the $T_{90}$" for each of the 18 mg ANDA products is 4 hours.  [Trial Tr. (V. Gray) 263:13-21].

224.    As shown in PX 248, for each of the twelve 18 mg samples tested, the amount of MPH released in each successive 2-hr interval increased over the amount released during the immediately preceding 2-hr hourly interval starting at t=0 and continuing through the second 2-hr interval (*i.e.*, through four hours), which is through the midpoint $T_{90}$ (*i.e.*, 4 hours) and for at least 3 hours.  [PX 248].

225.    Use of 2-hr periodic intervals in determining whether the 18 mg ANDA products provide an ascending release rate as required by Claim 1 of the '373 patent is necessitated by the dissolution data obtained by Defendants, which did not include hourly release data.  [Trial Tr. (V. Gray) 264:4-9; PX 248].

226.    Twelve of the twelve individual 18 mg ANDA products tested by Defendants provided "an ascending release rate over an extended period of time" in accordance with the Court's construction of this limitation of Claim 1 of the '373 patent. [Trial Tr. (V. Gray) 264:10-15; PX 248; D.I. 130, p. 2].

### 4.    Use of the ANDA Products as Directed Will Result in Literal Infringement of Claim 1

227.    The ANDA products are intended to be orally administered on a once-daily basis (*i.e.*, as a single dose) to individuals as a treatment for ADHD.  [PX 206, Package Insert, ANDRX 3925-57 at ANDRX 3933 (under "Indication And Usage") and ANDRX 3945 (the ANDA products are "administered orally once-daily in the morning."); Trial Tr. (V. Gray) 273:10-18].

228.    Use of the ANDA products as directed in the Package Insert provides a method for treating ADHD and literally meets Element (A) of Claim 1.  [Trial Tr. (V. Gray) 272:24-273:9; PX 206, ANDRX 3925-57 and ANDRX 3933 (the ANDA products "are indicated for the treatment of Attention Deficit Hyperactivity Disorder (ADHD)."); JDT (J. Vaughn) 1242-1243 ].

229.    In its Markman Order, the Court construed the language "a dosage form comprising methylphenidate" in Claim 1 of the '373 patent to mean "a pharmaceutical composition that includes a dose of methylphenidate."  [D.I. 130, Markman Order].

230.    Each of the four ANDA products is a pharmaceutical composition that includes a dose of MPH.  [Trial Tr. (V. Gray) 273:10-18; PFF ¶¶ 109-113].

231.    Administration of the ANDA products as directed in the package insert literally meets Element (B) of Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 273:10-18].

232.    Appropriate *in vitro* dissolution tests on samples of the ANDA products demonstrate that each dosage strength of the ANDA products provide "an ascending release rate over an extended period of time" as construed by the Court.  [PFF ¶¶ 184-186, 201-203, 210-212, 218-219; Trial Tr. (V. Gray) 273:19-274:6].

233.    The 54 mg, 36 mg, 27 mg and 18 mg ANDA products literally meet Element (C) of Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 273:19-274:6 and 216:6-16].

234.    Thus, following approval, the 18 mg, 27 mg, 36 mg and 54 mg ANDA products, in accordance with the prescribing instructions approved for and which

accompany the ANDA products, will be used by patients, doctors and caregivers in the United States to treat ADHD.  [*See* PFF ¶¶ 115-116].  This use of the ANDA products will meet each and every element of Claim 1 of the '373 patent.  [Trial Tr. (V. Gray) 274:7-12].

235.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of Defendants' ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of Claim 1 of the '373 patent.

### 5.    Defendants' Arguments in Response to the Infringement Showing Made by Plaintiffs Are Without Merit

236.    At trial, Defendants contended that the ANDA products do not literally infringe the claims of the '373 patent because (i) the Court's claim construction of "ascending release rate" requires a release of MPH from the sustained-release portion of a dosage form ("non-IR" MPH) during the first interval in a dissolution test and (ii) the ANDA products release only IR MPH, and not any MPH from the sustained-release tablet core, during the first hour in an *in vitro* dissolution test.  [*See, e.g.*, Trial Tr. (U. Banakar) 568:16-20].

237.    Defendants' argument is based on a misinterpretation of the Court's claim construction.  The Court did not rule that non-IR MPH (*i.e.*, MPH from the sustained-release tablet core) must be released during the first time interval in order for there to be an ascending release rate.  In any event, the evidence at trial shows that some non-IR MPH is, in fact, commonly released from Defendants' products during the first hourly interval of an *in vitro* dissolution test.

    (a)    **Defendants Misinterpret Parts of the Court's Claim Construction**

    (1)    **An "Ascending Release Rate" Does Not Require Release of Non-IR MPH during the First Interval in a Dissolution Test**

238.    Defendants' noninfringement position is premised on their assertion that Claim 1 requires a release of non-IR MPH during the first interval of the dissolution test. The claim, however, contains no such explicit requirement and was not interpreted to include such a requirement in the Court's Markman ruling. Defendants' dissolution expert, Dr. Banakar, testified that, in his opinion, an "ascending release rate" requires that some non-IR MPH must be released from a dosage form during the *first* interval in an *in vitro* dissolution test. [Trial Tr. (U. Banakar) 535:6-14].

239.    The Court's construction of "ascending release rate" does not support Dr. Banakar's view that non-IR MPH must be released during the first interval in order to meet that claim element. [D.I. 130, Markman Order, at p. 2].

240.    The determination of whether there is an ascending release *rate* looks at whether the amount of MPH released increases from one interval to the next (after the start of a dissolution test) and continues to increase through subsequent intervals — a comparison of *successive* intervals is necessary. [Trial Tr. (V. Gray) 388:11-389:8]. It makes no difference how much, if any, MPH is released in the first interval so long as more is released in the next interval because the claim specifies only an ascending *rate*. If the MPH release rate increases from one interval to the next interval, an "ascending release rate" occurred during that time period. [Trial Tr. (V. Gray) 389:15-390:2]. For

this purpose, the MPH release rate is determined for each interval by excluding the MPH attributable to the IR portion of the tablet.

241.    Since an increase in release rate between intervals establishes an "ascending release rate" [D.I. 130, Markman Order, at p. 2], it does not matter whether, after excluding any IR MPH, the amount of MPH during the first hour in a dissolution test is zero, 5 mg, 20 mg or some other amount as long as the amount of MPH released during the second interval *increases* compared to the amount released during the first interval.

242.    The Court's construction of an "ascending release rate" does not specify or require any minimum amount of non-IR MPH to be released during the first interval in a dissolution test.  [D.I. 130, Markman Order, at p. 2].  Dr. Banakar did not identify at trial any benefit that would accrue from release of non-IR MPH during the first interval.

243.    Ms. Gray disagreed with Dr. Banakar's opinion that a person of ordinary skill in the art would understand the claim term "ascending release rate" to require release of non-IR MPH during the first interval.  [Trial Tr. (V. Gray) 1323:2-6].

244.    Ms. Gray's release rate evaluation for the 54 mg ANDA products correctly compares the MPH release rates in separate, successive periodic intervals in determining whether ANDA products samples provided an "ascending release rate," as construed by the Court.  [*See* Trial Tr. (V. Gray) 251:5-252:2, 254:14-255:7 and 388:11-389:14; PX 241].  For example, when the MPH release rate in the first interval (after excluding the IR MPH) is zero and the MPH release rate in the second interval is 2.7 mg, an "ascending release rate" occurred over those intervals.  [*See* PX 241, at P ALZ 004573, sample "ANDRX E"].  Similarly, when the MPH release rate in the first interval (after excluding

60

the IR MPH) is 0.99 mg and the MPH release rate in the second interval is 2.53 mg, an "ascending release rate" occurred over those intervals.  [Trial Tr. (V. Gray) 254:14-20 and 389:15-390:2; PX 241, at P ALZ 004572, sample "ANDRX A"].

**(2)    The Periodic Intervals Being Compared Do Not Include the Hypothetical Interval before the Start of a Dissolution**

245.    Under Dr. Banakar's approach, the amount of non-IR MPH released from a dosage form during the first interval would have to be compared with "the amount released *before* t=0," a hypothetical one-hour period of time *before the in vitro dissolution test commences*.  [D.I. 134, Defendants' Opening Pretrial Brief (Nov. 2, 2007), at DFF ¶ 409; *see* Trial Tr. (U. Banakar) 540:4-13].  The Court's claim construction, however, explicitly requires that the periodic intervals of time, during which MPH release is compared, *start at zero hours* (*i.e.*, t=0), not one hour before t=0.  [D.I. 130, Markman Order, at p. 2].  "T=0" is the time point that marks the beginning of an *in vitro* dissolution test.  [Trial Tr. (V. Gray) 391:12-20 and 388:11-24].

246.    A dissolution test on a particular MPH dosage form commences when the dosage form is submerged in the dissolution medium — the environment in which drug release can occur.  Prior to the start of the dissolution test, there is no opportunity for drug release and no MPH release rate to measure.  *In vitro* dissolution tests have nothing to do with the hypothetical period of time before the test begins, and comparing MPH release during intervals before and after the start of a dissolution test is illogical.  [Trial Tr. (V. Gray) 387:18-388:10; 288:7-11; and 290:5-8].

247.    Ms. Gray testified that a person attempting to determine the release rate of a drug product would not compare the amount of MPH released in the first hourly

61

interval of an *in vitro* dissolution test with a hypothetical amount released before the test was commenced. She called this an "unheard of concept" and something that a person working in the field of dissolution would never do. [Trial Tr. (V. Gray) 289:4-12; and 290:4-8].

248. Dr. Banakar agreed on cross-examination that, in an *in vitro* dissolution test, samples are measured after the test is started, at time points after t=0. [Trial Tr. (U. Banakar) 594:13-18].

249. Defendants' assertion that the first periodic interval considered in determining whether an ascending release rate occurs is the one hour period *before* t=0 is inconsistent with its admission during the Markman proceedings that the intervals of time *start at t=0*. [D.I. 85, Defendants' Opening Markman Brief on Claim Construction, at p. 17 ("the parties agree that the time period commences at t=0.")].

250. Dr. Banakar acknowledged on cross-examination that the "first interval" after the start of a dissolution test is "zero to one hour" and the second interval is "one to two hours." [Trial Tr. (U. Banakar) 594:1-7].

251. Ms. Gray testified that the first two intervals that must be compared to evaluate if the release rate is increasing in an appropriate *in vitro* dissolution test are the first two intervals past T=0. [Trial Tr. (V. Gray) 389:1-8].

>        **(b)    The ANDA Products Would Infringe Even if Release of
>                Non-IR MPH Were Required in the First Interval**

252. Even if an "ascending release rate" required that some MPH must be released from the inner core ("non-IR" MPH) of the ANDA products during the *first*

interval in an *in vitro* dissolution test [Trial Tr. (U. Banakar) 535:6-14], the ANDA products still would meet the requirements of Claim 1 of the '373 patent.

253.    As explained below, the dissolution test results show that in a substantial number of tablets, the amount of MPH recovered during the first interval was too large to have been attributable solely to the IR portion.  Hence, it is reasonable to conclude that some non-IR portion of MPH was also released during the first interval.

254.    According to the ANDAs, the ANDA products are designed to have 25% of the total MPH in the IR coating, but the amount of IR MPH can be in the range of 22.5% to 27.5%.  [Trial Tr. (V. Gray) 1310:7-1311:3].  The MPH attributable to the IR coating in the ANDA products is excluded before comparing the MPH release rates in successive periodic intervals in determining whether the release rate element of the claims is met.  [D.I. 130, Markman Order; Trial Tr. (V. Gray) 251:5-16].

255.    Ms. Gray testified that, using the 25% specification for IR MPH content, many of the ANDA product samples tested by ARL (*i.e.*, 7 out of 36 samples) released non-IR MPH during the first hourly interval.  [Trial Tr. (V. Gray) 1311:17-22; and 253:10-23; PX 241; PX 243 and PX 245].

256.    Dr. Banakar testified that, even if one assumed that every sample was at the upper limit of allowable MPH content in the IR layer (27.5%), at least one of the samples released non-IR MPH during the first interval in a dissolution test.  [Trial Tr. (U. Banakar) 553:9-554:1; *see* Trial Tr. (V. Gray) 1311:4-16].

257.    On the other hand, if the ANDA product samples were assumed to be at the lower limit of allowable MPH in the IR layer (22.5%), Ms. Gray calculated that 31

out of the 36 ANDA product samples released non-IR MPH during the first hour in the dissolution test.  [Trial Tr. (V. Gray) 1314:19-1315:1; *see* 1312:18-1313:19 (54 mg results), 1313:20-1314:7 (36 mg results), and 1314:8-18 (27 mg results); PX 732-734; Trial Tr. (V. Gray) 1322:11-1323:1].

258.    Ms. Gray testified that some of the ANDA products release MPH from the tablet core (*i.e.*, non-IR MPH) during the first hour in an appropriate dissolution test (pH 7.5 medium) regardless of the assumed percentage content of the IR layer and thus release "over the entire range" of IR MPH content specified in the ANDA.  [Trial Tr. (V. Gray) 1315:2-9].

259.    A person experienced in dissolution testing would reasonably use the midpoint of the allowable range of MPH in the IR layer (25% ) in determining whether the release of MPH in the first hour also included release from the non-IR core, as Ms. Gray did in her infringement evaluation.  [Trial Tr. (V. Gray) 1315:10-24; and 1310:23-1311:3].  Defendants also acknowledged in their pretrial submission that Ms. Gray's use of the ANDA specification to quantify the amount of IR MPH in the ANDA products is "not necessarily unsound."  [D.I. 134, at p. 132, DFF ¶¶ 422-423].

260.    Defendants' scientist Dr. X. Cheng, who developed the ANDA products, confirmed that the ANDA products are designed to contain 25% of their total MPH dose in the IR drug coating.  [JDT (X. Cheng), at JDT 329:8-21 and JDT 330:11-17; Trial Tr. (X. Cheng) 634:19-23].

261.    Defendants' *in vitro* dissolution expert, Dr. Banakar did not supervise or conduct any *in vitro* dissolution tests on the ANDA products.  [Trial Tr. (U. Banakar) 580:14-581:10].

        **(c)**      **Defendants' Dissolution Tests on "DR Cores" Do Not
Establish the Dissolution Properties of the Complete
ANDA Products**

262.    Dr. Banakar attempted to buttress his opinion that no MPH is released
from the non-IR portion of the ANDA products during the first hour by referring to
certain dissolution tests done by Defendants on the tablet cores used to manufacture the
ANDA products that show that no MPH is released from the core (*i.e.*, non-IR MPH)
during the first hour. [Trial Tr. (U. Banakar) 557-560 (discussing DTX 1140-1143)]. In
the tests that Dr. Banakar relied on, none of the MPH was released from the core until
more than an hour after the dissolution test began.

263.    The tests relied upon by Dr. Banakar do not show that only IR MPH (and
no core MPH) will be released during the first hour in the completed product. As noted
above, release of MPH from the core is not required during the first hour of the
dissolution test in order for there to be an ascending rate of release. [PFF ¶¶ 240-244].
Even if a release of core or non-IR MPH were necessary during the first hour, the tests
done on the cores alone are not a reliable way to determine the release characteristics of
the completed tablet (which includes the outer IR layer). [Trial Tr. (M. Davies) 1250:9-
1251:6]. In addition, other internal tests are inconsistent with the selected tests relied on
by Dr. Banakar and show that in some samples, there is release of MPH from the
sustained-release core during the first hour. [*Id.* and 1252:3-1253:3; 1254:8-1255:11].


**REDACTED**

**REDACTED**

265.    The DR cores are not the finished MPH product that Defendants would sell if its ANDAs receive FDA approval, as witnesses for both sides agreed. [Trial Tr. (X. Cheng) 647:23-648:16; Trial Tr. (M. Davies) 1249:22-1250:8].

266.    Plaintiffs' formulation expert, Dr. Martyn Davies ("Dr. Davies") testified that *in vitro* dissolution tests on the DR cores are not a reliable way to evaluate the dissolution properties of the core when it is included in the complete tablet product. [Trial Tr. (M. Davies) 1250:9-1251:6].

267.    The MPH from the tablet core in the finished ANDA product would be expected to release at a faster rate than the MPH from the DR core by itself because the additional manufacturing processes involved in applying the IR coating onto the DR core are likely to change the release characteristics of the sustained-release coating. [Trial Tr. (M. Davies) 1250:9-1251:21]. Dr. Davies testified that, during the process of applying the IR MPH to the tablet cores, a solution containing the IR MPH is sprayed onto the tablet cores while the cores are revolving over each other. [Trial Tr. (M. Davies) 1250:9-1251:6]. The abrading and rubbing of the tablet cores that would occur during the IR coating process would likely disrupt the underlying sustained-release coating on the tablet cores and cause the cores to release MPH at a faster rate than the DR cores alone. [Trial Tr. (M. Davies) 1250:9-1251:21].

268.    Additional *in vitro* dissolution tests conducted by Defendants on DR cores show that MPH can be released from the DR core during the first hour in the dissolution

test.  [Trial Tr. (M. Davies) 1252:3-1253:3 and 1254:8-1255:11; PX 197A at 63300; PX

557, at 46113-114 and PX 563, at 66282].  For example, the dissolution test results on the

DR cores in PX 197A show that MPH is released within the first hour of the test.  [Trial

Tr. (M. Davies) 1307:7-1308:4].

269.    Defendants' assertion [D.I. 134, Defendants' Opening Pretrial Brief, p.

128] that the non-IR MPH in the ANDA products will begin to release several hours after

administration in a patient's body (*i.e.*, *in vivo*) is irrelevant to determining whether the

products meet the ascending release rate element of claim 1 because the "release rate is as

determined by an appropriate *in vitro* dissolution test."  [D.I. 130, Markman Order, p. 2;

*see* Trial Tr. (V. Gray) 219:12-19 ("*in vitro*" refers to outside the body, in a laboratory

environment)].

### (d)    Plaintiffs Used an Appropriate Dissolution Test for the ANDA Products

270.    In their pretrial brief, Defendants indicated that they would assert, through

the testimony of Dr. Needham and Dr. Banakar, that an "appropriate dissolution test" for

the ANDA products required a dissolution test that used two stages: an initial acidic

dissolution medium followed by a pH 7.5 dissolution medium.  [D.I. 134, at pp. 134-135;

DFF ¶¶ 430-433].  Defendants urged that by using an initial acid stage, only the IR MPH

would be released and one could determine the precise amount of IR MPH in the ANDA

products.  Defendants contended that this procedure was a "more appropriate" dissolution

test for the ANDA products.

271.    During trial, Dr. Banakar and Dr. Needham did *not* offer any testimony

that an "appropriate dissolution test" for the ANDA products required a dissolution test

that used an acidic dissolution medium followed by a dissolution medium having a pH above pH 7.0.

272.    Ms. Gray's testimony that an "appropriate" dissolution test for the ANDA products uses a pH 7.5 dissolution medium [*e.g.*, Trial Tr. (V. Gray) 224:10-22] was not challenged or rebutted by Defendants' witnesses at trial.

### (1)    Use of an Initial Acid Stage Is Not Appropriate

273.    Ms. Gray testified that the use of an acidic pH dissolution medium for the initial interval in dissolution tests on the ANDA products would not change the MPH release results, and she explained why:

> "[T]he immediate-release coating is what we call pH independent.  And that means no matter what the pH is, the immediate-release coat would fully dissolve within an hour."

[Trial Tr. (V. Gray) 239:18-240:3].

274.    Defendants admit that the immediate-release MPH portion of the ANDA products is pH independent — the "IR component…is pH independent (*i.e.*, the IR release will occur at any pH)."  [D.I. 134, at p. 133, DFF ¶ 425; Trial Tr. (X. Cheng) 643:3-6].

275.    Defendants' witness, Dr. Cheng, agreed that the IR MPH will be fully released in one hour in a dissolution medium "at any pH."  [Trial Tr. (X. Cheng) 642:21-643:11 and 644:1-4; *see* JDT (X. Cheng) at JDT 00330:7-17].

276.    A dissolution test that uses a pH 7.5 dissolution medium is appropriate for the ANDA products because *both* the IR MPH component and the extended-release MPH

component will release from the products in this dissolution medium. [Trial Tr. (V. Gray) 239:18-240:3, 240:18-241:7, and 243:16-19].

277.    The *in vitro* dissolution test that Defendants proposed to the FDA, and the FDA accepted, for the ANDA products uses a pH 7.5 dissolution medium throughout the test; it does *not* use two stages, *i.e.*, an initial acidic dissolution medium followed by a dissolution medium having a pH above pH 7.0. [Trial Tr. (V. Gray) 225:13-226:4 and 236:7-11; PX 227].

> **(2)    Plaintiffs' Dissolution Tests on the ANDA Products Using Acidic pHs Are Irrelevant**

**REDACTED**

279.    Defendants have pointed to preliminary tests conducted by ARL to evaluate the ANDA products that used dissolution media at several pHs below pH 7.0. [Trial Tr. (V. Gray) 245:5-18; PX 229].

280.    Plaintiffs conducted dissolution tests on the ANDA products using an acidic medium before the Court had issued its claim construction and so that they would have MPH release data under acidic conditions in the event that Defendants' proposed claim construction was adopted.  [Trial Tr. (V. Gray) 245:5-22].  The conduct of the tests does not suggest or imply that it would be correct to conduct the tests using an acidic medium.

**REDACTED**

     **(3)**     **The Acidic Dissolution Medium Mentioned in the '373 Patent Is Appropriate for the Exemplary Osmotic Dosage Forms**

282.    All of the exemplary dosage forms described in the Examples of the '373 patent are osmotic dosage forms, and four of them contain MPH (Examples 1-3 and 6) as the active drug.  [DTX 1, '373 patent].

283.    The osmotic dosage forms containing MPH exemplified in the '373 patent do not require a specific pH condition for proper drug release because they are pH-independent dosage forms.  [DTX 1, '373 patent, at col. 3, lines 25-30; Trial Tr. (V. Gray) 1316:18-1317:6].

70

284.    Use of an acidic dissolution medium (pH 3) in the Examples of the '373 patent for the osmotic dosage forms was appropriate because (i) the drug release mechanism of the dosage forms being tested is pH independent and thus does not require a particular pH and (ii) MPH is more stable in acidic media than in basic media (*e.g.*, which eliminates the step of calculating the amount of degradation products when determining the release rate).  [Trial Tr. (V. Gray) 1316:18-1317:6].

285.    USP Apparatus VII is a special-use dissolution apparatus that was developed for testing osmotic dosage forms.  [Trial Tr. (V. Gray) 233:11-234:6 and 1316:18-1317:6; PX 448, at pp. 60-61].

286.    The USP Apparatus VII would not be considered an appropriate dissolution apparatus for testing the ANDA products unless the preferred apparatus — USP Apparatus 1 or 2 — proved unsuitable for testing the products.  [Trial Tr. (V. Gray) 233:11-234:6 and 228:12-18; DTX 1, '373 patent, at col. 3, lines 25-30].

### (e)    There Is No "Error" in ARL's Dissolution Results

287.    Dr. Banakar conducted no dissolution tests of his own.  The dissolution tests conducted by ARL, and Ms. Gray's evaluation of the tests, are consistent with the tests performed by Defendants to generate the data they submitted to the FDA.  Despite this, Dr. Banakar testified at trial that, in his opinion, there were errors in the ARL test procedures.

288.    Ms. Gray refuted the criticisms advanced by Dr. Banakar and established that the test procedures were reliable and that her dissolution calculations were sound.  In particular, Dr. Banakar pointed to what he considered an anomaly in the reported

dissolution test results on the 54 mg samples — *i.e.*, that at 24 hours, more than 100% of the amount of MPH in the tablet had been recovered.  He considered this to be a measurement error and then proceeded to recalculate all the release data for each interval by multiplying the actually measured values by a fraction representing the value that would produce a hypothetical 100.0% release value at the 24-hour timepoint.  [Trial Tr. (U. Banakar) 570:11-24].  The recalculations had the effect of reducing the amount of MPH recovered at each interval.

289.    The first question is whether there was a measurement error in the 24 hours recovery.  ARL's seemingly "high" dissolution results at 24 hours — the basis for Dr. Banakar's claims of error in the tests — was not an error, but was simply a reflection of normal evaporation of the dissolution medium over 24 hours.  [*e.g.*, Trial Tr. (V. Gray) 269:15-270:15].

290.    Dissolution tests measure the concentration of a drug in the dissolution test media at various time points.  [Trial Tr. (V. Gray) 208:15-22 and 222:1-6].  As the drug is released from the dosage form and dissolves, the concentration of drug in the solution increases.  The concentrations are used to calculate the total amount of drug released at each time point of measurement.  [Trial Tr. (V. Gray) 222:1-21, discussing PX 726E].

291.    Standard dissolution tests, including the dissolution tests done by ARL, typically use an aqueous (*i.e.*, water) based dissolution medium.  [Trial Tr. (V. Gray) 220:8-13].  When the dissolution medium is heated and stirred for 24 hours, some evaporation of the liquid will occur.  [Trial Tr. (V. Gray) 268:1-19 and 269:2-21].  Dr.

Banakar agreed that evaporation of the aqueous dissolution medium will occur in dissolution tests run for 24 hours.  [Trial Tr. (U. Banakar) 598:18-599:2].

292.    Ms. Gray testified that the apparently "high" % Recovery results at the 24-hour time point in ARL's tests on the 54 mg ANDA products were fully explained by the natural phenomenon of evaporation of water from the test medium over time.  [Trial Tr. (V. Gray) 269:15-270:15].  In particular, as she explained, over a 24 hour time period, some amount of the dissolution medium (which is an aqueous solution that is being heated and stirred throughout that period) will have evaporated.  The decreased total volume of the dissolution medium at 24 hours will increase the concentration of the drug in the solution, leading to a total percent released that appears to exceed the amount of drug in the sample being tested (*i.e.*, values in excess of 100% of the dose).  [*Id.* at 268:13-19].

293.    The evaporative loss of medium measured at 24 hours did not require any adjustment of the results seen during the first 10 hours of the test, which are pertinent to the release rates at issue here.  The ANDA products fully release MPH by about 10 hours in a dissolution test.  [PFF ¶ 128; Trial Tr. (V. Gray) 272:17-23].  Ms. Gray confirmed that no significant evaporation occurs through 10 hours in a dissolution test.  [Trial Tr. (V. Gray) 270:4-19].  The ARL data relied on by Ms. Gray to establish infringement is accurate and reliable.  [Trial Tr. (V. Gray) 1320:16-1321:9].

294.    During the ARL dissolution tests on the 54 mg ANDA products, samples of dissolution media were withdrawn every hour through 12 hours and one additional sample was taken twelve hours later, at 24 hours.  [Trial Tr. (V. Gray) 266:1-267:1; PX 229, at P ALZ 004457 (under "Dissolution Methodology")].

73

295.    The sample taken at the 24-hour timepoint during the dissolution tests on the 54 mg ANDA products was exploratory and unnecessary since the ANDA products are designed to complete release of the MPH by about 10 hours in an *in vitro* dissolution test using pH 7.5 dissolution media.  [Trial Tr. (V. Gray) 266:13-267:19].

296.    The results of the ARL dissolution tests on the 54 mg ANDA products show that, overall, the ANDA products fully released the MPH within about 10 hours (*i.e.*, essentially 100% Recovery was observed by 10 hours).  [Trial Tr. (V. Gray) 272:17-23; PX 242, reporting an average % Recovery of 100.83% at 10 hours; PX 242, reporting % Recovery values ranging from 97.03% to 104.4% for the individual 54 mg tablets].

297.    The dissolution results generated by Defendants and presented in their ANDA also show that the ANDA products fully release MPH within about 10 hours.  In their ANDA, Defendants reported an average MPH release value of 100% at 10 hours, and individual release values ranging from 98% to 103% at 10 hours, from dissolution tests on the 54 mg ANDA products under the same test conditions used by Plaintiffs' testing laboratory (ARL).  [PX 210, at ANDRX 00201; Trial Tr. (V. Gray) 271:3-15].

298.    In ARL's dissolution tests on the 54 mg ANDA products using USP Apparatus 1 and pH 7.5 dissolution medium, the cumulative amounts of MPH released (expressed as "% Recovery") at 24 hours for the individual tablets were slightly over 100% — they ranged from 102.71 % (Cycle 2, ANDRX D) to 110.87% (Cycle 2, ANDRX A).  [Trial Tr. (V. Gray) 267:20-24; PX 238].

299.    The apparently "high" % Recovery results at the 24-hour time point in ARL's tests on the 54 mg ANDA products are the result of the decreased volume of the

test medium caused by the normal evaporation of some amount of the aqueous dissolution medium. [Trial Tr. (V. Gray) 269:15-21 and *see* 268:1-269:5].

300.    Number not used.

301.    Number not used.

302.    Number not used.

303.    To determine whether evaporation accounted for the observed concentrations and seemingly "high" % Recovery at 24 hours, ARL performed an evaporation study that confirmed that evaporation was, in fact, the cause of the seemingly "high" percent released values at the 24-hr time point in its dissolution tests on the 54 mg ANDA products. [Trial Tr. (V. Gray) 268:20-269:21 and 1320:21-1321:9; DTX 171; DTX 170, at P ALZ 005987].

304.    ARL's evaporation study demonstrated that, on average, 93.4% (or 467 mL) of the original volume of 500 mL remained after 24 hours, an evaporative loss of about 6.6% (or 33 mL). [DTX 170, at P ALZ 005987; DTX 171].

305.    Since evaporation explains the apparently "high" % Recovery values at 24 hours in ARL's tests on the 54 mg ANDA products, there is no reason to adjust or correct Plaintiffs' data. [Trial Tr. (V. Gray) 269:15-270:15 and 1321:21-1322:1].

306.    Even if a correction for volume loss is made to the 24 hour results, no adjustment would be made or is necessary for the dissolution results through 10 hours because any "error" from evaporation during that time period is insignificant. [Trial Tr. (V. Gray) 270:4-15].

307.    Ms. Gray satisfied herself to a reasonable scientific certainty that ARL's dissolution data on the ANDA products was accurate and reliable.  [Trial Tr. (V. Gray) 1320:16-1321:9].

308.    Defendants did not adjust the *in vitro* dissolution results that they submitted to the FDA in the ANDAs to account for any evaporation that occurred through 10 hours.  [Trial Tr. (V. Gray) 270:16-271:2; Trial Tr. (X. Cheng) 647:2-6 and 647:17-22; *see* PX 212, Defendants' standard test method "STM# FP-028, at ANDRX 00833 (in the calculation of amount of MPH released, the dissolution media volume is a *constant* value (500 mL)); PX 210, ANDRX 00201 (referencing Defendants' test method "STM# FP-028)].

309.    In its dissolution tests on the 54 ANDA products, ARL calculated the amount of MPH (% Recovery) in each dissolution sample using a constant dissolution volume (500 mL), using exactly the same calculation that Defendants used to obtain the dissolution results that they submitted to the FDA in the ANDA.  [PX 229, Plaintiffs' testing protocol, at P ALZ 4458 ("The samples will be analyzed using methodology detailed in references STM # FP-0028"); *see* PX 212, Defendants' standard test method "STM# FP-028, at ANDRX 0833 (in the calculation of amount of MPH dissolved, the "Dissolution volume" is a *constant* value of 500 mL); PX 210, ANDA for 54 mg product, at ANDRX 00201 (referencing Defendants' test method "STM# FP-028)].

