## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

-------------------------------------------------------------------

ALZA CORPORATION, and )
McNEIL-PPC., INC., )

              Plaintiffs )

                v. )
ANDRX PHARMACEUTICALS, LLC.  and )
ANDRX CORPORATION )

             Defendants. )

-------------------------------------------------------------------

C.A. No. 05-642-JJF

REDACTED:
PUBLIC VERSION

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

Dated: June 16, 2008

RAWLE & HENDERSON, LLP
William J. Cattie, III, Esq.
I. D. No. 953
George T. Lees, III
I.D. 3647
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
(302) 778-1200
Facsimile: 302-778-1400

Attorney for Defendants
Andrx Pharmaceuticals, LLC and
Andrx Corporation

Of Counsel:

John W. Bateman
C. Kyle Musgrove
Robert F. Vroom
Douglas T. Lee
KENYON & KENYON, LLP
1500 K Street, NW
Washington, DC 20005
202-220-4200

# TABLE OF CONTENTS

Page

I. INTRODUCTION ......................................................................................................... 1

    A. Claims At Issue ...................................................................................................... 1

    B. The Court's Claim Construction ............................................................................ 1

II. FINDINGS OF FACT THAT THE CLAIMS AT ISSUE ARE NOT INFRINGED ........ 3

    A. Andrx's Proposed ANDA Products Are Very Different From What Is Disclosed And Claimed In The Patents In Suit ...................................................... 3

    B. The Evidence Establishes That Andrx's Proposed ANDA Products Do Not Have An Ascending Release Rate ........................................................................... 5

        1. Andrx's position that release of MPH from the non-IR Component is required during the first periodic interval, i.e., t=0 to t=1, is consistent with the Court's claim construction and the '373 patent's definition of what constitutes an ascending release profile .......... 6

        2. In assessing whether Andrx's proposed products have an ascending release rate, Alza's Expert Ms. Gray ignored the first periodic interval and started at t=2 hours................................................................ 13

        3. Because Ms. Gray used a dissolution test which does not differentiate between release from the IR and non-IR portions she had to resort to her 25% "Label Claim" assumption in an effort to show infringement ................................................................................... 16

        4. If release from the non-IR portion is required during the first periodic interval, then Andrx's proposed ANDA products do not infringe because there is no such release ................................................. 18

        5. Ms. Gray's 25% label claim assumption cannot support a finding of infringement........................................................................................... 20

        6. Under the correct assumption, Andrx's proposed products, including the one tablet with more than 27.5% release in the first hour, demonstrably do not infringe.......................................................... 22

            a. The evidence supports the first hour assumption......................... 22

                (i) Andrx's Delayed Release Core testing ............................ 22

                (ii) Andrx's final product testing ........................................... 23

                (iii) Alza's "IR overcoat study" .............................................. 24

    C. The Evidence Relied Upon By Alza Cannot Be Used To Establish That Andrx's Proposed ANDA Products Have An Ascending Release Rate.............. 29

    D. At Trial, Plaintiffs Surfaced A New And Unsupported Theory That Was Not Raised During Discovery Or In The Pretrial Papers..................................... 30

**TABLE OF CONTENTS**
(continued)

Page

1.   Dr. Davies' Testimony Was, At Best, Unclear And Does Not Support That Andrx Is Likely To Market A Product With A Non-IR Release In The First Hour .................................................. 30

        a.   Dr. Davies provided no testimony regarding what products Andrx would be likely to market upon approval of its ANDA ............................................................................ 31

        b.   The DRCs cited by Dr. Davies do not fall within the ANDA's specification for the dissolution testing of the DRCs as that release was higher than allowed ............................ 33

E.   Claims 6 And 7: Substantially Ascending Methylphenidate Plasma Drug Concentration .................................................................................................. 39

    1.   Because Andrx's Proposed ANDA Products Were Designed To Have A Delayed Release Component, The Resulting Plasma Profiles Do Not Substantially Ascend Through 5.5 or 8 Hours As Required By The Claims .................................................................. 39

    2.   Andrx's Proposed ANDA Products Do Not Result In Plasma Profiles That Substantially Ascend Through 5.5 or 8 Hours .................. 46

III.   CONCLUSIONS OF LAW THAT THE CLAIMS AT ISSUE ARE NOT INFRINGED .................................................................................................. 51

A.   Andrx's Proposed ANDA Products Do Not Infringe The Patents In Suit ........... 51

B.   Plaintiffs Failed To Establish That Andrx's Proposed ANDA Products Will Directly Infringe The Asserted Claims ...................................................... 53

C.   The Law of Indirect Infringement ...................................................................... 53

D.   Defendants Are Not Liable For Induced Infringement Of The Asserted Claims ................................................................................................................ 54

E.   Defendants Are Not Liable For Contributory Infringement Of The Asserted Claims ................................................................................................ 57

F.   Plaintiffs Failed To Provide Any Evidence That Andrx, Upon Approval Of Its ANDA, Is "Likely To Market" A Product Which Infringes The Asserted Claims ................................................................................................ 59

G.   Even If This Court Were To Determine The Claims Were Infringed And Not Invalid, Plaintiffs' Still Are Not Entitled To Relief ...................................... 60

IV.   FINDINGS OF FACT THAT THE CLAIMS AT ISSUE ARE OBVIOUS .................. 63

A.   The Scope And Content Of The Prior Art .......................................................... 63

    1.   The State Of The Commercial Art .......................................................... 63

**TABLE OF CONTENTS**
(continued)

Page

|   |   |   |   |
|---|---|---|---|
| | 2. | The Prior Art Taught That MPH Was Associated With Acute Tolerance | 66 |
| | 3. | Once The Problem Of Acute Tolerance Was Recognized The Solution Of An Ascending Release Rate Would Have Been Obvious | 72 |
| | 4. | Acute Tolerance Associated With Nitrates For Angina Treatment Was Counteracted By Providing An Ascending Release Rate And Plasma Profile | 74 |
| | 5. | Dosage Forms Suitable For Providing An Ascending Release Rate Were Known In The Prior Art | 77 |
| | 6. | Alza's Expert Dr. Patrick Agreed That The Prior Art Suggested That MPH Was Associated With Acute Tolerance | 79 |
| | 7. | Dr. Patrick's Criticism of the Formulation Art Is Not Credible | 82 |
| | 8. | The Fact That A Pulsatile Formulation Is An Obvious Solution To Overcoming Acute Tolerance Does Not Teach Away From A Dosage Form That Provides An Ascending Release Rate And/Or A Substantially Ascending Plasma Profile | 89 |
| B. | | The Person Of Ordinary Skill In The Art Would Not Be Alza's Typical M.D | 94 |
| C. | | There Are Small Differences Between The Claimed Invention And The Prior Art Because, For Decades, ADHD Was Treated For More Than Eight Hours A Day With Methylphenidate Administrations | 100 |
| D. | | The Alleged Secondary Considerations Do Not Establish That The Claimed Invention Was Non-Obvious | 104 |
| | 1. | Long-Felt Need And The Failure Of Others – The Claimed Invention Did Not Provide A New Answer As Others Had Already Taught The Claimed Features | 104 |
| | 2. | Skepticism – The Evidence Establishes That An Answer Was Expected | 107 |
| | 3. | Unexpected Results – In View Of The Prior Art And The Fact That The First Clinical Trial Were Conducted In Children, It Is Clear That It Was Expected That The Treatment Would Be Safe And Effective | 108 |
| | 4. | Copying – Plaintiffs Only Made Conclusory Allegations Of Copying | 110 |

# TABLE OF CONTENTS
(continued)

Page

5. Commercial Success – Plaintiffs Failed To Establish That Any Commercial Success Was Due To The Patent Features And Was Not Due To Other Factors........................................................................ 111

    a. Dr. Rozek's four bases for his opinion do not support the alleged non-obviousness of the claims ........................................ 112

    b. A presumption of commercial success does not apply here ...... 113

    c. Dr. Rozek's analysis of methylphenidate based ADHD products was inconsistent and flawed........................................ 115

    d. Dr. Rozek simply assumes that Andrx copied Concerta®......... 117

    e. There is more than a single difference among ADHD products................................................................................... 118

    f. Dr. Rozek's opinion regarding commercial success should not be credited.......................................................................... 121

V. CONCLUSIONS OF LAW THAT THE CLAIMS AT ISSUE ARE OBVIOUS......... 122

VI. FINDINGS OF FACT THAT THE CLAIMS AT ISSUE ARE INVALID BECAUSE THEY CANNOT BE ENABLED .............................................. 128

  A. The Claims Of The Patents In Suit Are Not Enabled For Their Full Scope As A Matter Of Law ........................................................................... 128

    1. During The Claim Construction Proceedings, Alza Successfully Argued That The Claims At Issue Covered Any Dosage Form, But Alza Now Seeks To Limit The Claims To "Oral Extended Release Dosage Forms" Because Otherwise It Is Clear The Claims Are Not Enabled For Their Full Scope ............................................................... 130

    2. Alza's Position That The Claims Are Limited To Oral Extended Release Dosage Forms Should Be Rejected.......................................... 135

      a. Under Alza's newly minted construction, "dosage form" in claim 1 of the '373 patent would be narrower than the term "pharmaceutical composition" in claim 1 of the '129, which is directly contrary to Alza's many previous arguments to this Court and which makes no sense .................. 135

      b. Alza's Newly Minted Construction Is Based On The Assumption That "An Appropriate Dissolution Test" Requires The Use Of A USP Apparatus – Which Is Wrong And Also Is Directly Contrary To Its Previous Arguments To This Court.......................................................................... 137

      c. Alza's newly minted construction is contrary to the claim language used in the prosecution histories................................ 139

**TABLE OF CONTENTS**
(continued)

Page

d.    Alza's argument that the claims require an oral dosage form because they require an immediate release coating should be rejected because such a coating is not required......... 141

VII.   CONCLUSIONS OF LAW THAT THE CLAIMS AT ISSUE ARE INVALID BECAUSE THEY ARE ANALOGOUS TO SINGLE MEANS CLAIMS .................. 142

A.   The Claims At Issue Are Overly Broad And Not Enabled For Their Full Scope.......................................................................................................... 142

B.   Alza's Legal Arguments Misconstrue The Law And Are Inapplicable ............ 153

VIII.  FINDINGS OF FACT THAT THE EVIDENCE ALSO CONCLUSIVELY ESTABLISHES THE CLAIMS AT ISSUE ARE NOT ENABLED FOR THEIR FULL SCOPE ............................................................................................................ 157

A.   The Common Specification Of The Patents In Suit Only Provides An Enabling Disclosure For An Osmotic Tablet.................................................... 157

B.   The Prosecution History Of The Patents In Suit Indicate The Non-Enablement Of The Claims.................................................................................. 160

1.   The Provisional Applications 60/030,514 and 60/031,741 .................... 160

2.   Application No. 08/910,593 .................................................................... 162

C.   Alza's Own Experience In The Mid-1990s Demonstrates Non-Enablement For The Full Scope.......................................................................................... 164

D.   There Is No Dispute That The Claims Are Not Enabled For Their Full Scope If The "Dosage Form" And "Pharmaceutically Acceptable Composition" Limitations Are Not Reconstrued To Be Limited To Oral Extended Release Dosage Forms...................................................................... 167

E.   Dr. Needham's View Of Non-Enablement Is Not Rebutted Even If The Claims Are Reconstrued As Alza Suggests So As To Be Limited To Oral Extended Release Dosage Forms...................................................................... 171

F.   Nobody Disputes That, Even If The Claims Were Further Limited To Just Tablets And Capsules – As Dr. Davies Would Have It, Some Tablets Are Still Not Enabled............................................................................................... 173

G.   Even If The Term "Dosage Form" Were Limited Further To Tablets And Capsules, As Dr. Davies Asserts, The Claims Are Still Not Enabled For Their Full Scope; The Only Factual Dispute regarding Enablement Arises if the Claims Are Limited, as only Dr. Davies has Argued, to Tablets and Capsules ........................................................................................................... 173

1.   Breadth of the claims ............................................................................ 181

2.   The amount of direction or guidance presented..................................... 183

**TABLE OF CONTENTS**
(continued)

Page

|     | 3. | The relative skill in the art ................................................................ 184 |

|     | 4. | Nature of the invention .................................................................... 189 |

|     | 5. | The state of the prior art.................................................................. 192 |

|     | 6. | The predictability or unpredictability in the art ...................................... 193 |

|     | 7. | The presence or absence of working examples....................................... 194 |

|     | 8. | The quantity of experimentation necessary ........................................... 195 |

IX.    CONCLUSIONS OF LAW THAT THE CLAIMS ARE NOT ENABLED FOR THEIR FULL SCOPE BECAUSE UNDUE EXPERIMENTATION IS REQUIRED ...................................................................................................... 196

X.    IN THE ALTERNATIVE, BASED ON ALZA'S ARGUMENTS IN ITS FINAL PRETRIAL SUBMISSION AND THE TESTIMONY AT TRIAL, THE CLAIMS ARE ALSO INVALID FOR INADEQUATE WRITTEN DESCRIPTION................. 212

    A.    Findings Of Fact .............................................................................................. 212

    B.    Conclusions Of Law ........................................................................................ 214

XI.    FINDINGS OF FACT THAT THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ANDRX'S COUNTERCLAIMS THAT THE CLAIMS OF THE '129 PATENT ARE NOT INFRINGED AND ARE INVALID.................... 218

    A.    Procedural Background: Alza Tried To Withdraw The '129 Patent From The Case To Avoid An Unfavorable Decision On That Patent......................... 218

        1.    Andrx's Potential Need For A Court Decision On The '129 Patent To Trigger Impax's 180-Day Exclusivity On The '129 Patent ............. 221

        2.    Because Alza Has Included Claims in Its Pending Patent Applications That Are Nearly Identical to Claim 1 of the '129 Patent, Alza's Promise of a Covenant Not to Sue on the '129 Patent Does Not Eliminate the Threat to Andrx That It Will Be Sued for Infringement of Claims That Are Nearly Identical to Claim 1 of the '129 Patent ..................................................................... 228

XII.    CONCLUSIONS OF LAW THAT THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ANDRX'S COUNTERCLAIMS............................................. 231

XIII.    FINDINGS OF FACT THAT CLAIM 1 OF THE '129 PATENT IS ANTICIPATED............................................................................................................ 234

XIV.    CONCLUSIONS OF LAW THAT CLAIM 1 OF THE '129 PATENT IS ANTICIPATED............................................................................................................ 240

# TABLE OF AUTHORITIES

Page

*AK Steel Corp. v. Sollac & Ugine,*
    344 F.3d 1234 (Fed. Cir. 2003) ............................................................................... 198-199

*Amgen, Inc. v. Chugai Pharmaceutical Co.,*
    927 F.2d 1200 (Fed. Cir. 1991) .............................................................................. 143, 198

*Apotex, Inc. v. Food & Drug Admin.,*
    449 F.3d 1249 (D.C. Cir. 2006)………………………………………………………..228

*Automotive Tech. Int'l., Inc. v. BMW North America, Inc.,*
    501 F.3d 1274 (Fed. Cir. 2007) ...................................................................... 198-202, 204

*Bayer AG v. Biovail Corp.,*
    279 F.3d 1340 (Fed. Cir. 2002) ........................................................................................ 62

*C.R. Bard, In. v. Adv. Cardiovascular Sys., Inc.,*
    911 F.2d 670 (Fed. Cir. 1990) .......................................................................................... 53

*Caraco Pharmaceutical Laboratories, Ltd. No. 2007-1404*
    2008 U.S. App LEXIS 6838 (Fed. Cir. Apr. 1, 2008) ...................................219, 231-232

*Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.,*
    418 F. Supp. 2d 1021 (S.D. Ind. 2006)............................................................................ 56

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.,*
    145 F.3d 1303 (Fed. Cir. 1998) ..................................................................................... 148

*Daiichi Sankyo Co., Ltd. V. Apotex, Inc.,*
    501 F.3d 1254 (Fed. Cir. 2007) .............................................................................. 124-125

*Data Line Corp. v. Micro Techs., Inc.,*
    813 F.2d 1196 (Fed. Cir. 1987) .............................................................................. 147-148

*DSU Medical Corp. v. JMS Co., Ltd.,*
    471 F.3d 1293 (Fed. Cir. 2006) .................................................................................. 53-57

*Enzo Biochem, Inc. v. Gen-Probe Inc.,*
    323 F.3d 956 (Fed. Cir. 2002) ...............................................................................214-217

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,*
    279 F.3d 1022, (Fed. Cir. 2002). ................................................................................... 240

*Ex Parte Kung,*
    17 U.S.P.Q.2d 1545 (B.P.A.I. 1989) .................................................................... 150, 154

# TABLE OF AUTHORITIES

Page

*Ex Parte Maizel,*
   27 U.S.P.Q.2d 1662 (B.P.A.I. 1993). ............................... …………………………..150, 153

*Fiers v. Reve,*
   984 F.2d 1164 (Fed. Cir. 1993) ............................................................. 150, 153, 157, 214

*Genentech, Inc. v. Novo Nordisk A/S,*
   108 F.3d 1361 (Fed. Cir. 1997) ..................................................................... 198, 201, 204

*General Electric Co. v. Wabash Appliance Corp.,*
   304 U.S. 364 (1938) ............................................................................................ 145, 151

*Glaxo v. Novopharm,*
   110 F.3d 1562 (Fed. Cir. 1997) ................................................................................ 59-60

*Glaxo Wellcome, Inc. v. Eon Labs Mfg. Inc.,*
   2002 WL 1874830 (S.D.N.Y. Aug. 13, 2002) ............................................... 150, 207-208

*Graham v. John Deere Co.,*
   383 U.S. 1 (1966) ....................................................................................................... …122

*Halliburton Oil Well Cementing Co. v. Walker,*
   329 U.S. 1 (1946) ........................................................................................ 145-146, 155

*In re Bigio,*
   381 F.3d 1320 (Fed. Cir. 2004) ................................................................................... 123

*In re Cortright,*
   165 F.3d 1353 (Fed. Cir. 1999) ...................................................................... 142-143, 197

*In re Curtis,*
   354 F.3d 1347 (Fed. Cir. 2004) ..................................................................... 209-210, 214

*In re Donaldson,*
   16 F.3d 1189 (Fed. Cir. 1994) (*en banc*) .................................................146-147, 155-156

*In re Fuetterer,*
   319 F.2d 259 (C.C.P.A. 1963) ...................................................................... 149, 154, 157

*In re GPAC Inc.,*
   57 F.3d 1573 (Fed. Cir. 1995) ............................................................................... 123-124

# TABLE OF AUTHORITIES

Page

*In re Hyatt,*
708 F.2d 712 (Fed. Cir. 1983) .................................................................. 149, 151-152, 206

*In re Smyth*
480 F.2d 1376 (C.C.P.A. 1973) ...................................................................... 209-210, 214

*In re Speas*
2008 WL 100900 (Fed. Cir. Apr. 9, 2008) ........................................................... 199, 205

*In re Swinehart,*
439 F.2d 210 (C.C.P.A. 1971) ..................................................................................... 208

*In re Vaeck,*
947 F.2d 488 (Fed. Cir. 1991) ..................................................................................... 198

*In re Wands,*
858 F.2d 731 (Fed. Cir. 1988) ..................................................................................... 199

*J&M Corp. v. Harley-Davidson, Inc.,*
269 F.3d 1360 (Fed. Cir. 2001) ................................................................................... 147

*Johnston v. IVAC Corp.,*
885 F.2d 1574 (Fed. Cir. 1989) ....................................................................... 147-148, 156

*Joy Technologies, Inc. v. Flakt, Inc.,*
6 F.3d 770 (Fed. Cir. 1993) ........................................................................................... 62

*KSR Int'l., Co. v. Teleflex Inc.,*
127 S. Ct 1727 (2007) ........................................................................... 122-124, 126-127

*Liebel-Flarsheim Co. v. Medrad, Inc.,*
481 F.3d 1371 (Fed. Cir. 2007) ............................................... 153, 198-200, 204-205, 211

*Maryland Casualty Co., v. Pacific Coal & Oil Co.,*
312 U.S. 270 (1941) .................................................................................................... 233

*Mas-Hamilton Group v. LaGard, Inc.,*
156 F.3d 1206 (Fed. Cir. 1998) .................................................................................. 148

*MedImmune, Inc. v. Genentech, Inc.*
127 S. Ct. 764 (2007) .................................................................................................. 233

*Merck & Co., Inc. v. Biocraft Labs., Inc.*
874 F.2d 804 (Fed. Cir. 1989) .................................................................................... 128

# TABLE OF AUTHORITIES

Page

*Merck & Co., Inc. v. Apotex, Inc.,*
488 F. Supp.2d 418 (D. Del. 2007) .......................................................................231-232

*Monsanto Co. v. Syngenta Seeds, Inc.,*
503 F.3d 1352 (Fed. Cir. 2007) ...................................................................... 199-200, 205

*National Recovery Tech. v. Magnetic Separation Sys.,*
166 F.3d 1190 (Fed. Cir. 1990) ................................................................................. 197

*O'Reilly v. Morse,*
56 U.S. 62 (1953) ...........................................................143-145, 149, 151-154, 157, 206

*Ortho-MacNeil v. Laki Laboriatories,*
482 F. Supp.2d 478 (D. N.J. 2007) ............................................................................ 59-60

*Pfizer, Inc. v. Apotex, Inc.,*
480 F. 3d 1348 (Fed. Cir. 2007) ........................................................... 122, 124, 126-128

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.*
525 F. Supp.2d 680 (D. Del.2007)……………………………. …………………234

*Pharmaceutical Resources, Inc. v. Roxane Labs, Inc.,*
253 Fed.Appx. 26 (Fed. Cir. 2007) …........................................................... 199, 206, 207

*Schering Corp. v. Geneva Pharms., Inc.,*
339 F3d. 1373 (Fed. Cir. 2003) .................................................................................. 241

*Sitrick v. Dreamworks,*
516 F.3d 993 (Fed. Cir. 2008) ............................................................................ 199, 205

*SmithKline Beecham Corp. v. Apotex Corp,.*
403 F.3d 1331 (Fed. Cir. 2005) .......................................................................... 61, 241

*SmithKline Beecham Corp. v. Apotex Corp.,*
247 F. Supp. 2d 1011 (N.D. Ill. 2003)............................................................................ 51

*The Regents of the University of California v. Eli Lilly & Co.,*
119 F.3d 1559 (Fed. Cir. 1997) ...........................................................................214-216

*TorPharm, Inc. v. Thompson,*
260 F. Supp.2d 69 (D.D.C. 2003) ............................................................................... 225

## TABLE OF AUTHORITIES

Page

*U.S. v. Bristol-Myers Co.,*
  No. 822-70, 1982 WL 1816 (D.D.C. 1982)............................................................... 132

*University of Rochester v. G.D. Searle & Company,*
  358 F.3d 916 (Fed. Cir. 2004) ..............................................................................216-217

*Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.,*
  412 F.3d 1319 (Fed. Cir. 2005) ............................................................................ 234, 240

*Valmont Indust., Inc. v. Reinke Mfg. Co.,*
  983 F.2d 1039 (Fed. Cir. 1993) .............................................................................. 146-147

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.,*
  721 F.2d 1540 (Fed. Cir. 1983) .................................................................................. 143

*Warner-Lambert Co. v. Apotex Corp.,*
  316 F.3d 1348 (Fed. Cir. 2003) ................................................................................ 53-54

*Water Technologies Corp. v. Calco, Ltd.,*
  850 F.2d 660 (Fed. Cir. 1988) ...................................................................................... 54

### Statutes

35 U.S.C. § 102 (b)..............................................................................................70

35 U.S.C. § 103 (a)..............................................................................................122

35 U.S.C. § 112.........................................................................................passim

35 U.S.C. § 271(a)) ................................................................................................. 62

35 U.S.C. § 271(b)) ..........................................................................................53-54, 62

35 U.S.C. § 271(c))...........................................................................................53,62

35 U.S.C. § 271(e)(2) ............................................................................................ 57, 62

35 U.S.C. § 271(e)(4).............................................................................................. 61

35 U.S.C. § 71(e)(4)(A) .......................................................................................... 61

## I.    INTRODUCTION

### A.    CLAIMS AT ISSUE

501.    During the course of this litigation, Alza dropped many of its allegations of

infringement. Alza has moved the Court to dismiss the '129 patent in its entirety and are now

asserting only three claims from the '373 patent: claims 1, 6 and 7.

502.    As claims 6 and 7 depend from claim 1, if claim 1 is not infringed then claims 6

and 7 cannot be infringed.

503.    For ease of reference, the three claims at issue read:

1.    A method for treating ADD or ADHD comprising administering a dosage
form comprising methylphenidate that provides a release of methylphenidate at an
ascending release rate over an extended period of time.

6.    The method of claim 1 wherein said administration results in a
substantially ascending methylphenidate plasma drug concentration over a time
period of about 5.5 hours following said administration.

7.    The method of claim 1 wherein said administration results in a
substantially ascending methylphenidate plasma drug concentration over a time
period of about 8 hours following said administration.

(DTX 1, cols. 23-24).[1]

### B.    THE COURT'S CLAIM CONSTRUCTION

504.    The Court adopted all of Alza's proposed claim constructions.

505.    The Court construed the following terms:

---

[1]    Plaintiffs have requested that the '129 patent be dismissed from suit. This Court has not yet ruled upon this motion, but Plaintiffs have not had any expert opine that the '129 patent is infringed. Thus, Defendants are entitled to a judgment as a matter of law that Andrx's proposed ANDA products do not infringe claim 1 of the '129 patent.

1.     The phrases **"pharmaceutically acceptable composition"** and **"dosage form,"** as used in the claims of the '129 patent and the '373 patent, mean "a pharmaceutical composition that includes a dose of methylphenidate;"

2.     The phrase **"an ascending release rate over an extended period of time,"** as used in the claims of the '373 patent, means "a release of methylphenidate from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding periodic interval starting at t=0 and continuing through at least the midpoint of the $T_{90}$ and for at least three hours. The release rate is as determined by an appropriate in-vitro dissolution test. The ascending release rate does not include release of drug from any immediate-release drug coating that may be applied to the dosage form;"

3.     The term 'substantially' in the phrase **"substantially ascending methylphenidate plasma drug concentration,"** as used in the claims of the '129 patent and the '373 patent, means "approximately. Thus, a substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises over approximately [X] hours, but may include a slight dip;"

4.     The term 'about' in the phrase **"over a time period of about [X] hours following said administration,"** as used in the claims of the '129 patent and the '373 patent, means "approximately. Thus, a substantially ascending profile is one in which the plasma concentration of methylphenidate generally rises over approximately [X] hours, but may include a slight dip."

(D.I. 130) (emphasis in original).

506.     Incorporating the Court's claim construction, claim 1 of the '373 patent reads

(emphasis added):

A method for treating ADD or ADHD comprising administering a pharmaceutical composition that includes a dose of methylphenidate . . . that provides a release of methylphenidate . . . from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding period interval *starting at t=0 and continuing through at least the midpoint of the T90 and for at least three hours*. The release rate is as determined by an appropriate in-vitro dissolution test. *The ascending release rate does not include release of drug from any immediate release-drug coating that may be applied to the dosage form.*[2]

---

[2]     Duplicative text in the claim that would have occurred based upon Alza's proffered construction that this Court used has been omitted. For example, the first part of claim 1 would have read "a pharmaceutical composition that includes a dose of methylphenidate comprising methylphenidate." The second appearance of "comprising" and "methylphenidate" and the second appearance of "a release of methylphenidate" was merely ellipsed.

507.    Incorporating the Court's claim construction, claim 6 would add the following

language to that of claim 1 just set forth:

> wherein said administration results in an approximately ascending
> methylphenidate plasma drug concentration over a time period of approximately 4
> hours following said administration. A substantially ascending profile is one in
> which the plasma concentration of methylphenidate generally rises over
> approximately 5.5 hours, but may include a slight dip.

