860.    The scope of the prior art includes art that is "reasonably pertinent to the particular problem with which the inventor was involved." *In re GPAC Inc.*, 57 F.3d 1573, 1577 (Fed. Cir. 1995). Two separate tests define the scope of the relevant prior art: (1) whether the art is from the same field of the endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved. *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).

861.    If a reference disclosure relates to the same problem as that addressed by the claimed invention, that fact supports the use of that reference in an obviousness analysis. *GPAC*, 57 F.3d at 1578. Common sense teaches that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple references together like pieces of a puzzle. *KSR*, 127 S.Ct. at 1742.

862.    In this case, the inventors' field of endeavor is the treatment of attention deficit hyperactivity disorder (ADHD) through the use of pharmaceuticals as well as the art of pharmaceutical formulation.

863.    The scope that is reasonably pertinent to the particular problem with which the inventor was involved includes CNS disorders and their treatment, art relating to methylphenidate and other CNS stimulants, and art relating to acute tolerance (or tachyphylaxsis) issues seen in pharmaceuticals.

864.    Here, Ritalin SR® was known to have a problem in that it lost efficacy over the course of the day. (DTX 1 at col. 7, ll. 40-49). In researching the problem of instances where a sustained release dosage form had maintained the initially desired flat profile over time but lost

-123-

efficacy, the admittedly relevant art of Perel, Birmaher, etc., taught that acute tolerance was an issue. Indeed, Plaintiffs' own witnesses admit that acute tolerance was at least suggested with regard to MPH. This suggestion would have provided the impetus to seek out prior art relating to acute tolerance. Such art would have been extremely relevant and pertinent art. *See KSR*, 127 S.Ct. at 1741-42; *Pfizer*, 480 F.3d at 1362-65.

865.    The prior art treatment of angina with nitrates was known to cause acute tolerance. Thus, art relating to the treatment of angina with nitrates so as to overcome acute tolerance was clearly relevant and pertinent art. Thus, all the art discussed above is considered pertinent art. *Id.*

866.    The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art. *In re GPAC, Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995).

867.    The person of ordinary skill in the art, however, is also "a person of ordinary creativity, not an automaton," and a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ. *KSR*, 127 S.Ct. at 1742.

868.    Factors that may be considered in determining the level of ordinary skill in the art include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field. *Daiichi Sankyo Co., Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007). These factors are not exhaustive but are merely a guide to determining the level or ordinary skill in the art. *Id.*

869.    Here, Andrx proposes that the skill in the art be an individual who has at least a

B.S. or Pharm.D. in Pharmacy or a B.S. in chemistry, biology or engineering or a related scientific subject area. That individual would also have additional training either through advanced courses of study or work. The individual would have some experience with pharmaceuticals which would include work in formulation design and/or evaluation and a working knowledge of pharmacokinetics and pharmacodynamics and/or clinical medicine.

870.    Alza on the other hand, suggests that the person of ordinary skill in the art is an M.D., a Ph.D. in clinical pharmacology, clinical psychology or a comparable scientific field, and at least two years of practical experience, such as that gained through a residency, post-doctoral appointment or comparable experience. Alza takes this position because the claims relate to methods of treating ADHD.

871.    While it is true that physicians would prescribe the dosage forms to be administered, the art is directed to the use of a dosage form with an allegedly new type of release and an allegedly new plasma profile. Typically, physicians and the like do not generate such dosage forms, and thus, they are not of skill in the art absent some more specialized training. (See *Daiichi*, 501 F.3d at 1256-57; 12/13/07 Trial Tr. at 1106:24-1107:7 [Patrick]).

872.    Indeed, in this instance, it was the experienced M.D.s who approached Alza about generating a new dosage form. This clearly indicates that the person of ordinary skill is not an M.D., but rather is typically someone working in, or with, drug development organizations or who have similar types of experience. Additionally, Dr. Patrick confirmed that those typical M.Ds. or clinical psychologists would not typically have experience in dosage form design or in measuring *in vitro* dissolution rates as required by the claims of the '373 patent. (12/13/07 Trial Tr. at 1101:16-23; 1106:24-1107:7 [Patrick]).

873.    Thus, Andrx's proposed person of ordinary skill in the art is the appropriate standard.

874.    With regard to the differences between the claims and the prior art, the initial focus is "the objective reach of the claim." *KSR*, 127 S.Ct. at 1742. Here as discussed in the enablement section the claims are broad.

875.    Beginning with claim 1 of the '129 patent that claim, for all intents and purposes, merely requires a substantially ascending plasma profile over approximately 8 hours. A substantially ascending profile was obvious because one of ordinary skill in the art would expect that plasma profiles rising within the therapeutic window while remaining at or below the peaks of the prior art BID or TID regiments would be safe and effective. *See Pfizer*, 480 F.3d at 1366-68.

876.    As the *KSR* Court stated,

When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

127 S. Ct. at 1742.

877.    Moreover, the art based upon acute tolerance clearly taught an ascending plasma profile and provided a reasonable expectation of success that a substantially ascending profile for approximately 8 hours, i.e., approximately the length of a school day, and, thus, claim 1 of the '129 patent would have been obvious.

878.    With regard to claim 1 of the '373 relating to, in essence, the provision of an

ascending release rate of methylphenidate over an extended period of time, it is clear that the pertinent art related to providing an ascending plasma profile over time suggested such a release rate. Additionally, it would be expected that an ascending release rate for an extended period of time would be effective to provide the desired increasing plasma profile over time. Thus, this claim is obvious.

879.    To the extent the Plaintiffs argue that having an ascending release for at least ½ the $T_{90}$ or 3 hours (whichever is greater), it is evident that a determination of the extent of the release rate would merely be an optimization so as to provide the substantially ascending plasma profile for 8 hours. Such optimization of values does not add patentability to claim 1. *See Pfizer*, 480 F.3d at 1368.

880.    Finally, claims 6-7 of the '373 patent would have been obvious because the suggestion to have an ascending plasma profile over time which plasma profile was generated by an ascending release rate was present. Additionally, the desire would have been to have a substantially ascending profile through all time points up to 8 hours, so the shorter or gerrymandered time limitations of the dependent claims would also have been obvious.

881.    Plaintiffs argue that the prior art taught away from the claimed invention by indicating that a pulsatile formulation would have been obvious. Just because one solution is obvious, however, does not "teach away" from other obvious solutions especially where there are a limited number of solutions suggested. The obviousness of a pulsatile solution does not "teach away" from the claimed invention. *See KSR*, 127 S. Ct. at 1742.

882.    With regard to secondary considerations, the secondary considerations have not been established by Alza in any event. Therefore, the alleged secondary considerations do not

-127-

overcome the strong showing of obviousness. *Pfizer*, 480 F.3d at 1372.

883.    Alza relied at trial on Dr. Rozek's opinion regarding commercial success. For the reasons noted above, Dr. Rozek's testimony did not establish commercial success. Nevertheless, even if he had been able to establish commercial success, commercial success cannot overcome the strong obviousness case presented by the facts in this case.    *Merck & Co., Inc. v. Biocraft Labs., Inc.*, 874 F.2d 804, 809 (Fed. Cir. 1989).

## VI.    FINDINGS OF FACT THAT THE CLAIMS AT ISSUE ARE INVALID BECAUSE THEY CANNOT BE ENABLED

### A.    THE CLAIMS OF THE PATENTS IN SUIT ARE NOT ENABLED FOR THEIR FULL SCOPE AS A MATTER OF LAW

884.    Andrx asserts that claims 1 and 6-7 of the '373 patent and claim 1 of the '129 patent are invalid for lack of enablement. A conclusion of obviousness in this case is not inconsistent with a finding of lack of full scope enablement. Full scope enablement requires that a myriad of ascending release rate dosage forms be enabled (as described in detail below). Obviousness, on the other hand, only requires that the person of ordinary skill in the art would have had a reasonable expectation of success that at least one such dosage form could be made.

885.    Claim 1 of the '373 patent reads:

A method for treating ADD or ADHD comprising administering a dosage form comprising methylphenidate that provides a release of methylphenidate at an ascending release rate over an extended period of time.

(DTX 1 at col. 23, ll. 12-15).

886.    This is the only independent claim of the '373 patent. Claims 6-7 add that "said administration results in a substantially ascending methylphenidate plasma drug concentration

-128-

over a time period of about" certain defined time periods following administration of the dosage form. Claim 6 requires a time period of about 5.5 hours, and claim 7 requires a time period of about 8 hours. (DTX 1 at col. 24, ll. 9-21).

887.    The term "dosage form" was specifically construed by this Court as Alza proposed, *i.e.*, dosage form means "a pharmaceutical composition that includes a dose of methylphenidate." There is no requirement in the construction that the dosage form be any particular type of dosage form. (D.I. 130 at ¶ 1). More specifically, the construction does not require tablets, capsules or transdermals. Indeed, it does not even require oral dosage forms. Alza could have proposed such a construction, but it did not.

888.    Claims 6-7 of the '373 patent, as construed by the Court, likewise claim **any** dosage form that satisfies claim 1 of the '373 patent and also provides a substantially ascending methylphenidate plasma drug concentration over a time period of about 5.5 hours (claim 6) or about 8 hours (claim 7).

889.    The term "an ascending release rate over an extended period of time" was also construed by this Court as Alza had proposed. For relevant purposes with regard to Andrx's 112 defenses, that definition includes that:

> The release rate is as determined by *an appropriate in-vitro dissolution test*. The ascending release rate does not include release of drug from *any* immediate-release drug coating that *may* be applied to the dosage form.

(D.I. 130 at ¶ 2) (emphasis added).

890.    Claim 1 of the '129 patent states:

> A method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in a patient, wherein the method comprises administering

a pharmaceutically acceptable composition comprising methylphenidate and a
pharmaceutically acceptable carrier to said patient in a manner that achieves a
substantially ascending methylphenidate plasma drug concentration over a time
period of about 8 hours following said administration.

(DTX 3 at col. 23, ll. 12-19).  Claim 1 does not require an ascending release rate or dissolution

testing.

1. **During The Claim Construction Proceedings, Alza Successfully
Argued That The Claims At Issue Covered Any Dosage Form, But
Alza Now Seeks To Limit The Claims To "Oral Extended Release
Dosage Forms" Because Otherwise It Is Clear The Claims Are Not
Enabled For Their Full Scope**

891.    Now that Alza  realizes that the Court's construction leads to invalidity under

Section 112 for failure to enable the claims for their full scope and for lack of written

description, Alza argues that the claims should be reconstrued to be limited to "oral extended

release dosage forms" instead of "a pharmaceutical composition that includes a dose of

methylphenidate."

892.    Specifically, Plaintiffs' Responsive PreTrial Submission states:

Plaintiffs thought it was clear from the Court's construction of the claims that
they do not encompass these non-orally administered dosage forms [referring to,
among others, creams and suppositories], in part because they are not subjected to
standard *in vitro* dissolution tests.  Nevertheless, to the extent there is any doubt
on this score, *the Court should clarify its construction to make clear, consistent
with the express direction of the specification, that the claims cover only oral
extended release dosage forms* that exhibit the required MPH release rate
characteristics, and the substantially ascending MPH plasma characteristics.

(*Plaintiffs' Responsive Pretrial Submission* at 64)(emphasis added).

893.    Incredibly, having gone through almost the entire litigation, Alza requested that

the Court change its claim construction less than a week before trial without ever explaining

why, if it was so clear that "dosage form" in the claim meant "oral extended release dosage

form,"[22] it did not request such a construction earlier. It is readily apparent that, realizing the invalidity of the claims as construed, Alza wants the Court to disregard Alza's previous, successful claim construction position and reconstrue the claims in an effort to preserve their validity.

894. Additionally, as will be explained below, Alza's theory of the claim being limited to an "oral extended release dosage form" due to the dissolution testing required was, by and large, discredited when its dissolution expert, Ms. Gray, stated unequivocally that there were appropriate dissolution tests for non-oral dosage forms such as creams and suppositories. (12/11/07 Trial Tr. at 369:23-371:22 [Gray]).

895. Alza's position also makes no sense because Alza and its expert Dr. Davies have always taken the view that the term dosage form in the '373 patent and the term "pharmaceutically acceptable composition" of the '129 patent are synonymous. In other words, according to Alza, the types of dosage forms covered by both patents are the same. (12/14/07 Trial Tr. at 1274:2-1276:18 [Davies]). Claim 1 of the '129 patent, however, *does not* require a dissolution test at all, and thus, Alza is disingenuous in arguing that the ascending release rate term implies a particular type of dosage form. Alza is merely engaging in an after the fact attempt to reconstrue the claim.

896. In direct contrast to its current position, during the claim construction proceedings, Alza stated that "the specification indicates that the terms "dosage form" and "pharmaceutically acceptable composition" broadly encompass pharmaceutical compositions

---

[22]    A point of clarity appears necessary here. The term "oral extended release dosage form" is not limited to just tablets and capsules as Dr. Davies would have it. Rather, as was pointed out by Dr. Needham, "oral extended release dosage forms" include any type of dosage form ingested through the mouth. Such dosage forms would include, for example, lozenges and suspensions. (12/12/07 Trial Tr. at 700:17-701:4 [Needham]).

containing methylphenidate that can be adapted for administration to an individual." (D.I. 87 [*Alza's Opening Claim Construction Brief*] at 16). Alza also stated that "*[n]othing in the claim language itself* limits the term 'pharmaceutically acceptable composition' *to a specific means for releasing methylphenidate* from the composition." (*Id.* at 17) (emphasis added). Alza also cited and emphasized that another court had construed similar terminology so as to encompass pharmaceutical compositions *in all forms*. (*Id.* at 17 and 27; *see also id.* at 15 (*citing United States v. Bristol-Myers Co.*, No. 822-70, 1982 WL 1816 at \*1 (D.D.C. 1982) and stating ("'*dosage form' means 'any form in which ethical pharmaceuticals are packaged or formulated for use*....'")(emphasis added)). Finally, Alza indicated that the specification did not limit the means by which the dosage form supplied the methylphenidate; rather, the specification (and the claims) emphasize the functional requirements of the claimed composition. *Id.* at 17.

897.    In its Reply Brief on Claim Construction, Alza makes the position that plaintiffs were espousing, and which was adopted by this Court, even clearer. Alza first stated that:

> The claims of the '373 patent define the requirements of dosage form in simple terms; namely the dosage form must release the methylphenidate at an ascending rate of release for an extended period of time.

(D.I. 94 [Alza's Claim Construction Reply Brief] at 3).

898.    Alza also stated that "Andrx's expert, Dr. Banakar, acknowledges that there are *no limitations on the type of dosage form* that may be used in the claimed treatment methods." (*Id.* at 3, n.1). Finally, Alza stated:

> This plain meaning of the claims also is entirely consistent with the specification and prosecution history. For example, [the patents in suit], expressly state[] that the claimed methods are not limited to methods that use dosage forms described in the examples, but instead *encompass use of any dosage form that exhibits an ascending rate of release or provides a substantially ascending methylphenidate blood plasma concentration*.

(*Id.* at 18) (emphasis added).

899.    Accompanying Alza's reply was Dr. Davies' Declaration.  In that Declaration in a

section under the heading "A. Meaning of 'Dosage Form' and 'Pharmaceutical Composition,'"

Dr. Davies stated as follows:

> 18.    . . . the phrases "dosage form" and "pharmaceutically acceptable
> composition" *as they are used in the claims of the patents cover dosage forms
> that employ any type of sustained release mechanism*, as long as the dosage form
> provides an ascending release rate of methylphenidate over an extended period of
> time or a substantially ascending methylphenidate plasma concentration.
>
> *            *            *
>
> 20.    The phrases "pharmaceutically acceptable composition" and "dosage
> form" are not ordinarily read by individuals working in this field *as requiring a
> particular type of a delivery system unless those terms are accompanied by
> additional words that describe (explicitly)* these additional requirements of the
> composition or dosage form. . . .

(D.I. 97 at 8, ¶¶ 18 and 20) (emphasis added).

900.    Dr. Davies made it very clear that if someone meant to specify the type of dosage

form, they would say, for example, "osmotic dosage form" explicitly.  (*Id.* at 8, ¶ 20).  Indeed,

Dr. Davies was arguing against a proposed interpretation requiring the "dosage form" to be an

"osmotic dosage form."

901.    Of course, Dr. Davies' logic is equally applicable to Alza's present plea.  If the

claimed dosage forms were intended to be limited as Alza now proposes, then the claim term

would have stated an "oral extended release dosage form."  Without such an explicit notation,

there is no reason to limit the definition of "dosage form" as Alza requests. (*See also* 12/12/07

Trial Tr. at 744:20-745:5 (no qualifiers on the term "dosage form") [Needham]).

902.    At trial, when confronted with his prior statements setting forth an unlimited

definition of "dosage form," which stand in stark contrast to either Alza's proposed reconstruction of the term to "oral extended release dosage form" or to Dr. Davies' even more limited "tablets and capsules" proposal, Dr. Davies was simply at a loss to explain why he had not previously provided his present definition. Dr. Davies tried to refer to his intervening expert reports to support his view not realizing that those were not submitted to the Court (although they could have been had Plaintiffs really sought clarity prior to this Court's claim construction decision). (12/14/07 at 1274:2-1281:13 [Davies]).

903.    Indeed, Dr. Davies' present definition of capsules and tablets specifically excludes oral extended release dosage forms such as lozenges and suspensions. (12/12/07 Trial Tr. at 700:17-701:5 [Needham]). Indeed, Alza's questioning of Dr. Needham on cross made it quite clear that Alza's view is that oral dosage forms such as lozenges and buccal tablets are not enabled by the patent in suit (although they would exclude those from the claims for other reasons to be discussed below). (*See id.* at 740:15-741:10).

904.    Alza also argued that the dosage form limitation encompassed all the various types of dosage forms at the *Markman* Hearing:

> [P]laintiffs argue that the claim language . . . very broadly claims any type of acceptable composition comprising methylphenidate or any type of dosage form.

*    *    *

> But what the inventors are saying is our invention is a substantially ascending release rate and *that can be achieved with any type of dosage form*.

*    *    *

> There [are] plenty of disclosures in this patent to support the construction that we think is the correct and normal construction of these terms *covering all of the different types of dosage forms*.

(D.I. 109 [*Markman* Hearing] at 18:9-13; 26:15-18; 30:6-10) (emphasis added).

-134-

905.    After reviewing the patent, its claims and the Court's claim construction, Andrx's expert, Dr. Needham, agreed that under that construction, the claims are unlimited as to what type of dosage forms are covered. Specifically, the claim construction in this case does not limit the dosage forms to just oral dosage forms. (12/12/07 Trial Tr. at 695:20-697:23 [Needham]).

906.    The Court has granted Alza's previous claim construction request. Having done so, it is clear that the asserted claims of the '373 and '129 patents define the invention as the use (in treatment of ADD and ADHD) of *any* dosage form which has the functional requirement of the claims.

907.    To provide a context for what was typically thought to constitute a dosage form, it is worth noting that the United States Pharmacopeia ("USP"), a standard reference used in the pharmaceutical arts, from 1995 (the applicable one for the time when the first provisional was filed, *i.e.*, the earliest dates to which the claims of the patents in suit could possibly be entitled) has a section titled Pharmaceutical Dosage Forms, Section 1151. (DTX 656). That section provides a general reference relating to a large variety of dosage forms. Thus, while not limiting the possible dosage forms, it is clear that the dosage forms known as of 1995 included, at least, aerosols, capsules, creams, emulsions, gels, implants (aka pellets), inhalations, injections, lozenges, ointments, solutions, pastes, powders, solutions, suppositories, suspensions, transdermal systems (typically a patch), and tablets. (*Id.*, 12/12/07 Trial Tr. at 695:20-697:23 [Needham]).

-135-

2.    **Alza's Position That The Claims Are Limited To Oral Extended Release Dosage Forms Should Be Rejected.**

a.    **Under Alza's newly minted construction, "dosage form" in claim 1 of the '373 patent would be narrower than the term "pharmaceutical composition" in claim 1 of the '129, which is directly contrary to Alza's many previous arguments to this Court and which makes no sense**

908.    In its Responsive Pretrial submission quoted above, Alza has attempted to back away from its earlier statements and instead limit the dosage form to "oral extended release dosage forms." Alza's proffered pre-trial reason was that the Court's construction provides that the claimed ascending release rate must be demonstrated in an "appropriate" dissolution test. According to Dr. Davies, an appropriate dissolution test requires the use of a USP approved apparatus. (12/14/07 Trial Tr. at 1213:11-18 [Davies]). Dr. Davies further stated that the USP approved apparati at the time of the filing of the priority documents for the patents in suit related to testing of tablets, capsules and transdermals. (*Id.*).

909.    First, it is worth noting that even if this were true of the dosage forms claimed in the '373 patent, there is no such requirement for the claims of the '129 patent. Rather, those claims merely require the use of a dosage form which supplies a substantially ascending plasma profile. (12/12/07 Trial Tr. at 698:20-699:3 [Needham]). Indeed, if claim 1 of the '129 patent required such an ascending release rate, it would be in all relevant parts the same as claim 7 of the '373 patent.

910.    Indeed, Alza has argued all along that the '129 patent does not require an ascending release rate but is only limited by the plasma profile provided. (*See* D.I. 87 [*Alza's Opening Claim Construction Brief*] at 21 ("All of the claims of the '373 patent . . . specify that the claimed dosage forms provide 'an ascending release rate over an extended period of time.'

-136-

This limitation is not present in any of the '129 patent claims."); D.I. 109 [*Markman* Hearing] at 17:9-14 ("what you'll see here is ***that the '129 patent does not have any language in it that is directed to the ascending rate of release*** of the tablet. So ***it does not have the in vitro dissolution test*** as a part of these claims.") (emphasis added); D.I. 109 [*Markman* Hearing] at 57:18-20 ("In the '129 patent, there's no requirement that you have an ascending rate of release of the tablet.")).

911.    Nevertheless, as pointed out above, Alza has argued that the same types of dosage forms and pharmaceutically acceptable compositions are covered by both patents. Indeed, Alza proposed, and this Court adopted, the same definition for the related terms in both patents. (D.I. 130 at ¶ 1).

> **b.    Alza's Newly Minted Construction Is Based On The Assumption That "An Appropriate Dissolution Test" Requires The Use Of A USP Apparatus – Which Is Wrong And Also Is Directly Contrary To Its Previous Arguments To This Court**

912.    Secondly, Alza has represented to this Court that it was not contending that the dissolution tests would need to be from a USP apparatus to be "appropriate" within the meaning of that word in the '373 patent. Specifically, during the *Markman* hearing, Andrx's counsel in construing the term "ascending release rate" stated:

> And our construction of this term is broken down in three parts. And we've put that up on the slide.
>
> ***In vitro dissolution rate as measured in a USP dissolution apparatus, and I think they agree with that portion. I think they made that clear.***
>
> What they don't agree, and which I'll talk about in a moment is that the medium is biorelevant.

(D.I. 109 [*Markman* Hearing] at 83:22-84:7).

913.    Alza's counsel responded by making it clear that Alza did not agree with Andrx.

Namely, Alza contended that an "appropriate" dissolution test *did not require* the use of a USP

apparatus:

> On the question of the ascending release rate, the statement was made a couple of times that [Alza] agree[s] that it has to be a USP apparatus. *We do not agree with that, Your Honor.*

(D.I. 109 [*Markman* Hearing] at 133:19-23) (emphasis added).

