# EXHIBIT A

RECEIVED BY HAND

DEC 1 7 2007

A&G

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ALZA CORPORATION, and      ) Volume V
McNEIL, PPC, INC.,         )
                           )
            Plaintiffs,    )
                           ) C.A. No. 05-642-JJF
v.                         )
                           )
ANDRX PHARMACEUTICALS,     )
L.L.C., and ANDRX          )
CORPORATION,               )
                           )
            Defendants.    )


                    Friday, December 14, 2007
                    9:36 a.m.
                    Courtroom 4B

                    844 King Street
                    Wilmington, Delaware


BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge


APPEARANCES:

          ASHBY & GEDDES
          BY:  STEVEN J. BALICK, ESQ.

              -and-

          SIDLEY AUSTIN, LLP
          BY:  DAVID T. PRITIKIN, ESQ.
          BY:  JEFFREY P. KUSHNAN, ESQ.
          BY:  TODD WAGNER, ESQ.
          BY:  LOUIS E. FOGEL, ESQ.
          BY:  PETER S. CHOI, ESQ.

                    Counsel for the Plaintiffs



APPEARANCES CONTINUED:


        RAWLE & HENDERSON, LLP
        BY:  WILLIAM CATTIE, ESQ.

             -and-

        KENYON & KENYON
        BY:  JOHN W. BATEMAN, ESQ.
        BY:  C. KYLE MUSGROVE, ESQ.
        BY:  ROBERT F. VROOM, ESQ.

                    Counsel for Defendants

1114

```
1              THE COURT:  All right.  Be seated

2      please.

3              Good morning.  Ready to proceed.

4                      CROSS-EXAMINATION

5    BY MR. MUSGROVE:

6         Q.   Good morning, Dr. Patrick.

7         A.   Good morning, counsel.

8              THE WITNESS:  Good morning, Judge.

9         Q.   Dr. Patrick, during the course of

10     yesterday's cross-examination, you asked me a

11     couple of questions and I wanted to respond to

12     those, one of those to begin with and readdress

13     one of those at the end if that's okay with you.

14              You asked me if you recall about

15     the study that reproduced in Figure 4 of the

16     patent, whether that was adults or children.  Do

17     you recall that?

18         A.   Yes, I think.

19         Q.   Okay.  Can we pull up DTX 697, the

20     first page.  And if we could highlight down

21     here.

22              Now, Doctor, my understanding is

23     this is the study that went into the patent.

24     And right down here we see that the thirty-two
```

1115

1    patients were ages seven to twelve that were

2    enrolled?

3         A.   All right.

4         Q.   Do you see that?

5         A.   Yes.

6         Q.   So it was children?

7         A.   Yes.

8         Q.   And the regimens were OROS

9    regimens, 18, 36 and 54, and then the TID that

10   we were looking at was the 5, 10 and 15

11   milligrams given TID.  Do you see that?

12        A.   Yes.

13        Q.   Now, with that in mind, if you

14   need to know anything else about that, let me

15   know, but I would like to return to my DTX 1219

16   hypothetical slide.

17             And do you recall yesterday you

18   talked about the fact that this would be a safe

19   profile, but you weren't sure about efficacious

20   and wanted to know about children and adults.

21   Knowing what we just saw about the children, do

22   you believe with these being the peaks for the

23   TID, that this would be an efficacious regimen?

24        A.   Well, you had stated that they

1116

```
1    used 5 milligrams TID, 10, and 15.  Is this from

2    the 5, the 10 or the 15?

3           Q.   I believe it's normalized, Doctor.

4           A.   It's normalized?

5           Q.   I believe so.  I'm sure I'll be

6    corrected if I'm wrong.

7           A.   I would need to know that.

8           Q.   Well, assume for the moment that

9    it is normalized.

10          A.   All right.

11          Q.   Would that be an efficacious

12   profile?

13          A.   No.

14          Q.   Why not?

15          A.   Because it doesn't reach the

16   concentrations that characteristically are

17   necessary to treat ADHD.

18          Q.   And what levels do you think would

19   need to reach?

20          A.   Generally, I would estimate that

21   the vast majority of ADHD pediatric population

22   would respond somewhere between 7 and maybe 17

23   nanograms per mil.

24          Q.   But so if these peaks were higher,
```

1     and we just shift my line up, you could still

2     set a place where you started the low point and

3     run to a place that's below the peaks and have a

4     safe and efficacious profile; correct?

5              A.    No, I don't think that would be

6     efficacious.

7              Q.    And why not?

8              A.    Because the -- the dotted line you

9     have is below where you generally have

10    therapeutic action.

11             Q.    But --

12             A.    It would be desirable at four

13    hours in that it's relatively low and you'd

14    expect a low incidents of appetite suppression

15    and arrested growth.

16             Q.    And with a substantially ascending

17    profile as you understand it, we can actually

18    start a little higher, come down and then go

19    back up; correct?

20             A.    You're allowing for sub -- that's

21    the substantially component?

22             Q.    Yes, sir.

23             A.    I believe that's the construction.

24             Q.    Yes, sir.

1118

```
 1          Q.   Yes, sir.  So you could build in a
 2     little dip around lunchtime and be okay as far
 3     as a substantially ascending profile?
 4          A.   That's my understand --
 5     understanding of the construction.
 6          Q.   And that would be desirable around
 7     lunchtime; correct?
 8          A.   I think actually it would.
 9          Q.   Okay.  Now, could you turn to DTX
10     86, please?  It's in your black binder, I
11     believe.
12          A.   DTX, the number?
13          Q.   86.  It's the Swanson study.
14          A.   Yes.
15          Q.   And I just wanted to confirm in
16     the Swanson study, what we're talking about is
17     computer simulated profiles, correct?
18          A.   That, in his own words, had been
19     validated through the use of normal subjects
20     that I believe were adults, whereby you don't
21     have to have this -- confound the stressor of
22     multiple blood draws in the children when you're
23     trying to also correlate blood concentrations
24     with efficacy.
```

1            People don't like needles.

2       Q.   Okay.  My question, Doctor, is

3   those are simulated profiles; correct?

4       A.   Yes.

5       Q.   And could you turn to DTX 545 in

6   that binder, please?

7       A.   Yes.

8       Q.   And that's an article that you

9   wrote with some other individuals?

10      A.   That's correct.

11      Q.   And you wrote that with Dr. Tom

12  Gualtieri?

13      A.   Gualtieri.

14      Q.   And he's a medical doctor?

15      A.   He's a medical doctor, a pediatric

16  psychiatrist.

17      Q.   And Schroeder, who was he?

18      A.   He's a clinical psychologist that

19  works with children.

20      Q.   And on that, you were the

21  analytical chemist; correct?

22      A.   That's correct.

23      Q.   And if we go to Page 391 of the

24  article.  And if we go to the paragraph that

1    begins monitoring blood profiles.

2         A.    Yes.

3         Q.    Just look at the bottom down here,

4    the tolerance.

5              Now, this was a study more about

6    chronic tolerance; is that correct?  Or is it

7    acute tolerance?

8         A.    This study was most -- let me be

9    sure.  I had a couple of publications with

10   Gualtieri.  I think the primary thrust of this

11   study was to correlate incidence of side effects

12   with dose.

13        Q.    Okay.  But the tolerance that he's

14   talking about here, what type of tolerance is

15   that?

16        A.    He's saying it's probably

17   pharmacodynamically related rather than -- -

18   let's see.  Pharmacologic -- pharmacologic means

19   pharmacokinetic and pharmacodynamics.

20             Pharmacology is pharmacokinetics

21   and pharmacodynamics.  Had I had a hand -- if I

22   had known as much as I do now, I would have said

23   pharmacokinetic or pharmacodynamic.

24             So this really -- the scholar that

1121

1    Gualtieri is, I think he either made a mistake

2    or doesn't have a clear understanding of

3    pharmacologic, that pharmacodynamics factors

4    into pharmacologically.

5                Q.   Okay.  My question was, Doctor:

6    What type of tolerance are they talking about

7    here acute or chronic?

8                A.   I don't know.

9                Q.   But Dr. Gualtieri down here says,

10   If you develop tolerance, you'll simply raise

11   the dose until therapeutic effects are once

12   again achieved; correct?

13               A.   That is what he has stated here.

14               Q.   Okay.  So with regard to

15   effectiveness, at least one possibility if you

16   developed tolerance during the course of the

17   day, would be to have an escalating dose that

18   would continue to provide the effective amount;

19   correct?

20               A.   No. He -- in this case, the

21   tolerance would, in all likelihood, relate to

22   the child growing up and getting -- gaining more

23   weight.

24               So basically if you have him at

1122

1    the same dose and the child increases 25 percent

2    of the weight he had or she had a couple years

3    earlier, that would be in the realm of

4    tolerance, in that they're not getting the same

5    response from the same dose.

6         So you'd raise the dose.  But, in

7    fact, they're getting the same dose on a

8    milligram kilogram basis.

9         Q.    But one possibility would be if

10   you're seeing tolerance at a specific level, you

11   just raise the level; correct?

12        Raise the amount you're giving?

13        A.    I don't believe that -- once a

14   child has been titrated to a maintenance dose, I

15   don't think that this is a frequent encounter

16   unless the person puts on a lot of weight, which

17   becomes a little problematic because the drug

18   affects your appetite.  But they'll no doubt

19   grow.

20        Q.    Now, could you turn to DTX 153,

21   please?

22        If we could go just to the second

23   page of the abstract.

24        A.    Uh-huh.

1           Q.   Right here.

2                Now, this is the Perel abstract;

3      correct?

4           A.   Yes.

5           Q.   And you've seen this before;

6      correct, Doctor?

7           A.   Yes, I have.

8           Q.   And this talks about clockwise

9      hysteresis down here; correct?

10          A.   Yes, it does.

11          Q.   Is clockwise hysteresis synonymous

12     about acute tolerance?

13          A.   I don't -- I do not consider it as

14     I no, ma'am news with acute tolerance.

15          Q.   Why not?

16          A.   Because clockwise hysteresis

17     doesn't define a time frame, and the study is

18     inherently flawed.

19          Q.   Okay.  So you don't believe that

20     this study shows acute tolerance because of the

21     flaws you just mentioned?

22          A.   I haven't told you what the flaws

23     are.

24          Q.   Okay.  But that you believe it's

1    flawed; correct?

2            A.   Yeah, I know it is.

3            Q.   Okay.  Well, let's go to PTX 266,

4    please.

5                 It should be in your binder.

6            A.   266.  Yes.

7            Q.   Okay.  Could you turn to Page 8 of

8    that Volume 1, Page 8?

9                 If we could look at the top

10   paragraph up here.  This is from McNeil's

11   submission to the FDA; correct?

12           A.   That is -- that is what you showed

13   me yesterday, I believe.

14           Q.   A different part, I believe.

15   Yeah.

16           A.   Okay.

17           Q.   Now, up here McNeil stated to the

18   FDA, acute tolerance to methylphenidate has been

19   empirically documented by demonstrating that

20   methylphenidate concentrations measured soon

21   after an initial dose cause a greater

22   pharmacodynamic effect than concentrations

23   occurring at a later time.

24                That's a correct definition of

```
 1        acute tolerance; correct?

 2             A.   We'd have to know what how much

 3        later time.

 4             Q.   Okay.  But this is what McNeil

 5        told the FDA; right?

 6             A.   I'll take your word for it.

 7             Q.   Okay.  And then the Section 10

 8        says, This effect is seen graphically as a

 9        clockwise hysteresis in the plasma

10        concentration-effect relationship; correct?

11             A.   That's what it states.

12             Q.   Okay.  So McNeil is saying the

13        acute tolerance effect is seen graphically as

14        clockwise hysteresis; correct?

15             A.   That's what they say.

16             Q.   And you disagree with that?

17             A.   This is 2004.  I don't disagree

18        with that in that this is post-Swanson '99.

19             Q.   Okay.  Well, can we turn to the

20        next page, please?

21             A.   All right.

22             Q.   And if we look at this paragraph

23        right here.

24                  This cites to the Perel article,
```

1       number 16; correct?

2                     A.    That abstract?

3               Q.    Yes.  Yes:

4                     Perel's abstract.

5               A.    Yes.  Yes.

6               Q.    And this talks about the

7       pharmacodynamic effects predominant in the

8       earlier part and weaker in the later part;

9       correct?

10              A.    When you use a super pharmacology

11      which Perel does, which I can't imagine the

12      institution board would approve that study.

13              Q.    This doesn't say any super or

14      flaws, does it?

15              A.    Excuse me?

16              Q.    In this submission by McNeil to

17      the FDA, it doesn't say anything about problems,

18      about problems with Perel at all, does it?

19              A.    This is coming from probably a BS

20      pharmacist, and I believe this person would not

21      have the training and wherewithal to recognize

22      the problems with Perel.  So the person just

23      made a mistake.

24              Q.    And you believe that this went out

1    of McNeil with nobody reviewing it except a BS

2    pharmacist, McNeil sent a letter to the FDA by a

3    BS pharmacist without anybody of any skill

4    reviewing it?

5         A.    It says register pharmacist

6    lawyer.  Most registered pharmacist if they have

7    a doctorate, they'll say Pharm DR PH, so this is

8    a BS.

9         Q.    I'm sorry, Doctor, this is not my

10   question.  My question is do you think McNeil

11   let this out without other people reviewing it

12   who were skilled?

13        A.    I do not know that.

14        Q.    Doctor, you didn't know what

15   clockwise hysteresis was, did you?

16        A.    I have an idea, but I don't use it

17   in my own sections of manuscripts.

18        Q.    Now, what we have done is

19   yesterday I had a kind of looseleaf copy of your

20   deposition transcript.  Can I bring that up.

21             MR. MUSGROVE:  Your Honor, may I

22   approach?

23             THE COURT:  Yes, you may.

24        Q.    And could you turn to page 253 of

1    your deposition, it's the last page.

2         A.   Yes.

3         Q.   And if we could look at the first

4    line of that.  I'll bring it up on the Elmo.

5         A.   Yes, that's when I admitted that

6    I'm befuddled by this.

7         Q.   You were befuddled by the terms.

8    I asked you do you have an understanding as to

9    whether the -- after, for example, reading this,

10   and we were looking at the McNeil supplement

11   that we were just looking at, after reading this

12   whether the term clockwise hysteresis has any

13   relations to acute tolerance.

14             As I've stated before, I am to use

15   this word, but I will now, befuddled by

16   clockwise and counterclockwise hysteresis.

17             In fact, if we turn back to page

18   eight and I asked you if you would agree with

19   the statement beginning at the first full

20   paragraph that the acute tolerance for

21   methylphenidate has been empirically documented,

22   you said you wouldn't agree about what McNeil

23   said there, either, would you?

24        A.   I never read the entire article.

1    You handed it to me there, I got partly through

2    it and saw so much that I did not agree with

3    that if you may recall, a slight smile washed

4    over my face and I stopped reading it.

5            Q.   So you disagree with a lot of what

6    McNeil sent into the FDA and relied on to try to

7    keep my client off the market prior to the

8    issuance of this patent; correct?

9            A.   I found it not scientifically

10   rigorous.

11           Q.   And Dr. Greenhill, the

12   Dr. Greenhill that we've talked about a lot

13   being preeminent in the field, he was author on

14   the Perel abstract; correct?

15           A.   Yes.

16           Q.   Now, can we go -- you're going to

17   have to pull up your white binder, or you can

18   look at the screen.   If we can go to PX 137 in

19   the white binder.   And we could go to the Figure

20   2.

21           A.   All right.

22           Q.   Now, we've talked about this, or

23   this figure has been talked about quite a lot;

24   correct, Doctor?

1    A.    Yes.

2    Q.    And this was your work in 1989, or

3    was published in 1989?

4    A.    Yeah, the study was conducted in

5    '88.

6    Q.    And this shows a pretty -- with

7    regard to blood draws, I mean, we're talking

8    about a pretty flat profile up in this area?

9    A.    Yes.

10   Q.    And so from this, we know that

11   methylphenidate is being pretty well absorbed

12   from Ritalin-SR; correct?

13   A.    It's absorbed to the extent --

14   same extent as the BID immediate release.

15   Q.    And once methylphenidate is in a

16   plasma, it should behave the same regardless of

17   the formulation; correct?

18   A.    Not necessarily.

19   Q.    Okay.  Now, could you turn to DTX

20   627, please.  It's in your black binder, or I'm

21   sorry it's your white binder, still.  And if we

22   could go~

23   A.    And the number again?

24   Q.    D DTX 627, page 768.  And do you

1    recall talking about this article in this page

2    on direct?

3            A.   Yes.

4            Q.   Okay.  Now, and do you recall, if

5    we can go down to the right-hand column, this

6    paragraph down here, you were asked about this

7    column and the possible explanations and the

8    Jackson personal communication; do you recall

9    that?

10           A.   Yes.

11           Q.   You weren't asked about any of the

12   rest of this article on direct, were you?

13           A.   I commented on some of it, the

14   affects of the article.

15           Q.   Do you believe you commented on

16   any other parts of the article on direct?

17           A.   I'm not sure if it was on direct

18   or cross.

