1    years in the field of controlled release but

2    didn't have a Ph.D., could that person still be

3    within the skill of ordinary -- one of skill in

4    the art?

5                   "Answer:  Well, that's a very

6    different person than Dr. Needham's documented.

7    Dr. Needham's talking about a person with one

8    year's experience in controlled release.

9                   "Question:  That's not the

10   question I asked you.  This is important.

11   Forget for a moment what you're responding to

12   with Dr. Needham or what you think Dr. Needham

13   said and listen to my questions, which may not

14   be very precise, but then just tell me if

15   they're not precise and I'll do better, or try.

16   My question is, is there any level of experience

17   in industry in the field of controlled release

18   in your view that would substitute for the

19   advanced degree with regard to the person of

20   ordinary skill in the art under your standard?

21                   "Answer:  Well, look.  This is

22   meant to be a person of ordinary skill in the

23   art, the typical individual who would be at that

24   level, and the typical individual would that

1    level would have a Ph.D. and three years'

2    experience.  That's just my view.

3                    "Question:  I understand that, but

4    that doesn't answer my question.

5                    Answer:  But that -- this is about

6    the typical individual.  There may be, for

7    example, an individual who's been in a company

8    for 20 years and has been on courses, external

9    courses, who's developed particular expertise

10   that can facilitate, and -- but that's a very

11   different individual than Dr. Needham is talking

12   about.  Those individuals, to be frank, are the

13   exception.  As I sit here today, I cannot think

14   of an individual who I know has had a major

15   impact on the development of a product in the

16   pharmaceutical industry that I've been involved

17   with who hasn't had a Ph.D.

18                    "Question:  With regard to the

19   typical person then, it's your view that a Ph.D.

20   is required, fair?  Setting aside --

21                    "Answer:  A person of ordinary

22   skill in the art in controlled release would

23   have a Ph.D."

24                    Did I ask you those questions and

1    did you give those answers?

2            A.    And that's very similar to what

3    I've just told you just now.  It's absolute

4    true, a person who is typical skilled in the art

5    would be an individual who had a Ph.D. and three

6    years experience.  Remember, as the secretary of

7    the Controlled Release Society, I meet

8    individuals from all over the world who are

9    developing these formulations and that's

10    absolutely true.  So it is true.

11            Q.    Doctor, during the -- you

12    testified about claim construction on direct as

13    well; correct?

14            A.    That's correct.

15            Q.    With regard to claim construction,

16    you were talking about what type of dosage forms

17    would be included within the claim, do you

18    recall that?

19            A.    Sorry, I didn't quite hear you.

20            Q.    With regard to your direct, do you

21    recall testifying about what types of dosage

22    forms would be included within the claims?

23            A.    I did talk about that.

24            Q.    Now, with regard to the Court's

1    claim construction in this case, you actually

2    submitted a declaration regarding what a dosage

3    form should be; correct, sir?

4           A.    In my expert reports, I described

5    what I think in terms of the claims, in terms of

6    the patent, I described what I think the dosage

7    forms should be, and I said that should be oral

8    dosage forms, capsules and tablets.

9           Q.    I'm not asking about your expert

10   report.

11          A.    I'm sorry.

12          Q.    During claim construction in this

13   case, you put forward a definition of the term

14   dosage form, did you not?

15          A.    You mean in my direct testimony?

16          Q.    No.    I'm asking you, you put in a

17   declaration during claim construction.    Do you

18   recall that or not?

19          A.    I have written a number of reports

20   and I'm sure I talked about what would be the

21   appropriate dosage form for this patent.

22          MR. MUSGROVE:    May I approach,

23   Your Honor?

24          THE COURT:    Yes.

1    BY MR. MUSGROVE:

2        Q.    It's been marked as PX 132.  Take

3    a few moments if you need to orient yourself?

4        A.    No, this is my response to the

5    Markman brief, yes, I remember this.

6        Q.    Okay.  And in your response to the

7    Markman brief, you provided a specific

8    definition for the term dosage form, didn't you,

9    Doctor?

10        A.    That related the fact that the

11    interrelationship between pharmaceutical

12    composition and dosage form.

13        Q.    Yes.

14        A.    I do make a comment about that,

15    yes.

16        Q.    And your definition is on

17    paragraph 18, on page eight of the document?

18        A.    Sorry, yes.

19        Q.    That's your definition on

20    paragraph 18; correct?

21        A.    Well, that's a point that I'm

22    making regarding dosage form and

23    pharmaceutically acceptable composition.  But

24    I'm saying they can apply any type of sustained

1    release mechanism as long as the dosage form

2    provides an ascending release rate of

3    methylphenidate over an extended period of time

4    or an ascending methylphenidate plasma

5    concentration.  And that's entirely consistent

6    with my view as expressed throughout my expert

7    reports, that such a dosage form would be an

8    oral tablet.

9            Q.    Before we get there, you said that

10   they're the same; correct?

11           A.    I'm sorry?

12           Q.    You said the dosage form and

13   pharmaceutical composition are the same?

14           A.    Yes.

15           Q.    Your familiar with the Court's

16   claim construction in the case, correct?  Can we

17   pull up --

18           A.    I'm not quite sure.

19           Q.    If we could look at paragraph one

20   up here.  The term dosage form means a

21   pharmaceutical composition just like you said,

22   Doctor; right?

23           A.    I believe that it said a

24   pharmaceutical composition that includes a dose

1    of methylphenidate, that's correct.

2         Q.   Then on direct you started going

3    through immediate release from the other

4    portion, all of this to come to an oral dosage

5    form.   If you wanted to say the dosage form

6    meant oral dosage form, why didn't you just do

7    it here?

8         A.   I am sorry, I don't really

9    understand you.   I was just describing the

10   different types of release mechanisms that one

11   could have.   That could be -- one could have

12   different kinds of release mechanisms and

13   different formulations, but they would all

14   contain a dose of methylphenidate.

15        Q.   Right.

16        A.   And they would all be a

17   pharmaceutical composition that includes a dose

18   of methylphenidate.

19        Q.   Right.   And if you had understood

20   the claims to be limited to an oral dosage form,

21   you could have said so right here; right?   With

22   regard to your definition that we looked at in

23   paragraph 18 of your declaration, you could have

24   said dosage form means an oral dosage form;

1277

```
 1    correct?

 2            A.    I think that's sort of -- that's

 3    reading something without actually acknowledging

 4    the breadth of the opinion that I provided which

 5    clearly states that my view is that this patent

 6    relates to dosage forms which are oral dosage

 7    forms, tablets and capsules.  To read that in

 8    that way would be to ignore the whole body of

 9    the evidence that I've provided.

10            Q.    Well, Doctor, when you said that

11    the dosage forms are now limited to oral dosage

12    forms due to the Court's claim construction, you

13    actually turned to paragraph two of that

14    construction, didn't you?

15            A.    During my direct testimony?

16            Q.    Yes.

17            A.    I talked about paragraph two.

18            Q.    And that's what gets you to the

19    oral dosage form in your opinion; right?

20            A.    No.  It certainly reaffirms my

21    opinion that it's an oral dosage form, but I had

22    already provided evidence that I believed such

23    dosage forms, oral dosage forms were covered by

24    this particular patent, particularly tablets and
```

1    capsules.  I said that in my reports, all the

2    reports that I provided.

3              Q.   And did you say it in your

4    declaration where you provided a definition of

5    dosage form that just said a pharmaceutical

6    composition?

7              A.   I don't quite understand what

8    you're saying, but my declaration was over key

9    points.  If you read the whole body of the

10   evidence of my reports, it clearly highlights

11   that I believe that oral dosage forms, tablets

12   and capsules are enabled by this patent.

13             Q.   Doctor, we are going to pull up

14   paragraph 18 of your declaration again.  And you

15   said the phrases dosage form and

16   pharmaceutically acceptable composition as they

17   are used in the claims of the patents cover

18   dosage forms that employ any type of sustained

19   release mechanism.  Right?

20             A.   Provided that system gives an

21   ascending release rate of methylphenidate over

22   an extended period of time or substantially

23   ascending methylphenidate plasma concentration.

24   That would be done through an oral delivery

1    system, a tablet or a capsule.

2         Q.   Doctor, you'll agree with me --

3    this is just reading the rest of the patent,

4    right, or the claim, you didn't provide a

5    definition in your declaration for this

6    ascending release rate; correct?

7         A.   Well, I have read the patent and I

8    understood what the patent meant.  From my

9    perspective, and I just presented that I felt

10   that a dosage form and a pharmaceutically

11   acceptable composition would employ a release

12   mechanism that would give an extending release

13   rate of methylphenidate over an extended period

14   of time or some substantially ascending

15   methylphenidate plasma concentration.

16        Q.   Doctor, let me make it simple.  If

17   you meant a dosage form meant an oral dosage

18   form, why didn't you say so in your definition?

19        A.   But one would read all the

20   documents that I provided which included clear

21   direction that I as an expert clearly indicated

22   that oral dosage forms are enabled by this

23   patent.  In fact, I focused on oral dosage forms

24   in a way that Dr. Needham and others,

```
 1        Dr. Banakar, did not do.  And I clearly
 2        indicated that I feel that the -- those dosage
 3        forms are enabled by the claims in this patent.
 4             Q.   I understand the enablement
 5        question.  This is a document that you provided
 6        along with counsel to the Court for the Court to
 7        construe the claims; correct?  Correct, yes or
 8        no?
 9             A.   I also not only in paragraph 18,
10        but in other aspects of this declaration,
11        paragraph 26 I reprise the text that's within
12        the patent which clearly highlights a number of
13        oral delivery systems.
14             Q.   But, Doctor, I'm not asking you a
15        question as to whether oral dosage forms are
16        dosage forms, I think we all agree they are.
17        The question is:  Do the claims go beyond oral
18        dosage forms?  And you could have said they
19        don't, you could have told the Court these
20        dosage forms mean oral dosage forms, and you
21        didn't, did you?
22             A.   I clearly indicated -- I disagree
23        with you, because if you look at the whole body
24        of evidence that I have provided to the Court on
```

1281

1    a number of my expert reports, I clearly

2    indicate that I believe oral dosage forms are

3    enabled by this patent.

4           Q.   Doctor, before the claim

5    construction was issued by the Court, did any of

6    those expert reports of yours actually go into

7    the Court to clarify what you meant here?

8           A.   I am not a lawyer, I don't

9    understand the process.  All I do is that I'm

10   asked to provide evidence, my expert opinion,

11   and that's essentially what I did.  I believe

12   the claims enable one to make oral dosage forms

13   and that's what I've said repeatedly.

14          Q.   But that's not what you said right

15   there, is it, Doctor, in paragraph 18?  And I'll

16   represent to you --

17          A.   I'm not sure I disagree.  I'm not

18   sure I agree with you.  I think one should look

19   at the whole body of information that I provided

20   to the Court.

21          Q.   But now that the Court has

22   construed this in a way that it just includes

23   pharmaceutical compositions, then you tracked

24   through paragraph two to come to your conclusion

1    that dosage form is actually more limited;

2    correct?

3          A.   No, that's not correct.  I have

4    always indicated that I felt that they were oral

5    dosage forms that were enabled by this patent

6    before the claim construction came out from the

7    Court.  It's clear from my, all my expert

8    reports that that's what I believe is the case.

9    And that's what I have said today in my direct.

10         Q.   Now, with regard to your

11   enablement analysis, you only considered your

12   own standard of a person of ordinary skill in

13   the art in coming to that analysis; correct?

14         A.   I believe my enablement -- my

15   person of ordinary skill in the art is correct,

16   and I use that to insure that the patents would

17   be enabled.

18         Q.   And you had Dr. Needham's report

19   in hand when you considered the enablement

20   question; correct?

21         A.   Well, I don't believe I had read

22   Dr. Needham's report, but as I've indicated, I

23   do not agree with Dr. Needham that a person of

24   ordinary skill in the art has such a low degree

1283

```
1       of skill in the art.  I think that was set

2       artificially low to insure that the individual

3       could never develop any formulations.

4              Q.   So when you served your rebuttal

5       report, what were you rebutting if you hadn't

6       read Dr. Needham's report at that point?

7              A.   I'm not sure I understand you.  I

8       had read Dr. Needham's reports and I understand

9       his view, I just don't agree with it.  I believe

10      he is setting a standard so low that it would

11      make it difficult for an individual to achieve

12      the enablements of the patent.  And, of course,

13      he's deliberately setting it so low for that

14      reason.

15             Q.   Now, Dr. Needham worked at

16      industry a lot more than you have; correct?

17             A.   I'm not sure that's the case.

18      Bear in mind that I'm a chairman of Molecular

19      Profiles.  Molecular Profiles a successful

20      company.  We have been rewarded by the Phamraco,

21      nationally with the Queen's Award, we employ

22      twenty-eight people, we have over eighty clients

23      drawn from the pharmaceutical industry.  We work

24      with them every day helping them to solve their
```

1    problems, helping them to understand their

2    formulations.

3                Plus in my own academic group, I

4    have a large interest in the pharmaceutical

5    industry.  So I think I have great

6    representation and understanding what the

7    pharmaceutical industry is required.  I also --

8    you know, many of my students have gone on to be

9    highly -- have highly successful careers in the

10   pharmaceutical industry.

11            Q.    Now, Doctor, when did you found

12   Molecular Profiles, was it 1997?

13            A.    It's around that time, 1997.

14            Q.    That's after the person of

15   ordinary skill in the art that we're looking at;

16   correct?

17            A.    I'm sorry?

18            Q.    We're looking at 1996; correct?

19            A.    We are indeed.

20            Q.    Before 1996, Dr. Needham had

21   worked in industry a lot more than you had;

22   correct?

23            A.    Again, I'm not sure that's -- I

24   had tremendous direction with the pharmaceutical

1    industry, they had helped support a lot of my

2    research, my students were going to work in

3    industry, the industry were approaching me to

4    essentially do what I do within Molecular

5    Profiles, but do that within the university.

6    They had been doing that since I joined the

7    University of Nottingham, so you know, I think I

8    have a great appreciation of what a person of

9    ordinary skill in the art is in industry.

10         Q.   Had you actually worked in

11    industry as like a product development person to

12    assign work to actual industry people who

13    develop dosage forms by 1996?

14         A.   I had worked within industry doing

15    -- by 1996, I had worked at Rosch

16    Pharmaceuticals, I had been part of formulation

17    teams where a person of ordinary skill in the

18    art was an individual who had a Ph.D. and three

19    years experience in controlled release

20    formulations.

21              During my Ph.D., I also worked at

22    Mann Baker, another pharmaceutical firm.  Again,

23    the people that I was working with in making

24    formulations, those who had ordinary skill in

1    the art had a Ph.D. with at least three years

2    experience, particularly in the controlled

3    release formulations.  So even from those early

4    stages when I was doing my Ph.D. and my

5    preregistration, that was the ordinary skill in

6    the art.

7              Q.    You worked at Rosch for all of six

8    months; right?

9              A.    Yeah, quite intensive six months

10   where I did whole range of different

11   formulations, worked a whole range of different

12   research teams.  I worked with Mann Baker, and

13   then when I came to Nottingham, a lot of my work

14   was sponsored by the pharmaceutical industry.  I

15   got to know people working in research teams

16   within the different pharmaceutical industry.

17   My students went there as well.

18             Q.    Are you done?

19             A.    I am indeed.

20             Q.    Now, most of -- in fact, pretty

21   much all the art that we looked at that you said

22   would help one of ordinary skill in the art come

23   to a dosage form so easy was available by 1996;

24   correct?

1287

1    A.    Well, you know, when I did the

2    search to, you know -- it was -- I knew what I

3    was looking for, the patent taught me what to

4    look for and the examples I show were

5    illustrative of what was in the literature, and

6    that was all published before 1996.

7    Q.    Now, your experience -- based on

8    your experience with the industry, product

9    development in the pharmaceutical arts is an

10   iterative process; correct?

11   A.    Depends what you mean by an

12   iterative process.  A formulation scientist

13   would be assigned a particular formulation, and

14   for example, if it was the formulation such as

15   this, an extended release formulation, they

16   would be told this is the kind of release

17   profile we require.  And based on this, the

18   skill of ordinary skill in the art, they would

19   design a system to meet that formulation.  And

20   that would be routine.

21   Q.    Right.  What you do basically is

22   you try an approach, you test it to see if it

23   works and then if it doesn't, you modify it

24   until it does; correct?

1           A.    The normal formulation would

2    undertake an approach where one would design a

3    system to achieve a particular release rate, one

4    would make that system, test it, one may need to

5    modify or tune that system to achieve the

6    release rate, that's normal routine formulation

7    science.

8           Q.    Could we pull back up PX 707,

9    please.  Doctor, have you ever seen a dosage

10   form that looks like this?

11          A.    You're missing the point actually.

12   What this illustrates very clearly that in the

13   art was information about how to make a dosage

14   form where one changes the surface area to

15   achieve ascending release rate, and this was a

16   text that was provided to those of ordinary

17   skill in the art.  What it teaches you is to

18   think about a formulation where you could change

19   the surface area and one could make such a

20   formulation, which would change the surface area

21   to increase the release rate.

22          Q.    Could you take that orally?

23          A.    One could take a system such as

24   that orally within a capsule formulation.

1289

1      Q.   Now, if we go to PX 470.  If we

2   look -- go to the next page, please.  If we look

3   down at Figure 1, that says it's a target

4   dissolution; correct, Doctor?

5      A.   Sorry?

6      Q.   That's a target dissolution

7   profile?

8      A.   It does.  That's kind of typical

9   what one would get as a formulation scientist.

10  One would be told this is the kind of release

11  rate that we require, because we know that we

12  need to achieve a certain kind of release rate

13  to achieve the appropriate plasma concentrations

14  profile.  And that's what one would get.

15       And this patent describes some

16  target profiles and then it illustrates real

17  life examples which can achieve those profiles.

18  Actually the next patent, the Mehta patent shows

19  real life examples plus the real life

20  dissolution profiles.  These are things which

21  are routine within the pharmaceutical industry,

22  particularly to one of ordinary skill in the

23  art.

24      Q.   Doctor, you don't know if any of

1    these dissolution methods that you talked about

2    would actually work with methylphenidate;

3    correct?