310.    Dr. Banakar viewed a % MPH Recovery of "over 105%" as indicating an error in the data.  [Trial Tr. (U. Banakar) 602:14-603:12 and 615:11-17].

311.    Based on the "high" ARL data at 24-hours, Dr. Banakar recalculated Plaintiffs' dissolution data for the 54 mg, 36 mg and 27 mg ANDA products on the

76

assumption that the concentration should have showed a 100% Recovery at 24 hours (meaning that no evaporation occurred).  [Trial Tr. (U. Banakar) 570:11-24, 571:12-572:1, 597:7-9 and 614:13-615:17].  Dr. Banakar's assumption is incorrect in light of the evaporation study, showing that the concentrations reported by ARL were sound.  Dr. Banakar described his recalculation of all of the test results as "normalization."  [Trial Tr. (U. Banakar) 571:22-572:1].

312.    Dr. Banakar's recalculated release rate values, which assume that the ANDA products take 24 hours to fully release MPH, are not representative of the products.  As stated in the ANDAs, all of the MPH in the ANDA products is consistently released in a pH 7.5 dissolution medium by 10 hours, not 24 hours.  [PX 210, ANDA for 54 mg product, Defendants' Proposed Dissolution Method, at P ALZ 0199 — "the last interval, 0-10 hr, evaluates the *full release* of the labeled quantity of methylphenidate hydrochloride;" Trial Tr. (V. Gray) 272:17-23; and *see* PFF ¶¶ 197, 206, 215 (ANDRX and ARL dissolution test results on 54, 36, and 27 mg ANDA products showing around 100% Recovery at 10 hours)].

313.    In ARL dissolution tests on the 36 mg and 27 mg ANDA products, hourly samples of the dissolution medium were taken through 12 hours, which was the last time point in these tests.  [PX 229, at P ALZ 004457 (under "Dissolution Methodology")].

314.    Dr. Banakar recalculated Plaintiffs' test results on the 36 mg and 27 mg ANDA products even though *none* of the % Recovery values at 12 hours (the final sampling time for those tests) exceeded Dr. Banakar's acceptability limit of 105%.  [PX 239, ARL results on 36 mg ANDA product, showing % Recovery results at 12 hours for individual tablets ranging from 98.11% to 104.49%; PX 240, ARL results on 27 mg

ANDA product, showing % Recovery results at 12 hours for individual tablets ranging

from 98.19% to 104.6%; *see* Trial Tr. (U. Banakar) 574:17-21 (confirming that Dr.

Banakar recalculated the 36 mg and 27 mg data)].

315.    Dr. Banakar acknowledged that, even after he changed the data pursuant

to his so-called "normalization" process, the dissolution results for the 36 mg and 27 mg

ANDA products "didn't change" and the same samples that Ms. Gray had concluded

infringed still infringed (under her analysis).  [Trial Tr. (U. Banakar) 608:23-609:8].

316.    Dr. Banakar conceded that his supposed "normalization" of Plaintiffs'

dissolution data had a "disparate effect" on each of the three dosage strengths and that the

dissolution results on the 54 mg ANDA product were most affected by his recalculation

of the data.  [Trial Tr. (U. Banakar) 608:2-22].

317.    Dr. Banakar also acknowledged that he recalculated all of Plaintiffs'

dissolution data on the 54 mg ANDA products irrespective of whether the individual 54

mg samples had a percent MPH Recovery above 105% at 24 hours.  [Trial Tr. (U.

Banakar) 607:14-19].

318.    Ms. Gray testified that she disagreed with Dr. Banakar's approach to the

ARL data and that his recalculations destroyed the integrity of the data and simply

changed the data in a way favorable to Defendants.  [Trial Tr. (V. Gray) 1320:7-15 and

1322:2-10].

319.    Dr. Banakar admitted that he was not aware of ARL's evaporation study at

the time he recalculated the ARL dissolution data.  [Trial Tr. (U. Banakar) 618:17-619:3].

320.     Dr. Banakar testified that he had seen the ARL evaporation study by the time he was deposed in this case, but that he didn't consider it because the data "was illegible" to him.  [Trial Tr. (U. Banakar) 617:10-618:1].

321.     Defendants' counsel apparently did not provide Dr. Banakar with a printed and legible spreadsheet with the evaporation study data [DTX 170, at P ALZ 005987] that Plaintiffs had produced to Defendants' counsel in April 2007, months before Dr. Banakar's deposition in late July 2007.  [*See* DTX 169, letter from Plaintiffs' counsel to Defendants' counsel indicating that P ALZ 005987 was produced on April 13, 2007].

322.     The Court finds no basis for questioning the reliability of the evaporation study.  Defendants attempted during the cross-examination of Ms. Gray to suggest that the test results were suspect because the vessels used by Mr. Walker in the test had precisely the same weight.  [Trial Tr. (V. Gray) 385:6-20].  However, the empty beaker weights recorded in Mr. Walker's notebook pages for the evaporation study are all the same because he used the same beaker each time.  [Trial Tr. (V. Gray) 1321:13-17].

323.     Ms. Gray did not find any flaws in the evaporation study done by ARL. [Trial Tr. (V. Gray) 1321:10-12 and 1321:18-20].  There is no basis for questioning the reliability of the evaporation study conducted by ARL and relied on by Ms. Gray. Because the evaporation study explains the apparent anomaly in the percentage recovery amounts identified by Dr. Banakar, the Court finds no basis for adjusting the test results as proposed by Dr. Banakar.

**D.    Literal Infringement of Claims 6 and 7 of the '373 Patent**

324.    Claims 6 and 7 are dependent on Claim 1.  As construed by the Court, the term "substantially ascending methylphenidate plasma drug concentration over about [5.5 and about 8] hours" in Claims 6 and 7 of the '373 patent requires a MPH plasma concentration profile in which "the plasma concentration of methylphenidate generally rises over approximately [5.5 and 8 hours], but may include a slight dip."  [D.I. 130, Markman Order, p. 2].

325.    If Defendants' ANDAs are approved, the administration of the ANDA products to individuals as directed by Defendants' label will result in a substantial patient population having a substantially ascending MPH plasma drug concentration over a time period of both about 5.5 hours and about 8 hours.  [Trial Tr. (M. Angst) 398:1-5; 430:22-421:5; 435:16-437:8; 445:13-447:3; PX 257, at ALZ 4748-4761; PX 590; PX 591; PX 293, at ANDRX 1034-35; PX 294, at ANDRX 2265-68].  Plasma concentration data from patients administered Defendants' ANDA product conclusively establish this result.

326.    As part of the ANDA, Defendants submitted to the FDA MPH plasma concentration data generated by 50 subjects administered the 54 mg ANDA product.  [PX 293; PX 294; Trial Tr. (M. Angst) 420:8-434:19].  The 50 subjects were participants in one of two bioequivalency studies: (1) a "fed" study, in which the subjects were allowed to eat standardized meals; and (2) a "fasted" study, in which the subjects were not allowed to eat before being administered the drug.  [*Id*.].  There were 27 subjects in the fasted study and 23 subjects in the fed study.  The fasted study was performed twice.  [PX 293, at ANDRX 1034-35; PX 294, at ANDRX 2265-68; Trial Tr. (M. Angst) 431:6-

434:19].  Defendants' ANDA included the individual test data for all of the subjects as well as calculated mean data for both the fed and fasted studies.

327.    Defendants' test data show: (i) the mean MPH plasma concentration-time profile for the fed subjects is substantially ascending for about 5.5 hours and for about 8 hours; (ii) the mean MPH plasma concentration-time profile for the fasted subjects is substantially ascending for about 5.5 hours and for about 8 hours; and (iii) a substantial number of the subjects in each of the two test groups had MPH plasma concentration-time profiles that were substantially ascending for about 5.5 hours or for about 8 hours. [Trial Tr. (M. Angst) 422:2-448:8; 398:1-5; and 445:13-447:3; PX 257, at ALZ 4748-4751; PX 293, at ANDRX 1034-35].

328.    The Court credits the testimony of Dr. Martin Angst ("Dr. Angst") on the characterization of MPH plasma profiles for Defendants' ANDA product.  Dr. Angst is an expert in the field of pharmacokinetics, pharmacodynamics, clinical pharmacology and anesthesiology.  [Trial Tr. (M. Angst) 393:8-396:16; PX 256 (Dr. Angst's Curriculum Vitae)].  The analysis of plasma drug concentrations is one of the basic tools used in clinical pharmacology.  [Trial Tr.  (M. Angst) 394:1-3].  Dr. Angst has extensive experience in reviewing and analyzing plasma drug concentrations.  [*Id.*].

329.    At trial, Defendants provided no testimony contrary to that of Dr. Angst. In addition, Defendants did not proffer any witnesses having experience in clinical pharmacology.  The only testimony offered by Defendants concerning the MPH plasma profile data in Defendants' ANDA related to statistical analyses of the plasma profile data.  [Trial Tr. (S. Bolton) 748:20-750:18; DTX 694 (Dr. Bolton's Curriculum Vitae)].

There was no testimony offered by Defendants regarding the clinical significance of any aspect of the plasma data.

> **1.    The Mean "Fed" Plasma Concentration Data in Defendants' ANDA Establishes that Defendants' ANDA Products Will Likely Result in a Substantially Ascending MPH Plasma Drug Concentration over about 5.5 and about 8 Hours.**

330.    The mean MPH plasma concentration-time profiles for the ANDA products demonstrate the pharmacokinetic profiles that are likely to occur in any individual patient.  [Trial Tr. (M. Angst) 426:16-428:1].  Defendants' ANDA includes Figure 1.1 [PX 293, at ANDRX 1045] depicting the mean MPH plasma concentration-time profile for the fed subjects that were administered the 54 mg ANDA product.  In this figure, the line labeled "A:TEST" is the mean concentration profile for Defendants' 54 mg ANDA product, and the line labeled "B:REFERENCE" is the mean concentration profile for Plaintiffs' CONCERTA® product.

### DEFENDANTS' ANDA FIGURE 1.1 [PX 293, at ANDRX 1045]



331.    The mean MPH plasma concentration-time profile for the ANDA product in the fed study substantially ascends for both about 5.5 hours and for about 8 hours.  At 5.5 hours, the MPH plasma concentration is higher than at any earlier time.  At 8 hours, the MPH plasma concentration is also higher than at any earlier time.  [PX 293, at ANDRX 1034-35].

332.    The time at which the maximum MPH plasma concentration is reached ($T_{max}$) for Defendants' product is 9 hours after administration, which confirms that the MPH plasma concentration in patients administered the ANDA products substantially ascends for the period of time required by Claims 6 and 7 of the '373 patent.  [Trial Tr. (M. Angst) 426:5-428:14; PX 293, at ANDRX 1038; Trial Tr. (M. Mayersohn) 875:9-876:14].

333.    The mean MPH plasma concentration-time profile in Defendants' ANDA for the fed study has a slight dip in the MPH plasma concentration at around the 4-hour timepoint.  This slight dip is consistent with the claim requirements as construed by the Court.  [Trial Tr. (M. Angst) 400:17-406:1; 429:15-430:17; PX 293, at ANDRX 1045].

334.    The dip observed for the 54 mg ANDA product in the mean MPH plasma concentration-time profile is approximately 14% and qualifies as a "slight dip" according to the Court's construction of the claims of the '373 patent.  [Trial Tr. (M. Angst) 400:16-406:1; and 429:15-430:17].

335.    The '373 patent contrasts the mean MPH plasma concentration profile for CONCERTA® (given once-daily) with the mean profile of immediate-release MPH administered in the TID regimen.  A figure comparing the two profiles is shown in Figure 4 of the patent.  [Trial Tr. (M. Angst) 400:21-401:9; DTX 1].

336.    The patent characterizes the decline that occurs at around 6 hours in the CONCERTA® profile as a "slight dip" and the sharp declines that occur in the TID regimen as "troughs." [DTX 1, at col. 22:1-16]. The size of the "troughs" in Figure 4 of the patent are significantly larger that the size of the slight dips. In the troughs associated with the TID regimen, the MPH plasma concentration declines by approximately 35 to 40%. [Trial Tr. (M. Angst) 401:21-402:16].

337.    By contrast, the data that underlie Figure 4 of the '373 patent show that the average size of the dips for all of the individuals given CONCERTA® is 14.7%. [Trial Tr. (M. Angst) 404:13-405:18; PX 704].

**Average Max Dip Size in Subjects –**
**Fig. 4 of the '373 Patent**

| Subj. | Max Dip |
|---|---|
| 31 | 0.0 |
| 34 | 0.0 |
| 44 | 1.1 |
| 43 | 1.8 |
| 23 | 6.8 |
| 12 | 7.8 |
| 20 | 10.4 |
| 19 | 10.7 |
| 40 | 17.8 |
| 24 | 20.0 |
| 42 | 20.5 |
| 37 | 21.7 |
| 36 | 23.2 |
| 41 | 23.7 |
| 21 | 28.8 |
| 14 | 40.8 |
| **Average** | 14.7 |

338.    Dr. Angst also performed calculations on the data in the ANDA generated by giving the same individuals the same ANDA products on different days. Dr. Angst

showed that the MPH plasma concentration profiles for individuals given the ANDA product on one day differed by approximately 13.9%, on average, from the profiles produced in those same individuals given the same ANDA product on a different day. [Trial Tr. (M. Angst) 407:17-414:6; *see* PX 583 (comparison of first dips in same subject from R02-469 study prepared by Dr. Angst); PX 294, at ANDRX 2265-68 (underlying data used to prepare PX 583)]. Dr. Angst's calculations based on the inter-day variation seen in the same test subjects further establish that a person of ordinary skill in the art would expect to see a fluctuation of 10 to 15% of the MPH plasma concentration. [*Id.*].

339.    The '373 patent states that the decline observed in the CONCERTA® plasma profile is a "slight dip." Because the average size of the dip observed for the ANDA products in the mean-plasma concentration-time profile is approximately 14%, the dip observed with the ANDA products can be properly characterized as a slight dip according to the '373 patent. [*See* Trial Tr. (M. Angst) 405:14-406:1; 418:19-419:1]. In addition, the size of the dip observed with the ANDA products is much closer to the slight dip described in the '373 patent than the trough. [Trial Tr. (M. Angst) 514:14-515:14].

340.    A dip of 10 to 15% in MPH plasma concentrations will not have any therapeutic significance, and that is why profiles having dips of that magnitude along the way to their peak concentration are viewed as having substantially ascending MPH plasma concentrations. [Trial Tr. (M. Angst) 407:4-8]. This is confirmed by ALZA's clinical studies on CONCERTA®. During testing, CONCERTA® provided consistent therapeutic efficacy throughout the day despite exhibiting 10 to 15% variations in plasma

concentrations in patients.  [Trial Tr. (D. Guinta) 84:11-86:18; Trial Tr. (M. Angst) 406:11-407:3].

341.    Defendants offered no testimony or other evidence that a dip of 10 to 15% has any clinical significance.

342.    A dip on the order of 10 to 15% also would be considered the typical degree of variability seen in measured human plasma concentration values by a person of ordinary skill in the art, because measured MPH plasma concentrations of patients who have taken extended-release MPH products typically exhibit variability in the range of 10 to 15%.  [Trial Tr. (M. Angst) 407:17-409:24].

343.    As a result of this expected degree of variability, MPH plasma profiles produced by any particular extended-release MPH product will vary between patients and in the same patient who takes the same product on different days.  [Trial Tr. (M. Angst) 407:9-409:2].  For example, a patient that takes the same dose of the same extended-release MPH product on different days will not exhibit the same plasma concentration-time profile each time he or she takes the product.  [*Id*.].  The fluctuations in MPH plasma concentration over time are largely due to variations in how the drug is absorbed into the body, how the drug is distributed within the body, and how the drug is eliminated from the body.  [*Id.*].

344.    Because the decline observed in the mean MPH concentration profile for fed patients taking Defendants' product is within the normal range of variability that would be expected to occur, the decline is properly characterized as being no more than a slight dip within an otherwise ascending plasma concentration over time, and the plasma concentration overall is properly characterized as being a substantially ascending plasma

concentration according to the claims of the '373 patent.  [Trial Tr. (M. Angst) 429:4-431:5].

345.    A person of ordinary skill in the art would understand that recorded data points are somewhat inexact due to the inherent variability of plasma concentration data (including variability arising from measurement of the data).  [Trial Tr. (M. Angst) 407:17-409:25].  A statistical measure of variation in data, called a 95% confidence interval, is commonly used in pharmaceutical science to assess the variation in a particular set of data.  [Trial Tr. (M. Angst) 414:7-19].  By calculating the 95% confidence interval, one can determine the range of possible values within which one would expect each data point to be found 95% of the time.  [Trial Tr. (M. Angst) 413:21-25].

346.    One can determine 95% confidence intervals for the mean MPH plasma concentration time profile data shown in the '373 patent for CONCERTA® and for the data produced by Defendants during their own bioequivalence studies using CONCERTA®.  Fluctuations of 10-15% of the measured values for the test data generated using CONCERTA® fall within the 95% confidence intervals calculated for the data.

347.    One can also determine 95% confidence intervals for the mean plasma concentration data generated from testing of the ANDA products.  These 95% confidence intervals also show that fluctuations of 10-15% of the measured values fall within the 95% confidence interval for that data.  [Trial Tr. (M. Angst) 411:3-414:6; 423:23-424:9; *see* PX 437 (underlying calculations)].

348.    The 95% confidence interval statistical analysis of the CONCERTA® and the ANDA plasma data provides additional support for the conclusion that a person of ordinary skill in the art would not consider declines of 10 to 15% as being anything more than a slight dip within an overall ascending plasma concentration, and that plasma profiles with slight dips of this magnitude would be considered by such a person as being substantially ascending MPH plasma concentrations according to the '373 patent.

349.    Defendants' expert, Dr. Sanford Bolton ("Dr. Bolton") testified that, in his opinion, a 90% confidence interval would have been more appropriate to use to analyze the variability in the plasma concentration data.  [Trial Tr. (M. Angst) 414:7-19].

350.    However, a 95% confidence interval is the most commonly used interval in pharmaceutical science.  [Trial Tr. (M. Angst) 414:7-17].  Dr. Bolton's own textbook on pharmaceutical science states this fact.  [Trial Tr. (M. Angst) 414:13-17; PX 585 at 98 (Dr. Bolton's textbook referring to  the 95% confidence interval as "the most commonly used . . . . confidence interval . . . .")].  The Court finds that the use of the 95% confidence interval is an appropriate tool for understanding the variability and precision of the data points and that its application to the plasma concentration data for CONCERTA® and the ANDA product corroborates Dr. Angst's opinion that a 10 to 15% variation in the data would be expected by a person of ordinary skill in the art.

351.    Defendants' expert, Dr. Bolton, testified that, in his opinion, the decline observed in the mean profile for the fed subjects given Defendants' product is too large to be considered a "slight dip."  Dr. Bolton based his opinion entirely on his assumption that a decline can be considered a "slight dip" only if the dip was not "statistically

significant." [Trial Tr. (S. Bolton) 754:23-755:16; 759:1-760:11; Trial Tr. (M. Angst) 415:10-416:8].

352. Dr. Bolton is a statistician and is not a clinical pharmacologist and was proffered by Defendants only as an expert in statistics and biostatistics. [Trial Tr. (S. Bolton) 748:20-750:18; DTX 694 (Dr. Bolton's Curriculum Vitae)].

353. Neither Dr. Bolton nor any other witness for Defendants disputed the evidence that a decline in the MPH plasma concentration of 10 to 15% would have no clinical significance. Similarly, Defendants presented no evidence to suggest that variability of this magnitude is uncommon and unexpected.

354. The '373 patent makes no mention of "statistical significance" in discussing what a "slight dip" is within an otherwise ascending MPH plasma concentration. The patent does not use the test of statistical significance in any way to describe or explain fluctuations in MPH plasma profiles.

355. Defendants did not propose that the claim term "substantially ascending methylphenidate plasma concentration" be defined in a way that linked the existence of a slight dip with the concept of statistical significance, and there is no requirement for statistical significance of the size of decreases in MPH plasma concentrations in the Court's construction of the claims of the '373 patent. [*See* D.I. 130, Markman Order, p. 2].

356. Because the claims of the '373 patent involve the treatment of patients, the Court credits the testimony of Dr. Angst and Dr. Guinta that address the clinical and therapeutic significance of declines in MPH plasma concentrations. [Trial Tr. (D.

Guinta) 84:11-86:18; Trial Tr. (M. Angst) 406:11-407:3].  The testimony of Dr. Angst

and Dr. Guinta establishes that the clinical significance of fluctuations in the MPH

plasma concentration, along with the inherent variability observed to occur with plasma

concentrations, would be the most important factors that influence the determination by a

person of ordinary skill of whether a particular MPH plasma profile is substantially

ascending for the periods of time specified in the claims of the '373 patent.  [Trial Tr. (D.

Guinta) 84:11-86:18; Trial Tr. (M. Angst) 406:11-407:3].

357.    A person of ordinary skill in the art considering the significance of a

decline or fluctuation of MPH drug plasma concentration would be concerned about

whether and how a decline in drug plasma concentration impacts the treatment of the

patient, and not simply the statistical probability that a decline will occur.  Statistical

significance of a decline in a mean profile considered in isolation does not provide any

clinically relevant information, such as whether a measured decline will have clinical or

therapeutic effects or significance.  [Trial Tr. (M. Angst) 416:15-22].  Instead, statistical

significance considered in isolation simply indicates how probable it is that a decline will

occur.  [Trial Tr. (M. Angst) 415:14-19; and 416:15-22].  A small and insignificant

decline on the order of 10 to 15% which occurs regularly might be statistically significant

even though it lacks any therapeutic significance, while rather large declines that occur at

random times might not be statistically significant even though they would be expected to

have therapeutic effects.  [Trial Tr. (M. Angst) 416:15-417:8].

358.    Statistical significance is also irrelevant when one evaluates the size of a

fluctuation in the drug plasma concentration for a single individual.  Statistical

significance is only evaluated on the basis of collections of measurements from populations of individuals. [Trial Tr. (M. Angst) 415:20-416:13].

359.    Accordingly, the Court finds that evidence of the statistical significance of a fluctuation in MPH plasma profiles measured in populations of individuals given a particular product, standing alone, is not probative of whether declines being observed in such MPH plasma concentration-time profiles may be characterized as a slight dip or not. Instead, the Court finds that fluctuations of 10-15% within an individual MPH plasma profile, or within a collection of such profiles, are properly considered slight dips within the meaning of the '373 patent claims.

360.    The Court further finds that, based on Defendants' fed mean profile, the typical patient will exhibit a substantially ascending MPH plasma concentration profile for about 5.5 and for about 8 hours. [Trial Tr. (M. Angst) 428:2-431:5]. The fed profile is the type of profile that would be expected upon administration of all of the ANDA products to individuals as directed by the Defendants' label, because children generally eat breakfast before they would take their daily dose of the drug product. [*Id.* at 433:2-6].

> **2.    The Mean "Fasted" Plasma Concentration Data in Defendants' ANDA Establishes that Defendants' ANDA Products Will Likely Result in a Substantially Ascending MPH Plasma Drug Concentration over about 5.5 and about 8 Hours.**

361.    Defendants' mean fasted profile shows that a substantial fasted patient population taking the product would also be expected to have MPH plasma concentrations that substantially ascend for both about 5.5 and about 8 hours. [Trial Tr.

(M. Angst) 436:11-437:8; 446:15-447:3; PX 257, at ALZ 4751-4761; PX 590; PX 591; PX 294, at ANDRX 2265-68].

362.    Defendants' ANDA product was tested twice in fasted subjects. Defendants' ANDA includes the following figure, which provides the mean plasma concentration profiles from the two sets of fasted subjects (labeled "A1: Test" and "A2: Test").  [PX 294, at ANDRX 2281; Trial Tr. (M. Angst) 431:6-24].  The figure also shows mean MPH plasma concentrations Defendants measured from two sets of subjects administered CONCERTA® (labeled in the graph as "B1: Reference" and "B2: Reference").  [*Id.*].

**DEFENDANTS' ANDA FIGURE 1 [PX 294, at ANDRX 2281]**



363.    The two mean fasted profiles graphically represented above have an apparent $T_{max}$ at about 7 and 7.5 hours.  [Trial Tr. (M. Angst) 432:11-15].  The $T_{max}$, however, is subject to the inherent 10 to 15% variability associated with MPH plasma

concentrations.  [PFF ¶¶ 345-346].  A person of skill in the art would understand that this means that the exact or true $T_{max}$ cannot be pinpointed with absolute precision.  [Trial Tr. (M. Angst) 424:17-425:24].  Thus, as explained by Dr. Angst at trial, what can be determined is that the true $T_{max}$ occurs in a time frame where the reported concentrations are within 10 to 15% of the apparent (observed) $T_{max}$.  [Trial Tr. (M. Angst) 425:1-24]. Accordingly, for any individual profile, the true $T_{max}$ may occur somewhat earlier than the apparent $T_{max}$ or somewhat later than the reported $T_{max}$, *i.e.*, after it appears to begin to decline.  [*Id.*].  The claims of the '373 patent, in recognition of the somewhat imprecise nature of reporting plasma concentrations, merely require that the MPH plasma concentration ascend for *about* 5.5 or *about* 8 hours.  [DTX 1, at cols. 23-24].

364.    Given that the apparent $T_{max}$ in the two mean fasted profiles for Defendants' ANDA product occurs at about 7 and 7.5 hours after administration and given that the decline thereafter is very slight, it is reasonable to conclude that a substantial patient population would reach its true $T_{max}$ at "about 8" hours.  The MPH plasma concentrations of the two fasted profiles shown in the figure thus meet the requirement of being substantially ascending for about 5.5 hours.  [Trial Tr. (M. Angst) 428:7-14, 430:22-431:5, 432:11-15; PX 294, at ANDRX 2281].

365.    Neither of the mean profiles calculated using Defendants' ANDA data for fasted subjects contains any decline that is more than a slight dip.  In the first mean profile, the dip is 12%, and in the second mean profile, the dip is 10%.  [PX 294 at ANDRX 02265 ((6.83-5.99) ÷ 6.83) and ANDRX 02267 ((6.80-6.14) ÷ 6.80)].

366.    In addition to the above graphical representation of the mean plasma concentration profiles, Defendants provided tables in their ANDA reflecting the

statistical analysis of the plasma concentration measurements made in subjects administered the 54 mg ANDA product.  [PX 294, at ANDRX 2277].  Combining the data from the two data sets, Defendants reported the calculated mean peak MPH concentration as occurring between 7.0 and 7.1 (*i.e.*, 7.09) hours administration, with a standard deviation of approximately 1.07 hours.  [*Id.*].  Thus, as determined by Defendants, a substantial population of subjects given the ANDA product reached a maximum MPH concentration at approximately 8 hours after being administered the 54 mg ANDA product.

> **3.    The Individual Plasma Concentration Data in Defendants' ANDA Establishes that Defendants' ANDA Products Will Likely Result in a Substantially Ascending MPH Plasma Drug Concentration over about 5.5 and about 8 Hours.**

367.    Finally, individual MPH plasma concentration profiles for the 50 subjects that underlie the mean profiles for Defendants' product further confirm that a substantial patient population administered the ANDA products will have a MPH plasma concentration that substantially ascends for about 5.5 hours or about 8 hours.  [Trial Tr. (M. Angst) 436:10-14 (23 out of 50 substantially ascend for about 8 hours) and 437:1-8 (30 out of 50 substantially ascend for about 5.5 hours); PX 257, at ALZ 4748-4761; PX 590; PX 591; PX 293, at ANDRX 1034-35; PX 294, at ANDRX 2265-68].  Dr. Angst analyzed the individual fed and fasted profiles found in Defendants' ANDA and testified to this.  [Trial Tr. (M. Angst) 436:10-14; and 437:1-8; PX 257, at ALZ 4748-4761; PX 590; PX 591; PX 293, at ANDRX 1034-35; PX 294, at ANDRX 2265-68].  Defendants offered no witness who provided any testimony about the individual profiles.  In addition, Dr. Bolton did not analyze the individual profiles.

368.     Twenty-seven subjects participated in the fasted bioequivalence study of Defendants' product, and they were tested on two different occasions.  [Trial Tr. (M. Angst) 431:6-24 and 434:2-19].  Twenty-three subjects participated in the fed study and were tested on one occasion.  [*Id.*].  Of the 50 subjects tested in total, at least 23 had a profile in one of the tests that substantially ascended for about eight hours.  [Trial Tr. (M. Angst) 436:10-24; PX 257, at ALZ 4748-58; PX 590; PX 293, at ANDRX 1034-35 (table setting forth numerically all profiles obtained by Defendants in R02-470 non-fasting study, forming the basis for the corresponding profiles plotted in PX 257); PX 294, at ANDRX 2265-68 (table setting forth numerically all profiles obtained by Defendants in R02-469 fasting study, forming the basis for the corresponding profiles plotted in PX 257 and PX 590)].  At least 30 subjects had a profile in one of the tests that substantially ascended for about 5.5 hours.  [Trial Tr. (M. Angst) 437:1-8; PX 257, at ALZ 4748-61; PX 590; PX 591; PX 293, at ANDRX 1034-35; PX 294, at ANDRX 2265-68].

369.     Shown below is the profile for A: Test Subject No. 4, one of the subjects in the fed study.  As can be seen, the MPH plasma concentration substantially ascends for eight hours with no more than a slight dip along the way.  [Trial Tr. (M. Angst) 437:14-438:13; PX 257, at ALZ 4748].



370.    A person of ordinary skill in the art would expect the MPH plasma concentration profiles for individual subjects to show more variability than mean profiles, and that is true in the subjects administered the ANDA product.  [Trial Tr. (M. Angst) 446:5-9].  The variability can be illustrated by overlaying the profiles of one of the subjects taking Defendants' product who was tested twice.  [Trial Tr. (M. Angst) 444:5-445:5 and *see* 440:16-443:11; PX 700].



371.    In analyzing the individual MPH plasma concentration profiles, Dr. Angst took this increased intra-patient variability into account.  He first determined whether the profile was ascending most of the time toward its apparent $T_{max}$ and conservatively considered only those profiles where the concentration was moving in an upward direction at least 60% of the time.  [Trial Tr. (M. Angst) 428:24-429:20 and *see* 437:9-438:13 (evaluating individual profile A: Test Subject No. 4 from fed study)].  In some instances, Dr. Angst identified profiles where the apparent $T_{max}$ was reached somewhat earlier than 8 hours and the concentration appears to be trending down at 8 hours.  [*See* Trial Tr. (M. Angst) 518:20-519:7 and 440:16-442:15 (discussing A2: Test Subject No. 11]].  In each such instance, however, the recorded concentration at 8 hours was within 10 to 15% of the apparent $T_{max}$, and it is reasonable to conclude that these profiles substantially ascend for about 8 hours.  [Trial Tr. (M. Angst) 440:16-442:15; and 518:20-519:7].

372.    Some of the individual profiles identified by Dr. Angst had more than one single slight dip along the way.  [*See* Trial Tr. (M. Angst) 438:14-439:18 (discussing the profile for A1: Test Subject No. 21)].  The Court's claim construction allows profiles to be characterized as substantially ascending MPH plasma concentrations if they have more than one dip.  The Court's construction states that the profile may have "a" slight dip, but the article "a" is generally understood in patent law to allow for one or more. *Baldwin Graphic Sys. Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008).