508.    Incorporating the Court's claim construction, claim 6 would add the following

language to that of claim 1 set forth above:

> wherein said administration results in an approximately ascending
> methylphenidate plasma drug concentration over a time period of approximately 4
> hours following said administration. A substantially ascending profile is one in
> which the plasma concentration of methylphenidate generally rises over
> approximately 8 hours, but may include a slight dip.

## II.    FINDINGS OF FACT THAT THE CLAIMS AT ISSUE ARE NOT INFRINGED

509.    In order to determine whether Andrx's proposed ANDA products infringe the

'373 patent, two properties must be evaluated: (i) the release rate of Andrx's proposed ANDA

products in an appropriate *in vitro* dissolution test (claims 1, 6 and 7) and (ii) the plasma profile

provided by Andrx's proposed ANDA products (claims 6 and 7). If the first property is held not

to infringe then this Court does not need to examine the second. Although Andrx's proposed

ANDA products also do not infringe these claims for other reasons, the ANDA products' release

rates alone are dispositive of the infringement question.

### A.    ANDRX'S PROPOSED ANDA PRODUCTS ARE VERY DIFFERENT FROM WHAT IS DISCLOSED AND CLAIMED IN THE PATENTS IN SUIT

510.    Andrx's proposed products are tablets. Those tablets have two separate portions

of MPH. (PX 729). The first, largest and innermost portion of the MPH is in the tablet core.

That core is surrounded by a delayed release coating which is designed to prevent release until a

-3-

certain pH in the gastrointestinal tract is reached. On top of that delayed release or "enteric" coating, another, smaller portion of MPH is provided. That smaller portion of MPH is then coated with a color coating that is designed to dissolve as soon as it is placed in any aqueous medium, such as the acidic contents of the stomach. (*Id.*; 12/11/07 Trial Tr. at 546:5-548:12 [Banakar]; *Id.* at 629:5-630:24 [Cheng]).

511.    Andrx's delayed release coating consists of two particularly relevant ingredients. Those ingredients are Eudragit 100 and Zein. Eudragit 100 dissolves at a pH above 7 while Zein does not dissolve until the pH becomes very basic, *i.e.*, above 11.5 pH. There are 3 parts Zein to every part of Eudragit in Andrx's proposed formulation. (PX 729; 12/11/07 Trial Tr. at 629:5-630:24 [Cheng]).

REDACTED

-4-

REDACTED

514.    Dr. Banakar explained that the osmotic systems described in the patent have an immediate release portion over a delayed release portion. The delayed release portion in an osmotic dosage form, however, has a pore or hole through the coating. (*See, e.g.,* DTX 1 at 55 in Figure 1 and 54 in Figure 2). Thus, contrary to what one would expect with Andrx's proposed product, *i.e.,* a period of no release, osmotic devices would be expected to have some release of MPH from the non-IR portion within the first time interval. (12/11/07 Trial Tr. at 544:5-548:12). Such an expectation is confirmed from the data reported in the Examples of the patents in suit. (DTX 1; DTX 3).

**B.    THE EVIDENCE ESTABLISHES THAT ANDRX'S PROPOSED ANDA PRODUCTS DO NOT HAVE AN ASCENDING RELEASE RATE**

515.    The ascending release rate claim term, as construed by the Court, has numerous requirements. (*See,* ¶ 506, *supra.*) The parties dispute whether or not Andrx's proposed ANDA products satisfy several of the requirements. The primary disagreement concerns the basic question: do the claims require that the dosage form release at least some MPH from the non-IR portion during the first periodic interval?

516.    As provided in the Court's claim construction order, the ascending release rate does not include any immediate release (IR) component present in the dosage form (*i.e.,* "The ascending release rate does not include release of drug from any immediate release-drug coating that may be applied to the dosage form"). Thus only the non-IR component is to be used in calculating the occurrence of an ascending release rate.

517.    Andrx understands the Court's claim construction to require that, starting at t=0,

-5-

*i.e.*, the time of administration of the dosage form, there be an increased amount of methylphenidate released from the dosage form relative to the immediately preceding periodic interval. The '373 patent refers to the period of one hour before dosing as the period "preceding" administration of the dosage form. (DTX 1 Col. 10, lines 12-15). Furthermore, the '373 patent obviously recognizes that there will be zero release during this period before administration. (*Id.*; 12/11/07 Trial Tr. at 538:5-541:5 [Banakar]). Therefore, to have an ascending release rate beginning at t=0 requires that there be some release during the period between t=0 and t=1. This ensures, as the '373 patent requires, an ascending release rate from t=0.

518.    Alza, however, interprets the Court's claim construction to mean that the first periodic interval is ignored except for the purposes of comparing any release of the non-IR component in the first interval to the release of the non-IR component in the second interval to see if there is an ascending release rate starting with the second periodic interval. In effect, Alza's argument requires an ascending release rate be calculated from t=1, not t=0.

   1.   **Andrx's position that release of MPH from the non-IR Component is required during the first periodic interval, *i.e.*, t=0 to t=1, is consistent with the Court's claim construction and the '373 patent's definition of what constitutes an ascending release profile**

519.    Andrx's interpretation – that some non-IR methylphenidate be released in the initial periodic interval – is correct. This requirement is apparent from the Court's claim construction:

> a release of methylphenidate from the dosage form wherein the amount released in a periodic interval is increased over the amount released during the immediately preceding periodic interval *starting at t=0* and continuing through at least the midpoint of the $T_{90}$ and for at least three hours. The release rate is as determined by an appropriate in-vitro dissolution test. *The ascending release rate does not include release of drug from any immediate-release drug coating* that may be applied to the dosage form.

-6-

(D.I. 130 at ¶ 2)(emphasis added).

520.    From this language alone, it is clear the ascending release rate is defined as

beginning at t=0 (or, more precisely, in the first periodic interval which starts at t=0).

Additionally, this language corresponds with the definitions in the patent:

> In accord with the above-recited definitions, *an "ascending release rate over an*
> *extended time period" refers to ascending release rates of drug obtained from*
> *the time of administration of the dosage form through*, and preferably beyond,
> *the mid-point of the relevant $T_{90}$ for the dosage form*. To illustrate, consider a
> situation where a dosage form has a $T_{90}$ of about 8 hours. In this situation, "an
> ascending release rate over an extended time period" is achieved when the release
> rate at *each hour through t=4 hours* is greater than the release rate in the
> immediately-preceding hour.

(DTX 1 at col. 10, lines 41-50) (emphasis added); (12/11/07 Trial Tr. at 533:24-538:1

[Banakar]).  The release rates at each hour through t=4 hours includes t=1, not just t=2 as Alza

would require.  (12/11/07 Trial Tr. at 538:18-541:23 [Banakar])

521.    The question that arises – and which confused Ms. Gray – is to what does one

compare the release rate from the first periodic interval?  The patent, however, conclusively

answers that question:

> It will be appreciated that *the first periodic release rate measured*, e.g., the
> periodic release rate at t=1 hour (*unless equal to 0*), *will always be greater than*
> *the release rate during the preceding period, e.g., the hour before the dosage*
> *form was administered, and, thus, the first periodic release rate always*
> *constitutes an occurrence of an ascending release rate.*

(DTX 1 at col. 10, lines 10-16) (emphasis added); (12/11/07 Trial Tr. at 538:18-541:23

[Banakar]).[3] Thus, the patent specifically states that the first periodic interval is compared to the hour before the start of the test. The value for this hour prior to the start of the test is assigned the value of zero. (12/12/07 Trial Tr. at 624:4-626:12 [Banakar]). The patent also states that the first periodic release rate always constitutes an ascending release rate unless the release at t=1 hour is 0. In which case, the only logical conclusion is that if the release at t=1 is 0, there is not an ascending release rate during the first periodic interval.

522.    Andrx's interpretation that the claims require some non-IR methylphenidate to be released during the first interval is confirmed by *all* of the examples and tables provided in the patent. (DTX 1, 13: 61 - 23:4; 12/11/07 Trial Tr. at 541:24 - 544:4 [Banakar]). For example, table 3 and the surrounding text reads:

---

[3]    The patent provides that "administration" refers to the start of the dissolution test, not an *in vivo* administration: "As used herein, a drug release rate obtained at a specified time 'following administration' refers to the in vitro drug release rate obtained at the specified time following implementation of an appropriate dissolution test." (DTX 1 at col. 9, lines 25-29; *see also* 12/10/07 Trial Tr. 284:21-285:24 [Gray]).

The periodic release rates from the drug overcoat and the osmotic dosage form were determined at 30 minutes, 1 hour and then hourly for the next nine hours. **The 4 mg of methylphenidate contained within the drug overcoat was released within the first 30 minutes and the periodic release rate shown at t=1 hour of 0.41 mg constitutes drug released from the bi-layer osmotic dosage form during the second 30-minute interval.** No residual quantity of drug remained in the dosage form. The hourly results are shown in Table 3 along with an indication of the occurrences of an ascending release rate.

## TABLE 3

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 0.41 | **YES** |
| 2 | 1.05 | YES |
| 3 | 1.49 | YES |
| 4 | 1.57 | YES |
| 5 | 1.71 | YES |
| 6 | 1.75 | YES |
| 7 | 2.09 | YES |
| 8 | 2.14 | YES |
| 9 | 1.32 | NO |
| 10 | 0.48 | NO |

As seen from Table 3, exclusive of the immediate-release drug overcoat, more than 90% of the drug was released by t=9 hours and **ascending release rates occurred through t=8 hours**, an extended period of time well beyond the mid-point of the $T_{90}$.

(DTX 1, col. 16, l. 57 – col. 17, l. 20) (emphasis added).  It is particularly noteworthy that the

first paragraph provides "the periodic release rate shown at t=1 hour of 0.41 mg constitutes drug

release from the bi-layer osmotic dosage form during the second 30-minute interval" and that the

table provides an answer, "YES", for the occurrence of an ascending release rate in the first hour

(unlike Ms. Gray's tables).

523.    During the *Markman* proceedings, Alza confirmed that examples in the patent

illustrate the methodology for determining whether an ascending release rate has occurred:

> Accordingly, an "ascending release rate" occurs when the quantity of drug
> released during one specified time period exceeds the amount of drug released
> during the immediately preceding time period. The periods of time are termed
> "intervals" and have an equal duration. Moreover, as the specification makes
> clear, the first interval is the one *following* the administration of the dosage form
> (*i.e.*, the period from T=0, when the dosage form is ingested, to the end of the
> specified interval of time). *See, e.g.*, Exh. A, col. 9, lines 25-29 and 56-65. ***This
> methodology for determining whether an "ascending release rate" has occurred
> is also illustrated in several of the Examples in the specification.*** *See id.*,
> Example 1 at ***Table 1***; Example 2 at ***Table 2***.

(D.I. 87 (Alza Opening Markman Brief) at p. 23) (footnotes omitted, bolded-italics added).

524.    The two tables explicitly cited by Plaintiffs indicate an ascending release rate for

the first time period is required. The tables, and the surrounding text, read:

The periodic release rates from the dosage form were determined hourly for ten hours using in vitro dissolution testing. A residual quantity of drug of 0.72 mg remained in the dosage form. The results are shown in Table 1 along with an indication of whether an ascending release rate occurred.

**TABLE 1**

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|:---:|:---:|:---:|
| 1 | 0.22 | **YES** |
| 2 | 1.45 | YES |
| 3 | 1.72 | YES |
| 4 | 1.84 | YES |
| 5 | 2.05 | YES |
| 6 | 2.21 | YES |
| 7 | 2.13 | NO |
| 8 | 1.26 | NO |
| 9 | 0.39 | NO |
| 10 | 0.09 | NO |

As seen from Table 1, drug was released from the dosage forms at an ascending rate for an extended time period, i.e., more than 90% of the drug was released by t=8 hours and **ascending release rates occurred through t=6 hours**, an extended period of time well beyond the mid-point of the $T_{90}$.

(DTX 1, col. 14, ll. 37 – 63) (emphasis added).

\*     \*     \*

-11-

The periodic release rates from the dosage form were determined hourly for twelve hours. No residual quantity of drug remained in the dosage form. The results are shown in Table 2 along with an indication of the occurrences of an ascending release rate.

**TABLE 2**

| Time (hours) | Quantity of drug released (mg) | Ascending Release Rate Occurrence |
|---|---|---|
| 1 | 0.13 | **YES** |
| 2 | 1.16 | YES |
| 3 | 1.53 | YES |
| 4 | 1.61 | YES |
| 5 | 1.75 | YES |
| 6 | 1.79 | YES |
| 7 | 2.13 | YES |
| 8 | 2.18 | YES |
| 9 | 1.07 | NO |
| 10 | 0.43 | NO |
| 11 | 0.17 | NO |
| 12 | 0.13 | NO |

As seen from Table 2, more than 90% of the drug was released by t hours and **ascending release rates occurred through t=8 hours**, an extended time period well beyond the mid-point of the $T_{90}$.

(DTX 1, col. 15, ll. 39 – 64) (emphasis added).

525.    Alza's Dr. Patrick also agrees with Andrx's view of the Court's claim construction. Dr. Patrick testified – after having just reviewed the Court's claim construction – that figure 8 in U.S. Patent 5,256,850 to Wong *et al.* (DTX 634) did not have ascending release rate *until after t=2 hours because there was no release in the first two hour interval*:

> Q.    And this is PX 410 [Dr. Patrick's expert report], Paragraph 114. If it makes it easier to look at the screen, whichever. But do you see there that the ascending release rate over an extended period of time means, and then there's quite a bit of language? Do you see that?

A.    Yes.

Q.    Is it your understanding that that's the claim construction for that term that was ultimately adopted by this Court?

A.    Yes, I do.

Q.    Okay. And when we look at Figure 8 [of the '850 Wong Patent, DTX 634], in your opinion, having read that claim construction, how long is it ascending or when does it start ascending?

A.    *I would say it started ascending at two hours* and ascended to four, at least through four hours when you take the error bars into consideration.

Q.    Okay. And to your understanding, is that an ascending release rate from time equals zero?

A.    From time two hours to --

Q.    Right.

A.    -- six hours?

*Q.    Right. My question is that:  An ascending release rate from time equals zero, not from time equals two.*

*A.    I -- I would not characterize that as that.*

*Q.    And that -- why?  Because there's no release in the first two hours?*

*A.    Yes.*

(12/13/07 Trial Tr. at 1076:15 - 1077:24 [Patrick]) (emphasis added).

### 2.    In assessing whether Andrx's proposed products have an ascending release rate, Alza's Expert Ms. Gray ignored the first periodic interval and started at t=2 hours.

526.    Alza's Ms. Gray opined, however, that there is no requirement that there be some non-IR release during the first interval. Ms. Gray believes that it is not possible to determine whether there is an ascending release rate during the first periodic interval because she does not think that there is anything to compare the first release rate to. Thus, Ms. Gray effectively reads the claim construction as requiring that the amount released in a periodic interval is increased over the amount released during the immediately preceding periodic interval *starting with the second interval*. (12/10/07 Trial Tr. at 282:3-302:14, 12/11/07 Trial Tr. at 308:15-313:16,

335:23-337:24 [Gray]).

527.    In the dissolution test selected by Alza for testing Andrx's proposed ANDA products, the first periodic measurement (taken at t=1 hour), should have been compared, after excluding the methylphenidate from the IR component, to the release rate prior to the commencement of the dissolution test (which by definition is zero). However, Ms. Gray simply omitted this requirement from her analysis which can be seen from all of the tables in her exhibits. (*See* PX 241 – 246 and PX 248.) For example, as she did in all of her tables, in the table regarding the average data for Andrx's proposed ANDA product at the 54 mg dosage strength, Ms. Gray simply put "---" for the occurrence of an ascending release rate during the first periodic interval:

| Periodic Interval (h) | ARL Average (mcg/mL) | ARL Average % Recovery | (Andrx ANDA Average % Recovery) | ARL Average Quantity of Drug Released (mg) (Excluding 13.5 mg IR) | Ascending Release Rate Occurrence (Relative to Preceeding Interval) | ARL Average Quantity of Drug Released (mg) (Excluding 14.85 mg IR) | Ascending Release Rate Occurrence (Relative to Preceeding Interval) |
|---|---|---|---|---|---|---|---|
| 0 - 1 | 26.52 | 24.56 | 24.00 | 0.00 | --- | 0 | --- |
| 1 - 2 | 32.28 | 29.89 | 30.00 | 2.64 | YES | 1.29 | YES |
| 2 - 3 | 43.21 | 40.01 | | 5.46 | YES | 5.46 | YES |
| 3 - 4 | 56.27 | 52.10 | 53.00 | 6.53 | YES | 6.53 | YES |
| 4 - 5 | 68.50 | 63.43 | | 6.12 | | 6.12 | |
| 5 - 6 | 79.18 | 73.31 | | 5.34 | | 5.34 | |
| 6 - 7 | 90.47 | 83.77 | | 5.64 | | 5.64 | |
| 7 - 8 | 98.93 | 91.60 | 90.00 | 4.23 | | 4.23 | |
| 8 - 9 | 104.95 | 97.18 | | 3.01 | | 3.01 | |
| 9 - 10 | 108.90 | 100.83 | 100.00 | 1.97 | | 1.97 | |

T90 (ARL) Occurs Between 7-8 Hours; Midpoint of T90 Occurs Between 3.5 and 4 Hours

(Excerpt from PX 242).

528.    Ms. Gray's opinion regarding when the ascending release rate is required to begin should not be credited by this Court. When confronted with the '373 patent's instruction to compare the first measured interval with the release rate prior to administration, Ms. Gray replied

-14-

"***But that's the patent, that's not the claim construction, which was what I followed.***"

(12/11/07 Trial Tr. at 312:16-23 [Gray].) Ms. Gray further replied that she found language in the

patent "confusing" and had admitted that she had "struggled with this for a while." (12/10/07

Trial Tr. at 285:20-24 [Gray].)

529.    When asked if she thought the patent's instruction was inconsistent with the claim

construction, Ms. Gray replied "I, you know, don't know that I could make that judgment, but it

doesn't feel that way to me that -- ***it doesn't feel like it's consistent***." (12/11/07 Trial Tr. at

312:24-313:6 [Gray]).

530.    Moreover, the very same examples that Alza had relied upon during claim

construction as illustrating the methodology for determining an ascending release rate, were

simply dismissed by Ms. Gray as being examples. (12/11/07 Trial Tr. at 313:7-16 [Gray]).

531.    Ms. Gray was only able to analyze the data from the dissolution tests as she had in

her past; she could not understand that the patent could claim something on the basis of an

arbitrary benchmark:

> THE COURT: ....Can you in kind of a point-by-point manner tell us what it is
> that gives you concern about the predicates of the hypothetical that was posed to
> you?
>
> THE WITNESS: The hypothetical, we're always looking at before, T0, and that
> like I said, it's not part of the way I ever look at in vitro dissolution tests. So they
> were almost all built on that assumption.
>
> THE COURT: So that's the chief complaint?
>
> THE WITNESS: Correct.
>
> THE COURT: Is it -- is T0 -- was the point made to you that in the context of the
> claim construction and the assertions of infringement in this case, that T0 is
> essentially arbitrary as a benchmark?
>
> THE WITNESS: I -- all I can do is tell you what I read. And when I read T0,
> that is arbitrary to me that that is the beginning of the test.

-15-

(12/11/07 Trial Tr. at 390:24-391:20 [Gray].)

532.    Ms. Gray's inability to apply the test specifically indicated in the patent, *i.e.*, that

the first release rate measured should be compared to zero (the release rate before the start of the

dissolution test) forecloses her opinion from being credited:

> Q.    Right. And we looked, the immediately preceding hour can be the hour
> before administration. You are just having difficulty with that?
>
> A.    Yeah. I'm sorry. I will not be able to agree that for an in vitro dissolution
> standpoint, which is the test that we use to determine ascension. ***This is a concept
> that I just – I just don't understand – can't comprehend***.

(12/10/07 Trial Tr. at 291:10-19 [Gray])

### 3.    Because Ms. Gray used a dissolution test which does not differentiate between release from the IR and non-IR portions she had to resort to her 25% "Label Claim" assumption in an effort to show infringement

533.    The fact that Andrx's proposed ANDA products do not have a non-IR release

within the first hour is to be expected as Andrx designed its product to use a delayed release

coating. As the name implies, the delayed release coating delays the release of what it coats.

Andrx's proposed ANDA products are designed to have an initial release of MPH from the IR

coating, and then after a delay, the products begin to release MPH from the non-IR portion of the

methylphenidate.

534.    The parties agree that the claim construction requires that any IR methylphenidate

component be excluded from the analysis of the ascending release rate. The parties also agree

that Andrx's proposed ANDA products have an IR component. Therefore, Andrx's proposed

ANDA products have an IR methylphenidate component that needs to be excluded when

determining if there is an ascending release rate. However, because Alza's selected dissolution

-16-

test does not allow one to differentiate between methylphenidate released from the IR portion and the non-IR portion, an assumption about how much MPH is present in the IR coating in each tablet must be made.

535.    The assumption that Ms. Gray chose to make was based on the specification of Andrx's proposed ANDA products – its "label claim." Ms. Gray's label claim assumption is based on her reading of the ANDA specification which provides that there is, theoretically, 25% of the total amount of methylphenidate, based on the label (dosage strength), in the IR component. Under this analysis, for a 54 mg tablet, 54 mg represents the amount of MPH in the tablet; it does not represent the mass of the entire tablet. If 25% of the 54 mg is in the IR, that means that 13.5 mg (18 x 0.25) of the MPH is theoretically contained in the IR portion. (12/10/07 Trial Tr. at 253:10-254:13).

536.    Ms. Gray adopted the view that exactly 25% of the label claim will be contained in the IR component and, when evaluating her data, she assumed that 25% of the label is attributable to the IR component. (*Id.*) In other words, Ms. Gray took an average value and applied it indiscriminately as if it would be true of each tablet.

537.    Ms. Gray's assumption ignores, however, that Andrx's specification does not limit the amount of methylphenidate in the IR component to a single value, nor is it applied to any individual tablet. Instead the ANDA requires that the average IR component – from an assay of twenty tablets – will fall within the range of 22.5 – 27.5%. (12/12/07 Trial Tr. at 635:20 - 638:15 [Cheng]; DTX 231 and 1187). Thus, instead of requiring that there be exactly 25% of the methylphenidate in the IR component, the ANDA requires that the *average* value from *twenty* tablets fall within a range that is +/- 10% of the 25% value: 22.5-27.5%. For example, an

-17-

individual tablet could even contain IR MPH in an amount of the 22.5-27.5% range.

538.    Even though Ms. Gray acknowledged that there was a permissible weight range percent in the IR component, she still chose to attribute exactly 25% of the methylphenidate to the IR component in her individual tablet analysis.  (12/10/07 Trial Tr. at 276:8-277:12 [Gray]). When asked if it was reasonable to believe that each tablet would have 25% in the IR component, she responded "*I don't know.*  But I -- a range is usually -- the way a range is usually selected is that what you -- the predominance of the data occurs in the mid-point of the range." (12/11/07 Trial Tr. at 345:10-15 [Gray]).

### 4.    If release from the non-IR portion is required during the first periodic interval, then Andrx's proposed ANDA products do not infringe because there is no such release

539.    Ms. Gray testified that using her 25% label claim assumption, 29 out of the 36 tablets tested did not have a release greater than 25% in the first hour (and, thus, were assumed to have no non-IR release in the first hour).  Thus, those tablets clearly do not satisfy the requirement of some non-IR component release in the first hour.

540.    Ms. Gray also testified that 6 of the remaining 7 tablets tested would not satisfy the ascending release rate requirement using an assumption of 27.5% of the label claim in the IR component, as 6 of those 7 tablets had a release between 25% – 27.5% (and, thus, no non-IR release in the first hour).  (PX 241 (54 mg – Cycle 1, Andrx A, C); PX 243 (36 mg – Cycle 1, Andrx D, E); PX 245 (27 mg – Cycle 2, Andrx C)).

541.    While the 7th tablet exceeded 27.5% release in the first hour, the ANDA specifies that the average IR component of twenty tablets is to be within the 22.5% to 27.5% range.  Thus, when the 7th tablet is averaged with just the five other tablets of the same dosage strength tested

by Ms. Gray, the average IR component falls within the 22.5% to 27.5% range required by the

ANDA for twenty tablets. (12/12/07 Trial Tr. at 635:20-638:15[Cheng]; DTX 231; DTX 1187).

Such a result is expected when averaging is performed; in such an instance one higher result

being balanced by lower readings is to be expected. Indeed, looking at the 36 tablets evaluated

by Ms. Gray, in addition to this one higher result for the IR component, Ms. Gray also reported

that four tablets had a reading below the lower boundary of 22.5% at one hour (but, again, when

averaged with the other results, the IR component falls within the range specified in the ANDA).

542.    Ms. Gray's own data demonstrates that the mean data of the testing that she relied

upon would preclude a finding of infringement.

| Periodic Interval (h) | ARL Average (mcg/mL) | ARL Average % Recovery | (Andrx ANDA Average % Recovery) | ARL Average Quantity of Drug Released (mg) (Excluding 13.5 mg IR) | Ascending Release Rate Occurrence (Relative to Preceeding Interval) | ARL Average Quantity of Drug Released (mg) (Excluding 14.85 mg IR) | Ascending Release Rate Occurrence (Relative to Preceeding Interval) |
|---|---|---|---|---|---|---|---|
| 0 - 1 | 26.52 | 24.56 | 24.00 | 0.00 | --- | 0 | --- |
| 1 - 2 | 32.28 | 29.89 | 30.00 | 2.64 | YES | 1.29 | YES |
| 2 - 3 | 43.21 | 40.01 | | 5.46 | YES | 5.46 | YES |
| 3 - 4 | 56.27 | 52.10 | 53.00 | 6.53 | YES | 6.53 | YES |
| 4 - 5 | 68.50 | 63.43 | | 6.12 | | 6.12 | |
| 5 - 6 | 79.18 | 73.31 | | 5.34 | | 5.34 | |
| 6 - 7 | 90.47 | 83.77 | | 5.64 | | 5.64 | |
| 7 - 8 | 98.93 | 91.60 | 90.00 | 4.23 | | 4.23 | |
| 8 - 9 | 104.95 | 97.16 | | 3.01 | | 3.01 | |
| 9 - 10 | 108.90 | 100.83 | 100.00 | 1.97 | | 1.97 | |

T90 (ARL) Occurs Between 7-8 Hours; Midpoint of T90 Occurs Between 3.5 and 4 Hours

(Excerpt from PX 242).

543.    Only 7 out of 36 had release during the first hour under Ms. Gray's 25% label

claim assumption. Of those 7, 6 of them have less than 27.5% release in the first hour, so they

fall below the upper bound of the range even on an individual tablet.

544.    Regarding the one tablet with greater than 27.5% release in the first hour, Ms.

-19-

Gray agreed that there can be outliers in data and that *she "d[id]n't think one is enough" to rely upon in forming a conclusion*. (12/11/07 Trial Tr. at 366:1-14 [Gray]; *see also* 12/11/07 Trial Tr. at 317:5-319:23, 363:6-365:24 [Gray]; 12/11/07 Trial Tr. at 554:11-16 [Banakar]). Thus, under Defendants' interpretation, Andrx's proposed ANDA products do not infringe the claims of the '373 patent.

### 5. Ms. Gray's 25% label claim assumption cannot support a finding of infringement

545.    Additionally, the data upon which Ms. Gray relies makes it clear that an evaluation based on a 25% label claim assumption is not supported. As noted previously, of the 36 tablets tested for Alza, 29 of the tablets did not have a release of at least 25% of methylphenidate by one hour. (*See* PX 241, 243 and 245). Similarly, the average data for each of the three dosage strengths tested and relied upon by Ms. Gray released less than 25% by the end of the first hour (at one hour the average released from the 54 mg dosage strength was 24.56%, the 36 mg dosage strength released 24.06%, and the 27 mg dosage strength released 23.44% – *see* PX 242, 244 and 246).