914.    Finally, on cross-examination, the attention of Ms. Gray, Alza's dissolution

expert, was called to Alza's counsel's statement during the *Markman* Hearing. Ms. Gray then

stated:

> Q:    I'm saying the argument was from ALZA, who got their claim construction, ---
>
> A:    Mm-hmmm.
>
> Q:    --- that their construction would not require a USP apparatus; correct?
>
> A:    Well, I think that not require would mean, you know, if all other choices were explored and that's the only thing you were left with. Then, you know . . .
>
> *Q:    So an appropriate dissolution test doesn't require a USP apparatus, correct?*
>
> *A:    Certainly, it does require that you consider the USP apparatus.*
>
> *Q:    But --- I'm sorry.*
>
> *A:    And you know, there has to be some very, very good reason that they wouldn't be appropriate.*
>
> Q:    Now, have you had occasion to test suppositories in a dissolution test?
>
> A:    I don't think I have personally supervised or been a supervisor when a suppository test has been done. I have – I am familiar with suppository tests quite a few – or wait a minute. I take that back.
>
> I think I have with Kline maybe seen it, but . . .
>
> Q:    So you have seen dissolution tests for other dosage forms such as suppositories?
>
> A:    Yes.
>
> *Q:    There's no USP apparatus approved for suppositories; right?*

*A:   I – oh, I don't know that I would say that. We have – in the USP, there is, I think suppositories in the USP. And I believe they use the basket.*

*Q:   Now, you're also familiar with dissolution tests on things like creams and ointments [and] semi-solids; right?*

*A:   Yes.*

*Q:   What you're familiar with with regard to those, those don't use a USP apparatus; correct?*

*A:   There is a USP apparatus under consideration, but it's not officially in the compendia yet.*

Q:   Right.

A:   It is in FDA guidelines, though. There's definitely the apparatus there.

(12/11/07 Trial Tr. at 369:23-371:22 (emphasis added) [Gray]; *see also* Gray Dep. Tr. at 116:5-12 (discussing her experience testing suppositories)).

915.   Dr. Needham did confirm that the requirement of a dissolution test might lead one to disregard several dosage forms. (12/12/07 Trial Tr. at 699:13-17 [Needham]). Namely, Dr. Needham would disregard those dosage forms where the active was already in the gaseous phase or that were actually dissolved in the liquid phase such as aerosols, emulsions, inhalers, and solutions.

### c.   Alza's newly minted construction is contrary to the claim language used in the prosecution histories

916.   Both patents in suit on their face indicate that they are related to three provisional applications: 60/030,514 (DTX 152), 60/044,121 (DTX 35) and 60/031,741 (DTX 1144). For ease of reference, a chart depicting the various prosecution histories of the patents in suit can be found at DTX 654.

917.   These prosecution histories indicate that when the patentees intended to limit their claims to oral dosage forms they knew how to do so. Plaintiffs chose not to do that in the claims

that issued, so their claims should not be reconstrued to so limit them.

918.    Provisional Application 60/030,514 (the "'514 application") was filed November 12, 1996 and indicates that the "invention pertains to both a novel dosage form and to a novel method for administering a drug for producing a therapeutic effect." (DTX 152 at PALZ000771, lines 3-4).

919.    Provisional Application 60/031,741 (the "'741 application") was filed 13 days after the '514 application on November 25, 1996. As opposed to the '514 application which was directed to both dosage forms and methods of use, the '741 application focuses on the dosage form itself.    (DTX 1144 at PALZ 000827 at lines 5-6).

920.    In contrast to the patents in suit, the claims of the '741 application make explicit what dosage forms are being claimed, *e.g.*, claims 1-13 discuss an osmotic tablet, claims 14-40 are limited to specific formulations of *osmotic products*, and claims 42-47 either require "*an oral dosage form*" or that the dosage form is administered "*orally*."[23]    (DTX 1144 at PALZ 00866-875). Such specific, restrictive language relating to the mode of administration or that the dosage form be either an "oral dosage form" or a "tablet" is noticeably missing from the claims at issue in the patents in suit.

921.    A utility, or non-provisional, Patent Application No. 08/910,593 (the "'593 application") was filed which cited to three provisionals. (DTX 1145, Cover page).

922.    The original, as filed, claims in the '593 application included claims directed to dosage forms and pharmaceutical compositions for delivering the drug in a sustained and

---

[23]    Claim 41 does not require the use of a dosage form at all.

ascending dose. (*See* DTX 1145 at PALZ 000971-73, claims 19-29).

923.    The applicants then amended the claims. The two "dosage form" claims were amended to recite "dosage form tablet" and other claims were amended to recite that administration was through the oral route. (*See id.* at PALZ 001006-1009, claims 1, 6, 9, 11, 18, 26 and 30 (Response to Office Action dated 04/06/98); *see also id.* at PALZ 1017-1020 (Examiner's Interview and Amendment making claims 12 and 18 independent and making similar changes)).

924.    The claims in the patents in suit do not require oral administration and do not limit the dosage form recited despite applicant's earlier claims in the prosecution history indicating that they knew how to so limit the claims if desired.

> **d.    Alza's argument that the claims require an oral dosage form because they require an immediate release coating should be rejected because such a coating is not required.**

925.    Faced with the testimony from Ms. Gray, Plaintiffs retrenched yet again and switched their focus for their revised claim construction to the third sentence of the "ascending release rate." That sentence reads, "The ascending release rate does not include release of drug from *any* immediate-release drug coating that *may* be applied to the dosage form." (D.I. 130 ¶ 2) (emphasis added).

926.    Plaintiffs' argument in this regard is based on reading this portion of the construction as if the Court had required an immediate release coating. (*See, e.g.*, 12/12/07 Trial Tr. at 738:2-15 [Needham]; 12/14/07 Trial Tr. at 1213:23-1214:15 [Davies]). If an immediate release coating had been required, then perhaps plaintiffs theory might have some support. (*See, e.g.*, 12/14/07 Trial Tr. at 1214:11-15 [Davies] ("Q: Would it cover transdermal systems? A: I

-141-

believe because of *the need of the immediate-release drug coating* it wouldn't cover [transdermals].") (emphasis added)).

927.    Of course, the third sentence only informs the calculation for those situations in which an immediate release coating *might* be used. This does not limit the "dosage form" definition. (12/12/07 Trial Tr. at 745:6-746:2 [Needham]).

928.    In any event, whether the Court determines the term "dosage form" broadly embraces all dosage forms known from the time of the application of the patent until the patent expires, or whether the term "dosage form" is limited to oral extended release dosage forms as Alza argues, the claims are still not enabled for their full scope.

## VII.    CONCLUSIONS OF LAW THAT THE CLAIMS AT ISSUE ARE INVALID BECAUSE THEY ARE ANALOGOUS TO SINGLE MEANS CLAIMS

### A.    THE CLAIMS AT ISSUE ARE OVERLY BROAD AND NOT ENABLED FOR THEIR FULL SCOPE

929.    Section 112 includes what is known as the enablement requirement. That requirement demands that the patent specification enable "those [skilled] in the art to make and use the invention as broadly as it is claimed without undue experimentation." *In re Cortright*, 165 F.3d 1353, 1356 (Fed. Cir. 1999) (citation omitted).

930.    The first paragraph of 35 U.S.C. Section 112 provides, *inter alia*, that:

[t]he specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same... .

931.    *Cortright* makes clear that section 112 actually has two enablement requirements. One requirement perhaps is more familiar, *i.e.*, that the claims teach *some* way of practicing the

claim. The second requirement, however, requires that the claims do not greatly exceed the

scope of what is taught in the specification.

> The PTO will make a scope of enablement rejection where the written description
> *enables something within the scope of the claims, but the claims are not limited*
> *to that scope*. This type of rejection is marked by language stating that *the*
> *specification does not enable one of ordinary skill to use the invention*
> *commensurate with the scope of the claims*. On the other hand, if the written
> description does not enable any subject matter within the scope of the claims, the
> PTO will make a general enablement rejection, stating that the specification does
> not teach how to make or use the invention.

165 F.3d 1353, 1356 (emphasis added) (citations omitted).

932.    The fact that some experimentation is necessary means that the patent

specification is lacking in some regard, but if unduly extensive experimentation is necessary to

practice the full scope of the claim, the claim will fail. *W.L. Gore & Assocs., Inc. v. Garlock,*

*Inc.*, 721 F.2d 1540, 1557 (Fed. Cir. 1983).

933.    Enablement is an issue of law based on underlying facts. *Amgen, Inc. v. Chugai*

*Pharmaceutical Co.*, 927 F.2d 1200, 1212 (Fed. Cir. 1991).

934.    Some claims, however, are so broad in their scope that, as a matter of law, they

fail for lack of enablement for the full scope regardless of what is taught in the specification.

The instant claims are just such a situation.

935.    One of the first pronouncements of this legal principle was in a famous case

relating to the invention of the telegraph, *O'Reilly v. Morse*, 56 U.S. 62, 112-119 (1853).

Morse's Eighth claim stated that:

> I do not propose to limit myself to the specific machinery or parts of machinery
> described in the foregoing specification and claims; the essence of my invention
> being *the use of the motive power of the electric or galvanic current*, which I call

-143-

electromagnetism, ***however developed for marking or printing intelligible characters, signs, or letters, at any distances***, being a new application of that power of which I claim to be the first inventor or discoverer.

*Id.* at 112 (emphasis added).

936.    In rejecting the validity of claim 8 the Supreme Court first noted that it was

impossible to misunderstand the scope of this claim, *i.e.*, the claim covered the exclusive right to

every improvement where the motive power is the electric or galvanic current and the result was

the marking or printing of characters, signs, etc.  The Court went on to state:

> If this claim can be maintained, it matters not by what process or machinery the
> result is accomplished. For aught that we now know some future inventor, in the
> onward march of science may discover a mode of writing or printing at a distance
> by means of the electric or galvanic current, without using any part of the process
> or combination set forth in the plaintiff's specification. His invention may be less
> complicated-less liable to get out of order-less expensive in construction, and in
> its operation. But yet if it is covered by this patent the inventor could not use it,
> nor the public have the benefit of it without the permission of this patentee.
>
>     *    *    *
>
> The court is of opinion that the claim is too broad, and not warranted by law.

*Id.* at 113.

937.    The Court noted that it took as a given that another legendary inventor, Robert

Fulton, could not have taken out a patent covering the exclusive right to use steam as a motive

force even though in that patent he may have particularly described the process and machinery

he used in creating the first practical steamboat. *Id.*

938.    The Court further noted that the Patent Act in place at the time, like the present

Patent Statute, required that the specification provide a description of the manner and process of

making and using the same.  The manner and process of making and using the telegraph must be

set forth in exact terms.  Thus, in the past, patents had always been held to embrace only the

improvement described. *Id.* at 118-19.

      939.    The Court concluded by stating that:

> Indeed, if the eighth claim of the patentee can be maintained, there was no
> necessity for any specification, further than to say that he had discovered that, by
> using the motive power of electromagnetism, he could print intelligible characters
> at any distance. We presume it will be admitted on all hands, that no patent could
> have issued on such a specification. Yet this claim can derive no aid from the
> specification filed. It is outside of it, and the patentee claims beyond it. And if it
> stands, it must stand simply on the ground that the broad terms abovementioned
> were a sufficient description, and entitled him to a patent in terms equally broad.
> In our judgment the act of Congress cannot be so construed.

*Id.* at 119-120.

      940.    Several additional cases followed from the Supreme Court similarly holding

claims, which only differed from the prior art due to the functionality recited, as not enabled to

the full scope and/or indefinite based upon their breadth. *See, e.g., General Electric Co. v.

Wabash Appliance Corp.*, 304 U.S. 364, 368-73 (1938) (stating, among other things, "The

difficulty of making adequate description may have some bearing on the sufficiency of the

description attempted, but it cannot justify a claim describing nothing new except perhaps in

functional terms." [at 372-73]).

      941.    In the claims of the patents in suit, as will be discussed further below with regard

to obviousness, methods of treating ADD or ADHD in humans through the use of dosage forms

containing methylphenidate had been known for decades. Therefore, the only limitations that

possibly provide patentability to the claims are the functional limitations relating to an ascending

release rate and/or a substantially ascending plasma profile provided in the claims. Thus, these

Supreme Court cases make it clear that all the asserted claims of the patents in suit must fail for

lack of enablement.

942.    The line of Supreme Court cases described above reached its ascendant peak in

*Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 9-13 (1946). In *Halliburton*, the

Court noted that the language of the claim that described what was "new" did so "in terms of

what [the apparatus] will do rather than in terms of its own physical characteristics or its

arrangement in the new combination apparatus. We have held that a claim with such a

description of a product is invalid . . ." *Id.* at 9. In holding the claim invalid, the Court stated:

> ***Under these circumstances the broadness, ambiguity, and overhanging threat of
> the functional claim of Walker becomes apparent.*** What he claimed in the court
> below and what he claims here is that his patent bars anyone from using in an oil
> well any device heretofore or hereafter invented which combined with the Lehr
> and Wyatt machine performs the function of clearly and distinctly catching and
> recording echoes from tubing joints with regularity. ***Just how many different
> devices there are of various kinds and characters which would serve to
> emphasize these echoes, we do not know.*** The Halliburton device, alleged to
> infringe, employs an electric filter for this purpose. In this age of technological
> development there may be many other devices beyond our present information or
> indeed our imagination which will perform that function and yet fit these claims.
> And unless frightened from the course of experimentation by broad functional
> claims like these, inventive genius may evolve many more devices to accomplish
> the same purpose. Yet if Walker's blanket claims be valid, no device to clarify
> echo waves, now known or hereafter invented, whether the device be an actual
> equivalent of Walker's ingredient or not, could be used in a combination such as
> this, during the life of Walker's patent.
>
> Had Walker accurately described the machine he claims to have invented, he
> would have had no such broad rights to bar the use of all devices now or hereafter
> known which could accent waves.

*Id.* at 12-13 (emphasis added) (citations omitted).


943.    In response to the *Halliburton* decision which would have prevented any claims

such as those presently asserted, *i.e.*, claims whose entire patentability depended upon the

functionality alleged, Congress decided to expressly permit such functional language when it

amended the Patent Statute in the 1952 Patent Act. This permission was supplied in the then

new section 112. This section for the first time expressly permitted the patent applicant to use

the means plus function language that is now relatively commonplace. *See Valmont*, 983 F.2d at

1042 (Fed. Cir. 1993); *see also In re Donaldson Co.*, 16 F.3d 1189, 1194 (Fed. Cir. 1994) (*en*

*banc*).

944.    In permitting the use of means plus function language in section 112, however,

Congress recognized the concern expressed through the line of cases leading to the *Halliburton*

decision that the means for performing the function could not constitute **any** means for

performing the function or the claim would preempt the field.  Therefore, Congress enacted

compromise language so as to permit functional claiming while limiting the scope of the claim.

In this regard, what is now section 112, ¶ 6 reads:

> An element in a claim for a combination may be expressed as a means or step for
> performing a specified function without the recital of structure, material, or acts in
> support thereof, and ***such claim shall be construed to cover the corresponding***
> ***structure, material, or acts described in the specification and equivalents***
> ***thereof***.

(Emphasis added).

945.    The second clause of section 112, ¶ 6 confines the breadth of protection of the

means term.  "The applicant must describe in the patent specification some structure which

performs the specified function.  Moreover, a court must construe the functional claim language

'to cover the corresponding structure, material, or acts described in the specification and

equivalents thereof.'"  *Valmont Indus.*, 983 F.2d at 1042.  As such, this second clause has been

noted to operate "more like the reverse doctrine of equivalents than the doctrine of equivalents

***because it restricts the coverage of literal claim language***."  *Id.* (emphasis added); *see also*

*Donaldson*, 16 F.3d at 1194, n.5; *J & M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1367

(Fed. Cir. 2001); *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989); *Data Line*

*Corp. v. Micro Techs., Inc.*, 813 F.2d 1196, 1201 (Fed. Cir. 1987).

946.    In *Johnston*, the Federal Circuit noted that: "An element of a claim described as a means for performing a function, if read literally, would encompass *any* means for performing the function. But section 112 ¶ 6 operates to *cut back* on the types of *means* which could literally satisfy the claim language." 885 F.2d at 1580 (emphasis in original) (citation omitted).

947.    Likewise the Federal Circuit noted that the second clause of 112 provided "specific instruction on interpretation of this type of claim which otherwise might be held to be indefinite. Thus, the provision excludes some means which perform the specified function from *literally* satisfying the claim limitation." *Data Line Corp.*, 813 F.2d at 1201 (emphasis in original).

948.    During claim construction proceedings, no party in this case argued that section 112 ¶ 6 applied to the claims in issue. But in arguing against Andrx's proposed construction that the claims be limited to osmotic dosage forms, Alza argued (and prevailed in its argument) that the claims are not so limited and rather cover *any* dosage form which provides the claimed results.

949.    Nevertheless, it is clear that:

the "means" term in a means-plus-function limitation is essentially a generic reference for the corresponding structure disclosed in the specification.

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industries, Inc.*, 145 F.3d 1303, 1308 (Fed. Cir. 1998); *see also Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998).

950.    Here rather than use the generic term "means," which, because of Section 112 ¶ 6,

-148-

would require that the structure in the specification be looked to, Alza used the equivalent

generic terms "dosage form" and "pharmaceutically acceptable composition." Alza also

successfully argued that the plain meaning of those claims does not require that they be limited

to the specific structures, *i.e.*, osmotic dosage forms, disclosed in the working examples of the

specification.

951.    Even after the enactment of the language that now appears in section 112 ¶ 6,

*O'Reilly v. Morse* remains the law if the claims become defined only by their function, as they

are here.

> Claims directed merely to a "desired result" have long been considered
> objectionable primarily because they cover any means which anyone may ever
> discover of producing the result.

*In re Fuetterer*, 319 F.2d 259, 263 (C.C.P.A. 1963) (*citing O'Reilly v. Morse*, 15 How. 62, 14

L.Ed. 601).

952.    Indeed, such claims are typically called, or analogized to, "single means claims."

> The long-recognized problem with a single means claim is that it covers every
> conceivable means for achieving the stated result, while the specification
> discloses at most only those means known to the inventor. *See O'Reilly v. Morse*,
> 56 U.S. (15 How.) 62, 112, 14 L.Ed. 601 (1853). Thus, the claim is properly
> rejected for what used to be known as "undue breadth," but has since been
> appreciated as being, more accurately, based on the first paragraph of § 112.

*In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983).

953.    According to *Hyatt*, "[t]he propriety of a rejection based broadly on § 112 flows

irresistibly from th[e] premise [that the claim is a single means claim] despite any argument

appellant has made, ***or could conceivably make*** were this case to be returned to the board." *Id.*

at 715 (emphasis added). Thus, if the claims in suit are analogous to single means claims they

-149-

are invalid *per se.*

954.    Several cases have analogized claims to "single means claims" even when the

claims do not use the term "means" but instead use a generic, unbounded structural term. For

example, *Fiers v. Revel* involved an interference with a count which read "A DNA which

consists essentially of a DNA which codes for a human fibroblast interferon-beta polypeptide."

984 F.2d 1164, 1166 (Fed. Cir. 1993). The Federal Circuit defined this count as being

"analogous to a single means claim" "because [it] purports to cover all DNAs that code for" the

interferon.

> Claiming all DNA's that achieve a result without defining what means will do so
> is not in compliance with the description requirement; it is an attempt to preempt
> the future before it has arrived.

*Id.* at 1171.

955.    Similarly, the Board of Patent Appeals and Interferences stated in *Ex Parte*

*Maizel* that:

> Appellants *have not chosen to claim the DNA by what it is but, rather, by what*
> *it does*, i.e., encoding either a protein exhibiting certain characteristics, or a
> biologically functional equivalent thereof. *Appellants' claims might be*
> *analogized to a single means claim of the type disparaged by the [Federal*
> *Circuit]* in *In re Hyatt*, 708 F.2d 712, 218 USPQ 195 (Fed. Cir. 1983). The
> problem with the phrase "biologically functional equivalent thereof" is that it
> covers any conceivable means, i.e., cell or DNA, which achieves the stated
> biological result while the specification discloses, at most, only a specific DNA
> segment known to the inventor. *Clearly the disclosure is not commensurate in*
> *scope with the claims*.

27 U.S.P.Q.2d 1662, 1665 (B.P.A.I. 1993) (emphasis added); *see also Ex Parte Kung*, 17 U.S.

P.Q.2d 1545, 1548 (B.P.A.I. 1989) (analogizing to a single means claim and stating "Manifestly,

the claims at issue cover every conceivable monoclonal antibody which achieves the stated result

of recited reactivity, whereas appellants specification teaches only one very particular method or

means for accomplishing the claimed objective. Hence, we find that the enabling disclosure of the present specification is not commensurate in scope with the breadth of [the] claims...."); *Glaxo Wellcome, Inc. v. Eon Labs Mfg.*, 2002 WL 1874830 at \*4 (S.D.N.Y. Aug. 13, 2002), *appeal dismissed by Glaxo Wellcome, Inc. v. Eon Labs Mfg.*, 53 Fed. Appx. 913 (Fed. Cir. Dec. 2, 2002).

956. Case law from the 1800s first established the principle that you cannot claim every means for achieving a particular function. *O'Reilly*, 56 U.S. 62, 112-19. The asserted claims have violated that proscription.

957. The Telegraph Case was discussed in great detail above. *General Electric* involved claims to a tungsten filament "made up mainly of a number of comparatively large grains of such size and contour as to prevent substantial sagging and offsetting during a normal or commercially useful life ...." 304 U.S. 364, 368. The fatal flaw with the claim was that it "uses indeterminate adjectives which describe the function of the grains to the exclusion of any structural definition, and thus falls within the condemnation of the doctrine that a patentee may not broaden his product claims by describing the product in terms of function." *Id.*

958. While the claims at hand are not product claims, but rather are method of treatment claims, the same principle applies because the method of treatment uses as the object of the claim a product, *i.e.*, a "dosage form" or "pharmaceutically acceptable composition." Similarly, the product in the claims at issue is only defined by two things: (1) that it contain methylphenidate and perhaps some other excipient, and (2) that it perform the function of the claims. Whether it is called lack of enablement for the full scope or indefiniteness as overly broad is really a matter of semantics. Clearly if a claim is so broad as to be indeterminate in its

scope, as is the case with all the claims here, under Supreme Court precedent that claim is invalid as a matter of law. *General Electric*, 304 U.S. at 371-73.

959.    The Federal Circuit in *Hyatt*, however, indicated that the more proper ground of invalidity in a case like the present one is lack of enablement for the full scope. 708 F.2d at 714-15. In this instance, the claim is both overly broad, *i.e.*, lacking in enablement for the full scope, and indefinite.

960.    Having successfully argued that the dosage forms of claims 1 and 6-7 of the '373 patent and claim 1 of the '129 patent are limited only by whether those dosage forms provide the results claimed, Alza is left with what is, in effect, a "single means claim."

961.    Alza has claimed *any* dosage form that provides the results claimed and has avoided having those claims limited to the ONLY working embodiment disclosed, *i.e.*, an osmotic dosage form. As such, Alza is effectively in the same position as Mr. Morse found himself in the telegraph case.