19           Q.   Well, I'm telling you, I'm asking

20   you for the first time on cross, so if you think

21   you said it, it was on direct?

22           A.   Okay.  So then it was in direct.

23           Q.   Can we pull up page 1038 and 1039

24   of the trial transcript from yesterday.

1      A.    All right.

2            Q.    And if we look at 1038-3 through

3      1039-21.  And you're talking about the Birmaher

4      and Greenhill articles here, you were asked

5      about that.  And then you go to page 768; right?

6            A.    Right.

7            Q.    That's where we were.  And if we

8      can page down a little bit.  And it says is this

9      the page where you find some possible

10     explanations, and you say yes, it is.  And if

11     you'll look in the second column about

12     two-thirds of the way down, possible

13     explanations, why don't we pull that out and

14     highlight it.

15                 Then you talk a little bit about

16     that, the highlighting there.  And could we

17     scroll down to 21.  And then you move on the

18     Greenhill article; right?

19           A.    All right.

20           Q.    Okay.  Now, to this point in time

21     you haven't talked about anything other than the

22     page we were just looking at, 768; correct?

23           A.    I'm not sure when I made another

24     comment.

1133

1    Q.    Let's look at 1040, you were asked

2    again about this document, 1040 line 20, it says

3    and you were talking about the Greenhill

4    article, and counsel asked you now, I want to

5    ask you about the reference here.  We talked

6    about that with Dr. Harrison.  There is a

7    statement here on the hypothesis of

8    tachyphylaxis that refers to Jackson, person

9    communication.  That's Birmaher here at 768,

10   right.  We're still on 768; correct?

11   A.    Yeah.

12   Q.    And then you state that you didn't

13   find that to be strong support; correct?

14   A.    That is correct.

15   Q.    Now, I'll tell you there is a

16   reference later to Greenhill citing Birmaher

17   here, but there is no more discussion that I can

18   remember that I saw when I looked at the

19   transcript last night, I'm sure counsel will

20   correct me if I'm wrong, that talked about this

21   specific article.

22         If we can go back to DTX 627, if

23   we go back to 768.  Would you agree with me that

24   this section up here is kind of in a, what I

1134

1    would call a discussion section of kind of where

2    the art has been?

3             A.    That's what you -- that's how you

4    develop your introduction.

5             Q.    That's your introduction,

6    effectively; right?

7             A.    Right.

8             Q.    And then if we look down at the

9    next paragraph, just below that, the first line,

10    and it says, then they say what they've done

11    similar to what you have done is

12    methylphenidate-SR concentrations in plasma

13    following the administration to ADHD children.

14    Could clarify the bioavailability issue;

15    correct?

16             A.    All right.

17             Q.    And this published in 1989, the

18    same time as your work; correct?

19             A.    Yes.

20             Q.    Would they have necessarily needed

21    to do this work if they were aware of yours?

22             A.    Well, they published the same

23    year.  Rarely are separate laboratories aware of

24    studies that come out the same year because it

1135

 1    takes generally a year or so to collect the

 2    data, write the manuscript, so I view this as a

 3    coincidence.

 4            Q.   So they were likely unaware of

 5    your work; correct?

 6            A.   They may have been aware of it,

 7    they may not.  Does it tell what month in 1989

 8    it came out?

 9            Q.   I don't know -- it said it's

10    accepted in March 9th of 1989.

11            A.   Did they reference my work?

12            Q.   No, not that I recall.

13            A.   They did not reference my work.

14            Q.   Okay.

15            A.   I can't say whether they're aware

16    of my work or not.

17            Q.   So then they conducted their

18    experiments on the blood plasma levels; correct?

19            A.   That's correct.

20            Q.   Could we turn to page 771.  Can we

21    go down to this paragraph right here.

22            A.   All right.

23            Q.   This is what you called the

24    conclusion section of the paper; correct,

1    Doctor?

2              A.    The discussion section.

3              Q.    And they say based upon their

4    studies, and these are only preliminary

5    descriptive comments, it's not data, I

6    understand that, but they say this prolonged,

7    stable level raises a question about whether

8    methylphenidate-SR may be more prone to

9    tachyphylaxis, similar to other drugs; correct?

10             A.    It's taken out of context, and I

11   can put it in context for you, if you'd like me

12   to.

13             Q.    Put it in context.  That's fine.

14             A.    All right.  If you give a cursory

15   read of this article, it looks like they

16   actually compared immediate release against

17   sustained release.

18             Q.    Okay.

19             A.    You take a closer look, and they

20   didn't.  They compared high-dose immediate

21   release results that some of the same authors

22   collected and presented in an abstract something

23   like six or seven years earlier and are

24   scholarly enough to point that out.

1137

1        So basically I do not attach much

2    significance to what they call this preliminary

3    work.  And they go on and on about the

4    shortcomings of their own study.

5        And if you're trying to establish

6    efficacy with formulation, when you also are

7    sticking needles into the arms of children, you

8    can't separate out efficacy from the stressor,

9    the confounder of simultaneous pharmacokinetic

10   determinations.

11       That's why Swanson modeled it so

12   that it would be a valid pharmacodynamic-like

13   efficacy study.  He would have liked to have

14   taken blood samples, but that basically

15   confounds the study.

16       So that it can't -- the results

17   are largely meaningless.

18       Q.  You think these results are

19   meaningless; is that what you're saying?

20       A.  In terms of comparison to IR; yes.

21   In terms of comparison to SR; largely

22   meaningless --

23       Q.  Okay.

24       A.  -- in terms of efficacy.

1138

1    Q.   But they suggest a question about

2    tachyphylaxis.   You would agree with that;

3    correct?

4          A.   It raises a question.

5          Q.   Right.   Okay.

6               But they didn't establish it;

7    correct?

8          A.   No.

9          Q.   But they don't mention any of

10   those other possibilities that you talked about

11   in the introduction section; correct?

12         A.   Well, in view of the fact that

13   this would not -- if I were to do a peer review

14   of this, I would say reject this manuscript.   So

15   I'm not going to attach any significance to

16   this, because it's inherently flawed.

17         Q.   And you are above ordinary skill

18   in the art; right, Doctor?

19               You're one of the world's foremost

20   experts.   I think we heard that yesterday;

21   right?

22         A.   Well, my colleagues, people in

23   study sections of NIH who don't know me have put

24   that in writing.

1    Q.   And this would suggest to one in

2    ordinary skill in the art tachyphylaxis; right?

3         A.   Yes, because it would suggest --

4    it.

5         Q.   Right.  Right.

6         A.   -- raises a question.  They don't

7    even suggest it.

8         Q.   Can we go to the Greenhill

9    article, DTX 630?  Page 6, please.

10         And you were asked about this

11   paragraph right here.  Now, when we look down

12   here on the other explanations, some of the

13   explanations were the Birmaher article had

14   dropped out; correct?  There's not some of those

15   in there?

16        A.   I think it would be helpful to

17   have like a list of all the hypotheses from

18   Birmaher, the paper and all the ones here.  And

19   that could be put in the record, not that I know

20   what can be put in the record.

21         But I'd have to have the two and

22   actually make a table, because I might make a

23   mistake.

24        Q.   Okay.  Well, let's look at the

1    ones here.

2                We're talking about anecdotal

3    reports, lack of ability to provide long-term

4    coverage.  One possibility is poor compliance at

5    home with taking medication; correct?

6            A.    Yes.

7            Q.    That would be true of any

8    once-a-day medication; right?  You put it in;

9    somebody may not take it?

10           A.    That's correct.

11           Q.    Whether it's SR or whatever else;

12   correct?

13           A.    But it's not as simple as that.

14   May I elaborate?

15           Q.    I'm sorry?

16           A.    May I elaborate?

17           Q.    Well, can you answer my question

18   first?  It's:  That would be drew of every once

19   a day; right?

20           A.    Every once a day, yes.

21           Q.    Okay.  And then unpredictable

22   release of active methylphenidate from the

23   wax-matrix core, you saw that before in

24   Birmaher; correct?

1    A.   Yes.

2         Q.   And then there's change in

3    patient's weight or new stress in the

4    environment.   That's something that's patient

5    dependent and doesn't have anything to do with

6    dosage form; correct?

7         A.   That's -- that has to do with

8    things like a teacher having too high

9    unreasonable expectations, so, yes, I would

10   agree.

11        Q.   Now, on your direct yesterday, you

12   talked about a Pelham 1987 paper.   Do you recall

13   that?

14        A.   I know the paper.

15        Q.   And you indicated yesterday that

16   that paper was retracted?

17        A.   Retracted?

18        Q.   Retracted.

19        A.   It was retracted by Pelham

20   himself.   Yes.

21        Q.   And you indicated to me at

22   deposition that, therefore, nobody would rely on

23   that paper at all for anything; right?

24        A.   Somebody would rely on it if -- in

1142

1      a review article.  But if you're trying to

2      identify problems with SR from a scientific

3      point of view to develop a effective once-a-day

4      formulation, you would take more stock in the

5      subsequent paper.

6                   So there's some information in the

7      Pelham '87, but there's so little in the field

8      of methylphenidate SR that certainly if you want

9      to have a comprehensive review, like in some of

10     my own reviews, I'll use both of them.

11                  But it's interesting that Pelham

12     failed to replicate his findings in the '89 --

13     in the '90 paper.

14          Q.   But you wouldn't rely on that

15     document for any Ritalin-SR-type data; correct?

16          A.   The earlier one?

17          Q.   The earlier one, the 1987 article.

18     That's correct.

19          A.   I would want to have read it and

20     then read the '90.  And then I would not know

21     if -- if there's a premature release, or a lag

22     phase, or delayed onset.  But it would appear

23     that there's not.

24          Q.   Well, let's look at somebody that

1    did rely on it.  Okay.

2                Can you turn to PX 264?  And if

3    you could turn to, roughly, Volume 1, Page 8 of

4    that.

5                We've got it up here on the

6    screen, if it's easier, Doctor, and highlight

7    just this portion down here.  Right here as

8    well, please.

9                Just grab this whole section.

10   Right there, please.

11               Let's just look at it.  Do you

12   have it in front of you?  Okay.

13               Now, this is -- again, this is the

14   initial McNeil submission to the FDA; correct,

15   when they wanted to keep my client off the

16   market the first time, or keep generics off the

17   market, I should say?

18          A.   I don't know anything about that.

19          Q.   Okay.  So when they talked about

20   Ritalin SR at that point, they cited the Pelham

21   paper; correct?

22          A.   Yes, they did.

23          Q.   And that's the Pelham '87 paper;

24   correct?



1      A.   Yes.

2      Q.   The one that you don't think

3 should be relied on for anything?

4      A.   That's exactly not what I said.

5      Q.   Okay.

6      A.   I said you would rely on it,

7 because there's so limited amount of literature

8 related to methylphenidate SR, that I said you

9 would rely on it as part of a comprehensive

10 review of the literature.

11      Q.   Well, this is a comprehensive

12 review of the literature.  It doesn't mention

13 the Pelham '90 article, does it?

14      A.   I don't see it here.

15      Q.   Right.

16      A.   Is there -- you've gone through

17 the entire document, and there's no Pelham '90?

18      Q.   Well, there's a citation right

19 here for the Ritalin SR and there's no Pelham.

20      A.   In the whole article, though?

21      Q.   I don't know.  I don't know if I

22 went all the way through it.

23      A.   That would be meaningful.

24      Q.   Certainly they're not citing it

1145

1    for the Ritalin information; right?

2              A.   That's right.

3              Q.   And if you were going to cite to

4    Ritalin information, you would cite at least

5    both articles; right?

6              A.   I would.

7              Q.   Right.   Now, there's been some

8    questioning -- I know you haven't been present

9    for the whole trial, but there's been some

10   questioning about bioequivalency in this trial.

11   And could you turn to Volume 1, Page 17 of the

12   document in front of you?

13             A.   Of PX 624?

14             Q.   Yeah.   And if we look at the top

15   ALZA study.

16             A.   Actually, I never located that.

17   What's the number?

18             Q.   Well, we'll pull it up right here.

19   It's PX 624.   I'm sorry, PX 264.

20             A.   Probably in a different binder.

21             Q.   It's in the black one.   I'm sorry.

22             A.   This would be the Jane Axelrod

23   letter?

24             Q.   This would be the McNeil -- no,

1146

1    the second page.  It's McNeil's letter to the

2    FDA.  You're on the right document.

3                    It's got a cover page about

4    accepting the submission, and then it's got a

5    following submission.

6            A.    Page 17?

7            Q.    Right.  And Ritalin SR, according

8    to traditional biometrics would be bioequivalent

9    to Concerta; correct?

10           A.    I would like you to repeat that,

11   please.

12           Q.    Sure.  Ritalin SR, according to

13   traditional biometrics and bioequivalency would

14   be bioequivalent to Concerta; correct?

15           A.    No.

16           Q.    That's not what this document

17   says?

18           A.    That Ritalin SR is bioequivalent

19   to Concerta?

20           Q.    That's what it says.  Concerta

21   tablet, Ritalin-SR, two bioequivalent metrics,

22   yes.  That's what it says, Doctor?

23           A.    Since that's not correct, before I

24   agree with you on that, and I'm leaning toward

1    agreeing with you, I'm going to have to find out

2    what that footnote A is.

3        Q.    Sure.  It was two metrics or AUC,

4    zero infinity and Cmax, that's what it says at

5    the bottom of that.

6        A.    I believe you do not understand

7    what bioequivalent means.

8        Q.    The FDA understands what

9    bioequivalent is; correct?

10        A.    Yes.

11        Q.    And this was submitted to the FDA;

12    correct?

13        A.    Yes.

14        Q.    McNeil knows what bioequivalent

15    is; right?

16        A.    Yes.  Do you know why they put

17    that superscript A at two metrics?

18        Q.    I think this is another one.  Do

19    you want to tell me?

20        A.    Yeah.  To be bioequivalent, it's

21    not adequate to just have the same extent of

22    absorption and it's not adequate to have just

23    the same Cmax, it also has to have the same T

24    max.  So this is a qualified -- a qualification

1    of these two metrics.  So it's saying no, it's

2    not bioequivalent.

3         Q.   It's not, it's bioequivalent under

4    the two metrics; correct?

5         A.   Under those two metrics, but it's

6    not bioequivalent.

7         Q.   The FDA would know whether it was

8    bioequivalent or not; right?

9         A.   Yes they would.  It's absolutely

10   not and they know it's not.

11        Q.   Could we turn to DTX 626.  It's in

12   your white binder.

13        A.   I'm there.

14        Q.   If we could look at page 112.

15   Down here at the bottom.

16             Now, you talked about this on

17   direct; correct, sir?

18        A.   That's correct.

19        Q.   This sentence, a type of tolerance

20   to CNS stimulants that clearly does occur

21   clinically is an acute tolerance after a single

22   dose 20?

23        A.   That's what's stated here.

24        Q.   And this article doesn't indicate

1149

1    anything specifically about methylphenidate;

2    correct?

3             A.   Let's see what reference 20 is.

4    Acute tolerance, this is the cardiovascular

5    effects of cocaine.

6             Q.   It's not methylphenidate; correct?

7             A.   It's cocaine.

8             Q.   It's not methylphenidate; correct?

9             A.   It's cocaine.

10            Q.   With regard to the type of

11   tolerance, this talks about CNS stimulants

12   generally; correct?

13            A.   That's correct.

14            Q.   You don't agree with that because

15   you don't think it generalizes the CNS

16   stimulants; correct?

17            A.   That's -- see, when you make a

18   statement from -- like a scientific statement in

19   the scientific literature, you then give -- you

20   have to have a reference, and that's what the

21   statement refers to.  And that reference is

22   cocaine.

23            And in this particular case they

24   collected and paid no doubt some drug abusers,

1150

1    I'm not convinced that the drug abusers needed

2    to be paid, but they then gave them intranasally

3    97 milligrams of pharmaceutical cocaine, that's

4    about a tenth of a gram, which is probably more

5    than even a drug abuser would use in a single

6    dose, and then they started giving them

7    intravenous doses of cocaine.

8            Q.   So all the art that we just talked

9    about you don't think suggest that there was an

10   acute tolerance for methylphenidate; correct?

11           A.   Not until Swanson.

12           Q.   Let's look to DTX 152, please,

13   which is in your black binder.  DTX 152.  And

14   I'll represent that I think this is the first of

15   the provisional patent applications.

16           A.   Okay.

17           Q.   If you could go to the background

18   of invention section.

19           A.   On what page?

20           Q.   It's page one of the article,

21   starts the background of the invention section,

22   if you would confirm that?

23           A.   Yes.

24           Q.   Page two of the document continues

1151

```
 1        the background of the invention section?

 2              A.    Right.

 3              Q.    You have read patent prosecution

 4        histories during your involvement in this case;

 5        correct?

 6              A.    Only in a cursory fashion.  I have

 7        been provided with them, I didn't really know

 8        what to look for.

 9              Q.    And you cited them in your report;

10        correct?

11              A.    Yes.

12              Q.    So presumably you did more than a

13        cursory review?

14              A.    When it came to patents and patent

15        history, it is not very beneficial for me to

16        read it because I can't filter it in the way

17        that a lawyer would, so I don't have command of

18        in document.  But I have been provided it.

19              Q.    No, this isn't a specific document

20        you were provided.  I don't want to confuse you,

21        I want you to understand that.

22              A.    I was confused.  I'm sorry.

23              Q.    You were provided a different

24        prosecution history, that was with regard to the
```

1     Fung patent?

2          A.   Okay.

3          Q.   Is that correct?

4          A.   I believe it is.

5          Q.   And you relied on that document in

6     your report; correct?