4         A.   Oh, as a formulator who designs

5    formulations, I would use this information to

6    show that, in fact, one could make formulations

7    with methylphenidate.  There is no reason why

8    not absolutely one could do that.

9         Q.   Do you know if they would work?

10        A.   I'm sorry?

11        Q.   Do you know if they would work if

12   you made them?

13        A.   I'm sure a formulations person of

14   ordinary skill in the art based on this art

15   which was available and existing in 1996 would

16   have made formulations based on methylphenidates

17   which could achieve the appropriate release

18   profile that's required by the patent.  That's

19   what the patent says, the patent says that such

20   systems are able to achieve that release rate.

21        Q.   In your estimation, Doctor, how

22   many ascending release rate dosage forms could

23   one of ordinary skill in the art had made in

24   1996 with an ascending release rate of

1    methylphenidate?

2         A.   Just for me to understand your

3    question, are you talking about a formulator in

4    an industry or are you talking about --

5         Q.   I'm talking about one of ordinary

6    skill in the art, your person of ordinary skill

7    in the art, how many could they have made?

8         A.   Sure.   If a person of ordinary

9    skill in the art was presented with the

10   ascending release profile and said please

11   prepare a dosage form for methylphenidate to fit

12   that ascending release profile, they would have

13   been able to make such a formulation based on

14   the very simple materials that were provided

15   using conventional pharmaceutically accepted

16   materials that would have been used in 1996 that

17   are shown in this patent and in the next, one

18   could have made a formulation that would quite

19   easily with routine experimentation.

20        Q.   You keep saying a formulation.

21   How many could they have made?

22        A.   Oh, I think I have shown that they

23   could have made a number of different

24   formulations.   They could have made formulations

1    which where the formulation is based on beads

2    with different coatings, that's clearly

3    illustrated here.  One could have also made

4    formulations which are based on matrix tablets,

5    again, with different coatings.  A whole variety

6    of formulations that one could have made.

7          Q.   Could they have made more than

8    ten?

9          A.   I don't know.  A formulation

10   scientist who was presented with this problem in

11   industry would just simply say fine, somebody

12   with ordinary skill in the art would be able to

13   make a number of different formulations which

14   could enable the claims.

15         Q.   Could they make more than ten?

16         A.   I'm sure I could personally.  I'm

17   sure they could make more than ten different

18   formulations based just around these beads let

19   alone start considering formulations based

20   around tablets.  One can imagine a whole variety

21   of formulations.

22         Q.   Now, you reviewed Dr. Needham's

23   report; correct?

24         A.   I did review his report.

1293

1    Q.   But you didn't review the

2    prosecution history, did you?

3    A.   I think I said to you at

4    deposition that I did not, other than the few

5    portions that he cited in one of his reports I

6    saw, but I did not review the prosecution

7    history.

8    Q.   Doctor, could you turn to DTX

9    1144, please, in your binder, your black binder?

10   A.   The big binder?

11   Q.   The black binder.  You can set the

12   big one aside.

13   A.   This one?

14   Q.   No, set the big one aside.  It's

15   this one, the black one.

16   A.   Sorry, could you just repeat

17   again.

18   Q.   Sure.  DTX 1144.  Just let me know

19   when you're there.

20   A.   Okay.

21   Q.   And if you look at DTX 1144, do

22   you know any of the names on the front of this

23   patent application, Larry Hamel, Atul Ayer, are

24   those the ALZA people who developed their

1    formulation?

2            A.    I believe I may have met one or

3    two, but I can't recall them personally.

4            Q.    You probably met Dr. or Mr. Ayer

5    in the last week or so?

6            A.    Yes, I did meet him, that's

7    correct.

8            Q.    Now, just to reorient ourselves,

9    all the art that you cited about ascending

10    release rates was art prior to 1996; correct?

11            A.    I cited art which is prior to

12    1996, which is published well before 1996, yes.

13            Q.    And you met personally Mr. Ayer,

14    did you find him skilled in the formulation

15    arts?

16            A.    We didn't have that kind of

17    discussion, actually, we had a social discussion

18    about the weather in Delaware and how pleasant

19    it was, or not as the case may be.

20            Q.    Could we turn to page three of

21    this document.  It's PALZ 0000829 in the bottom

22    right.  If you want, Doctor, it may be easier to

23    look at the screen.

24            A.    I got page three.

1        Q.    If we could pull up this paragraph

2    right here.

3              Now, this is what the inventors

4    said as of 1996, they said that the above

5    presentation that they just went through teaches

6    that a critical and pressing need exist for a

7    novel dosage form for delivering a drug that

8    overcomes the shortcomings known to the prior

9    art.   That is, a long-felt need exist for a

10    dosage form for delivering a drug in a

11    substantially ascending rate that simultaneously

12    reduces or eliminates the need for frequency of

13    daily dosing.   Do you see that, Doctor?

14        A.    I see that's what's written, but I

15    think the whole tenant of this proposal is based

16    around the treatment of quite different to what

17    is being shown here, if you will read the whole

18    document, you'll see that it is trying to teach

19    for the treatment of attention deficit

20    disorders.

21        Q.    Doctor, this talks about a dosage

22    form, right, not a method, not anything else,

23    just a dosage form; correct?

24        A.    But you're taking one small

1296

1    section of the whole patent and illustrating it.

2        Q.   You'll agree with me that this

3    says a long-felt need exists for a dosage form.

4    And my question for you is, if it's so easy to

5    make a single dosage form that has an ascending

6    release rate, why are the inventors, all the

7    formulators on ALZA's project calling it a

8    critical and long-felt need to make such a

9    dosage form if it's so easy?

10       A.   Because in the context of the

11   therapeutic need they were trying to address.  I

12   would ask you also to look at the prior art that

13   I've shown as illustrated that it was entirely

14   feasible to achieve ascending release rates.

15       Q.   Now, go back for a moment to the

16   dissolution data that we talked about earlier,

17   is it your understanding that an actual batch of

18   each strength of tablets of Andrx's tablets was

19   submitted to the FDA in connection with each of

20   Andrx's ANDA's, do you understand that?

21       A.   No, you said it rather quickly.

22       Q.   Sure.  Is it your understanding

23   that an actual batch of each strength of tablets

24   was submitted to the FDA in connection with each

1297

1    of Andrx's ANDAs?

2         A.   Do you mean that they submitted

3    information about each of the -- each of the

4    strengths that they used?

5         Q.   They submitted actual physical

6    tablets, didn't they?

7         A.   I would have to look at that.  I

8    can't recall.

9         Q.   The pages that you cited as

10   showing dissolution during the first hour, the

11   ones you cite on your direct, are they

12   describing experiments with those ANDA

13   submission batches?

14        A.   They are described from

15   information that I saw from the -- what I view

16   to be related to ANDA.

17        Q.   They are not the actual ANDA

18   batches, are they, sir?

19        A.   They're exactly what I said in

20   terms of they're within the specification,

21   they're essentially the same formulation that

22   was used in the ANDA.

23        Q.   Did you cite to any experiments

24   with any delayed release coatings that were

1    actually included in the ANDA batches?

2           A.    Sorry, did I cite where, in my

3    direct?

4           Q.    Yes.

5           A.    I was just illustrating the point

6    that it had been suggested that in previous

7    testimony that there was no drug release from

8    the DR tablets before a certain time period.  I

9    was just illustrating that in some respects that

10   was highly selective use of data.

11          If you looked at the whole breadth

12   of data, you'd see that they were examples where

13   there was, in fact, drug release from such

14   formulations in the zero to one-and-a-half hour

15   point even though, you know, as I said in my

16   direct, I don't agree with such an approach in

17   assessing drug release.  I believe in looking at

18   the final formulation.

19          Q.    Do you believe that the batches on

20   the pages you cited have the same percentage of

21   ingredients as the actual submission batches?

22          A.    I believe as what I said in my --

23   when we started on this cross, that they fall

24   within the same ranges as is shown in the ANDA

1299

1   batch.  I clearly describe that to you.

2           Q.   And you focused on the ranges;

3   right?

4           A.   I focused on the whole body of

5   information in coming to that view.

6           Q.   You focused on the possibilities

7   of what might be sold; right?

8           A.   No.

9           Q.   You understand that with regard to

10  ANDA batches, you focus on what's likely to be

11  sold, you understand that?

12          A.   That's quite different.  You asked

13  me a different question.

14          Q.   I know.

15          A.   I was actually looking at --

16  sorry, I was actually looking at the table which

17  showed the formulary for the ANDA batches, it

18  showed the ranges of that formulae for that ANDA

19  batches.  And then if you look at the batches,

20  the information that we looked at, those indeed

21  fall into those ranges.  They're essentially the

22  same.

23          Q.   And you figured out well, if I set

24  this range here and that range here, possibly

1    some of these could fall within; is that what

2    you did?

3              A.    No.    I looked at the formulation

4    that was used to produce those dissolution

5    measurements which showed that there was release

6    in the zero to one-and-a-half hour time point,

7    and I looked at those formulations and those

8    formulations are essentially the same as used in

9    the ANDA batch.

10             Q.    If you focus on the ranges; right?

11             A.    No, if you focus on all the

12   information.

13             Q.    Okay.    Do you have any evidence

14   other than the ranges that the lots you referred

15   to are likely to be sold following approval?

16             A.    As I said, I looked at all the

17   information that was available to me to come to

18   that view.

19             Q.    Now, Doctor, I think pretty much

20   every other witness that plaintiffs put up as an

21   expert I heard asked about how many times they

22   have testified at trial, but I didn't hear that

23   with regard to you.    How many times have you

24   testified at trial?

1301

```
1          A.   This is my third trial.

2          Q.   How many times have you testified

3     at deposition just in ANDA cases?

4          A.   I think that would be on the order

5     of -- I have done that in five or six different

6     cases over ten years.

7          Q.   How many depositions in those five

8     or six cases?

9          A.   Well, it depends.  I guess in this

10    case I have had one.  And in most of the cases

11    I've had one.  I was involved in a case,

12    Prilosec, where I may have had say four or five

13    different depositions.

14         Q.   You have been involved in some of

15    the ANDA cases that had a lot of defendants;

16    correct?

17         A.   Yes, there was one particular case

18    which had a lot of defendants.

19         Q.   Now, stepping back for just a

20    moment to the batches that you talked about, you

21    would agree with me that the thickness of the

22    coating on any particular batch would make a

23    difference as to when it releases?

24         A.   It depends what you are talking
```

1    about.  You would have to place that in context.

2    If you're talking about those samples that we --

3    that I showed and illustrated, those samples

4    fell within the range of thickness that would be

5    required for the ANDA batch.

6            Q.   Could you turn -- I apologize, I

7    had you set down your big binder.  Could you

8    turn to in your big binder to PX 557?

9            A.   Yes.

10           Q.   And I think you cited to page

11   46113, when you get there.  And we can bring it

12   up on the screen if it makes it easier, Doctor.

13   Can we go to 46113, please.  If we can blow this

14   up, just the tables up here right now.

15                Now, you would agree that there is

16   quite a difference in the thickness of the

17   coating here; correct, Doctor, 11 milligrams

18   worth of coating, and that's the delayed release

19   coating versus 17 milligrams?

20           A.   I don't know.  Could you show me

21   the whole page again?

22           Q.   Sure.  We can bring up the whole

23   page.  It's hardly legible when you put up the

24   whole page.  But here we go, the tables were up

1  here and here is the dissolution chart down

2  here.

3          And so my question was, I think

4  this lays out the information you need, there is

5  lot numbers, milligram coating, this one talks

6  about 11 milligram coating and a 17 milligram

7  coating?

8          A.  Thank you for pointing that out.

9  That's really quite important.  That is

10  equivalent, Your Honor, to the range that is

11  satisfied within the ANDA batches.  So you're

12  allowed to have 11 milligram at the lower range,

13  you're allowed to have 17 milligram at the top

14  end.  What this shows is the batch, the top

15  batch falls absolutely bang in the range for

16  ANDA batches that they describe, and that shows

17  that you do get release within the first

18  one-and-a-half hours.  In fact, you get release

19  in the first hour.

20          Q.  You would say these are both

21  within the ANDA batch; right?

22          A.  If you do the math and calculate

23  for these different rates, you can show -- I

24  believe you can show that they fall at the

1    extremes of the ranges.

2            Q.    So you think 17 milligrams is at

3    the extreme of the range; correct?

4            A.    Sorry, I didn't hear you.

5            Q.    Strike it.

6                  Now, I want to go back to

7    enablement for one final question.  Now, based

8    on your experience in ANDA cases, when there is

9    a fairly sizeable product, there is often more

10   than one ANDA filer; is that correct?

11           A.    Sorry.  Are you saying that -- I

12   don't really understand your question.

13           Q.    Sure.  Well, I think we're

14   probably going to hear later today, Concerta is

15   a fairly sizeable product, right, as far as

16   sales in the market?

17           A.    Well, it's a very good product, so

18   it's successful.

19           Q.    And normally in a situation where

20   there is that much of a product on the table,

21   there is more than one ANDA applicant; right?

22           A.    That's not been the case.  I mean,

23   I have been involved in other cases where there

24   has just simply been one company, one ANDA, even

1305

1    though the product is very successful.

2        Q.   Does the fact that there were

3    actually two defendants here, one dropped out,

4    does the fact that there is one ANDA applicant

5    to you mean that perhaps it's not quite as easy

6    to make an ascending release rate product as you

7    say it is, even today?

8        A.   No, it wouldn't tell me that at

9    all.  In fact, when I look at the Andrx

10   formulation, it looks very routine and ordinary

11   to me and it's the kind of formulation one could

12   make to make an ascending release rate.  So I

13   could imagine that other companies coming on if

14   they so wished could make such formulations in

15   different ways.

16       Q.   And you would have found it easy

17   to do with your person of ordinary skill in 1996

18   as well; correct?

19       A.   Well, I have indicated that a

20   person of ordinary skill in the art would have

21   been able to make a formulation which achieved

22   -- for methylphenidate which achieved ascending

23   drug delivery.

24       Q.   And the formulation inventors here

1    who have since been dropped off the patent, the

2    formulation inventors who have been dropped off

3    the patent --

4         A.   Beyond what you mean.

5         Q.   You know that Larry Hamel and that

6    group that we looked at with regard to DTX 1144,

7    all but Mr. Hamel have been dropped off the

8    patent, right, including Mr. Ayer and everybody

9    else?

10        A.   I don't know that.

11        Q.   But those individuals who were

12   fairly skilled when they filed a patent

13   application in 1996, they said there was a

14   critical long-felt need for such a dosage form;

15   correct?

16        A.   Well, you have to be careful, they

17   were talking in the context of the therapeutic

18   need.

19        Q.   That paragraph we looked at didn't

20   say anything about methods of treatment, did it,

21   Doctor?

22        A.   Well, be careful, one can always

23   isolate a paragraph and ignore what's around it,

24   and that's what you're doing.  So I think it's

1    clear from the publication that they were

2    preparing formulations for a very specific need.

3                    MR. MUSGROVE:  No further

4    questions, Your Honor.

5                    REDIRECT EXAMINATION

6    BY MR. FOGEL:

7            Q.    A few questions, Professor Davies.

8    Nick, can we have DTX 197A back on the screen,

9    please.  If you could blow up the table.  Both

10   the graph and the table.

11                   So the first data point, Professor

12   Davies, right there, which is illustrated in the

13   table at 1.5 hours?

14           A.    Right.

15           Q.    Does this graph indicate to you

16   release of drug from the core within the first

17   hour?

18           A.    Yes, it does.

19           Q.    And why?

20           A.    Because that's -- that indicates

21   to me if one did a fit on that data, it would

22   show that we have an extended release profile,

23   it indicates to me that from zero to 1.5, one

24   has quite substantial release from pretty much

1    all the formulations that we see there.

2            Q.   And that can be shown down in the

3    graph down below?

4            A.   Yes, also in the graph.

5            Q.   Let's go to the second point I

6    have.  And let's go back to the declaration you

7    submitted in the Markman stage of this case.

8            A.   Right.

9            Q.   And specifically that's PX 132.

10   And let's look at paragraph 11 of this document,

11   and that's on pages five and six.  And let's

12   start on page five down at the bottom.

13            Does this paragraph set forth the

14   specific matters you were asked to address in

15   your declaration, sir?

16            A.   Yes, it does.

17            Q.   And let's take a closer look at

18   this paragraph.  Do you see that you were asked

19   to address three opinions of Dr. Banakar; one,

20   whether the claims are limited to osmotic dosage

21   form, osmotic dosage forms if you go to the next

22   page of this.  Two, whether there is a

23   description to suggest the claims -- whether is

24   there is a description to suggest the claims

1    cover nonosmotic dosage forms.  And the third

2    opinion you were asked to respond to, was

3    whether undue experimentation was needed to make

4    nonosmotic dosage form.  Correct?

5         A.   Correct.

6         Q.   Is it correct that the specific

7    opinion that you expressed in your report was

8    that dosage forms are not limited to osmotic

9    dosage forms?

10        A.   That's correct.

11        Q.   Was that the purpose of this

12   report that you submitted?

13        A.   Yes, it was.

14             MR. FOGEL:  I have no further

15   questions.

16             THE COURT:  All right.  Thank you.

17             MR. PRITIKIN:  Your Honor, our

18   next witness, Your Honor, we will be recalling

19   Vivian Gray.  And Mr. Wagner will conduct the

20   examination.

21             THE COURT:  All right.  Thank you.

22

23             VIVIAN GRAY, Ph.D.,

24        the deponent herein, having previously

1          been duly sworn on oath, was

2          examined and testified as follows:

3              MR. WAGNER:  May I proceed?

4              THE COURT:  Yes.

5              REDIRECT EXAMINATION

6    BY MR. WAGNER:

7          Q.  Ms. Gray, I would like to talk a

8    little bit about the topic of the amount of

9    methylphenidate from the tablet core that is

10   seen in the ANDA products that's released in the

11   first hour in in-vitro dissolution test in light

12   of some of Dr. Banakar's comments the other day.

13             Were you present in the courtroom

14   when Dr. Banakar testified that the amount of

15   immediate release methylphenidate in the ANDA

16   products can vary a bit around the 25 percent

17   specification?