373.    In assessing the significance of a fluctuation in MPH plasma concentration, the appropriate question to ask is whether the declines in MPH plasma concentration have any therapeutic or clinical significance in the patient.  By excluding

any profile in which there were one or more declines of greater than 15%, Dr. Angst identified only those profiles where the declines were of no therapeutic or clinical significance. [*See* Trial Tr. (M. Angst) 407:4-8]. At a minimum, Dr. Angst's analysis of the individual MPH plasma concentration profiles confirms that a substantial patient population who take Defendants' ANDA product will have MPH plasma concentrations that substantially ascend for about 5.5 and for about 8 hours. [Trial Tr. (M. Angst) 445:13-447:3 and *see* 398:1-5].

374. To summarize, out of the 23 fed profiles, seven profiles substantially ascended for about 5.5 and about 8 hours. [Trial Tr. (M. Angst) 445:13-24]. This is consistent with the mean profile based on fed subject data that shows the $T_{max}$ occurring for the 54 mg ANDA product at approximately 9 hours. [*Id.* at 446:1-14]. It is not surprising that not all of individual fed profiles exhibit a substantially ascending MPH plasma profile for about 5.5 or about 8 hours, because there is more variation in individual data. [*Id.*]. Overall, however, "'the conclusion is that the ANDRX product results in substantially ascending plasma concentration for about 5.5 and for about 8 hours in a substantial population." [*Id.* at 446:10-14]. As for the 27 subjects who were tested in the fasting study, 17 subjects substantially ascended for about 5.5 hours, and there were 15 subjects that substantially ascended for about 8 hours. [Trial Tr. (M. Angst) 446:15-447:3].

375. Based on these observations, if Defendants' ANDAs are approved by the FDA, administration of the 54 mg ANDA product to individuals as directed by Defendants' label will result in substantial numbers of individuals having substantially ascending MPH plasma concentration-time profiles for at least 8 hours. [Trial Tr. (M.

Angst) 398:1-5; 430:22-431:5; 435:16-437:8; 445:13-447:3; PX 257, at ALZ 4748-476;

PX 590; PX 591; PX 293, at ANDRX 1034-35; PX 294, at ANDRX 2265-68].

> **4.    Defendants Represented to the FDA that Their ANDA Products Exhibit Substantially Ascending MPH Plasma Concentrations for Both about 5.5 Hours and about 8 Hours.**

376.    Defendants represented to the FDA that their products would be

bioequivalent to Plaintiffs' product CONCERTA®, whether measured under conventional

criteria or more stringent criteria that compare the shape of the MPH plasma profile

produced by their products relative to the shape of the plasma profile produced by

CONCERTA®.  [Trial Tr. (S. Bolton) 772:13-776:5; *see also* PX 40, Letter from Janet

Vaughn of ANDRX Pharmaceuticals to FDA, at ANDRX 79751-3; JDT (J. Vaughn)

1210-13 (identifying herself as Andrx's "Director of regulatory affairs," responsible "for

reviewing all submissions to the FDA")].

377.    Specifically, Defendants represented to the FDA in a communication

dated March 25, 2004 that their products produced an AUC (area under the curve) and

$C_{max}$ (maximum concentration) between 80% to 125% of the AUC and $C_{max}$ criteria for

CONCERTA®.  [*Id.*].  Defendants further represented that their products would meet a

more stringent assessment of bioequivalence that focused on the shape of the MPH

plasma profile.  [*Id.*].  Specifically, Defendants asserted that when measured under a

"partial area under the curve" or $AUC_{pr}$ perspective, their products were essentially

indistinguishable from CONCERTA®.  [*Id.*].  The $AUC_{pr}$ is the "area under the curve up

to the population median $T_{max}$" (the time at which the maximum concentration of MPH is

observed).  [*Id.*].

378.    In this communication to the FDA, Defendants submitted to the FDA the following graphical representation of mean MPH plasma profile data from their ANDA for the purpose of demonstrating that their ANDA products (data points designated by a "●") will produce plasma profiles essentially indistinguishable to those produced by CONCERTA® (data points shown by "▲").  [*Id.*].



379.    The representation they provided to the FDA is an "average" plasma profile based on a selected subset of the MPH plasma test data in their ANDA.  [*Id.*]. The figure shown above compares that subset MPH plasma profile to the plasma profile exhibited by Defendants' testing of CONCERTA®.  [*Id.*].  The figure shows a substantial degree of similarity in the shape of the MPH plasma profiles associated with the ANDA product relative to plasma profiles associated with CONCERTA®.  [*Id.*].

380.    Moreover, Defendants' proposed label for the ANDA products includes a figure that purports to be representative of the bioavailability and mean pharmacokinetic

profile of the ANDA products when administered to patients according to the label. [PX 206, at ANDRX 03927]. That figure is identical to the figure found in the package insert for CONCERTA® [*compare* PX 490, at P ALZ 007627] as representative of the bioavailability and mean pharmacokinetic profile of CONCERTA®.

381.    The mean plasma concentration profile of individuals administered CONCERTA® exhibits a substantially ascending plasma concentration levels for about 5 and about 8 hours. In addition, a substantial number of individual plasma concentration profiles will exhibit substantially ascending plasma levels for about 5 hours or about 8 hours. [Trial Tr. (M. Angst) 448:6-451:2; PX 20, at ANDRX 1036-37, 1045; PX 257, PX 398]. Defendants' representations to the FDA regarding the bioavailability of its ANDA products as compared to CONCERTA® demonstrate that Defendants anticipated and expected that the administration of the ANDA products to individuals as directed by Defendants' label will result in substantial numbers of individuals having substantially ascending MPH plasma concentration-time profiles for at least about 5.5 or about 8 hours.

382.    Defendants' representations to the FDA are inconsistent with Defendants' arguments in this litigation that the decline in MPH plasma concentration that occurs when the ANDA products are administered to subjects at around two to four hours is not a slight dip. By representing to the FDA that their formulation is bioequivalent to CONCERTA®, Defendants acknowledge — as Dr. Angst testified — that this decline is without therapeutic significance, and does not prevent the profile from being characterized as being substantially ascending.

5.    **Defendants' Proposed 18, 27, And 36 mg ANDA Products Will Be Administered in a Manner that Achieves a Substantially Ascending MPH Plasma Drug Concentration over a Time Period of both about 8 Hours and about 5.5 Hours Following Said Administration.**

383.    Defendants' ANDA for the 18, 27, and 36 mg formulations does not provide bioequivalence test data.  [*See* JDT (J. Vaughn) 1223 (so testifying), 1210-13 (identifying herself as ANDRX's "Director of regulatory affairs," responsible "for reviewing all submissions to the FDA"); *see also* PX 18-28 (containing no such data)]. Nevertheless, the proposed 18, 27, and 36 mg ANDA products would result in substantially ascending MPH plasma concentration-time profiles for about 5.5 hours and 8 hours to the same extent as the proposed 54 mg ANDA product.  [Trial Tr. (M. Angst) 447:8-48:5, 450:13-451:1].

384.    MPH products in general are well known to exhibit linear pharmacokinetics.  [Trial Tr. (M. Angst) 447:8-448:5; PX 376, at P ALZ 7656 (observing "[s]everal studies have demonstrated a linear plasma concentration-dose relationship for the kinetics of MPH"); PX 377-78, at ALZ 125134 (reporting a linear plasma concentration-dose relationship for CONCERTA® at doses of 18 to 72 mg, which includes all of the dosages that Defendants propose to sell)].  Because of this, one can reliably predict the MPH plasma concentration-time profile for an 18 mg dose simply by dividing the observed plasma concentration values for a 54 mg dose by three, because 18 mg is one-third the dose of 54 mg.

385.    Profiles for 27 and 36 mg doses can likewise be predicted from a 54 mg plasma concentration time profile by dividing by 2 and 1.5, respectively.  [*Id.*].  The CONCERTA® profile in Figure 4 of the '373 patent was obtained using individual plasma

concentration time profiles that were scaled or "normalized" in exactly this way. [*Compare* DTX 308, at ALZ 270690 *with* DTX 1, Figure 4 (showing Figure 4 is identical with this C97-033-03 profile); DTX 308, at ALZ 270690 (original Figure 4 graph, noting profiles are "Normalized to 18 mg"); DTX 138, at ALZ 271500 (reflecting that the original "Dose Levels" ranged from "1" which was "18 mg" to "3," which was "54 mg")].

386.    The formulations of the proposed 18, 27, and 36 mg ANDA products are sufficiently similar to the formulation for Defendants' proposed 54 mg ANDA product that the former products would be expected to have this same, linear pharmacokinetic relationship with the latter product.  [*See* DTX 180, at ANDRX 4102-04 (ANDRX ANDA section entitled "Formulation Data"); Trial Tr. (M. Davies) 1247:9-1248:23].

387.    If Defendants' ANDAs are approved by the FDA, the 18, 27, 36, and 54 mg ANDA products will be used by patients, doctors and caregivers in the United States to treat ADHD in accordance with the prescribing instructions.  [PFF ¶¶ 109-116, 234]. Following these instructions, a substantial population of individuals given the ANDA product will exhibit substantially ascending MPH plasma concentration time profiles of about 8 hours.  These plasma profiles establish that Defendants' products will result in methods that meet the requirements of Claims 6 and 7 of the '373 patent.

388.    Plaintiffs' *in vitro* dissolution testing established that all or nearly all of the ANDA products provide an "ascending release rate over an extended period of time" and meet all the requirements of Claim 1 of the '373 patent.  Dr. Angst also testified, and the Court accepts, that the variation in the *in vitro* release rate associated with the ANDA products is so small that it does not cause the variation in MPH plasma concentrations in patients following administration of the ANDA products.  [Trial Tr. (M. Angst) 408:1-

18].  Although not every patient will experience the ascending plasma concentration with every administration of the ANDA products, it is reasonable to conclude that in a very substantial patient population, the ANDA products meeting the requirements of Claim 1 will also produce the plasma concentrations required in Claims 6 and 7 of the '373 patent.

389.    The Court concludes that use of the ANDA products is likely to produce substantially ascending MPH plasma concentrations in a substantial patient population and that each such tablet is covered by Claim 1 of the '373 patent.

390.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that following approval of Defendants' ANDAs, use of the 18, 27, 36 and 54 mg ANDA products will result in direct literal infringement of dependent Claims 6 and 7 of the '373 patent.

## IV.    UPON APPROVAL OF THE ANDAs, DEFENDANTS WILL ACTIVELY INDUCE INFRINGEMENT OF THE '373 PATENT

391.    Plaintiffs have established that Defendants' behavior will actively induce infringement of Claims 1, 6, and 7 of the '373 patent.

392.    Defendants knew of the '373 patent no later than about July 19, 2005, in view of the patent certification that Defendants sent to FDA on July 20, 2005.  [PX 17]. Defendants further knew (or should have known) that their activities would cause direct infringement of the '373 patent claims by September 1, 2005, the date the Complaint was filed in this action.  [D.I. 1, Compl.].

393.    Upon approval by the FDA, Defendants intend to market the ANDA products in the U.S.  [PX 13, ANDRX Answer, ¶ 31 ("ANDRX also admits that upon

approval by FDA, ANDRX intends to market its proposed methylphenidate hydrochloride products.")].

394.    Defendants will sell the ANDA products to "any and all" licensed buyers, including pharmacies and alternate care providers (hospitals, nursing homes and mail order pharmacies).  [JDT (L. Rosenthal) 1139-1140; PX 93, p. 10].

395.    Following FDA approval, Defendants will offer for sale, sell and/or distribute the ANDA products along with a package insert that provides instructions on how to administer and use the ANDA products to treat ADHD.  [PFF ¶¶ 109-116, 234]. Administration and use of the ANDA products by others as directed in the package insert will result in direct infringement of Claims 1, 6 and 7 of the '373 patent.

396.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Defendants will induce infringement of Claim 1, 6 and 7 of the '373 patent.  [*See* CL 13-18].

## V.    UPON APPROVAL OF THE ANDAs, DEFENDANTS WILL CONTRIBUTORILY INFRINGE THE '373 PATENT

397.    Plaintiffs have established that Defendants will contributorily infringe Claims 1, 6 and 7 of the '373 patent.

398.    Defendants knew of the '373 patent no later than about July 19, 2005, in view of the patent certification that Defendants sent to FDA on July 20, 2005.  [PX 17]. Defendants further knew (or should have known) that their activities would cause direct infringement of the '373 patent claims by September 1, 2005, the date the Complaint was filed in this action.  [D.I. 1, Compl.].

399.    The ANDA products do not have a "substantial non-infringing use." Following FDA approval, the ANDA products will be approved only for use in treating ADHD in accordance with the package insert.  The package insert does not state that the ANDA products are indicated for treating any other medical disorder or condition.  [PFF ¶¶ 109-116, 234].

400.    Following FDA approval, Defendants will offer for sale, sell and/or distribute the ANDA products along with a package insert that provides instructions on how to administer and use the ANDA products to treat ADHD.  [*Id.*].  Administration and use of the ANDA products by others as directed in the package insert will result in direct infringement of Claims 1, 6 and 7 of the '373 patent.

401.    Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Defendants will contributorily infringe Claim 1, 6 and 7 of the '373 patent. [*See* CL 20; *see also* CL 13-18].

## VI.    THE CLAIMED INVENTIONS WOULD NOT HAVE BEEN OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE ART AT THE TIME OF THE INVENTION

402.    Defendants have failed to establish by clear and convincing evidence that the claimed inventions would have been obvious to a person of ordinary skill in the art at the time of the invention.  The claimed inventions represented an unpredictable and unconventional solution to a problem whose source was unknown at the time of the invention and addressed a need in the field of ADHD treatment that had existed but had not been met for decades.  The inventions also represented an approach that a person of ordinary skill in the art would not have taken at the time of the invention based on the prior art and generally accepted beliefs of those working in the field of ADHD treatment

before the invention.  Nor would a person of ordinary skill in the art have reasonably expected that the claimed inventions would have worked for their intended purpose — *i.e.*, providing an effective, once-daily MPH dosage form that would not be accompanied by undesirable side-effects.  The prior art thus led away from the approach taken by the inventors to produce the claimed inventions, which has been shown unexpectedly to provide effective once-a-day treatment of ADHD.  Finally, numerous secondary considerations, including significant commercial success linked to the claimed invention, support the nonobviousness of the claims.

403.    Defendants agreed that a need for an effective once-a-day treatment of ADHD with MPH existed for many years before the claimed invention.  At trial, they offered no testimony, other evidence or explanation why, if the claimed inventions were obvious, no one had made the inventions before the ALZA scientists.

## A.    Overview

404.    Prior to the claimed inventions, the "gold standard" treatment for ADHD was immediate-release MPH (*i.e.*, Ritalin[®] and its generic counterparts) administered in multiple doses throughout the day according to a BID or TID regimen.  [Trial Tr. (K. Patrick) 1015:7-18; Trial Tr. (M. Mayersohn) 809:11-16].

405.    While the BID and TID regimens were effective in treating the symptoms of ADHD, it is undisputed that an unmet medical need existed for an extended-release once-daily MPH dosage form that obviated the practical problems associated with mid-day administration of a controlled substance in a school setting (*e.g.*, peer ridicule, noncompliance, drug storage, and drug diversion).  [DTX 630, at pp. 5-6; Trial Tr. (D.

Guinta) 35:1-36:6; Trial Tr. (M. Mayersohn) 906:2-20; 912:9-23; Trial Tr. (T. Needham) 714:21-715:16].

406.    Ciba-Geigy, the maker of Ritalin®, recognized this need and, in the early 1980s, introduced the drug product Ritalin SR® as an extended-release MPH dosage form.  [DTX 630, at p. 5; Trial Tr. (M. Mayersohn) 808:22-809:10].

407.    It is undisputed that Ritalin SR® was never widely accepted by clinicians. [Trial Tr. (M. Mayersohn) 810:10-22; Trial Tr. (K. Patrick) 1021:12-1022:1; Trial Tr. (D. Guinta) 29:16-22].  Thus, by 1997, more than 10 years *after* the introduction of Ritalin SR®, the need persisted for a once-daily, extended-release MPH dosage form that provided day long coverage in controlling the symptoms of ADHD.

408.    The claimed inventions met the long-felt need for an effective, once-a-day treatment of ADHD by taking an unconventional approach at odds with the prevailing thinking in the field of extended-release formulation development.  [Trial Tr. (K. Patrick) 1006:24-1008:11].  Prior to the claimed inventions, the objective of most extended-release drug formulations was to release drug at a *constant release rate*.  This was generally considered to be the approach that suited most therapeutic needs, because it delivered an amount of drug into the bloodstream that was sufficient to provide a desired therapeutic effect without causing fluctuations or excess dosing that would cause undesired side-effects.  [Trial Tr. (D. Guinta) 44:17-46:2; Trial Tr. (T. Needham) 848:23-849:8; Trial Tr. (K. Patrick) 1008:8-11, 1059:15-24; *see also* DTX 1, col. 2, line 63 to col. 3, line 12; Dep. Tr. (D. Feifel) 172:7-21].

409.    Before the claimed inventions, few, if any, extended-release drug formulations utilized an ascending release rate of drug over an extended period of time.

For example, at trial, Defendants' expert, Dr. Needham, could not identify a single example of an extended-release formulation that used an ascending release rate.  [Trial Tr. (T. Needham) 693:11-16; 709:2-9; 729:23-730:9; 731:10-19; and 730:10-731:1].

410.    A dosage form that delivered an ascending amount of a desired drug product over time was thus not a conventional design choice for an extended-release dosage form at the time of the invention.  Instead, the conventional approaches were (i) delivery of a constant amount of the drug over a desired period, or (ii) delivery of a descending amount over time, such as what was used in Ritalin SR®.  [Trial Tr. (D. Guinta) 44:17-46:2; Trial Tr. (T. Needham) 848:23-849:8; Trial Tr. (K. Patrick) 1008:8-11, 1059:15-24; see also DTX 1, col. 2, line 63 to col. 3, line 12; Dep. Tr. (D. Feifel) 172:7-21; Trial Tr. (T. Needham) 729:23-730:9, 731:10-19; Trial Tr. (M. Davies) 1217:11-1218:4]

411.    The claimed inventions, which treat ADHD by means of a MPH dosage form that releases drug at an *ascending release rate* for an extended period of time and, optionally, results in a *substantially ascending drug plasma concentration*, thus represented a significant and unpredictable departure from the conventional approach of producing formulations that sought to deliver essentially constant plasma drug concentrations.  [Trial Tr. (D. Guinta) 44:17-46:2; Trial Tr. (T. Needham) 848:23-849:8; Trial Tr. (K. Patrick) 1008:8-11, 1059:15-24].

412.    The claimed inventions also were a significant departure from the prevailing and only known approach for achieving effective, full-day treatment of ADHD at the time of the invention; namely, administering multiple doses of MPH at specific

points during the day according to the BID and TID dosing regimens using Ritalin®.
[Trial Tr. (K. Patrick) 1015:7-18; Trial Tr. (M. Mayersohn) 809:11-16].

413.    At the time of the invention, the mean plasma concentration profile produced by a BID regimen was well-known.  [*See* PX 137, Fig. 2].  It was also known that the timing of the peaks and troughs in the characteristic BID "sawtooth" plasma profile corresponded to points during a typical child's school day when more and less drug would be desired.  [Trial Tr. (K. Patrick) 1015:7-1020:1; and 1023:2-17; Trial Tr. (D. Guinta) 33:2-9; 39:19-44:16].  The person of ordinary skill in the art would have considered this type of profile to have been the logical starting point in attempting to design a new once-daily MPH dosage form, in part, because it was the only profile known to provide effective treatment of ADHD throughout the course of the school day. [*Id.*].

414.    Plaintiffs' primary expert witness on nonobviousness was Dr. Kennerly Patrick ("Dr. Patrick").  Dr. Patrick is a professor of pharmaceutical sciences at the Medical University of South Carolina, where he has been a faculty member since 1989. [Trial Tr. (K. Patrick) 996:2-12; PX 411 (Dr. Patrick's Curriculum Vitae)].  Since the late 1970s, Dr. Patrick has spent his entire career studying the pharmacology and pharmacokinetics of MPH and has published over 35 peer-reviewed articles dealing with various aspects of MPH.  [*Id.*; Trial Tr. (K. Patrick) 1001:3-13; PX 720].  He is considered by many of his peers to be a leading expert on the pharmacology of MPH. [Trial Tr. (K. Patrick) 1003:1-16].

415.    Defendants assert that the reasons why Ritalin SR® did not provide effective once-a-day treatment of ADHD were well known and clearly defined.  In

particular, Defendants assert that it was well known that acute tolerance to MPH was the well-accepted reason for the shortcomings of Ritalin SR®. Defendants additionally assert that a person of ordinary skill in the art would also have known that the solution to this problem would have been obvious, and would have led that person to arrive at a MPH dosage form exhibiting the characteristics that are the subject of the claims of the '373 patent. The Court does not agree.

416. Contrary to Defendants' interpretation of the prior art, the problems associated with Ritalin SR® were not clearly defined in the literature. [Trial Tr. (K. Patrick) 1021:12-1022:4; and 1026:24-1027:16]. The literature discussing acute tolerance with Ritalin SR® was speculative and included acute tolerance as one of many possible explanations for the perceived shortcomings associated with Ritalin SR®. [DTX 630, at pp. 5-6; DTX 627, at p. 768; Trial Tr. (K. Patrick) 1038:3-1039:21; 1027:17-1028:13; 1030:22-1031:6; and 1041:19-1042:6; Trial Tr. (D. Guinta) 106:7-107:3; and 161:7-14]. None of these hypotheses was tested by experimental studies. [Id.].

417. The parties essentially agree that acute tolerance was not experimentally established until the work of the ALZA scientists that resulted in the claimed inventions. [Trial Tr. (M. Mayersohn) 935:13-17; Trial Tr. (D. Guinta) 60:9-22]. Indeed, generic drug manufacturers seeking to develop commercial embodiments of the claimed inventions represented to the FDA as late as 2004 that the concept of acute tolerance with MPH "remains a theoretical one." [PX 265, at p. 4; Trial Tr. (K. Patrick) 1193:6-1195:10]. This statement was made over a decade after the publication dates of the prior art relied upon by the Defendants as purportedly linking acute tolerance with MPH.

418.    Even if acute tolerance associated with MPH had been suspected based on the observations reported in the prior art, the person of ordinary skill in the art would not have considered an ascending release rate of MPH over an extended period of time or a substantially ascending MPH plasma concentration profile over about 5.5 or 8 hours to have been an obvious or predictable solution to overcome this problem.  [Trial Tr. (K. Patrick) 1071:12-1072:8].

419.    In fact, Defendants' expert, Dr. Mayersohn, acknowledged that as of 1997, he was not aware of a single product that even attempted to overcome acute tolerance by use of a dosage form that produced a substantially ascending plasma concentration profile of the drug:

> Q.    We talked about this prior art, but you are not aware as you sit here today of actual products that would produce an ascending plasma concentration and that had been made and tested and shown to overcome acute tolerance with a single dosing regimen?
>
> A.    I am not aware of any such product.

[Trial Tr. (M. Mayersohn) 960:20-961:3].

420.    The evidence shows that a person of ordinary skill in the art would have looked to the immediate-release MPH (*i.e.*, Ritalin[®]) BID or TID regimens as the logical starting point in the design of a new dosage form, as such regimens were the only ones known at the time of the invention to be effective over the course of a day.  [Trial Tr. (K. Patrick) 1023:2-19; Trial Tr. (M. Mayersohn) 911:8-912:3].

421.    The BID and TID regimens were known to produce plasma concentration profiles that have a "trough" in plasma drug levels between "peaks" produced after each dose.  [Trial Tr. (D. Guinta) 43:3-9].  The person of ordinary skill in the art would have

recognized that periods of little, or no drug, resulting from an intermittent or pulsatile drug delivery approach were an important feature in overcoming acute tolerance, if such tolerance was observed with a drug.  [(K. Patrick) 1042:7-20; 1058:9-17; and 1071:12-1072:8; Trial Tr. (D. Guinta) 162:24-164:1; Trial Tr. (M. Mayersohn) 985:3-11].  Thus, if anything, to the extent that the prior art suggested any solution to overcome a problem of acute tolerance to a drug such as MPH, the solution would have been to produce a trough in the plasma profile between the periods where the MPH drug levels have peaked.  The BID and TID dosing regimens were the only plasma profiles known at the time of the invention to provide effective treatment through the course of an entire school day.  [Trial Tr. (K. Patrick) 1071:12-1072:1; Trial Tr. (M. Mayersohn) 983:3-10; 983:17-984:5; and 985:3-987:13].

422.    In addition, a person of ordinary skill in the art would have known that the side-effects associated with MPH were dose-dependent and that there was a narrow margin of safety for MPH (*i.e.*, between drug levels necessary to provide therapeutic efficacy and drug levels resulting in the incidence of side-effects).  [Trial Tr. (D. Guinta) 34:17-24; Trial Tr. (K. Patrick) 1025:14-21; and 1060:7-1061:13; Trial Tr. (M. Mayersohn) 947:5-950:8].  These would have been additional factors that would have led a person of ordinary skill in the art away from a dosing regimen that created a substantially ascending plasma concentration profile over about 5.5 or 8 hours, as such a profile would have been expected to lead to unacceptable side-effects and toxicity.  [Trial Tr. (K. Patrick) 1025:14-21; and 1059:15-1060:6; Dep. Tr. (D. Feifel) 171:20-172:21].

423.    A person of ordinary skill in the art would not have reasonably expected — much less had a basis for predicting — that a substantially ascending plasma

concentration profile over about 5.5 or 8 hours would be effective in the treatment of ADHD. In fact, the person of ordinary skill in the art would have expected that the claimed inventions would not have worked for their intended purpose. [Trial Tr. (K. Patrick) 1072:20-1073:3]. In addition, the person of ordinary skill in the art would have had a strong motivation to avoid such a profile because it would have been expected to create unacceptable side-effects that undermined the usefulness of the drug as means for treatment. [Trial Tr. (K. Patrick) 1059:15-1060:6; and 1072:15-1073:3]. The success of the claimed inventions, therefore, could not have been predicted based on the knowledge in the prior art or known to those working in the field of ADHD treatment using MPH.

### B.    The Inventions Claimed in the '373 Patent

424.    Claim 1 of the '373 patent claims methods of treating ADD or ADHD by administering a dosage form comprising MPH, wherein the dosage form releases MPH at an ascending release rate over an extended period of time. [DTX 1, at col. 23, lines 12-16].

425.    Claim 6 of the '373 patent claims the method of claim 1, "wherein said administration results in a substantially ascending MPH plasma drug concentration over a time period of about 5.5 hours following said administration." [*Id.* at col. 24, lines 9-12].

426.    Claim 7 of the '373 patent claims the method of claim 1, "wherein said administration results in a substantially ascending MPH plasma drug concentration over a time period of about 8 hours following said administration." [*Id.* at col. 24, lines 13-17].

### C.     The Level of Ordinary Skill in the Art

427.     The relevant time period for the purpose of determining the level of skill

in the art and the scope of the prior art with respect to the claims-at-issue is August 1997.

[DTX 1].

428.     Because the claims-at-issue are each directed to a "method for treating

ADD or ADHD," the person of ordinary skill in the art at the time of the discovery of the

claimed inventions would have been someone possessing clinical knowledge and

experience associated with the treatment of ADD or ADHD.  [Trial Tr. (K. Patrick)

1009:8-1010:11; PX 721].

429.     Defendants' primary expert on obviousness, Dr. Mayersohn, agreed that

the person of ordinary skill in the art would have been someone with a basic

understanding of the condition being treated —*i.e.*, ADD and ADHD.  [Trial Tr. (M.

Mayersohn) 900:18-24].

430.     Defendants' expert, Dr. Thomas Needham ("Dr. Needham"), also agreed

that a person of ordinary skill in the art would be someone who had in mind the clinical

purpose of the invention, which is treating ADD and ADHD.  [Trial Tr. (Needham)

739:8-14].

431.     The person of ordinary skill in the art would have had an understanding of

the underlying causes of ADHD, the primary patient population, and the pre-existing

treatment options that were available to treat ADHD.  Based on knowledge obtained from

clinical work, that individual would also have had an understanding of the importance of

proper dosing, timing of administration, and reducing of side-effects necessary for

successful treatment of the symptoms of ADHD.  [Trial Tr. (K. Patrick) 1010:12-1011:1; and 1012:6-11].

432.    Thus, the Court finds that a person of ordinary skill in the art would have been someone with an M.D., a Ph.D. in clinical pharmacology, clinical psychology or a comparable scientific field, and at least two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience.  [Trial Tr. (K. Patrick) 1009:8-1010:11].

433.    The person of ordinary skill in the art would not have been an individual with only a B.S. in pharmacy or a Pharm. D., or a B.S. in chemistry, biology, or engineering, or a related subject area, even if that person had additional training through advanced courses of study or work.  Without advanced clinical training, one cannot understand the complexities involved in the treatment of ADHD and the balance of factors that are important to efficacy and patient safety.  [Trial Tr. (K. Patrick) 1010:12-1011:1; and 1012:1-11].

434.    The majority of the named inventors of the '373 patent, *i.e.*, Diane Guinta, Suneel Gupta, and Sam Saks, each possessed education, training, and experience consistent with the level of skill in the art defined by the Plaintiffs.  [JDT (Guinta) 397, 416-418; JDT (Saks) 1047-1048; Trial Tr. (D. Guinta) 20:22-21:18; and 30:10-32:5].

      **D.**      **The Scope and Content of the Prior Art**

            **1.**      **The Prior Art Did Not Provide a Clear Explanation for the Failures of Ritalin SR®**

435.    The prior art did not establish that acute tolerance existed for MPH, or that it was known why Ritalin SR® was not an effective once-a-day MPH drug product for

treating ADHD.  [*See*, *e.g.*, Trial Tr. (K. Patrick) 1022:2-11; 1026:24-1027:16; 1036:18-24; Trial Tr. (D. Guinta) 106:7-107:3; 161:7-14].

436.    Despite this, Defendants assert that the sources of the problems with Ritalin SR® were well known and clearly defined at the time of the invention.  [Trial Tr. (M. Mayersohn) 810:10-22; *see also* D.I. 134, at p. 90, DFF ¶ 276].  In particular, Defendants assert that it was known that Ritalin SR® was not an effective once-a-day product because it produced a slower onset of action and a loss of therapeutic coverage towards the end of the day as compared to Ritalin® administered BID.  [*Id.*].

437.    Contrary to Defendants' assertions, the reasons why Ritalin SR® did not meet the need for an effective once-daily MPH dosage form were unclear at the time of the invention, and there was no commonly accepted explanation within the community of individuals working in the field of ADHD treatment at that time.  [*See* PFF ¶¶ 439-441, 459-460 *infra*].  Instead, the prior art reports inconsistent and contradictory information and theories why Ritalin SR® was not effective, and did not provide results comparable to the established BID or TID MPH regimens.  [*Id.*].

(a)    **The Pelham 1987 and Pelham 1990 Articles**

438.    Reports published in 1987 and 1990 by Dr. William Pelham ("Dr. Pelham") and his research group show that the reasons why Ritalin SR® was not effective as a once-a-day treatment product were not known at the time of the invention.