546.    Even though Ms. Gray testified that 29 out of the 36 individual measurements fell below 25% methylphenidate released in one hour and on average that the tablets had less than a 25% release of methylphenidate in one hour, Ms. Gray still decided to use the assumption that each tablet contained exactly 25% of the methylphenidate in the IR component.

547.    Thus, Ms. Gray repeatedly testified that the IR component in Andrx's proposed ANDA products will be "fully released in an hour." (12/10/07 Trial Tr. at 238:6 - 12 [Gray]; *see also* 239:18 - 240:3, 12/14/07 Trial Tr. at 1326:3 - 7 [Gray].) In direct contrast to that testimony, however, her label claim assumption leads to the result that 29 of the 36 tablets are viewed as

-20-

having the IR component continue releasing into the second hour. This *clearly* shows that there is a problem with either Ms. Gray's assumption or with the data. Yet, Ms. Gray ignored this inconsistency and merely continued to subtract her remaining assumed IR component from the methylphenidate released in the second hour to show infringement for a small portion of the tablets. (12/11/07 Trial Tr. at 353:19 – 354:5 [Gray].)

548.   There is no data to suggest that there is exactly 25% of the total methylphenidate dose in the IR component in Andrx's proposed ANDA products. Nevertheless, Ms. Gray still decided to use that assumption despite it leading to a result that she acknowledged would not occur, *i.e.*, that in 80% of the tablets tested, the IR component would be assumed to still be releasing in the second hour.

549.   Additionally, it is clear that there is an inherent problem in assigning the middle value of a permissible range to each individual tablet. The product is not designed for each tablet to have exactly 25% of the total methylphenidate in the IR component; the product is designed so that the average IR component in an assay of twenty tablets will fall within the range of 22.5 – 27.5%. (12/12/07 Trial Tr. at 635:20 - 638:15 [Cheng]; DTX 1187; DTX 231 at ANDRX00823). Ms. Gray, however, did not realize that the ANDA does not require each tablet to fall within the specified range, but rather that the ANDA only requires the average value from 20 tablets fall within the range. (*See* 12/12/07 Trial Tr. at 637:16-638:15 [Cheng]; DTX 231 and 1187.) The ANDA, however, makes clear that the IR portion of any one individual tablet can actually fall outside the 22.5 to 27.5% range as provided in the specification. This is likely what occurred with regard to this one "outlier" tablet.

**6.     Under the correct assumption, Andrx's proposed products, including the one tablet with more than 27.5% release in the first hour, demonstrably do not infringe**

550.    Alza's selected dissolution test requires an assumption be made regarding how to attribute release to the IR and non-IR components, *i.e.*, Ms. Gray's 25% label claim assumption. As Dr. Banakar testified, however, there is a much more sound and reasonable assumption that can be made instead of Alza's 25% label claim assumption.

551.    Based on the data collected by Alza and the way Andrx designed the product, the assumption that should be made is that the amount of methylphenidate released in the first hour of the dissolution test is all attributable to the IR portion of methylphenidate (the "first hour IR assumption"). (12/11/07 Trial Tr. at 561:2 - 568:20 [Banakar]). That is, no methylphenidate is released from the non-IR portion of the dosage form in the first hour.

552.    The first hour IR assumption is supported by the data relied on by Ms. Gray. In the individual tablet measurements, 29 out of 36 had a methylphenidate release of less than 25% at one hour and almost all – 35 out of 36 – had less than 27.5%. Only 1 out of 36 tablets had a release of greater than 27.5% in the first hour. Notably when the average release rates for the three dosage strengths were evaluated, *all* were less than 25% which means that even the one tablet that had a reading greater than 27.5% released at one hour still fell within the ANDA's permissible range for methylphenidate in the IR component.

**a.     The evidence supports the first hour assumption**

**(i)     Andrx's Delayed Release Core testing**

553.    Similar to the testing disclosed in the patent for the dosage forms in examples 1, 2, and 4 (which did not include an IR component), Andrx also did testing on intermediates of

-22-

their proposed products that only consisted of the delayed release cores ("DRC"). This testing, which was conducted under the same conditions as Ms. Gray's selected dissolution test for the proposed ANDA products, shows that the DRCs of the ANDA batches do not begin to release methylphenidate until after t=1 hour, *i.e.*, there is no release during the first periodic interval. (12/11/07 Trial Tr. at 558:21-560:16 [Banakar]; DTX 1141-1143.)

554.    For example, the DRCs for the 54 mg dosage strength (DTX 1143), releases 0% at one hour and, on average, 1% by 90 minutes. The average release jumps to 6% at two hours and 35% by four hours. This data shows that there is no release from the DRCs for at least an hour; and once the release begins it is significant. This supports Dr. Banakar's conclusion that the small release that may be seen in the IR overcoat study (discussed *infra*), is not from the DRC because if the release in the IR overcoat study was from the non-IR portion of Andrx's product the percentage released would be expected to increase significantly once release begins. As can be seen with relation to the IRC study (described further below), there is no significant increase in release rate until after the 75-90 minute mark. (12/11/07 Trial Tr. at 564:15- 565:3 [Banakar]).

555.    Thus, the DRC dissolution tests support the assumption that only the methylphenidate from the IR component will be released within the first hour.

### (ii)    Andrx's final product testing

556.    In addition to the testing that Andrx did on the DRCs, Andrx conducted dissolution testing on the finished product. This testing also supports the first hour assumption because it included sampling times at t=30 minutes and t=1 hour (as in Example 3 in the patent) which demonstrate that there is no release from the non-IR portion in the first hour. (*Cf.* DTX 1

-23-

Col. 16, l. 56 – col. 17, l. 21 with PX 18 at ANDRX00201-205 and PX 25 at ANDRX04042-43, 04056-59, 04068-71.))

557.    Ms. Gray does rely on some of the Andrx finished product testing, as Andrx was unable to produce to Alza any validated samples of its 18 mg product. However, Ms. Gray reported her analysis in PX 248 and only provided the release at t=2, 4, 8 and 10 hours – she omitted the data from the sampling points at t=30 minutes and 1 hour.[4]

558.    When Ms. Gray was asked on cross-examination to interpret the t=30 minutes and 1 hour data points that she had omitted, Ms. Gray admitted that the data looked like there was a gap in the release rates – *i.e.*, something was released pretty quickly in the first 30 minutes and almost nothing released in the second thirty minutes (t=1 hour). (12/11/07 Trial Tr. at 339:3-8 [Gray].)

559.    Similarly, Andrx's testing on the other dosage strengths also shows that only the IR component is released in the first hour, further supporting the first hour assumption. (*See e.g.*, PX 18 at ANDRX00201-205; PX 25 at ANDRX04042-43, 04056-59, 04068-71.)

### (iii)    Alza's "IR overcoat study"

560.    Testing done for Alza, but that Ms. Gray did not rely upon, also supports the assumption that the methylphenidate released in the first hour is attributable only to the methylphenidate contained in the IR component. The "IR overcoat study" (as the test was named by Alza's testing laboratory) used the same parameters as the dissolution test relied upon by Ms. Gray except that measurements were taken every fifteen minutes instead of hourly. The

---

[4]    Any assertion that Ms. Gray should have ignored the omitted time points because the analysis requires a comparison of time intervals of equal duration would necessarily mean that she could not rely on the data she did, as those intervals were not of equal duration (which had intervals of 2 or 4 hours).

"IR overcoat study" studied the release of methylphenidate from the IR component.

561.    As provided in the table below, the average of the data shows that about 23% of the methylphenidate is released within 15 minutes, it takes another 75 minutes (90 minutes total) for the release to get above 24% and then by the next reading, at 105 minutes total, about 26% is released, followed by about 28% release at 120 minutes:

Average

| Time (min) | % Rec. | Cum mg Rcvd | Quan. Rel. (mg) (Excl. 13.5 mg IR) | Ascend. Rel. Rate? | Quan. Rel. (mg) (Excl. 14.85 mg IR) | Ascend. Rel. Rate? |
|---|---|---|---|---|---|---|
| 15 | 22.58 | 12.20 | 0 | No | 0 | No |
| 30 | 23.13 | 12.49 | 0 | No | 0 | No |
| 45 | 23.33 | 12.60 | 0 | No | 0 | No |
| 60 | 23.47 | 12.67 | 0 | No | 0 | No |
| 75 | 23.67 | 12.78 | 0 | No | 0 | No |
| 90 | 24.28 | 13.11 | 0 | No | 0 | No |
| 105 | 25.94 | 14.01 | 0.51 | Yes | 0 | No |
| 120 | 28.01 | 15.13 | 1.12 | Yes | 0.28 | Yes |
| 135 | 30.24 | 16.33 | 1.20 | Yes | 1.20 | Yes |
| 150 | 32.62 | 17.61 | 1.28 | Yes | 1.28 | Yes |

(See DTX 397A, summarized in DTX 1175.)

562.    Dr. Banakar testified that this data shows that the non-IR component does not begin to release until 75 – 90 minutes after the start of the dissolution test.  (12/11/07 Trial Tr. at 562:21 - 563:14 [Banakar]).  The relatively large release in the first 15 – 30 minutes (which is also above the lower bound of the range for the IR component) indicates release of the IR component.  This large release is then followed by a period of essentially no release until about t=90 minutes.[5]  Furthermore, Dr. Banakar testified that the slight increase from 30-90 minutes cannot be the delayed release component 'leaking' as the increase would have been greater.

(12/11/07 Trial Tr. at 564:15 - 565:3 [Banakar].)  Dr. Banakar's testimony on the "IR overcoat study" was left unrebutted by Alza when Ms. Gray was called to testify again later during trial.

563.    Ms. Gray, when cross examined about this study and whether it showed that the non-IR release began around 90 minutes, testified that she "can't know," but she then stated that one can assume that there is non-IR component release when the reading gets above 25% which she agreed was past 90 minutes.  (12/11/07 Trial Tr. at 348:23 – 352:13 [Gray].)

564.    It should be noted that Ms. Gray's testimony that she "can't know" if this test established that the non-IR component does not release until after the first hour implies that she could not testify credibly that it showed that the non-IR release begins before the end of the first hour.  Therefore, since a non-IR component release is required to occur in the first periodic interval, Alza has failed to meet its burden of proof that such a requirement is met.

565.    The IR overcoat study, which was performed by Alza on Andrx's finished product samples, also detracts from Dr. Davies' assertion that the processing which occurs in making the intermediate DRCs into finished products (e.g., applying the immediate release coating) would, somehow, result in the DRCs to begin releasing before t=1 hour.[6]

566.    Additionally, the patent itself supports the first hour assumption.  In Examples 1 and 2 in the patent, the applicants disclosed an osmotic dosage form without an IR component; a dissolution test with hourly sampling points (and thus a first periodic interval from t=0-1 hours)

---

[5]     The slight increase which occurs from 30 – 75 minutes is within the measurement error of dissolution testing.  (12/11/07 Trial Tr. at 563:15 - 564:7 [Banakar]).

[6]     Additionally, no explanation has been put forward as to why Alza even conducted the "IR overcoat study" a month *after* it had concluded the testing relied upon by Ms. Gray.  In other words, Alza did not explain why it expended the effort on the "IR overcoat study" if the data upon which Ms. Gray relies, conducted a month earlier, was sufficient by itself to establish infringement.

was used to establish the presence of an ascending release rate.

567.    In Example 3, the applicants disclosed an osmotic dosage form which included 4 mg of methylphenidate in an IR overcoat. To evaluate its release profile, the applicants used the same dissolution test but included an additional sampling point at t=30 minutes. The thirty minute sampling point showed that the IR overcoat had released its 4 mg.

568.    In Example 6 (the only other example with an IR component), the applicants only used hourly sampling points. They "noted that the entire 4 mg immediate release dose was essentially released within the first hour" (DTX 1, col. 20, ll. 62-63).

569.    Thus, the patent teaches that one way to determine when the non-IR component begins to release (at least for the pH-independent osmotic dosage form as was tested in the patent) was to conduct dissolution testing with additional sampling points. As such, Alza's "IR overcoat study" of Andrx's proposed ANDA products follows the teachings of the patent by using sampling points of increased frequency. Moreover – and unlike what the tests showed in the patent – Alza's "IR overcoat study" shows that for Andrx's products, the non-IR component does not begin releasing until at least t=90 minutes in the dissolution test selected by Ms. Gray (and, therefore, that Andrx's proposed ANDA products do not have an ascending release rate at t=1 hour).

570.    Under this correct assumption, any amount released from an Andrx product, including amounts above 27.5% (1 tablet) or below 22.5% (4 tablets) evidences release only from the IR portion. Thus, even the single tablet that released more than 27.5% tablet during the first hour would not infringe. (12/11/07 Trial Tr. at 565:15-567:1, 568:16-569:10 [Banakar]).

-27-

571.    As mentioned previously Andrx's proposed ANDA products were designed to have an initial pulse when taken orally followed by a period of no release until the delayed release portion passes into the intestine. Once the delayed release portion begins to release, however, it is a more protracted release. (12/12/07 Trial Tr. at 629:10-630:24).

572.    This release in the body, however, was also mimicked in Ms. Gray's dissolution test. In that test, the IR portion releases the MPH within the first hour. The characteristics and composition of the delayed release coating, however, continues to delay release in a 7.5 pH dissolution test until roughly 1.5 hours have elapsed. (DTX 1140-43). All the data in this case indicates that Andrx's proposed products do not have an IR release during the first time interval.

573.    Alza's dissolution test does not permit quantitative valuation of the release from the IR and the non-IR portions of Andrx's products. Thus, Ms. Gray was required to assume the value of the IR portion of each Andrx tablet. Ms. Gray chose to assume that each tablet had exactly 25% of the total MPH value of the product in the IR coating. Ms. Gray's assumption might make some sense if it was applied to an aggregate amount of tablets, as opposed to just a single tablet. Indeed, it was so applied here with regard to the mean data analyses of Ms. Gray. (PX 242, 244, 246). Under such an analysis, however, none of Andrx's proposed dosage strengths showed release from the non-IR portion within the first hour. *Id.*

574.    With regard to an assumption for a particular tablet, however, Ms. Gray's assumption is faulty for all the reasons demonstrated above. Only 1 tablet had a release of more than 27.5% during the first hour. Such a tablet, however, would be viewed as an outlier and cannot carry Alza's burden on infringement.

575.    Moreover, the proper assumption is that there would only be release from the IR

-28-

portion of Andrx's products as demonstrated above. In any event, it is clear that Alza has not

proved that any Andrx product would meet the limitation of having "as ascending release rate

over an extended period of time."

### C.    THE EVIDENCE RELIED UPON BY ALZA CANNOT BE USED TO ESTABLISH THAT ANDRX'S PROPOSED ANDA PRODUCTS HAVE AN ASCENDING RELEASE RATE

576.    Additionally, Alza cannot meet its burden of establishing infringement because

there are dissolution tests which would have avoided the necessity of making any assumptions as

to the amount of MPH in the IR portion of the dosage form tested. The claims require that the

release rate is determined by an appropriate *in vitro* dissolution test. Here such a test could have

been, but was not, used. As such, Alza cannot carry their burden on infringement.

577.    At trial, Ms. Gray testified it was her opinion that the claim construction requires

that the "single best [dissolution] test" be used in testing for infringement.. (12/11/07 Trial Tr. at

345:16-21 [Gray].)

578.    Ms. Gray also admitted on cross examination that such a test would tell how the

IR and non-IR components were releasing:

Q.    But an appropriate test would tell you how both mechanisms of release,
the IR and the ER were releasing; correct?

A.    Yes. This in vitro testing is telling you that, because we know the IR
should actually release in an hour. We take an hour time point, and then we
proceed from there.

(12/11/07 Trial Tr. at 325:17-23 [Gray].)

579.    Ms. Gray admitted that her selected dissolution test did not allow her to separate

the release of the IR and non-IR components. (12/11/07 Trial Tr. at 346:2-4 [Gray].)

580.    Additionally, Ms. Gray's belief that the Court's claim construction requires the
use of the single best dissolution test means that she cannot just dismiss alternatives to her
selected dissolution test without determining whether or not they are superior to the test she used.
By Ms. Gray's own admissions, a test that elucidates both mechanisms of release – such as a two
stage dissolution test[7] – would be the test required by the claim construction. (*See also* 12/11/07
Trial Tr. at 567:2-568:15).

581.    Since Ms. Gray's test does not elucidate both mechanisms of release, her test was
insufficient to show infringement. Thus, Alza did not meet its burden of showing that Andrx's
proposed ANDA products have an ascending release rate because an appropriate dissolution test
was not used.

**D.    AT TRIAL, PLAINTIFFS SURFACED A NEW AND UNSUPPORTED THEORY THAT
WAS NOT RAISED DURING DISCOVERY OR IN THE PRETRIAL PAPERS**

**1.    Dr. Davies' Testimony Was, At Best, Unclear And Does Not Support
That Andrx Is Likely To Market A Product With A Non-IR Release
In The First Hour**

582.    Andrx devoted a substantial portion of its opening pretrial papers to establishing
that the Court's claim construction requires some release of MPH from the non-IR component
during the initial periodic interval and that Andrx's proposed ANDA products do not have such a
release. Yet Alza did not contend anywhere in its pretrial papers that Andrx's products do have
such a release. The first time Plaintiffs made this an assertion was during its rebuttal case at trial
through their expert Dr. Davies. Dr. Davies' direct testimony on this topic comprised only about

REDACTED

-30-

a page in the transcript. (*See* 12/14/07 Trial Tr. at 1252:3-1253:3 [Davies]).

583.    Dr. Davies' testimony was conclusory and consisted of citing to four pages from the entirety of Andrx's production as showing that there were some DRCs tested which had a non-IR release in the first hour. Furthermore, Dr. Davies only provided vague and conclusory testimony on cross-examination that the DRCs to which he referred were within the ANDA's specification.

584.    The DRCs referred to by Andrx's witnesses and on which Ms. Gray was cross-examined were DRCs that had the same formulations as those used in Andrx's ANDA submission batches. (*See* DTX 1140-43). On the other hand and as will be demonstrated below, the DRCs commented on by Dr. Davies on the other hand consisted of pages from laboratory notebooks that would be excluded from being sold because the dissolution data was outside of the ANDA specification. Therefore, the DRCs cited to by Dr. Davies would have been rejected by Andrx and could not have been marketed.

    a.    **Dr. Davies provided no testimony regarding what products Andrx would be likely to market upon approval of its ANDA**

585.    The relevant inquiry in an ANDA litigation is what will likely be marketed upon approval of the ANDA. Dr. Davies did not provide any testimony as to what Andrx is likely to market.

    Q.    Do you believe that the batches on the pages you cited have the same percentage of ingredients as the actual submission batches?

    A.    I believe as what I said in my -- when we started on this cross, that they fall within the same ranges as is shown in the ANDA batch. I clearly describe that to you.

REDACTED

Q.    And you focused on the ranges; right?

A.    I focused on the whole body of information in coming to that view.

Q.    And you focused on the ranges; right?

A.    I focused on the whole body of information in coming to that view.

Q.    You focused on the possibilities of what might be sold; right?

A.    No.

*Q.    You understand that with regard to ANDA batches, you focus on what's
likely to be sold, you understand that?*

*A.    That's quite different. You asked me a different question.*

*Q.    I know.*

*A.    I was actually looking at -- sorry, I was actually looking at the table
which showed the formulary for the ANDA batches, it showed the ranges of
that formulae for that ANDA batches. And then if you look at the batches, the
information that we looked at, those indeed fall into those ranges. They're
essentially the same.*

Q.    And you figured out well, if I set this range here and that range here,
possibly some of these could fall within; is that what you did?

A.    No. I looked at the formulation that was used to produce those dissolution
measurements which showed that there was release in the zero to one-and-a-half
hour time point, and I looked at those formulations and those formulations are
essentially the same as used in the ANDA batch.

Q.    If you focus on the ranges; right?

A.    No, if you focus on all the information.

Q.    Okay. *Do you have any evidence other than the ranges that the lots you
referred to are likely to be sold following approval?*

*A.    As I said, I looked at all the information that was available to me to
come to that view*

(12/14/07 Trial Tr. at 1298:19-1300:18 [Davies]) (emphasis added).


586.    Dr. Davies' testimony does not provide any evidence regarding what Andrx is

likely to market. Indeed, Dr. Davies and Alza offered no evidence that Andrx is likely to market

a product that differs from the samples tested by Ms. Gray (for which her testing actually shows

that the products do not infringe the patents in suit). Moreover, despite Dr. Davies' conclusory

assertions to the contrary, the DRCs to which he cited were out of specification and could not be

-32-

marketed by Andrx, let alone be likely to be marketed by Andrx.

     **b.** **The DRCs cited by Dr. Davies do not fall within the ANDA's specification for the dissolution testing of the DRCs as that release was higher than allowed**

   587. The specification in Andrx's ANDA, as filed, provides "in-process controls for ANDA batch[es]." (*See* PX 27 at ANDRX 5060-78 and PX 19 at ANDRX 592-601). For the dissolution testing of the 54 mg dosage strength, the DRCs "acceptance criteria" includes a release of 20-45% methylphenidate at t=4 hours. (PX 19 at ANDRX 594). For the lower dosage strengths (*i.e.*, 18 mg, 27 mg, and 36 mg) the DRCs "acceptance criteria" includes a release of 30-60% of methylphenidate at t=4 hours. (PX 27 at ANDRX 5062 (18 mg), 5064 (27 mg), and 5066 (36 mg)).

   588. As can be seen in each of the pages cited by Dr. Davies, the DRCs upon which he relies have a release at t=4 hours that exceeds the permissible upper bound of 45% release for the 54 mg dosage strength and of 60% release for the lower dosage strengths.

   589. Dr. Davies first cited to the following table and chart graph concerning Andrx's DRC testing for the 54 mg dosage strength:



| Time (hr) | V1 | V2 | V3 | V4 | V5 | V6 | Average | % RSD | Min. | Max. |
|---|---|---|---|---|---|---|---|---|---|---|
| 0.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | #DIV/0! | 0 | 0 |
| 1.5 | 11 | 9 | 12 | 10 | 14 | 10 | 11 | 18.3 | 9 | 14 |
| 2.0 | 19 | 18 | 21 | 19 | 23 | 20 | 20 | 10.0 | 18 | 23 |
| 2.5 | 29 | 27 | 29 | 28 | 32 | 27 | 29 | 6.5 | 27 | 32 |
| 3.0 | 37 | 35 | 37 | 37 | 40 | 36 | 37 | 4.5 | 35 | 40 |
| 6.0 | 76 | 75 | 75 | 77 | 77 | 76 | 76 | 1.2 | 75 | 77 |
| 8.0 | 91 | 91 | 90 | 93 | 91 | 93 | 92 | 1.3 | 90 | 93 |

(Excerpt from PX 197A at ANDRX 63300; *see* (12/14/07 Trial Tr. at 1252:6-17 [Davies])).

590.    Although this page cited by Dr. Davies does not have an actual sampling point at t=4 hours (it's the only page cited by Dr. Davies which does not include that sampling point), it can be interpolated from the graph that about 50% was released at t=4 hours.  This exceeds the permissible upper bound of 45% release for the 54 mg dosage strength, and thus it is outside of the ANDA's acceptance criteria for DRCs.

591.    Furthermore, the first sampling point was taken at 1.5 hours, so this data cannot demonstrate a release at t=1 hour.  All of the release could have occurred between 1 to 1.5 hours.

-34-

592.    Dr. Davies' cited to three other pages from the entirety of the documents

produced in this case (and none of the testing Alza conducted for this litigation):

Q.    Were there any other dissolution rate diagrams that you located from
Andrx's production that shows a release of methylphenidate from the DR-coated
core within the first hour?

A.    Yes, there were.

Q.    And can you identify the pages, sir?

A.    In PX 557 at [ANDRX] 46113 and 46114, also in PX 563 at [ANDRX]
66282.

MR. FOGEL: Thank you. I have no further questions.

(12/14/07 Trial Tr. at 1252:18-1253:5 [Davies]).

593.    The three additional pages cited by Dr. Davies are laboratory notebook pages and

do not appear to be related to the actual submission batches.

594.    The first additional page cited to by Dr. Davies provides data from the dissolution

testing of the DRC for 18 mg dosage strength (13.5 mg core) with two different levels of delayed

release coating, 11 mg of coating and 17 mg of coating (with Dr. Davies relying on the thinner

coating to show release within the first hour):

Methylphenidate HCl DR Tablets, 13.5 mg
Lot# SR1924-43-13.5 11mg Coating, SR1924-43-13.5 17mg Coating
Dissolution in pH7.5 Buffer. USP App.I @ 100 rpm. N=3
Volume corrections applied in the calculations

Amt Dissolved (%)

Lot# SR1924-43-13.5
11mg Coating
pH7.5 Buffer
100 rpm
USP App.I
Vankel

| Time (hr) | V1 | V2 | V3 | Average | % RSD | Min. | Max. |
|---|---|---|---|---|---|---|---|
| 0.0 | 0 | 0 | 0 | 0 | #DIV/0! | 0 | 0 |
| 1.0 | 8 | 8 | 9 | 8 | 6.9 | 8 | 9 |
| 1.5 | 24 | 24 | 24 | 24 | 0.0 | 24 | 24 |
| 2.0 | 40 | 39 | 40 | 40 | 1.5 | 39 | 40 |
| 2.5 | 54 | 55 | 56 | 55 | 1.8 | 54 | 56 |
| 4.0 | 88 | 88 | 89 | 88 | 0.7 | 88 | 89 |
| 8.0 | 101 | 107 | 106 | 105 | 3.1 | 101 | 107 |

Amt Dissolved (%)

Lot# SR1924-43-13.5
17mg Coating
pH7.5 Buffer
100 rpm
USP App.I
Vankel

| Time (hr) | V1 | V2 | V3 | Average | % RSD | Min. | Max. |
|---|---|---|---|---|---|---|---|
| 0.0 | 0 | 0 | 0 | 0 | #DIV/0! | 0 | 0 |
| 1.0 | 0 | 0 | 0 | 0 | #DIV/0! | 0 | 0 |
| 1.5 | 5 | 0 | 3 | 3 | 94.4 | 0 | 5 |
| 2.0 | 16 | 4 | 14 | 11 | 56.7 | 4 | 16 |
| 2.5 | 29 | 13 | 26 | 23 | 37.5 | 13 | 29 |
| 4.0 | 65 | 59 | 64 | 63 | 5.1 | 59 | 65 |
| 8.0 | 100 | 130 | 107 | 112 | 14.0 | 100 | 130 |



(Excerpt from PX 557 at ANDRX 46113.)

595.    This data included a sampling point at t=4 hours. For the thinner, 11 mg coated
DRC, the average released at t=4 hours was 88%. This exceeds the permissible upper bound of
60% release required by the ANDA specifications, and, therefore, this DRC falls outside the
ANDA.

-36-

596.   The next page cited by Dr. Davies provides data from dissolution testing of the

DRC for 27 mg dosage strength (20.25 mg core) with two different levels of delayed release

coating, 17 mg of coating and 22 mg of coating (with Dr. Davies relying on the lighter coating to

show release within the first hour):



(Excerpt from PX 557 at ANDRX 46114.)

597.   For the thinner, 17 mg coated DRC, the average released at t=4 hours was 74%.

-37-

This would exceed the permissible upper bound of a 60% release required by the ANDA specifications, and, therefore, this DRC also falls outside the ANDA.