962.    Alza may have invented a novel dosage form that achieves the claimed functional result, but Alza chose to claim, in essence, any way of administering methylphenidate to an ADHD patient which exists or ever will exist as long as it has one or both of the functionalities of the various claims.

963.    Thus, this case is similar to the Telegraph Case wherein the use of electromagnetism to mark or print intelligible character signs or letters over distance was what was claimed. To paraphrase the Supreme Court,

> Indeed, if these claims can be maintained, there was no necessity for any
> specification, further than to say that the inventors had discovered that by using an

-152-

> ascending release rate of methylphenidate over an extended period and/or
> providing a substantially ascending plasma profile over various time points, one
> could treat ADHD. We presume that it will be admitted on all hands, that no
> patent could have issued on such a specification. Yet these claims can derive no
> aid from the specification filed. They are outside of it, and the patentee claims
> beyond it. And if they stand, they must stand simply on the ground that the broad
> functional terms were a sufficient description, and entitled them to a patent in
> terms equally broad. In our judgment the act of Congress cannot be so construed.

(Paraphrased from *O'Reilly*, 56 U.S. at 119-20).

964.    Having argued for a claim construction that provided no limitation on the type of

dosage forms or pharmaceutical compositions that could be used, Alza must enable a similar

scope. It cannot do so. "The motto, 'beware of what one asks for,' might be applicable here."

*See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) (noting the

irony of the situation where the patentee sought a broad claim construction which it was then

unable to enable for the full scope).

## B.    ALZA'S LEGAL ARGUMENTS MISCONSTRUE THE LAW AND ARE INAPPLICABLE

965.    Alza's response to the foregoing analysis is set forth in Alza's Responsive Pretrial

Submission at pages 94 to 100 and only makes legal arguments (*See* D.I. 136). More

specifically, Plaintiffs argue that (1) the claims are not "single means" claims as single means

claims would be claims directed only to treatment of ADHD with MPH, (2) Defendants' case

law misinterprets the law and is at odds with clear Federal Circuit precedent, (3) the claims are

not means plus functions claims and are not subject to Section 112 ¶ 6, and (4) functional

language is not impermissible.

966.    With regard to Alza's first assertion, Alza misinterprets Andrx's argument.

Andrx's argument is that the claims are analogous to "single means claims." In that regard,

Andrx cited to several cases that have been analogized to "single means claims" in its pretrial

papers and *supra*. Specifically, *Fiers v. Revel* involved a count which was directed to a product, DNA, which codes for a particular human polypeptide. 984 F.2d at 1166, 1171. Similarly, in *Ex parte Maizel*, the applicants claimed a type of DNA, not by what it is, but rather by what it does. 27 U.S.P.Q.2d at 1665. *Ex parte Kung* likewise claimed "every conceivable monoclonal antibody which achieves the stated result of recited reactivity." 17 U.S.P.Q.2d at 1548; *see also In re Fuetterer*, 319 F.2d 259, 263 (C.C.P.A. 1963) ("Claims directed merely to a 'desired result' have long been considered objectionable primarily because they cover any means which anyone may ever discover of producing the result.") (*citing O'Reilly v. Morse*).

967.    All of these cases were included in Defendants' Opening Pretrial Submission in ¶¶ 48-52. Yet Alza has not responded to any of these cases. Presumably they would have done so if they had a response.

968.    Alza does not seriously contest that they claim a method of treatment using *any conceivable dosage form* (although Alza would propose to limit the claims now to *any conceivable oral extended release dosage form*)[24] which exhibits the ascending release rate and/or the substantially ascending plasma profile without any tie to the specification. Such a claim is analogous to a "single means claim" in the same way as the DNA cases cited above.

969.    Next Alza argues that Andrx misapplies the law because its cases are old Supreme Court cases and "cases discussing 'single means' claims have been made largely irrelevant by enactment of the 1952 Patent Act (which was subsequent to both of the 'seminal cases' cited by Defendant)." (D.I. 136 [Alza's Responsive Pretrial Paper] at 95). Alza also argues that Andrx

---

[24]    As noted in detail below, Dr. Davies would further narrow this claim construction to apply only to specific oral dosage forms, *i.e.*, tablets and capsules.

misrepresents the law when it stated that:

> For example, Defendants assert that Congress validated *Halliburton's* prohibition
> on functional claims through its enactment of the 'means plus function' standard
> of 35 U.S.C. 112, sixth paragraph, stating that it operates 'more like the reverse
> doctrine of equivalents than the doctrine of equivalents *because it restricts the
> coverage of literal claim language*.' [See DFF ¶¶ 40-42]. Yet, in *In re
> Donaldson*, an en banc panel of the Federal Circuit *expressly rejected this
> characterization* of the Congressional intent. *See In re Donaldson Co., Inc.*, 16
> F.3d 1189, 1994 (Fed. Cir. 1994)(en banc)....

*Id.* at 96 (emphasis in original).

970.    With regard to Alza's first argument that "single means" cases are largely

irrelevant, Andrx admits that those cases are somewhat rarely cited. They clearly are still

applicable, however, as noted by the cases cited by Andrx above. Indeed, to the extent that

Alza's argument is that the Telegraph Case is bad law because it is old, Alza cites to no

Congressional overruling of that case, and, of course, the Federal Circuit cannot overrule the

Supreme Court. Perhaps most importantly, the "single means" cases are not relevant anymore to

actual means plus function claims because section 112, ¶ 6 limits those claims to the structure

disclosed and equivalents thereof. In this case, *if* the claims had been written in means plus

function language, which they were not, then the claims would have been limited to the osmotic

dosage forms and their equivalents. Single means case law, however, is still relevant by analogy

when the claims are not in means plus function language, as is the case here.

971.    With regard to the *Donaldson* argument, Alza picks a fight with a straw man.

Andrx specifically acknowledged that Congress overruled *Halliburton* when it enacted what

became paragraph 6 of Section 112. (Andrx Opening Pretrial Brief at ¶¶ 40-41). It is also

undisputed that what became paragraph 6 took into account Halliburton's concern regarding

overbreadth and thus limited the means claimed to the corresponding structure disclosed in the

specification or equivalents thereof. On the other hand, Andrx never argued that it was

Congress's intent to codify the reverse doctrine of equivalents as Alza argues. Rather, Andrx

noted that the section *operates* to restrict the scope of claim language to the means disclosed in

the specification or equivalents thereof similar to the reverse doctrine equivalents. Indeed, this

operation is noted in the same *Donaldson* case which Alza attempts to say Andrx

mischaracterized:

> Furthermore, there is no legislative history suggesting that Congress's purpose in
> enacting paragraph six was to codify the reverse doctrine of equivalents,[FN5]
> and thus there is no reason to believe that Congress intended to limit the
> application of paragraph six to post-issuance claim interpretation.
>
> FN5. Of course, **this is not to say that this may not have been one of the *results*
> of enacting this paragraph**. In *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580,
> 12 USPQ2d 1382, 1386-87 (Fed. Cir. 1989), this court noted that **paragraph six
> effectively restricts the scope that one would attribute to means-plus-function
> language** if one were to read it in a vacuum without reference to the specification.

16 F.3d at 1194 & n.5 (italics in original, bolding emphasis added).

972.    For means-plus-function claims, *Halliburton* was overruled by paragraph 6, and

in exchange paragraph 6 operates to limit the possible scope of the means claimed. Where

paragraph 6 is not applicable, as both Alza and Andrx agree is the case here, the principle of

*Halliburton* remains good law.

973.    With regard to Alza's argument that its claims are not governed by 112, ¶ 6,

Andrx agrees. The claims have not been so construed. Indeed, if paragraph 6 applied, Andrx

would not be challenging full scope enablement because the dosage forms would be limited to

osmotic dosage forms and their equivalents. Of course, under such a definition, Andrx would

also not infringe which is why Alza argued for the broad construction it is now stuck with. Thus,

Alza's plethora of claim construction cases cited on pages 97-99 of its Responsive Pretrial Paper

are simply irrelevant.

974.    Finally, with regard to Alza's argument that functional language is permissible, Andrx agrees that in some cases functional language is permissible. It is also true that functional language must still comply with Section 112 and is not permissible in all cases.

975.    The problem here is not the functional language alone. The problem is the generic term "dosage form" (as initially proposed by Alza and as defined by the Court) coupled with the functional language of the claims. If the claims were limited to an osmotic dosage form with the functional language, there would be no enablement challenge based only on the functional language. However, when the claims cover *any conceivable* dosage form which meets the functional limits of the claim, the case law cited by Andrx, and not refuted by Alza, such as *O'Reilly v. Morse*, *In re Fuetterer*, *Fiers v. Revel*, *etc.* are implicated, and the claims are invalid as a matter of law.

## VIII.    FINDINGS OF FACT THAT THE EVIDENCE ALSO CONCLUSIVELY ESTABLISHES THE CLAIMS AT ISSUE ARE NOT ENABLED FOR THEIR FULL SCOPE

976.    The next portion of the enablement analysis investigates whether undue experimentation would be required to practice the full scope of the claims. The Court need only reach this analysis if it does not agree that the claims are invalid as a matter of law because of their unlimited nature in claiming any dosage form or pharmaceutical composition that provides the results of the claim.

### A.    THE COMMON SPECIFICATION OF THE PATENTS IN SUIT ONLY PROVIDES AN ENABLING DISCLOSURE FOR AN OSMOTIC TABLET

977.    We first turn to the specification and prosecution histories of the patents in suit.

The specifications of the two patents in suit are, in all material parts, the same because the application that led to the '129 patent was a continuation of the application that led to the '373 patent. Only the specification of the '373 patent will be cited for ease of reference.

978.    The common specification explains that one area of research with regard to dosage forms and methods of treatment was to provide extended or delayed release products instead of the more typical immediate release dosage forms. (DTX 1 at col. 2, l. 45 - col. 3, l. 11). The specification notes that the focus of these efforts has mainly been to provide drug release "at a substantially constant release rate over an extended time period." (DTX 1 at col. 2, ll. 63-66). Such a release is noted to lead to an ascending plasma drug concentration for a reasonably short period of time and then the plasma drug concentration is intended to remain substantially constant over an extended period of time. (DTX 1 at col. 2, l. 66 - col. 3, l. 3).

979.    In further describing the prior art, the patent describes previously used bi-layer osmotic dosage forms and indicates that such prior art dosage forms achieve an extended substantially constant release rate, and indicates that a dosage form which achieves "*an ascending release rate for an extended time period of at least 50% of the $T_{90}$ period is not found within the prior art*." (DTX 1 at col. 10, ll. 52-65 (emphasis added)).

980.    The patentees next describe the bi-layer osmotic dosage forms that have been developed to achieve the ascending release rates of the invention. The patentees state that:

> Importantly, the bi-layer tablet cores of the present invention are configured such that each component layer is substantially round in cross-dimension with a circumferential width and a length between a top and a bottom end. The two layers are compressed together longitudinally such that the resulting bi-layer tablet core has the same circumferential width as the component layers and a length that combines the lengths of the component layers.

(DTX 1 at col. 11, ll. 16-23). The patentees define this "longitudinally compressed tablet" or

LCT at col. 11, lines 3-35. The patentees also describe their "surprising discovery" that a novel tri-layer osmotic system can achieve an ascending release rate. (DTX 1 at col. 12, ll. 9-48).

      981.    After a description of some more particularly preferred embodiments, the patentees set forth illustrative examples. Examples 1-3 detail bi-layer LCT osmotic dosage forms containing methylphenidate and having ascending release rates. Example 4 details a tri-layer LCT osmotic dosage form employing pseudoephedrine hydrochloride, and Example 5 details a tri-layer osmotic dosage form using nicardipine. The latter does not indicate whether the tri-layer system was an LCT. Example 6 and Examples 8 and 9 (by reference to Example 6) then give more detail in providing the construction of tri-layer LCT osmotic dosage forms incorporating methylphenidate. (*See also* 12/12/07 Trial Tr. at 691:13-692:1 [Needham]).

      982.    Figures 1 and 2, the only drawings of dosage forms of the invention in the patents, are osmotic dosage forms. Figure 1 is a bi-layer osmotic dosage form; Figure 2 is a tri-layer osmotic dosage form with an immediate release overcoat. (DTX 1 at Figures 1 and 2; DTX 1 at col. 6, ll. 18-23; *see also* 12/12/07 Trial Tr. at 691:13-692:1 [Needham]).

      983.    Example 7 provides an indication of the plasma drug concentrations produced by using a 14 mg methylphenidate tri-layer osmotic dosage form with an applied 4 mg immediate-release overcoat. This Example cites to Figure 4 of the patent and indicates that the plasma drug concentration provided therein "substantially ascend[s] (save for a slight 'dip' between t=5.5 hours and t=6.5 hours)." (DTX 1 at col. 22, ll. 4-8).

      984.    As was indicated earlier, the language of claim 1 of the '373 patent merely requires the treatment of ADD or ADHD by "administering a dosage form" containing methylphenidate to achieve the resulting ascending release rate over an extended period of time.

-159-

(*See also* 12/12/07 Trial Tr. at 694:22-696:2 [Needham]).

985.    Claims 6 and 7 of the '373 patent are dependent on claim 1, but the additional limitations in these claims do not include any further restrictions on the dosage form. Rather these claims further limit the results required of the dosage form. (*Id.* at 711:11-713:13).

986.    Similarly, claim 1 of the '129 patent claims a method for treating ADD or ADHD in a patient wherein "a pharmaceutically acceptable composition" containing methylphenidate and a pharmaceutically acceptable carrier (and perhaps other ingredients) is administered and results in a substantially ascending plasma drug concentration over about 8 hours following administration. (*Id.* at 713:14-714:6).

## B.    THE PROSECUTION HISTORY OF THE PATENTS IN SUIT INDICATE THE NON-ENABLEMENT OF THE CLAIMS

987.    Both patents in suit on their face indicate that they are related to three provisional applications. Two of those applications, 60/030,514 (DTX 152) and 60/044,121 (DTX 35), name Suneel Gupta, Diane Guinta, Carol Christopher, and Samuel Saks as inventors. The third, 60/031,741 (DTX 1144), names Larry Hamel, Atul Ayer, Jeri Wright, Andrew Lam, and Padmaja Shivanand as inventors. The patents in suit have had Andrew Lam, Padmaja Shivanand, Atul Ayer, Zahedeh Hatamkhany, Jeri Wright and Richard Weyers removed as inventors. The remaining inventors are Suneel Gupta, Diane Guinta, Carol Christopher, Samuel Saks, and Lawrence Hamel.

### 1.    The Provisional Applications 60/030,514 and 60/031,741

988.    Provisional Application 60/030,514 (the "'514 application") was filed November 12, 1996 and indicates that the "invention pertains to both a novel dosage form and to a novel

-160-

method for administering a drug for producing a therapeutic effect." (DTX 152 at PALZ000771, lines 3-4).

989.   Provisional Application 60/031,741 (the "'741 application") was filed 13 days after the '514 application on November 25, 1996. As opposed to the '514 application, which was directed to dosage forms and methods of use, the '741 application *focuses only on the dosage form* and not the method of use. (DTX 1144 at PALZ 000827 at lines 5-6; 12/12/07 Trial Tr. at 679:4-24 [Banakar]).

990.   The '741 application describes an immediate release dosage form followed by a description of the prior art sustained-release dosage form. With regard to the prior art sustained-release dosage form, the applicants state that:

> The sustained-release dosage form delivers a drug in a nonascending profile, often in a descending profile, over time. This dosage form, however, may not provide the required therapy and the appropriate blood pattern. For drugs, such as the central nervous system acting drugs, that are delivered from a sustained-release, nonascending dosage form, the patient often develops an acute tolerance to the drug which is manifested by a short duration and a decrease in the intensity needed for acceptable therapy. *The prior art sustained-release dosage form is devoid of means that compensate for its shortcomings inherent therein*.

(DTX 1144 at PALZ 000829, ll. 2 – 9)(emphasis added).

991.   The applicants then provided that:

> The [immediately preceding quoted paragraph] teaches that a *critical and pressing need exists for a novel dosage form for delivering a drug that overcomes the shortcomings known to the prior art.* That is, a *long-felt need exists for a dosage form for (1) delivering a drug in a sustained-ascending rate* that simultaneously reduces or eliminates the need for frequency of daily dosing; for (2) delivering a drug in a sustained-compensating dose to substantially compensate for acute tolerance to the drug and thereby maintain a preselected clinical profile; for (3) *administering the drug in an increasing dose* to lessen or eliminate acute or chronic tolerance to the drug to provide effective therapy; and

-161-

(4) *for delivering the drug in a sustained, ascending-controlled profile* clinically indicated for both medical and psychomedical effects.

(*Id.* at ll. 10-19) (emphasis added); *see also* 12/12/07 Trial Tr. at 678:23-679:24 [Needham]).

992.    The Detailed Description of the '741 application provides that:

In accordance with the practice of this invention, *it has now been discovered [that] a novel dosage form* can be made available characterized by an ascending rate of drug delivery over time. *The dosage form provided by this invention delivers a drug at a continuously increasing rate for a predetermined period of time. The dosage form of this invention is unexpected and it is a breakaway from the prior art existing dosage form technologies that deliver a drug at a constant zero-order unchanging rate over time.* The dosage form of this invention avoids delivery at a zero order rate as it delivers a drug continuously in an ascending rate over time. The profile of the prior art dosage form consists of a short start-up in delivery, followed by a constant unchanged rate. *The profile of this invention departs from the prior art* by making available a dosage form wherein the drug release rate follows an ascending profile to achieve a desired drug delivery pattern. The dosage form of this invention achieves the ascending pattern by combining the dimensions of the dosage form with the internal formulation of the dosage form.

(DTX 1144 at PALZ 000832, line 20 - 000833, line 4 (emphasis added); *see also* 12/12/07 Trial

Tr. at 680:1-681:19 [Needham]).

993.    The following pages then describe an osmotic LCT dosage form. (12/12/07 Trial

Tr. at 681:20-682:2 [Needham]).

## 2.    Application No. 08/910,593

994.    Next, Suneel Gupta, Diane Guinta, Carol Christopher and Samuel Saks filed a

non-provisional patent Application No. 08/910,593 (the "'593 application") which claimed

priority to the three provisional applications. (DTX 1145, Cover page).

995.    The original, as filed, claims in the '593 application included claims directed to

dosage forms and pharmaceutical compositions for delivering the drug in a sustained and

-162-

ascending dose. (*See* DTX 1145 at PALZ 000971-73, claims 19-29).

996.    The Examiner rejected all of the claims (including claims 19-29) over Goodman

and Gillman and a Higuchi reference.  The examiner stated that:

> The primary reference teaches that tolerance may be acquired to the effects of
> many drugs resulting in the decrease of the therapeutic index.  This phenomenon
> is well known and results in the necessity of increasing the dosage of said drugs to
> obtain the same pharmacological effect.  ***Nothing unobvious is seen in providing***
> ***for such an increase in a sustained release formulation in view of Higuchi who***
> ***teaches such formulations which may be tailored for any release profile***
> ***including increasing patterns of release***.

(DTX 1145, PALZ 000999 (Office Action of 12/30/97) (emphasis added); *see also* 12/12/07

Trial Tr. at 685:2-686:8 [Needham]).

997.    The applicants then amended the claims.  The two "dosage form" claims were

amended to recite "dosage form <u>tablet</u>" and other claims were amended to recite that

administration was through the oral route.  (*See* PALZ 001006-1009, claims 1, 6, 9, 11, 18, 26

and 30 (Response to Office Action dated 04/06/98); *see also* PALZ 1017-1020 (Examiner's

Interview and Amendment making claims 12 and 18 independent and making similar changes)).

998.    Additionally, the applicants responded and stated that it was not easy to move

from one type of dosage form to another.

> The rejection is traversed of all the claims as unpatentable over Higuchi.  The
> Higuchi patent ***discloses a dosage form manufactured as a jelly roll***, with [sic] is
> a spiral configuration with a possible increase in delivered drug.  However, the
> Higuchi dosage form, after ingestion gradually erodes and thereby exposes the
> drug without any consideration of the intended therapy.  ***More importantly, there***
> ***is an absence of disclosure in Higuchi for converting the jelly roll into any***
> ***other dosage forms, including the dosage form tablet, used by this invention,***
> ***without destroying Higuchi.***  That is, a dosage form, oral solid dosage form, and
> the manufacture of these forms require compression, a direct applied force, to
> produce the dosage form of this invention.  Under pressure, the jelly roll would
> splatter all of its ingredients.  The jelly roll of Higuchi cannot be converted into

any other form without destroying the structure of the jelly roll. For example, compression requires a lower punch, an upper punch and a die with the manufacture accompanied by pressure, all of which are foreign to Higuchi. The prior art textbook pertaining to the management of dosage form, Remington's Pharmaceutical Sciences, Seventeenth Edition, pg 1603 to 1624, (1985) teaches manufacturing techniques that show the Higuchi jelly roll is unacceptable for converting to other forms, and it must be restricted to its original design.

The rejection of all claims is traversed further because the prior art does not provide a reference for considering Goodman and Gilman in view of Higuchi. The Goodman and Gilman reference does not teach a sustained and ascending dose, and *the Goodman and Gilman reference does not teach how to change Higuchi into different and unrelated dosage forms* for arriving at the invention of applicants without defeating the purpose of Higuchi.

(*Id.* at PALZ 1011-12 at p. 7-8 (emphasis added); *see also* 12/12/07 Trial Tr. at 689:22-690:20

[Needham]).

999.    The Examiner then allowed all the pending claims with minor amendments. (*Id.* at

PALZ 1017-21). After some technical issues were addressed, the applicants then asked that the

patent be withdrawn from issue and that an issued patent be pulled as if it had not issued. (*Id.* at

PALZ 001056-57). The Patent Office vacated the grant of the patent. (*Id.* at PALZ 1060-61).

## C.    ALZA'S OWN EXPERIENCE IN THE MID-1990S DEMONSTRATES NON-ENABLEMENT FOR THE FULL SCOPE

1000.   Indeed, the actual evidence in this case indicates that, to the extent dosage forms

other than osmotics were attempted by those of at least ordinary skill in the art, the dosage forms

did not provide the desired ascending release rate.

1001.   Mr. Lam, one of the formulators whom Alza deleted as an inventor on the patents

in suit, indicated that he has a B.S. in Chemical Engineering, had been at ALZA since 1987 and

had worked in formulation and product development from then through the 1996-99 time-frame.

Mr. Lam also indicated that he had worked on osmotic systems and other, more traditional

systems, such as a matrix system. (Lam Dep. Tr. at JDT 00769-88). In other words, Mr. Lam had far more experience at the relevant time frame than is required of one of ordinary skill in the art (which will be discussed, *infra*).

1002. Mr. Lam testified that he was approached in 1994 by Larry Hamel to "evaluate[] if an ascending release profile can be delivered by the OROS technology", *i.e.*, through an osmotic device. (Lam Dep. Tr. at JDT 00790-93). Alza was known as of that time period, to have the most expertise in osmotic devices. Yet prior to being asked in 1994 to evaluate the feasibility of OROS and an ascending release rate *in vitro* for this product, Mr. Lam had not produced an ascending release profile with any active drug. (*See* Lam Dep. Tr. at JDT 00791-807).