7          A.   Yes.

8          Q.   So you read it enough to feel

9     comfortable to rely upon it in a report;

10    correct?

11         A.   That's correct.

12         Q.   Okay.  So you had some

13    understanding I assume of the prosecution

14    history process, or did you not?

15         A.   I still don't know what the

16    prosecution process means.

17         Q.   Do you understand that the

18    background of the invention section is typically

19    where the inventors tell people what was known

20    in the art before the invention?

21         A.   That makes sense.

22         Q.   Okay.  Can we look down here at

23    the bottom of page three -- I'm sorry, bottom of

24    page two?

```
 1              A.    All right.
 2              Q.    If we could look down here.   And
 3    specifically right here.   You're not convinced
 4    methylphenidate had a suggestion of having acute
 5    tolerance as of 1996; correct?
 6              A.    Incorrect.
 7              Q.    You think methylphenidate --
 8              A.    The operative word here is
 9    suggest.  And I didn't say that it hasn't been
10    suggested.  I said it wasn't established.  It
11    was basically a history why SR wasn't working,
12    and there was a list of various possibilities.
13              Q.    But that was a strong suggestion?
14              A.    It was a suggestion.
15              Q.    Strong suggestion?
16              A.    It was no stronger than any number
17    of others.
18              Q.    Well, in this document they don't
19    talk about any number of others in the
20    background of the invention; correct?
21              A.    You want me to --
22              Q.    I'll represent it to you.   If we
23    look right here, they say for drugs that act on
24    the central nervous system, like
```



1    methylphenidate, dispensed have a sustained

2    release nonascending dosage form the patient

3    often develops an acute tolerance to the drug

4    manifested by a shortened duration and a

5    decrease in the intensity of the therapeutic

6    effect needed for acceptable therapy.  Do you

7    see that?

8           A.    I do see that.

9           Q.    Do you disagree with that

10   statement as of 1996?

11          A.    I disagree that that had been

12   established.

13          Q.    Now, you indicated that it wasn't

14   -- that Ritalin-SR was just known as not working

15   very well.  Is that a fair characterization or

16   how would you characterize it?

17          A.    Clinicians, colleagues of mine

18   have said that it just doesn't work.

19          Q.    Would you agree that as of -- that

20   over the course of the clinical experience with

21   Ritalin-SR, that two problems were generally

22   identified, one, the delayed onset, and two, the

23   drop off later in the day?

24          A.    No, there were some other

1155

```
1   conspicuous concerns.  One had to do with the

2   single strength.  Titration is such a critical

3   issue with individualization of drug therapy in

4   ADHD and with Ritalin-SR, you're limited to 20

5   milligrams or 40 milligrams, and/or in severe

6   cases 60 milligrams.

7              Q.   And you think that was a big deal;

8   correct?

9              A.   The clinicians did and I do.

10             Q.   Now, could you turn to page 145 of

11  your deposition in front of you, please.  And if

12  we could pull up line three, the questioning

13  began at line three on page 145.

14             And do you know what speculations

15  are now as to why Ritalin-SR was not successful?

16             One speculation that I do not

17  necessarily subscribe it to, so you don't

18  subscribe to it, but you don't discount, is that

19  it was available in only one strength.  That's

20  just something that you said was very important;

21  correct?

22             A.   I don't discount.

23             Q.   That's not what you said before;

24  right -- strike that.
```

1          Could we look at DTX 1, please?

2          A.   May I return to that question?

3          Q.   You can get asked it on redirect

4    if they like.

5          DTX 1, column seven.

6          MR. PRITIKIN:  Your Honor, I think

7    we should read at least the following question

8    and answer into the record.

9          THE COURT:  You can do that under

10   Rule 106.

11         MR. PRITIKIN:  Thank you.  So the

12   question that was read by Mr. Musgrove is at

13   page 145, line -- beginning at line three and

14   ending at line seven, and then the next question

15   at line eight is:

16         "Question:  Okay."

17         And then the answer begins at line

18   nine.

19         "So that in methylphenidate

20   therapy is distinguished by requiring titration

21   to optimize an individual's needs and this is a

22   condition where it doesn't assist much in terms

23   of knowing the individual's weight, which with a

24   lot of other drug therapies that is pertinent.

1157

1    So with the limitation of only being able to

2    give either 20 milligrams or 40 milligrams or 60

3    milligrams you are highly constrained.  And

4    there has been a publication by a colleague of

5    mine that not surprisingly if you cut a

6    Ritalin-SR tablet in half, you get a different

7    dissolution profile.  So that's not an

8    alternative, so that doesn't allow for the

9    flexibility."

10                THE COURT:  All right.

11   BY MR. MUSGROVE:

12           Q.   And that was something, Doctor,

13   that you said you did not subscribe to; correct?

14           A.   I believe I said -- was what you

15   just read into the record something I said?  I

16   believe it is; right?

17           Q.   That was part of what you said,

18   yes.

19           A.   Okay.

20           Q.   Right before that --

21           A.   Why are you asking if I don't

22   subscribe to it?

23           Q.   Because right before that, you

24   just said one speculation that I do not

1      necessarily subscribe to; correct?

2              A.   I don't necessarily, because there

3      is acute tolerance that had been demonstrated by

4      Swanson.  But then I'm glad that this was read

5      into the record.  My position is that's a

6      serious consideration, and that's actually

7      consistent with what was just read.

8              Q.   Can we look at DTX 1, please,

9      column seven.  Around line 35, the paragraph

10     down here.  And this is what the patentee said

11     about what was known clinically about

12     Ritalin-SR?

13             A.   And this is what page?

14             Q.   This is column seven.

15             A.   DTX number what?

16             Q.   DTX 1 is the patent in suit,

17     column seven.

18             A.   I bet it's in the other binder.

19             Q.   It's in the other binder.  I'm

20     sorry, sir.

21              Now, they state here the clinical

22     experience with this dosage form, which is in

23     the sustained-release oral dosage form,

24     methylphenidate has been disappointing in the

1159

1    behavioral symptoms in patients taking the

2    controlled-release dosage form is less well

3    controlled later in the day compared to patients

4    taking multiple doses of IR, and then there is

5    slower onset of action; correct, that's what

6    they said?

7              A.    I don't necessarily agree with

8    this.

9              Q.    Right.  But you may not agree with

10   this?

11             That's what the patentee indicated

12   in the patent-in-suit?

13             A.    Yes.

14             Q.    You don't agree with it?

15             A.    That's correct.

16             Q.    Okay.  Now, the loss of efficacy

17   in a controlled release, sustained release

18   dosage form over the course of a day, that's

19   what we saw yesterday that McNeil defines as

20   acute tolerance; right?

21             A.    That's my understanding.

22             Q.    Okay.  Now, Doctor, can we turn

23   back -- keep that same binder in front of you --

24   to DTX 631.

     1              A.   The Fung article?

     2              Q.   The Fung article, yes.

     3                   And this was the other -- I said I

     4       would turn to the other question you asked me

     5       yesterday that I was unable to respond to at

     6       that time.

     7              A.   All right.

     8              Q.   If we turn to Page 25.  If we

     9       could look at this paragraph right here.

    10                   Now, you asked me about where I

    11       saw that the sustained release dosage form lost

    12       efficacy during the course of the day.  Do you

    13       recall asking me about that?

    14              A.   Yes.

    15              Q.   Right at the top of this

    16       paragraph.  You were asked about some of the

    17       bottom parts on direct, but at the top it says

    18       Reichek has presented data in this Symposium

    19       that showed a transdermal nitroglycerin system

    20       to be effective for several hours, but not a

    21       24-hour period as claimed.

    22                   And then it says, The transdermal

    23       system had the conventional input mode, which we

    24       looked at yesterday, which was flat.  Do you

1161

1      recall that?

2                  A.    Yes.

3                  Q.    Okay.   And that's what this says;

4      correct?

5                  A.    Yes.   It's not referenced, so it

6      would not --

7                  Q.    Right.

8                  A.    -- have a lot of impact.

9                  Q.    It was part of -- you mentioned

10     yesterday this was a group of presentations from

11     the symposium; correct?

12                 A.    Yeah.

13                 Q.    Okay.   And that was the data that

14     was submitted at the symposium; correct?

15                 A.    If Fung has that correct; however,

16     you don't base scientific hypothesis

17     substantiation on a statement one person says

18     another person said at the symposium without a

19     reference.

20                 Q.    Now, down here, we talked

21     yesterday about the fact that there was a --

22     basically a twice-a-day regimen or an on-off

23     regimen, and then there was the proposed regimen

24     of the ascending release rate and the ascending

1162

1    plasma profile?

2          A.    Yes.

3          Q.    And you were very concerned about

4    that not being appropriate because of the

5    heights that profile would go to; correct?

6          A.    That was one of a couple of

7    concerns I have with that.

8          Q.    The other concern was this is a

9    nitrate article.  You didn't like it for that

10   reason; right?

11         A.    That's one that just occurred to

12   me just then.  Another concern was that it

13   presents a time frame that goes out to about 18

14   hours with a peak concentration right about the

15   time the child should be trying to go to sleep.

16         Q.    But you could design -- you could

17   have an ascending profile and just set your

18   cut-off at eight hours; right?

19         A.    With this technology?

20         Q.    You could put a -- attach together

21   with eight hour, not with nitrates specifically

22   perhaps, but if we were doing methylphenidate,

23   you could set the profile you want; right?

24               You could set a cut-off point?

1        A.    By basically removing the patch.

2        Q.    Or it could have released all of

3    the drug; correct?

4        A.    That's incorrect.

5        Q.    So now, if we turn to PX 420.

6        A.    The existing patches only release

7    36 percent of the dose.

8        Q.    Well, Doctor, you could -- with an

9    oral dosage form, you could set the profile you

10   desire; correct?

11       A.    As you pointed out, I'm not a

12   formulation scientist.

13       Q.    Okay.  PX 420.

14             It's the white binder.  It's the

15   Fung patent that you looked at.

16             Okay.  I'm sorry, 420.

17             PX 420.

18       A.    Yes.

19       Q.    Okay.  Now, you testified about

20   this on direct yesterday; correct?

21       A.    That's correct.

22       Q.    There was quite a bit of an

23   examination of Dr. Mayersohn about this

24   reference; correct?

1    A.    I believe there was.

2    Q.    Okay.  Now, you don't even know

3    why this reference was selected to be included

4    in the report to begin with; correct?

5    A.    Give me a moment to consider that

6    question.  (Witness reviewing.)

7    I do know why simply.

8    Q.    Why did you collect it?

9    A.    In this reference, this reference

10   is dated ten years after the Fung, basically his

11   narrative at a conference.  That's the Fung

12   publication you just directed my attention to.

13   This is ten years later.  And

14   instead of proposing an ascending release

15   profile, he's now locked onto a continuous

16   release which I find curious if we are to put

17   any stock in the desirability of a substantially

18   ascending profile.

19   Q.    Could you turn to your deposition

20   transcript at Page 187, please, sir?

21   Just let me know when you're

22   there.  Line 14 is where we started.

23   A.    187?

24   Q.    Of your deposition transcript.

1    MR. MUSGROVE:  May I approach,

2    Your Honor?

3                    THE COURT:  Yes.

4                    THE WITNESS:  Is this --

5                    (Following a discussion held off

6    the record:)

7                    THE WITNESS:  187, yes.

8        Q.    And with regard to these questions

9    and answers, I'll represent to you that

10   Paragraph 77 of your report referred to this

11   Fung patent and 79 referred to the prosecution

12   history that Dr. Mayersohn was questioned about,

13   but you weren't questioned about on direct.

14                    Okay?  Just for content.

15                    So if we start around Line 14, it

16   says:  And I'm going to ask you just to answer

17   this question yes or no, and counsel can let me

18   know if I'm getting into a protected area, but

19   do you know how the patent that's identified

20   here in Paragraph 77 was collected?

21                    Mr. Kushnan objected.

22                    And I said, Selected in regards to

23   putting it in his report.  And you said, No.

24                    If you could look at 79, Paragraph

1    79, which is that prosecution history.  All

2    right.

3                    And, again, I'm just looking for a

4    yes or no question or yes or no answer.  Prior

5    to this litigation, have you ever had occasion

6    to look at office actions or file histories

7    before for patents?

8                    Answer:  No.

9                    Okay.  Do you know how this office

10   action was selected to be in your report?

11                   Answer:  No. I would like to have

12   an opportunity to revise that last -- I said,

13   Absolutely.

14                   You said, response.  It's possible

15   that I was involved in selecting it in the

16   report in that I was provided information and

17   then -- and we stopped because of counsel.

18                   So you were provided information

19   about that?

20                   MR. PRITIKIN:  Well, Your Honor, I

21   think, again, more needs to be read into the

22   record.  There was an agreement between the

23   parties that was rigorously carried out both

24   ways, that there would not be inquiries into the

1    methods by which the expert reports were

2    prepared.

3                    The conversations with counsel

4    that led up to them, that it was respected on

5    both sides.  And pursuant to that after the

6    questions that were asked of Dr. Patrick as to

7    how these particular items were selected,

8    Mr. Musgrove himself said on the record, on Page

9    188 and at Line 18, Your counsel may want to

10   stop you.

11                   And then Mr. Kushnan said, Don't

12   go any further.  And then Mr. Musgrove said,

13   That's fine.  And on that note, why don't we

14   take a break.

15                   MR. MUSGROVE:  I stopped him off

16   from going any further.  That's fine.

17                   THE COURT:  All right.  It's in

18   the record.

19   BY MR. MUSGROVE:

20          Q.   Now, do you recall Paragraph 79 --

21   well, strike that.

22                   Do you recall seeing any Fung

23   literature after the '94 patent?

24          A.   I do not believe I have.

1168

1    Q.   Did you search for any Fung

2    literature after the '94 patent?

3         A.   I did not.

4         Q.   Okay.

5              MR. MUSGROVE:   May I approach,

6    Your Honor.

7              THE COURT:   Yes.

8

9    BY MR. MUSGROVE:

10        Q.   Doctor, DTX 1221, have you ever

11   seen that before?

12        A.   No.

13        Q.   Okay.  And this is a Fung

14   reference and it says 1997; correct, sir?

15        A.   Yes, it does.

16        Q.   Did I give you two copies?

17        A.   Yes.

18        Q.   Okay.  And that was received in

19   February 20th of 1997?

20        A.   All right.  Yeah.

21        Q.   So --

22        A.   Received February 20th, 1997.

23        Q.   And this isn't prior art to the

24   patents; correct, sir?

1169

```
 1              A.  This is right in that area.  I
 2     would leave the answer to that up to the
 3     counsel.
 4              Q.  Okay.  Now, if we could look at
 5     the right-hand column under the nitroglycerin
 6     tolerance data.  Bring up PTX 1221, please.
 7                  The nitroglycerin tolerance data
 8     paragraph.
 9                  And I know you haven't seen this
10     yet sir, so please feel free to read the
11     paragraph yourself.
12              A.  Okay.  Let's look into what
13     reference 10 and 11 are.
14                  Ten is Funk 1991.  11 is Fung '91.
15              Q.  And here they're reporting --
16     they're reporting acute tolerance; right?  Acute
17     tolerance within ten hours?
18              A.  In a rat.
19              Q.  Right.  In a rat.  I agree.
20                  Now, if we look over at the
21     discussion section on 1143.  Tell me when you're
22     there, Doctor.
23              A.  I'm there.
24              Q.  Could you read the first paragraph
```

1    to yourself, and then I'll ask you a couple

2    questions.

3              A.    (Witness reviewing.)    Let's see

4    what's References 16 through 19?

5              Q.    You want to look at reference 15

6    as well.

7              A.    All right.

8              Q.    Okay.    Now, they say over a decade

9    ago you first surmised that non-linear dosing

10   modes during the nitroglycerin on period may

11   improve clinical efficacy of intermittent

12   therapy; do you see that?

13             A.    Yes.

14             Q.    And that's the Fung 1994 article?

15             A.    The one we've already been looking

16   at.

17             Q.    So they suggest that the -- and

18   they say the utility of this approach has not

19   been evaluated.    And why?    Because there are

20   only recent advances in computer controlled

21   delivery systems that allow the evaluation;

22   correct?