18         A.  Yes.

19         Q.  Dr. Banakar testified that it

20   could vary between 22-and-a-half percent and

21   27.5 percent.  Do you recall that?

22         A.  Yes.

23         Q.  According to the ANDAs, how much

24   methylphenidate is there in the immediate

1311

1    release coating of those products?

2            A.   25 percent, and that is within the

3    range of 22.5 to 27.5.

4            Q.   Do you also recall that

5    Dr. Banakar evaluated the amount of

6    methylphenidate released from the tablet core of

7    the Andrx product during the first hour and he

8    assumed that 27.5 percent of the total amount of

9    methylphenidate was in the IR layer?

10           A.   Yes.

11           Q.   How many of the 36 ANDA product

12   samples tested by ARL had some nonimmediate

13   release methylphenidate released in the first

14   hour under that 27.5 percent assumption made by

15   Dr. Banakar?

16           A.   One.   One out of 36.

17           Q.   Now, let's move to the 25 percent

18   specification.   How many of the 36 ANDA product

19   samples tested by ARL released some non-IR

20   methylphenidate in the first hour using the ANDA

21   specification of 25 percent?

22           A.   Seven out of 36.

23           Q.   Did Dr. Banakar evaluate the

24   amount of non-IR methylphenidate released in the

1    first hour using the minimum end of the range,

2    that is the assumption that the immediate

3    release coating contains 22.5 percent of the

4    total amount of methylphenidate?

5         A.   I don't know.  He did mention that

6    22.5 percent was at the lower end of the range,

7    but he -- he did not testify about any results.

8         Q.   Did you do an analysis under the

9    22.5 percent assumption to determine the amount

10   of nonimmediate release methylphenidate released

11   in the first hour at pH 7.5?

12        A.   Yes.

13        Q.   How did you do that analysis?

14        A.   I looked at the ARL results and

15   excluded 22.5 percent of methylphenidate, and

16   then determined how much IR -- no, tablet core

17   methylphenidate was released after an hour.

18        Q.   And did you prepare a

19   demonstrative with the results of that analysis?

20        A.   Yes, I did.

21        Q.   Can we put up Plaintiff's Exhibit

22   732, please.  What is Plaintiff's Exhibit 732?

23        A.   I don't have it here.  It's

24   something I will read off the chart.

```
 1              MR. WAGNER:  May I approach?

 2              THE COURT:  Yes.

 3              THE WITNESS:  I'll just read it.

 4      Sorry.  This is the ANDA samples that are

 5      analyzed for Andrx 54 milligram tablet.  As you

 6      can see, I excluded the 22.5 percent of

 7      methylphenidate, and determined how much non-IR

 8      was released in that hour.

 9              Q.  Can you just tell us which of the

10      columns you were focusing your attention on?

11              A.  Yes, column four and five.

12              Q.  Can we highlight those columns,

13      please.  What are the results of your analysis

14      for the 54 milligram ANDA products as shown on

15      the screen?

16              A.  Twelve of the 54 milligram tablets

17      showed a release of the tablet core, release of

18      methylphenidate from the tablet core within the

19      hour.

20              Q.  Let's look at the results for the

21      36 milligram dosage strength.  Can we please put

22      up Plaintiff's Exhibit 733.  What is Plaintiff's

23      Exhibit 733?

24              A.  Okay.  This is the -- my analysis
```

1    of the ANDA samples for the Andrx 36 milligrams

2    tablets.

3            Q.    And what are the results of your

4    analysis on the 36 milligram tablets?

5            A.    That eleven out of twelve showed

6    methylphenidate released from the tablet core

7    within an hour.

8            Q.    Let's look at the results for the

9    27 milligram dosage strength.    And can we put up

10   Plaintiff's Exhibit 734, please.

11                What is this exhibit?

12           A.    This is my analysis of the ANDA

13   samples for Andrx 27 milligram tablets.

14           Q.    And what are your results as shown

15   on the screen?

16           A.    That eight out of the twelve

17   showed a methylphenidate release from the tablet

18   core within the first hour.

19           Q.    So if you assume the amount of

20   methylphenidate in the immediate release coating

21   is at the lower end of the acceptable variation,

22   how many of the 36 ANDA product samples tested

23   by ARL released methylphenidate from the tablet

24   core in the first hour at pH 7.5?

1       A.    31 out of 36.

2       Q.    And what does your analysis

3  compared with Dr. Banakar's evaluation tell us

4  about whether the ANDA products release

5  methylphenidate from the tablet core during the

6  first hour in a dissolution test at pH 7.5?

7       A.    The methylphenidate released from

8  the tablet core occurs over the entire range of

9  the ANDA specification.

10      Q.    What would a person experienced in

11 dissolution testing consider as the amount of

12 immediate release methylphenidate that is

13 representative of the ANDA products based on the

14 information in the ANDA and knowing that some

15 variation is allowed?

16      A.    We would select a 25 percent, the

17 midpoint of the ANDA specification.

18      Q.    And what percentage for the amount

19 of methylphenidate in the IR coating did you use

20 in concluding that all or nearly all of the ANDA

21 products will infringe Claim 1 of the '373

22 patent?

23      A.    The 25 percent midpoint of the

24 ANDA specification.

1          Q.   Were you also asked to evaluate

2    whether plaintiff's commercial product,

3    Concerta, provides an ascending release rate

4    over an extended period of time and is covered

5    by Claim 1 of the '373 patent.

6               Did you reach a conclusion about

7    each of the four dosage strengths of Concerta?

8          A.   Nearly all of the Concerta tablets

9    showed an ascending release rate over an

10   extended period of time and met Claim 1.

11         Q.   How did you go about reaching that

12   conclusion?

13         A.   I looked at the dissolution

14   results from the NDA for Concerta that was filed

15   to the FDA and I took those results and applied

16   the same methodology that I used for the Andrx

17   products.

18         Q.   Let's talk about the dissolution

19   tests that ALZA used to test Concerta in the

20   NDA, do you have an opinion on whether ALZA used

21   an appropriate dissolution test in its

22   dissolution test of the Concerta products?

23         A.   Yes, I did.  They used apparatus

24   seven which was appropriate for the osmotic

1317

1    dosage form and ALZA used 3, pH 3 for the

2    dissolution medium which was appropriate for a

3    dissolution test for the extended release, the

4    drug release properties of Concerta which were

5    pH independent and the methylphenidate is stable

6    in acid.

7         Q.    Did you prepare a spreadsheet with

8    your methylphenidate release rate evaluation for

9    each of the four dosage strengths of plaintiff's

10   product, Concerta?

11        A.    Yes.

12        Q.    Let's look at Plaintiff's Exhibit

13   454.   What is this exhibit?

14        A.    This is my release rate evaluation

15   of Concerta 18 milligrams.

16        Q.    And what does this spread sheet

17   show?

18        A.    The spreadsheet shows that five

19   out of six samples showed a -- met the criteria

20   of an ascending release rate over an extended

21   period of time.

22        Q.    Would you please identify the five

23   18 milligram Concerta samples that met the

24   ascending release rate element of Claim 1?

1           A.    Simple, two, three, four, five and

2    six.

3           Q.    Let's look at Plaintiff's Exhibit

4    455, please.  What is this exhibit?

5           A.    This is my release rate evaluation

6    of Concerta 27 milligram tablets.

7           Q.    And what does this analysis show?

8           A.    This showed that six out of six

9    met the criteria of an ascending release rate

10   over an extended period of time.

11          Q.    Let's go to Plaintiff's Exhibit

12   456.  And what is this exhibit?

13          A.    This is my release rate evaluation

14   of the Concerta 36 milligram tablets.

15          Q.    And what were the results of that

16   evaluation?

17          A.    That was five out of the six met

18   the criteria of an ascending release rate over

19   an extended period of time.

20          Q.    Would you please identify the five

21   36 milligram Concerta samples that met the

22   substantially ascending release rate element of

23   Claim 1?

24          A.    Sample number one, two, three,

1319

1    four and five.

2              Q.   And lastly let's look at

3    Plaintiff's Exhibit 457.   What is this exhibit?

4              A.   This is my release rate evaluation

5    for Concerta 54 milligram tablets.

6              Q.   And what does this spreadsheet

7    show?

8              A.   This showed that all tablets met

9    the criteria for an ascending release rate over

10   an extended period of time.

11             Q.   Let's talk about the other two

12   elements of Claim 1.   How did you conclude that

13   Concerta provides a method of treating ADHD?

14             A.   Because the package insert says

15   that Concerta provides a method for treating

16   ADHD.

17             Q.   How did you conclude that Concerta

18   is a pharmaceutical composition containing a

19   dose of methylphenidate as required by Claim 1?

20             A.   The package insert says that

21   Concerta is a extended release dosage form

22   administered once a day containing

23   methylphenidate.

24             Q.   Let's talk just a bit more about

1    some of the things we heard from Dr. Banakar in

2    his examination.  Were you present in the

3    courtroom when Dr. Banakar testified that the

4    ARL dissolution results had errors that he said

5    were apparent to him?

6        A.    Yes.

7        Q.    And did you hear Dr. Banakar

8    testify that he accepted the ARL data, but then

9    went on to recalculate the numbers using

10   normalization?

11       A.    Yes.

12       Q.    In your opinion, did Dr. Banakar's

13   normalization preserve the integrity of the ARL

14   data?

15       A.    No, he changed the data.

16       Q.    Let's talk about why he did that.

17   Dr. Banakar said that you brushed aside the data

18   at the 24 hour time point.  Did you brush aside

19   the ARL data at the 24 hour time point?

20       A.    Absolutely not.

21       Q.    Did you satisfy yourself to a

22   reasonable scientific certainty that the ARL

23   dissolution data was accurate and reliable?

24       A.    Yes.  ARL performed a study that

1321

1    showed that the high results were at 24 hours

2    were due to evaporation, and because of -- I

3    know through my experience that 12 hours and

4    below some evaporation can occur, but it's

5    insignificant, and it will be a insignificant

6    level, and I completely relied on with this,

7    considering this, I completely relied on the

8    data as to calculate the ascending release rate,

9    and found that it was reliable and accurate.

10           Q.   Do you know of any flaws in the

11   evaporation study done by ARL?

12           A.   No.

13           Q.   Do you know why the beaker weights

14   recorded in Brian Walker's notebook pages for

15   the evaporation study were all the same?

16           A.   Yes, they were the same beaker

17   each time.

18           Q.   Have any flaws in that study been

19   identified?

20           A.   No.

21           Q.   The evaporation study accounted

22   for what was observed in 24 hours in the AR.   Is

23   there any reason to adjust the AR number as

24   Dr. Banakar did?

1          A.    No.

2          Q.    Dr. Banakar testified that he

3    adjusted all of the data for all of the samples

4    whether or not the results at 24 hours were over

5    105 percent based on the view if you adjust one,

6    you have to adjust them all.  Do you agree with

7    that approach?

8          A.    No.  As a matter of fact, he

9    changed the data and it turned out to be

10   favorable for Andrx.

11         Q.    Let's go back for a moment to the

12   charts we showed which looked at the 27, 36 and

13   54 milligram ANDA products that were done using

14   the assumption that 22.5 percent of the total

15   dose of methylphenidate was attributable to the

16   immediate-release coating.  Do you recall that?

17         A.    Yes.

18         Q.    In the charts that were put up on

19   the screen, did you use Dr. Banakar's format for

20   the charts showing the amounts released in the

21   first hour?

22         A.    Dr. Banakar's format, you mean the

23   way that the chart that he used --

24         Q.    The way the data was arranged?

1323

1       A.   Yes.  Right.  Yes.

2            Q.   Do you agree with Dr. Banakar's

3   assumption that release during the first hour is

4   necessary to have an ascending rate of release

5   under the Court's claim construction?

6       A.   No.

7            MR. WAGNER:  Thank you.

8                 RECROSS-EXAMINATION

9   BY MR. MUSGROVE:

10           Q.   Just a few questions, Ms. Gray.

11      A.   Okay.

12           Q.   Right after Dr. Banakar concluded

13  his examination, Dr. Cheng got examined.  Were

14  you here for that as well?

15      A.   Most of it, yeah.

16           Q.   Okay.  Were you here for the

17  portion where Dr. Cheng explained that that 22.5

18  percent to 27.5 percent number was taken off of

19  a grouping of tablets?

20           A.   I might have missed that part, I'm

21  not sure.

22           Q.   And I understand Dr. Cheng was

23  somewhat difficult to understand, but with

24  regard to a single tablet, do you recall if she

1    said that it would be possible for a tablet here

2    or there to fall outside the 22.5 to 27.5 IR

3    range?

4            A.    I don't recall what she said.

5            Q.    With regard to the 27.5 on your

6    direct, you said there would be one such tablet;

7    correct?

8            A.    Okay.  Yes.

9            Q.    And if Dr. Cheng, if I'm right

10   about what her testimony says, and there could

11   be a sample that falls outside of 27.5, that one

12   sample could be accounted for just by that

13   instance; right?

14           A.    I don't know if I agree.  I mean,

15   I don't know what she said, but I don't know

16   that I agree that a specification actually can

17   be violated by having something above it or

18   below it.

19           Q.    Well, it wouldn't be violated if

20   you were taking a grouping of tablets, correct,

21   and measuring the grouping?

22           A.    I think that all the -- all the

23   products should be within that specification,

24   that's what it's there for, a specification

1    meaning everything must be within that range.

2         Q.   And you were asked some questions

3    about Dr. Banakar's assumption about 27.5

4    percent.  Do you recall his testimony being that

5    actually what he would have assumed was that all

6    release in the first hour, whether or not below

7    25 or above 25, was attributable to the IR

8    coating, do you recall that?

9         A.   Would you repeat that?  He said --

10   okay.  Go ahead and repeat what you say that he

11   said.

12        Q.   No.  Do you recall what

13   Dr. Banakar's assumption was with regard to how

14   much was in the IR coating during that first

15   hour for any individual tablet?

16        A.   His assumption for the IR coating?

17   He made the assumption there was -- he made two

18   assumptions; one, that it would be -- he did the

19   table so that it would be 25 percent and then

20   27.5 percent.

21        Q.   You don't recall Dr. Banakar

22   testifying that he thought the proper assumption

23   was that whatever was released, whether below 25

24   or above 25, was all IR coating, do you recall

1    that?

2            A.    He made that assumption I believe.

3            Q.    Now, you would agree that you

4    would expect all of the IR to be released in the

5    first hour; correct?

6            A.    Yes, that's what the ANDA

7    documents say.

8            Q.    And under your 25 percent

9    assumption, 29 of the samples, 29 of the 36 that

10   ARL tested would not have released all their IR

11   in the first hour; correct?

12           A.    Right.    Let me say it again so I

13   can be sure you said it right.    Seven met the

14   release.

15           Q.    Why don't we work through this.

16   You stated on your direct that seven out of 36

17   were above 25 percent; correct?

18           A.    Yeah, 25 were at 25 percent.

19           Q.    Right.    And so if there were seven

20   out of 36 that were 25 or above, then there

21   would be 29 that were below 25 percent; correct?

22           A.    Yes.

23           Q.    So under your assumption of 25

24   percent label claim assumption, 29 of those

1    tablets would not have had IR released in the

2    first hour; correct?

3              A.    Correct.

4              Q.    And with regard to those samples

5    where you're applying your 25 percent label

6    claim, did you -- well, let's work on a

7    hypothetical example rather than looking at

8    charts.  But with regard to if you had tablet

9    22.5 percent release in the first hour --

10             A.    Uh-huh.

11             Q.    -- that would not meet your label

12   claim assumption; correct?

13             A.    Did you say below 22.5 percent?

14             Q.    No, it's at 22.5 percent.  I'm

15   talking about the 25 percent label claim

16   assumes, your normal assumption?

17             A.    Well, but there is a specification

18   associated with that.

19             Q.    But your 25 percent label claim

20   assumes, just to orient us where we are, if you

21   had 22.5 percent release in the first hour from

22   a tablet, you would take the 25 percent off of

23   the 22.5 and you would enter a zero for that

24   first hour; correct?

1328

1    A.    Well, this is, you know, this is a

2    hypothetical that, you know, doesn't go along

3    with what the specifications say.

4    Q.    Let's put up if we can PX 723, or

5    732, I'm sorry, one of the charts she was just

6    looking at.  And if we could look at -- I'm

7    going to pick one of the zero ones just so you

8    know, cycle one, Andrx B, if we look at that,

9    23.05 percent recovery.  Do you see that?

10    A.    Yes.

11    Q.    If we go to the 25 percent label

12    claim which I think is right here in this sixth

13    column; is that correct?

14    A.    Uh-huh.

15    Q.    So for the first hour, that's

16    below 25, so we get a zero; correct?

17    A.    Correct.

18    Q.    Now, would you continue say the

19    next hour, the entry was 25.5, what entry would

20    you have had in the second hour for the 25

21    percent assumption?  Do you understand what I'm

22    asking or not?

23    A.    No, I'm sorry.

24    Q.    I apologize.

1    A.    Yeah.

2    Q.    With regard to the second hour.

3    A.    The second hour.

4    Q.    The second hour.

5    A.    The chart does not cover the

6    second hour.

7    Q.    We dealt with the first hour, so

8    I'm giving you a hypothetical.  The second hour

9    the total release is 25.5 percent.

10    A.    Okay.

11    Q.    What would the entry be in the

12    second hour under the 25 percent label claim?

13    It would be .5 percent?

14    A.    Well, I'd like to see the data.

15    You know -- okay, this is a hypothetical, but

16    you know.

17    Q.    I'm happy to look at your data, I

18    just don't have it in what I was given by the

19    plaintiffs.

20    A.    It's easier to answer if I have

21    data in front of me to analyze it.

22    MR. MUSGROVE:  Your Honor, with

23    the Court's indulgence, I apologize.

24    THE COURT:  Sure.

BY MR. MUSGROVE:

Q.   If we could pull up PX 245.   And
if we could just to pull up a random sample,
let's go back to that same Andrx B sample right
here.  And so we saw that you would exclude --
this is a different amount, but it's still the
25 percent label claim, the 6.75 is different
than what we were looking at before?