439.    In the 1987 Pelham et al. article relied upon by Defendants [D.I. 134, at DFF ¶ 276], the authors suggested that Ritalin SR® exhibited a delayed onset of action in certain measures of therapeutic efficacy and that clinical efficacy waned earlier in the day

in other measures of efficacy as compared to Ritalin® administered BID.  [DTX 621, at 497-499].  The authors noted that their studies did "*not provide a complete answer*" to the question as to why Ritalin SR® was not as effective as Ritalin® administered BID.  [*Id.* at p. 500 (emphasis added)].

440.    Three years later, in a 1990 publication, the same research group reported that the efficacy of Ritalin SR® and the BID dosing regimen was "generally equivalent." [PX 134, at p. 226].   The authors specifically reported that their results "*contradicted*" and "*contrast[ed]*" with the findings in their earlier paper, where they reported that Ritalin SR® was not as effective as immediate-release Ritalin® administered according to a BID regimen.  [*Id.* at p. 235 (emphasis added); *see also* Trial Tr. (K. Patrick) 1022:2-11].

441.    Because of the confusion shown in these publications and other prior art, the person of ordinary skill in the art would not have understood there to be a clearly defined problem with Ritalin SR®, nor would that person have understood there to be a clearly defined solution to the efficacy issues with Ritalin SR®.  [Trial Tr. (K. Patrick) 1022:2-11].

           **(b)**       **The Greenhill Publications Did Not Identify Acute Tolerance as the Reason for the Difference in Efficacy Between Ritalin SR® and the Immediate-Release Ritalin® BID and TID Regimens**

442.    Defendants refer to several publications by Dr. Laurence Greenhill ("Dr. Greenhill").  Dr. Greenhill is a clinical psychiatrist who was widely considered to be one of the leading authorities on the use of psychostimulants to treat ADHD.  [Trial Tr. (K. Patrick) 1027:17-1028:13; and 1030:22-1031:6; Trial Tr. (D. Guinta) 95:6-12].

443.    In his papers, Dr. Greenhill listed a number of hypotheses as being possible reasons for the underlying cause or causes of Ritalin SR®'s lack of efficacy.  The explanations offered by Dr. Greenhill were diverse and included:  issues with the wax-matrix nature of the Ritalin SR® dosage form; differences in the rate of drug absorption (*i.e.*, the "ramp effect"); acute tolerance; poor compliance at home; and dosing inflexibility due to the availability of only a single 20 mg dose, among other things. None of these hypotheses was supported by any experimental studies.  [Trial Tr. (K. Patrick) 1030:22-1031:6; and 1038:3-1040:19].

444.    The papers by Dr. Greenhill do not identify acute tolerance to MPH as being the sole or even most probable explanation for the problems with Ritalin SR®.  Dr. Greenhill's publications also provide no suggestion to a person of ordinary skill as to how one would resolve potential problems with acute tolerance.  The papers by Dr. Greenhill thus provide no motivation or suggestion to arrive at the claimed inventions, and Defendants' assertions rest on hindsight and the discoveries made by the inventors of the '373 patent and published after the invention was made.

### (c)    Birmaher 1989

445.    A paper by Dr. Boris Birmaher published in 1989 does not identify acute tolerance as being the source of the problems with Ritalin SR®.  Instead, the Birmaher 1989 paper, which was co-authored by Dr. Greenhill, identifies acute tolerance as one of many possible shortcomings of Ritalin SR®.  [DTX 627; Trial Tr. (M. Mayersohn) 828:3-23].  The Birmaher 1989 paper also does not provide any suggestion as to how one would approach development of a once-a-day dosage form that overcame the problems in effectiveness reported for Ritalin SR®.  [DTX 627, at pp. 770-771].

446.    Regarding the comparative efficacies of Ritalin SR® and Ritalin®, the
Birmaher paper expressly reported that "*[t]he reason for this lack of efficacy is not
clear*."  [DTX 627, at p. 768 (emphasis added)].  Numerous "possible explanations" were
offered by the authors including: "problems in absorption in the gastrointestinal track
from its wax-matrix resin vehicle, delayed absorption, pharmacokinetic differences or
differences at the brain receptor level (pharmacodynamic differences) or tachyphylaxis
(Jackson, pers. commun.)."  [*Id.*; Trial Tr. (K. Patrick) 1038:3-1040:13].

447.    The only support for the tachyphylaxis hypothesis provided in the article
was a citation to a "personal communication."  [DTX 627, at p. 768].  The Court credits
the testimony of Dr. Patrick that a person of ordinary skill in the art would not have relied
on this statement as a basis for concluding that acute tolerance was the source of Ritalin
SR®'s problems.  Dr. Patrick explained that statements supported only by citation to a
personal communication are unusual in scientific publications and not an appropriate
basis for establishing scientific conclusions.  [Trial Tr. (K. Patrick) 1040:21-1041:10].

448.    The explanations provided in the Birmaher paper followed a clinical study
performed by the authors, but the publication cautions that "[t]here are *many limitations*
inherent in this study."  [DTX 627, at p. 770-771 (emphasis added)].  The authors
explained that the limitations include the lack of adequate controls, the failure to follow
the standard dosing method for the BID regimen (*i.e.*, only one dose was administered
instead of two), and the small sample size of the patient population that was studied.
[*Id.*].

449.    Although the Birmaher paper stated that the plasma concentration profile
of Ritalin SR® "resembles that seen with long-acting dextroamphetamine sulfate" and

states that this "*raises a question* about whether MPH-SR may be more prone to tachyphylaxis,*"* [DTX 627, at p. 771 (emphasis added)], the Court credits the testimony of Drs. Patrick and Guinta that the person of ordinary skill in the art would not have attached much significance to this statement because the data provided in the paper do not provide a direct comparison between Ritalin SR® and the BID immediate-release dosing regimen and because the "question" itself was raised as a result of flawed studies, acknowledged by the authors of the report themselves.  [Trial Tr. (K. Patrick) 1038:3-1039:21; and 1136:19-1137:22; Trial Tr. (D. Guinta) 98:6-99:10].

### (d)    The 1991 Perel Abstract

450.    An abstract published in 1991 by J.M. Perel et al. did not establish that acute tolerance was the reason for the lack of effectiveness of Ritalin SR® and did not suggest any solution to the problems exhibited by Ritalin SR®.  [Trial Tr. (K. Patrick) 1189:5-9].

451.    Defendants' expert testified that this abstract, which also names Dr. Greenhill as a co-author, indicated that "clockwise hysteresis" was associated with MPH. [Trial Tr. (M. Mayersohn) 841:7-842:1].  [Trial Tr. (M. Mayersohn) 934:12-16].  The Court has excluded Defendants' expert's testimony about "clockwise hysteresis" from the trial record.  [D.I. 174, Memorandum Order (April 28, 2008)].

452.    Like the Birmaher publication, the information in the Perel abstract would not have been considered relevant to the treatment of children with ADHD because of serious flaws in the experimental design of the studies.  [Trial Tr. (K. Patrick) 1184:6 – 1186:16].

453.    The study summarized in the 1991 Perel et al. abstract involved very high doses of MPH that would not have been considered relevant to the vast majority of pediatric ADHD patients.  [*Id.*].  In addition, the MPH plasma concentration levels were taken by repeatedly drawing blood from the children over the course of the day.  Because children dislike needles, this method of measuring MPH levels would have interfered with the measures of therapeutic efficacy that were being evaluated by the authors. [Trial Tr. (K. Patrick) 1185:13-1186:16; *see also* Trial Tr. (D. Guinta) 55:18-56:23].

454.    Indeed, one year after the abstract was published, a review article by Dr. Greenhill surveying the art relating to ADHD treatment methods provided numerous speculative explanations for the failings of Ritalin SR® (aside from acute tolerance) that echoed many of the hypotheses originally offered by Dr. Greenhill in 1989.

(e)    **Greenhill 1992**

455.    The review paper published by Dr. Greenhill in 1992 did not state that acute tolerance was the only or most likely source of the problems with Ritalin SR® and would not have suggested any particular solution to the problems seen with Ritalin SR® to a person of ordinary skill in the art at the time of the invention.

456.    Dr. Greenhill's 1992 paper was a review article that provided a survey of the then-existing knowledge reported in the literature regarding ADHD treatment methods.  [DTX 630].  As in his earlier paper published in 1989 (co-authored by Birmaher), this publication proposed a number of speculative hypotheses attempting to explain the perceived lack of efficacy of Ritalin SR® as compared to Ritalin® administered BID or TID.  [Trial Tr. (K. Patrick) 1030:22-1031:6].  Although it referred to tachyphylaxis as one possible cause, *it further expanded* upon a number of other

possible problems that had been identified in his earlier papers, and did not single out any particular explanation as the most likely cause of the failure of Ritalin SR® to meet the need for an effective once-daily MPH dosage form.  [Trial Tr. (M. Mayersohn) 932:5-933:8; Trial Tr. (K. Patrick) 1039:20-1040:13; Trial Tr. (D. Guinta) 106:7-107:3; and 161:7-14].

457.    Notably, Dr. Greenhill acknowledged that Ritalin SR® was developed to meet the need for a once-daily MPH dosage form and noted that Ritalin® administered BID showed "*no significantly different effect* in the classroom, the home environment, or during the continuous performance test," and that numerous studies did *not* "show a definite advantage for either MPH formulation over the other."  [DTX 630, at pp. 5-6]. There were conflicting views, however, about the relative performance of each product and Dr. Greenhill noted that "some authors have suggested that SR-20 [Ritalin SR®] may not be as effective" as Ritalin®.  [*Id.* at p. 6].

458.    As a possible explanation for the reports about the lack of efficacy of Ritalin SR®, the article by Dr. Greenhill stated: "MPH-10 BID tablets produce higher peak plasma concentrations and yield a steeper absorption phase slope than do the longer-acting SR-20 preparations.  Current theory suggests that psychostimulant medication effects on ADHD are related to the rate of absorption (ramp effect), so standard MPH's steeper absorption curve may give it more powerful beneficial and adverse effects, particularly during long-term maintenance."  [DTX 630, at p. 6 (emphasis added); Trial Tr. (K. Patrick) 1029:19-1031:22].

459.    Dr. Greenhill offered other explanations for the perceived problems with Ritalin SR®: "This concept has raised the possibility that MPH-SR's greater duration of

action may alter pharmacokinetics (hepatic auto-induction) or receptor

pharmacodynamics, inducing tachyphylaxis or tolerance.  Other explanations for the

anecdotal reports of MPH-SR's lack of ability to provide long-term coverage include poor

compliance at home with taking medication, unpredictable release of active MPH from

the SR's wax-matrix core, change in the patient's weight, or new stress in the

environment."  [*Id.*; Trial Tr. (K. Patrick) 1031:23-1036:17].  In support of many of these

explanations, Dr. Greenhill cited to his earlier 1989 paper, which named Dr. Birmaher as

the first author.  [DTX 630, at pp. 6, 24].

460.    Dr. Guinta testified that Dr. Greenhill's 1992 review article provided

nothing more than a "laundry list" of speculative possibilities for the lack of efficacy of

Ritalin SR®.  [Trial Tr. (D. Guinta) 106:7-107:3; and 161:7-14].  Dr. Patrick testified that,

at the time of the invention, the person of ordinary skill in the art would not have known

which of the many possibilities cited in the paper was the real explanation for the

problems with Ritalin SR®.  [Trial Tr. (K. Patrick) 1026:24-1027:16; and 1036:18-24].

The Court credits this testimony and finds that the article did not indicate which one of

the many possible explanations Dr. Greenhill considered the most likely.  The Court

finds, therefore, that a person of ordinary skill in the art would not have known in 1997

which one of these possibilities, if any, was the real explanation for the problems

observed with Ritalin SR®.

## 2.    The Prior Art Showed that Only a BID or TID Regimen Provided Effective Extended Treatment of ADHD

461.    The mean MPH plasma concentration profiles resulting from a BID

regimen of Ritalin® and a once-a-day regimen with Ritalin SR® were well known in the

prior art. The seminal publication describing these profiles was published in 1989 by Plaintiffs' expert, Dr. Kennerly Patrick. [PX 137; Trial Tr. (D. Guinta) 40:2-41:7; Trial Tr. (K. Patrick) 1012:16-1013:6].

462. Before the invention, the only regimen known to provide effective extended treatment of ADHD was one in which Ritalin® was administered on a BID or TID regimen. [Trial Tr. (M. Mayersohn) 911:8-912:3; Trial Tr. (K. Patrick) 1015:7-18].

463. The most pronounced and apparent difference between the BID plasma concentration profile and the plasma concentration profile for Ritalin SR® is the "trough" in the MPH plasma concentration that occurs in the middle of the profile resulting from the BID regimen. [Trial Tr. (D. Guinta) 44:9-16; Trial Tr. (K. Patrick) 1023:2-7].

464. The timing of the peaks and troughs produced in the BID regimen was recognized as being important. [Trial Tr. (K. Patrick) 1015:7-1020:1, 1023:2-17; Trial Tr. (D. Guinta) 33:2-9, 39:19-44:16]. In particular, periods where high levels of MPH are found in the plasma generally correspond to periods where greater therapeutic efficacy is required (*e.g.*, morning and early afternoon). Similarly, periods where low levels of drug are found in the plasma (*e.g.*, lunchtime and in the evening) generally correspond to periods where limiting side-effects such as appetite suppression and insomnia would have been seen as being critical. [Trial Tr. (D. Guinta) 41:8-44:16; Trial Tr. (K. Patrick) 1023:2-19].

465. A person of ordinary skill would have considered the trough in the middle of the plasma profile produced in the BID regimen to be particularly important because of the need to avoid the known MPH side effect of appetite suppression around lunchtime. [Trial Tr. (D. Guinta) 42:3-43:2; Trial Tr. (K. Patrick) 1017:23-1019:3]. Having low

levels of drug at lunchtime was considered to be beneficial in MPH treatment regimens because it allowed children to eat lunch, which resulted in less irritability during the day and normal growth.  [Trial Tr. (K. Patrick) 1017:23-1019:3].

466.    In attempting to formulate a new once-a-day MPH dosage form, a person of ordinary skill in the art would have been led to a plasma concentration profile that included the "peaks" and "troughs" in MPH levels that result from administering Ritalin® according to the BID or TID regimens.  [Trial Tr. (K. Patrick) 1023:2-19; *see also* Trial Tr. (D. Guinta) 44:9-16].

467.    Dr. Patrick's publication also would have shown a person of ordinary skill in the art that the rate of increase in the plasma concentration profile following administration of immediate-release MPH (*i.e.*, the "absorption phase") is slightly steeper than the rate of ascension seen in the plasma profile after administration of Ritalin SR®. [PX 137, Figure 2].  The more rapid rate of ascension in the MPH plasma concentration produced by the immediate-release MPH was referred to as the "ramp effect" and was postulated as being one possible reason for the enhanced effectiveness of the BID regimen over Ritalin SR®.  [Trial Tr. (K. Patrick) 1016:15-1017:22; and 1031:9-1032:22].

468.    The prior art discussing the "ramp effect" would have led a person of ordinary skill in the art to conclude that that the effectiveness of a MPH treatment regimen was very sensitive to even slight changes in the rate of absorption of MPH (*i.e.*, the steepness of the slope).  [Trial Tr. (K. Patrick) 1017:4-22; and 1031:7-22; Trial Tr. (M. Mayersohn) 978:19-980:18].

469.    The information in the prior art about the "ramp effect" would not have led a person of ordinary skill in the art to develop an extended-release MPH drug product that produced an ascending plasma concentration because that person would have recognized that maintaining a rate of increase in the MPH plasma concentration comparable to the "ramp effect" increase would have resulted in lethal MPH plasma concentrations after a short period.  [Trial Tr. (K. Patrick) 1049:6-1052:3; PX 723].

470.    Knowledge of a possible "ramp effect" would not have led a person of ordinary skill in the art to design a MPH dosage form that produced an ascending plasma concentration lasting about 5.5 or about 8 hours.  [Trial Tr. (K. Patrick) 1050:4–1052:9]. Instead, a person of ordinary skill in the art would have sought to produce an extended-release formulation that would produce only short periods during which there would be an ascending MPH plasma concentration comparable to the "ramp effect" rate of increase in MPH plasma concentration seen after administration of immediate-release MPH products.  A plasma concentration profile based on a "ramp effect" would necessarily mimic the BID plasma concentration profile because such a profile includes "reset" periods (i.e., a trough) between each absorption phase that prevent MPH from reaching toxic plasma concentration levels in the patient.  [Id.].

471.    Defendants' expert, Dr. Mayersohn, testified that producing a once-daily drug formulation that mimicked the peaks and troughs in the BID and TID regimens was within the skill of a person of ordinary skill in the art in the mid-1990s.  [Trial Tr. (M. Mayersohn) 983:17-984:5].

### 3.    The 1996 "MTA Study" Recommendations Teach
Away from the Claimed Invention

472.    A person of ordinary skill in the art at the time of claimed inventions would have been aware of, and considered, the recommendations made in a landmark paper published in 1996 by leading experts in the field of ADHD treatment.  [PX 593; Trial Tr. (D. Guinta) 77:1-78:11].  This study, known as the "MTA Study," was commissioned by the National Institutes of Mental Health and was designed to compare the existing methods of treating ADHD.  [*Id.*].

473.    Based on the results of the MTA study, the leading experts in the field of ADHD treatment recommended using a sculpted MPH dosing regimen to treat ADHD patients, in which the amounts of MPH given later in the day decrease, rather than increase.  [PX 593].  Specifically, to treat ADHD, the experts recommended that most children be given immediate-release MPH three times a day (*i.e.*, according to a TID regimen).  [Trial Tr. (D. Guinta) 79:7-81:11].

474.    In the recommended TID regimen, the experts suggested reducing the amount of MPH given in the third dose relative to the amounts given in the first two doses.  More specifically, in the "sculpted" regimen discussed in the paper, the experts suggested giving a patient 10 mg of immediate-release MPH in the morning, 10 mg of immediate-release MPH at lunchtime, and a reduced dose of 5 mg of immediate-release MPH in the afternoon.  [*Id.*; PX 593, at p. 5].  The smaller third dose was perceived to be necessary to reduce the risk of side-effects occurring later in the day, which would have significantly adverse consequences for school-aged children, such as appetite suppression at dinner time and insomnia at bed time.  [Trial Tr. (K. Patrick) 1020:2-22].

475.    The MPH dosing regimen proposed by the experts based on the MTA study, in which a lower dose of MPH is given at the end of the day, is inconsistent with the speculation in the literature that acute tolerance was associated with MPH.  [Trial Tr. (D. Guinta) 161:7–162:12].  If MPH exhibited acute tolerance, a third dose that was half the size of the first two doses would have resulted in significantly reduced efficacy and would have defeated the entire purpose of the TID regimen, which was to provide control later in the day when necessary.  [*Id.*; *see also* Trial Tr. (D. Guinta) 80:11-81:4; Trial Tr. (K. Patrick) 1020:2-16].

**4.    The CNS Stimulant Art Would Not Have Been Considered Useful to a Person of Ordinary Skill Attempting to Design a New Once-a-Day MPH Dosage Form and Would Not Have Suggested that MPH Exhibits Acute Tolerance or a Solution to this Problem**

476.    Publications describing acute tolerance in connection with other drugs, such as cocaine and nicotine, would not have suggested to a person of ordinary skill in the art that acute tolerance was known to exist for MPH, and would not have suggested that such problems could be resolved by using a dosage form that had an ascending rate of release of MPH over an extended period of time or which produced a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours.

477.    Defendants argue that acute tolerance was known to be associated with certain CNS stimulants, such as cocaine and nicotine, and that this knowledge would have been considered by a person of ordinary skill in the art in designing an extended-release formulation of MPH for treating ADHD.  [Trial Tr. (M. Mayersohn) 820:13-21; *see also* D.I. 134, at p. 93, DFF ¶ 285].

478.    The Court finds that publications reporting acute tolerance associated with CNS stimulants would not have been generalized to MPH and would not have provided any guidance to a person of ordinary skill in the art seeking to design a once-a-day MPH dosage form for the treatment of ADHD.

### (a)    The Angrist Publication

479.    A review article by Dr. Burton Angrist would not have suggested that acute tolerance was exhibited by MPH and would not have suggested that this was the source of the problem with Ritalin SR®.  The Angrist publication also would not have suggested that an effective once-a-day MPH drug product should be designed to include an ascending rate of drug release or to produce a substantially ascending MPH plasma concentration.

480.    The Angrist publication that Defendants rely upon discussed the effects of certain CNS stimulants in animals and people.  [DTX 626].  In a discussion of acute tolerance, the only CNS stimulants mentioned in Angrist are cocaine and *d*-amphetamine. [DTX 626, at pp. 112-13].  MPH was not discussed in the Angrist publication.  [Trial Tr. (K. Patrick) 1047:19-21].

481.    In people, Angrist stated that "[a] type of tolerance to CNS stimulants that clearly does occur clinically is an acute tolerance after a single dose, which disappears quickly.  This effect demonstrated by Fischman et al. probably is clinically meaningful during the course of an individual stimulant binge and could either contribute to abusers' safety or, conversely, lead to higher doses being taken." [DTX 626, at p. 112].  This statement was made in the context of binging activity by drug abusers who were examined after taking cocaine intranasally or intravenously.  These studies were designed

to better understand the basis of cocaine drug addiction and would not have been considered useful in the design of treatments for children with ADHD.  [Trial Tr. (K. Patrick) 1046:5-1047:18].

482.    Defendants' expert, Dr. Mayersohn, agreed on cross-examination that studies involving cocaine in drug abuse situations would not have been relevant or helpful to a person of ordinary skill in the art seeking to develop a new way of treating ADHD in children.  [Trial Tr. (M. Mayersohn) 919:18-920:18; and 920:19-922:7].

483.    The Angrist paper also made reference to other work in preparation regarding "decrements in the effects of oral *d*-amphetamine at a time when plasma levels have plateaued rather than declined."  [DTX 626, p. 113; *see also* DTX 944].  Because one of the metabolites of *d*-amphetamine is a false transmitter that competes with *d*-amphetamine in binding to the receptor, statements making a connection between *d*-amphetamine and acute tolerance would not have been extrapolated to MPH because MPH has a different mechanism of action compared to *d*-amphetamine and the basis for tolerance with amphetamines is not relevant to MPH.  Acute tolerance is observed with *d*-amphetamine,.  This phenomenon does not occur with MPH. [Trial Tr. (K. Patrick) 1047:22-1049:5].

###        5.    The Published Work of the ALZA Scientists Describing the Discovery of the Claimed Inventions Established for the First Time that MPH Exhibits Acute Tolerance

484.    The prior art, including the prior art cited by Defendants, did not establish that MPH exhibited acute tolerance, and a person of skill in the art seeking to develop an extended-release form of MPH would not have assumed that MPH exhibited acute tolerance.

485.    In the mid-1990s, very little was known about the pharmacodynamics of MPH.  The "sipping studies," conducted by the ALZA scientists, were the first studies specifically designed to explore the pharmacodynamics of MPH.  The results of these studies were eventually published in two prestigious scientific journals, and are recognized as being the most exhaustive investigations that had ever been conducted on this subject.  [Trial Tr. (D. Guinta) 46:3-47:14; and 49:3-20].  These studies were the first to make the connection between MPH and acute tolerance through valid, scientific research, and led the way to the claimed inventions and their commercial embodiment, CONCERTA®.  [Trial Tr. (D. Guinta) 60:9-22; and 82:10-24].

486.    As late as 2004, generic drug makers seeking to market commercial embodiments of the claimed inventions reported to the FDA that the available clinical data did not support a conclusion that MPH exhibited acute tolerance.  In a section of a Citizen Petition submission entitled "Issues on Acute Tolerance," these generic drug makers reported that the "*concept of acute tolerance remains a theoretical one*."  [PX 265, at p. 4 (emphasis added); Trial Tr. (K. Patrick) 1193:6-1195:10].

487.    The generic drug makers also stated:

> Overall, the currently available clinical data and analysis results in the literature *do not* support the existence of acute tolerance in the pharmacological effect of MPH.

[PX 265, at p. 5 (emphasis added)].  These statements, made to the FDA (and outside the context of this litigation), directly contradict the testimony of Defendants' expert, Dr. Mayersohn, that the *prior art* provided "a very good argument" for acute tolerance at the time the invention was made.  [Trial Tr. (M. Mayersohn) 936:15-24].  The Court finds

that the prior art did not support the existence of acute tolerance with MPH and that acute tolerance would not have provided a motivation to make the claimed invention.

> **6.    The Prior Art Did Not Establish a Connection Between Acute Tolerance and MPH, but Even if It Did, the Claimed Inventions Would Not Have Been Obvious**

488.    Whether or not a person of ordinary skill in the art, before the invention, believed acute tolerance existed for MPH, that person would not have concluded that overcoming that problem could be predictably achieved using a dosage form that released MPH at an ascending rate for an extended period of time, or by producing a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours, as required by the patent claims.

489.    Before the invention, the prior art and general knowledge in the art clearly taught away from the approach required by the claimed invention.  At that time, the prior art and general knowledge had established that the only plasma profile known to be effective in treating ADHD over an extended period was a sawtooth profile produced using BID or TID dosing regimens.  [Trial Tr. (M. Mayersohn) 911:8-912:3; Trial Tr. (K. Patrick) 1015:7-18].  A person of ordinary skill wishing to make an extended-release drug product that would be effective would have tried to mimic the only profile known at the time to work; namely, the sawtooth profile.  [Trial Tr. (K. Patrick) 1023:2-19].

490.    It was also known, and was specifically recommended by experts in the field of ADHD, that lower doses of MPH be provided toward the end of the day to avoid undesirable side-effects.  [DTX 630, at pp. 12-13 ("Severe insomnia can be managed by changing the time of dosing, with most of the medication given early in the day.")].

491.    Conventional approaches to extended-release drug formulation also taught that it would have been desirable to deliver a constant release rate of a drug for an extended period.  [Trial Tr. (D. Guinta) 44:17-46:2; Trial Tr. (T. Needham) 848:23-849:8; Trial Tr. (K. Patrick) 1008:8-11, 1059:15-24; *see also* DTX 1, col. 2, line 63 to col. 3, line 12; Dep. Tr. (D. Feifel) 172:7-21].

492.    Defendants argue that knowledge of acute tolerance would have made the solution to the problems of Ritalin SR® obvious to a person of ordinary skill in the art, and that the obvious solution would have led such a person to arrive at the claimed inventions.  [Trial Tr. (M. Mayersohn) 842:2-16].  To the extent that Defendants' theories about acute tolerance are entitled to any weight, that knowledge would further teach away from the claimed treatment methods, because the prior art suggested that the way to overcome acute tolerance of a drug was to use a pulsatile delivery regimen.  With a pulsatile regimen, the profile would reflect a low plasma drug concentration during a period of "no drug" administration.  [Trial Tr. (K. Patrick) 1042:7-20; *see also* Trial Tr. (M. Mayersohn) 983:3-10].  A BID or TID regimen produces a MPH plasma concentration profile comparable to what would be produced by a pulsatile delivery system.  [Trial Tr. (D. Guinta) 162:24-164:1].

493.    Ritalin® administered according to the BID or TID regimens was considered to be effective in treating the symptoms of ADHD.  [Trial Tr. (K. Patrick) 1042:7-20].  Because the effects of acute tolerance were not observed when patients were administered immediate-release Ritalin® under the BID or TID regimens, the person of ordinary skill in the art — especially a person concerned about acute tolerance — would have understood that the "trough" in plasma concentration associated with the BID

regimen likely played an important role in providing better overall effectiveness by serving as a recovery period allowing for any drug tolerance to dissipate.  [*Id.*].  Thus, a person of ordinary skill in the art would have been strongly motivated to mimic the sawtooth pattern exhibited by Ritalin® administered BID as a potential solution to the problem of finding an effective once-a-day dosage form.  [*Id.*].

494.    At trial, Dr. Guinta explained why the sawtooth pattern of the BID plasma profile would have been considered necessary if acute tolerance was a concern:

> [T]he most common way to overcome tolerance is to give the drug in a pulse fashion.  So Ritalin immediate-release does just that, it gives one pulse of drug and the second pulse of drug and then for people who take it three times a day, a third pulse of drug. . . .

[Trial Tr. (D. Guinta) 162:24-164:1].

495.    Defendants' expert, Dr. Mayersohn, agreed that an intermittent dosing approach, which provides for a recovery period, was the typical solution to address problems of acute tolerance *assuming* it was known to exist with a particular drug:

> Q.    And so we can agree, that if there was acute tolerance and you knew about it, one way of avoiding it would be to use a dosing regimen that allowed for a recovery in the middle of the day?
>
> A.    It would seem reasonable.
>
> Q.    That's intermittent dosing; right?
>
> A.    Yes.

[Trial Tr. (M. Mayersohn) 983:3-10].

496.    Dr. Mayersohn also testified to the importance of including a recovery period in a drug delivery approach that attempted to solve the problem of acute tolerance:

Q.    In general, the typical way to deal with acute tolerance if you knew about it was intermittent dosing?

A.    Or increasing the size of subsequent doses, yes.

Q.    And the time between the dosings as you put it allows the body to reset, is that the way to describe it?

A.    Yeah.

[Trial Tr. (M. Mayersohn) 985:3-11].

497.    The sawtooth plasma concentration profile characterized by administration of Ritalin® according to the BID and TID regimens includes such a recovery period, [Trial Tr. (D. Guinta) 162:24-164:1], and Dr. Mayersohn agreed that it would have been possible in the mid-1990s to design a once-a-day MPH formulation that produced a plasma profile that looked like the sawtooth profile of the BID regimen or the TID regimen.  [Trial Tr. (M. Mayersohn) 983:17-984:5].

498.    Thus, even assuming that the prior art taught that MPH was linked to acute tolerance, the Court finds that the most logical starting place for a person of ordinary skill in the art seeking to design a once-daily MPH dosage form would have been a dosage form that mimicked an intermittent or pulsatile drug delivery profile that included a recovery period, such as that produced by the immediate-release Ritalin® BID and TID regimens, which were known to be effective for an extended period of time.

7.    **The Various Nitrate References Cited by Defendants Confirm the Importance of Using an Intermittent Dosing Profile to Overcome Acute Tolerance**

499.    Defendants cite a number of publications and patents concerning drugs unrelated to MPH and argue that these references teach the use of escalating drug release rates and ascending plasma concentration profiles as approaches to overcoming the

problem of acute tolerance to drugs.  [DTX 631; DTX 1221; DTX 632; DTX 633; Trial Tr. (M. Mayersohn) 842:23-843:34; and 851:8-22].  The Court finds that these references do not suggest the use of ascending release rates or substantially ascending drug plasma concentrations as solutions to acute tolerance exhibited by a drug, and that these references would not have been considered relevant by a person of ordinary skill in the art seeking to develop a new once-daily, extended-release MPH dosage form for use in the treatment of ADHD.

500.    Most of the publications and patents cited by Defendants concern nitrate drugs.  Comparing nitrates to MPH, Dr. Patrick testified that "[t]he drugs are different in every regard you can imagine."  [Trial Tr. (K. Patrick) 1055:7-10].  Dr. Patrick explained that these differences include: nitrates act on the smooth muscle tissue of the vasculature while MPH acts on receptors in the central nervous system; nitrates are prodrugs that must be converted into a biologically active metabolite, which is not the case for MPH; nitrates do not cross the blood-brain barrier, while MPH must; and nitrates exhibit a much broader margin of safety than MPH, meaning that increasing doses of nitrates can be provided without causing an increase in frequency or severity of side-effects.  [Trial Tr. (K. Patrick) 1053:21-1055:24; and 1060:17-1061:8].