598.    The last page cited by Dr. Davies concerned the cores for the 18 mg dosage strength:

| | | | | | | | Amount Dissolved (%) | | | | | | | Vessel # | Bath # |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time (hr.) | V1 | V2 | V3 | V4 | V5 | V6 | V7 | V8 | V9 | V10 | V11 | V12 | V1-V6 | 9 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | V7-V12 | 10 |
| 1 | 3 | 2 | 3 | 6 | 0 | 2 | 0 | 0 | 1 | 7 | 7 | 2 | V13-V18 | 11 |
| 2 | 20 | 18 | 21 | 29 | 13 | 19 | 13 | 14 | 18 | 18 | 28 | 17 | V19-V24 | 12 |
| 4 | 66 | 96 | 94 | 101 | 78 | 84 | 88 | 66 | 95 | 84 | 83 | 96 | | |
| Tablet weight (g) | 0.3302 | 0.3306 | 0.3321 | 0.3266 | 0.3342 | 0.3294 | 0.3390 | 0.3359 | 0.3305 | 0.3327 | 0.3272 | 0.3327 | | |

| | | | | | | Amount Dissolved (%) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Time (hr.) | V13 | V14 | V15 | V16 | V17 | V18 | V19 | V20 | V21 | V22 | V23 | V24 | Mean | %RSD | Min | Max |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | NA | 0 | 0 |
| 1 | 1 | 0 | 0 | 1 | 2 | 2 | 2 | 0 | 1 | 1 | 1 | 2 | 2 | 114 | 0 | 7 |
| 2 | 16 | 19 | 14 | 17 | 18 | 20 | 18 | 19 | 11 | 16 | 21 | 16 | 18 | 23.1 | 10 | 29 |
| 4 | 95 | 65 | 72 | 77 | 94 | 81 | 93 | 93 | 59 | 75 | 87 | 80 | 84 | 14.2 | 59 | 101 |
| Tablet weight (g) | 0.3303 | 0.3350 | 0.3339 | 0.3356 | 0.3399 | 0.3314 | 0.3325 | 0.3329 | 0.3386 | 0.3324 | 0.3390 | 0.3309 | 0.3325 | | | |

Specifications:

| Hours | Amount (%) Dissolved |
|---|---|
| 1 | NMT 20% |
| 2 | NMT 30% |
| 4 | 30% - 60% |



Methylphenidate HCl ER Tablets, 18mg (DRC 13.5mg)

(PX 563 at ANDRX 66282).

599.    For these DRCs, the average released at t=4 hours was 84%. This exceeds the permissible upper bound of a 60% release required by the ANDA specifications, and, therefore, this DRC falls outside the ANDA. *It is also interesting to note that on the face of this*

-38-

*document it is specified that 30-60% is to be released at t=4 hours.* Thus, just from this

document alone, it is unclear how or why Dr. Davies would assert that this data is relevant as the

release exceeds what it states is allowable.

600.    It is clear that Dr. Davies' testimony should not be credited because, based on the

release at t=4 hours alone, the DRCs to which he cites are not within the ANDA's specification

and, therefore these DRCs could not be marketed by Andrx (let alone be likely to be marketed).

E.    CLAIMS 6 AND 7: SUBSTANTIALLY ASCENDING METHYLPHENIDATE PLASMA
       DRUG CONCENTRATION

   1.    **Because Andrx's Proposed ANDA Products Were Designed To Have
          A Delayed Release Component, The Resulting Plasma Profiles Do Not
          Substantially Ascend Through 5.5 or 8 Hours As Required By The
          Claims**

601.    Claims 6 and 7 depend from claim 1 and add the requirement that the

administration of the dosage form result in a substantially ascending methylphenidate plasma

drug concentration for about, respectively, 5.5 or 8 hours.

602.    The Court's claim construction provides that this means:

   approximately. Thus, a substantially ascending profile is one in which the plasma
   concentration of methylphenidate generally rises over approximately [X] hours,
   but may include a slight dip.

(D.I. 130 [Claim Construction Order]).

603.    The primary disagreement between the parties is what is meant by "may include a

slight dip." The disagreement arises because the term slight dip is not a term of art in the

pharmaceutical sciences (although the experts *do* agree that "slight dip" is *not* a term of art).

(12/11/07 Trial Tr. at 401:1-6, 484:24-485:20 [Angst] and 12/12/07 Trial Tr. at 752:6-13

[Bolton].)

-39-

604.    Dr. Angst, one of Alza's experts, in his direct testimony, testified:

Q.    Can we put up column 22, lines 1 through 16. And let me ask you first, is the term slight dip a technical term that is used in the field of clinical pharmacology?

A.    No, it is not. A slight dip is a purely descriptive term.

(12/11/07 Trial Tr. at 401:1-6; see also 484:24 - 485:20 [Angst].)

605.    The patent itself also indicates that the term dip is not a term of art; in the only

appearance of the word dip, it is provided inside quotation marks:

As shown in FIG. 4, the plasma drug concentration following each administration of an immediate-release dose rises relatively rapidly and then declines at a generally characteristic rate until the next dose is administered. The plasma drug concentration following administration of the tri-layer osmotic dosage form also exhibits an initial relatively rapid rise due largely to release of drug from the immediate-release drug overcoat. Subsequently, however, the plasma drug concentration does not decline but continues to substantially ascend (save for a slight *"dip"* between t=5.5 hours and t=6.5 hours) through a time period of 9.5 hours.

(DTX 1, col. 21, l. 64 – col. 22, l. 8) (emphasis added).

606.    Thus, the claim construction permits "*a* slight dip" and the patent uses this

"purely descriptive term" only once – it does not provide a definition or even a description of

that term. The patent only provides that the plasma profile depicted in Figure 4 has an initial

rapid rise and subsequently does not decline but continues to substantially ascend for 9.5 hours,

except for the slight dip that occurs between 5.5 and 6.5 hours. Therefore, other than what can

be gleaned from the text of the patent, the meaning of a slight dip must come from Figure 4 – as

noted by Dr. Angst:

Q.    Now, are you relying on any literature, any peer reviewed articles to support your interpretation of what a slight dip is?

A.    I don't think we -- I have been asked this question today, *the question what does a slight dip mean. And my answer to that, or my testimony was it's purely descriptive. And so there is no implicit technical meaning, it's descriptive. So in my opinion, the next logical step is okay, if there is a slight dip indicated or described, you would go to the source data to examine what's meant by that.*

Q.    Okay. But maybe in answer to the question, you're not relying on any peer reviewed articles to support your position on slight dip; isn't that right?

A.    So, I just said, there is no technical meaning to slight dip. This implies that there is no scientific body that would define what a slight dip is.

(12/11/07 Trial Tr. at 484:24-485:20 [Angst].)

607.    The patent provides that "In FIG. 4, plasma drug concentrations obtained from one group of study participants (n=16) while treated with the experimental regimen represented by [(]open diamonds) and while treated with the standard regimen represented by [(]closed circles) are shown in graph form." So, the plasma profile depicted in Figure 4 using open diamonds is the aggregate data from the study and which is described as having a slight dip at 5.5. to 6.5 hours:



FIG. 4

608. One of Andrx's experts, Dr. Sanford Bolton, testified that the only way to comport the patent's teaching that the plasma profile in Figure 4 "does not decline but continues to substantially ascend" with the profile depicted in Figure 4 – which has what appears to be a decline at 5.5 to 6.5 hours – is that the apparent decline is not actually a decline. (12/12/07 Trial Tr. at 753:6-755:16 [Bolton])

609. In other words, while the data depicts a decline, if one cannot attribute scientific significance to the decreasing values, then the decline is only apparent and cannot be referred to as an actual decline. (*See id.*) Thus, the patent can accurately state that the plasma profile in Figure 4 does not decline when the data shows what appears to be a decline (and the patent refers to this apparent decline as a slight dip).

610. Dr. Bolton testified that based on his review of the patent, he came to the understanding that a substantially ascending profile does not decline but could have an apparent decline – *i.e.*, a decline that is not statistically significant. (12/12/07 Trial Tr. at 754:23-755:16, 759:1-3 [Bolton].)

611. Dr. Bolton also testified that with just what is disclosed in the patent, he was unable to test his hypothesis. Dr. Bolton was only able to test it after he was provided Alza's confidential data underlying the study depicted in figure 4. (12/12/07 Trial Tr. at 757:17-758:4 [Bolton].)

612. Dr. Bolton analyzed the underlying data and found that the decrease in the average methylphenidate plasma drug concentration from 5.5 to 6.5 hours was not statistically significant. (12/12/07 Trial Tr. at 758:14-760:11 [Bolton].) Therefore, because the difference was not statistically significant, one cannot say that the apparently lower value obtained at 6.5

-42-

hours was actually less than the apparently higher value obtained at 5.5 hours – thus the plasma profile depicted in figure 4 cannot be said to have a decline (but could be described as having "a slight dip"). (12/12/07 Trial Tr. at 761:19 - 762:4 [Bolton].)

613.    Dr. Bolton also reviewed the biostudies that Andrx submitted to the FDA for its proposed ANDA products. Andrx conducted two biostudies, both of which used the 54 mg dosage strength and were conducted on healthy adult volunteers wherein one had fed subjects and the other had fasted subjects (the fasted study was a replicate study, so each subject was tested twice with the ANDA product). From these studies, there are three sets of data:

"A" data, from the fed study which had 23 subjects; and

"A1" and "A2" data, from the fasting replicates which had 27 subjects.

(See DTX 1200-1203.)

614.    The average data from the three studies of Andrx's proposed ANDA products can be graphed as:







(*See* PX 293 at ANDRX 1045 and PX 294 at ANDRX 2281.)

615.    Based on his statistical analysis of the data, Dr. Bolton concluded that the profile

from each of the studies had one or more statistically significant decreases. (12/12/07 Trial Tr. at

752:3-755:16 [Bolton]). Moreover, each had a statistically significant decrease from 2 to 3

hours. (12/12/07 Trial Tr. at 765:6-13 [Bolton]). Furthermore, this decline is expected as

Andrx's proposed ANDA products have a delayed release enteric coating. This delayed release

coating prevents release of the MPH in the core until the dosage form passes through the

stomach and into the more basic regions of the intestines. Thus, the non-IR release from the core

would not be expected to begin until about 1.5 hours after exposure to the basic environment of

the intestines. (*See* 12/11/07 Trial Tr. at 321:19-23; 367:6-15 [Gray]; 585:14-587:3 [Banakar]).

616.    Therefore, unlike the plasma profile depicted in Figure 4, none of these profiles

substantially ascend for either 5.5 or 8 hours.  For at least this reason, Andrx's proposed ANDA products do not infringe claim 6 or claim 7 of the '373 patent.

> **2.    Andrx's Proposed ANDA Products Do Not Result In Plasma Profiles That Substantially Ascend Through 5.5 or 8 Hours**

617.    Because Alza could not rely on the patent to argue that Andrx's proposed ANDA products have a substantially ascending methylphenidate plasma drug concentration, they had to resort to unsupportable assertions.

618.    But generally, Dr. Angst opined that the Court's claim construction meant that a plasma profile would be substantially ascending when the number of increases exceeded the number of decreases and that the decreases could not be more than 15% from either the previous reading or the maximum reading.  This means that there can be many decreases and that the profile continues to substantially ascend past its maximum concentration.

619.    The flaws present in Dr. Angst's opinion are easily seen by the fact that the following hypothetical plasma profile satisfies his criteria and would be substantially ascending for 8 hours:



(DTX 143).

620.    Dr. Angst's response to the fact that, under his criteria, such a profile is

substantially ascending for 8 hours was that it was hypothetical:

> Q.    So your conservative criteria would even pick up something like this
> which I don't think anybody would look at and say it's substantially ascending for
> about eight hours; isn't that right?
>
> A.    Well, let me just point out that this is a hypothetical.

(12/11/07 Trial Tr. at 499:14-20 [Angst]).

621.    Dr. Angst testified that, in his opinion, the profile shown below, which is very

similar to the hypothetical profile above, substantially ascends for 8 hours:



(PX 397 at P ALZ 7690.013; *see also* 12/11/07 Trial Tr. at 449:20 - 450:4 [Angst].)

622.    Dr. Angst's interpretation of what constitutes a "slight dip" is well founded.  Dr. Angst testified that a slight dip is not a term of art – it is a "purely descriptive term."  Dr. Angst further noted that the patent's use of the term "dip" was contrasted against the term trough (which was used in describing the plasma profile from the traditional Ritalin three times a day regimen).  (12/11/07 Trial Tr. at 401:7-10 [Angst].)  And, looking at the plasma profile for the Ritalin regimen in Figure 4, a trough is a decrease of "about 35 to 40 percent."  (12/11/07 Trial Tr. at 402:11-16 [Angst].)

623.    Dr. Angst stated that he averaged the maximum plasma decrease of each of the 16 participants in the study underlying figure 4 as part of the bases for his determination that "a slight dip" included a decrease of up to 15% in an individual plasma profiles.  Specifically he

-48-

stated:

> Q.    Could we take a look at PX 704. And what is shown here?
>
> A.    Each subject is listed here. And the maximum dip size observed in each
> subject, it is listed here.
>
> Q.    And in what order have you arranged this?
>
> A.    These are ranked from minimum dip size to maximum dip size.
>
> Q.    And *what is the range of the maximum dip size in the individual profiles
> that underlie Figure 4 in the patent*?
>
> A.    The range from zero percent to *about 41 percent*.
>
> Q.    And have you calculated the average?
>
> A.    The average is indicated on the bottom, 14.7 percent. So cluster around
> here.

(12/11/07 Trial Tr. at 404:13-405:13 [Angst].)

624.    When averaging out the maximum declines to aid him in determining that "a
slight dip" was a decline of no more than 15%, however, Dr. Angst artificially increased the
average by including values, such as the 41% decrease described above, which even he
acknowledges would be a trough.

625.    Alza's criticism that Dr. Bolton's opinion only allows for the evaluation of
aggregated data (*e.g.*, an average plasma profile) misses the point. First, since all parties agree
that "a slight dip" is not a term of art, its meaning must necessarily come from the patent's
disclosure, and the patent only provides a meaning for a slight dip in the context of aggregate
data; therefore, any meaning from the patent is limited to aggregate data.

626.    Secondly, all of Dr. Angst assertions appear to provide some sort of basis of what
might be expected from aggregate data. For example, his 15% derived from the 'max dip sizes,'
as provided in PX 704, results in 8 of the underlying individual profiles qualifying as

-49-

substantially ascending while the other 8 of the underlying profiles are disqualified.

627.    Moreover, the *only* value that might reasonably serve as the basis for establishing a numerical value for "a slight dip," would be that depicted in Figure 4. On cross examination, Dr. Angst testified that based on the underlying data, the dip actually depicted in Figure 4 is a 6.6% decrease; yet this value does not appear to have played any role in Dr. Angst's opinion – if it had then Dr. Angst acknowledgement that Andrx's proposed ANDA products' decline of 14% (*see* 12/11/07 Trial Tr. at 429:21-430:2 [Angst]) would have been over twice that permitted by the slight dip and Andrx's proposed ANDA products could not infringe.

628.    Regardless of these flaws in Dr. Angst's opinion, his opinion also should not be credited to the extent he now asserts that "a slight dip" can mean multiple dips and not just a single permitted dip as he and Alza provided during the *Markman* proceedings. Dr. Angst's explanation for his view that "a slight dip" can mean multiple dips *is not based on anything in the patent or his experience*, instead *it is only based on what he has been told is permissible in patent law*:

> Q.    Let's see. Let's just talk for a minute about your criteria for determining whether a plasma profile [is] substantially [ascending]. *In your view, there can be multiple slight dips; is that fair?*
>
> *A.    I said that today, yes.*
>
> Q.    Okay. Can we put up the claim construction order for a moment, the second page of it? Now, you have to agree that the claim construction, which is ALZA's proposal says that a substantially ascending plasma profile which is one in which the plasma concentration of methylphenidate generally rises over approximately "X" hours, but may include a slight dip; is that right?
>
> A.    That's right. That's what it says there. And again, *I'm not an expert in interpretation of legal language, but I have been informed that ["a"] doesn't mean one.*
>
> Q.    Well, *it certainly doesn't say anything right there about more than one dip; is that fair?*

> *A.*     *Well, again, I was informed that ["a"] doesn't mean one.* So it could
> also include two. *And I say again, I'm not an expert in legal language, but this
> is the information I got.*

(12/11/07 Trial Tr. at 492:21-494:1 [Angst]) (emphasis added).

629.     Even if patent claims can sometimes be construed to extend "a" to include a

plurality as opposed to one, the *claim* here does not even use the term "a slight dip"; *instead that*

*phrase is part of the Court's claim construction.* So Dr. Angst and Alza are actually asserting

that the claim can be construed by the Court to permit "a" slight dip and then that construction

should be reconstrued to mean "one or more" slight dips. Yet nothing in the patents in suit

support this construction.

630.     Alza's interpretation of the Court's claim construction is not based on the patent's

disclosure; rather, it is based on information that is not disclosed in the patent. Furthermore,

their proffered boundaries for what would qualify as a substantially ascending plasma profile

allows for descending plasma profiles to qualify as substantially ascending. Although, Dr. Angst

tries to dismiss such results as being the extreme – the fact that such extremes would qualify as

substantially ascending – and thus infringing – necessarily means that Alza's proposal cannot be

credited.

## III.     CONCLUSIONS OF LAW THAT THE CLAIMS AT ISSUE ARE NOT INFRINGED

### A.     ANDRX'S PROPOSED ANDA PRODUCTS DO NOT INFRINGE THE PATENTS IN SUIT

631.     Alza cannot meet its burden of establishing that Andrx's ANDA products infringe

the asserted claims of the patents in suit *even though* all of the claim constructions urged by

Alza were adopted by the Court.

-51-

632.    As construed by the Court, claim 1 of the '373 patent requires that the dosage form has an ascending release rate attributable to the non-IR coating from time t=0. In order to have such an ascending release rate from time t=0, there must be some release of MPH from the non-IR component during the first periodic interval, *i.e.*, from t=0 to t=1 hour. This is explicitly stated in the patent. According to the patent, the first periodic release rate at t=1h will always be greater than the release rate during the preceding period, *e.g.*, the hour before the dosage form was administered, and thus, the first periodic release rate always constitutes an occurrence of an ascending release rate, *unless the periodic release rate at t=1 hour is zero*. Thus, the patent makes clear that if there is no release during the period from t=0 to t=1, then there is not an ascending release rate during this period. The patent also makes it clear that an ascending release rate over an extended period of time refers to ascending release rates of drug obtained from the time of administration of the dosage form and through the greater of 3 hours or the midpoint of the relevant $T_{90}$. This is consistent with the Court's construction that the ascending release must start at t=0, *i.e.*, the time of administration. Clearly, there can be no ascending release rate if there is no non-IR release at all during the first periodic interval.

633.    Because of the design of Andrx's ANDA products, the delayed-release core (*i.e.*, the non-IR component) only begins to release methylphenidate after a delay. In other words, as would be expected, the *delayed*-release core does not begin to release methylphenidate starting at or near t=0, as required by the claims.

634.    The dissolution test used by Alza to analyze whether Andrx's proposed products infringe does not allow one to distinguish between release from the IR and non-IR components as is required by the patent claims and the claim construction adopted by the Court. Thus, Alza's test cannot prove infringement.

635.    The remaining asserted claims require evaluation of the plasma drug
concentration, which is required to be "substantially ascending." Even though Alza successfully
argued for a construction that specified that the profile "generally rises" but may have "a slight
dip," Alza's current position is that "substantially ascending" allows for *many* dips and that a
profile continues to substantially ascend *past its peak concentration* for however long it takes to
drop 15% from the peak concentration.

636.    Even with such a definition, Alza's expert concludes that less than a third of the
profiles for Andrx's ANDA products had a substantially ascending methylphenidate plasma drug
concentration for eight hours.

**B.    PLAINTIFFS FAILED TO ESTABLISH THAT ANDRX'S PROPOSED ANDA
PRODUCTS WILL DIRECTLY INFRINGE THE ASSERTED CLAIMS**

637.    All of the claims in the patents in suit are method claims – methods for treating
ADD or ADHD. As the claims are method claims, it is undisputed that Andrx will not practice
the claimed method but, at most, will enable others to practice the claimed methods. Therefore,
Andrx cannot be found to directly infringe the patents in suit but, at most, could be found to
indirectly infringe. *See Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363, 1363 n.7
(Fed. Cir. 2003).

**C.    THE LAW OF INDIRECT INFRINGEMENT**

638.    There are two kinds of indirect infringement: contributory infringement or active
inducement of infringement under 35 U.S.C. § 271(c) or § 271(b), respectively. In order for
Andrx to be found liable for contributory or active inducement of infringement, Alza must prove
someone will directly infringe the patents in suit by administering Andrx's ANDA products
because proving a direct infringement is a necessary requirement to establish indirect

-53-

infringement. *DSU Medical Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303 (Fed. Cir. 2006).

639.    In addition to proving direct infringement by some person, contributory infringement also requires Andrx "knowing" that the their methylphenidate product will be especially made or especially adapted for use in the infringement of the patents in suit, and also that Andrx's ANDA products have no suitable substantial noninfringing uses. *C.R. Bard, Inc. v. Adv. Cardiovascular Sys., Inc.*, 911 F.2d 670, 673 (Fed. Cir.1990). If Andrx's product is capable of being substantially used without infringing Alza's patents, then Andrx cannot be liable for contributory infringement. *Id.*

640.    Active inducement of infringement also has other requirements (in addition to proving a direct infringement). An inducer must have an affirmative intent to cause direct infringement. *See DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 06 (Fed. Cir. 2006) (Section III B *en banc*). Thus, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities. *Id.*; *see also Warner-Lambert*, 316 F.3d at 1363 ("Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent.").

## D.    DEFENDANTS ARE NOT LIABLE FOR INDUCED INFRINGEMENT OF THE ASSERTED CLAIMS

641.    Inducement requires more than the mere intent to encourage the acts constituting infringement which Plaintiffs have urged. Rather, inducement requires evidence of culpable conduct, directed to encouraging infringement, and the inducer must have an affirmative intent to cause direct infringement. *DSU*, 471 F.3d at 1306.

642.    In this case, Andrx merely has the intention to obtain approval of its products and

sell the products to treat ADHD. On the other hand, Andrx does not have the culpable intent to infringe the patents in suit. Thus, inducement cannot lie. *Id.*

643.    Andrx has no direct contact with patients, and thus, does not direct patients to use its products. Andrx does plan to provide prescribing information to be used by physicians, who then direct the patients to take the tablets. This activity will lead to non-infringement in all instances where the tablet used does not have an ascending release rate as required by claim 1. Indeed, as any tablet which is tested to determine whether it meets claim 1 is destroyed prior to its use in the treatment, Plaintiffs are attempting to rely on percentages for direct infringement.

644.    The Federal Circuit sitting *en banc* recently restated the requirements of inducement, and more specifically, it set for the standard regarding what type of intent is required for inducement. *See DSU*, 471 F.3d at 1304-06 (Section III B *en banc*). *DSU* is not cited anywhere in Plaintiffs' pretrial submission. In *DSU* the Federal Circuit summarized the requirements of inducement as follows:

> Under section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they "actively and *knowingly* aid[ed] and abett[ed] another's direct infringement." *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir 1988) (emphasis in original). However, **"knowledge of the acts alleged to constitute infringement" is not enough.** *Warner-Lambert Co. v. Apotex Corp.*, **316 F.3d 1348, 1363 (Fed. Cir. 2003) (citation omitted). The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven."** *Id.* at 1364 (citing *Manville*, 917 F.2d at 554).

*DSU*, 471 F.3d at 1305 (italics in original, bolding added).

645.    Rather than citing *DSU* Plaintiffs stated that:

>     Since there is no dispute that Defendants had knowledge of the patent-in-suit,
>     Plaintiffs are simply required to show intent to encourage the acts constituting
>     infringement.

*Plaintiffs' Opening Pretrial Submission* at 43.

646.    This is simply not the law post-*DSU*:

>     *Grokster* has clarified that ***the intent requirement for inducement requires more***
>     ***than just intent to cause the acts that produce direct infringement***. Beyond that
>     threshold knowledge, the inducer must have an affirmative intent to cause direct
>     infringement. . . . Accordingly, inducement ***requires evidence of culpable***
>     ***conduct***, directed to encouraging another's infringement, not merely that the
>     inducer had knowledge of the direct infringer's activities.

*DSU*, 471 F.3d at 1306 (emphasis added). In declining to reverse the denial of a request for a

new trial, the *DSU* panel noted the existence of advice of counsel and that the alleged inducer did

not believe its product infringed, and thus it lacked the specific intent required for inducement.

*Id.* at 1307.

647.    However, as explained above and explained in *Cardiac Pacemaker*, here the

product either infringes or it does not, and even under Ms. Gray's testimony viewed most

favorably for Plaintiffs, it is clear there will be substantial instances of non-infringement. 418 F.

Supp. 2d 1021, 1042 (S.D. Ind. 2006). Where the same acts that induce infringement also induce

non-infringement, and the evidence here established that, at most, infringement occurred less

than 3% of the time (*i.e.*, 1 out of 36 tablets), it is clear that Defendants do not have an

affirmative intent to cause direct infringement.

648.    Moreover, *DSU* made clear that the intent element was a subjective one based on

its holding that the advice of counsel insulated the alleged inducement. *Id.* at 1307. Here, the

evidence overwhelmingly evidences Andrx's good faith belief that it will not induce

-56-

infringement:

(1)    Andrx's development work was directed towards, and achieved, a product having a period of no release (as can be seen from the mean dissolution tests and most of the individual dissolution tests and from the mean and individual plasma profiles).

(2)    Andrx's development work and ANDA filing took place not only prior to its knowledge of the patent but also prior to issuance of the '373 patent.

(3)    Andrx's proposed product admittedly has a non-ascending profile in every other test performed for Alza (but those tests were not relied on by Ms. Gray).

(4)    In the testing relied upon by Ms. Gray, only 1 tablet out of 36 (or less than 3% of the tablets), had a release above 27.5% in the first hour.

(5)    Even in Ms. Gray's selected dissolution test, using her 25% label claim assumption, Ms. Gray still opined that Andrx's product does not infringe a substantial portion of the time.

(6)    With regard to claims 6 and 7, based on Alza's own expert's testimony, *at most*, these claims are infringed less than 40% and 30% of the time, respectively.

(7)    Andrx sent a Detailed Statement explaining, prior to commencement of suit, why it believed the product would not lead to infringement (*see* PX 17).

649.    In *DSU*, a factor synonymous with item 6 above, standing alone, was sufficient to find no inducement. This case presents many more such factors and offers no factors evidencing a "culpable" mind or specific intent to cause infringement rather than non-infringement. As such, Andrx will not induce infringement if its ANDA products are marketed.

## E.    DEFENDANTS ARE NOT LIABLE FOR CONTRIBUTORY INFRINGEMENT OF THE ASSERTED CLAIMS

650.    With regard to contributory infringement, as Plaintiffs' recognize, the statute requires that there be no substantial non-infringing uses. *Plaintiffs' Opening Pretrial Submission* at 45. Plaintiffs, however, argue that "the ANDA products will be approved *only* for use in treating ADHD in accordance with the package insert." *Id.* (emphasis in original). Plaintiffs' argument, however, ignores the fact that the treatment of ADHD is only an infringement if the

remainder of the limitations in claims 1, 6 and 7 are met, *i.e.*, if an ascending release rate is provided and, in the case of claims 6 and 7, the substantially ascending plasma profiles of the claims are met.