1003. Similarly, Mr. Hamel, one of the named inventors, who had worked in formulation since 1977 and by 1993 was head of all the formulators, engineers and scale-up people, also had not worked on an ascending release rate product prior to the work on methylphenidate. Mr. Hamel's background included a BS in Biology. He additionally took many graduate courses in pharmacology and related fields. He took only one pharmacokinetics course. Mr. Hamel was not directly involved in the design of Concerta®. Rather, he turned that over to Mr. Lam's group. (Hamel Dep. Tr. at JDT 00714-16; JDT 00729-31).

1004. Mr. Lam indicated that he began the project by looking at different potential designs for an osmotic system to see if they could achieve an extended release rate and even tried at least one or two non-osmotic matrix systems. (Lam Dep. Tr. at JDT 00803-805). Mr. Lam testified at deposition that his group worked on the matrix designs for approximately a month or two, but that they did not achieve an ascending release rate. (Lam Dep. Tr. at JDT 00805-807).

-165-

1005.  Therefore, it is certainly reasonable to infer that Alza included only ***prophetic*** examples of non-osmotic dosage forms in some of the priority applications because Alza had not been able to achieve an ascending release rate with anything but an osmotic dosage form.  It is also reasonable to infer that the reason those examples were later deleted (and not replaced by actual manufactured non-osmotic examples) was because Alza had tried and failed to make such non-osmotics (just as Mr. Lam testified and the lack of evidence presented by Alza of such a dosage form indicates).

1006.  Mr. Lam further stated that other designs were tested, including both OROS designs and an unidentified number of designs that were not based on osmotic technology.  Of that unidentified number of non-osmotic device formulations, Mr. Lam indicated, contrary to the statement of Alza's witness Mr. Ayer at trial,that he did not recall that any of the non-OROS technology resulted in an ascending release rate over an extended period of time.  (Lam Dep. Tr. at JDT 00866-67).

1007.  This evidence indicates that ALZA was only able to achieve an ascending release rate in osmotic devices, a technology area for which it was the noted expert and for which its design team was vastly beyond the level of ordinary skill in the art as depicted by Mr. Lam, Mr. Ayer, Mr. Hamel, *etc*.  And the evidence indicates that ALZA only achieved the ascending release rate by the design of its LCT technology, which it has described as novel and sought claims for and were allowed claims on (even though it chose for its own reasons not to let those claims issue).  (Shivanand Dep. Tr. at JDT 01177-78; Hamel Dep. Tr. at JDT 00735-36; DTX 663; DTX 664; DTX 665 at ALZ 00148316, ALZ 00148338; DTX 666).

1008.  Even with regard to the LCT technology, ALZA was not able to utilize its more

-166-

traditional bilayer osmotic tablet design to achieve a commercially viable product. Alza had to resort to the more atypical and newly developed trilayer LCT osmotic tablet design to achieve a commercially viable product. (Lam Dep. Tr. at JDT 00908-909; Hamel Dep. Tr. at JDT 00733-36; DTX 667 at ALZ 00151022; DTX 668 at ALZ 00157396; DTX 669 at ALZ 00309730; DTX 670 at ALZ 00169419; DTX 671 at ALZ 00161211; DTX 672; *see also* 12/12/07 Trial Tr. at 693:17-694:21 [Needham]).

1009. Mr. Hamel also noted that the LCT was brand new technology that required design of unique manufacturing equipment to support its manufacture. It is difficult to believe that, if one of ordinary skill in the art could readily make a wide variety of dosage forms to achieve the results claimed, ALZA would have gone to the time and expense to use this new technology with all its technical problems rather than modifying what was known in the art. (Hamel Dep. Tr. at JDT 00750-51).

## D. THERE IS NO DISPUTE THAT THE CLAIMS ARE NOT ENABLED FOR THEIR FULL SCOPE IF THE "DOSAGE FORM" AND "PHARMACEUTICALLY ACCEPTABLE COMPOSITION" LIMITATIONS ARE NOT RECONSTRUED TO BE LIMITED TO ORAL EXTENDED RELEASE DOSAGE FORMS

1010. As discussed earlier, this Court's definition of the terms "dosage form" and "pharmaceutical composition"—which was pressed by Alza during the claim construction phase—is unlimited to any particular dosage form. (D.I. 130 ¶ 1; DTX 656; DTX 1170).

1011. Based on this definition, Dr. Needham explained that many types of dosage forms would not be enabled by the specification of the patents in suit. (12/12/07 Trial Tr. at 694:22-698:14, 699:18-705:11 [Needham]). More specifically, Dr. Needham testified that it would be very difficult to go from the osmotic dosage forms described in the patents in suit to any other type of dosage form because the technology is "significantly different." (*Id.* at 697:24-698:14).

Dr. Needham felt that his views were supported by the applicants' distinction of the Higuchi reference during prosecution where they indicated that it is difficult to go from one dosage form to another. (*Id.* at 690:5-691:12).

1012. Dr. Needham did acknowledge that because the claims of the '373 patent require dissolution testing in an *in vitro* environment, some dosage forms wherein the drug was essentially already dissolved would not be covered by the claims. Examples of such dosage forms are those where the active is already in the gaseous or the liquid phase.[25] (12/12/07 Trial Tr. at 699:7-16 [Needham]).

1013. Claim 1 of the '129 patent, however, has no requirement of an ascending release rate and its accompanying dissolution test, so, according to Dr. Needham, dosage forms such as the gaseous or liquid phase dosage forms would not be excluded from the scope of that claim. (12/12/07 Trial Tr. at 698:20-699:17 [Needham]) (distinguishing between claim 1 of the '129 patent and claim 1 of the '373 patent).

1014. Nevertheless, Dr. Needham does believe that the claim definition determined by the Court would include examples that, while perhaps not the most desirable commercial embodiments, are covered by the definition of the claims, such as suppositories. Similarly, the claim definition would encompass all the oral dosage forms, including capsules, swallow tablets, lozenges, buccal tablets, chewable tablets and suspensions. Other non-oral dosage forms such as transdermals, gels and ointments would also be included in the definition. (12/12/07 Trial Tr. at 699:18-701:24 [Needham]).

---

[25]     Dosage forms wherein the active is administered in a liquid carrier but wherein the active is still in the solid phase such as injectable suspensions and oral suspensions would still be included, however.

1015.   Alza's Dr. Davies does not rebut Dr. Needham's conclusion of non-enablement if the claims cover non-oral embodiments. Rather, despite the definition supplied to the claims by the Court, Dr. Davies believes one of ordinary skill in the art would apply "common sense" to limit the enablement inquiry to only tablets and capsules. (12/14/07 Trial Tr. at 1213:3-1216:24 [Davies]). Dr. Davies based the use of "common sense" on the standard of enablement that Alza's counsel provided. (*Id.* at 1207:23-1208:9; PX 705). As will be explained below, however, Dr. Davies' standard is the wrong standard.

1016.   To be clear, Andrx does not dispute that "common sense" should be applied to the enablement analysis. Andrx, however, believes that "common sense" was taken into account during the claim construction analysis when the definition according to one of ordinary skill in the art, for which Plaintiffs' offered Dr. Davies' Declaration, was reviewed by the Court. When Dr. Davies submitted his view of how the term "dosage form" should be construed in the context of a claim directed towards treating ADHD with MPH, Dr. Davies never indicated that "common sense" on the behalf of the person of ordinary skill in the art would lead that person to read in the words "oral extended release" in front of the term "dosage form" as Alza now proposes. Dr. Davies also certainly did not propose that the term "dosage form" be limited to tablets and capsules as he proposes now despite Alza's construction being "oral extended release dosage form." Thus, Dr. Davies' hindsight attempt to limit the claims further than provided in the claim construction so as to avoid a finding of non-enablement should be discounted.

1017.   Indeed, Dr. Davies' testimony makes it clear that he does not view all dosage forms as being enabled; rather he just does not believe that dosage forms other than tablets and capsules need to be enabled. Indeed, he indicates that the patents in suit only give guidance with regard to tablets and capsules.

-169-

Q:    Do you think it is necessary to enable the '373 patent for all dosage forms including things such as nasal sprays, ointments, creams, suppository, lozenge, tablets?

A:    No.

Q:    And why not?

A:    Because it's clear the guidance that's given by the patent relates to oral delivery systems such as tablets and capsules.

(12/14/07 at 1214:16-1215:1 [Davies]).

1018.    Again, what is required in this instance for enablement for the full scope is a legal question and depends on the construction given the claims. If the guidance in the specification is limited to tablets and capsules, then Alza should have argued that the claims are limited to tablets and capsules. Yet even in their proposed reconstruction, Alza does not offer such a restrictive definition but rather would provide for all oral extended release dosage forms. Since the claims are not so limited, they are not enabled for the full scope.

1019.    Since the claims are not limited to the guidance provided by the specification, by Dr. Davies' own admission, the claims are not enabled for their full scope.

1020.    Furthermore, as stated earlier, the requirement of an *in vitro* dissolution test does not limit the claims of the '373 patent to capsules, tablets and transdermals because as Alza's dissolution expert, Ms. Gray, noted, other non-oral dosage forms, including suppositories and gels and ointments, can be tested in an appropriate *in vitro* dissolution test.

1021.    Similarly, the language in the definition of ascending release rate, which provides for an optional immediate release coating, does not require that the claims be limited to oral extended release dosage forms since there is no requirement that the dosage form have such an immediate release coating, *i.e.*, an IR coating is not a definitional requirement relating to a

dosage form.

1022. In any event, the preceding two paragraphs do not apply to claim 1 of the '129 patent since that claim does not include a dissolution test.

1023. Thus, when the scope of the claim is appropriately applied as construed, *i.e.*, to not be limited to an oral extended release dosage form, Dr. Needham's opinion that the claims are not enabled for their full scope is not rebutted.

E.  **DR. NEEDHAM'S VIEW OF NON-ENABLEMENT IS NOT REBUTTED EVEN IF THE CLAIMS ARE RECONSTRUED AS ALZA SUGGESTS SO AS TO BE LIMITED TO ORAL EXTENDED RELEASE DOSAGE FORMS**

1024. As noted previously, Alza seems to be unclear as to what the term "dosage form" in the claims means. It's first proposal, which was adopted by the Court, was that dosage form means "a pharmaceutical composition that includes a dose of methylphenidate." (D.I. 130 ¶ 1). Now it has requested in its Pretrial Submission that the Court reconstrue the term "dosage form" to mean "oral extended release dosage forms." (D.I. 136 [Alza's Responsive Pretrial Brief] at 64). Alza's expert Dr. Davies, however, then seeks to limit the term "dosage form" even more than the reconstruction Alza proposes, namely Dr. Davies would limit the "oral extended release dosage forms" to only tablets and capsules.

1025. Even if the claims are now reconstrued as Alza would like them, *i.e.*, for the dosage forms to be limited to oral extended release dosage forms or even to tablets and capsules as Dr. Davies suggests, Dr. Needham has testified that the claims still are not enabled for their full scope. Dr. Davies implicitly agrees with Dr. Needham's position by indicating that, with regard to enablement, he focused only on tablets and capsules and did not consider whether other oral extended release dosage forms are enabled.

-171-

1026.  Dr. Needham noted that oral dosage forms would include at least capsules, lozenges, tablets, and suspensions. (12/12/07 Trial Tr. at 700:17-701:5 [Needham]). Dr. Davies does not dispute that these all would constitute oral dosage forms. Rather, Dr. Davies would again use "common sense" to limit Alza's proposed reconstruction even further to just tablets and capsules. (12/12/07 Trial Tr. at 1213:3-1216:4 [Needham]).

1027.  With regard to the oral dosage forms, Dr. Needham gave two specific examples of tablets that he did not think were enabled, namely buccal and chewable tablets. (12/12/07 Trial Tr. at 702:1-703:18 [Needham]). Indeed, Dr. Needham indicated that even today it would be difficult to make a buccal tablet that meets the limitations of the claims. (*Id.* at 702:1-23).

1028.  Similarly, Dr. Needham noted that chewable tablet would even seem to fit with Dr. Davies' "common sense" approach since chewable tablets are often times used for children, the main subpopulation for ADHD drugs. Dr. Needham again indicated that, even at his skill level and even as of today, he might be able to come up with a few approaches for chewable tablets but that it would be very difficult to reduce to practice. (12/12/07 Trial Tr. at 703:24-703:18 [Needham]). Of course, Dr. Needham is far in excess of ordinary skill in the formulation art, with over 25 years of experience as of the 1996 first provisional date and over 35 years of experience at the time of his testimony.

1029.  Again, Dr. Davies did not rebut this specific evidence of non-enablement offered by Dr. Needham. Rather, Dr. Davies actually implied that the enablement of another oral dosage form, *i.e.*, a lozenge, is not required by the claims. (12/14/07 Trial Tr. at 1214:16-1215:1 [Davies]). In other words, under Alza's proposed reconstruction of the claims, Dr. Davies still admits that there are non-enabled embodiments.

-172-

1030. Indeed, the questions posed to Dr. Needham on cross-examination implied that lozenges and buccal tablets would be extremely difficult to enable. (12/12/07 Trial Tr. at 740:11-741:10 [Needham]). This testimony further supports lack of enablement for the full scope even if "dosage form" is limited to just oral extended release dosage forms.

## F.   NOBODY DISPUTES THAT, EVEN IF THE CLAIMS WERE FURTHER LIMITED TO JUST TABLETS AND CAPSULES – AS DR. DAVIES WOULD HAVE IT, SOME TABLETS ARE STILL NOT ENABLED

1031. As noted above, Dr. Needham testified that neither buccal nor chewable tablets are enabled by the specification of the patents in suit. Counsel for Alza on cross-examination even further exemplified that buccal tablets would not be enabled. (12/12/07 Trial Tr. at 740:11-741:10 [Needham]). Alza's response, however, appears to be that buccal tablets would not have been investigated as a commercial embodiment by one of ordinary skill in the art. This response, however, is a legal response which will be addressed below.

1032. Of course, buccal tablets are tablets as the name specifies.

1033. Additionally, no one has disputed Dr. Needham's testimony that a chewable tablet is desirable for a main subpopulation of ADHD patients, *i.e.*, children, and is not enabled by the specification.

1034. Chewable tablets are tablets as the name states.

1035. Thus, at least two types of tablets, one of which would be a desirable commercial embodiment, are not enabled by the specification of the patents in suit.

## G.   EVEN IF THE TERM "DOSAGE FORM" WERE LIMITED FURTHER TO TABLETS AND CAPSULES, AS DR. DAVIES ASSERTS, THE CLAIMS ARE STILL NOT ENABLED FOR THEIR FULL SCOPE; THE ONLY FACTUAL DISPUTE REGARDING

-173-

### ENABLEMENT ARISES IF THE CLAIMS ARE LIMITED, AS ONLY DR. DAVIES HAS ARGUED, TO TABLETS AND CAPSULES

1036.   Dr. Davies believes that the common specification does not have to enable all "oral extended release dosage forms" despite Alza's argument that the claim covers all such dosage forms. Rather, Dr. Davies asserts that the common specification need only enable tablets and capsules.

1037.   Dr. Needham indicated that the specification of the patents in suit is actually of no aid other than with regard to making an osmotic dosage form. Specifically, Dr. Needham noted that Column 2, lines 45-62, of the '373 patent discusses the prior art focus of delayed-release and sustained release systems, and mentions several systems, including osmotic systems, which are known in the prior art. (12/12/07 Trial Tr. at 692:2-693:16 [Needham]).

1038.   The patent merely summarizes that there are dosage forms which are known to be useful in achieving the prior art focus of constant release rate and constant plasma profile. The patent, however, then states that it was surprising that one of these dosage forms, osmotic systems, which were particularly notable for meeting the previously recognized desired release and plasma levels could also meet an ascending release rate and a sustained ascending plasma profile. In this way, the patent teaches one of ordinary skill in the art that dosage forms outside of those typically used in the prior art will be necessary to achieve the ascending release rate and sustained ascending plasma levels. Thus, the patent indicates that non-routine (or undue) experimentation would be required to make other non-osmotic dosage forms that achieve the claimed result of an ascending release rate. (12/12/07 Trial Tr. at 697:24-698:14 [Needham]).

1039.   Dr. Needham's views are supported by the various Alza inventors' statement in the prosecution history that it is difficult to move between various dosage forms and that there

-174-

was a long-felt need in the art for an ascending release dosage form.[26]

1040.  Alza's expert Dr. Davies believes that the sections just cited indicate that the prior art can be readily modified to achieve the results of the claims.  Dr. Davies, however, acknowledges that he did not review the prosecution history of the patents other than to the extent they were quoted in Dr. Needham's report.  (12/14/07 Trial Tr. at 1293:1-7 [Davies]).

1041.  The prosecution history indicates that the asserted claims of the patents in suit are not enabled for the full scope of the claimed invention.  As mentioned in the provisional applications and throughout the prosecution process, the patentees were seeking claims to a particular dosage form.  The patentees indicated that there was a long felt need for a dosage form that could provide the ascending release rate and sustained  ascending profile of the claims in the '373 and '129 patent, and that applicants had to develop a novel dosage form to achieve the desired results.  This reinforces that the applicants represented that it would be non-routine to develop any dosage form other than the ones described in the patents to achieve the claimed ascending release rate.  (12/12/07 at 671:10-673:24, 678:7-22, 680:6-681:19 [Needham]).

1042.  It is worth noting that some of the provisional applications and priority applications do mention the possibility of other types of dosage forms that might achieve the results claimed.  The provisional applications not directed particularly to the dosage form indicate that representative dosage forms including a hydrogel matrix containing a plurality of tiny pills, drug releasing beads, a concentration gradient on a polymer substrate rolled on itself, a

---

[26]  Alza may point out that several witnesses testified that they were unaware of such a clinical need. Nevertheless, case law is clear that the patentees' statements regarding the state of the prior art are admissions. Here, the patentees clearly indicated that the ascending release rate dosage form itself, not just a method of treatment, was critically needed in the prior art.  (DTX 1144 at PALZ 000829 at ll. 10-19).  Such an admission demonstrates that the prior art did not broadly enable such dosage forms as of 1996.

-175-

multilayer system with increasing doses of drug, or a dosage form which releases a drug from a polymer by diffusion, flux through pores or rupture of the polymer matrix may achieve the ascending release rate of the claims as ultimately issued. Notably, the application indicates that such dosage forms *may* be made (as opposed to have been made). (DTX 152 at PALZ 000778-80; 12/12/07 Trial Tr. at 674:16-675:14 [Needham]).

1043. These proposed dosage forms merely indicate approaches that one could take in attempting to achieve the desired results. There is no teaching that such an approach had worked or would actually work. (12/12/07 Trial Tr. at 674:16-675:14 [Needham]). It is telling that the description of these proposed dosage forms was deleted from the patents as issued.

1044. These proposed dosage forms are also contrary to the actual experience of Alza in attempting to generate such dosage forms. Recognizing the difficulties caused by Mr. Lam's testimony, Alza tried to discredit Mr. Lam in its pretrial submissions and with the testimony of Mr. Ayer at trial. (D.I. 136 [Alza's Responsive Pretrial Submission] at ¶¶ 685-86).

1045. Mr. Ayer was the head of formulation and a research fellow at Alza overseeing 30 employees and had been at Alza for 20 years by the mid-1990s. (12/10/07 Trial Tr. at 168:11-169:12 [Ayer]). He was also one of the formulators that ALZA deleted as an inventor from the patents in suit. (DTX 1, Certificate of Correction). He had several formulators working for him, and he would help them with troubleshooting on formulations. (12/10/07 Trial Tr. at 169:17-24 [Ayer]).

1046. Mr. Ayer testified that he had manufactured non-osmotic dosage forms for other products that had an ascending release rate for a long period of time and that such work was easy. (12/10/07 Trial Tr. at 171:20-174:4 [Ayer]). Mr. Ayer further stated that Ms. Geri Wright,

-176-

a formulator, had formulated non-osmotic dosage forms, which had an ascending release rate over time, using pseudoephedrine hydrochloride as a proxy. (*Id.* at 175:18-177:4). Mr. Ayer did acknowledge that Alza did not make any non-osmotic ascending release rate dosage forms of MPH. (*Id.* at 195:19-196:12; *see also* DTX 661 at Response to Interrogatory Nos. 21, 25 and 26). Mr. Ayer attempted to downplay Mr. Lam's deposition testimony that Alza had been unsuccessful in making such non-osmotic dosage forms by classifying Mr. Lam as merely an administrator and not a formulator. (12/10/07 Trial Tr. at 177:5-179:24 [Ayer]).

    1047.  Mr. Ayer's testimony should not be credited.  First, despite Mr. Ayer's testimony that Alza kept its notebooks relating to all of his projects, he could not point to a single example in any notebook that actually demonstrated a non-osmotic dosage form with an ascending release rate.  He pointed to one notebook page to indicate that Alza generated a single example of a non-osmotic proposal relating to pseudoephedrine. (12/10/07 Trial Tr. at 188:14-189:1; 194:22-198:4 [Ayer]). However, it is stated on this notebook page that "the idea is that the $H^+$ citric and the drug will react with the $CO_3^-$ in the *osmotic* and 'POP' when completed." (DTX 1151 at ALZ00012323 [page 48]). Thus, even this evidence does not appear to support Mr. Ayer's contention that Alza had produced a non-osmotic dosage form. Moreover, even if the composition were a non-osmotic, Alza and Mr. Ayer were unable to show any evidence that the formulation on this page, dated May 25, 1995, produced an ascending release rate. (12/10/07 Trial Tr. at 190:10-191:8 [Ayer]). Indeed, other pages in the notebook have dissolution results recorded, but this one does not. (*See, e.g.*, ALZ 00012298). Mr. Ayer confirmed that there was no release rate data in the notebook in question with regard to any non-osmotic system. Mr. Ayer further stated that any actual data on the formulation he pointed to was contained in some unidentified, apparently unproduced, Alza notebooks. (12/10/07 Trial Tr. at 188:14-190:16

-177-

[Ayer]).

1048.  Alza did not produce any notebooks to substantiate any of Mr. Ayer's testimony

that he had made non-osmotic dosage forms that had an ascending release rate.

Q:  Okay.  Now, did you bring any other notebooks with you today?

A:  No.

Q:  Okay.  So we don't have any notebooks on the midazolam product for instance?

A:  No.

Q:  Okay.  What about the ibuprofen non-osmotic, any notebook on that today?

A:  No.

*      *      *

Q:  Okay.  Well, with regard to the other three products you've identified, we don't have any actual data here today that indicates those products were made in non-osmotic form and had an ascending release rate; correct?

A:  No.

Q:  Okay.  And with regard to the one that you pointed to for Ms. Geri Wright's notebook?

A:  Yes.

Q:  Similarly we don't have data to indicate that that was an ascending release rate product either, do we?

A:  No.

Q:  And ALZA keeps notebooks; right?

A:  I beg your pardon?

Q:  ALZA keeps their notebooks?

A:  Yes.

(12/10/07 Trial Tr. at 192:17-194:13 [Ayer]).