23             A.    That's what it says.

24             Q.    Okay.    And, in fact, if we look up

1171

```
 1        at the table at the top, and this is

 2        theoretical, but Table 1 at the top, we've got

 3        several types of profiles; right?

 4                    They've got the flat profile,

 5        constant profile.  Do you see that?

 6               A.   Yes.

 7               Q.   You've got the linear increase

 8        profile.  Do you see that?

 9               A.   Yes.

10               Q.   Exponential increase; do you see

11        that?

12               A.   Yes.

13               Q.   And we've got what they call the

14        hyperbolic.  Do you see that?

15               A.   For Ritalin, yes.

16               Q.   Hyperbolic looks like a

17        substantially ascending profile; right?

18               A.   It does.

19               Q.   And their estimate was based on

20        the newly available clinical computer

21        monitoring, you would get the 22-percent change

22        from the constant; right?

23               A.   Yes.

24               Q.   Okay.  Now, we know you wouldn't
```

1    want to use the linear increase; right, because

2    of the side effects issues you were talking

3    about?

4          A.   We don't know that that -- well,

5    it has been used in that this new patch Daytrana

6    is basically that linear.

7          Q.   Okay.

8          A.   There's a lot of side effects with

9    them and that's a whole story in itself.

10         Q.   Right.   You wouldn't want to use

11   it because of the side effects that are showing

12   up with Daytrana; right?

13         A.   It's not as simple as that, but

14   that is a prominent issue.

15         Q.   Okay.   And we're definitely not

16   going to want the expediential increase; right?

17         A.   No.   Do we have a time frame

18   there?

19         Q.   I don't think there is a time

20   frame, no, sir.   It says infusion rate versus

21   time, but they don't give you a scale?

22         A.   I would be hazarding responses

23   without a -- any time frame.   I think that this

24   renders this not useful for me.

1      Q.   Now, could we look to the last

2    portion of the document, please.  And if we

3    could look first at this paragraph right here.

4    The concept of dosage escalation.  Do you see

5    where I am, sir?

6      A.   Yes, I do.

7      Q.   This, again, this is nitroglycerin

8    art; right?

9      A.   I believe it is.

10      Q.   It says the concept of dosage

11    escalation to overcome nitroglycerin tolerance

12    is well-accepted clinically.  Do you see that?

13      A.   Yes.  Let's see how he

14    substantiates that.

15      Q.   Okay.

16      A.   That statement does not appear to

17    be supported by scientific citations.

18      Q.   It doesn't have a reference;

19    right?

20      A.   That's what I should have said.

21      Q.   Okay.  And you understand, though,

22    that what's generally known by the public can

23    still be prior art; right, antidotal

24    information?

1174

1      A.    I don't have a clear understanding

2  if that -- if just somebody talking can prevent

3  somebody from patenting something.  I thought it

4  had to be presented at a public, like an

5  abstract or something like that, that's the

6  instruction I have gotten from my patent lawyers

7  when I'm trying to develop drugs at the Medical

8  University of South Carolina, I can talk to

9  somebody, but I can't send an abstract or the

10  clock starts running.

11      Q.    But do you have an understanding

12  if something is generally well-known in the art,

13  whether it's published or not, but clinicians

14  know it, i.e., that you would escalate dosage to

15  overcome tolerance, that that's still prior art

16  if that's well-known in the art?

17      A.    Well, I am not convinced that this

18  statement is correct.

19      Q.    I understand that because it

20  doesn't have a citation; correct?

21      A.    That's correct.

22      Q.    And if it's antidotal, it can

23  never have an citation; correct?

24      A.    Well, we actually did see Jackson,

1    but from the nitrate art that we have been

2    discussing pertaining to this trial, this

3    statement seems to be contradictory.

4         Q.   Now, if we go to the next page,

5    the next column, we actually see over here they

6    say that obvious limitations to their approach

7    exist because the finite limits in dose

8    escalation, the risk of complicating side

9    effects, induction of rebound responses, et

10   cetera, do you see that?

11        A.   Yes.

12        Q.   That would just tell you what type

13   of profile you would want to design, that's the

14   limitation?

15        A.   That would -- that's just part of

16   -- is that in the discussion section?

17        Q.   It's at the very end, sir.  I'm

18   sorry, it's the next to the last paragraph just

19   before the acknowledgments.

20        A.   In the discussion section you're

21   allowed a lot of latitude in terms of what you

22   want to say, so this person is aware the side

23   effects are an issue with almost any drug.

24        Q.   So that tells you how you design

1    the profile; right?

2         A.   Not strictly by side effects.   A

3    lot of times side effects are of secondary

4    consideration if it's a life-threatening

5    condition or something like that.   If you're

6    about to have a heart attack, if I were, I

7    wouldn't mind having a headache as long as I

8    don't die.

9         Q.   Right.

10         So what you would want to do is

11    you would want to draw the line between efficacy

12    and side effects?

13         A.   Yeah, strike a balance.

14         Q.   And with regard to methylphenidate

15    if we would have done that, we would have looked

16    at that hyperbolic curve; correct?

17         A.   This computer simulated hyperbolic

18    curve.

19         Q.   Right, that's what we would have

20    looked at?

21         A.   No, you wouldn't have, because

22    there is no relevance to this article in the

23    nitrate field to methylphenidate, and this is

24    just a simulation a computer can generate, it's

1177

1    basically any simulation you can conceive of.

2         Q.    As you said, this was published

3    roughly close in time to when the patents were

4    filed?

5         A.    You'll have to advise me on that.

6    I think it's right in that period, so I can't

7    tell you whether, it might get right down to the

8    month.

9         Q.    The first patent I think was

10   filed, the provisional was November 12th, '96, I

11   don't know the exact date of when this was

12   published, but it was received February 20th?

13        A.    And accepted June 12th, probably

14   appeared in the scientific literature two to

15   three or four months later.

16        Q.    Right.

17             So but between the time of the

18   patent filing and the time of the article being

19   sent in, there were roughly four months, a

20   little bit over?

21        A.    Somebody would have to deal with

22   that carefully.

23        Q.    Now, your concern about the

24   nitrate arts, if we could look back over on the

1    left-hand column, 1144, that left-hand column

2    and specifically, Doctor, I'm looking at the

3    last sentence just before the bottom of -- just

4    before this paragraph.  And it says this

5    approach may have general utility for probing

6    other tolerance phenomena and optimizing dosing

7    strategies for other drugs.  Do you see that?

8        A.  Yes.

9        Q.  So Fung thinks that the nitrate

10   art might be relevant to other tolerant inducing

11   drugs; right?

12       A.  The operative word here is "May".

13   And "may" just makes it nebulous.

14       Q.  Because you want to know, right,

15   that's how you do things, you analyze them

16   scientifically and you want to know whether it

17   would be applicable; right?

18       A.  You would want to have a sound

19   scientific footing, and in a discussion section

20   to say something may happen does not have a

21   significant impact in a scientific development

22   of a hypothesis.

23       Q.  And can we look -- I'm sorry, go

24   ahead.

1179

1        A.    Hypothesis to be tested.

2        Q.    Can we look at the very last

3    paragraph, the conclusionary paragraph of this

4    article.    And if we look at this last sentence,

5    in conclusion they say such an approach may be

6    useful for the study of other agents with time

7    dependent pharmacodynamics and for rationale

8    improvements of their therapeutic efficacy.    Do

9    you see that?

10        A.    Yes.

11        Q.    So, again, they're stating that

12    this could be useful to analyze, study other

13    agents; correct?

14        A.    Computer model, it was in its

15    infancy, so yeah, there is a lot of chatter

16    about computers being able to now assist.

17        Q.    And that was part of the problem

18    with Fung putting his 1984 work into practice

19    was the computer modeling, it just had become

20    available; correct?

21        A.    So basically they're stating that

22    now we have computers.

23        Q.    And that's what Swanson did, he

24    did a computer simulation roughly in the same

1    period?

2              A.    No, that's not what he did.    He

3    validated a simulation with real pharmokinetics

4    in human beings, not genetically modified rats

5    that have a heart rate of about six times

6    humans.    So the value of this model is so

7    limited.    And I'm not convinced they even used

8    that rat model, but -- so I don't put much stock

9    in this.

10              Q.    Now, I just want to remind you,

11    I'm not trying to indicate that this is prior

12    art, okay, but with regard to your concerns

13    about whether the Fung 1984 paper was

14    effectively abandoned because of that 1994

15    publication, this seems to say still a good

16    idea, but we need a computer to come along.

17    Fair?

18              A.    Does he actually say it's still a

19    good idea?

20              Q.    I believe he does.    But he says we

21    first surmised that nonlinear dosing modes, and

22    this was on that 1143, that we looked at during

23    the nitroglycerin period may improve efficacy

24    during the therapy, but the utility of this

1    approach has not been evaluated, and he said

2    recent advances in computer-controlled delivery

3    systems have allowed the implementation of that.

4          During the discussion on the next

5    page he states our results therefore indicated

6    that novel nitroglycerin input regimens may be

7    rationally designed through the use of an

8    existing PK/PD model of nitrate tolerance.  And

9    it goes on, with computer-optimized infusion, I

10   believe that's what he's saying?

11         A.   I think it says that he's

12   stubborn.

13         Q.   Whether it's stubborn or not,

14   Doctor, you were then shown the Fung 1994

15   patent; correct?

16         A.   Yes.

17         Q.   And you relied on that with regard

18   to your reference to the 1984 article?

19         A.   That is correct.

20         Q.   You were not shown by counsel this

21   1997 article; correct?

22         A.   Today is the first time I've seen

23   that.

24         MR. MUSGROVE:  No further

1    questions, Your Honor.

2              THE COURT:  All right.  Thank you.

3              MR. PRITIKIN:  I have a few

4    questions, Your Honor.  I wonder, though, if it

5    might make sense to take our morning break at

6    this point?

7              THE COURT:  All right.  If we take

8    it now, I have a short scheduling conference in

9    a criminal case that I'll take up at 11 o'clock,

10   so instead of having you just sit around, why

11   don't we say we'll come back at 11:20 and that

12   will give me fifteen minutes to get that

13   conference complete.

14             MR. PRITIKIN:  That would be fine

15   with us.  Thank you.

16             THE COURT:  Thank you.  We'll in

17   be in recess.

18             (A brief recess was taken.)

19             THE CLERK:  All rise.

20             THE COURT:  All right.  Be seated,

21   please.

22        REDIRECT EXAMINATION

23   BY MR. PRITIKIN:

24             Q.  Dr. Patrick, in the questions that

1183

```
 1        I asked you and in the questions that you were

 2        asked by Mr. Musgrove, we had looked at various

 3        articles that suggested acute tolerance as a

 4        possible explanation for the problems with

 5        Ritalin SR.

 6                    You didn't mean to suggest in your

 7        testimony that there were no such suggestions,

 8        did you?

 9              A.   No, I didn't.

10              Q.   And you took that into account in

11        reaching your conclusions in this case?

12              A.   I did.

13              Q.   Now, could we take a look at DTX

14        153.  And we'll put that up.

15                    And if we could go to the next

16        page.  This is the Perel abstract?

17              A.   In the white or the black binder?

18              Q.   Well, we can probably just look at

19        it on the screen.

20              A.   Okay.  All right.

21              Q.   This is an abstract.  It's not the

22        article; correct?

23              A.   There was not an article

24        associated with it.  They did not publish this.
```

1      Q.    Okay.   You made the statement to

2   Mr. Musgrove when he was questioning you about

3   this, and I don't have it verbatim, but I think

4   you said, you know, it is wrong.   Would you like

5   to know why?

6            And you never provided the

7   explanation.   Can you tell us why you know it's

8   wrong?

9      A.    Well, Perel here has dosed

10   children with .9 milligrams per kilogram which

11   is the absolute top dose that is clinically

12   allowed.   Typically the doses are around .15,

13   .3, and in severe cases .6.

14            In no circumstances can you ever

15   justifiably exceed .9 without risking a lawsuit

16   or something because serious side effects are

17   inevitable.

18            So .9 milligrams per kilogram,

19   that would be like me taking 90 milligrams of

20   immediate release methylphenidate.   This would

21   be like nine tablets.

22            That would have such a profound

23   effect, without having proven that.   I don't

24   want to prove that.

1185

1    You are going to introduce
2  pharmacological effects that are pertinent to
3  maybe one child in thousands.  Children do not
4  receive that high a dose.
5              But a lot of times
6  pharmacologists, when they're looking, when
7  they're trying to tease out certain aspects of a
8  drug's effect, they go to supra pharmacological
9  doses a lot of times to test some hypotheses.
10             I'm surprised that an
11  institutional review board at a university would
12  allow such doses with these children.
13             Then we're talking about observing
14  behaviorial effects at this mega dose while
15  they're taking blood samples from children.  And
16  over the course of the day, it's either going to
17  be in a cannula that frequently clots, and you
18  end up having to reset it, or they may be taking
19  separate sticks.  I'm not sure.  Usually an
20  abstract won't tell you the details.
21             But many children are terrified of
22  needles.  And I've never a met a child that
23  likes needles.
24             And to see blood drawn out of your

1188

1  arm, how do you separate that from your

2  underlying ADHD, from this mega dose of

3  methylphenidate?  It's just -- the study design

4  is flawed, and I would never approve such a

5  study.

6          I routinely submit human subject

7  studies that I write in the course of my -- and

8  I forwarded studies to the institutional review

9  boards at the medical university, and they are

10  carefully scrutinized.  And every --  everything

11  has to be absolutely safe or else the university

12  has a chance to -- that will likely be set --

13  have the stage set for a lawsuit.

14          There's no way this could be

15  conducted at doses like that.  That's just to

16  begin with.

17          There's concerns with other

18  aspects of Perel's work.  He is the individual

19  that had confused the pharmacology of

20  methylphenidate literature by publishing that

21  methylphenidate's well absorbed, because he was

22  administering to humans radioactive

23  methylphenidate.  And he found all the

24  radioactivity in their urine after, say, 24

1    hours.

2              And he took that to mean, or

3    people that read his articles took it to mean

4    that the drug's well absorbed.  Well, in fact,

5    only one percent of the two isomers of

6    methylphenidate D and L, only one percent of the

7    L ever even reaches the bloodstream intact.

8              It gets metabolized before it

9    reaches the systemic circulation.  Only 25

10   percent of the D, which is the active isomer,

11   reaches the bloodstream.

12             But for a long time, the myth was

13   that's well absorbed rather than poorly

14   absorbed, which we now know because of Perel's

15   work.

16             Further, Perel had demonstrated to

17   his satisfaction in the Journal of Pharmacology

18   Experiment of Therapeutics in 1973 that the

19   parahydroxy metabolite of methylphenidate is the

20   primary species in the brain of rats and I tried

21   to replicate that work.

22             And the compound they synthesized

23   was different than mine.  And my -- so what I

24   synthesized the first authentic standard to

1    parahydroxy methylphenidate, it had completely

2    different chemical characteristics than what

3    Perel had synthesized.  And he never published

4    how he synthesized it, but you could get from

5    him the method which I did get, and so I

6    submitted the authentic compound to the Journal

7    of Medicinal Chemistry in 1981 and had a

8    discussion how it's so different from Perel's.

9    And I had a table showing all the differences.

10    And no doubt it went -- one of the reviewers

11    would have been one of those groups, somebody in

12    that group, and that's only fair to have them

13    have an opportunity.  And they refused to let me

14    discuss this.

15          So I finally had to be satisfied

16    that the statement that the physical and

17    chemical properties of my parahydroxy

18    methylphenidate differed from that stated in the

19    Perel study.

20          And then when I was invited to

21    White Plains, New York to Ceiba Geigi, which is

22    now Novartis, they said yeah, when you provided

23    us a sample that you -- that we requested from

24    you, we still have it, it's crystalline, white

1189

1    crystalline compound, what Perel sent us has

2    turned into a black oil.  So Perel doesn't

3    design perfect studies and this is another

4    example.

5              Q.   Do you think a person of skill in

6    the art would have found this abstract useful in

7    designing a new once-a-day methylphenidate

8    treatment in 1996?

9              A.   Not at all.

10             Q.   Now, could you turn to DX 1221.

11   Do you have a hard copy of it there?  Let me

12   hand you one, it might save a little time.

13             Now, Dr. Patrick, DTX 1221 is a

14   new trial exhibit that I think was added this

15   morning, so this is not something you had seen

16   before; correct?

17             A.   This is the same article I was

18   looking at not long along here?

19             Q.   That's right.

20             A.   No, I have never seen it before.

21             Q.   And this was an article that was

22   published in 1997 with Dr. Fung as one of the

23   co-authors?

24             A.   That's correct.

1          Q.   So this is not prior art to the

2   '373 patent, that's your understanding?

3          A.   What is the actual date that's

4   pertinent to the patent?

5          Q.   November 1996.  This comes after

6   that?

7          A.   Yes.  After.

8          Q.   Let's turn to page 1143.  And

9   under this paragraph discussion, let's blow that

10  up.  And then it carries over, but we'll go

11  through this first, there is one word I think

12  that carries over into the next column.

13          And let's look down, this is

14  Doctor -- the same Dr. Fung, thirteen years

15  after the first article that we looked at.  "The

16  current clinical approach to minimize tolerance

17  employs an intermittent NTG regimen, which

18  imposes an 8 to 12 hour nitrate-free interval."

19          Is that consistent or inconsistent

20  with the understanding that you had developed

21  looking at the literature you looked at?

22          A.   I believe that's -- I'm going to

23  have to look at that in the context of that

24  specific literature.  If you will give me a

1    moment, or at least think about it.