A.   Okay.

Q.   But it's still 25 percent; right?

A.   Yes.

Q.   So with regard to this, you get
6.22 cumulative recovery and you're excluding
6.75; correct?

A.   Correct.

Q.   So we assume none has released
from the ER in the first hour?

A.   Right.

Q.   Your assumptions continue to
record basically that IR would continue to
release into the second hour; correct?

A.   Okay.

Q.   Do you agree with that?

A.   Yeah.

1           Q.    Would you expect that to be the

2      case?

3           A.    That it would continue to release

4      in the second hour?

5           Q.    That you would have IR releasing

6      into the second hour.

7           A.    No, it's supposed to be released

8      in the first hour.

9           Q.    You wouldn't expect to have 29 out

10     of 36 releasing IR into the second hour, would

11     you?

12          A.    Well, I mean, they already started

13     to release in the first -- wait a minute.  We're

14     talking about the immediate release coat?

15          Q.    Yes, ma'am.

16          A.    So we're assuming that the

17     immediate release coat has dissolved in the

18     first hour.

19          Q.    Right.  But what I'm saying, you

20     continue until you meet that 6.75 to continue to

21     subtract into the second hour, your assumption

22     basically means that any time you don't have a

23     release in the first hour, you're actually going

24     to knock the release rate down in the second



1    hour, too; right?

2           A.    But the assumption is it is all

3    released in the first hour.

4           Q.    Right.  But the way you've

5    conducted your assumption, you're actually

6    subtracting it from the value in the second

7    hour, too; right?

8           A.    True.

9           Q.    Because if we subtracted 6.22 from

10   7.89, it would be bigger than this; right?

11          A.    From -- wait a minute.  From 7.89

12   subtracted --

13          Q.    In this case it wouldn't have made

14   a difference; right?

15          A.    Correct.

16          Q.    Now, but 29 of the -- 29 out of

17   the 36 you would have done that, correct, made

18   that subtraction the second hour?

19          A.    You're saying that the way that we

20   -- because we subtracted out the 25 percent from

21   the first hour that that carried over

22   continually?

23          Q.    That's correct, right.

24          A.    Well, it carries over continually.



1333

```
 1              Q.   Now, there has been -- and I have

 2      contributed to it, but there has been a lot of

 3      hubbub about evaporation in the case; correct?

 4              A.   Right.

 5              Q.   With regard to the first hour data

 6      that we're looking at, evaporation doesn't make

 7      any difference whatsoever?

 8              A.   No.

 9              Q.   It only makes a difference for the

10      T90 calculations?

11              A.   Well, I don't know that it makes

12      any difference.

13              Q.   If it were to impact anything that

14      we've talked about in this case, whether the

15      first hour, the T90 would be the T90

16      calculation; right?

17              A.   Well, my judgment is it's not

18      going to affect any of the data below twelve

19      hours.

20              Q.   I understand that, but what I'm

21      asking you is if it were to impact any of it, it

22      would be the T90 calculation; correct?

23              A.   Possibly, but I don't think it

24      would be significant.
```

1      Q.    Now, Mr. Walker, the person who

2   did the tests at ARL, he didn't come here to

3   testify, did he?

4      A.    No.

5           MR. MUSGROVE:   No further

6   questions, Your Honor.

7           THE COURT:   All right.   Thank you.

8           MR. WAGNER:   Nothing further.

9           THE COURT:   Thank you, Ms. Gray.

10          MR. PRITIKIN:   Your Honor, we have

11  just one more witness.   It might make sense for

12  us to take a short afternoon break if that would

13  be acceptable and then wind up.

14          THE COURT:   All right.   We'll be

15  in recess for fifteen minutes.

16          (A brief recess was taken.)

17          THE COURT:   All right.   Be seated,

18  please.

19          MR. PRITIKIN:   Your Honor,

20  plaintiff's call as their last witness,

21  Dr. Richard Rozek and he will be examined by

22  another of our associates, Michael Hatcher.

23          THE COURT:   All right.

24          MR. HATCHER:   May I approach, Your

1    Honor?

2                    THE COURT:  Yes, you may.

3                    THE CLERK:  Please state and spell

4    your full name for the record.

5                    THE WITNESS:  My name is Richard

6    Phillip, P-H-I-L-L-I-P, Rozek, R-O-Z-E-K.

7

8            RICHARD PHILLIP ROZEK, Ph.D.,

9                the deponent herein, having first

10                been duly sworn on oath, was

11                examined and testified as follows:

12                    DIRECT EXAMINATION

13    BY MR. HATCHER:

14            Q.   Dr. Rozek, starting after high

15    school, please summarize your educational

16    background?

17            A.   After I graduated from high school

18    I enrolled in college and I earned a bachelor of

19    arts degree with a major in mathematics from the

20    College of St. Thomas, it's now called the

21    University of St. Thomas.

22                    I then went to graduate school at

23    the University of Minnesota and I earned a

24    master of arts degree with a major in

1    mathematics from the University of Minnesota.

2                I taught for a year in between and

3    I then returned to graduate school at the

4    University of Iowa and earned a master of arts

5    degree in economics.  And I finally earned a

6    Ph.D. degree with a major in economics from the

7    University of Iowa.

8         Q.    When did you earn that degree?

9         A.    The last degree I earned was in

10   1976.

11        Q.    What do you currently do for a

12   living?

13        A.    Currently I'm an economist and

14   senior vice-president at National Economic

15   Research Associates, which is often abbreviated

16   NERA, N-E-R-A.  It's a firm of consulting

17   economists that work on applying microeconomic

18   theory to the business and public policy

19   question.

20        Q.    Does your work at NERA focus on

21   any particular field of business?

22        A.    I primarily work on -- well, at

23   NERA, I am organizational within the

24   intellectual property practice, so I work almost

1337

```
 1    exclusively on intellectual property problems in

 2    the health care industry, and a few other

 3    industries as projects arise, and within the

 4    health care industry I focus on pharmaceuticals.

 5         Q.   What experience do you have in the

 6    pharmaceutical industry?

 7         A.   Well, I have been working on

 8    pharmaceutical industry problems for well over

 9    thirty years.  I started as a graduate student

10    working with my dissertation advisor, actually

11    working as a research assistant for my

12    dissertation with advisors from the National

13    Science Foundation Grant to study social and

14    private rates of return to pharmaceutical

15    innovation.

16              And then I proceeded to my first

17    academic job at the University of Pittsburgh as

18    an economist where I taught industrial

19    organization.  And one of the industries I used

20    as an example was the pharmaceutical industry.

21              And during my tenure at Pitt I

22    attended conferences on the pharmaceutical

23    industry as well.  And then following my time at

24    the University of Pittsburgh I went to the
```

1    Federal Trade Commission in Washington, and

2    worked on antitrust and regulatory issues in a

3    number of industries, including the

4    pharmaceutical industry.

5              And following about six-and-a-half

6    years at the FTC I went to the Pharmaceutical

7    Manufacturers Association which is called now

8    called Pharma, or Pharmaceutical Research and

9    Manufacturers of American, and there I was the

10   economists at the organization and Pharma is a

11   trade association that represents the research

12   based pharmaceutical firms.

13             And at Pharma as the economist I

14   dealt with a lot of issues related to providing

15   information to both the general public and to

16   policy makers who are interested in both

17   domestics and international issues.  I manage

18   the association contract issues on issues such

19   as the costs to develop a drug, productivity of

20   pharmaceutical scientists compared to scientists

21   funded by the National Institutes of Health and

22   questions that had economic content.

23             And then I conducted my own

24   research on pharmaceutical industry issues such

1339

1    as the benefits of protecting intellectual

2    property through economic development.

3                Following my work at Pharma, I

4    went to my current employer, NERA, and moved

5    from senior consultant to a vice-president.  And

6    now my current role is senior vice-president.

7                And initially I went to NERA in

8    the energy group, but gradually I moved into

9    doing more health care work and more

10   pharmaceutical work specifically so that now my

11   work is probably seventy-five percent

12   pharmaceutical.  And a variety of areas.

13        Q.   Let me briefly follow-up about a

14   couple of the jobs you mentioned.  Did your work

15   at the FTC involve analyzing the sales of

16   pharmaceutical products and the market forces

17   regarding those sales?

18        A.   Yes.  In evaluating mergers, for

19   example, when we look at market shares measured

20   in terms of sales, and look at how the markets

21   were evolving in terms of what were the entry

22   conditions into the market, and what were the

23   new technologies that could enter a market to

24   address particular therapies.

```
 1              And that would involve looking at

 2      sales, both in dollars and units, looking at

 3      trends in sales, looking at R & D spending and

 4      looking at the nature of competition in the

 5      industry given that there are a lot of

 6      interesting issues in the pharmaceutical

 7      industry such as it's a regulated industry, for

 8      example.

 9              Q.   You also mentioned your current

10      job at NERA.  Does that work involve analyzing

11      the sales of pharmaceutical products and the

12      market forces regarding those sales?

13              A.   Yes, it does.  I work at NERA on a

14      variety of problems, litigation problems such as

15      the present matter, and advice given to

16      pharmaceutical firms.

17              Recently I did a project for a

18      firm that had a license agreement with a

19      pharmaceutical firm and the license agreement

20      paid it a running royalty based on future sales

21      and the company asked us, asked me specifically

22      to address the question of if we want to convert

23      that agreement from the running royalty, the

24      royalty that paid annually based on sales to a
```

1341

1    lump sum agreement, take a cash payment, what

2    should we ask our partner to pay us in cash

3    today, which meant that we had to forecast sales

4    of that pharmaceutical product.

5            That was using the technology at

6    issue into the future and determine what would

7    be a fair lump sum payment as opposed to a

8    running royalty.

9            And then I also advised firms on

10   economic issues related to valuing intellectual

11   property in the industry, valuing marketing

12   resources, valuing manufacturing resources so

13   that they comply with the tax laws that govern

14   paying arm's length prices for the R & D, their

15   manufacturing and marketing activities that are

16   done in the industry when you have a

17   multinational company, pay the right -- report

18   the right revenue in each associated country in

19   which it operates and you pay your fair share of

20   tax in that country.

21           So I advise firms on how to divide

22   the dollar revenue among the various functions

23   that are performed by the firm and in each

24   country.

1      Q.   Moving on from your work

2  experience, have you written any articles

3  regarding the economics of the pharmaceutical

4  industry?

5      A.   In total I have about fifty

6  articles including reprints of some articles and

7  that would be publications in journals, book

8  chapters and so on.  About half of the articles

9  that I have address pharmaceutical industry

10  issues.

11      Q.   Could you put up PX 495.  Do you

12  recognize PX 495, Dr. Rozek?

13      A.   Yes.  This is a copy of my resume

14  or curriculum vitae that I submitted with my

15  expert report in the matter.

16      Q.   Does this include a complete list

17  of your publications?

18      A.   Not on this page, but on the

19  subsequent pages, yes, it includes a complete

20  list of publications for the past ten years,

21  since 1997 I should say.

22      Q.   Have you previously testified as

23  an expert witness in the area of commercial

24  success and the market factors relevant to that

1    success?

2            A.   Yes, I have.  I have testified on

3    commercial success.  As a matter of fact, I

4    testified in this Court in 2003 on a project

5    where my employer, NERA, was retained by Kenyon

6    & Kenyon.

7            Q.   When you say in this Court, who

8    was the judge?

9            A.   Judge Farnan.

10           Q.   Are you being compensated for your

11   work in this case?

12           A.   Yes, I receive my normal

13   compensation from NERA.

14           Q.   Do you have an hourly rate that

15   you receive?

16           A.   No, I am a salaried employee.

17   NERA bills for my time at $550 an hour.

18           Q.   Moving on from your qualifications

19   and your compensation, I would like to focus on

20   your opinions in this case.  Were you asked to

21   apply your expertise to the facts of this case?

22           A.   Yes, I was.

23           Q.   What were you asked to do?

24           A.   I was asked to assess whether or

1    not the product, Concerta, is a commercial

2    success.

3            Q.    We'll walk through the analysis

4    that you performed in a moment, but first let me

5    ask, have you formed any opinions based upon

6    your analysis?

7            A.    Yes, I have two broad opinions

8    based on my analysis.

9            Q.    What are those opinions?

10           A.    First, based on the analysis I

11   did, Concerta is a commercial success.  And

12   secondly, the commercial success is due to the

13   patented features and its delivery methodology.

14   By that I mean the methodology by which that

15   exhibits an ascending release rate of

16   methylphenidate and that results then in a

17   substantially ascending methylphenidate plasma

18   concentration over five-and-a-half or eight

19   hours.

20           Q.    Let's talk about why you hold

21   those opinions in a little more detail now.

22   First I would like to talk about why you have

23   concluded that Concerta is a commercial success.

24   What makes a pharmaceutical product a commercial

1345

1    successful?

2            A.    In my view, there are many factors

3    to look at in determining whether a given

4    product is a commercial success.    And I tried to

5    apply that general approach here by looking at

6    the absolute information that was available on

7    Concerta itself, its sales, its sales over time,

8    and I looked -- I went to look not only at sales

9    in dollars, but sales in units.    And I did that

10   by using two different unit measures.

11           And then I looked at Concerta as

12   it performed relative to other products.    And in

13   that case I looked at other products for

14   treating the specific disease that's been

15   referred to as ADHD.    And I also looked at

16   Concerta's performance generally among all

17   pharmaceutical products.

18           Q.    Now, you mentioned sales.    By that

19   did you mean absolute sales?

20           A.    Yes, absolute sales measured as I

21   said, in dollars and units.

22           Q.    All right.    And what data did you

23   analyze to determine Concerta's sales?

24           A.    Well, my overall work I analyzed a

1    lot of data, specifically on sales.  I used data

2    from a commercial data service referred to as

3    IMS, and that's a service that I've used in

4    other cases, both litigation cases and other

5    projects I have done in the pharmaceutical

6    industry.  It's also a data service that

7    pharmaceutical firms use to make business

8    decisions and so I'm familiar with the data, and

9    I'm familiar with how it's compiled and how it

10   is used both in litigation and nonlitigation

11   matters.  So I used that data and that was

12   available on both unit and dollar sales.

13        Q.   And did you prepare any exhibits

14   memorializing the results of your analysis?

15        A.   Yes, I did.

16        Q.   Could you put up exhibit PX 499;

17   please.  Do you recognize PX 499?

18        A.   Yes.  This is an exhibit that I

19   prepared, or that other people helped me prepare

20   some of these exhibits and they're a little bit

21   better at manipulating the graphics packages

22   than me, but they help me, and under my

23   direction these exhibits were prepared.

24             This was an exhibit to my recent

1347

1    expert report that looked at their sales, total

2    prescription sales and new prescription sales of

3    Concerta in the U.S. over the period 2000 to

4    2006.

5            Q.    What were Concerta's absolute

6    sales from launch in 2000 through the end of

7    2006?

8            A.    Well, I should point out that 2000

9    is a partial year, since Concerta was launched

10   in -- it was approved in August and launched in

11   August of 2000, so that's only a partial year.

12   But from -- and that's 62 million in 2000, and

13   the rest of the data are full year data.  And

14   the total for the entire period August 2000

15   through 2006, the last full year for which data

16   were available are just over $4 billion in total

17   sales as reported by IMS.

18           Q.    Did you also look at Concerta's

19   unit sales from launch in 2000 until, or through

20   the end of 2006?

21           A.    Yes, I did.  Units I measured here

22   as total prescriptions and new prescriptions as

23   opposed to individual pills.  And in that case,

24   going over the same time period in both new

1    prescriptions and total prescriptions, Concerta

2    had over 42 million prescriptions.

3            Q.   Did you also prepare a graphical

4    representation of this data?

5            A.   Yes, I did.

6            Q.   Could you please put up PX 500.

7    What is PX 500?

8            A.   This again is an exhibit from my

9    expert report in this matter.  It looks really

10   at the data from that previous exhibit that were

11   in column one under the dollar sales and it just

12   is a bar graph to further describe or further

13   display that data.

14           Q.   Has Concerta's absolute sales

15   numbers increased over time?

16           A.   Yes.  As I said before, 2000 was a

17   partial year, and 2001 through 2006 are full

18   sales data, full year data.  2006 was the last

19   year for which data was available, and it

20   exhibits an increasing pattern, each year they

21   sold more than the previous year.

22           Q.   Did you calculate the growth rate?

23           A.   Yes, I did.  I calculated the

24   compound full growth rate for the full year data

1    that I had from 2001 through 2006, and that was

2    approximately 23 percent annual growth.

3            Q.    Moving on from the absolute sales

4    numbers, I believe another factor you mentioned

5    was sales relative to other methylphenidate

6    products.  Why didn't --

7            A.    Well, I mentioned sales relative

8    to other ADHD products, but that had two

9    components to it.

10           Q.    Was one of those components sales

11   relative to methylphenidate products?

12           A.    Yes.

13           Q.    Why did you focus on sales

14   relative to other methylphenidate products?

15           A.    Well, first of all, in looking at

16   the information that's available about Concerta

17   in the Physician's Desk Reference, you see it

18   contains an ingredient methylphenidate.  And it

19   treats the ADHD medical problem.  So I was

20   looking for other drugs that treated that

21   problem, and I was struck by the fact that in

22   this particular therapeutic area, there are

23   multiple versions of products that contain

24   methylphenidate that are approved by the Food

1    and Drug Administration for treating ADHD.

2            And in looking at the kinds of

3    products that are approved, I saw not only

4    generics, that's where you might see multiple

5    versions of a particular chemical, but in this

6    case not only do we have generic versions, but

7    we had branded versions of products that

8    contained methylphenidate and even among the

9    branded products there were branded immediate

10   release products and branded extended release

11   products.

12           So there were a variety of

13   methylphenidate based products available that

14   had been approved by the Food and Drug

15   Administration for treating ADHD and that were

16   actively being sold in the marketplace over the

17   time period that I was interested in examining.

18           So I focused on the

19   methylphenidate based products as one of the

20   series of analysis I did.  And then I focused on

21   a broader set of products that included the

22   methylphenidate products, the other treatments

23   for ADHD, including other treatments for ADHD.

24           Q.   Did you create an exhibit listing

1      the other available methylphenidate products?