501.    At trial, Defendants' expert, Dr. Mayersohn, acknowledged that there are "*important differences*" between MPH and nitrates in terms of pharmacology, therapeutic results, and the way the drugs work in the body.  [Trial Tr. (M. Mayersohn) 946:15-24]. The nitrate references cited by Defendants also state that the pharmacokinetic properties of nitrates are "*quite unusual*."  [DTX 631, at p. 22 (emphasis added)].

502.    Publications regarding nitrates would not have been generalized to MPH and would not have provided useful information to a person of ordinary skill in the art seeking to develop a new ADHD treatment method.  [Trial Tr. (K. Patrick) 1056:1-18]. Pharmacology is a rational science.  Because the drugs are very different, the person of ordinary skill in the art would not have looked to literature involving nitrates for guidance in the design of a new MPH dosage form useful for treating ADHD.  [*Id.*].

503.    If the nitrate references relied upon by the Defendants were considered by a person of ordinary skill in the art, that person would have concluded that the nitrate literature teaches away from the claimed inventions because it suggests the use of an *intermittent* dosing profile or a substantially *descending* plasma drug concentration to overcome acute tolerance for nitrates.  [*See* PFF ¶¶ 504-507, 552 *infra*].

504.    The 1984 article by Dr. Ho-Leung Fung cited by Defendants taught a method of overcoming tolerance associated with nitrates that includes a "drug washout period," which is similar to the trough observed in the BID regimen that was used with immediate-release MPH.  [DTX 631, at p. 25; Trial Tr. (K. Patrick) 1058:9-17].

505.    In a patent that issued ten years later, the author of the Fung article reiterated that "*a nitrate-free interval, e.g., by interrupting administration during the night, might provide the means for avoiding tolerance.*"  [PX 420, at col. 3, lines 24-29]. In fact, during the prosecution of the patent application, Fung stated: "The *only solution* to date to counter the tolerance problem associated with nitroglycerin administration is *intermittent dosing*."  [PX 421, at p. 5 (emphasis added)].  Defendants' expert, Dr. Mayersohn, agreed that the reference to "intermittent dosing" in the Fung patent was

consistent with the "multiple" dosing regimen used with the BID and TID Ritalin regimens.  [Trial Tr. 957:2-958:2].

506.    At trial, Defendants introduced another publication by Fung relating to nitrates.  [DTX 1221; Trial Tr. (K. Patrick) 1168:10–1169:3; and 1189:13–1190:7].  That article was published in 1997 and is *not* prior art to the '373 patent.  [*Id.*].  However, it further reiterated that the "current" approach to minimizing tolerance associated with nitrates employs *an intermittent dosing regimen with a nitrate free interval*.  [DTX 1221, at p. 1143; Trial Tr. (K. Patrick) 1190:8–1191:19].

507.    Taken as whole, the literature relating to nitrates would not have suggested to a person of ordinary skill in the art in 1997 that a drug delivery method involving an ascending rate of MPH drug release and, optionally, a substantially ascending plasma concentration profile, would be effective to overcome acute tolerance, or that such approaches would be useful or effective for treating ADHD.  [*Id.*; *see also* Trial Tr. (K. Patrick) 1065:23-1066:6].

508.    Defendants' expert, Dr. Mayersohn, made reference to the "everyday example" of acute tolerance to the effect of nicotine in cigarettes.  [Trial Tr. (M. Mayersohn) 859:18-860:21].  Dr. Mayersohn did not cite to any literature reference in support of his testimony.  [*Id.*].

509.    The nicotine literature does not suggest a dosage form that has an ascending rate of release of a drug or which produces a substantially ascending plasma concentration of the drug as options for addressing problems caused by acute tolerance exhibited by nicotine.  Instead, this literature suggests that a "rebooting" period (*i.e.*, a drug-free interval) between intermittent administrations of the drug was necessary to

139

overcome acute tolerance.  Defendants' own papers confirm that this is what the nicotine literature teaches.  [*See, e.g.*, D.I. 134, at p. 95, DFF ¶ 291 ("Typically, however, the acute tolerance effect dissipates rather quickly as might happen during a period of no drug administration.  One can think of this as a *'rebooting'* or normalization of the body system.  Such a situation is known to occur for nicotine obtained from cigarette smoking.") (emphasis added); *see also* DTX 628, at p. 236 (reporting that "*successive peaks* of high nicotine concentration, as obtained by cigarette smoking, *are better able to overcome tolerance* partially to produce psychologic effects" (emphasis added))].

510.    At trial, Dr. Mayersohn admitted that "simple *multiple* dosing" was the approach by which acute tolerance to nicotine was overcome. [Trial Tr. (M. Mayersohn) 859:18-860:1 (emphasis added)].   Multiple dosing is what occurs with the immediate-release Ritalin® BID ("twice-daily") and TID ("three-times daily") dosing regimens, which provide a pulsatile drug delivery profile.  [Trial Tr. (D. Guinta) 162:18-164:1].

8.    **The Various Nitrate References Cited by Defendants Do Not Provide Any Indication that the Proposed Approaches for Overcoming Acute Tolerance Were Capable of Actually Achieving that Goal**

511.    At trial, Defendants' expert, Dr. Mayersohn, testified that the 1984 Fung paper [DTX 631] and U.S. Patent No. 4,956,181 issued to Gerald W. Bayer (issued in 1990) [DTX 632] disclosed drug delivery devices that provide an escalating release rate of drug and increasing plasma drug concentrations in order to overcome acute tolerance with nitrate drugs.  [Trial Tr. (M. Mayersohn) 849:15-850:15; and 851:8-852:4].

512.    However, as acknowledged by Defendants' expert, the proposals in the Fung paper were made in a "*speculative fashion*" and the article itself states that the

"*validity of this dosing approach has to be experimentally tested.*"  [DTX 631, at p. 25 (emphasis added); Trial Tr. (M. Mayersohn) 944:10-945:24; and 946:1-14].  Similarly, nothing in the Bayer patent suggested that its methods described were ever employed as an approach for overcoming acute tolerance with nitrates.  No experimental data was provided in the patent.  [Trial Tr. (K. Patrick) 1062:6-12; Trial Tr. (M. Mayersohn) 958:22-959:20].

513.    Years after the publication of these documents, nothing in the nitrate literature suggested that the methods discussed in the Fung paper and the Bayer patent were successfully put to use to overcome tolerance of nitrates.  In 1992, about eight years after the publication of the Fung paper and two years after the issuance of the Bayer patent, Fung submitted a patent application to the PTO, which eventually issued as U.S. Patent No. 5,278,192 ("the Fung patent").  [PX 420].  This patent clearly suggests that the proposals in the Fung paper and the Bayer patent remained untested and speculative.

514.    The specification of the Fung patent expressly made reference to and summarized the methods and devices described in the 1984 Fung paper and the earlier issued Bayer patent. [PX 420, at col. 4, lines 36-46; Trial Tr. (K. Patrick) 1063:6-1064:1; PX 420 at col. 4, lines 50-55; Trial Tr. (K. Patrick) 1064:6-13].  The Fung patent stated, however, that:

> [a]t present *no* dosage regimen with nitrovasodilators has been developed that can achieve the dual objectives of avoidance of hemodynamic tolerance while continuously maintaining their beneficial effects.

[PX 420, at col. 2, lines 3-7 (emphasis added); Trial Tr. (K. Patrick) 1064:14-22].  In 1997, the person of ordinary skill in the art would have interpreted these statements to

141

mean that no successful method of overcoming tolerance had been achieved with nitrates. [Trial Tr. (K. Patrick) 1064:14-1065:2].

515.    In fact, the Fung patent suggested methods for treating cardiovascular symptoms that are completely different from the earlier methods disclosed by Fung.  The claims of the patent relate to a method of vasodilator therapy comprising administering a dose of a *nitrite* (as opposed to an organic nitrate) at a *constant rate* (as opposed to an ascending rate).  [PX 420 (claim 17); col. 5, lines 35, 40; Trial Tr. (K. Patrick) 1065:3-13].  The solution to overcoming tolerance claimed in the Fung patent involved methods and drug compounds that are different from those originally proposed in the 1984 Fung paper and the Bayer patent.  [Trial Tr. (K. Patrick) 1065:3-11].

516.    Fung also reported in 1997 that the utility of the approaches to overcoming tolerance associated with nitrates that he "surmised" over a decade earlier in 1984, *see* DTX 631, had *never* been evaluated to determine if they could, in fact, overcome acute tolerance.  [DTX 1221, at 1143; Trial Tr. (K. Patrick) 1191:20–1192:8].

517.    Nothing in the prior art suggested that acute tolerance could actually be overcome using a drug delivery device that provided an escalating release rate of drug or increasing plasma drug concentrations, as suggested by Defendants.  In addition, nothing in the prior art suggested that the methods utilized could be predictably applied to arrive at an effective, once-daily MPH dosage form.

9.    **The Drug Delivery and Plasma Concentration Profiles Disclosed in the Various Nitrate References Cited by Defendants Would Not Have Been Suitable for the Treatment of ADHD**

518.    The drug release and plasma concentration profiles disclosed in the references relied upon by Defendants would not have been considered useful for the treatment of ADHD with MPH.

519.    Defendants have pointed to Figure 4 of the 1984 Fung paper, which provides a "proposed nitrate dosing mode" as a profile that would have been adopted with MPH to overcome acute tolerance.  [DTX 631, at p. 24; Trial Tr. (M. Mayersohn) 846:9-847:6].  This figure would not have provided any guidance to a person of ordinary skill in the art seeking to develop a new MPH dosage form for the treatment of ADHD because the proposed mode of drug delivery would result in excessive and unacceptable levels of MPH leading to side-effects.  [Trial Tr. (K. Patrick) 1059:15-1060:6; and 1061:7-13].

520.    Defendants' expert, Dr. Mayersohn, agreed that nitrates have a much higher margin of safety compared to MPH in terms of side-effects.  [Trial Tr. (M. Mayersohn) 948:4-950:8 (testifying about Figure 3 of the 1984 Fung paper)], and that when using "higher and higher concentrations [of drug, the person of ordinary skill in the art must stay] within the safety margins" of the drug.  [Trial Tr. (M. Mayersohn) 847:7-9].  It was also known that the side-effects associated with MPH are dose dependent, meaning that as the amount of drug is increased, the severity and incidence of side-effects increases.  [Trial Tr. (D. Guinta) 34:17-24; Trial Tr. (K. Patrick) 1025:14-21].

521.    Given these factors, the proposed drug delivery approaches for nitrates described in the 1984 Fung paper would not have been applied to MPH and the treatment

of ADHD.  As shown in Figure 4 of the Fung paper, the plasma drug concentrations in the proposed drug delivery mode greatly exceed the plasma drug concentrations of the conventional nitrate dosing mode.  The person of ordinary skill in the art would have found such a drug delivery approach inapplicable to an extended-release, once-daily form of MPH as MPH has a narrow margin of safety and the relationship between side-effects and MPH plasma concentration was known to be dose-dependent.  [Trial Tr. (K. Patrick) 1025:14-21, 1059:12-1061:13; *see also* Trial Tr. (D. Guinta) 34:17-24; Trial Tr. (M. Mayersohn) 947:5-950:8].

522.    The nitrate drug release rate profiles disclosed in the Bayer patent would not have been considered to be useful in the treatment of ADD or ADHD.  In the profiles described in the patent, drug levels ascend throughout the day and remain at therapeutically relevant levels 24 hours after drug administration.  No rational person familiar with the needs of a child having ADHD would have considered release profiles such as those described in the Bayer patent to be relevant to the treatment of ADHD in children because high MPH levels in the evening would raise concerns about unwanted side-effects.  This is not an issue, however, with nitrate drugs due to their greater margin of safety and relative insensitivity to side-effects.  [Trial Tr. (K. Patrick) 1061:14-1062:24].

523.    The Bayer patent does not teach a dosage form that releases drug at an ascending rate through the mid-point of the $T_{90}$.  [Trial Tr. (K. Patrick) 1063:1-5].

524.    In further support of the obviousness of the claimed inventions, Defendants cite to U.S. Patent No. 5,156,850, which issued in 1992 to Patrick S. Wong as

teaching ascending releases rates of drug through the midpoint of the $T_{90}$. [DTX 634; D.I. 134, at pp. 101-102, DFF ¶ 313; Trial Tr. (M. Mayersohn) 856:4-16; 857:17-858:10].

525.    The Wong patent dealt with the problem of elevated blood pressure that occurs in the morning shortly before a patient wakes up. The solution to the problem proposed by the patent involves a dosage form that provides a drug-free period in the evening followed by delayed release of drug in the morning. [Trial Tr. (K. Patrick) 1067:3-23]. The working examples of the patent involved the cardiovascular drugs verapamil and nicardipine, which are calcium channel blockers that block the influx of calcium ions into cardiac cells. [Trial Tr. (K. Patrick) 1067:24-1068:16].

526.    The Wong patent would not have provided any guidance to a person of ordinary skill in the art seeking to develop a new dosage form for the treatment of ADHD with MPH because the working examples provided in the patent involve drugs that have a different mechanism of action as compared to MPH. [*Id.*].

527.    In addition, the release rate profiles shown in Figures 6 and 8 of the patent would not have been considered useful to a person of ordinary skill in the art seeking to develop a new dosage form for the treatment of ADHD with MPH because they show very little drug reaching the bloodstream for the first few hours, which is a critical period in children with ADHD as it corresponds to the first part of the school day when control of symptoms is important. Following this drug-free period, the release rate of drug increases for a period of time and then remains continuous for an extended period. This delayed release of drug during later portions of the day would also be unacceptable for children taking MPH because it would interfere with lunch and dinner times and bedtime. [Trial Tr. (K. Patrick) 1069:3-19; and 1069:24-1070:19].

145

528.    Defendants' expert, Dr. Mayersohn, agreed that there is nothing in the Wong patent that indicates that the drug delivery patterns described would be useful for overcoming acute tolerance or that the methods described could be used to treat ADHD. [Trial Tr. (M. Mayersohn) 970:5-971:13; *see also* Trial Tr. (K. Patrick) 1068:17-23].

### E.    The Differences Between the Prior Art and the Claimed Invention

529.    Claims 1, 6 and 7 of the '373 patent include a limitation that the dosage forms used in the claimed treatment methods provide "an ascending release rate over an extended period of time."  [DTX 1].

530.    The prior art relied upon by Defendants does not teach treatment methods using dosage forms that release MPH at an ascending rate of release for an extended period of time.  [Trial Tr. (T. Needham) 662:6-9; Trial Tr. (K. Patrick) 1006:24-1008:11].

531.    Immediate-release formulations of MPH do not release the active ingredient at an ascending rate for an extended period of time.  Instead, these products release essentially all of the MPH in the dosage form immediately after ingestion.  [Trial Tr. (D. Guinta) 41:12-22; Trial Dr. (K. Patrick) 1015:19-1016:8].

532.    Ritalin SR® does not release MPH at an ascending rate of release for an extended period of time.  By design, Ritalin SR® releases MPH at a primarily descending rate of release for most of the period during which MPH is released from the dosage form.  [Trial Tr. (M. Mayersohn) 907:5-15; 909:1-7; and 910:16-911:8; Trial Tr. (T. Needham) 729:17-22; Trial Tr. (M. Davies) 1217:23-1218:4].

533.    Ritalin SR® releases MPH at an ascending rate for only about an hour, after which the amounts released in each subsequent interval of time decreases.  [DTX 621, at 500].

534.    Ritalin SR® does not provide an ascending rate of release over an extended period of time as that claim element has been interpreted by the Court.  [D.I. 130; Trial Tr. (T. Needham) 729:17-22; Trial Tr. (M. Davies) 1217:11-1218:4; Trial Tr. (M. Mayersohn) 907:5-15; 909:1-7; and 910:16-911:8].

535.    Ritalin SR® does not release increasing amounts of MPH through at least the mid-point of the $T_{90}$ of the product, nor does it release MPH at an ascending rate for at least three hours.  [*Id.*].

536.    Claims 6 and 7 of the '373 patent are dependent from Claim 1. The differences between these claims and the prior art includes all of the differences noted above with respect to Claim 1.

537.    The prior art relied upon by Defendants does not teach treatment methods using a once-a-day dosage form that produces a substantially ascending MPH plasma concentration for about 5.5 hours or about 8 hours. [Trial Tr. (K. Patrick) 1006:24-1008:11].

538.    Immediate-release MPH dosage forms are characterized by a plasma concentration of MPH that peaks within 2 hours following administration and then rapidly descends.  [Trial Tr. (D. Guinta) 41:12-22; Trial Dr. (K. Patrick) 1015:19-1016:8].

539.    Immediate-release MPH products do not meet the ascending release rate requirement of the claims, nor do they produce substantially ascending MPH plasma concentrations for about 5.5 or about 8 hours as required by Claims 6 and 7 of the '373 patent.  [*Id.*; D.I. 130].

540.    The MPH plasma concentration profile observed following administration of Ritalin SR® does not exhibit a substantially ascending plasma concentration for about 5.5 or about 8 hours as required by dependent Claims 6 and 7 of the '373 patent.  [Trial Tr. (M. Mayersohn) 907:5-15; 909:1-7; and 910:16-911:8; DTX 621, at 500; Trial Tr. (D. Guinta) 45:15-46:2].

541.    Ritalin SR® produces an essentially constant MPH plasma concentration for approximately 4 to 5 hours and after that the MPH plasma concentration decreases rapidly.  [*Id.*].

542.    The differences between dependent Claim 6 and 7, thus, include both that the dosage form specified in the claims released MPH at an ascending rate through at least the midpoint of the $T_{90}$ of the dosage form and for at least 3 hours, and that it produces a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours.

543.    None of the attributes of the dosage forms of the claimed methods is disclosed or suggested in the prior art.

**1.    The Knowledge in the Art Before the Inventions Taught Away from the Claimed Treatment Methods**

544.    The claimed inventions would not have been obvious because the knowledge in the art taught away from the claimed inventions.  At the relevant time

148

period, a person of ordinary skill in the art would have considered the timing of the peaks and troughs associated with the immediate-release MPH (*i.e.*, Ritalin[®]) dosing regimens to be important to the effectiveness of treating ADHD with MPH because periods where high levels of drug are found in the plasma correspond to periods where therapeutic efficacy is required, and the periods where low levels of drug are found in the plasma correspond to periods where limiting side-effects is critical.  [*See supra,* PFF ¶¶ 462-466].

545.    Thus, a person of ordinary skill in the art seeking to develop a once-a-day MPH dosage form for treating ADHD would have been motivated to design a dosage form that delivered a blood plasma profile similar to that of immediate-release Ritalin[®], which was considered to be the "gold standard" for treating ADHD.  [*Id.*].

546.    To the extent that the "ramp effect" was considered important to the efficacy of the immediate-release Ritalin[®] dosing regimens, the person of ordinary skill in the art would have incorporated this feature into a plasma concentration profile that resembled that for the BID or TID dosing regimens.  Because the slope associated with the rate of rise in plasma MPH levels is severe, the person of ordinary skill in the art would not have extended the "ramp effect" through the course of the entire day because such an approach would have raised concerns about serious side-effects.  [*See supra,* PFF ¶¶ 468-470].

547.    Another MPH drug product under development in the late 1990's, confirms that the "sawtooth" plasma concentration profile of Ritalin[®] administered BID would have been considered a desirable profile.  [PX 543].  Ritalin LA[®] was approved for marketing in 2002 by the developers of Ritalin[®] and Ritalin SR[®].  [*Id.* (2002)].

Ritalin LA® is characterized by a sawtooth-like MPH plasma profile having two peaks separated by a significant drop in plasma concentration between the peaks. [*Id*. at p. 2253-54]. This profile is comparable to the peak-trough-peak plasma profile associated with a BID dosing of the immediate-release MPH products. [*Id*.].

548.    The "sculpted" TID regimen recommended in the MTA study utilized a third dose that was smaller than the first two doses of drug taken during the day. This pattern of drug dosing with MPH is inconsistent with providing a patient with substantially ascending MPH plasma drug concentrations. [Trial Tr. (D. Guinta) 81:12-82:3].

### 2. The Prior Art Did Not Provide a Motivation to Arrive at the Drug Release and Plasma Concentration Profiles Encompassed by Claimed Inventions

549.    The claimed inventions would not have been obvious, because, among other reasons, the prior art did not provide a suggestion or motivation to treat ADHD using a dosage form that released MPH at the ascending rate in the claims or which optionally produced a substantially ascending MPH blood plasma concentration as required by the claims. The only source of motivation identified by Defendants is the phenomenon of acute tolerance with MPH. However, the prior art did not establish that MPH exhibited acute tolerance. It was the groundbreaking experimental research of ALZA scientists who discovered and proved that acute tolerance was associated with MPH. Before that work was published, a person of skill in the art seeking to develop an extended-release form of MPH would not have interpreted the prior art as establishing that acute tolerance was associated with MPH or that it was the reason why Ritalin SR®

was not an effective once-a-day MPH drug product.  [*See supra,* PFF ¶¶ 484-487, 504-507].

550.    The statements made to the FDA in 2004 by generic drug makers that the "concept of acute tolerance remains a theoretical one" confirms that, more than a decade after their publication dates, the references relied upon by Defendants in support of knowledge in the prior art of acute tolerance for MPH (*i.e.*, Birmaher, Pelham, Greenhill, Perel, and Angrist) would not have been read by researchers in the field of ADHD treatment as establishing that MPH exhibited acute tolerance.  [*See supra,* PFF ¶¶ 484-487].

551.    Even if acute tolerance had been linked to MPH in the prior art, the prior art taught away from the claimed inventions.  In 1997, the prior art taught that the most common way of overcoming acute tolerance for a particular drug was to use an intermittent dosing approach characterized by a drug recovery or reset period.  Both the nitrate and nicotine art cited by Defendants confirm that intermittent dosing was the only known method by which acute tolerance with those drugs was overcome.  The BID and TID MPH dosing regimens, the only regimens known to be effective in extended treatment of ADHD, also incorporate such drug recovery or reset periods.  [*See supra,* PFF ¶¶ 494, 510].

552.    One prior art reference in the nitrate field cited by Defendants, the Kochinke patent, in fact suggests taking the opposite approach to what is required by the claimed inventions; namely, a decreasing release rate.  The Kochinke reference was cited by Defendants in their opening briefs as being comparable to the prior art describing nitrates, but was not relied upon during trial.  [D.I. 134, at DFF ¶ 309; Trial Tr. 1066:7-

22]).  The Kochinke patent specifically states that acute tolerance with nitrates may be overcome using a dosage form that provides "*a period of decreasing dosage . . . throughout the administration period*."  [DTX 633, at col. 15, lines 45-57 (emphasis added)].

### 3.    The Person of Ordinary Skill in the Art Would Not Have Held a Reasonable Expectation that the Claimed Inventions Could Be Successfully Employed to Solve the Need for a Once-Daily MPH Dosage Form

553.    The claimed inventions would not have been obvious because a person of ordinary skill in the art would not have reasonably expected — or predicted — that they would provide effective once-a-day treatment of ADHD based on the experiences seen with Ritalin SR® as compared to the BID and TID Ritalin® regimens, and because profiles that produce higher MPH plasma concentrations throughout the day would have been expected to produce unacceptable side-effects.  [Trial Tr. (K. Patrick) 1023:2-19; 1025:14-21; 1060:7-1061:13; 1072:20-173:3].

554.    For example, Table 5 of the Pelham 1990 paper indicated that insomnia was observed at a higher rate in patients taking Ritalin SR® compared to patients taking Ritalin® with a BID regimen.  [PX 134, at Table 5].  The authors of the 1992 Greenhill paper published in 1992 stated that, if insomnia is a problem, higher levels of drug should be administered earlier in the day.  [DTX 630, at pp. 12-13 ("Severe insomnia can be managed by changing the time of dosing, with most of the medication given early in the day.")].  The person of ordinary skill in the art would have expected an increased incidence of side-effects with an ascending MPH delivery profile.  [*Id*.; Trial Tr. (K. Patrick) 1059:12-1060:6; Trial Tr. (D. Guinta) 34:17-24].

555.    Defendants argue that a person of ordinary skill in the art would have known that an ascending plasma concentration profile that maintained drug levels below the peak levels observed with the immediate-release Ritalin® TID profile would have avoided side-effects and achieved effectiveness over a long period of time.  [*See* DTX 1219; Trial Tr. 1095:19-1097:16].  However, an ascending plasma profile that provided a MPH plasma concentration below peak levels observed with a TID profile would not have been expected to be efficacious in treating the symptoms of ADHD.  [*Id.*; Trial Tr. (K. Patrick) 1116:11-1117:10].  Thus, such a profile would not have been reasonably expected to lead to a useful alternative to the BID and TID regimens.  [*Id.*].

556.    Even assuming that acute tolerance was suspected with MPH, the prior art provided no basis for expecting that a substantially ascending plasma concentration profile or ascending release rate of drug would overcome the problems of acute tolerance exhibited by MPH.  The scientific literature demonstrates that the only regimens that were ever successfully put to practical use in a dosage form that overcame acute tolerance for nitrates, or any other drug, used an intermittent or pulsatile dosing pattern, analogous to the peak and trough sawtooth pattern produced by BID or TID dosing with MPH.  [DTX 631, at p. 25; PX 420, at col. 3, lines 24-29; PX 421, at p. 5; DTX 1221, at p. 1143; Trial Tr. (K. Patrick) 1058:9-17; 1190:8-1191:19].  Even after the discovery of the claimed inventions, researchers working with nitrates reported that the validity of the ascending plasma concentration profiles in overcome acute tolerance had not been tested.  Thus, the person of ordinary skill in the art would not have reasonably expected a substantially ascending plasma concentration profile or an ascending release rate of drug

to overcome acute tolerance, assuming it was known to exist with MPH.  [*See supra,* PFF

¶¶ 505-507; *see also* Trial Tr. (K. Patrick) 1072:20-1073:3].

### 4.    The Claimed Inventions Would Not Have Been Obvious to Try

557.    The person of ordinary skill in the art would not have found it obvious to

try a dosage form that produced an ascending rate of release in an *in vitro* test (through

the midpoint of the $T_{90}$ and for at least three hours), or, in addition, produced a

substantially ascending plasma concentration of MPH for about 5.5 or about 8 hours in

order to develop a once-daily MPH dosage form.

558.    The conventional thinking in the field of extended-release dosage form

development was to develop dosage forms that released drugs at a constant rate, or which

when administered would produce essentially constant drug plasma concentrations for

extended periods.  The reason for this was that the general goal of extended-release

formulations was to produce a constant drug plasma concentration in the patient that was

sufficient to provide effectiveness, but did not fluctuate or produce excess drug plasma

concentrations that would cause undesired side-effects.  In other words, the general goal

of an extended-release formulation was to produce a constant plasma concentration

within the therapeutic window of the drug (*i.e.*, high enough to deliver efficacy, but

below levels that caused side-effects).

559.    Extended-release dosage forms that released a drug at an ascending rate,

or which produced a substantially ascending drug plasma concentration, were generally

unknown before the invention.  For example, Defendants' expert Dr. Needham testified

that dosage forms exhibiting an ascending release rate of extended period of time simply did not exist in the mid-1990s. [Trial Tr. (T. Needham) 730:10-731:1].

560.    Dr. Needham also acknowledged that at the time of the claimed inventions, the objective of most extended-release drug dosage forms was to release drug at a constant rate (with the remainder employing a constant or descending rate). [Trial Tr. (T. Needham) 693:11-16; and 709:2-9]. Dr. Needham also testified that a person of ordinary skill in the art would not have had significant experience with dosage forms that resulted in ascending release rates, and that he was not aware of dosage forms in the mid-1990s that exhibited an ascending release rate of drug for over 3 or 4 hours or more. [Trial Tr. (T. Needham) 663:10-14; 730:10-731:1].

561.    The experiences of those working in the field of extended-release formulation development, thus, would not have made it obvious to try a MPH dosage form with an ascending release rate over an extended period of time. [Trial Tr. (K. Patrick) 1072:9-1073:3; Trial Tr. (M. Davies) 1217:11-22; Trial Tr. (T. Needham) 693:11-16; 709:2-9; 729:23-730:9].

562.    The prior art knowledge about Ritalin SR®, and general experiences in treating ADHD with MPH, also would not have provided a motivation for a person of ordinary skill to produce a dosage form that released MPH at an ascending release rate for an extended period, or which would produce a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours.

563.    The efficacy issues with Ritalin SR® were not clearly defined and the prior art provided many explanations for its perceived shortcomings. These included formulation-related issues with the wax-matrix dosage form and dosing inflexibility due

to the availability of only a single 20 mg dose, among other things.  [Trial Tr. (D. Guinta) 37:3-38:15].  If the person of ordinary skill in the art believed that the shortcomings with Ritalin SR® were formulation-related, that person would have sought to improve upon the erosion characteristics of Ritalin SR®'s wax-matrix dosage form, rather than attempting to produce a dosage form having an unconventional (*i.e.*, ascending) release rate.  [*Id.*].  If the person of ordinary skill in the art believed that more flexible dosing options were necessary, that person would have sought to develop new dosage strengths such as doses less than 20 mg and doses greater than 20 mg.  [*Id.*].

564.     In addition, given that the BID and TID dosing regimens were the only known regimens that could successfully treat the symptoms of ADHD all day and given that the plasma concentration profiles exhibited by multiple dosing of immediate-release MPH was known, the person of ordinary skill in the art would have been strongly motivated to mimic these plasma concentration profiles in an extended-release, once-daily MPH drug formulation.  Thus, the claimed inventions would not have been obvious to try because the prior art taught away from the claimed inventions.  [*See supra* PFF ¶¶ 408, 410, 413, 420-423, 465-470, 472-475].

565.     Even assuming acute tolerance with MPH was thought to be responsible for the problems with Ritalin SR®, the only solution suggested by the prior art was a formulation that would yield a plasma concentration profile having a reset period, such as that caused by intermittent dosing.  A person of ordinary skill in the art would not have expected that a substantially ascending plasma concentrations of MPH would be successful both in treating ADHD and at the same time avoiding excessively high MPH concentrations.  The successful BID and TID dosing regimens, if viewed as models for

overcoming acute tolerance, suggested the importance of a trough drug levels to not only

serve as a reset period, but also to avoid a steep and continuous increase in MPH plasma

concentrations that would result in serious side-effects if extended for about 5.5 or about

8 hours.  Side-effects with MPH were known to be dose dependent and the margin of

safety for MPH was known to be small.  [*See supra,* PFF ¶¶ 21-24].

566.    For all drugs, Defendants' expert, Dr. Mayersohn, acknowledged that he

was not aware of any products that in 1997 overcame acute tolerance by use of a dosage

form that produced a substantially ascending plasma concentration profile:

> Q.    We talked about this prior art, but you are not aware as you sit here
> today of actual products that would produce an ascending plasma
> concentration and that had been made and tested and shown to
> overcome acute tolerance with a single dosing regimen?
>
> A.    I am not aware of any such product.