651. However, even assuming *arguendo* that all of Dr. Angst's assertions are correct, he still testified that only 23 of the 77 profiles for Andrx's proposed ANDA products would substantially ascend for about 8 hours and that 30 out of 77 would substantially ascend for about 5.5 hours. (12/11/07 Trial Tr. at 451:16-452:5 [Angst].) Thus, taking Dr. Angst assertions as correct, only about 29.9% (23/77) of the time would Andrx's proposed ANDA products infringe claim 7's substantially ascending plasma profile for eight hours; and about 39% (30/77) of the time would Andrx's proposed ANDA products infringe claim 6's substantially ascending for five and half hours. *In other words, it could be expected that in over 60% of the administrations, Andrx's proposed ANDA products would fall outside of claim 6 and over 70% of the time Andrx's proposed ANDA products would fall outside of claim 7.*

652. Thus, Plaintiffs' expert Dr. Angst only alleges that claims 6 and 7 are met – at most – less than 40% and less than 30% of the time, respectively. Since upwards from 60% and 70% of the usage will be non-infringing of those claims, clearly there is a "substantial non-infringing use."

653. As stated above, the claim construction requires some non-IR release of MPH during the first hour. Under this standard, Ms. Gray acknowledges that the mean values of each of the proposed dosage strengths do not infringe even under her 25% label claim assumption.

654. Additionally, even under her 25% label claim assumption as applied to individual tablets 29 out of 36 do not infringe. Stated differently, under that assumption, less than 20% of

the tablets that Andrx proposes to sell would infringe claim 1 of the '373 patent.

655.    Finally, if one were to apply the 27.5% label claim assumption, Ms. Gray also acknowledges that less than 3% of the proposed Andrx products (1/36) would infringe.

656.    Thus, even assuming some infringement of claim 1 (which has not been established), there are still substantial non-infringing uses of Andrx's ANDA product, and therefore, contributory infringement does not lie.

F.    PLAINTIFFS FAILED TO PROVIDE ANY EVIDENCE THAT ANDRX, UPON
APPROVAL OF ITS ANDA, IS "LIKELY TO MARKET" A PRODUCT WHICH
INFRINGES THE ASSERTED CLAIMS

657.    Alza had the burden to establish infringement: "A patentee seeking relief under § 271(e)(2) must prove by a preponderance of the evidence that what is to be sold will infringe. That burden is not shifted under § 271(e)(2)." *Glaxo v. Novopharm*, 110 F.3d 1562, 1568 (Fed. Cir. 1997). It is not incumbent upon the accused infringer to disprove infringement. *Glaxo*, 110 F.3d at 1567.

658.    The Federal Circuit has provided:

The relevant inquiry is whether the patentee has proven by a preponderance of the evidence that the alleged infringer will likely market an infringing product. What is likely to be sold, or, preferably, what will be sold, will ultimately determine whether infringement exists.

*Glaxo*, 110 F.3d at 1570.

659.    In *Ortho-McNeil v. Kali Laboratories*, Kali "concede[d] that the ANDA would permit it to sell an infringing product, but argue[d] that this is not conclusive of whether it is likely to do so." 482 F. Supp. 2d 478, 501 (D.N.J. 2007). The Court, did not find the "variance found in the one tablet that Ortho-McNeil relies so strongly on" to be persuasive. 482 F. Supp.

-59-

2d at 504. The Court also faulted Ortho-McNeil for not running its own tests:

> Ortho-McNeil has no evidence outside of the ANDA to suggest that Kali will sell an infringing tablet. In any event, the Federal Circuit has said that 'access to actual samples and the extensive technical data required by the FDA [during the ANDA process] generally removes much of the uncertainty from a court's otherwise hypothetical inquiry' into whether an ANDA applicant is likely to sell an infringing product.

(482 F. Supp. 2d at 504 citing and quoting *Glaxo*, 110 F.3d at 1569 n.2.)

660.    In this case, Alza did test Andrx's product. Those tests, relied on by Ms. Gray, do not establish infringement for the previously stated reasons.

661.    Dr. Davies, however, put forth a conclusory, alternative theory. Dr. Davies did not rely on any testing by Alza, rather Dr. Davies relied on some testing from various Andrx laboratory notebooks.

662.    Dr. Davies, however, provided no evidence that such a product is likely to be marketed by Andrx upon approval of its ANDA.[8] Indeed, as demonstrated above, the testing relied on by Dr. Davies established that the test results were on dosage forms which would not be marketed because they did not meet the ANDA specification.

663.    Thus, this Court should find that Alza failed to carry its burden in establishing infringement and, therefore, find that Andrx's proposed ANDA products do not infringe any of the asserted claims.

### G.    EVEN IF THIS COURT WERE TO DETERMINE THE CLAIMS WERE INFRINGED

---

[8]    It is potentially noteworthy that the Court in *Ortho-McNeil* recognized that this permissible variance in the ANDA which could allow for an infringing table to be sold "only suggests that it sought to insulate itself from the criminal and civil penalties that might result from selling a product exceeding that permissible variance, not that it is likely to sell an infringing tablet." 482 F. Supp. 2d at 504.

## AND NOT INVALID, PLAINTIFFS' STILL ARE NOT ENTITLED TO RELIEF

664.    Plaintiffs' cited 35 U.S.C. Section 271(e)(4) and stated without argument that they are entitled to an order (an injunction) directing the FDA not to approve the ANDAs in suit until January 31, 2018. *See Plaintiffs' Opening Pretrial Submission* at 45, CL 22-24. Presumably, Plaintiffs believe that if any amount of infringement lies, no matter how small, it is entitled the order specified in 271(e)(4)(A) which reads:

> For an act of infringement described in [271(e)(2)] –
>
> (A)    the court shall order the effective date of any approval of the drug… involved in the infringement to be a date which is not earlier than the date of the expiration of the patent which has been infringed….

665.    Plaintiffs' argument appears to be based on the use of the mandatory "shall." Andrx, has only been able to find one case that analyzes the use the word "shall" in this section. That case is *SmithKline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1045-52 (N.D. Ill. 2003), *aff'd on other grounds*, 403 F.3d 1331(Fed. Cir. 2005) (Posner, J., by designation). In this instance, Judge Posner assumed that the patent was valid and infringed (although *de minimis* infringement was occurring, as is the case here) and set about to determine if the statute required him to ignore equity and grant the relief requested by SmithKline. *Id.* at 1048-52. Judge Posner, in a well reasoned opinion, determined that the injunction indicated in 271(e)(4)(A) should only apply when patent law would normally have applied an injunction. *Id.* at 1049. In response to the use of the word "shall," Judge Posner noted that "shall versus may" arguments are "weak" and "shall" sometimes is used to mean must, but it is also used to mean other words such as should, will or may and the meaning given the words should depend on the context. *Id.* Thus, if equity requires in an unusual case that 271(e)(4)(A) not be applied, that should be the case and cited to applicable Supreme Court and other precedent. *Id.* at 1050.

-61-

666.    Here equity so demands. As explained above, even if some minimal amount of direct infringement does occur from the use of Andrx's product, Andrx will not contribute to or induce that infringement, and thus Alza is not entitled to any remedy against Andrx.

667.    Moreover, even if the Court finds that Andrx will contribute to or induce that minimal amount of direct infringement, the Court should not order the FDA to hold off approving Andrx's ANDA until after the '373 patent expires, which would have the effect of enjoining Andrx from engaging in activities that are not infringing for many years. Rather, this Court should allow the FDA to approve Andrx's ANDA, in which case Andrx may bring its products to market, and Alza can bring an action against Andrx based on Andrx's sales of those products. It is not unprecedented to have one case be brought under 35 USC § 271(e)(2) seeking to stop the approval of an ANDA, and a later suit brought under 35 USC § 271(a), (b) or (c) seeking to enjoin sales of the ANDA product after the ANDA is approved. *See Bayer AG v. Biovail Corp.*, 279 F.3d 1340 (Fed. Cir. 2002).

668.    Should such a subsequent action be brought based on sales of Andrx's ANDA product, the Court will have range of remedies available to it, and can thus fashion a remedy that is appropriate for any minimal amount of infringement by Andrx, while still permitting Andrx to engage in activities that are non-infringing. *See Joy Techs., Inc. v. Flakt, Inc.*, 6 F.3d 770, 776-77 (Fed. Cir. 1993). In contrast, in this 271(e)(2) action, this Court essentially has one remedy available to it: delaying the approval of Andrx's ANDA until the '373 patent expires. Use of this drastic remedy is inappropriate in a situation where the vast majority of the ANDA products sold will not give rise to infringement.

-62-

## IV.    FINDINGS OF FACT THAT THE CLAIMS AT ISSUE ARE OBVIOUS

### A.    THE SCOPE AND CONTENT OF THE PRIOR ART

#### 1.    The State Of The Commercial Art

669.    There is no dispute between the parties regarding the state of the *commercial* art regarding methylphenidate to treat ADD and ADHD (referred to collectively as "ADHD") prior to the time of the alleged invention(s) in the patents in suit.

670.    Methylphenidate (MPH) was first used to treat ADHD in the 1950s. MPH was dosed as an immediate release product that provided blood plasma levels which rapidly rose for the first two hours and then dropped back towards zero fairly quickly due to the short half-life and rapid absorption of MPH in the body. (*See* PTX 137 at 170). Due to these plasma levels, Ritalin IR was only effective for controlling the symptoms of ADHD for about 3 to 5 hours on average. (PX 574 at 1).

671.    Many of the patients using MPH were, and are, children. Thus, there was a desire as of the mid 1990s to have a once-a-day dosage form to avoid children having to take a second dose at school. (DTX 1 at col. 6, line 66 - col. 7, line 40) The desire to control children's ADHD during school hours indicated that the once-a-day dosage form should last for 8-9 hours. (12/13/07 Trial Tr. at 1087:17-1088:1 [Patrick]). The desire to make sure that the drug was out of the child's system in time for them to go to sleep also indicated that the drug should be exiting the system by no later than 12 hours after the initial dose. (12/10/07 Trial Tr. at 137:13-138:5 [Guinta]; *see also* 12/13/07 Trial Tr. at 1069:13-19 [Patrick]).

672.    The typical approach to achieve a once-a-day dosage form was to provide a dosage form which permitted the blood plasma level of the active ingredient to rapidly get above

the minimal effective dose level and then maintain the blood concentration of the active ingredient fairly steady within the therapeutic window for as long as possible. (12/10/07 Trial Tr. at 44:17-45:21 [Guinta]). The therapeutic window is the window between the effective concentration in the blood and the higher blood concentration which is typically associated with side effects. (*Id.*).

673.    This typical approach was tried by Ciba Geigy, the manufacturer of the branded MPH immediate release product, and Ciba launched such a sustained release product in 1983. (PPFF ¶ 41). The product that embodied this typical approach was named Ritalin SR®. Despite the availability of a marketed once-a-day formulation in Ritalin SR®, however, the market did not move to Ritalin SR® in great quantities because it seemed not to provide the desired clinical outcome of symptom control over the entire course of the day in some individuals. (DTX 1 at col. 7, lines 35-49).

674.    Due to this lack of desired effect in some individuals, the market continued to use IR MPH twice-a-day (or BID) to provide effect throughout the school day. Another clinical regimen that was used and was gaining momentum as of the mid 1990s was the use of IR MPH three times a day (or TID) to extend symptom control into the evening hours when students would be doing their homework. (12/10/07 Trial Tr. at 146:22-147:11 [Guinta]). This TID regimen would include either three doses of the same amount of MPH all three times or perhaps might substitute a half dosage for the third dose. (*Id.*; *see also id.* at 80:11-81:11).

675.    There was initially quite a bit of speculation regarding why the typical approach of the Ritalin SR® product did not work. (DTX 627 at 768). The problem was that there did not appear to be any well designed studies of what occurred with Ritalin SR® after it was ingested.

-64-

The first studies including actual blood plasma levels of the Ritalin SR® product were published in 1989. (PX 137; DTX 627). PX 137 provided a plasma level comparison between Ritalin SR®, a proposed generic version of Ritalin SR® and the prior art twice daily immediate release:



(Excerpt of Figure 2 in PX 137).

676.    This data confirmed that Ritalin SR® was actually functioning as a typical sustained release product is intended to function. More specifically, the blood levels achieved with Ritalin SR® rose to what was believed to be a therapeutic level and stayed fairly constant at that level for a prolonged period of time   The design objective was met, and it was fully believed that the relatively constant blood level profile provided by Ritalin SR® would provide a therapeutically effective level of MPH during the school hours. (12/10/07 Trial Tr. at 39:19-40:4; 43:10-44:16 ("The most notable difference is that the — where the IR profile levels decrease [],  the SR profile has a nice flat high level of drug that's delivered to the bloodstream"), 45:15-21

("Q: Did Ritalin SR follow the conventional approach? A: It actually is quite a nice profile. Yes, it rose, it didn't achieve the very highest level, it covered the trough period and provided a steady level of drug and then it wore off. And then the plasma levels declined.") [Guinta]).

677.    Ritalin SR$^®$ thus provided fairly constant blood levels of drug, yet at the same time was known to be therapeutically ineffective in many children as the day wore on. (DTX 1 at col. 7, lines 40-47; 12/12/07 Trial Tr. at 810:14-22 [Mayersohn]; 12/10/07 Trial Tr. at 108:19-109:2 and 158:20-23 [Guinta]). Ironically, it became increasingly clear that the constant blood levels of MPH, provided over a prolonged period of time with Ritalin SR$^®$, could be the problem.

678.    MPH, like other CNS stimulants, is subject to a phenomenon known as acute tolerance. (DTX 626 at 112; DTX 152 at PALZ000772, line 19-PALZ000773, line 2; 12/10/07 Trial Tr. at 97:19-98:16 and 120:10-122:9 [Guinta]). Drugs for which acute tolerance is a problem characteristically have decreased therapeutic efficacy over time even though the blood level of drug remains the same. (PX 266; 12/12/07 Trial Tr. at 813:1-17 [Mayersohn]). Simply put, a greater amount of drug is needed for efficacy at a later point in time to achieve the same therapeutic effect at an earlier point in time. Indeed, the acute tolerance issue with MPH was discussed in the prior art and Alza's own expert testified to that effect. (12/10/07 Trial Tr. at 97:19-98:16, 105:8-107:7 and 120:10-122:9 [Guinta]). Once the problem with Ritalin SR$^®$ became apparent, the solution to solving the problem was obvious. (12/12/07 Trial Tr. at 842:2-17 [Mayersohn]). Alza doesn't claim to have postulated the problem with Ritalin SR$^®$, they just confirmed the prior art's suggestion of the problem.

### 2.    The Prior Art Taught That MPH Was Associated With Acute Tolerance

679.    There is no dispute between the parties regarding the definition of acute tolerance. As Dr. Mayersohn noted, tolerance generally is the decline of the effect of a drug over time, *i.e.*, the drug seems to be losing its effectiveness. If that tolerance develops over several days, weeks or months, that effect is called chronic tolerance. If the tolerance occurs after the first administration of a drug, that effect is called acute tolerance. Acute tolerance has a quick onset, and it quickly disappears during a rest period of non-administration such as an overnight washout period. (12/12/07 Trial Tr. at 813:1-24 [Mayersohn]; *see also* Plaintiffs' Pretrial Findings of Fact ("PPFF") at ¶¶ 352, 359).[9]

680.    The art relied upon at trial noted the likelihood of acute tolerance with MPH beginning in 1986. Specifically, the Angrist publication indicated that acute tolerance existed for central nervous system ("CNS") stimulants generally and noted that "a type of tolerance to CNS stimulants that clearly does occur clinically is an acute tolerance after a single dose." (DTX 626 at 112-113). Indeed, another ADHD drug, amphetamines, was noted by Angrist to show less of an effect over time when the plasma concentration had plateaued, *i.e.* it demonstrated acute tolerance. (*Id.* at 113). Since methylphenidate is a CNS stimulant, upon reading the Angrist publication, a person of ordinary skill in the art would understand that methylphenidate would also likely exhibit acute tolerance. (12/12/07 Trial Tr. at 821:11-825:11 [Mayersohn]).

681.    Indeed, the patentees confirmed that the prior art indicated that MPH was associated with acute tolerance. The patentees reported in the "Background of the Invention" of

---

[9]    Acute tolerance is also known as tachyphlaxis and is represented graphically as clockwise hysteresis. (*Id.* at 1102:2-9 [Patrick]; PX 266 at Vol. 1, p. 8; 12/10/07 Trial Tr. at 102:2-20 [Guinta]).

the '514 provisional application that the use of a CNS stimulant such as MPH *often* led to the

development of acute tolerance (just as Angrist had reported):

> *For drugs that act on the central nervous system, like methylphenidate*,
> dispensed from a sustained-release nonascending dosage form, *the patient often
> develops an acute tolerance to the drug* manifested by a shortened duration and a
> decrease in the intensity of the therapeutic effect needed for acceptable therapy.
> The prior sustained-release delivery is also devoid of means that compensate for
> its shortcomings inherent therein.

(DTX 152 at PALZ 000772, line 19 - 000773, line 2 (emphasis added)).  Dr. Mayersohn

confirmed that this paragraph from the '514 application supported his view that acute tolerance

was known for central nervous system acting drugs such as MPH.  (12/12/07 Trial Tr. at 825:12-

826:17 [Mayersohn]; 12/13/07 Trial Tr. at 989:23-991:3 [Mayersohn]).

682.    Dr. Guinta also confirmed at trial that MPH was known in the art to be associated

with acute tolerance when she was questioned about this portion of the '514 application:

> Q:    Okay.  Let's take a look at—let's go to the next page, page two
> here.  And this is still in the background of the invention section and if we look
> down at the bottom of the page, it says, "For drugs that act on the central nervous
> system like methylphenidate dispensed from a sustained-release nonascending
> dosage form, the patient often develops an acute tolerance to the drug manifested
> by a shortened duration and a decrease in the intensity of the therapeutic effect
> needed for acceptable therapy."  Do you see that?
>
> A:    Yes.
>
> Q:    *Is that indicating before you did your work, it was known that
> drugs that act on the central nervous system, for those kind of drugs the patient
> often develops an acute tolerance?*
>
> *A:    Yes, I think that it means that a patient can develop acute
> tolerance to the effect of stimulants.*
>
> *Q:    And that's something that was known before you did your work;
> is that right?*
>
> *A:    Yes.*  In a general sense, because stimulants when abused often
> need to be taken in higher and higher amounts in order to provide the desired
> effects for drug abusers.
>
> Q:    Let me ask you a couple of things about this.  I think you said—

well, it does indicate that for these kinds of drugs, drugs that act on the central nervous system, the patient often develops an acute tolerance. *It's not just occasionally, it's often; is that right?*

> A:    *It says often.*

> Q:    And you mentioned drugs of abuse, *but it doesn't seem to be referring to the drugs of abuse, it states a decrease in intensity of therapeutic effect needed for acceptable therapy; isn't that right?*

> A:    *Yes. But I think what it says a patient often develops, okay, if we think about drugs in this class, it's known that some patients do need to take higher and higher doses of drug over time to get an effect.*

> *Q:    That was something that was known before you did your work?*

> *A:    It was known clinically.*

(12/10/07 Trial Tr. at 120:10-122:9 [Guinta]) (emphasis added).

683.    Then, as noted previously, in 1989, the first plasma studies of Ritalin SR® was published. In one of the first articles reporting such plasma profiles as well as measuring the behavioral effects of Ritalin SR®, Birmaher, *et al.* noted that:

> preliminary descriptive comments can be made about MPH-SR pharmacokinetics. The flattened curve of MPH plasma concentrations after MPH-SR ingestion (Fig. 2) resembles that seen with long-acting dextroamphetamine sulfate by Brown et al. (1980). *This prolonged, stable level raises a question about whether MPH-SR may be more prone to tachyphylaxis*, similar to that seen using a [sic] sympathomimetics with longer half-lives than standard MPH, such as the amphetamines (Nedergaard et al., 1988) or inhaled beta adrenergic agonists (Pauwels, 1988).

(DTX 627 at p. 771) (emphasis added).

684.    It is notable that after completing this research, Dr. Birmaher points only to tachyphylaxis as a possible explanation for Ritalin SR®'s failings in the Discussion section of the paper. (12/12/07 Trial Tr. at 834:5-836:15 [Mayersohn]).[10] It is also notable that that Dr. Birmaher

---

[10]    Dr. Mayersohn explained that this language would point one of ordinary skill in the art to the likelihood of tachyphylaxis or acute tolerance because most scientists will not make strong declarative statements but will rather "hedge" a little bit. Indeed, similar "hedging" was present in the Swanson paper which Alza and Dr. Patrick assert "established" the occurrence of acute tolerance with MPH. (12/12/07 Trial Tr. at 836:16-838:13 [Mayersohn]; *see*

indicated that the behavioral effects observed when MPH was administered to patients were "similar" to those that previously had been observed with amphetamines and inhaled beta adrenergic agonists, two drugs that were known to produce acute tolerance. (DTX 627 at 771).

685.    In 1991, against this backdrop, a talk was given by Dr. J. M. Perel at the Ninety-second Annual Meeting of the American Society for Clinical Pharmacology and Therapeutics. The abstract that was published regarding that talk is DTX 153, published more than one year prior to the earliest possible application date for the patents in suit. As such, DTX 153 is unquestionably prior art under 35 U.S.C. § 102(b).

686.    DTX 153 reports on a clinical study of the use of MPH and indicated that the clinical "effects return to baseline faster than the [MPH] levels, indicating clockwise hysteresis." (DTX 153 at 160, PII-45). Dr. Mayersohn testified on cross examination that clockwise hysteresis indicated acute tolerance. (12/13/07 Trial Tr. at 933:9-934:17 [Mayersohn]; *see also* DTX 1150 (abstract); 12/10/07 Trial Tr. at 100:5-101:20 [Guinta]).[11]

687.    Indeed, Plaintiff McNeil's Supplement to its Citizen Petition confirms that acute tolerance is indicated by clockwise hysteresis.

> Acute tolerance for methylphenidate has been empirically documented by demonstrating that methylphenidate concentrations measured soon after an initial dose cause a greater pharmacodynamic effect then concentrations occurring at a later time. ***This effect is seen graphically as a clockwise hysteresis in the plasma concentration-effect relationship***. As reviewed below, several studies have documented biological hysteresis for methylphenidate's effects on brain dopamine and clinical hysteresis for methylphenidate's effects on ADHD

DTX 86 at 295 ("Acute tolerance to methylphenidate *appears* to exist."), and 303 ("Together, these two studies support the hypothesis that acute tolerance *may contribute* to the reduced efficacy in sustained-release compared with immediate release forms of methylphenidate.")) (emphasis added).

[11]    While some testimony was stricken by the Court relating to clockwise hysteresis, the testimony regarding DTX 153 was not stricken.

outcomes.

(PX 266 at Vol. 1, page 8) (emphasis added). One of the publications cited by McNeil prior to

the commencement of the litigation in support of its demonstration of acute tolerance is the Perel

abstract. (*Id.* at Vol. 1, page 9 & n. 16).

688.    Finally, there was clinical information that was in the prior art that had been

reported on Ritalin SR®. That information was obtained by the inventors in their review of the

literature and in their meetings with doctors who treat ADHD. (12/10/07 Trial Tr. at 158:15-23,

97:19-98:16, 105:8-107:7 and 120:10-123:1 [Guinta]). That information is memorialized by the

inventors in the patents in suit. Specifically, the patentees stated:

> In fact such a sustained-release dosage form of methylphenidate has been
> commercially available for several years. ***Clinical experience with this dosage
> form, however, has been disappointing in that behavioral symptoms in patients
> taking the controlled-release dosage form is less well-controlled later in the day
> compared to those patients taking multiple doses of the immediate-release
> dosage form.***

(DTX 1, col. 7, lines 35-47)(emphasis added).

689.    When the patent states that "behavioral symptoms" are "less well-controlled later

in the day" with the commercially available sustained-release dosage form, it is indicating that

the behavioral improvement produced by Ritalin SR® was not as good later in the day, even

though the plasma concentrations remained steady. In this way, the patent is clearly indicating

that acute tolerance was observed in patients who were given Ritalin SR®. Indeed, Alza's expert

Dr. Patrick agreed that the clinical phenomena reported in the patent meets the definition of acute

tolerance used by Plaintiff McNeil in its submissions to the FDA. (12/14/07 Trial Tr. at 1158:8-

1159:21 [Patrick]; PX 266 at Vol. 1, p. 7, n. 7; *see also* PPFF at ¶ 352).

690.    Thus, the prior art actually taught, based on clinical testing, that MPH exhibited

acute tolerance. As Dr. Mayersohn testified, Alza studies merely designed studies to confirm what had been reported previously regarding MPH and acute tolerance. (12/13/07 Trial Tr. at 935:3-936:24 [Mayersohn]; *see also* 12/10/07 Trial Tr. at 130:12-21 [Guinta]).

### 3.    Once The Problem Of Acute Tolerance Was Recognized The Solution Of An Ascending Release Rate Would Have Been Obvious

691.    Dr. Mayersohn testified that as of 1995, the typical approach for treating acute tolerance was to increase the amount of active supplied to maintain the same therapeutic effect. (12/12/07 Trial Tr. at 842:2-17 [Mayersohn]; *see also* DTX 545 at 391 ("In either event, a physician faced with the development of tolerance [of MPH] would probably simply raise the dose until therapeutic effects were once again achieved or until toxic effects supervened.")).

692.    Dr. Feifel, an expert for Alza who is a medical doctor who treats ADHD (the only such expert by either party), did not appear at trial. Dr. Feifel, however, agreed with Dr. Mayersohn's view by acknowledging at deposition that a common sense approach to overcome acute tolerance would be to have an escalating plasma profile. (Feifel Dep. Tr. at 91-92; *see also* 12/12/07 Trial Tr. at 842:2-17 [Mayersohn]). One obvious way to provide such an increasing plasma profile would be to provide an increasing release of the drug. (12/12/07 Trial Tr. at 842:23-853:5 [Mayersohn]; *see also* Feifel Dep. Tr. at 89:21-93:19, 185:12-186:16).

693.    Dr. Guinta also acknowledged that it was known clinically that some patients taking stimulants such as MPH needed higher and higher dosages to provide continued therapeutic effect. (12/10/07 Trial Tr. at 120:10-122:9 [Guinta]). The Angrist publication also suggested that acute tolerance with stimulants can be counteracted with increased dosages by disclosing that stimulant abusers seeking the continued effect often have to take higher dosages. (DTX 626 at 112; *see also* DTX 545 at PALZ007776).

694.    The desired duration of ADHD treatment with MPH for school-aged children was about 8 hours, *i.e.*, the duration of a normal school day. Because acute tolerance was known to be associated with MPH, one would have expected diminished efficacy of MPH if blood levels were, as was the case for Ritalin SR®, maintained at a constant level (*i.e.*, a "flat" plasma profile) over time. This is simply a direct consequence of acute tolerance — that a person adjusts to a particular level of the drug over time and that same level of drug becomes less effective over time. (12/12/07 Trial Tr. at 813:1-23 [Mayersohn]).

695.    Thus, the common sense approach to maintaining effectiveness for the eight hour period would have been to provide an ascending release rate which provided a substantially ascending plasma profile for 8-9 hours. That is, one skilled in the art, aware of the acute tolerance problem associated with MPH, would have provided MPH to achieve an ascending plasma profile (as opposed to a flat plasma profile) for about 8 hours. Achieving an ascending plasma profile would have required providing increasing amounts of the drug over an extended period during which it was desired to maintain therapeutic efficacy. Therapeutic efficacy could thereby be maintained and acute tolerance counteracted by the simple expedient of effectively providing more drug over time to the patient. (Feifel Dep. Tr. at 89:21-90:12; 185:12-186:7). Whereas a patient with a flat plasma level of drug, would adjust to that level with a decreased therapeutic response to the drug, the patient exposed to an increasing amount of the drug would maintain an acceptable therapeutic response.

696.    An increasing drug concentration, *i.e.*, larger doses to maintain the same effect, was the very solution that Dr. Guinta suggested was required for patients taking stimulants to treat ADHD prior to the alleged invention. (12/10/07 Trial Tr. at 120:10-122:19 [Guinta]). Similarly, Dr. Mayersohn and Alza's absent expert Dr. Feifel agreed that this was the common

-73-

sense approach. (12/12/07 Trial Tr. at 842:2-17 [Mayersohn]; Feifel Dep. Tr. at 91-92). Indeed, not only was the solution of providing an increasing plasma level of stimulants, such as MPH, a common sense approach to overcoming acute tolerance, it was also the approach used with other drugs that exhibited acute tolerance.