1049.  One cannot credit Mr. Ayer's testimony that Alza had made non-osmotic dosage

forms that had an ascending release rate.  Mr. Ayer could only point to one formulation produced

more than 12 years ago and he was not able to substantiate with a lab notebook or any other

evidence that this formulation was actually a non-osmotic dosage form or whether it achieved an ascending release rate

1050.  Furthermore, Mr. Ayer's testimony that such an ascending release rate is easy to achieve is belied by his contrary statements in the provisional patent applications and in the patents in suit themselves.

1051.  Mr. Ayer stated that he had 90 patents to his name. Thus, he was very familiar with the invention disclosure process. (12/10/07 Trial Tr. at 196:12-20 [Ayer]). Mr. Ayer also confirmed that he would aid in drafting the patent application and would review the final application and be involved in reviewing amendments. In other words, Mr. Ayer was very involved with the patent process when he was a named inventor. (*Id.* at 198:16-199:7). Mr. Ayer also signed the inventor's oath where he stated that all statements made of his own knowledge were true and that all statements made on information and belief were believed to be true. He reviewed the applications with that admonition in mind. (*Id.* at 201:6-202:10; DTX 10 at Declaration).

1052.  Mr. Ayer's statements in a priority application filed in 1997, contradict his sworn testimony on direct examination:

> Q:    . . . Now, if you could turn to page six, the numbered page six of [DTX 10], under the detailed description and specification. Are you there?
>
> A:    Yes.
>
> Q:    We could bring it up on the screen but it's the dosage form of this invention . . . and this was an invention related to the Concerta project, right, the dosage form?
>
> A:    Okay.
>
> Q:    *Is unexpected and it is a breakaway from the prior art existing dosage form technologies that deliver a drug at a constant zero-order and unchanging rate over time. Do you see that?*

*A:*    *Yes.*

*Q:*    *You didn't say anything there about ascending release rates being common; right, or easy to do?*

*A:*    *Yeah.*

Q:    Okay. Now, if you turn two pages before to page three, numbered page three, if we can look at the first full paragraph, the above presentation. *Do you see that it says a critical and pressing need exist for a – and a long-felt need exist for a dosage form for delivering a drug in a sustained ascending rate that simultaneously reduces or eliminates the need for a frequency of daily dosing, do you see that?*

*A:*    *Yes.*

*Q:*    *You didn't say anything about the fact that had been done [in the prior art], right with the three projects you worked on?*

*A:*    *Okay, so.*

*Q:*    *So you characterized it as a long-felt and a critical need to have such [a] dosage form; correct?*

A:    I did not draft this.

Q:    You reviewed it; correct?

A:    But I believed.

Q:    *You believed that; right?*

*A:*    *I believed.*

(12/10/07 Trial Tr. at 202:17-204:7 (emphasis added) [Ayer]; *see also* DTX 1144 at PALZ 000829 and 000832).

1053.   In other words, Mr. Ayer confirmed that he, in the 1996-97 timeframe, as one of at least ordinary skill in the art, believed that ascending release rate dosage forms were "unexpected" and represented a "breakaway" in the art. He also believed that such dosage forms constituted a "long-felt" and "critical" need.

1054.   Again, this testimony is consistent with Dr. Needham's view that the ability to make a variety of such dosage forms would be beyond the level of ordinary skill in the art. This testimony is also inconsistent with Dr. Davies' opinion that such dosage forms are routine

matters because if they were so routine one would have expected the art to have satisfied the long-felt and critical need in this area.

1055.  Finally, Mr. Ayer's denigration at trial of Mr. Lam's role also is inconsistent with the evidence. Mr. Ayer's testimony at trial indicated that Mr. Lam only provided administrative support to the team. Yet, Mr. Ayer, a seasoned patent applicant, declared that Mr. Lam was a co-inventor on DTX 10 relating to the dosage form claims on the Concerta® project. (DTX 10 at Declaration). Mr. Ayer knew that Mr. Lam was not properly named as an inventor unless he added something to the invention process. Thus, his characterization of Mr. Lam at trial as merely providing administrative support is at odds with his contemporaneous declaration of Mr. Lam as a co-inventor. (12/10/07 Trial Tr. at 204:8-205:16 [Ayer]).

1056.  Alza's efforts to denigrate Mr. Lam's involvement are understandable since he greatly undercuts its defense to Andrx's charge of non-enablement for the full scope.

1057.  Based on all the foregoing, claims 1 and 6-7 of the '373 patent and claim 1 and of the '129 patent, even if read only to encompass tablets and capsules, are not enabled for the full scope of the claims

1058.  Additional factors support the conclusion that undue experimentation is required to reach the full scope of the claims even if the claims are interpreted as being limited to tablets and capsules.

### 1.    Breadth of the claims

1059.  As discussed in great detail earlier, the dosage forms encompassed within the asserted claims include any dosage form that achieves the results desired. Thus, these claims are

extremely broad. (12/12/07 Trial Tr. at 694:22-695:14 [Needham]).

1060. As shown above, the pharmaceutical literature provides a large number and a wide variety of dosage forms. As is clear from the common specifications' recitation of the prior art oral dosage forms, each one of these dosage forms encompasses a genus with many separate species. The claims of both patents cover any one of those dosage forms formulated in such a way to achieve the claimed result. (*Id.* at 695:20-700:11, 744:11-746:16 [Needham]).

1061. Dr. Davies stated that "dosage form" should be limited to tablets and capsules and perhaps transdermals in part due to those dosage forms having standard *in vitro* dissolution test protocols because that is what the specification gives guidance for. (12/14/07 Trial Tr. at 1213:3-15 [Davies]; Davies Dep. Tr. at 79:2 – 82:10). Dr. Davies stated at trial for the first time that he would not include transdermals because of the "need" of the immediate release drug coating. (12/14/07 Trial Tr. at 1213:23-1214:15 [Davies]).

1062. Dr. Davies present contention is directly contrary to Alza's counsel's previous representation to the Court that Alza did not contend that an "appropriate" dissolution method required a USP apparatus. (D.I. 109 [*Markman* Hearing] at 133:19-23).

1063. Furthermore, Dr. Davies' testimony is also at odd with the testimony of Ms. Gray, Alza's dissolution expert, who indicated that there are appropriate dissolution methods for products other than tablets, capsules and transdermals, which do not require USP apparati. (12/11/07 Trial Tr. at 369:23-371:22 [Gray]). Dr. Davies indicated that Defendants "should talk to [Ms.] Gray" on this point. (Davies Dep. Tr. at 82:11-83:13 and errata sheet).

1064. Therefore, Dr. Davies' testimony on this point should be given no weight as it is

an attempt to retract a representation made by Alza to the Court in hopes of limiting the dosage form definition after Alza argued for a construction of any dosage form or pharmaceutical composition. It is also contrary to Ms. Gray's testimony, as well as being contrary to Dr. Needham's testimony. (12/12/07 Trial Tr. at 698:15-699:17; 701:6-24 [Needham]) (an appropriate dissolution test does not require use of a USP apparatus).

1065.    Dr. Davies also expressed the view during deposition that the claims of the '129 patent require the use of an appropriate dissolution test. (Davies Dep. Tr. at pp 88-91; 93-95). Such testimony is at odds with both the language of the claims and Alza's repeated arguments to this Court. As such, any testimony related to limiting the number of dosage forms included in the claims of the '129 patent should not be given any weight.

1066.    Dr. Davies stated that he had not considered the full scope of the claims of the '129 patent because he had not considered whether there were ways to get a substantially ascending plasma profile other than by using an ascending release rate. (Davies Dep. Tr. at pp. 135-137). Indeed, Dr. Davies has not provided rebuttal evidence on any factor with regard to the claims of the '129 patent.

1067.    Additionally, it is worth noting that the measurement of the plasma drug concentration required by all asserted claims, except for claim 1 of the '373 patent, can be "measured in any appropriate body fluid or tissue." (DTX 1, col. 1, ll. 45-50). Such language further expands the scope of the claims, especially that of claim 1 of the '129 patent.

1068.    This factor weighs in favor of undue experimentation.

-183-

## 2.    The amount of direction or guidance presented

1069.  The common specification as issued provides only examples of osmotic dosage forms. The specifications of several of the abandoned applications referenced in the common specification give hypothetical examples of other non-osmotic dosage forms. However, a person of ordinary skill in the art would not be able to correlate, with any degree of confidence, the performance of an osmotic system to any other dosage form. The theoretical concepts, excipients used and specific formulations that are necessary to develop a successful osmotic dosage form have little relationship or direct applicability to developing a product using other types of dosage form technologies. Thus, outside the applicability to osmotic dosage forms, the direction or guidance provided for any of the other multitude of dosage forms is, at best, minimal. (12/12/07 Trial Tr. at 697:24-698:14, 710:8-711:5 [Needham]; 12/14/07 Trial Tr. at 1221:5-24 [Davies]).

1070.  The evidence regarding Mr. Lam's own experience with matrix and other non-osmotic systems and ALZA's work on the osmotic devices leading to Concerta®, indicates that ALZA had great difficulty in achieving a workable solution. This would also have been expected of one of ordinary skill in the art even after issuance of the patent because the patents do not provide guidance for any dosage form other than osmotics. (12/12/07 Trial Tr. at 697:24-698:14, 710:8-711:10 [Needham]).

1071.  Meanwhile, all of the guidance that Dr. Davies relies on comes from outside the patent. Thus, again, upon reading the patent, a person of ordinary skill in the art would have had to perform research outside the patent to determine what non-osmotic approaches to take.

1072.  This factor weighs in favor of undue experimentation.

### 3.    The relative skill in the art

1073.  With regard to the dosage form and pharmaceutical composition limitations, *i.e.*, the formulation limitations, of the claims, Dr. Needham opined that the person of ordinary skill in the art would have had at least a B.S. (or similar degree) in Pharmacy (or a similar field such as Chemical Engineering or Chemistry) and would have had several years of general formulation experience.  In addition, the person of ordinary skill in the art would likely have had one or more years of modified or controlled release experience, but would not have had experience in achieving an ascending rate of release.  This level of experience would have been the same throughout the entire period of 1995-1999.  (12/12/07 Trial Tr. at 662:13-663:2 [Needham]).

1074.  Dr. Needham explained that he based his definition on his own personal work experience in industry over a period of 10 years from 1979 through 1989.  During those 10 years, his positions included Director of New Product Development for the Drug Delivery Business Unit at Travenol and Section Head of Pharmaceutical Development for G.D. Searle.  (12/12/07 Trial Tr. at 655:9-658:2 [Needham]; DTX 646).  As such, part of Dr. Needham's duties was to select the persons to work on developing formulations.  In his experience, the typical person of ordinary skill in the art had a Bachelor's degree and some years of experience.  That experience, however, was typically with regard to creating a single type of dosage form using some specific excipients that they used over and over; basically, this person would have several years of this type of formulation experience and would be a "hands on" developer.  (*Id.* at 664:18-666:24; 667:11-16; 726:23-727:20 [Needham]).

1075.  If the project required more than one type of dosage form, however—such as a representative number of the dosage forms covered by the claims of the patents in suit—that

-185-

person would generally have been at a loss to create additional dosage forms without returning to square one. (*Id.*)

1076. Dr. Needham did not consider the person of ordinary skill in the art to be someone like himself or Mr. Ayer, *i.e.*, the heads of the formulation groups at their respective companies. This level of skill, which is what Dr. Davies would require, is a much more theoretically focused level of skill, rather than the average skill in the art. Persons having the skill level of Dr. Needham and Mr. Ayer are clearly above the ordinary skill in the art and reflect more the type of person that would be an inventor. (12/12/07 Trial Tr. at 667:17-668:3 [Needham]).

1077. Dr. Davies has opined that one of ordinary skill in the art of controlled release would have had a Ph.D. in Pharmacy, Chemical Engineering, or Chemistry, and three years of experience in industry in the field of controlled release. (12/14/07 Trial Tr. at 1208:10-18 [Davies]). Dr. Davies indicated at deposition that "a person of ordinary skill in the art in controlled release would have a Ph.D." (Davies Dep. Tr. at 201:20-21). Once Dr. Davies realized that none of the formulators on the Concerta® project met his level of skill, he sought to backtrack at trial and stated that although the Ph.D. was not a necessity it was a requirement for the "typical" person of ordinary skill. Without a Ph.D., the person would otherwise need "many years" in the controlled release industry to meet Dr. Davies' standard. (12/14/07 at 1268:18-1268:3, 1268:22-1272:10 [Davies]). He based his opinion on the people he has interacted with in academia and later (since 1997) in his company Molecular Profiles. (*Id.* at 1283:15-186:17; Davies Dep. Tr. at. pp. 196-203).

1078. Mr. Ayer's testimony supports Dr. Needham's view and undercuts Dr. Davies' definition. Mr. Ayer stated that he had a B.S. in chemistry and electrical engineering. (12/10/07

Trial Tr. at 185:13-15 [Ayer]). Mr. Ayer, however, had 20 years of development experience by the time he worked on the Concerta® project. During that time he had risen to the head of formulation and his role was to troubleshoot the designs prepared by the formulation group. (*Id.* at 168:18-169:24). Mr. Ayer determined the appropriate individuals to put on the Concerta® project to develop the dosage form.

1079.   The first person assigned to develop the dosage form was Ms. Geri Wright who had only a B.S. in chemistry. She also had an unspecified amount of experience in dosage form development, although the experience was sufficient in Mr. Ayer's view to get the job done. (12/10/07 Trial Tr. at 185:3-12, 186:24-186:10 [Ayer]). This testimony regarding who would work on the development project is similar to Dr. Needham's view that the person could have a B.S. degree and several years of experience in dosage form development. It is far afield from Dr. Davies' requirement of a Ph.D. *and* three years of experience specifically in controlled release dosage form technology.

1080.   The second person assigned to take over the project from Ms. Wright was Dr. Padmaja Shivanand. (12/10/07 Trial Tr. at 174:22-175:4 [Ayer]). Dr. Shivanand was granted her Ph.D. in 1995. (JDT 01151:2-9). She began working as a formulator on the Concerta® project that very same year; *i.e.*, she did not have three years of experience. (JDT 01159:18-23). Again, the fact that she was assigned as the primary formulator on the project supports Dr. Needham's view that the person would have a B.S. with several years experience or that person could have an advanced degree with less experience. This real world example indicates that Dr. Davies' requirement of a Ph.D. *and* three years of experience specifically in controlled release is not supported.

-187-

1081.   Dr. Davies only applied the question of whether undue experimentation was required in applying his level of skill in the art to the question. He did not hypothetically apply Dr. Needham's definition of the level of skill in the art to his analysis to determine whether the claims are enabled for their full scope. (12/14/07 Trial Tr. at 1282:10-1283:13 [Davies]; Davies Dep. Tr. at pp. 203, 208 and 209). Indeed, Dr. Davies went so far as to implicitly acknowledge that the claims would not be enabled for their full scope under Dr. Needham's standard when he stated that Dr. Needham's standard was "set artificially low to insure that the individual could never develop any formulations." (*Id.*).

1082.   Of course, Dr. Needham had much more industry experience (10 years) as of 1996 than did Dr. Davies. Dr. Davies disputed this fact based at least in part on his working at Roche Pharmaceuticals and working as a pharmacist at a hospital each for six months.

1083.   Indeed, when Dr. Davies was working at Roche for his "quite intensive six months" doing a "whole range of different formulations" gaining his own industry experience, he was not even "Dr." Davies at the time. (12/14/07 Trial Tr. at 1285:10-1286:17 [Davies]; PX 179 at 2). He had just graduated with his Bachelor or Science in Pharmacy and had not started his Ph.D. studies. (PX 179 at 2). Thus, he would not have qualified as a person of ordinary skill in the art under his own definition. Similarly, any work done at Mann Baker (another pharmaceutical company) was also done during his Ph.D. studies, so again, Dr. Davies would not have qualified under his own definition of one of ordinary skill in the art. (12/14/07 Trial Tr. at 1285:10-1286:17 [Davies]; PX 179 at 2).

1084.   Based on the foregoing, Dr. Needham's level of skill in the art should be used.

1085.   Additionally, Dr. Needham indicated that the person of ordinary skill in the art

would likely have no experience in attempting to achieve an ascending release rate and a sustained ascending plasma profile. (12/12/07 Trial Tr. at 663:10-14, 692:2-13 [Needham]; DTX 1 at col. 4, ll. 13-39). Thus, the person of ordinary skill in the art would need additional guidance to achieve the ascending release rates and profiles.

1086. Dr. Needham's view is confirmed by Mr. Hamel and Mr. Lam's testimony. Despite their many years in the industry, they had not deal with such dosage forms.

1087. This supports a conclusion of undue experimentation. (*Id.* at 663:10-14, 709:2-710:14 [Needham]). Moreover, all the evidence indicates that people of such a level of skill could not get other dosage forms to work.

1088. Since Dr. Davies only applied his standard of the person of ordinary skill with regard to non-enablement, Dr. Needham's testimony is unrebutted when the correct standard of skill is applied.

## 4.    Nature of the invention

1089. The nature of the invention of the patents is any method of treating ADD or ADHD that administers methylphenidate in such a way to provide an increasing *in vitro* rate of release and/or an increasing plasma profile. The Court's claim construction makes clear that the increasing release rate is determined using an appropriate dissolution test.

1090. In essence, the asserted claims cover any means or way of achieving a functional result. (12/12/07 Trial Tr. at 694:22-695:14, 711:6-714:6 [Needham]).

1091. As the applicants noted several times during prosecution of the patents, conventional extended release products focused on maintaining a constant release rate and/or a

constant blood plasma profile for extended periods. One of ordinary skill in the art who would be formulating the dosage forms to achieve the claimed results would thus have to go beyond their typical skill set, *i.e.*, formulating constant release dosage forms, to achieve a number of dosage forms that provide an ascending release rate and/or a substantially ascending plasma profile. (*Id.* at 663:10-14, 692:2-13, 712:10-22 [Needham]).

1092. Even if the claims were construed more narrowly and were restricted to tablets and capsules as advocated by Dr. Davies, there are many possible approaches one could take that may or may not yield success in achieving the desired results. Indeed, as noted above, Dr. Needham's testimony is unrebutted that, at the very least, buccal and chewable tablets are not enabled. (12/12/07 Trial Tr. at 702:1-703:18 [Needham]).

1093. Overall, formulation of a dosage form is an iterative process. A formulator with ordinary skill in the art, when tasked to achieve the results described in the claims, would usually take a generally known approach to developing the product. Thus, outside of the specific working examples provided in the patent, one would not know what formulations would be successful or how many changes would be necessary to effect the desired result. (12/12/07 Trial Tr. at 705:24-710:2 [Needham]).

1094. Moreover, osmotic dosage forms such as those described in the patent are typically not used by formulators as a starting point to begin formulating any other dosage forms as osmotic dosage forms are viewed as unique unto themselves, so the examples in the patents as issued provide little, if any, guidance to creating any other dosage forms. (12/12/07 Trial Tr. at 697:24-698:17, 710:8-711:5 [Needham]; 12/14/07 Trial Tr. at 1221 5-24 [Davies]).

1095. Dr. Davies cited to several possible approaches to yield an ascending release rate

-190-

dosage form but could not say which approaches would be successful with methylphenidate. (*See* Davies Dep. Tr. at pp. 222-224). The art cited by Dr. Davies at trial, similar to the opinion espoused by Dr. Needham, indicates that while there were some approaches one could try to provide an ascending release rate, these were merely starting points for specific dosage forms and were not at all representative of the entire scope of the claims. (12/12/07 Trial Tr. at 708:9-709:1 [Needham]).

1096. Dr. Davies alleged that it would be a routine matter to make a matrix tablet with an ascending release rate for an extended period of time. (12/14/07 Trial Tr. at 1239:17-1240:11, 1291:20-1292:6 [Davies]). However, Dr. Davies' opinion is not supported by the facts in this case. Mr. Lam's experience, as someone with at least ordinary skill in the art, was that his group spent one to two months working on a matrix formulation of methylphenidate and could not get it to provide an ascending release rate for an extended period of time. (Lam Dep. Tr. at JDT 00805-807). In addition, Mr. Lam said this group worked on many non-osmotics and could not get them to work. (Lam Dep. Tr. at JDT 00866-67). Thus, the direct evidence indicates that such development was not routine.

1097. Andrx is not arguing that no formulations could have been made by one of ordinary skill in the art. Andrx acknowledges that the osmotic dosage forms described in the patent in suit could be made. However, it would have required undue experimentation to create other non-osmotic dosage forms that are within the scope of the claims. Indeed, there has been significant testimony of specific embodiments that are not enabled, *i.e.*, suppositories, lozenges, buccal tablets and chewable tablets. (12/12/07 Trial Tr. at 699:18-703:18, 740:11-741:24 [Needham]). Thus, the claims are not enabled for their full scope.

1098.  Additionally, Dr. Davies testified it would take several months of iterative experimentation before even one additional dosage form could be reduced to practice by his person of higher ordinary skill; clearly making all or even representative dosage forms encompassed by the full scope of the claims would have required undue experimentation. (12/14/07 Trial Tr. at 1240:24-1241:9 [Davies])

1099.  This factor weighs in favor of undue experimentation.

### 5.    The state of the prior art

1100.  As noted in the common specification and discussed above, most extended release dosage form work in the 1996-99 time frame had been done to achieve constant release rates and constant plasma profiles.  The art had not focused on providing an extended ascending release rate or plasma profile.  (12/10/07 Trial Tr. at 202:17-204:7 [Ayer]; 12/12/07 Trial Tr. at 663:10-14, 692:2-693:17, 709:2-710:4 [Needham]).

1101.  Because ascending release rate profiles were not common in the prior art one would be undertaking a mostly new endeavor (as ALZA's own experience indicates).  (12/12/07 Trial Tr. at 693:17-694:21 [Needham]).

1102.  Dr. Davies' testimony that the prior art taught ways to control release and thus could theoretically provide any desired profile is contrary to the real world evidence in this case. While the prior art clearly taught approaches to pursue and may have even provided some approaches that might work, the provisional applications and prosecution history describe a "long felt" need for providing dosage forms that achieve the result claimed.  Moreover, the prosecution history includes statements by the patentee that one could not move readily from the teaching of one type of dosage form, *e.g.*, the Higuchi jelly roll, to any other dosage form.

-192-

Therefore, all the intrinsic evidence undercuts Dr. Davies' testimony. Having made assertions of long felt need and inability to move between different dosage forms in order to obtain the patents in suit, Alza cannot now backtrack through Dr. Davies' testimony and argue the opposite.

1103. Additionally, Mr. Lam indicated that Alza had worked on a matrix system, *i.e.*, one of the systems that Dr. Davies said could routinely be made to provide the ascending release rate. (Lam Dep. Tr. at JDT 00803-805). Despite Alza's evidence of skill in the art of controlled release recited above, Alza could not get such a dosage form to work despite spending one to two months on the project. (Lam Dep. Tr. at JDT 00805-807). According to Mr. Lam, Alza also tried other formulation approaches and could not get them to work. (Lam Dep. Tr. at JDT 00866-67). Similarly, Alza had to devise an entirely new osmotic capsule to achieve the ascending release rate and the substantially ascending plasma profile. Thus, Alza's failure to produce a non-osmotic dosage form with an ascending release rate also undercuts Dr. Davies' assertions. (12/12/07 Trial Tr. at 693:17-694:21 [Needham]).