2         Q.  Do you recall -- let me see if I

3    can simplify this and shorten it a bit.  Do you

4    recall we had looked at the Fung patent?

5         A.  Yes.

6         Q.  And was it your understanding that

7    the intermittent approach was still being

8    recommended by Dr. Fung?

9         A.  I believe he said a continuous

10   approach.

11        Q.  Continuous in that?

12        A.  Yes.

13        Q.  Now he's recommending

14   intermittent?

15        A.  That's what I see, yes.

16        Q.  And he imposes a nitrate-free

17   interval.  That is not an ascending release

18   profile, is it?

19        A.  No.

20        Q.  And if we look down, let's look --

21   let's stay in the same paragraph there.  He

22   says, "Over a decade ago, we first surmised that

23   non-linear dosing modes during the NTG-on period

24   may improve the clinical efficacy of

1    intermittent therapy, but the utility of this

2    approach has not been evaluated."

3            And so in this article, Dr. Fung

4    was reporting thirteen years later that that

5    approach from 1984 had not been evaluated.  Is

6    that consistent with the conclusions that you

7    drew in the case?

8            A.   Yes.

9            Q.   Now, do you have PX 266 handy

10   there?  Do you have it there in the notebook,

11   Dr. Patrick?

12           A.   Yes.

13           Q.   We have the first page on the

14   screen.  And this is the McNeil response, I

15   think Mr. Musgrove had characterized it as the

16   response to the generics in the FDA.  Let's see

17   if we can put this in context.  Let's look at

18   the very first line there.  Can we zero in on

19   that.

20           Now, we have got to go up to the

21   title right there.  Right here.  Comments on

22   HellerEhrman response.  And if we look further

23   down, let's go down to see what this is

24   responding to, this sentence.  You got to find

1193

1    the paragraph that begins on May 14th.

2                "On May 14th, 2004 a law firm,

3    HellerEhrman, submitting on Docket Number

4    2004P-0139 comments in response to McNeil's

5    petition."

6                Let me hand you, sir, PX 265.

7                And if you take a look at PX 265,

8    Dr. Patrick, do you see that this is a document

9    from HellerEhrman dated May 14th, 2004 to the

10    Food & Drug Administration?

11        A.    Yes.

12        Q.    All right.  Now, you haven't seen

13    this before today, I take it?

14        A.    No, I haven't.

15        Q.    But let's see what was being

16    responded to.  And could you turn over to page

17    four of this document.  And let's see what the

18    generics were telling the FDA in the section

19    issues on acute tolerance.  Do you see that

20    section?

21        A.    Yes.

22        Q.    And if we look down, you see the

23    sentence, "This concept of acute tolerance

24    remains a theoretical one."

1194

```
 1              A.   Yes.

 2              Q.   Is that what they were telling the

 3   FDA in 2004?

 4              A.   And it's got several references.

 5              Q.   Well, that's interesting you asked

 6   about that.  Let's look at the authority they

 7   said at Footnote Number 1.

 8              A.   I recognize those names.

 9              Q.   They cite you --

10              A.   That's right.

11              Q.   -- as one of the authorities;

12   correct?

13              A.   Yes.

14              Q.   Were you saying in 2004 that it

15   was still a theoretical question?

16              A.   No.

17              Q.   By then, you thought it had been

18   established?

19              A.   Yes.

20              Q.   All right.  Let's see what else

21   they were telling the FDA.

22              If we turn over to page -- let's

23   look at Page 5.

24              And let's look at the sentence
```

1    overall, right above the heading there.

2              They were telling the -- the

3    generics were telling the FDA in 2004 overall,

4    the currently available clinical data and

5    analysis results in the literature do not

6    support the existence of acute tolerance in the

7    pharmacological effect of methylphenidate.

8              Do you think in 2004 that was a

9    correct statement?

10             A.   No.

11             Q.   Now, let's see what McNeil said in

12   response to this.  And could you look back at PX

13   266?

14             Let's turn to page -- let's look

15   at Page 9.

16             Let's look first at Note 17.  Can

17   we blow that up?

18             Just look at 17 there.  Pull that

19   up, this footnote.

20             What is the document that McNeil

21   was calling to the attention of the FDA?

22             A.   This is the first imperical study

23   that was able to supply scientific

24   substantiation to the acute tolerance theory.

```
 1        So now it's moving from theory to a scientific

 2   principle.

 3             Q.   But this is the invention;

 4   correct, the sipping studies?

 5             A.   Yes.

 6             Q.   Now, let's look back in the text

 7   and see what McNeil said about this.

 8             Let's look at the sentence

 9   starting with Swanson.  Swanson and colleagues

10   confirmed the existence of acute tolerance in

11   the methylphenidate treatment of ADHD youth.

12             Is that a fair statement?

13             A.   They supported it strongly.

14             Q.   And let's look at the support they

15   provided by that.  Let's look at Footnote 15.

16             I have to go back to the prior

17   page to see 15.  And that is a Swanson

18   publication from 2001?

19             A.   With the director of NIA, Norow

20   (phonetic).

21             Q.   And let's look at the other

22   support, if we go back to Footnotes 18, 19 and

23   20.

24             And these are all Swanson
```

1197

```
 1        articles?

 2               A.   Yes.

 3               Q.   A couple of them with Gupta,

 4    Volkow 2002, 2003, 2002?

 5               A.   Yes.

 6               Q.   All after the invention?

 7               A.   That's correct.

 8               Q.   Now, let me cover just one other

 9    topic briefly.  Could we put up the -- I think

10    it's 634.  Let's put up 634.

11                    This is the Wong patent.  I think

12    you were asked some questions about that as well

13    yesterday.

14                    And let's look at Figure 8.  And

15    we'll just pull that up.

16                    And Figure 8, is that one of the

17    exemplary release rates in the patent?

18               A.   It is verapamil, I believe.

19               Q.   For verapamil?

20               A.   Yes.

21               Q.   And how long are the intervals?

22               A.   Two hours.

23               Q.   Each of these is two.  So if I

24    have the red dot there, that's two, four, six,
```

1    eight, ten, so forth?

2         A.   Yes.

3         Q.   And in a profile of this kind with

4    the release continuing here in hours eight, ten,

5    twelve, even fourteen, do you consider that

6    appropriate for treating ADHD?  Could you use

7    that with methylphenidate?

8         A.   I would think it might be

9    appropriate for treating obesity in that you'd

10   suppress appetite at lunch and dinner.

11   Unfortunately, if it were used for obesity,

12   which is not what you asked, you wouldn't be

13   able to go to sleep.

14        Q.   And what about for verapamil to

15   treat the cardiovascular disease?

16        A.   That's what it's designed to do.

17        Q.   Now, this is the first interval,

18   and this is the second, and this is the third

19   interval?

20        A.   Yes.

21        Q.   Now, in which of the intervals is

22   the rate of release the highest?

23             Let's just do them by number one,

24   two, three, four, five.

1199

```
 1              A.   I would say the fourth.

 2              Q.   This is -- I'm pointing to the

 3     fourth interval --

 4              A.   Yes.

 5              Q.   -- is the highest release rate?

 6              A.   The error bar in the third makes

 7     it a bit equivocal, but the fourth I would say.

 8              Q.   And it would reach the highest

 9     release rate between six and eight hours?

10              A.   That's correct.

11              Q.   And then the release rate goes

12     down after that?

13              A.   It does go down, but not

14     substantially.

15              Q.   Now, in the first interval, is it

16     correct there is a very small amount or a

17     negligible amount released?

18              A.   It's negligible.

19              Q.   And in the second interval, the

20     rate of release is greater?

21              A.   That's correct.

22              Q.   And would it be correct to say

23     that in the second interval as compared to the

24     first interval, the rate of release is higher?
```

1       A.    Yes.

2           Q.    And if we compare the first two

3    intervals after t=0, the rate of release in the

4    second interval is higher than it is in the

5    first?

6           A.    That's correct.

7           MR. PRITIKIN:  No further

8    questions, Your Honor.

9               THE COURT:  All right.  Thank you.

10              Thank you, Doctor.  You may step

11   down.

12              MR. PRITIKIN:  Your Honor, we are

13   calling as our next witness, Dr. Martin Davies.

14   And the examination will be conducted by an

15   associate, Louis Full.

16              THE CLERK:  Please state and spell

17   your full name for the record.

18              THE WITNESS:  My name is Martin

19   Christopher Davies.

20              THE CLERK:  Please place your left

21   hand on the Bible and raise your right hand.

22              Do you solemnly swear that the

23   testimony you are about to give to the Court in

24   the case now pending will be the truth, the

1201

```
 1        whole truth, and nothing but the truth so help
 2        you God?
 3                   THE WITNESS:  I do.
 4   BY MR. FOGEL:
 5             Q.   Good morning, Professor Davies.
 6             A.   Good morning.
 7             Q.   Where do you live?
 8             A.   I live in England.
 9             Q.   And what do you do?  What do you
10   do for a living, sir?
11             A.   I'm a professor at the School of
12   Pharmacy with the University of Nottingham in
13   Great Britain.
14             Q.   And are you familiar with the
15   company called Molecular Profiles?
16             A.   Yes.  Molecular Profiles is a
17   spin-out company from my research lab at the
18   university.  I started it about ten years ago.
19   And I was the founder chairman.
20                  I'm still the chairman.
21             Q.   And what do you teach at the
22   University of Nottingham?
23             A.   I teach areas of pharmaceutical
24   science.  In particular, drug delivery and
```

1202

1  controlled release.

2          Q.   Do you also direct a research

3  group at the university?

4          A.   Yes, a research group at the

5  School of Pharmacy.  They are divided into five

6  research divisions.

7               I am the director of one of those

8  research divisions.  I have about ten Ph.D.

9  students, about five post-doctoral fellows.  And

10  graduated, over ten Ph.D.'s and about 40

11  post-doctoral fellows, many of whom have gone on

12  to the pharmaceutical industry.

13          Q.   What are the main areas of your

14  research?

15          A.   I guess I'm most -- best known for

16  my work in terms of understanding how drug

17  formulations work.  And so in the area of

18  pharmaceutical science of formulation and drug

19  delivery.

20          Q.   How many peer-reviewed papers have

21  you either published or presented at the

22  scholarly meeting?

23          A.   I have over -- I think it's of the

24  order of 330 peer-reviewed scientific papers in

1    leading international scientific journals.

2           Q.   And are you on the editorial board

3    of any academic journals?

4           A.   Yes.  I'm the editorial board of

5    four of I guess the best known journals in the

6    area of drug delivery in pharmaceutical science.

7           Q.   Have you received any recognition

8    for your research accomplishments?

9           A.   Over the years, myself and my

10   research group have received a number of awards.

11   I guess the most recent and possibly the most

12   pleasing was the fact that Molecular Profiles

13   was awarded the Queen's Award for Industry in

14   the category of innovation.

15              And quite separate and also very

16   pleasing, the School of Pharmacy was also

17   awarded a Queen's Award for Industry.

18          Q.   Can you explain what the Queen's

19   Award is?

20          A.   It's the highest accolade given to

21   an industry within the UK.  It recognizes

22   innovation and high achievement, and it's

23   conferred by -- it's quite severely peer

24   reviewed, it's conferred by the prime minister,

1    Tony Blair, and I was very fortunate to go to

2    Buckingham Palace to meet the Queen and some

3    members of the royal family and talk about our

4    work.

5         Q.    And what specific type of work did

6    you win the Queen's award for?

7         A.    We won the Queen's award at

8    Molecular Profiles for our work in helping the

9    pharmaceutical industry understand their

10   formulations to develop better formulations.

11        Q.    Let's go over your educational

12   background.  When did you graduate from college?

13        A.    I graduated in 1985, top of my

14   class, from the University of Brighton.

15        Q.    And what did you do after you

16   graduated?

17        A.    Like all pharmacist I did a

18   preregister, so I did six months, six months at

19   a leading London university hospital and then I

20   did six months at Roche Pharmaceuticals making

21   formulations.

22        Q.    Did you go on to graduate school

23   after that, sir?

24        A.    I'm sorry?

1205

1       Q.    Did you go on to graduate school

2    after that?

3       A.    Yes, I went to Kings College

4    University of London to do my Ph.D.

5       Q.    When did you receive your Ph.D.?

6       A.    Around 1985.

7       Q.    And what did you study?

8       A.    It's in formulation science,

9    particularly it's in testing tablet coatings and

10   how they stuck to tablets, the kinds of things

11   that are of interest in this particular

12   litigation as well.

13      Q.    Where did you go after receiving

14   your Ph.D.?

15            Where did you go after you

16   received your Ph.D.?

17      A.    I went to the University of

18   Nottingham where I've been ever since, the last

19   twenty or so years.

20      Q.    Can we display PX 179.

21            Professor Davies, what's being

22   displayed here?

23      A.    This is the front page of my

24   curriculum vitae.

```
 1          Q.   Professor Davies, are you being
 2   compensated for your time spent in this case?
 3          A.   Yes.  I'm being paid $800 an hour
 4   generally, which is my standard rate.  And I'm
 5   being paid $1,030 per hour at trial.
 6          Q.   And does your compensation depend
 7   in any way on the outcome of this case?
 8          A.   No, it does not.
 9          Q.   Can we display DTX 1 on the
10   screen, please.  This is the '373 patent that's
11   at issue in this case.  Have you had a chance to
12   review this patent in preparation for your
13   testimony here today?
14          A.   Yes, I did.
15          Q.   If you would turn to Figure 4.
16   Have you looked at the formulation underlying
17   the open circle plasma concentration profile in
18   Figure 4?
19          A.   Yes, I have.
20          Q.   What is this formulation?
21          A.   This is 18 milligram formulation
22   is very similar to that used in the Concerta 18
23   milligram product.
24          Q.   Of methylphenidate?
```

1    A.    Indeed.

2    Q.    Have you formed an opinion about

3  how this dosage form compares to the

4  commercially available Concerta 18 milligram

5  dosage form?

6    A.    Yes.    I believe there would have

7  been no difference in the methylphenidate plasma

8  profiles for these two formulations if they were

9  ingested which you could attribute to the

10  differences in the formulations.

11    Q.    Were you asked to focus on any

12  other particular issues in this case?

13    A.    Yes, I was.

14    Q.    And what other issue did you focus

15  on?

16    A.    Whether the asserted claims were

17  enabled.

18    Q.    Did you reach a conclusion about

19  that?

20    A.    Yes, I did.

21    Q.    And what was your conclusion?

22    A.    I believe they are enabled.

23    Q.    Let's talk a little bit more about

24  your conclusion.    How did you obtain the

1    enablement standard that you applied to the

2    facts of this case?

3              A.    The legal team kindly gave it to

4    me.

5              Q.    Let's look at PX 705 in your

6    binder.  Is this in general the enablement

7    standard that you applied to the facts of this

8    case?

9              A.    That's correct.

10             Q.    In your opinion, what was the

11   background of one of ordinary skill in the art

12   for developing extended release dosage forms in

13   1996?

14             A.    I believe it was high.  I believe

15   that individual would have a Ph.D. in pharmacy,

16   chemistry or chemical engineering; would have

17   three years industrial experience in the field

18   of controlled release.

19             Q.    Is your opinion regarding the high

20   level of skill in this art consistent with the

21   views of Andrx's own expert, Dr. Banakar?

22             A.    Yes, they are.  He also agreed

23   that the skill level was high.  He went on to

24   say that that factored in favor of their being

1    no undue experimentation to enable the claims.

2         Q.   And were you in the courtroom when

3    Dr. Needham testified that you set the level of

4    ordinary skill too high?

5         A.   Yes, I was.

6         Q.   Do you agree with Dr. Needham?

7         A.   No, I don't.

8         Q.   And why not?

9         A.   I believe Dr. Needham is setting

10   the skill too low.  And I also believe he's

11   doing that for a specific reason.  I believe he

12   wants to create a division between the skills

13   that are required to get controlled consistent

14   and constant release or descending release from

15   that which is required to get ascending release.

16   In reality, as I explained, a formulation

17   scientist who has ordinary skill in the art

18   would know how to do any kind of profile, that's

19   what they're trained to do.

20        Q.   Well, let's switch gears.

21             Do controlled release drugs play a

22   part in any of the classes you teach at the

23   University of Nottingham?

24        A.   Yes, they do.  Since I joined the

1210

1    school in 1985, I have taught practically every

2    course in the pharmaceutical sciences, including

3    those in drug delivery.  The school is

4    particularly well-known for its activity in the

5    area of drug delivery, and it's a strong feature

6    of our undergraduate curriculum.

7         Q.    What is meant by the phrase drug

8    delivery?

9         A.    Simply put it means being able to

10   deliver the drug in an effective way to meet a

11   therapeutic need.

12        Q.    Do you have a particular interest

13   within the field of drug delivery?

14        A.    Yes, I do.  I guess it's the field

15   that I am probably best known for.  There is a

16   society called the Controlled Release Society.

17   This is the premier international society which

18   is dedicated to drug delivery.  And I was

19   elected the scientific secretary of that society

20   for six years.  And I was the chief scientist of

21   the society implementing strategies, so I have

22   particular interest in the area.