2          A.   Yes, I did.

3          Q.   Can we please put up PX 497.  Do

4      you recognize this exhibit?

5          A.   Yes.  This again is an exhibit

6      that I prepared or was prepared under my

7      direction and was included in my original expert

8      report in this matter.

9              And this list the methylphenidate

10     products and the date of approval, date of first

11     sale, I should say, the seller of the product

12     and then whether it had an extended release

13     delivery methodology in it.

14         Q.   What methylphenidate products were

15     available when Concerta launched in 2000?

16         A.   Concerta is number six in the list

17     and has a block around it to make it easier to

18     focus on that.  The products labeled one through

19     five were branded products that were available

20     prior to August of 2000 -- well, I should say

21     they were sold prior to August of 2000.  That

22     included the branded products Ritalin,

23     Ritalin-SR, Methylin, Metadate ER, and Methylin

24     ER.

```
 1              In addition, the list for --
 2    listed under numbers ten and eleven are generic
 3    versions that were also available, generic
 4    versions of methylphenidate which would be an
 5    immediate release product and generic version od
 6    methylphenidate-SR which is an extended release
 7    version of methylphenidate.  And those had
 8    multiple sellers, and sellers changed over time.
 9    People were entering and exiting the market,
10    entering and exiting that particular segment of
11    the market over the period.
12              Q.   And what methylphenidate products
13    became available after Concerta launched in
14    2000?
15              A.   After Concerta launched there were
16    three methylphenidate-based products, Metadate
17    CD, Ritalin LA and Daytrana.
18              Q.   Did you prepare an exhibit
19    memorializing the results of your analysis of
20    the relative sales of Concerta and the other
21    methylphenidate products?
22              A.   Yes, I did.
23              Q.   Could we please put you up PX 504.
24    Do you recognize PX 504?
```

1353

1        A.    Yes.

2        Q.    What does it show?

3        A.    This is exhibit from my expert

4    report that looks at dollar sales of the

5    methylphenidate products, dollar sales in the

6    U.S. of the methylphenidate products as reported

7    by IMS for the years 2000 through 2006.  And

8    those product, I grouped all of the generic

9    products together, I just took all the generic

10   of the methylphenidate immediate release and the

11   methylphenidate sustained release, I took those

12   two separate categories and grouped all the

13   generic sales together rather than reported it

14   separately by individual seller.

15       Q.    How did Concerta's sales compare

16   to all those other methylphenidate products?

17       A.    You can see from this graph that

18   the launch year 2000 was the partial year for

19   sales of Concerta, but after 2000, when we had

20   full year data from 2001 through 2006, Concerta

21   was the leading product in this grouping, in

22   this collection of products, namely those that

23   contained methylphenidate.  And it sales grew

24   each year from 2001 through 2006 as well as

1    growing in 2001 over 2000, it is the leading

2    product.  And by 2006, IMS reports Concerta

3    sales at over $900 million.

4            And you can see that the next

5    largest brand, or next largest product I should

6    say has about a hundred million dollars in

7    sales, so Concerta by 2006 was selling nine

8    times more than the next leading methylphenidate

9    based product.

10           Q.   So to be clear, the line that

11   extends to the top of the graph represents

12   Concerta dollar sales?

13           A.   Yes.  The key got cut off.  Yes,

14   the line at the top is the Concerta graph, the

15   one with the diamond shape year-by-year markers.

16           Q.   I believe you testified to this

17   before, but did you also analyze unit sales?

18           A.   Yes, I did.

19           Q.   And did you prepare an exhibit

20   memorializing the results of that analysis?

21           A.   Yes.

22           Q.   Can you please put up PX 505.  Do

23   you recognize PX 505?

24           A.   Yes, I do.  This again is another

1355

1    exhibit from my expert report.

2            Q.   And what does this show?

3            A.   This shows units measured as total

4    prescriptions of the methylphenidate based

5    products sold in the U.S. as reported by IMS.

6    And Concerta again is the -- I think in my

7    original exhibit it was dark blue, it should

8    show up that way here, I think, but it's the

9    diamond shape.

10           Q.   You have a pointer up there, I

11   believe.  If you want to point to one which is

12   Concerta?

13           A.   Right there.

14           Q.   The line extending up to the top

15   of the graph?

16           A.   Right.  Again, similar pattern

17   that 2000 was the year of launch, but by 2001

18   and every year thereafter, through 2006,

19   Concerta becomes the leading product, and

20   remains and grows over time, so that by 2006,

21   there is over eight million prescriptions

22   annually for Concerta and that is about a little

23   over approximately four times more than the next

24   largest selling product.  And I should mention

1    that the next largest selling product --

2            Q.   Looks like purple?

3            A.   Looks like purple and has the

4    squares is collectively the generic

5    methylphenidate product, so it's the sum of

6    sales from multiple sellers.

7            Q.   So as the unit sales of Concerta

8    go up, the unit sales for the generic

9    methylphenidate products dive down?

10           A.   Correct.  That was a generic

11   methylphenidate immediate release product.

12           Q.   The comparisons you just made were

13   between Concerta and all other methylphenidate

14   products.  Did you also compare Concerta to only

15   the extended release methylphenidate products?

16           A.   Yes.

17           Q.   And did you prepare an exhibit

18   memorializing the results of your analysis?

19           A.   Yes, I did.

20           Q.   Could you please display PX 511.

21   Do you recognize PX 511?

22           A.   Yes.  This again is another

23   exhibit from my expert report.

24           Q.   And what does it show?

1357

1    A.    This exhibit again based on IMS

2    data looks at a subset of the data that was on

3    the previous exhibit that dealt with dollar

4    sales of the methylphenidate based products and

5    it only looks at Concerta and the other extended

6    release methylphenidate products.   And in this

7    one, the legend is clear at the bottom which

8    products are represented there, are Concerta is

9    the dark blue line with the diamonds, the

10    diamond shapes, and here it's interesting in

11    that 2000 when Concerta was launched, it -- and

12    that's only partial year data, it already was

13    the leading product in 2000 among the extended

14    release methylphenidate products.   And it grew

15    from that level of sales in 2000 year by year

16    and was each year from 2000 through 2006 the

17    leading methylphenidate based extended release

18    product sold in the U.S. based here on dollar

19    sales.

20         And then again it's that same $929

21    million that we saw from the previous charts in

22    the year 2006 for Concerta sales.   And that

23    again is the next leading set of products had

24    sales about hundred million, so about nine

```
 1      times, Concerta was selling about nine times

 2      more than the next leading methylphenidate based

 3      extended release product.

 4             Q.    Another metric you mentioned was

 5      sales relative to all ADHD products.  Did you

 6      prepare a demonstrative showing the other

 7      nonmethylphenidate ADHD products?

 8             A.    Yes, I did.

 9             Q.    Can we please put up PX 714.

10             Other than methylphenidate

11      products, what products were available to treat

12      ADHD when Concerta launched?

13             A.    Well, Concerta, recall Concerta

14      launched in August of 2000.  Other products that

15      were available prior to that were products with

16      the brand name Cylert and another product with

17      the brand name Adderall, and those were the only

18      two.  Those were two that were available prior

19      to August of 2000.

20             Q.    And have other nonmethylphenidate

21      ADHD products come on the market since Concerta

22      launched?

23             A.    Yes.  As indicated in this

24      demonstrative, after August of 2000, there were
```

1    four other products, Adderall XR, Focalin,

2    Focalin XR, and finally Strattera.

3         Q.   Did you prepare an exhibit

4    memorializing the results of your analysis of

5    the sales of Concerta relative to all ADHD

6    products?

7         A.   Yes.

8         Q.   Can you please put up PX 520.  Do

9    you recognize PX 520?

10        A.   Yes.  This again is an exhibit

11   from my original expert report, and again, using

12   IMS data on dollar sales.  And here I just

13   looked at dollar sales in 2006.  I did it for

14   purposes of illustration.

15        Q.   And how have Concerta's sales, or

16   how did Concerta sales in 2006 compare to all

17   ADHD products?

18        A.   Well, you see Concerta ranks

19   number two among all products available for

20   treating ADHD or approved for treating ADHD.

21   And the column under dollars, that's 929 million

22   that we've looked at before in another context,

23   that represents 28 percent of the sales of all

24   of these products that are approved for treating

2360

1    ADHD.

2              And this includes -- this includes

3    generics as well as -- I did not record the

4    generics separately, I just recorded all the

5    sales of generics in a single line, even though

6    they may be represented by multiple sellers.

7    And there are generic versions of Adderall which

8    is the amphetamine product, the Adderall XR

9    product is the product that ranks above Concerta

10   at 34 percent.  But Concerta and Adderall XR are

11   the only two products that had more than 20

12   percent of the total dollar sales.

13             Q.   Are you aware of any information

14   that Andrx considers these sales as successful?

15             A.   Yes, I am aware of public

16   statements that Andrx has made regarding the

17   product Concerta, or its efforts to produce a

18   generic version of Concerta.

19             Q.   Did you prepare a demonstrative

20   illustrating that information?

21             A.   Yes, I did.

22             Q.   Can we please put up PX 713.  And

23   what is the evidence or information that you

24   were aware of, Dr. Rozek?

1    A.    These were again quotes that I had

2    included in my expert report.    It was easy to

3    put in a demonstrative here.    These were

4    examples of public statements Andrx was making

5    to its investors and regulators about its

6    business and its business plans.

7           For example, in the second quote

8    on that demonstrative says Concerta presently

9    has brand sales of approximately $800 million.

10   We continue to believe that our generic version

11   of Concerta could generate significant earnings

12   regardless of who the FDA deems will have the

13   180 days of exclusivity.    That was a public

14   statement Andrx was making about its attempts to

15   launch a generic version of Concerta.

16        Q.    I would like you to tell me why

17   you concluded that Concerta's commercial success

18   is due to the patented invention.    What is the

19   basis for your opinion that Concerta's

20   commercial success is due to Concerta's delivery

21   methodology, specifically its release rate and

22   resulting plasma concentrations?

23        MR. VROOM:    Your Honor, could I

24   reserve an objection to bring out on cross about

```
 1        his basis?

 2                        THE COURT:   Sure.

 3                        MR. VROOM:   Thank you.

 4        BY MR. HATCHER:

 5                   Q.   Let me repeat the question.

 6                   A.   Can I answer?

 7                   Q.   I'll repeat it.

 8                   A.   All right.

 9                   Q.   What is the basis for your opinion

10        that Concerta's commercial success is due to

11        Concerta's delivery methodology, specifically

12        its release rate and resulting plasma

13        concentrations?

14                   A.   Well, I think there are four

15        elements to my opinion on that issue.  And

16        first, it's my understanding of patent law that

17        one can make a presumption that the commercial

18        success is related to the characteristics

19        described in the patent.  Secondly, I think the

20        analysis I did with the methylphenidate based

21        products, both all methylphenidate based

22        products and specifically the extended release

23        methylphenidate based products illustrates that

24        Concerta is a success as well as part of the
```

1    information I relied on to determine that

2    Concerta was a commercial success, but also

3    illustrates the important features that drive

4    that success.

5            And third, as we saw with the

6    quote I cited from Andrx, Andrx is attempting to

7    copy Concerta because it views this to be a

8    significant source of earnings.

9            And finally, I looked at other

10   factors that we as economist would look at for

11   trying to understand why there is a difference

12   and why there is such a difference in sales

13   among products that contain the same active

14   pharmaceutical ingredient.

15           So I looked at factors that might

16   drive a difference and I couldn't identify any

17   such other factors besides the delivery

18   methodology that's embodied in Concerta.

19           Q.   Let's talk about each of those

20   four factors you just mentioned.  The first

21   factor you mentioned was a presumption.  What

22   did you mean by that?

23           A.   Well, it's my understanding that

24   the patent law is structured as follows:  That

1    if you show that a product is a commercial

2    success and that product is covered by the

3    claims of the patent at issue, in this case the

4    '373 patent, that you're then allowed to presume

5    that the commercial success is due to the

6    patented features.

7            Q.   And do you have an understanding

8    of whether the claims of the asserted patent

9    cover Concerta?

10           A.   Yes.  My understanding is that the

11   claims, Claims 1, 6 and 7 really describe a

12   product that has an ascending release rate for

13   an extended period of time, and that then

14   results in a substantially ascending

15   methylphenidate plasma concentration ratio for

16   five-and-a-half or eight hours.

17           Q.   And do those claims cover

18   Concerta?

19           A.   Yes.

20           Q.   And what is the basis of your

21   understanding?

22           A.   The basis of my understanding is

23   the testimony that I have either read that's

24   been given during this week or I've heard.

1365

1    Q.   Do you have any independent expert

2    opinion on that?

3    A.   No, I'm relying on the testimony

4    I've heard and that was available to me in the

5    form of expert reports at the time I wrote my

6    expert report.

7    Q.   The second factor you mentioned

8    was relative sales of methylphenidate products.

9    And I believe you mentioned the features of

10   those products.  Why did you look at that?

11   A.   Well, as I said, I was really

12   struck when I started studying this particular

13   product market that there were multiple types of

14   products available that contained

15   methylphenidate.  There were products that were

16   generic, of course, which you would expect to

17   have multiple -- there was an patent on the

18   chemical, you expect generic entry to result in

19   multiple products, but in this case there were

20   multiple brand products there were multiple

21   products that both were immediate release and

22   sustained release or extended release products,

23   and there were both brand and generic, so there

24   were all of these different products that had

```
 1        the same underlying active pharmaceutical

 2        ingredient, but had some differences, they were

 3        brand, they were generic, they were extended

 4        release, they were immediate release, and yet I

 5        say -- and then I saw in the data the

 6        substantial sales in both dollars and units that

 7        Concerta generated.

 8                      So I was struck by that, and so I

 9        -- when you see this kind of picture, you say

10        well, what's driving it?  These are the same --

11        these are products I should say with the same

12        underlying chemical, methylphenidate.  What's

13        driving that difference between Concerta and the

14        other products?

15                      Concerta is growing fairly

16        rapidly, 23 percent annual, compound annual

17        growth rate whereas those other products don't

18        appear to be moving very fast.  Then I grouped

19        the generic ones together into a single

20        category.

21                      So I was struck by that and I was

22        interested in trying to explain those

23        differences and understand those differences.

24              Q.    What did you determine was the
```

1      primary differentiating factor explaining

2      Concerta's relative sales?

3           A.   Well, I determined that the

4      primary differentiating factor was the delivery

5      methodology that Concerta used, and that was

6      what was described in the '373 patent.

7           Q.   And how does Concerta's delivery

8      methodology differ from those other products?

9           A.   Well, it's a methodology that

10     provides an ascending release rate of

11     methylphenidate over an extended period of time,

12     that then results in a substantially ascending

13     methylphenidate plasma concentration for

14     five-and-a-half or eight hours.

15          Q.   And do any of the other

16     methylphenidate products on the market have an

17     ascending release rate over an extended period

18     of time resulting in substantially ascending

19     plasma concentrations for about 5.5 or 8 hours?

20          A.   It's my understanding that no

21     other product available has that delivery

22     characteristic.

23          Q.   And what is the basis for that

24     understanding?

1        A.    It's just the technical experts

2    that I have heard.

3        Q.    And what other -- how else does

4    Concerta differ from those other methylphenidate

5    products?

6        A.    Well, it differs in a lot of other

7    ways in a sense.  I mean, but, those are not

8    necessarily ways that would drive those sales.

9    For example, it differs in price.  There are

10   generic versions of methylphenidate available,

11   and they're largely available at lower prices,

12   so that was one of the factors that I looked at,

13   that there were generics available, they were

14   lower priced than Concerta, but yet Concerta

15   sales grew.  They grew in dollars, of course,

16   for the higher price product you might want to

17   put a question mark there, but then I looked at

18   unit sales, and the unit sales grew as well in

19   spite of lower price alternatives being

20   available.

21            And then if you notice, if you

22   recall the list of products that were approved,

23   brand products, there were a lot of products

24   approved with Ritalin in the title.  There was a

1369

1    Ritalin immediate release, a Ritalin-SR version

2    and a Ritalin LA version, so those were all sold

3    by a company, Novartis, which is a successor

4    firm to Ceiba Geigi.

5        They had been selling Ritalin

6    products in some form for thirty or thirty-five

7    years before Concerta was launched.  So Novartis

8    had an established reputation in this

9    marketplace, and had been introducing new

10    products to the marketplace over time.  Yet,

11    Concerta outsold these products that were

12    available from the established players.

13        So that meant ALZA and McNeil had

14    to overcome that entrenched position that

15    Novartis had in this marketplace.  So again,

16    that more or less was an obstacle generating

17    sales in the market along with the lower priced

18    generics being available.  Yet Concerta sales in

19    both dollars and units grew substantially over

20    the 2000 to 2006 period.

21        So, you know, I looked at those

22    kinds of issues and as explanations, but back to

23    the delivery methodology as the reason Concerta

24    sales exceeded in such a dramatic way is sales

1   of the other methylphenidate based products.

2        Q.   You just discussed differing

3   sellers and differing prices as possible

4   alternatives to the delivery methodology as

5   explaining the commercial success.  Did you also

6   consider marketing?

7        A.   Oh, yes, I considered a number of

8   other factors that might drive that success.

9   And I considered, you know, these are all

10  methylphenidate based products, they're all

11  approved by the FDA to treat ADHD, they are all

12  approved by the FDA as safe and effective

13  treatment for that product, they were equal on

14  that basis.  I talked about price, I talked

15  about the reputation that Novartis had in this

16  marketplace having introduced a number of

17  products and having been in the marketplace a

18  long time.

19            I then eventually looked at

20  marketing expenditures and, I realized what is

21  marketing.  Marketing in this case is providing

22  information to physicians, patients, payers,

23  pharmacists about the product.  But what does

24  that information embody?

1371

1          That information embodies what the

2    FDA allows you to tell the health care community

3    about your product, the only market for approved

4    indications and you have to have fair and

5    balance presentations of your marketing message.

6    The FDA regulates these things.

7          So I looked at the type of

8    information that ALZA and McNeil were

9    distributing to the health care community about

10   the product, and I saw that they were

11   distributing information about the therapeutic

12   properties of the product subject to the

13   approved indications.  And those therapeutic

14   properties were really the characteristics

15   embodied in the patent.