[Trial Tr. (M. Mayersohn) 960:20-961:3].  Thus, such a profile could not have been

obvious to try.

567.    In addition, Dr. David Feifel ("Dr. Feifel"), a psychiatrist who treats

patients with ADHD, testified at his deposition that he would not have thought at the time

of the invention that a dosage form that produced an ascending plasma concentration of

MPH would have been desirable or effective to treat ADHD.  [Dep. Tr. (D. Feifel)

185:12-186:16; and *see* Errata Sheet (Sept. 7, 2007)].  Dr. Feifel explained that such an

approach would not be "prudent" because of the risk of increasing the incidence of side-

effects.  [*Id*. at 92:13-16; 170:22-171:1; and 185:12-186:16].  Dr. Feifel also testified that

an ascending plasma concentration profile would not have been desirable because such an

approach presented physicians with a "moving target" in plasma drug levels that made

balancing the optimal dose necessary to treat the symptoms of ADHD, with the need to avoid side-effects, difficult.  [*Id*. at 171:14-172:21].

568.    Even assuming that acute tolerance was thought to occur with MPH, Dr. Feifel testified that an ascending plasma concentration profile would not have been an approach that a person of ordinary skill in the art would consider "prudent" because there would have been no expectation that such an approach would successfully overcome acute tolerance and because such an approach would have been understood to create other potential problems, such as unacceptable side-effects.  [*Id*. at 185:12-186:7].

569.    Defendants cite to the deposition testimony of Dr. Feifel as supporting the position that "increasing doses or increasing rates of drug delivery would be a logical option" to overcome acute tolerance.  [D.I. 134, at pp. 95-96, DFF ¶ 293 (citing Dep. Tr. (D. Feifel) 91-92)].  However, Defendants have taken this testimony out of context because Dr. Feifel specifically testified that such an approach would not have been one that he would have considered likely to succeed.  [Dep. Tr (D. Feifel) 92:14-16; 185:12-186:16; and *see* Errata Sheet (Sept. 7, 2007)].  Moreover, neither Dr. Feifel nor any other witness offered any testimony even remotely suggesting that the specific *in vitro* dissolution requirements set forth in Claim 1 and included in dependent Claims 6 and 7 would have been a logical or obvious option to try.

570.    The nonobviousness of a dosage form that had an ascending rate of release of drug over an extended period of time and that produced a substantially ascending MPH plasma concentration as set forth in the claims is strongly confirmed by the fact that no one tried this approach before the ALZA scientists who are the inventors on the '373 patent.  If one credited the testimony of Defendants' expert that a "good argument" could

be made for the occurrence of acute tolerance with MPH in the early 1990s [Trial Tr. (M. Mayersohn) 936:15-24], and if, as Defendants argue, it would have been obvious to try the methods embodied by Claims 1, 6, and 7 of the '373 patent, others would undoubtedly have come up with the same solution in the more than 12 years between the launch of Ritalin SR® and the invention. It is undisputed that there was a long-felt need for a once-daily MPH dosage form, and the fact that the ALZA scientists were the first to solve this need confirms that the claims were not obvious try. [*See supra*, PFF ¶¶ 27-29, 32-34, 39-43, 47-50, 71-84].

## 5.    The Claimed Inventions Were Not Predictable

571.    The claimed inventions would not have been considered to be predictable solutions for meeting the need for a once-daily MPH dosage form by a person of ordinary skill at the time of the invention. The only regimens known to be effective in providing all day control of ADHD symptoms were the BID and TID regimens based on immediate-release MPH products. [*See*, *e.g.*, Trial Tr. (K. Patrick) 1015:7-18; Trial Tr. (M. Mayersohn) 809:11-16]. The reasons for the failure of Ritalin SR® were not understood before the invention and would not have established any basis for expectations about what approach might prove effective in providing a once-a-day effective treatment of ADHD. [*See*, *e.g.*, Trial Tr. (K. Patrick) 1022:2-11; 1026:24-1027:16; 1036:18-24; Trial Tr. (D. Guinta) 106:7-107:3; 161:7-14]. The need to avoid side-effects, particularly late in the day, was a paramount concern in using MPH to treat ADHD. Concerns about side-effects, particularly whether they would make a treatment regimen effective and viable, would have been paramount. One would not have expected that a substantially ascending MPH plasma profile for about 5.5 or about 8 hours could be

implemented without causing such side-effects.  [*See*, *e.g.*, Trial Tr. (K. Patrick) 1023:2-19; 1025:14-21; 1060:7-1061:13; 1072:20-173:3].  Extended-release dosage forms that provided ascending release rates of an active ingredient were unconventional and generally unknown at the time of the invention.  [*See*, *e.g.*, Trial Tr. (K. Patrick) 1072:9-1073:3; Trial Tr. (M. Davies) 1217:11-22; Trial Tr. (T. Needham) 693:11-16; 709:2-9; 729:23-730:9].  Considering all these facts, the person of ordinary skill in the art would not have predicted that the claimed inventions would provide effective once-a-day treatment of ADHD.  [*Id.*, *see*, *e.g.*, Trial Tr. (K. Patrick) 1072:20-1073:3].

572.     Even if acute tolerance were thought to be associated with MPH, the person of ordinary skill in the art could not have predicted the effectiveness of the claimed inventions for providing extended control of ADHD symptoms.  The only solution to acute tolerance reported in the prior art for other drugs utilized the same pattern of intermittent or pulsatile drug delivery that was integral to the only ADHD treatment known to be effective at the time of the invention, the BID and TID regimens.  Other teachings regarding the use of ascending plasma drug concentrations remained speculative, untested and were later abandoned.  [*See supra* ¶¶ 512-517].

## F.     Secondary Considerations Support the Nonobviousness of the Claims

573.     The nonobviousness of the claimed inventions is further supported by secondary considerations that have a nexus to the asserted claims.  These objective factors include: (a) meeting a long-felt, but unmet medical need; (b) the failure of others in attempting to meet the need; (c) unexpected results; (d) copying; and (e) commercial success.

### 1. Long-Felt, But Unmet Needs and the Failure of Others

574.    The facts supporting this secondary consideration are undisputed.

575.    Since at least the introduction of immediate-release Ritalin® in the 1950s, a long-felt need existed in the field of ADHD treatment for an extended-release once-daily MPH dosage form.  [Trial Tr. (K. Patrick) 1006:24-1007:5; Trial Tr. (M. Mayersohn) 906:2-20; 912:9-23; Trial Tr. (T. Needham) 714:21-715:16].

576.    In recognition of this need, Ritalin SR® was introduced by Ciba-Geigy in the early 1980s as an extended-release once-daily MPH dosage form, but it was not widely adopted and failed to meet the need that existed in the prior art.  [Trial Tr. (M. Mayersohn) 912:24-913:21; Trial Tr. (K. Patrick) 1006:12-1008:11; and 1021:12-1022:1; DTX 630, at 5 ("The sustained-release preparation or MPH-SR became available in 1984, and was intended to promote once-per-day MPH dosing.")].

577.    The commercial embodiment of the claimed inventions, CONCERTA®, was introduced in 2000 and was the first drug product that met the long-felt need for an extended-release, once-daily MPH dosage form.  [*Id*.].

### 2. Unexpected Results

578.    The unexpected results flowing from practicing the treatment methods of the asserted claims supports the nonobviousness of the claimed inventions.  It was surprising and unexpected to those working in the field of ADHD treatment that a dosage form that released MPH at an ascending rate for an extended period of time, and which produced a substantially ascending MPH plasma concentration for about 5.5 or about 8 hours, would be a safe and effective way to treat ADHD.

579. The person of ordinary skill in the art would have expected treatment methods involving plasma concentrations of drug that steadily increased as required by the claims to increase the incidence of side-effects that are associated with MPH. [Trial Tr. (K. Patrick) 1025:14-24; Trial Tr. (D. Guinta) 34: 17-24]. For example, the prior art showed that Ritalin SR®, which produces a significant plasma concentration for a sustained period during the middle of the day, was accompanied by a three-fold increase in the incidence of insomnia and an increased incidence of appetite suppression relative to the BID regimen using immediate-release MPH. [PX 134, at ALZ 00024099, Table 5]. By contrast, CONCERTA® does not exhibit an increased incidence of these side-effects relative to the BID and TID regimens. [PX 371, at p. 209].

580. In addition, it was surprising and unexpected to observe some levels of therapeutic effectiveness in the ascending plasma concentration profiles at very low plasma levels. [Trial Tr. (D. Guinta) 69:3-10]. It was also surprising and unexpected that levels of MPH in the simulated ascending plasma concentration profile that were below levels of MPH in the simulated BID plasma concentration profile resulted in the same therapeutic effects. [Trial Tr. (D. Guinta) 73:7-74:14].

### 3.    Commercial Success

581. The commercial success of CONCERTA® supports the nonobviousness of the asserted claims. CONCERTA® is a commercial success both in absolute terms, and compared to other ADHD products. [Trial Tr. (R. Rozek) 1343:18-1361:15].

582. There were five brand MPH products and generic versions of two brand MPH products commercially available in the U.S. when CONCERTA® was launched in August 2000: Ritalin®, Ritalin SR®, Methylin®, Methylin® ER, Metadate®, generic MPH

hydrochloride, and generic MPH hydrochloride SR.  [Trial Tr. (R. Rozek) 1350:24-1352:17; PX 497].  And, in addition to the other available MPH products, several other stimulants were approved for the treatment of ADHD.  [Trial Tr. (R. Rozek) 1358:4-1359:2].

583.    CONCERTA® generated over $4 billion in cumulative dollar sales and resulted in over 42 million total prescriptions and new prescriptions in the U.S. from its launch in August 2000 through 2006.  [Trial Tr. (R. Rozek) 1346:13-1348:13; PX 499; PX 500; PX 501; PX 502].

584.    From 2000 through 2006, dollar sales, total prescriptions, and new prescriptions of CONCERTA® in the U.S. increased substantially.  [Trial Tr. (R. Rozek) 1348:14-21; PX 500; PX 501; PX 502].  For instance:



**ANNUAL DOLLAR SALES OF CONCERTA IN THE U.S.**

Note: Concerta launched in August 2000.

[PX 500].

585.    CONCERTA® exhibited annual sales growth in the U.S. from $333 million (2001) to $930 million (2006), which represents a compound annual growth rate of dollar sales of approximately 23 percent.  By contrast, dollar sales of all MPH products excluding CONCERTA® grew only 12 percent annually from 2001 to 2006.  [Trial Tr. (R. Rozek) 1348:22-1349:2; PX 500; PX 503].

586.    Defendants recognize that CONCERTA® generates substantial levels of sales and represents an opportunity for growth, making public statements, for instance, that it believed generic sales of CONCERTA® would "generate significant earnings" for Defendants.  [Trial Tr. (R. Rozek) 1360:13-1361:15; PX 713].

587.    CONCERTA® is a commercial success relative to other MPH products, including MPH products utilizing other extended-release delivery methodologies.  In 2001, its first full year after launch, dollar sales of CONCERTA® exceeded the total dollar sales of all other MPH products combined by more than 75 percent.  [Trial Tr. (R.

Rozek) 1352:18-1354:15; PX 504]. This is graphically shown as follows:



[PX 504].

588.    Similarly, in 2001 total prescriptions and new prescriptions of CONCERTA® exceeded each of the MPH products including the low-price generic versions of MPH that had been commercially available for decades. By 2006, total prescriptions and new prescriptions of CONCERTA® were four times greater than the total prescriptions and new prescriptions of the next closest MPH product. [Trial Tr. (R. Rozek) 1354:16-1356:11; PX 505; PX 506].

589.    Likewise, CONCERTA® emerged as the leading extended-release MPH product within one year from its launch and continued to grow substantially faster than the alternative products. [Trial Tr. (R. Rozek) 1356:12-1358:3; PX 511; PX 512; PX 513].

590.    CONCERTA® is a commercial success relative to all products used to treat ADHD.  [Trial Tr. (R. Rozek) 1359:3-1360:12].  Based on sales (dollars, total prescriptions, and new prescriptions) in the U.S. for 23 brand and generic ADHD products, CONCERTA® emerged as a leading product.  Of these 23 products, only two products (CONCERTA® and Adderall XR®) captured 20 percent or more of dollar sales, total prescriptions, or new prescriptions of all ADHD products in 2006.  CONCERTA® accounted for 28 percent, 23 percent, and 24 percent of the dollar sales, total prescriptions, and new prescriptions of all ADHD products, respectively.  [Trial Tr. (R. Rozek) 1359:3-1360:12; PX 520; PX 521; PX 522].  CONCERTA® quickly displaced BID and TID immediate-release Ritalin® regimens, which had been the standard of care in ADD and ADHD treatment for more than 30 years.  [Trial Tr. (R. Rozek) 1352:18-1354:15; PX 504].

### (a)    Nexus Between CONCERTA® and the Asserted Claims

591.    There is a nexus between CONCERTA® and the asserted claims, making secondary considerations evidence tied to CONCERTA®, such as evidence of CONCERTA® meeting a long-felt need and CONCERTA®'s resulting commercial success, indicative of the nonobviousness of the asserted claims.  That nexus is shown in three way in this case: (a) by the presumption of such a nexus when the product or method at issue is within the scope of the asserted claims; (b) by the sales levels of CONCERTA® compared to other MPH products and the differences between CONCERTA® and those MPH products; and, (c) by the lack of any other factor explaining the commercial success of CONCERTA®.  [Trial Tr. (R. Rozek) 1362:9-1363:18].

(b)    **CONCERTA® Is Within the Scope of the Asserted Claims**

592.    Treatment of a patient with CONCERTA® satisfies all of the limitations of each of the asserted claims, and thus is within the scope of each of the asserted claims, giving rise to a presumption of a nexus between CONCERTA® and each of the asserted claims.  [Trial Tr. (R. Rozek) 1363:19-1365:6].

593.    CONCERTA® is a dosage form containing 18, 27, 36 or 54 mg of MPH. [Trial Tr. (V. Gray) 1319:17-23; PX 490].

594.    All dosage strengths of CONCERTA® are administered for the treatment of ADHD.  [Trial Tr. (V. Gray) 1319:11-16; PX 490].

595.    All dosage strengths of CONCERTA® consistently exhibit, when submitted to an appropriate dissolution test, an ascending release of MPH over an extended period of time (*i.e.*, for at least three hours, and through at least the midpoint of $T_{90}$.  [Trial Tr. (V. Gray) 1316:1-1319:10; PX 454; PX 455; PX 456; PX 457].

596.    All dosage strengths of CONCERTA®, when ingested, consistently result in a substantially ascending MPH plasma drug concentration over at least about 5.5 hours.  [Trial Tr. (M. Angst) 448:6-451:2; PX 20, at ANDRX 01036-37, 01045; PX 257, PX 398].  This is illustrated, *inter alia*, by data showing mean MPH plasma concentrations in subjects administered CONCERTA®.  The mean data show that the plasma concentration is ascending, without a slight dip, through at least 5.5 hours after administration of CONCERTA® in the population of subjects tested.  [Trial Tr. (M. Angst) 448:6-449:14; PX 20, at ANDRX 01036-37, 01045].

597.    All dosage strengths of CONCERTA®, when ingested, consistently result in a substantially ascending MPH plasma drug concentration over at least about 8 hours. [Trial Tr. (M. Angst) 448:6-451:2; PX 20, at ANDRX 01036-37, 01045; PX 257, PX 397].  The mean data also show that the plasma concentration in these subjects is substantially ascending through about 8 hours.  [Trial Tr. (M. Angst) 448:6-449:14; PX 20, at ANDRX 01036-37, 01045].

598.    Defendants point to testimony from Plaintiffs' expert witness Dr. Martin Angst, who, when analyzing individual patient plasma data, estimated that approximately 40% of patients given CONCERTA® would be individually expected to see a substantially ascending MPH plasma concentration for about 8 hours.  [Trial Tr. (M. Angst) 449:15-450:12; PX 397; PX 398].  The mean plasma profile for CONCERTA® achieves an 8 hour ascending profile, and the evidence shows that CONCERTA® does so in a very substantial portion of the individual patient profiles.  [*Id.*; *see also supra* ¶¶ 378-381].  Given the enormous use of CONCERTA® and the mean data showing substantially ascending MPH plasma concentrations for about 8 hours for that patient population, evidence that approximately 40% of individual patient plasma profiles show the substantially ascending MPH plasma concentration for about 8 hours called for by asserted Claim 7 is sufficient to find a nexus (and a presumption thereof) between CONCERTA® and asserted Claim 7.

(c)    **Sales Data Establishes that CONCERTA®'s Delivery Profile Is Responsible for its Commercial Success**

599.    As of the end of 2006, doctors and patients had a choice between nine different products for the treatment of ADHD that contain MPH, including two of which that are available in generic versions, Ritalin® and Ritalin SR®.  Seven of those products

are extended-release products, including generically available Ritalin SR® . [Trial Tr. (R. Rozek) 1350:24-1352:17; PX 497].

600.    From a dollar sales, a total prescriptions and a new prescriptions perspective, CONCERTA® dominated the other available MPH products in 2006. CONCERTA® ranked first based on dollar sales, total prescriptions, and new prescriptions representing approximately 74 percent, 55 percent, and 55 percent of total dollar sales, total prescriptions, and new prescriptions of MPH products, respectively. In contrast, the next largest selling MPH product represented 9 percent, 15 percent, and 14 percent of total dollar sales, total prescriptions, and new prescriptions of MPH products, respectively. [Trial Tr. (R. Rozek) 1352:18-1358:3; PX 504; PX 505; PX 506; PX 507; PX 508].

601.    The primary differentiating factor between these products is the method by which they deliver MPH. [Trial Tr. (R. Rozek) 1366:24-1373:11; PX 497; PX 498].

602.    CONCERTA®'s delivery profile is an ascending release rate over an extended period of time, resulting in substantially ascending plasma concentrations both for at least about 5.5 hours and for at least about 8 hours. [*See* Trial Tr. (D. Guinta) 76:13-24; Trial Tr. (M. Angst) 448:6-451:2; PX 20, at ANDRX 1036-37, 1045; PX 257; PX 398].

603.    No other MPH product that is commercially available has a delivery profile with an ascending release rate over an extended period of time. Nor does any other MPH product have a delivery profile with an ascending release rate over an extended period of time that results in substantially ascending plasma concentrations for at least about 5.5 hours. Nor does any other MPH product have a delivery profile with an

ascending release rate over an extended period of time that results in substantially

ascending plasma concentrations for at least about 8 hours.  [Trial Tr. (R. Rozek) 1367:7-

1368:2].

604.    That CONCERTA® substantially outsells all other MPH products,

including two low-cost generic versions, and the primary difference between the products

(other than price) is their drug delivery profile, demonstrates that the delivery profile of

CONCERTA® is responsible for its success.  [Trial Tr. (R. Rozek) 1366:24-1373:11].

605.    The claimed attributes of CONCERTA®'s delivery profile are the portions

that are responsible for CONCERTA®'s commercial success.  Those are the attributes that

other available MPH products lack, and that Defendants copied — the ascending release

rate for an extended period of time and the substantially ascending plasma

concentrations.  [Trial Tr. (R. Rozek) 1373:12-1375:24; *see also* Trial Tr. (D. Guinta)

76:13-24; Trial Tr. (M. Angst) 448:6-451:2; PX 20, at ANDRX 1036-37, 1045; PX 257;

PX 398].  That Defendants copied those attributes, and not, for instance, the OROS®

osmotic delivery technology, demonstrates that Defendants agree that those are the

attributes that account for the effectiveness, and thus the commercial success, of

CONCERTA®.  [Trial Tr. (R. Rozek) 1373:12-1375:24].

        (d)    **No Other Factors Explain the Commercial Success of CONCERTA®**

606.    Other economic factors do not explain the commercial success of

CONCERTA®.  CONCERTA® is a success in the face of substantial competition due to

the availability of other brand and generic immediate and extended-release MPH

products and the availability of other brand and generic products for treating ADHD.

And, CONCERTA® is a success in the face of the availability of low-cost generic versions of both immediate and extended-release MPH products.  [Trial Tr. (R. Rozek) 1376:1-1377:12; *see also* Trial Tr. (R. Rozek) 1368:3-1372:15].

607.    While CONCERTA® is marketed by ALZA and McNeil, those marketing activities are consistent with other leading ADHD products, Adderall XR® and Strattera®. [Trial Tr. (R. Rozek) 1376:20-1377:2; *see also* Trial Tr. (R. Rozek) 1370:2-1372:15].

608.    Defendants have provided no evidence that the unexpected results, commercial success, and the satisfaction of the long-felt need for an effective once-a-day treatment method are due to prior art features found in CONCERTA®, or due to features of CONCERTA® other than those reflected in the asserted claims.

609.    Defendants cite a statement by Plaintiffs' witness, Dr. Feifel, to assert that Ritalin LA®, which has a different release rate and different plasma profile, provides the "same benefits" as CONCERTA®.  [D.I. 134, at DFF ¶ 368].  But this merely shows that there is more than one way to achieve an efficacious drug product — not that release rate and plasma profile of CONCERTA® are not critical to its success.  Dr. Feifel did not testify that the claimed ascending release rate and substantially ascending plasma concentration features of CONCERTA® are unimportant to the success of CONCERTA®. Dr. Feifel stated that Ritalin LA® can be used to treat ADD and ADHD and that, in some patients, it can provide comparable effectiveness.  [Dep. Tr. (D. Feifel) 131:14-132:8]. At the same time, Dr. Feifel expressed his opinion that CONCERTA® is the "gold standard" — and thus superior — to other products, including Ritalin LA®.  [*Id.*].

4.    **Copying**

610.    Defendants' copying of CONCERTA® and its delivery profile supports the nonobviousness of the asserted claims.

611.    Defendants have expended substantial efforts attempting to produce a copy of a commercial embodiment of the invention that is marketed by Plaintiffs. For example, Defendants have represented to the FDA that the plasma profile that the ANDA product exhibits is highly similar to that of CONCERTA®, Plaintiffs' commercial embodiment of the claimed invention:



[PX 40, at ANDRX 79751-3; JDT (J. Vaughn) 1210-13].

612.    Moreover, Defendants have admitted that CONCERTA®, and particularly its plasma profile, was the primary design influence for their ANDA product. [JDT (Cheng) 276-278, 280].

172

## VII.  THE CLAIMED INVENTIONS ARE NOT ANTICIPATED BY THE PRIOR ART

613.    Ritalin SR® does not anticipate the claims because, *inter alia*, all of the asserted claims require that the dosage form release MPH "at an ascending release rate over an extended period of time." [DTX 1].  It is undisputed that Ritalin SR® is a sustained-release, wax matrix MPH dosage form that, by design, releases MPH at a generally *descending* release rate over time.  [Trial Tr. (M. Davies) 1217:11-1218:4; Trial Tr. (T. Needham) 729:17-22; PX 335, at P ALZ 006863; PX 337, at p. 390 (P ALZ 006876); PX 410, at ¶ 35; PX 574, at p. 1; PX 417, at P ALZ 7735].

614.    Claims 1, 6 and 7 of the '373 patent require that the dosage form release MPH "at an ascending release rate over an extended period of time." [DTX 1].  Because Ritalin SR® does not meet this limitation of the claims, it does not anticipate the claims.

615.    Claim 7 of the '373 patent also requires that the dosage form result in a substantially ascending MPH plasma drug concentration over a time period of about 8 hours following administration.  [DTX 1].  Defendants argue that the requirements of Claim 7 are inherently anticipated by Ritalin SR®, which was administered to patients before the invention of the asserted claims.  [*See, e.g.*, D.I. 134, Defendants' Opening Pretrial Brief,, pp. 87-89].  MPH plasma concentrations of Ritalin SR® have been measured and published, and the record contains profiles produced by Ritalin SR®.  [PX 137 (Fig. 2); PX 627 (Fig. 1); DTX 122, at p. 945-946; DTX 45, at ALZ 00046471-46472; DTX 139, at 00045673-45678].  There is no example in the record of a MPH plasma profile for Ritalin SR® showing an ascending plasma concentration for about 8 hours.

616.    Although Ritalin SR® has been in use for almost 25 years and has been widely studied and analyzed, Defendants have been unable to come forward with any empirical evidence to support their argument that Ritalin SR® ever produced the plasma concentration profile required by Claim 7.  Moreover, Ritalin SR® was not designed to produce such a profile, but rather a profile that ascended for a short period of time and then declined.  [Trial Tr. (M. Davies) 1217:11-1218:4; Trial Tr. (T. Needham) 729:17-22; PX 335, at P ALZ 006863; PX 337, at p. 390 (P ALZ 006876); PX 410, at ¶ 35; PX 574, at p. 1; PX 417, at P ALZ 7735].  As Defendants' expert Dr. Mayersohn testified, Ritalin SR® did not work by producing a substantially ascending plasma concentration in the patient over about 8 hours.  [Trial Tr. (M. Mayersohn) 910:16-911:3].

617.    Given the absence of any empirical evidence based on the plasma concentration profile produced by Ritalin SR®, Defendants rely entirely on speculative comments made by two experts in this case — Dr. Mayersohn and Dr. Feifel.  The essence of this testimony is that, at least in some patients, Ritalin SR® could have produced (or could not be proven to not have produced) an anomalous result in which the MPH plasma concentration was still ascending about 8 hours after ingestion of a Ritalin SR® tablet.  [*See* Trial Tr. (M. Mayersohn) 865:7-866:13; Trial Tr. (D. Feifel) 187:10-188:21; and *see* Errata Sheet (Sept. 7, 2007)].  This testimony is not based on any analysis of blood plasma profiles in subjects that were administered Ritalin SR® or results from any application of a pharmacokinetic analytical technique to available Ritalin SR® plasma profiles.  The testimony is not sufficient to show by clear and convincing evidence that Ritalin SR® necessarily produced MPH plasma concentration profiles that were substantially ascending for about 8 hours or longer.

618.     In any event, even if the Court were to accept the argument that an MPH

plasma profile required by Claim 7 necessarily occurred in a patient administered Ritalin

SR®, this would not render Claim 7 invalid as inherently anticipated by the prior art.

Claim 7 is dependent on Claim 1, which further requires that the dosage form release

MPH at an ascending rate for an extended period of time.  It is undisputed that Ritalin

SR® does not release MPH at an ascending release rate over an extended period of time.

It is thus undisputed that the requirements of claims dependent on Claim 1 of the '373 are

not met by evidence concerning administration of Ritalin SR® or the inherent physical or

biological attributes of Ritalin SR®.

## VIII.   THE CLAIMS-IN-SUIT ARE FULLY ENABLED

619.     Defendants have failed to establish by clear and convincing evidence that

Claims 1, 6, and 7 of the '373 patent are not enabled.  At trial, Plaintiffs conclusively

showed that only routine, and not undue, experimentation is all that a person skilled in

the art would have to expend to produce extended-release dosage forms that meet the

desired release rate characteristics of the claims.

### A.     The Claims-in-Suit Are Directed to Treatment Methods that Use Oral Dosage Forms

620.     Claims 1, 6, and 7 of the '373 patent are drawn to methods of treating

ADD/ADHD.  [*See* DTX 1, '373 Patent, at col. 23, line 13, col. 24, line 9, col. 24, line

13].  Claim 1 of the '373 patent specifies the requirements of dosage forms that provide

this utility by reference to the dissolution rate of MPH from the dosage form that is to be

administered.  [*See* DTX 1 at col. 23, lines 14-15 (Claim 1, requiring "a dosage form . . .

that provides a release of methylphenidate at an ascending release rate over an extended

175

period of time"); *see* D.I. 130, Markman Order at 2 (construing this limitation, while maintaining these same fundamental requirements)]. Dependent Claims 6 and 7 add a further limitation, requiring that the dosage form produce a particular MPH plasma profile in a subject administered the dosage form. [*See* DTX 1 at col. 24, lines 9-17 (Claims 6 and 7, requiring "a substantially ascending methylphenidate plasma drug concentration over a time period of about," 5.5 or 8 hours "following said administration," respectively); *see* D.I. 130, Markman Order at 2 (construing this limitation, while maintaining these same fundamental requirements)].

621.    A person of ordinary skill in the art would understand the asserted claims to require the use of oral dosage forms, and in particular, extended-release oral tablets and capsules. [Trial Tr. (M. Davies) 1213:3-1215:12].

622.    The claims, the patent specification, and the Court's claim construction all clearly show that "dosage forms" refers to oral dosage forms in the context of the asserted claims. [*See* DTX 1 at col. 4, lines 19-23 ("[w]ith the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for sustained-release *oral* dosage forms adapted to provide such a release rate over a suitable extended time period"); DTX 1 at col. 2, lines 53-55 ("[t]here are many approaches to achieving sustained-release of drugs from *oral* dosage forms known in the art"); DTX 1 at col. 6, lines 6-14 ("[t]he invention broadly embraces *oral* sustained-release dosage forms that provide an ascending drug release rate over an extended time period, methods of making such dosage forms and methods of using such dosage forms to maintain therapeutic effectiveness for a desired prolonged therapy period with respect to any appropriate drugs and drug therapies as would be apparent to a person of skill in

the art in view of the disclosure herein."); *see also* DTX 1 at col. 10, lines 17-21 ("[t]he

ascending release rates described herein refer to the release rate from a dosage form

adapted to provide sustained-release of drug and do not include release of drug from any

immediate-release drug coating that may be applied to the dosage form.")].

623.    The references to use of immediate-release drug coating similarly in the

patent disclosure necessarily indicates that the claimed dosage forms are oral dosage

forms such as tablets and capsules.  [Trial Tr. (M. Davies) 1213:23-1214:9].  In addition,

the requirement that the claimed dosage forms exhibit an ascending rate of release as

measured through "an appropriate dissolution test" further establishes that the claimed

dosage forms are oral dosage forms.  [Trial Tr. (M. Davies) 1213:3-18; DTX 1 at col. 9,

lines 25-30; DTX 1 at col. 9, line 66 to col. 10, line 52].  This provides a further basis for

the conclusion that the claims are directed to oral dosage forms, as such dissolution

testing is most commonly employed with oral dosage forms.  [*Id.*; *infra* ¶¶ 127-163 (Trial

Tr. (V. Grey); *see also* PX 479 at ALZ 004378-84].

624.    The Court has construed the claims to require that the dosage form have

an ascending rate of release for an extended period of time, which must be at least 3

hours.  [*See* D.I. 130, Markman Order at 2].  Oral dosage forms, unlike other types of

dosage forms that can be contemplated, are capable of producing such a profile.  [Trial

Tr. (M. Davies) 1215:2-12]

625.    A skilled formulator would use "common sense" in evaluating the types of

dosage forms that would be suitable to use in practicing the claimed invention.  [Trial Tr.

(M. Davies) 1215:13-1216:1].  The skilled formulator would consider (1) whether the

dosage form was going to be taken by children or adults, (2) what condition was being

treated, and (3) the existence of any compliance issues.  [Trial Tr. (M. Davies) 1215:13-1216:1].

626.    Based on the guidance provided by the Court's claim construction, the specification of the '373 patent, and what was known in the literature, the Court concludes that a person skilled in the field of formulation development would have eliminated certain types of dosage forms as being inappropriate for use as an extended-release dosage form for treating patients with ADD/ADHD.  The types of dosage forms that would have been eliminated include powders, buccal tablets, liquid products, nasal sprays, inhalers, transdermal systems, suppositories, creams and parenterals or injectables.  [Trial Tr. (M. Davies) 1214:6-1216:24].  As the claims reference treatment of ADD/ADHD as the objective of the method of treatment, a person of skill in the art would not regard such dosage forms as being suitable or within the scope of the claims.