## 4.    Acute Tolerance Associated With Nitrates For Angina Treatment Was Counteracted By Providing An Ascending Release Rate And Plasma Profile

697.    One of ordinary skill in the art would have looked to other drugs exhibiting acute tolerance to confirm the common sense approach of delivering more of the drug over time to counteract the decreased therapeutic response associated with acute tolerance. (12/12/07 Trial Tr. at 842:18-843:23 [Mayersohn]; 12/13/07 Trial Tr. at 895:16-896:2; 992:13-993:6 [Mayersohn]).

698.    As of 1995 it was known that the use of nitrates for angina resulted in acute tolerance. (12/12/07 Trial Tr. at 842:18-843:23 [Mayersohn]; 12/13/07 Trial Tr. at 1079:9-12 [Patrick]). In fact, as of that time period, other than CNS stimulants such as methylphenidate, nitrates were the only other class of orally-administered drugs that were known to be associated with acute tolerance. (12/13/07 Trial Tr. at 1082:12-17 [Patrick]). Therefore, solutions adopted to counteract acute tolerance with nitrates used to treat angina would be particularly relevant to addressing the same problem associated with CNS stimulants such as methylphenidate. (12/13/07 Trial Tr. at 1082:12-18 [Patrick]; *see generally id.* at 1078:6-1082:18; *see also* Patrick Dep. Tr. at 202).

699.    In 1984 Ho-Leung Fung published an article that addressed the use of nitrates to treat angina. (DTX 631). The Fung article recognized the acute tolerance problem associated

-74-

with nitrate treatment and disclosed addressing that problem by providing an ascending nitrate release rate and plasma profile.

700.    The Fung article indicated that the nitrate drug, isosorbide dinitrate, produced tolerance within 6 to 10 hours after oral dosing. (DTX 631 at 25; 12/12/07 Trial Tr. at 842:23-851:5 [Mayersohn]; 12/13/07 Trial Tr. at 943:22-944:9 [Mayersohn], 12/13/07 Trial Tr. at 1085:5-1089:5 [Patrick]; 12/14/07 Trial Tr. at 1159:22-1161:12 [Patrick]).

701.    Based upon data from other studies conducted with isosorbide nitrate, Fung stated that a, "rising nitrate 'blood level' may be beneficial in producing sustained nitrate action", rather than dosing with a controlled release dosage form that produced sustained nitrate plasma concentrations at a relatively constant value over the dosing period. (DTX 631 at 24, 25 and Figure 4; 12/12/07 Trial Tr. at 844:23-849:14 [Mayersohn]). Thus, Fung concluded that, "it would appear that this conventional dosing mode [*i.e.*, a controlled release dosage form which provided a relatively constant plasma concentration over time] may not be optimum for sustained nitrate therapy." (DTX 631 at 25).

702.    Fung understood that a flat plasma profile would not be optimal with nitrates because of the acute tolerance associated with their administration. Indeed, Fung taught that such a profile would not provide sustained nitrate action, suggesting that the flat profile would result in a decreased therapeutic response. (12/12/07 Trial Tr. at 846:9-847:9 [Mayersohn]; DTX 631 at 25).

703.    In light of the Fung article, one of ordinary skill in the art would have believed that similar flat plasma profile provided by Ritalin SR® for methylphenidate, also known to exhibit acute tolerance, would have resulted in decreased therapeutic efficacy over time. (*Id.*;

-75-

12/12/07 Trial Tr. at 844:23-849:14 [Mayersohn]; 12/13/07 Trial Tr. at 1085:5-1088:1 [Patrick]; 12/14/07 Trial Tr. 1159:22-1161:12 [Patrick]; DTX 1, col. 7, lines 35-50).

704.    Fung stated that, to overcome nitrate tolerance, "an alternate input mode might be one that involves *escalating rates of drug delivery so that increasing systemic nitrate concentrations may be achieved*." (DTX 631 at 25 (emphasis added); *see also* 12/12/07 Trial Tr. at 849:15-850:14 [Mayersohn]; 12/13/2007 Trial Tr. at 1088: 2-23 [Patrick]). Fung thus clearly indicated to one of ordinary skill that to effectively counteract acute tolerance associated with nitrates, one could use a dosage form that provided an increasing rate of nitrate release resulting in an ascending plasma profile. (12/12/07 Trial Tr. at 842:23-851:6 [Mayersohn]).

705.    As discussed above, acute tolerance results in the same level of drug being less effective over time, resulting in a decreased therapeutic response. The solution proposed by Fung, *i.e.*, to provide an increasing amount of drug over time, is an obvious response to the need to maintain therapeutic efficacy over a desired time period — to provide an increasing amount of drug over time.    Thus, not only was the acute tolerance problem with methylphenidate recognized in the art, the logical solution to acute tolerance was explicitly recognized in the art, *i.e.*, providing an increasing amount of the drug over time. In other words, what the patents in suit claim was merely an obvious solution, *i.e.*, an increasing drug release rate and/or the associated ascending plasma profile, to a known problem, *i.e.*, acute tolerance exhibited with methylphenidate.

706.    Based on the recognition in the art of both the known problem and the obvious solution, one of ordinary skill in the art would, in view of such prior art, have had a very reasonable expectation of providing a dosage form with an ascending release rate of

-76-

methylphenidate that would largely counteract the problem of acute tolerance associated with this drug.

### 5.    Dosage Forms Suitable For Providing An Ascending Release Rate Were Known In The Prior Art

707.    A few exemplary dosage forms that all the experts agree could have provided the ascending release rates were known in the prior art.  (12/14/07 Trial Tr. at 1234:6-18 [Davies]; 12/12/07 Trial Tr. at 722:4:723:20 [Needham]).

708.    One such example is U.S. Patent 4,956,181 to Bayer *et al.* issued on September 11, 1990.  (DTX 632).  This patent cited the Fung publication discussed hereinabove and specifically addressed acute tolerance associated with nitrate therapy.  (DTX 632 at col. 1, ll. 42-61).

709.    The Bayer *et al.* patent describes a method of administering nitrates in a way to avoid tolerance through a transdermal patch applied to the skin.  Following an initial washout period, the nitrate is delivered at an effective rate and, after achieving that rate, the delivery rate is then increased over a "ramp-up" time period of from about 8 to about 21 hours.  (DTX 632 at col. 3, ll. 10-50).  Alza's expert Dr. Davies specifically stated that this patent could have been used in the mid 1990s to make an ascending release rate transdermal system form of methylphenidate.  (12/14/07 Trial Tr. at 1245:12-18 [Davies]).  The inventors of the Bayer *et al.* patent indicated that this release profile could be achieved with oral dosage forms as well.  (DTX 632 at col. 4, ll. 19-24; col. 8, ll. 51-57 (mentioning oral dosage forms as well as others); col. 10, ll. 1-25; 12/12/07 Trial Tr. at 851:8-853:5 [Mayersohn]).

710.    Another prior art patent, U.S. Patent 5,156,850 to Wong *et al.* (the "'850 patent")

also admittedly taught ascending release rate osmotic dosage forms specifically. (12/12/07 Trial Tr. at 858:7-10 [Mayersohn]; 12/14/07 Trial Tr. at 1197:8-1200:6 [Davies]; DTX 634). The '850 patent discloses an osmotic dosage form of verapamil that provides an ascending release rate (after an initial period of no release). (DTX 634 at col. 17, l. 15 – col. 18, l. 33; Figures 6 and 8). Once release begins, the release rate is ascending for greater than 3 hours (Figs. 6 and 8) and, in the case shown in Figure 6, appears to be ascending beyond one-half the $T_{90}$. (*Compare* Figs. 6 and 7).[12]

711.    Similarly, Figures 10 and 11 include an ascending release rate for nicardipine after a period of no drug release. Again, the release rate ascends for longer than 3 hours and for more than one-half the $T_{90}$. (*Compare* Figures 10 and 11). Indeed, nicardipine was also used as the active ingredient in Example 5 of the patent in suit. (DTX 1 at col. 18, l. 35 - col. 19, l. 16).

712.    Therefore, the plain disclosure of the '850 patent belies any suggestion by Alza that the '850 patent is somehow not relevant to teaching how to make an ascending release rate dosage form suitable for use with methylphenidate. In fact, the '850 patent actually states that this same dosage form could be used with methylphenidate among other drugs, even though the '850 patent does not provide any specific examples of an osmotic dosage form with methylphenidate. (DTX 634 at col. 10, ll. 16-29). Moreover, verapimil, for which an osmotic dosage form is specifically exemplified in the '850 patent, has an aqueous solubility very similar to methylphenidate. Therefore, one skilled in the art would have expected the same dosage form to be suitable for use with methylphenidate as disclosed in the '850 patent. (12/12/07 Trial Tr. at 858:11-18 and 888:15-24 [Mayersohn])

---

[12]    According to the patents in suit, the parameter $T_{90}$ is the time needed for 90% of the cumulative amount of drug to be released into the *in vitro* dissolution medium. (DTX 1 at col. 9, ll. 37 – 40).

713.    The person of ordinary skill in the art, having read the prior art, would therefore have been led to the creation of a dosage form that would counteract the acute tolerance associated with methylphenidate administration, as observed with the Ritalin SR® product. (12/12/07 Trial Tr. at 859:15-17 [Mayersohn]). The solution taught by the prior art was a once a day methylphenidate formulation that provided an escalating rate of drug delivery to achieve an ascending plasma profile over an extended and defined period of time. (12/12/07 Trial Tr. at 842:2-850:14 [Mayersohn]). The prior art suggests that such a rate of release could have been achieved with at least both oral dosage forms and transdermal dosage forms. (12/12/07 Trial Tr. at 870:23-871:17 [Mayersohn]; DTX 632; DTX 634; 12/14/07 Trial Tr. at 1245:12-18 [Davies]).

714.    Except for the Wong patent (DTX 634)[13] and the Patrick reference (PX 137), none of the above cited references were considered by the Examiner during examination of the patents in suit.

### 6.    Alza's Expert Dr. Patrick Agreed That The Prior Art Suggested That MPH Was Associated With Acute Tolerance

715.    Alza responded to the evidence put on regarding the scope and content of the art through use of its expert Dr. Patrick.

716.    Dr. Patrick agreed with several points made by Defendants. First, Dr. Patrick agreed that there was a motivation to create a once a day MPH product that would be better than Ritalin SR®. (12/13/07 Trial Tr. at 1006:12-20; 1021:12-1022:1 [Patrick]; *see also* 12/10/07 Trial Tr. at 26:23-27:23 and 29:16-22 [Guinta]). Dr. Patrick also agreed that Ritalin SR® had a fairly flat or "plateau" profile. (*Id.* at 1108:23-1109:14 [Patrick]; 12/10/07 Trial Tr. at 43:10-

---

[13]    While DTX 634 (the '850 Wong patent) was not cited during prosecution of the patents in suit, a patent sharing the same specification (*i.e.*, U.S. Patent 5,785,994) was cited during prosecution.

44:8 [Guinta]). Additionally, Dr. Patrick agreed that treating ADHD with dosage a form containing MPH was known in the art. In other words, the only potentially new thing about claim 1 of the '373 patent was the requirement that the dosage form have an ascending release rate over an extended period of time. (*Id.* at 1100:17-1101:9 [Patrick]). Dr. Patrick also agreed that the person of ordinary skill in the art would be looking for a dosage form to permit treatment for 8-9 hours at a time. (12/13/07 Trial Tr. at 1091:9-13 [Patrick])

717.    Dr. Patrick also agreed that it had been suggested in the prior art that methylphenidate was associated with acute tolerance. (*Id.* at 1082:19-1084:2; 12/14/07 Trial Tr. at 1153:2-14 [Patrick]).

718.    Indeed, Dr. Patrick did not—and could not—dispute that the Perel abstract attributes acute tolerance to the use of MPH. (*See* DTX 153; 12/14/07 Trial Tr. at 1127:14-1129:10 [Patrick]). Rather, Dr. Patrick tried to discount Perel by indicating that it was not a perfect study. Dr. Patrick, however, acknowledged that Dr. Greenhill, an expert in the area, was an author on the abstract. And in any event, Dr. Patrick cannot change the words of the abstract

itself which very clearly associate MPH with acute tolerance.[14]

719.   Dr. Patrick's opinion that the relationship between MPH and acute tolerance was

suggested is in agreement with the background section of the specifications of the patents in suit,

the earlier-filed provisional applications upon which those patents are based, and McNeil's

Citizen Petition filed with the FDA. All of these papers, of course, were filed prior to the start of

this litigation, and, therefore, are inherently more credible than countervailing statements made

during litigation.

720.   For example, in the Background of the Invention section, the patentees stated that:

> For drugs that act on the central nervous system, like methylphenidate, dispensed
> from a sustained-release nonascending dosage form, the patient often develops an
> acute tolerance to the drug manifested by a shortened duration and a decrease in
> the intensity of the therapeutic effect needed for acceptable therapy.

(DTX 152 at PALZ 000772; *see also* 12/10/07 Trial Tr. at 120:10-122:9 [Guinta]).

721.   Dr. Patrick even acknowledged that the background of the invention section

---

[14]     Dr. Patrick similarly tried to cast confusion on some of the other art references, most notably Birmaher and
others (including Dr. Greenhill) and a 1992 review article by the same Dr. Greenhill. With regard to the Birmaher
article, Dr. Patrick only examined the introduction which posited various possible explanations for Ritalin SR®'s
failure. (12/14/07 Trial Tr. at 1130:19-1134:7 [Patrick]). Dr. Patrick failed to take into account the concluding
portions of the article which only discuss tachyphylaxis or acute tolerance as an explanation. (12/14/07 Trial Tr. at
1138:1-1139:7 [Patrick]; DTX 627 at 771).

Dr. Patrick's criticism of the Greenhill 1992 article was also misplaced. In that review article Dr. Greenhill
stated the following with regard to the failings of MPH-SR:

> **Current theory** suggests that psychostimulant medication effects on ADHD are related
> to the rate of absorption (ramp effect), so standard MPH's steeper absorption curve may give it
> more powerful beneficial and adverse effects, particularly during long-term maintenance. **This
> concept has raised the possibility** that MPH-SR's **greater duration of action** may alter
> pharmacokinetics (hepatic auto-induction) or receptor pharmacodynamics, **inducing
> tachyphylaxis** or tolerance.

(DTX 630 at 6) (emphasis added). By the plain text of these words, Dr. Greenhill explained that the current theory
behind MPH SR's failure was related to the rate of absorption. This theory led to the potential cause of the
tachyphylaxis or acute tolerance associated with MPH. Dr. Greenhill then cautiously mentioned some other possible
explanations. (*See* 12/12/07 Trial Tr. at 838:14-839:24 [Mayersohn]). Thus, contrary to Dr. Patrick's view, this
article does not point away from acute tolerance.

would be the section where the inventors tell the public what was known in the art prior to the invention. (12/14/07 Trial Tr. at 1150:12-1151:2; 1152:17-21 [Patrick]). Moreover, Dr. Guinta, one of the inventors on the patents in suit, confirmed that this statement was accurate regarding what was known clinically in the art. (12/10/07 Trial Tr. at 120:10-122:9 [Guinta]).

722.    In McNeil's Citizen's Petition, they stated that a substantially flat plasma profile resulted in a loss of 40% of efficacy indicating acute tolerance associated with Ritalin SR®. (PX 266 at Vol. 1, p. 9). Dr. Patrick agreed that the inventors' statement regarding what was evidenced by years of clinical use of Ritalin SR® met the definition of acute tolerance used by McNeil in their submission to the FDA. (12/14/07 Trial Tr. at 1159:16-21 [Patrick]).

723.    Thus, the totality of Dr. Patrick's testimony indicates that MPH was known to be associated with acute tolerance.

## 7.    **Dr. Patrick's Criticism of the Formulation Art Is Not Credible.**

724.    Dr. Patrick criticized the prior art teachings discussed above of using a dosage form providing an increasing release rate, hence ascending plasma profile, to counteract acute tolerance. Dr. Patrick's criticisms, however, are fraught with inconsistencies and significant mischaracterizations of the prior art and, thus, are not credible.

725.    Dr. Patrick stated that: (1) one of ordinary skill in the art would not look at the nitrate art; (2) the time frames or slopes of the ascending plasma profiles in the prior art dosage forms would not lead to an acceptable increasing release rate dosage form of methylphenidate; and (3) Fung abandoned his approach of providing an increasing release rate of nitrates to overcome acute tolerance associated therewith for the treatment of angina. Dr. Patrick erroneously concluded that the only logical choice for once a day methylphenidate treatment

-82-

would be a dosage form that provides a pulsatile profile mimicking the "sawtooth" profile seen in BID and TID administrations of methylphenidate with immediate release dosage forms.

726.    Dr. Patrick's suggestion that the nitrate art would not be viewed as relevant in the development of a methylphenidate dosage form is inconsistent with his own testimony and the specifications of the patents in suit. Dr. Patrick indicated that only four types of drugs were known in the mid 1990s to exhibit acute tolerance. (12/13/07 Trial Tr. at 1079:13-21 [Patrick]). Those four types of drugs included CNS stimulants such as methylphenidate and nitrates used for angina treatment. Dr. Patrick acknowledged that the method of administration of MPH to treat ADHD would have been similar to the method of administration of nitrates for anti-anginal treatment. (12/13/07 Trial Tr. at 1082:12-17 [Patrick]). One skilled in the art would, therefore, clearly have found art related to the issue of acute tolerance in nitrates relevant to addressing the acute tolerance problem in CNS stimulants such as methylphenidate. (12/12/07 Trial Tr. at 842:23-843:23 [Mayersohn], DTX 1221).

727.    Furthermore, the inventors of the patents in suit recognized the general applicability of an increasing release rate and ascending plasma profile to counteract acute tolerance associated with certain drugs. (12/10/2007 Trial Tr. at 111:11-113:17 [Guinta]; DTX 152 at PALZ 000771 ("While this invention presents central nervous system drugs in greater detail, it is understood the invention is generic and embraces drugs broadly administered using the dosage forms and the method of this invention."); claim 1 at PALZ 000794 ("1. A method for lessening the incidence of tolerance in a patient administered a drug that develops tolerance in the patient, wherein the method comprises administering the drug in a sustained and increasing dose to produce the intended effect.")).  Indeed, the common specification of the patents in suit indicates that the treatment would be applicable to many classes of drugs including CNS-acting

-83-

drugs and cardiovascular acting drugs.

728.    Specifically, the patents state:

There are numerous clinical situations and drug therapies that could be improved
with the use of dosage forms that provide a sustained and ascending release rate
over an extended time period. Exemplary dosage forms, as disclosed herein,
comprise CNS-acting drugs *and cardiovascular-acting drugs. It will be
appreciated by persons of skill in the art that the invention is applicable to many
other types of drugs and drug therapies.* Examples of suitable types of drugs
include, but are not limited to, [a laundry list].

(DTX 1 at col. 5, ll. 27-47 (emphasis added); *see also* Examples 4 and 5 dealing with

formulations of pseudoephedrine and nicardipine (the latter being a cardiovascular drug

mentioned in the prior art '850 patent (DTX 634)). Nitrates are, of course, "cardiovascular-

acting drugs" and were known to exhibit acute tolerance.

729.    Therefore, Dr. Patrick cannot credibly dismiss the teachings of the Fung article

and other prior art regarding acute tolerance with nitrates or other drugs when the inventors of

the patents in suit acknowledged that increasing release rate dosage forms would be generally

applicable with such drugs.

730.    Dr. Patrick's suggestion that the prior art teachings regarding increasing release

rates would not result in an acceptable methylphenidate dosage form is disingenuous. Andrx

agrees that one of ordinary skill in the art would not have selected a release rate and an

accompanying rising plasma profile that would cause unacceptable side effects. A substantially

ascending plasma profile, however, need not have a steep slope that would quickly yield side

effects. Rather, the profile would be designed to provide efficacy and avoid side effects based on

what was known in the art.

-84-

731.    Dr. Patrick's testimony regarding the desire to avoid an ascending plasma profile completely ignores important facts known from the prior art. In particular, one skilled in the art would know the MPH plasma levels that were both safe and effective for treating ADHD from what Dr. Patrick even admits was the "gold standard," *i.e.*, BID administration.

732.    Persons skilled in the art knew that MPH treatment, particularly in school-aged children, required sustained efficacy over a time frame of 8 to 9 hours. Moreover, persons skilled in the art also knew that MPH plasma levels that did not rise much above the highest peak of a BID or TID profile would result in a safe product. (12/10/07 Trial Tr. at 140:2-14 [Guinta]; 12/13/07 Trial Tr. at 1090:11-1092:21 and 1095:13-18 [Patrick]) Thus, the prior art clearly established the two important parameters for methylphenidate therapy to be both safe and effective, regardless of whether administered more than once or only once a day. Those parameters were therapeutic efficacy for 8-9 hours and avoidance of side effects associated with plasma levels of MPH going above the BID or TID peaks.

733.    One skilled in the art seeking to develop a once-daily dosage form of MPH that overcame acute tolerance would have applied the prior art approach of providing an increasing release rate, hence ascending plasma profile. (12/12/07 Trial Tr. at 842:2-17, 847:24-848:13, 849:15-850:14; 851:15-22, 858:19-859:22 [Mayersohn]). Such a dosage form would be designed to quickly achieve an initial level of MPH that would have therapeutic efficacy as known from BID administration and would then provide rising plasma levels throughout the desired period of efficacy to counteract acute tolerance. (Feifel Dep. Tr. at 185:12-186:16; *see also* Alza's Pretrial Brief at p. 32). The dosage form would also be designed to provide peak plasma concentrations that approximate the highest peaks of the BID or TID regiment so as to ensure safety.

-85-

734.    The prior art and, in particular, the Bayer and/or Wong patents, both of which describe ascending release rate dosage forms, would have been especially instructive to a person skilled in the art in development of such a dosage form of methylphenidate.  (DTX 632; DTX 634).  Thus, a person of ordinary skill in the art, in view of critical information relating to safe and effective plasma concentrations known from BID and TID administration, and prior art such as Bayer and Wong which teach how to make an increasing release rate dosage form, have been reasonably able to design a safe and effective once-daily dosage form of MPH.[15]

735.    Perhaps Dr. Patrick's most egregious mischaracterization of the prior art is his suggestion that Fung abandoned the approach suggested in his 1984 article of increasing nitrate release rate to counteract acute tolerance observed in nitrate therapy for angina.  The Fung 1984 article makes it clear that two types of profiles would be expected to work with acute tolerance: (1) the intermittent profile suggested by Dr. Patrick and (2) a substantially ascending profile produced by an increasing release rate.  (DTX 631 at 24, 25 and Figure 4).  Dr. Patrick then cited to a later 1994 Fung patent given to him by Alza's counsel which dealt with nitrites in an attempt to undercut the Fung 1984 publication.  (*See* PX 420; PX 725 (Demonstrative); 12/13/07 Trial Tr. at 1063:6-1066:6 [Patrick]).

736.    The 1994 patent, U.S. Patent No. 5,278,192, however, does not at all indicate that Fung abandoned his approach but rather discloses that nitrate tolerance can be avoided altogether if *nitrites* rather than *nitrates* are administered continuously over 24 hours for vasodilation. (PX 420 at col. 5, ll. 2-11).  While there is extensive discussion in the '192 patent concerning

---

[15]    Indeed, if such prior art references could not be used to manufacture such additional dosage forms, the claims of the patents in suit are necessarily invalid under Section 112 which, unlike obviousness, requires that more than one dosage form be achievable from the prior art.  Rather, as will be explained below, Section 112 requires that the number of dosage forms achievable be similar to the total number of dosage forms covered by the claim.

nitrate tolerance, there is no indication in the '192 patent that acute tolerance is associated with nitrites. Thus, Dr. Fung's invention in the '192 patent overcomes the acute tolerance associated with nitrates by using a different drug, *i.e.*, nitrites, ***not associated with acute tolerance***, to treat conditions that were otherwise treated by drugs, *i.e.*, nitrates, that exhibited acute tolerance. (PX 420 at col. 4, l. 67 – col. 5, l. 16).

737.    Dr. Patrick's suggestions that the '192 patent somehow evidences Dr. Fung's abandonment of his suggested 1984 approach to nitrate tolerance by providing an increasing release rate are misplaced. Indeed, for a drug such as nitrites that do not exhibit acute tolerance, a conventional sustained release dosage form providing a flat plasma profile would be expected to be quite satisfactory. That is, in fact, exactly the type of administration that the '192 patent appears to disclose.

738.    To the extent that Dr. Patrick's testimony suggests that the '192 patent addressed the problem of acute tolerance by providing other than an increasing plasma rate, thereby contradicting the 1984 Fung article, it is simply incorrect and misleading. Dr. Fung's '192 patent does not address acute tolerance by modification of any dosage form or release rate, but by providing a different drug not associated with acute tolerance.

739.    A 1997 Fung publication indeed confirms that Dr. Fung never abandoned his increasing release rate approach to addressing nitrate tolerance for angina treatment. In the 1997 article, Dr. Fung actually confirmed, through the use of computer simulated profiles, the approach described in his 1984 article. (DTX 1221).

740.    The 1997 Fung article also confirms that (1) it was well accepted clinically to

increase doses to overcome tolerance, (2) it was acknowledged that researchers would look to other art, such as the nitrate art, when dealing with similar types of tolerance issues, and (3) that different types of ascending profiles and increasing dose could be used depending on the balance of side effects and efficacy. (*See* DTX 1221 at 1143-44). More specifically, for a method of treatment wherein quick efficacy is desired but which has a somewhat narrow therapeutic window such as MPH, Fung indicates that a hyperbolic profile, *i.e.* a profile which quickly rises above a therapeutic level and then has a subsequent more gradual increase, would have been desirable. *Id.* According to Dr. Patrick, the hyperbolic profile is a substantially ascending profile. (12/14/07 Trial Tr. at 1171:16-18 [Patrick]).

741.    In the 1997 article, Fung criticizes conventional nitrate therapy that used intermittent dosing as not addressing tolerance that develops within the daily dosage interval. Fung then discusses how advances in computer-controlled delivery systems enabled accurate modeling of an increasing release rate dosage form. (DTX 1221 at 1140). Thus, the 1997 Fung article shows that Fung never intended to abandon the approach espoused in his 1984 paper but sought to and, in fact, did validate it as the technology enabled him to test his proposals.

742.    Based on all the foregoing, prior to November 1996, it was known to persons of ordinary skill in the art that: (1) MPH was associated with acute tolerance; (2) acute tolerance could be counteracted by a dosage form that provided increasing release rates of the active from the dosage form during a desired period of therapeutic efficacy; (3) methods for making once a day dosage forms with increasing release rates had been disclosed in the prior art; and (4) the BID/TID regimens indicated what plasma levels were known to be the lower boundary of efficacy and the upper boundary of side effects and as long as a plasma profile ascended between the lower and upper boundaries those plasma levels would have been expected to be both safe

-88-

and effective for treating ADHD. Therefore, it would have been obvious to a person with

ordinary skill in the art to develop a once daily dosage form that provided an ascending release

rate of MPH to counteract acute tolerance and that was both safe and effective based on known

BID/TID MPH plasma levels.

> **8.    The Fact That A Pulsatile Formulation Is An Obvious Solution To
> Overcoming Acute Tolerance Does Not Teach Away From A Dosage
> Form That Provides An Ascending Release Rate And/Or A
> Substantially Ascending Plasma Profile**

743.    Alza has also argued through Dr. Patrick that, since the BID regimen was known

to work, the only obvious solution to the once a day problem was to mimic that profile with a

pulsatile formulation that released drug twice at separate times. Alza's argument is that this one

obvious solution "teaches away" from an ascending plasma profile. Alza also argues that one of

ordinary skill in the art would have thought that the steep ramp and the troughs provided by the

IR BID dosing are necessary to achieve a safe and effective treatment.