1104. This factor weighs in favor of undue experimentation.

### 6.    The predictability or unpredictability in the art

1105. As discussed above, formulation efforts to achieve the results in the claims were not predictable because such an approach had not been the focus of most formulators (and certainly would not have been the focus of the ordinarily skilled formulator). (12/12/07 Trial Tr. at 709:2-710:2 [Needham]).

1106. Even in the more well defined art of constant release formulations, there would be large amounts of unpredictability. But, here, where the art was much less well defined, there would be a much larger degree of unpredictability. (*Id.* at 709:3-7 [Needham]).

-193-

1107.  Dr. Davies acknowledges that while he believes some dosage forms could have been made without undue experimentation, he had not undertaken a consideration of how many could be made.  Rather, Dr. Davies concerned himself with whether one could have made a single non-osmotic dosage form.  Indeed, Dr. Davies was unable to say whether even 10 additional non-osmotic dosage forms could have been made without undue experimentation.  (12/14/07 Trial Tr. at 1291:20-1292:21 [Davies]; Davies Dep. Tr. at pp. 274-275).  While one dosage form might have been able to be made without undue experimentation, that does not meet the test for full scope enablement where the claims cover a large number of different types of dosage forms.  (12/12/07 Trial Tr. at 704:7-705:8 [Needham]).

1108.  Moreover, Dr. Davies did not review the prosecution histories of the patents in suit, and has indicated that he did not recall the provisional applications indicating a long felt or critical need to provide a dosage form which yielded an ascending release rate and substantially ascending plasma drug concentration.  (Davies Dep. Tr. at pp. 281-83).

1109.  Finally, Dr. Davies indicated that there are novel dosage forms being developed all the time.  (Davies Dep. Tr. at pp. 289-91).  Thus, the field is evolving and unpredictable.  (12/12/07 Trial Tr. at 709:18-710:7 [Needham]).

1110.  This factor weighs in favor of undue experimentation.

## 7.  The presence or absence of working examples

1111.  The only working examples in the common specification are to particular osmotic formulations.  (12/12/07 Trial Tr. at 691:21-692:1 [Needham]).

1112.  The provisional applications mention other non-osmotic dosage forms which may

be used. But all of them appear to be prophetic and not examples that were actually made or tested. No data was provided. Those examples were not "working examples" and do not actually appear in the specification of the patents as issued in any event. (12/12/07 Trial Tr. at 674:16-676:17 [Needham]).

1113. Thus, the patents only have working examples devoted to the very narrow area of osmotic dosage forms, and any disclosure related to those osmotic devices do not provide suggestions about what is likely to work with any other dosage form. (12/12/07 Trial Tr. at 697:24-698:14 [Needham]).

1114. Indeed, Dr. Davies did not indicate that the osmotic tablets taught him anything about how to make non-osmotic dosage forms. Rather, he pulled examples of non-osmotic dosage forms from the literature and stated that such non-osmotic dosage forms could be adapted to provide a product with an ascending release rate or a substantially ascending plasma profile.

1115. This factor weighs in favor of undue experimentation.

### 8.    The quantity of experimentation necessary

1116. Based on the fact that ascending release rates and sustained ascending profiles were not a large focus in the art and the level of skill in achieving such rates was not common, significant quantities of experimentation would be necessary to design a dosage form that would achieve them. (12/12/07 Trial Tr. at 709:2-9, 711:15-714:6 [Needham]).

1117. The patents and prosecution history also support this by indicating that there was a long felt need for such dosage forms (which had not been met) and that it was surprising that an osmotic form could actually achieve the claimed results.

-195-

1118. Furthermore, there is also the actual experience of ALZA. Mr. Lam stated that they could not get a matrix system to work. The fact that the project started in 1993, and the LCT trilayer osmotic tablet that became the commercial product was not finally decided on until 1998, suggests much experimentation. Moreover, ALZA, the experts in osmotic dosage forms, were unable to get one of their typical osmotic dosage forms to work and instead had to develop a completely novel osmotic dosage form to achieve the results on a consistent, reproducible basis. (12/12/07 Trial Tr. at 693:17-694:2 [Needham]).

1119. One of ordinary skill in the art would not typically be able to correlate results from an osmotic dosage form to a non-osmotic dosage form. Excessive experimentation would be necessary to achieve any other dosage form, much less any significant number of other dosages forms so as to justify enablement of the full scope of the claims. (12/12/07 trial Tr. at 703:19-705:8, 710:23-711:10 [Needham]).

1120. This factor weighs in favor of undue experimentation.

1121. One of Andrx's deponents, Xiu Xiu Cheng, indicated in deposition that Andrx was able to develop a bioequivalent product with a reasonable amount of effort. (Cheng Dep. Tr. at JDT 00277-279, 00288-297). However, even if one or a few, dosage forms could be formulated without undue experimentation, this is not sufficient to show that the claims, which cover many dosage forms, are enabled for their full scope. (12/12/07 Trial Tr. at 638:22-640:21 [Cheng]; *id.* at 704:7-705:8 [Needham]).

1122. All these factors weigh in favor of undue experimentation, and thus, further support that the asserted claims are not enabled for their full scope.

## IX.    CONCLUSIONS OF LAW THAT THE CLAIMS ARE NOT ENABLED FOR THEIR FULL SCOPE BECAUSE UNDUE EXPERIMENTATION IS REQUIRED

1123.    The enablement requirement is an important limitation on the scope of patent

claims, preventing applicants from receiving more in patent protection than they give in

disclosure. The enablement requirement demands not only that the patent teach some way to

practice the invention, it also demands that the specification enable "those in the art to make and

use the invention as broadly as it is claimed without undue experimentation." *In re Cortright*,

165 F.3d 1353, 1356 (Fed. Cir. 1999).

1124.    As the Federal Circuit stated in *In re Cortright*, lack of enablement:

> takes several forms. The PTO will make a scope of enablement rejection where
> the written description *enables something within the scope of the claims, but the
> claims are not limited to that scope.* This type of rejection is marked by language
> stating that the specification does not enable one of ordinary skill to use the
> invention commensurate with the scope of the claims. On the other hand, if the
> written description does not enable any subject matter within the scope of the
> claims, the PTO will make a general enablement rejection, stating that the
> specification does not teach how to make or use the invention.

165 F.3d 1353, 1356 (Fed. Cir. 1999) (emphasis added) (citations omitted).

1125.    The law specifies such a requirement due to the *quid pro quo* of the patent process

wherein an inventor is supposed to exchange progressive teaching in the art for the statutory

monopoly of the patent claims. Therefore,

> The enablement requirement ensures that the public knowledge is enriched by the
> patent specification to a degree at least commensurate with the scope of the
> claims. The scope of the claims must be less than or equal to the scope of the
> enablement. The scope of the enablement, in turn, is that which is disclosed in the
> specification plus the scope of what would be known to one of ordinary skill in
> the art without undue experimentation.

*National Recovery Techs., Inc. v. Magnetic Separation Sys., Inc.*, 166 F.3d 1190, 1195-96 (Fed.

Cir. 1999).

1126. The issue of enablement is a matter of law based on underlying facts. *See Automotive Techs. Int'l, Inc. v. BMW North America, Inc.*, 501 F.3d 1274, 1281 (Fed. Cir. 2007); *National Recovery Techs.*, 166 F.3d at 1194.

1127. To be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without "undue experimentation." *See In re Vaeck*, 947 F.2d 488, 496 (Fed. Cir. 1991) (specification must teach those skilled in the art "how to make and how to use the invention as broadly as it is claimed").

1128. Furthermore, the scope of enablement must be commensurate with the scope of the claim or the patent is non-enabled. *See Amgen*, 927 F.2d at 1216-17. In other words, where a range of options are claimed, as here, there must be reasonable enablement of the full scope of the range. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007).

1129. The specification itself does not necessarily need to describe how to make and use every possible variant of the claimed invention. Rather, the person of ordinary skill in the art may often have knowledge from the prior art, supplemented by routine experimentation, to fill in the gaps in a reference, interpolate betweens disclosed embodiments and perhaps even extrapolate beyond the disclosed embodiments, depending upon the predictability in the art. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

1130. However, even if the person of ordinary skill in the art is permitted to supplement the material disclosed in the specification with what is well known in the art, that is "'merely a rule of supplementation, not a substitute for a basic enabling disclosure.'" *Automotive Techs.*,

501 F.3d at 1283 (*quoting Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997)).

1131.   In determining whether undue experimentation is required, the Federal Circuit has applied the test from *In re Wands*, 858 F.2d 731, 737 (Fed.Cir.1988).  The Federal Circuit has set forth a number of factors to guide courts in the determination of what constitutes undue experimentation, including: 1) the quantity of experimentation necessary; 2) the amount of direction or guidance presented; 3) the presence or absence of working examples; 4) the nature of the invention; 5) the state of the prior art; 6) the relative skill of those in the art; 7) the predictability or unpredictability of the art; and 8) the breadth of the claims.  *Id.*

1132.   The *Wands* factors do not need to be applied rigidly in every case, however.  *See Liebel-Flarsheim Co.*, 481 F.3d at 1378-80; *Automotive Techs.*, 501 F.3d at 1280-85; *AK Steel Corp.*, 344 F.3d at 1243-45.

1133.   This case is similar to several recent cases wherein the Federal Circuit affirmed summary judgment determinations of non-enablement for the full scope.  *See Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1361 (Fed. Cir. 2007) ("*any* plant cell") (emphasis in original); *Automotive Techs.*, 501 F.3d at 1282 (means construed as including mechanical and electronic sensors); *Liebel-Flarsheim Co.*, 481 F.3d at 1374-75 (embodiments included syringes having pressure jackets and those without pressure jackets); *Sitrick v. Dreamworks*, 516 F.3d 993 at 999-1000 (Fed. Cir. 2008) (embodiments included both video games and movies); *Pharmaceutical Resources, Inc. v. Roxane Labs., Inc.*, 253 Fed. Appx. 26, 30 (Fed. Cir. 2007) (nonprecedential) ("any surfactant in any concentration") (emphasis in original); *In re Speas*, 2008 WL 1009000 at *1 (Fed. Cir. Apr. 9, 2008) (nonprecedential) (stating that enablement for

the full scope requires "a commensurately broad description encompassing how to utilize the invention to create *any and all such devices and systems*") (emphasis added)..

1134. In *Monsanto Co.*, the Federal Circuit upheld the finding of non-enablement for the full scope due to the claims covering two classes of flowering plants and at the time of filing it was not known how to perform the recited function on one of those two classes. 503 F.3d at 1360-1362.

1135. In *Automotive Technologies*, the claims covered both mechanical and electronic side impact sensors in cars. The claims were held not enabled for their full scope because, while the mechanical sensors were enabled, the electronic sensors were not. 501 F.3d at 1282-1285.

1136. *Liebel-Flarsheim* involved claims directed to syringes with and without pressure jackets. The Court found one class, syringes without pressure jackets, non-enabled and thus, upheld the finding of nonenablement for the full scope. 481 F.3d at 1378-81.

1137. These cases seem to require that where the claims cover multiple embodiments certainly no less than half of those embodiments must be enabled. As will be discussed in greater detail below, in this instance, it is unclear how many embodiments are covered by the claims, but the range includes *any and all* dosage forms that achieve the results claimed. Alza's expert Dr. Davies, however, was unable to state whether even an additional 10 embodiments were enabled. Arguably, the only enabled embodiment is for a particular type of osmotic dosage form. Thus, the claims are not enabled for their full scope.

1138. This conclusion is supported further by the reasoning of the previously disclosed cases finding non-enablement as a matter of law in upholding the summary judgment findings.

-200-

1139.   In *Automotive Technologies*, the Court noted that two columns and five figures in the patent were devoted to mechanical side impact sensors while only one short paragraph and one figure was devoted to an electronic sensor.  501 F.3d at 1282.  In this case, both figures of the patents in suit are directed to osmotic dosage forms and approximately 10 columns are directed to specific discussion of manufacturing osmotic dosage forms.  (DTX 1 at Figures 1 and 2; col. 13, l. 63 - col. 23, l. 10).  Other specific oral dosage forms are mentioned in one paragraph in column 2 of the '373 patent as part of the background invention. These dosage forms are mentioned in the context of sustained release oral dosage forms that were known in the prior art. There is no discussion of any working embodiment of a non-osmotic dosage form in the patents in suit.

1140.   Similarly in *Automotive Technologies*, the textual description provided little detail regarding how such an electronic sensor would be manufactured.  501 F.3d at 1283.  Here there is no textual detail in the patents in suit regarding how to manufacture a non-osmotic dosage form which provides either an ascending release rate or an ascending plasma profile for the time claimed.  Rather, the patent cites one to a textbook for examples of various sustained release dosage forms known in the art.  (DTX 1 at col. 2, ll. 45-62).

1141.   In *Automotive Technologies*, as is the case here, the plaintiff argued that despite the limited disclosure, "the knowledge of one skilled in the art was sufficient to supply the missing information."  501 F.3d at 1283.  In disagreeing, the Federal Circuit quoted *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d at 1366 and stated:

> *It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement.*  Although the knowledge of one skilled in the art is indeed relevant,

> ***the novel aspect of an invention must be enabled in the patent.*** The novel aspect
> of this invention is using a velocity-type sensor for side impact sensing.

501 F.3d at 1283 (emphasis added).

1142. The Federal Circuit then noted specific statements from the prosecution history

and stated:

> ***Thus, according to [the patentee], using inertial or acceleration sensors to sense***
> ***side impacts represented a "breakthrough" in side impact crash sensing. Given***
> ***that the novel aspect of the invention is side impact sensors, it is insufficient to***
> ***merely state that known technologies can be used to create an electronic sensor.***
> As we stated in *Genentech*, the rule that a specification need not disclose what is
> well known in the art is "merely a rule of supplementation, not a substitute for a
> basic enabling disclosure." 108 F.3d at 1366. We further stated that the "omission
> of minor details does not cause a specification to fail to meet the enablement
> requirement. However, when there is no disclosure of any specific starting
> material or of any of the conditions under which a process can be carried out,
> undue experimentation is required." *Id.*

501 F.3d at 1283 (emphasis added).

1143. Similarly, in the present case, the novel aspect of the invention according to the

patentees is the provision of methylphenidate in an ascending release rate over an extended

period of time and the substantially ascending plasma drug profile of methylphenidate. The

patent further states that there is thus a need for dosage forms to supply the desired novel release

and profile. (DTX 1 at col. 4, ll. 9-30). Yet the specification only discloses osmotic dosage

forms to supply this "novel aspect of the invention" while claiming all such dosage forms.

*Automotive Technologies* makes it clear that relying on the skill in the art, and the literature

search that Dr. Davies performed to provide the skill in the art, is a concession that the

specification fails to provide the novel aspect across the full range of embodiments of the claim.

501 F.3d at 1283 ("the novel aspect of the invention ***must be enabled in*** the patent") (emphasis

added).

1144.   The prosecution history is even more explicit in that it states that a:

a *critical and pressing need exists for a novel dosage form for delivering a drug that overcomes the shortcomings known to the prior art.*  That is, a *long-felt need exists for a dosage form for (1) delivering a drug in a sustained-ascending rate* that simultaneously reduces or eliminates the need for frequency of daily dosing; for (2) delivering a drug in a sustained-compensating dose to substantially compensate for acute tolerance to the drug and thereby maintain a preselected clinical profile; for (3) *administering the drug in an increasing dose* to lessen or eliminate acute or chronic tolerance to the drug to provide effective therapy; and (4) *for delivering the drug in a sustained, ascending-controlled profile* clinically indicated for both medical and psychomedical effects.

(DTX 1144 at PALZ 000829, ll. 10-19) (emphasis added).  If only routine experimentation was

required to provide the methods and dosage forms included in the art, such a "critical" and

"long-felt" need to supply a dosage form and method for administering the sustained increasing

release rate and sustained ascending profile would not have existed.

1145.   The provisional application also stated that:

In accordance with the practice of this invention, *it has now been discovered [that] a novel dosage form* can be made available characterized by an ascending rate of drug delivery over time.  *The dosage form provided by this invention delivers a drug at a continuously increasing rate for a predetermined period of time.  The dosage form of this invention is unexpected and it is a breakaway from the prior art existing dosage form technologies that deliver a drug at a constant zero-order unchanging rate over time.*  The dosage form of this invention avoids delivery at a zero order rate as it delivers a drug continuously in an ascending rate over time.  The profile of the prior art dosage form consists of a short start-up in delivery, followed by a constant unchanged rate.  *The profile of this invention departs from the prior art* by making available a dosage form wherein the drug release rate follows an ascending profile to achieve a desired drug delivery pattern.  The dosage form of this invention achieves the ascending pattern by combining the dimensions of the dosage form with the internal formulation of the dosage form.

(DTX 1144 at PALZ 000832, line 20 - 0008333, line 4 (emphasis added); *see also* 12/12/07 Trial

Tr. at 680:1-681:19 [Needham]).  Again, if the dosage form is *unexpected* and is a *breakaway*

from the prior art, the *Automotive Technologies* decision makes it clear that the dosage forms must be enabled by the specification. That is not the case here.

1146.    The prosecution history also addresses the inability to convert between dosage forms and the nonobviousness of the dosage form. All that intrinsic evidence indicates non-enablement for the full scope.

1147.    Indeed, here it is clear that Alza is not only seeking to use the prior art to supplement the disclosure, it is seeking to use the prior art *as* the disclosure. This is not sufficient to provide enablement for the full scope of the claims. In such a situation, "undue experimentation is required." 501 F.3d at 1283-84.

1148.    Ultimately, in this case, the specification provides merely "'a starting point, a direction for further research'" regarding any dosage form other than an osmotic dosage form. *Id.* at 1284 (*quoting Genentech*). The specification does not provide guidance to the person of ordinary skill in the art how to make and use any dosage form other than an osmotic dosage form, and thus, does not enable them. *Id.*

1149.    Finally, the *Automotive Technologies* court noted that enablement of one of the two claimed embodiments in that case was insufficient. The court also noted the irony of the pyrrhic victory that the plaintiff won in getting the claims construed broadly only to have the claims found invalid based upon the expansive nature of the claim. *Id.* at 1285. That is exactly what has occurred here. Having successfully argued that its claims should not be limited to osmotic dosage forms, the patents in suit must enable all the dosage forms. They are not so enabled.

1150.  *Liebel-Flarsheim* also strongly supports a finding of nonenablement in this case for many of the same reasons.  481 F.3d at 1378-1380.

1151.  One item worthy of particular note from *Liebel-Flarsheim* is the reliance on the inventors' testimony regarding failures to make a jacketless system.  481 F.3d at 1379 (the fact that inventors admitted that they tried unsuccessfully to produce a pressure-jacketless system supports a conclusion that undue experimentation would have been required).  Similarly here, Mr. Lam, initially one of the named inventors, but in any event a formulator involved in development of the product, testified that Alza could not get matrix or other non-osmotic dosage forms to work despite considerable effort.  This also supports nonenablement.

1152.  *Monsanto Co.* likewise provides that if extrinsic evidence indicates that one of the dosage forms claimed (here a matrix dosage form) did not work that lack of enablement for the full scope is proper.  503 F.3d at 1361-62.

1153.  Indeed, in this case, everyone acknowledges that many dosage forms would be difficult to make.  Dr. Davies tries to ignore those dosage forms by terming them "inappropriate."  Whether appropriate or not, they are claimed.  As such, the claims are not enabled to the full scope.

1154.  Two more full scope of enablement cases have come down from the Federal Circuit since trial occurred; in those two cases, enablement for the full scope was found to be lacking.

1155.  In *Sitrick v. Dreamworks*, the court again focused on the claim construction to determine whether the full scope was enabled.  516 F.3d 993.  In that case, the claims were

directed towards performing certain activities in both movies and video games, and as such, the specification must enable both. The court found the use in video games enabled while finding the use in movies not enabled. Thus, enablement for the full scope was lacking. *Id.* at 999-1000.

1156. *In re Speas* was issued as a non-precedential decision by a unanimous panel of the court. *See* 2008 WL 1009000. That panel made perhaps the clearest pronouncement yet when it stated that "to be enabled [for its full scope] the claim must be described by a commensurately broad description encompassing how to utilize the invention to create ***any and all such devices and systems***." *Id.* at *1 (emphasis added). The panel cited both *In re Hyatt* and *O'Reilly v. Morse* discussed in the preceding legal section.

1157. An analysis of the *Wands* factors, which are addressed in the fact section further support a finding of nonenablement for the full scope. There are two cases that are relevant here.

1158. In the recent, nonprecedential *Pharmaceutical Resources* case, the Federal Circuit upheld a summary judgment of nonenablement for the full scope based largely on two of the *Wands* factors, *i.e.*, the unpredictability of the art and the breadth of the claims. That decision notes that the scope of the claims permitted "any surfactant in any concentration." 253 Fed. Appx. at 30 (emphasis in original).

1159. In this case, as discussed previously, the claims of the '129 patent provide for any and all dosage forms which provide the required plasma profile for approximately 8 hours wherein the plasma profile can be measured in any appropriate bodily fluid or tissue. Claim 1 of the '373 patent covers any and all dosage forms which provide any magnitude of the required ascending release rate in an appropriate dissolution media. The dependent claims of the '373 patent add the additional functional requirement of the required plasma profile for approximately

-206-

the specified time period(s) wherein the plasma profile can be measured in any appropriately bodily fluid or tissue. The breadth of this claim is readily apparent.

1160. With regard to the unpredictability of the art, the court noted that the patentee stressed the unpredictability of the pharmaceutical field in question as expressed in the patent and the prosecution history. 253 Fed. Appx. at 29. As recited above, here the patentees indicated during the prosecution history that their method represented a "breakaway" from the prior art and that you could not extrapolate between, or modify, dosage forms and expect success. This clearly demonstrates the unpredictability in the art at issue.

1161. In the *Pharmaceutical Resources* case, the court found only three working embodiments was insufficient to enable the broad scope of the claims. 253 Fed. Appx. at 30-31. In the present case, all of the working embodiments are slightly varying osmotic formulations. This is insufficient to enable the broad scope of these claims.

1162. The case of *Glaxo Wellcome, Inc. v. Eon Labs Mfg.*, 2002 WL 1874830 (S.D.N.Y. August 13, 2002) is similar to the present case.

1163. In *Glaxo*, the District Court granted summary judgment of nonenablement for an ANDA filer based on the determination that the claim was broader than what was enabled by the specification. The patent-in-suit, United States Reissue Patent No. 33,994 contained a broad claim that was directed towards a sustained release formation of bupropion hydrochloride, with a specific dissolution profile. *Glaxo*, 2002 WL 1874830 at * 1. After construing the claim, the Court next set out to determine whether the claim as construed was fully enabled under § 112. *Id.* at *4. The Court recognized that the claim must be bounded in some way by the specification:

> However, a claim employing functional language 'covers any and all embodiments which perform the recited function. Legitimate concern often properly exists, therefore, as to whether the scope of protection defined thereby is warranted by the scope of enablement indicated and provided by the description contained in the specification.'

*Id.* (*citing In re Swinehart*, 439 F.2d 210, 213 (C.C.P.A.1971)).