23        Q.    What does it mean to have a

24   controlled release dosage form?

1        A.    It means to have a dosage form

2    which has as the word says, controlled,

3    preprogram, predetermined release rates.

4        Q.    Would a controlled release dosage

5    form be highly -- would that be highly

6    predictable?

7        A.    It would be highly predictable.

8        Q.    How much was known about

9    controlled release dosage forms in November of

10    1996?

11        A.    It was a very mature field.   There

12    was a considerable amount known.   Work had been

13    going on in the field for at least thirty years.

14        Q.    In trying to determine that the

15    asserted claims were enabled, did you base your

16    conclusion on the Court's claim construction?

17        A.    Yes, I did.

18        Q.    If we can turn to the Court's

19    claim construction, page two.   And the Court has

20    defined the language, "An ascending release rate

21    over an extended period of time," in the third

22    line it says, "The amount released in a periodic

23    interval is increased over the amount released

24    during the immediately preceding periodic

1    interval starting at T=0 and continuing through

2    at least the midpoint of the T90 and for at

3    least three hours."

4            What are the first two intervals

5    that this language tells us are to be compared?

6            A.    This helps us understand that the

7    first interval starts at T=0 and continues to a

8    point at which the second interval starts, so it

9    helps us understand that the first time period

10    starts at T=0 up to a particular time point, and

11    then there is the next time period, periodic

12    interval.

13            Q.    How do you know the first time

14    period starts at T=0?

15            A.    Because it clearly states here

16    that it does in the claim construction.

17            Q.    Does an ascending rate of release

18    require any release of drug in the first

19    interval?

20            A.    No, it doesn't.

21            Q.    And why not?

22            A.    Because what's important, what it

23    says here is that what must happen is that the

24    second time period, the rate at which the drug

1213

1    is released from the second time period must be

2    greater than that in the first time period.

3            Q.    Let's move on to another topic.

4    As construed by the Court, what types of dosage

5    forms do the asserted claims refer to?

6            A.    Yes.

7            Q.    What types of doses, dosage forms

8    do the asserted claims refer to?

9            A.    I believe they refer to oral

10   delivery systems, tablets and capsules.

11           Q.    In November of 1996, what types of

12   dosage forms had standard in-vitro dissolution

13   test protocols?

14           A.    They would be tablets and capsules

15   and transdermal systems.

16           Q.    And where are you basing that

17   information from?

18           A.    That comes from the USP.

19           Q.    And could all three of those

20   dosage forms, capsule, tablets and transdermal

21   be used to treat ADD or ADHD?

22           A.    Yes, they could.

23           Q.    Let's focus on the last sentence

24   of the Court's claim construction regarding an



1    ascending release rate over an extended period

2    of type.  It reads, "The ascending release rate

3    does not include release of drug from any

4    immediate-release drug coating that may be

5    applied to the dosage form."

6              What does this tell you about the

7    kinds of dosage forms covered by the asserted

8    claims?

9         A.   It tells me that this is focused

10   on oral systems, those tablets and capsules.

11        Q.   Would it cover transdermal

12   systems?

13        A.   I believe because of the need of

14   the immediate-release drug coating, it wouldn't

15   cover transference.

16        Q.   Do you think it is necessary to

17   enable the '373 patent for all dosage forms

18   including things such as nasal sprays,

19   ointments, creams, suppository, lozenge,

20   tablets?

21        A.   No.

22        Q.   And why not?

23        A.   Because it's clear the guidance

24   that's given by the patent relates to oral

1    delivery systems such as tablets and capsules.

2        Q.   As construed by the Court, Claim 1

3    requires that the dosage form have an ascending

4    rate of release for an extended period of time

5    which must be at least three hours.  Does that

6    provide any additional guidance as to the types

7    of dosage forms covered by the asserted claims

8    of the '373 patent?

9        A.   Again, that -- that helps us

10   understand that to -- to achieve that, you need

11   to use tablets or capsules, so that you could

12   get such a profile.

13       Q.   And how does a skilled formulator

14   decide on which dosage form to make for a given

15   drug?

16       A.   They would consider -- you know,

17   they'd use their common sense, frankly.  And

18   they'd look at whether you needed a dosage form

19   that required immediate release or sustained

20   release, whether the dosage form was required to

21   treat adults or children.

22            They'd look at the condition that

23   the dosage forms required to treat.  They'd also

24   look at issues related to compliance that may be

1    significant issues around the treatment.

2                So there are a number of factors

3    that they'd take into account in deciding which

4    dosage forms to use.

5           Q.   And what medical condition is

6    treated by the invention of the '373 patent?

7           A.   ADD, ADHD, which is a once-a-day

8    treatment.

9           Q.   Knowing that the patients will be

10   treated for ADD or ADHD and that drug would only

11   be taken once a day, how would that affect which

12   dosage forms one of skill in the art would

13   consider making?

14          A.   Well, you are -- I guess your

15   targets group would be young children, children

16   particularly in school.  And particularly with

17   this particular condition, there would be huge

18   issues around compliance and insuring taking the

19   medicine.

20               So that would eliminate a

21   significant number of medicines.  Someone would

22   consider type of dose and forms, and that would

23   focus your mind as a formulator of ordinary

24   skill in the art to use tablets or capsules.

```
1          Q.    Well, let's switch gears.

2                What are the different rates of

3     release that a dosage form can exhibit?

4          A.    A dosage form can give you

5     descending rate of release, or a constant rate

6     of release, or an ascending rate of release.

7          Q.    And in 1996, were there known

8     techniques for making a dosage form that could

9     be released at each of these rates?

10         A.    Yes, there were.

11         Q.    What does it mean in simple terms

12    to have a decreasing rate of release?

13         A.    Simply at each time interval after

14    the formulation is adjusted, the rates of

15    release of the drug decreases.

16         Q.    And how prevalent was it in 1996

17    to have a dosage form with a decreasing rate of

18    release?

19         A.    It was quite common.  Most of the

20    dosage forms had a decreasing rate of release

21    because there it -- that was fine for the

22    particular therapy you need.

23         Q.    Can you provide an example of a

24    dosage form that had a decreasing rate of
```

1    release?

2                A.    It's Ritalin SR.

3                Q.    Did you say Ritalin SR?

4                A.    SR, yes.

5                Q.    Let's talk now about constant rate

6    release profiles.  What does it mean to have a

7    constant rate of release?

8                A.    Simply over the period of time

9    which the drug is released from a formulation,

10   the rate at which it's released is constant at

11   each time interval.

12               Q.    And how prevalent were constant

13   rate of release formulations in the mid-1990s?

14               A.    It was -- it was something that

15   one could do, make a constant rate of release

16   system that was fine.  There weren't that many

17   oral delivery systems for -- that would provided

18   constant rates of release, because the therapy

19   you need wasn't there.

20               Q.    How difficult was it at that time

21   to make a dosage form that released the drug at

22   a constant rate?

23               A.    It wasn't difficult at all.

24               Q.    The last possibility you mentioned

1219

1    was the ascending rate of release profile.  What

2    does that mean?

3         A.    That means that, again, over the

4    time period of which the drug is released, that

5    each time interval, periodic interval, the rate

6    at which the drug is released increases.

7         Q.    And how prevalent were ascending

8    rate of release dosage forms in the 1990s?

9         A.    I can't think of one, because

10   there wasn't a clear therapy, particular need.

11        Q.    Nobody had recognized a need for

12   it at that time?

13        A.    That's correct.

14        Q.    How difficult would it have been

15   in 1996 for a person of ordinary skill to make a

16   dosage form that released the drug at an

17   ascending release rate?

18        A.    Not difficult at all.

19        Q.    Well, let's focus on dosage forms

20   with an ascending rate release.  Are there

21   working examples of such dosage forms in the

22   '373 patent?

23        A.    Yes, there are.

24        Q.    And what --

1220

1          A.    There are examples which are

2     osmotic that have systems that are shown in the

3     patent.

4          Q.    Do you believe that based on the

5     disclosures of the '373 patent, and that person

6     with general knowledge of skill -- let me say

7     that again.  I'm sorry.

8               Do you believe that a person of

9     ordinary skill in 1996 based on disclosure of

10    the '373 patent and that person's general

11    knowledge, could have made osmotic dosage forms

12    with an ascending rate of release through at

13    least the mid-point of the T90 and for at least

14    three hours?

15         A.    Yes, I do.

16         Q.    Does the '373 patent identify

17    approaches to making non-osmotic sustained

18    release drugs?

19         A.    Yes, it does.

20         Q.    If we could have DX 1 at Column 2,

21    Lines 53 to 62.

22               Here is some -- there's been some

23    testimony on this column and line number during

24    the case, so we won't have you read it.  But as

1    of November of 1996, how well known were the

2    approaches shown on the slide in the field of

3    controlled release drug design?

4            A.   Very common.  Very well known.

5            Q.   Assume that a person of ordinary

6    skill was looking at the '373 patent in the

7    mid-1990s. Have you formed an opinion about

8    whether they would have needed working examples

9    of non-osmotic dosage forms in order to

10   prepare -- in order to make formulations having

11   an ascending rate of release through the

12   mid-point of the T90 and for at least three

13   hours?

14           A.   I believe they would have needed

15   examples, because there's -- it's a rich

16   literature out there showing how to prepare

17   non-osmotic systems.  It's different for osmotic

18   systems, because they're rather unique to

19   themselves as Dr. Needham said.  And some

20   guidance there would have helped as is shown in

21   the patent.

22           Q.   So the patent, the specialty of

23   the patent was really osmotic, but there was --

24           A.   That's correct.

1    Q.    Which were more common in the art

2    at the time, osmotic dosage forms or non-osmotic

3    dosage forms?

4        A.    Non-osmotic dosage forms.

5        Q.    Let's talk about a few of the

6    known techniques for making non-osmotic dosage

7    forms that had an ascending rate of release.

8            If we could have PX 706 on the

9    screen.  What does this document show?

10       A.    This is a document I prepared to

11   show some of the exemplary techniques that could

12   be used for ascending release.  On the left-hand

13   side, you have the general name of a system.

14           On the right-hand side, you have

15   some references that relate to those systems.

16       Q.    And if I could just have you focus

17   on the dates on the references on the right hand

18   side.

19       A.    All -- I guess all the dates are

20   pre-1996.

21       Q.    If a person of ordinary skill in

22   1996 wanted to make non-osmotic dose -- wanted

23   to make a non-osmotic dosage forms of

24   methylphenidate with an ascending rate of

1    release as described in the claims of the '373

2    patent, could they have used these techniques?

3         A.    They could have used these

4    techniques.  Yes.

5         Q.    Well, let's discuss a few of these

6    examples.

7              Starting with the first technique

8    described on this slide, the erodible system.

9    If we could have PX 465.

10             What is this document?

11        A.    This is called a Treatise on

12   Controlled Drug Delivery.  It's a book on

13   controlled drug delivery.

14        Q.    If we go to the next page at the

15   bottom, the copyright page.  When was this

16   publication?

17        A.    1992.

18        Q.    If we go to the preface of the

19   treatise, which I believe is the next page, this

20   is Page 2 of the preface.  And go to the second

21   sentence of the last sentence of the second

22   paragraph starting with however.

23             And could you read that sentence

24   out loud, please?

1          A.    However, the book is written in a

2     readable, basic, didactic format, with solved

3     problems and end of chapter problems, allowing

4     for this volume to be used as an educational

5     tool or text for the practicing scientist and

6     the student alike.

7                What does that sentence mean to

8     you?

9          A.    It means that the text is for

10    somebody who has ordinary skill in the art and

11    also for students who's learning the art.

12         Q.    What does this treatise disclose

13    about erodible systems?

14         A.    It has a chapter on erodible

15    systems.

16         Q.    Let's turn to ALZ 7265.

17                And is this the first page of the

18    chapter that you just mentioned?

19         A.    Yes, it is.

20         Q.    Let's skip ahead to the end of

21    this chapter.  Focus specifically on Page 217.

22                After the conclusion section,

23    there's a section called -- that's entitled

24    Problems.

1225

1        What does this -- what is this

2    referring to?

3        A.    After the students have read the

4    chapter, there are a number of problems which

5    are set, which literally just check whether

6    they've understood the chapter.

7        Q.    And what conclusions do you

8    draw -- I'm sorry.

9        Can you read the first question

10    out loud?

11        A.    The very first question of the

12    chapter on erodible systems is Assuming

13    heterogeneous degradation, design a device that

14    will yield an increasing release rate.

15        So the very first question deals

16    with designing a controlled release formulation

17    with increasing release rate.

18        Q.    And what conclusions do you draw

19    from the fact that this is posed as the first

20    question?

21        A.    Well, it's quite clearly something

22    that was known in the art, i.e. increasing

23    release rate.  It's the first question.

24        Typically the first question tends

1    to be the easiest of the -- of a particular set

2    of questions.  But it's quite clear that the

3    authors are testing the student on something

4    related to increasing release rate, i.e.

5    something that was well known.

6              Q.   We're not going to go through all

7    these problems, but you mentioned that the first

8    question is typically the easiest question.

9    Just in looking at this, is that the case for

10   this reference as well?

11             A.   I believe so.

12             Q.   Well, assume that the person

13   reading this did not know the answer, how would

14   they have figured it out?

15             A.   The author very kindly, at the end

16   of the chapter, provides solutions to the

17   problems.

18             Q.   If we can go to Page 218, and blow

19   up the bottom part.

20             Can you go back one page?

21             The bottom there says The answers.

22   And have you prepared a demonstrative of --

23   well, let's look at the answer.

24             Let's look at the answer.  Can you

1    read the answer out loud for us?

2         A.   Sure.   The answer is devices whose

3    exposed surface area increases with time and

4    will lead to increasing release rate.   An

5    example is a cone composed of a degradable

6    polymer coated with a non-degradable polymer cut

7    off at the top.

8         Q.   Just so that the record is clear,

9    it's -- an example is a cone composed of a

10   degradable polymer?

11        A.   Yes, degradable.

12        Q.   Okay.   And have you prepared a

13   demonstrative illustrating how this would work?

14        A.   Yes, I have.

15        Q.   Can we have PX 707?

16             What are we seeing now?

17        A.   Well, here is a demonstrative I

18   prepared just to illustrate that very solution.

19   On the left-hand side, you have the cone where

20   we cut off the top.

21             On the outside is this

22   non-erodible polymer.   And on the inside is the

23   exposed surface of the erodible polymer that

24   contains drug.

1          As time elapses, this surface

2    erodes releasing the drug.  And as you see, you

3    go from this formulation to this.  You see that

4    the surface area increases by increasing the

5    surface area, you're increasing the rate of drug

6    delivery.

7          Q.   Can the rate of drug release be

8    altered by using this technique?

9          A.   Yes, it can.

10          Q.   And in 19 -- in 1996, would a

11    person of ordinary skill have been able to

12    manipulate the geometric shapes in order to

13    alter the release rates?

14          A.   Yes.  There were a number of

15    examples with people used different geometric

16    shapes to also alter release rate.

17          Q.   And would a person of skill in the

18    art at that time be able to do that without --

19    without using undue experimentation?

20          A.   Yes, they could.

21          Q.   Could we have PX 706 on the

22    screen, again.  The next technique I want to

23    talk about is the pH controlled erosion coating.

24    What is a pH dependent coating?

1229

1        A.    A pH dependent coating in

2   particular used in oral drug delivery is a

3   coating which will only dissolve at certain pHs.

4   So, for example, an enteric coating is a coating

5   which is on an oral drug delivery system which

6   doesn't dissolve in the stomach, in the acid

7   conditions of the stomach, but when it moves to

8   the more alkaline conditions of the intestines,

9   it will dissolve and then allow the release of

10  the drug.

11       Q.    And could this technique be used

12  to create an ascending rate of release?

13       A.    Yes, it can.  There are two

14  examples there that I've shown that can show how

15  to do that.

16       Q.    Let's start with first the Rudnic

17  patent, which is PX 470.  In general, what does

18  the Rudnic patent disclose?

19       A.    It shows how one can using various

20  beads with different coatings and different

21  formulations, one can achieve different release

22  rates of particular drug.  And one can use this

23  to show how one can achieve ascending drug

24  delivery.

1           Q.    And let's look at Figure 1 from

2      the patent.  What is being shown here?

3           A.    Here we have three pellets, pellet

4      A, pellet B, and pellet C.  Pellet A is an

5      uncoated pellet, and simply containing the drug.

6      Below we have a figure which is percent

7      dissolved versus time.  And it shows the

8      dissolution profile for the three different

9      formulations.

10                So if we look at the first

11     formulation which has just simply drug present,

12     no coating, no inhibition to the solvent, and

13     you see here quite a quick release of the drug

14     from pellet A.

15                Then we have a second pellet B,

16     this is a sustained release pellet where the

17     coating is pH dependent.  So the drug starts to

18     be released in the stomach and then when it gets

19     into the intestines, it continues to be

20     released.

21                And then we have a third pellet C,

22     which has a pH-controlled erosion coating.  So

23     in that case, the drug is released once it gets

24     into the small intestine as shown in pellet C

1    here.