16          And then I looked at whether or

17   not they were marketing this product to a

18   greater or lesser extent than other products in

19   the market to see if that was having an effect.

20          So I looked at sampling activity

21   and I looked at physician contact activity and

22   minutes, and I didn't see that Concerta was

23   being marketed to any greater extent than other

24   treatment for ADHD.

1              So I looked at the type of message

2    that was being disseminated as well as the

3    quantity of messages that were being

4    disseminated as information to the health care

5    community about Concerta and I saw that

6    information that was disseminated by Alza McNeil

7    focused on the therapeutic properties as it had,

8    and it was not done to any greater extent or

9    less, greater or less extent than other products

10   that were available for treatment of ADHD.

11             So I looked at marketing and then

12   I looked at -- finally I looked at why does

13   Andrx want to enter this market, and why does --

14   why does Andrx want to copy this particular

15   product.

16        Q.   So you looked at the differing

17   sellers, the differing prices, the differing

18   market and the differing delivery methodologies

19   and any other factors, and you settled on the

20   differing delivery methodologies of the

21   methylphenidate products as the factor

22   explaining Concerta's commercial success?

23        A.   Correct.   I think that was what

24   was -- after I had -- the presumption aside, I

1    looked at these other factors and concluded that

2    it was the delivery methodology.

3            Q.    And when you say the delivery

4    methodology of Concerta is responsible for its

5    success, what exactly do you mean?

6            A.    Specifically I mean the product

7    that has the ascending release rate for an

8    extended period of time that then results in a

9    substantially ascending methylphenidate plasma

10   concentration level for five-and-a-half or eight

11   hours.

12           Q.    Now, those are not the only parts

13   of Concerta delivery methodology, for example,

14   Concerta achieves its release rate by using OROS

15   delivery technology, how did you conclude that

16   those specific parts of Concerta's delivery

17   methodology are responsible for its success?

18           MR. VROOM:    If I could object,

19   Your Honor.    I don't believe it's in his expert

20   report.    If it is, I apologize.

21           MR. HATCHER:    It is in the expert

22   report.    I can show you right now if you would

23   like, Your Honor.

24           THE COURT:    Your objection is



1    noted.

2                    MR. VROOM:    Thank you.

3            Q.    Would you like me to repeat the

4    question?

5                    Those are not the only parts of

6    Concerta's delivery methodology, for instance,

7    Concerta achieves its release rate by using OROS

8    delivery technology.    How did you conclude that

9    those specific parts of Concerta's delivery

10   methodology are responsible for its success?

11           A.    Well, that's when I looked at the

12   Andrx product and I looked at whether or not the

13   Andrx product was using the OROS technology, and

14   I found out that it was not.

15                   What Andrx was seeking to copy or

16   imitate from Concerta was the delivery method

17   involving the ascending release rate and the --

18   that then has the effect of the substantially

19   ascending methylphenidate plasma concentration.

20           Q.    How do you know Andrx copied the

21   ascending release rate for an extended period of

22   time and a substantially ascending

23   methylphenidate plasma concentrations for about

24   5.5 or eight hours?

1    A.    Well, that was information

2    available to me from the scientific experts, it

3    was presented in court during this past week, I

4    either read that or heard it, and it was also

5    available to me in the form of expert reports.

6    Q.    So you don't have any independent

7    expertise in this area, you're just relying on

8    the technical expert testimony?

9    A.    Right.  I'm an economist, not a

10   pharmacologist or chemist or dosage form expert.

11   Q.    Why does Andrx copying of just

12   those specific features and not the OROS

13   delivery technology cause you to conclude that

14   those are the attributes responsible for the

15   success?

16   A.    Well, I think in my analysis, I

17   saw the success that Concerta exhibited and I

18   saw Andrx targeting Concerta as a source of

19   profits and revenues, and then I saw Andrx's

20   application for ANDA specifically focused on

21   those characteristics that I described earlier

22   to you having to do with the ascending release

23   rate and resulting substantially ascending

24   plasma concentration.

1    Q.    Let's move on to the last factor

2    you gave for your opinion on the nexus, the

3    fourth factor you mentioned was the lack of any

4    other factors explaining the success.  What did

5    you mean by that?

6    A.    Well, like we've talked about

7    earlier, I looked at other economic factors that

8    might be driving sales of a drug or a drug

9    product over time.  I looked at the nature of

10   competition and I saw it in this case, generic

11   competition at lower prices, I saw an

12   established sophisticated pharmaceutical firm,

13   Novartis, selling products already in this

14   marketplace and those I said were obstacles.

15   I saw the FDA having approved a

16   number of methylphenidate based products as safe

17   and effective, they were all neutral in that

18   regard, so why would Concerta sell more than

19   these other products?

20   When I looked at marketing

21   activities, and I said well, they are marketing

22   it, but they're marketing about the product

23   characteristics and they're not marketing in

24   terms of overall spending or effort to a greater

1377

1  or lesser extent than other products, other

2  brand products which we treat ADHD.

3            And I then concluded that these

4  other factors, some of them were actually

5  handicaps that ALZA McNeil had to overcome and

6  they did, and Concerta achieved substantial

7  sales.

8            So I did not identify any other

9  factor that would explain the sales of Concerta

10 and the sales growth of Concerta in both dollars

11 and units over time, besides its delivery

12 methodology.

13            MR. HATCHER:  Thank you,

14 Dr. Rozek.  I have no further questions.

15            MR. VROOM:  Your Honor, we have a

16 few cross binders.  Is it okay if we approach?

17            THE COURT:  Sure.

18            MR. VROOM:  Thank you.  May I

19 proceed, Your Honor?

20                 CROSS-EXAMINATION

21 BY MR. VROOM:

22       Q.  I'll try to be as brief as I can,

23 Dr. Rozek.  I guess since you're kind of warmed

24 up already being on the stand I'll give you a

1    couple of softballs here, so if I can get caught

2    up a little bit, give opposing counsel a couple

3    of sound bites.

4                    Ritalin, that was the gold

5    standard, wasn't it, before Concerta came along?

6            A.   I think Dr. Patrick referred to it

7    that way if I'm not mistaken.

8            Q.   And now you would say that

9    Concerta is the gold standard?

10           A.   I believe that term was used to

11   characterize Concerta, too, yes, as opposed to

12   now, as opposed to when Ritalin was first

13   available.

14           Q.   Thank you.

15                    I know you distinguish yourself

16   from being a pharmacologist or somebody else in

17   the pharmaceutical science. You identified

18   yourself as an economist; correct?

19           A.   Yes.

20           Q.   Do you still consider yourself a

21   scientist?

22           A.   Well, economics is the social

23   science, so in that sense, I consider myself a

24   social scientist.

1379

1     Q.    And when you were approached with

2     this question, did you go into it assuming that

3     Concerta was a commercial success or did you

4     kind of do the scientific method where you

5     assume -- you came up with a hypothesis and

6     tried to prove it or disprove it?

7          A.    I went into it without knowing

8     what the data was going to reveal.  I was asked

9     a question, is Concerta a commercial success as

10    you would look at these things from an economic

11    perspective, and the first thing I would look at

12    is -- I'm not sure if it was actually in this

13    order, I would look at the product description

14    in the Physicians' Desk Reference, I would look

15    at -- do a little bit more work on the disease

16    and what kind of products are available to treat

17    the disease.  I look at whether products had

18    been approved, then I asked for data.

19              Once I get a better understanding

20    of the disease and the types of products that

21    are available, and that could include possibly

22    nonpharmaceutical therapies as well.  What

23    really competes here, so I would then ask for

24    some data so I would analyze the data --

```
 1          Q.   If I can interrupt you and you can
 2     put it in on redirect.  If I don't ask another
 3     question, I'm going to have to cool down and
 4     give you some more softballs.
 5               I believe you said that the
 6     commercial success is a multidimensional problem
 7     that requires a lot of individual product
 8     analysis at both the absolute and relative
 9     levels, either in part here or at your
10     deposition; is that correct?
11          A.   That's a paraphrase -- I have
12     characterized it as a multidimensional problem,
13     yes.
14               MR. VROOM:  May I approach the
15     witness, Your Honor?
16               THE COURT:  Yes.
17               MR. VROOM:  Thank you.
18     BY MR. VROOM:
19          Q.   Here is a copy are of your
20     deposition, Dr. Rozek.  Go to page 41, and there
21     were a few corrections you made to the
22     transcript, and we tried to have them inserted
23     here to reflect when the changes were made and
24     the official errata sheet is at the back and you
```

1    can read the text as it was originally recorded.

2    Page 41, line 13:

3              "Question:  Do you have a -- a

4    definition of -- of what makes something a

5    commercial success:

6              "Answer:  I think it's a

7    multidimensional problem that -- that requires a

8    lot of individual product analysis at both the

9    absolute and relative levels."

10             Were you asked that question and

11   did you give that answer?

12        A.   Yes.

13        Q.   So basically as I understand it,

14   you can't just look at the end of the graph you

15   put up there, the 900 million in sales and say

16   commercial success?

17        A.   I wouldn't want to do that.

18        Q.   You don't think a reasonable

19   economist would do that?  That's another

20   softball, by the way.

21        A.   Well, I can't say how other

22   economists would necessarily view this, but I

23   don't think that's part of the discipline of

24   economics to look at a single data point and say

1    yes or no, just to a question.

2         Q.   Fair enough.

3              And having gone through your

4    report and taken your deposition, listened to

5    your testimony, would you say it's fair -- would

6    you say this is a complicated analysis to

7    determine whether or not something is a

8    commercial success?

9         A.   Well, I would say it's an economic

10   analysis of factors that economists are familiar

11   with through their training and experience in

12   looking at.  And it may be complicated in some

13   cases because data aren't readily available and

14   it may be complicated because there are other

15   factors involved, I just don't know.  But in

16   this case, the tools were -- that I used are

17   tools that are part of the economic discipline,

18   and the data in this particular case, data from

19   a commercial data service like IMS were readily

20   available to me and information from the FDA in

21   terms of the electronic orange book to identify

22   what products had been approved and at what

23   time, data from the red book on prices were

24   readily available, so I mean, it's gathering

1383

1    that information and analyzing it within -- from

2    the perspective as an economist.

3            Q.   So you got to look at all that

4    information, you look got to look at pricing,

5    you got to look at competition, you got to look

6    at marketplace, you got to look at all that

7    stuff, and would you say if you're off on some

8    of your underlying pieces, that you would have

9    to go back and reassess your overall conclusion

10   that it's a commercial success?

11           A.   Well, that's why you want to look

12   at it in multiple dimensions to see if they all

13   help and converge on it.

14           Q.   So that is a yes to my question?

15           A.   You look at multiple pieces of

16   information, you're saying some are wrong.

17           Q.   Is that another yes to my

18   question?

19           A.   My answer is as I said, you look

20   at multiple pieces of information to see if

21   there is some sort of --

22           Q.   And if your multiple pieces of

23   information, if you're off on some or all of

24   them, you're going to still say it's a

1    commercial success or do you have to go back and

2    reassess?

3         A.    You look at the data to make sure

4    that you're looking at the underlying data in

5    terms of whether it's a reliable data source,

6    you want to be sure the analysis you do with

7    that data is done in a rigorous way.

8         Q.    When you did your analysis, is it

9    correct that the success of Concerta is due to

10   its delivery methodology?

11        A.    When I did my analysis --

12        Q.    Was that your opinion?

13        A.    It's my opinion, but when I did my

14   analysis, when I actual did the analysis --

15        Q.    Was that a yes?  I apologize for

16   the bad question.

17        A.    I was trying to address the

18   question as to whether or not Concerta was a

19   commercial success.  As a result of my analysis,

20   I concluded that it indeed was a commercial

21   success.  And then a second piece of the work

22   was why.

23        Q.    And, in fact, the only factor that

24   you could identify that was different, what

1  could make Concerta different would be the

2  delivery methodology; is that correct?

3      A.    Correct.  I should say --

4      Q.    I guess could I get the Elmo up,

5  please.  Your counsel can ask you to keep going,

6  but I said I would try to be brief and I can't

7  do it if I don't start cutting you off.

8           Right here it says Concerta is now

9  the most commonly prescribed drug for treating

10  ADD and ADHD.  Did I read that correctly?

11      A.    Well, one page is cut off a little

12  bit on the right-hand side.

13      Q.    I apologize.  Is that better?

14      A.    Yeah.  I didn't hear you say the

15  word "product".

16      Q.    Okay.  I'll try it again.

17  Concerta is now the most commonly prescribed

18  drug product for treating ADD and ADHD.  Did I

19  get it right that time?

20      A.    Yes.

21      Q.    Okay.  And this is from page 57,

22  plaintiff's reply brief, if you will.  Do you

23  agree with that statement?

24      A.    Well, I don't think that's

1    consistent -- it depends on what year you're

2    looking at and over time.  There is no -- I need

3    to know the year.

4            Q.   Let's go with now, let's go with

5    like last week this was written?

6            A.   Well, I said I stopped collecting

7    data at the end of 2006 which was the last full

8    year that data were available.

9            Q.   Why don't we go back to 2006,

10   then?

11           A.   I only seen the press release from

12   the early portion of 2007.

13           Q.   I'm happy making it 2006.  Let's

14   go with 2006.

15           A.   I'm not sure -- I think if I

16   recollect -- in terms of dollars, I believe my

17   own chart that I put up earlier today had

18   Adderall XR selling more.  I just don't recall

19   as I sit here, I would have to look at my expert

20   report to see if Adderall is being prescribed

21   more or had more new prescriptions.

22           Q.   I'm going to take that as a no.

23   But if you'll turn to the black binder, the last

24   exhibit, I believe it's 1223.  Pull that up,

1    please.  And we got to see lots of the exhibits

2    from your report during the direct, but not

3    quite all of them were there.  So 1223 is my

4    attempt at least to give you all of the exhibits

5    from your report so you can answer some

6    questions like this.

7         A.   Okay.

8         Q.   I think it's page 23 of the file

9    is my guess again.  How about 32.  Page 32 of

10   that exhibit.  This is total prescriptions of

11   ADHD products; correct?

12        A.   Yes.  This is Exhibit 24 from my

13   original expert report and it's entitled Annual

14   Total Prescriptions of ADHD Product in the U.S.

15        Q.   The legend for this is on page 30

16   of this exhibit, if you want to refer back to

17   that.

18             So the statement in plaintiff's

19   reply brief on page 57, does this help you

20   answer it better now?

21        A.   Well, yes.  As you recall, I made

22   the comment about what year you were talking

23   about, and you can see that in 2003, Concerta is

24   the most prescribed product for treating ADHD.

1        Q.   And so in the brief, if we can go

2   back to the Elmo, please, the now that was

3   written last week, maybe the week before, you

4   think that's 2003 they're talking about?

5        A.   Well --

6        Q.   You're working with them, so I

7   don't know.  Maybe you have got a better idea.

8        A.   Well, I didn't write this, but --

9        Q.   No, but I will give you a little

10  hint here.  These proposed findings of fact, do

11  you want to guess who they're putting up for

12  that proposition?

13       A.   I can see from my data, 2003 was

14  -- by 2006 Adderall XR had, I believe that's

15  Adderall XR.

16       Q.   Since you mentioned Adderall XR,

17  is Adderall XR a commercial success?

18       A.   Well, I think you asked me that in

19  my deposition.

20       Q.   I certainly did.

21       A.   And I said no.

22       Q.   It was no.  I didn't mean to talk

23  over you.

24            MR. VROOM:  I apologize, Your

1    Honor.

2         A.   I said it's possible there could

3    be more than one commercial success in the

4    marketplace.   I hadn't really done the

5    multidimensional analysis on Adderall XR that I

6    did on Concerta.

7         Q.   So is it you don't know is the

8    answer?

9         A.   I don't.

10        Q.   How about I think I asked you this

11   also at your deposition, Ritalin-SR, was it a

12   commercial success at any time?

13        A.   Well, Ritalin-SR is now available

14   in generic form, and I looked only at data from

15   2000 forward, by that time it was already

16   generic.

17        Q.   So you don't know; is that

18   correct?

19        A.   I don't know.

20        Q.   So if there are statements in the

21   briefs or proposed findings of fact that

22   Ritalin-SR is not a commercial success, based on

23   your testimony you wouldn't agree with that?

24        A.   I would say that I was not asked

1    to address that question, and I didn't in any of

2    the work I have done in this matter.

3         Q.    Thank you very much.

4              I guess while I'm trying to

5    collect myself here, it came up with Dr. Davies

6    that he had been in several ANDA cases with lots

7    of ANDA applicants.  And you testified on direct

8    that you could understand why Andrx was coming

9    into the market or what the motive was because

10   of the 900 million or whatever the figure is.

11   Why don't you think there are more defendants

12   here, from an economist perspective?

13        A.    I don't know why -- in terms of

14   why more people haven't submitted ANDA?

15        Q.    Certainly.

16        A.    They may be waiting for the

17   outcome of the patent case here.  Maybe the

18   characteristics of the drug is a controlled

19   substance, it is causing some reluctance to

20   launch this, enter this particular marketplace.

21        Q.    Anything else come to mind?

22        A.    Well --

23        Q.    And that's just a yes or no

24   question.

1391

1   A.   I don't know.  You just asked me

2   that question, those are two things that came to

3   my mind.

4        Q.   I appreciate your expert opinion.

5            I believe you also testified on

6   direct that part of the success is due to the

7   ascending release rate of the product -- of

8   Concerta; is that correct?

9        A.   Yes.

10       Q.   Could we get DTX 3, last page,

11  Claim 1.  You should have DTX 3 in your binder

12  there.  You can just watch the screen if you

13  want.

14           Do you remember at your deposition

15  I asked you if the commercial success of

16  Concerta was attributable to this claim?

17       A.   I remember you asked me a number

18  of questions about whether it was attributable

19  to certain claims.  I don't remember this one in

20  particular.  I mean, I don't remember.

21       Q.   What's your opinion now?

22       A.   This, DTX 3, is the '129 patent?

23       Q.   That is correct.

24       A.   And the '129 patent from my

1      understanding is no longer a part of this case.