627.    Defendants' expert Dr. Needham initially took the position that the claims-in-suit "include any dosage form that achieves the results desired."  [D.I. 134, at pp. 55-56, DFF ¶ 155].  Dr. Needham expressed the opinion that the claims-in-suit encompassed powders, buccal tablets and a variety of liquid products, as well as non-oral dosage forms such as nasal sprays, inhalers, transdermal systems, suppositories, creams as well as a variety of parenteral or injectable dosage forms.  [Trial Tr. (T. Needham) 697:6-20; DTX 1170; *see also* D.I. 134, at DFF ¶¶ 18, 38, 233].

628.    However, almost all of these dosage forms would have been eliminated by a skilled formulator as being inappropriate to use in the extended-release dosage forms required by the claims for treating ADD/ADHD.  [Trial Tr. (M. Davies) 1213:23-1216:24].  The only dosage forms in the USP that a skilled formulator would have

seriously considered for purposes of practicing the full scope of the claims would have been a tablet or capsule.  [Trial Tr. (M. Davies) 1213:3-1216:24].

629.    At trial, Dr. Needham agreed that a skilled formulator would be guided by common sense in making a dosage form.  [Trial Tr. (T. Needham) 739:15-24]. Considering the scope of the construed claims and their relation to treating ADD/ADHD, Dr. Needham also agreed that a skilled formulator would have excluded dosage forms such as gels, aerosols, injectables, suppositories, lozenges, buccals, ointments, creams, etc., as possible types of dosage forms that would be used to implement the claimed invention due to patient compliance issues, the requirement for daily administration, and other practical reasons.  [Trial Tr. (T. Needham) 737:4-741:24].

**B.    The Claims-in-Suit Are Fully Enabled under 35 U.S.C. § 112, First Paragraph**

**1.    While the Claimed ADHD Treatment Methods Were Not Predictable, Producing a Dosage Form that Released MPH at an Ascending Rate for an Extended Period of Time Was**

630.    The patent disclosure explains that it was surprising that effective, full-day treatment of ADHD could be achieved using a dosage form that released MPH at an ascending rate for an extended period of time.  In particular, the patent disclosure explains:

> One aspect of the present invention pertains to providing improved drug therapy for those clinical situations where therapeutic effectiveness of an administered drug therapy unexpectedly decreases at time periods before the end of the intended therapy period.  It has been surprisingly discovered that, in an exemplary clinical situation, administration of drug at a release rate that is ascending, rather than substantially constant, over an extended time period provided therapeutic efficacy that did not decrease before the end of the prolonged therapy period.

[DTX 1 at col. 4, lines 13-18].

631.    The unpredictability in the field of ADHD treatment is illustrated by the failure of Ritalin SR® to provide an effective once-a-day treatment method despite its capacity to produce a generally flat MPH plasma concentration. [*See supra* ¶¶ 43-49, 407]. The approach taken to ADHD treatment by the inventors ran counter to conventional thinking. It was not suggested by the prior art and would not have been considered to be a predictable approach based on what was known in the scientific literature and what was generally known to those working in the field of ADHD treatment. [Trial Tr. (D. Guinta) 44:17-46:2; Trial Tr. (T. Needham) 848:23-849:8; Trial Tr. (K. Patrick) 1008:8-11, 1059:15-24; *see also supra* ¶¶ 411-413].

632.    The '373 patent contrasts the discovery of the new approach to treating ADHD with the need for extended-release dosage forms that can be adapted from the prior art that provide the desired ascending MPH release rate and substantially ascending MPH plasma concentration profiles ("With the discovery that administration of drug at a release rate that is substantially ascending provides improved drug therapy, a need arises for sustained-release oral dosage forms adapted to provide such a release rate over a suitable extended time period") [DTX 1, col. 4, lines 19-23].

633.    The '373 disclosure also discusses specific examples that can be used to implement the invention. [DTX 1 at col. 4, lines 31-35]. Incidental to that description of examples, the inventors discuss the relative merits of osmotic dosage forms developed by ALZA scientists that exhibit an ascending rate of release of MPH. [*Id.*]. The ALZA inventors believed these particular examples of osmotic dosage forms were independently deserving of patent protection. [*Id.*]. As the specification states, "[i]t has been

180

surprisingly discovered that oral osmotic dosage forms exhibiting an ascending drug

release rate for an extended period of time has been achieved." [DTX 1 at col. 1, lines

31-33]. The specification goes on to point to these examples in support. [DTX 1 at col.

4, lines 33-35].

634.    Initially, Defendants' expert, Dr. Needham, asserted that this language

indicated that it would be "equally surprising and non-routine for one of ordinary skill in

the art in the 1990s to convert another constant release dosage form into an ascending

release dosage form." [Needham Rep. ¶ 124, s*ee also* D.I.134,  at  DFF ¶¶ 126-27].

However, Defendants' presented no testimony at trial on this point.

> **2.    Routine, Not Undue Experimentation, Is All that Would
> Be Required to Produce Extended-Release Dosage
> Forms that Meet Desired Release Rate Characteristics,
> as Illustrated by the Extensive Guidance in the Prior
> Art**

635.    Unlike the field of discovery of a new method for treating ADHD, the

field of production of extended-release dosage forms is not unpredictable. The

production of a dosage form that provided an ascending MPH release rate, thus, would

not have presented challenges or unpredictability that would required the exercise of

undue experimentation.

636.    The formulation literature at the time of the invention was extensive and

would have provided clear guidance to a person skilled in the formulation arts regarding

how to adapt known types of controlled release dosage form technologies to produce

dosage forms that exhibit ascending release rates of MPH and/or substantially ascending

plasma concentration time profiles as required by the claims-in-suit.

637.    The Court credits the testimony of Plaintiffs' expert Dr. Martin Davies ("Dr. Davies"), who, as discussed *infra*, provided numerous examples from the literature of ways that a skilled formulator could have made dosage forms that had the release characteristics and produced the MPH plasma concentrations set forth in the claims of the '373 patent.  [Trial Tr. (M. Davies) 1222:5-1223:3].  Dr. Davies is an expert in the fields of pharmaceutical science of formulation and drug delivery.  [Trial Tr. (M. Davies) 1202:2-1204:9, 1209:20-1210:6; PX 179 (Dr. Davies' Curriculum Vitae)].

638.    Defendants' only expert on fact issues underlying the question of enablement was Dr. Needham, who offered opinions as to the alleged difficulty of making the claimed dosage forms.  The Court does not credit Dr. Needham's testimony because he acknowledged at trial that he had reached his conclusions without considering or analyzing any articles, patents or publications concerning extended-release dosage forms before preparing his expert report, and specifically, the literature cited by Dr. Davies.  [Trial Tr. (T. Needham) 735:9-736:3].

639.    A skilled formulator, looking to implement the claimed invention through types of dosage forms other than the examples of osmotic dosage forms described in the '373 specification, would have consulted well-known sources for guidance.  [Trial Tr. (M. Davies) 1220:16-1221:21].

640.    For example, the specification of the '373 patent and the prior art literature describe in extensive detail a wide range of extended-release dosage form technologies that could have been employed to produce dosage forms according to the claims-in-suit with only routine experimentation.  [Trial Tr. (M. Davies) 1220:4-1221:4, 1222:5-1223:5, 1244:23-1247:8].

641.    The '373 patent discloses osmotic dosage forms having an ascending rate of release.  [Trial Tr. (M. Davies) 1219:19-1220:3].  A person of ordinary skill, based on the disclosures of the '373 patent and that person's general knowledge, could have made osmotic dosage forms with an ascending rate of release through at least the midpoint of the $T_{90}$ and for at least 3 hours.  [Trial Tr. (M. Davies) 1220:4-15].

642.    The '373 patent also identifies approaches to making non-osmotic dosage sustained-release dosage forms.  [Trial Tr. (M. Davies) 1220:16-21, citing DX 1 at col. 2, lines 53-62].  As of August 1997, these approaches were "very well known" in the field of controlled release drug design.  [Trial Tr. (M. Davies) 1220:20-1221:4-21; *see also* Trial Tr. (A. Ayer) 171:15-175:4].

643.    Moreover, earlier ALZA filed patent applications, to which the '373 patent claims priority, provide numerous examples of oral extended-release dosage forms that are suitable for use in the claimed methods.  [PX 477, at P ALZ 778-81].  Several of these earlier applications provide numerous examples of ascending release rate dosage forms that employ a number of different and well-known types of sustained-release systems (*e.g.*, multilaminate systems, tiny time pills embedded in a hydrogel substrate, drug releasing beads, concentration gradient systems using erodible or nonerodible polymers, and diffusion systems).  [*Id.*; *see also* Trial Tr. (M. Davies) 1239:20-1240:15].

644.    At the time of the invention, the skilled formulator could have employed any of a number of well-known techniques to make dosage forms that had the required release rate characteristics, including, erodible systems, pH-controlled erosion coatings, non-uniform drug concentration, as well as other techniques.  [Trial Tr. (M. Davies) 1222:5-1223:3; PX 706].

(a)    **Erodible Systems**

645.    One technique that could have been employed to make a dosage form that produced the claimed ascending rate of release of drug and ascending plasma concentration of MPH was an erodible system.  [Trial Tr. (M. Davies) 1222:21-1223:3, 1228:7-20; PX 706].

646.    At the time of the invention, the task of designing an ascending release rate dosage form utilizing an erodible system was considered so straightforward that it formed the basis of a chapter review question in the well-known textbook, Kydonieus' *Treatise on Controlled Drug Delivery*.  [Trial Tr. (M. Davies) 1223:7-1225:14; PX 465, at 217].  In the first review question, the task is to "design a device that will yield an increasing release rate."  [Trial Tr. (M. Davies) at 1225:9-14; PX 465 at 217].

647.    The textbook's answer to this question was a "[d]evice whose exposed surface area increases with time and will lead to increasing release rate."  [Trial Tr. (M. Davies) 1226:12-1227:4; PX 465, at 218].  The specific example that the textbook provides is "a cone composed of a degradable polymer coated with a nondegradeable polymer cut off at the top."  [Trial Tr. (M. Davies) 1227:5-7].  As this hypothetical device is exposed to an aqueous environment over time, its surface area containing the drug increases, leading to an increasing release rate of the drug from the device.  [Trial Tr. (M. Davies) 1227:12-1228:20; PX 465, at 218; PX 707].  The textbook answer illustrates the relatively well-settled and predictable nature of the field of extended-release dosage form development.

648.    A skilled formulator could have used the information in patent disclosure in conjunction with any of a variety of well-known extended-release formulation

184

techniques and designs to produce a dosage form with an ascending release rate and to thereby practice the full scope of the claimed methods of treating ADHD. [Trial Tr. (M. Davies) 1220:4-1221:4, 1228:8-1233:3, 1239:20-1240:22; DTX 1 (Figures 3 and 4)]. Beyond the teachings of Figures 3 and 4 themselves in the '373 patent, any other substantially ascending plasma concentration time profiles desired could be deconvoluted and used to derive *in vitro* dissolution requirements based on the good correlation between *in vivo* and *in vitro* characteristics apparent from the patent. [Trial Tr. (M. Davies) 1242:10-1244:22].

### (b)    pH-Controlled Erosion Coatings

649.    Another technique that a skilled formulator could have used at the time of the invention to make a dosage form that produced the claimed ascending rate of release of drug and ascending plasma concentration of MPH was a pH-controlled erosion coating. [Trial Tr. (M. Davies) 1228:21-1229:13; PX 706]. Examples in the literature showed how this could be readily accomplished.

### (i)    Rudnic et al., U.S. Patent No. 5,326,570

650.    At the time of the invention, a skilled formulator would have recognized that Figure 1 in the Rudnic '570 patent [PX 470], which is reproduced below, disclosed a cumulative dissolution profile for pellets B and C that could have been used to produce dosage forms with an ascending release rate. [Trial Tr. (M. Davies) 1229:16-1233:3; PX 470, at Figure 1; PX 708; PX 709].



**Rudnic '570 Patent, Figure 1**

651.    The pellet B system shows the distinct increasing slope profile between time points indicating an ascending rate of release, as can be seen when plotting the rate of release for that system alone.  [Trial Tr. (M. Davies) 1230:1-1232:14; PX 708]. However, the C pellet system shows essentially no release for approximately the first 5 hours owing to its "pH-controlled erosion" coating, *i.e.*, Eudragit coating, and then it shows an ascending rate of release.  [Trial Tr. (M. Davies) 1230:1-1231:20, 1233:4-11; PX 470 at Figure 1, col. 3, line 66 – col. 4, line 50; PX 709].

652.    A skilled formulator could have combined these two pellet types (*e.g.*, B and C) in equal parts to produce, by routine experimentation, a dosage form that exhibits an ascending release rate over an extended period of time.  [Trial Tr. (M. Davies) 1232:20-1234:1; PX 709].

### (ii)    Mehta et al., U.S. Patent No. 4,728,512

653.    Another example of pH-controlled erosion techniques for making an ascending rate of release profile is found in the Mehta '512 patent.  [PX 471].  As described by Dr. Davies, "[t]he Mehta patent is another example of using different beads

with different coatings to achieve a particular controlled release profile. And again, it's an example where one can use a combination of beads to finely tune to achieve the profile that you so wish." [Trial Tr. (M. Davies) 1234:12-24].

654.    The Mehta '512 patent includes actual raw data that shows an ascending rate of release profile. [Trial Tr. (M. Davies) 1235:1-3; PX 471, Figures 3 and 4]. At the time of the invention, a skilled formulator could have produced a dosage form that combines an appropriate mixture of the two spheroid systems depicted in Figures 3 and 4 of the Mehta '512 patent to produce a dosage form that provides an ascending release rate of a drug for an extended period of time. [Trial Tr. (M. Davies) 1234:12-24; PX 471].

655.    In the mid-1990s, there were of number of different types of polymer coatings that could be used to achieve a pH-controlled erosion. [Trial Tr. (M. Davies) 1235:4-12]. "Polymers known as Eudragit ... were widely used for such coatings." [*Id.*]. In fact, the examples discussed in the Rudnic '570 and Mehta '512 patents utilized Eudragit coatings to achieve an ascending rate of release. [Trial Tr. (M. Davies) 1235:17-20]. Moreover, according to PX 482, U.S. Patent No. 5,567,441 to Chen (issue date October 22, 1996), at col. 3, lines 26-31:

> The enteric coatings are 'pH dependant' which describes the well known effect of an enteric coating which prevents release of the dosage form in the low pH conditions of the stomach[,] but permits release in the higher pH conditions of the small intestine.

The Chen '441 patent identifies "Eudragit S or L" as an enteric coating. [Trial Tr. (M. Davies) 1235:21-1236:15, citing to col. 3, line 36 of the Chen '441 patent, PX 482].

**REDACTED**

657.    According to Dr. Davies, one of ordinary skill in the art, in August 1997, would have known that a dosage form capable of delivering an ascending release of MPH could have been made by using a Eudragit coating.  [Trial Tr. (M. Davies) 1236:23-1237:4].  Moreover, it would have only required routine, not undue, experimentation for one of skill in the art in 1997 to use the pH-controlled erosion coating technique to make MPH into a dosage form with an ascending rate of release to the midpoint of the $T_{90}$ and for at least three hours.  [Trial Tr. (M. Davies) 1237:5-16]

### (c)    Non-Uniform Drug Concentration

658.    At the time of the invention, a skilled formulator could also have produced dosage forms having non-uniform drug concentrations that would have met the claimed requirement for an ascending rate of release of drug and substantially ascending plasma concentration of MPH.  [Trial Tr. (M. Davies) 1237:17-1239:19; PX 706].  In this technique, the drug is not dispersed uniformly through the dosage form; rather, there would be different drug concentrations at different points within the dosage form.  [Trial Tr. (M. Davies) 1237:17-1238:2].

659.    A 1986 article published in the *Journal of Controlled Release* by Ping Lee [PX 472], highlights how one of ordinary skill could have used this technique to achieve different release rates.  [Trial Tr. (M. Davies) 1238:3-8].  This is graphically illustrated for diffusion controlled matrix systems having the geometries of a (1) planar sheet, (2) cylinder and (3) a sphere.  [PX 472 at 5, Figure 2].

660.    Dr. Davies used PX 710 to describe the principle of non-uniform drug concentration and how it could have been used to make an ascending release dosage form.  [Trial Tr. (M. Davies) 1238:9-1239:10].  Specifically, he gave as an example a

spherical bead wherein the outside of the bead has a low concentration, the middle of the

bead has an intermediate concentration, and the core of the bead has the highest

concentration.  [*Id*.; PX 710].  When this dosage form is released, according to Dr.

Davies:

> initially we would have the outer portion released, the low
> concentration, and then gradually as the solution got into the next
> layer, you would have more release, and then finally once it got into
> the core, one would have the higher rates of release.  This just
> illustrates that one can achieve an ascending rate of release just by
> simply changing the level of drug concentration within the
> formulation.

[Trial Tr. (M. Davies) 1239:1-10; PX 710].

661.    In 1997, it would have only required routine, not undue, experimentation

for one of skill in the art to use the non-uniform drug concentration technique to make a

dosage form with an ascending rate of release to the midpoint of the $T_{90}$ and for at least

three hours.  [Trial Tr. (M. Davies) 1239:11-19].

### (d)    Other Techniques for Making an Ascending Release Dosage Form

662.    In addition to the three techniques (Erodible Systems, pH-Controlled

Erosion, and Non-Uniform Drug Concentration) discussed *supra*, Dr. Davies identified

other known techniques that, in the mid-1990s, could have been used to make a dosage

form that produced the claimed ascending rate of release of drug and ascending plasma

concentration of MPH.  [Trial Tr. (M. Davies) 1239:20-1240:23].  For example, one of

skill in the art could have used a "wax coating," a "matrix or reservoir system," "systems

which release the drug by diffusion or by dissolution," or "combinations of these different

systems" to make a formulation that had an ascending rate of release.  [Trial Tr. (M.

Davies) 1240:3-15].

(e)      **Transdermal Patches**

663.    If the claims of the '373 patent were understood to cover the use of transdermal patches, at the time of the invention, a skilled formulator could have used known techniques for making transdermal patches that would release MPH at an ascending rate through at least the mid-point of the $T_{90}$ and for at least three hours and that would produce the claimed ascending MPH plasma concentration.  [Trial Tr. (M. Davies) 1244:23-1247:8].

664.    Defendants' expert, Dr. Needham, conceded at trial that one of ordinary skill "would have had a reasonably good idea of how to proceed" to achieve a transdermal system that provided increasing drug delivery rates.  [Trial Tr. (T. Needham) 722:24-723:24].

665.    According to Dr. Davies, U.S. Patent No. 5,262,165 to Govil et al. (issued Nov. 16, 1993) [PX 474] discloses a transdermal patch with multiple chambers having different release rates of the drug. [Trial Tr. (M. Davies) 1245:20-1247:2; PX 474 at col. 9, lines 51-58; PX 712].  By varying the drug concentration and the penetration enhancers (which "enhance the transport of the drug across the skin"), the Govil '165 patent demonstrated an ascending drug delivery rate from a transdermal patch.  [Trial Tr. (M. Davies) 1246:2-21; PX 474, at col. 9, lines 51-58; PX 712].

666.    The technique described in the Govil '165 patent [PX 474] could have been used to make, through routine experimentation in the mid-1990s, a transdermal system with an ascending release rate of MPH through the mid-point of the $T_{90}$ and for at least three hours.  [Trial Tr. (M. Davies) 1246:21-1247:8].

667.    Similarly, the procedure described in U.S. Patent No. 4,956,181 to Bayer et al. (issued Sept. 11, 1990), DTX 632, could have been used to make MPH into an ascending release rate transdermal system.  [Trial Tr. (M. Davies) 1245:6-18; DTX 632]. In fact, Defendants relied on the Bayer '181 patent, DTX 632, to show that prior art transdermal patches could provide an ascending release profile.  [D.I. 134, at DFF ¶ 307 (discussing the Bayer *et al.* patent, DTX 632); *see also* Trial Tr. (Needham) 722:4- 723:24].  As interpreted by Defendants, the "delivery rate is . . . increased over a 'ramp up' time period," in this prior art reference.  [D.I. 134, at DFF ¶ 307].

668.    Defendants further emphasize that "[w]hile the [Bayer '181] patent is directed to transdermal dosage forms, the inventors indicated that other dosage forms, *including oral dosage forms*, can be used."  [D.I. 134, at DFF ¶ 307 (emphasis added)]. This confirms Dr. Davies' opinion that common strategies for achieving an MPH ascending release rate and a substantially ascending profile could have been employed across oral and transdermal dosage forms with only routine experimentation.  [Trial Tr. (M. Davies) 1239:20-1240:22; 1244:10-1245:11; 1247:3-8].

669.    The '373 patent disclosure, in conjunction with the extensive knowledge in the prior art, would have provided sufficient guidance to a person skilled in the field of extended-release formulation development to practice the claimed invention with routine, not undue experimentation.  [Trial Tr. (M. Davies) 1220:8-1221:4; 1228:7-20; 1233:17- 1234:11; 1237:5-16; 1239:11-1240:22; 1244:10-1245:11; 1247:3-8; PX 706].

3.    **Implementing a Desired Dissolution or Plasma Profile Would Have Been a Matter of Routine Effort for a Person Skilled in the Field of Extended-Release Formulation Development as of the Filing Date of the Patent.**

670.    The Court credits the testimony of Dr. Davies that, at the time of the invention, producing a wide variety of dosage forms that would have met the requirements of the claims-in-suit would have been a matter of routine experimentation for a person skilled in the art based on the patent disclosure and the teachings in the prior art.  [Trial Tr. (M. Davies) 1220:8-1221:4; 1228:7-20; 1233:17-1234:11; 1237:5-16; 1239:11-1240:22; 1244:10-1245:11; 1247:3-8; PX 706].

(a)    **Controlled Release Dosage Forms Development Is a Predictable Field**

671.    The field of controlled release formulations was a "very mature" and highly predictable field in August 1997, the effective filing date of the '373 patent, with work in this area going back at least thirty years.  [Trial Tr. (M. Davies) 1210:23-1211:13; DTX 1 at col. 1 (claiming priority to August 19, 1997)].

672.    Controlled release systems are designed to be predictable: hence they are called "controlled release systems."  [Trial Tr. (M. Davies) 1210:23-1211:7].  The controlled release dosage form field is devoted to the production of dosage forms that are "controlled, preprogram[med], predetermined release rates."  [*Id.*].  This is possible because the materials used in extended-release dosage forms, such as polymers of various types, are highly consistent in their characteristics and highly predictable in their behavior.  Moreover, the dissolution behavior (*i.e.*, how an active ingredient is released

from the dosage form as it dissolves) of the various types of dosage forms is highly
predictable.

673.    The release rate characteristics of an extended-release dosage form can be
precisely modeled with mathematical formulae.  [*See, e.g.*, Trial Tr. (M. Davies) 1231:2-
20].  This enables a skilled formulator to produce a desired dissolution profile through a
straightforward design process.  [*Id.*].  Specifically, after being provided a desired
dissolution rate profile, the formulator selects the appropriate materials and structures
that, based on straightforward mathematical calculations, will produce the desired release
rate profile.  [*Id.*].

674.    One of ordinary skill in the art of controlled release would have had the
tools to make dosage forms having various release rates, including descending, constant,
and ascending, because "that is what they are trained to do."  [Trial Tr. (M. Davies)
1209:2-19].  However, Defendants' expert, Dr. Needham, suggests that the field of
controlled release should be understood as divided into two arts: the art of "*ascending*
release" and the art of "*constant* release" formulation.  [*Id.*; D.I. 134, at DFF ¶¶ 177, 185-
86].  The distinction defendants are drawing is not one that one of ordinary skill in the
formulation art would recognize, because many of the dosage forms developed in the so-
called "constant release formulation" art are what one of ordinary skill would use to
achieve ascending release rates.  [Trial Tr. (M. Davies) 1209:8-19; 1241:18-1242:9].

### (b)    Level of Skill of Extended-Release Dosage Form Developers Is High

675.    The claims-in-suit concern methods of treating ADD/ADHD.  [*See* PFF ¶¶
95-96].  As of August 19, 1997, a person of ordinary skill in the field of these patents

would have been someone with an M.D., or a Ph.D. in clinical pharmacology or a comparable scientific field, and about two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience. [Trial Tr. (M. Angst) 509:7-14; Trial Tr. (K. Patrick) 1009:8-24; *see* PFF ¶¶ 427-432].

676.    The field of the invention of the claims in suit spans both medical treatment and formulation development. To practice the full scope of the treatment methods claimed in the '373 patent, a person of ordinary skill in the art would have consulted, or worked in collaboration with, persons of ordinary skill in the areas of formulating pharmaceutical products and *in vitro* dissolution testing, to the extent necessary. [Trial Tr. (M. Davies) 1208:10-18; 1243:13-1244:6; *see also* Trial Tr. (M. Angst) 511:8-17].

677.    As of August 19, 1997, a person of ordinary skill in the art of formulating pharmaceutical products would have had a Ph.D. in Pharmacy, Chemical Engineering, or Chemistry, and three years experience in industry working with controlled release systems for drug delivery. [Trial Tr. (M. Davies) 1208:10-18].

678.    The high skill level of this specialist would have allowed that individual to readily formulate a range of dosage forms that could have delivered desired characteristics. [Trial Tr. (M. Davies) 1208:10-1209:19; 1290:21-1292:21].

679.    Defendants' expert Dr. Umesh Banakar agreed that the level of skill in the extended-release dosage formulation field was "high." [Trial Tr. (M. Davies) 1208:19-1209:1; *see* D.I. 86 (Declaration of Umesh V. Banakar, Ph.D.) ¶¶ 124-125].

680.    At trial, Defendants' expert, Dr. Needham, expressed the view that one of ordinary skill in the art "would not have had experience with ascending release rates" in the mid-1990s.  [Trial Tr. (T. Needham) 663:10-14].

681.    However, preparing a dosage form that had a constant, descending or ascending profile required the "same skill set" of a formulation scientist who was one of ordinary skill in the art.  [Trial Tr. (M. Davies) 1209:9-19, 1241:24-1242:9].  In fact, in 1997, there were known techniques for making a dosage form that could be released at a constant, descending, or ascending rate.  [Trial Tr. (M. Davies) 1217:1-10].

682.    The training and experience of the ALZA formulators who worked on CONCERTA® reflects the high level of skill found in the formulation field at the time of the invention.  [Trial Tr. (M. Davies) 1268:4-17].  The formulation team was led by Dr. Shivanand, who had a Ph.D. in Pharmaceutical Sciences.  [JDT (Shivanand) 1151-53]. While in 1995 she herself had less than a year of experience in controlled release, other members of her team and those who guided its work had well over three years experience at the time, such as Mr. Hamel and Mr. Ayer.  [JDT (Shivanand) 1160-61; JDT (Hamel) 714, 718; Trial Tr. (A. Ayer) 167:11-169:24].

      **(c)     The Quantity of Experimentation Needed to Develop<br>           Suitable Extended-Release Dosage Forms Is Reasonable**

683.    A person skilled in the art, when looking at the '373 patent in August 1997, could have prepared dosage forms (osmotic and non-osmotic) that provided ascending rates of release of MPH through the midpoint of the $T_{90}$ and for at least three hours with only routine effort.  [Trial Tr. (M. Davies) 1220:8-1221:4; 1228:7-20; 1233:17-1234:11; 1237:5-16; 1239:11-1240:22; 1244:10-1245:11; 1247:3-8; PX 706].

684.    Defendants' expert, Dr. Needham, expressed the view that "a heck of a lot of work" would be required to develop dosage forms falling within the scope of the claims.  [Trial Tr. (T. Needham) 728:12-18; *see also* D.I. 134, at DFF ¶¶ 199-200]. However, he reached this conclusion without doing more than a "quick kind of search" of the prior art literature, without considering the specific references discussed in Dr. Davies' expert report, and without focusing on the conclusions of Defendants' expert, Dr. Mayersohn, that the prior art provides examples of drug delivery systems that provide an ascending rate of release.  [Trial Tr. (T. Needham) 731:22-737:3].

685.    In fact, Dr. Needham admitted that he reached the conclusions in his expert report without considering or analyzing a single article, patent, or other publication that provided a specific example of a dosage form that had an extended rate of release. [Trial Tr. (T. Needham) 735:9-736:3].

686.    Dr. Needham agreed with Defendants' expert, Dr. Mayersohn, that "a person of ordinary skill in the art would also would have noted that oral dosage forms providing ascending release rates were known in the prior art."  [Trial Tr. (T. Needham) 736:4-737:3].

687.    Routine experimentation is very common to formulation work, and such routine experimentation would be needed to develop any new formulation, even a new constant release rate form.  [Trial Tr. (M. Davies) 1240:24-1242:9].  Formulations must be manufactured and tested to insure they work as designed.  [*Id.*].  If the formulation does not behave as expected, then changes can be made to adjust the behavior of the formulation.  [*Id.*].

688.    The design, formulation, production, testing and optimization of a new dosage form (with either a constant or ascending release rate) could have taken several months of effort in August 1997.  [Trial Tr. (M. Davies) 1240:24-1242:9].  Extended-release dosage forms are produced according to well-known procedures, using widely available and well-characterized materials, and are assessed using simple dissolution tests.  [*Id.*].  This work does require some time, potentially spanning several months, but in the controlled-release art field, this type of work does not amount to being an uncertain or unpredictable undertaking.  [*Id.*].  Preparing ascending release rate MPH extended-release dosage forms therefore involves only routine experimentation by the skilled formulator.  [*Id.*].

> **(d)    The Absence of Working Examples of Non-Osmotic Dosage Forms in the Specification Is Immaterial Given Breadth of Teachings in the Prior Art, Predictability in the Field and Abilities of the Person Skilled in the Art**

689.    Skilled formulators would have used their typical skill set to formulate dosage forms meeting the required characteristics of the claims-in-suit.  [Trial Tr. (M. Davies) 1209:8-19; 1241:18-1242:9].  Publications that were over a decade old at the time of the invention disclose methods for producing dosage forms that provide an ascending release rate.  [Trial Tr. (M. Davies) 1221:5-1247:8; *see also* PX 706].

690.    At the time of the invention, many existing dosage forms, when loaded with a uniform drug concentration, would intrinsically release drug at decreasing rates over time, not constant rates.  [Trial Tr. (M. Davies) 1217:11-22].  Accordingly, even to achieve the "constant release rate" that was desired in the prior art over an extended period of time, it had always been necessary for formulators to take steps to stage later releases of drug in a manner that counteracted the intrinsic decline in rate found in many

dosage forms. [Trial Tr. (M. Davies) 1218:5-23]. Those very same steps would readily

lead the person skilled in the art to envision how to produce a dosage form that would

provide an ascending release rate, if so desired. [Trial Tr. (M. Davies) 1219:24-1220:18;

*see also* PX 706].

691.    Dr. Needham contended that the "art had not focused on providing an

extended ascending release rate or plasma profile." [D.I. 134, at DFF ¶ 164]. But,

whether or not the art had previously focused on this, even in the course of developing

constant release rates, one of ordinary skill in the formulation art field would have

possessed the essential skill set and methods needed to develop ascending release rate or

substantially ascending plasma concentration time profile dosage forms. [Trial Tr. (M.