744.    Alza's arguments are not well taken. While Andrx agrees that a pulsatile

formulation would have been one obvious solution to overcoming acute tolerance, more than one

solution can be obvious. In this instance, the facts indicate that an ascending profile and the

ascending release rate would have been obvious solutions to the issues associated with Ritalin

SR®. (12/12/07 Trial Tr. at 842:2-17, 847:24-848:13, 849:15-850:14, 851:15-22 and 858:19-

859:22 [Mayersohn]; Feifel Dep. Tr. at 185:12-185:16).

745.    By the mid 1990s the effective concentration for methylphenidate was known.

(12/13/07 Trial Tr. at 1095:19-1096:23 [Patrick]) It was also known that blood levels lower than

the highest peak of the BID or TID IR regimen should not cause undue side effects. (12/13/07

Trial Tr. at 1090:11-1092:21, 1095:13-18 [Patrick]; 12/12/07 Trial Tr. at 860:22-862:7

[Mayersohn]). Thus, as indicated previously, the boundaries of a therapeutic window for MPH *in vivo* was known. There would be no reason to think that blood levels within that therapeutic window would cause undue side effects. (12/10/07 Trial Tr. at 138:6-140:14; 146:22-147:11; 148:15-150:6 [Guinta]; 12/13/07 Trial Tr. at 1095:13-18 [Patrick]; 12/12/07 Trial Tr. at 860:22-862:7 [Mayersohn]; D.I. 136 [Alza's Responsive Pretrial Submission] at 32).

746.    Similarly, with regard to Dr. Patrick's assertion that a steep ramp was viewed as necessary for effectiveness, this suggestion is illogical. As an initial matter, Dr. Patrick viewed a requirement of a steeply ascending MPH plasma concentration slope to be "a stretch." (12/13/07 Trial Tr. at 1017:4-15 [Patrick]).

747.    Additionally, since the effective level of MPH was known *in vivo*, a profile that started at the effective level and then continued to rise (regardless of the slope of the rise) would be expected to be effective. (12/12/07 Trial Tr. at 863:20-864:4 [Mayersohn]). In other words, there is no reason to believe that once you have reached the threshold of effectiveness that increasing the amount of drug at a reasonable rate would lead to a loss in efficacy.

748.    Dr. Guinta confirmed that an ascending profile would have been safe as long as it stayed equal to or below the BID peaks:

Q:    But in term of it didn't — the possibility of side effects was something that you would deal with later as far as, you know, doing your work to come up with a more effective dosage form? The side effects didn't inhibit you from moving forward; is that fair?

A:    No. When we write a clinical protocol, it has to be reviewed by an independent ethics committee an institutional review board before it can be conducted.

It also is admitted to the [FDA]. *And the primary responsibilities of the independent institutional review board and the FDA are to make sure that the study being proposed does not pose any safety risks to children.*

-90-

So given that we were going to do the studies in children, who, in fact, are not even capable of giving informed consent, they have to give assent. *That safety was paramount.*

*You couldn't even begin to conceive of a study if you weren't going to guarantee the safety.* So while the purpose of the investigation was to look at effects, certainly the safety was very important.

*And if we had proposed anything that looked unsafe to the Ethics Committee or to the FDA, they would have stopped us and put us on clinical hold.*

Q:      And before you did even your first sipping study, you didn't — for that very reason, for that very important reason, you didn't think, ah, you know, we better not use an ascending profile[,] that's going to be unsafe; is that fair?

A:      Yes.

*Q:      You didn't think that the ascending profile was going to produce serious side effects, otherwise, you never would have done the first sipping study; isn't that fair?*

*A:      Yes.  And ascending profile never reached plasma levels.  Was never going to reach the concentrations that were higher than the second dose of IR.*

*Q:      And a long as you were going to be ascending, the ascending was going to stay below the second, the highest peak that the IR produced, you could feel pretty comfortable that you weren't going to have unacceptable side effects; isn't that fair?*

*A:      That was our assumption*, although we, of course, were going to monitor safety very carefully.

Q:      Of course, but you were comfortable enough about it that you felt okay going ahead with the study; isn't that fair?

A:      Yes.

(12/10/07 Trial Tr. at 138:6-140:14 (emphasis added) [Guinta]; 12/13/07 Trial Tr. at 1095:13-18 [Patrick] (agreeing that there is no concern in putting the final plasma concentration as high as the second peak in the BID regimen)).  Similarly, since the blood plasma concentration would start at an effective amount and proceed upward, such a profile would have been expected to be effective.  (12/13/07 Trial Tr. at 1095:19-1096:23 [Patrick])

749.    Alza argues that there was a "teaching away" from having a peak concentration late in the day, *i.e.*, 8 hours after administration.  Alza's position is contrary to the evidence.  A

typical TID regimen would produce a blood plasma concentration time profile wherein the third

peak was higher after the 8 hour mark when the dose was administered:



FIG. 4

(DTX 1 at Figure 4; *see also* 12/10/07 Trial Tr. at 148:15-150:6 [Guinta]).  Having such a peak

after the 8 hour mark of the day removed any concern that an ascending plasma profile only

through 8 hours would be expected to cause undue side effects.  (*Id.*)

750.    Finally, to the extent Alza suggests that there would have been a "teaching away"

from the ascending profile because there would be less concern about safety and efficacy with a

pulsatile formulation, such an allegation is not supported by the facts.  A pulsatile formulation

would have had more concerns regarding effectiveness than would a substantially ascending

profile.  Specifically, the decrease of the plasma level around lunchtime to the levels of the BID

or TID dosing in the pulsatile formulation would have raised concerns with regard to efficacy at

lunch. (12/12/07 Trial Tr. at 809:22-810:9 (Please note: there are typographical errors in this section of the transcript; the transcript should read Ritalin **IR** from 809:16-810:9, then switch to Ritalin SR®), 982:20-987:12; 992:3-10 (concern about lack of coverage in the trough especially at lunch where behavior tends to be rowdier) [Mayersohn]).

751.    Indeed, Dr. Feifel explained at deposition that the trough "open[s] up the possibility if gaps in the therapeutic coverage. And then often times, and in the particular case with methylphenidate, when you have a very rapid transition in the blood, especially downwards, we've seen adverse events that correlate to that very rapid transition that fall in blood levels. (Feifel Dep. Tr. at 171:2-8; *see generally id.* at 170:1-171:8).

752.    Similarly, there would have been concerns about the "rebound effect" experienced with the BID and TID regimen in any pulsatile formulation.[16] (DTX 1146 at ALZ 0095074 ("Furthermore, a 'rebound effect' of worsening behavioral and cognitive functions occurs as each dose of methylphenidate wears off, and before the next dose can be given [*i.e.*, in the trough]").

753.    This "rebound effect" was noted as being of foremost concern in Alza's pre-litigation documents. Alza's documents also indicate that the concerns they raise in the present litigation with regard to the substantially ascending profile, *i.e.*, appetite suppression and insomnia, were of much less concern than the "rebound effect." (DTX 1147 (for forecasting notes only two concerns: "Reduces frequency of rebound effect. Avoids dosing during school hours."; DTX 1148 at ¶ 3 under Discussion items ("Added value offered by such a system would be a) eliminating the need for school-time dosing (vs SR and IR); b) reducing the

frequency of rebound effect (vs. SR and IR); . . . Reduction in other side effects (appetite suppression, headache and insomnia) would be obvious bonuses but are not absolutely necessary for project continuation."); 12/10/07 Trial Tr. at 133:24-137:12; 140:223-146:21 (rebound effect) [Guinta]).

754.    Andrx agrees that with regard to a pulsatile formulation these possible side effects, while serious did not, and should not, have discouraged the development of a pulsatile formulation (and ultimately did not as Ritalin LA was marketed beginning in 2002). (D.I. 136 [Plaintiffs' Responsive Pretrial Submission] at Findings of Fact ¶¶ 460-462).

755.    Similarly, any potential concerns over insomnia or appetite suppression with a substantially ascending profile, would be unfounded as long as the profile ascended within the therapeutic window, and thus would not have "taught away" from the substantially ascending profile. Indeed, the substantially ascending profile would have had an advantage over the pulsatile formulation with regard to the concerns of "rebound effect" or a lack of coverage during the school day because the plasma profile does not substantially decline. (12/13/07 Trial Tr. at 992:3-10 [Mayersohn]; *see also* Feifel Dep. Tr. at 169:24-171:8).

756.    However, there need not be only one obvious solution to a problem. Such is the case here; both the substantially ascending and pulsatile profiles would have been obvious.

## B.    THE PERSON OF ORDINARY SKILL IN THE ART WOULD NOT BE ALZA'S TYPICAL M.D.

757.    The asserted claims of both the '373 and '129 patents are directed to methods for treating ADHD with a dosage form containing methylphenidate. Such a dosage form will

---

<sup>16</sup>    The "rebound effect" is the term used for an actual worsening of the behavioral and cognitive functions

CASE 1:05-cv-00642-JJF

provide an *in vitro* release rate of methylphenidate that increases over time, resulting in substantially ascending plasma concentrations of methylphenidate for certain periods of time.

758.    Everyone agrees that the person of ordinary skill in the art would be a practitioner as of the 1996 timeframe because that is the earliest date to which any claim may be entitled. The scientific specialty areas to which the claims are directed include formulation (which includes the measurement of *in vitro* drug dissolution), pharmacokinetics (which includes the plasma drug concentration-time profile in a living body) and pharmacodynamics (which includes the time-course of a pharmacologic or therapeutic response as it relates to plasma drug concentrations in a living body). The claims discuss use of a "dosage form" or a "pharmaceutically acceptable composition" to achieve the desired results listed in the claims.

759.    Thus, as Dr. Mayersohn explained, one of ordinary skill in the art at the relevant time would be a person conversant with and having an understanding of the general background associated with the results claimed in the patents in suit. (12/12/07 Trial Tr. 871:20-872:10 [Mayersohn]). Such an individual would have at least a B.S. or Pharm.D. in Pharmacy or a B.S. in chemistry, biology or engineering or a related scientific subject area. That individual would also have several additional years training either through advanced courses of study or work. The individual would have some experience with development of pharmaceuticals including evaluation of pharmaceuticals and including an understanding of pharmacokinetics and pharmacodynamics and may have an understanding of clinical medicine. (12/12/07 Trial Tr. 871:10-872:10 [Mayersohn]; 12/13/07 Trial Tr. at 896:20-900:17 [Mayersohn]). On cross-examination Dr. Mayersohn clarified that he did not believe that *specific experience with regard to treating ADHD or ADD (such as a physician or psychoanalyst)* was a requirement.

---

during the lunch time drop in plasma levels with the BID and TID regimens.

(12/13/07 Trial Tr. at 896:20-900:13 [Mayersohn]).

760.    Alza's definition of one of ordinary skill in the art is someone with an M.D., a Ph.D. in clinical pharmacology, clinical psychology or a comparable scientific field, and at least two years of practical experience such as that gained through a residency, post-doctoral appointment or comparable experience. (D.I. 136 [Plaintiffs' Responsive Pretrial Submission] at p.5). Dr. Patrick, however, clarified at deposition that this two years of practical experience by such an M.D. or clinical psychologist would typically be in the pharmaceutical industry doing research drug development and that nothing else came to mind with regard to any other types of practical experience. (Patrick Tr. at 112:4-114:14).

761.    Alza does not agree with Dr. Mayersohn's definition because "without advanced clinical training, one cannot understand the complexities involved in the treatment of ADHD and the factors that are important to efficacy, patient safety, and tolerability." (PPFF ¶ 280). Rather, according to Alza, "[t]he person of ordinary skill in the art would have had an understanding of the underlying causes of ADHD, the primary patient population, and the treatment options that were available to treat ADHD. Based on knowledge obtained from clinical work, that individual would also have had an understanding of the importance of proper dosing, timing of administration, and minimization of side-effects necessary for successful treatment of the symptoms of ADHD." (*Id.* at ¶ 278).

762.    Claim 1 of the '373 patent as interpreted by the Court requires only that the dosage form have an ascending release rate for an extended period of time which, as construed, means an increasing release rate through the greater of 3 hours or half the $T_{90}$ as determined in an appropriate *in vitro* dissolution test. It does not require a particular outcome, plasma profile, or

-96-

anything else. Rather, the method of treatment uses a known drug for that treatment and merely uses an allegedly new dosage form. Indeed, Dr. Patrick confirmed that everything about this claim was old except for the ascending release rate. (12/13/07 Trial Tr. at 1100:11-1101:9 [Patrick]).

763.    If Alza's person of ordinary skill in the art would, of necessity, have their practical experience in research drug development, then such an individual would be included within Dr. Mayersohn's definition. Against that backdrop, both a clinical and a research drug development understanding is present in both definitions since experience in pharmacodynamics necessarily carries with it clinical connotations.

764.    On the other hand, if the person of ordinary skill in the art need only have two years of residency in treating ADD or ADHD, the individuals identified by Alza as being ones of ordinary skill in the art, such as an M.D., clinical psychologists, etc., would likely have minimal, if any, experience either creating the key component of the claim, *i.e.*, the new dosage form, or determining whether the dosage form provided an ascending release rate, *i.e. in vitro* dissolution testing. This was confirmed by Alza's own witnesses Dr. Patrick and Dr. Guinta. (12/13/07 Trial Tr. at 1101:16-23 [Patrick]; 12/10/07 Trial Tr. at 125:9-17 [Guinta]).

765.    Alza's level of skill in the art ignores that the work of designing a method of treatment is typically not performed by just any M.D. or clinical psychologist with a 2 year residency. Rather it involves the work of drug companies and others involved in the development of new methods of treatment. Thus, this level of skill in the art should be rejected. (12/12/07 Trial Tr. at 871:13-872:10 [Mayersohn]).

766.    Indeed, Alza's absent expert Dr. Feifel was just such an M.D. and would have

qualified as a person of ordinary skill under this broader definition. Dr. Feifel could not have

been clearer, however, that he would not have been up to the task of coming up with any new

method of treatment involving an alleged novel dosage form. Nevertheless, even Dr. Feifel, as a

non-expert in the field, agreed that rising plasma profiles would have been an obvious way to

counteract acute tolerance:

> Q:     Now, what if you were advising a drug manufacturer about how to
> develop a new dosage form to deal with acute tolerance; what would you advise?
>
> A:     *Well, I think that's probably outside of my area of expertise.*
> *That relates more to issues in terms of an organism's response to*
> *pharmacokinetic profiles so I wouldn't – I wouldn't have expertise in that.* But
> I would generally try to suggest they create something that counteracted the
> tolerance that either tried to obviate it in some way by – tolerance sometimes can
> be treated by spacing doses or by increasing the potency of the compound later
> on. *I mean, those would be my non-expert general ideas.*
>
> Q:     Now, when you say "increasing the potency of the compound later
> on," what do you mean?
>
> A:     I don't really have any specific strategies for that. That's really
> something I think an expert in pharmacology, of drug development, might know
> how to do.
>
> Q:     *Are you saying that you would try to increase the plasma*
> *concentration of the drug over time but you don't know how to actually*
> *accomplish that; is that –*
>
> A:     *Yes, increasing the plasma levels once I would know that there is*
> *acute tolerance and – would be something, a reasonable possibility to*
> *counteract that.*

(Feifel Dep. Tr. at 91:10-92:8) (emphasis added).

767.    Indeed, Alza's persons of ordinary skill in the art were the very people who

approached Alza about creating a dosage form to treat ADHD with MPH because the M.Ds.

were incapable of generating such a method of treatment. (12/10/07 Trial Tr. at 46:3-20

[Guinta]; Guinta Dep. Tr. at JDT 00399-400, JDT 00476-80; Hamel Dep. Tr. at 00718-24, JDT

00746).

768.    Furthermore, there is simply no evidence that at the time that Alza began its work
on the project that any of the inventors had any personal understanding of the causes of ADHD,
the primary patient population, the treatment options available, proper dosing, etc., other than
through the information Dr. Guinta gathered from performing a literature search and talking to
experts. (12/10/07 Trial Tr. at 32:6-18 [Guinta]).  Such information was readily available based
on the years of use of methylphenidate to treat ADHD and easily would have been understood by
someone with the training described by Dr. Mayersohn.

769.    While Drs. Guinta, Gupta and Saks all had a background in the clinical side, Dr.
Guinta confirmed that Alza (and by implication, those three inventors) had no understanding of
ADHD or MPH prior to beginning their work and thus would not have qualified under Alza's
definition. (12/10/07 Trial Tr. at 32:6-18 [Guinta]; Lam Dep. Tr. at JDT 00774-78;  Saks Dep.
Tr. at JDT 01048-54; Hamel Dep. Tr. at JDT 00717-18).  On the other hand, each of these
inventors, as having knowledge directed to pharmacokinetics, clinical medicine, etc. would have
qualified under Dr. Mayersohn's definition.

770.    Perhaps most importantly, the area where there is not overlap between the
definitions of the parties, as noted above, is for the typical M.D. or clinical psychologist.  No one
who testified regarding obviousness at trial had such a background, so clearly it is not required.
Indeed, the one person who had such a background, Dr. Feifel, was not called by plaintiffs at
trial.  In any event, as quoted above, Dr. Feifel's testimony supported Dr. Mayersohn's view of
the obviousness of the approach claimed in the patent.  (Feifel Dep. Tr. at 89:21-94:8; 94:10-16,
185:12-186:9, 186:11-16).

-99-

771.    Thus, Alza's definition of the person of ordinary skill in the art, to the extent it

would encompass a typical clinician meeting patients and prescribing medications to treat

ADHD but does not require that individual to have a background in drug development, is not

correct.

772.    This Court should find that Dr. Mayersohn's level of skill in the art is most

appropriate. Dr. Patrick did not apply Dr. Mayersohn's level of skill in the art in reaching his

conclusions. (12/13/07 Trial Tr. at 1012:12-15 [Patrick]). Thus, Dr. Patrick's analysis of

obviousness should not be credited.

### C.    THERE ARE SMALL DIFFERENCES BETWEEN THE CLAIMED INVENTION AND THE PRIOR ART BECAUSE, FOR DECADES, ADHD WAS TREATED FOR MORE THAN EIGHT HOURS A DAY WITH METHYLPHENIDATE ADMINISTRATIONS

773.    Claim 1 of the '373 patent reads:

A method for treating ADD or ADHD comprising administering a dosage form
comprising methylphenidate that provides a release of methylphenidate at an
ascending release rate over an extended period of time.

(DTX 1).

774.    This is the only independent claim of the '373 patent. Claims 6 and 7 add that,

"said administration results in a substantially ascending methylphenidate plasma drug

concentration over a time period of about" 5.5 and 8 hours, respectively. (*Id.*)

775.    The only independent claim of the '129 patent that is being asserted is claim 1.

Claim 1 of the '129 patent states:

A method for treating Attention-Deficit Disorder or Attention-Deficit
Hyperactivity Disorder in a patient, wherein the method comprises administering
a pharmaceutically acceptable composition comprising methylphenidate and a
pharmaceutically acceptable carrier to said patient in a manner that achieves a

-100-

substantially ascending methylphenidate plasma drug concentration over a time
period of about 8 hours following said administration.

(DTX 3).

776.    The textual bodies of the '373 and '129 patents are, in all material respects, the

same. Therefore, for ease of reference, all citations to the common areas of the specification will

cite to the text of the '373 patent. (Compare DTX 1 and 3).

777.    The specification states that:

One commonly-used indicator of drug availability is the concentration of drug
that is obtained within the blood or plasma, or other appropriate body fluid or
tissue, of a patient following administration of the drug. For convenience, this
concentration may be referred to as *"plasma drug concentration" hereinafter*
*which is intended to be inclusive of drug concentration measured in any*
*appropriate body fluid or tissue*.

(DTX 1 at col. 1, ll. 42-50)(emphasis added).

778.    The specification and the Court's claim construction indicate that drug release

rates for oral dosage forms are measured as an *in vitro* rate of dissolution. (DTX 1 at col. 2, ll. 2-

5; D.I. 130).

779.    It is not disputed that methods of treating ADHD with methylphenidate through

the use of dosage forms were known in the art. Both Ritalin IR and Ritalin SR® provided such

methods. (*See, e.g.,* 12/13/07 Trial Tr. at 1100:17-20 [Patrick]).

780.    As will be discussed in more detail in the Section 112 portion of these findings,

under the Court's claim construction, the term dosage form means "a pharmaceutical

composition that includes a dose of methylphenidate." It is undisputed that the oral dosage

forms of the '850 patent (DTX 634) are dosage forms. Similarly, although whether a

transdermal is a "dosage form" covered by claim 1 was contested by Alza of the first time at trial, the Bayer patent teaches a dosage form that is a transdermal.

781.    The prior art, as noted above, taught that it would be desirable to overcome the acute tolerance associated with MPH treatment through the use of an ascending release rate. (*See* DTX 634; 12/12/07 Trial Tr. at 864:5-865:6 [Mayersohn]). The Fung article does not provide for a specific length of time for such an ascending release rate. The length of the time of the ascending release rate would be based on the length of the ascending plasma profile desired for treatment. (*See* 12/13/07 Trial Tr. at 1100:17-20 [Patrick]).

782.    It is undisputed that the art desired a dosage form that would treat ADHD for at least the 8 hours covered by BID treatment and perhaps for the 12 hours covered by TID treatment. As discussed above, the person of ordinary skill in the art thus would have used a substantially ascending plasma profile of at least 8 hours to provide such treatment. (12/12/07 Trial Tr. at 860:22-864:4 [Mayersohn]).

783.    Given the short half-life of MPH where one can see that the plasma profile ascends at most two hours post the last increasing release rate, this indicates that one of ordinary skill in the art would have wanted to provide an ascending release rate for at least 6 hours so as to provide the 8 hours of a substantially ascending profile. This would be far more than the 3 hours required by the claim as defined.

784.    Of course, the claim has been interpreted to require an ascending release rate for the greater of 3 hours or ½ the $T_{90}$. It is clear that one also would want 90% of the dosage to be delivered by at least 8-9 hours so as to not provide an ascending profile much past the latest coverage known, *i.e.*, the last TID peak at 10-11 hours. One would not want to go longer than

that due to the concerns of having circulating MPH in the blood of children late in the evening so as to affect sleep patterns. (12/12/07 Trial Tr. at 862:8-863:19 [Mayersohn]).

785.    Dr. Davies has confirmed that the Bayer patent (DTX 632) could be used to provide such an ascending release rate. Similarly, the '850 patent could also be modified so as to provide such an ascending release rate. (DTX 634).[17]

786.    Should Alza argue that there is nothing specifically in the prior art to identify targeting ½ the $T_{90}$ for the ascending release rate, it is worth noting that the ½ the $T_{90}$ language was added to the specification only with the February 1999 filing of the '317 application. (*See* DTX 14 at original specification at p. 17). Alza has asserted that the claims are entitled to a priority date of November 1996. None of the 1996 and 1997 applications include a recitation of ½ the $T_{90}$ as the period the release rate should ascend for. This confirms that a specific recitation of ½ the $T_{90}$ in the prior art was not necessary to find obviousness.

787.    Similarly, Alza has not put in any rebuttal evidence in this case that there is something non-obvious about the patentees' selection of the ascending release rate through ½ the $T_{90}$. Rather, it is clear that the ascension is just that necessary to provide the ascending plasma profiles sufficient to treat ADHD over the course of the 8 hour school day. (12/15/07 Trial Tr. at 1243:12 – 1244:9 [Davies]).

788.    Thus, when the art is considered as a whole, there are no non-obvious differences between what is taught in the prior art and what is claimed in claim 1 of the '373 patent.

---

[17]    It is questionable whether other dosage forms could have been supplied without undue experimentation. If they could not, however, than the claims of the '373 patent must fall for their failure to be enabled for their full scope.

789.    Claims 6 and 7 of the '373 patent similarly add the requirement that the dosage forms of claim 1 provide a "substantially ascending methylphenidate plasma drug concentration over a time period of about" 5.5 or 8 hours after administration, respectively.

790.    As noted above, the art taught that it would be desirable and achievable to have a substantially ascending profile for 8 hours. Such a profile would necessarily substantially ascend through 5.5 hours as well. Thus, claims 6 and 7 add nothing patentable to claim 1. (12/12/07 Trial Tr. at 872:21 – 873:7 [Mayersohn]).

791.    Similarly, claim 1 of the '129 patent is, in essence, claim 7 of the '373 patent without the requirement that the dosage form have an ascending release rate over an extended period of time. As such, claim 1 of the '129 patent is obvious for at least the same reason as claim 7 of the '373 patent. Indeed, as will be shown below, claim 1 of the '129 patent is anticipated.

792.    After completing the analysis of the first three factors which are to be considered in an obviousness analysis, claims 1, 6 and 7 of the '373 patent and claim 1 of the '129 patent would have been obvious as of the mid-1990s.

**D.    THE ALLEGED SECONDARY CONSIDERATIONS DO NOT ESTABLISH THAT THE CLAIMED INVENTION WAS NON-OBVIOUS**

**1.    Long-Felt Need And The Failure Of Others – The Claimed Invention Did Not Provide A New Answer As Others Had Already Taught The Claimed Features**

793.    Alza and Andrx both agree that there was a need for a once a day MPH dosage form for treating ADHD. While the need in the art and the failure of Ritalin SR® motivated others to look for a solution to the issue, those issues do not support the non-obviousness of the

-104-

claims of the patents in suit. The reasons why relate to the breadth of the claims and the

development of computer assisted drug delivery in the mid 1990s.[18]

794.    In the 1997 article by Dr. Fung mention earlier, he notes that in his article from

1984 (DTX 631) he had proposed an increasing release rate to treat the problem, but that he had

been unable to test such a system due to the lack of adequate computer aided delivery assistance.

Such assistance was only recently available. Specifically, Dr. Fung stated:

> Over a decade ago, we first surmised that non-linear dosing modes during the
> NTG-on period may improve the clinical efficacy of intermittent therapy [citation
> to DTX 631], but the utility of this approach has not been evaluated. ***Recent
> advances in computer-controlled delivery systems have allowed the
> implementation of complex dosing strategies [citation omitted], and have
> therefore allowed us to test the pharmacodynamics of NTG resulting from such
> non-linear dosing regimens.***

(DTX 1221 at 1143 (emphasis added); *see also* 12/14/07 Trial Tr. at 1169:19-1170:23, 1179:2-

22 [Patrick]).

795.    Those computer simulations allowed Dr. Fung to propose and test several plasma

profiles for a product with a relatively narrow therapeutic window (such as MPH), the hyperbolic

increase would have produced an ideal plasma profile because it permitted a quick rise above the

effectiveness thresholds while avoiding the side effect threshold which would have been reached

with either the linear or exponential increase models. (DTX 1221 at 1143, Table 1; *see also*

12/10/07 Trial Tr. at 139:11 – 140:14 [Guinta]). Alza's expert Dr. Patrick agreed that the

hyperbolic profile looks like a substantially ascending profile. (12/14/07 Trial Tr. at 1170:24-

---

[18]     It is of note, however, that claims 1, 6 and 7 of the '373 patent and claim 1 of the '129 patent are not
limited to the situation where effectiveness is maintained throughout the full course of the day. A shallow plasma
level increase which does not necessarily rise to the therapeutically effective level would be covered by these claims
but would not satisfy any long felt need. Thus, the claims are not limited to methods which allegedly meet any
"long felt need." Thus, any secondary consideration in this regard is not commensurate with the scope of the claims.

1171:23 [Patrick]). Dr. Patrick also confirmed that, depending on the time frame, one would

have found the linear and exponential profiles less useful for MPH. (*Id.* at 1171:24-1172:24

[Patrick]).