1164.  In analyzing the issue of enablement, the court looked to the specification, and specifically the two very similar working examples, through the eyes of one of ordinary skill in the art. *Glaxo*, 2002 WL 1874830 at * 4.  The court determined that due to the breadth of the claim, the limited examples, and the unpredictability of the chemical arts, the claim was not enabled to its full scope and, therefore was invalid. *Id.* at *5-6.

1165.  Just as in *Glaxo Wellcome*, Plaintiffs have sought to eliminate all structure from their claim terms, which raises an issue of non-enablement. *Glaxo*, 2002 WL 1874830 at *4. There are no meaningful limitations on the claims of the patents in suit.  Under the Court's claim construction, there is no structure in these claims to provide guidance regarding how to achieve the claims.  Similarly, there are very few working examples and they all are related to osmotic dosage forms. *Id.* at *5.  Thus, the *Glaxo Wellcome* case also supports a finding of non-enablement for the full scope.

1166.  All of the evidence is sufficient to demonstrate non-enablement for the full scope. Furthermore, from a legal perspective, while the prior art is allowed to *supplement* the specification, here Dr. Davies tries to use it as a *substitute* for the specification.  Again, according to Dr. Davies, all one needed to know was the desired profile and the desired release rate and it would be routine to achieve it.  Similar to the earlier discussion of the Telegraph Cases, what Dr. Davies is indicating is that there need not have been any specification as the

-208-

claims were sufficient instruction. This is legally incorrect.

1167. Finally, if one were to take Dr. Davies at his word, he was only stating that a formulator of ordinary skill in the art could make *a* dosage form meeting the claims. He was unable to say whether the formulator of ordinary skill in the art could make as few as ten dosage forms. The question here is how many dosage forms are covered by the claims and whether a commensurate number are taught by the patent. Here, even taking Dr. Davies in the best light possible, the claims are invalid as lacking enablement for the full scope, *i.e.*, a commensurate scope of enablement.

1168. Against, this litany of recent cases, Alza and Dr. Davies realize that the claims are nonenabled if the claims are construed as covering any dosage form without limitation. Thus, Alza asks for reconstruction of the claims to encompass just "oral extended release dosage forms." Dr. Davies even further circumscribes his enablement requirement by focusing only on tablets and capsules since he used "common sense" and this is what the specification gives guidance for.

1169. Dr. Davies indicated that this application of "common sense" was given to him as an appropriate legal standard. (12/14/07 Trial Tr. at 1207:23-1208:9 [Davies]; PX 705). Alza's Responsive Pretrial Submission discusses this legal allegation of "common sense" on page 65 and cites to *In re Smythe*, 480 F.2d 1376, 1383 (C.C.P.A. 1973) and *In re Curtis*, 354 F.3d 1347, 1355-56 (Fed. Cir. 2004) as supporting this proposition relating to enablement. (D.I. 136 [Alza's Responsive Pretrial Submission] at 65-66).

1170. Alza assertions are simply wrong. Section 112 ¶ 1 has three separate requirements: (1) the enablement requirement, (2) the written description requirement, and (3)

best mode. Broad genus claims such as those here often implicate both of the first two requirements. Indeed, *Smythe* is a case which mentions both the written description and enablement requirements. In that regard, the claims appealed from the PTO in that case include claims 34, 37-40, 43 and 44 which were rejected under the written description requirement and claims 47-50 which were rejected under the enablement requirement. 480 F.2d at 1378.

1171.    The portion of *Smythe* relied on by Alza, however, is the written description portion where the focus is on whether the applicants demonstrated possession of the generic invention. In that instance, since the allegedly inoperative liquids were "predictably inoperative," written description for the genus was found. Finally, the Court in *Smythe* noted that it would have been difficult to sequester the "predictably inoperative" liquids from the claim without running afoul of the indefiniteness standard of 112 ¶ 2. *Id.* at 1385.

1172.    With regard to the rejection on enablement, however, the *Smythe* court determined that any liquid or gas was usable in the claims without undue experimentation. *Id.* at 1386.

1173.    Thus, *Smythe* does not stand for the proposition asserted.

1174.    *In re Curtis*, the other case principally relied on by Alza on the "common sense" point is similarly a written description case. However, unlike *Smythe*, written description in *Curtis* for genus claims was held to be lacking because operability of the non-disclosed species was not predictable. 354 F.3d at 1355-56.

1175.    Thus, these cases are simply inapplicable to the present enablement issue. Moreover, even if they were applicable, the difficulty present in *Smythe* with regard to the

-210-

definiteness of claim language is not present. It was clear from the prosecution history that the patentees could have chosen to claim "oral extended release dosage forms" or indeed "tablets and capsules," but they chose instead to claim "dosage forms" generally.

1176. Similarly, Dr. Davies never indicated that other dosage forms would be inoperative, and Dr. Needham indicated that other dosage forms might work. There is a difference between inoperativeness and the "common sense" analysis of Dr. Davies which would limit the claim to the commercially desirable dosage forms.

1177. Finally, Dr. Davies' "common sense" analysis is contrary to law once the claim has been construed. *Leibel-Flarsheim* actually indicates that the non-enabled embodiment of the syringe without a pressure jacket was "impractical" and thus was "taught away from" by the specification of the patent in suit. 481 F.3d at 1379. Clearly, under Dr. Davies' "common sense" analysis which focused on the impracticality of other dosage forms, the *Leibel-Flarsheim* court should have held the claims sufficiently enabled by the syringe with a pressure jacket described in the specification. The Court did not do so. Instead the court stated that it had already construed the claims to include both types of syringes (just as the term "dosage form" has been construed to be directed to "pharmaceutical compositions") and that having done so, the full scope of the claim must be enabled. *Id.* at 1378-79. Far from using the "impractical" nature of the syringe without a pressure jacket to exclude such syringes from the full scope analysis, the court rather determined that such a concession in the specification (similar to Alza's concessions of impracticality of other dosage forms at trial) indicated that the claims were not enabled for the full scope. *Id.* at 1379-80. Thus, Alza and Dr. Davies' attempt to limit the scope of enablement analysis to something less than the present scope of the claims as construed should not be countenanced.

1178.  Based on all the foregoing, claims 1 and 6-7 of the '373 patent and claim 1 of the '129 patent are not enabled for their full scope and therefore they are invalid.

## X.    IN THE ALTERNATIVE, BASED ON ALZA'S ARGUMENTS IN ITS FINAL PRETRIAL SUBMISSION AND THE TESTIMONY AT TRIAL, THE CLAIMS ARE ALSO INVALID FOR INADEQUATE WRITTEN DESCRIPTION

### A.    FINDINGS OF FACT

1179.  Plaintiffs' citation of *In re Smythe* and *In re Curtis* in their Responsive Pretrial Submission to which Defendants have previously not been able to respond implicates another related ground for finding that the asserted claims are invalid under Section 112, first paragraph, *i.e.*, the written description requirement.

1180.  Claims 1 and 6-7 of the '373 patent and claim 1 of the '129 patent are directed to a method of treating ADHD by administering a dosage form selected from a genus of structurally undefined dosage forms.  The genus is defined solely by its function.  In the case of the '373 patent, the genus is defined by whether the dosage form in question produces an ascending release rate for an extended period of time, and, in the case of the dependent claims, whether the dosage form in question produces both the ascending release rate and a substantially ascending plasma concentration for a certain period of time.  With regard to claim 1 of the '129 patent, the genus is defined by whether the dosage form provides a substantially ascending plasma concentration for about 8 hours.

1181.  The genus here is very large under the Court's definition.  The definition covers *all* dosage forms presently known and even those yet to be invented that yield the results claimed.  Indeed, the patents in suit also indicate that "[t]he invention broadly embraces oral sustained-release dosage forms that provide an ascending drug release rate over an extended time

-212-

period." (*Id.* at col. 6, ll. 6-9).

1182. In stark contrast to the very broad scope of the claims, the patents in suit describe only one type of dosage form that works to achieve the claimed results, *i.e.*, an osmotic dosage form. Both parties' formulation experts, Dr. Needham and Dr. Davies, agreed that osmotic dosage forms are unique. Thus, the disclosure of osmotic dosage forms does not indicate to one of ordinary skill in the art that the inventors were in possession of dosage forms other than osmotics that would provide the claimed ascending release rate and substantially ascending plasma profiles.

1183. Even if the "dosage form" limitation were improperly reconstrued so as to limit the claims to only oral extended release dosage forms or limited even further, as Dr. Davies would do, to tablets and capsules, the description of osmotic dosage forms in the specification still does not show possession of any other type of oral extended release dosage forms. Indeed, one skilled in the art would not understand the description of osmotic dosage forms to include non-osmotic dosage forms.

1184. Dr. Davies even acknowledges that one of ordinary skill in the art would have to review information outside the specification to make additional dosage forms. Thus, Dr. Davies does not view the patents in suit as describing dosage forms other than osmotic dosage forms. (12/14/07 Trial Tr. at 1240:16-1243:5 [Davies]).

1185. The patents in suit do indicate that there were many known approaches to achieve traditional sustained release dosage forms. Such traditional sustained release dosage forms provide a constant release rate and flat plasma profile. However, the claims of the patents in suit do not call for traditional sustained release dosage forms because they require ascending release

-213-

rates and substantially ascending plasma profiles. Thus, these other "traditional" approaches do not describe or show possession of dosage forms that provide an ascending release rate and substantially ascending plasma profile. Such release rates and plasma profiles are provided by non-traditional sustained release dosage forms. The only such dosage forms described in the patents in suit are the specifically adapted osmotic dosage forms (DTX 1, col. 2, ll.55-62).

1186.  The claims of the patents in suit have been construed to cover all dosage forms including non-oral dosage forms. Yet there is not even a single mention in the specification of the patents in suit of a non-oral dosage form. This is further evidence that the inventors did not have possession of the full breadth of the genus of dosage forms claimed.

## B.    CONCLUSIONS OF LAW

1187.  *In re Curtis* indicates that *Smythe* supports "the proposition that, in some cases, a disclosure naming a species can support later-filed claims to a genus if it clearly conveys to one of skill in the art characteristics common to all species that explain how and why they make the invention operable." 354 F.3d 1347.

1188.  "A written description of an invention involving a chemical genus, like a description of a chemical species, 'requires a precise definition, such as by structure, formula, [or] chemical name,' of the claimed subject matter sufficient to distinguish it from other materials." *The Regents of the University of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) (*quoting Fiers*, 984 F.2d at 1171).

1189.  A written description of a species in a genus is not necessarily sufficient to describe the genus. *Id.* Similarly, broad language to the genus in the specification or in an original claim does not necessarily provide adequate description for the claims in issue. *Enzo*

-214-

*Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002); *see also Regents of UOC*, 119 F.3d at 1568.

1190.   In this regard, *Enzo* and *Regents* provide some examples. *Regents* indicates that generic formulae of chemical formulas usually satisfy the written description requirement because one of skill in the art can distinguish the common structure to the genus and determine what is within the claim. The Court distinguished a description of a genus by function and indicated that typically such a genus is not adequately described:

> [A] generic statement such as "vertebrate insulin cDNA" or "mammalian insulin cDNA," without more, *is not a adequate written description of the genus because it does not distinguish the claimed genus from others, except by function.* It does not specifically define any of the [species] that fall within its definition. *It does not define any structural features commonly possessed by members of the genus that distinguish them from others.* One skilled in the art therefore cannot, as one can do with a fully described genus, visualize or recognize the identity of the members of the genus. *A definition by function, as we have previously indicated, does not suffice to define the genus because it is only an indication of what the [species] does, rather than what it is. It is only a definition of a useful result rather than a definition of what achieves that result. Many such [species] may achieve that result. The description requirement of the patent statue requires a description of an invention, not an indication of a result that one might achieve if one made that invention.*

(119 F.3d at 1568) (emphasis added) (citations omitted).

1191.   *Enzo* expands further on *Regents*:

> We next address Enzo's additional argument that the written description requirement for the generic claims is necessarily met as a matter of law because the claim language appears in ipsis verbis in the specification. We do not agree. *Even if a claim is supported by the specification, the language of the specification, to the extent possible, must describe the claimed invention so that one skilled in the art can recognize what is claimed.* The appearance of mere indistinct words in a specification or a claim, even an original claim, does not necessarily satisfy that requirement.
>
> One may consider examples from the chemical arts. A description of an anti-inflammatory steroid, i.e., a steroid (a generic structural term) described even in

terms of its function of lessening inflammation of tissues fails to distinguish any steroid from others having the same activity or function. Similarly, the expression " an antibiotic penicillin" fails to distinguish a particular penicillin molecule from others possessing the same activity. *A description of what a material does, rather than of what it is, usually does not suffice.* The disclosure must allow one skilled in the art to visualize or recognize the identity of the subject matter purportedly described.

*Enzo*, 323 F.3d at 968 (emphasis added)(citations omitted).

1192. The cases also make clear that description of a sufficient number of species within the very broad genus may provide adequate written description if the numbers of species described indicates "that the inventors had made a generic invention, i.e., that they had possession of the breadth of the genus as opposed to merely one or two such species." *Id.* at 967.

1193. *University of Rochester v. G.D. Searle & Company* takes the *Regents* and *Enzo* analysis and applies it with equal force to method claims and outside of the biotechnology field. 358 F.3d 916 (Fed. Cir. 2004). The claims in *Rochester* deal with methods for inhibiting particular enzymatic activity through the use of non-steroidal compounds. *Id.* at 918. The *Rochester* court affirmed that the patent in suit in that case does not disclose just which compounds have the desired properties, and "[w]ithout such disclosure, the claimed methods cannot be said to have been described." *Id.* at 927. Furthermore, it stated that adequate written description requires precise definitions such as by structure, formula, chemical name or physical properties, not a mere wish or plan for obtaining the invention. *Id.*

1194. In this case, all the experts acknowledge that osmotic dosage forms are described in the specification. The question is whether such a limited disclosure is adequate for description of the genus, which encompasses all dosage forms that achieve the claimed result, *i.e.*, an ascending release rate of MPH.

-216-

1195. The answer here is no. Dr. Needham indicated, and Dr. Davies agreed, that the achievement of other dosage forms would have been based on research and work outside the patent specification and that one would not know what other dosage forms would work prior to beginning work. Also, there are no common structural features between the various dosage forms and the examples because, as indicated earlier, osmotic dosage forms are unique and do not share common properties with non-osmotic dosage forms.

1196. To put it simply, whether the claims are construed as encompassing all dosage forms or reconstrued as merely encompassing oral extended release dosage forms, there is no description in the patents in suit which define the genus by structure, formula, chemical name or physical properties. Rather, the genus is only defined by the function of the species, *i.e.*, the description is merely what the genus does, not what species it encompasses. Such a description is insufficient to meet the written description requirement. *Enzo*, 323 F.3d at 968; *Rochester*, 358 F.3d at 926-27.

1197. The evidence of record establishes that Alza was unable to produce any dosage forms, other than a select species, *i.e.*, an osmotic dosage form, which provided the ascending release rate and/or substantially ascending plasma profile. Thus, the evidence is consistent with the failure of the specifications of the patents in suit to describe any non-osmotic dosage form that could achieve the claimed ascending release rate and/or substantially ascending plasma profile. Alza certainly could not have described that which they did not have possession of. A single described species, *i.e.*, osmotic dosage forms, simply does not evidence possession of the full breadth of the claims. Therefore, the claims of the patents in suit are invalid for failure to provide a written description for the full scope of the claims. (Lam Dep. Tr. at JDT 00803-807, 866-67).

-217-

1198.   Thus, claims 1 and 6-7 of the '373 patent and claim 1 of the '129 patent are invalid for lack of written description.

## XI.    FINDINGS OF FACT THAT THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ANDRX'S COUNTERCLAIMS THAT THE CLAIMS OF THE '129 PATENT ARE NOT INFRINGED AND ARE INVALID

### A.    PROCEDURAL BACKGROUND: ALZA TRIED TO WITHDRAW THE '129 PATENT FROM THE CASE TO AVOID AN UNFAVORABLE DECISION ON THAT PATENT

1199.   In its original complaint, filed on September 1, 2005, Alza included claims against Andrx for infringement of the '129 patent.  (D.I. 1, ¶¶ 59-72).  Along with its answer, Andrx submitted counterclaims for a declaratory judgment that the '129 patent was not infringed and invalid.  (D.I. 6, ¶¶ 88-91).

1200.   Alza pursued its claims for infringement of the '129 patent against Andrx until about a week before trial, when it indicated that it was withdrawing those claims.  Although Alza contended that it was withdrawing the '129 patent to streamline the case, the apparent reason for this change of strategy was to avoid having to address the unfavorable evidence regarding the '129 patent that had been developed during discovery.  This includes the testimony of Alza's own expert Dr. David Feifel, who indicated that it was very likely that at least one patient who had taken the prior art Ritalin-SR® product had a methylphenidate plasma concentration that satisfied claim 1 of the '129 patent.  (D.I. 175, Feifel Dep. Tr. at 187:24-190:21 and errata sheet).  At the beginning of trial, counsel for Alza asked the Court to dismiss Andrx's counterclaims on the '129 patent for lack of subject matter jurisdiction because Alza was withdrawing its claims for infringement of the '129 patent against Andrx.  (12/10/07 Trial Tr. at 3:6-4:5).  Counsel for Andrx asked the Court to reject Alza's attempt to remove the '129 patent from the case without issuing a court decision holding that the '129 patent was not infringed and/or invalid.  (12/10/07

-218-

Trial Tr. at 4:6-6:7).

1201.    During trial and at the Court's request, Alza and Andrx submitted letters to the

Court setting forth their respective positions on the '129 patent issue. (D.I. 144, 146, 147).

Andrx argued that its counterclaim was justiciable because: (i) Andrx may need a court decision

holding that the '129 patent is not infringed and/or invalid to trigger the 180-day exclusivity of

Impax Laboratories, Inc. ("Impax") and thereby get its product onto the market; and (ii) Alza has

a pending patent application with claims substantially identical to claim 1 of the '129 patent, and

thus a covenant not to sue on the '129 patent would not eliminate the threat that Andrx would be

sued for infringement of a patent with one or more claims that were substantially identical to

claim 1 of the '129 patent. Andrx asked the Court to enter a judgment holding that the claims of

the '129 patent were not infringed because Alza had failed to meet its burden of proof as to that

claim. (D.I. 146 at 5). Alza argued that a covenant not to sue eliminated subject matter

jurisdiction because there was no longer a threat that Alza would sue Andrx for infringement of

the '129 patent. (D.I. 147).

1202.    Subsequent to trial, on April 1, 2008, the Federal Circuit ruled in *Caraco*

*Pharmaceutical Laboratories, Ltd.*, No. 2007-1404, 2008 U.S. App. LEXIS 6838 (Fed. Cir. Apr.

1, 2008) that an ANDA applicant's need for a court decision on a patent to trigger the 180-day

exclusivity of another ANDA applicant and thereby get its product on the market is sufficient to

give the Court subject matter jurisdiction over a claim for declaratory judgment of non-

infringement and/or invalidity on that patent, even where the patent owner has given the ANDA

applicant a covenant not to sue it for infringement of that patent.

1203.    On April 2, 2008, Andrx submitted a letter to the Court reporting the issuance of

-219-

the *Caraco* decision, and applying it to the facts of this case. (D.I. 172). On April 15, 2008, Alza submitted a letter in response, in which it argued that the *Caraco* decision was not applicable to this case because Impax and Andrx share 180-day exclusivity on the '129 patent, and that Andrx thus does not need a court decision on the '129 patent before it can market its product. (D.I. 173).

1204. As explained below, despite Alza's protestations to the contrary, it is not at all clear that Impax and Andrx share 180-day exclusivity on the '129 patent. More particularly, whether Impax and Andrx share 180-day exclusivity on the '129 patent depends on several facts that are unknown to Andrx, including: (i) the exact date and time that Impax's paragraph IV certification on the '129 patent was received by FDA, and (ii) the exact date and time that Alza's papers listing the '129 patent in the Orange Book in connection with its Concerta® drug product were received by FDA. Andrx has asked Alza for this information on several occasions, but Alza has not provided it to Andrx (and Alza has indicated that it does not have the requested information concerning Impax's paragraph IV certification). Depending on these facts, Impax may have 180-day exclusivity on the '129 patent, Andrx may have 180-day exclusivity on the '129 patent, or Impax and Andrx may share 180-day exclusivity on the '129 patent.

1205. Moreover, 180-day exclusivity is determined by FDA, not Alza. Thus, Alza's arguments that Impax and Andrx are entitled to shared exclusivity do not eliminate the uncertainty about who FDA will ultimately determine is entitled to 180-day exclusivity on the '129 patent. From Andrx's perspective, there continues to be uncertainty about who is entitled to 180-day exclusivity on the '129 patent – and, in particular, whether Impax has 180-day exclusivity on the '129 patent that may prevent Andrx from ever marketing its ANDA product.

-220-

1206.  In addition, as explained below, due to Alza's pending patent applications, Andrx has continuing uncertainty about whether Alza will sue it for infringement of a patent with claims that are substantially identical to claim 1 of the '129 patent.

## 1. Andrx's Potential Need For A Court Decision On The '129 Patent To Trigger Impax's 180-Day Exclusivity On The '129 Patent

1207.  Andrx submitted its ANDA No. 76-655 to FDA seeking permission to market a generic version of Alza's 54 mg Concerta® tablets on January 31, 2003. Andrx submitted its ANDA No. 76-772 to FDA seeking permission to market generic versions of Alza's 18 mg, 27 mg and 36 mg Concerta® tablets on June 27, 2003.

1208.  At some point in time prior to July 19, 2005, Impax, which was previously a defendant in this action[27], submitted ANDA No. 76-535 to FDA seeking permission to market generic versions of Alza's 18 mg, 27 mg, 36 mg and 54 mg Concerta® tablets.

1209.  When Andrx and Impax submitted their ANDAs to FDA, neither the '373 patent nor the '129 patent had been issued by the PTO. Consequently, neither of those patents was listed in the Orange Book in connection with Alza's Concerta® tablets at that time. Accordingly, Andrx and Impax did not include certifications regarding those patents when they submitted their ANDAs.

## REDACTED

REDACTED

---

[27]     Impax was dismissed from the case pursuant to a stipulation of dismissal in which Alza's claims against Impax were dismissed with prejudice, and Impax's counterclaims against Alza were dismissed for lack of subject matter jurisdiction. (D.I. 75).

[28]     A copy of the September 6, 2005 letter is attached as Exhibit 1.

REDACTED

1216.  Under the Hatch-Waxman statute, the first applicant to submit an ANDA on a

particular brand name drug product that contains a paragraph IV certification is entitled to 180

days of "generic exclusivity." This generally means that that ANDA applicant is entitled to a
180-day period in which it is the only ANDA applicant that is allowed to sell a generic version of
that drug product. This applicant is often referred to as the "first-filer." The way that this
exclusivity is implemented is that FDA will not approve other ANDAs on the same drug product
until the 180-day exclusivity period ends.