2            Q.   Looking at Figure 1 and the plot

3    specifically on the bottom of the slide, can you

4    tell us what the T90 is for pellet B?

5            A.   The T90 for pellet B would be

6    somewhere right in here of the order of about

7    seven-and-a-half hours.

8            Q.   Would it have been typical for one

9    of skill to convert the type of plot shown in

10   Figure 1 into a plot showing release rates for

11   this data?

12           A.   Yes, it would be simple

13   mathematics to do that.

14           Q.   And how does the slope of the

15   lines in Figure 1 relate to the rate of release?

16           A.   Well, as you see, for example,

17   with pellet C, you see that at each time

18   interval, the slope increases here.  And that

19   tells us that the drug is being released at an

20   increased rate, it's an ascending release rate.

21           Q.   Let's focus on pellet B for the

22   time being.  You prepared a demonstrative

23   showing a release rate for pellet B?

24           A.   Yes, I have.

1       Q.   Can we have PX 708.   What is being

2   shown here?

3       A.   Here we have release rate as a

4   function of time.   And I have calculated the

5   release rate for each time interval periodic

6   interval.   And those are shown here in the

7   demonstrative.

8       Q.   And does the rate of release for

9   pellet B ascend through the midpoint of the T90

10  and does it ascend for at least three hours?

11      A.   Yes, it does.

12      Q.   And can you just explain how you

13  get there?

14      A.   Well, the T90 for pellet B was of

15  the order of seven-and-a-half hours, that would

16  mean it would be somewhere in this region here,

17  but just over three hours.   And you can clearly

18  see that the rate of release increases through

19  that midpoint and at least for three hours.

20      Q.   Could a dosage form make use of a

21  combination of pellets B and C?

22      A.   Yes, they could.   And, in fact,

23  that's exactly what's taught by this patent, by

24  using a combination of the pellets one can

1233

```
 1        achieve the desired release profile and one

 2        would simply mix the different pellets, place

 3        them in the capsule for the final formulation.

 4             Q.   Can we have PX 709.  And what is

 5        being shown here?

 6             A.   Here it's shown that if one takes

 7        an equal quantity of both pellet B and pellet C

 8        and combine them, and one can combine the

 9        release rates, it shows that one can extend the

10        release, the ascending period of release for up

11        to a period of eight hours.

12             Q.   What does combining pellets into a

13        capsule allow the formulator to do?

14             A.   Well, the formulator is interested

15        in achieving a particular release profile, so it

16        enables you to finely tune the profile.

17             Q.   Could more than two types of

18        pellets be combined inside a capsule?

19             A.   Sure.  One could combine all three

20        different types of pellets if one wished to

21        achieve a specific release profile.

22             Q.   Could this technique be used --

23        could this technique had been used to create a

24        dosage form that ascends through the midpoint of
```

1    the T90 and for at least three hours?

2         A.    Absolutely.   It's very clear one

3    could use such an approach to develop such a

4    system.

5         Q.    And how much experimentation would

6    have been required to do that?

7         A.    It would be routine

8    experimentation that would be required.

9         Q.    Do you believe it would require

10    undue experimentation?

11         A.    No, I don't.

12         Q.    Can we have PX 706 on the slide

13    again, please, on the screen again.   Thank you.

14              I want to focus your attention on

15    the second reference for pH control erosion

16    coating which is PX 471.   What in general does

17    the Mehta patent disclose?

18         A.    The Mehta patent is another

19    example of using different beads with different

20    coatings to achieve a particular controlled

21    release profile.   And again, it's an example

22    where one can use a combination of beads to

23    finely tune to achieve the profile that you so

24    wish.

1      Q.   Does this patent include actual

2   data showing an ascending rate of release?

3      A.   Yes, it does.

4      Q.   In the mid 1990s, what type of pH

5   controlled erosion coating -- strike that.

6           In the mid 1990s, what types of pH

7   controlled erosion coatings were commonly used?

8      A.   There were a number of different

9   polymeric tests that were used for pH controlled

10  erosion, including polymers known as Eudragit,

11  that was the commercial name, they were widely

12  used for such coatings.

13     Q.   Is Eudragit coating the same thing

14  as a Eudragit coating?

15     A.   Yes, I believe it's just the way

16  you say it.

17     Q.   Okay.  By the way, do the examples

18  in the Rudnic and the Mehta patent utilize a

19  Eudragit coating?

20     A.   That's correct.

21     Q.   Turn to PX 482, which is U.S.

22  Patent Number 5,567,441, issuing in October 22,

23  of 1996.  Do you see that there?

24     A.   Right.

1    Q.   If you could turn to column three,

2   lines 26 to 36.   It says the enteric coatings

3   are pH dependent which describes the well-known

4   effect of an enteric coating which prevents

5   release of the dosage form in the low pH

6   conditions of the stomach, but permits release

7   in the higher pH conditions of the small

8   intestine.   And it gives some examples at line

9   36, it gives the example of Eudragit S or L.

10       A.   That's correct.

11       Q.   What is this passage describing to

12   you?

13       A.   It's showing that one could use

14   such a coating to achieve a particular release

15   rate.

16       Q.   What significance does a pH

17   controlled Eudragit have in this case?

18       A.   It's one of the polymers that's

19   used by Andrx to achieve the release rate from

20   their formulation.

21       Q.   Of methylphenidate?

22       A.   Correct.

23       Q.   Let's sum up.   In November of

24   1996, would a person of ordinary skill have

1   known that an ascending release dosage form of

2   methylphenidate could have been made by using a

3   Eudragit coating?

4        A.   Yes, they could.

5        Q.   How much experimentation would one

6   of skill in the art have needed to do in 1996 to

7   use the pH controlled erosion coating technique

8   to make methylphenidate into a dosage form with

9   an ascending rate of release to the midpoint of

10   the T90 and for at least three hours?

11        A.   As I've said, there was ample

12   literature there to be able to do that, so it

13   would be routine.

14        Q.   Would it require undue

15   experimentation?

16        A.   No, it would not.

17        Q.   Can we have PX 706 on the screen

18   again.  Will you please describe technique

19   number three?

20        A.   The third example is when one you

21   could use non- uniform drug concentrations in

22   the dosage form.  So in this case, it wouldn't

23   be a uniform concentration of the drug

24   throughout the dosage form.  There would be

1    different concentrations at different points

2    within the dosage form.

3                And this article published in the

4    Journal of Controlled Release by Lee highlights

5    how one could do that to achieve different

6    release rates.

7            Q.    And that article, is that PX 472?

8            A.    That's correct.

9            Q.    Let's turn to PX 710.  What is

10    this describing?

11            A.    This is a -- just an illustration

12    of what I've just talked about.  Imagine we have

13    a spherical bead formulation, and I have given

14    the drug a color, green color, so it's a light

15    green on the outside, and then a darker green,

16    and then finally an even darker green.  The

17    intensity of the green reflects the

18    concentration.

19                So gradually on the outside we

20    have a low concentration, then we have an

21    intermediate concentration, and then finally we

22    have a high concentration in the middle.

23                If such a system were to be

24    released and I have shown a plot here, said

1  release is a function of time, initially we

2  would have the outer portion released, the low

3  concentration, and then gradually as the

4  solution got into the next layer, you would have

5  more release, and then finally once it got into

6  the core, one would have higher rates of

7  release.  This just illustrates that one can

8  achieve an ascending rate of release just by

9  simply changing the level of drug concentration

10  within the formulation.

11         Q.   And could the non-uniform drug

12  concentration technique be used in 1996 to make

13  a dosage form that had an ascending release

14  profile through the midpoint of the T90 and for

15  at least three hours?

16         A.   Yes, I believe it could.

17         Q.   How much experimentation would

18  that require to make?

19         A.   It wouldn't be undue.

20         Q.   In addition to the technique we

21  have been discussing today, were there other

22  known techniques in the mid 1990s that could

23  have been used to achieve an ascending rate of

24  release that is covered by the asserted claims?

1    A.   Yes, I have just illustrated a few

2    examples just to illustrate this point.

3    Q.   Can you just briefly identify a

4    few of those other techniques?

5    A.   One could have used, for example,

6    wax coating.  One could have used matrix or

7    reservoir systems, systems which release the

8    drug by diffusion or by dissolution.  And one

9    could use a combination of these different

10   formulations to achieve an ascending rate of

11   release.

12   Q.   And, in fact, the patent itself

13   tells you that, we looked at that earlier;

14   correct?

15   A.   That's correct.

16   Q.   Well, let's sum up.  How much

17   experimentation would one of ordinary skill have

18   needed to do in the mid 1990s to make

19   methylphenidate into an ascending release dosage

20   form that ascended through the midpoint of the

21   T90 and for at least three hours?

22   A.   I think it would be routine

23   experimentation.

24   Q.   And how long in your opinion would

1    it have taken in November of 1996 to make a

2    dosage form of methylphenidate that had an

3    ascending release rate?

4         A.   I believe it would have taken a

5    matter of a few months.  These are very routine

6    methods of actually plotting the formulation,

7    making the formulation and testing it, and even

8    if you had to fine tune that formulation, that

9    would take of the order of a few months.

10        Q.   And why do you consider a few

11   months of time to be routine experimentation?

12        A.   From my experience, that's typical

13   of what it takes to actually produce a

14   formulation.

15        Q.   Would you consider that to be

16   undue experimentation?

17        A.   No, I would not.

18        Q.   How long in your opinion would it

19   have taken in November of 1996 to make a dosage

20   form of methylphenidate that had a constant

21   release rate?

22        A.   I think the same time period, a

23   period of a few months.

24        Q.   Why do you believe it would have

1    taken a few months to make either a constant

2    rate or an ascending rate dosage form?

3         A.    Because essentially as I've

4    described at the beginning, it's the same skill

5    set one would use, as a formulation scientist

6    you would be presented with a profile that was

7    required and you just use your skill set to

8    achieve that profile whether it was descending,

9    constant or ascending.

10        Q.    Could we have the asserted claims

11   on the screen again, please?

12             You understand that Claim 6 and 7

13   of the '373 patent added a further requirement

14   that there be a substantially ascending

15   methylphenidate plasma drug concentration over a

16   time period of about five and a half hours or

17   eight hours following said administration?

18        A.    Yes.

19        Q.    In 1996, how would a formulation

20   scientist have gone about making a dosage form

21   that would have achieved the plasma

22   concentration profiles described?

23        A.    In exactly the way I have

24   described.  They would look in the literature in

1      the art and the design formulation.  They test

2      the formulation.  May even have to fine tune

3      that formulation.

4               But that would be done in a

5      routine way.

6               Q.   Now, you're aware that Claim 6 and

7      7 refer to a plasma drug concentration?

8               A.   Right.

9               Q.   Are you familiar with the concepts

10     of deconvolution?

11               A.   Yes.

12               Q.   And let me ask the question again,

13     just so we're clear.  How would a formulation

14     scientist have gone about making a dosage form

15     that would have achieved the plasma

16     concentration profiles described?

17               A.   I see.  In that case, the

18     formulation scientist would work with colleagues

19     or themselves.

20               They would do a deconvolution.

21     It's a standard approach that was used at that

22     time where one would deconvolution the plasma

23     profile and produce, what is emphatically an in

24     vitro dissolution profile.

1244

```
1              And that corresponding dissolution
2      profile is the profile that the formulation
3      scientist would try and replicate.
4              Q.   So these two people would work
5      together; is that what you're saying?
6              A.   That's correct.
7              Q.   Could one perform deconvolution
8      studies from methylphenidate in the mid-1990s?
9              A.   Oh, absolutely.
10             Q.   Using the techniques that we
11     discussed for making ascending release rate,
12     could a person of ordinary skill in 1996 have
13     used these techniques for making a dosage form
14     that had a substantially ascending
15     methylphenidate plasma drug concentration over a
16     time period of about five and a half or about
17     eight hours after the drug was administered?
18             A.   Yes.  I believe they could using
19     the approach that I described in doing the
20     deconvolution of the plasma profile to generate
21     the in vitro profile.
22              Yes, they could.
23             Q.   If Claim 1 of the '373 patent
24     covers a dosage form involving a transdermal
```

1245

```
 1    patch, do you have an opinion as to whether a

 2    person of ordinary skill could have made such a

 3    dosage form in 1996 without undue

 4    experimentation?

 5         A.   Yes, I do.  I believe they could.

 6         Q.   And were there known techniques at

 7    that time for making transdermal patches that

 8    would release a drug at an ascending rate

 9    through at least the mid-point of the T90 and

10    for at least three hours?

11         A.   Yes, they were.

12         Q.   Can we have DX 632 on the screen?

13              Now, there's already been a lot of

14    testimony on the Bayer patent in this case.  Can

15    the procedure described in this patent be used

16    to make methylphenidate into an ascending

17    release rate transdermal system?

18         A.   Yes, it could.

19         Q.   You can take that down.

20              Were there any other known

21    ascending release rate transdermal systems?

22         A.   Yes, there were.

23         Q.   And if you could turn to PX 712.

24              Can you describe what's being
```

1    depicted here?

2           A.   Yes.   This is a patent that I

3    found by Govil, et al.

4           It's a patent published in 1993.

5    And in this particular formulation, it's a

6    transdermal patch which has two different drug

7    chambers arranged in a central drug chamber of a

8    surrounding cylindrical drug chamber.

9           Not only do we have drug presence

10   of different levels of these two chambers, but

11   what we also have is what is called penetration

12   enhances.   These are molecules that tended to

13   enhance the transport of the drug across the

14   skin.

15          They literally approved the

16   permeability of the skin to the drug.   By using

17   different drug levels and also using different

18   penetration enhancers, the author showed that

19   they could have ascending drug delivery from

20   such a patch.

21          Q.   Can this technique, which is

22   described in the Govil patent, PX 474, be used

23   to achieve an ascending release rate of

24   methylphenidate through the mid-point of the T90

1247

1    and for at least three hours?

2         A.   Yes.  I believe it could.

3         Q.   And how much experimentation would

4    one of skill in the art have needed to do in the

5    mid-1990s to make a transdermal patch that had

6    an ascending release rate of methylphenidate and

7    would be covered by the asserted claims?

8         A.   I believe it's routine.

9         Q.   Let's switch topics.  Professor

10   Davies, are you aware that Professor Angst

11   testified that methylphenidate products are

12   known to exhibit linear pharmacokinetics?

13        A.   That's correct.

14        Q.   And have you examined the

15   formulations of the 18, 27, 36 and 54-milligram

16   ANDA products?

17        A.   Yes, I have.

18        Q.   And for the record, those are

19   found at DTX 180 and 4103 and 4104.

20             Have you formed an opinion about

21   the pharmacokinetic relationship between these

22   four dosages?

23        A.   Yes.  The 18, 27, and 36 are the

24   same formulation, but obviously with increasing

1    drug levels as the 54.

2                Those same 18, 27, 36 would have

3    the same pharmacokinetic profile as that in the

4    54, because they have linear pharmacokinetic

5    profiles.

6                Q.  Do you know whether Andrx

7    submitted in vivo bioequivalence studies for

8    each of the 18, 27, 36 and 54-milligram ANDA

9    products?

10               A.  I believe they only submitted the

11   54.

12               Q.  And what's your understanding for

13   why?

14               A.  Because the FDA understood there

15   was a linear pharmacokinetic relationship

16   between the 18, 27, 36 and 54-milligram systems.

17               Q.  Just so we're clear, what

18   conclusions do you draw, if any, from the FDA's

19   decision to only require Andrx to submit in vivo

20   data for the 54-milligram dose?

21               A.  But -- in effect, there's a linear

22   pharmacokinetics for the methylphenidate for the

23   18, 27, 36, and 54.

24               Q.  Well --

1249

1    A.    That's what I think as well.

2    Q.    Let's switch to one last topic.

3          You understand there's a dispute

4    between the parties as to whether

5    methylphenidate will be released from the core

6    of Andrx's ANDA product within the first hour

7    during an in vitro dissolution test.

8          Are you familiar with the

9    testimony given by Dr. Banakar that no drug

10   would be released from the DR-coated core during

11   the first hour?

12   A.    Yes.

13   Q.    Can you explain what has been

14   referred to as the DR-coated core?

15   A.    That is a formulation which

16   doesn't contain the immediate release layer.

17         So this is the formulation that

18   has a drug at the center with the eudragit

19   signed coating on it, but it's applied with

20   further coating to the -- with the immediate

21   release drug layer.

22   Q.    And what was the basis for

23   Dr. Banakar's opinion that there would be no

24   release from the core?

1      A.    He did some -- oh, sorry.    There

2    was some in vitro dissolution test taken on that

3    DR formulation.

4         Q.    Just so we're clear, it was just

5    on the DR-coated core portion; correct?

6         A.    That's correct.

7         Q.    It was not on the final product?

8         A.    Not on the final formulation.

9         Q.    Now, would a dissolution test on

10   just the core be a reliable way to predict the

11   dissolution rate from the core when it is

12   included in a complete tablet?

13        A.    I don't believe that's the case.

14        Q.    Why not?

15        A.    Well, that ignores completely the

16   fact that you're placing this additional layer

17   on top of that formulation.    The very process of

18   spraying on the immediate release layer with the

19   drug and the polymer would spray the drug

20   polymer solution onto the tablet, would wet the

21   tablet.    And these tablets are in a big pan and

22   they're resolving over each other.