2      It was at the time I wrote my expert report.

3              Q.    It was at the time you wrote your

4      expert report.  My understanding is that it's

5      still in the case.  They are trying to have it

6      dismissed, my understanding may be wrong.  But

7      I'll just tell you that.  But at the time this

8      was part of your expert report and you did have

9      an opinion on this, do you recall what the

10     opinion was at the time?

11             A.    Let me just read the claim again.

12     I remember you asked me a series of questions

13     about both patents, I just don't remember the

14     specifics about each one.

15             Q.    I'm happy to point you to your

16     deposition if you want to make it quicker.

17             A.    Okay.  If you have the page cite

18     to where you asked me the question about this

19     specific claim, I would appreciate that.

20             Q.    I believe it is 194.  I'm a little

21     bit off.  I apologize.  195.  Line 22.  I asked

22     you the question if I can have you look at Rozek

23     3, I'll represent that's the '129 patent, I see

24     I say the '129 patent, last page, column 23

1393

1    Claim 1, is the commercial success attributable

2    to Claim 1?  Answer:  Yes.

3              Did I ask you that question, did

4    you give that answer?

5         A.   Correct.

6         Q.   Do you still have that same

7    opinion?

8         A.   Well, I think these claims are

9    very similar to the claims in the '373 patent,

10   so yes, this is part of the reason for the

11   commercial success is this.

12        Q.   And there is no ascending release

13   rate requirement in this claim?

14        A.   Not in this claim, correct.

15        Q.   So if the commercial success is

16   attributable to this claim, where there is this

17   ascending release rate, then that's not

18   necessary for the commercial success; correct?

19        A.   No.  The commercial --

20        Q.   I'll go with the no, that's fine.

21             And your understanding of the

22   attributes of Concerta coming from the claimed

23   features, what is that from?  What's your

24   understanding based on?

1          A.    Coming from the claimed features.

2          Q.    Yes.   You were not the

3    pharmaceutical scientist, so you relied on

4    someone for the understanding that the claimed

5    features lead to the attributes that were

6    marketed?

7          A.    My understanding is that the --

8          Q.    Who did it come from, just an

9    identity?

10          A.    Oh, I heard from -- that was the

11    testimony of --

12          Q.    I'll try to help you a little bit.

13    I'm asking as provided in your expert report and

14    as provided in your deposition in case it's not

15    the same person.

16          A.    Well, I cited -- I cited doctors

17    -- I cited doctor --

18          Q.    You got it with the F there.

19          A.    Dr. Feifel.

20          Q.    There you go.

21          And you said you weren't here for

22    some of the trial at least, but you had read all

23    the transcripts?

24          A.    Not all of the transcripts, I read

1    --

2              Q.   How did you select which

3    transcripts to read?

4              A.   I think I read the transcripts

5    from days one and two, but day one I skipped the

6    first part where they were discussing procedural

7    issues.

8              Q.   I won't -- on the off chance of

9    offending somebody, I won't ask which other

10   parts you skipped.

11              Did you see anything from

12   Dr. Feifel on any of those days?

13              A.   No, I didn't.

14              Q.   You're aware Dr. Feifel has not

15   testified in the trial?

16              A.   I have not seen a reference to

17   Dr. Feifel in the trial.

18              Q.   Okay.  And do you disagree with me

19   about the proposition that he was your only

20   source for linking these things up as of your

21   report and your deposition?

22              A.   No.  No, there were other expert

23   reports that were --

24              Q.   Ms. Gray was for the ascending

1    release rate part?

2            A.    Right.

3            Q.    But not the outcome, the

4    pharmacodynamic properties?

5            A.    I read reports from Dr. Davies,

6    Dr. Angst, and Ms. Gray as well as Dr. Feifel.

7    They were all available to me at the time I did

8    my expert report and then I believe the original

9    expert report, and I believe they did some

10   rebuttal reports that I subsequently read prior

11   to my deposition.

12           MR. VROOM:    Your Honor, would you

13   prefer to take up later in papers or do you want

14   to me to go out and point out now in the

15   depositions where he said it was Dr. Feifel?

16           THE COURT:    It's up to you.

17           MR. VROOM:    I'll take my time at

18   the podium.    I'll try to pick it up as we go

19   along.    I think we'll run into it that way.

20   BY MR. VROOM:

21           Q.    When you were looking at the

22   marketing of Concerta, and please, I'll give you

23   all your exhibits now so you can go through them

24   when you want to, how did you like potentially

1    weigh the importance of how much money was spent

2    each year on marketing?

3         A.    I looked overall at the trend in

4    marketing, without looking -- I mean, I looked

5    at the entire period and I looked at the general

6    behavior of the market, or the general -- I

7    shouldn't say behavior, the general pattern of

8    marketing activities in different categories.

9    Sampling and -- excuse me, sampling and I looked

10   at --

11        Q.    Is there any sampling for these

12   controlled substances?

13        A.    I think there are some level of

14   sampling activity.  I think there are certain

15   restrictions on the way you can -- samples can

16   be distributed.

17        Q.    So there is a good number of

18   sampling done, it's just restricted?

19        A.    Well, I think the fact that there

20   are restrictions make the sampling activity more

21   difficult and that may not be -- that may not be

22   the primary way to disseminate information for

23   controlled substances because of the

24   difficulties that are imposed upon people to

1    request samples.

2              Q.   DTX1223, slide number 13.  Page

3    number 13.  I think we saw a slide on your

4    direct talking about maybe -- I'll probably get

5    the number wrong, so you correct me, the 14

6    percent annual compounded growth rate.  Is that

7    a ballpark?

8              A.   I didn't have a slide on the

9    compound annual growth rate, I think I said it

10   was 23 percent for dollar sales.

11             Q.   You look at 2005, you look at

12   2006, the sales went down, the number of

13   prescriptions went down; is that correct?

14             A.   Yes, the number of total

15   prescriptions went down.

16             Q.   And as an economist, did that peak

17   your curiosity?

18             A.   I made the observation -- I mean,

19   I was aware that sales went down slightly in

20   2006, dollar sales went up.

21             Q.   And ignoring the 2000, because

22   that's a partial year, but looking at the

23   differences in the different years, your

24   curiosity wasn't peaked to figure out perhaps

1399

1    why there was different changes?

2            A.   Well, markets are going to change

3    over time, as was pointed out in my direct

4    testimony.

5            Q.   Is this a yes?

6            A.   There were new products

7    introduced, too.

8            Q.   How about dollars spent on

9    marketing during those years, maybe a lot of

10   dollars spent in 2001, a big jump in 2002, did

11   you look at any of that?

12           A.   Well, I'm familiar with the life

13   cycle of spending.

14           Q.   Did you look at the amount of

15   dollars spent on marketing in each of the years?

16           A.   Yes.

17           Q.   Okay.  And is that in any of your

18   exhibits?

19           A.   Well, I shouldn't say -- I looked

20   at particular types of marketing activities.

21           Q.   Marketing activities?

22           A.   Not necessarily dollars spent on

23   marketing.

24           Q.   In each year you looked at that,

```
 1      different marketing activities?

 2              A.   Yes, I looked at it over the

 3      period of 2000 to 2006 just like I had the sales

 4      data.

 5              Q.   And in --

 6              A.   And I looked at it in terms of

 7      unit measures in some cases as well as dollars.

 8              Q.   Would you be surprised if the

 9      years where there was more growth more was spent

10      on marketing?

11              A.   Well, I would expect that when a

12      product is first launched at that beginning

13      stage of its life cycle, that that's the role of

14      marketing is to provide information that this

15      product is available and has these

16      characteristics, so I would expect that there is

17      information that is being provided and that it

18      won't surprise me that there was a period when

19      there was -- when there was -- product was new,

20      you have to tell the medical community that this

21      product existed.

22              Q.   After it's known, you don't have

23      to tell the medical community that?

24              A.   You have to keep reminding the
```

1401

1       community --

2              Q.   Just a yes or no, please.  I'm

3       sorry.

4              A.   Well, you tell -- first of all,

5       you can tell them it's new and then you may have

6       new information based on clinical trials that

7       you are still conducting, they conduct Phase IV

8       clinical trials, they get new information from

9       that.

10             Q.   I'm going to take this one as a

11      maybe.

12             You were saying you had to provide

13      the information at the beginning of the life

14      cycle when it was a new product.  How long does

15      that last?  Is that period over 2000 or does

16      that go over to 2001?  Is it still going on now?

17             A.   Well, the information you have

18      about a product isn't necessarily constant, you

19      don't have necessarily all the information that

20      you're going to impart on day one when it's

21      launched, you have the information based on the

22      clinical trials, you have an approval from the

23      FDA, you tell the medical community that, what

24      you're allowed to -- what you're allowed to tell

```
 1        it based on the approve indication, the health

 2        care community I should say, and then over time

 3        you may have new information based on Phase IV

 4        clinical studies to impart to the marketplace.

 5        There may be new products available for treating

 6        ADHD and you want to talk about your product

 7        relative to new products.

 8                    There is a lot of reasons you want

 9        to disseminate information through the product

10        life cycle, so I wouldn't be surprised to have

11        changes to the life cycle, it has peaks and

12        troughs or you may switch from one type of

13        marking --

14             Q.    Would you say that's a slight dip

15        in 2006?

16             A.    Total prescriptions went down in

17        2006 compared to 2005, but they were still

18        higher than all of the prior years, 2000 through

19        2004.

20             Q.    And in your report, do you recall

21        that you said that McNeil's messages focus on

22        Concerta's therapeutic attributes such as its

23        unsurpassed twelve hour efficacy, the rapid

24        onset of action, no variability in absorption,
```

1    no use potential side effects?

2            A.    Yes, I don't know if those are the

3    exact words, but I recall discussing that in my

4    expert report, discussing the thrust of the

5    message.

6            Q.    DTX 1, Claim 6, please.  Do you

7    have an understanding of how you get twelve hour

8    efficacy from substantially ascending

9    methylphenidate plasma drug concentration over

10   five-and-a-half or eight hours?

11           A.    Well, that really -- I mean,

12   that's a scientific question.

13           Q.    Yes.  And you've read all those

14   reports and read all the testimony.

15           A.    As I said, that's not my area of

16   expertise.

17           Q.    So you don't know, you don't have

18   an understanding?

19           A.    Right.  I know that's if it's a

20   marketing message and it has to be approved by

21   the FDA.  And I know the scientists inform those

22   decisions.

23           Q.    Go back to the Elmo, please.  Here

24   is what I read before so you can tell me if I

1    missed something, if you recall.  If not, I can

2    read it again if you would like.  Do you think I

3    got it right before?

4         A.   Yes.  And then you notice that I

5    cited for that the footnote 70 is a Concerta

6    business plan, 2003 Concerta business plan.

7         Q.   And you're telling me that because

8    my questions about Dr. Feifel?

9         A.   No.  You're asking me how do I

10   know that.  I know that from their business plan

11   as opposed to some scientific piece of

12   information.

13        Q.   And are these therapeutic

14   attributes present in the claims of the '373

15   patent?

16        A.   I think the way the therapeutic --

17   the claims of the patent describe the way the

18   therapeutic attributes are achieved.

19        Q.   So these are -- they flow from the

20   claims of the '373 patent?

21        A.   Again, that is a scientific

22   question about --

23        Q.   If I can direct you to your

24   deposition, page 184, line 16, okay, in the

1    sentence that goes with footnote 70.

2         A.   I missed the page.

3         Q.   184.  Line 16.  Let me know when

4    you're there.

5         A.   I found it.

6         Q.   And the sentence that goes with

7    footnote 70, it reads, "McNeil's message focused

8    on Concerta's therapeutic attributes such as its

9    unsurpassed twelve hour efficacy, rapid onset of

10   action, no variability in absorption, and low

11   abuse potential/side effects?

12        "Answer:  Yes.  That is another

13   characterization from the 2003 Concerta business

14   plan:

15        "Question:  And these therapeutic

16   attributes, are those also present in the claims

17   of the patents-in-suit?  And to the extent you

18   want to look at the other ALZA expert reports, I

19   have those available for you for your review."

20        Objection.  I'm sorry, could

21   you -- objection, vague.  Could you read the

22   question back.  I'm sorry.  Last question read

23   back by the reporter.

24        "Question:  Do you understand the

1   question?

2                    "Answer:  Yes.

3                    "Can you provide an answer then?

4                    "Answer:  I think the efficacy and

5    safety of the product flows from the -- the

6    ascending release rate for an extended period of

7    time which provides substantially ascending

8    methylphenidate plasma concentration for a

9    specified period of time and that I -- I -- and

10   then -- so then that -- of those properties of

11   Concerta lead to its efficacy and safety and

12   that I got -- I -- I am relying on Dr. Feifel

13   to -- to help me understand that.

14                    "Question:  Is --

15                    "Answer:  Specifically his

16   rebuttal report.

17                    "Question:  And so do those

18   properties go to the unsurpassed twelve hour

19   efficacy, rapid onset of action, no variability

20   in absorption and low abuse potential/side

21   effects as provided in the sentence?

22                    "Answer:  Yes."

23                    Were you asked those questions and

24   did you give those answers?



1407

```
1        A.   Yes, I did.

2        Q.   And --

3        A.   Yes, I was asked those questions

4   and yes, I gave those answers.

5        Q.   I kind of asked you earlier about

6   the unsurpassed twelve hour efficacy, twelve

7   hour efficacy, you're not sure where that comes

8   from; is that correct?  Yes or no?

9        A.   I'm not sure of the medical

10  reasons that underlie that.

11       Q.   And the rapid onset of action?

12       A.   Other than there is an immediate

13  release portion of the technology.

14       Q.   Thank you.

15            So that comes from the immediate

16  release portion; correct?

17       A.   Yes.

18       Q.   And you're aware that the

19  immediate release portion is optional in these

20  claims?

21            I'll say no for you.

22       A.   Okay.  Thank you for answering.

23       Q.   How about no variability in

24  absorption, where do you think the no
```

1    variability in absorption comes from?

2         A.    Those are really scientific

3    questions that I -- I am not an expert at

4    addressing those.

5         Q.    I understand.  But you've said

6    that this is why Concerta is a commercial

7    success because of these features.  I asked you

8    if these features came from the claims and you

9    said yes.  You said Dr. Feifel helped you with

10   that?

11        A.    I was relying on the medical or

12   scientific information to inform that part of my

13   opinion.

14        Q.    Okay.  The low abuse

15   potential/side effects, I think you had an

16   answer for me at your deposition on this one,

17   where does the low abuse potential come from, do

18   you recall?

19        A.    I don't remember what I said

20   exactly at my deposition as I sit here.  If you

21   want to point me to the page, that's fine, but

22   the inability to grind up the product as one of

23   the factors that contribute to low abuse

24   potential.

1    Q.    I don't think that was quite your

2    answer.    I think your answer is it's a

3    once-a-day product, so it's staying at home --

4         A.    That's part of the reason, too.

5    There are multiple factors, I think that --

6         Q.    Why is it hard to grind up, before

7    we go back and look at your testimony?

8         A.    I think I remember a piece, that

9    may have been a piece of medical literature that

10   I read on that.

11        Q.    It's your understanding now that

12   that is part of the reduced abuse-potential?

13        A.    I don't recall.

14        Q.    You said a moment ago that was

15   part of it.

16        A.    I said a moment ago that I

17   recalled the inability to grind it up was part

18   of the way it could be abused.    And taking it

19   once a day so you don't have to take it to

20   school is another part of that.    I just don't --

21        Q.    We can go back to your deposition,

22   but what I understood you saying in your

23   deposition was because you don't have to take it

24   to school, it's not going to end up being

1    diverted and somebody will then grind it up and

2    snort it?

3              A.    Yes.    I mean, I think if you're

4    characterizing that as what I said, I recall

5    discussing the issue of once a day.

6              Q.    Is there anything about Concerta

7    other than it's a once-a-day product that makes

8    it a low abuse potential dosage form?

9              A.    I just don't know.

10             Q.    You don't know.    That's fine.

11   That's fine.

12             How about all the other drugs you

13   looked at for treating ADHD, do any of them have

14   a low abuse potential?

15             A.    I don't know specifically about --

16   I don't know about all the drugs.

17             Q.    What I understood you to say and

18   what I asked you at the beginning is you could

19   only identify certain aspects, the delivery

20   profile, the delivery methodology of Concerta,

21   that's the only thing you could come up with

22   that was different than all those other drugs?

23             A.    Yes.

24             Q.    And that was -- led you to your

1411

1    conclusion.  So do any of the other drugs that

2    you looked at, do they have low abuse potential?

3         A.    Well, if the criteria for low

4    abuse potential is you take it once and then you

5    don't take it at school, once a day so you don't

6    take it at school, there were other long-acting

7    products available or extended release products.

8         Q.    Fair enough.  So all the other

9    ones that you looked at that were once-a-day

10   products are ones that you wouldn't take to

11   school, they would also have the same low abuse

12   potential; is that correct?

13        A.    Yes.

14        Q.    So this isn't something that's

15   special to Concerta, is that what you're saying?

16        A.    I think it's a characteristic that

17   would be available from other extended release

18   products.

19        Q.    So is it correct that that's not

20   something that Concerta has that's different

21   than those other products, for example, Adderall

22   XR?

23        A.    Adderall XR is a different

24   chemical, assume Adderall XR if its an extended

1    release would have that same characteristic of

2    once a day, you don't take it to school with

3    you, less opportunity for diversion.

4             Q.   Can we go to 1223 again, slide 32

5    if I'm right.  You talked about the obstacles

6    that ALZA overcame with Concerta.  Adderall XR

7    was launched after Concerta; is that correct?

8             A.   Yes.

9             Q.   Okay.  And Ritalin,

10   methylphenidate used to be the gold standard for

11   treatment for ADHD and Concerta is now.  I'm not

12   sure when that switch over happened, but here is

13   a product not methylphenidate, comes on the

14   market afterwards and now has higher sales, they

15   have bigger obstacles to overcome in the ADHD

16   market; right?

17            A.   Yes.

18            Q.   Some people have even said,

19   characterized amphetamines as being viewed as

20   dangerous.  You can read in their brief to get a

21   better cite if you would like?