Davies) 1217:1-1219:18; 1243:6-1244:22].

**4.    There Is No Evidence that the ALZA Scientists Were
Unable to Develop Non-Osmotic Dosage Forms to
Implement the Invention**

**(a)    ALZA's Research Efforts Focused on Osmotic Dosage
Forms Because that Was the Field Where it Had
Intellectual Property and Special Expertise**

692.    In the mid 1990s, Mr. Atul Ayer was Director of formulations, and led the

formulation group at ALZA. [Trial Tr. (A. Ayer) 168:18-169:2]. The formulation group

would develop new solid dosage forms. [*Id.* at 169:1-24]. Specifically, they were

responsible for the laboratory work for the development of all new formulations. [*Id.*].

693.    ALZA elected to implement the invention in its commercial form using

osmotic-release dosage forms because of commercial considerations. ALZA was a

pioneer in the development of osmotic dosage forms and had previously developed and

198

patented a number of extended-release drug products using this technology. [Trial Tr. (A. Ayer) 170:1-172:14].

694.    In the mid-1990s, a skilled formulator could have developed a non-osmotic dosage form having an ascending release rate with only routine effort. [Trial Tr. (A. Ayer) 173:24-175:4]. Mr. Ayer had done so many times prior to 1997. [Trial Tr. (A. Ayer) 171:20-173:23 (describing three non-osmotic dosage forms that had an ascending rate of release for an extended period of time)]. These ascending release rate dosage forms included, among others, matrix systems, beads approach, pH-sensitive membranes and polymer coatings. [Trial Tr. (A. Ayer) 171:20-172:12]. In fact, ALZA had worked with "more than 30 or 40 formulations" that were a mixture of osmotic and non-osmotic dosage forms. [JDT (Guinta) 402-403].

695.    Defendants have cited testimony of Mr. Andrew Lam, an ALZA employee, to support their allegations that production of non-osmotic dosage forms having an ascending release rate was unpredictable and would require undue experimentation. [D.I. 134, at DFF ¶¶ 134-135, 168, 181, 198]. At the time of the invention, Mr. Lam did not have responsibilities for designing and testing extended-release dosage forms. [Trial Tr. (A. Ayer) 177:5-178:22]. In particular, Mr. Lam's responsibilities did not include any laboratory or bench work involving the development of particular dosage forms. [Trial Tr. (A. Ayer) 177:21:24]. Instead, Mr. Lam, in his capacity as being a product development manager for the CONCERTA® project, was responsible for the logistical coordination of the research group charged with responsibility for developing a new MPH extended-release dosage form. [*Id*. at 177:5-20; *see also* JDT (Lam) 788].

696.    Mr. Lam testified that on his own initiative, he experimented with design of non-osmotic dosage forms, but he abandoned the effort before he got them to work. [JDT (Lam) 804-805].  Mr. Lam's ad hoc, personal experimental experiences are irrelevant to the question whether a person skilled in the field of extended-release formulation development would have had to engage in undue experimentation to produce the claimed dosage forms.  Mr. Lam's personal experiences are also contrary to the experiences of Dr. Ayer, who actually had direct responsibilities for design and development of MPH dosage forms that would be suitable for use in the claimed ADHD treatment methods.  Mr. Lam's personal experiences are also inconsistent with the testimony of Dr. Davies that explain why a person of ordinary skill in the formulation arts would not have found it difficult to produce any of a wide variety of extended-release dosage forms that provided an ascending MPH release rate as required by the claims.

697.    Plaintiffs' Proposed Findings of Facts should be treated as Conclusions of Law and vice versa, as appropriate.

## IX.    CONCLUSIONS OF LAW

### A.    Jurisdiction

CL1.    This is an action for patent infringement that arises under the Patent Laws of the United States codified at Title 35 of the United States Code and the Abbreviated New Drug Application provisions of the Hatch-Waxman Amendments to the FDCA, 21 U.S.C. § 355(j).

CL2.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338.

CL3.    This Court has personal jurisdiction over the parties.

CL4.    Venue in this Judicial District is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

**B.    Infringement by The Defendants**

**1.    Legal Standard for Infringement**

CL5.    A patent is infringed when a person "without authority makes, uses or sells any patented invention, within the United States during the term of the patent. . ." 35 U.S.C. § 271(a).

CL6.    Plaintiffs' suit against Defendants for patent infringement is predicated on Defendants' filing of two ANDAs with the FDA seeking approval to market a generic version of CONCERTA®, acts which give rise to an infringement suit under 35 U.S.C. § 271(e)(2). *See Abbott Labs. v. Torpharm, Inc.*, 300 F.3d 1367, 1371 (Fed. Cir. 2002); *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1244-45 (Fed. Cir. 2000); 35 U.S.C. § 271(e)(2).

CL7.    A patent infringement analysis involves two steps.  First, the court determines the meaning of the patent claims as a matter of law.  Second, the court compares the properly construed claims to the allegedly infringing product or method. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996).

CL8.    A patent owner may establish infringement under either of two theories: literal infringement or the doctrine of equivalents.  Literal infringement exists if each element of at least one claim of a patent is met by the alleged infringer's product.

*Panduit Corp. v. Dennison Mfg. Corp.*, 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987); *Merck & Co. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480, 485 (D. Del. 2002).

CL9.    The patentee bears the burden of proving infringement by a preponderance of the evidence.  A preponderance of the evidence means such evidence which, when considered and compared with that opposed to it, produces a belief that what is sought to be proved is more likely true than not.  *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 n.15 (Fed. Cir. 2005).

CL10.  Where, as here, the infringement inquiry is provoked by an ANDA filing, the question of infringement focuses on what is likely to be sold or used following FDA approval.  *Abbott Labs.*, 300 F.3d at 1373; *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1047 (Fed. Cir. 2001) ("the infringement inquiry focuses on the hypothetical infringement that would occur if the defendant's [A]NDA were approved and the defendant began to make and sell the drug.").

CL11.  Infringement is established when a plaintiff proves, by a preponderance of the evidence, that the accused product or method *sometimes* meets all of the limitations of the asserted patent claims.  *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 622-23 (Fed. Cir. 1995) ("an accused product that sometimes, but not always, embodies a claimed method nonetheless infringes."), *quoted in Impax Labs., Inc. v. Aventis Pharms., Inc.,* No. Civ.A. 02-581 JJF, 2004 WL 253482, at *3 (D. Del. Feb. 5, 2004); *Purdue Pharma, L.P. v. F.H. Faulding and Co.*, 48 F. Supp. 2d 420, 439, 441 (D. Del. 1999) (finding infringement of method of treatment claims where all the elements of the claims were present in "the accused use of…[defendant's drug product] *in some patients*"), *aff'd,* 230 F.3d 1320 (Fed. Cir. 2000); *Interspiro USA, Inc. v. Figgie Int'l, Inc.*,

815 F. Supp. 1488, 1512 (D. Del. 1993) ("it is of no moment that in certain modes of operation…[defendant's product] may not operate in a way that would infringe the '145 patent.  It matters only that the accused device operate in an infringing way at some time."), *aff'd*, 18 F.3d 927 (Fed. Cir. 1994).

CL12.  Infringement is a question of fact.  *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1302 (Fed. Cir. 2005).

CL13.  35 U.S.C. § 271(b) states, "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  35 U.S.C. § 271(b).

CL14.  Direct infringement of a patent claim under 35 U.S.C. § 271(a) is a prerequisite to finding that a party has induced infringement of the claim.  *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 n.7 (Fed. Cir. 1988).

CL15.  In addition to direct infringement, a patent holder must prove that once the defendants knew of the patent, they "actively and knowingly" encouraged another's direct infringement.  *DSU Medical Corp. v. JMS Co, Ltd.*, 471 F.3d 1293, 1305 (Fed. Cir. 2006) (pertinent section en banc), citing *Water Technologies Corp. v. Calco Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988); *see also Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990).

CL16.  If a defendant offers a product with the object of promoting its use to infringe, as shown by affirmative steps taken to foster infringement, it is then liable for the resulting acts of infringement by third parties.  *DSU Medical*, 471 F.3d at 1305-1306.

CL17.  Evidence of "active steps…taken to encourage direct infringement" includes advertising an infringing use or *instructing how to engage in an infringing use*

203

and these steps show an affirmative intent that the product be used to infringe. *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005); *see Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1361 (Fed. Cir. 2006).

CL18.  Instructions or directions for using a defendant's proposed generic drug product, such as in a label or package insert, in a manner that would result in direct infringement shows an affirmative intent that the product be used to infringe and renders the defendant liable for inducing infringement. *See*, *e.g.*, *In re Omeprazole Patent Litig.*, 490 F. Supp. 2d 381, 485-86 (S.D.N.Y. 2007) (Defendant ANDA filer found to induce infringement of method of treatment claim based on package insert for generic product); *see also Metro-Goldwyn-Mayer*, 545 U.S. at 936 ("[I]nstructing how to engage in an infringing use show[s] an affirmative intent that the product be used to infringe….").

CL19.  Direct and induced infringement may both be proven through circumstantial evidence. *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006); *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (citing *Michalic v. Cleveland Tankers, Inc.*, 364 U.S. 325, 330 (1960)).

CL20.  To establish contributory infringement, plaintiffs must show that Defendants knowingly induced infringement and possessed specific intent to encourage another's infringement and that the ANDA products are "not a staple article or commodity of commerce suitable for substantial noninfringing use." 35 U.S.C. § 271(c); *Cross Med. Prods.*, 424 F.3d at 1312.  Direct infringement of a patent claim under 35

U.S.C. § 271(a) is a prerequisite to finding that a party has contributorily infringed a claim. *Id*.

### 2.    Plaintiffs' Remedy for Infringement by the Defendants

CL21.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of Claim 1, 6 and 7 of the '373 patent.

CL22.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Defendants' activities relating to the ANDA products will induce infringement of Claim 1, 6 and 7 of the '373 patent.

CL23.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Defendants' activities relating to the ANDA products will contributorily infringe Claim 1, 6 and 7 of the '373 patent.

CL24.  35 U.S.C. § 271(e)(4) provides that for an act of infringement described by § 271 (e)(2), the patent owner's remedies include the following:

> (A)  the court shall order the effective date of any approval of the drug. . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed;
>
> (B)  injunctive relief may be granted against an infringed to prevent the commercial manufacture, use, offer to sell, or sale within the United States. . .
>
> (C)  damages or other monetary relief may be awarded against an infringer. . .

CL25.  As a remedy for Defendants' infringement, the Court shall order that any approval of ANDA Nos. 76-665 and/or 76-772 by the FDA occur no earlier than January 31, 2018, the date on which the patent-in-suit and the existing FDA (pediatric) exclusivity attached thereto expires.  35 U.S.C. § 271(e)(4); *see, e.g.*, *Celgene Corp. v. Teva Pharms. USA, Inc.*, 412 F. Supp. 2d 439, 441-42 (D.N.J. 2006).

CL26.  As a remedy for Defendants' infringement, the Court shall enjoin Defendants, and any successor-in-interest to the ANDAs, from manufacturing, offering to sell, selling, or using within the United States, or importing into the United States, Methylphenidate Hydrochloride Extended-Release Tablets (54, 36, 27 and 18 mg) in accordance with ANDA Nos. 76-655 and 76-772 during the life (including applicable FDA exclusivity) of the '373 patent.  35 U.S.C. § 271(e)(4); *see, e.g.*, *Celgene*, 412 F. Supp. at 441-42.

## C.    The Asserted Claims Would Not Have Been Obvious

CL27.  The ultimate conclusion of obviousness is a question of law based on underlying facts.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).

CL28.  Defendants bear the burden of establishing the claims are invalid for reasons of obviousness by clear and convincing evidence.  *Glaxo Group Ltd. v. Apotex, Inc.,* 376 F.3d 1339, 1348 (Fed. Cir. 2004).

CL29.  An invention is patentable under § 103 if a person of ordinary skill in the art would not have considered the differences between the claimed invention and the prior art obvious at the time the invention was made.  *KSR Int'l v. Teleflex Inc*., 127 S. Ct. 1727, 1734 (2007).

CL30.  The analysis for obviousness requires four factual determinations to be made by the Court:  "1) 'the scope and content of the prior art'; 2) the 'differences between the prior art and the claims'; 3) 'the level of ordinary skill in the pertinent art'; and 4) objective evidence of nonobviousness."  *See Takeda Chem. Indust. v. Alphapharm PTY, Ltd.*, 492 F.3d 1350, 1355 (Fed. Cir. 2007).  And, "[w]hile the sequence of these questions might be reordered in any particular case, the factors continue to define the inquiry that controls."  *KSR*, 127 S. Ct at 1734.

CL31.  Factors that may be considered in determining level of ordinary skill in the art include:  (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field.  *See Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983).

CL32.  The use of hindsight is prohibited in an obviousness analysis.  *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 36 (1966); *see also In re Omeprazole Patent Litig.*, 483 F.3d 1364, 1381 (Fed. Cir. 2007) (Newman, J., dissenting).

CL33.  To establish a *prima facie* showing of obviousness of a patent claim, the evidence must show "some objective teaching in the prior art or that knowledge generally available to one of ordinary skill in the art would lead that individual to combine the relevant teachings of the references."  *In re Fine*, 837 F.2d 1071, 1074 (Fed. Cir. 1988).

CL34.  A suggestion or motivation to combine may come from within the references themselves or may come from the knowledge held by the person of ordinary skill.  *KSR*, 127 S. Ct. at 1742.

CL35.  When the prior art teaches away from the combination of elements that are encompassed by a patent claim, the claimed invention likely would not have been obvious to a person of ordinary skill in the art.  *KSR*, 127 S. Ct. at 1740 ("when the prior art teaches away from combining certain known elements, discovery of a successful means of combining them is more likely to be nonobvious"); *In re Icon Health & Fitness, Inc.*, 496 F.3d 1374, 1381 (Fed. Cir. 2007).

CL36.  In addition, useful results that flow from a claimed invention that are unexpected or that could not have been predicted support the inference that a person of ordinary skill in the art would not have found the discovery to be obvious. *KSR*, 127 S. Ct. at 1740; *see also Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008) (existence of numerous "unpredictable alternatives" supported the conclusion of nonobviousness).

CL37.  Objective indicia of nonobviousness, or "secondary considerations," are also relevant to determining the obviousness or nonobviousness of the asserted claims. Secondary considerations include commercial success, long felt but unsolved needs, copying, and the failure of others.  *Graham*, 383 U.S. at 16-17; *Akamai Techs, Inc. v. Cable & Wireless Internet Servs, Inc.* 344 F.3d 1186, 1196 (Fed. Cir. 2003).

CL38.  Secondary considerations of nonobviousness are presumed to have a nexus to a claimed invention if the article sold falls within the scope of the claims.  *See J.T. Eaton & Co. v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997).

CL39.  A long-felt need existed for a once-a-day treatment method for ADD and ADHD that others failed to meet.

CL40.  The claimed treatment methods provide a surprising and unexpectedly superior way of treating ADD and ADHD.

CL41.  Defendants copied the commercial embodiment of the claimed invention.

CL42.  The claimed invention enjoys substantial commercial success.

CL43.  The asserted claims are valid and not obvious under 35 U.S.C. § 103.

**D.**     **The Asserted Claims Were Not Anticipated**

CL44.  The first step in an anticipation analysis is claim construction.  *Helifix, Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1346 (Fed. Cir. 2000).

CL45.  The second step in an anticipation analysis involves a comparison of the construed claim to the prior art.  To be anticipating, a prior art reference must disclose each and every limitation of the claimed invention.  [*Id*.].  "Anticipation requires that 'each element of the claim at issue is found, either expressly described or under the principles of inherency, in a single prior art reference or that the claimed invention was previously known or embodied in a single prior art device or practice.'"  *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 771 (Fed. Cir. 1983).

CL46.  Any limitation not explicitly taught must be inherently taught and would be so understood by a person experienced in the field.  *In re Baxter Travenol Labs.*, 952 F.2d 388, 390 (Fed. Cir. 1991); *see also Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268-69 (Fed. Cir. 1991) (to anticipate, every element of the claims must appear in a single prior art reference, or if not expressly shown, then demonstrated to be known to persons experienced in the field of technology).

CL47.  The principle of "inherency," in the law of anticipation, requires that any information missing from the reference would nonetheless be known to be present in the subject matter of the reference, when viewed by persons experienced in the field of the invention.  However, "anticipation by inherent disclosure is appropriate only when the reference discloses prior art that must necessarily include the unstated limitation, [or the reference] cannot inherently anticipate the claims." *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1373 (Fed. Cir. 2002) (emphasis in original); *Hitzeman v. Rutter*, 243 F.3d 1345, 1355 (Fed. Cir. 2001) ("consistent with the law of inherent anticipation, an inherent property must necessarily be present in the invention described by the count, and it must be so recognized by persons of ordinary skill in the art"); *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999) (that a feature in the prior art reference "could" operate as claimed does not establish inherency).

CL48.  Thus, when a claim limitation is not explicitly set forth in a reference, evidence "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Continental Can Co.*, 948 F.2d at 1268.  It is not sufficient if a material element or limitation is "merely probably or possibly present" in the prior art. *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002); *see also W.L. Gore & Associates, Inc.  v. Garlock, Inc.*, 721 F.2d 1540, 1554 (Fed. Cir. 1983) (anticipation "cannot be predicated on mere conjecture respecting the characteristics of products that might result from the practice of processes disclosed in references").

CL49.  An expert's conclusory testimony, unsupported by documentary evidence, cannot supplant the requirement of anticipatory disclosure in the prior art reference itself.

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 98 F. Supp. 2d 362, 387 (S.D.N.Y. 2000); *see also Motorola, Inc. v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1473 (Fed. Cir. 1997) (same); *accord W.L. Gore & Assocs., Inc.*, 721 F.2d at 1554 (reversal of judgment of invalidity on grounds that expert's testimony of inherent anticipation, based on unsupported assertions without any testing, cannot serve as basis for finding anticipation).

CL50.  Claims 1, 6, and 7 of the '373 patent are valid and not anticipated by the prior art.

### E.    The Claims-in-Suit Are Fully Enabled under 35 U.S.C. § 112, First Paragraph

CL51.  Enablement is assessed using the perspective of a person skilled in the relevant art.  *See, e.g., In re Smythe*, 480 F.2d 1376, 1383 (C.C.P.A. 1973).

CL52.  A claim is enabled if a person skilled in the art can practice the invention as claimed without undue experimentation.  35 U.S.C. § 112, first paragraph; *In re Wands,* 858 F.2d 731, 737 (Fed. Cir. 1988).

CL53.  Defendants must prove by clear and convincing evidence that undue experimentation would be required to practice the claimed invention.  *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1155 (Fed. Cir. 2004).

CL54.  Whether "undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations."  *In re Wands*, 858 F.2d at 737.  These factors include: "(1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of

the prior art, (6) the relative skill of those in the art, (7) the predictability or

unpredictability of the art, and (8) the breadth of the claims." *Id.*; *see also Chiron Corp.*

*v. Genentech,* 363 F.3d 1247, 1256 (Fed. Cir. 2004).

CL55.  The asserted claims are valid and enabled under 35 U.S.C. § 112, first

paragraph.

CL56.  The asserted claims are valid and are not "impermissible single means"

claims.

CL57.  The asserted claims are not "means plus function" claims.  The "means

plus function" provisions of Paragraph 6 of § 112 generally only apply to claims that

expressly invoke the language "means for" or "steps for" achieving a specified result.

*Phillips v. AWH Corp.,* 415 F.3d 1303, 1310, 1313 (Fed. Cir. 2005); *On Demand Mach.*

*Corp. v. Ingram Indus.*, 442 F.3d 1331, 1341 n.2 (Fed. Cir. 2006).


X.    **CONTINGENT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW FOR THE PREVIOUSLY ASSERTED CLAIMS OF THE '129 PATENT**

698.    Plaintiffs submitted a proposed Order [D.I. 144] dismissing Plaintiffs'

claims of infringement under the '129 patent against Defendants with prejudice, and

dismissing Defendants' declaratory judgment counterclaims under the '129 patent without

prejudice.

699.    Plaintiffs represented to the Court that the '129 patent would not be

asserted in the future against Defendants concerning the products that currently are the

subject of ANDA Nos. 76-665 and 76-772. [D.I. 147]. Any dispute arising over the '129 patent was mooted by Plaintiffs' representation that they will not sue on the '129 patent.

700.    Because the Court has not yet ruled on the motion to dismiss, Plaintiffs submit contingent proposed findings of fact and conclusions of relating to infringement and validity issues pertaining to the previously asserted claims of the '129 patent.

### A.    ALZA Obtains the '129 Patent

701.    To secure patent rights in the United States, ALZA first filed provisional applications on November 12, 1996, November 25, 1996, and April 22, 1997, which were assigned provisional application serial numbers 60/030,514 ("the '514 provisional application"), 60/031,741 ("the '741 provisional application"), and 60/044,121 ("the '121 provisional application"), respectively. [PX 3-PX 5].

702.    These provisional applications, along with non-provisional applications, eventually led to the '129 patent. [DTX 2].

703.    The '129 patent was filed on March 8, 2001. The '129 patent is a CON of the '373 patent. [DTX 2].

704.    The specifications of the '373 and '129 patents are essentially the same. [DTX 1, col. 1, line 25 to col. 23, line 25; DTX 2, col. 1, line 25 to col. 23, line 10].

705.    Claim 1 of the '129 patent covers methods for treating ADD or ADHD by administering a pharmaceutically acceptable composition comprising MPH and a pharmaceutically acceptable carrier, wherein the composition provides a substantially ascending MPH plasma drug concentration over a time period of about 8 hours following administration of the dosage form:

> 1.      A method for treating Attention-Deficit Disorder or
> Attention-Deficit Hyperactivity Disorder in a patient, wherein
> the method comprises administering a pharmaceutically
> acceptable composition comprising methylphenidate and a
> pharmaceutically acceptable carrier to said patient in a manner
> that achieves a substantially ascending methylphenidate plasma
> drug concentration over a time period of about 8 hours
> following said administration.

[DTX 2, col. 23, lines 11-19].

706.    Dependent Claims 4-6 of the '129 patent specify that the claimed

composition comprises "about [x] mg of methylphenidate," with "[x]" corresponding to

"about 18 mg" (Claim 4), "about 36 mg" (Claim 5), and "about 54 mg" (Claim 6).  [DTX

2, col. 24, lines 7-12].

707.    The Court has construed "pharmaceutically acceptable composition" to

have the same meaning as "dosage form."  [D.I. 130].

708.    The '129 patent claims priority to the '514 provisional application, the '741

provisional application, and the '121 provisional application.  [DTX 2].

709.    The PTO issued the '129 patent, titled "Methods and Devices for

Providing Prolonged Drug Therapy," on August 16, 2005.  [D.I. 126, Pretrial Order, Joint

Statement of Admitted Facts, ¶ 6].

710.    ALZA is the current assignee of the '129 patent.  [D.I. 126, Pretrial Order,

Joint Statement of Admitted Facts, ¶ 7].  ALZA owns all rights, title and interest in the

'129 patent, including all rights needed to enforce the '129 patent.

711.    ALZA holds approved NDA No. 21-121 for extended-release MPH

hydrochloride, which is marketed under the tradename CONCERTA® in the United

States.  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 8].

712.    ALZA's NDA identifies the '129 patent as a patent "with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale" of CONCERTA®, and the FDA accordingly listed that patent in its list of Approved Drug Products with Therapeutic Equivalence Evaluations ("the Orange Book").  [D.I. 126, Pretrial Order, Joint Statement of Admitted Facts, ¶ 9].

**B.    Literal Infringement of Claims 1 and 4-6 of the '129 Patent**

713.    As construed by the Court, the term "substantially ascending methylphenidate plasma drug concentration over about 8 hours" in Claim 1 of the '129 patent requires a MPH plasma concentration profile in which "the plasma concentration of methylphenidate generally rises over approximately 8 hours, but may include a slight dip."  [D.I. 130, Markman Order, p. 2].

714.    Dependent Claims 4-6 of the '129 patent specify that the claimed composition comprises about 18, 36 or 54 mg of MPH.  [DTX 2, col. 24, lines 7-12].

715.    For the reasons set forth *supra*, if Defendants' ANDAs are approved, the administration of the 18, 36, and 54 mg ANDA products to individuals as directed by Defendants' label will result in a substantial patient population having a substantially ascending MPH plasma drug concentration over a time period of about 8 hours.  [*See* PFF ¶¶ 324-401].  Thus, Claims 1 and 4-6 of the '129 patent will be infringed by the use of the ANDA products.  [*Id*.].

**C.    The Claimed Inventions of the '129 Patent Would Not Have Been Obvious**

716.    For the reasons set forth *supra*, Defendants have not proven by clear and convincing evidence that Claims 1 and 4-6 of the '129 patent would have been obvious at the time of the invention to a person of ordinary skill in the art.  [*See supra* ¶¶ 402-612].

**D.    The Claimed Inventions of the '129 Patent Are Not Anticipated by the Prior Art**

717.    For the reasons set forth *supra*, Defendants have not proven by clear and convincing evidence that use of Ritalin SR® inherently anticipated Claim 1 of the '129 patent.  [*See* PFF ¶¶ 615-617].

718.    Dependent Claims 4-6 of the '129 patent specify that the claimed composition comprises "about 18 mg" (Claim 4), "about 36 mg" (Claim 5), and "about 54 mg" (Claim 6).  [DTX 2, col. 24, lines 7-12].

719.    Because Ritalin SR® was available only as a 20 mg dosage form  [DTX 630, at p. 6 (Table 1); *see also* DTX 621; DTX 491; DTX 500], there were no 18 mg, 36 mg or 54 mg dosage forms of Ritalin SR®.  Inherent anticipation requires that every claim limitation *necessarily* be present in a single prior art reference.

720.    Use of Ritalin SR® in the treatment of ADD/ADHD did not anticipate Claims 4-6 of the '129 patent.

216

### E.    The '129 Patent Claims Are Fully Enabled

721.    Asserted Claims 1 and 4-6 of the '129 patent are drawn to methods of treating ADD/ADHD by administering a dosage form of MPH that produces a particular MPH plasma profile in a subject administered the dosage form.  [*See* DTX 2; D.I. 130, Markman Order at 2 (construing this limitation, while maintaining these same fundamental requirements)].

722.    A person of ordinary skill in the art would understand Claims 1 and 4-6 of the '129 patent to involve the use of oral dosage forms, and in particular, extended-release oral tablets and capsules.  [*See* PFF ¶¶ 620-629].

723.    A skilled formulator, looking to implement the claimed invention through types of dosage forms other than the examples of osmotic dosage forms described in the specification, would have consulted well-known sources for guidance.  [*See* PFF ¶¶ 635-669].

724.    For the reasons set forth *supra*, in 1997, it would have only required routine, not undue, experimentation for one of skill in the art to make a dosage form whereby the plasma concentration of MPH generally rose over approximately 8 hours, but which may have included a slight dip.  [*See* PFF ¶¶ 670-691].

### F.    CONCLUSIONS OF LAW FOR THE '129 PATENT

CL58.  In view of Plaintiffs' representation that they will not sue on the '129 patent, there is no case or controversy with regard to the '129 patent and no declaratory judgment jurisdiction concerning this patent.  *Super Sack Manufacturing Corp. v. Chase Packaging Corp.*, 57 F.3d 1054, 1055, 1060 (Fed. Cir. 1995) (a patentee's "promise to

assert neither [of two patents] against [plaintiff] as to any of its past or present products precludes the existence of an actual controversy.").

### 1.     Infringement by the Defendants

CL59.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, use of the 18 mg, 27 mg, 36 mg and 54 mg ANDA products will result in direct literal infringement of Claims 1 and 4-6 of the '129 patent.

CL60.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Defendants' activities relating to the ANDA products will induce infringement of Claims 1 and 4-6 of the '129 patent.

CL61.  Plaintiffs have met their burden of proving, by a preponderance of the evidence, that, following approval of the ANDAs, Defendants' activities relating to the ANDA products will contributorily infringe Claims 1 and 4-6 of the '129 patent.

CL62.  35 U.S.C. § 271(e)(4) provides that for an act of infringement described by § 271 (e)(2), the patent owner's remedies include the following:

> (A)  the court shall order the effective date of any approval of the drug. . . involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed;

> (B)  injunctive relief may be granted against an infringed to prevent the commercial manufacture, use, offer to sell, or sale within the United States. . .

> (C)  damages or other monetary relief may be awarded against an infringer. . .

CL63.  As a remedy for Defendants' infringement, the Court shall order that any

approval of ANDA Nos. 76-665 and/or 76-772 by the FDA occur no earlier than January

31, 2018, the date on which the '129 patent and the existing FDA (pediatric) exclusivity

attached thereto expires.  35 U.S.C. § 271(e)(4); *see, e.g.*, *Celgene Corp. v. Teva Pharms.*

*USA, Inc.*, 412 F. Supp. 2d 439, 441-42 (D.N.J. 2006).

CL64.  As a remedy for Defendants' infringement, the Court shall enjoin

Defendants, and any successor-in-interest to the ANDAs, from manufacturing, offering to

sell, selling, or using within the United States, or importing into the United States,

Methylphenidate Hydrochloride Extended-Release Tablets (54, 36, 27 and 18 mg) in

accordance with ANDA Nos. 76-655 and 76-772 during the life (including applicable

FDA exclusivity) of the '373 patent.  35 U.S.C. § 271(e)(4); *see, e.g.*, *Celgene*, 412 F.

Supp. at 441-42.

### 2.    The Asserted Claims Would Not Have Been Obvious

CL65.  Claims 1 and 4-6 of the '129 patent are valid and not obvious under 35

U.S.C. § 103.

### 3.    The Asserted Claims Were Not Anticipated

CL66.  Claims 1 and 4-6 of the '129 patent are valid and not anticipated by the

prior art.

### 4.    The '129 Patent Claims Are Fully Enabled under 35 U.S.C. § 112, First Paragraph

CL67.  Claims 1 and 4-6 of the '129 patent are valid and enabled under 35 U.S.C.

§ 112, first paragraph.

CL68.  Claims 1 and 4-6 of the '129 patent are valid and are not "impermissible single means" claims.

CL69.  Claims 1 and 4-6 of the '129 patent are not "means plus function" claims. The "means plus function" provisions of Paragraph 6 of § 112 generally only apply to claims that expressly invoke the language "means for" or "steps for" achieving a specified result.  *Phillips v. AWH Corp.,* 415 F.3d 1303, 1310, 1313 (Fed. Cir. 2005); *On Demand Mach. Corp. v. Ingram Indus.*, 442 F.3d 1331, 1341 n.2 (Fed. Cir. 2006).

ASHBY & GEDDES

*/s/ John G. Day*

_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. # 2403)
Tiffany Geyer Lydon (I.D. # 3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
302-654-1888

*Attorneys for Plaintiffs*
*ALZA Corporation and McNeil PPC, Inc.*

*Of Counsel*

David T. Pritikin
Thomas D. Rein
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, IL  60603
312-853-7000

Jeffrey P. Kushan
Todd A. Wagner
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
202-736-8000

Michael D. Hatcher
SIDLEY AUSTIN LLP
717 North Harwood, Suite 3400
Dallas, TX  75201
214-981-3300

Dated:  June 16, 2008