796.    Dr. Fung also noted that, while the exponential increasing input would be

expected to provide the best efficacy,

> Obvious limitations to this approach exist, including the finite limits in dose
> escalation, the risk of complicating side effects such as headaches, and/or the
> induction of rebound responses after abrupt drug withdrawal. These factors need
> to be addressed before this strategy can be employed in a clinical setting.

(DTX 1221 at 1144). Dr. Patrick confirmed that you would want to balance efficacy and side

effects and that for methylphenidate you would have wanted the computer simulated hyperbolic

curve. (12/14/07 Trial Tr. at 1175:4-1176:18 [Patrick]).

797.    Dr. Fung also noted that his approach would have general utility regardless of

drug release. (DTX 1221 at 1144; 12/14/07 Trial Tr. at 1177:23-1179:22 [Patrick]).

798.    To sum up, in a paper submitted within 4 months of the earliest priority date of

the patents in suit, Dr. Fung stated that: (1) he had not abandoned his approach set forth in his

1984 paper (DTX 631), (2) prior to the 1997 timeframe he had not been able to test his

suggestion due to inadequate computing developments, (3) he now could test his suggestion

through the simulations, (4) that his approach seemed to work for nitroglycerin, and (5) that such

an approach would likely have general applicability to other tolerance inducing drugs. (DTX

1221 at 1143-44; 12/14/07 Trial Tr. at 1180:10-1181:23 [Patrick]).

799.    Based on the foregoing, the Fung 1997 article makes it clear that a failure to

satisfy any long-felt need was not due to a failure to appreciate the desirability of a substantially

ascending plasma profile and the accompanying ascending release rate. Rather, the failure to satisfy the need was based on required technical advances in other fields such as computer simulation development which was not available until the mid 1990s. (DTX 1221).

800.    Thus, any long felt need merely provided the motivation to improve the Ritalin SR®/conventional approach to once a day treatment of ADHD. Any long felt need, however, does not support non-obviousness since other technical advances were required before the obvious solution could be confirmed.

801.    Furthermore, Alza treats Ritalin SR® as a failure of others. This is simply inapplicable because Ritalin SR® is the prior art starting point. Additionally, here, as Dr. Feifel confirmed, others have succeeded by using other approaches than those claimed. (Feifel Dep. Tr. at 17:1-16; 23:17-2; 24:5-10; 29:7-30:5). In his mind much of Concerta®'s commercial advantage over other MPH products could be attributed to the familiarity gained by being first to market. (Feifel Dep. Tr. at 23:17-24:24, 30:6-16).

802.    Thus, plaintiffs have not demonstrated any failure of others.

## 2.    Skepticism – The Evidence Establishes That An Answer Was Expected

803.    In its pre-trial papers, Alza cited to the expected testimony of Dr. Guinta to indicate the skepticism of others. (Alza's Responsive Pretrial Brief at ¶511-514).

804.    The only reports of skepticism by Dr. Guinta, however, did not relate to whether the art was skeptical, rather she stated *that Alza was skeptical* that they could do anything about the problem since the typical approach of a flat plasma profile had provided less than desirable results. (12/10/2007 Trial Tr. at 26:23-27:23 [Guinta]).

-107-

805. Indeed, Dr. Guinta indicated that people came to Alza to suggest that they improve Ritalin SR®. (*Id.* at 26:23-30:1 [Guinta]). Far from suggesting skepticism, the fact that doctors approached Alza asking them to "fix" Ritalin SR® indicates that they thought such a solution could be generated.

### 3. Unexpected Results – In View Of The Prior Art And The Fact That The First Clinical Trial Were Conducted In Children, It Is Clear That It Was Expected That The Treatment Would Be Safe And Effective

806. Alza states that it was surprising that an ascending release rate and a substantially ascending plasma profile would be safe and effective. Alza posits this based on a plasma profile which ascends with a steeply ascending plasma profile. (12/13/07 Trial Tr. at 1049:6-1052:9 [Patrick]). However, it is clear (as Alza's own witnesses testified) that as long as the profile begins at the effective plasma level and ascends but stays below and earlier than the last peak of the TID regimen, such a regimen would be expected to be safe and effective. (12/10/07 Trial Tr. at 139:18-140:14, 148:23-150:6 [Guinta]; 12/13/07 Trial Tr. at 1093:6-1095:18 [Patrick]). An example of this type of profile is Dr. Fung's hyperbolic profile. (DTX 1221 at 1143).

807. Indeed, Dr. Fung noted in his 1997 article that it was readily apparent in the art that in dealing with acute tolerance one would both (1) provide an increasing dose to provide effectiveness while (2) designing the type of ascending profile so as to not cause unacceptable side effects effects. (DTX 1221 at 1143-44). So results of effectiveness without unacceptable side effects would be expected.[19]

808. Additionally, Alza has presented no evidence that the side effect profile provided

---

[19] It is worth noting, however, that claims 1, 6 and 7 of the '373 patent and claim 1 of the '129 patent are not limited to the situation where effectiveness is maintained while avoiding side effects. The steep ascending plasma profile mentioned by Dr. Patrick, while unacceptable in practice, would be covered by the claims. Thus, the claims

any unexpected results in any regard.

809.    Specifically, with regard to Alza's art cited in its pretrial findings, it is interesting to note that the 3 time increased difficulty falling asleep with regard to Ritalin SR® was in comparison to a BID regimen which would have a last peak at approximately 6 hours.  (PPFF ¶332).

810.    Concerta® was not compared to the BID regimen used in the Ritalin SR® studies. (*See* PX 371).  Rather, Concerta® was compared to the TID regimen which would have a last peak around 10 hours or approximately 2 hours past the required ascension of any asserted claim and 4 hours after the last BID peak.  However, even as compared to the TID regimen Concerta® was associated with a greater incidence of insomnia.

811.    The difference between the two studies in whether the BID or TID treatment is the point of comparison is most notable because the BID regimen was similar to placebo in the Ritalin SR® study whereas in the Concerta® study, children on placebo fell asleep within 6 or 7 minutes, while the TID children took 33 minutes (0.55 h) and the Concerta® children took 39 minutes (0.65 h) to fall asleep.  (PX 414 at 233, Table 5; PX 371 at 209).  Thus, as Dr. Guinta testified, insomnia is still a problem with Concerta®.  (12/10/07 Trial Tr. at 148:23-149:8 [Guinta]).  Additionally, a product which had its plasma peak at 8 hours (as in claim 7 of the '373 patent) would have been expected to cause less insomnia than the TID regimen which has a last peak around hour 10.  (12/10/07 Trial Tr. at 149:9-150:6 [Guinta]).

812.    The side effect most discussed at trial was loss of appetite, but it is interesting to

_____

are not limited to only products which allegedly have "unexpected results."  Thus, any secondary consideration in this regard is not commensurate with the scope of the claims.

note that in the Ritalin SR® study 45% of the children on placebo had less appetite, 62% of the children on the BID had loss of appetite and 76% of the children had loss of appetite on Ritalin SR®. In the Concerta® study on the other hand only one child had loss of appetite on placebo while 6 lost appetite on TID and 7 had loss of appetite on Concerta®. Again, both the TID and Concerta® clearly increased loss of appetite, and Concerta® increased the loss of appetite the most; this is the same result seen in the Ritalin SR® study, *i.e.*, the once a day treatment had the most incidents of loss of appetite. (PX 414 at 233, Table 5; PX 371 at 209). Thus, there is no evidence of *any* success, much less unexpected success, on the two side effect measures pointed to be Alza when those measures are compared to the prior art.

813.    Alza does not cite to any study directly comparing the Ritalin SR® and Concerta® incidents of side effects, so no unexpected results have been established by Alza in any event.

### 4.    Copying – Plaintiffs Only Made Conclusory Allegations Of Copying

814.    With regard to copying of the claimed invention, Plaintiffs did not include such an allegation in its Responsive Findings of Fact but did include such an allegation on pages 56 and 57 of its Responsive Pre-trial Brief. All of Plaintiff's allegations are based on copying of the plasma profile of the claimed invention.

815.    As noted previously, however, claim 1 of the '373 patent does not require any particular type of plasma profile; it only requires an ascending release rate. For the reasons expressed in the non-infringement section of this paper, it is clear that Andrx did not copy Plaintiffs commercial embodiment, much less the claimed invention of claims 1, 6 and 7 of the '373 patent. Rather, Andrx designed their product to have a period of no release from the non-IR portion of its product while the claims require some release from the non-IR portion beginning in

the first hour.

### 5.    Commercial Success – Plaintiffs Failed To Establish That Any Commercial Success Was Due To The Patent Features And Was Not Due To Other Factors

816.    While commercial success can serve as an indicator that a claim is non-obvious, commercial success cannot make an otherwise obvious claim non-obvious. Richard Rozek (Alza's economic expert), testified that it was his opinion that sales alone cannot satisfy the multidimensional analysis needed to determine if a product is a commercial success. Dr. Rozek acknowledged that while Concerta® has had substantial sales, it is not the most prescribed or best-selling ADHD drug product on the market. The best-selling, most prescribed drug product is Adderall XR® (which uses a biphasic delivery of amphetamines) even though it was launched after Concerta®.

817.    Despite its larger number of sales than Concerta®, Dr. Rozek testified that he had not determined if Adderall XR® was a commercial success.

818.    Dr. Rozek misunderstood the scope of the claims at issue. For example, Dr. Rozek always referred to the patent's delivery methodology as being **both** an ascending release rate **and** a substantially ascending methylphenidate plasma drug concentration. (12/14/07 Trial Tr. at 1344:3-19 , 1364:7-16, 1367:7-22, 1373:3-11 [Rozek]). Therefore, although Dr. Rozek purported to provide testimony about each of the claims at issue, he functionally only addressed claims 6 and 7 of the '373 patent – the claims which require both the ascending release rate and the substantially ascending methylphenidate plasma drug concentration. Thus, Dr. Rozek's testimony cannot be used to support the non-obviousness of claim 1 of the '373 patent.

819.    Furthermore, while Dr. Rozek opined that Concerta®'s commercial success is

attributable to claim 6, among others, his understanding of the clinical effectiveness of Concerta®
was gained from Dr. Feifel. (12/14/07 Trial Tr. at 1405:6-1408:13 [Rozek]). Dr. Feifel's
deposition testimony, however, focused on the substantially ascending methylphenidate plasma
drug concentration for 8 hours (as in claim 7) and not for just 5.5 hours (as in claim 6). Thus,
Dr. Rozek's opinion can only be described as having any clinical basis with regards to the
substantial ascension for 8 hours.

820.    Dr. Rozek's limited understanding is readily apparent by his admission that he did
not have an understanding as to how claim 6's substantially ascending methylphenidate plasma
drug concentration for 5.5 hours can result in the twelve hour efficacy he thought important for
Concerta®'s commercial success. (12/14/07 Trial Tr. at 1403:6-22 [Rozek]).

### a.    Dr. Rozek's four bases for his opinion do not support the alleged non-obviousness of the claims

821.    Dr. Rozek testified that he had four bases for his opinion that "Concerta's
commercial success is due to Concerta's delivery methodology, specifically its release rate and
resulting plasma concentrations." First, it was his understanding that patent law allows one to
make a presumption that the commercial success is related to the characteristics described in the
patent. Second, he analyzed the sales of MPH based ADHD products and found that those sales
illustrate that Concerta® is a success. Third, he relied upon Andrx seeking to market a generic
version of Concerta® because of the significant source of earnings. Fourth, Dr. Rozek "looked at
other factors that we as economist would look at for trying to understand why there is a
difference and why there is such a difference in sales among products that contain the same
active pharmaceutical ingredient." (12/14/07 Trial Tr. at 1262:9-1363:18 [Rozek]). As
explained below, none of these bases can withstand scrutiny, and thus Dr. Rozek's opinion

-112-

should be rejected.

### b.     A presumption of commercial success does not apply here

822.    Dr. Rozek's first basis noted that a legal presumption can be afforded that the commercial success is due to the patented invention. Such a presumption, however, is only permitted if the marketed product embodies the claimed features, and is coextensive with them.

823.    Concerta® possesses features and has properties that are not limited to those claimed in the patent. For example, Concerta® contains an immediate release coating, its delivery of methylphenidate is pH-independent, and it uses an osmotic based delivery system (Alza's OROS system). In addition to failing to appreciate that the claimed features are not coextensive with the marketed product, Dr. Rozek failed to realize that Concerta® only meets the claim limitations in a minority of instances. Thus, Concerta® does not embody the claimed features.

824.    Dr. Rozek testified that it was his understanding that Concerta® was the product covered by the patent. When asked on cross examination if his understanding was that Concerta® was covered by claims 1, 6 and 7 one hundred percent of the time, Dr. Rozek stated that it was. (12/14/07 Trial Tr. at 1421:8-1422:6 [Rozek]). This is not correct.

825.    Dr. Angst testified earlier in the trial that it was his opinion that Concerta®, according to his criteria, had a substantially ascending methylphenidate plasma drug concentration for 8 hours in less than 40% of the profiles he analyzed (*i.e.*, 27 out of 77 profiles). (12/11/07 Trial Tr. at 449:15-23 [Angst]; *see also* PX 397). Dr. Angst also testified that in under 60% of the profiles that he analyzed, Concerta® had a substantially ascending methylphenidate plasma drug concentration for 5.5 hours (*i.e.*, 41 out of 77 profiles). (12/11/07

Trial Tr. at 450:5-12 [Angst]; *see also* PX 398).

826.    When confronted with Dr. Angst's testimony that Concerta® only provides a
substantially ascending methylphenidate plasma drug concentration in only some of its
administrations, Dr. Rozek stated that he was confused. (12/14/07 Trial Tr. at 1422:7-1423:18
[Rozek]). Dr. Rozek simply maintained that, contrary to the evidence offered by Dr. Angst, it
was his understanding that Concerta® is the product covered by the claims. (12/14/07 Trial Tr. at
1422:7-1423:18 [Rozek]).

827.    Dr. Rozek assumed that all sales of Concerta® go toward considering it a
commercial success while only a fraction of those sales result in the claims being satisfied. As
Dr. Rozek improperly considered all sales in his analysis as evidencing commercial success and
did not make any allowance for Alza's other experts' opinions, Dr. Rozek's opinion should be
rejected.

828.    Indeed, it is illogical that, since Concerta® only meets the 8 hour profile less than
40% of the time, claim 7 would be considered to be commercially successful when less than half
the Concerta® sales would be covered by the claim. In other words, Concerta® is more
commercially successful, *i.e.*, sells more product, when its use is ***not covered*** by claim 7 than
when it is.

829.    Similarly, claim 6, which Dr. Rozek is unsure how it supports the clinical
indication of Concerta®, covers less than 60% of the uses of Concerta®. Again, it is illogical that
one would say the commercial success is due to the invention covered by claim 6 when over
40% of Concerta®'s sales are not covered by claim 6, *i.e.*, the commercial success is
approximately equal between covered and uncovered uses.

830.    Finally, under Dr. Angst's infringement analysis, use of Andrx's product would infringe claim 6 less than 40% of the time and claim 7 less than 30% of the time. It again is illogical that a claim which would allegedly infringe substantially less than half the time the claim is met could have commercial success tied to it since the claims are clearly not co-extensive with the requirement of commercial success.

831.    Thus, the actual data regarding use of the product versus the scope of the claim indicates that any commercial success is *not* coextensive with the claim.

### c.    Dr. Rozek's analysis of methylphenidate based ADHD products was inconsistent and flawed

832.    Additionally, for the most part, Dr. Rozek centered his analysis on other methylphenidate products. When compared to just other methylphenidate products, Concerta® has been the most prescribed ADHD drug product from 2001 to 2006 (the first full year after launch to the last year of data for which Dr. Rozek had access). But it is not the most prescribed ADHD drug product overall. For example, in 2006, Concerta® had 28% of the total market in terms of dollar sales, while Adderall XR® had 34% and Strattera® had 18% (the top three ADHD drug products account for 80% of the market in dollar sales). (PX 520).

833.    Dr. Rozek also did not take into account that Concerta® was the first new branded MPH product in many years. Dr. Feifel made it clear that this "first mover effect" contributed greatly to Concerta®'s commercial success. (Feifel Dep. Tr. at 31:6-19). Indeed, Dr. Feifel stated that that is one of the main reasons he continues to predominantly prescribe Concerta®. (Feifel Dep. Tr. at 23:17-24:24, 30:6-16). Clearly this is a factor outside the claims, and it was not factored into Dr. Rozek's analysis.

834.    Dr. Rozek was asked on direct if he had considered marketing as a potential explanation. He responded that "I didn't see that Concerta was being marketed to any greater extent than other treatment for ADHD." (12/14/07 Trial Tr. at 1371:22-24 [Rozek]).

835.    Dr. Rozek's analysis of marketing expenditures with regard to Concerta®, however, applies a different standard than his "success" analysis. While Dr. Rozek looked to other methylphenidate products to gauge Concerta®'s success, Dr. Rozek did not compare Concerta®'s marketing to that of the other methylphenidate products (as he did with sales). Instead, he compared Concerta®'s marketing to all other ADHD treatments.[20] (See 12/14/07 Trial Tr. at 1349:3-1350:2; 1358:4-1360:12 [Rozek]).

836.    Additionally, Dr. Rozek admitted during cross examination that he had not looked at the amount of dollars spent on marketing, but instead only looked at indirect measures: physician contacts, minutes spent providing information to physicians, and numbers of samples provided. (See exhibits 29-31 in DTX 1223). Thus, his comparisons regarding success and expenditures were related to separate groupings and were selected to make Concerta® appear most favorable in each comparison.

837.    The evidence demonstrates, contrary to Dr. Rozek's assertions that while Concerta® has averaged about 200,000 physician contacts from 2001 – 2006, the remaining methylphenidate products have each averaged somewhere around 25,000 physician contacts. Thus, Concerta® has approximately an 8:1 advantage in its marketing ratio when compared to the

[20]    All ADHD products, except one, consist of schedule II stimulants (methylphenidate or amphetamine); the exception is Strattera®. Strattera® uses a new drug entity and had to overcome barriers not present for the methylphenidate or amphetamine products. Thus, not surprisingly, Strattera® is the most heavily marketed ADHD drug product because it requires more doctor education on a new entity whereas most doctors are familiar with methylphenidate and amphetamines. Concerta®, however, is the second most heavily marketed product, followed by Adderall XR® (the number one ADHD drug product).

next highest promoted methylphenidate product. (*See exhibit* 30 in DTX 1223). Thus, marketing is one clear explanation for the greater success of Concerta® versus other methylphenidate products.

838.    Further support for this is found in Dr. Rozek's own exhibit. By far the three most marketed products from 2000-2006 are Strattera®, Concerta® and Adderall XR®. (*See exhibits* 29-31 in DTX 1223). Not surprisingly, those three, while comparable in both their dollar sales and their marketing efforts, vastly dwarf all the other products in both sales and marketing.

### d.    Dr. Rozek simply assumes that Andrx copied Concerta®

839.    Dr. Rozek relied on Andrx's proposed ANDA products as demonstrating that the delivery methodology is the important factor.

840.    On direct, when asked to explain what he meant by delivery methodology, Dr. Rozek provided:

> Specifically I mean the product that has the ascending release rate for an extended period of time that then results in a substantially ascending methylphenidate plasma concentration level for five-and-a-half or eight hours.

(12/14/07 Trial Tr. at 1373:6-11 [Rozek]).[21]

841.    Dr. Rozek testified that it was his understanding that Andrx had copied Concerta®'s "delivery methodology" and that Andrx did not copy Concerta®'s other properties,

---

[21]    It is interesting to note that this understanding of the "delivery methodology" does not account for Dr. Rozek's opinion provided in his expert report and confirmed on cross examination – that the commercial success of Concerta® can be attributed to claim 1 of the '129 patent. (12/14/07 Trial Tr. at 1392:20-1393:19 [Rozek]). That claim only requires an ascending plasma profile, it does *not* require the ascending release rate. Thus, the only requirement present in both patents is the ascending plasma profile.

such as the OROS osmotic delivery system. Dr. Rozek was asked on direct how he concluded that the OROS delivery system was not responsible for Concerta®'s commercial success – Dr. Rozek's circular reasoning was that because Andrx did not copy the OROS delivery system it was not important. (12/14/07 Trial Tr. at 1413:3-7 [Rozek]).

842.    Regardless, as provided in more detail in above, Dr. Rozek is incorrect that Andrx copied Concerta® or its delivery methodology. Andrx's proposed ANDA products do not have any non-IR release in the first hour. This also leads to the result that Andrx's proposed ANDA products have a designed decline in its plasma profile from the delayed release it designed in its products. Concerta® does not have such a designed decline in its plasma profile. Indeed, far from copying the claimed invention, Alza's expert Dr. Angst confirmed that use of Andrx's product infringes claims 6 and 7 in substantially less than half the administrations.

### e.    There is more than a single difference among ADHD products

843.    Dr. Rozek testified that he could only identify a *single* difference between Concerta® and the competing products which could be responsible for Concerta®'s success: its delivery methodology. Dr. Rozek's testimony stands in contrast to that of Alza's other experts. For example, Dr. Feifel testified that at least part of Concerta®'s success is due to it being the first to market. (Feifel Dep. Tr. at 23:1-24:24; 30:6-16; 30:24-31:19).

844.    Additionally, Dr. Feifel testified that Concerta®'s lowered abuse potential is also responsible for it success:

    Q:    "Concerta reduces chances of abuse because it is made from a paste."

    A:    I see that, yes.

-118-

Q:    Has that been your experience with Concerta?

A:    I have very little experience in my patients producing – having abuse, but I do believe that is true, that statement.

Q:    *And is that a result of Concert being an osmotic dosage form that it has this reduced chance of abuse?*

A:    I think there's two factors that give Concerta a reduced chance. One is the fact that it's from a long-acting formulation and long-acting formulations of stimulants tend to produce less reinforcing effects when they're taken. However, most medications, long-acting or short-acting, their pharmacokinetics in the brain can be changed by physically modifying them, by chopping them up. *And so I think the fact that that's not physically possible as far as I know with the Concerta, that if you chopped it up you would produce a paste or a gel, it also eliminates the possibility and the likelihood of people trying to divert it for recreational uses by changing its physical properties and snorting it.*

Q:    *In your view, is that one of the things that has contributed to the success of Concerta, the reduced possibility of abuse?*

A:    *I think that's a contributor, yes.*

(Feifel Dep. Tr. at 192:7-193:9) (emphasis added).

845.    Although Dr. Rozek dismissed differentiating factors as unimportant, he did credit some attributes for Concerta[®]'s commercial success that *are not* claimed features of the patent. Dr. Rozek testified that Concerta[®]'s marketing message of "unsurpassed twelve hour efficacy, rapid onset of action, no variability in absorption and low abuse potential/side effects" were the attributes that flowed from the claims' requirements and which were responsible for its success. (12/14/07 Trial Tr. at 1402:20-1403:5 [Rozek]).

846.    As noted previously, there is no evidence in this case tying the "unsurpassed twelve hour efficacy" to an ascending release rate that could be as low as 3 hours (claim 1 of the '373 patent) or an ascending plasma profile of approximately 5.5 hours (claim 6). Similarly, there is no evidence than an ascending plasma profile of 8 hours (claim 7) is related to twelve

-119-

hour efficacy (indeed the patent has some unasserted claims relating to a substantially ascending plasma profile of 9.5 hours which would more closely correspond to 12 hour efficacy). (*See* claim 8 of the '373 patent; *see also* col. 22 at ll. 4-23 (equating the 9.5 hour substantially ascending profile with comparable efficacy and safety when compared to the TID over 12 hours); Figure 4 of the '373 patent showing a substantially ascending profile through 9.5 hours).

847.    Dr. Rozek's understanding of Concerta®'s "rapid onset of action" was due to its immediate release coating. (12/14/07 Trial Tr. at 1407:11-17 [Rozek]). Dr. Rozek was unaware, however, that the immediate release coating is not a required element of the patented invention (indeed, much of the non-infringement controversy in this case arises due to the need to exclude the IR component from the ascending release rate analysis). (*See* 12/14/07 Trial Tr. at 1407:18-22 [Rozek]). Thus, one of the features which Dr. Rozek testified was responsible for part of Concerta®'s commercial success – its rapid onset of action – is not claimed.

848.    Dr. Rozek further testified that Concerta® was a commercial success due to the *single* difference between Concerta® and the competing products that he was able to identify: its delivery methodology. Dr. Rozek testified that, for example, all once a day ADHD products have the same lowered abuse potential – as each can be administered once at home thereby limiting the potential for diversion to abusers as the products do not need to be transported or administered away from home. (12/14/07 Trial Tr. at 1410:17-1412:3 [Rozek]).

849.    Dr. Rozek's opinion, however, fails to acknowledge at least one feature that Alza has represented as important for and unique to Concerta® – its use of Alza's OROS osmotic delivery system. Indeed, Dr. Rozek went so far as to testify that the OROS is not an important feature for Concerta®. (12/14/07 Trial Tr. at 1413:3-7 [Rozek]).

-120-

850.    Dr. Rozek was unaware Alza has made representation to the DEA that OROS itself lowers the abuse potential for Concerta®. For example, in documents which were not provided to Dr. Rozek in his preparation for this case, Alza has sought to have the DEA reschedule Concerta® so that it would be subject to less stringent prescribing requirements. Similarly, Alza unsuccessfully petitioned the FDA to require that any generics to Concerta® employ a mechanism that would lower its abuse potential. (*See* PX 266 at Vol. 1, p. 15).

851.    The OROS osmotic delivery system is not used in any other ADHD product, nor is it used in Andrx's proposed product. (12/14/07 Trial Tr. at 1413:3-7 [Rozek]). As Dr. Feifel indicated, the purportedly lowered abuse potential afforded Concerta® by the OROS system allows for a competitive advantage for Concerta®. (Feifel Dep. Tr. at 191:19-193:9).

852.    Interestingly, Dr. Rozek admitted that he was aware that at least at one time OROS itself had been patented. (12/14/07 Trial Tr. at 1417:22-1418:3 [Rozek]). Thus, Dr. Rozek's complete dismissal of a previously patented feature of Concerta® – that is not present in any other competing product – constitutes a flaw in his analysis.

### f.    Dr. Rozek's opinion regarding commercial success should not be credited

853.    Dr. Rozek's conclusion that Concerta® is a commercial success due to the patents in suit cannot be credited. Dr. Rozek failed to consider that Concerta® only embodies the patent in a minority of administrations, failed to accurately consider marketing efforts favoring Concerta®; he also failed to appreciate non-claimed but important features in Concerta®, including the OROS technology. As such, Concerta®'s success has no relevance to the obviousness inquiry.

854.    Based on all the foregoing, Plaintiffs' have not established secondary considerations for the asserted claims of the patents in suit.

## V.    CONCLUSIONS OF LAW THAT THE CLAIMS AT ISSUE ARE OBVIOUS

855.    A claim is invalid if the difference between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which the subject matter pertains.  35 U.S.C. § 103(a).

856.    The ultimate conclusion of obviousness is a question of law based on underlying facts.  *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007).

857.    A claim is presumed valid, but when the prior art cited against the claims was not part of the prosecution, as was the case here, the presumption of validity should be voided.  *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1745 (2007)

858.    In *Graham v. John Deere Co.*, the Supreme Court set forth the criteria to determine the obviousness or nonobviousness of claimed subject matter.  *Graham v. John Deere Co.*, 383 U.S. 1 (1966).  The criteria are: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) secondary considerations, or objective indicia of nonobviousness, such as a long-felt need for the claimed invention, commercial success of the invention, and failure of others to achieve the invention. *Id.* at 17-18.

859.    The Supreme Court has recently reaffirmed the relevance and preeminent nature of the *Graham* factors.  *KSR*, 127 S.Ct. at 1731.

-122-