REDACTED

1219.  Under the patent-by-patent approach to determining who is entitled to 180-day exclusivity, an ANDA applicant is not deemed to have *submitted* an ANDA containing a paragraph IV certification on that patent until *both* (i) its paragraph IV certification papers have been *received* by FDA, and (ii) it has *sent* a notice letter regarding its position on that patent to the NDA holder and patent owner.  The FDA made this clear in a January 28, 2003 letter (attached as Exhibit 2) to two ANDA applicants (Torpharm and Purepac) that had a dispute over which of the two was entitled to 180-day exclusivity with respect to a particular patent. In that letter, FDA ruled that Purepac first submitted an ANDA containing a paragraph IV certification on the patent at issue on June 13, 2000 where (i) it submitted its paragraph IV certification papers to FDA on May 25, 2000, (ii) that paragraph IV certification was stamped "received" by FDA on May 26, 2000, and (iii) Purepac sent a notice letter to the patent owner  on June 13, 2000.  This was because June 13, 2000 was the earliest date by which its paragraph IV certification had been *received* by FDA and its notice letter had been *sent*.  (Exhibit 2, pages 7-8). Using the same logic, the FDA ruled that the earliest date that Torpharm first submitted an ANDA containing a paragraph IV certification on the patent at issue was June 16, 2000 where (i) it submitted its paragraph IV certification papers to FDA on June 13, 2000, (ii) that paragraph IV certification was stamped "received" by FDA on June 16, 2000, and (iii) it sent a notice letter to the patent owner on June 13, 2000.  This was because June 16, 2000 was the earliest date by which its paragraph IV certification had been *received* by FDA and its notice letter had been *sent*.  (Exhibit 2, page 8).  Accordingly, FDA ruled that Purepac was entitled to 180-day exclusivity with respect to the patent at issue.  This ruling was later upheld at the district court level and on appeal.  *See TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 79-82 (D.D.C. 2003), *aff'd*, *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 888-89 (D.C. Cir. 2004).

REDACTED

REDACTED

1224.   Under the pre-amendments version of the Hatch-Waxman statute, the first-filer's

180-day exclusivity may be "triggered" by either a court decision holding the patent at issue not

infringed, invalid or unenforceable, or the commercial marketing of the first-filer's ANDA

product.

REDACTED

2.    **Because Alza Has Included Claims in Its Pending Patent Applications
That Are Nearly Identical to Claim 1 of the '129 Patent, Alza's
Promise of a Covenant Not to Sue on the '129 Patent Does Not
Eliminate the Threat to Andrx That It Will Be Sued for Infringement
of Claims That Are Nearly Identical to Claim 1 of the '129 Patent**

1228.  Alza has several pending patent applications in the same family as the

applications that led to the '373 and '129 patents.  At the time of trial, at least two of these

applications included claims that were nearly identical to claim 1 of the '129 patent.

1229.  Claim 1 of the '129 patent reads:

A method for treating Attention-Deficit Disorder or Attention-Deficit Hyperactivity Disorder in a patient, wherein the method comprises administering a pharmaceutically acceptable composition comprising methylphenidate and a pharmaceutically acceptable carrier to said patient in a manner that achieves a substantially ascending methylphenidate plasma drug concentration over a time period of about 8 hours following said administration.

1230.  At the time of trial, claim 38 of Alza's pending application 10/639,355 read[29]:

A method comprises administering a pharmaceutically acceptable composition comprising 100 ng to 500 mg of methylphenidate and a pharmaceutically acceptable carrier to said patient in a manner that achieves a substantially ascending methylphenidate plasma concentration over a time period of about 8 hours following said administration.

1231.  At the time of trial, claim 38 of application 10/639,355 had been allowed over the prior art, and the only outstanding rejection of that claim was that it was not patentably distinct from claim 1 of the '129 patent (*i.e.*, the claim had been rejected for "obviousness-type double patenting" over claim 1 of the '129 patent).  Such a rejection may be overcome by submitting a terminal disclaimer, by which the applicants disclaim the portion of the term of any patent that issues from the pending application that would extend beyond the expiration date of the patent on which the rejection is based.  At the time of trial, Alza had indicated that it intended to overcome the obviousness-type double patenting rejection by submitting a terminal disclaimer.

1232.  However, following trial, on March 25, 2008, Alza went in a different direction.  Specifically, Alza amended claim 38 of application 10/639,355 to recite a method that includes

---

[29]     The publicly available papers submitted in connection with Alza's pending patent applications in the same family as the '373 and '129 patents may be viewed at the "Public PAIR" portion of the PTO's web site, which is at http://portal.uspto.gov/external/portal/pair.

administering a pharmaceutical composition that achieves an "ascending release rate" of methylphenidate, instead of a "substantially ascending methylphenidate plasma concentration." This was apparently done to put Alza in a better position vis-à-vis the issue of whether the Court has subject matter jurisdiction over Andrx's counterclaims on the '129 patent, and also to avoid having to submit to the PTO the damaging evidence about the validity of claim 1 of the '129 patent that had emerged during discovery and trial.

1233.    At the time of trial, claim 35 of application 10/639,914 read:

A method comprising administering a composition that comprises a CNS-acting drug and a pharmaceutically acceptable carrier to a patient in a manner that achieves a substantially ascending plasma drug concentration over an extended time period following said administration.

1234.    Following trial, on February 5, 2008, Alza amended claim 35 of application 10/639,914 to recite a method that requires administering a pharmaceutical composition that achieves an "ascending release rate" of methylphenidate, instead of a "substantially ascending methylphenidate plasma concentration."

1235.    Under the PTO rules, Alza is free at any time to re-submit claims in its pending applications in the same family as the applications that led to the '373 and '129 patents (or in new applications that claim priority to those applications) that are substantially identical to claim 1 of the '129 patent, just like the claims it had submitted at the time of trial. The PTO may allow those claims even if they are not patentably distinct from claim 1 of the '129 patent, as long as (i) Alza submits a terminal disclaimer disclaiming the portion of the term of any patent including such claims that would extend beyond the term of the '129 patent, and (ii) the claims are not completely identical to claim 1 of the '129 patent.

1236.    Alza has not offered to give Andrx a covenant not to sue on any patents issuing

-230-

from Alza's pending applications in the same family as the '129 and '373 patents. Alza's covenant not to sue Andrx on the '129 patent has not eliminated the threat that Alza will sue Andrx for infringement of a patent with one or more claims that are substantially identical to claim 1 of the '129 patent (*i.e.*, claims to a method of administering a pharmaceutical composition that achieves a "substantially ascending methylphenidate plasma concentration" over a period of about 8 hours). This is because, as noted above, Alza is free to re-submit such claims at any time.

## XII.    CONCLUSIONS OF LAW THAT THIS COURT HAS SUBJECT MATTER JURISDICTION OVER ANDRX'S COUNTERCLAIMS

1237.    An ANDA applicant's need for a court decision on a patent to trigger the 180-day exclusivity of another ANDA applicant before it can market its own product is sufficient to confer subject matter jurisdiction to a district court over the ANDA applicant's claim for a declaratory judgment that the patent is not infringed and/or invalid. *See Caraco Pharmaceutical Laboratories, Ltd.*, No. 2007-1404, 2008 U.S. App. LEXIS 6838 (Fed. Cir. Apr. 1, 2008).[30]

## REDACTED

---

[30]    The patent owner has submitted a petition for panel rehearing and/or rehearing en banc of the *Caraco* decision. That petition is currently pending. In addition, Andrx notes that the Federal Circuit has not yet issued an opinion in the appeal (Fed. Cir. Appeal No. 2007- 1362) of this Court's decision in *Merck & Co., Inc. v. Apotex, Inc.*, 488 F. Supp.2d 418 (D. Del. 2007), in which this Court addressed an issue very similar to that raised in *Caraco* but reached the opposite result.

REDACTED

1240.  In *Caraco*, it was not absolutely certain that Caraco needed a court decision on the patent at issue there (the '941 patent) to trigger the 180-day exclusivity of the first-filer (Ivax), in that it was possible that Ivax could trigger its own exclusivity by commercially marketing its product. Ivax was prevented from commercially marketing its product until 2012 because it had been found liable for infringement of a different patent (the '712 patent). However, as the Federal Circuit specifically noted, that obstacle could be removed by a judgment obtained by someone else (such as Caraco) that the '712 patent was invalid. In that scenario, Ivax would have been free to market its own product, and thereby trigger its own exclusivity on the '941 patent. *See* 2008 U.S. App. LEXIS 6838, **17-18 ("a subsequent Paragraph IV ANDA filer could obtain a court judgment invalidating the '712 patent, which would allow the FDA to approve Ivax's drug. With FDA approval, Ivax would be legally free to sell its generic drug, and its exclusivity period would be triggered on the day of its first commercial marketing.") In this way, it was not absolutely certain that Caraco needed a court decision on the '941 patent to trigger Ivax's exclusivity. Despite that uncertainty, the Federal Circuit held that Caraco's claims for a declaratory judgment of non-infringement and invalidity on the '941 patent were justiciable because Caraco *might* need a court decision on the '941 patent to trigger Ivax's exclusivity.

REDACTED

-232-

REDACTED

1242. An entirely separate basis for this Court having subject matter jurisdiction over Andrx's counterclaims on the '129 patent is that Alza's promise of a covenant not to sue in no way eliminates the uncertainty over whether Andrx may be held liable for infringement of a claim substantially identical to claim 1 of the '129 patent, due to Alza's pending patent applications. As explained above, Alza may re-submit and obtain allowance of such claims in its pending applications, and then assert them against Andrx. Andrx may be able to eliminate this uncertainty by obtaining a ruling that claim 1 of the '129 patent is not infringed and/or invalid because such a ruling may have preclusive effect in any future litigation over patents with claims that are substantially identical to claim 1. In these circumstances, this Court has subject matter jurisdiction over Andrx's counterclaims. *See generally MedImmune, Inc. v. Genentech, Inc.*, 127 S. Ct. 764, 771 (2007) (*quoting Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 2733 (1941)) ("the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between the parties having adverse

---

REDACTED

-233-

legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment"). At a minimum, this is a factor that should be taken into account in resolving the subject matter jurisdiction issue.

1243. Andrx recognizes that this Court addressed a similar issue in *Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, 525 F. Supp. 2d 680 (D. Del. 2007), where it dismissed a declaratory judgment counterclaim on a patent due to a covenant not to sue on that patent notwithstanding a pending application to reissue that patent. However, in *Pfizer v. Ranbaxy*, there was no indication that the patent owner would seek claims in the pending reissue application that were substantially identical to the claims in the patent at issue. Indeed, the evidence was to the contrary: the patent owner sought reissue to correct a defect that had led the Federal Circuit to declare one of the claims to be invalid in prior litigation between the parties. Thus, the evidence indicated that claims in any reissue patent would be substantially different from the claims in the patent at issue. Here, the situation is very different, in that Alza has indicated that it will pursue claims that are substantially identical to claim 1 of the '129 patent, and has only withdrawn those claims while this Court is considering the issue of whether it has subject matter jurisdiction over Andrx's counterclaims on the '129 patent.

## XIII.  FINDINGS OF FACT THAT CLAIM 1 OF THE '129 PATENT IS ANTICIPATED

1244. Anticipation, like infringement, is a question of fact. *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005). There is symmetry between anticipation and infringement summarized by the maxim that that which literally infringes if later anticipates if earlier. *Upsher-Smith Labs.*, 412 F.3d at 1322. In this instance, Andrx only alleges anticipation of claim 1 of the '129 patent, and Andrx's allegation is based on the symmetry

-234-

between anticipation and infringement.

1245.  In this case, Alza has made it clear throughout that its view is that if even one person taking a single dose of the Andrx proposed products has a substantially ascending plasma drug concentration over a time period of about 8 hours, such a use would infringe, and presumably, under Alza's thinking, Andrx would be liable as an indirect infringer.  The other side of the coin for Alza, however, is that if such a single use would infringe now, a single use of a once a day methylphenidate product (Ritalin SR®) in the prior art would be anticipatory.

1246.  Moreover, it is clear that Ritalin SR® met the other limitations of the claim as it was a pharmaceutically acceptable composition containing methylphenidate and was used for treating ADHD.  It had other ingredients that acted as pharmaceutically acceptable carriers.  Thus, if the drug plasma concentration of Ritalin SR® substantially ascended to around 8 hours, it would anticipate.

1247.  As Alza interprets the Court's claim construction regarding what a substantially ascending methylphenidate plasma drug concentration, claim 1 of the '129 patent literally covers the situation where any individual anywhere in the world on a single day is administered a dosage form containing methylphenidate for treatment of ADD or ADHD and achieves a substantially ascending plasma drug concentration for a period of 8 hours in any appropriate fluid or tissue.

1248.  If the Court agrees with Alza's infringement assertions, then such a profile would have occurred at least once in at least one person upon administration of Ritalin SR®.  (12/12/07 Trial Tr. at 865:7-866:9 [Mayersohn]).

-235-

1249. Indeed, Dr. Feifel, one of Alza's experts, conceded at much at deposition. Dr.

Feifel was asked the following questions and gave the following answers:

Q:    Okay fair. Now with Ritalin SR, I guess as we've talked about, that generally produced a flat methylphenidate profile; is that fair?

A:    That's fair.

Q:    What's your view as to – if you looked at every patient who ever received Ritalin SR, what's your view as to whether any of those ever exhibited a methylphenidate plasma concentration that ascended from zero to eight hours?

A:    Oh, boy. It's an incredibly speculative question. I think what you're asking is if I were to take all the patients who ever received Ritalin SR and was able to view their plasma levels would there be at least one of them that demonstrated an ascending profile?

Q:    Yes.

A:    I think that there's a good chance that that would have happened.

*Q:    And ascending plasma profile over eight hours; is that fair?*

*A:    I think that – if the numbers were high enough and I assume that there were – altogether thousands if not millions of patients given – prescriptions given or doses given, that there would be one profile that would fit that pattern.*

Q:    Ritalin SR was on the market beginning in 1983, correct?

A:    I'm not sure, but that – I know that it was available in the '80s.

Q:    And as I think you intimated, hundreds of thousands if not millions of patients received Ritalin SR; is that correct?

A:    Correct.

Q:    And out of all those patients, the odds are overwhelming that at least one had a plasma concentration profile of methylphenidate that ascended from zero to eight hours; is that fair?

[Alza counsel]: Objection; vague.

A:    I would say that that's a reasonable guess given known variability from patient to patient and....

(Feifel Dep. Tr. at pp. 187-188) (emphasis added).


1250. Dr. Feifel was not asked any questions regarding clarification at his deposition by

counsel for Alza. However, on September 7, 2007, Dr. Feifel submitted an errata sheet

"clarifying" his testimony as follows (with the additions bolded):

Q:    Okay fair. Now with Ritalin SR, I guess as we've talked about, that generally produced a flat methylphenidate profile; is that fair?

A:    That's fair.

Q:    What's your view as to – if you looked at every patient who ever received Ritalin SR, what's your view as to whether any of those ever exhibited a methylphenidate plasma concentration that ascended from zero to eight hours?

A:    Oh, boy. It's an incredibly speculative question. I think what you're asking is if I were to take all the patients who ever received Ritalin SR and was able to view their plasma levels would there be at least one of them that demonstrated an ascending profile?

Q:    Yes.

A:    I think that there's a good chance that that would have happened in the sense that a patient could conceivably have a higher plasma concentration at hour 8 than earlier in the day. I do not believe, however, that a patient taking Ritalin SR would have a plasma concentration that reached a maximum at about 8 hours.

Q:    And ascending plasma profile over eight hours; is that fair?

A:    I think that – if the numbers were high enough and I assume that there were – altogether thousands if not millions of patients given – prescriptions given or doses given, that there would be one profile that would fit that pattern *in the sense that a patient could conceivably have a higher plasma concentration at hour 8 than earlier in the day. I do not believe, however, that a patient taking Ritalin SR would have a plasma concentration that reached a maximum at about 8 hours*.

Q:    Ritalin SR was on the market beginning in 1983, correct?

A:    I'm not sure, but that – I know that it was available in the '80s.

Q:    And as I think you intimated, hundreds of thousands if not millions of patients received Ritalin SR; is that correct?

A:    Correct.

Q:    And out of all those patients, the odds are overwhelming that at least one had a plasma concentration profile of methylphenidate that ascended from zero to eight hours; is that fair?

[Alza counsel]: Objection; vague.

A:    I would say that that's a reasonable guess given known variability from patient to patient [and . . .] *in the sense that a patient could conceivably have a higher plasma concentration at hour 8 than earlier in the day. I do not believe, however, that a patient taking Ritalin SR would have a plasma concentration that reached a maximum at about 8 hours*.

(Feifel Dep. Tr. at pp. 187-188 and errata sheet) (additions emphasized).

1251. Dr. Feifel's attempt to take back his testimony is unsuccessful because Alza's construction permits the maximum concentration to occur significantly prior to 8 hours so long as the profile has risen for more than 60% of the time and the decline from the maximum concentration has not dropped more than 15%. (*See, e.g.,* DTX 143 (which in Alza's view is substantially ascending for 8 hours even though the maximum occurred at 2 hours ; *see also* PX 397 at P ALZ 7690.013)). Therefore, Dr. Feifel's revised testimony has not changed as it is not required that the plasma concentration reach its peak at about 8 hours.

1252. Dr. Mayersohn confirmed that after reading Dr. Feifel's deposition testimony, both he and Dr. Feifel shared the same view that Ritalin SR® produced a plasma profile that substantially ascended for eight hours in some patients between 1983 and 1996. (12/12/07 Trial Tr. at 865:7-870:20 [Mayersohn]).

1253. Besides experts on both sides agreeing that some patient at some point in time took Ritalin SR® and had a substantially ascending methylphenidate plasma drug concentration for about 8 hours – under Alza's "conservative" view of that requirement – a slight broadening of that conservative view, results in actual data from the administration of Ritalin SR® falling under the patent.

1254. Alza's Dr. Angst testified that "conservatively" he viewed that the Court's claim construction use of the phrase "a slight dip" in construing substantially ascending meant that there could be many declines in the plasma profile and as long as they were either alone or in the aggregate less than a 15% decrease would be permitted. However, if "a slight dip" allowed for a 20% decrease then actual data would show that Ritalin SR® anticipates claim 1 of the '129 patent.

1255.    Alza, during the development of Concerta®, performed clinical trials involving

Ritalin SR®. (*See, e.g.,* DTX 139).  Even from this limited study alone, involving just a few

dozen subjects, some of the subjects had a substantially ascending methylphenidate plasma drug

concentration for about 8 hours if "a slight dip" includes decreases of up to 20%.  For example,

in DTX 139 at ALZA 45673-45675, patient number 102 had an increasing methylphenidate

plasma profile through six hours, which then decreased by 19.9% at eight hours.  (*See* 12/11/07

Trial Tr. at 455:21-460:5 [Angst]; *see also* 12/11/07 Trial Tr. at 460:24-462:14 [Angst]

(testifying that subject number 114 would also be captured with a 20% dip)).  Thus, allowing a

dip to be up to a 20% decrease – instead of the "conservative" 15% decrease used by Dr. Angst –

two people (subject numbers 102 and 114) out of the couple dozen people in this study alone had

a substantially ascending methylphenidate plasma drug concentration for eight hours under

Alza's view of that requirement:

> Q.    But if it turned out that your criteria were 20 percent, we'd pick up this
> Ritalin SR profile; isn't that fair?
> A.    *If somebody would establish a criteria of 20 percent, this would be*
> *captured.*

(12/11/07 Trial Tr. at 460:19-23 [Angst]) (emphasis added).

1256.    Even though experts on both sides of this litigation testified that they thought that

someone somewhere would have had a substantially ascending methylphenidate plasma drug

concentration with a dip of up to 15%, and even though Dr. Angst agreed that two people out of

a small study conducted by Alza using Ritalin SR® would be substantially ascending for 8 hours

if a dip allowed a decrease of up to 20% decrease – *Alza did not proffer any evidence to*

*factually dispute the anticipation of claim 1 of the '129 patent*.  Even on cross-examination, Dr.

Angst was not able to dispute that inherent anticipation would have occurred out of the millions

of administrations Ritalin SR® because he "ha[d]n't been asked that question – explored that question." (See 12/11/07 Trial Tr. at 464:5-466:8 [Angst]).

1257. Because at least one expert on each side agreed that someone somewhere who took Ritalin SR® met the limitations of claim 1 of the '129 patent as interpreted by Alza and because the data shows that some of just a few dozen subjects administered Ritalin SR® had a substantially ascending methylphenidate plasma drug concentration for eight hours (when allowing 20% to be considered a slight dip), claim 1 of the '129 patent is anticipated by the prior use of Ritalin SR®.

## XIV.  CONCLUSIONS OF LAW THAT CLAIM 1 OF THE '129 PATENT IS ANTICIPATED

1258. Alza has argued that if Andrx were to market its product it would induce infringement of claim 1 of the '129 patent if even only a single patient had a substantially ascending plasma drug concentration over about 8 hours.

1259. A finding of induced infringement requires an underlying finding of direct infringement. *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1033 (Fed. Cir. 2002).

1260. It is black letter law that that which literally infringes if later anticipates if earlier. *Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1322 (Fed. Cir. 2005).

1261. Thus, if administering Andrx's product would induce infringement when the plasma profile limitations are met in only a single person, then the same would be true for an administration of Ritalin SR® where the plasma profile limitations are met in a single person.

-240-

1262.  Since Ritalin SR® was on the market for more than a decade prior to the earliest possible filing date of the '129 patent, based upon the evidence, claim 1 is anticipated.

1263.  To hold otherwise would prevent the public from practicing the prior art of using Ritalin SR® to treat ADHD.  Such preclusion is not allowed.  *See SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345-46 (Fed. Cir. 2005); *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1379-81 (Fed. Cir. 2003).

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

-----------------------------------------------------------------X

ALZA CORPORATION, and )
McNEIL-PPC., INC., )
)
)
                    Plaintiffs )            CIVIL ACTION NO.
)
                    v. )                    05-CV-0642
)
ANDRX PHARMACEUTICALS, LLC and )
ANDRX CORPORATION )
)
                    Defendants. )
-----------------------------------------------------------------X

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 16th day of June, 2008, a copy of

DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW was

served via electronic means upon the following person(s):

Steven J. Balick, Esq.                      David P. Pritikin, Esq.
John G. Day, Esq.                           Thomas D. Rein, Esq.
Tiffany Geyer London, Esq.                  Sidley Austin, LLP
Ashby & Geddes                              One South Dearborn
500 Delaware Ave., 8th Floor              Chicago, IL 60603
P.O. Box 1150
Wilmington, DE 19899

Jeffrey P. Kushan, Esq.                     Michael D. Hatcher, Esq.
Todd A. Wagner, Esq.                        Sidley Austin, LLP
Sidley Austin, LLP                          717 North Harwood, Ste. 3400
1501 K Street, N.W.                         Dallas, TX 75201
Washington, DC 20005

### [SIGNATURE ON NEXT PAGE]

2445512-1

/s/ George T. Lees III #3647
William J. Cattie, III, Esq.
I. D. No. 953
George T. Lees III
I.D. No. 3647
300 Delaware Avenue, Suite 1015
P. O. Box 588
Wilmington, DE 19899-0588
(302) 778-1200
Attorney for Defendants
ANDRX PHARMACEUTICALS, LLC
ANDRX CORPORATION

Of Counsel:

John W. Bateman, Esq.
C. Kyle Musgrove, Esq.
Robert F. Vroom, Esq.
Douglas T. Lee, Esq.
KENYON & KENYON LLP
1500 K Street, NW
Washington, DC 20005

2445512-1