23              And they're abrading and rubbing

24   over each other wet.    And that's likely to cause

1       some disruption of the ANDA underlying coating.

2               This very process is likely to

3       cause a change in the characteristics of the

4       formulation and the change in the

5       characteristics of the release from the

6       formulation.

7               Q.    Would you expect the rate of

8       dissolution in the finished product to be

9       different than the rate of dissolution of the

10      core by itself?

11              A.    By the nature of putting on that

12      additional coating with the course by that

13      coating process, I believe that that's true.

14              Q.    And would the core from the

15      finished tablet release at a faster rate than

16      the core from just the DR-coated tablet then?

17              A.    I believe that's the possibility,

18      absolutely.  I believe that would occur if one

19      had a disruption of the layer.

20              That is occurring through the

21      tablet -- excuse me, during the coating process.

22              Q.    Let's look at the dissolution test

23      on the cores that Dr. Banakar testified about.

24      These four samples are shown in DX 1140 and 1143

1    that were added to the exhibit list before

2    trial -- right before trial.

3                    Are you aware of other dissolution

4    tests that were done at Andrx on the core?

5            A.    Yes, I am.

6            Q.    Let's look at PX 197A.

7                    And if you go to 63300.  Is this

8    the core for a 54-milligram tablet that is the

9    same formulation as the core in the ANDA

10   product?

11           A.    Yes, it is.

12           Q.    What is this showing?

13           A.    Well, it's clearly showing that

14   there's release within that first type area, as

15   you can clearly see here.  Not exceeding from

16   the graph, but you also see it in the figures

17   that are shown here.

18           Q.    Were there any other dissolution

19   rate diagrams that you located from Andrx's

20   production that shows a release of

21   methylphenidate from the DR-coated core within

22   the first hour?

23           A.    Yes, there were.

24           Q.    And can you identify the pages,

```
1     sir?

2              A.   In PX 557 at 46113 and 46114, also

3     in PX 563 at 66282.

4              MR. FOGEL:  Thank you.  I have no

5     further questions.

6              THE COURT:  All right.  Break for

7     lunch and then come back at 1:30.

8              MR. MUSGROVE:  That would be my

9     preference.

10             THE COURT:  Pardon.

11             MR. MUSGROVE:  Yes.  That would be

12    my preference.

13             THE COURT:  Okay.

14             THE CLERK:  All rise.

15             (Whereupon a luncheon recess was

16    taken.)

17             THE COURT:  All right.  Be seated,

18    please.  Good afternoon.

19             MR. MUSGROVE:  Your Honor, we have

20    a few exhibits books.  May we approach?

21             THE COURT:  Yes.

22                  CROSS-EXAMINATION

23    BY MR. MUSGROVE:

24             Q.   Good afternoon, Dr. Davies.
```

1        A.    Good afternoon to you.

2        Q.    Right at the end there, you cited

3    to a few documents and you said that those were

4    the same formulations as the ANDA batch.  Do you

5    recall that?

6        A.    I'm sorry, I didn't quite hear

7    you.

8        Q.    The dissolution documents that you

9    looked at right at the end, I believe you stated

10   that those were the ANDA, those were similar to

11   the ANDA batch?

12       A.    I think I stated that they --

13   they're essentially the same formulation.

14       Q.    And what --

15       A.    These were the same relative

16   ingredients, that's what I've said in my expert

17   report, that's what I tried to say earlier on.

18       Q.    And what did you do to determine

19   that those were the same formulations?

20       A.    I compared the actual formulation

21   formula to -- between the batches and to see

22   that they were indeed the same formulations with

23   the same kind of -- within the specification of

24   the ANDA batch.

1255

1    Q.   So you looked at the entire

2    specification of the ANDA batch in making that

3    determination?

4        A.   It depends what you mean by that.

5    I looked at the -- I think I highlighted in my

6    expert report, I looked at the formula which

7    showed the ranges for the ANDA batch, in other

8    words, it shown which ingredients are in which

9    portion of the formulation, and the ranges, and

10   then I compared that with those batches to make

11   sure that it was within those ranges.

12       Q.   And I have a few exhibits that are

13   not in your binder.

14           MR. MUSGROVE:  May I approach,

15   again, Your Honor?

16           THE COURT:  Yes.

17   BY MR. MUSGROVE:

18       Q.   Doctor, you understand that what

19   I've just handed you, DDX 1225, is the batch

20   record for the ANDA 54 milligram batch?

21       A.   You have handed me a document

22   which is a section of that portion, yes.

23       Q.   Okay.  And is that something you

24   considered in forming your opinion?

1          A.    I'm sorry, I can't hear you.

2          Q.    Is that something you considered

3     in forming your opinion?

4          A.    I looked at this information that

5     was provided which showed the ranges, the

6     formulae for all the different formulations,

7     where it would show, for example, the ranges of

8     the anticipated weights per tablet for the

9     different ingredients.

10         Q.    So is the answer to my question

11    you didn't consider that document?

12         A.    I considered a number of documents

13    when I looked at this, but I'm telling you

14    specifically what I compared the formulations to

15    those which are described within the ANDA batch,

16    the batch before that illustrates the ranges for

17    each particular dosage form and that's what I

18    compared it to.

19         Q.    So you focused on the ranges and

20    not the specific batch record; is that correct?

21         A.    Well, I focused on the actual

22    formulaes, the formulations, which includes the

23    ranges that were to be -- which was submitted to

24    the FDA as representative of the 18, 27, 36 and

1    54.

2         Q.    Doctor, I'm not sure, perhaps you

3    did answer my question, but I'm not sure.    Are

4    you saying you considered that document or not,

5    the actual batch record for the ANDA, did you

6    consider that or did you consider another

7    document?

8         A.    I considered the documents which

9    were in the ANDA which showed the formulary for

10   the different formulations of different 18, 36,

11   et cetera, 27 and 54, and compared that with the

12   batches that I saw for the 54, and that showed

13   that they laid within the specification for the

14   ANDA batches for the 54 milligram.

15        Q.    So you focused on the ranges in

16   the document, is that what you're saying?

17        A.    I'm not quite sure if I understand

18   you.    But Andrx has submitted a general

19   formulary where it says the formulations, all

20   the formulations for the 54 milligram will be

21   within a certain specification.    Within that

22   specification for certain components within

23   that, there are demonstrated ranges.

24              Now, when I looked at the

1    formulations to see whether they compared to

2    those that were within the ANDA batch, they

3    absolutely fall within those formulations

4    ranges.

5              Q.   Do you still have your white

6    binder, your binder that plaintiff's counsel had

7    handed you up there?

8              A.   Sorry.

9              Q.   Do you still have your binder that

10   plaintiff's counsel had handed you?

11             A.   Yes.

12             Q.   Can you flip through and identify

13   from that binder, if it's in there, which

14   document you're relying on?

15             A.   I'm afraid I can't find it.  I'm

16   not quite sure if it's here.  It's certainly in

17   my expert report which I described to you which

18   highlights particular figures which illustrate

19   the pages which I referred to directly.

20             Q.   Well, I'm not sure if this is the

21   document or not, but could you look at DTX 180

22   in here?

23             A.   Sorry, which one?

24             Q.   DTX 180.  Is that the document,

1    Doctor?

2            A.    Sorry?

3            Q.    Is that the document?

4            A.    I don't think so.  But I'll have a

5    quick check.

6                  Actually, yes, it is.  Thank you

7    very much, it is.  If you look on the -- let's

8    have a quick check.  I believe it is.  If I look

9    at my expert report, I would know exactly, but I

10   believe it is on a similar table that I see on

11   Andrx 04103, but I just want to absolutely

12   double-check with my expert report.

13           Q.    But you believe that's what it is?

14           A.    I said I would be very happy to

15   check my expert report, but this is the kind of

16   document that shows the compositional statements

17   for the different 18, 27, 36, and 54 milligram

18   were included in the ANDA.

19           Q.    And did you focus on -- under

20   each, under each of the weight percentages or

21   tablets, there is a weight-by-weight percentage.

22   Do you see that -- strike that.

23                 This document, if we look down at

24   the delayed release tablets, did you focus on

1    the weight-per-weight percentages there, or did

2    you focus on the range that would be permitted

3    in a tablet?

4        A.    I'm sorry, I don't -- I focused on

5    the whole document, so I would look at both the

6    milligrams per tablet and the percentage weight

7    by weight.

8        Q.    Well, with regard to your

9    consideration today as to whether or not these

10   particular formulations that you pointed out

11   were within the formulation that we're talking

12   about here, what did you look at in that

13   document?

14       A.    As I've indicated, I looked at the

15   whole thing.  I looked at both -- I looked to

16   make sure that all the ingredients were present

17   within the formulation.  I also looked to make

18   sure that the relative -- the weight percentage,

19   the milligrams per tablet, I looked at that as

20   well.

21       Q.    Did you look at the specific

22   weight percentage, or did you look at ranges

23   over here?  Did you look at the specific weight

24   percentages that are set forth?

1            A.    Perhaps if we -- if I show you

2    from my documents I could help you with that.    I

3    looked at both, but I made sure that the

4    formulation fell within the ranges as shown in

5    the documentation.

6            Q.    So you focused on the ranges?

7            A.    Both, I focused on everything.    I

8    made a check on everything.

9            Q.    But you don't know what you

10    focused on despite the fact that you testified

11    on direct that these batches are the same;

12    right?

13            A.    No, that's not true at all.    I

14    indicated on direct that I looked at the

15    formulation and I checked it against the

16    formulation for the ANDA batches such as this,

17    and I made sure that it fell within the ranges

18    that were shown for the ANDA batch.    It is the

19    same formulations, essentially the same as the

20    ANDA batch formulation.

21            Q.    Now, the document that I handed

22    you, DTX 1225, the batch record, was that

23    something that you considered?

24            A.    I'm sorry?

1          Q.   Was that something you considered,

2     DTX 1225?

3          A.   I very well may have considered it

4     in this approach, but I particularly focused on

5     the table such as this and I compared it with

6     the data, where I looked at the batch record for

7     those formulations, compared what was on the

8     batch records to such a table and it's clear

9     that those formulations lie within the range for

10    the ANDA batch.

11              MR. MUSGROVE:  And, Your Honor,

12    unfortunately this is a fairly big document, but

13    I only have one copy.  May I approach?

14              THE COURT:  Yes.

15    BY MR. MUSGROVE:

16         Q.   This is DTX 1226 I have handed to

17    the witness.

18              Doctor -- well, let me let you

19    clean up a little bit.

20         A.   Thank you.

21         Q.   And my question is with regard to

22    the testimony you gave today on direct with

23    regard to the similarity of formulations, was

24    that a document you considered?

1263

1      A.    The documents that I referred to I

2    referred to in my expert reports and I wish I

3    could show that to you and illustrate that to

4    you directly, but I compared the information,

5    the batch record for the formulation and

6    compared it to such a table as this to

7    illustrate that it fell within the range,

8    essentially the same formulation that's used in

9    the ANDA batch.

10      Q.    And you didn't feel that necessary

11    to talk about those specific documents on

12    direct?

13      A.    I'm very happy to do it now if you

14    want to do it.

15      Q.    Doctor, could we put up, or could

16    we put up PTX 197A.  It's in your white binder,

17    I believe.  And specifically page 63300.  And if

18    we could just enlarge that.

19           Now, Doctor, this was the one

20    specific document you testified about on direct;

21    correct, that we saw on the screen?

22      A.    I believe there is the document

23    that I testified to illustrate that it was

24    release within the first hour.

1          Q.    We don't have a first hour time

2    point on this document, do we, Doctor?

3          A.    Well, we clearly have release

4    after an hour-and-a-half.  The first time

5    interval, that clearly indicated to me that

6    there -- drug has been released during that

7    period.

8          Q.    Well, Doctor, that's because if

9    you get release at one-and-a-half hours and you

10   draw a straight line, it is going to look like

11   there is release at one hour; correct?

12         A.    As a scientist as I look at this,

13   does this mean that there is release during that

14   period from zero to one-and-a-half hours?

15   Absolutely, there is.

16         Q.    Okay.  And you do recall, though,

17   with regard to the documents -- were you here

18   when Dr. Cheng testified, were you in court that

19   day?

20         A.    I believe I was in court when she

21   testified.

22         Q.    And you recall the documents that

23   she looked at actually had the one hour time

24   point release; is that correct?

1265

1     A.    I don't recall that, actually.

2         Q.    Now, I'd like to -- on direct you

3     testified that like yourself, Dr. Banakar,

4     defendant's expert, thought that skill in the

5     art was high.  Do you recall that?

6         A.    Yes, he stated that in his expert

7     report.

8         Q.    If we could look at paragraph --

9     I'll represent this is Dr. Banakar's report.

10    Are you focusing on paragraph 125, it's my

11    opinion that because the relative skill of a

12    person of ordinary skill in the art is high,

13    this factor weighs in favor?

14        A.    You're drifting away slightly.

15    Are you saying -- yes, I was focusing on 124 and

16    125 where he says the relative skill in the art

17    is high.

18        Q.    Did you focus on his actual level

19    of skill in the art that he set forth in the

20    same document?

21        A.    Well, I focused on the fact that

22    he stated that the relative skill was high, and

23    I would have to agree with him on that respect.

24        Q.    Do you recall what Dr. Needham's

126

1    skill in the art was?

2         A.   Much lower, actually, as indicated

3    by Dr. Needham.

4         Q.   If we could go back to the Elmo

5    again, please.  If we could look at paragraph 28

6    which is the beginning of Dr. Banakar's skill in

7    the art.  And Dr. Banakar talks about he would

8    expect such persons to minimally have a college

9    degree in pharmacy, BS or Pharm D., in some

10   closely related discipline, that doesn't sound

11   like a very high skill, does it?

12        A.   Actually, that's quite different

13   even to Dr. Needham.  In fact, if you look at

14   that, he's saying they should have a background

15   in pharmacy or chemical engineering.  He also

16   went on to say that they should have a number of

17   years experience.  That's quite different to

18   what Dr. Needham says.  So Dr. Needham and

19   Dr. Banakar are disagreeing with each other.

20             I just have to think based on my

21   experience, my knowledge of the last twenty

22   years, pharmaceutical industry, that that is the

23   person of experience in the art, of ordinary

24   experience in the art, that's my view.

```
 1          Q.    And your person of ordinary skill
 2     in the art requires a Ph.D., don't they?
 3          A.    I believe that the majority, it's
 4     typical of individuals who are ordinary skill in
 5     the art practicing formulation science within
 6     the pharmaceutical industry would have a Ph.D.,
 7     particularly in respect to this particular
 8     litigation would have three years experience in
 9     the controlled release field.   That's my
10     experience because, you know, over eighty and
11     ninety of my people have got into industry, I
12     know what they have been doing, industry is
13     supported by my work for years, I know what
14     these people are, I know what the ordinary skill
15     in the art is.
16          Q.    Doctor, with all due respect, I
17     don't think you're answering my question.   Your
18     ordinary skill in the art requires a Ph.D.,
19     doesn't it?
20          A.    I think a person of ordinary skill
21     in the art I would say would require a Ph.D.   Is
22     it possible for an individual who spends many
23     years in the industry without a Ph.D. to get to
24     that level?  Of course.  But I am saying that a
```



1   person of ordinary skill in the art would have a

2   Ph.D. and three years experience in controlled

3   release.

4           Q.    Okay.  And to your understanding,

5   people at ALZA that were assigned the actual

6   process as far as working on the process, they

7   don't meet that level of skill in the art;

8   correct?

9           A.    I don't think that's true.  I

10  think many of the people who were assigned that

11  particular project do.  But there were also

12  individuals who had decades of experience who

13  didn't have a Ph.D., but that had decades of

14  experience who were quite different to the

15  person of skill in the art that Dr. Banakar or

16  Dr. Needham would like you to believe.  So I

17  think that's much more consistent with my view.

18                  MR. MUSGROVE:  Can I approach,

19  Your Honor?

20                  THE COURT:  Yes.

21  BY MR. MUSGROVE:

22          Q.    Is this your deposition, Doctor?

23          A.    That's correct.

24          Q.    Could you turn to page 200 of your

1269

1    deposition?

2        A.    Sorry.  Pardon.  Which page?

3        Q.    200.

4        A.    Thank you.

5        Q.    Actually if we could start at 199.

6    Are you there?

7        A.    Yes.

8        Q.    And if we start about line 12, I

9    asked you:

10            "Well, let's just take your

11    specific example.  You say a Ph.D. and three

12    years' experience in industry.  Would -- if they

13    didn't have a Ph.D., is there some amount of

14    experience that could substitute for that

15    advanced degree, or is a Ph.D. an absolute

16    requirement?

17            "Answer:  All I know is that

18    somebody of ordinary skill in the art in this

19    area, particularly in the controlled release,

20    would have a Ph.D. level, would have -- be given

21    this goal, would have three years -- in my view,

22    three years' experience in the field."

23            And I asked you:

24            "If they'd worked for, say, 20