22            A.   Certainly Adderall XR is achieving

23   those levels of total prescriptions as reported

24   by IMS and as I said, there there can be more

1413

1    than one commercially successful product in the

2    marketplace.

3              Q.    Back to the OROS system, you said

4    Andrx didn't copy the OROS feature, they were

5    copying the other stuff, so the OROS isn't that

6    important.  Is that fair?

7              A.    Correct.

8              Q.    Thank you.

9              Could I have you turn in your

10   binder to DTX 1106.

11             A.    I should say it's not important to

12   Andrx, it's important to ALZA.

13             Q.    Why?

14             A.    Because that's their original

15   technology and they're comfortable with using

16   that technology.

17             Q.    They have kept other people out of

18   the market with that technology?

19             A.    I understand it was patented at

20   some point.

21             Q.    If you look at DTX 1106, did

22   plaintiff's counsel ever provide that to you?

23             A.    Let me find it.  I don't recall

24   seeing this document.

```
 1          Q.    Okay.  Have you on your brief

 2   review there been able to discern what it is?  I

 3   can help you if you would like.  I'm not sure if

 4   I would trust me either, though.

 5          A.    It looks like it's some sort of

 6   submission to the Drug Enforcement

 7   Administration.

 8          Q.    Is it your understanding that's

 9   who regulates methylphenidate?

10          A.    Well, it's one of the

11   organizations involved in it.  I mean, the FDA

12   has a role in regulating the drug as well, and

13   the Drug Enforcement Administration has

14   responsibility in certain aspects as well

15   related to schedule products.

16          Q.    The DEA is the one that actually

17   schedules it, it's their schedule, is that

18   reasonable to assume?

19          A.    Yes, the schedule is published by

20   the DEA and maintained by the Drug Enforcement

21   Administration.

22          Q.    On the third page you can see a

23   letter on McNeil letterhead to the head of the

24   DEA, and the RE line is petition for ruling
```

1    making, continues on to reschedule

2    methylphenidate hydrochloride in the OROS

3    delivery system from Schedule II to Schedule III

4    of the Controlled Substances Act.

5              A.   I see that, yeah.

6              Q.   And you provided in your report in

7    the brief I believe as well, that the other is a

8    stigma, some didn't like prescribing

9    methylphenidate because of it abuse potential,

10   is that a fair characterization?

11             A.   I don't remember exactly what I

12   said.  I know the scheduled substance status

13   effects how easy it is to prescribe a drug, and

14   may make some physicians reluctant to use it.

15             Q.   I won't make you go back to your

16   deposition for that point.

17                  Feel free to look at this as much

18   as you want to, but I'll direct you to page --

19   volume one, page 28 is what it says at the

20   bottom, Bates number ALZ 00067904.074.  Let's

21   blow up A, in the next two paragraphs.  And

22   again, feel free to read the rest of the

23   document, but I went here because it's kind of

24   distilled down.

1              You look in the second paragraph,

2     the second point that I'm making that the slower

3     absorption rate from Concerta leads to some

4     lower abuse potential.  And I'm not sure if you

5     skipped over these parts in the transcript or

6     not, but you can see some articles have been

7     cited elsewhere, other people talking about

8     acute tolerance and abuse likeable and euphoria,

9     but the second part they're describing Concerta

10    where with its ascending release rate and

11    substantially ascending plasma profile as being

12    the slower absorption rate, extended residence

13    time in the body reduces its potential.  Do you

14    agree with that, or at least with the words that

15    are written there?

16         A.   I mean, I have no reason -- I

17    don't have a basis to disagree with that.

18         Q.   The first point they're making,

19    though, in the first paragraph is that the OROS

20    product itself, this osmotic delivery system, it

21    comes in a hard little capsule-shaped container

22    that the body doesn't digest, passes after you

23    take it.  It makes it very hard to grind it up.

24    And, in fact, there is something in there, I

1417

1    believe it's called polyoxyl, if you grind it up

2    and you mix it and try to inject it, IV drug

3    abusers try to do it, it can actually be fatal.

4    And if you try to extract it using kitchen

5    methodology, you can flip through some great

6    pictures of hitting Concerta with a hammer, how

7    to get it out with Vodka, all this stuff, it's

8    very difficult to do.

9              Do you think any of the other

10   products you looked at, Adderall XR, any of the

11   other products have an OROS system that makes it

12   hard to do like this?

13        A.    I'm not aware of other products

14   that have the OROS system that treat ADHD.

15        Q.    So back to your opinion, you had

16   said in your report, you confirmed with me that

17   you had one factor you were able to come up

18   with, delivery methodology that was able to

19   differentiate among the other products.  Do we

20   have a second one now?

21        A.    No.

22        Q.    You have been giving me really

23   long answers.  You're welcome to give me a long

24   one on that one.

```
 1          A.    I mean, I don't know what you want
 2    me to say.  The OROS technology is not patented
 3    anymore.
 4          Q.    Is this something that makes
 5    Concerta different than everything else you
 6    looked at?
 7          A.    I don't know the science behind
 8    all the other delivery, the extended release
 9    delivery systems, whether they would have
10    similar ability to be used or abused in that
11    regard.
12          Q.    If ALZA is telling the DEA how
13    special their product is because of the OROS and
14    it should be rescheduled, we saw in the RE line
15    they mentioned OROS, not methylphenidate, the
16    methylphenidate in OROS, do you have a reason to
17    think that they might be fudging a little bit
18    with the DEA?
19          A.    I have not seen this document.  I
20    don't know what the -- and I don't know enough
21    of the science of the other extended release
22    delivery systems to know if this is unique to
23    OROS or not.  And there are other extended
24    release delivery systems that --
```

1419

```
 1              Q.   I'll direct the Court's attention

 2     to -- I won't make you go through it now, but in

 3     DTX 1223, in Exhibit 4 to your report you go

 4     through several different products, Concerta is

 5     first, Daytrana, Metadate, Ritalin-SR,

 6     Ritalin-LA, you say who the seller is, the

 7     company and then the delivery methodology and

 8     you provide a paragraph, maybe two on each one.

 9     So if you read there and saw that it was just

10     beads and tablets and stuff you could crush

11     up --

12              A.   Some are patches as well.  So that

13     they're not all the same in that regard, but

14     there are multiple ways of delivering the

15     product.

16              Q.   Could we go back to Claim 1, 6 and

17     7.  The plaintiffs have talked quite a bit about

18     this.  If you read the beginning of the claim,

19     it's a method for treating attention deficit

20     disorder or ADHD -- sorry, DTX 1, it's a method

21     for treating ADD or ADHD comprising, the first

22     part, we get the word comprising, that's known

23     as a preamble in a patent.  Then you got

24     comprising, its transition, the body, and that
```



1      tells you all that different element pieces of

2      the claim.  The methylphenidate parts in the

3      part of the invention, the body of the claim;

4      right?

5               A.   I'm not a lawyer, either.  I mean,

6      you're using some apparently technical terms.  I

7      understand the words that are there, but you're

8      saying they have specific legal interpretation.

9               Q.   It seems to me that it's a method

10     for treating ADD as they have been saying, so

11     you should be looking your drafts, you know,

12     should be centered on methods for treating ADD,

13     all those drug products, I think everything in

14     the direct were just methylphenidate products,

15     you didn't have this comparing them to the other

16     things, but I'll withdraw that question.

17               You have read the transcripts and

18     you have heard some testimony.  We just heard

19     Ms. Gray testify.  How often did she say that

20     Concerta was covered by Claim 1?

21               A.   I didn't count.

22               Q.   I know you didn't count.  What did

23     she say, a hundred percent of the time, fifty

24     percent, never?

1421

```
 1              A.    How many times did she say a
 2     particular phrase in her testimony?  I'm not
 3     sure what you're asking me to comment on.
 4              Q.    I apologize for being unclear.
 5              I believe on direct you said the
 6     claims covered Concerta?
 7              A.    Yes.
 8              Q.    Okay.  With what frequency does
 9     Claim 1 cover Concerta, or with what frequency
10     does Concerta fall under Claim 1?
11              A.    I'm confused by what you're asking
12     me.  Concerta is the product covered by the
13     patent it claims.
14              Q.    That's your opinion based on the
15     technical experts; right?
16              A.    Right, that's my opinion.
17     Concerta is that product.
18              Q.    It's your opinion based on the
19     technical experts; correct?
20              A.    Correct.
21              Q.    So a hundred percent of the time
22     is your answer for Claim 1?
23              A.    I'm still confused by what you're
24     asking.  Concerta -- based on the scientific
```

1    experts that I've heard, Concerta is the product

2    covered by Claims 1, 6 and 7 of the '373 patent.

3              Q.   A hundred percent of the time,

4    that's your understanding?

5              A.   Yes, Concerta is that product

6    that's covered by those claims.

7              Q.   Okay.  I just wanted to make sure

8    that was what you were actually saying.

9              I was actually taking notes and

10   getting ready for the cross here during

11   Ms. Gray's testimony, so I'm not quite sure what

12   she said, but we can look back and see what she

13   said.

14             But I believe Dr. Angst said --

15   you read his testimony, I believe he said that

16   out of the 77 Concerta profiles using his

17   definition, 40 of them would be substantially

18   ascending for eight hours.  Does that ring a

19   bell?

20             A.   I don't remember the exact

21   numbers.

22             Q.   But you think it's a hundred

23   percent?

24             A.   No, I think Concerta is a product

1423

1   covered by the claims, that's the conclusion I'm

2   drawing from the scientific testimony that I

3   heard.

4        Q.   If about half the time, we'll just

5   use that as a nice round number, half the time

6   Concerta is covered by these claims, how does

7   that figure into these are the reason for its

8   commercial success, only half the time you're

9   going to be covered by the claims?

10       A.   I'm confused by what you're

11  asking.  The product is covered by the claims of

12  the patent, the product has sales relative to in

13  absolute terms over time relative to other

14  products with the same active ingredient and

15  relative to other treatments for ADHD and

16  relative to all pharmaceutical products and my

17  view is that's the product that is covered by

18  the claims of the patent.

19            MR. VROOM:  Thank you very much,

20  Dr. Rozek.

21            Thank you, Your Honor.

22            THE COURT:  All right.  Any

23  redirect?

24            MR. HATCHER:  No, Your Honor.

```
1                    THE COURT:  All right.  Thank you.

2       You may step down.

3                    MR. PRITIKIN:  That concludes our

4       case, Your Honor.

5                    Just a couple of housekeeping

6       items I think that we might want to attend to

7       this afternoon very briefly.

8                    THE COURT:  All right.

9                    MR. PRITIKIN:  First, I know there

10      were some additional exhibits marked during the

11      trial.  Would you like us to give you an updated

12      exhibit list?  Would you prefer that we give you

13      a new -- both sides give you a new comprehensive

14      list that can be substituted that has all the

15      exhibits on it?  What would be most helpful to

16      the Court?

17                    THE COURT:  I suspect that a

18      revised comprehensive list is the most efficient

19      way.  You two talk with each other.

20                    MR. PRITIKIN:  We will.

21                    THE COURT:  And then whatever

22      bounces out as an exhibit that's objected to,

23      you'll submit that separately and then we'll

24      deal with those in the post trial decision.
```

1425

1    MR. PRITIKIN:  Very good.

2    And related to that, as you know,

3    during the trial there were some objections to

4    the scope of the testimony and the like.  What

5    we would propose is that we talked to opposing

6    counsel and perhaps we file simultaneous briefs

7    with the Court and simultaneous sentences that

8    would be limited to these evidentiary issues and

9    do it in one fell swoop.

10    THE COURT:  That's fine.  It

11    should really be done in the -- and I think

12    you're suggesting this, but just to be sure,

13    that it's done before the submission of your

14    post trial findings of fact, proposed findings

15    of fact and conclusions of law.

16    MR. PRITIKIN:  We had submitted

17    the proposed findings and conclusions before the

18    trial.  Do you want us to redo them?

19    THE COURT:  Not redo them, but you

20    get an opportunity to refine them.

21    MR. PRITIKIN:  All right.

22    THE COURT:  And you may also be

23    successful, one side or the other, in having

24    something stricken from the record which would

1    depart from your pretrial filings.  So my view

2    would be if you could get your objections

3    briefed up, I can make rulings on them, get that

4    back to you, and then if it affects in any way

5    the pretrial filings, or in some way you want to

6    refine post trial what you filed pretrial,

7    you'll be able to do that.

8            MR. PRITIKIN:  All right.  Very

9    good.  We had filed briefs, too.  Would we redo

10   those?

11           THE COURT:  No.

12           MR. PRITIKIN:  Just leave the

13   briefs as they are.  So this would be just the

14   proposed findings?

15           THE COURT:  It's all laid out in

16   the pretrial solutions.  This is just because

17   things might have changed at the trial.  I

18   haven't compared the objections to the report.

19   You were all so aggressive in your objections, I

20   assume I'm going to find something.  Could it be

21   I won't?  Well, maybe, I don't know.  But if I

22   find something, I'm not reluctant to strike it.

23   And then -- but then I don't know how that might

24   play into what you would ultimately argue.

1427

```
 1              MR. PRITIKIN:  I understand.

 2    That's fine.

 3              So as far as the briefs that would

 4    be filed on these objections.

 5              THE COURT:  They should be

 6    memorandums.  They don't have to be in full

 7    briefing form or anything like that, just enough

 8    so that you get your argument in and whatever

 9    relevant case you're relying on.  I mean,

10    whatever relevant section of the report you're

11    relying on.  If you say it was in the report and

12    if you're arguing it wasn't in it, whatever

13    supports that.

14              MR. PRITIKIN:  That's fine.  So we

15    would have simultaneous briefings on that and

16    perhaps a simultaneous response.  Would that be

17    acceptable?

18              THE COURT:  Yes.

19              MR. PRITIKIN:  If we were looking

20    at a week, ten days, would that work?

21              THE COURT:  Yes.

22              MR. PRITIKIN:  We will talk to

23    them and take into account the holidays and

24    propose a schedule to the Court.
```

```
 1                    THE COURT:  The sooner I get that,

 2        the sooner you get the chance to submit that one

 3        little paper refining and then we can get to a

 4        decision for you.

 5                    MR. PRITIKIN:  Very good.  And

 6        then the other thought we had was that we would

 7        provide the Court with binders that have all of

 8        the demonstratives in them that have been used.

 9        Some of them were scattered in various

10        notebooks, but we thought it might be useful to

11        have one comprehensive set with all the

12        demonstratives.

13                    THE COURT:  That would be helpful.

14                    MR. PRITIKIN:  I think that's

15        everything we have from the standpoint of

16        administrative matters.

17                    THE COURT:  All right.  Thank you.

18                    MR. BATEMAN:  We just had one or

19        two housekeeping issues of our own.  One is we

20        did prepare some designations from the

21        deposition of plaintiff's expert, David Feifel,

22        including the famous errata sheet and we wanted

23        to submit those to Your Honor.  We understand

24        plaintiffs may want to submit
```

1   counter-designations but we have those to hand

2   up.

3           THE COURT:  All right.  You can

4   pass those up.

5           MR. BATEMAN:  Thank you, Your

6   Honor.

7           We did have just that one exhibit

8   we wanted to offer up without a sponsoring

9   witness.  It's just a laboratory notebook.  We

10  thought it was relative to some of the

11  formulations that were discussed today by

12  Dr. Davies, and --

13          MR. PRITIKIN:  I guess I would

14  have to look at it.  We may have no objection,

15  and we may, but we certainly will look at it.

16          THE COURT:  If there is no

17  objection, just include it on the comprehensive

18  list that you will submit.  If there is an

19  objection, it will go to that objection

20  briefing.

21          MR. BATEMAN:  I understood that

22  they would want to take a look at it, I just

23  wanted to offer it for the record.

24          THE COURT:  And did you recite a

```
1      number?  Do you have a number to proffer on

2      that?

3                     MR. BATEMAN:  I did not give a

4      number, but we were planning on making it DTX

5      1227.

6                     THE COURT:  All right.

7                     MR. BATEMAN:  And I'll just say

8      this for the record, it has production numbers

9      Andrx 49566 through 49673.

10                    And then the last thing which I

11     think is moot, but we had prepared some

12     objections to the testimony of plaintiff's

13     expert, Dr. Angst, as outside the scope of his

14     expert report, but I gather we can just take

15     that up in the context of these briefs?

16                    THE COURT:  In these simultaneous

17     filings on some schedule it gets in here

18     probably in the first half of January.

19                    MR. PRITIKIN:  Yes, Your Honor,

20     our understanding would be that if someone has

21     an objection to an expert having testified

22     beyond the scope of a report, the record had to

23     be made during the trial.  In other words,

24     neither party can come along now and go back
```

1431

1   retroactively when no objection was made during

2   the trial.

3                   THE COURT:  That's correct.

4                   MR. PRITIKIN:  All right.  Thank

5   you.

6                   THE COURT:  And just to clarify,

7   it would be the report and expert deposition,

8   because if you got fair notice in the expert

9   deposition, that would be something that would

10   be considered in whether or not it was outside

11   the scope of your pretrial information.

12                   MR. BATEMAN:  Thank you, Your

13   Honor.

14                   MR. PRITIKIN:  Yes, Your Honor.

15   These are the binders with our demonstratives in

16   them.

17                   THE COURT:  Pass them up.

18                   All right.  Thank you very much.

19   Have a great weekend.  I'm going to see my

20   friends from Nice and Witness, so you can pass

21   on out.

22                   (Court recessed at 5:12 p.m.)

23

24

```
 1      State of Delaware     )
                              )
 2      New Castle County     )

 3


 4                  CERTIFICATE OF REPORTER

 5

 6          I, Dale C. Hawkins, Registered Merit
        Reporter and Notary Public, do hereby certify that
 7      the foregoing record, pages 1,112 to 1,432 inclusive,
        is a true and accurate transcript of my stenographic
 8      notes taken on December 14, 2007, in the
        above-captioned matter.

 9
            IN WITNESS WHEREOF, I have hereunto set my
10      hand and seal this 14th day of December, 2007, at
        Wilmington.

11

12      _____

13                      Dale C. Hawkins, RMR

14

15

16

17

18

19

20

21

22

23

24
```